## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| The Hertz Corporation, *et al.*,[1] | Case No. 20-11218 (MFW) |
| Debtors. | (Jointly Administered) |
| | **Obj. Deadline:  June 18, 2020 at 4:00 p.m. ET**<br>**Hr'g Date:  June 25, 2020 at 3:00 p.m. ET** |

### DEBTORS' MOTION FOR ORDER REJECTING CERTAIN UNEXPIRED VEHICLE LEASES EFFECTIVE *NUNC PRO TUNC* TO JUNE 11, 2020 PURSUANT TO SECTIONS 105 AND 365(a) OF THE BANKRUPTCY CODE

The debtors and debtors in possession (collectively, the "**Debtors**" or "**Company**") in the above-captioned cases hereby file this motion (the "**Motion**"), pursuant to sections 105 and 365 of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an order substantially in the form attached hereto as **Exhibit A** (the "**Order**") rejecting leases with non-debtor affiliate Hertz Vehicle Financing LLC ("**HVF**") of certain vehicles set forth in **Exhibit B** attached hereto. In support of this Motion, the Debtors rely upon and incorporate by reference the *Supplemental Declaration of Jamere Jackson in Support of Debtors' Motion for Order Rejecting Certain Unexpired Vehicle Leases Effective Nunc Pro Tunc to June 11, 2020 Pursuant to Sections 105 and 365(a) of the Bankruptcy Code* (the "**Supplemental Declaration**"), filed concurrently herewith.

---

[1]      The last four digits of The Hertz Corporation's tax identification number are 8568.  The location of the debtors' service address is 8501 Williams Road, Estero, FL 33928.  Due to the large number of debtors in these chapter 11 cases, for which joint administration for procedural purposes has been ordered, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at https://restructuring.primeclerk.com/hertz.

In further support of the Motion, the Debtors, by and through their undersigned counsel, state as follows:

**PRELIMINARY STATEMENT**

1.      The global COVID-19 pandemic, and the related governmental and social responses, have had a devastating impact on the rental car business of the Debtors.  The pandemic has led to a dramatic and profound drop in demand for rental cars and shows no signs of a quick rebound, depriving the Debtors of their primary source of revenue.  As a result, much of Debtors' fleet of vehicles now sits mostly idle, and will remain so for the foreseeable future.

2.      The pandemic and resulting economic crisis have also had a negative effect on the used car market, causing prices for pre-owned vehicles to drop.  This has also had a negative impact on the Debtors.  The Debtors lease most of their fleet from HVF.  The terms of those leases tie the amount of the Debtors' rental payments to the depreciation in the market value of the leased vehicles via a reduction in each vehicle's expected residual value at the lease's termination.  As a result, the current crisis has caused the monthly cost of the Debtors' fleet to increase while at the same time drastically limiting the Debtors' ability to utilize that fleet.

3.      As a result of these facts, the Debtors must take immediate action to reduce their fleet and limit the Debtors' exposure to potential administrative claims for post-petition rent and thereby preserve the value of their estates for the benefit of their stakeholders.  Accordingly, through this Motion, the Debtors seek entry of an order authorizing the Debtors to reject their leases for the 144,372 vehicles identified on Exhibit B.[2]  Rejection of these leases will reduce the

---

[2] The Debtors reserve all rights to argue that no administrative claims exist as to idle vehicles, even if this Motion is not granted.

monthly base rent payment and result in an estimated monthly savings of approximately $80.3 million.

4.    Although a "master lease" agreement supplies certain common background terms, the Debtors have separate leases for each of their vehicles that are divisible for purposes of assumption and rejection under section 365.  The Debtors' leasing of vehicles through the master lease agreement and the various schedules appended thereto is structured on a per-vehicle basis, with provisions for rent calculations, individual lease terms, new vehicle leases and the rejection of non-conforming vehicles all done per-vehicle.

5.    The Debtors request that the rejection of the vehicle leases be effective *nunc pro tunc* as of the date of this Motion to limit the Debtors' exposure to a potential post-petition rent claim for vehicles that the Debtors do not anticipate using. The Debtors will immediately surrender possession of the vehicles to HVF and cause The Hertz Corporation, as servicer, to dispose of the vehicles as provided in the master lease agreement, or turn them over to the trustee for the holders of the HVF debt.

## **JURISDICTION, VENUE AND PREDICATES FOR RELIEF**

6.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*, dated February 29, 2012 (Sleet, C.J.). This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these Chapter 11 Cases (as defined below) and this Motion is proper in this District under 28 U.S.C. §§ 1408 and 1409.

7.    The predicates for the relief requested by this Motion are sections 105 and 365 of the Bankruptcy Code and rules 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

AMERICAS 102972841
RLF1 23564073v.1

8.      Pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## BACKGROUND

### A.      Overview

9.      On May 22, 2020 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). The Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee has been appointed by the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**"), nor has a trustee or examiner been appointed in these Chapter 11 Cases.

10.      Additional background and information regarding the Company, including its business operations, its corporate and capital structure, its restructuring activities, and the events leading to the commencement of these Chapter 11 Cases, is set forth in detail in the *Declaration of Jamere Jackson in Support of the Debtors' Petitions and Requests for First Day Relief* [ECF No. 28] (the "**First Day Declaration**").

4

**B.** **Overview of the Master Lease Agreement**

11.     The Company is a leading provider of vehicle rentals around the world, serving customers under the Hertz, Dollar, and Thrifty brands.[3]  The Company and its franchisees operate a total of more than 12,000 locations across North America, Europe, Latin America, Africa, Asia, Australia, the Caribbean, the Middle East and New Zealand. [4]

12.     During the year ended December 31, 2019, the Debtors operated a peak U.S. rental fleet of approximately 567,000 vehicles.[5]  Most of those vehicles were purchased by a non-debtor, special-purpose financing subsidiary, HVF, with the proceeds of notes (the "**Secured Notes**") issued by non-debtor affiliate Hertz Vehicle Financing II LP ("**HVF II**") and indirectly secured by the vehicles. [6]  The Bank of New York Mellon Trust Company, N.A. is the indenture trustee and collateral agent under the facility (the "**ABS Trustee**") for both HVF and HVF II.[7]

13.     Debtors The Hertz Corporation and DTG Operations, Inc. (collectively, the "**Lessees**") are party to an Amended and Restated Master Motor Vehicle Operating Lease and Servicing Agreement, dated October 31, 2014, (the "**Master Lease Agreement**," attached to the Supplemental Declaration as Exhibit 1) with HVF.   Under the terms of the Master Lease Agreement, HVF agrees to lease to the Lessees, and the Lessees agree to lease from HVF, certain vehicles identified on schedules produced by the Lessees from time to time.   Master Lease Agreement § 2.1(a).

---

[3] First Day Declaration at ¶ 22.

[4] *Id*. at ¶ 20.

[5] Supplemental Declaration, Ex. 2.

[6] First Day Declaration at ¶¶ 58-59.

[7] *Id*. at ¶ 59.

5

14.     The Master Lease Agreement itself supplies background terms but does not result in the lease of any vehicles by the Debtors.  Rather, such leases are created through the inclusion of vehicles on schedules that are appended to the Master Lease Agreement over time. Under the terms of the Master Lease Agreement, the Lessees can unilaterally add or remove leased vehicles.   Specifically, the Lessees are to deliver schedules from time to time identifying additional vehicles that the Lessees wish to lease from HVF.  *Id*. § 2.1(c).  The Lessees may reject new vehicles received that do not conform to criteria specified on the schedule, such as make, model, and model year. *Id*. § 2.1(d).  Vehicles that suffer "casualties" and are no longer operable are also removed from lease at the end of each calendar month.  *Id*. § 4.6.  Finally, the Lessees may also return any leased vehicle to the servicer at any time, although the obligation to pay rent for such vehicle will continue until it is sold or the term otherwise expires.  *Id*. § 2.4.  The number of leased vehicles has varied considerably over time.  On October 31, 2014, the date that the Master Lease Agreement was executed, the Debtors were leasing 472,921 vehicles.[8]  The total vehicles leased dropped to as low as 432,377 vehicles on January 31, 2016, and then increased to a peak of 556,229 vehicles on June 30, 2019.  At the end of last month, the Debtors were leasing 493,748 vehicles.[9]

15.     Under Section 3.1 of the Master Lease Agreement, the term of a vehicle lease is determined on a per-vehicle basis.  The term of any given vehicle lease begins on "the date referenced in the applicable Lease Vehicle Acquisition Schedule with respect to such Lease Vehicle but in no event shall such date be a date later than the date that funds are expended by HVF to acquire such Lease Vehicle."  *Id*. § 3.1(a).  The term of the lease for each vehicle is also

---

[8] Supplemental Declaration, Ex. 2.

[9] *Id*.

AMERICAS 102972841
RLF1 23564073v.1

set on a per-vehicle basis, as it may end when such vehicle is sold, rejected, reallocated among the Lessees, or the "Maximum Lease Termination Date" is reached, defined to be the earlier of 48 months from the commencement of the vehicle lease, or 72 months after the end of the calendar year prior to the vehicle's model year. *Id*. § 3.1(b).

16.     Under Section 4 of the Master Lease Agreement, the Lessees may pay rent for each vehicle that generally consists of a base rent, a variable rent, and an incremental depreciation true-up adjustment to rent, all of which are or may be calculated on a per vehicle basis.    The "base rent" component of the lease payment is calculated using straight-line depreciation for each vehicle based upon its assumed holding period and assumed residual value, and compensates HVF for expected depreciation. *Id*. § 4.2.  The "variable rent" component of the lease payment is determined based on the costs of HVF's financing activities, including interest expense and service fees, thus passing on the costs of such activities to the Debtors.   *Id*. § 4.5. The "true-up rent" component of the lease payment incrementally adjusts depreciation on a month-to-month basis based on an estimation of the current market value of each vehicle. *Id*. § 4.4.  To the extent a vehicle's book value falls short of its estimated current market value, the Lessees pay the "true-up rent" as part of the lease payment.

17.     Each agreement to lease an individual vehicle is subject to vehicle-specific conditions precedents, including that certain events of default would result from the leasing of that particular vehicle, that HVF has sufficient available funds to purchase such vehicle, and that such vehicle meets certain eligibility requirements, including criteria concerning the vehicle's age and certificate of title. *Id*. § 2.1(b).  The Master Lease Agreement provides for reallocation of vehicles among lessees and includes a formula for calculating certain costs on a per-vehicle basis.  *Id*. §

AMERICAS 102972841
RLF1 23564073v.1

2.2(a).  The Master Lease Agreement provides lessees with an option to purchase leased vehicles on a per-vehicle basis, and includes per-vehicle cost calculations for any such purchases.  *Id*. § 2.3.

18.     In the case of an event of default in the Master Lease Agreement, such as failure by a Lessee to pay rent when due, the Lessor may repossess any of the vehicles under Lease. *Id*. §§ 9.1, 9.1.1, 9.3.2.  But in the event that the ABS Trustee seeks to seize vehicles in order to recover unpaid amounts on the Secured Notes, it may do so only with respect to such number of leased vehicles necessary to generate disposition proceeds in an aggregate amount sufficient to pay the particular series of notes with respect to which an liquidation event has occurred.  *Id*. § 9.4(e).  The measure of damages in the event of default or liquidation event is based on unpaid rent for particular leased vehicles, plus certain out-of-pocket costs, expenses and interest.  *Id*. § 9.5.

### C.     Effect of the COVID-19 Pandemic

19.     With air travel at record levels in 2018 and 2019, the Company was prospering, achieved ten consecutive quarters of year-over-year revenue growth through the end of 2019. [10]   In March of 2020, however, the Company's business was acutely impacted by reductions in travel and restrictions on movement brought about by the coronavirus pandemic—a crisis that the Company could not have foreseen or avoided.[11]   Whether voluntarily or by government mandate, the air travelers the Company serves largely stopped flying and its local customers largely stopped driving.  The effect on the Company's revenue was devastating. [12]

---

[10] First Day Declaration at ¶ 2.

[11] *Id*. at ¶ 3.

[12] *Id*. at ¶ 5.

AMERICAS 102972841
RLF1 23564073v.1

20.     At the same time, the crisis subjected the Company to unanticipated demands on its cash reserves.  As noted above, The Hertz Company, as servicer, is obligated to estimate depreciation for the Debtors' fleet each month and the Lessees pay the full loss in value, as reflected in certain pricing guides, against the prior month.  A sharp and unexpected reduction in used car values precipitated by the coronavirus crisis burdened the Company with a monthly rental payment, including a depreciation "true-up," of nearly $400 million due on the Master Lease Agreement.[13]  The Company elected not to consume its limited liquidity and did not make that payment.  After the Company failed to find a longer-term solution with the Company's primary U.S. and Canadian creditor groups, the Debtors commenced these Chapter 11 Cases with the goals of stabilizing their operations, assessing their options, and charting a course for a strong future.[14]

21.     Now, the Debtors have identified over 144,372 vehicles under lease that the Debtors expect will generate limited or no revenue.[15]  While the Master Lease Agreement allows the Lessees to return vehicles to HVF, it also provides that the Lessees would remain obligated to pay rent for as long as it takes to sell to the vehicle or until that vehicle's lease term otherwise terminates.  These sales could take months, leaving the Debtors potentially exposed to claims that they owe hundreds of millions of dollars in rent for vehicles that they expect will provide little or no benefit to the estate.  Thus, the Debtors have exercised their business judgment to reject immediately leases of certain vehicles they do not believe they are likely to need.

---

[13] *Id*. at ¶ 9.

[14] *Id*.

[15] Supplemental Declaration at ¶ 9.

9

**RELIEF REQUESTED**

22.     By this Motion, pursuant to sections 105 and 365 of the Bankruptcy Code, the Debtors seek entry of the Order rejecting the leases of certain vehicles set forth in **Exhibit B** attached hereto.  The Lessees will immediately surrender possession of the vehicles *in situ* to the Lessor and cause The Hertz Corporation, as servicer, to dispose of the rejected vehicles as provided in the Master Lease Agreement, or turn them over to HVF under the control of the ABS Trustee on agreed terms.

**BASIS FOR RELIEF**

**I.    The Debtors Have Exercised Their Sound Business Judgment to Reject the Specified Vehicle Leases**

23.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  A debtor's motion to assume or reject an unexpired lease or executory contract is subject to judicial review under the business judgment standard.  *See In re Trans World Airlines, Inc.*, 261 B.R. 103, 120-21 (Bankr. D. Del. 2001) (citing *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989)); *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co.* (*In re Wheeling-Pittsburgh Steel Corp.*), 72 B.R. 845, 847-48 (Bankr. W.D. Pa. 1987); *see also Nickels Midway Pier, LLC v. Wild Waves, LLC* (*In re Nickels Midway Pier, LLC*), 341 B.R. 486, 493 (D.N.J. 2006) ("Although the Bankruptcy Code does not specify the standard to be applied in assessing the decision of a trustee or debtor in possession to assume or reject a contract, the Third Circuit has adopted the business judgment standard." (citing *Sharon Steel*, 872 F.2d at 39-40)).  This standard is satisfied when a debtor determines that assumption or rejection will benefit the estate.  *See Sharon Steel*, 872 F.2d at 39 (citing *Wheeling-Pittsburgh*, 72 B.R. at 846) (quoting *In re Stable Mews Assocs., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984))).

10

24.     A court should approve the assumption or rejection of an unexpired lease or executory contract where a debtor's business judgment has been reasonably exercised.  *See, e.g., In re III Enters., Inc. V*, 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("Generally, a court will give great deference to a debtor's decision to assume or reject an executory contract.  A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment—a standard which we have concluded many times is not difficult to meet."), *aff'd sub nom., Pueblo Chem., Inc. v. III Enters. Inc., V*, 169 B.R. 551 (E.D. Pa. 1994); *Wheeling-Pittsburgh*, 72 B.R. at 849 ("Ordinarily, courts accord the debtor's business judgment a great amount of deference since the decision to assume or reject an executory contract is an administrative not a judicial matter . . . .  '[C]ourt approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course.'") (internal quotation marks and citation omitted) (quoting *Summit Land Co. v. Allen* (*In re Summit Land Co.*), 13 B.R. 310, 315 (Bankr. D. Utah 1981)).

25.     Only where the debtor's actions are a product of bad faith, whim, caprice or a gross abuse of its managerial discretion should the business decision be disturbed.  *See Trans World Airlines*, 261 B.R. at 121 ("A debtor's decision to reject an executory contract must be summarily affirmed unless it is the product of 'bad faith, or whim or caprice.'" (citation omitted)); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.* (*In re Richmond Metal Finishers, Inc.*), 756 F.2d 1043, 1047 (4th Cir. 1985) ("Transposed to the bankruptcy context, the rule as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankrupt's retained business discretion."); *III Enters.*, 163 B.R. at 469 ("We will not substitute our own business judgment for that of the Debtor, nor

11

will we disturb its decision to reject the [contract] unless 'the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim.'" (citation omitted)); *Wheeling-Pittsburgh*, 72 B.R. at 849 ("[T]he court should not interfere with or second guess the debtor's sound business judgment unless and until evidence is presented that establishes that the debtor's decision was one taken in bad faith or in gross abuse of its retained business discretion.").

26.     Ample business justification exists to merit judicial approval of the proposed rejection of the vehicle leases. The COVID-19 pandemic and the resulting severe drop in air travel have profoundly reduced demand for rental cars. As a result, much of the Debtors' fleet of vehicles now sits mostly idle. The rental payments associated with these unused vehicles constitute an unnecessary drain on the Debtors' resources and provide little or no benefit to the Debtors' estates. For these reasons, the Debtors have determined, in the exercise of their sound business judgment, that immediate rejection of the leases of the vehicles set forth in Exhibit B is necessary to reduce their obligations, manage their fleet, and reorganize their businesses, while avoiding the potential incurrence of unnecessary post-petition claims for rent. The Court should approve the Debtors' rejection of those leases in the exercise of their sound business judgment.

## II.     The Vehicle Leases Are Distinct Contracts That May Be Rejected under Section 365

### A.     A Single Lease Agreement Document May Be Divisible for Purposes of Assumption and Rejection under Section 365

27.     Although the Master Lease Agreement supplies certain common background terms, the vehicle leases are separate for purposes of assumption and rejection.

28.     In the context of section 365, this Court has held that the question of whether a specific contract or lease is an indivisible agreement or is severable is a question of state law. *In re Buffets Holdings, Inc.*, 387 B.R. 115, 120 (Bankr. D. Del. 2008) (Walrath, J.) ("The

determination of whether a specific contract or lease is an indivisible agreement or is several agreements in one is a question of state law."); *see also Pirinate Consulting Group, LLC v. C.R. Meyer & Sons Co. (In re Newpage Corp.)*, 2017 Bankr. LEXIS 413, at *13 (Bankr. D. Del. Feb. 13, 2017) ("State law governs the question whether an agreement is divisible or indivisible for the purposes of assumption and rejection under Bankruptcy Code § 365."); *DB Structured Prods. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc)*, 402 B.R. 87, 94 (Bankr. D. Del. 2009) (applying New York law to question of whether contract governed by New York law was severable).  Here, Section 17 of the Master Lease Agreement provides that it shall be governed by New York law.

29.     Under New York law, whether or not a contract or lease is a single, integrated document depends on the contracting parties' intent, as evidenced by the language of the contract itself viewed in light of the circumstances at the time of contract formation."  *See DB Structured Prods.*, 402 B.R. at 94 ("There is no formulaic test under New York law for determining whether a contract is severable. Rather, as with all contract interpretation, severability 'is a question of the parties' intent, to be determined from the language employed by the parties, viewed in light of the circumstances surrounding them at the time they contracted.'") (quoting *Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re Am. Home Mortg. Holdings, Inc.)*, 379 B.R. 503, 521 (Bankr. D. Del.) (citations omitted), *reconsideration denied*, 383 B.R. 585 (Bankr. D. Del. 2008).

30.     This Court has found that the question of whether severability is feasible under the contract often turns on whether the pieces of a contract sought to be severed are "economically interrelated."  *See DB Structured Prod.*, 402 B.R. at 100 ("[C]ontracts are economically interdependent when the consideration underlying each contract supports the other contract, such that non-performance under one contract would constitute a failure of the

13

consideration underlying the other contract"); *The Shaw Group, Inc. v. Bechtel Jacobs Co., LLC (In re The IT Group)*, 350 B.R. 166, 179 (Bankr. D. Del. 2006) (economic interdependence is "critical feature" of agreements where cross-default provisions are upheld; cross-default clause unenforceable where no evidence that contracts were "economically interdependent" or "intertwined"); *see also In re Sanshoe Worldwide Corp.*, 139 B.R. 585, 596 (S.D.N.Y. 1992) (leases not construed as single instrument where leases were for separate spaces in same building, but did "not have the same subject matter or purpose, and one agreement [was] not the subsidiary of the other"). When the terms sought to be severed are not economically related, then a contract is "by its terms, nature and purpose . . . susceptible of division and apportionment" and will therefore be divisible. *DB Structured Prods.*, 402 B.R. at 94; *see also In re Balfour MacLaine Int'l*, 85 F.3d 68, 81 (2nd Cir. 1996) ("[A] contract is considered severable and divisible when by its terms, nature and purpose, it is susceptible of division and apportionment.") (citation omitted).

31. For example, in *In re Cafeteria Operators, L.P.*, 299 B.R. 384 (Bankr. N.D. Tex. 2003), the court found that the debtors could assume a master lease with respect to some properties and reject it with respect to others. The court found that the parties to the master lease intended the agreement to be divisible because the expiration dates of the various underlying leases covered by the master sublease agreement were different; and because the debtors-lessees of those expired properties were required to vacate the premises once the individual sublease on a property expired, even though the master lease remained in effect with respect to the other properties. *Id*. at 390-91. The master lease also included a release provision whereby one of the underlying properties could be severed from the terms of the master sublease in the event that the debtors subleased the property to a third party. *Id*. at 391. Finally, as a practical matter, there was nothing

to demonstrate that the individual facilities could not be operated separately and independently of each other.  *Id*. at 392.

32.    Similarly, in *In FFP Operating Partners, LP*, 2004 Bankr. LEXIS 1192, at *13 (Bankr. N.D. Tex. Aug. 12, 2004), the court found that a lease covering numerous properties was divisible where the lessor had the unilateral right to sell any of the properties, the single rent payment could be apportioned among the properties pursuant to schedules, and the lease did not terminate if one property was damaged or condemned but remained in force for the remaining properties.  The court further noted that the presence of a cross-default provision in each of the leases was "simply not dispositive" and merely "one fact that must be weighed with all of the other evidence when determining the parties' intent."  *Id.*

33.    Finally, in the specific context of master vehicle leases, bankruptcy courts have found that rejection of individual vehicle leases may be appropriate relief.  *See In In re Aleris Int'l, Inc.*, 2009 Bankr. LEXIS 4758, at *3 (Bankr. D. Del. 2009) ("each of the [v]ehicle [l]eases is a separate contract that may be rejected independently of the master agreement that governs each such [v]ehicle [l]ease"); *In re iPCS Wireless, Inc.*, Case No. 03-62695 (N.D. Ga. Nov. 18, 2003) (granting a motion (i) seeking a determination that a master lease agreement between the debtor and Enterprise Fleet Services was a severable, apportionable contract under state law, (ii) authorizing rejecting of the master lease with respect to vehicles that the debtors deemed "burdensome," and (iii) determining that the master lease remained in full force with respect to any and all remaining vehicles that the debtors may either assume or reject on an individual basis).

**B.    The Vehicle Leases Are Divisible from the Master Lease Agreement**

34.    Here, the Master Lease Agreement functions on a per-vehicle basis.  The terms of the Master Lease Agreement and the schedules make clear that the parties intend the total

number and identity of vehicles under lease to vary, with inclusion on a schedule being determined unilaterally by the Lessees.  Master Lease Agreement § 2.1(c).  As described above, the Lessees may identify on these schedules additional vehicles for new leases (§ 2.1(c)), may reject non-conforming vehicles (§ 2.1(d)), and may remove vehicles from lease on account of casualty (§ 4.6).  The Lessor may also return any leased vehicle to the servicer, provided that the term of such vehicle will continue until it is sold or the term otherwise expires.  *Id*. § 2.4.  Under these provisions, the amounts of leased vehicles have varied considerably under the term of the Master Lease Agreement, ranging from 432,000 to 556,000.  *Supra* at ¶ 14.

35.     Likewise, payments under Section 4 of the Master Lease Agreement are also calculated on a per-vehicle basis. The Master Lease Agreement itself does not effect a lease of the vehicles but instead such vehicles are leased through their inclusion on schedules that are subsequently added at different times.  The "base rent" component of the lease payment is using straight-line depreciation for each vehicle based upon its assumed holding period and assumed residual value.  *Id*. § 4.2.  A "variable rent" component of each lease payment passes on the costs of HVF's financing activities to the Lessee, *id*. § 4.5, while the "true-up rent" component of the lease payment incrementally adjusts depreciation on a month-to-month basis based on an estimation of the current market value of each vehicle.  *Id*. § 4.4.  To the extent a vehicle's book value falls short of its estimated current market value, the Lessees pay the "true-up rent" as part of the lease payment. Likewise, under Section 3.1 of the Master Lease Agreement, the term of a vehicle lease is determined on a per-vehicle basis and almost always by the Lessee, who is required to take in account considerations such as the purchase date of a vehicle and the calendar year of the vehicle's model.  *Id*. § 3.1.

AMERICAS 102972841
RLF1 23564073v.1

36.     Together, these provisions confirm that the intent of the parties as set forth in the Master Lease Agreement was to provide for the flexible leasing of individual vehicles varying substantially in number and identity over time.  The Master Lease Agreement merely provides the umbrella terms broadly applicable to each individual lease.  The acquisition or the termination of one vehicle does not have any impact upon the remaining leased vehicles; indeed, throughout the existence of the Master Lease Agreement, the number of leased vehicles varied widely, depending on the Company's business needs.  *Supra* at ¶ 14.  Moreover, there is no provision in the Master Lease Agreement asserting that the leased assets are to be leased altogether or not at all, i.e. no provision indicating that the parties intended an all-or-nothing lease.  (Nor could there be, since the Master Lease Agreement contemplates great variation in the numbers and identity of vehicles leased.)  The terms of the Master Lease Agreement thus confirm the intuitive conclusion that the lease of one vehicle under this contract *is in no way economically dependent on the lease of some other vehicle*.  The Master Lease Agreement is therefore by "its terms, nature and purpose . . . susceptible of division and apportionment."  *See DB Structured Prods.*, 402 B.R. at 94.  Accordingly, the Debtors may reject the leases of some vehicles associated with the Master Lease Agreement without rejecting the leases for all vehicles and, by extension, may reject the leases for the vehicles identified in Exhibit B.

37.     This Court's decision in *Buffets Holdings* is not to the contrary.  In that case, the Court refused to allow the debtors-lessees to reject their Illinois law-governed master leases with respect to certain locations and assume them with respect to others. 387 B.R. 115, 118-19. The debtors had entered into a sale-leaseback transaction pursuant to which the debtors assigned their ground leases and sold the structures built thereupon to the lessor; the debtors then subleased the grounds and buildings from the lessor pursuant to four master leases. *Id.* at 118. The court held

17

that the parties had intended the master leases to be an integrated, indivisible agreement, and for this reason rejected the debtors' motion to reject and to assume individual leases. *Id*. at 128.

38.     Among other things, this court noted that each property under lease in the *Buffets Holdings* master leases could only be extended if all of the underlying property leases were similarly extended. *Id*.  The court also noted that, following a default on one of the individual leases, the lessor had "the right to declare the entire Master Lease in default or to treat only the individual lease in default*." Id*.  Finally, the court noted that the lessor's purpose in entering into the master leases was to assure the lessor that it would be repaid for the money it provided to the debtors in the sale transaction preceding the lease-back. *Id*. at 127-28.  On that basis, the court reasoned that the case before it was "dramatically different from the situation where the lessor has an independent reason to enter into each lease and then just seeks to reduce its risk by including cross-default provisions in each lease." *Id*. at 128.  The court concluded that the individual leases were "economically interdependent" and that the lessor's interest was in the totality of the leases as opposed to each separate lease. *Id*.

39.     Here, in contrast to *Buffets Holdings*, no sale-leaseback transaction provides a basis for concluding that the leases are "economically interdependent."  Rather, the Master Lease Agreement expressly contemplates, unlike in *Buffets Holdings*, that vehicle leases, with individual terms and calculations of rent, would be created and terminated for as long as the Master Lease Agreement is in effect.  Critically, in *Buffets Holdings*, the lessee was not permitted to alter unilaterally the set of assets under lease. *Id*. at 122-23.  In this case, however, the Lessees are permitted to and do alter greatly the number of vehicles under lease each month through schedules delivered to the Lessor.  Finally, while failure to pay rent may constitute breach of the Master

AMERICAS 102972841
RLF1 23564073v.1

Lease Agreement as whole, there remains "an independent reason to enter into each lease," and the default provisions allow the Lessor to manage its risk. *Id*. at 128; *see supra* at ¶ 18.

40.     Thus, because the Master Lease Agreement, by "its terms, nature and purpose . . . is susceptible of division and apportionment," the Court should approve the Debtors' rejection of the leases identified in Exhibit B. *See DB Structured Prods.*, 402 B.R. at 94. The Debtors request that the rejection of the vehicle leases be effective *nunc pro tunc* as of the date of this Motion to limit the Debtors' exposure to a potential post-petition rent claim for vehicles that the Debtors do not anticipate using. *See In re Rupari Holding Corp.*, 2017 Bankr. LEXIS 4095, at *14 (Bankr. D. Del. Nov. 28, 2017) ("[B]ankruptcy courts may exercise their equitable powers in granting [ ] a retroactive [rejection] order when doing so promotes the purposes of Section 365(a).").

## <u>RESERVATION OF RIGHTS</u>

41.     The Debtors reserve all rights. Without limiting the generality of the foregoing, nothing contained herein is or should be construed as: (a) an admission as to the validity, extent, perfection, priority, allowability, enforceability, or character of any claim or any security interest which purportedly secures such claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (c) a promise to pay any claim; (d) a waiver of any claims or causes of action which may exist against any creditor or interest holder; (e) an assumption or rejection of any executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, except as specified herein, and nothing herein otherwise affects the Debtors' rights under section 365 of the Bankruptcy Code to

assume or reject any executory contract or unexpired lease with any party, except as specified in this Motion; (f) granting third-party beneficiary status or bestowing any additional rights on any third party; or (g) being otherwise enforceable by any third party.

## NOTICE

42.     Notice of this Motion has been provided to the following parties, or, in lieu thereof, their counsel: (i) the U.S. Trustee; (ii) the U.S. Notes Agent; (iii) the Senior Credit Agreement Agent; (iv) the administrative agent under the ALOC Facility; (v) the successor trustee under the Promissory Notes; (vi) the U.S. ABS Agent; (vii) the indenture trustee under the HFLF ABS Notes; (viii) the administrative agent and collateral agent under the U.S. Vehicle RCF; (ix) the indenture trustee under the European Vehicle Notes; (x) the administrative agent and collateral agent under the European ABS Notes; (xi) the indenture trustee and collateral agent under the Hertz Canadian Securitization Notes; (xii) the lender under the Donlen Canada Securitization Program; (xiii) the administrative agent and the security trustee under the Australian Securitization Notes; (xiv) the lender under the New Zealand RCF; (xv) the lender under the U.K. Financing Facility; (xvi) holders of the fifty (50) largest unsecured claims against the Debtors (on a consolidated basis); (xvii) the Internal Revenue Service; (xviii) the Securities and Exchange Commission; (xix) United States Attorney for the District of Delaware; (xx) any such other party entitled to notice pursuant to Bankruptcy Rule 2002; (xxi) the state attorneys general for all states in which the Debtors conduct business; and (xxii) HVF.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## NO PRIOR REQUEST

43.     No previous request for the relief sought herein has been made by the Debtors to this Court or any other court.

AMERICAS 102972841
RLF1 23564073v.1

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court grant the relief requested in this Motion, the Order, and such other and further relief as is just and proper.

AMERICAS 102972841

RLF1 23564073v.1

Dated: June 11, 2020

*/s/ Brett M. Haywood*
**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Brett M. Haywood (No. 6166)
Christopher M. De Lillo (No. 6355)
J. Zachary Noble (No. 6689)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Collins@rlf.com
Knight@rlf.com
Haywood@rlf.com
DeLillo@rlf.com
Noble@rlf.com

—and—

**WHITE & CASE LLP**

Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone:     (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com

J. Christopher Shore (admitted *pro hac vice*)
David M. Turetsky (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone:     (212) 819-8200
cshore@whitecase.com
david.turetsky@whitecase.com

Jason N. Zakia (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, IL 60606
Telephone:     (312) 881-5400
jzakia@whitecase.com

Ronald K. Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
Andrew Mackintosh (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:     (213) 620-7700
rgorsich@whitecase.com
aaron.colodny@whitecase.com
amackintosh@whitecase.com
doah.kim@whitecase.com

*Proposed Co-Counsel to the Debtors and
Debtors-in-Possession*

AMERICAS 102972841
RLF1 23564073v.1