**EXHIBIT A**

EFiled:  May 21 2020 10:07PM EDT
Transaction ID 65652125
Case No. N20C-05-189 VLM

# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

Hannah Ayoub
Nicole Stevens;
Shontrell Higgs
Julius Burnside
Magalie Sterlin
Arthur Stepanyan
Howard Junious
Laketa Collins
Michelle Johnson
Brian Steinberg
Antwone Person
Michael Koss
Amanda Koss
Cheryl Young
Stephanie Keene
James Keene
Barbara Fernandez
Thomas John Channell
Michael Channell
Jessica Gurumendi
   *Plaintiffs*

    vs.

Hertz Global Holdings, Inc.
The Hertz Corporation
Rental Car Intermediate Holdings, LLC
Hertz Investors, Inc.
Hertz Vehicles LLC
Hertz Vehicle Financing LLC and
Hertz Vehicle Financing II LP
Hertz Local Edition Corp.
Dollar Rent A Car, Inc.
Thrifty Rent-A-Car System LLC
Icahn Associates Holding, LLC
Icahn Enterprises LP
Icahn Enterprises Holdings LP
Icahn Capital LP
Icahn Enterprises GP, Inc.

Paul Stone
Kathryn Marinello
John P. Tague,
Mark Paul Frissora
M. David Galainena
Richard Frecker

Civil Action No.:


**JURY TRIAL DEMANDED**

Richard E. Esper
Leslie Hunziker          .
Tom Kennedy
Jodi Allen
Jeffrey T. Foland
Murali Kuppuswamy
Tyler Best
Alexandreia Marren
Frederic Deschamps
Jamere Jackson
Eliana Zem
Robin C. Kramer
Opal G. Perry
Matthew Jauchius
Tom Callahan                    .
Scott Massengill

Henry R. Keizer
David A. Barnes
Carolyn N. Everson
Vincent J. Intrieri
Samuel Merksamer
Anindita Mukherjee
Daniel A. Ninivaggi
Kevin M. Sheehan
SungHwan Cho
          *Defendants*

# PLAINTIFFS' COMPLAINT

# Table of Contents

INTRODUCTION ........................................................................................ 4

BACKGROUND ON HERTZ THEFT REPORTING AND THE SERIOUS
ISSUES HERTZ CORPORATE HAS BEEN IGNORING FOR YEARS ...................... 6

    HERTZ FALSIFIES PAYMENT INFORMATION IN POLICE REPORTS
    TO SECURE ILLEGAL ARRESTS & PROSECUTIONS ............................... 11

    HERTZ ERASES RENTAL EXTENSIONS AND BACKDATES THE
    RENTAL DUE DATE ........................................................................ 15

    HERTZ'S FAILURE TO INVESTIGATE THEFT REPORTS
    RESULTS IN ILLEGAL ARREST AND PROSECUTIONS .......................... 18

    HERTZ IMPROPERLY DESTROYS ITS RECORDS RELATING TO THE
    CRIMINAL PROSECUTION OF CUSTOMERS ....................................... 23

DIRECTOR AND OFFICER LIABILITY AND NOTICE TO THE CORPORATION ................... 24

PARTIES .................................................................................................. 30

    PLAINTIFFS ................................................................................... 30

    DEFENDANTS ................................................................................ 62

JURISDICTION, VENUE, JOINDER ................................................................. 68

CAUSES OF ACTIONS ................................................................................ 70

CLAIMS FOR RELIEF ................................................................................. 91

# Introduction

1.      Defendants Hertz Global Holdings and The Hertz Corporation have been hiding a massive corporate scandal, aided and abetted by their directors and officers.

2.      Hertz has been falsely reporting untold numbers of customers for car theft, throwing them in jail on felony charges for months, prosecuting them, causing them to lose their jobs, giving them criminal records, causing them to lose their homes, and separating them from their family and loved ones. These customers have paid for their cars and are authorized to use the rentals.

3.      The company's computer and inventory tracking systems are broken. However, the top corporate officers and directors have decided that verifying theft reports, and fixing their computers, would be too expensive.

4.      Defendant Hertz has instead decided—at the very highest level—to mass report its own customers to the police without verification, effectively using the police, criminal justice system, and taxpayers to subsidize inventory control for a private corporation.

5.       Hertz and its top officials are dishonestly and maliciously turning potential civil disputes with customers about payment (payment which Hertz has usually already received)— which are required to be arbitrated or addressed in small claims court—into criminal theft reports and prosecutions. As this Complaint explains, by doing so the company is savings tens of millions of dollars.[1]

6.      Hertz's policies, procedures, and practice disproportionately condemn poor minorities to prison and prosecution while presuming their guilt. Many of these innocent individuals—lacking money and access to effective legal services—remain wrongfully imprisoned for months as their cases slowly wind their way through the courts.

---

[1] More information on this scandal can be found here: www.truthhertz.net.

7.      This plan is as brilliant as it is evil, saving the company millions upon millions of dollars it would otherwise have to spend updating its broken systems and paying corporate security personnel to verify the thousands of theft reports it makes every year.

8.      As a result of this routine and systemic mass reporting, without verification or investigation, many innocent customers have been wrongfully detained, arrested, thrown in prison, prosecuted, and had their lives destroyed.

9.      This is not some sort of error. The company and its leadership have known about these problems for many years—since at least 2015, and likely far earlier—after falsely imprisoned customers and police agencies notified Hertz corporate about these serious issues. Hertz did nothing to address these problems, instead deliberately placing the Almighty Dollar before the lives and safety of their customers, including the Plaintiffs.

10.     Hertz has even been sued and lost lawsuits for intentional infliction of emotional distress and malicious prosecution for the same conduct at issue in this case in 2017—but has continued to falsely report customers for theft calculating that it will make more money if it does not fix the problem.

11.     Hertz's corporate representatives testified in those lawsuits that their "marching orders" are to routinely disregard the standard operating procedures designed to safeguard against and prevent false reports as part of cost saving measures imposed by Hertz corporate.

12.     What differentiates this scandal from Worldcom, Enron, Arthur Anderson, Bear Stearns, FIFA, Volkswagen, WeWork, or even Madoff, is that those cases were only about money. Uniquely, the clients in this case had their lives destroyed, with consequences in the hundreds of millions of dollars.

13.     Thomas Channel cannot undo the heart attack he suffered as he was being held at gunpoint for car theft, nor the resulting emergency operation. Plaintiff Julies Burnside cannot get

back the 7 months he spent in prison. Plaintiff Shontrell Higgs cannot undo the 171 days she spent in jail, or bring back the baby that she miscarried. Plaintiff Michael Koss, a Marine Combat Veteran, cannot get back the last 7 years that felony charges have been pending against him and his wife, utterly altering their lives and family.

14.    The tragedies that Hertz—who files thousands of police reports per year—has caused could fill many books.

15.    Hertz, a company which claims to be Number 1 in customer service, has been given every chance by Plaintiffs to voluntarily address what they are doing to their customers, but the response has been callous disregard.

16.    There is no excuse for this conduct. The criminal justice system does not exist to be used as a repo service for a massive multinational company worth billions of dollars which cannot be bothered to track its vehicles and rentals. No company should be mass filing unverified police reports, especially when those false reports endanger the freedom and safety of its customers and disproportionately impact minorities.

### Background on Hertz Theft Reporting and the Serious Issues Hertz Corporate has Been Ignoring for Years

17.    Any theft report must be undertaken with the utmost seriousness given that it has the potential to ruin a customer's life. Hertz therefore has several corporate policies which are supposed to govern theft reporting by the company. These policies are allegedly designed to safeguard against false reports. In reality they are ignored and twisted to cut costs resulting in false theft reports.

18.    Hertz and its subsidiaries are Delaware corporations. Hertz also has approximately 15 corporate security managers who participate and supervise the theft reporting process at the various locations around the country.

19.     When a vehicle is missing or is allegedly overdue, Hertz Vehicle Control generates what Hertz calls a "theft package." This theft package is then given to the police to initiate a theft report. This theft package purports to detail all contact with the renter, payment information, the rental due date, extensions made by the renter, and the renter's prior rental history.

20.     Hertz has a major systemic failure in that it is filing false theft reports. These can be categorized as missing inventory and overdue rentals.

21.     Missing inventory reports are self-explanatory, and generally consist of vehicles allegedly missing from Hertz locations without permission where Hertz does not know what happened to the vehicle. In these cases, Hertz reports only the car stolen and does not name a customer in the theft report.

22.     Overdue rental reports occur when the renter has allegedly kept the rental past the due date and has not extended or contacted the company. In these cases, Hertz personally names the renter as having stolen the car.

23.     Although the title of the applicable crime varies from jurisdiction to jurisdiction, the law generally provides something to the effect:

> (a) A person is guilty of theft of rental property if the person, with the intent specified in § 841 of this title, takes, destroys, converts, wrongfully withholds or appropriates by fraud, deception, threat, false token, false representation or statement, or by any trick, contrivance or other device to avoid payment for or to otherwise appropriate rental property entrusted to said person. For purposes of this section, "property" shall include the use of vehicles or other movable property.

Del. Code tit. 11 § 849.

24.     The classic example of such a type of car theft is where a vehicle is rented with the intent of never returning or paying for it. The "renter" simply absconds with the car.

25.     Contrarily, any renter extension, contact with the company, payment, or prior rental history with Hertz is a clear indication that the renter has no intent to steal a rental car. There may be civil issues that arise during a rental, but they are not disputes for the criminal justice system.

26.     Yet, many customers who were the subject of theft reports by Hertz have claimed that they were reported to the police despite extending their rental, being in contact the company, paying, having a prior rental history, and otherwise not breaking the law.

27.     How could this happen?

28.     Hertz has several nationwide systemic problems which are resulting in blatantly false police reports for both missing inventory and overdue rental cases. This is resulting in innocent customers being thrown in jail and prosecuted, a massive civil rights issue. Unfortunately, this problem predominantly and invidiously affects black and minorities.

29.     These systemic issues are well known to the company but have been ignored for many years because fixing them would decrease Hertz's profits.

30.     The systemic problems cause blatantly false police reports to be submitted, resulting in the arrest and prosecution of customers without probable cause both for missing inventory cases and for allegedly overdue rentals:

   a.   **Falsification of Payment Information** - Hertz's theft reports falsely tells the police the renter never paid and provided a denied card. Secretly, however, Hertz actually fully charges the customer but never updates the police with the payment information. Incredibly, Hertz policy W7-02(D) specifically describes and requires this outrageous process, which guarantees that every Hertz theft report contains falsified payment information.

   b.   **Deletion of Rental Extensions** - In certain scenarios Hertz's computer systems secretly delete customer rental extensions, and backdate the rental due date, resulting in false police reports which claim that the renter never extended or contacted the company. Not only do customers believe they have an extension, but sometimes this extension process occurs over and over during the rental with the renter having no idea there is an issue. Hertz's systems provide no indication to employees who handle extensions that there is a problem with the rental so the customer is also not informed of the issue. The customer who believes the rental is extended, is then suddenly arrested despite having been in contact with the company.

c. **Failure to Perform Adequate Investigation** - Hertz has directed its vehicle control and corporate security personnel to violate Hertz policy W7-02(a)(17) which requires an investigation by a corporate security manager to confirm the accuracy of theft reports. Instead, Hertz has told the local security managers that their "marching orders" are to refrain from verifying, investigating, or otherwise double checking police reports for extensions or payment. This results in every Hertz theft report being unverified. Because no investigation or check is performed, every Hertz theft report contains significant inaccuracies regarding due dates, extensions, payments, customer contacts, returns, and other important information.

d. **Destruction of Records** - Despite criminally reporting customers for theft, and being required by Hertz policy and the law to preserve all related information, Hertz outrageously deletes almost all renter information and data. This information and data often contains proof that the renter paid and extended the rental, that the renter had no intent to steal the car, and that Hertz's initial theft report was false. In a prior lawsuit, the Court granted severe spoliation sanctions against Hertz for its destruction of documents.

31.     These systemic errors are explained in more detail below.

32.     For allegedly overdue rentals, authorities pursue charges is because they rely on Hertz's false theft package which claim that: (1) the customers did not pay, (2) the customers did not extend or contact Hertz, (3) that Hertz internally verified the accuracy of the report, and (4) that there is probable cause to conclude that the customers have criminal intent to steal a vehicle.

33.     The authorities are unaware that the theft package is unverified, one-sided, does not fully capture the rental histories of the customer, fails to record and erases extensions, backdates due dates, contains false payment information, ***and that Hertz destroys all internal data which could exonerate the customer and contradict the theft package***.

34.     For allegedly missing vehicles, authorities pursue charges is because they rely on Hertz's false theft package which claim that :(1) they believe Hertz's theft package which says that the only way the vehicle could be missing is that it was stolen off of Hertz's lot, (2) they have no idea that Hertz routinely loses track of cars, (3) they do not know that instead of investigating where missing cars are, Hertz simply reports them stolen and has the police find them, and (4) they do not know that Hertz does not note in its rental system which cars it reported as "stolen," resulting in customers being rented stolen cars.

35.     Invariably, when the prosecution and police are informed that the customer had in fact paid for the rental, returned the rental, extended the rental, or was rented a stolen car the charges are dropped.

36.     Perniciously, despite filing these police reports, Hertz never intends to pursue a prosecution to trial, yet also never withdraws the cases. Instead, it lets the case linger while the innocent customer either sits in prison or is prosecuted. When the renter contacts Hertz to ask for help, Hertz falsely tells the customer that it is out of Hertz's hands whether to continue the prosecution.

37.     For what purpose would Hertz be filing false police reports but not actually pursuing prosecutions? The answer is that Hertz has realized that it is exponentially cheaper to simply file criminal theft reports against customers—even if they are false.

38.     By reporting missing or overdue vehicles to the police, with little or no investigation or verification,  Hertz gets the following benefits:

    a.  Hertz avoids spending money on personnel to verify if the theft reports are accurate;

    b.  The police immediately recover the vehicle at taxpayer expense, instead of Hertz hiring repossession services;

    c.  If Hertz treated these rentals as a civil and not criminal issue, the rental contracts require that these matters be arbitrated. If Hertz arbitrated these matters it would cost an enormous amount of money. By filing a criminal report, Hertz avoids arbitration and instead receives restitution through the criminal justice system;

    d.  Hertz writes off the rental car and/or makes an insurance claim for the "stolen" property.

39.     If this seems incredible, it is all documented in Hertz's own policies and testimony, as described below.

# Hertz Falsifies Payment Information in Police Reports
# to Secure Illegal Arrests & Prosecutions

40.    In every theft report there are two implicit variables: payment and time.

41.    If the rental vehicle is paid, or the renter has provided Hertz a valid form of credit (e.g., a credit card number), it should be clear that the renter does not intend to steal the car. Indeed, in any type of consumer theft report, the determinative factor is payment.

42.    Hertz routinely provides false information to the police in its theft packages about customer payment to secure criminal charges against the renter. To understand how and why, some background is needed on Hertz's billing process.

43.    When a customer initially rents a car from Hertz, they provide a credit card to Hertz as a letter of credit so that Hertz can charge for any costs associated with the rental.

44.    At the time of the initial rental, Hertz puts something called an "authorization hold" on the customer's card. An authorization hold is not a permanent charge, it simply checks the customer's account to see if it is valid and has funds. This temporary charge does not appear on any monthly billing statements, and is not a bill or payment.

45.    If the customer later extends the rental, Hertz also places an authorization hold on the customer's card. Again, this is not a final billing or payment.

46.    Only at the end of the rental, after the rental is closed out, does Hertz actually charge the customer's card for payment on the full rental.

47.    Although, an authorization hold may be denied during the rental for a variety of reasons, such as a low balance, *this says nothing about whether the final billing charge will go through*.

48.    When filing theft reports, Hertz first finalizes and prints out paper theft packages compiled in Oklahoma City which claim that the customer never paid for the rental and that the

card was "denied." However, when the theft package is printed out, ***the customer has not yet been***

***billed***. The paper theft packages state that the customer owes the full balance of the rental. Then

and only then, after the theft package is printed out, does Hertz charge the customer for the car

rental. The final billing charge is almost always successful.

49.     Yet, despite having just charged the customer and received payment, Hertz then

gives the now out-of-date paper theft package to the police claiming that the renter never paid, has

an outstanding balance of many thousands of dollars, and that the renter provided an invalid card.

50.     At no point does Hertz inform the police that the customer has been charged.

51.     As is immediately obvious, this means that many if not all overdue Hertz police

report contains materially false information.

52.     Incredibly, this is not the result of some sort of massive error, but instead has been

deliberately written into Hertz's policy since at least 2007:

---

**D.**     <u>Closing Associated Rental Agreements</u>

    **1.**     The OKC Vehicle Control Department (North America), Car Control Department (Brazil), Location/Branch Manager (Europe, Australia and New Zealand) must close the RA after verifying the Theft Vehicle Report with police. Therefore, North America and Brazil rental locations <u>must not</u> close the RA or perform an exchange on the RA.

    **2.**     Once confirmed that the theft/conversion has been reported to the police, the responsible management (as listed above) must Close RAs in the ASAP/TAS/CARS+/HTZRENT Post Return or BCHCLOSE applications by:

- Entering an approximate 'mileage in', estimating 70 miles/100 kilometers per day.
- Recording the date the vehicle was reported stolen in the 'return date and time' field.
- Ensuring the Rent and Return locations are the same.
- Applying the 'best' or lowest rate available.

---

Exhibit 1 - W7-02 Theft Reporting Policy.

53.     The reason the policy is written in this manner is because Hertz knows that if police

were aware that Hertz had charged the customer, and always had a letter of credit to bill the

customer at its discretion, the theft report would not be accepted.

54.     Indeed, when the customers provide proof of payment to the prosecutors, the prosecutions are dismissed.

55.     Hertz has known about this issue for many years but has stubbornly refused to revise the policy. Given that Hertz files at least 10,000 police reports a year, and this policy has been in place since at least 2007, the number of affected individual is huge.

56.     Every named Plaintiff reported for overdue rental theft was billed by Hertz after the theft report was printed out; in no cases were the police were told about the payments.

57.     This policy is at a minimum reckless, it is a corporate device to obtain police action against customers where there is otherwise no probable cause to do so. There is no legitimate or valid reason for such a policy.

58.     All corporate Hertz defendants and their employees, the named defendant directors, and the named defendant officers were aware of this policy and refused to change it or otherwise take action.

59.     In September 2017 Hertz lost a malicious prosecution trial in Philadelphia. As with Plaintiffs' cases explained in this Complaint, Hertz had given a theft package to the police which said she owed $2,445, when in reality Hertz had received payment of $2,445 a week before the police report.

60.     Hertz's national supervisor for Vehicle Control, Julie Wilkerson, attempted to dissemble on the witness standard about whether Hertz had told the police about Grady's payment:

| COUNSEL: | Do you believe if there's -- I think you testified if there's omitted facts, they should be corrected, correct? |
|---|---|
| WILKERSON: | Yes. |
| COUNSEL: | Eventually did Hertz become aware of additional facts in regards to Ms. Grady's rental that should have been provided to the police? |
| WILKERSON: | Which facts? |

| | |
|---|---|
| COUNSEL: | Well, the payment of $2400. |
| WILKERSON: | **That was actually in the theft package. The police had that information.** |
| COUNSEL: | **The police had that information?** |
| WILKERSON: | **Yes, it's in the billing page of the theft package.** |

Exhibit 4 - Wilkerson Testimony, at pp. 5-6 (emphasis added).

61.    This testimony was untrue. Wilkerson supervised Hertz vehicle control for many years, and she was—and is—well aware that a theft package provided to the police never contains payment information for the simple reason that the renter is charged only after the theft package is generated and taken to police. See Exhibit 1 - W7-02(D).

62.    When she later tried to repeat her misstatement, she was impeached and ultimately forced to admit that her testimony was untrue:

| | |
|---|---|
| COUNSEL: | Ma'am, I'm asking you was 2445 paid, yes or no? |
| WILKERSON: | Yes. |
| COUNSEL: | And that information was never updated to the police, correct? |
| WILKERSON: | No. |
| COUNSEL: | It was not corrected, correct? It was not updated to the police, correct? |
| WILKERSON: | **They had the information.** |
| COUNSEL: | I'm asking you if the information that it was paid was updated to the police, yes or no? |
| WILKERSON: | **The police actually have the theft package and this was in the theft package.** |
| COUNSEL: | Ma'am, you just identified that that is not a payment for 2445, it's what is owed. Do you understand the difference between -- |
| WILKERSON: | Yes. |
| COUNSEL: | -- money in your bank account -- |

| WILKERSON: | Yes. |
|---|---|
| COUNSEL: | -- and what is owed to you? It's the difference between an asset and a liability, right? |
| WILKERSON: | Yes. |
| COUNSEL: | Okay. Understand the difference? |
| WILKERSON: | Yes. |
| COUNSEL: | You deal with this every day? |
| WILKERSON: | Yes. |
| *COUNSEL:* | *So let's be clear. The police didn't know $2445 was paid before they signed an affidavit of probable cause allowing Ms. Grady to be arrested, correct? Correct, ma'am?* |
| *WILKERSON:* | *Correct.* |
| COUNSEL: | No further questions. |

Exhibit 4 - Wilkerson Testimony, at pp. 54-55 (emphases added).

63.    Wilkerson's evasive testimony demonstrates that she and Defendants were always well aware that it is impossible for theft packages to show renter payments; Hertz policy mandates that the renter's credit card be charged after the theft package is generated.

## Hertz Erases Rental Extensions and Backdates the Rental Due Date

64.    As noted, every rental theft report is based on two main variables: payment and time. In addition to misrepresenting payment, Hertz also utterly botches the time component of the overdue vehicle theft reports.

65.    In sum and substance, after renters extend the rental period, Hertz's computer systems outrageously deletes the customer extensions *without notice to the customer*.

66.    When a customer calls in to Hertz to extend the rental, the renter can call the location or Hertz corporate's 1800 extension number. When the customer extends, Hertz then

places an authorization hold on the card. If the authorization hold is approved by the bank, then the extension appears on Hertz's records.

67.     However, if the authorization hold is denied, Hertz's computer systems at Vehicle Control erase the extension and backdate the due date of the rental. Not only is the customer not informed of the voided extension, but the deletion is also not apparent to Hertz employees.[2]

68.     To be very clear, when the Plaintiffs allege that Hertz erases the extension what they mean is that Hertz's computer programs completely erase any evidence not only that the renter ever extended, but that the renter ever attempted to contact Hertz in the first place.

69.     The problem is immediately apparent to even the most cursory observer. The renter has been told that he is authorized to use the car for an extended period, yet Hertz has secretly canceled the extension and erased any evidence it ever existed.

70.     It is one thing if Hertz wants a new form of payment and lets the customer know; it is something else entirely if Hertz memory holes the rental extension. In some cases, the renter has extended over 10 times and each time, without notice to the renter, Hertz secretly erased the extensions.

71.     Hertz then reports the customer to the police claiming that the due date of the rental was months before and that the renter never extended or contacted Hertz about the rental. This information not only goes directly to whether the renter extended and was authorized to use the vehicle, but also is vital information about whether the renter had actually absconded with an intent to steal the vehicle. No exculpatory information from the Contract Notebook is given to the police.

---

[2] Although the extension is erased, the Contract Notebook which contains a history of the rental contacts (which is not consulted by Vehicle Control), can retain information showing that the renter had contacted Hertz.

72.    A perfect example is plaintiff Hanna "John" Ayoub. Mr. Ayoub rented from the Hertz location in Wilmington, DE at the Amtrak Station in early April 2019. He had rented many times before. He diligently extended his rental every week for one additional week, and had let Hertz know that he intended to rent the vehicle through at least late May 2019.

73.    On April 15, 2019, he called the Hertz location, as was his routine, to extend for another week. A Hertz employee named Kelsey told him that he was good to go and that Hertz had hit his card for $308. In fact, he received an app alert from Capital One that a pending authorization hold for $308 had pinged his account.

74.    Bizarrely, the next day, the Hertz Wilmington location called him and told him the car was overdue and asked if he wanted to extend. Mr. Ayoub was understandably confused, and insisted that he had just extended the day before. The Hertz employee was adamant that the computer system showed no extension or renter contact on April 15, 2020, despite the fact that Mr. Ayoub knew he had called.

75.    After a long phone call, Mr. Ayoub grew frustrated and simply started extending with Hertz corporate at the 1800 number because the location was not being responsive.

76.    He has detailed phone records showing phone calls with Hertz corporate every 7 days extending the rental through June 2019.

77.    What Ayoub did not know was that on April 15, 2019, the authorization hold showing up on his credit card records was denied. This resulted in Hertz's system erasing his rental extension. He was never told any of this.

78.    Ayoub then tried to extend again, and was similarly ignorant that his 10 additional rental extensions through June 2019 were apparently also erased without notice to him, because no one from Hertz ever called him or told him there was an issue.

79.     On May 7-8, 2019, he received emails from a Hertz investigator who claimed that the Wilmington location had a hold on the vehicle and that it had to be returned. However, he spoke with Wilmington and confirmed that he was authorized to have the rental.

80.     Unaware there was an issue, Ayoub was charged $2,309.74 on May 24, 2019. He saw the charge and spoke with Hertz whose employees assured him rental was in fact continuing. In actuality, unknown to Ayoub, Hertz reported the truck he was renting stolen on May 28, 2019.

81.     Hertz had falsely told the police that Ayoub never paid for the rental, that it was due on April 15, 2019, and that he not extended. None of this was remotely true. Hertz also told the police that Ayoub said he would return the vehicle on May 8, 2019, but fraudulently neglected to tell police that Ayoub had in fact then confirmed with the Wilmington location that he was authorized to have the rental.

82.     Like many police reports by Hertz, the entire theft package regarding Ayoub was a fiction created by horrendous policy and practices that Hertz has known about for years but done nothing to fix.

83.     As a result he was arrested, jailed, and prosecuted.

## Hertz's Failure to Investigate Theft Reports
## Results in Illegal Arrests and Prosecutions

84.     It is egregious that false information regarding payment and extensions appear in Hertz's theft packages, but even a simple investigation and verification of these theft packages would prevent false information about customer from being given to the police.

85.     However, no investigations take place in violation of Hertz's own policies.

86.     The theft package is compiled in Oklahoma City by Vehicle Control by largely automated processes. Under Hertz policy W7-02(a)(17), after the theft package is sent to the location, the local corporate security manager is then supposed to investigate and verify the accuracy of the theft package:

Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

<u>See</u> Exhibit 1 - W7-02 Theft Reporting Policy.

87.    The policy is unambiguous. Yet, in that prior Philadelphia case against Hertz which resulted in the 2017 malicious prosecution verdict, a Hertz corporate designee admitted that the corporate security managers have been told by corporate to not perform the required investigation:

| COUNSEL: | Is it your testimony that you don't go to the location and question any of the Hertz employees when you receive a theft package? |
|---|---|
| MR. LIVINGSTON: | That's my testimony, yes. |
| COUNSEL: | Why? |
| MR. LIVINGSTON: | Because I mean the package has been completed, all the reports have been reviewed, I guess, by OKC. **And my marching orders are to report the car stolen** when I get the -- again, I do look at it for everything being accurate, as far as I can tell, within the report itself. |
| COUNSEL: | Yeah. *But you don't do any independent investigation?* |
| MR. LIVINGSTON: | *I do not.* |
| COUNSEL: | *You don't do any check?* |
| MR. LIVINGSTON: | *I do not.* |

Exhibit 2 - Livingston Testimony, at p.194-96, 115-117 (emphasis added) (objections omitted).

88.    This was confirmed by another designee, a manager for the company:

| COUNSEL: | We deposed Mr. Rich Livingston Tuesday. He indicated that he doesn't put the package together. He just gets it from Oklahoma City and then basically just couriers it to the police. Is it your understanding that the corporate security manager or assistant corporate security manager actually puts the theft package together? Or is it your understanding that the theft package is put together in Oklahoma City and then |

|  | sent to the corporate security manager at the location where the car was allegedly taken from? |
|---|---|
| MR. JAUSSI: | *So it's my understanding that Oklahoma City generates the packet and all the pertaining documents within it, feeds Ken Graeber or Rich Livingston, right, and Ken Graeber or Rich Livingston essentially print, file, and go seek a police report claim or case number.* |
| COUNSEL: | Okay. *So the theft package is already completed in Oklahoma City before it's sent to the corporate security manager at the Hertz location* where the car was allegedly taken from, correct? |
| MR. JAUSSI: | *That's my understanding, correct.* |

Exhibit 3 - Jaussi Testimony, at pp. 69-70 (emphases added) (objections omitted).

89.    According to Livingston, corporate security personnel do not even have access to rental information to verify the accuracy of theft reports.

| COUNSEL: | Do you have access to phone logs to determine when a renter called in? |
|---|---|
| MR. LIVINGSTON: | I do not. |
| COUNSEL: | Do you have access to any kind of logs that determine the contacts the renter had with Hertz? |
| MR. LIVINGSTON: | Do not. |

Livingston Testimony, at p. 205. He also confirmed he does not attempt to ascertain whether a customer was billed, nor does he engage in any discussion with the location employees about the rental or the renter.

90.    Hertz's policy also requires that every missing vehicle and overdue rental theft report have a checklist completed to make sure that due diligence has been done before reporting the vehicle stolen. <u>See</u> W7-02(a)(4). Hertz also ignores this requirement of the policy, and does not complete the required checklist for any theft report.

91.    A simple investigation that complied with W7-02 of Hertz's systems would reveal customer extensions, attempts to extend, customer contact with Hertz, and payments which would reveal that the theft package is materially false.

92.    Note the contrast to the payment issue. There, W7-02(D) is an absurd policy instituted and maintained by the company. Here, the policy reasonably requires an investigation to verify the accuracy of the theft package, but Hertz deliberately instructs employees to disregard the black letter policy. Unconscionably, this policy is supposed to be a safeguard that prevents false police reports.

93.    As with the payment issue, Julie Wilkerson and Hertz have long known about this issue. Wilkerson claimed at the Philadelphia trial that she expected her corporate security managers to conduct local investigations:

| | |
|---|---|
| COUNSEL: | In fact, this is a procedure [W7-02(a)(17)] that you follow to make sure that innocent people aren't wrongfully arrested for accidental reporting to the police, correct? |
| WILKERSON: | Correct. |
| . . . . | |
| COUNSEL: | Now, it says here that the question was asked of [Livingston] or anyone working for him or working with him, if they did any check and his response was no, not on his side of the fence. Do you see that? |
| WILKERSON: | I do see that. |
| COUNSEL: | Now, you just testified that he would have checked the computer system of some sort, right? |
| WILKERSON: | *He should have checked the computer system*. |

Exhibit 4 - Wilkerson Testimony, at pp. 37-46 (objections omitted) (emphases added).

94.    Wilkerson and Hertz were not being candid: the company had told Livingston and all other US personnel not to check the computer system nor do any other sort of investigative check.

95.    She was then constrained to admit that the failure to conduct local investigations violated Hertz's policy W7-02(a)(17) in thousands of cases:

| | |
|---|---|
| COUNSEL: | How many theft reports have come out of Philadelphia? |
| MR. EDELSTEIN: | When? |
| COUNSEL: | In 2013-2014, ma'am. |
| WILKERSON: | A lot. |
| COUNSEL: | A lot? |
| WILKERSON: | Yes. |
| COUNSEL: | And what would you say? |
| WILKERSON: | Maybe 2000. |
| COUNSEL: | *Do you know — excuse me. Mr. Livingston testified that he's gone into court and handled about 400 of these and he's never done a local investigation to determine the truth and veracity of those theft packages?* |
| WILKERSON: | No, I didn't know that. |
| COUNSEL: | *That would fall well below the policies and procedures of even Hertz Corporate policies, correct?* |
| WILKERSON: | *Yes.* |

Exhibit 4 - Wilkerson Testimony, at pp. 37-46 (objections omitted) (emphases added).

96.    Despite Wilkerson's false testimony, she knew at the time she testified that training materials from inside Hertz Vehicle Control actually direct employees to ignore the local investigation requirement of W7-02(a)(17).

97.    It was stipulated by Hertz at the trial that Hertz was around that time cutting costs (and corners).

# Hertz Improperly Destroys Its Records Relating to the Criminal Prosecution of Customers

98.     Hertz policy specifically prohibits the destruction of records in contemplation of litigation, governmental investigation, or third party subpoenas—as does applicable spoliation law.

99.     Furthermore, the company requires that any records related to a criminal prosecution of a customer be retained for seven years.

100.    Yet, Hertz does none of this. Hertz instead deletes all recorded phone calls and all rental records including the Rental Contract Notebook, even for those customers who have been reported to the police for theft.

101.    Those phone calls and rental records often contain information proving that the customer contacted the company and extended the rental. This information is exculpatory. Because Hertz does not provide customers in writing proof of extensions or contacts with the company, these are often the only records of what happened during the rental.

102.    Notably, these records often completely contradict the what Hertz gives the police in the theft package.

103.    Again, Hertz has known for years that this is a serious issue. In the 2017 Philadelphia trial, a Hertz designee testified that Hertz had purged and destroyed Grady's rental file even though it reported her for theft and knew that investigations of its records were forthcoming:

> COUNSEL:    So you're telling me, as you sit here today, you're speaking, just so you know, as Hertz's voice. You're the corporate designee, the person most knowledgeable from Hertz to testify as to certain things. You've been identified as someone to speak to and you've identified that there was and an email, that you, as general manager, sent to Oklahoma City billing to determine whether or not the 2500 on 7/15 was a final bill, partial payment, full payment or what it is, correct?

| JAUSSI: | Correct. |
|---|---|
| COUNSEL: | And as you sit here today, you're telling me that you personally do not know whether or not that payment was a final payment, or that payment was authorized, or that payment cleared, or that payment was a partial payment or a full payment, correct? |
| JAUSSI: | Correct. All they stated from my recollection is that it was *purged*. It's been *purged*. There's no further information that could be provided because ***that contract has been purged***. |

Jaussi Deposition, at pp. 37-38 (emphases added).

104.    Hertz has not stopped destroying documents. The destruction is particularly pernicious because Hertz claims that its theft packages are accurate and complete, but it known that they are one sided and filled with false information. To keep up the façade, Hertz simply deletes the evidence showing otherwise.

105.    Note that in the 2017 case, the police records showed that Hertz was called after the police arrested the customer and a Hertz representative, after researching the customer's rental history, admitted that the police report for an overdue rental had been a mistake (because the renter had extended). The representative was looking at the customer's information. It was this exonerating information that was purged by Hertz.

## Director and Officer Liability and Notice to the Corporation

106.    Officers handle the day to day duties and run a corporation. Directors handle the overarching goals of the corporation. Both are supposed to provide oversight of the conduct of the business.

107.    In doing so, the directors and officers establish rules which the corporation must follow. These rules are often known as standard operating procedures which govern the corporation's conduct, both internally and externally.

108.    Like any corporation, the primary goal is turn a profit. However, the company must do so in accordance with its standard operating procedures and the law.

109.    In any rental car business, the company has to make sure that the customer is not wrongfully reported for car theft, and ensure that the police reports it files are true, accurate, correct, and that any materials are corrected. This is required in every state.

110.    Every state requires that not only does the initiating party have probable cause to start a prosecution, but that any continuation of a prosecution also be supported by probable cause.

111.    Within Hertz, the director and officers have promulgated standard operating procedures which are supposed to make sure that good, paying customers are not wrongfully arrested and prosecuted.

112.    The directors and officers draft, promulgate, revise, and supervise these policies.

113.    For instance, W7-02, the theft reporting procedure provides that "Location, Maintenance, Area, Country Head Office and. OKC Management must ensure compliance to this procedure." All directors and officers have a duty to correct issues with Hertz's theft reporting process if known to them, or if they should have known.

114.    W7-02 provides that the Procedure Owner is "Senior Executive Vice President, Chief Administrative Officer and General Counsel."

115.    W7-02 provides that the Process Owner is "Vice President, Corporate Operations."

116.    As discussed above W7-02 is severely flawed both in its language, intent, purpose, and execution.

117.    Some portions, such as W7-02(D), are poorly written and disastrously implemented. That section requires that theft reports be filed *before* the customer is charged, but the theft reports claims the renter's card was denied and that the renter owes the money. Hertz never supplements payment information to the police, nor does any Hertz requires that Hertz employees do so.

118.    In contrast, other portions of W7-02, such as (a)(17) and (a)(4), contain sensible and vital safeguards against false reports—but which the company has told employees not to follow.

119.    For instance, subsection (a)(17) requires a full local investigation to verify and confirm the theft package compiled in Oklahoma City by Vehicle Control. Yet, Hertz corporate has directed that this local investigation not be done, and in fact the content of the package is not verified by location employees.

120.    Furthermore, subsection (a)(4) requires that a standard checklist be completed for every theft report to make sure all steps are correctly completed before a theft report, and so that there is documentation showing that Hertz properly verified the theft report. This, too, is not done.

121.    The failure of the Hertz corporate defendants, the directors, and the officers to address these issues is undeniable. The directors and officers are individually liable for these failures because they (1) participated in developing and implementing the theft reporting process, (2) knew about the problems with Hertz's theft reporting process, and (3) negligently supervised and managed the theft reporting process. The Defendants have a duty to ensure that Hertz's procedures are safe, effective, comply with the law, and comply with industry standards.

122.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the actions and omissions of their employees, including the individual Defendants.

123.    These flaws with W7-02 and Hertz's related policies and procedures have directly and proximately led to the Plaintiffs being wrongfully reported to the police, and wrongfully detained, arrested, imprisoned, and prosecuted.

124.    As the testimony and evidence above show, Hertz's top directors, officers, and managers have long known that W7-02's content and implementation is severely flawed. Despite this they have done nothing.

125.    **First**, W7-02 has been in place since at the latest 2007 as has Hertz's general theft reporting process. It is poorly written and it is immediately obvious that it will result in materially false theft reports. Yet, despite being revised in 2009, 2015, and renamed in or around 2019, Defendants continue using this policy which virtually guarantees false theft reports. See Exhibit 1.

126.    **Second**, in 2015, the chief of police at the Louisville Regional Airport Authority decided to limit Hertz theft reports due to Hertz submitting false police reports. His officers were told by Hertz employees that Hertz had an inventory control problem. His officers specifically notified Hertz Corporate Security of this serious problem. See Exhibit 5 - Emails from Louisville Police.

127.    **Third,** in November 2016, the Indianapolis Airport Police similarly imposed restrictions on Hertz theft reports due to false reports leadings to the wrongful arrests of customers.

128.    **Fourth**, in January 2017, Hertz was found liable for malicious prosecution and punitive damages in Texas, after it reported a man to the police who had never even rented a car from Hertz. He had notified the company his identity was stolen, but they reported him for theft anyway.

129.    **Fifth,** in September 2017 Hertz lost a malicious prosecution and intentional infliction of emotional distress jury trial in Philadelphia, PA (the case was filed in 2015). Hertz's national supervisor for theft reporting was confronted and impeached during testimony, and expressly told of the problems in this complaint. Hertz had falsely reported a customer for an overdue rental theft in 2013, but had failed to realize that she had extended and paid for the rental. When she was arrested the first time, Hertz told the police that it was a mistake and just a civil payment issue at most. However, Hertz then continued to prosecute her, and she spent 12 days in jail, and prosecuted her for nine months. Rather than turn over the exonerating information, it destroyed all the renter's records.

130.    **Sixth**, on November 14, 2017, Hertz's general counsel and executive vice president defendant Richard Frecker was sent a letter by counsel detailing the theft reporting problems Hertz had. The letter spoke about how the Philadelphia court had ordered a punitive damages trial against Hertz, and notified Hertz of the Indianapolis case.

131.    **Seventh**, in late November 2017, Nancy Cullen-Smits, who currently has a lawsuit pending in Virginia state court against Hertz, was arrested for two hours in a car she was renting. Hertz had lost track of the vehicle and had no idea the company had even rented the vehicle to her. Hertz made only trite attempts at apologies and Cullen-Smits elevated her concerns to the CEO, Kathryn Marinello.

132.    Other lawsuits are also pending against Hertz in Florida (for a false report in 2008) and Ohio (for a false report in 2018) for identical conduct.

133.    The Defendants have known since at the very latest 2017—and in reality well before—that Hertz has a serious issue and has been submitting false reports. The corporate and individual defendants' failure to address these problems, which they had the ability and duty to do, imposes liability on them.

134.    At no point did the directors and officers ever share the general public, or their shareholders, of the systemic failures which they knew to exist and did nothing address.

135.    Directors and officers have responsibilities to the general public, the corporation, and the shareholders. Their compensation packages can be clawed back when they have engaged in inappropriate actions and omissions.

136.    Additionally, the actions and omissions of the Directors and Officers have essentially used the police as a taxpayer funded repo service, and have needlessly wasted hundreds of millions of dollars of taxpayer money in an effort to cut costs, increase profits, and bolster their executive performance packages.

137.    As a direct and proximate result of Defendant's acts and omissions, Plaintiffs have incurred severe and substantial damages and actual harm. These damages include but are not limited to:

a.  Monetary damages;

b.  Fees incurred from criminal justice system;

c.  Physical injury;

d.  Severe mental distress, as well as severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression;

e.  Loss of reputation;

f.  Loss of the time he spent unjustly incarcerated;

g.  Harm to personal, social, and professional relationships;

h.  Emotional pain and suffering; and,

i.  Lost wages.

*****

# Parties

138.    No Plaintiff knew about the widespread, systemic, and pervasive problems within Hertz, which give rise to this lawsuit, until at the earliest mid-2018.

## Plaintiff Nicole Stevens

139.    Nicole Stevens is a citizen of Texas and was prosecuted in Harris County, Texas.

140.    She is a 38-year old mother of 10 children (plus a nephew she has cared for since he was an infant).

141.    On April 18, 2018, Plaintiff Nicole Stevens rented a car from the Hertz location in Jersey Village, TX to help with childcare needs. She was a Hertz Gold Club member.

142.    She called the 1-800 Hertz number for extensions and extended the rental several times.

143.    At some point in late May or early June 2018, Ms. Stevens called the Hertz 1-800 number for roadside assistance, and told Hertz to pick up the car because a tire on the car had hit a curb. At this point, Ms. Stevens was in Chicago.

144.    Around the time of this call she spoke with an Arab woman in the billing department who confirmed that that Hertz was going to be towed to the Hertz location at O'Hare airport, and from there taken back to the Jersey Village location.

145.    Ms. Stevens then continued traveling up to Minnesota where she has roots. She was told by someone in Chicago that the car had been towed.

146.    A Hertz invoice shows that she paid a total of $1,101.25 for the rental to Hertz, and that her amount due to Hertz is "0.00".

147.    She moved on with her life and continued taking care of her large family.

148.    However, Hertz and its employee, manager Christopher Green, had called the police on June 27, 2018, and accused Ms. Stevens of felony theft of a vehicle.

149.    Hertz and defendant Green falsely told the police that Stevens "had rented a vehicle and never returned it"—despite the fact that Stevens had called Hertz to pick up the vehicle. Hertz also alleged that the vehicle's return date was April 25, 2018, and that they never were able to contact her after her initial rental. None of this was true.

150.    The false police report also claimed that she had taken the vehicle "with the intent to deprive the Complainant of the property." The theft report also claimed that Stevens owed $1101.25 to Hertz.

151.    This was bizarre because Stevens had extended the rental with the corporate phone number, and repeatedly spoke with both corporate HQ employees and Jersey Village, TX branch employees after April 25, 2018.

152.    At no point were the misrepresentations and omissions in the police report corrected or withdrawn by Defendants.

153.    Stevens was pulled over in October 2018 in Minnesota for wearing her seatbelt incorrectly. When the police officer ran her license, he returned to the car with his hand on his gun, said she had a warrant out for theft, and demanded that she get out of the vehicle. She responded, "I have 10 kids, I haven't stolen anything." He asked again, she got out, and he arrested her and chained her to a fence—she was totally baffled by what was happening.

154.    Starting with her arrest, Plaintiff began a one-month hellish journey being transported in prison vans from Minnesota to Texas.

155.    Conditions were gross and humiliating and included repeated strip searches, cells the size of dog kennels, and being forced to wear the same panties and bra for one week with no changing or washing. Female inmates with prurient interests in mind placed their hands on her and attempted to sexually assault her.

156.    When the jail finally began to transfer her to Texas, it was not a straight-shot 16-hour drive. Instead, it was a circuitous route to 5 different jails all over the country. She and the other inmates were shackled on their wrists and ankles. Any movement tightened the cuffs which dug into her skin and bone. She was stuffed in the front of the van with two other inmates and was forced to sleep sitting up.

157.    Upon arriving in Arkansas, she was then jailed there for ten days while she waited for further transfer to Texas. The Arkansas jail was awful. At one point, the first floor of the jail flooded with raw sewage forcing Stevens and the fellow inmates to sit on tables.

158.    After her stay in Arkansas she took a prison bus (a Greyhound type bus with cages installed for each seat) to a prison near the Rio Grande, and was then put in another prison van and transported for 5 to 10 hours at night to the Harris County lockup.

159.    She then sat in prison for three more days before being released.

160.    Despite the fact that Hertz knew she had returned the car, she was told by the court personnel when she showed up to multiple hearings from November 2018 to June 2019 that the Hertz employee who reported her, defendant Green, was the one who had to withdraw the allegation. This was never done by Green, Hertz, or anyone else.

161.    At no point was there probable cause to continue with the prosecution. In addition to having never been filed, the report and prosecution should have been withdrawn immediately.

162.    It was only in June 2019, after paying for an attorney and attending several court hearings (which were repeatedly continued), that she learned that the prosecutor had dismissed her case.

163.    The dismissal stated: "**no probable cause exists at this time to believe the defendant committed the offense".**

164.    Stevens suffered severe mental and emotional damages, which included

miscarrying.

## Plaintiff Shontrell Higgs

165.    Shontrell Higgs is a citizen of Florida and was prosecuted in Broward County, Florida.

166.    Higgs started a Hertz rental on February 28, 2019, with at TD Bank card. She extended the rental on March 1 (to March 7), March 6 (to March 14), March 12 (to March 29), and March 21, 2019 to (April 10). She has phone records proving these phone call took place. She also spoke with Hertz on March 8, 2019.

167.    On the March 21, 2019 call she provided Hertz with a new Walmart Money Card because there was a billing issue with the TD Bank card. As part of the continuing rental Hertz placed authorization holds on that card on March 21 and March 28.

168.    On April 5, 2019, Higgs received a call from a woman named Jordan who said she worked for Hertz and wanted to know when Higgs was retuning the car to make sure it was not reported stolen. Higgs told her that she had extended to April 10. Jordan said that this was fine.

169.    Then at 12:15 pm on April 9, 2019, Jordan and Higgs communicated again by text message about returning the rental on April 10:



170.    As can be seen, Hertz knew when Higgs was going to return the vehicle.

171.    However, unknown to Higgs, Hertz had already reported Higgs for car theft on April 5, 2019. The theft package claimed that she had not extended the rental and that she had not paid for it. The theft report said nothing about Higgs providing Hertz on March 21, 2019, with a new credit card and Hertz extending the rental to April 10, 2019. Bizarrely, Hertz's investigator only contact Higgs after the police report was filed and never told her that a police report was filed or that there was a serious issue with the rental.

172.    Just a few hours after texting with Jordan about the upcoming return, Higgs was arrested while getting take out with her godmother. She was utterly baffled.

173.    Higgs was jailed for 37 days, and not once did she speak with her public defender. While in jail she found out she was pregnant, missed her nursing school graduation, could not work, and was separated from her finance and two children.

174.    At her first preliminary hearing, upon the first time speaking with her public defender, she was presented with a prearranged plea deal and told that she had to take a no contest plea or spend another 4 months in jail waiting for another hearing. Utterly confused and terrified she pled no contest, but then shortly thereafter filed a motion to withdraw the plea. It is still being litigated.

175.    At no point has Hertz informed the prosecutors that the police report was false, that Higgs extended the rental, that Higgs' paid $1,057 for the rental, or otherwise asked to right this wrong.

176.    After being released from prison Higgs tragically miscarried. Then, because Higgs had not paid restitution to Hertz, she was rearrested. In total, Higgs spent 171 days in jail solely as a result of Hertz's false police report.

177.    Her motion to withdraw her plea is pending in the Florida 4th District.

**Plaintiff Julius Burnside**

178.    Julius Burnside is a citizen of Mississippi and was prosecuted in Gwinnet County, Georgia.

179.    On December 26, 2017, Mr. Burnside's insurance company rented him a car from Hertz. He provided a valid debit card from Fifth Third Bank. He spoke with Hertz during that time period and told them everything was fine with his rental.

180.    On or around February 7, 2018, he took over the rental from the insurance company. He extended the rental on the corporate extension number. When he would extend, an authorization hold for $320 would appear on his Fifth Third Bank app.

181.    He continued to extend, with the last extension being until the end of March or early April 2018.

182.    Hertz charged Burnside's card $2,343 on March 26, 2018, and he figured everything was fine. He returned the rental on April 2, 2018.

183.    Unbeknownst to him, Hertz had reported Burnside to the police on March 27, 2018, for car theft. Hertz falsely claimed that Burnside did not pay for it and did not return the rental car to its Norcross location by a due date of February 17, 2018.

184.    Hertz also falsely told the police that they had attempted to contact Mr. Burnside about the overdue rental but that he had ignored them.

185.    As a result of Hertz's allegations, Burnside was charged with Theft by Conversion, and was accused of failing "to make a specified return of the vehicle" by February 17, 2018, while "knowingly convert[ing] said property to his own use in violation of the agreement." Exhibit 5 - Police Documents.

186.    Burnside only learned about this charge and the warrant for his arrest on April 11, 2018, and turned himself in totally confused. After a short jail stay, he was let go.

187.    Given that he had returned the car on April 1, 2018, had paid in full, and had always been in touch with the company he assumed that someone had made a mistake which would be quickly corrected. ***Why would he possibly be prosecuted for theft of a rental vehicle he had returned and paid for?***

188.    He contacted Hertz and asked them to take care of this obvious issue, and assumed it was being taken care of.

189.    However, due to taking care of a relative out of state, Mr. Burnside missed a hearing date and Hertz had never withdrawn the prosecution. As a result, Burnside was arrested by a bounty hunter, ***and then held in jail for 6.5 months.*** Not only was he ripped way from his family, but he was working two jobs which earned approximately $80,000 a year.

190.    During those 6.5 months, he stubbornly refused to plead guilty despite the insistence of prosecutors and maintained that he had always extended and spoke with Hertz. However, after his family asked him to swallow his pride, he pled guilty to the alleged crimes so he could return to them in September 2019.

191.    Upon his release, he then did some research and found online that Hertz was notorious for losing rental extensions and filing false police reports. He then filed a motion to withdraw his plea with the benefit of counsel, and not only was his plea withdrawn but the prosecution dropped all charges against him.

## Plaintiff Magalie Sterlin

192.    Magalie Sterlin is a citizen of Florida and is being prosecuted in Broward County, Florida.

193.    Sterlin rented a car on April 17, 2017, for 1 week, and then extended it at least three times to early to mid May.

194.    At all times during the rental, Ms. Sterlin was in contact with Hertz personnel who knew that she did not intend to steal a car.

195.    On or around May 9, 2017, Hertz told Sterlin that the vehicle's registration was expiring and because of that she should exchange the vehicle for a new rental car.

196.    She was also told on or around May 10, 2017, that if she extended the rental that she could ignore any communication from Hertz about the vehicle being overdue.

197.    Ms. Sterlin was in close contact with Hertz, who knew that she was not absconding with the vehicle.

198.    On May 24, 2017, Hertz's charged Sterlin $1,546.21. Sterlin had also spoken with Hertz and was set to return the vehicle on May 29, 2017.

199.    Sterlin was arrested on May 28, 2017, and charged with failure to return a rental vehicle.

200.    Hertz had filed a false police report on May 25, 2017, claiming that Sterlin had not paid for the rental and had a net due of $1,546.21, and also claimed it was overdue.

201.    Even if the vehicle was overdue, Hertz knew that at no point was there any intent to steal the vehicle.

202.    If the classic example of rental car theft is someone who fraudulently rents a car with an invalid card and never talks to the company again, then Sterlin's case bears no similarity to such a crime.

203.    This was not a situation where the renter refused to speak with the company, or provided an invalid card.  Instead, the company simply wanted the vehicle back because of an upcoming registration expiration.

204.    This is not a circumstance where a private company should be filing (false) police reports to essentially use the police to repossess car.

205.    Defendants made only bare, minimal efforts to repossess the vehicle themselves without resorting to police action against a customer.

206.    Sterlin is still being prosecuted by Defendants almost three years later.

## Plaintiff Arthur Stepanyan

207.    Arthur Stepanyan is a citizen of North Carolina and was prosecuted in Mecklenburg County, North Carolina.

208.    Plaintiff is a longtime VIP Hertz customer at the Charlotte Airport location, and is a Gold Club Member. His credit card has been on file for years. If there are any problems with his rental, then Hertz simply calls him on his phone number. He is well known at the location.

209.    In early March 2019 he rented a Silver Dodge Ram from the Charlotte location, and then returned it two weeks later on March 14, 2019. On March 16, 2019, he reserved a Ford 150, but after arriving at the location decided he did not like the F150 because it did not have a trailer hitch. Hertz then convinced him to rent the Dodge Ram from his prior rental instead and gave him a deal.

210.    Hertz's employees did the paperwork and he left the lot with the Silver Dodge Ram. The Hertz employee in the booth guarding the lot checked his paperwork before he left to make sure his rental was okay. Everything was normal to Stepanyan's knowledge and the same as any other car rental.

211.    Mr. Stepanyan was unaware that Hertz had erroneously listed a Ford 150 on his rental contract, not the Dodge Ram, and failed to catch the error at the booth when he left the lot. All of this was negligent and reckless. Mr. Stepanyan continued with his rental and received no calls from Hertz that anything was amiss; in the past, if there was an issue he would be called. Stepanyan knew that Hertz would bill him at the end of the rental for the full amount of the rental on the card he had provided.

212.    As Plaintiff was driving on August 5, 2019 in the Silver Dodge Ram he noticed a police car abruptly start to follow him without its lights on. He figured it was because he was not wearing his seatbelt.

213.    However, then 4 or 5 police cars were following him without his lights on. Plaintiff was scared, but also not entirely sure what was going on or who they were after. By the time he pulled into his house there were 10 to 15 cars following him who then arrayed themselves in front of his house. At this point the lights came on, they were all screaming "show me your hands," and many guns were pointed directly at him. They were also screaming "don't turn around."

214.    This was one of the most terrifying moments of his life. He asked them over his shoulder with his hands up "All this for a seatbelt ticket?" and was told to shut up. This happened in front of his neighbors.

215.    After about two minutes, they shackled him and accused him of car theft. They said the car he was driving was reported stolen.

216.    He was shocked, and told them to look in the glovebox for the rental agreement. He also gave them the number of the Hertz VIP associate at the Charlotte location who knows him well, whom he believes is named Jordetta.

217.    During all this he was sitting handcuffed in the back of a police car. The cuffs were so tight that his thumb now has permanent nerve damage and feels like a piece of plastic.

218.    However, when he and the police called the VIP associate at the Charlotte location and attempted to explain the situation, she hung up the phone. They called back three or four times from multiple numbers and she refused to pick up.

219.    The police spent three hours on the phone trying to contact Hertz corporate, but got the run around. The police persisted in calling because they could tell that this was not a normal stolen car report and they did not want to arrest him.

220.    When the police finally got in touch with someone at Hertz corporate, the representative said "we don't see anything in the system but if you have a report then just arrest the customer."

221.    The entire time Plaintiff was utterly baffled, especially because the police told him that the police report did not name him but only said that the vehicle itself was stolen.

222.    Given Hertz's instructions the police had not choice but to throw him in jail.

223.    He sat for 24 hours in a cell wondering how he had ended up in jail. The holding cell was extremely cold, making his time locked up miserable and torturous.

224.    When Plaintiff bailed out of prison for $2,000, he went to the Charlotte airport Hertz location to figure out what had happened. He went to the VIP lounge and the representative named Jordetta was present. When she saw him walk in, her expression changed.

225.    She claimed that when she was called during his arrest she thought it was a prank call and that is why she hung up. She claimed that only when he walked in that very second to the VIP lounge did she realize it was not a prank and that the police had been calling about him. This does not explain why she did not pick up phone calls from multiple numbers who were repeatedly trying to get in touch with her.

226.    The VIP representative introduced him to a general manager for Hertz named David Nipper. Nipper is an area manager for Charlotte, NC for Hertz.

227.    Plaintiff and Nipper discussed what happened, but Nipper said that he could not do anything about dropping the prosecution or fixing what happened. The only thing Nipper did was give Plaintiff the number for defendant Timothy Burrell, the corporate security manager responsible for Charlotte, NC.

228.    It should be noted that it is positively absurd that, upon learning a false police report was made about one of your best customers, the response of the area manager was to give the

customer a phone number of someone else in the company. A responsible manager would have immediately been on the phone with Hertz corporate demanding that this be fixed and the prosecution withdrawn.

229.    When Plaintiff called Burrell, who according to Hertz policy W7-02 (Theft Reporting) is directly responsible for all theft reports in Charlotte, NC, he was also told by Burrell that there was nothing he could do regarding the prosecution.

230.    In fact, behind the scenes, instead of reviewing Stepanyan's file to determine what had happened to a longtime customer, Hertz absurdly told the police to prosecute Stepanyan for failure to return the March 1 to March 14 rental—despite Hertz's own records showing that Stepanyan had actually returned the car. This was, at a minimum, grossly negligent and reckless.

231.    Even though Hertz had rented the Silver Dodge Ram to Plaintiff, it turned out that Hertz incredibly had no idea Plaintiff was driving the vehicle. When Hertz could not find the vehicle on its lot, the first thing Hertz should have done was contact the last known renter (Plaintiff) as a part of an investigation into the whereabouts of the vehicle. This step is mandated by Hertz policy and common sense.

232.    Hertz reported the vehicle as stolen *without doing any adequate investigation or verification* to determine whether the vehicle had *actually been stolen*. Hertz, in fact, had no information the car was stolen. The investigation mandated by W7-02(a)(17) was not performed, nor was the W7-02(a)(4) checklist completed. Had the local security manager actually investigated Defendants would have realized the car was not stolen.

233.    Hertz, however, decided to use the police as a repo service (subsidized by the taxpayers) to recover a vehicle it had lost track of, and filed a false police report in support thereof.

234.    Not only does this expressly violate both North Carolina law and Hertz's own policies (as described below), but it is shocking and outrageous behavior given that a false car theft report is certain to result in an innocent's person's arrest and imprisonment.

235.    As described below, it is standard practice at Hertz to file unverified, incomplete, false police reports for the purpose of recovering vehicles the company has lost track of.

236.    Eventually, the prosecution dropped the case against Stepanyan stating that the e "victim/business does not want to cooperate."

237.    Mr. Stepanyan has not only suffered physical injury, but also monetary damages, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

## Plaintiff Howard Junious

238.    Howard Junious is a citizen of California and was prosecuted in Kern County, California.

239.    On January 8, 2018, following an auto accident, Howard Junious's insurance company, State Farm, initially rented a Toyota for him until January 14, 2018, from the Hertz Bakersfield, CA location. Mr. Junious provided a credit card ending for incidental expenses when he picked up the rental.

240.    On January 12, 2018, rental notes in the Contract Notebook entered by Hertz corporate in Oklahoma City indicate that State Farm then extended the rental period to January 19, 2018.[3]

---

[3] This single screenshot of one note (out of nine) from Junious's Contract Rental Notebook is the only such note ever produced by Hertz in any of these cases. Despite these notes existing for every car rental, Hertz jealously hides these notes from prosecutors and police because they often contradict the theft packages, and deletes them despite knowing they are relevant to pending criminal investigations and cases and contain exculpatory evidence.

241.    On Jan. 20, 2018, a rental note entered by the Bakersfield location indicates "SPOKE TO CUSTOMER" and that the customer is "paying out of pocket." rental return date is listed on the Hertz rental notes.

242.    In fact, on January 20, 2018, Mr. Junious returned to the location and upgraded the rental to a 2017 Dodge Ram. Mr. Junious agreed to personally pay for the rental at this point using the valid credit card ending in 2404. Mr. Junious expressly told Hertz, when asked how long he needed the car, that it was for an indefinite period until he was able to get a new car. There was no issue with Hertz who said that as long as he provided a valid credit card that could be charged there were no problems.

243.    On or around January 24, 2018, Mr. Junious followed up with Hertz by phone because he wanted to confirm that the activity on his credit card from Hertz was okay. Essentially, charges from Hertz were appearing on his account and then disappearing after around 1 day.

244.    Mr. Junious was told by Hertz that Hertz routinely places "holds" on customers' credit cards—which temporarily show up and then disappear on the customer's online financials— to verify that the card is valid and that the rental is authorized and continuing. He was told that the total rental bill would be formally charged later and only then show up on his statement.

245.    Mr. Junious also spoke with Hertz on January 30, 2018, to again clarify and confirm his rental was okay:

*[intentionally left blank]*



246.    Hertz's holds appeared on Junious's credit card from January 20, 2018 onward—as discussed with Hertz's employees—and he was continuously billed for the rental as discussed and agreed with Hertz. He knew of no issues. He was charged $1,375.94 on March 14, 2018.

247.    Unbeknownst to him, Hertz and its employees went to the police and filed a police report on March 15, 2018, falsely claiming that Junious had stolen the car, never paid a dime for the rental, and that they had not heard from the renter. They said the return date was January 29, 2018. All of this was absolutely false.

248.    ***Not only had both State Farm and Junious been billed,*** at all points in time authorization holds were being placed by Hertz on Plaintiff's credit card for the rental, objectively indicating to the customer and Hertz that the rental was authorized and continuing.

249.     Furthermore, Mr. Junious never knew about and/or was told about a return date of January 29, 2018. ***Hertz's own rental notes do not even show a return date of January 29, 2018***.

250.     Indeed, when Junious spoke with Hertz one day after January 29, 2018—on the January 30, 2018 call—he was not told the rental was overdue but instead that everything was fine.

251.     He was also never told about any such return date when he spoke with Hertz both in person and on the phone on January 20 and January 24 respectively.

252.     To his surprise Junious was arrested and jailed on April 1, 2018, for embezzlement This is defined by California Penal Code § 503 as requiring a showing that defendant "fraudulently appropriated the property" and "intended to deprive the owner of its use."

253.     By definition, embezzlement and fraud do not occur when the rental property alleged to have been embezzled was being paid for pursuant to an agreement with the rental company. That Hertz omitted this payment from the theft package was material and inexcusable. There was no probable cause to report Junious or continue with his prosecution.

254.     On May 7, 2018, after Junious had languished in prison for a month, there was a preliminary hearing. Whether Junious had paid for the rental was a prominent issue.

255.     Unbelievably, a Hertz manager named James Nichols testified under oath, plainly reading from the false theft package given to the police, that Junious had never paid any money for the rental.

256.     Not only did Hertz fail to verify and investigate the theft package before submitting it to the police, but no one at Hertz bothered to verify if this information was accurate before testifying in court.

257.     As a result, Junious remained imprisoned until June 1, 2018, and was only released for medical reasons.

258.    Hertz did not withdraw the prosecution, and the prosecutors continued to demand that Junious take a plea deal, threatening him with a significant jail time.

259.    On October 8, 2018, Hertz unwittingly submitted a restitution request to the prosecution. This restitution request actually admitted that Junious had paid $1,345 for the rental, completely contradicting the prior testimony and theft report by Hertz.

260.    The prosecution nevertheless attempted to convince Junious to take a plea deal, but threatening a trial. Junious refuse. On the day of trial, November 1, 2018, the prosecutors instead dropped the case in the interests of justice, finally acknowledging that they could not possibly win a case against Junious.

## Plaintiff Hanna Ayoub

261.    Hannah Ayoub is a citizen of Pennsylvania. Hannah was accused in Wilmington, Delaware, arrested and prosecuted in New Jersey, and prosecuted in New Castle, Delaware.

262.    Mr. Ayoub's case is described above and incorporated here by reference.

263.    In short, he rented a car with Hertz at the Wilmington, DE Amtrak station at the beginning of April 2019 and his phone records show that he extended every week with the Wilmington branch, including on April 15, 2019 (to April 22, 2019).

264.    However, on April 16, 2019, he received a phone call from Hertz Wilmington telling him the rental was due April 15, 2019, and asking if he wanted to extended. He spent a long, exasperating time on the phone with the branch explaining that he had extended the day before.

265.    The branch was adamant that there was no record that he had extended or contacted Hertz on April 15, 2019. His rental extension and contact had been erased, and his rental due date backdated. Fed up with the location, Ayoub began extending on the corporate 1800 number without further issues (or so he though).

266.    On May 7-8, he was contacted by an aggressive investigator who worked for Hertz who that claimed Ayoub had to return the car. However, after some confusion where Ayoub initially said he would return the car, Ayoub spoke with Wilmington and the investigator and confirmed that he was authorized to have the car. The investigator then left him alone.

267.    Ayoub continued extending the rental, week over week, through early June 2019. On May 24, 2019, he paid $2,309.44. He called Hertz several times and confirmed the rental was okay.

268.    Then, to his shock, he was arrested on June 2, 2019. Hertz had claimed in a blatantly false theft package that the rental was due back on April 15, that Ayoub had promised to return the car but failed to do so, that Ayoub had not paid for therental, and that Ayoub had refused to contact the company.

269.    Apparently, Hertz's vehicle control department did not record his voluminous contacts with the company, his payment, or that Hertz was extending his rentals. It is no coincidence that Hertz claimed the vehicle was due April 15, 2019, the original date Hertz's computer systems erased Ayoub's extension.

270.    Hertz theft package was egregiously false, and there was no probable cause to report him or continue to prosecute him.

271.    As a result he was prosecuted in New Jersey and in New Castle, Delaware for several months.

272.    The New Jersey prosecutor dismissed the case upon reading the theft report, finding that it was a civil not criminal matter.

273.    The New Castle prosecutor dismissed the case after being shown Ayoub's extensive contact with the company and his payment.

## Plaintiff Laketa Collins

274.    Laketa Collins is a citizen of Florida and was prosecuted in Pinellas County, Florida.

275.    Plaintiff Laketa Collins is a 39-year old mother of 2 adolescent boys.  Following a car accident, Ms. Collins' insurance company, Geico, rented her a car from the Hertz Clearwater location.

276.    When Collins picked up the car on July 7, 2018, she provided Hertz with a valid credit card from Fifth Third Bank as a security deposit, although Geico was paying for the rental.

277.    The rental started on July 7, 2018, and was initially supposed to last until July 11, 2018. However, Geico called Collins after five days and let her know they were extending the rental with Hertz because they had not yet been able to secure her a replacement car.

278.    Geico extended the rental a total of two times, until July 18, 2018.

279.    As of July 18, 2018, Collins spoke with Hertz on the corporate 1-800-4174 rental extension number and extended the rental. She took over the payments for the rental on the card she had already provided to Hertz at the beginning of the rental.

280.    Collins extended the rental several more times on the 1-800 number, in July and August 2018. There were no issues.

281.    In August 2018, the rental car key was misplaced. Collins, at this time was out of state. Ms. Collins spoke with Hertz Roadside at the end of August about towing the car. She spoke with an employee, a black woman, who gave her a claim number and told Collins that Hertz was on the way to pick up the car. The employee said nothing about the car being stolen. The car was in fact retrieved.

282.    On or around August 29, 2019, her card was charged $2,290.60 for the car rental.

283.    Over half a year later, on Valentine's Day 2019, after she had tucked her kids to bed, Collins briefly stepped out to run an errand around the corner from her house.

284.    While she was driving, five or six officers pulled her over. Their guns were drawn. The police then told her that their automatic plate reader said that she had a warrant out for her arrest. This was, to put it mildly, a complete shock. She had no idea what the officers were talking about. They then told her that it was for car theft.

285.    Collins insisted that the car she was driving was her car, registered in her name.

286.    After going back and forth with one of the officers, who repeatedly accused her of theft, he finally told her that it related to a rental car back in August 2018. She was still confused because her Hertz rental was an insurance rental through Geico, and the rental was paid for and returned.

287.    She was then taken to the police station and fingerprinted, booked, and jailed overnight. She did not post bail ($500 of $5,000) until later that morning—money she frankly needed to take care of her family—and did not make it back time before her kids woke up and went to school. They were frightened and confused where their mom was.

288.    The entire experience was bizarre, jarring, and humiliating for her and her entire family.

289.    The more Collins learned about what happened, the more bizarre it became.

290.    According to police documents, a Hertz employee named Joseph Gatewood reported the car stolen on August 30, 2019. Gatewood and Hertz falsely claimed that after she rented the car on July 7, 2018, they never heard from her again. Hertz falsely claimed that the rental was due back July 11, 2018, had never been extended, and that Collins had simply absconded. Hertz further stated that Collins owed them over $2,000.

291.    Not only was this not true, but this is more evidence that Hertz is erasing extensions. Geico has confirmed that it actually extended the rental to July 18, 2018, then Collins took over extending the rental.

292.    Not only did Hertz not record Collins' extensions into August 2018, but it never recorded any of Geico's extensions either.

293.    Hertz never withdrew the charges against her. Despite Hertz being sent subpoeans for the case, no one appeared for the case.

294.    On July 19, 2019, the prosecutors finally nolle prossed the charges stating that "further investigation of this case by the State Attorney's Office has revealed that further prosecution is not warranted."

## Plaintiff Michelle Johnson

295.    Michelle Johnson is a citizen of California who resides in Illinois. Johnson was prosecuted in Hamilton County, Indiana.

296.    Ms. Johnson was visiting Indiana from California to take care of her invalid mother for from 2018 into 2019.

297.    She routinely reserved cars on Hotwire with Thrifty Car Rentals (Thrifty is run by Hertz and Hertz Vehicle Control and Corporate Security handle theft reports for Thrifty).

298.    Johnson paid Hertz thousands of dollars from 2018 to 2019 over many rentals. Because there were many billing issues, Johnson was routinely on the phone and was a diligent renter.

299.    In December 2018 she rented a car from the Thrifty in Indianapolis, through Hotwire. She spoke with Hertz/Thrifty throughout the rental, but was suddenly hit on 2/13 with a charge for $3,578.20.

300.    This was a huge overcharge. She called Thrifty to complain, and was told her complaint was being "escalated." Then, over the next several months, she was told by Thrifty personnel that she should not return the car because it would make it hard to "close out" her rental and impossible to give her a credit.

301.    She was utterly confused, because this was unlike all her prior rentals: however, she followed their directions over the next several months.

302.    In or around May she had an accident with the car and reported it to her insurance.

303.    To her dismay, she was arrested in July 2019 without warning. She was taken to jail, and then prosecuted until January 2020 when the case was dismissed.

304.    Her life was destroyed because of this, and because charges were pending she could not visit her home state of California. She is now facing foreclosure and the loss of her home.

## Plaintiff Brian Steinberg

305.    Brian Steinberg is a citizen of New Jersey but was arrested and detained in Las Vegas, Nevada.

306.    Steinberg, a dentist, decided to take a two-week vacation out to Las Vegas. Upon landing he rented a Hertz car on March 2, 2018. He stopped at the Flamingo for 30 minutes, but when he came back police immediately detained and arrested him.

307.    He was then interrogated and searched for two terrifying hours by police who claimed he stole the car.

308.    Only at the end of this ordeal did the police let him go. Hertz had "lost" this car from inventory. Instead of conducting a proper search of Hertz's lots and realizing that it was still at a Hertz location, Hertz reported the car as stolen without any adequate investigation.

309.    Then, despite having told the police the car was stolen, Hertz did not update its systems. The Henderson location then rented Steinberg the "stolen" car.

310.    This is absurd and outrageous. As a result, Steinberg was detained for two hours, terrified, and his vacation was ruined.

## Plaintiff Antwone Person

311.    Antwone Person is a citizen of Illinois was prosecuted in Cook County, Illinois.

312.    Person rented a Hertz vehicle starting on April 29, 2019. Person validly extended the rental.

313.    On June 14, 2019, Person was arrested and hauled off to jail. He was completely baffled because he thought he had a valid rental. He was released after several hours and not told what was happening. Right now he is in legal limbo.

314.    It turned out that Hertz had falsely told the police that Person had rented a car on April 15 which was due back on April 29, 2019, but had not been returned. This was untrue.

315.    As a result of this false report, Person was reported to the police arrested, jailed, and prosecuted.

## Plaintiffs Michael and Amanda Koss

316.    Michael and Amanda Koss are citizens of Oklahoma and were arrested, prosecuted, and imprisoned in Oklahoma City jail.

317.    They had lived in Washington, but were moving to Oklahoma to be near Michael's dying dad. Michael had done several tours in Iraq as a Marine, and then several more overseas with General Dynamics. As a result, he had rented with Hertz probably around 50 times. He had so many points compiled he sometimes could rent vehicles for free.

318.    Michael and Amanda went to the Hertz location at the Seattle-Tacoma Airport in early 2013, and rented a car. Because the power was out they filled out a paper rental contract. They informed the Hertz employee they wished to rent the vehicle for two months, maybe longer, so the Hertz employee made an open-ended, handwritten contract and went on their way.

319.    Michael conducted his rental the same way he had fifty times before.

320.    One night a couple months later, Michael and Amanda pulled up to his father's house to cook him dinner. However, as they drove in to the neighborhood approximately 8 police cars were following them.

321.    When they parked, and officer walked up to them and asked if this was their car. They responded that they were renting it and were immediately placed in handcuffs. This occurred in front of the entire neighbor, and Michael's parents and grandmother.

322.    Then, because he legally had a firearm, he was accused of possessing a firearm during the commission of a felony. This was a surreal, nightmarish experience.

323.    They were then jailed for approximately 12 hours, a humiliating and terrifying experience. Upon being released, they showed up to multiple hearing dates but their names were never called. To this day, the charges remain pending against them and have never been withdraw.

324.    After this experience, Michael walked into the Hertz corporate offices in Oklahoma City demanding answers, but was ignored by Hertz and asked to leave.

325.    As best as can be ascertained, Hertz never recorded the Kosses' rental correctly, did not investigate or call the Kosses, and reported the vehicle as missing and stolen—despite it having been rented to a customer.

326.    The ramifications of Defendants' conduct have been severe. Michael's PTSD from multiple combat tours was triggered and he experienced deep depression. Family members pushed Amanda to divorce Michael, unable to believe that a large corporation like Hertz could do such a thing. Michael's grandmother and father both died thinking it was possible that he stole a car.

327.    Both Michael and Amanda are confronted with what life could have been

328.    Monetarily, the damages have been severe, because both have pending felonies against them. Michael's earning capacity was $250,000 prior to this false report and he had a

security clearance. Now, he has to work an IT job, essentially taking a $150,000 a year pay cut. Amanda is a trained physical therapist, but due to the pending felony, instead bartends. They each had to pay $2,400 in bail, and then another $8,000 for a criminal lawyer. The property confiscated during the arrest was also worth around $5,000.

329.    Michael Koss is an American hero, but was treated with absolute disrespect by Hertz and the other defendants.

## Plaintiff Cheryl Young

330.    Cheryl Young is a citizen of California and was prosecuted in San Joaquin County, California.

331.     Young rented a car from the Manteca, CA location in May 2018 and gave them her Mastercard. For the first three weeks she extended with the location, and even visited the location to explore exchanging her vehicle.

332.    However, after three weeks, she then started extending with the 1800 corporate extension number and kept the car.

333.    As the rental continued into July she spoke with Hertz, and if there was an issue she called Hertz to extend and confirm she could use the rental.

334.    Then in early August 2018, she received an email from a Terry Wells, claiming that Hertz was taking legal action to recover the car. Wells apparently worked for a company hired by Hertz named Collateral Consultants.

335.    This was confusing, as Young had been extending the rental. Nevertheless, on August 9, 2018, Young told Wells she was retrurning the car and wrote: "I apologize for the inconvenience. I have no intention of stealing the vehicle." On August 10, 2018, she let Wells know the car had been returned by email, as well as called the Manteca location. In a voice call,

Wells told Young that once the car was verified returned any action against Young would be stopped and taken care of.

336.    Following the return, Hertz billed Young $3,932.47. This was a significant overbilling. Young spoke with Hertz repeatedly and the bill was reduced to $1,899.47. Young's receipt says "Amount Due: 0.00 USD." At no point was she told by billing that she was being prosecuted.

337.    It was only in April 2019 that Young learned when applying for a job that Hertz had actually filed a police report on August 9, 2019, and then had formal charges filed against her on September 13, 2018. Why Hertz would initiate and continue a prosecution against a customer who had returned the car and paid?

338.    Because there was a pending felony case against her, Young was turned down for multiple jobs. She is a nurse/healthcare administrator and background checks are required.

339.    Unable to get work, she contacted Hertz to confirm that the vehicle was returned and ask why she was being prosecuted. A Hertz employee confirmed the return, but was singularly unhelpful about having the clearly unwarranted prosecution dropped. She was told to Google "OKC, OK":

[*intentionally left blank*]



340.    She later emailed Hertz' corporate security manager Clifford Gray in December 2019 asking him to drop the charges and pull the warrant. Gray falsely told her that Hertz could not stop pursuing the case against her.

341.    Young was forced to go to Court until the case was dropped shortly before Christmas 2019.

**Plaintiff Stephnie and James Keene**

342.    Stephanie and James Keene are citizens of Florida and James was arrested in Pinellas County, Florida.

343.    James and Stephanie were rented a Hertz car on a Tuesday night in August 2019 by their insurance company from the Clearwater Hertz.

344.    On Wednesday morning, James took the car to wor. On the way back from work James was dropping an employee off at her apartment while Facetiming with his wife Stephanie.

345.    Yet, as he pulled into the employee's parking lot, multiple police officers pulled him over with guns out. His wife was panicking, seeing this develop on Facetime.

346.    She quickly drove to the apartment complex and watched as her husband was detained, arrested, and accused of stealing a car for 1.5 hours as the police spoke with Hertz.

347.    James desperately explained to them that he just rented the car a day earlier and that there was no way he could have stolen it. He was finally let go.

348.    It was later learned that the license plate on the car rented to the Keenes was reported stolen by Hertz out of Jacksonville, FL one year prior on a different car. During that time span Hertz absurdly failed to realize that the plate was reported stolen, transferred the plate to a new car, completed all the paperwork, and then rented out the stolen plate on a new car to the Keenes.

349.    The experience was entirely humiliating and terrifying for both Keenes. The Keenses tried to call a district manager to complain about their treatment, but could not get anyone. Then, randomly, a customer service representative called them to ask how they enjoyed their rental. Only at this point were they able to speak with a manager at the Clearwater location.

350.    The manager told them that this happens because the corporate and local computer systems cannot talk to each other and are separate.

## Plaintiff Barbara Fernandez

351.    Barbara Fernandez is a citizen of Florida who resides in Miami-Dade. She was prosecuted in Alachua County, Florida.

352.     On February 7 2017, Plaintiff Barbara Fernandez rented a Toyota Yaris from the Hertz location in Gainesville, FL. She was a Hertz Gold Member.

353.    The rental ticket shows that the rental was initially for one week (due 2/14/2017). However, Ms. Fernandez had told the two Hertz employees renting her the car (one black and one

white man who were both in their 40s) that it would be a long-term rental since she and her husband were in the middle of moving houses. They told her to call each week to extend the rental—which she did every week.

354.    When first renting the vehicle she provided a valid credit card from Regions Bank, and also gave Hertz her temporary address (a La Quinta Inn in Miami) since she was in the middle of moving. She specifically informed the Hertz employees that the address on her driver's license was out of date.

355.    For the first three weeks, she extended the rental with the Gainesville branch. However, after three weeks she started to use the corporate rental extension number listed by Hertz on the rental material due to cheaper rates.

356.    At no point did any representative tell her there was a problem with the rental. On May 1, 2017, she paid Hertz $2,304.73 on her Regions Bank card. Ms. Fernandez continued to call and confirm rental extensions with Hertz corporate after this payment, and there was no issue. She arranged with Hertz corporate to return the rental on June 7, 2017 in Miami.

357.    On June 6, 2017, her husband Jose saw someone trying to tow away the rental car from the hotel parking lot. When confronted, it was a repo man who said that he had to take the car. Ms. Fernandez demanded that the police be called.

358.    When the police arrived, to her surprise they told her Hertz had reported the car stolen as of May 3, 2017, in Gainesville. Hertz was saying that the car was due back on March 27, 2017. This was entirely untrue; Fernandez had been diligently extending the rental and did not suddenly stop in March 2017. She was confused because she had been constantly talking to Hertz who never said anything about this.

359.    Ms. Fernandez was scared and frightened, but pulled out her phone and showed the police the $2,304.73 payment on May 1, 2017, and additional pending charges on her bank account for rental extensions after May 1, 2017.

360.    This is documented in the police incident report: "Ms. Fernandez showed me via phone bank statements that on 05/01/2017 she had paid $2,304.73 to Hertz rental car company and has not missed a payment since she had rented the listed vehicle."

361.    Incredibly, Hertz's May 3, 2017 theft report alleged that she had never paid for the rental and owed $2,304.73—the exact amount she had already paid several days earlier. She was not arrested at that time, and was not told there was any further problem.

362.    Unfortunately, two years later in 2019 her daughter was driving a car in Ms. Fernandez's name. The police stopped the car and informed her daughter that her mother had a warrant out for her arrest.

363.    Shocked, Ms. Fernandez immediately turned herself in in August 2019 trusting that the mistake would be quickly corrected. Instead, she spent the night in a jail cell, and realized to her horror that she was in the middle of an Orwellian nightmare.

364.    She was then prosecuted for half a year, until just a few days before trial the prosecutor dropped all the charges on or around January 17, 2020.

## Plaintiffs Thomas and Michael Channell

365.    Michael and Thomas John Channell are citizens of Florida and were prosecuted in Palm Beach County, Florida. Thomas is Michael's father.

366.    Michael and Thomas Channell rented a Chevy Malibu from Hertz in November 2017. They specifically had a multi-month contract approved by Hertz, where the rental continues month over month. Instead of being charged at the end of the rental, in multi-month rentals the

renter is charged at end of every month period. The Channells were charged around the 22nd or 23rd of each month.

367.    In January 2018, the Channells exchanged the Malibu for a Toyota Camry, but their multi-month rental continued unaffected, and was supposed to continue until June.

368.    However, as Thomas Channel was driving on May 12, 2018, he was pulled over by the police. To his shock, they accused him of car theft, and held him at gunpoint on the pavement as he desperately tried to explain that it was just a rental car.

369.    As he was panicking on the highway he began to have a massive heart attack. He was rushed to the emergency room and had to have emergency heart surgery.

370.    As he was undergoing surgery, Hertz called his son Michael, apologized, and told him where the impound lot was to pick up the car.

371.    It turned out that when the Channels had exchanged the cars in January, Hertz had treated the exchange addendum as a whole new contract with a due date of February 22, 2018.

372.    Hertz Vehicle Control had failed to realize that there was a continuing multi-month contract, which even the most basic investigation should have caught.

373.    As a result, Hertz reported Michael Channell for car theft, resulting in a police report against Michael and the arrest of his father. Not only did Thomas Channell rent the car with Michael, and was supposed to be an authorized driver, but Hertz also owed a duty to Thomas because as a family member of Michael it was entirely foreseeable that Thomas would be in the car.

374.    As a direct and proximate result of Hertz's conduct, Thomas Channell suffered a heart attack, they were both falsely accused of car theft, and the Channells have been subjected to extraordinary mental and emotional pain and suffering. Hertz's conduct also increased the risk of harm to Thomas Channell and was a substantial factor in bringing about this injury.

**Plaintiff Jessica Gurumendi**

375.    Jessica Gurumendi is a citizen of Florida, who was harmed in Chicago, Illinois.

376.    Jessica rented a Chevy Impala from Dollar, which is owned by Hertz, at the Orlando, FL airport. She rented the car because she was driving to Illinois. The rental started on December 14, 2019, and was originally supposed to expire on January 4, 2020. On January 3, she extended the rental until February 5, 2020.

377.    Yet, on January 31, 2020, her car turned off and a tow company appeared out of nowhere claiming it was stolen in Illinois. She called customer service and was told that it had been remotely deactivated. She was then transferred to roadside assistance, and spoke with someone named Cameron.

378.    She explained that she had extended the rental and that this should not be happening. Cameron acknowledged that there was an extension in the system for a contract with a number of 187895525 for a car with Michigan plate DZD2917.

379.    Later, Jessica learned from the O'Hare airport location that the rental had been botched from the beginning. Defendants thought she had rented a blue Hyundai 2019, not an Impala. The extensions on her contract were therefore not being processed correctly.

380.    Instead, Defendants had reported the Impala as stolen without any real investigation and without knowing if it was even stolen.

381.    After spending hours resolving this nightmare, she was issued an accurate and updated contract extending the rental out to February 14, 2020.

382.    As a result of Defendants' towing the car before Jessica could fully clean out her belongings, and not letting her access the vehicle, an approximately $10,000 ring went missing.

383.    The entire situation was extremely stressful, as was the loss of the engagement ring.

# Defendants

384.    All Hertz companies, directors, and officers are referred to jointly as "Hertz" throughout this complaint, unless otherwise specified.

385.    Defendant Stone has been President and CEO of Hertz since May 16, 2020.  Stone previously held the position of Chief Retail Operations Officer since March 6, 2018.

386.    Defendant Marinello was President and Chief Executive Officer of Hertz from January 3, 2017 until May 16, 2020. She remains a consultant and a board director for Hertz.

387.    Defendant Tague was President and CEO of Hertz from November 21, 2014 to January 2, 2017. He was aware of the conduct and deficient policies and continued their implementation.

388.    Defendant Frissora was CEO and Executive Chairman of Hertz from January 1, 2007 until September 7, 2014. Under Frissora, Hertz promulgated and used highly defective theft reporting polices and procedures which led to customers and vehicles being wrongfully reported to the police.

389.    Defendant Galainena is an Executive Vice President and Secretary and has also served as General Counsel for Hertz since April 1, 2019.

390.    Defendant Frecker is former General Counsel and Executive Vice President of Hertz. He held these positions until he resigned on March 19, 2019. Frecker previously held other legal positions in Hertz dating back to 2008.

391.    Defendant Esper has served as Senior Vice President and Chief Accounting Officer of Hertz since November 2018. He previously served as Vice President and Controller of the Company beginning March 2018.

392.    Defendant Hunziker has served as Senior Vice President of Investor Relations, Corporate Communications and Corporate Responsibility since January 2017 and Senior Vice President of Investor Relations since December 2009 for Hertz.

393.    Defendant Kennedy served as a Senior Executive Vice President and Chief Financial Officer of Hertz from December 2013 to August of 2018.

394.    Defendant Allen has served as Executive Vice President and Chief Marketing Officer of Hertz since October 2017.

395.    Defendant Foland served as Senior Executive Vice President and Chief Revenue Officer from January 2015 until February 28, 2017.

396.    Defendant Kuppuswamy has served as Executive Vice President and Chief Human Resources Officer of the Company since September 2017.

397.    Defendant Best served as Executive Vice President and Chief Information Officer of Hertz from January 2015 to April 2018. Best oversaw Hertz's global information technology functions.

398.    Defendant Marren served as Executive Vice President of North American Rental Car Operations from August 2015 until May 2017.

399.    Defendant Deschamps has served as the Executive Vice President of Pricing, Revenue Management and Fleet Operations since November 2017 and the Senior Vice President of Pricing and Revenue Management since January 2016.

400.    Defendant Jackson has served as Executive Vice President and Chief Financial Officer of Hertz since September 2018.

401.    Defendant Zem served as Executive Vice President and Chief Human Resources Officer from June 2015 until September 2017.

402.    Defendant Kramer served as Senior Vice President and Chief Accounting Officer of Hertz from May 2014 until November 2018.

403.    Defendant Perry has served as Executive Vice President and Chief Information Officer of Hertz since August 2018.

404.    Defendant Jauchius served as Executive Vice President and Chief Marketing Officer of Hertze from October 2015 until March 2017.

405.    Defendant Callahan has served as the President of Donlen Corporation since January 2013. Mr. Callahan succeeds Gary Rappeport, the former CEO of Donlen, who retired on December 31, 2012, as the principal executive officer of Donlen. Mr. Callahan served, in addition to President of Donlen, as Chief Operating Officer of Donlen since September 2008. Prior to being named Chief Operating Officer, Mr. Callahan served as Executive Vice President and Senior Vice President of various aspects of operations at Donlen since 2006.

406.    Defendant Massengill has served as Senior Vice President and Treasurer of Hertz Holdings and Hertz since July 2008.

407.    Defendant Mukherjee has served as a director of Hertz Global Holdings and Hertz since May 2018.

408.    Defendant Sheehan has served as a director of Hertz Global Holdings and Hertz since August 2018.

409.    Defendant Keizer has been a director of the Company since October 15, 2015. Keizer has been the Independent Non-Executive Chair of the Company since January 2017. Keizer is also a member of the audit committee of the Board (the "Audit Committee").

410.    Defendant Barnes has been a director of the Company since May 18, 2016. Barnes is also a member of the Audit Committee and the compensation committee of the Board (the "Compensation Committee").

411.    Defendant Everson has been a director of the Company since May 15, 2013. Thus, Defendant Everson was a member of the Board during much of the misconduct complained of herein.

412.    Defendant Intrieri has been a director of the Company since September 15, 2014. Defendant Intrieri was appointed to the Board pursuant to a Nomination and Standstill Agreement (the "Nomination and Standstill Agreement") the Company entered into with Carl C. Icahn.

413.    Defendant Ninivaggi has been a director of the Company since September 15, 2014. Defendant Ninivaggi was appointed to the Board pursuant to the Nomination and Standstill Agreement.

414.    Defendant Cho has been a director of the Company since May 31, 2017. Defendant Cho was appointed to the Board pursuant to the Nomination and Standstill Agreement.

415.    Defendant Hertz Global Holdings, Inc., is a Delaware corporation with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Its registered agent for service of process within the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Hertz is engaged in the automobile and equipment rental businesses worldwide. The Company's stock is traded on the New York Stock Exchange under the ticker symbol "HTZ."

416.    Defendant The Hertz Corporation is a Delaware corporation with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Its registered agent for service of process within the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The Hertz Corporation runs the car rental operations, vehicle control, corporate security, and all other functions pertinent to this lawsuit, including for Hertz subsidiaries and Dollar and Thrifty. Specifically, Hertz vehicle control and corporate security handle theft reporting for Dollar and Thrifty.

417.    Defendant Rental Car Intermediate Holdings, LLC is a Delaware corporation with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Its registered

agent for service of process within the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

418.    Defendant Hertz Investors, Inc. is a Delaware corporation with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Its registered agent for service of process within the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

419.    Defendant Hertz Vehicles LLC is a Delaware corporation with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Its registered agent for service of process within the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Hertz Vehicles LLC is the company that is listed as actually owning the vehicles rented out by Hertz.

420.    Defendant Hertz Vehicle Financing LLC is a Delaware corporation with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Its registered agent for service of process within the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

421.    Defendant Hertz Vehicle Financing II LP is a Delaware corporation with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Its registered agent for service of process within the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

422.    Defendant Hertz Local Edition Corp. is a Delaware corporation with principal executive offices located at 8501 Williams Road, Estero, Florida 33928. Its registered agent for service of process within the State of Delaware is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

423.    Dollar Rent A Car, Inc. is an Oklahoma Corporation with a principal office located in Hertz's Florida Offices.

424.    Thrifty Rent-A-Car System LLC is an Oklahoma corporation with principal executive offices located at Hertz's Florida Offices.

425.    Defendant Icahn Associates Holding LLC is a Delaware corporation with principal executive offices located at 767 Fifth Avenue, Suite 4700, New York, NY 10153. Ichan Associates owns approximately 40% of Hertz stock, or approximately 55 million shares. IA is a subsidiary of Icahn Enterprises.

426.    Defendant Icahn Enterprises LP is a Delaware corporation with principal executive offices located at 767 Fifth Avenue, Suite 4700, New York, NY 10153.

427.    Icahn Enterprises Holdings LP is a Delaware corporation with principal executive offices located at 767 Fifth Avenue, Suite 4700, New York, NY 10153.

428.    Icahn Capital LP is a Delaware corporation with principal executive offices located at 767 Fifth Avenue, Suite 4700, New York, NY 10153.

429.    Icahn Enterprises GP, Inc. is a Delaware corporation with principal executive offices located at 767 Fifth Avenue, Suite 4700, New York, NY 10153.

430.    The five Icahn defendants actively manage Hertz, actively appoint board members, actively participate in appointing and removing officers, and participate in making policy at Hertz. The Icahn Defendants, indeed all Defendants, have been aware of the serious problems that affect Hertz's theft reporting since at least September 2017 but have done nothing to fix the issues despite having the ability and duty to do so.

*****

# Jurisdiction, Venue, and Joinder

431.    Personal Jurisdiction over the corporate defendants in the State of Delaware is proper because the corporate defendants are incorporated here and are citizens of this state. The corporate defendants also carry on business in this forum which has resulted in at least one plaintiff being falsely reported to the police in New Castle County. Jurisdiction over the individual defendants is appropriate under § 3114 because they are directors and officers of Hertz, and have consented to jurisdiction in this state.

432.    Venue is appropriate in this forum because this matter involves significant issues of Delaware law due to the fact that the Defendants have availed themselves of incorporation here, Defendants transact business in this state, and at least some of Defendants' conduct and harm occurred in this forum.

433.    Joinder of the plaintiffs is appropriate in this case because the plaintiffs are asserting a "right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action." Joinder of the defendants is appropriate in this case because the plaintiffs have asserted against the defendants "jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action."

434.    Specifically, for purposes of joinder, the operative occurrence or series of occurrences from which Plaintiffs' right to relief arise were the defendants' drafting, institution, maintaining, and failure to revise Hertz's extraordinarily deficient theft reporting policies, all of which imposes liability on the corporate and individual defendants for inter alia negligent supervision and management. The most significant date is on November 14, 2017, when all

Defendants were directly and unambiguously warned after losing a malicious prosecution trial in Philadelphia in 2017, that Hertz's theft reporting policies and procedures—including W7-02—were extraordinarily deficient and causing grievous harm to customers.

435.    All defendants at all points failed to take steps to revise the policies and procedures, and in fact affirmatively approved of the continued use of these policies and procedures. The negligent, grossly negligent, reckless, intentional and/or malicious drafting of these polices and procedures, failure to revise these policies and procedures, and the continuing use of these policies and procedures directly and proximately caused significant harm to all plaintiffs.

436.    All defendants are also liable for the other alleged torts, including inter alia malicious prosecution, abuse of process, intentional/negligent infliction of emotional distress, false arrest/imprisonment, and unfair trade practices caused by these tortious business practices.

437.    The defendants' concerted, coordinated, and deliberate course of conduct not only constitutes an occurrence of series of occurrence giving rise to Plaintiffs' claims, but it also gives rise to common issues of fact and law as to all of Plaintiffs' claims.

*****

## COUNT I – Malicious Prosecution

*All Plaintiffs*
*(excluding Higgs, Sterlin, Michael Koss, Amanda Koss, Antwone Person)[4]*
*v.*

*All Defendants*

438.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

439.    The elements of malicious prosecution are: (1) the commencement of a criminal prosecution against the plaintiff; (2) causation (initiation, procurement, or continuation) of the action by the defendant; (3) termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the absence of probable cause for the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff.

440.    All corporate defendants (jointly known as "Hertz") are alleged to be vicariously liable for the conduct of their employees, including the individual Defendants.

441.    The individual defendants are liable for this tort due to their participation in crafting the policies and procedures used to prosecute the plaintiffs, as well as their negligent, grossly negligent, reckless, knowing, intentional, and/or malicious supervision and management of Hertz's theft reporting process.

442.    All Defendants' conduct, actions, and omissions were negligent, grossly negligent, reckless, malicious, and/or intentional.

443.    At all points the conduct, actions, omissions of the individual Defendants and other Hertz employees was foreseeable to Hertz and done at Hertz's direction and with Hertz's blessing.

---

[4] Because plaintiffs Higgs, Sterlin, Kosses, and Person's criminal cases are still pending, they cannot yet bring a cause of action against Defendants for malicious prosecution.

444.     Hertz failed to follow, and in fact deliberately disregarded, its own basic standard operating procedures and protocols designed to prevent false police reports, including Hertz national policy W7-02(a)(4) and (17) pertaining to investigating and verifying theft reports.

445.     Hertz policy W7-02(D) is furthermore intentionally drafted and implemented to obtain police prosecutions by providing false payment information to the authorities.

446.     Defendants are unjustifiably turning what they know are civil disputes into criminal matters. Defendants knew or should have known that all Plaintiffs had no criminal intent to steal a rental vehicle.

447.     The initiation and continuation of the theft allegations by Defendants lacked probable cause because *inter alia* they: (1) falsely told the authorities the renter had not paid for the rental car, (2) conveyed a false history of the renters' contacts and extension history with Hertz to the authorities, (3) failed to tell police that Hertz systems erase rental extensions without notice to customers or Hertz employees, (4) failed to convey to the police exculpatory information in Hertz's rental records and contract notebook, (5) were never properly investigated or verified, and (6) because Hertz destroyed all rental information regarding the renters thereby preventing the authorities and the accused from obtaining exculpatory information.

448.     In several cases described in this complaint (such as Julius Burnside and Cheryl Young), despite the renter voluntarily returning and paying for the car, Defendants inexpcaliby pursued criminal charges against the Plaintiffs for many months and years despite being asked to drop the prosecutions.

449.     In all instances, when Defendants were asked to help the prosecutions, they falsely told the Plaintiffs that they were powerless to do so, thereby disregarding their duty not to continue prosecutions for which there is no probable cause and which Defendants did not even intend to pursue.

450.    In some cases, in conjunction with the above failures, Defendants caused the arrest and prosecution by the customers without probable cause by (1) failing to realize that the vehicle had been rented out and then reporting the vehicle stolen as lost inventory despite having no idea if it was stolen (e.g., Stepanyan and Gurumendi), or (2) absurdly renting cars that were previously reported stolen to unwitting customers (e.g., Steinberg and the Keenes).

451.    The facts applicable to each individual Plaintiff are incorporated by reference.

452.    Defendants directly and proximately caused police and prosecutorial actions to be initiated and continued against the Plaintiffs without probable cause. Not only was materially false information provided to the police, but Defendants failed to supplement omitted and material information to the police and prosecutorial authorities, including information on payment and extensions.

453.    Defendants failed to withdraw or otherwise inform the police and prosecutorial authorities that they wished to withdraw the charges against the Plaintiffs, and/or not continue with charges or prosecution, despite the absence of probable cause.

454.    Defendants, in filing the police reports, did not intend to follow through on the prosecutions.

455.    Defendants is not using the criminal justice system for the legitimate purpose of bringing alleged criminals to justice, but instead as a free taxpayer funded repo service to cut costs. Defendants have long known that it has routinely been falsely reporting innocent customers for theft, or lost cars as stolen, but has taken no steps to correct the problem.

456.    As a direct and proximate result of Defendants' conduct in initiating criminal complaints without probable cause and failing to withdraw the criminal complaints as set forth above, Plaintiffs have suffered severe damages, including but not limited to monetary damages,

loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

457.    As a direct and proximate result of Defendants using the criminal justice system for an objective other than bringing Plaintiffs to justice, Plaintiffs have suffered severe damages, including but not limited to monetary damages, loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

458.    Plaintiffs also request punitive damages due to the outrageous behavior of Defendants, their reckless disregard for Plaintiffs' rights and life, and because Defendants have had years of notice that the company is wrongly reporting innocent customers for car theft but has done nothing to fix the problems but instead continue to make false and unverified police reports.

*****

## COUNT II – Abuse of Process

*All Plaintiffs*
*v.*

*All Defendants*

459.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

460.    A defendant is liable for abuse of process when prosecution is instituted by the defendant against the plaintiff or continued against the plaintiff for an ulterior motive or purpose not warranted by law, and which has no proper purpose.

461.    Hertz is alleged to be vicariously liable for the conduct of its employees, including the individual Defendants.

462.    The individual defendants are liable for this tort due to their participation in crafting the policies and procedures used to prosecute the plaintiffs, as well as their negligent, grossly negligent, reckless, knowing, intentional, and/or malicious supervision and management of Hertz's theft reporting process. The individual defendants also owe a personal duty to the Plaintiffs.

463.    All Defendants' conduct, actions, and omissions were negligent, grossly negligent, reckless, malicious, and/or intentional.

464.    At all points the conduct, actions, and omissions of the individual Defendants and other Hertz employees was foreseeable to Hertz and done at Hertz's direction and with Hertz's blessing.

465.    The initiation and continuation of criminal proceedings against Plaintiffs by Defendants was done without probable cause.

466.    Defendants acted for a purpose other than bringing plaintiffs to justice as they knew or should have known when they filed the criminal complaint against Plaintiffs that Defendants

never intended to pursue criminal cases against the Plaintiffs and were instead using the police as a taxpayer funded repo service.

467.    Hertz knew that the plaintiffs (1) had permission to use the rentals, (2) had provided payment or a letter of credit, and (3) otherwise had no intent to steal the car.

468.    At no point did Defendants correct the misrepresentations made in their police report and testimony, nor did they withdraw the prosecution despite there being no probable cause to continue with it.

469.    Hertz is not using the criminal justice system for the legitimate purpose of bringing alleged criminals to justice, but instead as a free taxpayer funded repo service to cut costs. Hertz and the individual Defendants know that it has routinely been falsely reporting innocent customers for theft, but has taken no steps to correct the problem.

470.    Defendants made this false complaint carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously. Hertz failed to follow, and in fact deliberately disregarded, its own basic standard operating procedures and protocols designed to prevent false police reports, including Hertz national policy W7-02.

471.    Defendants' failure to withdraw the criminal complaint they initiated against Plaintiffs was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

472.    As a direct and proximate result of Defendants' conduct in initiating a criminal complaint without probable cause and failing to withdraw the criminal complaint as set forth above, Plaintiff has suffered severe damages, including but not limited to monetary damages, loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

473.    As a direct and proximate result of Defendants using the criminal justice system for an objective other than bringing Plaintiffs to justice, Plaintiffs have suffered severe damages, including but not limited to monetary damages, loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

474.    Defendants made these false complaints carelessly and/or negligently and/or recklessly and/or knowingly and/or intentionally and/or maliciously. Defendants failed to follow, and in fact deliberately disregarded, its own basic standard operating procedures and protocols designed to prevent false police reports, including Hertz national policy W7-02.

475.    Defendants' failure to withdraw the criminal complaints it initiated against Plaintiffs was careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious.

476.    As a direct and proximate result of Defendants' conduct in initiating criminal complaints and continuing them without probable cause as set forth above, Plaintiffs have suffered severe damages, including but not limited to monetary damages, loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression..

477.    As a direct and proximate result of Defendants using the criminal justice system for an objective other than bringing Plaintiffs to justice, Plaintiffs have suffered severe damages, including but not limited to monetary damages, loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

478.    Plaintiffs also request punitive damages due to the outrageous behavior of Defendants, their reckless disregard for Plaintiffs' rights and life, and because Defendants have

had years of notice that the company is wrongly reporting innocent customers for car theft but has done nothing to fix the problems but instead continued to make false and unverified police reports.

*****

**COUNT III – False Arrest/Imprisonment**

*All Plaintiffs*
*v.*

*All Defendants*

479.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

480.    A defendant is liable for abuse of process when prosecution is instituted by the defendant against the plaintiff or continued against the plaintiff for an ulterior motive or purpose not warranted by law, and which has no proper purpose.

481.    Hertz is alleged to be vicariously liable for the conduct of its employees, including the individual Defendants.

482.    The individual defendants are liable for this tort due to their participation in crafting the policies and procedures used to prosecute the plaintiffs, as well as their negligent, grossly negligent, reckless, knowing, intentional, and/or malicious supervision and management of Hertz's theft reporting process. The individual defendants also owe a personal duty to the Plaintiffs.

483.    All Defendants' conduct, actions, and omissions were negligent, grossly negligent, reckless, malicious, and/or intentional.

484.    At all points the conduct, actions, and omissions of the individual Defendants and other Hertz employees was foreseeable to Hertz and done at Hertz's direction and with Hertz's blessing.

485.    The initiation and continuation of criminal proceedings against Plaintiffs by Defendants was done without probable cause.

486.    As a direct and proximate result of the false, incomplete, and inaccurate information provided to police, Defendants caused the plaintiffs to be wrongfully detained, arrested, and/or imprisoned, or otherwise unfree to leave.

487.    As a direct and proximate result of Defendants' conduct, actions, and omissions, Defendants caused severe damages to Plaintiffs, including but not limited to monetary damages, loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression

488.    Plaintiffs also request punitive damages due to the outrageous behavior of Defendants, their reckless disregard for Plaintiffs' rights and life, and because Defendants have had years of notice that the company is wrongly reporting innocent customers for car theft but has done nothing to fix the problems but instead continued to make false and unverified police reports.

*****

**COUNT IV – Intentional/Negligent Infliction of Emotional Distress**

*All Plaintiffs*
*v.*

*All Defendants*

489.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

490.    The elements of intentional infliction of emotional distress are that Defendant (1) acted intentionally or recklessly, (2) acts and omissions were extreme and outrageous, (3) Plaintiff suffered serious emotional distress, and (4) Defendant's conduct was a substantial factor in bringing about Plaintiff's serious emotional distress.

491.    The elements of negligent infliction are that (1) the Defendant was negligent, (2) the plaintiff suffered serious emotional distress, and (3) Defendant's negligence was a substantial factor in causing the serious emotional distress.

492.    Hertz is alleged to be vicariously liable for the conduct of its employees, including the individual Defendants.

493.    The individual defendants are liable for this tort due to their participation in crafting the policies and procedures used to prosecute the plaintiffs, as well as their negligent, grossly negligent, reckless, knowing, intentional, and/or malicious supervision and management of Hertz's theft reporting process. The individual defendants also owe a personal duty to the Plaintiffs.

494.    All Defendants' conduct, actions, and omissions were negligent, grossly negligent, reckless, malicious, and/or intentional.

495.    At all points the conduct, actions, and omissions of the individual Defendants and other Hertz employees was foreseeable to Hertz and done at Hertz's direction and with Hertz's blessing.

496.    Knowing full well that Defendants' theft reporting procedures and policies resulted in false police reports, and know that Defendants were using the authorities for improper purposes, Defendants nevertheless initiated and continued criminal actions which led to arrest, jailing, and prosecution of Plaintiffs.

497.    Defendants acted recklessly and/or maliciously and/or negligently and/or for a purpose other than bringing plaintiffs to justice as they knew or should have known when they initiated and continued the criminal complaint against Plaintiffs that they were not guilty of any c*ri*me.

498.    Defendants acted with negligence and/or reckless disregard and/or intentional disregard of the probability that Plaintiffs (and many other customers across the country) would suffer severe emotional distress as result of their actions and omissions.

499.    Defendants' failure to withdraw the criminal complaint they initiated against Plaintiffs were careless and/or negligent and/or reckless and/or knowing and/or intentional and/or malicious. Defendants acted with negligent and/or reckless disregard of the probability that Plaintiffs (and many other customers across the country) would suffer severe emotional distress as result of its actions and omissions.

500.    As a direct and proximate result of Defendants' conduct in initiating criminal complaints and failing to withdraw the criminal complaints as set forth above, Plaintiffs have suffered severe damages, including but not limited to monetary damages, loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.. Defendants' conduct was a substantial factor in causing Plaintiffs serious and severe emotional distress. Any reasonable person would be unable to cope with arrest, jailing, and prosecution.

501.    Defendants' failure to withdraw the criminal complaint they initiated against Plaintiff was intentional and/or reckless and/or negligent.

502.    The acts and omissions of Defendants were extreme and outrageous in a civilized society.

503.    The use of the criminal justice system is of the utmost seriousness and innocent individuals who have done nothing wrong should not be thrown in prison without warning and prosecuted for felonies, nor should their name be associated with extremely damaging felonious charges they did not commit.

504.    As a result of the intentional and/or reckless and/or malicious and/ outrageous conduct of Defendants, punitive damages are demanded of Defendants. This concerted and deliberate conduct by a company over many years, perpetrated and endorsed by its top officers and directors, is utterly alien to a civilized society and must be condemned and punished in the strongest possible terms.

*****

**COUNT V – Negligence/Gross Negligence**

*All Plaintiffs*
*v.*

*All Defendants*

505.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

506.    The elements of negligence are (1) duty, (2) breach, (3) causation, and (4) damages.

507.    Hertz is alleged to be vicariously liable for the conduct of its employees, including the individual Defendants.

508.    The individual defendants are liable for this tort due to their participation in crafting the policies and procedures used to prosecute the plaintiffs, as well as their negligent, grossly negligent, reckless, knowing, intentional, and/or malicious supervision and management of Hertz's theft reporting process. The individual defendants also owe a personal duty to the Plaintiffs.

509.    All Defendants' conduct, actions, and omissions were negligent, grossly negligent, reckless, malicious, and/or intentional.

510.    At all points the conduct, actions, and omissions of the individual Defendants and other Hertz employees was foreseeable to Hertz and done at Hertz's direction and with Hertz's blessing.

511.    Defendants owed Plaintiffs a duty because they rented a car from Defendants.

512.    All defendants, including the individual defendants, had a duty to conduct the rental properly and to not falsely report Plaintiffs to the police because (1) Defendants rented a vehicle to Plaintiffs, (2) undertook to file a police report with respect to these persons, and (3) because it was foreseeable that filing a false police report that Plaintiffs stole the vehicles would result in severe damages. All Defendants also undertook to draft, institute, and promulgate theft reporting polices and processes, resulting in a duty to Plaintiffs.

513.    At all points Defendants had notice that Hertz had a serious problem with making false police reports, and keeping track of renter contacts, but at no point corrected these issues or ceased making the reports. This notice was especially apparent after the September 2017 Grady verdict, the November 13, 2017 order for a punitive damages trial, and a November 14, 2017 letter to then general counsel and executive vice president Richard Frecker detailing Hertz's problems and failures.

514.    At all points Defendants had notice that Defendants were directing Hertz personnel to ignore W7-02(a)(4) and (17), and that they also knew and intended that false police be filed with false information regarding customer payments.

515.    The reporting of Plaintiffs to the police with false information, for improper purposes, breached the duty of care.

516.    The omissions of Defendants in failing to properly supervise the theft reporting process breached the duty of care, as did the improper management of the theft reporting process.

517.    The conduct of Defendants was not only careless, but also malicious, reckless, willful, wanton, and demonstrated a total indifference to the lives of Defendants' customers including Plaintiffs. Defendants exhibited a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

518.    Due to Defendants' tortious conduct and omissions, the Defendants have directly and proximately caused Plaintiffs monetary damages, had them arrested, imprisoned, and prosecuted for crimes and conduct they had not committed. They have been falsely labeled car thieves, and has suffered severe damages, including but not limited to monetary damages, loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

519.    Due to the outrageous, malicious, reckless, and intentional nature of Defendants'

conduct, punitive damages are requested.

*****

**COUNT VI – Negligent Supervision and Management**

*All Plaintiffs*
*v.*

*All Defendants*

520.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

521.    The elements of negligence are (1) duty, (2) breach, (3) causation, and (4) damages.

522.    The corporate and individual defendants are liable for this tort due to their participation in crafting the policies and procedures used to prosecute the plaintiffs, as well as their negligent, grossly negligent, reckless, knowing, intentional, and/or malicious supervision and management of Hertz's theft reporting process. The individual defendants also owe a personal duty to the Plaintiffs.

523.    Hertz is alleged to be vicariously liable for the conduct of its employees, including the individual Defendants.

524.    The individual defendants are liable for this tort due to their participation in crafting the policies and procedures used to prosecute the plaintiffs, as well as their negligent, grossly negligent, reckless, knowing, intentional, and/or malicious supervision and management of Hertz's theft reporting process. The individual defendants also owe a personal duty to the Plaintiffs.

525.    All Defendants' conduct, actions, and omissions were negligent, grossly negligent, reckless, malicious, and/or intentional.

526.    At all points the conduct, actions, and omissions of the individual Defendants and other Hertz employees was foreseeable to Hertz and done at Hertz's direction and with Hertz's blessing.

527.    Defendants owed Plaintiffs a duty because they rented a car from Defendants.

528.    All Defendants' conduct, actions, and omissions were negligent, grossly negligent, reckless, malicious, and/or intentional.

529.    At all points the conduct, actions, and omissions of the individual Defendants and other Hertz employees was foreseeable to Hertz and done at Hertz's direction and with Hertz's blessing.

530.    Defendants owed Plaintiffs a duty because they rented a car from Defendants.

531.    All defendants, including the individual defendants, had a duty not to falsely report Plaintiffs to the police because they rented the vehicles to Plaintiffs, because Defendants undertook to file a police report with respect to these persons, and because it was foreseeable that filing a false police report that Plaintiffs stole the vehicles would result in severe damages. All Defendants also undertook to draft, institute, and promulgate theft reporting polices and processes.

532.    At all points Defendants had notice that Hertz had a serious problem with making false police reports, and keeping track of renter payment and contacts, but at no point corrected these issues or ceased making the reports. This notice was especially apparent after the September 2017 Grady verdict, the November 13, 2017 order for a punitive damages trial, and a November 14, 2017 letter to then general counsel and executive vice president Richard Frecker detailing Hertz's problems and failures.

533.    At all points Defendants had notice that Defendants were directing Hertz personnel to ignore W7-02(a)(4) and (17), and that they also knew and intended that false police be filed with false information regarding customer payments.

534.    The reporting of Plaintiffs to the police with false information, for improper purposes, breached the duty of care.

535.    The omissions of Defendants in failing to properly supervise the theft reporting process breached the duty of care, as did the improper management of the theft reporting process.

536.    The defendants in this action also breached the duty of care when they reported Plaintiffs to the police for car theft, or the car the plaintiffs were renting as stolen, despite knowing or should have knowing that the Plaintiffs had not stolen the rental vehicles or that the vehicles were not stolen.

537.    The conduct of Defendants was not only careless, but also grossly negligent, malicious, reckless, willful, wanton, and demonstrated a total indifference to the lives of Defendants customers including Plaintiffs. Defendants exhibited a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

538.    Due to Defendants' tortious conduct and omissions, it directly and proximately caused Plaintiffs monetary damages, had them arrested, imprisoned, and prosecuted for crimes and conduct they had not committed. They have been falsely labeled a car thieves, and have suffered severe damages, including but not limited to monetary damages, loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

539.    Due to the outrageous and unjustifiable nature of Defendants' conduct, including the years of notice that it was occurring, punitive damages are requested.

*****

**COUNT VII – Unfair Trade Practices**

*All Plaintiffs*
*v.*

*All Defendants*

540.    Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint.

541.    The Hertz defendants advertise the company as number 1 in customer service.

542.    Defendants, however, do not inform customers that they have known for years that they deliberately and routinely files false and unverified theft reports against customers.

543.    Defendants do not inform customers that they not only instruct employees to disregard policy safeguards against false police reports, but that the policies are deliberately crafted to result in false reports.

544.    Defendants advertising and marketing schemes, including their material omissions, are fraudulent and improperly do the following:

- Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

- Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

- Advertising goods or services with intent not to sell them as advertised;

- Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

545.    All Plaintiffs relied on Defendants advertising and marketing when renting a car with Hertz, and had they known Hertz's actual customer service philosophy would have never rented with the company.

546.    As a direct and proximate cause of Defendants' deceptive and fraudulent advertising and marketing scheme, all Plaintiffs suffered severe damages, including but not limited to monetary damages, loss of wages, physical injury, loss of freedom, severe emotional distress, mental suffering, mental anguish, sleeplessness, restlessness, anxiety, and depression.

547.    Plaintiffs request punitive damages, treble damages, or other exemplary damages due to the outrageous conduct of Defendants.

*****

## CLAIMS FOR RELIEF

Wherefore, Plaintiffs demand judgment in his favor on all Counts and against Defendants, jointly and severally, for an amount well in excess of the jurisdictional amount required to guarantee a jury trial. Plaintiffs request that this Court determine and declare that Plaintiffs are additionally awarded and afforded on all Counts:

(a)   Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction, including for loss of freedom, improper prosecution, physical injury, miscarriage, mental and emotional damage, monetary damage, and lost wages;

(b)   Punitive damages to punish Defendants for its outrageous conduct, self-interest, and duplicitous behavior;

(c)   Exemplary damages to set an example for others;

(d)   Attorneys' fees and court costs;

(e)   the loss of time and opportunity;

(f)   lost employment opportunities;

(g)   Delay damages; and

(h)   Restitutionary disgorgement of all profits Defendant obtained as a result of unlawful, unfair, and/or fraudulent business practices;

(i)   Mental and emotional pain and suffering;

(j)   Punitive and exemplary damages to punish Defendant and especially to deter other companies from acting in such a manner;

(k)   Costs and attorney's fees; and

(l)   Prejudgment interest;

(m)   Such other and further relief as the Court deems just, necessary, and appropriate under the circumstances or allowed by statute.

## SPOLIATION CLAUSE

Plaintiffs demand that Defendant stake necessary actions to ensure the preservation of all documents and things related to the case—in any format—hardcopy, electronic, audio, and visual.

Defendants are also put on notice to preserve all things including but not limited to information, materials, communications, or other content/data related to the averments in this case.

## DEMAND FOR JURY TRIAL

Plaintiffs herby demands a trial by jury on all claims and issues so triable.


Dated: May 21, 2020

Of Counsel:

Francis Malofiy
Francis Alexander, LLC
280 N. Providence Road, Suite 1
Media, PA 19063
Telephone: (215) 500-1000
Facsimile: (215) 500-1005
francis@francisalexander.com

James E. Beasley, Jr.
THE BEASLEY FIRM, LLC
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000

Respectfully submitted,

FARNAN LLP

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
919 North Market Street, 12th Floor
Wilmington, DE  19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com


*Attorneys for Plaintiffs*

EFiled:  May 21 2020 10:07PM EDT
Transaction ID 65652125
Case No. N20C-05-189 VLM

# EXHIBIT 1

**Procedure Owner:**    Senior Executive Vice President, Chief Administrative Officer and General Counsel

**Process Owner:**    Vice President, Corporate Operations

Executive Summary

- This Worldwide procedure applies to the Rent-A-Car (RAC) Division of The Hertz Corporation and includes requirements for reporting vehicle thefts and conversions.
- All Hertz vehicle thefts and conversions must be documented on the Theft/Recovery Vehicle Report.
- All vehicle thefts from customers must also be documented on the Vehicle Theft from Customer Report.
- <mark>Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure.</mark>

Key Revisions

Section G covering retail car sales repossession was added.

# Procedure



| No. | Subject | | | | Date |
|---|---|---|---|---|---|
| **W7-02 RAC:** | <mark>**REPORTING**</mark> | <mark>**VEHICLE**</mark> | <mark>**THEFTS**</mark> | <mark>**AND**</mark> | **July 23, 2015** |
| | <mark>**CONVERSIONS**</mark> | | | | |

**Scope:**    This Worldwide Procedure applies to the North American Rent-A-Car (RAC) Division, including Canada and Puerto Rico/St. Thomas.

**Purpose:**    To provide the guidelines for reporting and processing retail car sales.

**Index:**
|   |   |
|---|---|
| A. | General |
| B. | Distribution of Initial Theft/Conversion Report |
| C. | Vehicle Thefts from Customers |
| D. | Closing Associated Rental Agreements |
| E. | Reconciling Open Theft/Conversion Files to CARRENT and VISION |
| F. | Distribution of Completed Theft/Conversion Report |
| G. | Retail Car Sales Repossession |

**Procedure:**

A.    General

1.    All thefts, conversions and disappearances of Hertz vehicles must be reported to the police as soon as discovered and management must assist the police with both their investigation and the recovery of the vehicle.

    a.    Conversions - Report conversions to police no later than 60 days from the original or extended due date (considered the date and time stolen) or earlier if research indicates that the vehicle is not likely to be returned (phone numbers given are no good, mail is returned "Addressee Unknown," etc.).

    b.    Fraudulent ID, Stolen ID, Theft from Premises - Report rentals involving fraudulent or stolen credit cards or ID and vehicles reported missing from Hertz premises, to police upon detection.

2.    The Theft/Recovery Vehicle Report (Form 702003P - available in i-Forms) must be utilized to report each incident.

    a.    Vandalism - The theft, conversion or disappearance of parts from a rental vehicle while the vehicle is out on rent or in control by a person not employed by Hertz is considered vandalism and reported in accordance with Procedure W7-01, Reporting Vehicle Accidents.

    b.    Unauthorized Access - Unauthorized access to Hertz property when Hertz vehicles are stolen must be reported on a Worldwide Breach of Security Report, in accordance with Procedure W1-41, Breaches of Security.

3.    There are four (4) vehicle theft categories:

- Theft by Conversion - refer to Procedure W1-12 RAC, Controlling Overdue Rentals
- Theft by Fraud - refer to Procedure W1-12 RAC, Controlling Overdue Rentals
- Theft from Hertz Premises - refer to Procedure W9-18 RAC, Controlling Vehicle Physical Inventories
- Theft from Customer - refer to Section C of this Procedure

4.    Prior to Reporting Thefts to Police - Ensure requirements outlined in Procedures W1-12 and W9-18 were followed, prior to reporting a vehicle missing from inventory and reporting thefts to police. In addition, a Missing Vehicle Checklist has been developed and must be completed by the specific individuals conducting research of missing vehicles, prior to reporting thefts to the police (refer to Procedure W9-18).

5.    Complaints or Warrants - In jurisdictions that require a complaint or warrant be lodged against the renter prior to alarming the car, the responsible Corporate/Country Security Manager (North America/Brazil) or an appointed designee has a maximum of ten (10) additional days from receipt of the file to complete research before reporting the conversion (refer to Procedure W1-12 RAC).

6.    Authorizing Arrests or Prosecution - No level of management will authorize an arrest or prosecution on behalf of Hertz, nor will any employee sign any criminal complaint against an individual on behalf of Hertz, without the express approval of 1) the

responsible Corporate/Country Security Manager or a lawyer in the Law or Human Resources Department, Park Ridge/ Legal and Corporate Affairs Department, HEL and 2) in the case of the arrest, prosecution or filing of a criminal complaint against a current or recently terminated employee, the express approval of the Senior Vice President, Labor Relations and HR Practices, Park Ridge.

> Note: The only allowable exception is for the reporting of personally witnessed vehicle thefts, where the employee who witnessed the vehicle theft may cooperate with the law enforcement authorities, if requested, but must immediately advise the responsible Area/Location Manager.

7. <u>Police Removal of Hertz Property</u> - If in connection with a theft/conversion/disappearance, the police remove any property from Hertz premises, custody or control, it is the responsibility of the Area/Location Manager (or delegate) to obtain a receipt from the police, if one is customarily given.

8. <u>Timely Notification of Theft Information</u> - Individuals who are advised of a theft must notify the Hertz personnel responsible for preparing the Theft Vehicle Report (refer to Section B.1 below) of alarm/report details (date reported, reported to, alarm number, etc.) within one (1) work day of receipt of information from the reporting police agency so that the Theft Vehicle Report can be completed and distributed timely (refer to Section F).

   a. <u>North America (only)</u> - Send all relevant theft information/documentation to OKC Vehicle Control at OKCtheftandrecovery@hertz.com.

9. <u>Police Refusal to File Report</u> - If for any reason the police are unwilling to file a report of theft/conversion/disappearance, indicate this fact on the Theft Vehicle Report, in the police file or alarm/report number section. Immediately contact the Corporate/Country Security Manager responsible for the location where the vehicle was rented or missing, who will work with the Corporate Legal Department to resolve issues.

10. <u>Thefts from Customers</u> - All thefts and disappearances of vehicles from a customer while on rent must be reported to the police authorities by the customer (refer to Section C).

11. <u>Updating Systems for Vehicle Hot Status</u> - Once alarm/complaint information on reported thefts, conversions or disappearances has been received, the OKC Vehicle Control Department (North America), Owning Country Car Control Manager (Europe), National Fleet Accounting Manager (Australia) will enter all initial alarm information and change the vehicle status to "H" (Hot) in the CARRENT Theft and Conversion system (Brazil and New Zealand must be updated in VISION) and also their applicable counter system (i.e., ASAP/"G" (Theft), "H" (Stolen) or "W" (True Conversion) in CARS+, etc.).

   > Note: In Canada, refer to System Information & Training Bulletin #5835, Car Control Hold Codes in CARS+.

12. <u>Preventing Rentals of Hot/Stolen Vehicles</u> - Every attempt must be made to prevent Hot/Stolen vehicles from being rented or incurring non-revenue moves.

a.  Once the vehicle "Hot" status is entered in the applicable rental counter system (ASAP, HLES, TAS, CARS+, HTZRENT), this will assist in systematically preventing the rental of a stolen vehicle until alarm cancellations are processed.

b.  When counter systems are inoperable or do not automatically prevent the rental of vehicles in a Hot Status a manual status check must be performed, by either physically checking the status codes in CARRENT (at the time of rent) or by checking the CARRENT "Hot," "Legal" and "Safety" hold list provided by the responsible Region/Pool/Car Control Manager. Listings must be updated and issued by Car Control Management, (at a minimum) weekly.

c.  For Non-automated locations, a manual "user created" equivalent OLQ report or manually created report using active theft file data (for non CARRENT Countries of Brazil and New Zealand) must be distributed by the responsible management to ensure these locations are not renting vehicles reported stolen.

d.  CARRENT Countries - Utilize the CARRENT "Daily Police Report" (North America - report ID FSCC0011, Europe - report ID FSCC0045, and Australia - report ID FSCC0070) to identify vehicles in hot status which are now being re-rented. Refer to W7-03 RAC, Recovery of Converted or Stolen Vehicles, for further details.

13.  Internal Audit Reporting - If the theft/conversion/disappearance involves loss of rental vehicles as the result of a theft ring, conspiracy or other concerted criminal activity, a copy of the completed Theft Vehicle Report must be forwarded to the Senior Vice President, Audit and Chief Risk Officer who must further distribute to the following officers of The Hertz Corporation:

- Chairman and Chief Executive Officer
- Group President responsible for the affected Division
- Senior Executive Vice President and Chief Financial Officer
- Executive Vice President, General Counsel and Secretary
- Senior Vice President and Chief Accounting Officer

14.  Write-Off of Stolen Vehicles - When a vehicle remains "converted" or "stolen" for a period of one (1) year (six (6) months in Brazil) from the "date converted/stolen" (as noted on the monthly VISION RAC Aging of Conversion Report, available from RDS, or similar report (i.e., Report ID VCAP0027 in North America)) it must be written-off.

| Country | Responsible for Performing Write-Off |
|---|---|
| North America (includes US, Canada, Puerto Rico and St. Thomas) and Brazil | Vehicle Control Department, OKC |
| EMEA and Asia Pacific | International Fleet Accounting, OKC |

15.  Confirming Theft Details in VISION - If the initial Theft or Conversion is not processed in VISION by OKC Fleet Accounting (North America), International Fleet Accounting (Europe and Australia) or Head Office (Brazil) this will appear as a

reconciling item on the Suspend Hold list. Refer to Procedure W6-18 Fleet Suspensions/Deletions for requirements.

16. <u>Vehicle Title Documents</u> - Vehicle titles must be handled in accordance with Procedure W1-18 RAC, Control of Vehicle Titles, and for all other countries their minimum legal requirement.

17. <u>Corporate/Country Security Manager Investigations</u> - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

18. <u>Follow-Up Correspondence</u> - All follow up correspondence pertaining to Theft Vehicle Reports must be sent to the responsible Corporate/Country Security Manager, who will distribute copies to other appropriate individuals, with a copy retained in the Vehicle Theft/Conversion file.

19. <u>Retention</u> - The following report/files included in this procedure must be retained as required by Procedure W1-06, Record Retention & Management Program:

- VISION RAC Aging of Conversion Report
- Theft Vehicle Reports and all related documentation
- Owning City/Country Theft/Conversion File - Each Owning City/Country Car Control Manager (or designee) must maintain a "Vehicle Theft/Conversion" file, containing all documents pertaining to each reported vehicle theft or conversion, including vehicles that are on active alarm or have been reported as recovered.

**B.**   <u>Distribution of Initial Theft/Conversion Report</u>

1. The Theft/Conversion Report must be prepared and then reported to the police by the responsible management stated below:

| Type of Theft | Responsible for Preparing the Theft/Conversion Report | Responsible for Reporting to Police |
|---|---|---|
| Theft – Conversion | <u>North America</u><br>OKC Vehicle Control Department - prepares theft package and forwards to Renting City. | Renting City |
| Theft – Fraud | <u>Brazil</u><br>Car Control Department | Renting City |
| Theft from Renter (1) | <u>Europe, Australia and New Zealand</u><br>Location/Branch Manager - prepares theft package and forwards to Renting City. | Customer or Renting City |
| Theft from Hertz Premises (2) | | Last Known Hertz Location |
| (1) Requires the Customer to complete the Vehicle Theft from Customer Report (Form 702005P). Refer to Section C.<br>(2) The theft package must be forwarded to the last known Hertz location to have possession of the vehicle. | | |

2.    The Theft/Conversion Report must be completed as follows:

- Check "Initial Report" and then identify the type of theft (as stated in table above);

- The report must be typed and all the required information (unit, description, serial, license numbers, etc.) recorded in the "Vehicle Description" section. All information must be accurate to ensure reporting police agency records and alarms the correct vehicle. Whenever possible, record vehicle information from a copy of vehicle's registration and attach a copy to the 702003P being presented to the police.

- Note:    Odometer reading - is the Vehicle's last recorded mileage before the theft occurred, if stolen from lot. If on rental, the actual "out" mileage recorded on the RA.

- Enter the information required in the "Rental Information" area. If the vehicle was not on rental when stolen, leave this section blank and indicate in "Summary of What Happened" section that the vehicle was not rented and the exact circumstances of theft (last known date, mileage, etc.).

- Enter all available information about the renter (if applicable).

- Enter all alarm information (police authority reported to, date reported, location of vehicle at time of theft, etc.). In the case of Conversions, enter the due date as the "Date & Time Stolen." If the vehicle was stolen from a renter, the "Date & Time Stolen" is generally the date the vehicle was discovered missing. If the vehicle was stolen from Hertz' premises, the "Date & Time Stolen" is the date of the last movement, unless the theft was actually witnessed. This date appears on the Depreciation Run, the VISION RAC Aging of Conversion Report and is used by OKC Fleet Accounting to determine the write-off date if the vehicle is not recovered.

- Where a conversion has occurred and the Counter Representative remembers the description of the customer, or if the theft was witnessed, enter it in "Description of Renter or Suspect" section (where applicable).

- Use summary section to document any additional facts obtained pertinent to the Theft/Conversion being reported.

- Signature of the responsible Hertz management employee completing the report, including the date.

C.    Vehicle Thefts from Customers

1.    Whenever a customer calls or is present at the rental counter and reports that the vehicle has been stolen from them, advise the customer that to the extent possible, they are responsible for reporting the theft to the police.

    a.    Whenever a customer indicates they reported the theft to the police, obtain all required information (date reported, agency reported to, police complaint number, etc.) and contact the police to confirm the theft details.

b.  If not reported, advise the customer to immediately report the incident to the police and call Hertz back with the required facts.

c.  If the customer is unable or refuses to report the theft to the Police, the Theft Vehicle Report (702005P, available in iForms) is prepared by the individuals outlined in Section B. and forwarded to the a location in the area/jurisdiction where the customer claims the theft occurred.

Note: In U.S Cities which have access to Department of Motor Vehicle (DMV) files, management can confirm alarm status by entering the full serial number into the DMV system.

2.  Regardless of whether reported by the customer or subsequently by Hertz, document <u>all</u> details of the occurrence (date, time, location of vehicle at time of theft, etc.) on a Vehicle Theft from Customer Report (an equivalent local language translation can be used where required) and in all cases, every attempt must be made to have the customer sign the form. Whenever possible, have a Manager speak with the customer to record this information.

3.  If the customer was overdue from their original rental due date and is now reporting the vehicle has been stolen from them, contact the OKC Vehicle Control Department (North America), Car Control Department (Europe and Brazil), Fleet Accounting Manager (Australia), Insurance Manager (New Zealand). It is possible that "Locators" or "Retrieval" services were utilized to repossess the vehicle from the customer and therefore, it must not be reported stolen.

4.  Have the customer turn in or send in the keys and rental documentation to the vehicle. If it is determined that the customer left the keys in the vehicle prior to being stolen or any of the details surrounding the theft are unusual, refer to Procedure W7-42, Do Not Rent and immediately contact the responsible Corporate/Country Security Manager.

5.  The completed Vehicle Theft from Customer Report must be forwarded immediately to the Responsible Manager (i.e., Area Manager of the Renting City (North America and Brazil), Country Security Managers Delegate (Europe), National Fleet Accounting (Australia)) who must then ensure it is forwarded to those identified in Section B. in order for the Theft/Conversion Report to be prepared. Additionally:

•  The OKC Vehicle Control Department (North America)/Car Control Department (Brazil) must immediately verify information with the police, upon receipt.

•  Australia Locations must verify with the police <u>before</u> sending to National Fleet Accounting, once received a scanned copy must be forwarded to International Fleet Accounting, OKC to enter into VISION.

•  All vehicle thefts from customers and incidents of vandalism must be reported to the First Notice of Loss (FNOL) Office (North America) or the responsible HCM/Country Claims Department (all other Countries) daily.

**D.    Closing Associated Rental Agreements**

1.    The OKC Vehicle Control Department (North America), Car Control Department (Brazil), Location/Branch Manager (Europe, Australia and New Zealand) must close the RA after verifying the Theft Vehicle Report with police. Therefore, North America and Brazil rental locations must not close the RA or perform an exchange on the RA.

2.    Once confirmed that the theft/conversion has been reported to the police, the responsible management (as listed above) must Close RAs in the ASAP/TAS/CARS+/HTZRENT Post Return or BCHCLOSE applications by:

- Entering an approximate 'mileage in', estimating 70 miles/100 kilometers per day.

- Recording the date the vehicle was reported stolen in the 'return date and time' field.

- Ensuring the Rent and Return locations are the same.

- Applying the 'best' or lowest rate available.

- Providing background information (e.g., theft from renter, date reported, etc.), in the 'remarks' section.

Note:    If determined that a charge card was used fraudulently and the true card holder did not rent, close out the RA and only bill for the amount authorized by the card company at time of rental. On cash rentals later confirmed to be fraudulent rentals (e.g., stolen passport, stolen company ID, other) the bill must be no greater than the amount of actual deposit taken, so the final net due equals zero.

**E.    Reconciling Open Theft/Conversion Files to CARRENT and VISION**

1.    It is critical that every open Theft/Conversion Vehicle Report at each reporting City/Country be properly recorded as such, both in CARRENT (except for Brazil and New Zealand where CARRENT is not currently utilized) and in VISION.

2.    To verify this, each Owning City/Country Car Control Manager, Fleet Manager (North America, Brazil and Europe)/Fleet Accounting Manager (Australia) or designated employee must perform a monthly reconciliation of all active Theft/Conversion files.

a.    Compare all open Theft Vehicle Reports to the monthly VISION RAC Aging of Conversion Report. All open thefts/conversions must appear on this report with a Depreciation status code of "C" (Active Conversions).

b.    All open Theft/Conversion Vehicle Reports must also appear in CARRENT with a status code of "H" (Hot). Responsible Management must either compare all files to the CARRENT Theft and Conversion By Unit Report or to a user created OLQ report that lists all "H" status vehicles.

c.    Investigate any active Theft/Conversion files that are not appearing as such on the VISION RAC Aging of Conversion Report (or equivalent country report) or in CARRENT. Document notations of variances, related research and resolutions on reports. Contact OKC, Vehicle Control (North America) /OKC Fleet Accounting (other Countries) directly for items not appearing on the

VISION RAC Aging of Conversion Report. Add any active Theft/Conversion files not appearing in CARRENT immediately.

Note: Whenever functional, RDS Reports must be reviewed on line, annotated as required above in Document Direct and retained in RDS.

F.  Distribution of Completed Theft/Conversion Report

On completion of the Theft Vehicle Report, and after confirming theft details with the police, distribute immediately as follows:

| Copy | North America | Brazil | Europe | Australia | New Zealand |
|---|---|---|---|---|---|
| 1 | OKC Vehicle Control Department (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) |
| 2 | HCM - First Notice of Loss (FNOL) Department, Dallas | Country Insurance Department | Country HCM Department | Country Insurance Department | Country Insurance Manager |
| 3 | Owning Area Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control & State Distribution Manager | Island Car Control & Operations Manager |
| 4 | Responsible Corporate Security Manager | Responsible Corporate Security Manager | Responsible Country Security Manager | Responsible Corporate Security Manager | Responsible Corporate Security Manager |

(1) Faxed/scanned copy of Initial Theft Report only - OKC Fleet Accounting must update vehicle depreciation status in VISION.

G.  Retail Car Sales Repossession

1.  When a financial institution rejects funding of a Retail Deal, and the customer has taken possession of vehicle, store management should immediately begin search for alternative funding
    a.  Alternative funding found- resign deal
    b.  Unable to find alternative funding- notify GM by phone to discuss. GM notifies Director of situation

2.  Store Management should attempt phone contact with customer to return vehicle
    a.  Car returned proceed to step VII
    b.  Vehicle not returned contact GM, Director and Corporate team and update situation
    c.  If a Trade is involved contact OKC, Retail Processing

3.  Corporate team forwards store Default Letter and strategy for handling going forward

4.  Store mails Default letter to customer following individual state guidelines. Letter should be sent both regular and certified mail.

5.  If the car is returned proceed to step VII. If not, conduct follow-up per state guidelines

6.  If car still remains out contact GM, Director and Corporate Team for decision on repossession
    a.  If Corporate Team decides on repossession they should email Sr. Director Corporate Security to initiate repossession procession
    b.  Corporate security will assign local region security manager to handle. If no region security mgr in area security will then provide Corporate Car Sales team with a Repossession vendor to handle

    c.   Corporate Team emails Vehicle Control to create 723 and monitor vehicle

7.    If car is returned,  inspect for damage.  Decide whether or not to repair and sell vehicle

8.    OKC Retail Processing  will send Notice of Sale and re-Title vehicle per state guidelines

**Executive Summary**

- This Worldwide procedure applies to the Rent-A-Car (RAC) Division of The Hertz Corporation and includes requirements for reporting vehicle thefts and conversions.
- All Hertz vehicle thefts and conversions must be documented on the Theft/Recovery Vehicle Report.
- All vehicle thefts from customers must also be documented on the Vehicle Theft from Customer Report.
- Location, Maintenance, Area, Country Head Office and OKC Management must ensure compliance to this procedure.

**Key Revisions**

This procedure has been reissued to advise that the specific actions required to be taken prior to reporting a vehicle missing from inventory and reporting thefts to the police, are included in Procedure W9-18, Controlling Vehicle Physical Inventories (Section A.4). In addition, a Missing Vehicle Checklist has been developed and must be completed by the specific individuals conducting research of missing vehicles, prior to reporting thefts to the police (refer to Procedure W9-18).

# Procedure



| No. | Subject | Date |
|---|---|---|
| **W 7 - 0 2 R A C :** | **REPORTING VEHICLE THEFTS AND CONVERSIONS** | **August 21, 2009** |

**Scope:** This Worldwide Procedure applies to the Rent-A-Car (RAC) Division of The Hertz Corporation.

**Purpose:** To provide requirements for reporting thefts, conversions or the disappearance of Hertz vehicles.

**Index:** A. General
B. Distribution of Initial Theft/Conversion Report
C. Vehicle Thefts From Customers
D. Closing Associated Rental Agreements
E. Reconciling Open Theft/Conversion Files to CARRENT and VISION
F. Distribution of Completed Theft/Conversion Report

**Procedure:**

**To open a specific Section, click on the arrow. To open all Sections, click either Shift+ or**

**View/Expand All Sections on the Menu Bar**

A. General

1. All thefts, conversions and disappearances of Hertz vehicles must be reported to the police as soon as discovered and management must assist the police with both their investigation and the recovery of the vehicle.

   a. Conversions - Report conversions to police no later than 60 days from the original or extended due date (considered the date and time stolen) or earlier if research indicates that the vehicle is not likely to be returned (phone numbers given are no good, mail is returned "Addressee Unknown," etc.).

   b. Fraudulent ID, Stolen ID, Theft from Premises - Report rentals involving fraudulent or stolen credit cards or ID and vehicles reported missing from Hertz premises, to police upon detection.

2. The Theft/Recovery Vehicle Report (Form 702003P - available in i-Forms) must be utilized to report each incident.

   a. Vandalism - The theft, conversion or disappearance of parts from a rental vehicle while the vehicle is out on rent or in control by a person not employed by Hertz is considered vandalism and reported in accordance with Procedure W7-01, Reporting Vehicle Accidents.

   b. Unauthorized Access - Unauthorized access to Hertz property when Hertz vehicles are stolen must be reported on a Worldwide Breach of Security Report, in accordance with Procedure W1-41, Breaches of Security.

3. ──There are four (4) vehicle theft categories:

   - Theft by Conversion - refer to Procedure W1-12, Controlling Overdue Rentals

   - Theft by Fraud - refer to Procedure W1-12, Controlling Overdue Rentals

   - Theft from Hertz Premises - refer to Procedure W9-18, Controlling Vehicle Physical Inventories

   - Theft from Customer - refer to Section C of this Procedure

4. Prior to Reporting Thefts to Police - Ensure requirements outlined in Procedures W1-12 and W9-18 were followed, prior to reporting a vehicle missing from inventory and reporting thefts to police. In addition, a Missing Vehicle Checklist has been developed and must be completed by the specific individuals conducting research of missing vehicles, prior to reporting thefts to the police (refer to Procedure W9-18).

5. Complaints or Warrants - In jurisdictions that require a complaint or warrant be lodged against the renter prior to alarming the car, the responsible Corporate/Country Security Manager (North America/Brazil) or an appointed designee has a maximum of ten (10) additional days from receipt of the file to complete research before reporting the

conversion (refer to Procedure W1-12).

6. <u>Authorizing Arrests or Prosecution</u> - No level of management will authorize an arrest or prosecution on behalf of Hertz, nor will any employee sign any criminal complaint against an individual on behalf of Hertz, without the express approval of 1) the responsible Corporate/Country Security Manager or a lawyer in the Law or Human Resources Department, Park Ridge/ Legal and Corporate Affairs Department, HEL and 2) in the case of the arrest, prosecution or filing of a criminal complaint against a current or recently terminated employee, the express approval of the Vice President, Global Labor Relations and HR Practices, Park Ridge.

   Note: The only allowable exception is for the reporting of personally witnessed vehicle thefts, where the employee who witnessed the vehicle theft may cooperate with the law enforcement authorities, if requested, but must immediately advise the responsible Area/Location Manager.

7. <u>Police Removal of Hertz Property</u> - If in connection with a theft/conversion/disappearance, the police remove any property from Hertz premises, custody or control, it is the responsibility of the Area/Location Manager (or delegate) to obtain a receipt from the police, if one is customarily given.

8. <u>Timely Notification of Theft Information</u> - Individuals that are advised of a theft must notify the Hertz personnel responsible for preparing the Theft Vehicle Report (refer to B.1) of alarm/report details (date reported, reported to, alarm number, etc.) within one (1) work day of receipt of information from the reporting police agency so the Theft Vehicle Report can be completed and distributed timely (refer to Section F).

9. <u>Police Refusal to File Report</u> - If for any reason the police are unwilling to file a report of theft/conversion/disappearance, indicate this fact on the Theft Vehicle Report, in the police file or alarm/report number section. Immediately contact the Corporate/Country Security Manager responsible for the location where the vehicle was rented or missing, who will work with the Corporate Legal Department to resolve issues.

10. <u>Thefts from Customers</u> - All thefts and disappearances of vehicles from a customer while on rent must be reported to the police authorities by the customer (refer to Section C).

11. <u>Updating Systems for Vehicle Hot Status</u> - Once alarm/complaint information on reported thefts, conversions or disappearances has been received, the OKC Vehicle Control Department (North America), Owning Country Car Control Manager (Europe), National Fleet Accounting Manager (Australia) will enter all initial alarm information and change the vehicle status to "H" (Hot) in the CARRENT Theft and Conversion system (Brazil and New Zealand must be updated in VISION) and also their applicable counter system (i.e., ASAP/"G" (Theft), "H" (Stolen) or "W" (True Conversion) in CARS+, etc.).

   Note:    In Canada, refer to System Information & Training Bulletin #5835, Car Control Hold Codes in CARS+.

12. <u>Preventing Rentals of Hot/Stolen Vehicles</u> - Every attempt must be made to prevent Hot/Stolen vehicles from being rented or incurring non-revenue moves.

a.  Once the vehicle "Hot" status is entered in the applicable rental counter system (ASAP, HLES, TAS, CARS+, HTZRENT), this will assist in systematically preventing the rental of a stolen vehicle until alarm cancellations are processed.

b.  When counter systems are inoperable or do not automatically prevent the rental of vehicles in a Hot Status a manual status check must be performed, by either physically checking the status codes in CARRENT (at the time of rent) or by checking the CARRENT "Hot," "Legal" and "Safety" hold list provided by the responsible Region/Pool/Car Control Manager. Listings must be updated and issued by Car Control Management, (at a minimum) weekly.

c.  For Non-automated locations, a manual "user created" equivalent OLQ report or manually created report using active theft file data (for non CARRENT Countries of Brazil and New Zealand) must be distributed by the responsible management to ensure these locations are not renting vehicles reported stolen.

d.  CARRENT Countries - Utilize the CARRENT "Daily Police Report" (North America - report ID FSCC0011, Europe - report ID FSCC0045, and Australia - report ID FSCC0070) to identify vehicles in hot status which are now being re-rented. Refer to W7-03 RAC, Recovery of Converted or Stolen Vehicles, for further details.

13.  Internal Audit Reporting - If the theft/conversion/disappearance involves loss of rental vehicles as the result of a theft ring, conspiracy or other concerted criminal activity, a copy of the completed Theft Vehicle Report must be forwarded to the Staff Vice President, Internal Audit who must further distribute to the following officers of The Hertz Corporation:

- Chairman and Chief Executive Officer
- Executive Vice President responsible for the affected Division
- Executive Vice President and Chief Financial Officer
- Senior Vice President, General Counsel and Secretary
- Senior Vice President, Finance and Corporate Controller

14.  Write-Off of Stolen Vehicles - When a vehicle remains "converted" or "stolen" for a period of one (1) year (North America)/six (6) months (Brazil, Europe & Australia) from the "date converted/stolen" (as noted on the monthly VISION RAC Aging of Conversion Report or similar report, available from RDS (ie., North America use Report ID VCAP0027)) it must be written-off.

| Country | Responsible for Performing Write-Off |
| --- | --- |
| • North America (includes US, Canada, Puerto Rico and St. Thomas) | • Vehicle Control Department, OKC |
| • Brazil, Europe and Australia | • International Fleet Accounting, OKC |

15. Confirming Theft Details in VISION - If the initial Theft or Conversion is not processed in VISION by OKC Fleet Accounting (North America), International Fleet Accounting (Europe and Australia) or Head Office (Brazil) this will appear as a reconciling item on the Suspend Hold list. Refer to Procedure W6-18 Fleet Suspensions/Deletions for requirements.

16. Vehicle Title Documents - Must be handled in accordance with Procedure W1-18, Control of Vehicle Titles, and for all other countries their minimum legal requirement.

17. Corporate/Country Security Manager Investigations - Every theft/conversion/disappearance must be promptly investigated by the Corporate/Country Security Manager responsible for the location from which the related Theft Vehicle Report is filed. All employees are required to cooperate fully with such an investigation.

18. Follow-Up Correspondence - All follow up correspondence pertaining to Theft Vehicle Reports must be sent to the responsible Corporate/Country Security Manager, who will distribute copies to other appropriate individuals, with a copy retained in the Vehicle Theft/Conversion file.

19. Retention - The following report/files included in this procedure must be retained as required by Procedure W1-06, Record Retention & Management Program:

- VISION RAC Aging of Conversion Report

- Theft Vehicle Reports and all related documentation

- Owning City/Country Theft/Conversion File - Each Owning City/Country Car Control Manager (or designee) must maintain a "Vehicle Theft/Conversion" file, containing all documents pertaining to each reported vehicle theft or conversion, including vehicles which are on active alarm or have been reported as recovered.

B. Distribution of Initial Theft/Conversion Report

1. The Theft/Conversion Report must be prepared and then reported to the police by the responsible management stated below:

| Type of Theft | Responsible for Preparing the Theft/Conversion Report | Responsible for Reporting to Police |
|---|---|---|
| Theft - Conversion | North America<br>• OKC Vehicle Control Department - prepares theft package and forwards to Renting City. | Renting City |
| Theft - Fraud | | Renting City |
| | Brazil | |
| Theft - from Renter (1) | • Car Control Department | Customer or Renting City |
| | Europe, Australia and New Zealand | |
| | • Location/Branch Manager - prepares | |

| Theft - from Hertz Premises (2) | North America<br>• OKC Vehicle Control Department - prepares theft package and forwards to Renting City.<br><br>Brazil<br>    • Car Control Department<br>Europe, Australia and New Zealand<br>• Location/Branch Manager - prepares theft package and forwards to Renting City. | Last known Hertz location |
|---|---|---|

| |
|---|
| (1) Requires the Customer to complete the Vehicle Theft from Customer Report (Form 702005P). (Refer to Section C.) |
| (2) The theft package must be forwarded to the last known Hertz location to have possession of the vehicle. |

2.    The Theft/Conversion Report must be completed as follows:

- Check "Initial Report" and then identify the type of theft (as stated in table above);

- The report must be typed and all the required information (unit, description, serial, license numbers, etc.) recorded in the "Vehicle Description" section. All information must be accurate to ensure reporting police agency records and alarms the correct vehicle. Whenever possible, record vehicle information from a copy of vehicle's registration and attach a copy to the 702003P being presented to the police.

> Note:    Odometer reading - is the Vehicle's last recorded mileage before the theft occurred, if stolen from lot. If on rental, the actual "out" mileage recorded on the RA.

- Enter the information required in the "Rental Information" area. If the vehicle was not on rental when stolen, leave this section blank and indicate in "Summary of What Happened" section that the vehicle was not rented and the exact circumstances of theft (last known date, mileage, etc.).

- Enter all available information about the renter (if applicable).

- Enter all alarm information (police authority reported to, date reported, location of vehicle at time of theft, etc.). In the case of Conversions, enter the due date as the "Date & Time Stolen." If the vehicle was stolen from a renter, the "Date & Time Stolen" is generally the date the vehicle was discovered missing. If the vehicle was stolen from Hertz' premises, the "Date & Time Stolen" is the date of the last movement, unless the theft was actually witnessed. This date appears on the Depreciation Run, the VISION RAC Aging of Conversion Report and is used by OKC Fleet Accounting to determine the write-off date if the vehicle is not recovered.

- Where a conversion has occurred and the Counter Representative remembers the description of the customer or if the theft was witnessed enter it in "Description of Renter or Suspect" section (where applicable).

- Use summary section to document any additional facts obtained pertinent to the Theft/Conversion being reported.

- Signature of the responsible Hertz management employee completing the report, including the date.

C. Vehicle Thefts from Customers

1. Whenever a customer calls or is present at the rental counter and reports that the vehicle has been stolen from them, advise the customer that to the extent possible, they are responsible for reporting the theft to the police.

   a.  Whenever a customer indicates they reported the theft to the police, obtain all required information (date reported, agency reported to, police complaint number, etc) and contact the police to confirm the theft details.

   b.  If not reported, advise the customer to immediately report the incident to the police and call Hertz back with the required facts.

   c.  If the customer is unable or refuses to report the theft to the Police, the Theft Vehicle Report (702005P, available in iForms) is prepared by the individuals outlined in Section B. and forwarded to the a location in the area/jurisdiction where the customer claims the theft occurred.

   Note:   In U.S Cities which have access to Department of Motor Vehicle (DMV) files, management can confirm alarm status by entering the full serial number into the DMV system.

2. Regardless of whether reported by the customer or subsequently by Hertz, document all details of the occurrence (date, time, location of vehicle at time of theft, etc.) on a Vehicle Theft from Customer Report (an equivalent local language translation can be used where required) and in all cases, every attempt must be made to have the customer sign the form. Whenever possible, have a Manager speak with the customer to record this information.

3. If the customer was overdue from their original rental due date and is now reporting the vehicle has been stolen from them, contact the OKC Vehicle Control Department (North America), Car Control Department (Europe and Brazil), Fleet Accounting Manager (Australia), Insurance Manager (New Zealand). It is possible that "Locators" or "Retrieval" services were utilized to repossess the vehicle from the customer and therefore, it must not be reported stolen.

4. Have the customer turn in or send in the keys and rental documentation to the vehicle. If it is determined that the customer left the keys in the vehicle prior to being stolen or any of the details surrounding the theft are unusual, refer to Procedure W7-42, Do Not Rent and immediately contact the responsible Corporate/Country Security Manager.

5. The completed Vehicle Theft from Customer Report must be forwarded immediately to the Responsible Manager (ie., Area Manager of the Renting City (North America and Brazil), Country Security Managers Delegate (Europe), National Fleet Accounting (Australia)) who must then ensure it is forwarded to those identified in Section B. in order for the Theft/Conversion Report to be prepared. Additionally;

- The OKC Vehicle Control Department (North America)/Car Control Department (Brazil) must immediately verify information with the police, upon receipt.

- Australia Locations must verify with the police before sending to National Fleet Accounting, once received a scanned copy  must be forwarded to International Fleet Accounting, OKC to enter into VISION.

- All vehicle thefts from customers and incidents of vandalism must be reported to the First Notice of Loss (FNOL) Office (North America) or the responsible HCM/Country Claims Department (all other Countries) daily.

D.  Closing Associated Rental Agreements

1.  The OKC Vehicle Control Department (North America), Car Control Department (Brazil), Location/Branch Manager (Europe, Australia and New Zealand) must close the RA after verifying the Theft Vehicle Report with police.  Therefore, North America and Brazil rental locations must not close the RA or perform an exchange on the RA.

2.  Once confirmed the theft/conversion has been reported to the police, the responsible management (as listed above) must Close RAs in the ASAP/TAS/CARS+/HTZRENT Post Return or BCHCLOSE applications by:

- Entering an approximate 'mileage in', estimating 70 miles/100 kilometers per day.

- Recording the date the vehicle was reported stolen in the 'return date and time' field.

- Ensuring the Rent and Return locations are the same.

- Applying the 'best' or lowest rate available.

- Providing  background information (e.g, theft from renter, date reported, etc), in the 'remarks' section.

Note:    If determined that a charge card was used fraudulently and the true card holder did not rent, close out the RA and only bill for the amount authorized by the card company at time of rental. On cash rentals later confirmed to be fraudulent rentals (e.g., stolen passport, stolen company ID, other) the bill must be no greater than the amount of actual deposit taken, so the final net due equals zero.

E.  Reconciling Open Theft/Conversion Files to CARRENT and VISION

1.  It is critical that every open Theft/Conversion Vehicle Report at each reporting City/Country be properly recorded as such, both in CARRENT (except for Brazil and New Zealand where CARRENT is not currently utilized) and in VISION.

2.  To verify this, each Owning City/Country Car Control Manager, Fleet Manager (North America, Brazil and Europe)/Fleet Accounting Manager (Australia) or designated employee must perform a monthly reconciliation of all active Theft/Conversion files.

a.    Compare all open Theft Vehicle Reports to the monthly VISION RAC Aging of Conversion Report.  All open thefts/conversions must appear on this report with a

Depreciation status code of "C" (Active Conversions).

b.  All open Theft/Conversion Vehicle Reports must also appear in CARRENT with a status code of "H" (Hot).  Responsible Management must either compare all files to the CARRENT Theft and Conversion By Unit Report or to a user created OLQ report that lists all "H" status vehicles.

c.  Investigate any active Theft/Conversion files that are not appearing as such on the VISION RAC Aging of Conversion Report (or equivalent country report) or in CARRENT.  Document notations of variances, related research and resolutions on reports.  Contact OKC, Vehicle Control (North America) /OKC Fleet Accounting (other Countries) directly for items not appearing on the VISION RAC Aging of Conversion Report.  Add any active Theft/Conversion files not appearing in CARRENT immediately.

Note:  Whenever functional, RDS Reports must be reviewed on line, annotated as required above in Document Direct and retained in RDS.

F.  Distribution of Completed Theft/Conversion Report
On completion of the Theft Vehicle Report, and after confirming theft details with the police, distribute immediately as follows:

| Copy | North America | Brazil | Europe | Australia | New Zealand |
|------|---------------|--------|--------|-----------|-------------|
| 1 | OKC Vehicle Control Department (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) | OKC Fleet Accounting (1) |
| 2 | HCM - First Notice of Loss (FNOL) Department, Dallas | Country Insurance Department | Country HCM Department | Country Insurance Department | Country Insurance Manager |
| 3 | Owning Area Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control Manager | Owning Country Car Control & State Distribution Manager | Island Car Control & Operations Manager |
| 4 | Responsible Corporate Security Manager | Responsible Corporate Security Manager | Responsible Country Security Manager | Responsible Corporate Security Manager | Responsible Corporate Security Manager |

(1) Faxed/scanned copy of Initial Theft Report only - OKC Fleet Accounting must update vehicle depreciation status in VISION.

# EXHIBIT 2

Page 1

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

- - -

KELLY A. GRADY,                  : CIVIL ACTION
                                 :
                Plaintiff,       : NOVEMBER TERM, 2015
                                 :
        vs.                      :
                                 : NO. 151103380
                                 :
THE HERTZ CORPORATION; HERTZ     :
RENT-A-CAR PHILADELPHIA INTL.    :
AIRPORT; JOHN DOE(s),            :
                                 :
                Defendant.

- - -

Oral sworn testimony of RICHARD
LIVINGSTON, held at ZANARAS REPORTING & VIDEO, 1845
Walnut Street, Suite 938, Philadelphia, Pennsylvania,
taken on Tuesday, October 4, 2016, commencing at 10:08
a.m., before Lynda DiGrazio-Smith, a NJ Certified
Court Reporter (Lic. #30XI002212), Certified Livenote
Reporter, Licensed CaseViewNet Realtime Provider and
Notary Public for the State of New Jersey.


ZANARAS REPORTING & VIDEO

Registered Professional Reporters

1845 Walnut Street, Suite 9382112 Bay Avenue

Philadelphia, PA 19103        Ocean City, NJ 08226

215.790.7857                  877.GO.DEPOS

RICHARD LIVINGSTON

Page 53

1                    THE WITNESS:  Yeah.  I can't tell

2      you.  I just don't know.

3      BY MR. MALOFIY:

4           Q.   So you recall you being the person

5      required to go to court from May 2010, until a

6      certain point.  Then it was Mr. Graeber; right?

7           A.   Yes.  Right.

8           Q.   And then it was a Mr. Lomis?

9           A.   Yes.

10           Q.   Or was there someone else?

11           A.   No.  Mr. Lomis.

12           Q.   Okay.  What's Mr. Lomis's title?

13           A.   Assistant corporate security manager.

14           Q.   How long has he been at Hertz?

15           A.   Since February of 2016.

16           Q.   Okay.  Mr. Graeber is still with Hertz?

17           A.   No.

18           Q.   Or no?

19           A.   He's not.

20           Q.   When did he stop -- did he no longer --

21      was he no longer employed at Hertz after

22      February 2016?

23           A.   No.  He was not.  He left somewhere in

24      the summer.  I am going to say July of 2015.  Again,

RICHARD LIVINGSTON

Page 54

1    that's an approximate.

2            Q.    I understand.   Why did he leave?

3            A.    He got laid off.

4            Q.    Okay.   Do you understand the

5    circumstances regarding his being laid off?

6            A.    My understanding was, it was just a

7    corporate decision to lay off a large group of

8    people at that time for cost savings.

9            Q.    Okay.   What was his role?

10           A.    Assistant corporate security manager.

11           Q.    So they laid him off and they hired on

12   another corporate security manager roughly six

13   months later?

14           A.    Yes.

15           Q.    What was the reason for that?

16           A.    They found out that they made a mistake

17   in laying him off.

18           Q.    Did they ask for him to come back?

19           A.    They did.

20           Q.    And what was his response?

21           A.    He's already obtained other employment.

22           Q.    Do you know where he's now employed?

23           A.    With the federal government, but I don't

24   know exactly what the job is.

RICHARD LIVINGSTON

Page 108

1          A.   I'd be at the airport.

2          Q.   So which police officers would you give

3    it to?

4          A.   Whoever arrived to take the report.

5          Q.   How would they know to pick up a report?

6          A.   I'd call them on the phone.

7          Q.   So first, you would receive this theft

8    package from Oklahoma City?

9          A.   Right.

10         Q.   You wouldn't review the theft package.

11   Correct?

12         A.   I'd look at it to make sure that

13   everything is in order.

14         Q.   What does that mean?  All the pieces of

15   the sandwich are there?

16         A.    The dates are right and everything

17   was -- there's numerous copies of the same

18   information.  Make sure everything is correct on it.

19         Q.   How would you determine if it's correct,

20   if you didn't have the factual knowledge relating to

21   it?

22         A.   Well, I can look at all the pages on

23   that and make sure that they have it throughout the

24   report is the same.

RICHARD LIVINGSTON

Page 109

1          Q.    You would look through the report for

2    basic typos.  Is that right?

3          A.    In most cases, yes.

4          Q.    Would you do any other determination,

5    other than looking for typos within the theft

6    package itself?

7          A.    No.

8          Q.    Would you check any Hertz systems?

9          A.    No.

10          Q.    Okay.  So your investigation or your

11    review of the theft package was solely strictly the

12    pages contained within the theft package itself?

13          A.    That's correct.

14          Q.    So then once you received it, how would

15    you receive it?  E-mail?  Fax?

16          A.    At one time it was faxed, now it's

17    e-mailed.

18          Q.    Okay.  How many of these things do you

19    receive a day?

20                MR. WOLF:  At what point?

21    BY MR. MALOFIY:

22          Q.    At any point.  Does it change?

23          A.    I don't receive any anymore.

24          Q.    Why not?

RICHARD LIVINGSTON

Page 115

1    was the car stolen, yes.

2          Q.   Okay.  Would they ask you questions or

3    do the interview at that point?

4          A.   No.  They would not interview me.

5          Q.   What's the form?  7548?

6          A.   I'm sorry?

7          Q.   Are you familiar with the 75 --

8          A.   I'm not -- yeah, the 48 is what

9    Philadelphia uses.

10         Q.   Yes.

11         A.   Yes.

12         Q.   You're familiar with that form?

13         A.   Yes.

14         Q.   Do you recall being interviewed by the

15   police, when you turned in the theft package?

16         A.   No.

17         Q.   No.  When you put in the theft package,

18   what were the checks done to confirm the information

19   was correct?  When I say, What were the checks done,

20   I mean what, as the corporate security manager, did

21   you do to confirm that the information was true,

22   accurate and correct, if anything?

23         A.   I went through the form to make sure

24   that everything was in order.

RICHARD LIVINGSTON

Page 116

1        Q.    When you say, Everything was --

2        A.    Well, for example, for the State, you

3    need like a certified mailing, make sure that the

4    mailing was included in the theft report.

5        Q.    Besides, I mean, from my testimony, it

6    sounds like you didn't do anything as far as checks

7    and balances, to confirm the information was

8    correct, other than making sure the pieces in the

9    theft package were there?

10       A.    Right.

11       Q.    And then, also, checking for typos.  Is

12   that accurate?

13              MR. WOLF:  Well, I'll just object to

14   his testimony speaks for itself.  And it's not

15   counsel's characterization of the testimony.

16              MR. MALOFIY:  Well, there's no

17   characterization there.  It was crystal clear.

18              MR. WOLF:  The record will speak for

19   itself.

20              MR. MALOFIY:  Right.  And I can ask a

21   question and build it with foundation with prior

22   facts for prior things he's testified to.

23   BY MR. MALOFIY:

24       Q.    Now, my understanding, sir, is that when

RICHARD LIVINGSTON

Page 117

1      you received this theft package, your testimony is

2      that you didn't do any independent investigation,

3      other than looking at the package itself and then

4      you would check to see if there were typos --

5              A.    Right.  My company would --

6              Q.    -- and make sure -- hold on a second.

7              A.    I'm sorry.

8              Q.    And make sure that the different parts

9      that were supposed to comprise the theft package

10     were there.  Correct?

11             A.    Yes.

12             Q.    Okay.  What parts are supposed to

13     comprise the theft package?

14             A.    Well, what the police actually require,

15     which is a certified mailing.

16             Q.    Okay.  What else?

17             A.    Car information.

18             Q.    What else?

19             A.    That's probably just about it.

20             Q.    Okay.

21             A.    They might require more in court, but...

22             Q.    Now, it says here, Submitted DNR 14 A,

23     do you know what that means, on this Exhibit 32,

24     page 3?

RICHARD LIVINGSTON

Page 137

1           Q.   You'd agree with me that -- oh, you

2    don't even know if 1805 was charged on Ms. Grady's

3    card.  Correct?

4           A.   I'm sorry?

5           Q.   I am going back to page 4 of 16 of

6    Exhibit 32.  You don't even know if 1805 was charged

7    on the card, correct, on Ms. Grady's card?

8           A.   No.  I do not.

9           Q.   But it says it here.  Correct?

10          A.   Okay.

11          Q.   I'm reading that correctly; right?

12   Credit card authorization would be 1805?

13          A.   That's the estimated charge, yes.

14          Q.   Okay.

15          A.   I don't know if that was charged to the

16   card or not.

17          Q.   Now, you did no investigation to

18   determine whether or not it was charged to the card?

19          A.   Absolutely not.

20          Q.   Okay.  Let's go to page 7 of 16.

21               Before I do that -- strike that.

22               Am I correct that page 4, 5 and 6 are

23   part of the Hertz contract?

24          A.   Yes.

RICHARD LIVINGSTON

Page 195

1          A.    No.    No.    You have mechanics.    You have

2     mechanic bays.    You have probably ten mechanic bays

3     in the back of the building.    Maintenance, but I

4     don't deal with them.    Most of the people there are

5     on a regional basis.

6          Q.    Okay.    Besides you in, you know,

7     corporate security and besides Mr. Lomis,

8     Mr. Graeber, Mr. -- who you already identified

9     yourself, is there anyone else that's involved in

10    corporate security or vehicle location tracking?

11         A.    For the Philadelphia area?

12         Q.    Yeah.

13         A.    No.

14         Q.    And that would be at all relevant times

15    that we're talking about.    Correct?

16         A.    Yes.

17         Q.    Is it your testimony that you don't go

18    to the location and question any of the Hertz

19    employees when you receive a theft package?

20         A.    That's my testimony, yes.

21         Q.    Why?

22         A.    Because I mean the package has been

23    completed, all the reports have been reviewed, I

24    guess, by OKC.    And my marching orders are to report

RICHARD LIVINGSTON

Page 196

1    the car stolen when I get the -- again, I do look at

2    it for everything being accurate, as far as I can

3    tell, within the report itself.

4            Q.    Yeah.  But you don't do any independent

5    investigation?

6            A.    I do not.

7            Q.    You don't do any check?

8            A.    I do not.

9            Q.    How far away is your office from the

10   Philadelphia Hertz office?

11           A.    From the airport?

12           Q.    Yeah.  Philadelphia Airport Hertz

13   office?

14           A.    Half a mile, three-quarters of a mile.

15           Q.    So how long would it take you to get

16   there by car?

17           A.    Five minutes.

18           Q.    Okay.  Is it your testimony that when

19   you receive a theft package that deals with the

20   Philadelphia Hertz Airport location, you wouldn't go

21   and speak to individuals there regarding the theft

22   package?

23               MR. WOLF:  Asked and answered, but

24   you can answer.

RICHARD LIVINGSTON

Page 197

1              THE WITNESS:  In reference to?

2    BY MR. MALOFIY:

3              Q.   Receiving a theft package and doing any

4    kind of inquiry, you wouldn't do that normally?

5                   MR. WOLF:  Asked and answered, but

6    you can answer.

7                   THE WITNESS:  A conversion has

8    nothing to do with the people that wrote the

9    contract or anything like that.  No, I would not.

10   BY MR. MALOFIY:

11             Q.   Would you have to speak to the rental

12   representative who was?

13             A.   I don't know who -- what are you talking

14   about as far as a rental representative.

15             Q.   The person who rented the car to the

16   renter.

17             A.   All right.

18             Q.   Did you ever speak to them in regards to

19   a theft or a conversion or a stolen vehicle?

20             A.   Possibly if there was fraudulent

21   paperwork submitted to them, I might.

22             Q.   But it wouldn't be your practice to do

23   that.  Correct?  To enter --

24             A.   Not in the normal course of business

RICHARD LIVINGSTON

Page 205

1          A.    I have never been deposed for Hertz.

2          Q.    Okay.  Are you aware of any lawsuits

3     against Hertz for improperly reporting a car stolen

4     when it was not?

5          A.    I am not.

6          Q.    Okay.  Have you ever complained that the

7     Hertz computer systems are not -- strike that.

8                Do you have access to phone logs to

9     determine when a renter called in?

10         A.    I do not.

11         Q.    Do you have access to any kind of logs

12    that determine the contacts the renter had with

13    Hertz?

14         A.    Do not.

15                MR. MALOFIY:  I want to take a half

16    hour break for lunch and finish up?

17                MR. WOLF:  Do you need a break?

18                THE WITNESS:  I need to go.

19                MR. WOLF:  Let's finish.

20                MR. MALOFIY:  We're going to be a few

21    hours.

22                MR. WOLF:  A few more hours?

23                MR. MALOFIY:  Absolutely.  Yeah.  I

24    got a lot of documents to go through.  If you want a

RICHARD LIVINGSTON

Page 215

1    changes between the contract and that sheet.  What

2    exactly transpired to make that happen, I don't

3    know.

4           Q.   Okay.  At any point would -- as a

5    corporate security manager or anyone in your

6    division of one other person, I mean -- I don't mean

7    to make that --

8           A.   It is all right.

9           Q.   -- let me strike that.

10               As a corporate security manager for

11   Hertz for this area or anyone working with you or

12   for you, would they have done any independent

13   investigation in to what payments are made with the

14   car before filing a police report?

15          A.   Not on my side of the fence.  On OKC's

16   side possibly.

17          Q.   Okay.

18          A.   We're still the same company.  I just

19   don't know what they do, possibly do to investigate

20   that further.

21          Q.   That's one of the questions I had.  Who

22   does this investigation if you don't, the corporate

23   security manager?

24          A.   As far as I know, vehicle control does

RICHARD LIVINGSTON

Page 216

1   all that paperwork.

2        Q.   Well, you said paperwork --

3        A.   Well --

4        Q.   -- what do you mean by that?

5        A.   Whatever they do to glean the

6   information that they put down in the theft package.

7        Q.   Do you know how that process is done?

8        A.   I do not.

9        Q.   If you don't know, who would know?

10       A.   Vehicle control would know.

11       Q.   Do you know if someone is testifying

12   from vehicle control?

13       A.   I do not know.

14       Q.   Did anyone from vehicle control talk to

15   you in regards to this case?

16       A.   No.

17       Q.   Did anyone from Hertz internally talk to

18   you in regards to this case?

19       A.   No.

20       Q.   Do you know anyone in vehicle control or

21   investigation that does the investigations for

22   vehicle control?

23       A.   All vehicle control does different tasks

24   within it but I don't know who does what.

RICHARD LIVINGSTON

Page 374

1    recovered the vehicle?

2         A.    They know it.  They had to take it out

3    of the system.

4         Q.    Did you ever tell police that Ms. Grady

5    was -- were you aware that Ms. Grady was released?

6         A.    I didn't even know she was arrested.

7         Q.    So you didn't know she was detained?

8         A.    Correct.

9         Q.    What procedure was in place to notify

10   the police that Ms. Grady had made a payment of

11   $2,000?

12        A.    It has no bearing on the case

13   whatsoever.

14        Q.    I didn't ask --

15        A.    There's no procedure.

16        Q.    I didn't ask you --

17        A.    There's no procedure --

18        Q.    -- whether or not it's your judgment --

19             MR. WOLF:  He's answering the

20   question.

21             THE WITNESS:  -- in place.

22   BY MR. MALOFIY:

23        Q.    Let me ask it again so we have a clean

24   answer.  What procedure was in place at Hertz to

RICHARD LIVINGSTON

Page 375

1    inform the police that Hertz had made a charge that

2    went through on her bank for $2,500 days before the

3    report of the car stolen, which was not included in

4    the theft package or any information previously

5    provide to the police?

6              A.    There is no procedure in place because

7    it's not relevant.

8              Q.    So it's Hertz's position that payment

9    for a vehicle, pursuant to an agreement with Hertz,

10   is not relevant to prosecuting a young lady for a

11   theft of a vehicle?

12             A.    Hertz is only trying to recover even a

13   fraction of their loss from them not having the car

14   back when it was contracted to be back.

15             Q.    Isn't it true that she had an agreement

16   to the end of July and she paid the $2,500 pursuant

17   to that agreement?

18             A.    As far as the paperwork I see, no.

19             Q.    Why was the $2,500 paid to Hertz by Ms.

20   Grady on the same credit card and on the same rental

21   contract?

22                   MR. WOLF:   Same objection.   That's

23   been noted throughout the course of today.   He's

24   already testified he has nothing to do with billing.

RICHARD LIVINGSTON

Page 376

1    He doesn't know it.  Joe Jaussi is the proper

2    individual to be answering that question.

3              It's outside this witness' area of

4    expertise.

5    BY MR. MALOFIY:

6         Q.   I'm asking the context of corporate

7    security and also notifying the correct law

8    enforcement of changes to the facts and the scenario

9    relating to a criminal complaint filed on behalf of

10   Hertz against a renter.  That's the context the

11   question is being asked.

12        A.   Money paid prior to the car being stolen

13   is strictly a contractual thing prior to.  After

14   it's reported stolen, it becomes restitution.

15        Q.   Where in any of the documents do you see

16   the updated information that Hertz had received a

17   payment of $2,500?

18        A.   I haven't seen it in any of the

19   documents there.  That's because it is not revelent.

20              MR. WOLF:  Relevant.

21              MR. MALOFIY:  I understand.

22              THE WITNESS:  Thank you.

23   BY MR. MALOFIY:

24        Q.   Where in the documentation do you see

RICHARD LIVINGSTON

Page 377

 1    anywhere where Ms. Grady kept in constant contact

 2    with Hertz?

 3            A.   I don't.

 4            Q.   Okay.  And what investigation did you

 5    do, if any, to determine whether or not she was in

 6    constant contact with Hertz during the course of the

 7    rental?

 8            A.   I personally didn't.  I imagine the OKC

 9    did, but I can't...

10            Q.   You don't know that information.

11    Correct, sir?

12            A.   That's correct.

13            Q.   All right.  And you don't know what OKC

14    did; right?

15            A.   I don't know what exact steps they took,

16    no.

17            Q.   Right.  And as you came here today and

18    also the discovery you produced, you didn't produce

19    the actual procedure to follow in regards to the

20    theft.  Correct?

21            A.   That was my mistake, I apologize.

22                 MR. WOLF:  We have already been over

23    this.

24                 MR. MALOFIY:  And you will supplement

# EXHIBIT 3

JOSEPH MICHAEL JAUSSI

Page 1

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY

FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

- - -

KELLY A. GRADY,                    :
                                   : CIVIL ACTION
                                   : NOVEMBER TERM,
2015                               
         Plaintiff,                :
                                   : NO. 151103380
    vs.                            :
                                   :
THE HERTZ CORPORATION; HERTZ :
RENT-A-CAR PHILADELPHIA INTL.:
AIRPORT; JOHN DOE(s),              :
                                   :
         Defendants.               :


- - -

October 16, 2016

- - -

    Oral deposition of JOSEPH MICHAEL JAUSSI,

taken pursuant to notice, held at 1845 Walnut

Street, Suite 938, Philadelphia, Pennsylvania,

commencing at 11:56 a.m., on the above date,

before Jennifer P. Miller, RPR, CCR, CRR, and

Notary Public for the Commonwealth of

Pennsylvania, State of Delaware and the State

of New Jersey.

JOSEPH MICHAEL JAUSSI

Page 69

1  theft package and all the overdue notes

2  associated with the transaction.

3      Q.   Do you know the name of the

4  individuals who were involved with putting

5  together the theft package regarding Ms. Kelly

6  Grady?

7      A.   Say -- state the question again.

8      Q.   Name the individuals who are involved

9  in putting together the theft package relating

10 to Ms. Kelly Grady?

11     A.   It's my understanding that Rich

12 Livingston was on vacation at the time.  Ken

13 Graeber put the package together after he

14 received all the pertaining information within

15 the package for Oklahoma City.

16     Q.   We deposed Mr. Rich Livingston

17 Tuesday.  He indicated that he doesn't put the

18 package together.  He just gets it from

19 Oklahoma City and then basically just couriers

20 it to the police.

21               Is it your understanding that

22 the corporate security manager or assistant

23 corporate security manager actually puts the

24 theft package together?  Or is it your

JOSEPH MICHAEL JAUSSI

Page 70

1   understanding that the theft package is put

2   together in Oklahoma City and then sent to the

3   corporate security manager at the location

4   where the car was allegedly taken from?

5              MR. WOLF:  I'm going to object

6        to the characterization.  His testimony

7        will speak for itself.

8              You can answer.

9              THE WITNESS:  So it's my

10        understanding that Oklahoma City generates

11        the packet and all the pertaining

12        documents within it, feeds Ken Graeber or

13        Rich Livingston, right, and Ken Graeber or

14        Rich Livingston essentially print, file,

15        and go seek a police report claim or case

16        number.

17   BY MR. MALIFOY:

18        Q.   Okay.  So the theft package is

19   already completed in Oklahoma City before it's

20   sent to the corporate security manager at the

21   Hertz location where the car was allegedly

22   taken from, correct?

23        A.   That's my understanding, correct.

24        Q.   So who specifically by name do you

# EXHIBIT 4

1

```
 1               IN THE COURT OF COMMON PLEAS
         FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
 2                  CIVIL TRIAL DIVISION
                        - - -
 3
     KELLY GRADY,                  : NOVEMBER TERM, 2015
 4              Plaintiff         :
         vs.                       :
 5                                 :
     THE HERTZ CORPORATION;        :
 6   HERTZ RENT-A-CAR PHILADELPHIA :
     INTL AIRPORT,                 :
 7              Defendants         : NO. 3380

 8                      - - -

 9            Thursday, September 14, 2017
                 Afternoon Session
10
                        - - -
11
                 Courtroom 475
12                  City Hall
             Philadelphia, Pennsylvania
13
                        - - -
14
     BEFORE:  THE HONORABLE PAULA A. PATRICK, J., and a
15           Jury

16                      - - -

17

18

19

20

21

22

23

24

25
```

*Danielle O'Connor, RPR, CRR 215-683-8023*

Case ID: 151103380
Control No.: 17093136

2

1 APPEARANCES:

2 FRANCIS ALEXANDER, LLC
  BY: FRANCIS MALOFY, ESQUIRE
3     ALFRED JOSEPH FLUEHR, ESQUIRE
  280 N. Providence Road
4 Media, PA 19063
  Counsel for Plaintiff
5
  EDELSTEIN LAW, LLP
6 BY: JAY L. EDELSTEIN, ESQUIRE
      CHRISTOPHER LEEDS, ESQUIRE
7 230 S. Broad Street, Suite 900
  Philadelphia, PA 19102
8 Counsel for the Defendants

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Danielle O'Connor, RPR, CRR 215-683-8023*

3

1 **INDEX**

2
  **WITNESS**          **DR** **CR** **RDR** **RCR**
3
  Julie Wilkerson       --   4   55   56
4
  John Cocklin         57  64   --   --
5 (Voir Dire)

6 John Cocklin         68  97   --   --

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Danielle O'Connor, RPR, CRR 215-683-8023*

4

1          - - -
2          (The following occurred in open court
3 outside the presence of the jury:)
4          - - -
5          THE COURT: Is there anything we need
6 to discuss before the jury comes in?
7          MR. MALOFY: No, Your Honor.
8          THE COURT: Are you sure?
9          MR. MALOFY: Yes, Your Honor.
10          - - -
11          (Whereupon, the jury entered the
12 courtroom at 1:22 p.m.)
13          - - -
14          THE COURT: Welcome back, ladies and
15 gentlemen. We'll proceed now with the
16 cross-examination of the Hertz representative.
17          MR. MALOFY: Thank you.
18 May I proceed, Your Honor?
19          THE COURT: Yes, go ahead.
20          MR. MALOFY: Thank you.
21          - - -
22          CROSS-EXAMINATION
23          - - -
24 BY MR. MALOFY:
25 Q.    A few questions. And thank you for being

*Danielle O'Connor, RPR, CRR 215-683-8023*

5

1 here. I know you were here the whole time.
2          My understanding is you flew in from
3 Florida. Are you from Oklahoma or Florida? I'm
4 confused.
5 A.    **I'm from Oklahoma. I do work down in Florida.**
6 Q.    Okay. I see. A few things.
7          You would agree as the corporate
8 designee here on behalf of the Hertz Corporation
9 that prior to a report to the police -- and if a
10 report is made, you would agree with me that it must
11 be true?
12 A.    **Correct, yes.**
13 Q.    And you'd agree with me that it must be
14 accurate?
15 A.    **Yes.**
16 Q.    And you'd agree with me that it also must be
17 correct?
18 A.    **Yes.**
19 Q.    And would you also agree with me that if
20 there's omissions in the facts, that there's a duty
21 that Hertz corrects those omissions?
22 A.    **Yes.**
23 Q.    Did Hertz do that in this case?
24          MR. EDELSTEIN: Objection, Your Honor.
25          THE COURT: Overruled. She can

*Danielle O'Connor, RPR, CRR 215-683-8023*

Case 16-3380
Control No.: 17093136

**6**

1   answer.
2          THE WITNESS: I'm not sure what
3   omissions you're talking about.
4   BY MR. MALOFIY:
5   Q.   Do you believe there were any omissions in the
6   information provided to the police, yes or no?
7   A.   At what time?
8   Q.   At any time.
9   A.   We gave them what we had at -- what
10  information we had. We handed the theft report off
11  to the police, the information that we had, and then
12  that was given to the police. And what they did
13  from there is up to them.
14  Q.   Do you believe if there's -- I think you
15  testified if there's omitted facts, they should be
16  corrected, correct?
17  A.   Yes.
18  Q.   Eventually did Hertz become aware of
19  additional facts in regards to Ms. Grady's rental
20  that should have been provided to the police?
21  A.   Which facts?
22  Q.   Well, the payment of 2400.
23  A.   That was actually in the theft package. The
24  police had that information.
25  Q.   The police had that information?

Danielle O'Connor, RPR, CRR 215-683-8023

**7**

1   A.   Yes, it's in the billing page of the theft
2   package.
3   Q.   What page is that, ma'am?
4   A.   We went over it this morning.
5          MR. MALOFIY: Court's indulgence.
6          (Pause.)
7          MR. MALOFIY: I need the date on this.
8   BY MR. MALOFIY:
9   Q.   Ma'am, do you know when this was completed,
10  this document that you had reviewed with counsel?
11  A.   It's on there.
12  Q.   Okay.
13  A.   July the 12th, 2013. It says, "process date."
14          MR. EDELSTEIN: You're writing on my
15  document.
16          MR. MALOFIY: I don't mean to do that.
17  That's why...
18          MR. EDELSTEIN: Okay.
19  BY MR. MALOFIY:
20  Q.   I want to go to something, ma'am.
21          This was July the 12th you said it was
22  created?
23  A.   July the 12th, 2013, I believe is when it said
24  the rental was closed. We had to close the rental
25  out --

Danielle O'Connor, RPR, CRR 215-683-8023

**8**

1   Q.   Yes.
2   A.   -- in order to report it stolen.
3   Q.   I understand. If I could make sure? Let me
4   confirm that, ma'am.
5          MR. MALOFIY: Can I approach the
6   witness?
7          THE COURT: Ginelle, can you give that
8   to the witness?
9          THE WITNESS: So it says "date, time
10  posted, July 12th, 2013, at 12:34 p.m."
11  BY MR. MALOFIY:
12  Q.   Okay.
13  A.   We closed it back to May 31st, because that's
14  all the authorization we got at time of rent. And
15  it says right there, "bill to auth plus 15 percent
16  Vehicle Control, Alicia Brown."
17  Q.   I see.
18          MR. MALOFIY: Can I have that document
19  back?
20  BY MR. MALOFIY:
21  Q.   Can we put up P-6? That document was created
22  on 7/12, correct?
23  A.   What?
24  Q.   7/12, that was your testimony, correct?
25  A.   When the rental was closed, correct.

Danielle O'Connor, RPR, CRR 215-683-8023

**9**

1   Q.   And when the payment went down, I'd like to
2   blow this up for the benefit of the jury and also
3   for Ms. Wilkerson -- Mrs. Wilkerson or Ms.?
4   A.   Mrs. Wilkerson.
5   Q.   Mrs. Wilkerson, my apologies.
6          The payment was put through and Hertz
7   was paid 2445 on 7/15, correct?
8   A.   Right. So we closed it and it went through
9   the process to force charge through the bank.
10  Q.   Isn't it a fact that the car was paid?
11  A.   No.
12  Q.   It wasn't?
13  A.   It wasn't paid in full.
14  Q.   Well, I'm sorry --
15          MR. MALOFIY: Objection.
16          MR. EDELSTEIN: Objection to what?
17          THE COURT: Okay. But you asked the
18  question, so now she answered it.
19  BY MR. MALOFIY:
20  Q.   The car -- let's be clear. Hertz received
21  1805, correct?
22  A.   At time of rent we received 1805
23  authorization.
24  Q.   Did Hertz receive and put in their bank
25  account $1805, yes or no?

Danielle O'Connor, RPR, CRR 215-683-8023

CRR 215-683-8023380
Control No.: 17093136

10

1  A.    Yes.  But then we force charged 2,444.94
2  cents, but the car wasn't actually picked up
3  until -- we didn't recover our car until September
4  11th, 2013.
5  Q.    That's a different issue, when you recovered
6  your car.  We can move to that and I will.  But
7  let's go to the payment.
8         You don't dispute that you received --
9  Hertz put in their bank account $1805, correct?
10 A.    Correct.
11 Q.    And you don't dispute that Hertz put in Hertz'
12 bank account $2,444.94, correct?
13 A.    Correct.
14 Q.    And you don't dispute that when you produce
15 this theft package and the report to the police that
16 was completed on 7/12, correct?
17 A.    Correct, but --
18 Q.    Hold on.
19 A.    But it wasn't paid in full.
20 Q.    And this payment was 7/15/2013, days later,
21 correct?
22 A.    It has to go through the process.
23 Q.    Is that correct, ma'am?
24 A.    Yes.
25 Q.    Yes, it is correct.

11

1  A.    But it still wasn't paid in full.
2  Q.    I think what we're going at is because you
3  didn't receive it until September --
4         THE COURT:  Counsel, do you want to go
5  into that?  Because I made a ruling on that
6  earlier.
7         MR. MALOFIY:  Fair enough, Your Honor.
8         THE COURT:  It's up to you if you want
9  to go into it.
10 BY MR. MALOFIY:
11 Q.    Let's be clear.  OnStar, correct, was called?
12 A.    They were called, but not by Hertz.
13 Q.    When OnStar was called, did Hertz know where
14 their vehicle was?
15 A.    Not at that time.
16 Q.    Oh, Hertz --
17 A.    The police had to notify us.
18 Q.    Well, Hertz actually spoke to the police on
19 7/22, correct?
20 A.    Correct.
21 Q.    You don't dispute that Hertz representatives
22 spoke to the police in regards to Ms. Grady's
23 rental, correct?
24 A.    And told her she wasn't authorized to keep the
25 car.

12

1  Q.    Hold on a second.  They also told her she did
2  not steal the car, correct?
3  A.    That's what they said.
4  Q.    Are you disputing what they said, Trooper
5  Kemmerling?
6  A.    No, no.
7  Q.    So you accept the representation from Trooper
8  Kemmerling and the state police report that said
9  Hertz had said the car was not stolen, correct?
10 A.    Correct.  But he let -- he did not let her
11 take our car and our asset.  And Trooper Kemmerling
12 also told her she could be -- Philadelphia PD might
13 go after her.
14 Q.    Well, he said "might," and there's dispute as
15 to that and that's for the jury to decide.
16 A.    Okay.
17 Q.    Let me move to something else.
18         You admit and you accept the
19 representation that Hertz said the car was not
20 stolen, correct, on that day?  On 7/22, when a Hertz
21 representative was contacted, Hertz said the car was
22 not stolen?
23 A.    Someone at Hertz said that, yes.
24 Q.    Who was that?
25 A.    I have no idea.

13

1  Q.    Well, if there was a call and there was a
2  situation and someone called the number, they would
3  have called up and it would have got directed right
4  to you, right?
5  A.    That's correct, but they weren't directed
6  right to me.
7  Q.    And was it you who said the car was not stolen
8  or was it someone else?
9  A.    It was not me.
10 Q.    Well, where are the notes to indicate who said
11 that, ma'am?
12 A.    There are no notes because we don't know who
13 said that.
14 Q.    I'm sorry?
15 A.    I don't know who said that.
16 Q.    Did you ask?
17 A.    Ask who?
18 Q.    Well, ask anyone at Hertz who said that.
19 A.    No.
20 Q.    Did you do that?
21 A.    No.
22 Q.    You could have done that, right?
23 A.    I could have.
24 Q.    You could have got an e-mail, put a global
25 message out to everyone in the corporate global --

Control No.: 17093136

14

1  Hertz corporate global and said, I need to know who
2  said that, that is a serious matter, I have to
3  testify in court under oath; you could have done
4  that, right?
5  A.  Well, we didn't actually have our car back at
6  that time.
7  Q.  No, no.  I'm asking before you took the stand
8  today, before you testified to this jury, you could
9  have sent an e-mail to everyone at Hertz saying, I
10  need this information, who spoke to the police
11  officers on this date and said Ms. Grady was
12  authorized, correct?
13  A.  Someone at Hertz could have said that, yes.
14  Q.  But you didn't do that as you took the stand
15  here today, correct?
16  A.  No.
17  Q.  And you don't have any notes in your system to
18  indicate -- you don't have any notes in your system
19  that records that phone call where the Hertz
20  representative said it, right?
21  A.  Well, first of all, they don't document what
22  Hertz representative they spoke to in the notes at
23  the police, nor do they say what phone call they
24  called.  So it's a little difficult for me to
25  understand who Officer Kemmerling called and who he

15

1  exactly spoke to.  Usually, we would get that
2  information if they spoke to us.
3  Q.  But Trooper Kemmerling testified he spoke to
4  Hertz, he called the number, was routed to the 800,
5  gave the information on the contract and that would
6  have gone, you said, to I believe it was Oklahoma
7  City Vehicle Control, correct?
8  A.  Correct.
9  Q.  That's where it should have gone, correct?
10  A.  Where it should have gone.
11  Q.  And if it should have gone in the right place
12  and things happened the right way, they should have
13  filed procedure and that phone call should have been
14  documented in the notes, correct?
15  A.  Correct.
16  Q.  And it wasn't, correct?
17  A.  But Officer Kemmerling didn't say what phone
18  number he called.
19  Q.  And it wasn't documented in the notes,
20  correct?
21  A.  Correct.
22  Q.  Thank you.  Now, let me get to another point.
23  Ms. Grady brought her phone record in this case,
24  TD -- excuse me -- Bank record, correct?
25  A.  Yes.

16

1  Q.  Are you familiar with bank statements?
2  A.  Yes.
3  Q.  You are.  Do you work with them?
4  A.  No, I don't work with them.
5  Q.  You're familiar with them?
6  A.  Yes.
7  Q.  Have you seen them before?
8  A.  Yes.
9  Q.  Now, does Hertz have a bank account?
10  A.  Yes.
11  Q.  It does.  Who does it bank with?
12  A.  I can't give you the exact name.
13  Q.  Well, you could have done an investigation and
14  looked at Hertz' bank statements to determine and
15  confirm the 1805 and the $2445, correct?
16  A.  It's actually on the document we already
17  presented to you this morning.
18  Q.  The one before the charges went through,
19  correct?
20  A.  The 1805, when she rented, and then when we
21  closed out the contract on July 12th, the force
22  charge is the two charges.
23  Q.  I understand.  We'll get to the force charge
24  in a minute.  You could have brought your bank
25  records here today.  You're here as a fact witness

17

1  for Hertz.  You're here as a corporate designee to
2  bind the corporation; do you understand that?
3  A.  Yes.
4  Q.  And you're here and what you say binds the
5  corporation to Hertz.
6       Did Hertz bring any corporate bank
7  statements here today to go over and look at the
8  bank's statement to determine what was paid or what
9  was not?
10  A.  Well --
11  Q.  Yes, it did or no, it didn't, ma'am, and then
12  you can explain.
13  A.  It's in the theft package what was billed.
14  The 1805 and the 2444 are actually on the closed --
15  Q.  I'm sorry.  Maybe I'm not clear.  My question
16  was a little different.
17       Did you bring the bank records to this
18  court here today, yes or no?
19  A.  No, we have securities.  I can't just pop up a
20  bank record.
21  Q.  We asked for it in discovery I'll represent as
22  an officer of the court.
23       MR. EDELSTEIN:  Objection, Your Honor.
24       THE COURT:  You object to that?
25       MR. EDELSTEIN:  I object to that

103380
Control No.: 17093136

18

1  editorialization, yes.
2          THE COURT:  All right.  It's
3  sustained.
4          MR. EDELSTEIN:  The jury has heard it,
5  so it doesn't matter.
6  BY MR. MALOFIY:
7  Q.    Let me go to Exhibit 13.
8          MR. MALOFIY:  Do you have that, Mr.
9  Segal?
10 BY MR. MALOFIY:
11 Q.    Now, do you know who Kenneth Graeber is?
12 A.    **The assistant corporate security at the time.**
13 Q.    Of where?
14 A.    **Hertz, Philadelphia.**
15 Q.    Did you ever speak to him?
16 A.    **Yes.**
17 Q.    You know who he is, right?
18 A.    **Yes.**
19 Q.    Do you know he gave an interview in this case?
20 A.    **Yes.**
21 Q.    Did you review that interview?
22 A.    **Yes.**
23 Q.    It says here, the interview was taken, if I'm
24 not mistaken, on 7/23/2013.  Do you see that?
25 A.    **Yes.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

19

1  Q.    Now, if you go down here, it says --
2          MR. MALOFIY:  And if you go to the
3      second page, Mr. Segal, blow this portion up
4      for the benefit of the jury.  Bring that up.
5  BY MR. MALOFIY:
6  Q.    When he was questioned by the police officer,
7  Officer Ianoconne took the stand here, the question
8  was asked of Kenneth Graeber:  "How much of a
9  payment was received from the renter."
10         "ANSWER:  We received 1805 for the
11     contracted rental and a deposit."
12         MR. EDELSTEIN:  Judge --
13 BY MR. MALOFIY:
14 Q.    Do you see --
15         MR. EDELSTEIN:  Just for the record,
16     although I have no problem with the actual
17     question, the questions are being asked of --
18     as to what the actual statement says, not as to
19     what the officer said when he was in the
20     courtroom --
21         THE COURT:  Okay.
22         MR. EDELSTEIN:  -- as I understand it.
23         MR. MALOFIY:  That's correct.
24         MR. EDELSTEIN:  Okay.
25         THE COURT:  All right.

*Danielle O'Connor, RPR, CRR 215-683-8023*

20

1  BY MR. MALOFIY:
2  Q.    Do you see that?
3  A.    **What was the question?**
4  Q.    It says here in the interview that was
5  conducted by and between Officer Ianoconne and
6  Kenneth Graeber, who's the assistant corporate
7  security manager of the Philadelphia branch at the
8  time, correct?
9  A.    **Yes.**
10 Q.    And the question was asked of him in his
11 interview on 7/23/2013:  "How much of a payment was
12 received from the renter, Question.
13         "ANSWER:  We received 1805 for the
14     contracted rental and a deposit."
15         Do you see that?
16 A.    **Yes.**
17 Q.    Why wasn't any additional information provided
18 to Officer Ianoconne?
19 A.    **It was.  The whole theft package was given to**
20 **him.**
21 Q.    The theft package you showed does not have the
22 payment of 2445, ma'am; isn't that correct?
23 A.    **No, it does.**
24 Q.    It was made on 7/12, ma'am; isn't that true?
25 A.    **Yes, but the interview was 7/23.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

21

1  Q.    Right, but you don't have the payment --
2  there's no -- there's no indication that the
3  additional 2445 was paid by Ms. Grady before a
4  police interview was taken, correct?
5  A.    **It was in the theft package that Mr. Graeber**
6  **handed to the detective questioning him.**
7  Q.    What you showed me is as identifying 2445 was
8  the rate that Ms. Grady was supposed to get; isn't
9  that correct?
10 A.    **No.**
11 Q.    It's not?
12 A.    **20 --**
13 Q.    Isn't it true that the payment was on 7/15, we
14 just looked at that on TD Bank records, you didn't
15 dispute that, ma'am, right?
16 A.    **Right.  It was closed out on 7/12 and it went**
17 **through the cycle as a force charge on 7/15.**
18 Q.    Right.  So why didn't -- Officer Ianoconne,
19 why wasn't he provided with that information in the
20 interview?
21 A.    **He was provided the theft package.**
22 Q.    The theft package did not identify a payment,
23 ma'am.
24 A.    **In the theft package, there does have the 1805**
25 **in the payment.  If he had looked at the theft**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Case 2:15-cv-03380
Control No.: 17093136

22

1    package, it was right there.
2    Q.    Let me go to another -- I understand your
3    testimony.  But let's go to something else so we can
4    make this clear.  Exhibit 3 --
5            MR. EDELSTEIN:  Your Honor, let me
6        just object to that editorialization again.
7        It's clear.  She testified that the theft
8        package showed it.  So whether it's clear to
9        Mr. Malofiy --
10           THE COURT:  Objection is sustained.
11       Her testimony is what it is.
12           MR. EDELSTEIN:  We're supposed to do
13       this without editorializing.
14           THE COURT:  We're supposed to,
15       correct.
16           MR. MALOFIY:  Mr. Edelstein has done
17       it quite a bit.
18           THE COURT:  You didn't object.
19           MR. MALOFIY:  I know I didn't.  I was
20       giving him some leeway.  I thought he would do
21       the same.
22           MR. EDELSTEIN:  I appreciate it, and
23       I'll give you some leeway.
24   BY MR. MALOFIY:
25   Q.    If we could go to Exhibit 3, paragraph 20.

24

1    Q.    Isn't it true that Hertz also received a
2    payment of 2445 --
3            MR. EDELSTEIN:  Objection, Your Honor.
4        There's testimony it was a force charge, not a
5        payment made by Ms. Grady.
6            MR. MALOFIY:  I would appreciate if
7        the witness testified.
8            THE COURT:  He objected based upon a
9        characterization of the question.  You just
10       have to rephrase the question.
11   BY MR. MALOFIY:
12   Q.    Ma'am, isn't it true that this Answer 20 did
13   not identify all the payments that Hertz had
14   received in regards to Ms. Grady's rental?
15           MR. EDELSTEIN:  Just note my
16       objection.  That wasn't the question that was
17       asked, Your Honor.
18           THE COURT:  Overruled.  Go ahead.
19           THE WITNESS:  So we received one
20       payment that she authorized of 1805, the other
21       payment of $2400 and some change was a force
22       charge.
23   BY MR. MALOFIY:
24   Q.    Let me ask you something about force charge.
25   You received the payment, did you not?

23

1    Let me see it real quick.
2            Did you review interrogatories that
3    were signed under oath in this case, verified
4    answers to interrogatories?
5    A.    No.
6    Q.    You didn't.  Let me go to Exhibit 3.  These
7    were the interrogatories that were propounded upon
8    Hertz.  Could we pull that up for the jury?
9            Can you see that, ma'am?
10   A.    Yes.
11   Q.    Now, to be clear, these were the
12   interrogatories in this case, these are the answers
13   from Hertz.
14           You didn't have a chance to review
15   these?
16   A.    I did see that.  I'm sorry.
17   Q.    And it said here on 20:  "Describe in detail
18   all payments, including date, time, amount, and
19   payment method Kelly Grady made for the rental of
20   the Chevy Yukon."  Do you see that?
21   A.    Yes.
22   Q.    And the answer was:  "One payment on April
23   17th, 2013, at 1:57 p.m. for 1805 to a Visa card
24   ending in 0583."  Do you see that?
25   A.    Yes.

25

1    A.    We didn't receive any authorization from TD
2    Bank, so she has up to six months to dispute the
3    charge.
4    Q.    You received the payment, ma'am, correct?
5    A.    Yes.
6    Q.    You received the payment and did Ms. Grady
7    ever deny that charge?
8    A.    No.
9    Q.    And did Ms. Grady ever send you a letter to
10   corporate saying I deny this charge?
11   A.    No.
12   Q.    And did you have any evidence whatsoever that
13   she called up and she said no, this charge can't go
14   through?
15   A.    She would dispute the charge with her bank,
16   not with Hertz.
17   Q.    I'm asking if she called Hertz and you have
18   any evidence whatsoever in this world to say she
19   ever disputed that charge?
20   A.    She didn't dispute with Hertz.  She would have
21   to dispute with her credit card company.
22   Q.    And you have nothing in Hertz' file to
23   indicate she disputed this in any way, shape, or
24   form, correct?
25   A.    That's correct.

CRR 215-683-8023380
Control No.: 17093136

26

1  Q.  So, to be clear, you would agree -- you would
2  agree with me that Hertz received 1805 on 4/27/2013,
3  correct?
4  A.  **As an authorization, correct.**
5  Q.  And she provided you her credit card when she
6  initially rented the car, correct?
7  A.  **At time of rent.**
8  Q.  She did that?
9  A.  **Yes.**
10 Q.  Did she ever withdraw her authorization to
11 you, yes or no?
12 A.  **No.**
13 Q.  Have you ever had billing issues or
14 communications issues as Hertz has had with its bank
15 or with someone else's bank?
16 A.  **Yes, we have billing issues.**
17 Q.  Sometimes there's problems with banks talking
18 to other people's banks and there's issues, correct?
19 A.  **Correct.**
20 Q.  You don't dispute that, that's not unusual,
21 that there might be a problem with a wire or
22 communications between the two banking institutions,
23 correct?
24 A.  **No, not at all.**
25 Q.  Did you do any investigation to determine --

*Danielle O'Connor, RPR, CRR 215-683-8023*

28

1  supervisor?
2  A.  **Yes.**
3  Q.  And my understanding also, it's actually part
4  of your job to make sure those overdue vehicle
5  investigations are done properly, correct?
6  A.  **Yes.**
7  Q.  And it's your job to manage a fleet of
8  $700,000 cars?
9  A.  **Yes.**
10 Q.  And, basically, you regulate all the stealing
11 off of Hertz' lot?
12 A.  **Well, we handle four different types of**
13 **thefts.**
14 Q.  Well, that's one type -- any type of theft,
15 you represent the stealing off of Hertz' property?
16 A.  **Yes.**
17 Q.  I'm a little confused as to what factual
18 knowledge you have about this case.  I know you're
19 testifying here as a corporate designee, but I have
20 a few questions for you.
21 A.  **Okay.**
22 Q.  Do you recall ever speaking to Ms. Grady?
23 A.  **No.**
24 Q.  Would you remember speaking to Ms. Grady if
25 you did?

*Danielle O'Connor, RPR, CRR 215-683-8023*

27

1  I'll withdraw the question.
2         Let me move forward to this:  My
3  understanding, if I understand your testimony
4  correctly, is that if someone calls in and the card
5  isn't -- you call it Block status?
6  A.  **Yes, it's blocked in Pick Up status.**
7  Q.  And it would go right to you or someone in
8  your office, correct?
9  A.  **In the Vehicle Control area.**
10 Q.  How many people are in that office?
11 A.  **Seventy.**
12 Q.  Seventy people?
13 A.  **Yes.**
14 Q.  That's a lot of people handling this.  How
15 many cars does Hertz have?
16 A.  **Currently or in 2013?**
17 Q.  Let's go with 2013.
18 A.  **At the time we had approximately 700,000 cars.**
19 Q.  700,000?
20 A.  **Uh-huh, in North America.**
21 Q.  And, you know, my understanding, and correct
22 me if I'm wrong, is that you've worked for Vehicle
23 Control for over ten years; is that correct?
24 A.  **Yes.**
25 Q.  And my understanding also is that you're the

*Danielle O'Connor, RPR, CRR 215-683-8023*

29

1  A.  **It would be in the notes.**
2  Q.  Ma'am, you didn't bring any notes here today,
3  did you?
4  A.  **I did.**
5  Q.  Do you have the notes of the police officer?
6  A.  **I have the theft package --**
7  Q.  I'm asking --
8  A.  **-- with the notes.**
9  Q.  -- when the police officer called on 7/22 and
10 let this young lady go, do you have notes of that
11 conversation in your records?
12 A.  **No.**
13 Q.  No, you don't.  Sometimes notes aren't taken,
14 correct?
15 A.  **Correct.**
16 Q.  In this case you've heard the testimony of
17 Joseph Jaussi, it was read in, correct?
18 A.  **Yes.**
19 Q.  He said the records were purged in regards to
20 Ms. Grady.  Do you remember that?
21 A.  **Yes.**
22 Q.  Do you dispute his testimony which was under
23 oath and bound the Hertz Corporation?
24 A.  **Well, it's the definition --**
25 Q.  I would ask for a yes --

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136
03380

30

1    A.    -- definition of purged.
2              MR. EDELSTEIN:  Objection, Your Honor.
3        He asked the question.
4    BY MR. MALOFIY:
5    Q.    Do you dispute it, ma'am, yes or no, and then
6    you can explain?
7              MR. EDELSTEIN:  Your Honor, he asked
8        the open-ended question.
9              THE COURT:  He did.  So that's
10       sustained.  Rephrase the question.  What you
11       just asked is fine.
12   BY MR. MALOFIY:
13   Q.    Ma'am, do you dispute Joseph Jaussi's
14   testimony that the records were purged, yes or no?
15   A.    No.  Can I give the definition of purged,
16   though?
17   Q.    I think it's subjective to a degree, but maybe
18   your counsel can follow up with you.
19   A.    Sure.
20   Q.    You see hundreds of packages every day,
21   correct, hundreds of theft packages?
22   A.    Yes.
23   Q.    And I think you were testifying that in the
24   months of -- in the months of July and the summer
25   months, it gets real busy?

*Danielle O'Connor, RPR, CRR 215-683-8023*

31

1    A.    Yes.
2    Q.    Real busy?
3    A.    During the summer months.
4    Q.    And I imagine when someone calls on the phone
5    and they're trying to get ahold of a representative,
6    then they get routed to another department, that
7    would happen, right?
8    A.    Right.
9    Q.    And then they would sit on the phone for a
10   long time and they get routed to another department
11   because you're very busy, right?
12   A.    We're busy, but when we have a theft that
13   comes through, it's routed to us.  We have someone
14   available to take those calls.
15   Q.    You're supposed to have someone available,
16   correct?
17   A.    We do have someone available.
18   Q.    Okay.
19   A.    It's a theft package.  It's our asset, we want
20   it back.
21   Q.    So your goal in this instance was to get your
22   asset back, correct?
23   A.    Correct.
24   Q.    On 7/22, you knew that your asset was no
25   longer with Ms. Grady, correct?

*Danielle O'Connor, RPR, CRR 215-683-8023*

32

1    A.    We didn't have it back.
2    Q.    I'm asking you, did you know, yes or no, that
3    your asset was no longer with Ms. Grady on 7/22?
4    A.    Somebody at Hertz did.
5    Q.    Right.  Now, who at Hertz knew?
6    A.    I'm not sure, because the police officer
7    didn't tell me what phone number or who he spoke to.
8    Q.    Well, you mean the police officer -- you mean
9    there's no notes here today that indicate that,
10   correct?
11   A.    Correct.
12   Q.    You do what, about a hundred theft packages
13   per day; is that about right?
14   A.    Some days.
15   Q.    So in the course of you've been sitting here,
16   maybe 400, 500 theft packages went out, correct?
17   A.    Yes.
18   Q.    Basically, this is a mechanical process, you
19   pretty much just approve them?
20   A.    No.
21   Q.    No?
22   A.    No.
23   Q.    Isn't it sort of automated, or you actually do
24   a hundred theft packages a day that are this big?  I
25   mean --

*Danielle O'Connor, RPR, CRR 215-683-8023*

33

1    A.    So every night that I left here, I went back
2    to my hotel and reviewed theft packages, page by
3    page by page.
4    Q.    You did?
5    A.    I did.
6    Q.    How many did you review since you've been
7    here?
8    A.    About 380.
9    Q.    I see.  Now, let's be clear, you're here to
10   testify as to the policies and procedures of Hertz
11   Rental Car Corporation, correct?
12   A.    Yes.
13   Q.    And you're here also to discuss this policy
14   W7-02, correct?
15   A.    Yes.
16   Q.    Are you familiar with that policy?
17   A.    Yes.
18   Q.    And you're familiar with that policy because
19   that's a policy that you work with, correct?
20   A.    Yes.
21   Q.    And that's a policy which basically regulates
22   all the stealing off of Hertz' lot, correct?
23   A.    Yes.
24   Q.    Did you help draft that?
25   A.    No.

*Danielle O'Connor, RPR, CRR 215-683-8023*

Case 15-683-8023380
Control No.: 17093136
09/14/2017 08:38:32 PM

34

1   Q.   You didn't.  Who helped draft that document?
2   A.   **Corporate counsel.**
3   Q.   Lawyers?
4   A.   **Yes.**
5   Q.   I see.  Are you technically an officer of the
6   Hertz Corporation?
7   A.   **No.**
8   Q.   Are you just strictly an employee?
9   A.   **I am an employee.**
10  Q.   So no officers of the Hertz Corporation came
11  to this court today, correct, or at any point during
12  this trial, correct?
13  A.   **No.**
14  Q.   Any board members came?
15  A.   **No.**
16           MR. MALOFIY:  And can we pull up
17       W7-02?  Mr. Segal, do you know that number?  Is
18       it P-9?  Thank you.
19  BY MR. MALOFIY:
20  Q.   You're familiar with this document, correct?
21  A.   **Yes.**
22           MR. MALOFIY:  I want to go up here and
23       I want to blow up -- right here, let's blow
24       this up, Mr. Segal.
25  BY MR. MALOFIY:

*Danielle O'Connor, RPR, CRR 215-683-8023*

35

1   Q.   Mrs. Wilkerson, can you see that?
2   A.   **Yes.**
3           MR. MALOFIY:  Thank you, Mr. Segal.
4       Can we elevate that?
5   BY MR. MALOFIY:
6   Q.   "Executive summary, this worldwide procedure
7   applies to the rent-a-car division of the Hertz
8   Corporation and includes requirements for reporting
9   vehicle thefts and conversions."  Did I read that
10  correctly?
11  A.   **Yes.**
12  Q.   It says:  "All vehicle theft and conversions
13  must be documented on a theft recovery vehicle
14  report."  Did I read that correctly?
15  A.   **Yes.**
16  Q.   Then it says:  "All vehicle thefts from
17  customers must also be documented on the vehicle
18  theft from customer report."  Did I read that
19  correctly?
20  A.   **Yes.**
21  Q.   And here's what I'm getting at and where I'm
22  going with this, it says near the last line:
23  "Location, maintenance, area, country, head office,
24  and OKC management must ensure compliance with this
25  procedure."  Do you see that?

*Danielle O'Connor, RPR, CRR 215-683-8023*

36

1   A.   **Yes.**
2   Q.   Is it your job to ensure compliance with this
3   procedure?
4   A.   **Yes.**
5   Q.   And you're the person in charge of 700,000
6   cars to make sure as the regulator that these cars
7   and these -- excuse me -- procedures are followed,
8   correct?
9   A.   **Correct.**
10  Q.   Now, when it says "location," that means in
11  this instance the Philadelphia location, correct?
12  A.   **Correct.**
13  Q.   Just to make this clear, this here says:
14  "W7-02 RAC, reporting vehicle thefts and
15  conversions, August 21st, 2009."  Did I read that
16  correctly?
17  A.   **Yes.**
18  Q.   That's the policy in effect at the time Ms.
19  Grady was arrested and policy in effect at the time
20  of 2013-2014, correct?
21  A.   **Yes.**
22  Q.   The purpose of this standard operating
23  procedure, correct, was to provide requirements for
24  reporting thefts, conversions, or the disappearance
25  of Hertz vehicles, correct?

*Danielle O'Connor, RPR, CRR 215-683-8023*

37

1   A.   **Correct.**
2           MR. MALOFIY:  Pull that back, Mr.
3       Segal.  Can we go to the next page?  Page 3 --
4       page 4.  Excuse me.  With the court's
5       indulgence?  Try page 5.  There also.
6   BY MR. MALOFIY:
7   Q.   All right.  You're intimately familiar with
8   this whole theft package correct -- excuse me, this
9   whole theft procedure, correct?
10  A.   **Yes.**
11  Q.   You use it on a daily basis?
12  A.   **Yes.**
13  Q.   In fact, this is a procedure that you follow
14  to make sure that innocent people aren't wrongfully
15  arrested for accidental reporting to the police,
16  correct?
17  A.   **Correct.**
18  Q.   And it's important these policies and
19  procedures are followed by Hertz Corporation,
20  correct?
21  A.   **Correct.**
22  Q.   And if Hertz doesn't follow this problem --
23  this procedure, that would be a failure on the part
24  of Hertz, correct?
25  A.   **Correct.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

Control No.: 17093136

38

1    MR. MALOFIY:  Now, I'd like to blow up
2    17 for the benefit of the jury.
3    BY MR. MALOFIY:
4    Q.    "Corporate/country security manager
5    investigations, every theft conversion disappearance
6    must be promptly investigated by the
7    corporate/country security manager responsible for
8    the location" --
9    MR. MALOFIY:  Can you highlight
10    "location," Mr. Segal?
11    BY MR. MALOFIY:
12    Q.    -- "from which the related theft vehicle
13    report is filed."  In this instance, the location
14    would be Philadelphia, correct?
15    A.    **Correct.**
16    Q.    Now, it goes on to say -- and I want to
17    highlight this, too, Mr. Segal -- "all employees are
18    required to cooperate fully with such an
19    investigation."  Did I read that correctly?
20    A.    **Yes.**
21    Q.    Now, it also says there must be promptly
22    investigated.  Do you see that?
23    A.    **Yes.**
24    Q.    Now, in this instance --
25    MR. EDELSTEIN:  You sound like Darth

*Danielle O'Connor, RPR, CRR 215-683-8023*

39

1    Vader.
2    MR. MALOFIY:  I do, really?  Do I need
3    new batteries?  I'm sorry.
4    Is it okay?
5    BY MR. MALOFIY:
6    Q.    In this instance, you've heard the testimony
7    of Richard Livingston, correct?
8    A.    **Yes.**
9    Q.    And Richard Livingston is, I believe,
10    currently, the corporate security manager, not the
11    assistant security manager of Philadelphia, but the
12    corporate security manager of Philadelphia, correct?
13    A.    **Yes.**
14    Q.    You've worked with him many times, correct?
15    A.    **Yes.**
16    Q.    Now, Mr. Livingston testified under oath that
17    he does no investigation whatsoever at the local
18    level.  Did you hear that?
19    A.    **I heard that, but he does check, check to make**
20    **sure that the VIN is correct, check to make sure**
21    **that there's no movement, or check to make sure that**
22    **the car hasn't been returned.**
23    Q.    I'm sorry.  Do a typo check on the VIN.  What
24    else?
25    A.    **Make sure that there's no further movement on**

*Danielle O'Connor, RPR, CRR 215-683-8023*

40

1    the vehicle.
2    Q.    Uh-huh.
3    A.    **And then make sure that the car has not been**
4    **returned.  He has to make sure the car has hot been**
5    **returned.**
6    Q.    Returned?
7    A.    **Returned.  By the renter.**
8    Q.    How would he do that?
9    A.    **He goes into the system and check.**
10    Q.    What system, ma'am?
11    A.    **His vehicle movement system.**
12    Q.    Oh, I see.  Well, if he didn't do that, that
13    would be a failure, correct?
14    A.    **Yes.**
15    Q.    And he would not be following Hertz' policies
16    and procedures, correct?
17    A.    **Correct.**
18    Q.    Now, let me go to Mr. Livingston's deposition
19    testimony which was read into the record.  And I'm
20    going to go to page P8-54, top right-hand quadrant,
21    which is page 215.
22    MR. MALOFIY:  Mr. Segal, I got some
23    psychedelic thing going on on my computer.
24    Okay.  Thank you.
25    Now, if we could, for the benefit of

*Danielle O'Connor, RPR, CRR 215-683-8023*

41

1    Mrs. Wilkerson, could we blow up 10 to 16,
2    lines 10 through 16 on page 215?
3    BY MR. MALOFIY:
4    Q.    Question was asked:  "As a corporate security
5    manager for Hertz for this area or anyone working
6    with you or for you, would they have done any
7    independent investigation and what payments are made
8    with the car before filing a police report?
9    His answer:  "No, not on my side of
10    the fence."
11    Should he have checked to see if any
12    additional payments were made on that car?
13    A.    **Mr. Livingston didn't report this car stolen.**
14    Q.    I'm just asking you, he said specifically,
15    ma'am, he's the manager of Philadelphia, right,
16    security manager?
17    A.    **Correct.**
18    Q.    And he still is the security manager, correct?
19    A.    **Right, but he also --**
20    Q.    Hold on.  He was the very big guy.
21    MR. EDELSTEIN:  She's answering the
22    question, Your Honor.
23    THE COURT:  She was.
24    THE WITNESS:  It's okay.
25    BY MR. MALOFIY:

*Danielle O'Connor, RPR, CRR 215-683-8023*

Case 2:15-cv-03380
09/14/2017 08:38:32 PM
Control No.: 17093136

42

1  Q.    I'm sorry.  I stepped on your words.  Go
2  ahead.
3  A.    Go ahead.  What's the question?
4  Q.    Mr. Livingston is the awfully big guy, he's
5  like 7 feet tall, right?
6  A.    Yes.
7  Q.    He's the corporate security manager for Hertz
8  Rental Car Corporation here in Philadelphia,
9  correct?
10 A.    Correct.
11 Q.    Now, it says here that the question was asked
12 of him or anyone working for him or working with
13 him, if they did any check and his response was no,
14 not on his side of the fence.  Do you see that?
15 A.    I do see that.
16 Q.    Now, you just testified that he would have
17 checked the computer system of some sort, right?
18 A.    He should have checked the computer system.
19 Q.    If he failed to check the computer system, he
20 would have failed to follow the policies and
21 procedures of Hertz which must be followed, correct,
22 ma'am?
23 A.    Correct.  But he also in the thing that you
24 read, testimony that you read, it said he didn't
25 file police reports.

43

1  Q.    Ma'am, Mr. Livingston is the head of a two-man
2  department, correct?
3  A.    Correct.
4  Q.    Let's be clear.  It's him and one other
5  person, right?
6  A.    Yes.
7  Q.    And that one other person was Mr. Graeber,
8  correct?
9  A.    At the time, yes.
10 Q.    And then Mr. Graeber was let go.  Do you
11 remember why?
12 A.    Yes.
13 Q.    He was let go why?
14 A.    I'm not sure.
15 Q.    He was let go, according to Mr. Livingston's
16 testimony, because Hertz wanted to cut costs.  Do
17 you remember that?
18 A.    No.
19        MR. MALOFIY:  Well, let's pull it up.
20        MR. EDELSTEIN:  We'll stipulate that
21    that was the testimony, Judge.
22 BY MR. MALOFIY:
23 Q.    Hertz --
24        THE COURT:  It's been stipulated to.
25    All right.

44

1  BY MR. MALOFIY:
2  Q.    Hertz Corporation wanted to cut the costs so
3  they let Mr. Graeber go, correct?
4  A.    If you say so, yes.
5  Q.    And by doing so, they're basically cutting
6  costs at the local investigation at the local level
7  to prevent innocent people from being wrongfully
8  accused of car theft, correct?
9        MR. EDELSTEIN:  Objection, Your Honor.
10        THE COURT:  Sustained.
11 BY MR. MALOFIY:
12 Q.    Ma'am, does Hertz global -- excuse me, Hertz
13 Corporation, are they able to do a local
14 investigation on every case?
15 A.    Well, that's the reason why we have Oklahoma
16 City specialized in doing the investigation.  We
17 have specialized people that work for us and also
18 that's why we hire the private investigator to go
19 out and assist us and also get the repossession
20 company involved, to show what investigation we need
21 to do.  We work hand-in-hand with both of those
22 companies.  We try to do our due diligence before we
23 report a car stolen.
24 Q.    How many theft reports have come out of
25 Philadelphia?

45

1        MR. EDELSTEIN:  When?
2  BY MR. MALOFIY:
3  Q.    After daily basis in 2013-2014, ma'am.
4  A.    A lot.
5  Q.    A lot?
6  A.    Yes.
7  Q.    And what would you say?
8  A.    Maybe 2000.
9  Q.    Do you know -- excuse me.  Mr. Livingston
10 testified that he's gone into court and handled
11 about 400 of these and he's never done a local
12 investigation to determine the truth and veracity of
13 those theft packages?
14 A.    No, I didn't know that.
15 Q.    And that would be falling well below the
16 standard of care even by Hertz' own policies and
17 procedures?
18        MR. EDELSTEIN:  Objection to the
19    leading conclusion.
20        THE COURT:  Sustained.  You have to
21    rephrase.
22        MR. MALOFIY:  I'll rephrase it.  Thank
23    you.
24 BY MR. MALOFIY:
25 Q.    That would fall well below the policies and

103380
Control No.: 17093136

46

1  procedures of even Hertz Corporate policies,
2  correct?
3  **A.    Yes.**
4  **Q.**    Do you think it's acceptable for 400 cases to
5  go to court and no local investigation to be done
6  whatsoever?
7               MR. EDELSTEIN:  Objection, Your Honor.
8  The testimony was that Mr. Livingston didn't
9  actually do it, not no investigation was done.
10              THE COURT:  Overruled.  I'll let her
11  answer.
12              THE WITNESS:  Yeah.  We have
13  investigated it.  We investigate each overdue
14  renter.  Each theft is investigated.
15              MR. MALOFIY:  Ma'am, read back my
16  question for the witness, please.  Sorry.
17                   - - -
18              (Whereupon, the court reporter read
19  the record as requested.)
20                   - - -
21              THE WITNESS:  By Mr. Livingston?
22  BY MR. MALOFIY:
23  **Q.**    By the two people in that office who handle
24  the 400 cases that went to court and no local
25  investigation was done, that's what I'm referring

47

1  to, ma'am.
2  **A.    There is some investigation being done.**
3  **Q.**    Check for typos and the VIN number, correct?
4  **A.    And movement.**
5  **Q.**    On the system, right, on the computer system?
6  **A.    Yes.**
7  **Q.**    Let's go to that computer system right now.
8  Let's talk about that.
9               Now, you indicated that it was Mr.
10  Graeber who made the police report on behalf of
11  Hertz to Detective -- to Officer Ianoconne, he was
12  the one who gave the interview, correct?
13  **A.    Correct.**
14  **Q.**    And it wasn't Mr. Livingston?
15  **A.    Correct.**
16  **Q.**    Both those two people work in one office,
17  correct?
18  **A.    Yes.**
19  **Q.**    And Mr. Graeber answers to Mr. Livingston,
20  correct?
21  **A.    Correct.**
22  **Q.**    Now, let's go to combination 8 of P-3, which
23  is the interrogatory, the question to defendant and
24  the answer of defendant's.  Can we pull that combo
25  up for the benefit of the jury and also for Ms.

48

1  Wilkerson -- Mrs. Wilkerson, excuse me, ma'am.
2               It says here, 8, this was a question
3  posed to Hertz Corporation:  "Identify the computer
4  systems that the Hertz employees identified in the
5  immediately preceding interrogatory consulted while
6  on the phone with the police on July 22nd, 2013, and
7  what information was on that system regarding Ms.
8  Grady."
9               The answer:  "Objection.  This
10  interrogatory assumes a computer system was
11  consulted with during Mr. Graeber's conversation
12  with Officer Brighter.  Mr. Graeber" -- I'd like to
13  highlight this, Mr. Segal -- "Mr. Graeber did not
14  utilize any computer system while speaking with
15  Officer Brighter on July 22nd, 2013."  Do you see
16  that, ma'am?
17  **A.    Yes, I see it.**
18  **Q.**    And these sworn interrogatories, where we
19  asked whether or not a computer system was used, the
20  sworn answers verified answers from Hertz
21  Corporation by Mr. Livingston was that no computer
22  system was used?
23              MR. EDELSTEIN:  Objection, Your Honor.
24  BY MR. MALOFIY:
25  **Q.**    Do you understand that?

49

1               MR. EDELSTEIN:  The question in the
2  interrogatory was what was used while on the
3  phone with the police.  That's the question.
4               MR. MALOFIY:  I'm asking a follow-up
5  question, not this specific question, but a
6  follow-up question.
7               THE WITNESS:  So basically --
8               THE COURT:  No, I have to rule on the
9  objection.
10              The objection at this time is
11  sustained only because you can't change what
12  the interrogatories are saying.  If it's a
13  separate question, that's fine.
14              MR. MALOFIY:  I'm asking a follow-up
15  question, a different question.  I already
16  asked that question.  Maybe the confusion is on
17  the screen.  So we can block that out now.
18  Thank you.
19  BY MR. MALOFIY:
20  **Q.**    Isn't it true that Mr. Graeber utilized no
21  computer system whatsoever in regards to before he
22  reported this to the police?
23  **A.    No.  It actually says "while speaking."  So
24  while he was speaking to the detective, he wasn't on
25  the computer system.  That's the verbiage in what**

Case 15-68356-23380

Control No.: 17093136

09/14/2017 08:38:32 PM

17093136

50

1  you just read me.

2          MR. MALOFIY:  Let me be more specific

3  with the court's indulgence.

4          Let me move to 21, combo 21.  Do you

5  have that, Mr. Segal?

6  BY MR. MALOFIY:

7  Q.     You looked at the questions which we

8  propounded upon Hertz, which we served on Hertz and

9  the answers, correct?

10  A.     Yes.

11  Q.     And you saw that Mr. Livingston had signed

12  these under oath, correct?

13  A.     Yes.

14  Q.     We had asked of Hertz Corporation:  "Describe

15  in detail all actions/steps taken and communications

16  the Hertz manager identified in the complaint as

17  filing the August 2013 police report regarding Kelly

18  Grady."  That's Ken Graeber, correct?

19  A.     Yes.

20  Q.     So let's read this again:  "Describe in detail

21  all actions/steps taken and communications the Hertz

22  manager" -- I'll insert Ken Graeber -- "took before

23  reporting the Chevy Yukon stolen on around July

24  22nd, 2013, including identifying all employees he

25  communicated with and the contents of the

51

1  communication, identifying all employees he

2  communicated with and the contents of the

3  communication."  I think that was twice.  I

4  apologize if I read that twice.  I think it was

5  written twice.  "Identifying all computer systems he

6  consulted and the program names and reasons for

7  doing so."

8          MR. MALOFIY:  Highlight this bottom

9  line, "identifying all computer systems he

10  consulted and the program names and reasons for

11  doing so."

12  BY MR. MALOFIY:

13  Q.     The answer, there was an objection lodged.

14  And then it said:  "The police report was not filed

15  by a Hertz manager in August 2013.  Mr. Graeber

16  reviewed the rental contract, investigation

17  performed, and had communications with individuals

18  in Hertz' Vehicle Control Department in Oklahoma

19  City, Oklahoma.  A theft package was put together

20  and reported to the airport police."  Do you see

21  that?

22  A.     Yes.

23  Q.     Now, it doesn't identify all computer systems

24  he consulted and the program names and reason for

25  doing so, does it?

52

1  A.     No, but he was on the phone with Hertz Vehicle

2  Control.

3  Q.     I'm just asking you, verified answer said that

4  that was produced in discovery.

5  A.     Okay.

6  Q.     Right, ma'am?

7  A.     Yes.

8  Q.     And even if he was on the phone, he didn't

9  consult any computer systems, right?

10  A.     Well, we're speaking about it over the phone.

11  Q.     But he personally did not consult any computer

12  systems, correct?

13  A.     No, he didn't put his fingers on the keyboard.

14  Q.     And then a day after this, he went to the

15  police and told them the only payment was 1805,

16  correct?

17  A.     In a deposit, yes.

18  Q.     Ma'am, I'm going to put this back up to you,

19  this document.  Do you see that document?

20  A.     Yes.

21  Q.     Now, you say, oh, the 2445 was identified on a

22  document, right?

23  A.     Yes.

24  Q.     And you'd agree that that document was created

25  7/12/13, correct?

53

1  A.     Yes.

2  Q.     And you agree the payment went through on

3  7/15, three days later, correct?

4  A.     Yes, correct.

5  Q.     And you'd agree with me that wasn't actually

6  the payment identified, it was what was owed,

7  correct?

8  A.     No.

9  Q.     Doesn't it indicate what was owed and not what

10  was paid on 7/12, ma'am?

11  A.     No.

12  Q.     What does it say?

13  A.     It says that we had to close the vehicle out

14  to 5/31/2013 because we didn't have anymore

15  authorization.  It's on this form right here.

16  Q.     I'm sorry.  Maybe my question wasn't clear.  I

17  asked you a different question.

18          Isn't it true that it doesn't show

19  that the payment of 2445 was made on that document?

20  A.     Yeah, it shows it was --

21  A.     It was owed?

22  A.     It was owed at the time.

23  Q.     And it was not paid, correct?

24  A.     Not on 7/12.

25  Q.     Right.  And three days later it was paid,

Case 2:15-cv-03380

Control No.: 17093136

54

```
1    correct, ma'am?
2    A.    Not in full.
3    Q.    Ma'am, I'm asking you was 2445 paid, yes or
4    no?
5    A.    Yes.
6    Q.    And that information was never updated to the
7    police, correct?
8    A.    No.
9    Q.    It was not corrected, correct?  It was not
10   updated to the police, correct?
11   A.    They had the information.
12   Q.    I'm asking you if the information that it was
13   paid was updated to the police, yes or no?
14   A.    The police actually have the theft package and
15   this was in the theft package.
16   Q.    Ma'am, you just identified that that is not a
17   payment for 2445, it's what is owed.  Do you
18   understand the difference between --
19   A.    Yes.
20   Q.    -- money in your bank account --
21   A.    Yes.
22   Q.    -- and what is owed to you?  It's the
23   difference between an asset and a liability, right?
24   A.    Yes.
25   Q.    Okay.  Understand the difference?
```

*Danielle O'Connor, RPR, CRR 215-683-8023*

55

```
1    A.    Yes.
2    Q.    You deal with this every day?
3    A.    Yes.
4    Q.    So let's be clear.  The police didn't know
5    2445 was paid before they signed an affidavit of
6    probable cause allowing Ms. Grady to be arrested,
7    correct?  Correct, ma'am?
8    A.    Correct.
9          MR. MALOFIY:  No further questions.
10         THE COURT:  Any redirect?
11         MR. EDELSTEIN:  Just two.  I promise.
12         - - -
13         REDIRECT EXAMINATION
14         - - -
15   BY MR. EDELSTEIN:
16   Q.    Mr. Graeber, the assistant corporate manager
17   who worked for Mr. Livingston --
18   A.    Yes.
19   Q.    -- he did the investigation?
20   A.    Yes.
21   Q.    And he would have -- in an effort to find car
22   movement, how would he have determined that, meaning
23   was the car back in Hertz' possession?
24   A.    Yes, so he would have gone into a specialized
25   system that shows all cars that have been checked in
```

*Danielle O'Connor, RPR, CRR 215-683-8023*

56

```
1    or have an idle sighting at the location to prove
2    that the car was back in Hertz' possession.
3    Q.    And, again, when did the car come back to your
4    possession?
5    A.    September 11th, 2013.
6          MR. EDELSTEIN:  Thank you.  That's all
7    I have.
8          THE COURT:  Anything else, Counsel?
9          MR. MALOFIY:  No.  One second, Your
10   Honor.  Court's indulgence.
11         (Pause.)
12         - - -
13         RECROSS-EXAMINATION
14         - - -
15   BY MR. MALOFIY:
16   Q.    Help my confusion.  Did you actually fly in
17   from Florida?
18   A.    I -- yes.
19   Q.    You flew in from Florida to here?
20   A.    I took a special route, yes.
21         MR. MALOFIY:  No further questions.
22         THE COURT:  Anything else?
23         MR. EDELSTEIN:  No, Your Honor.
24         THE COURT:  Thank you, ma'am.  Watch
25   your step.
```

*Danielle O'Connor, RPR, CRR 215-683-8023*

57

```
1          - - -
2          (Witness excused.)
3          - - -
4          THE COURT:  Who's your next witness?
5          MR. EDELSTEIN:  Mr. Cocklin.
6          THE COURT:  That's the expert.
7    Step up.
8          THE COURT CRIER:  State your full
9    name.
10         THE WITNESS:  John Cocklin,
11   C-O-C-K-L-I-N.
12         - - -
13         ...JOHN COCKLIN, having been duly
14   sworn/affirmed, was examined and testified as
15   follows:
16         - - -
17         THE COURT:  Your witness.
18         - - -
19   DIRECT EXAMINATION ON VOIR DIRE
20         - - -
21   BY MR. EDELSTEIN:
22   Q.    Good afternoon, Mr. Cocklin.
23   A.    Good afternoon.
24   Q.    How are you today?
25   A.    Okay.
```

*Danielle O'Connor, RPR, CRR 215-683-8023*

09/14/2017 08:38:32 PM

Control No.: 17093136

# EXHIBIT 5

**Grimes, Josh**

| | |
|---|---|
| **From:** | Sohan, Jim |
| **Sent:** | Friday, June 26, 2015 12:55 PM |
| **To:** | Watkins, Robert; Grimes, Josh |
| **Cc:** | Hairgrove, Jason |
| **Subject:** | RE: Hertz |

Concur.

*Thanks,*

*Jim*

**From:** Watkins, Robert
**Sent:** Friday, June 26, 2015 12:42 PM
**To:** Grimes, Josh; Sohan, Jim
**Cc:** Hairgrove, Jason
**Subject:** RE: Hertz

I agree 100%.  Actually 'that was what I was thinking'.

# *Mike Watkins*

## Assistant Chief
## Department of Public Safety
## Louisville Regional Airport
## Work 502 380-8283
## Cell   502 608-7739

**From:** Grimes, Josh
**Sent:** Friday, June 26, 2015 12:11 PM
**To:** Watkins, Robert; Sohan, Jim
**Cc:** Hairgrove, Jason
**Subject:** Hertz

Off. Hairgrove spoke to a Hertz sales rep in Nashville who confirmed they received a car from a customer that was originally rented in Louisville back in March.  It sat on  his lot for 60 days until it was sold 6/6 to a car lot in Hopkinsville, KY.  We took a report on 3/25 from Hertz that this was stolen missing from their inventory.

After that, we did a complete search online of all VIN #'s in the stolen auto database and got a return of 2 more Hertz autos believed to have been sold or scrapped.  The Nashville Hertz rep commented that Louisville office is horrible with their paperwork and vehicle tracking.

Until Hertz corporate takes some action with their Louisville lot and personnel, I recommend that we suspend taking stolen auto reports for Hertz for "missing inventory" unless they physically see someone steal an auto, have evidentiary proof of such or obviously non returns that warrants have been taken.  Hairgrove has reached out to their Corporate Security office.

Capt. Josh Grimes
*Department of Public Safety*
**Louisville International Airport**
**POLICE-FIRE-EMS**
(502) 366-2611  Firehouse
(502) 380-8380  Captain's Office
(502) 366-6074  Fax

**SUPERIOR COURT**
**CIVIL CASE INFORMATION STATEMENT (CIS)**

EFiled: May 21 2020 10:07PM EDT
Transaction ID 65652125
Case No. N20C-05-189 VLM

COUNTY:  (N)   K   S        CIVIL ACTION NUMBER:_____

| | |
|---|---|
| Caption:<br><br>Hannah Ayoub, et al. v.<br><br>Hertz Global Holdings, Inc., et al.<br><br>(see attached sheet) | Civil Case Code: _____<br>CMIS<br><br>Civil Case Type: Civil Miscellaneous<br>(SEE REVERSE SIDE FOR CODE AND TYPE)<br><br>MANDATORY NON-BINDING ARBITRATION (MNA) _____<br><br>Name and Status of Party filing document:<br>Plaintiffs (see attached sheet)<br><br>Document Type: (E.G.; COMPLAINT; ANSWER WITH COUNTERCLAIM)<br>Complaint<br><br>JURY DEMAND:  YES _X_   No _____ |
| ATTORNEY NAME(S):<br>Brian E. Farnan<br><br>ATTORNEY ID(S):<br>4089<br><br>FIRM NAME:<br>Farnan LLP<br><br>ADDRESS:<br>919 N. Market St., 12th Floor<br>Wilmington, DE 19801<br><br>TELEPHONE NUMBER:<br>(302) 777-0300<br><br>FAX NUMBER:<br>(302) 777-0301<br><br>E-MAIL ADDRESS:<br>bfarnan@farnanlaw.com | IDENTIFY ANY RELATED CASES NOW PENDING IN THE SUPERIOR COURT OR ANY RELATED CASES THAT HAVE BEEN CLOSED IN THIS COURT WITHIN THE LAST TWO YEARS BY CAPTION AND CIVIL ACTION NUMBER INCLUDING JUDGE'S INITIALS:<br><br>_____<br><br>_____<br><br>EXPLAIN THE RELATIONSHIP(S):<br><br>_____<br><br>_____<br><br>_____<br><br>_____<br><br>OTHER UNUSUAL ISSUES THAT AFFECT CASE MANAGEMENT:<br><br>_____<br><br>_____<br><br>(IF ADDITIONAL SPACE IS NEEDED, PLEASE ATTACH PAGE) |

**THE PROTHONOTARY WILL NOT PROCESS THE COMPLAINT, ANSWER, OR FIRST RESPONSIVE PLEADING IN THIS MATTER FOR SERVICE UNTIL THE CASE INFORMATION STATEMENT (CIS) IS FILED.  THE FAILURE TO FILE THE CIS AND HAVE THE PLEADING PROCESSED FOR SERVICE MAY RESULT IN THE DISMISSAL OF THE COMPLAINT OR MAY RESULT IN THE ANSWER OR FIRST RESPONSIVE PLEADING BEING STRICKEN.**

Revised 01/2019

# SUPERIOR COURT CIVIL CASE INFORMATION STATEMENT (CIS) INSTRUCTIONS

## CIVIL CASE TYPE

Please select the appropriate civil case code and case type (e.g., **CODE** - **AADM** and **TYPE** - **Administrative Agency**) from the list below.  Enter this information in the designated spaces on the Case Information Statement.

**APPEALS**
AADM - Administrative Agency
ACER -  Certiorari
ACCP -  Court of Common Pleas
AIAB -   Industrial Accident Board
APSC -  Public Service Commission
AUIB -  Unemployment Insurance Appeal Board

**COMPLAINTS**
CABT – Abatement
CASB – Asbestos
CAAA - Auto Arb Appeal
CMIS - Civil Miscellaneous
CACT - Class Action
CCON – Condemnation
CCLD – Complex Commercial Litigation Division **(NCC ONLY)**
CDBT - Debt/Breach of Contract
CDEJ - Declaratory Judgment
CDEF - Defamation
CEJM - Ejectment
CATT - Foreign & Domestic Attachment
CFJG - Foreign Judgment
CFRD - Fraud Enforcement
CINT -  Interpleader
CLEM - Lemon Law
CLIB -  Libel
CMAL - Malpractice
CMED - Medical Malpractice
CPIN -  Personal Injury
CPIA -  Personal Injury Auto
CPRL - Products Liability
CPRD - Property Damage
CRPV - Replevin
CSPD - Summary Proceedings Dispute
CCCP - Transfer from CCP
CCHA - Transfer from Chancery

**MASS TORT**
CABI - Abilify Cases
CBEN - Benzene Cases
CFAR - Farxiga Cases
CHON - Honeywell Cases
CMON - Monsanto Cases
CPEL -  Pelvic Mesh Cases
CPLX -  Plavix Cases
CPPI -  PPI Cases
CTAL - Talc Cases
CTAX - Taxotere Cases
CXAR - Xarelto Cases

**INVOLUNTARY COMMITMENTS**
INVC- Involuntary Commitment

**MISCELLANEOUS**
MAGM - AG Motion - Civil/Criminal Investigations *
MADB - Appeal from Disability Board *
MAFF -  Application for Forfeiture
MAAT -  Appointment of Attorney
MGAR -  Appointment of Guardianship
MCED -  Cease and Desist Order
MCON -  Civil Contempt/Capias
MCVP -  Civil Penalty
MSOJ -  Compel Satisfaction of Judgment
MSAM -  Compel Satisfaction of Mortgage
MCTO -  Consent Order
MIND -  Destruction of Indicia of Arrest *
MESP -   Excess Sheriff Proceeds
MHAC -  Habeas Corpus
MTOX -  Hazardous Substance Cleanup
MFOR -  Intercept of Forfeited Money
MISS -   Issuance of Subpoena
MLEX -  Lien Extension
MMAN -  Mandamus
MWIT -  Material Witness *
MWOT - Material Witness - Out of State
MRAT -  Motion for Risk Assessment
MROP -  Petition for Return of Property
MCRO -  Petition Requesting Order
MROD -  Road Resolution
MSEL -   Sell Real Estate for Property Tax
MSEM -  Set Aside Satisfaction of Mortgage
MSSS -  Set Aside Sheriff's Sale
MSET -  Structured Settlement
MTAX -  Tax Ditches
MREF -  Tax Intercept
MLAG -  Tax Lagoons
MVAC -  Vacate Public Road
MPOS -  Writ of Possession
MPRO -  Writ of Prohibition

**MORTGAGES**
MCOM - Mortgage Commercial
MMED - Mortgage Mediation
MORT - Mortgage Non-Mediation (Res.)

**MECHANICS LIENS**
LIEN - Mechanics Lien

## * Not eFiled

## DUTY OF THE PLAINTIFF

Each plaintiff/counsel shall complete the attached Civil Case Information Statement (CIS) and file <u>with</u> the complaint.

## DUTY OF THE DEFENDANT

Each defendant/counsel shall complete the attached Civil Case Information Statement (CIS) and file <u>with</u> the answer and/or first responsive pleading.

Revised 10/2019

**Plaintiffs:** Hannah Ayoub, Nicole Stevens, Shontrell Higgs, Julius Burnside, Magalie Sterlin, Arthur Stepanyan, Howard Junious, Laketa Collins, Michelle Johnson, Brian Steinberg, Antwone Person, Michael Koss, Amanda Koss, Cheryl Young, Stephanie Keene, James Keene, Barbara Fernandez, Thomas John Channell, Michael Channell, and Jessica Gurumendi

**Defendants:** Hertz Global Holdings, Inc., The Hertz Corporation, Rental Car Intermediate Holdings, LLC, Hertz Investors, Inc., Hertz Vehicles LLC, Hertz Vehicle Financing LLC, Hertz Vehicle Financing II LP, Hertz Local Edition Corp., Dollar Rent A Car, Inc., Thrifty Rent-A-Car System LLC, Icahn Associates Holding, LLC, Icahn Enterprises LP, Icahn Enterprises Holdings LP, Icahn Capital LP, Icahn Enterprises GP, Inc., Paul Stone, Kathryn Marinello, John P. Tague, Mark Paul Frissora, M. David Galainena, Richard Frecker, Richard E. Esper, Leslie Hunziker, Tom Kennedy, Jodi Allen, Jeffrey T. Foland, Murali Kuppuswamy, Tyler Best, Alexandreia Marren, Frederic Deschamps, Jamere Jackson, Eliana Zem, Robin C. Kramer, Opal G. Perry, Matthew Jauchius, Tom Callahan, Scott Massengill, Henry R. Keizer, David A. Barnes, Carolyn N. Everson, Vincent J. Intrieri, Samuel Merksamer, Anindita Mukherjee, Daniel A. Ninivaggi, Kevin M. Sheehan, and SungHwan Cho