THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| The Hertz Corporation, *et al.*,[1] | Case No. 20-11218 (MFW) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE HERTZ CORPORATION AND ITS DEBTOR AFFILIATES

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700

J. Christopher Shore (admitted *pro hac vice*)
David M. Turetsky (admitted *pro hac vice*)
Andrew T. Zatz (admitted *pro hac vice*)
Andrea Amulic (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200

Jason N. Zakia (admitted *pro hac vice*)
111 South Wacker Drive

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Brett M. Haywood (No. 6166)
Christopher M. De Lillo (No. 6355)
J. Zach Noble (No. 6689)
One Rodney Square
910 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700

---

[1]    The last four digits of The Hertz Corporation's tax identification number are 8568.  The location of the debtors' service address is 8501 Williams Road, Estero, FL 33928.  Due to the large number of debtors in these chapter 11 cases, which are jointly administered for procedural purposes only, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at https://restructuring.primeclerk.com/hertz.

Chicago, IL 60606
Telephone: (312) 881-5400

Roberto J. Kampfner (admitted *pro hac vice*)
Ronald K. Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
Andrew Mackintosh (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700

*Attorneys for the Debtors and Debtors in Possession*

Dated: March 1, 2021

AMERICAS 106663920

Table of Contents

Page

I.  INTRODUCTION .................................................................................. 1
    A.  Definitions and Exhibits ............................................................... 1
        1.  Definitions ......................................................................... 1
        2.  Exhibits ............................................................................ 1
    B.  Notice to Creditors ...................................................................... 1
    C.  Background and Overview of the Plan ........................................ 5
    D.  PSA & Commitment Letter ...................................................... 11
    E.  The Plan Sponsors .................................................................... 11
    F.  Disclosure Statement Enclosures ............................................. 12
    G.  Inquiries .................................................................................... 12
II. OVERVIEW OF THE COMPANY'S OPERATIONS ....................... 13
    A.  The Company's Prepetition Business Operations ..................... 13
    B.  The Company's Corporate Structure ........................................ 14
    C.  The Company's Prepetition Capital Structure .......................... 15
        1.  Equity ............................................................................. 15
        2.  Financial Debt ................................................................ 15
        3.  Intercompany Obligations .............................................. 26
        4.  Trade Debt and Other Liabilities Relating to Operations ... 27
    D.  Events Leading to the Commencement of the Chapter 11 Cases ... 27
III. OVERVIEW OF THE CHAPTER 11 CASES .................................. 31
    A.  Commencement of Chapter 11 Cases ....................................... 31
    B.  First Day Motions ..................................................................... 31
    C.  Procedural Motions and Applications ....................................... 31
    D.  Retention of Chapter 11 Professionals ..................................... 32
    E.  Appointment of Creditors Committee ....................................... 32
    F.  Statements and Schedules, Rule 2015.3 Financial Reports, and Claims Bar Dates ......................................................................... 33
    G.  Use of Certain Asserted Cash Collateral and Related Adequate Protection ... 34
    H.  Equity Sale ................................................................................ 34
    I.  Repayment in Full of the U.S. Vehicle RCF (or, Sidecar Facility) ... 35
    J.  Exclusivity ................................................................................ 35
    K.  Executory Contracts and Unexpired Leases ............................. 35
        1.  The Rejections ................................................................ 36
        2.  The Assumptions ............................................................ 37
    L.  Key Employee Incentive Programs ........................................... 40
    M.  Prepetition Litigation ............................................................... 41
        1.  The False Police Report Plaintiffs Cases ....................... 41
        2.  Prepetition Representative Actions and Related Mediation ... 42
        3.  Certain Prepetition Causes of Action of the Debtors ...... 50
    N.  Alternative Dispute Resolution Procedures .............................. 52

AMERICAS 106663920

Table of Contents

Page

O.    Litigation Regarding the Prepetition HVF II ABS Program Master Lease
      Agreement.................................................................................... 52
P.    Temporary Suspension of Sales at Hertz Car Sales Locations ..................... 53
Q.    Debtor-In-Possession Financing ........................................................ 53
R.    Post-Petition Donlen Asset-Based Securitization Facility........................... 54
S.    Canadian Asset-Based Securitization Facility ....................................... 54
T.    Interim Asset-Based Securitization Facility .......................................... 55
U.    Sale of Substantially All of the Assets of Donlen Corp. and Its Debtor
      Subsidiaries................................................................................. 55
V.    Efforts to Restructure Non-U.S. Debt.................................................. 56
W.    Lombard Vehicle Financing Facility & European ABS Facility Waivers ..... 58
X.    Committee's Adversary Proceeding ................................................... 58
Y.    Diligence to the Committee and Other Stakeholders............................... 59

IV.   SUMMARY OF THE PLAN ............................................................. 60
A.    General ..................................................................................... 60
B.    Administrative Claims and Priority Claims ........................................... 60
      1.    Administrative Claims ........................................................ 61
      2.    DIP Claims...................................................................... 62
      3.    HVF Master Lease Administrative Claims ................................ 62
      4.    Postpetition Fleet Financing Administrative Claims ..................... 62
      5.    Professional Fee Claims...................................................... 63
      6.    Priority Tax Claims............................................................ 64
C.    Classification of Claims and Interests................................................. 64
      1.    Classification in General ..................................................... 64
      2.    Summary of Classification................................................... 64
      3.    Class Identification ........................................................... 65
      4.    Treatment of Claims and Interests ......................................... 66
      5.    Special Provision Governing Unimpaired Claims ........................ 72
      6.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
            Bankruptcy Code .............................................................. 72
      7.    Elimination of Vacant Classes.............................................. 72
      8.    Separate Classification of Other Secured Claims ........................ 72
      9.    Voting Classes; Presumed Acceptance by Non-Voting Classes.......... 72
      10.   Controversy Concerning Impairment....................................... 73
D.    Means for Implementation of the Plan................................................ 73
      1.    No Substantive Consolidation............................................... 73
      2.    Restructuring Transactions; Effectuating Documents ................... 73
      3.    Sources of Consideration for Plan Distributions.......................... 74
      4.    New Money Investment ...................................................... 74
      5.    Issuance and Distribution of Reorganized Hertz Parent Interests........ 75
      6.    New Reorganized Debt ....................................................... 75

ii

# Table of Contents

|  |  |  |
|---|---|---|
| 7. | Replacement of First Lien Letters of Credit | 76 |
| 8. | HVF II and Interim Fleet Financing Settlement | 76 |
| 9. | HVF III Fleet Financing | 77 |
| 10. | General Unsecured Claim and General Unsecured Elective Claim Recoveries | 77 |
| 11. | Intercompany Claim Settlement | 78 |
| 12. | HHN Restructuring | 78 |
| 13. | International Vehicle Financing Claims | 78 |
| 14. | Corporate Existence | 79 |
| 15. | Vesting of Assets in the Reorganized Debtors | 79 |
| 16. | Cancellation of Existing Securities | 79 |
| 17. | Corporate Action | 81 |
| 18. | New Organizational Documents | 82 |
| 19. | Reorganized Hertz Parent and Reorganized Hertz Corp. Board | 82 |
| 20. | Exemption from Certain Taxes and Fees | 83 |
| 21. | Preservation of Causes of Action | 83 |
| 22. | Insurance Policies and Surety Bonds | 84 |
| 23. | Management Equity Incentive Plan | 86 |
| 24. | Employee Obligations | 86 |
| 25. | Defined Benefit Qualified Pension Plans of Hertz and Non-Debtor Affiliate Puerto Ricancars, Inc. | 87 |
| 26. | Workers' Compensation Programs | 89 |
| 27. | Collective Bargaining Agreements | 89 |
| E. | Treatment of Executory Contracts and Unexpired Leases | 89 |
| 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 89 |
| 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 90 |
| 3. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 91 |
| 4. | Assumption Dispute Resolution | 92 |
| 5. | Indemnification Obligations | 93 |
| 6. | Contracts and Leases Entered into After the Petition Date | 93 |
| 7. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 93 |
| 8. | Reservation of Rights | 93 |
| 9. | Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4) | 94 |
| F. | Provisions Governing Distributions | 94 |
| 1. | Timing and Calculation of Amounts to Be Distributed | 94 |
| 2. | Special Rules for Distributions to Holders of Disputed Claims and Interests | 94 |
| 3. | Rights and Powers of Distribution Agent | 95 |

# Table of Contents

| | | |
|---|---|---|
| 4. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 95 |
| 5. | Securities Registration Exemption | 99 |
| 6. | Compliance with Tax Requirements | 100 |
| 7. | Allocations | 101 |
| 8. | No Postpetition or Default Interest on Claims | 101 |
| 9. | Setoffs and Recoupment | 101 |
| 10. | Claims Paid or Payable by Third Parties | 101 |
| G. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims. | 102 |
| 1. | Allowance of Claims | 102 |
| 2. | Claims and Interests Administration Responsibilities | 102 |
| 3. | ADR Procedures | 102 |
| 4. | Estimation of Claims | 103 |
| 5. | Adjustment to Claims Register Without Objection | 103 |
| 6. | Time to File Objections to Claims | 104 |
| 7. | Disallowance of Claims | 104 |
| 8. | Amendments to Proofs of Claims | 104 |
| 9. | Reimbursement or Contribution | 104 |
| 10. | No Distributions Pending Allowance | 105 |
| 11. | Distributions After Allowance | 105 |
| 12. | Single Satisfaction of Claims | 105 |
| H. | Settlement, Release, Injunction, and Related Provisions | 105 |
| 1. | Compromise and Settlement of Claims, Interests, and Controversies | 105 |
| 2. | Discharge of Claims and Termination of Interests | 106 |
| 3. | Releases by the Debtors | 106 |
| 4. | Releases by Holders of Claims and Interests | 107 |
| 5. | Exculpation | 109 |
| 6. | Injunction | 110 |
| 7. | Subordination Rights | 111 |
| 8. | Release of Liens | 112 |
| I. | Conditions Precedent to Consummation of the Plan | 112 |
| 1. | Conditions Precedent to the Effective Date | 112 |
| 2. | Waiver of Conditions | 114 |
| 3. | Substantial Consummation | 114 |
| 4. | Committee Complaint | 114 |
| 5. | Effect of Non-Occurrence of Conditions to the Effective Date | 114 |
| J. | Modification, Revocation, or Withdrawal of the Plan | 114 |
| 1. | Modification and Amendments | 114 |
| 2. | Effect of Confirmation on Modifications | 115 |
| 3. | Effect of Confirmation | 115 |
| 4. | Revocation or Withdrawal of the Plan | 115 |
| K. | Retention of Jurisdiction | 115 |

AMERICAS 106663920

Table of Contents

L.     Miscellaneous Provisions..............................................................118
       1.     Immediate Binding Effect................................................118
       2.     Additional Documents ....................................................118
       3.     Payment of Statutory Fees ..............................................118
       4.     Reservation of Rights.....................................................118
       5.     Transaction Expenses......................................................119
       6.     Successors and Assigns....................................................119
       7.     Service of Documents .....................................................119
       8.     Term of Injunctions or Stays..........................................120
       9.     Entire Agreement ...........................................................120
       10.    Nonseverability of Plan Provisions................................121
       11.    Dissolution of Committee ..............................................121
       12.    Expedited Tax Determination .........................................121
       13.    Computation of Time ......................................................121
       14.    Governing Law ...............................................................121
       15.    Reference to Monetary Figures.......................................122
       16.    Reference to the Debtors or the Reorganized Debtors....122
       17.    Controlling Document ....................................................122

V.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
       PLAN................................................................................................122
       A.     Continuation of the Chapter 11 Cases ...........................122
       B.     Liquidation under Chapter 7 ..........................................123

VI.    TRANSFER RESTRICTIONS AND  CONSEQUENCES UNDER FEDERAL
       SECURITIES LAW..........................................................................123
       A.     Section 1145 Securities...................................................123
       B.     Private Placement............................................................124
       C.     Restrictions on Rights Offering Participants and on Transfer ....................127

VII.   CERTAIN TAX CONSEQUENCES OF THE PLAN...........................127
       A.     Consequences to the Debtors ..........................................128
              1.     Cancellation of Debt ..............................................128
              2.     Limitation of NOL Carryforwards and Other Tax Attributes....................129
       B.     Consequences to Holders of Certain Claims ...................130
              1.     Holders of Class 5 – Unsecured Funded Debt Claims....................131
              2.     Holders of Classes 6 and 7 – General Unsecured Claims and General
                     Unsecured Elective Claims......................................132
       C.     Character of Gain or Loss ...............................................132
       D.     Distributions in Discharge of Accrued Interest or OID................133
       E.     Information Reporting and Backup Withholding .........................133

VIII.  SOLICITATION AND VOTING PROCEDURES ............................134
       A.     Holders of Claims Entitled to Vote on the Plan.............134
       B.     Solicitation Package.........................................................135

Table of Contents

C.     Voting Record Date ....................................................................... 136
D.     Voting on the Plan ......................................................................... 136
E.     Ballots Not Counted...................................................................... 137

IX.    **FACTORS TO CONSIDER BEFORE VOTING**................................................. **138**
A.     Risks Relating to the Debtors' Business Operations and Financial Condition
       ......................................................................................................... 138
       1.     Continued Disruptions Caused by the COVID-19 Outbreak ...................... 138
       2.     Reductions in Levels of Business and Leisure Travel .................................. 139
       3.     Competition ....................................................................................... 140
       4.     Seasonal Nature of Business............................................................... 140
       5.     Increased Vehicle Cost ...................................................................... 140
       6.     Environmental Laws and Regulations................................................. 141
       7.     Union-Represented Employees........................................................... 142
B.     Certain Bankruptcy Law Considerations ........................................ 142
       1.     Risk of Non-Confirmation of the Plan............................................... 142
       2.     Non-Consensual Confirmation .......................................................... 142
       3.     Financial Projections......................................................................... 142
       4.     Allowed Claims Could Exceed Estimates .......................................... 143
       5.     U.S. Federal Income Tax Risks ......................................................... 143
       6.     Risk of Non-Occurrence of the Effective Date .................................. 143
       7.     Conversion into Chapter 7 Cases ...................................................... 144
       8.     Parties in Interest May Object to the Plan's Classification of Claims
              and Interests ...................................................................................... 144
       9.     The Debtors May Fail to Satisfy Vote Requirements ......................... 144
       10.    Continued Risk Upon Confirmation .................................................. 144
       11.    The Debtors May Object to the Amount or Classification of a Claim.......... 145
       12.    Contingencies Could Affect Votes of Impaired Classes to Accept or
              Reject the Plan .................................................................................. 145
       13.    Releases, Injunctions, and Exculpations Provisions May Not Be
              Approved ........................................................................................... 145
C.     Factors Relating to Securities to Be Issued.................................... 145
       1.     Significant Holders of Reorganized Hertz Parent Interests ................ 145
       2.     Interests Subordinated to the Reorganized Debtors' Indebtedness....... 146
       3.     Dividends ........................................................................................... 146
       4.     Restricted Securities Issued under the Plan May Not Be Resold or
              Otherwise Transferred Unless They Are Registered Under the
              Securities Act or an Exemption from Registration Applies........................ 146
D.     Factors Relating to the Rights Offering ......................................... 147
E.     Additional Factors .......................................................................... 149
       5.     Debtors Could Withdraw the Plan ..................................................... 149
       6.     Debtors Have No Duty to Update ...................................................... 149
       7.     No Representations Outside this Disclosure Statement Are Authorized ...... 149

AMERICAS 106663920

Table of Contents

Page

        8.     No Legal or Tax Advice Is Provided by this Disclosure Statement ............. 149

        9.     No Admission Made ....................................................................................... 150

**X.      CONFIRMATION OF THE PLAN ........................................................................ 150**

    A.     Acceptance of the Plan.................................................................................... 150

    B.     Best Interests Test ......................................................................................... 151

    C.     Feasibility....................................................................................................... 151

    D.     Notices and Confirmation Hearing ............................................................... 151

**XI.     CONCLUSION AND RECOMMENDATION ..................................................... 154**

EXHIBIT A:  Plan

EXHIBIT B:  Plan Support Agreement

EXHIBIT C:  List of Debtors

EXHIBIT D:  Debtors' Organizational Structure

EXHIBIT E:  Financial Projections

EXHIBIT F:  Liquidation Analysis

EXHIBIT G:  [RESERVED]

EXHIBIT H:  Exit Term Loan Facility Term Sheet

EXHIBIT I:   Exit Revolving Credit Facility Term Sheet

AMERICAS 106663920

# I.
# INTRODUCTION

This is the disclosure statement (the "**Disclosure Statement**") of The Hertz Corporation ("**Hertz Corp.**") and its debtor affiliates (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company**"), in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), filed pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") and in connection with the *Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and Its Debtor Affiliates* dated March 1, 2021 (the "**Plan**"), a copy of which is annexed to this Disclosure Statement as **Exhibit A**.  The Plan constitutes a separate chapter 11 plan for each Debtor.

### A.  Definitions and Exhibits

#### 1.  Definitions

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan or as the context otherwise requires.

#### 2.  Exhibits

The following exhibits to this Disclosure Statement are incorporated as if fully set forth herein and made part of this Disclosure Statement:

- **Exhibit A** – Plan
- **Exhibit B** – Plan Support Agreement
- **Exhibit C** – List of Debtors
- **Exhibit D** – Debtors' Organizational Structure
- **Exhibit E** – Financial Projections
- **Exhibit F** – Liquidation Analysis
- **Exhibit G** – [RESERVED]
- **Exhibit H** – Exit Term Loan Facility Term Sheet
- **Exhibit I** – Exit Revolving Credit Facility Term Sheet

### B.  Notice to Creditors

The purpose of this Disclosure Statement is to set forth information that (1) summarizes the Plan, (2) advises Holders of Claims or Interests of their rights under the Plan, (3) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (4) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

AMERICAS 106663920

By Order dated [●], 2021 [D.I. [●]] (the "**Disclosure Statement Order**"), the Bankruptcy Court approved this Disclosure Statement, finding that it contains "adequate information," as that term is used in section 1125(a)(1) of the Bankruptcy Code.  The Bankruptcy Court's approval of this Disclosure Statement is not an endorsement of the Plan.

**IT IS THE DEBTORS' OPINION THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, AND EQUITY INTEREST HOLDERS.  THEREFORE, THE DEBTORS RECOMMEND THAT ALL PERSONS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

**BALLOTS FOR VOTING TO ACCEPT OR REJECT THE PLAN MUST BE RECEIVED BY [●], AT 4:00 P.M. (PREVAILING EASTERN TIME) (THE "<u>VOTING DEADLINE</u>").**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS THE FIRST DATE OF THE HEARING TO APPROVE THE DISCLOSURE STATEMENT, WHICH WAS [●], 2021 (THE "<u>RECORD DATE</u>").**

**A HEARING TO CONSIDER CONFIRMATION OF THE PLAN (THE "<u>CONFIRMATION HEARING</u>") WILL BE HELD BEFORE THE HONORABLE MARY F. WALRATH, UNITED STATES BANKRUPTCY JUDGE, IN COURTROOM 4 OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 5TH FLOOR, WILMINGTON, DELAWARE 19801, ON [●], 2021 AT [●] (PREVAILING EASTERN TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD.  THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE [●], 2021, AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY.  A COPY OF THE PLAN IS ANNEXED HERETO AS <u>EXHIBIT A</u>.  THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS AND PROVISIONS OF THE PLAN.  ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.**

**<u>SECURITIES LAW NOTICES</u>:  THE ISSUANCE OF AND THE DISTRIBUTION OF REORGANIZED HERTZ PARENT INTERESTS ISSUED PURSUANT TO <u>ARTICLE IV</u> OF THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "<u>SECURITIES ACT</u>") AND ANY OTHER APPLICABLE SECURITIES LAWS.**

**THE ISSUANCE AND SALE OF THE REORGANIZED HERTZ PARENT INTERESTS PURSUANT TO THE RIGHTS OFFERING TO HOLDERS OF UNSECURED FUNDED DEBT CLAIMS PURSUANT TO THE RIGHTS OFFERING PROCEDURES ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN**

AMERICAS 106663920

SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER. SUCH SECURITIES WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS, UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE PLAN PROVIDES FOR THE DISTRIBUTION OF SUBSCRIPTION RIGHTS TO HOLDERS OF ALLOWED UNSECURED FUNDED DEBT CLAIMS. THE EXERCISE OF THOSE SUBSCRIPTION RIGHTS IS LIMITED PURSUANT TO THE TERMS OF THE RIGHTS OFFERING PROCEDURES TO HOLDERS OF UNSECURED FUNDED DEBT CLAIMS THAT ARE A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A OF THE SECURITIES ACT AS CERTIFIED PURSUANT TO THE RIGHTS OFFERING PROCEDURES. THE SUBSCRIPTION RIGHTS ARE NOT TRANSFERRABLE INDEPENDENT OF THE ASSOCIATED ALLOWED UNSECURED FUNDED DEBT CLAIM. PLEASE NOTE THAT NOT ALL HOLDERS OF UNSECURED FUNDED DEBT CLAIMS WILL BE ELIGIBLE TO PARTICIPATE IN THE RIGHTS OFFERING. PARTICIPATION IN THE RIGHTS OFFERING IS SUBJECT TO THE LIMITATIONS SET FORTH IN THE SUBSCRIPTION PROCEDURES, INCLUDING LIMITATIONS ON THE NUMBER OF PARTICIPANTS IN THE RIGHTS OFFERING. THE DEBTORS URGE HOLDERS OF UNSECURED FUNDED DEBT CLAIMS TO REVIEW THE SUBSCRIPTION PROCEDURES CAREFULLY IN CONNECTION WITH THE PLAN.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (INCLUDING UNDER THE CAPTION "FINANCIAL PROJECTIONS" AND EXHIBIT E), AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

**READERS ARE FURTHER CAUTIONED THAT MANY OF THE ASSUMPTIONS, RISKS, AND UNCERTAINTIES RELATING TO THE FORWARD LOOKING STATEMENTS CONTAINED HEREIN, INCLUDING THE IMPLEMENTATION OF THE PLAN, ARE BEYOND THE CONTROL OF THE DEBTORS. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL IN THE COMPANY'S FILINGS WITH THE SEC AND UNDER THE HEADING "FACTORS TO BE CONSIDERED BEFORE VOTING" BELOW, AS WELL AS THE ABILITY OF MANAGEMENT TO EXECUTE ITS PLANS TO MEET ITS GOALS AND OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES.  PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND TO, AND UNDERTAKE NO OBLIGATION TO, UPDATE OR OTHERWISE REVISE ANY FORWARD LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.**

**NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.**

**THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT, EXCEPT THAT THE DEBTORS' COURT-APPROVED CHAPTER 11 COUNSEL IS AUTHORIZED TO PROSECUTE APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN BEFORE THE BANKRUPTCY COURT.**

**THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THE DISCLOSURE STATEMENT.**

AMERICAS 106663920

---

### **WHERE TO FIND ADDITIONAL INFORMATION**

Hertz Parent and Hertz Corp. currently file annual reports with, and furnish other information to, the SEC.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link. Each of the following filings is incorporated as if fully set forth herein and is a part of this Disclosure Statement (but later information filed with the SEC that updates information in the filings incorporated by reference will update and supersede such information):

- Annual Report on Form 10-K for the fiscal year ended December 31, 2020, filed with the SEC on February 26, 2021;

- Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2020, June 30, 2020, and September 30, 2020 filed with the SEC on May 11, 2020, August 10, 2020, and November 9, 2020; and

- Current Reports on Form 8-K filed with the SEC between March 1, 2020 and February 28, 2021.

---

### C.  Background and Overview of the Plan[2]

Hertz is an iconic brand that has long signified excellence in vehicle rentals around the world. Through one or more of its Hertz, Dollar, Thrifty and Firefly brands, the Company offers vehicle rentals in North America, Africa, Asia, Australia, Canada, the Caribbean, Europe, Latin America, the Middle East and New Zealand, through both Company owned or franchise locations.  As is the case with other travel-related businesses, the Company's business was severely impacted by the COVID-19 pandemic and the resulting lockdowns.  The pandemic resulted in a dramatic decrease in revenue, leading to the filing of the Chapter 11 Cases on the Petition Date.

Following the commencement of the Chapter 11 Cases, the Company continued the difficult task of stabilizing its business that it had begun prepetition.  Among other things, the Company negotiated a settlement with its ABS lenders, significantly reduced its vehicle fleet, rejected leases for unprofitable locations, continued to right-size its business operations, and raised the financing it needed to continue to operate and refresh its fleet during 2021.  After the Company's business had been stabilized, the Company began formulating a plan of reorganization with the goal of emerging from chapter 11 in the summer of 2021.

Specific efforts toward a plan began in November of 2020, when the Company held a series of meetings with various constituents and potential plan sponsors to jump-start a competitive process. The Company also established a data room and conducted a series of diligence meetings with several potential plan sponsors.  Eventually, the Company received three credible plan proposals. The Company entered into vigorous negotiations with each of the three potential sponsor groups. The negotiations involved the exchange of various term sheets and other documents and numerous

---

[2]    **This overview is qualified in its entirety by reference to the Plan**.  The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise, or limit any rights, claims, or causes of action if the Plan is not confirmed.  You should read the Plan in its entirety before voting to accept or reject the Plan.

virtual meetings between the Company, potential plan sponsors and their respective representatives. Ultimately, the Company determined that the proposal set forth in the Plan and supported by the Plan Sponsors was the most favorable proposed transaction. The Debtors filed the Plan after obtaining certain commitments from the Plan Sponsors, which remain subject to certain diligence, documentation, and other conditions.

The Plan implies a total enterprise value of approximately $4.846 billion, which is reflected through the issuance of new first lien debt and the sale of new common stock of Hertz Global Holdings, Inc., the parent corporation of the Debtors. The new common stock of Hertz Parent is referred to in the Plan as the Reorganized Hertz Parent Interests. Under the Plan, the existing equity of Hertz Parent will be extinguished and the Plan Sponsors will acquire at least 51% of the Reorganized Hertz Parent Interests from a combination of a direct investment and the exercise of subscription rights under the Rights Offering conducted pursuant to the Plan. The remaining Reorganized Hertz Parent Interests will be made available to the holders of Unsecured Funded Debt Claims pursuant to the Rights Offering under certain procedures subject to approval by the Bankruptcy Court. The Rights Offering will be fully backstopped by the Backstop Parties, which include the Plan Sponsors, with no backstop fee but subject to a breakup fee. The Plan also provides for the Debtors to obtain exit financing to fund Plan distributions and working capital.

The transactions set forth in the Plan will raise approximately $5.253 billion in cash proceeds as follows:

- $2.283 billion, subject to certain adjustments, from the purchase of Reorganized Hertz Parent Interests by the Plan Sponsors through a direct investment;

- $1.970 billion, subject to certain adjustments, from a Rights Offering in respect of the Reorganized Hertz Parent Interests. The Rights Offering will be offered to holders of Unsecured Funded Debt Claims subject to certain subscription procedures and will be fully backstopped by the Backstop Parties; and

- $1.000 billion from exit financing in the form of a secured term loan.

The funds generated by these transactions will be used, in part, to provide distributions to creditors as follows:

- Payment in full of Administrative Claims, including all amounts due in respect of the Debtors' DIP Financing, cure costs arising from the assumption of Executory Contracts and Unexpired Leases, and accrued and unpaid professional fees;

- Payment in full of Claims arising from the Debtors' prepetition first lien facilities;

- Payment in full of Claims arising under the Debtors' prepetition second lien notes;

- Payment in full of Other Secured Claims and Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code; and

6

- Distributions to holders of Unsecured Funded Debt Claims (including the Debtors' guarantee of the HHN Notes) and General Unsecured Claims of a cash payment estimated to be equal to approximately 70% of the allowed amount of such claims.

In addition, in connection with the Rights Offering, holders of Unsecured Funded Debt Claims will receive Subscription Rights entitling them to participate in the Rights Offering under the Plan subject to certain subscription procedures and may elect to exchange their Unsecured Funded Debt Claims for Reorganized Hertz Parent Interests in connection with the Rights Offering in lieu of the cash payment described above, in each case subject to certain procedures and requirements. **PLEASE NOTE THAT NOT ALL HOLDERS OF UNSECURED FUNDED DEBT CLAIMS WILL BE ELIGIBLE TO PARTICIPATE IN THE RIGHTS OFFERING. PARTICIPATION IN THE RIGHTS OFFERING IS LIMITED TO QUALIFIED INSTITUTIONAL BUYERS AND IS SUBJECT TO OTHER LIMITATIONS SET FORTH IN THE SUBSCRIPTION PROCEDURES, INCLUDING LIMITATIONS ON THE NUMBER OF PARTICIPANTS IN THE RIGHTS OFFERING. THE DEBTORS URGE HOLDERS OF UNSECURED FUNDED DEBT CLAIMS TO REVIEW THE SUBSCRIPTION PROCEDURES CAREFULLY IN CONNECTION WITH THE PLAN.**

Under the Plan, the Debtors will also obtain a secured revolving facility of $1.500 billion with a sublimit for letters of credit and will emerge from chapter 11 protection with approximately $850 million in cash on their balance sheet. The Debtors believe that such liquidity is sufficient to fund their operations after emergence.

In addition to the transactions described above, the Plan provides for the refinancing of the Company's U.S. ABS facilities, the continuation of the Company's foreign ABS facilities and the comprehensive restructuring of the Debtors' European business.

With respect to Europe, the Plan, in conjunction with an English scheme of arrangement, provides for (a) the allowance of an Unsecured Funded Debt Claim in respect of the Debtors' guarantee of certain notes (the HHN Notes) in the amount of $790 million; (b) the purchase of such Claim by the Plan Sponsors or the payment of such Claim under the Plan, in either case, for a cash payment equal to 70% of such claim (approximately $553 million); (c) the use of the proceeds paid in respect of such claim to pay down the HHN Notes; and (d) the issuance of €250 million in new notes to be issued by Hertz International Ltd., a direct subsidiary of Hertz Corp. and the parent of HHN. The Debtors believe that the foregoing transactions are sufficient to comprehensively restructure their European business.

The Debtors believe that the Plan accomplishes all of the goals that they sought to achieve by commencing the Chapter 11 Cases. If consummated, the Plan will significantly reduce the Debtors' leverage, provide the Debtors with sufficient cash to run their businesses, and provide recoveries to unsecured creditors significantly in excess of what creditors would receive in a liquidation of the Debtors' if the Plan were not consummated. The Debtors urge all holders of Claims entitled to vote on the Plan to vote to accept the Plan.

The following table provides a summary of the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan:

AMERICAS 106663920

| Class and Designation | Applicable Entities | Impairment and Entitlement to Vote | Treatment under the Plan | Estimated Allowed Amount/ Approx. Percentage Recovery[3] | Estimated Recovery in Chapter 7[4] |
|---|---|---|---|---|---|
| 1. (Other Priority Claims) | Each Debtor | Unimpaired **Not Entitled to Vote** (Presumed to Accept) | Each Holder of an Allowed Other Priority Claim shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course). | Est. Allowed Amount: TBD  Est. Recovery: 100% | 3-4% |
| 2. (Other Secured Claims) | Each Debtor | Unimpaired **Not Entitled to Vote** (Presumed to Accept) | Each Holder of an Allowed Other Secured Claim shall receive at the applicable Debtor's, or the applicable Reorganized Debtor's, discretion: (i) payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, payment shall be made in accordance with its terms in the ordinary course); (ii) Reinstatement of such Holder's Allowed Other Secured Claim; (iii) the applicable Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or (iv) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. | Est. Allowed Amount: $1 million  Est. Recovery: 100% | 100% |

---

[3]  Recoveries are based on a total enterprise value of $4.846 billion for the Debtors, together with their non-Debtor subsidiaries.

[4]  Estimated liquidation recoveries listed in this chart are on a consolidated basis.  However, potential liquidation recoveries vary on a debtor-by-debtor basis.  More detail on projected debtor-by-debtor recoveries in a hypothetical chapter 7 liquidation is provided in the Liquidation Analysis attached hereto as **Exhibit F**.

AMERICAS 106663920

| Class and Designation | Applicable Entities | Impairment and Entitlement to Vote | Treatment under the Plan | Estimated Allowed Amount/ Approx. Percentage Recovery[3] | Estimated Recovery in Chapter 7[4] |
|---|---|---|---|---|---|
| 3. (First Lien Claims) | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | Unimpaired **Not Entitled to Vote** (Presumed to Accept) | Holder of an Allowed First Lien Claim shall receive payment in full, in Cash, of the unpaid portion of its liquidated Allowed First Lien Claim on the Effective Date and with respect to any unliquidated Claim with respect to undrawn letters of credit shall retain all legal and equitable rights with respect to such Claims until such letters of credit are released. | Est. Allowed Amount: $1.27 billion (minus the First Lien Donlen Paydown Amount plus letters of credit drawn after the Petition Date plus outstanding and accrued interest and fees through the Effective Date)  Est. Recovery: 100% | 4-54% |
| 4. (Second Lien Note Claims) | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | Unimpaired **Not Entitled to Vote** (Presumed to Accept) | Each Holder of an Allowed Second Lien Note Claim shall payment in full, in Cash of the Allowed amount of such Claim against Hertz Corp. and the Subsidiary Guarantors. | Est. Allowed Amount: $350 million (plus accrued and outstanding interest and fees through the Effective Date)  Est. Recovery: 100% | 0% |
| 5. (Unsecured Funded Debt Claims) | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | Impaired **Entitled to Vote** | Each Holder of an Allowed Unsecured Funded Debt Claims against Hertz Corp. and the Subsidiary Guarantors shall receive its Pro Rata share of: (i) the Unsecured Funded Debt Cash Amount; and (ii) Subscription Rights. | Est. Allowed Amount: $3.49 billion (plus the amount of letters of credit drawn with respect to the ALOC Facility on the Effective Date)  Est. Recovery: 70% | 0-1% |
| 6. (General Unsecured Claims) | Each Debtor | Impaired **Entitled to Vote** | Each Holder of an Allowed General Unsecured Claim against a Debtor shall receive, subject to the General Unsecured Elective Claim election, of its Pro Rata share of the General Unsecured Recovery Cash Pool Amount without regard to the particular Debtor against which such Claim is Allowed. | Est. Allowed Amount: $[545 million]  Est. Recovery: 70% | 0-1% |

9

AMERICAS 106663920

| Class and Designation | Applicable Entities | Impairment and Entitlement to Vote | Treatment under the Plan | Estimated Allowed Amount/ Approx. Percentage Recovery[3] | Estimated Recovery in Chapter 7[4] |
|---|---|---|---|---|---|
| 7. (General Unsecured Elective Claims) | Each Debtor | Unimpaired **Not Entitled to Vote (Presumed to Accept Plan)** | Each Holder of an Allowed General Unsecured Elective Claims shall receive, on the Effective Date or as soon as practical thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Elective Claim, Cash in an amount equal to the lesser of (a) the Allowed amount of such Holder's General Unsecured Elective Claim and (b) $[●] without regard to the particular Debtor against which such Claim is Allowed. Each Holder electing to be treated as a Holder of an Allowed General Unsecured Elective Claim shall irrevocably waive the right to assert such Claim as a General Unsecured Claim. | Est. Allowed Amount: TBD<br><br>Est. Recovery: 100% | 0-1% |
| 8. (Prepetition Intercompany Claims) | Each Debtor | Unimpaired / Impaired **Not Entitled to Vote** (Presumed to Accept or Reject) | Each prepetition Intercompany Claim shall be, at the option of Debtors or Reorganized Debtors as applicable, either: (i) reinstated, or (ii) canceled and released without any distribution on account of such Claims; provided, however, that Intercompany Claims of HIRE (Bermuda) Limited against Hertz Corp. shall be Reinstated. | Est. Allowed Amount: TBD<br><br>Est. Recovery: 0% or 100% | 0-1% |
| 9. (Section 510(b) Claims) | Each Debtor | Impaired **Not Entitled to Vote** (Presumed to Reject) | Section 510(b) Claims will be canceled, released, discharged, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Claims. | Est. Allowed Amount: $0<br><br>Est. Recovery: 0% | 0% |
| 10. (Intercompany Interests) | Each Debtor | Unimpaired **Not Entitled to Vote** (Presumed to Accept) | Intercompany Interests shall be Reinstated so as to maintain the organizational structure of the Debtors as such structure exists on the Effective Date unless implementation of the Restructuring requires otherwise. | Est. Allowed Amount: N/A<br><br>Est. Recovery: N/A | 0% |

10

| Class and Designation | Applicable Entities | Impairment and Entitlement to Vote | Treatment under the Plan | Estimated Allowed Amount/ Approx. Percentage Recovery[3] | Estimated Recovery in Chapter 7[4] |
|---|---|---|---|---|---|
| 11. (Existing Hertz Parent Equity Interest) | Hertz Corp. | Impaired **Not Entitled to Vote** (Presumed to Reject) | Existing Hertz Parent Interests shall be cancelled and released without any distribution on account of such Interests. | Est. Allowed Amount: Approximately 156 million shares<br><br>Est. Recovery: 0% | 0% |

### D.  PSA & Commitment Letter

[The Debtors and the Plan Sponsors, Certares Opportunities LLC and its affiliates ("**Certares**") and Knighthead Capital Management, LLC and its affiliates ("**Knighthead**"), have executed and entered into the Plan Support Agreement attached here to as **Exhibit B** (the "**PSA**") pursuant to which the Plan Sponsors have agreed to take certain actions in respect of the Plan.  The PSA contemplates that additional parties, including the Committee, may join the PSA by executing one or more joinders thereto.]

Attached as Exhibit C to the Plan is a Commitment Letter whereby the Plan Sponsors have committed to acquire up to an aggregate of approximately $4.2 billion of Reorganized Hertz Parent Interests through a combination of the Backstop Parties Direct Equity Investment and the Backstop Commitment on terms set forth in the Backstop Commitment Term Sheet attached as Exhibit B to the Plan.

### E.  The Plan Sponsors

With their broad investment experience in the travel and leisure industry and involvement in complex restructurings, the Plan Sponsors are each uniquely qualified to become the Debtors' strategic partners.

Established in 2008, Knighthead is a leading credit-investment management firm with $5.5 billion of assets under management. Knighthead's credit platform combines bottom-up fundamental research with top-down macro analysis to seek investment opportunities across capital structures. Most recently, Knighthead led transformational financings in restructuring proceedings for PCG and LATAM Airlines Group and most recently, in partnership with Certares, in Azul Brazilian Airlines. With an experienced team of investment professionals, specializing in credit analysis, sourcing, trading and restructuring, Knighthead is prepared to work with the Debtors' management to realize their vision for a modern mobility company.

Certares is a private investment platform dedicated to investing in the travel, tourism and hospitality sectors with approximately $4.5 billion of assets under management, making Certares a significant player in the global travel industry. In 2019 alone, Certares portfolio companies booked $104 billion in travel. Certares' investments include American Express Global Business Travel, Internova Group, TripAdvisor and others.

AMERICAS 106663920

Certares and Knighthead have recently formed the CK Opportunities Fund, a co-managed vehicle specifically dedicated to investments in travel and leisure.

Given the Plan Sponsors' deep knowledge and focus on the travel, tourism and hospitality sectors and the complementary assets that drive distribution, scale and supplier relationships, the Plan Sponsors are positioned to help grow the Debtors' business. The Debtors believe that a partnership with Certares and Knighthead will provide significant strategic and commercial opportunities for the Debtors and maximize the value of the Estates. As a result, the Plan provides superior recoveries for creditors of the Estates at a critical time as the Company emerges from bankruptcy.

### F.  Disclosure Statement Enclosures

The following three (3) documents accompany transmittal of this Disclosure Statement:

1. **Disclosure Statement Order**.  A copy of the Disclosure Statement Order (without exhibits), which, among other things, approves this Disclosure Statement, establishes procedures for voting on the Plan (the "**Voting Procedures**"), and schedules the Confirmation Hearing and the deadline for objecting to confirmation of the Plan.

2. **Confirmation Hearing Notice**.  A copy of the notice of the Voting Deadline, which sets out, among other things, notice of the date, time, and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "**Confirmation Hearing Notice**").

3. **Ballots**.  One or more Ballots (and return envelopes) for voting to accept or reject the Plan (unless you are not entitled to vote because (a) your Claim is not impaired under the Plan and you are presumed to accept the Plan, (b) you are deemed to reject the Plan, or (c) your Claim is subject to an objection filed by the Debtors, which Claim is temporarily disallowed for voting purposes).  See Section VIII of this Disclosure Statement for an explanation of which parties are entitled to vote and a description of the Voting Procedures.

### G.  Inquiries

If you have any questions about the Disclosure Statement and accompanying materials, please contact Prime Clerk LLC, the Debtors' voting agent (the "**Voting Agent**"), at (877) 428-4661 (domestic toll free) or +1 (929) 955-3421 (international).  Additional copies of this Disclosure Statement, the Plan, or the Plan Supplement (when filed) are available by visiting the Voting Agent's website, https://restructuring.primeclerk.com/hertz/ or upon written request made to the Voting Agent at the following address:

<div align="center">

**Hertz Ballot Processing**
**c/o Prime Clerk LLC**
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

</div>

PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

AMERICAS 106663920

## II.
## OVERVIEW OF THE COMPANY'S OPERATIONS

### A.  The Company's Prepetition Business Operations

Hertz Parent, though Hertz Corp. and various other indirect subsidiaries, is primarily engaged in the vehicle rental business.  The Hertz name has been used in connection with this business since 1923 and is one of the most recognizable brands in the world.  Hertz Corp. is the successor to corporations that have been engaged in the vehicle rental or leasing business since 1918.  As of May 22, 2020 (the "**Petition Date**"), the Company also provided vehicle leasing and fleet management services (the "**Donlen Business**") through its subsidiary Donlen Corporation ("**Donlen Corp.**").  As discussed in Section U, below, the Bankruptcy Court approved a sale of substantially all of the Company's assets associated with the Donlen Business at a hearing on March 1, 2021, which sale is expected to close in March 2021.

Hertz operates its vehicle rental business globally primarily through the Hertz, Dollar and Thrifty brands from Company-owned and franchisee locations.  Each of the Company's brands offers distinct price points, levels of service, offerings, and products.  While the Company maintains brand differentiation through separate airport counters, reservations, marketing and other customer contact activities, it achieves synergies by utilizing a single fleet and fleet management team and combined vehicle maintenance and certain back-office functions.

As of the Petition Date, vehicle rentals under one or more Company brands were offered at locations in the North America, Africa, Asia, Australia, Canada, the Caribbean, Europe, Latin America, the Middle East and New Zealand.  These locations include Company-owned and franchise locations.

The Company's core business has long been serving travelers at commercial travel terminals. Hertz began serving rail travelers at its first train station location in 1926 and air travelers at its first airport location in 1932.  In 2019, the Company generated approximately 65% of its worldwide vehicle rental revenues from airport locations.  Air travelers have historically comprised the vast majority of customers to the Company's airport locations.

Through its off-airport locations, the Company serves a broader range of customer needs.  These include temporary replacements of out-of-service vehicles, vehicles suitable for specific personal or business travel use, or vehicles suitable for earning money through a rideshare network.

In addition to the different customer needs they meet, the Company's airport and off-airport operations differ in other respects as well.  Significantly, unique to the Company's airport locations is the relationship between the Company and the airports' operators, which are typically governmental bodies or authorities.  At each airport that has a Company-owned location, the Company has obtained a lease and/or concession from the airport operator allowing it to operate there.  The terms of an airport concession typically require that the Company pay concession fees to the airport's operator based on a percentage of the revenues generated by the Company at the airport, subject to a minimum annual guarantee.  Under most concessions, the Company must also pay fixed rent for terminal counters and other physical facilities.  Most concessions are for a fixed length of time, while others create operating rights and payment obligations that are terminable at

AMERICAS 106663920

any time.   In contrast to the complex airport concession arrangements, the majority of the Company's off-airport locations are leased from private landlords on privately negotiated terms.

To complement its core vehicle rental business, the Company has also historically maintained a used vehicle retail sales business.  Fleet age and mileage are important quality metrics within the rental car industry.  In order to keep its fleet within target age and mileage parameters, the Company perennially acquires new vehicles and disposes of used vehicles.  Historically, it has acquired some of its vehicles through manufacturer programs by which manufacturers agree to repurchase vehicles at a set price in the future or otherwise guarantee the depreciation rate on the subject vehicles (the "**Program Vehicles**").  For vehicles purchased outside of such programs (the "**Non-Program Vehicles**"), the Company is responsible for disposal and bears the risk of unexpected depreciation.

Selling retired fleet vehicles direct to consumers permits the Company to capture a greater amount of vehicle residual value than through wholesale channels.  In 2019, the Company was one of the top-10 sellers of pre-owned vehicles in the United States, operating primarily through 87 Company-operated retail locations under the "Hertz Car Sales" name.  In addition, in 2019, the Company sold vehicles in 35 U.S. states and several European countries through its Rent2Buy program, whereby rental customers could elect to purchase a rented vehicle and be credited a portion of the rental fee towards the purchase price.  As discussed in Section P, below, the Company temporarily suspended operations at its Hertz Car Sales locations in November of 2020.

As of the Petition Date, the Company also owned and operated a vehicle fleet outsourcing business operated under the Donlen name.  Donlen services include vehicle leasing, consulting, fleet management, and administrative services.  Donlen's proprietary telematics products and services offer customers enhanced visibility into driver and vehicle performance.  The Company acquired the Donlen Business in 2011 and thereafter continued to operate it largely as a standalone business through Debtor Donlen Corp. and its subsidiaries.  As discussed in Section U, the Bankruptcy Court approved a sale of substantially all of the Company's assets associated with the Donlen Business at a hearing on March 1, 2021, which sale is expected to close in March 2021.

### B.  The Company's Corporate Structure

In total, the Company comprises approximately 125 entities.  A list of entities that are Debtors in these Chapter 11 Cases is attached hereto as **Exhibit C**.  An organizational chart depicting the Company's overall ownership structure as, well as identifying those entities that are Debtors in these Chapter 11 Cases, is attached hereto as **Exhibit D**.

Hertz Corp. is the Company's primary operating entity for the majority of its U.S. vehicle rental business, which is operated through the Hertz brand, while DTG Operations Inc. primarily operates the Dollar and Thrifty brands in the U.S.  As noted above, as of the Petition Date, the Company conducted its Donlen Business through Donlen Corp., a direct subsidiary of Hertz Corp., and Donlen Corp.'s various subsidiaries.  The Company also operates U.S. vehicle rental business through subsidiaries of Debtor Dollar Thrifty Automotive Group, Inc., and, in Puerto Rico and the U.S. Virgin Islands, through an indirect subsidiary of non-Debtor Hertz International Ltd. ("**HIL**"), a direct subsidiary of Hertz Corp.

14

HIL, which is incorporated in Delaware, is the Company's primary intermediary to its non-U.S. businesses.  First, HIL is the indirect parent of substantially all of the Company's non-U.S. operating entities.  Second, HIL licenses the Hertz name and various other Company-owned marks to substantially all of the Company's international franchisees.  Such marks are owned by Hertz System, Inc., Dollar Rent A Car, Inc. and Thrifty Rent-A-Car Systems, LLC, subsidiaries of Hertz Corp., and licensed to HIL for the purposes of issuing sublicenses.

The Company employs a mix of Company-owned and franchised locations in the U.S., Europe, Australia, and New Zealand.  Subject to limited exceptions for U.S. territories, Hertz and affiliated brand locations in Africa, Asia, South America, and the Caribbean are franchise only.  The Company's non-U.S. operations are conducted primarily through direct and indirect subsidiaries of Hertz Holdings Netherlands BV ("**HHN**").

## C.  The Company's Prepetition Capital Structure

### 1.  Equity

As of the Petition Date, Hertz Parent was a publicly traded company, listed on the New York Stock Exchange under the symbol HTZ, with approximately 142,294,110 shares of common stock issued and outstanding.  As discussed in Section H, below, Hertz Parent issued and sold in excess of 13 million additional shares of common stock subsequent to the Petition Date.

### 2.  Financial Debt

As of the Petition Date, the Company had approximately $19.0 billion in aggregate financial debt incurred through a variety of financing programs with third parties.  As further detailed herein, a substantial portion of the Company's prepetition consolidated debt related to fleet financing activities involving bankruptcy remote non-Debtor affiliates as the direct obligors, but for which one or more Debtors, through leasing or other arrangements, undertook payment obligations designed to support the ultimate payment of such financings.  As further detailed in Section III, below, the Debtors have reduced or extinguished certain financial debt obligations outstanding as of the Petition Date and undertaken certain new financial debt obligations.

The following chart provides a summary of the Company's significant third-party financial debt obligations as of the Petition Date, including such obligations as to which non-Debtors are the primary or sole direct obligors.[5]

| Facility | Petition Date Outstanding Principal |
|---|---|
| ***Non-Vehicle Debt*** | |
| First Lien Term Loan | $656 million |
| First Lien RCF | $615 million |

---

[5]     All amounts where the principal obligation is in a currency other than United States dollars have been converted to United States dollars using the applicable foreign exchange rate as of the Petition Date.

AMERICAS 106663920

| Facility | Petition Date Outstanding Principal |
|---|---|
| Senior Second Priority Secured Notes | $350 million |
| Unsecured Notes | $2,700 million |
| 7.000% Unsecured Promissory Notes | $27 million |
| ***Vehicle Debt*** | |
| U.S. Vehicle RCF | $93 million |
| HVF II U.S. ABS Program | $10,893 million |
| Donlen U.S. ABS Program | $1,592 million |
| HHN Notes (estimated in USD) | $790 million |
| European ABS Program (estimated in USD) | $650 million |
| Hertz Canadian Securitization (estimated in USD) | $251 million |
| Donlen Canada Securitization (estimated in USD) | $27 million |
| Australian Securitization (estimated in USD) | $149 million |
| New Zealand RCF (estimated in USD) | $46 million |
| Lombard Vehicle Financing Facility (estimated in USD) | $229 million |

These financing programs are described in further detail below.

### (a) Non-Vehicle Debt

#### (i) The U.S. First Lien Facilities

Hertz Corp. is the lead borrower under the June 30, 2016 First Lien Credit Agreement. Barclays Bank PLC acts as the First Lien Agent thereunder. The First Lien Credit Agreement provides for both a term loan (the "**First Lien Term Loan**") and revolving credit facility (the "**First Lien RCF**," and, together with the First Lien Term Loan, the "**First Lien Facilities**"). The First Lien RCF provides a sub-limit for letters of credit (the "**First Lien Revolving LC Facility**"). The original maximum principal amount of the First Lien Term Loan was $700 million due 2023. As of the Petition Date, the outstanding principal balance of the First Lien Term Loan was approximately $656 million. As of the Petition Date, the outstanding principal balance of the First Lien RCF was approximately $615 million and there were $243 million in outstanding issued letters of credit under the First Lien RCF.

The obligors in respect of the First Lien Credit Agreement are (i) Hertz Corp.; (ii) each of the Subsidiary Guarantors; and (iii) Rental Car Intermediate Holdings, LLC. Their obligations are secured by the collateral (the "**Prepetition Senior Secured Debt Collateral**"), which includes (a) cash equivalents (other than restricted fleet cash) and investment property (excluding cash and cash equivalents requiring perfection through control), (b) deposit accounts (other than in respect of restricted fleet cash) (excluding deposit accounts requiring perfection through control), customer receivables accounts and the Collateral Proceeds Account (c) intellectual property,

16

(d) vehicle rental concession rights (excluding vehicle concessions in which security interests have not been perfected and/or to the extent such grant would result in adverse business consequences to the Company), (e) interests in leased real property and fixtures, and (f) general intangibles as pledged by the U.S. Note Obligors and Rental Car Intermediate Holdings, LLC.  The Prepetition Senior Secured Debt Collateral expressly excludes, among other things, assets requiring perfection through control, including cash, cash equivalents, deposit accounts and other bank or securities accounts (other than specified proceeds accounts).

As further detailed in Section X, below, the Committee has sought to avoid, on behalf of the Debtors' estates, the First Lien Agent's liens in certain of the Prepetition Senior Secured Debt Collateral.

The First Lien Agent and the Second Lien Notes Trustee are parties to the Intercreditor Agreement, which generally governs the parties' respective rights as between one another regarding the Prepetition Senior Secured Debt Collateral.  As of the Petition Date, the Company had used borrowings under the First Lien Facilities for general corporate purposes including funding U.S. operations and, through various inter-company loans, funding working capital needs in the Company's international operations.

### (ii) Standalone U.S. Letter of Credit Facilities

As of the Petition Date, the Company had two standalone U.S. letter of credit facilities.  The first—the First Lien Standalone LC Facility—was established pursuant to a November 2, 2017 Letter of Credit Agreement between Hertz Corp., certain lenders, and the First Lien Agent as administrative agent and collateral agent.  The First Lien Standalone LC Facility was in the original principal amount of $400 million with a 2021 maturity.  The obligors in respect of the First Lien Standalone LC Facility are (i) Hertz Corp.; (ii) each of the Subsidiary Obligors; and (iii) Rental Car Intermediate Holdings, LLC.  Their obligations are secured by the Prepetition Senior Secured Debt Collateral.  As of the Petition Date, there were $299 million in outstanding issued letters of credit under the First Lien Standalone LC Facility.  Prior to the Petition Date, the Company had used the Standalone Letter of Credit Facilities for general corporate purposes, including to secure its performance in respect of airport concession agreements and to secure its obligation with respect to its vehicle financing facility.

The second—the ALOC Facility (together with the First Lien Standalone LC Facility, the "**Standalone Letter of Credit Facilities**")—was established pursuant to a December 13, 2019 Credit Agreement between Hertz Corp. and Goldman Sachs Mortgage Company as lender and administrative agent.  The ALOC Facility was in the original principal amount of $250 million with a 2023 maturity.  The obligors in respect of the ALOC Facility are (i) Hertz Corp.; (ii) each of the Subsidiary Obligors; and (iii) Rental Car Intermediate Holdings, LLC.  The ALOC Facility is unsecured.  As of the Petition Date, there were $200 million in outstanding issued letters of credit under the ALOC Facility.  The Debtors estimate that approximately $162 million of such letters of credit will be drawn as of June 30, 2021.

Case 20-11218-MFW    Doc 2913    Filed 03/02/21    Page 27 of 163

### (iii) The Second Lien Notes

Pursuant to an indenture dated June 6, 2017, Hertz Corp. issued the Second Lien Notes in the original principal amount of $1.250 billion.  BOKF, N.A. (the "**Second Lien Notes Trustee**") is the successor indenture trustee and collateral agent in respect of the Second Lien Notes.  Hertz Corp. and each of the Subsidiary Guarantors is an obligor on the Second Lien Notes.  Proceeds of the Second Lien Notes were used, in part, to retire prior notes.  Obligations in respect of the Second Lien Notes are secured by the Prepetition Senior Secured Debt Collateral (as defined below).  The Second Lien Notes Trustee and the First Lien Agent are parties to the Intercreditor Agreement, dated June 6, 2017, generally governing the parties' respective rights as between one another regarding the Prepetition Senior Secured Debt Collateral.  As of the Petition Date, Second Lien Notes were outstanding in the aggregate principal amount of $350 million.

### (iv) The U.S. Unsecured Notes

Pursuant to indentures dated October 16, 2012, September 22, 2016, August 1, 2019, and November, 25, 2019, respectively (as each such indenture may have been amended, supplemented or otherwise modified from time to time), Hertz Corp. issued the following series of senior unsecured notes (the "**Unsecured Notes**"): (i) the 6.250% Unsecured Notes, due 2022; (ii) the 5.500% Unsecured Notes, due 2024; (iii) the 7.125% Unsecured Notes, due 2026; and (iv) the 6.000% Unsecured Notes, due 2028.  The Unsecured Notes Trustee with respect to each series of Unsecured Notes is Wells Fargo Bank, N.A.  The Hertz Corp. and each of the Subsidiary Guarantors is an obligor in respect of the Unsecured Notes.  Proceeds of the Unsecured Notes were used, in whole or substantial part, to retire prior notes.  As of the Petition Date, Unsecured Notes were outstanding in the following principal amounts:

| Unsecured Notes | |
| --- | --- |
| Series | Outstanding Principal |
| 6.250% Unsecured Notes | $500 million |
| 5.500% Unsecured Notes | $800 million |
| 7.125% Unsecured Notes | $500 million |
| 6.000% Unsecured Notes | $900 million |
| Unsecured Notes Total | $2,700 million |

### (v) Other Non-Vehicle Financial Debt

As of the Petition Date, Hertz Corp. had approximately $27 million of unsecured obligations outstanding in the form of the 7.000% Unsecured Promissory Notes issued in January 1998.  Hertz Corp. also had non-vehicle debt obligations amounting to approximately $20 million on account of financed leases for various non-vehicle equipment and hardware as of the Petition Date.

18

### (b) Vehicle Debt

#### (i)  U.S. Vehicle RCF

As of the Petition Date, Hertz Corp., as borrower, and Rental Car Intermediate Holdings, LLC, as guarantor, were obligors under a Credit Agreement dated June 30, 2016 providing for a revolving credit facility (the "**U.S. Vehicle RCF**").  Credit Agricole Corporate and Investment Bank was the U.S. Vehicle RCF administrative agent and The Bank of New York Mellon Trust Company, N.A. was the collateral agent.  The collateral securing the obligations in respect of the U.S. Vehicle RCF were the vehicles financed thereunder and certain related assets.  The original maximum principal amount of the U.S. Vehicle RCF was $200 million.  As of the Petition Date, the outstanding principal balance of the U.S. Vehicle RCF was approximately $93 million.  Proceeds of the U.S. Vehicle RCF had been used primarily to finance vehicles that are to be sold through its direct to consumer retail used car sales platform.

As discussed in Section I, below, the Company repaid the entire U.S. Vehicle RCF after the Petition Date.

#### (ii) HHN Notes

Pursuant to indentures dated September 22, 2016 and March 23, 2018, respectively (as each such indenture may have been amended, supplemented or otherwise modified from time to time), non-Debtor HHN issued the following series of unsecured notes (the "**HHN Notes**"): (i) 4.125% Senior Notes due 2021 (the "**HHN 4.125% Unsecured Notes**") in the original aggregate principal amount of €225 million; and (ii) 5.500% Senior Notes due 2023 (the "**HHN 5.500% Unsecured Notes**") in the original aggregate principal amount of €500 million.  Wilmington Trust, National Association is the indenture trustee in respect of the HHN Notes.  The obligors in respect of the HHN Notes are Hertz Corp., each of the Subsidiary Guarantors, and non-Debtor affiliates (i) HHN; (ii) Hertz Automobielen Nederland B.V.; (iii) Hertz Autovermietung GmbH; (iv) Hertz Belgium BVBA; (v) Hertz Fleet (Italiana) S.r.l.; (vi) Hertz France SAS; (vii) Hertz Italiana S.r.l.; (viii) Hertz Luxembourg S.à r.l.; and (ix) Hertz UK Receivables Ltd.

As of the Petition Date, proceeds of the HHN Notes had been used to repay existing indebtedness and to finance the Company's vehicle rental operations in Italy, Belgium and Luxembourg and a portion of its assets in the United Kingdom, France, The Netherlands, Spain and Germany.  As of the Petition Date, the amounts of the HHN Notes outstanding, expressed in U.S. Dollars, were approximately as follows:

| HHN Notes | |
| --- | --- |
| Series | Outstanding Principal |
| HHN 4.125% Unsecured Notes | $246 million |
| HHN 5.500% Unsecured Notes | $548 million |
| HHN Notes Total | $794 million |

AMERICAS 106663920

### (iii) New Zealand RCF

As of the Petition Date, Non-Debtor affiliate Hertz New Zealand Holdings Limited was the borrower under a September 26, 2016 Facility Agreement with Bank of New Zealand providing for a revolving credit facility in the original maximum principal amount of NZD$60 million (the "**New Zealand RCF**").   Non-Debtor affiliates Hertz New Zealand Limited and Tourism Enterprises Limited are also obligated on the New Zealand RCF as guarantors.  Obligations in respect of the New Zealand RCF are secured by a pledge of substantially all of each obligor's assets.  As of the Petition Date, proceeds of the New Zealand RCF had been used to finance the Company's New Zealand rental vehicles and for other corporate purposes.

As of the Petition Date, the principal amount outstanding under the New Zealand RCF, expressed in U.S. Dollars, was approximately $46 million.

### (iv) Lombard Vehicle Financing Facility

As of the Petition Date, non-Debtor affiliates Hertz Vehicle Financing U.K. Limited and Hertz (UK) Limited were borrowers under the Lombard Vehicle Financing Facility Agreement providing for a revolving credit facility in the original maximum principal amount of £250 million (the "**Lombard Vehicle Financing Facility**").  Hertz Corp. is also obligated on the Lombard Vehicle Financing Facility as a guarantor.  Obligations in respect of the Lombard Vehicle Financing Facility are secured by a security assignment of buyback agreements in respect of financed vehicles.  As of the Petition Date, proceeds of the Lombard Vehicle Financing Facility had been used to finance the Company's U.K. rental vehicles.

As of the Petition Date, the principal amount outstanding under the Lombard Vehicle Financing Facility, expressed in U.S. Dollars, was approximately $229 million.

### (v) ABS Programs and Other Securitizations

As of the Petition Date, the vast majority of funding for the Company's rental car fleet and its fleet leasing fleet had been raised through various asset-backed securities programs (each, an "**ABS Program**").  While additional entities are involved in all of the ABS Programs, and variations in structure exist, the simplified general arrangement is as follows:

- A Company-owned special purpose entity (the "**Issuer**") raises funds by selling notes (the "**ABS Notes**") in the capital markets.  Each of the Issuers is a non-Debtor affiliate.

- The Issuer loans the proceeds of the ABS Notes to a second Company-owned special purpose entity (the "**Vehicle Owner**"), creating an intercompany obligation from the Vehicle Owner to the Issuer, which uses such proceeds to fund vehicle purchases (directly or through a related ownership entity).

- Pursuant to leases, whether with a Company operating entity, in the case of the Company's rental car business (each, a "**Company Lessee**"), or a third party lessee, in the case of the Company's fleet leasing business (a "**Third-Party Lessee**"), the Vehicle Owner leases the vehicles in exchange for payments that are used by the Vehicle Owner to repay the Issuer

AMERICAS 106663920

on the intercompany obligation, which payments are used by the Issuer to pay principal and interest to the holders of the ABS Notes.

- The obligations in respect of the ABS Notes are secured by the vehicles financed thereby and certain related assets.

### (A) Prepetition HVF II ABS Program

Non-Debtor affiliate Hertz Vehicle Financing II LP ("**HVF II**") is the Issuer under the Company's U.S. rental car ABS Program (the "**Prepetition HVF II ABS Program**").  Prior to the Petition Date, the Company utilized the Prepetition HVF II ABS Program to facilitate its financing activities relating to the vehicles used by the Company in its U.S. daily vehicle rental operations. Non-Debtor affiliates Hertz Vehicle Financing LLC ("**HVF**") and Rental Car Finance LLC acted, or were eligible to act, as Vehicle Owners under the Prepetition HVF II ABS Program and Debtors Hertz Corp. and DTG Operations, Inc. ("**DTG Operations**") acted, or were eligible to act, as Company Lessees under the Master Lease Agreement.  Hertz Corp. guaranteed the obligations of all other Company Lessees under the Prepetition HVF II ABS Program.  As further explained below, those obligations substantially correspond to the obligations of HVF II in respect of the ABS Notes it issued pursuant to the Prepetition HVF II ABS Program.

Pursuant to the October 31, 2014 Amended and Restated Base Indenture and Amended and Restated Group I Supplement, under which Bank of New York Mellon Trust Company, N.A. is the HVF II Trustee, HVF II issued term ("**MTN**")[6] and revolving ("**VFN**")[7] ABS Notes (*i.e.*, the HVF II Notes) secured by one or more shared or segregated collateral pools consisting primarily of portions of the Company's U.S. rental vehicle fleet financed pursuant to the Prepetition HVF II ABS Program and related assets that were allocated as the ultimate indirect collateral for the respective HVF II Notes.  HVF II Notes and their respective outstanding principal amounts as of the Petition Date were as follows:

| HVF II Notes | | |
|---|---|---|
| Series | Original Expected Final Payment Day | Petition Date Outstanding Principal |
| *MTNs* | | |
| Series 2015-3 | 2020 | $371 million |
| Series 2016-2 | 2021 | $595 million |
| Series 2016-4 | 2021 | $424 million |
| Series 2017-1 | 2020 | $450 million |
| Series 2017-2 | 2022 | $370 million |

---

[6]   Within each series of MTN HVF II Notes there is subordination based on class.  In addition to the total third party debt in the table below, MTN issuances from 2017 onward include Class RR—risk retention—notes totaling $547 million that are held by Hertz Corp.

[7]   Within the series of HVF II Notes there is subordination based on class.

AMERICAS 106663920

| HVF II Notes | | |
|---|---|---|
| Series 2018-1 | 2023 | $1,058 million |
| Series 2018-2 | 2021 | $213 million |
| Series 2018-3 | 2023 | $213 million |
| Series 2019-1 | 2022 | $745 million |
| Series 2019-2 | 2024 | $799 million |
| Series 2019-3 | 2024 | $800 million |
| HVF II MTN Total | | $6,038 million |
| *VFNs* | | |
| Series 2013-A | 2022 | $4,855 million |
| HVF II Notes Total | | $10,893 million |

The VFN HVF II Notes were issued pursuant to a privately negotiated agreement with a group of financial institutions. The MTN HVF II Notes were sold in global format through the Depository Trust Company and beneficially owned by a larger number of investors.

In exchange for proceeds of the HVF II Notes, pursuant to the Fourth Amended and Restated HVF Base Indenture dated November 25, 2013 and the Amended and Restated Group I Supplement dated October 31, 2014, HVF issued a note (the "**HVF Series 2013-G1 Note**") to HVF II in the original principal amount of $2.35 billion. The HVF II Trustee is the indenture trustee and collateral agent in respect of the HVF Series 2013-G1 Note. HVF's obligations in respect of the HVF Series 2013-G1 Note are secured by portions of the Company's U.S. rental vehicle fleet financed pursuant to the Prepetition HVF II ABS Program and related assets.

As further discussed in Section D, below, the occurrence of one or more amortization events in respect of the Prepetition HVF II ABS Program required the Company to use proceeds of vehicle sales to pay down the HVF II Notes and prohibited the Company to use proceeds to purchase new vehicles. As further discussed in Section O, below, pursuant to the HVF II Lease Order and the Extended HVF II Lease Order, subsequent to the Petition Date the Company has materially reduced its obligations in respect of the Prepetition HVF II ABS Program through, among other things, the sale of vehicles leased thereunder.

### (B) Prepetition Donlen ABS Program

Non-Debtor affiliate Hertz Fleet Lease Funding LP ("**HFLF**"), a subsidiary of the Donlen Corp., is a special purpose entity created to act as the Issuer under the Company's U.S. fleet leasing ABS Program (the "**Prepetition Donlen ABS Program**"). As of the Petition Date, the Company utilized the Prepetition Donlen ABS Program to finance lease receivables and the related vehicles under lease to Donlen Corp.'s U.S. fleet management customers. The debt outstanding under this program is non-recourse to Donlen Corp. and Hertz Corp. and principal repayment is derived solely from the proceeds of third party payments owing under the leases. Non-Debtor affiliate DNRS II LLC received proceeds of the ABS Notes issued by HFLF under the Prepetition Donlen ABS Program and, through the Donlen Trust, acquired vehicles that were, in turn, leased to Third-

AMERICAS 106663920

Party Lessees.  In addition, prior to the Petition Date, Donlen Corp. from time to time entered into syndication transactions with third-party investors pursuant to which such investors acquired a beneficial interest in an agreed upon portfolio of leases of Third-Party Lessees.  Once syndicated, the leases included in syndication transactions were not included in the collateral for the HFLF ABS Notes (defined below).

Pursuant to the September 30, 2013 HFLF 2013 Base Indenture and various supplements thereto, as to each of which Bank of New York Mellon Trust Company, N.A. (also the HFV II Trustee) acts as indenture trustee and collateral agent, HFLF issued MTN and VFN ABS Notes (collectively, the "**HFLF ABS Notes**") secured by vehicles and related lease and other rights that were allocated as the ultimate direct or indirect collateral for HFLF's financings.  The HFLF ABS Notes and their respective outstanding principal amounts as of the Petition Date were as follows:

| HFLF ABS Notes | | |
|---|---|---|
| Series | Maturity | Petition Date Outstanding Principal |
| *MTNs* | | |
| Series 2017-1 | 2021 | $155 million |
| Series 2018-1 | 2022 | $374 million |
| Series 2019-1 | 2023 | $578 million |
| HFLF MTN Total | | $1,107 million |
| *VFNs* | | |
| Series 2013-2 | 2022 | $485 million |
| HFLF ABS Notes Total | | $1,592 million |

The VFN Notes were issued pursuant to a privately negotiated agreement with a group of financial institutions.  The MTN Notes were sold in global format through the Depository Trust Company and beneficially owned by a larger number of investors.[8]

Pursuant to the Group I Loan Agreement dated September 30, 2013, HFLF lent, and DNRS II LLC borrowed, proceeds of the HFLF ABS Notes (the "**Group I Loan**").  The original committed amount under the Group I Loan agreement was $2 billion.  DNRS II LLC's obligations in respect of the Group I Loan are secured by its beneficial interest in the vehicles and vehicle leases held by Donlen Trust and certain related rights (other than the leases subject to the syndication transactions described above).

As a result of the commencement of the Chapter 11 Cases, one or more amortization events occurred in respect of the Prepetition Donlen ABS Program, requiring the Company to use proceeds of vehicle sales to pay down the HFLF ABS Notes and prohibiting the Company to use

---

[8]    As of the Petition Date, there were an additional $11 million in Class RR note balances held by Hertz Corp. related to the Prepetition Donlen ABS program.

proceeds to purchase new vehicles.  Subsequent to the Petition Date, the Company materially reduced the balance of the HFLF ABS Notes through vehicle sales activities.

As discussed in Section U, below, the Company sold substantially all of the assets associated with the Donlen Business in March 2021, including its equity interest in HFLF.

### (C) European ABS Program

Non-Debtor affiliate International Fleet Financing No.2 B.V. ("**IFF No. 2**") is a special purpose entity created to act as the Issuer under the European ABS Program.  The Company utilizes the European ABS Program to finance vehicles used in its rental operations in France, the Netherlands, Germany, and Spain.  Pursuant to an Issuer Facility Agreement dated September 25, 2018, IFF No. 2 issued variable funding rental car asset-backed notes (the "European ABS Notes") that permit borrowings by IFF No. 2 on a revolving basis in an original aggregate amount up to €1.0 billion with a term of two years.  Credit Agricole acts as the administrative agent and BNP Paribas acts as the collateral agent for the European ABS Program.  IFF No. 2's obligations in respect of the European ABS Notes are secured by the Company's Dutch, French, German, and Spanish fleets and related assets.  Vehicle Owners[9] and Company Lessees[10] vary by region under the European ABS Program.  As of the Petition Date, the aggregate principal amount of European ABS Notes outstanding, expressed in U.S. Dollars, was approximately $650 million.

Each Vehicle Owner under the European ABS Program is party to a facility agreement pursuant to which it obtains proceeds of the European ABS Notes (each a "**FleetCo Facility Agreement**").  Each European ABS Company Lessee rents vehicles from its respective Vehicle Owner.  Pursuant to a September 28, 2018 guarantee and indemnity, Hertz Corp. guaranteed all obligations of each European ABS Company Lessee to its respective Vehicle Owner, including the payment of rent under the relevant lease agreements.

### (D) Australian Securitization

Non-Debtor affiliate HA Fleet PTY Limited ("**HA Fleet**") is an entity created to act as the Issuer under the Australian Securitization.  The Australian Securitization is the primary fleet financing facility for the Company's vehicle rental operations in Australia.

Pursuant to the October 31, 2014 Master Amendment and Restatement Agreement, HA Fleet is entitled to issue VFN notes in the original maximum principal amount of AUD$250 million (the "**Australian Securitization Notes**").[11]  Westpac Banking Corporation acts as the administrative agent in respect of the Australian Securitization Notes and PT Limited is the security trustee.  HA

---

[9]    The European ABS Vehicle Owners are non-Debtor affiliates (i) Stuurgroep Fleet (Netherlands) B.V. (Netherlands); (ii) RAC Finance S.A.S. (France); (iii) Hertz Fleet Limited (Germany); and (iv) Stuurgroep Fleet (Netherlands) B.V. Spanish Branch (Spain).

[10]    The European ABS Company Lessees are non-Debtor affiliates (i) Hertz Automobielen Nederland B.V. (Netherlands); (ii) Hertz France S.A.S. (France); (iii) Hertz Autovermietung GMBH (Germany); and (iv) Hertz de España SL (Spain).

[11]    Holders of Australian Securitization Notes are or may include (i) Westpac Banking Corporation; (ii) Royal Bank of Canada, (iii) Sydney Branch; and (iv) National Australia Bank.

AMERICAS 106663920

Fleet's obligations in respect of the Australian Securitization Notes are secured by rental vehicles used in the Company's Australian operations and certain related rights.  As of the Petition Date, the aggregate principal amount of Australian Securitization Notes outstanding, expressed in U.S. Dollars, was approximately $149 million.

In addition to being an Issuer, HA Fleet is also the Vehicle Owner under the Australian Securitization Program.  Non-Debtor affiliate Hertz Australia PTY Limited is the Company Lessee in respect of the Australian Securitization Program.  Hertz Corp. guaranteed the lease payments and certain performance in respect of the Australian Securitization Program.

### (E) Prepetition Hertz Canadian Securitization Program

Non-Debtor affiliate TCL Funding Limited Partnership ("**Funding LP**") is a special purpose entity created to act as the Issuer under the Company's Prepetition Hertz Canadian Securitization Program (the "**Prepetition Hertz Canadian Securitization Program**").  The Prepetition Hertz Canadian Securitization Program is the primary fleet financing facility for the Company's vehicle rental operations in Canada.

Pursuant to a Base Indenture and the Series 2015-A Supplement, each dated September 14, 2015, Funding LP issued VFN ABS Notes that provided for aggregate maximum borrowings of CAD$350 million on a revolving basis (the "**Hertz Canadian Securitization Notes**").  BNY Trust Company of Canada acts as indenture trustee and collateral agent for the Hertz Canadian Securitization Notes.  Funding LP's obligations in respect of the Hertz Canadian Securitization Notes are secured by the Company's Canadian rental vehicle fleet and related assets.  Funding LP's obligations in respect of the Hertz Canadian ABS Notes are guaranteed by non-Debtor affiliates HC Limited Partnership, Hertz Canada Vehicles Partnership, and DTGC Car Rental Limited Partnership.  As of the Petition Date, the aggregate principal amount of Hertz Canadian Securitization Notes outstanding, expressed in U.S. Dollars, was approximately $251 million.

Under the Prepetition Hertz Canadian Securitization Program, Hertz Canada Vehicles Partnership and DTGC Car Rental Limited Partnership are Vehicle Owners.  Debtors Hertz Canada Limited and Dollar Thrifty Automotive Group Canada Inc. act as agents for renting the Vehicle Owner's vehicles to consumers rather than as Company Lessees in the ABS Program structure described above.  Pursuant to a September 14, 2015 Performance Guarantee, Hertz Corp. guaranteed certain obligations of Hertz Canada Limited and Dollar Thrifty Automotive Group Canada Inc. in respect of the Prepetition Hertz Canadian Securitization Program.

### (F) Donlen Canadian Securitization Program

In December 2019, Donlen Corp. established a securitization platform (the "**Donlen Canadian Securitization Program**") to finance its Canadian vehicle leasing operations.  Under the Donlen Canadian Securitization Program, non-Debtor affiliate Donlen Canada Fleet Funding LP stands in the position of the Issuer in the ABS Program structure described above, but it raises funds not by issuing notes but by borrowing under a December 31, 2019 loan agreement with Canadian Imperial Bank of Commerce, as the committed lender, and Computershare Trust Company of Canada, as trustee of Stable Trust, as conduit lender.  The Vehicle Owner under the Donlen Canadian Securitization Program is Donlen Fleet Leasing Ltd., which leases vehicle fleets to Third-Party

25

Lessees.  Obligations in respect of the Donlen Canadian Securitization Program are secured by assets financed thereunder and a deed of hypothec.  Hertz Corp. guaranteed certain obligations relating to the Donlen Canadian Securitization Program.

The Donlen Canadian Securitization Program provided for aggregate maximum borrowings of CAD$50 million on a revolving basis and a maturity of December 2022.  As of the Petition Date, the principal amount outstanding under the Donlen Canadian Securitization Program, expressed in U.S. Dollars, was approximately $27 million.

As discussed in Section U, below, the Bankruptcy Court approved a sale of substantially all of the Company's assets associated with the Donlen Business, including its equity interest in Donlen Canada Fleet Funding LP, at a hearing on March 1, 2021 which sale is expected to close in March 2021.

### 3.  Intercompany Obligations

In addition to the third-party debt described above, in the ordinary course of the Company's business, certain of the entities within the Company engage in intercompany transactions.  Such transactions result in various intercompany balances, claims and obligations, and include, among other things, (a) IP licensing arrangements, (b) ordinary course payments, such as payments related to insurance, taxes, and payroll made by one entity on behalf of other entities within the Company, (c) equity contributions, and (d) intercompany loans.  Intercompany loans represented the large majority of the value of the Company's intercompany balances outstanding as of the Petition Date.  The Company's intercompany loans are governed by written loan agreements with arm's length terms and conditions, including variable interest rates based on a fixed percent over a benchmark rate.  As of the Petition Date, the Debtors had intercompany loan balances in the following approximate aggregate amounts:

| Petition Date Intercompany Loan Balances | | | |
|---|---|---|---|
| **Lender** | **Borrower** | **Currency** | **Outstanding** |
| CMGC Canada Acquisition ULC | Donlen Fleet Financing | CAD | 18,000,000 |
| Dollar Thrifty Automotive Group Canada | CMGC Canada Acquisition ULC | CAD | 16,100,000 |
| Dollar Thrifty | The Hertz Corporation | USD | 3,900,315,690 |
| Donlen Corporation | The Hertz Corporation | USD | 548,000,000 |
| Hertz Canada Limited | CMGC Canada Acquisition ULC | CAD | 17,500,000 |
| Hertz International, Ltd. | The Hertz Corporation | USD | 327,794,920 |
| HIRE (Bermuda) Limited | The Hertz Corporation | EUR | 73,928,564 |
| HIRE (Bermuda) Limited | The Hertz Corporation | GBP | 27,586,414 |
| HIRE (Bermuda) Limited | The Hertz Corporation | CHF | 250,000 |

AMERICAS 106663920

| Petition Date<br>Intercompany Loan Balances | | | |
|---|---|---|---|
| HIRE (Bermuda) Limited (Domestic) | The Hertz Corporation | USD | 271,375,786 |
| Dollar Thrifty Automotive Group, Inc. | TRAC Asia Pacific, Inc. | AED | 1,599,300 |
| The Hertz Corporation | Hertz Global Holdings, Inc. | USD | 132,713,682 |

### 4.  Trade Debt and Other Liabilities Relating to Operations

In the ordinary course of its business, the Company incurs significant debt to trading partners for goods and services.  As of the Petition Date, the Debtors estimate that they had outstanding approximately $450 million in trade debt.

As noted in Section B, below, the Company sought and obtained authority in the Chapter 11 Cases to make payments on account of prepetition claims of certain critical vendors, pursuant to which the Company has satisfied a portion of the trade debt outstanding as of the Petition Date.

In addition, in the ordinary course of its business, the Company is from time to time a party to various legal proceedings, typically involving operational issues common to the vehicle rental business, including claims by employees and former employees, customers, third-party motorists, and governmental investigations.  As of the Petition Date, the Company was a defendant in approximately 1,800 lawsuits, the majority of which were related to vehicle accident suits handled through the Company's self-insurance program.

### D.  Events Leading to the Commencement of the Chapter 11 Cases

The COVID-19 pandemic precipitated the filing of the Chapter 11 Cases.  Through the end of 2019, the Company had reported year-over-year growth for ten consecutive quarters through the end of 2019.  This success helped the Company to raise $750 million in equity in July of 2019, which it used to deleverage its balance sheet by repaying debt obligations.  The first two months of 2020 showed the Company's revenue growth continuing.  In January and February of 2020, Company-wide revenue was up 6% year-over-year on 8% higher U.S. car rental volume.

The Company's positive revenue trajectory suffered a stunning reversal in March of 2020 when the pandemic, and government responses to the pandemic, began to impact the Company's core U.S. rental business.  The World Health Organization declared the COVID-19 crisis a pandemic on March 11, 2020.  In response, local and national governments around the world instituted shelter-in-place and similar orders and travel restrictions, and airline travel decreased suddenly and dramatically.  For example, in mid-April, data reported by the U.S. Transportation Security Administration indicated that U.S. air passenger volume had dropped to less than 5% of rates recorded on corresponding days in 2019.

The drop in air traffic had an immediate and acute effect on the Company's airport business.  For the two months preceding the Petition Date, daily reservations at U.S. airport locations—which

27

had historically been the largest single contributor to the Company's global revenue—were down approximately 90% from the corresponding period in 2019.

The pandemic also had a severe impact on other areas of the Company's business. With movement restricted, people drove less, got into fewer accidents, and used fewer rideshares, all of which resulted in significantly reduced demand at the Company's off-airport locations. Between March 21 and the Petition Date, total daily reservations at U.S. off-airport locations were down approximately 70% or more from what they were for the same period in 2019 (excluding cargo vans).

Reduced demand across the Company's locations decimated its revenue. For example, in April 2020, the first full month of operating during the pandemic, the Company's global revenue was down approximately 70% from April of 2019.

The drop in revenue was not the crisis' only attack on the Company's liquidity. To maintain access to funding at existing levels under the Prepetition HVF II ABS Program, the governing documents required the Company to remain in compliance with certain collateral value ratios. The Company's compliance with those ratios was tested by reference to used vehicle pricing guides (the "**Pricing Guides**"). In situations where the Pricing Guides showed that the Company's leased Non-Program Vehicles had depreciated faster than their book depreciation, the Company was obligated to pay the calculated reduction in value into the Prepetition HVF II ABS Program to remain in compliance with its collateral value ratios.

The COVID-19 crisis distorted the market for used vehicles in the U.S. and globally by severely constraining demand. The Company saw firsthand the drop in demand for its preowned vehicles at its Hertz Car Sales locations. Stay-at-home orders effectively shut down vehicle sales in states where such orders were in effect, causing the Company's retail sales activity to plummet. By way of illustration, during each week from February 9, 2020 through March 14, the Company hit peak daily sales of more than 1,000 vehicles. From March 21 through April 15, the Company's daily vehicles sales never reached 400. Dispositions through other channels were also severely disrupted. Most notably, wholesale vehicle auctions were variously shut down or switched to limited online-only operations.

According to one of the Pricing Guides, the value of the Company's Non-Program Vehicles dropped by more than 1.5% in March and nearly 2.5% in April 2020. As a result, the amount the Company would have had to pay into its Prepetition HVF II ABS Program to maintain compliance with its funding ratios was approximately $135 million. Together with other related payments under the HVF II ABS Program master lease agreement (the "**Master Lease Agreement**") and net of credits, the Company's total Prepetition HVF II ABS Program payment due April 27, 2020 was approximately $389.5 million.

Making this payment would have consumed a substantial portion of the Company's available cash, with the prospect of larger depreciation true-up payments coming due in the following months. Indeed, J.D. Power, the owner of the NADA Pricing Guide, provided an outlook in its *April 2020 COVID-19 Used Car and Light Truck Guidelines Plus Industry Update* which called for used vehicle prices to fall 7% from March to June of 2020. When the payment came due on April 27, the Company was engaged in negotiations with its Prepetition HVF II ABS Program creditors to

AMERICAS 106663920

reduce the amount of the lease payment. However, the parties were unable to reach an agreement and the Company elected not to make the payment and defaulted on the Master Lease Agreement, its primary fleet lease.

Before coming to this decision, the Company took proactive steps to avoid default. Ordinarily, the Company would have been able to simultaneously reduce its lease burden and generate cash to pay its obligations by selling down its vehicle fleet. The state of the used vehicle market in April 2020, however, effectively eliminated this option. Accordingly, the Company was forced to turn elsewhere, while continuing to evaluate a range of alternatives with respect to the size and composition of its fleet.

It began by cutting costs in hopes of preserving liquidity sufficient to see it through the crisis while still meeting its financial obligations. The Company reduced its capital expenditures, including by reducing its new vehicle purchase commitments by approximately $4 billion. It cut down on sales and marketing spend that was rendered cost-ineffective by an unreceptive market. It consolidated off-airport rental locations in the U.S. and Europe to reduce overhead costs. It negotiated with airport authorities and lessors to abate or defer the Company's obligations under airport concession agreements and off-airport leases. And, it reduced its workforce to align staffing levels with the reduced demand for its products.

The Company's workforce cost management began as a furlough program in March, with the Company remaining hopeful that demand would return quickly and it could bring its furloughed employees back. By April, it became clear to the Company that the pandemic would not be a transient interruption in its business. Accordingly, the Company made the difficult decision to pivot to terminations in managing its workforce. Globally, as of the Petition Date, the Company's workforce actions in the wake of the pandemic had affected over 21,000 employees, of whom approximately 14,400 had been terminated.

In addition to managing costs, the Company, together with many of its peer companies facing similar challenges, engaged prior to the Petition Date with the U.S. and European governments regarding possible aid to the rental car industry. Access to significant government rescue funds was uncertain and did not proceed on a timeline that would allow the Company to timely meet all anticipated obligations to creditors, including in respect of the Prepetition HVF II ABS Program, during the course of the pandemic.

The Company's April 27, 2020 default in respect of the Prepetition HVF II ABS Program had implications for that program and certain other of the Company's U.S. financing arrangements. With respect to the Prepetition HVF II ABS Program, amortization events and liquidation events occurred as of May 5, 2020. The occurrence of an amortization event required the Company to use proceeds of vehicle sales to pay down the HVF II Notes and prohibited the Company to use proceeds to purchase new vehicles. Absent an agreement, the occurrence of a liquidation event would have allowed the affected holders of HVF II Notes to direct the liquidation of vehicles serving as collateral for their notes. To avert a liquidation, the Company reached an agreement (the "**Forbearance Agreement**") with the requisite holders of HVF II Notes to forebear from exercising their liquidation remedy.

At the same time as it entered into the Forbearance Agreement, the Company entered into agreements (the "**Waiver Agreements**") with certain lenders under the First Lien Credit Agreement, the First Lien Standalone LC Facility, the ALOC Facility, and the U.S. Vehicle RCF to waive actual or potential defaults relating to, among other things, the Company's defaults under the Master Lease Agreement. The Forbearance Agreement and the Waiver Agreements allowed the Company to avert a chapter 11 filing on May 5 to protect its fleet and avoid widespread cross-defaults across its capital structure. However, the Forbearance Agreement and the Waiver Agreements lasted only through May 22, 2020.

Between May 5 and May 22, the Company, directly and through its advisors, actively engaged with many of its lenders. In accordance with the Forbearance Agreement and Waiver Agreements, it provided counterparties with information about its finances, operations, and projections, both through document productions and through calls with Company representatives and advisors. In the course of these discussions, the Company pressed its lenders to extend their waivers and forbearances to permit a meaningful exploration of potential reorganization structures prior to entering chapter 11.

It also explored waivers or other agreements to permit its international affiliates to avoid participating in the Chapter 11 Cases as Debtors. The efforts succeeded with lenders to the Company's European and Australian affiliates. Immediately before the Petition Date, holders of Australian Securitization Notes agreed to waive cross defaults to a Hertz Corp. bankruptcy filing on a permanent basis. And, consistent with their respective prepetition commitments and/or assurances, shortly after the Petition Date, the lender under the Lombard Vehicle Financing Facility and requisite holders of the 2021 Notes, the 2023 Notes, and the European ABS Notes agreed to waive cross defaults to a Hertz Corp. bankruptcy filing through September 30, 2020. Despite its best efforts, the Company was unable to obtain similar concessions from its U.S. and Canadian creditors.

As the expiration date of the Forbearance Agreement and Waiver Agreements approached and the prospect of a bankruptcy filing became imminent, the Debtors offered Key Employee Retention Letter Agreements to approximately 340 employees providing for retention payments in the aggregate amount of approximately $16.2 million (the "**Prepetition KERP Program**"). Under the terms of such letter agreements, employees were obligated to return the retention payments in the event that their employment with the Company terminated prior to March 31, 2021 under certain specified circumstances, including voluntary departure. The Prepetition KERP Program was implemented in recognition of, among other things, (i) the financial and operational uncertainty the Company and its remaining employees faced as they navigated unprecedented circumstances arising from COVID-19's adverse impact on the global travel sector, (ii) the substantial additional efforts undertaken by the Company's key employees with a reduced work force in response to an extremely challenging business environment, (iii) the forfeiture of the recipients' rights to participate in the Company's 2020 annual bonus plan, and (iv) the risk that the Company's challenges would result in the departure of key employees and the significant benefits to the Company of providing incentives for such employees to remain with the Company for the term of the Prepetition KERP Program.

On May 22, 2020, immediately before the Forbearance Agreement and Waiver Agreements expired, to protect the Company and preserve value for its stakeholders, the Company's board, in

AMERICAS 106663920

consultation with its advisors, determined that the commencement of these Chapter 11 Cases was in the best interests of the Company and its stakeholders.

## III.
## OVERVIEW OF THE CHAPTER 11 CASES

### A.  Commencement of Chapter 11 Cases

On May 22, 2020, the Debtors commenced the Chapter 11 Cases.  The Debtors continue managing their properties and operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.  First Day Motions

Shortly after the Petition Date, the Debtors filed motions with the Bankruptcy Court seeking various forms of relief designed to facilitate a smooth transition for the Debtors into chapter 11 (the "**First Day Motions**").  The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered, among others, orders:

- Authorizing the Debtors to use certain cash collateral [D.I. 204];

- Authorizing, but not directing, the Debtors to pay certain taxes [D.I. 541];

- Authorizing, but not directing, the Debtors to pay foreign and critical vendors [D.I. 542];

- Authorizing, but not directing, the Debtors to honor obligations to their franchisees [D.I. 543];

- Authorizing, but not directing, the Debtors to continue and maintain certain customer programs [D.I. 544];

- Establishing procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [D.I. 548];

- Authorizing, but not directing, the Debtors to pay certain fees to airport authorities [D.I. 563];

- Authorizing, but not directing, the Debtors to maintain their insurance programs [D.I. 584];

- Authorizing, but not directing, the Debtors to continue using their cash management system and other related relief [D.I. 586]; and

- Authorizing, but not directing, the Debtors to pay employee wages and related obligations [D.I. 593].

### C.  Procedural Motions and Applications

The Debtors have filed various motions and applications regarding procedural issues, many of which are typical in chapter 11 cases of similar size and complexity.  The Bankruptcy Court granted substantially all of the relief requested in those procedural motions and entered, among others, orders:

AMERICAS 106663920

- Directing the joint administration of the Chapter 11 Cases for procedural purposes only [D.I. 182];

- Establishing notice and hearing procedures for trading in equity securities in the Debtors and settling record date for notice potential and sell-down procedures with respect to trading claims against the Debtors [D.I. 200];

- Extending the deadline by which Debtors may file notices to remove actions [D.I. 941; 2266];

- Extending the time to file schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, statements of financial affairs, and Bankruptcy Rule 2015.3 financial reports [D.I. 540];

- Extending the Nonresidential Real Property Lease Extension Period (as defined below) [D.I. 1458; 2174; 2213; 2287];

- Confirming the worldwide automatic stay and certain other debtor protections under the Bankruptcy Code [D.I. 184];

- Establishing procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals [D.I. 534];

- Establishing procedures for the retention and compensation of professionals used by the Debtors in the ordinary course of their business [D.I. 547]; and

- Establishing procedures to assume or reject executory contracts and unexpired leases [D.I. 1246].

### D.  Retention of Chapter 11 Professionals

The Debtors have filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases.   The Debtors' professionals include (i) White & Case LLP as bankruptcy counsel; (ii) Richards, Layton & Finger, P.A. as co-counsel; (iii) FTI Consulting, Inc. as restructuring advisor; (iv) Moelis & Company LLC as investment banker; (v) Ernst & Young LLP as audit and tax services provider; (vi) Prime Clerk LLC as claims and noticing agent, and administrative advisor; (vii) Deloitte Tax LLP as tax services provider; (viii) Boston Consulting Group, Inc. as strategic advisor; and (ix) McCarthy Tétrault LLP as Canadian Restructuring Counsel.

### E.  Appointment of Creditors Committee

On June 11, 2020, pursuant to section 1102 of the Bankruptcy Code, the U.S. Trustee appointed the Committee to represent the interests of unsecured creditors in the Chapter 11 Cases [D.I. 392]. The members of the Committee are: (a) American Automobile Association, Inc.; (b) Emma Bradley; (c) Janice Dawson; (d) International Brotherhood of Teamsters;[12] (e) Pension Benefit

---

[12]     The International Brotherhood of Teamsters is a member of the Committee in its capacity as representative for Local Unions 20, 25, 79, 89, 104, 114, 117, 118, 150, 175, 206, 222, 272, 299, 305, 317, 327, 355, 385, 399, 431, 449, 455, 481, 492, 495, 528, 529, 541, 618, 641, 665, 667, 682, 745, 769, 781, 813, 830, 853, 856, 886, 901, 922, 926, 931, 986, 988 and 996, and their respective members.

AMERICAS 106663920

Guaranty Corporation; (f) Sirius XM Radio Inc.; (g) Southwest Airlines Co.; (h) U.S. Bank, National Association, as indenture trustee; and (i) Wells Fargo Bank, N.A., as indenture trustee.

The Committee has retained Kramer Levin Naftalis & Frankel LLP as counsel and Benesch, Friedlander, Coplan & Aronof LLP as co-counsel. Additionally, the Committee has retained Berkeley Research Group, LLC as its financial advisor and UBS Securities LLC as its investment banker.

### F.  Statements and Schedules, Rule 2015.3 Financial Reports, and Claims Bar Dates

On August 11, 2020, the Debtors filed their schedules of assets and liabilities and statements of financial affairs [D.I. 964–1023] (collectively, as amended, the "**Schedules**"). On November 21 and 22, 2020, the Debtors filed certain amended Schedules [D.I. 1824–1889].

On June 24, 2020, the Bankruptcy Court entered an order extending the deadline by which the Debtors were required to file the financial reports required under Bankruptcy Rule 2015.3 to August 10, 2020. On August 10, 2020, the Debtors filed their first financial report required under Bankruptcy Rule 2015.3 [D.I. 963].

On September 9, 2020, the Bankruptcy Court entered an order approving (i) October 21, 2020, at 5:00 p.m., prevailing Eastern Time, as the deadline for persons or entities (except governmental units) to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**"); (ii) November 18, 2020, at 5:00 p.m., prevailing Eastern Time, as the deadline for governmental units to file proofs of claim in the Chapter 11 Cases (the "**Governmental Bar Date**"); (iii) the later of (x) the General Bar Date or the Governmental Bar Date, as applicable; and (y) 5:00 p.m. prevailing Eastern Time, on the date that is thirty (30) days after the service of an order authorizing the Debtors' rejection of any executory contract or unexpired lease of the Debtors as the deadline for persons or entities asserting claims resulting from such rejection to file proofs of claim in the Chapter 11 Cases; and (iv) the later of (a) the General Bar Date or Governmental Bar Date, as applicable; and (b) 5:00 p.m. prevailing Eastern Time on the date that is thirty (30) days after the date on which the Debtors provide notice of an amendment or supplement to the Debtors' Schedules as the deadline for persons or entities affected by such amendment or supplement to file proofs of claim in the Chapter 11 Cases [D.I. 1240].

To date, in excess of 14,600 proofs of claim have been filed against the Debtors in the aggregate alleged amount of approximately $104.3 billion. To date, the Debtors have filed not fewer than eleven omnibus claim objections [D.I. 2091, 2092, 2093, 2094, 2096, 2461, 2462, 2463, 2464, 2794 & 2795]. The Court has entered orders with respect to not fewer than nine such omnibus objections and remaining orders are pending. [D.I. 2400, 2401, 2402, 2403, 2405, 2738, 2739, 2712 & 2717]. Moreover, on February 2, 2021, the Debtors filed a motion for an order waiving Local Rule 3007-1(f)(i), which limits the total number of substantive omnibus claim objections filed each calendar month [D.I. 2594]. On February 11, 2021, the Court granted this request, thereby permitting the Debtors to file up to six (6) substantive omnibus claim objections each calendar month with each substantive omnibus claims objection not to exceed 150 claims [D.I. 2754]. As of the date of filing this Disclosure Statement, approximately 1,000 claims have been expunged and/or withdrawn from the Debtors' claims register. The Company's assessment of the validity

AMERICAS 106663920

of claims received has not been completed.  Such amount includes duplicate claims across multiple Debtor entities.  These claims will be reconciled to amounts recorded in the Company's accounting records.  Differences in amounts recorded and claims filed by creditors will be investigated and resolved, including through the filing of objections with the Bankruptcy Court, where appropriate.  The Company may ask the Bankruptcy Court to disallow claims that the Company believes are duplicative, have been later amended or superseded, are without merit, are overstated or should be disallowed for other reasons.  In light of the substantial number of claims filed, and expected to be filed, the claims resolution process may take considerable time to complete and likely will continue after the Debtors emerge from bankruptcy.

### G.  Use of Certain Asserted Cash Collateral and Related Adequate Protection

Throughout the Chapter 11 Cases, the Debtors have had access to purported cash collateral in accordance with various consensual interim orders providing for access to such purported cash collateral and adequate protection while preserving various rights of the Debtors, the Committee, Prepetition Secured Parties, and Ad Hoc Unsecured Noteholders as described below.

On May 26, 2020, the Debtors filed a motion seeking authority to use certain purported cash collateral and provide adequate protection to the prepetition secured parties asserting an interest in such cash collateral [D.I. 137].  On May 27, 2020, the Court entered the *Agreed Interim Order (I) Authorizing Use of Cash Collateral and (ii) Granting Adequate Protection and Related Relief to Prepetition Secured Parties* [D.I. 204] (the "**First Interim Adequate Protection Order**") granting such authority.  The Court entered the *Second Agreed Interim Order (i) Authorizing Use of Cash Collateral and (ii) Granting Adequate Protection and Related Relief to Prepetition Secured Parties* [D.I. 559] (the "**Second Interim Adequate Protection Order**") on June 24, 2020, and the *Third Agreed Interim Order (i) Authorizing Use of Cash Collateral and (ii) Granting Adequate Protection and Related Relief to Prepetition Secured Parties* [D.I. 1131] (the "**Third Interim Adequate Protection Order**" and, together with the First Interim Adequate Protection Order and the Second Interim Adequate Protection Order, the "**Adequate Protection Orders**") on August 25, 2020, in each case extending the Debtors' authority to use such purported cash collateral and provide adequate protection.  The Adequate Protection Orders have been extended by agreed stipulations [D.I. 882, 2052, and 2614], and the Debtors currently have authority to use the purported cash collateral through April 17, 2021.

The Debtors, Committee, Prepetition Secured Parties, and Ad Hoc Unsecured Noteholders have reserved all rights in connection with the Adequate Protection Orders, including the extent of the Prepetition Secured Parties' interests (if any) in the purported collateral.  To the extent that the authority granted pursuant to the Adequate Protection Orders terminates, the parties may litigate these issues and seek a lien determination order from the Court.

### H.  Equity Sale

On June 11, 2020, the Debtors filed a motion for authority to sell shares of common stock of Hertz Parent to raise up to $1 billion in financing [D.I. 387] (the "**Equity Sale Motion**").  As part of the proposed sale, the Debtors entered into a sale agreement with Jefferies LLC, as sales agent, pursuant to which the Debtors would be able to offer and sell shares of Hertz Parent stock having

an aggregate offering price not to exceed $1 billion.  On June 12, 2020, the Bankruptcy Court entered an order granting the Equity Sale Motion [D.I. 417].  On June 15, 2020, the Company commenced an "at the market" offering (the "**ATM Program**") of up to $500 million of its common stock, but that afternoon the Staff (the "**Staff**") of the Securities and Exchange Commission's Division of Corporation Finance verbally notified the Company that the Staff was reviewing the related prospectus supplement.  Promptly thereafter, the Company suspended all sales of common stock pursuant to the ATM Program.  On June 18, 2020, the Company terminated the ATM Program.

Prior to its suspension on June 15, 2020 and ultimate termination on June 18, 2020, Hertz Parent issued 13,912,368 shares under the ATM Program for net proceeds of approximately $28 million.

### I.   Repayment in Full of the U.S. Vehicle RCF (or, Sidecar Facility)

On August 11, 2020, on the Debtors' motion [D.I. 789], the Court entered its *Final Order (i) Authorizing Use of Sidecar Cash Collateral for Repayment in Full of Prepetition Sidecar Credit Facility, (ii) Granting Adequate Protection to the Prepetition Sidecar Secured Parties, and (iii) Granting Related Relief* [D.I. 1030] (the "**Sidecar Order**").  Pursuant to the authority granted therein, the Debtors fully satisfied all of their obligations in respect of the U.S. Vehicle RCF on or about August 12, 2020 by application of approximately $100 million in cash collateral.  Upon payment the claims of the lender under the U.S. Vehicle RCF were indefeasibly satisfied in full and discharged, and the Prepetition Sidecar Liens were automatically released and terminated.

### J.   Exclusivity

Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

The Exclusive Periods currently remain in effect.  On September 16, 2020, the Debtors filed a motion [D.I. 1316] (the "**Exclusivity Motion**") to extend the Exclusive Plan Period through and including March 22, 2021, and the Exclusive Solicitation Period through and including May 17, 2021.  On October 15, 2020, the Bankruptcy Court entered an order granting the extensions requested [D.I. 1411] (the "**Exclusivity Order**").

### K.   Executory Contracts and Unexpired Leases

As of the Petition Date, the Debtors were parties to numerous executory contracts and unexpired leases.  As part of their restructuring efforts, the Debtors, in consultation with their advisors, have undertaken, and continue to undertake, a review of their executory contracts and unexpired leases with a view to rejecting or renegotiating those agreements that are overly burdensome to the Debtors and assuming those which are beneficial to the Debtors.  On August 26, 2020, the Debtors filed a motion to implement certain procedures (the "**A/R Procedures**") to govern the assumption

AMERICAS 106663920

or rejection of executory contracts and unexpired leases, and the abandonment of certain personal property in connection therewith [D.I. 1142] (the "**A/R Procedures Motion**"). On September 10, 2020, the Bankruptcy Court entered an order [D.I. 1246] (the "**A/R Procedures Order**") granting the A/R Procedures Motion.

Without limiting the generality of the foregoing, the Debtors have engaged in a comprehensive review of the Debtors' unexpired real property leases in order to rationalize and realign the geographic footprint of the Debtors' business in light of changes in individual behavior and economic activity resulting from COVID-19 and the Debtors' go-forward business plan. As of the date of this Disclosure Statement, the Debtors have ceased vehicle rental operations at approximately 93 airport locations and 641 off-airport locations.

Whereas chapter 11 debtors are generally free to assume or reject executory contracts and unexpired leases at any time prior to confirmation of a plan, section 365(d)(4)(A) of the Bankruptcy Code provides that a debtor has an initial period of only 120 days after the commencement of the chapter 11 case to assume, assign, or reject unexpired leases of nonresidential real property (the "**Lease Assumption Period**"). Pursuant to section 365(d)(4)(B), the Bankruptcy Court may, upon a showing of cause, extend the Nonresidential Real Property Lease Assumption Period an additional ninety (90) days.

On September 16, 2020, to, among other things, support their ongoing location rationalization efforts, the Debtors filed a motion to extend the Lease Assumption Period through and including December 21, 2020 [D.I. 1317] (the "**365(d)(4) Extension Motion**"). On October 8, the Bankruptcy Court entered an order [D.I. 1458] (the "**365(d)(4) Extension Order**") granting the 365(d)(4) Extension Motion. The Lease Assumption Period expired on December 21, 2020. The Bankruptcy Court entered three orders approving stipulations that extend the Lease Assumption Period (together, the "**Extension Stipulation Orders**"). On December 18, 2020, the Bankruptcy Court entered an omnibus order approving 50 stipulations extending the Lease Assumption Period [D.I. 2174]. On December 21, 2020, the Bankruptcy Court entered a second omnibus order approving 12 stipulations extending the Lease Assumption Period [D.I. 2213]. On December 28, the Bankruptcy Court entered an order approving one stipulation extending the Lease Assumption Period [D.I. 2287]. The Extension Stipulation Orders approved extensions ranging from one to five months, with three- and five-month extensions being the most common.[13]

### 1. The Rejections

The Debtors filed six omnibus motions to reject executory contracts and unexpired leases prior to entry of the A/R Procedures Order (the "**Rejection Motions**"). After the Court entered the A/R Procedures Order, the Debtors filed twelve separate notices of rejection of certain contracts and leases (the "**Rejection Notices**," and together with the Rejection Motions, the "**Rejections**"). Detail on each of the Rejections is provided in the chart below.

---

[13] The Debtors also obtained an additional extension stipulation and order with respect to one lease that had previously been extended one month, by an additional one month [D.I. 2479].

AMERICAS 106663920

| No. | D.I. | Filed Date | Order D.I. | Order Entry Date | Contracts | Description |
|---|---|---|---|---|---|---|
| Rejection Motions (prior to entry of the A/R Procedures Order) | | | | | | |
| 1st | 610 | 6/26/2020 | 711 | 7/13/2020 | 33 | Executory Contracts |
| 2nd | 841 | 7/13/2020 | 942 | 8/10/2020 | 58 | Executory Contracts |
| 3rd | 877 | 7/31/2020 | 1188 | 9/3/2020 | 161 | Off-airport leases and associated contracts |
| 4th | 1117 | 8/21/2020 | 1214 | 9/8/2020 | 19 | Airport leases and associated contracts |
| 5th | 1139 | 8/26/2020 | 1224 | 9/8/2020 | 51 | Executory contracts |
| 6th | 1163 | 8/31/2020 | 1328[14] | 9/18/2020 | 96 | Off-airport leases and associated contracts |
| Rejection Notices (after entry of the A/R Procedures Order) | | | | | | |
| 1st | 1383[15] | 9/29/2020 | 1587 | 10/23/2020 | 27 | Off-airport leases and associated contracts |
| 2nd | 1391 | 9/30/2020 | 1535 | 10/19/2020 | 40 | Airports leases and associated contracts |
| 3rd | 1498 | 10/13/2020 | 1676 | 11/2/2020 | 8 | Executory contracts |
| 4th | 1672 | 10/30/2020 | 1805 | 11/19/2020 | 12 | Off-airport leases and associated contracts |
| 5th | 1978 | 11/30/2020 | 2264 | 12/23/2020 | 25 | Airports leases and associated contracts |
| 6th | 1979 | 11/30/2020 | 2265 | 12/23/2020 | 68 | Off-airport leases and associated contracts |
| 7th | 2228 | 12/21/20 | 2637 | 2/8/2020 | 36 | Airports leases and associated contracts |
| 8th | 2230 | 12/21/20 | 2638 | 2/8/2020 | 100 | Off-airport leases and associated contracts |
| 9th | 2231 | 12/21/20 | 2639 | 2/8/2020 | 28 | Off-airport leases and associated contracts |
| 10th | 2232 | 12/21/20 | 2640 | 2/8/2020 | 83 | Off-airport leases and associated contracts |
| 11th | 2233 | 12/21/20 | 2904 | 3/1/2020 | 73 | Off-airport leases and associated contracts |
| 12th | 2238 | 12/21/20 | 2641 | 2/8/2020 | 1 | One Donlen lease |

## 2. The Assumptions

The Debtors filed two omnibus motions to assume executory contracts and unexpired leases prior to entry of the A/R Procedures Order (the "**Assumption Motions**").  After the Court entered the A/R Procedures Order, the Debtors filed twelve separate notices of assumption of certain contracts

[14] On November 19, 2020, the Bankruptcy Court entered a further order approving a stipulation and agreement between the Debtors and certain former executives regarding the rejection of executory contracts identified in the Fifth Omnibus Rejection Motion [D.I. 1805] not included in the order entered on September 8, 2020.

[15] Amended and supplemented by Docket Nos. 1393 and 1400, respectively.

AMERICAS 106663920

and leases (the "**Assumption Notices**," and together with the Assumption Motions, the "**Assumptions**").   Detail on each of the Assumptions is provided in the chart below.

| No. | D.I. | File Date | Order D.I. | Order Entry Date[16] | Contracts | Description |
|---|---|---|---|---|---|---|
| **Assumption Motions (Prior to entry of the A/R Procedures Order)** | | | | | | |
| 1st | 737 | 7/15/2020 | 898 | 8/5/2020 | 1 | Insurance program |
| 2nd | 845 | 7/29/2020 | 1025 | 8/11/2020 | 17 | Auto finance contracts |
| **Assumption Notices (After entry of the A/R Procedures Order)** | | | | | | |
| 1st | 1436 | 10/6/2020 | 1586 | 10/23/2020 | 12 | Contracts related to tolling vendor |
| 2nd | 1731 | 11/10/2020 | 1977 | 11/30/2020 | 19 | Contracts related to car sales vendor |
| 3rd | 1758 | 11/13/2020 | 2087 | 12/14/2020 | 27 | Airport leases and associated contracts |
| 4th | 1980 | 11/30/2020 | 2447 | 1/14/2021[17] | 4 | Airport leases and associated contracts |
| 5th | 2008 | 12/3/2020 | 2250 | 12/22/2020 | 1 | Fleeting contract |
| 6th | 2179 | 12/18/2020 | 2358 | 1/7/2021 | 1 | Contracts related to sales partner |
| 7th | 2183 | 12/19/20 | 2718 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 8th | 2184 | 12/19/20 | 2720 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 9th | 2185 | 12/19/20 | 2719 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 10th | 2186 | 12/19/20 | 2723 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 11th | 2187 | 12/19/20 | 2728 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 12th | 2188 | 12/19/20 | 2729 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 13th | 2189[18] | 12/19/20 | 2731 | 2/10/2021 | 96 | Off-airport leases and associated contracts |
| 14th | 2190 | 12/19/20 | 2730 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 15th | 2191 | 12/19/20 | 2733 | 2/10/2021 | 100 | Off-airport leases and associated contracts |

---

[16] Several of the contracts listed on the non-residential real property Assumption Notices filed on December 19th and 20th are still subject to ongoing cure reconciliation or other negotiations with the applicable counterparties.  Such contracts were removed from the applicable order granting the Assumption Notice. The Debtors intend to seek additional orders granting assumption of such contracts once outstanding disputes are resolved.

[17] Entry of an order on contracts with two of the airport counterparties included in this notice is still pending final cure reconciliation.

[18] As amended by Docket No. 2229.

AMERICAS 106663920

| No. | D.I. | File Date | Order D.I. | Order Entry Date[16] | Contracts | Description |
|---|---|---|---|---|---|---|
| 16th | 2192 | 12/19/20 | 2734 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 17th | 2193 | 12/19/20 | 2735 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 18th | 2194 | 12/19/20 | 2736 | 2/10/2021 | 66 | Off-airport leases and associated contracts |
| 19th | 2195 | 12/19/20 | 2724 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 20th | 2196 | 12/19/20 | 2725 | 2/10/2021 | 100 | Off-airport leases and associated contracts |
| 21st | 2197 | 12/19/20 | 2726 | 2/10/2021 | 13 | Off-airport leases and associated contracts |
| 22nd | 2199 | 12/20/20 | 2727 | 2/10/2021 | 97 | Airport leases and associated contracts |
| 23rd | 2200 | 12/20/20 | 2721 | 2/10/2021 | 91 | Airport leases and associated contracts |
| 24th | 2201 | 12/20/20 | 2737 | 2/10/2021 | 93 | Airport leases and associated contracts |
| 25th | 2202 | 12/20/20 | 2722 | 2/10/2021 | 75 | Airport leases and associated contracts |
| 26th | 2203 | 12/20/20 | Pending | Pending | 34 | Airport leases and associated contracts |
| 27th | 2227 | 12/21/20 | Pending | Pending | 9 | Off-airport leases and associated contracts |
| 28th | 2234 | 12/21/20 | 2732 | Pending | 16 | Airport and off-airport leases and associated contracts |
| 29th | 2263 | 12/23/20 | 2397 | 1/11/2021 | 1 | Contracts related to sales partner |
| 30th | 2269 | 12/23/20 | Pending | Pending | 1 | Airport lease |
| 31st | 2508 | 1/21/21 | Pending | Pending | 12 | Off-airport leases and associated contracts |

The Debtors are continuing to evaluate their portfolio of Executory Contracts and Unexpired Leases[19] and will continue to file rejection and assumption notices based on such evaluation. Pursuant to Article V.A of the Plan and subject to the conditions thereof, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed; provided that, to the extent a contract is with a Donlen Debtor, to the extent it has not been previously assumed by a Final Order of the Bankruptcy Court it shall be deemed rejected.

---

[19] As noted above, the Debtors have obtained extensions of the section 365(d)(4) deadline with respect to over sixty leases for non-residential real property, extending the deadline as far as May 21, 2021.

AMERICAS 106663920

## L. Key Employee Incentive Programs

On August 27, 2020, the Debtors filed a motion [D.I. 1153] (the "**2020 KEIP/EIP Motion**") to approve a key employee incentive plan (the "**Proposed 2020 KEIP**") and an employee incentive plan (the "**Proposed 2020 EIP**").  Under the Proposed 2020 KEIP, fourteen (14) members of the Debtors' senior management team would have been eligible to receive awards upon the Debtors' achievement of certain performance targets with respect to the second half of 2020.  The aggregate awards under the Proposed 2020 KEIP at target was $4.3 million.  Under the Proposed 2020 EIP, as originally filed with the Bankruptcy Court, approximately 295 employees would have been eligible to receive awards upon the Company's achievement of certain performance targets with respect to the second half of 2020.  The aggregate awards under the Proposed 2020 EIP at target was $7.4 million.

Following an initial hearing on the Proposed 2020 KEIP and the Proposed 2020 EIP, the Debtors abandoned efforts to obtain approval of the Proposed 2020 KEIP and modified their request regarding the Proposed 2020 EIP.  On October 22, 2020, the Bankruptcy Court entered an order [D.I. 1560] approving an employee incentive plan covering approximately 291 employees with titles of Senior Vice President or lower (the "**2020 EIP**").  Under the 2020 EIP, participants were eligible to receive awards upon the Company's achievement of certain performance targets with respect to the second half of 2020.  The aggregate target awards under the 2020 EIP were $6.6 million, subject to scaling according to actual performance relative to goals.

On January 26, 2021, the Debtors filed with the Bankruptcy Court a motion [D.I. 2538 (sealed), 2539 (redacted)] (the "**2021 KEIP/EIP Motion**") to approve a key employee incentive plan for 8 members of the Debtors' senior management, having titles Executive Vice President or higher (the "**2021 KEIP**") and an employee incentive plan for 42 employees with Senior Vice President and Vice President titles (the "**2021 EIP**," and together with the Proposed 2021 KEIP, the "**2021 KEIP/EIP**").  On February 16, 2021, the Bankruptcy Court entered an order [D.I. 2793] approving the 2021 KEIP/EIP subject to modifications noted in the Debtors' reply in support of the 2021 KEIP/EIP Motion [D.I. 2778] filed with the Bankruptcy Court on February 15, 2021.

The 2021 KEIP/EIP provides participants the opportunity to earn awards based on corporate performance measured by certain key financial metrics and for accomplishing restructuring milestones by the applicable award qualification dates.  The 2021 KEIP/EIP will conclude at the end of the quarter in which the Plan becomes effective in accordance with its terms, and, in any event, not later than December 31, 2021.  Depending upon scaling according to actual financial performance in the categories of financial metrics relative to goals, attainment or non-attainment of restructuring milestones by the applicable award qualification dates, and proration that may result based upon the ultimate term of the 2021 KEIP/EIP, aggregate award opportunities range from a possible minimum payout of $0 to a possible maximum payout of approximately $10.5 million.

Since the Petition Date the Debtors have also continued their historical practice of offering incentive pay and commission opportunities to certain employees who are not participants 2021 KEIP/EIP.  Without limiting the generality of the foregoing, for 2021, certain eligible employees that are not participants in the 2021 KEIP/EIP will have opportunities to earn incentive bonuses based on, among other things, corporate performance in 2021 relative to goals set for financial

AMERICAS 106663920

metrics in the 2021 KEIP/EIP.  This is consistent with the Debtors' historical practice of offering junior level employees opportunities to earn incentive awards that are aligned with the opportunities of their more senior managers.

## M. Prepetition Litigation

As noted above, the Debtors were party to numerous civil actions as of the Petition Date, including in various state and federal courts across the U.S.  As a result of the filing of the Chapter 11 Cases, all civil actions against the Debtors were stayed.  The discussion that follows describes subsequent events in the Chapter 11 Cases relating to certain of the Debtors' ligation matters that were pending as of the Petition Date.

### 1.  The False Police Report Plaintiffs Cases

On June 25, 2020, the following plaintiffs filed a motion for relief from the automatic stay in the Chapter 11 Cases to continue to prosecute their prepetition actions in state court: (i) Hannah Ayoub and the other plaintiffs in the civil action titled *Hannah Ayoub,* et al. *v. Hertz Global Holdings, Inc.,* et al., No. N20C-05-189 VLM, currently stayed in the Superior Court, State of Delaware; (ii) Roula Vangelis (on behalf of her minor children) in the civil action titled *Roula Vangelis* et al. *v. Hertz Global Holdings, Inc.,* et al., No. 200501362, currently stayed in the Philadelphia Court of Common Pleas, Commonwealth of Pennsylvania; (iii) Brent Williams in the civil action titled *Brent Williams v. The Hertz Corporation*, No. 19-CA-012657 (Tampa), currently stayed in the Circuit Court of the 13th Judicial Circuit, Hillsborough County, State of Florida; (iv) Nancy Cullen-Smits and Ryan Smits, in the civil actions titled *Nancy Cullen-Smits v. The Hertz Corporation* (CL19000548-00) and *Ryan Smits v. The Hertz Corporation* (CL19000547-00), currently stayed in Fauquier County Circuit Court, Commonwealth of Virginia; and (v) Henry B. Essick III in the civil action titled *Henry B. Essick v. The Hertz Corporation,* et al., No. 2019-cv-03424, currently stayed in the Montgomery County Court of Common Pleas, State of Ohio [D.I. 589] (all plaintiffs, named and unnamed, collectively, the "**False Police Report Plaintiffs**").

While the particulars of their respective actions vary, the False Police Report Plaintiffs cumulatively allege that Hertz and certain Non-Debtor defendants falsely reported them to local law enforcement agencies for vehicle theft despite either being in authorized possession of Hertz rental cars, or having duly returned their rental cars.  They allege that these purported false police reports resulted from known technological issues and human errors affecting Hertz's asset recovery process for missing vehicles.  The False Police Report Plaintiffs further claim that they were wrongfully arrested and prosecuted on account of these false police reports, suffering various damages as a result.

On July 17, 2020, the Debtors commenced an adversary proceeding, *The Hertz Corporation*, et al. *v. Ayoub* et al., Adv. Pro. No. 20-50761, against the False Police Report Plaintiffs (the "**False Police Report Plaintiffs Adversary**").  In the False Police Report Plaintiffs Adversary, the Debtors seek an injunction extending the automatic stay to the False Police Report Plaintiffs' claims against non-Debtor defendants in the various state court actions.

On October 21, 2020, counsel for the False Police Report Plaintiffs filed Proofs of Claim with the Bankruptcy Court on behalf of the twenty-six (26) *Ayoub* and related pending state court action

plaintiffs, 115 new False Police Report Plaintiffs identified by name only and an "unknown" putative class of False Police Report Plaintiffs. On February 2, 2021, the False Police Report Plaintiffs filed a second Motion for Relief from Automatic Stay on behalf of the 115 new plaintiffs and the unknown putative class plaintiffs.

A Pre-Trial Conference is scheduled with the Bankruptcy Court for March 17, 2021 to address pending matters related to the False Police Report Plaintiffs.

### 2.    Prepetition Representative Actions and Related Mediation

On December 17, 2020, the Debtors filed a motion [D.I. 2160] (the "**Representative Action Mediation Motion**") for an order approving a stipulation regarding the mediation of claims arising from certain class, putative class, or other representative actions pending as of the Petition Date (collectively, the "**Representative Actions**"), which include consumer, employee, and securities claims, among others. The stipulation was agreed to by the Debtors, the Committee, and the purported lead claimants in the Representative Actions listed below. The Bankruptcy Court approved the stipulation on January 14, 2020 [D.I. 2450].

The approved mediation process seeks to resolve all eighteen pending Representative Actions against the Debtors and the related Proofs of Claim filed with respect to such actions.

As a precondition to participating in the mediation process, putative representatives in each of the Representative Actions without preliminarily approved class settlements were required to file a motion pursuant to Bankruptcy Rule 7023 (a "**Rule 7023 Motion**") concerning their class proofs of claim on or before December 21, 2020. The confidential, non-binding mediations took place between February 3 and February 23, 2021, and focused on the allowability, validity, amount, and priority of the purported class proofs of claim. The results of the mediations with respect to each matter are discussed in turn below.

As noted below, the Debtors intend to file motions seeking to certify a purported class exclusively for settlement purposes, pursuant to Bankruptcy Rule 7023 and/or approval of the settlement agreements pursuant to Bankruptcy Rule 9019(a) by the dates of the scheduled March omnibus hearing. For the mediations that did not result in a settlement, the Debtors will file an omnibus objection to the Rule 7023 Motions on the basis that the claims are untimely and/or improperly filed under the Bar Date Order. To the extent the Bankruptcy Court deems any purported class claim untimely, unnamed members of such purported class may seek relief from the Bar Date and file individual Proofs of Claim on any available basis and the Debtors will reserve all rights to the extent such relief is sought. If the Bankruptcy Court determines any purported class claims were timely filed, or the same is agreed by settlement or other stipulation, the parties will meet and confer to propose a briefing schedule on the remaining issue of class certification.

The eighteen (18) Representative Actions and the status of mediation and settlement approval with respect to each are discussed below. Sixteen (16) of the Representative Actions participated in the mediation process described above. The remaining two (2) did not formally participate, but instead will use the prepetition settlement agreements reached in such cases to dictate recovery.

AMERICAS 106663920

### (a) Aiyekusibe v. Hertz Corp.

On December 21, 2020, plaintiffs in the putative class action *Aiyekusibe v. Hertz Corp.*, No. 18-cv-00816-MRM (M.D. Fla.), filed a Rule 7023 Motion [D.I. 2219]. The underlying class action complaint alleges that Hertz Corp. misclassified the positions of certain employees as exempt to avoid paying overtime wages, in violation of the Fair Labor Standards Act ("**FLSA**"). On April 15, 2019, putative class plaintiffs filed a motion to conditionally certify the class pursuant to FLSA procedures, which the Debtors did not oppose. On January 28, 2020, a magistrate judge recommended that conditional certification be granted; approval of that recommendation is pending. At the time, the parties agreed to schedule mediation to resolve the claims on a class-wide basis, but the process was stayed upon the commencement of the Chapter 11 Cases.

On February 19, 2021, the parties mediated this matter and came to a tentative settlement. The tentative settlement contemplates that, in full satisfaction of all claims asserted by plaintiffs (Aiyekusibe and Lal), or that could have been asserted by plaintiffs in any Proof of Claim filed with the Bankruptcy Court either directly or on behalf of a putative class or collective, and all individual Proofs of Claim filed with the Bankruptcy Court by any purported members of the class or collective, the Debtors will agree to an Allowed $3.3 million general, unsecured, nonpriority claim and a $750,000 507(a)(4) priority claim against Hertz Corp. in favor of members of the classes or collective asserted in such Proofs of Claim. The tentative settlement is subject to the approval of the Bankruptcy Court.

### (b) Bradley v. Hertz Corp.

On December 18, 2020, Emma Bradley, plaintiff in the putative class action *Bradley v. Hertz Corp.*, No. 3:15-cv-00652-NJR-RJD (S.D. Ill.), filed a Rule 7023 Motion [D.I. 2169]. The underlying class action complaint challenges two fees that the Debtors levied on Missouri rentals—an "Energy Surcharge" and a "Vehicle Licensing Cost Recovery"—alleging that the fees were charged in violation of the unfairness prohibitions of the Missouri Merchandising Practices Act ("**MMPA**"). More specifically, the complaint alleges that neither fee accurately reflected the actual costs incurred by Hertz Corp. and/or were calculated improperly. In August 2019, Hertz Corp. was granted summary judgment on four of the six counts set forth in the complaint, all of which were dismissed with prejudice. The remaining two counts relate to unfair and deceptive practices under the MMPA.

On February 22, 2021, the parties mediated this matter and came to a tentative settlement. The tentative settlement contemplates that, in exchange for a cash payment of $150,000 by Hertz Corp., plaintiffs will dismiss the Class Proof of Claim and the underlying putative class action with prejudice. The tentative settlement is subject to the approval of the Bankruptcy Court.

On February 24, 2021, the Debtors filed their First Omnibus Representative Actions 9019 Motion[20]

---

[20] "**First Omnibus Representative Actions 9019 Motion**" means *The Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) And Fed. R. Bankr. P. 9019 to (i) Approve Certain Settlement Agreements Between The Hertz Corporation and the Plaintiffs in Certain Purported Class/Representative Actions And (ii) Grant Related Relief* [D.I. 2868], filed on February 24, 2021.

AMERICAS 106663920

seeking approval of the tentative settlement reached with respect to this matter.

### (c) DeNicolo v. Hertz Corp. & Viking Client Servs.

On December 21, 2020, Ronald G. DeNicolo, plaintiff in the putative action *DeNicolo v. Hertz Corp., et al.*, No. 2019-CV-0210-YGR (N.D. Cal.) filed a motion for leave to file a class proof of claim against the Debtors in the Chapter 11 Cases [D.I. 2206]. The underlying class action complaint alleges that Hertz Corp. and a third-party debt collection agency breached the covenant of good faith and fair dealing with Hertz Corp.'s customers in California and Illinois by waiting more than 30 days from the date of alleged loss to notify customers for the first time that Hertz Corp. had claims against them for damage to rental cars, and subsequently passed the claim to the collection agency. Mr. DeNicolo's class action complaint, filed January 11, 2019, was initially stayed when the District Court granted a motion to compel arbitration. However, the class action against Hertz Corp. was remanded to the District Court in January 2020 when the arbitrator ruled that she did not have jurisdiction because Mr. DeNicolo was not bound by the arbitration provision. As of the Petition Date, discovery was underway and the parties were preparing to brief class certification.

On February 17, 2021 the parties mediated this matter but the mediation resulted in an impasse. Informal settlement discussions are ongoing. However, Hertz plans to proceed with filing a formal objection in Bankruptcy Court to plaintiff's time-barred claim(s) and related Rule 7023 Motion for Class Certification.

### (d) Graham v. Hertz Corp.

On December 20, 2020, Mark Graham, plaintiff in the putative class actions *Graham v. Hertz Corp.*, No. 1:20-cv-00339-DAD-SKO (E.D. Cal.) and *Graham v. Hertz Corp.*, No. 2020-01140867 (California Superior Court, Orange County), filed a Rule 7023 Motion [D.I. 2198]. The underlying class action complaints allege that Hertz Corp. violated the FLSA and California wage and hour laws by, among other things, failing to pay overtime, grant paid and unpaid breaks, and promptly pay final wages upon separation. As of the Petition Date, Hertz Corp. had filed an answer to the class action complaint. No further briefing or discovery had taken place.

This action was mediated together with *Reece v. Hertz Corp.*, the outcome of which is discussed directly below.

### (e) Reece v. Hertz Corp.

On December 21, 2020, Dean Reece, plaintiff in the putative class action *Reece v. Hertz Corp.*, No. 4:20-cv-02991-JSW, filed a Rule 7023 Motion [D.I. 2235]. The underlying class action complaint alleges, among other things, that Hertz Corp. misclassified damage appraisers as exempt from the overtime provisions of the FLSA and protections of the California Labor Code, thus failing to provide these employees with minimum and overtime wages, meal and/or rest periods, pay compensation due upon termination, and provide accurate itemized wage statements. As of the Petition Date, no responsive pleading had been filed.

On February 21, 2021, *Reece v. Hertz Corp.* was mediated together with *Graham v. Hertz Corp.*, discussed directly above, and the parties came to a tentative settlement. The tentative settlement

44

contemplates that, in full satisfaction of all claims asserted by plaintiffs, or that could have been asserted by plaintiffs in a Proof of Claim filed with the Bankruptcy Court, or in any of the lawsuits, either directly or on behalf of a putative class, the Debtors agreed to an Allowed $1.1 million general, unsecured, nonpriority claim against Hertz Corp. in favor of members of the classes asserted in such Proofs of Claim and lawsuits, with the Debtor paying the employers' share of the payroll taxes, provided that the amount assigned to wages by Plaintiffs does not exceed 20% of the total amount of the general, unsecured, nonpriority claim Allowed.  The tentative agreement is subject to approval of the Bankruptcy Court.

**(f) Green v. The Hertz Corp.**

On December 18, 2020, Arlean Green, plaintiff in a putative class action *Green v. Hertz Corp.*, No. 20-cv-01006 (M.D. Fla.), filed a Rule 7023 Motion [D.I. 2180].  The underlying class action complaint alleges that the Debtors failed to provide the requisite 60-day notice before mass layoffs in March and April of 2020, in violation of the Worker Adjustment and Retraining Notification ("**WARN**") Act.  As of the Petition Date, no responsive pleading had been filed by Hertz Corp.

On February 23, 2021, the parties mediated this matter and came to a tentative settlement.  The tentative settlement contemplates that, in full satisfaction of all WARN Act and analogous state law claims asserted by plaintiff, or that could have been asserted by plaintiff in any Proof of Claim filed with the Bankruptcy Court, either directly or on behalf of a putative class or collective, and all individual Proofs of Claim filed with the Bankruptcy Court by any purported members of the class or collective, including Proofs of Claim filed by the Teamsters Union and affiliated entities for amounts designated as Claims, the Debtors agreed to an Allowed $2.5 million claim entitled to priority under section 507(a)(4) of the Bankruptcy Code.  The tentative settlement is subject to approval by the Bankruptcy Court.

**(g) Kemal v. Hertz Corp.**

On December 21, 2020, Polat Kemal, plaintiff in the putative class action *Kemal v. Hertz Corp.*, No. 19-cv-05461-RWL (S.D.N.Y.) filed a Rule 7023 Motion [D.I. 2214].  The underlying class action complaint alleges that certain employees of Hertz Corp. were improperly classified as exempt employees, in violation of New York law, resulting in the denial of overtime pay for hours worked in excess of forty hours per week.  As of the Petition Date, no class had been certified, but the claims were scheduled to be mediated with the related claims in the *Aiykusibe* Representative Action.

On February 19, 2021, the parties mediated this matter and came to a tentative settlement. The tentative settlement contemplates that, in full satisfaction of all claims asserted by plaintiff, or that could have been asserted by plaintiff, or in any Proof of Claim filed with the Bankruptcy Court either directly or on behalf of a putative class or collective, the Debtors will pay $200,000 in cash. The payment is the sole source of recovery for any such claims asserted by plaintiff, or that could be asserted by plaintiff or in any Proof of Claim and is in full release of any related claims of any purported class member.  The tentative settlement is subject to approval by the Bankruptcy Court.

**(h) Kurth v. Hertz Corp.**

On December 21, 2020, Kathryne Anne Kurth, plaintiff in the putative class action *Kurth v. Hertz*

AMERICAS 106663920

*Corp.*, No. 18-cv-2785 (N.D. Ill.) filed a Rule 7023 Motion [D.I. 2205]. The underlying class action complaint alleges that Hertz Corp. collected a "concession recovery fee" at return locations where no such cost was incurred in violation of, among others, the Illinois Consumer Fraud and Deceptive Business Practices Act. The Court found that four of those transactions were subject to an arbitration agreement, and Hertz's motion to compel arbitration as to those transactions was granted. The fifth transaction was dismissed with prejudice as plaintiff was aware of the alleged deception at the time she entered into the agreement. The arbitrator entered an award in favor of Hertz Corp. Plaintiff then filed a motion to vacate the award. As of the Petition Date, the motion to vacate was fully briefed and pending decision. The District Court entered an Order Staying Case on June 5, 2020 following Hertz's filing of a Notice of Suggestion of Bankruptcy.

On February 5, 2021, the parties mediated this matter and came to a tentative settlement. The tentative settlement contemplates that, in exchange for a cash payment of $20,000 by Hertz Corp., plaintiff will dismiss the Class Proof of Claim and the underlying litigation with prejudice. The tentative settlement is subject to the approval of the Bankruptcy Court.

### (i)  Lee (Campbell) v. Hertz Corp.

On December 18, 2020, Peter Lee, plaintiff in the putative class action *Lee (Campbell) v. Hertz Corp.*, No. 18-cv-07481-RS (N.D. Cal.) filed a Rule 7023 Motion [D.I. 2165]. The underlying class action complaint alleges that Hertz Corp.'s use of a standard background check inappropriately imports arrest and conviction information into the hiring process, in violation of Title VII of the Civil Rights Act of 1964. As of the Petition Date, briefing on class certification was ongoing.

On February 8, 2021, the parties mediated this matter and came to a tentative settlement. The tentative settlement contemplates that, in full satisfaction of all claims asserted by plaintiffs, or that could have been asserted by plaintiffs in any Proof of Claim file with the Bankruptcy Court either directly or on behalf of a putative class, the Debtors will agree to an Allowed $1.75 million general, unsecured claim against Hertz Corp. The parties also agree that plaintiffs' attorneys will provide semi-annual oversight of compliance with the programmatic relief, for two years. The parties further agreed that the Debtors will pay a post-petition administrative expense of up to $200,000 for legal fees incurred for programmatic undertakings to be paid to Plaintiffs for documented, reasonable fees. The tentative settlement is subject to approval by the Bankruptcy Court.

### (j)  Margulis v. Hertz Corp.

On December 21, 2020, Daniel Margulis, plaintiff in the putative class action *Margulis v. Hertz Corp.*, No. 2:14-cv-01209 (D.N.J.) filed a Rule 7023 Motion [D.I. 2218]. The underlying class action complaint alleges that Hertz Corp. charged a concealed currency conversion fee to customers who rented vehicles abroad and used an inflated exchange rate in violation of, among other laws, the New Jersey Consumer Fraud Act. As of the Petition Date, Hertz Corp.'s motion for summary judgment was fully briefed.

On February 11, 2021 the parties mediated this matter and came to a tentative settlement. The tentative settlement contemplates that, in exchange for a cash payment of $150,000 by Hertz Corp.,

AMERICAS 106663920

plaintiff will dismiss the Class Proof of Claim and the underlying putative class action with prejudice. The tentative settlement is subject to approval of the Bankruptcy Court.

On February 24, 2021, the Debtors filed their First Omnibus Representative Actions 9019 Motion seeking approval of the tentative settlement reached with respect to this matter.

### (k)  Mitton v. Hertz Global Holdings, Inc.

On November 13, 2020, James D. Mitton, plaintiff in the putative class action *Mitton v. Hertz Global Holdings, Inc.*, No. 19-cv-01312 (C.D. Cal.) filed a Rule 7023 Motion [D.I. 1748]. The underlying class action complaint alleges that Hertz Parent violated various state laws, including the California Constitution, by failing to disclose to consumers that their private data may be exposed when mobile phones or other devices were paired with the vehicles, and by failing to delete private data that was collected during such pairings. As of the Petition Date, a decision was outstanding on Hertz Parent's Motion to Compel Arbitration. Discovery had just begun and there had been no class certification briefing. The District Court entered an Order Staying Case on May 28, 2020 following Hertz's filing of a Notice of Suggestion of Bankruptcy.

On February 5, 2021, the parties engaged in mediation and agreed to a tentative settlement. The tentative settlement contemplates that, in return for a cash payment of $230,000, plaintiff will dismiss with prejudice his Class Proof of Claim and the underlying putative class action. The tentative settlement is subject to approval of the Bankruptcy Court.

On February 24, 2021, the Debtors filed their First Omnibus Representative Actions 9019 Motion seeking approval of the tentative settlement reached with respect to this matter.

### (l)  Moore v. Hertz Local Edition Corp. & Hertz Corp.

On December 21, 2020, Wendellyn Moore, plaintiff in the putative class action *Moore, et al. v. Hertz Local Edition Corporation, et al.*, No. 19-cv-010127 (S.D. Cal.) filed a Rule 7023 Motion [D.I. 2223]. The underlying class action alleges that Company-wide practices resulted in the failure to pay minimum and overtime wages, to include all applicable remuneration in calculating the overtime rate, to compensate for off-the-clock work, to provide paid meal and/or rest breaks, and other violations of the California Labor Code and the California Business and Professions Code. The action is brought under California's Private Attorneys General Act ("**PAGA**"), which provides a cause of action for aggrieved employees to recovery civil penalties for Labor Code violations. As of the Petition Date, there had not yet been any briefing on class certification and no class had been certified.

On February 18, 2021, the parties mediated this matter and came to a tentative settlement. The tentative settlement contemplated that, in full satisfaction of all claims asserted by plaintiff, or that could have been asserted by plaintiff, in any Proof of Claim filed with the Bankruptcy Court either directly or on behalf of a putative class against Debtors, the Debtors will agree to an Allowed $1 million general, unsecured claim against Hertz Local Edition Corp. in favor of all members of the classes asserted in such Proofs of Claim, with apportionment to various class members and claims (including in respect of the PAGA claim) to be determined by counsel, as approved by the Bankruptcy Court. The tentative settlement is subject to approval by the Bankruptcy Court.

AMERICAS 106663920

### (m) Moretti v. Hertz Corp.

On November 25, 2020, Enrico Moretti, plaintiff in the putative class action *Moretti v. Hertz Corp., et al.*, No. 14-cv-00469-LPS (D. Del.) filed a Rule 7023 Motion [D.I. 1943]. The underlying class action complaint alleges that Hertz Corp.'s licensee-agencies based in Mexico would advertise one rate, only to have renters pay a higher rate upon arriving at their destination, after failing to disclose that insurance coverage was mandatory. Furthermore, plaintiffs allege that renters were charged an inflated exchange rate when converting from USD to the Mexican peso. As of the Petition Date, the parties were engaged in briefing on discovery-related issues. There had been no briefing on class certification and no class had been certified.

Hertz filed its Notice of Suggestion of Bankruptcy on May 27, 2020. The District Court failed to enter an order formally staying the case as a result of a procedural deficiency, but no further action has occurred on the docket.

On February 19, 2021, the parties engaged in mediation process, but those discussions resulted in an impasse. Informal settlement discussions are ongoing. However, Hertz plans to proceed with filing a formal objection to plaintiff's time-barred bankruptcy claim(s) and related Rule 7023 Motion for Class Certification.

### (n) Ramirez v. Hertz Local Edition Corp.

On December 21, 2020, Daniel Ramirez, plaintiff in the putative class actions *Ramirez v. Hertz Local Edition Corporation,* et al., No. 2:20-cv-00061 (C.D. Cal.) ("**Ramirez I**") and *Ramirez v. Hertz Local Edition Corporation,* et al., No. 19STCV26477 (Super. Ct., L.A. Cnty.) ("**Ramirez II,**" together with Ramirez I, the "**Ramirez Actions**") filed a Rule 7023 Motion [D.I. 2226]. The underlying class action complaints allege California state law claims for violations of the California wage and hour laws, including, among other things, that the defendants failed to pay employees wages for all hours worked at minimum wage and overtime hours worked at the overtime rate due to the alleged policy, practice, and/or procedure of automatically deducting a portion of employees' daily hours worked for first meal period, failing to authorize or permit legally compliant first meal periods, failing to authorize or permit legally compliant rest periods, failing to provide accurate wage statements, and failing to timely pay employees all wages due upon separation of employment. As of the Petition Date, no class had been certified and the question of class certification had not been briefed.

This case is a combination of *Pamela Miranda and Daren Naik v. Dollar Thrifty Group Operations, Inc.* and *Daniel Ramirez v. Hertz Local Edition Corporation.* The Miranda/Naik Plaintiffs declined to participate in the bankruptcy-related mediation process. Their case will remain stayed. However, the Company plans to proceed with filing a formal objection to plaintiffs' claim(s), which the Debtors contend are time barred.

On February 15, 2021, the parties mediated Ramirez I and Ramirez II, but the matter resulted in an impasse. The parties remain at an impasse, but Daniel Ramirez has agreed to withdraw the two class action Proofs of Claim he filed in the Chapter 11 Cases and withdraw his 7023 Motion for class certification. Mr. Ramirez will continue to pursue his individual claims and his PAGA representative claim against the HLE and Hertz Local Edition Transporting, Inc. However, the

48

Debtors reserve all rights with respect to such claims and plan to proceed with a formal objection to plaintiffs' time-barred bankruptcy claim(s) and a related Rule 7023 Motion for Class Certification.  The Debtors have informed plaintiff that they reserve all rights regarding Claim Allowance, including objection to Ramirez pursuing any claims against HLE and reserving all rights with respect to whether plaintiff's PAGA claims require class certification.

### (o) In re Hertz Global Inc. Secs. Litig. (Ramirez Jr.)

On December 21, 2020, Sheet Metal Workers' Local No. 80 Pension Trust Fund, plaintiff in the putative class action *Ramirez, Jr. v. Hertz Global Holdings Inc*., et al., No. 2:13-cv-07050 (D.N.J.) filed a Rule 7023 Motion [D.I. 2224].  The complaint alleges that the Debtors' violated federal securities laws by withholding information that would impact share prices and used that information for personal benefit and for the benefit of certain private equity firms, in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.  Plaintiffs' fourth amended complaint in the matter was dismissed with prejudice on April 27, 2017.  Plaintiffs appealed to the Third Circuit and the court affirmed the dismissal with prejudice on September 20, 2018.  On February 9, 2019, plaintiffs filed a motion for relief from judgment and for leave to amend with the district court.  The motion was denied and plaintiffs appealed.  As of the Petition Date, that second appeal was fully briefed and awaiting oral argument.

Plaintiffs advocated that the Third Circuit should proceed with the appeal as to the individual defendants—that is, former Hertz Senior Executives Mark Frissora, Elyse Douglas and Jatindar Kapur.  The Third Circuit did so and, on October 13, 2020, issued an opinion affirming the district court's dismissal of plaintiffs' motion as untimely.

On February 3, 2021, the parties participated in a mediation process and agreed to a tentative settlement.  The settlement contemplates that, in exchange for a cash payment of $250,000 by Hertz Corp., plaintiffs will dismiss the Class Proof of Claim and the underlying putative class action with prejudice.  The tentative settlement is subject to approval of the Bankruptcy Court.

On February 24, 2021, the Debtors filed their First Omnibus Representative Actions 9019 Motion seeking approval of the tentative settlement reached with respect to this matter.

### (p) Sharma v. Hertz Corp.

On December 18, 2020, Sanjeev Sharma, plaintiff in the putative class action *Sharma* et. al. *v. Hertz Corp.*, No. 19CV359023 (Cal. Super. Ct., Santa Clara Cnty.), filed a Rule 7023 Motion [D.I. 2164].  The complaint alleges that the Debtors failed to reimburse employees for business expenses relating to their employment, including cell-phone and home internet use, paying tolls when moving company vehicles between locations, among others, in violation of the California Labor Code and the California Business and Professions Code.  The action is brought under PAGA.  As of the Petition Date, no class had been certified and the question of class certification had not been briefed.

On February 22, 2021, the parties mediated this matter and came to a tentative settlement.  The tentative settlement contemplates that, in full satisfaction of all claims asserted by plaintiff, or could have been asserted by plaintiff, or in any Proof of Claim filed with the Bankruptcy Court either directly or on behalf of a putative class or collective, the Debtors will pay $150,000 in cash.

49

The payment is the sole source of recovery for any such claims asserted by plaintiff or in any Proof of Claim, and is in full release of the claims of any purported class member alleged in the complaint or any other expense claim that could have been alleged based off the allegations in the complaint. The tentative settlement is subject to approval of the Bankruptcy Court.

### (q) Dawson v. Hertz Transp., Inc.

In *Dawson v. Hertz Transp., Inc.*, No. 17-cv-08766 (C.D. Cal.), the complaint alleges that Hertz Transporting, Inc. failed to provide minimum wages, overtime, paid meal and rest breaks, wage accounting, and separation wages in violation of the California Labor Code. The action is brought under PAGA. Proceedings in the case were automatically stayed on May 22, 2020, pending the Company's Bankruptcy Cases and a tentative settlement remained pending approval.

This matter was not mediated as part of the formal mediation process. Instead, the Company and plaintiffs agreed to stipulate in the Bankruptcy Court to certain matters, including certification of the class for settlement purposes only, an Allowed $1.5 million general unsecured claim, and an Allowed $50,000 priority unsecured claim. The parties will seek Bankruptcy Court approval of their stipulations.

### (r) Johnston v. Hertz Corp.

In *Johnston v. Hertz Corp.*, No. 17-cv-1966-JAM-EFB (E.D. Cal.), the complaint alleges that Hertz Corp. failed to provide minimum wages, overtime, paid meal/rest breaks, wage accounting, and separation wages, in violation of the California Labor Code. In December 2019, the Company entered into mediated settlement discussions with plaintiffs and reached an agreement to settle all claims for $500,000, which was approved by the underlying court but had not yet been paid. Proceedings in the case were automatically stayed on May 22, 2020, pending the Company's Bankruptcy Cases, and the settlement remains unpaid.

This matter was not mediated as part of the formal mediation process. The parties will seek Bankruptcy Court approval for prepetition settlement and related payment.

### 3.   Certain Prepetition Causes of Action of the Debtors

The Debtors are retaining all Causes of Action pursuant to <u>Article IV.T</u> of the Plan. A non-exhaustive list of such Causes of Action will be identified in the Schedule of Retained Causes of Action filed in connection with the Plan Supplement.

As described in greater detail in Article V.H of this Disclosure Statement, the Plan contains releases by the Debtors of certain Released Parties identified therein. For the avoidance of doubt, the following parties that may otherwise fall within the definition of Released Parties are expressly excluded from such definition (the "**Specified Non-Released Parties**"): (1) the following defendants in the Clawback Litigation (defined below): (i) Mark Frissora, (ii) John Jeffrey Zimmerman, and (iii) Scott Sider; (2) Accenture LLP; (3) Herc Holding Inc. and any of its Affiliates, successors, or assigns (the "**Herc Parties**") solely with respect to Claims arising from the Separation and Distribution Agreement, dated as of June 30, 2016, between Hertz Parent and Herc Holding Inc. and all other documents executed in connection therewith or related thereto; and (4) the Donlen Corp. and any of its subsidiaries solely on account of Claims relating to the

Donlen Sale.  A brief and non-exclusive summary of the Debtors' known and asserted Claims with respect to each Specified Non-Released Party is set forth below.[21]

### (a)  The Clawback Litigation

On March 25, 2019 and March 28, 2019 respectively, the Debtors commenced litigation in the U.S. District Court for the District of New Jersey against Mark Frissora and John Jefferey Zimmerman (*The Hertz Corp. et al., v. Frissora et al.*, Civ. A. No. 2:19-cv-09827 (the "**New Jersey Clawback Litigation**")), and in Florida state court against Scott Sider (*The Hertz Corp. et al., v. Sider*, Case No. 2019-ca-2603 (the "**Florida Clawback Litigation**" and, together with the New Jersey Clawback Litigation, the "**Clawback Litigation**")).  Messrs. Frissora, Zimmerman, and Sider are each former executive officers of Hertz Parent's predecessor entity ("**Old Hertz Holdings**").  The complaints predominantly allege breach of contract and seek repayment of incentive-based compensation received by the defendants in connection with restatements included in the Old Hertz Holdings Form 10-K for the year ended December 31, 2014 and related accounting for prior periods.  The Debtors are also seeking recovery for the costs of the SEC investigation that resulted in an administrative order on December 31, 2018 with respect to events generally involving the restatements included in Old Hertz Holdings Form 10-K for the year ended December 31, 2014 and other damages resulting from the necessity of the restatements. The Company is pursuing these legal proceedings in accordance with its clawback policy and contractual rights.

The parties are currently involved in motion practice in the New Jersey Clawback Litigation and discovery and depositions have commenced in the Florida Clawback Litigation.  In September and October 2020, the judge in the New Jersey Clawback Litigation entered orders requiring the parties and applicable insurers to attend and participate in mediation. A tentative settlement with Scott Sider has been reached in the Florida Clawback Litigation. The tentative settlement is subject to Bankruptcy Court approval.

### (b)  The Hertz Corporation v. Accenture LLP

On April 4, 2019, the Debtors commenced litigation against Accenture LLP ("**Accenture**") in the U.S. District Court for the Southern District of New York, case captioned *The Hertz Corporation v. Accenture LLP*, Civil Action No. 19-3508 (S.D.N.Y) (the "**Accenture Litigation**").  Accenture is a technology services vendor selected to redevelop Hertz' digital platforms.  By the Accenture Litigation, the Debtors primarily assert breach of contract claims related to the project.

### (c)  Herc Parties

There is no litigation pending against the Herc Parties.  However, in connection with a July 2016 reverse tax spin of Hertz Equipment Rental Corporation (n/k/a Herc Rentals, Inc.), the Herc Parties and Hertz Parent entered into the Herc Documents, which the Debtors carve out of the releases set

---

[21]    Nothing herein is intended to or shall be construed to limit the Debtors' retention of claims against parties subject to any other Causes of Action; including, but not limited to, those set forth in the Schedule of Retained Causes of Action.

forth in the Plan so that they may enforce their rights with respect to the Herc Documents following the Effective Date of the Plan.

## N.  Alternative Dispute Resolution Procedures

Most of the thousands of General Unsecured Claims and Unsecured Litigation Claims filed against the Debtors are contingent and disputed and need to be liquidated through traditional claim objections and/or protracted litigation in multiple jurisdictions, at the significant expense of time and resources for the Debtors, the Court, and all other parties in interests. To streamline this process, the Debtors have developed certain alternative dispute resolution procedures (the "ADR Procedures") to facilitate settlement discussions, and if necessary, mediation, or consensual arbitration, to efficiently resolve many of the disputed claims. The ADR Procedures are specifically designed to provide a fair and cost-effective method for resolving such claims for the Debtors and the participating claimants alike. Subject to certain exclusions and limitations, the Debtors will designate, in their sole discretion, the claims eligible to participate in the ADR Procedures.

The ADR Procedures consists of (i) an Initial Assessment Procedure; (ii) a Settlement Offer Exchange Procedure; (iii) a Mediation Procedure; (iv) an Optional Binding Arbitration Procedure; and (v) a Claim Satisfaction Procedure, each as further explained in the ADR Procedures attached as Exhibit A to the Plan.

## O.  Litigation Regarding the Prepetition HVF II ABS Program Master Lease Agreement

On June 11, 2020, the Debtors filed a motion [D.I. 390] (the "**HVF II Lease Rejection Motion**") to reject its lease obligations with respect to certain vehicles under the Master Lease Agreement on a vehicle-by-vehicle basis.  The HVF II Trustee, certain HVF II Lenders, and Deutsche Bank AG, New York Branch, as agent (collectively, the "**HVF II Lease Rejection Objectors**") filed an objection [D.I. 567] to the Debtors' proposed rejection, including on the basis that the Master Lease Agreement is not susceptible to rejection on a vehicle-by-vehicle basis.

Following arms' length negotiations, the Debtors and the HVF II Lease Rejection Objectors reached an agreement temporarily resolving certain matters between them and adjourning, *sine die*, the HVF II Lease Rejection Motion.  The terms of this agreement were approved by the Bankruptcy Court in an agreed order entered July 24, 2020 [D.I. 805] (the "**HVF II Lease Order**").  Among other things, the HVF II Lease Order directed the Debtors to (i) make $650 million of base rent payments under the Master Lease Agreement to the HVF II Trustee in six equal monthly payments of approximately $108 million commencing in July 2020; (ii) dispose of at least 182,521 lease vehicles between June 1, 2020 and December 31, 2020, where the proceeds of the dispositions, subject to certain exclusions set forth in the Master Lease Agreement, would be used to make payments under the Master Lease Agreement; (iii) fund interest payments on the Master Lease Agreement from draws on certain existing letters of credit; and (iv) suspend litigation relating to the Master Lease Agreement until not sooner than January 15, 2021 with all parties reserving all rights with respect to future litigation claims.  For the period from June 1, 2020 through December 31, 2020, the Company disposed of more than 199,000 vehicles that

52

counted against their disposition obligations pursuant to the HVF II Lease Order, generating total proceeds of $4.25 billion.

On January 7, 2021 the Debtors filed a motion [D.I. 2364] (the "**HVF II Lease Order Extension Motion**") for an order approving an extension, with modifications, of the agreement embodied in the HVF II Lease Order.  Such extension, which was agreed between the Debtors and the HVF II Lease Rejection Objectors, provided for the release of certain claims related to the HVF II ABS Program.  In addition, it provided (i) for the extension of the forbearance period through September 30, 2021, and (ii) for the Company to dispose of 121,510 vehicles covered by the Master Lease Agreement with target cumulative disposition proceeds of $2.23 billion.  The base rental payment under the modified agreement is $84 million per month from January 1, 2021, through September 30, 2021.  The HVF II Lease Order Extension Motion also provided that obligations on account of vehicle casualties would be allowed to accrue as superpriority administrative claims in lieu of timely payment.  The Court approved the HVF II Lease Order Extension Motion on January 20, 2021 [D.I. 2489] (the "**Extended HVF II Lease Order**").

### P.  Temporary Suspension of Sales at Hertz Car Sales Locations

The high volume of vehicles that the Debtors sold pursuant to the HVF II Lease Order, combined with their need to preserve remaining vehicles for use in their fleet pending new financing and vehicle purchases in 2021, left the Debtors with insufficient inventory of surplus vehicles to maintain sales operations at the 87 Hertz Car Sales locations operating as of the Petition Date.  As a result, in November of 2020, the Debtors suspended operations at all of their Hertz Car Sales locations.  At the time of suspension, the Debtors maintained their licenses to sell vehicles at all of these locations but also undertook a review of their retail vehicle sales needs in view of anticipated fleet needs going forward.  In connection with their location rationalization process, the Debtors rejected leases at eleven (11) Hertz Car Sales locations to right-size the Company's footprint and geographic coverage.[22]

### Q.  Debtor-In-Possession Financing

On October 29, 2020, the Bankruptcy Court entered an order authorizing, on a final basis, the Debtors to obtain debtor-in-possession financing [D.I. 1661].  In accordance with the Bankruptcy Court's order, on October 30, 2020, Hertz Corp., as borrower, and Hertz Parent and the Subsidiary Guarantors as guarantors, entered into the DIP Credit Agreement. The DIP Credit Agreement provides for a superpriority secured debtor-in-possession credit facility comprised of delayed-draw term loans in an aggregate amount of up to $1.65 billion, of which (i) up to $1.0 billion is permitted to be used as equity for new interim fleet financing, giving the Debtors the ability to replenish their vehicle fleet in the future; and (ii) up to $800 million is permitted to be used for working capital and general corporate purposes.  The DIP Loans are available in multiple draws of at least (i) $250 million each, or (ii) the remaining available commitments if such commitments are less than $250 million.  The DIP Loans bear interest at a rate of LIBOR plus 7.25% (subject to a 1.00%

---

[22]     The rejections were accomplished through various of the Rejection Notices filed on December 20, 2021 detailed in the chart of contract rejections included in section III.K.1 of this Disclosure Statement.

AMERICAS 106663920

LIBOR floor).  The Debtors' obligations under the DIP Credit Agreement are secured on a first priority basis, subject to certain specified exceptions, by substantially all of the Debtors' assets.

As of February 28, 2021, the Debtors have drawn a total of $500,000,000 in DIP Loans under the DIP Credit Agreement.

### R.  Post-Petition Donlen Asset-Based Securitization Facility

As a result of the Debtors' chapter 11 filings, one or more amortization events occurred under the Prepetition Donlen ABS Program and, as a result, collections from lease payments and vehicle dispositions that collateralize the Prepetition Donlen ABS Program were required to be applied exclusively to repay the Prepetition Donlen ABS Program and additional loan proceeds could not be drawn from the Prepetition Donlen ABS Program following the Petition Date.

As a result, Donlen Corp. lost access to the Prepetition Donlen ABS Program to finance its purchase of vehicles for its customers in the ordinary course of business and meet its capital needs. In consultation with their advisors, the Debtors determined that Donlen Corp.'s then-immediate capital needs were best fulfilled with a new securitization facility incurred at a newly-formed non-Debtor indirect subsidiary of Donlen Corp., Donlen Fleet Lease Funding LLC ("**DFLF**"), which would fund the acquisition of vehicles on a similar basis as the Prepetition Donlen ABS Program (the "**Postpetition Donlen ABS Program**").  On September 22, 2020, the Debtors filed a motion seeking approval for DFLF to enter into a new $400 million securitization facility in connection with the Postpetition Donlen ABS Program and seeking an order authorizing Hertz Corp. and Donlen Corp. to enter into certain agreements in connection with the Postpetition Donlen ABS Program [D.I. 1349] (the "**Postpetition Donlen ABS Program Motion**").  On October 12, 2020, the Bankruptcy Court entered an order granting the relief requested in the Postpetition Donlen ABS Program Motion [D.I. 1489].  On October 16, 2020, DFLF issued the Series 2020-1 Notes in an aggregate principal amount of up to $400 million pursuant to this new facility.

### S.  Canadian Asset-Based Securitization Facility

As a result of the Debtors' chapter 11 filings, one or more amortization events occurred under the Prepetition Hertz Canadian Securitization Program.  The Prepetition Hertz Canadian Securitization Program has remained in effect after the chapter 11 filings, but it matures by its terms on March 31, 2021.  The Debtors therefore began the process of seeking a new Canadian financing facility in August of 2020.  In consultation with their advisors, the Debtors determined that a proposal received from Deutsche Bank AG, Canada Branch, was the most favorable for the Debtors.  On December 23, 2020, the Debtors filed a motion seeking approval to enter into a new CAN$400 million Canadian asset-based securitization facility to refresh the Debtors' Canadian fleet and refinance the series of notes then outstanding with respect to its existing Canadian asset-based securitization facility [D.I. 2277] (the "**Hertz Canadian Securitization Program Motion**").  Funding LP, the Issuer under the then outstanding series of notes, is also the proposed borrower under the new series of notes, which is issued pursuant to the same master securitization structure.  On January 13, 2021, the Bankruptcy Court entered an order granting the Hertz Canadian Securitization Program Motion [D.I. 2438].  On January 27, 2021, TCL issued a new series of notes in an aggregate principal amount up to CAN$350 million pursuant to the master securitization structure.

AMERICAS 106663920

## T.  Interim Asset-Based Securitization Facility

On May 5, 2020, as a result of the Debtors' failure to timely comply with its payment obligations under the Master Lease Agreement, one or more amortization events occurred under the Prepetition HVF II ABS Program. Accordingly, the Debtors lost access to cash from the Prepetition HVF II ABS Program to fund purchases of new vehicles. In consultation with their advisors, the Debtors determined that a new asset-based securitization facility would be the most efficient and cost effective way to finance their 2021 fleet purchases, and that a short-term facility would provide the Debtors with maximum flexibility in ultimately financing their exit from chapter 11. On November 4, 2020, the Debtors filed a motion to enter into a master lease and other facility documents with respect to a new $4 billion fleet financing asset-based securitization facility [D.I. 1698] (the "**Fleet Financing Motion**"). As described therein, a newly-formed non-Debtor wholly-owned subsidiary of Hertz Corp., Hertz Vehicle Interim Financing, LLC ("**HVIF**"), would serve as Issuer under the new facility, the proceeds of which would be used to purchase new vehicles for lease to the Debtors for use in their fleet.

On November 24, 2020, the Bankruptcy Court entered an order granting the Fleet Financing Motion [D.I. 1930]. As of February 28, 2021, HVIF has borrowed an aggregate gross amount of $380 million under the facility.

## U.  Sale of Substantially All of the Assets of Donlen Corp. and Its Debtor Subsidiaries

On November 25, 2020, the Debtors filed a motion regarding procedures for the marketing of and the ultimate sale (the "**Donlen Sale**") of substantially all of the assets of Donlen Corp. and its Debtor subsidiaries pursuant to section 363 of the Bankruptcy Code [D.I. 1953] (the "**Donlen Sale Motion**"). On that same date, the stalking horse bidder, Freedom Acquirer LLC (collectively with its permitted assignees, the "**Stalking Horse Bidder**"), executed a stalking horse stock and asset purchase agreement (the "**Stalking Horse SAPA**") with certain Debtors and non-Debtors, which served as the stalking horse bid. Pursuant to the Stalking Horse SAPA, the Stalking Horse Bidder agreed to pay anticipated cash consideration of between $875 million and $900 million in connection with the Donlen Sale.

On December 17, 2020, the Bankruptcy Court entered an order approving the bidding procedures (the "**Bidding Procedures**") specified in the Donlen Sale Motion [D.I. 2158] (the "**Bidding Procedures Order**"). The Bidding Procedures set forth, among other things, key dates and times for the Donlen Sale process. Thereafter the Debtors marketed the Donlen Assets pursuant to the Bidding Procedures. The Debtors did not receive any qualified bids prior to the final bid deadline established by the Bidding Procedures Order other than the bid from the Stalking Horse Bidder. Therefore, on February 23, 2021, pursuant to the Bidding Procedures, after consultation with the appropriate parties, the Debtors cancelled the auction scheduled for February 24, 2021 and designated the Stalking Horse Bidder as the Successful Bidder. [D.I. 2839].

At a hearing on March 1, 2021, the Bankruptcy Court approved the Donlen Sale to the Stalking Horse Bidder. The Debtors intend to close the Donlen Sale in early March 2021.

AMERICAS 106663920

## V.  Efforts to Restructure Non-U.S. Debt

At or around the Petition Date, the Debtors obtained waivers through September 30, 2020 of cross-defaults relating to the commencement of the Chapter 11 Cases from, among others, the holders of the HHN Notes (the "**HHN Notes Waivers**").  The HHN Notes Waivers were subsequently extended through December 31, 2020.  While the HHN Notes Waivers were in effect, the Company sought to negotiate a long-term restructuring of their European business.  On November 30, 2020, HHN, HIL, and an ad hoc group of Holders of the HHN Notes (the "**HHN Ad Hoc Group**") reached an agreement on such a restructuring, memorialized in a Lock-Up-Agreement (the "**LUA**").  The LUA contemplates three interdependent components, which would occur once all the necessary conditions to effectiveness of the LUA were met.

The first component was the issuance of €250 million of new notes (the "**New HIL Notes**") by HIL to subscribing holders of HHN Notes.  The New HIL Notes would raise new financing to provide working capital to the Company's European operations and fund European fleet purchases during 2021.  The second component was the allowance of an allowed unsecured claim against the Debtors, which were guarantors of the HHN Notes, in an amount equal to the  outstanding amount of the HHN Notes (the "**Replacement HHN Notes Guarantee Claims**"), which claim would be the exclusive claim against the Debtors in respect of their guarantees of the HHN Notes.  The Replacement HHN Notes Guarantee Claim would be bifurcated from the HHN Notes and then sold through an auction to qualified investors.  The proceeds of the sale would be paid to the holders of HHN Notes to reduce the amount of the HHN Notes.  The third component was the exchange of the HHN Notes (after the application of the proceeds from the sale of the Replacement HHN Notes Guarantee Claim) for two series of new notes to be issued by HHN (the "**New HHN Notes**").  The senior series of New HHN Notes would be issued to the holders of HHN Notes subscribing to the New HIL Notes in the same amount as the HHN Notes being exchanged for senior New HHN Notes.  The junior series would be issued to the holders of HHN Notes not subscribing to the New HIL Notes in an amount approximately equal to 55% (face value) of the HHN Notes being exchanged for junior New HHN Notes.  The New HHN Notes would be guaranteed by certain non-U.S. non-Debtor affiliates.

On 30 November 2020, Hertz UK Receivables Ltd. (the "**Scheme Company**"), a co-issuer of the HHN Notes, commenced an English law scheme proceeding (the "**English Proceeding**") to effect a scheme of arrangement (the "**Scheme of Arrangement**") to implement the restructuring described above.  The English Proceeding was commenced by issuing a practice statement letter to the holders of the HHN Notes and subsequently filing a claim form with the English court.  The English Proceeding was intended to effect the restructuring described above by: (i) raising financing through the issuance of the New HIL Notes, (ii) facilitating the exchange of the HHN Notes for the New HHN Notes, and (iii) effecting the sale of the Replacement HHN Notes Guarantee Claims.  The Scheme of Arrangement was approved by the requisite majorities of creditors (the "**Scheme Creditors**") at a meeting held on January 15, 2021.  The hearing (the "**English Hearing**") on sanctioning (i.e., approving) the Scheme of Arrangement was originally scheduled for February 5, 2021, but was adjourned as set forth in more detail below.

Following the commencement of the English Proceeding, the duly-authorized foreign representative of the Scheme Company commenced a proceeding under chapter 15 of the Bankruptcy Code seeking entry of an order (i) granting recognition of the English Proceeding

pursuant to section 1517 of the Bankruptcy Code as a "foreign main proceeding" (as that term is defined in section 1502(4) of the Bankruptcy Code) of the Scheme Company, and all relief attendant therewith; (ii) recognizing the duly appointed representative of the English Proceeding as the "foreign representative" (as that term is defined in section 1502(4) of the Bankruptcy Code) of the English Proceeding, (iii) granting full force and effect and comity to the Scheme of Arrangement proposed in the English Proceeding within the territorial jurisdiction of the United States, and (iv) granting certain other related relief.  The hearing (the "**Chapter 15 Hearing**") on the relief requested in the chapter 15 proceeding was originally scheduled for January 20, 2021 but, like the English Hearing, was adjourned, as set forth below.

The Debtors also filed a motion [D.I. 2280] (the "**Bifurcation Motion**") with the Bankruptcy Court seeking an order (the "**Bifurcation Order**") (i) Allowing the Replacement HHN Notes Guarantee Claim as a general unsecured claim against the Debtors that guaranteed the HHN Notes and (ii) bifurcating such claim from the HHN Notes.   Several constituencies opposed the Bifurcation Motion.  Specifically, the U.S. Trustee filed an objection to the Bifurcation Motion [D.I. 2455] and the Debtors have been advised that the Committee opposes the Bifurcation Motion (although the Committee has not filed an objection as of the filing of this Disclosure Statement). While the Bifurcation Motion was originally set to be heard on January 26, 2021, the hearing was adjourned to February 24, 2021 and then subsequently to March 17, 2021 in an attempt to resolve such objections.  The English Hearing and Chapter 15 Hearing were similarly adjourned, and as at the date of this Disclosure Statement those hearings were scheduled for March 9, 2021, and March 17, 2021 respectively.

The LUA requires the holders of HHN Notes to forbear from exercising remedies against HHN until the LUA is terminated.  HHN is currently in default of certain of its obligations under the LUA.  Accordingly, the majority of Holders of HHN Notes party to the LUA may terminate that agreement at any time.  In the event of a termination of the LUA, the holders of the HHN Notes would no longer be required to forbear from exercising remedies.

The Plan provides an alternative to the European restructuring described above.  Under the Plan and a revised Scheme of Arrangement, the HHN Notes would be restructured as follows:

(a) the holders of HHN Notes will receive an allowed Unsecured Funded Debt Claim (the "**HHN Notes Guarantee Claims**") against the Debtors on account of the Debtors' guarantee of the HHN Notes in the amount of $790,105,000.  That amount is equal to €725,000,000 based on the exchange rate in effect on the Petition Date (1.0898);

(b) the Plan Sponsors will purchase the HHN Notes Guarantee Claims on the Effective Date for cash in an amount of $553,073,500 (70% of such claim), which amount shall be paid to the HHN Notes Trustee; upon receipt of such payment, the Holders of the HHN Notes shall be entitled to no further distributions or recoveries under the Plan;

(c) the HHN Notes Trustee shall apply the $553,073,500 payment to the HHN Notes, after converting the outstanding principal amount of the HHN Notes to Dollars at the exchange rate in effect of the Petition Date.  The remaining outstanding amount of the HHN Notes after the application of such payment shall be $237,031,500, which shall be converted back to Euros at the exchange rate as of the Petition Date;

AMERICAS 106663920

(d) The HHN Notes shall then be exchanged for new secured notes of aggregate equal amount to be issued by HHN on such terms as are agreed and approved in connection with an amended Scheme of Arrangement;

(e) upon the occurrence of the effective date, the Plan Sponsor shall be deemed to have exercised the subscription rights issued in respect of the HHN Notes Guarantee Claims and shall pay the exercise price as specified in the rights offering documents, thereby entitling the Sponsor to 12% of the Reorganized Hertz Parent Interests to be issued at exit in respect of the rights issued in respect of the HHN Notes Guarantee Claims.

In conjunction with the filing of the Plan, the Debtors anticipate working with the Ad Hoc Group to amend or replace the LUA as needed so as to be able to (a) move forward to obtain approval and/or sanction of the Scheme of Arrangement, as modified to replace the conditionality related to the entry of the Bifurcation Order and the consummation of the transactions contemplated thereby with similar conditions related to the approval and consummation of the Plan, and (b) obtain prompt access to the funding contemplated by the issuance of the new HIL notes to ensure that HHN has sufficient liquidity for the ongoing operation of its business and to implement its fleet plan for 2021.

### W. Lombard Vehicle Financing Facility & European ABS Facility Waivers

In May 2020, the lenders under the Lombard Vehicle Financing Facility and the European ABS Facility agreed to temporary waivers with respect of cross defaults to a Hertz Corp. bankruptcy filing. The European ABS Facility continues to operate under a temporary waiver, which has been extended to March 5, 2021. The waivers provided for under the Lombard Financing Facility have also been extended to March 5, 2021 under the terms of a lock-up agreement entered into on December 24, 2020 (as amended).

The Company intends to negotiate a comprehensive restructuring with the lenders under the European ABS Facility and Lombard Vehicle Financing Facility which the Debtors anticipate will provide that those facilities will continue on amended terms and that all guarantees of such facilities by Hertz Corp. will be released in connection with the Plan.

### X.  Committee's Adversary Proceeding

On August 26, 2020, the Committee filed a motion seeking standing to prosecute certain claims on behalf of the Debtors' estates [D.I. 1141] (the "**Committee Standing Motion**"). The Debtors consented to the Committee having standing, but reserved the right to settle. On September 8, 2020, the Bankruptcy Court entered an order granting the Committee Standing Motion [D.I. 1220]. On September 11, 2020, the Committee filed an adversary complaint [D.I. 1272] (the "**Committee Complaint**"), thereby commencing the adversary proceeding styled *The Official Committee of Unsecured Creditors v. Barclays Bank PLC & BOKF, N.A.*, Bankr. D. Del. Adv. No. 20-50842 (the "**Committee Adversary Proceeding**"). The Committee Complaint contains four counts. In count one, the Committee seeks a declaratory judgment, on behalf of the Debtors' estates, that the Debtors' cash in certain deposit accounts on the Petition Date is not and was not subject to the liens of the First Lien Agent or the Second Lien Note Trustee (collectively, the "**Collateral Agents**") pursuant to the terms of the Collateral Agents' respective security agreements and

58

applicable law. Count two seeks a declaratory judgment, on behalf of the Debtors' estates, that any liens the Collateral Agents may have in approximately $307 million of cash held in certain deposit accounts on the Petition Date are unperfected and subject to avoidance, and are avoided, under section 544(a) of the Bankruptcy Code. Counts three and four seek declaratory judgments, on behalf of the Debtors' estates, that the Collateral Agents' liens do not extend to $580 million in money market securities owned by Hertz Corp. on the Petition Date that became subject to such liens during the 90 days prior to the Petition Date (the "**Preference Period**"), or to the proceeds of the sale of money market securities during the Preference Period, because the attachment of such liens should be avoided either as a preferential transfer or a constructively fraudulent transfer.

If the Plan is confirmed and the Effective Date occurs, the Committee Complaint will be dismissed.

### Y. Diligence to the Committee and Other Stakeholders

Throughout the Chapter 11 Cases, the Debtors have provided, and continue to provide, significant diligence to the Committee, various lenders, and other stakeholders. Specifically with respect to the Committee, the Debtors have provided access to a comprehensive data room that has been continuously updated and have conducted weekly advisors calls as well as monthly calls with management to provide detailed updates and address additional diligence requests on an ad hoc basis as the Chapter 11 Cases have progressed. Beginning in the early stages of the Chapter 11 Cases, the Debtors also executed NDAs with other key stakeholders and/or their respective professionals and variously provided data room access, advisor calls, management calls, and responses to ad hoc diligence requests. The Debtors believe that the substantial information that they have provided to their key stakeholders throughout the Chapter 11 Cases has ensured robust creditor oversight and opportunity for input and participation in these Chapter 11 Cases.

Additionally, since November 2020, the Debtors have been actively engaged in soliciting proposals from other potential plan sponsors in addition to the Plan Sponsor. The Debtors have received and considered alternate plan proposals ("**Alternate Proposals**") from two other potential sponsors, one of which is the Ad Hoc Noteholder Group formed in the Chapter 11 Cases (the "**Ad Hoc Noteholder Group**").[23]  In soliciting and negotiating the Alternate Proposals, the Debtors provided the advisors to the proponents thereof access to a robust plan data room; conducted multiple diligence sessions, including with management; and evaluated the constructs of the Alternate Proposals in detail. The Debtors continued to engage in negotiation and consideration of the Alternate Proposals up until shortly prior to filing this Disclosure Statement. Following substantive, good-faith, arms' length negotiations with all parties, the Debtors determined that the plan construct proposed by the Plan Sponsor and presented in the Plan provides the best path forward to maximize value of the Debtors' estates and is in the best interests of the Debtors' stakeholders.

---

[23] The Ad Hoc Noteholder Group filed the *Verified Statement of Willkie Farr & Gallagher LLP and Young Conaway Stargatt & Taylor, LLP Pursuant to Bankruptcy Rule 2019* [D.I. 268] on June 1, 2020 disclosing the names and addresses of each member of the Ad Hoc Noteholder Group, as well as the approximate amount of each member's notes held, controlled or otherwise having discretionary authority over.

AMERICAS 106663920

## IV.
## SUMMARY OF THE PLAN

### A.  General

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the consideration that each class is to receive under the plan and (c) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (a) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (b) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.  Under the Plan, Classes 5, 6, 9, and 11 (and certain of Class 8) are impaired, and Holders of Claims or Interests in such impaired Classes are entitled to vote to accept or reject the Plan unless such Classes of Claims or Interests are deemed to reject the Plan (i.e., Classes 9 and 11 (and certain of Class 8)) or a Holder's Claim is subject to an objection filed by the Debtors.  Ballots are being furnished herewith to all Holders of Claims in Classes 5 and 6 that are entitled to vote to facilitate their voting to accept or reject the Plan.  Classes 9 and 11 (and certain of Class 8) are deemed to reject the Plan, and, therefore, Holders of Claims or Interests in such Class will not vote on the Plan.  Classes 1, 2, 3, 4, 7 and 10 (and Certain of Class 8) are unimpaired under the Plan and therefore deemed to accept the Plan.

### B.  Administrative Claims and Priority Claims

To confirm the Plan, Allowed Administrative Expenses must be paid in full or in a manner otherwise agreed by the Holders of such Claims.  Administrative Expenses are the actual and necessary costs and expenses of the Chapter 11 Cases.  Those expenses include compensation for individuals working on behalf of the Debtors, amounts owed to vendors providing goods and services during the Chapter 11 Cases, tax obligations incurred after the Petition Date, Section 503(b)(9) Claims, management costs, and certain statutory fees and expenses.   Other Administrative Expenses include the actual, reasonable, necessary, and unpaid fees and expenses of the professionals retained by the Debtors and the Creditors' Committee.

In accordance with section 1123(a)(1) of the Bankruptcy Code, (i) Administrative Claims, including DIP Claims, HVF Master Lease Administrative Claims, Professional Fee Claims, Canadian Fleet Financing Administrative Claims, Interim Fleet Financing Administrative Claims, and postpetition Intercompany Claims, and (ii) Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III of the Plan.

## 1.  Administrative Claims

Except with respect to Professional Fee Claims, DIP Claims, HVF Master Lease Administrative Claims, Canadian Fleet Financing Administrative Claims, Interim Fleet Financing Administrative Claims, and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor, or, after the Effective Date, such Holder and the applicable Reorganized Debtor, agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; provided, that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

Except as otherwise provided in Article II.A of the Plan or the Claims Bar Date Order, and except with respect to Administrative Claims that are Professional Fee Claims or DIP Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided, that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business.

The Reorganized Debtors, in consultation with the Plan Sponsors, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.  The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

## 2.  DIP Claims

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the aggregate amount of the then outstanding DIP Obligations (as defined in the DIP Order), including (i) the principal amount outstanding under the DIP Financing on such date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued and unpaid fees, expenses and indemnification obligations payable under the DIP Documents.  Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall be indefeasibly paid in full, in Cash, by the Debtors on the Effective Date or such later date as the DIP Claims become due and payable pursuant to any agreement such Holder and the Debtors or the Reorganized Debtors.  Contemporaneously with the foregoing payment, the DIP Financing facility and the DIP Documents shall be deemed canceled, all commitments under the DIP Documents shall be deemed terminated, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Financing shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders.  The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors; provided, that any provisions of the "DIP Loan Documents" (as such term is defined in the DIP Order) governing the DIP Financing facility that by their terms survive the payoff and termination of such facility shall survive in accordance with the terms of such DIP Loan Documents.

## 3.  HVF Master Lease Administrative Claims

As set forth in Article IV.H of the Plan, the repayment of the HVF II Notes in full shall constitute the full and final satisfaction, settlement, release, and discharge of each HVF Master Lease Administrative Claim against the Debtors.

## 4.  Postpetition Fleet Financing Administrative Claims

Each Reorganized Debtor shall assume all of its obligations under the Canadian Fleet Financing Debtor Documents to the extent of such obligations and, as of the Effective Date, such obligations shall become obligations of such Reorganized Debtor as provided in the Canadian Fleet Financing Debtor Documents  according to their terms and shall be Unimpaired.  Upon such assumption, all of the Canadian Fleet Financing Administrative Claims shall be deemed satisfied in full, including any Administrative Claims granted under section 364(c) of the Bankruptcy Code.

To the extent HVIF does not repay in full in Cash the then-outstanding obligations with respect to the Interim Fleet Financing Notes pursuant to Article IV.H of the Plan, each Reorganized Debtor shall assume all of its obligations under the Interim Fleet Financing Debtor Documents to the extent of such obligations and, as of the Effective Date, such obligations shall become obligations of such Reorganized Debtor as provided in the Interim Fleet Financing Debtor Documents according to their terms and shall be Unimpaired.  Upon such assumption, all of the Interim Fleet

AMERICAS 106663920

Financing Administrative Claims shall be deemed satisfied in full, including any Administrative Claims granted under section 364(c) of the Bankruptcy Code.

5. **Professional Fee Claims**

(a) **Final Fee Applications**

All final requests for allowance and payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.  Any objections to Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of final requests for allowance and payment of Professional Fee Claims.

(b) **Professional Fee Claims Estimate**

Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services compensable by the Debtors' Estates before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date; provided that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors shall, in consultation with the Plan Sponsors, estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

(c) **Professional Fee Escrow**

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash based on their evaluation of the Professional Fee Claims Estimates, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the New Reorganized Debt, or otherwise).  The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (ii) shall be held in trust for the Professionals and for no other Person or Entity until all Professional Fee Claims have been irrevocably paid in full; provided, that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors.  Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; provided that the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow by the Reorganized Debtors without any further action or order of the Bankruptcy Court.

AMERICAS 106663920

**(d) Post-Effective Date Fees and Expenses**

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention, compensation for services rendered, or reimbursement for expenses incurred on or after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**6.  Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree (whether before or after the Effective Date) to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**C.  Classification of Claims and Interests**

**1.  Classification in General**

Pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code, a Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan; provided that a Claim is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only if such Claim is an Allowed Claim in that Class and such Claim has not been satisfied, released, or otherwise settled before the Effective Date.

The classification provided by the Plan reflects, among other things, the different legal rights and obligations of the respective Classes, as well as the nature and type of Claims at issue.  For example, General Unsecured Claims consist, in large part, of vendor- and lease-related claims which may be against one or less than all Debtors.  Conversely, certain other claims, such as the Unsecured Notes Claims, are joint and several obligations of multiple Debtors.

**2.  Summary of Classification**

All Claims and Interests, except for Administrative Claims, including DIP Claims, Canadian Fleet Financing Administrative Claims, Interim Fleet Financing Administrative Claims, HVF Master Lease Administrative Claims, Professional Fee Claims, Priority Tax Claims, and postpetition Intercompany Claims are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections

AMERICAS 106663920

1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.B. of the Plan.  The Plan shall constitute a separate Plan for each of the Debtors.  For all purposes under the Plan, each Class will contain a sub-Class for each Debtor: (i) Classes 3, 4, and 5 shall be vacant for each Debtor other than Hertz Corp., the Subsidiary Guarantors and Rental Car Intermediate Holdings, LLC, and (ii) Class 11 shall be vacant for each Debtor other than Hertz Parent.  Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

### 3.  Class Identification

| Class | Applicable Entities | Claim/Interest | Status | Voting Rights |
|---|---|---|---|---|
| 1 | Each Debtor | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Each Debtor | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | First Lien Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | Second Lien Note Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | Unsecured Funded Debt Claims | Impaired | Entitled to Vote |
| 6 | Each Debtor | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Each Debtor | General Unsecured Elective Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

AMERICAS 106663920

| Class | Applicable Entities | Claim/Interest | Status | Voting Rights |
|-------|---------------------|----------------|--------|---------------|
| 8 | Each Debtor | Prepetition Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Reject) |
| 9 | Each Debtor | Section 510(b) Claims | Impaired | Not Entitled to Vote (Presumed to Reject) |
| 10 | Each Debtor | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 11 | Hertz Parent | Existing Hertz Parent Equity Interest | Impaired | Not Entitled to Vote (Presumed to Reject) |

### 4.  Treatment of Claims and Interests

#### (a) Class 1 – Other Priority Claims

Class 1 consists of all Other Priority Claims against each Debtor; i.e., Claims against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim; or (ii) a Priority Tax Claim..

Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).

Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claim are not entitled to vote to accept or reject the Plan.

#### (b) Class 2 – Other Secured Claims

Class 2 consists of all Other Secured Claims against each Debtor; i.e., any Secured Claim against any Debtor, including any Secured Tax Claim, other than a (i) First Lien Claim; (ii) Second Lien Note Claim; and (iii) DIP Claim, unless otherwise classified in Article III.B.

Except to the extent that a Holder of an Allowed Other Secured Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each such Holder shall receive at the applicable Debtor's, or the applicable Reorganized Debtor's, discretion:

AMERICAS 106663920

(i)     payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, payment shall be made in accordance with its terms in the ordinary course);

(ii)    Reinstatement of such Holder's Allowed Other Secured Claim;

(iii)   the applicable Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or

(iv)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

Class 2 is Unimpaired under the Plan.  Each Holder of an Allowed Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

### (c) Class 3 – First Lien Claims

Class 3 consists of all First Lien Claims against (i) Hertz Corp.; (ii) the Subsidiary Guarantors; and (iii) Rental Car Intermediate Holdings, LLC; i.e., all Claims against such entities constituting (i) First Lien Term Loan Claims (i.e., claim arising from or based upon the term loans issued pursuant to the First Lien Credit Agreement or any other First Lien Term Loan Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding as of the Petition Date was in the aggregate amount equal to approximately $656,250,000); (ii) First Lien Revolving Loan Claims (i.e., claims arising from or based upon the revolving loans issued pursuant to the First Lien Credit Agreement or any other First Lien Loan Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding as of the Petition Date was in the aggregate amount equal to approximately $615,000,000); (iii) First Lien Hedge Claims (i.e., claims arising from or based upon the First Lien Hedge Agreements, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding as of the Petition Date was in the aggregate amount equal to approximately $2,312,987.44); and (iv) First Lien LC Claims (i.e., all First Lien Revolving LC Claims and First Lien Standalone LC Facility Claims).

First Lien Claims shall be Allowed against Hertz Corp. and each Subsidiary Guarantor in the amount of $1,271,932,486, minus the First Lien Donlen Paydown Amount, plus letters of credit drawn after the Petition Date plus the First Lien Hedge Claims, plus outstanding and accrued interest and fees from the Petition Date through the Effective Date as required to render the First Lien Claims Unimpaired.

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed First Lien Claim shall receive payment in full, in Cash, of the unpaid portion of its liquidated Allowed First Lien Claim on the Effective Date and with respect to any unliquidated Claim with respect to undrawn letters of credit shall retain all legal and equitable rights with respect to such Claims until such letters of credit are released.

AMERICAS 106663920

Class 3 is Unimpaired under the Plan. Each Holder of an Allowed First Lien Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed First Lien Claims are not entitled to vote to accept or reject the Plan.

### (d) Class 4 – Second Lien Note Claims

Class 4 consists of all Second Lien Note Claims against (i) Hertz Corp. and (ii) the Subsidiary Guarantors; i.e., all Claims against such entities arising from or based upon the Second Lien Note Indenture or any other Second Lien Note Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding as of the Petition Date was in the aggregate amount equal to approximately $350,000,000.

Second Lien Note Claims shall be Allowed against Hertz Corp. and each Subsidiary Guarantor in the amount of $362,750,694 plus accrued and outstanding interest and fees from the Petition Date through the Effective Date as required to render the Second Lien Note Claims Unimpaired.

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Second Lien Note Claim shall receive payment in full, in Cash of the Allowed amount of such Claim against Hertz Corp. and the Subsidiary Guarantors.

Class 4 is Unimpaired under the Plan. Each Holder of an Allowed Second Lien Note Claim is deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Second Lien Note Claims are not entitled to vote to accept or reject the Plan.

### (e) Class 5 – Unsecured Funded Debt Claims

Class 5 consists of all Unsecured Funded Debt Claims against (i) Hertz Corp.; (ii) the Subsidiary Guarantors; and (iii) Rental Car Intermediate Holdings, LLC; i.e., all Claims against such entities constituting (x) the Unsecured Note Claims, (y) the HHN Notes Guarantee Claims, and (z) the ALOC Facility Claims.

Unsecured Funded Debt Claims shall be Allowed against Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC in the amounts set forth below:

| Unsecured Funded Debt Claim | Allowed Amount |
|---|---|
| 5.500% Unsecured Note Claims | $804,522,222 |
| 6.000% Unsecured Note Claims | $926,700,000 |
| 6.250% Unsecured Note Claims | $503,211,806 |
| 7.125% Unsecured Note Claims | $511,083,333 |
| HHN Notes Guarantee Claims | $790,105,000 |

AMERICAS 106663920

| Unsecured Funded Debt Claim | Allowed Amount |
|---|---|
| ALOC Facility Claims | An amount equal to the letters of credit drawn with respect to the ALOC Facility on the Effective Date. |

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Unsecured Funded Debt Claim against Hertz Corp. and the Subsidiary Guarantors shall receive:

(i)     Cash in an amount equal to 70% of its Allowed Unsecured Funded Debt Claim; or

(ii)    Reorganized Hertz Parent Interests pursuant to the exercise of its Pro Rata share of Subscription Rights.

Pursuant to the Backstop Commitment Agreement and the Rights Offering Procedures, an Eligible Unsecured Funded Debt Holder may exercise its Subscription Rights in consideration for either (i) Cash, in which case it shall receive a Cash distribution pursuant to the Plan, or (ii) the contribution of its Allowed Unsecured Funded Debt Claims, which Claim shall be valued at 70% of its Allowed Unsecured Funded Debt Claim determined at Plan Equity Value.

Class 5 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

### (f) Class 6 – General Unsecured Claims

Class 6 consists of all General Unsecured Claims against a Debtor; i.e., any Unsecured Claim, against the Debtors, other than (i) Administrative Claims; (ii) Priority Tax Claims; (iii) Other Priority Claims; (iv) Section 510(b) Claims; (v) Intercompany Claims; (vi) Unsecured Funded Debt Claims; and (vii) General Unsecured Elective Claims.

On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of an Allowed General Unsecured Claim against a Debtor shall receive, subject to the General Unsecured Elective Claim election, its Pro Rata share of the General Unsecured Recovery Cash Pool Amount without regard to the particular Debtor against which such Claim is Allowed;[24] provided, that, no Holder of an Allowed General Unsecured Claim shall receive a recovery that exceeds 70% of the Allowed amount of its General Unsecured Claim.

Class 6 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

### (g) Class 7 – General Unsecured Elective Claims

Class 7 consists of all General Unsecured Elective Claims against a Debtor; i.e., Claims against any Debtor other than a 7.000% Unsecured Promissory Notes Claim, a Class Action Claim, or any Claim Filed on account of an individual included in any Class Action Claim, that would otherwise

---

[24] The Plan Sponsors are considering whether to allocate and, if so, the proper allocation of recoveries amongst the various General Unsecured Creditors at the various Debtors.

be an Allowed General Unsecured Claim that (i) is either (a) Allowed in the amount of $[●] or less, or (b) Allowed in an amount greater than $[●], but which is reduced to $[●] and treated as a General Unsecured Elective Claim for purposes of this Plan in full and final satisfaction of such Claim by an irrevocable written election of the Holder of such Claim made on a timely and properly delivered and completed Ballot or other writing reasonably acceptable to the Debtors; and (ii) the Holder of which makes an irrevocable written election to be treated as a General Unsecured Elective Claim on a timely and properly delivered and completed Ballot or other writing reasonably acceptable to the Debtors; provided, however, that any General Unsecured Claim that was originally Allowed in excess of $[●] may not be subdivided into multiple General Unsecured Claims of $[●] or less for purposes of receiving treatment as a General Unsecured Elective Claim; provided, further, that to the extent that a Holder of a General Unsecured Elective Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtors arising from or relating to the same obligations or liability as such General Unsecured Elective Claim, such Holder shall only be entitled to a distribution on one General Unsecured Elective Claim against the Debtors in full and final satisfaction of all such Claims.

Except to the extent that a Holder of an Allowed General Unsecured Elective Claim agrees to less favorable treatment, each Holder of an Allowed General Unsecured Elective Claims shall receive, on the Effective Date or as soon as practical thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed General Unsecured Elective Claim, Cash in an amount equal to the lesser of (a) the Allowed amount of such Holder's General Unsecured Elective Claim and (b) [●] without regard to the particular Debtor against which such Claim is Allowed. The treatment provided to General Unsecured Elective Claims shall be funded from the General Unsecured Recovery Cash Pool Account. Each Holder electing to be treated as a Holder of an Allowed General Unsecured Elective Claim shall irrevocably waive the right to assert such Claim as a General Unsecured Claim.

Class 7 is Unimpaired under the Plan and is not entitled to vote to accept or reject the Plan.

### (h) Class 8 – Prepetition Intercompany Claims

Classification: Class 8 consists of all prepetition Intercompany Claims; i.e., collectively any Claim (i) held by a Debtor against any Debtor, or (ii) of a non-Debtor direct or indirect subsidiary of Hertz Parent against any Debtor.

Treatment: Each prepetition Intercompany Claim shall be, at the option of Debtors or Reorganized Debtors as applicable (in consultation with the Plan Sponsors), either:

(i)     Reinstated; or

(ii)    canceled and released without any distribution on account of such Claims;

provided, however, that Intercompany Claims of HIRE (Bermuda) Limited against Hertz Corp. shall be Reinstated.

AMERICAS 106663920

Voting: Holders of Claims in Class 8 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, such Holders are not entitled to vote or accept or reject the Plan.

### (i)  Class 9 – Section 510(b) Claims

Class 9 consists of all Section 510(b) Claims against a Debtor; i.e., any Claim against any Debtor (i) arising from the rescission of a purchase or sale of a Security of any Debtor or an Affiliate of any Debtor; (ii) for damages arising from the purchase or sale of such a Security; or (iii) for reimbursement or contribution Allowed under section 502 of the Bankruptcy Code on account of such a Claim; provided that a Section 510(b) Claim shall not include any Claims subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to any Interest.

Section 510(b) Claims will be canceled, released, discharged, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Claims.

Holders of Claims in Class 9 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

### (j)  Class 10 Intercompany Interests

Class 10 consists of all Intercompany Interests held by a Debtor in another Debtor; i.e., an Interest held by a Debtor in another Debtor or a non-Debtor subsidiary.

Intercompany Interests shall be Reinstated so as to maintain the organizational structure of the Debtors as such structure exists on the Effective Date unless implementation of the Restructuring requires otherwise.

Class 10 is Unimpaired under the Plan.  Each Holder of an Intercompany Interest is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

### (k) Class 11 – Existing Hertz Parent Interests

Class 11 consists of all Existing Hertz Parent Interests; i.e., all Interests in (or against) Hertz Parent.

Existing Hertz Parent Interests shall be cancelled and released without any distribution on account of such Interests

Class 11 is Impaired under the Plan.  Each Holder of an Existing Hertz Parent Interest is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Hertz Parent Interests are not entitled to vote to accept or reject the Plan.

### 5. Special Provision Governing Unimpaired Claims

Except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoff or recoupment against Reinstated Claims or Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing in the Plan shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by the Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 6. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

### 7. Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 8. Separate Classification of Other Secured Claims

Each Other Secured Claim, to the extent secured by a Lien on collateral different from the Collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under the Plan.

### 9. Voting Classes; Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

### 10. Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### D.  Means for Implementation of the Plan

### 1.  No Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

### 2.  Restructuring Transactions; Effectuating Documents

Prior to, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may take any and all actions as may be necessary or appropriate in the Debtors' reasonable discretion to effectuate the Restructuring Transactions described in, approved by, contemplated by, or necessary to effectuate the Plan, in accordance with the Plan Support Agreement, including: (i) the execution and delivery of any New Organizational Documents, including any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, arrangement, continuance, dissolution, sale, purchase, or liquidation, in each case, containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of the New Organizational Documents, including any appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (v) the execution, delivery, and filing of the Exit Facility Documents; (vi) the execution and delivery of the HVF III Documents; (vii) the implementation of the HHN Restructuring and execution and delivery of any documents in connection therewith, (viii) the solicitation and implementation of the Rights Offering, and (ix) all other actions that the Debtors determine to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan (collectively, the "**Restructuring Transactions**").  The Restructuring Transactions shall be structured in a manner that takes into account the tax position of creditors, the Plan Sponsors, and the Reorganized Debtors.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

73

### 3.  Sources of Consideration for Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtors shall fund distributions under the Plan with (i) Cash on hand; (ii) Cash proceeds from the New Money Investment; and (iii) the proceeds of the Exit Term Loan Facility.

### 4.  New Money Investment

#### (a) Backstop Parties Direct Equity Investment

On the Effective Date, in accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties shall purchase its pro rata portion of the Minimum Backstop Parties Direct Equity Allocation at Plan Equity Value (without any discounts or premiums) in consideration for an amount equal to its pro rata portion of the Backstop Parties Direct Equity Investment.

#### (b) Rights Offering

Following approval by the Bankruptcy Court of the Disclosure Statement and the Rights Offering Procedures, Hertz Parent shall conduct the Rights Offering in accordance with the Backstop Commitment Agreement and the Rights Offering Procedures.  Each Holder of an Allowed Unsecured Funded Debt Claim shall be issued Subscription Rights to purchase, pursuant to the terms set forth herein in the Backstop Commitment Agreement and the Rights Offering Procedures, its Pro Rata allocation of the Rights Offering Reorganized Equity Allocation at Plan Equity Value (without any discounts or premiums).  Any transfer of an Allowed Unsecured Funded Debt Claim shall include the applicable Subscription Rights.  The Holder of an Allowed Unsecured Funded Debt Claim may exercise the Subscription Rights by surrender of such Claims.  The Backstop Parties shall be required to purchase the Reorganized Hertz Parent Interests issuable in connection with the HHN Subscription Rights pursuant to Article IV.L of the Plan.

The Rights Offering Procedures shall set forth limitations on the number of Holders Allowed Unsecured Funded Debt Claims that may exercise Subscription Rights such that the total number of holders of Reorganized Hertz Parent Interests following the Effective Date shall be less than [●] holders such that the Reorganized Hertz Parent Interests shall not be a class of securities that is required to be registered under Section 12 of the Exchange Act.  The New Organizational Documents shall contain restrictions on transfer in order to ensure that the Reorganized Hertz Parent Interests shall not subsequently be held by a number of holders that would require such class of securities to be registered under the Exchange Act.

The consummation of the Rights Offering is conditioned on the satisfaction or waiver (in accordance with the Backstop Commitment Agreement) of all conditions specified in the terms of the Backstop Commitment Agreement and the Rights Offering Procedures.

#### (c) Backstop

In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, on or prior to the Effective Date, each of the Backstop Parties shall purchase its Backstop Amount of the Rights Offering Shortfall pursuant to the Backstop Commitment Agreement.  There

AMERICAS 106663920

shall be no backstop fee or other commitment fee owed or payable to the Backstop Parties other than a [3-5]% break-up fee payable in the event of certain terminations of the Backstop Commitment Agreement in accordance with the terms thereof.

## 5. Issuance and Distribution of Reorganized Hertz Parent Interests

The issuance of the Reorganized Hertz Parent Interests in accordance with the Backstop Commitment Agreement and the Rights Offering Procedures shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

Any Entities' acceptance of Reorganized Hertz Parent Interests shall be deemed to be its agreement to be bound by the New Shareholders Agreement and the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.  The New Shareholders Agreement and New Organizational Documents, as applicable, shall be binding on all Entities receiving, and all holders of, the Reorganized Hertz Parent Interests (and their respective successors and assigns), whether any such Reorganized Hertz Parent Interests are received or to be received on or after the Effective Date, in each case, pursuant to the Plan and regardless of whether such Entity executes or delivers a signature page to the New Shareholders Agreement and the New Organizational Documents.  Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, (in consultation with the Plan Sponsors) may condition the receipt of any Reorganized Hertz Parent Interests issued pursuant to the Plan upon the recipient thereof duly executing and delivering to the Debtors (or the Reorganized Debtors, as applicable) counter-signature pages to the New Shareholders Agreement.

All of the shares of Reorganized Hertz Parent Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the Reorganized Hertz Parent Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

## 6. New Reorganized Debt

The Reorganized Debtors shall issue the New Reorganized Debt and provide any related guarantees, and the New Reorganized Debt will be made available to the Reorganized Debtors, pursuant to and subject to the terms and conditions set forth in the Exit Facility Documents, and subject to the Plan Sponsor Consent Rights.

Confirmation shall be deemed approval of the issuance and incurrence of the New Reorganized Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Court previously, the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to issue and incur the New Reorganized Debt and related guarantees, including the Exit Facility Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or

75

Reorganized Debtors may deem to be necessary to consummate the New Reorganized Debt, and subject to the Plan Sponsor Consent Rights.

### 7. Replacement of First Lien Letters of Credit

On or prior to the Effective Date, subject to the Plan Sponsor Consent Rights, the Debtors shall replace the outstanding and undrawn letters of credit issued pursuant to the First Lien Revolving LC Facility and the First Lien Standalone LC Facility with letters of credit issued pursuant to the Exit Facility Documents or otherwise backstop or cash collateralize such letters of credit. Contemporaneously therewith, all outstanding undrawn letters of credit issued under the First Lien Revolving LC Facility and First Lien Standalone LC Facility shall be canceled, unless otherwise backstopped or cash collateralized.

### 8. HVF II and Interim Fleet Financing Settlement

On or prior to the Effective Date, the Debtors shall cause HVF II to repay in full in Cash the then-outstanding obligations with respect to the HVF II Notes with the proceeds of a new asset backed securitization facility and/or securities to be issued by a newly formed non-Debtor bankruptcy remote subsidiary of Hertz Corp.

On or prior to the Effective Date, the Debtors may cause HVIF to repay in full in Cash the then-outstanding obligations with respect to the Interim Fleet Financing Notes with the proceeds of a new asset backed securitization facility and/or securities to be issued by a newly formed non-Debtor bankruptcy remote subsidiary of Hertz Corp.  To the extent HVIF does not repay in full in Cash the then-outstanding obligations with respect to the Interim Fleet Financing Notes, the Debtors shall assume all of their obligations with respect to the Interim Fleet Financing Facility pursuant to Article II.D, supra.

The Debtors shall consult with the Plan Sponsors with respect to the terms of the repayment of the HVF II Notes and the Interim Fleet Financing Notes with such terms subject to the Plan Sponsor Consent Rights.

The repayment of the HVF II Notes and, to the extent applicable, the Interim Fleet Financing Notes in full shall constitute the full and final satisfaction, settlement, release, and discharge of each HVF Claim and Interim Fleet Financing Administrative Claim against the Debtors, including any Administrative Claims granted under section 364(c) of the Bankruptcy Code.  Contemporaneously with the foregoing payment, (i) the HVF II Notes, the Series 2013-G1 Note, and, to the extent applicable, the Interim Fleet Financing Notes shall be deemed canceled; (ii) the HVF Facility Documents, the HVF II Facility Documents, and, to the extent applicable, the Interim Fleet Financing Documents shall be deemed terminated (except if utilized for HVF III), (iii) all Liens on property of HVF, HVF II, or, to the extent applicable, HVIF arising out of or related to the Series 2013-G1 Note, the HVF II Notes, or, to the extent applicable, the Interim Fleet Financing Notes shall automatically terminate, and all collateral subject to such applicable Liens shall be automatically released, in each case without further action by the HVF Trustee, HVF II Trustee, the HVF II Lenders, the HVIF Trustee, and the Interim Fleet Financing Lenders; and (iv) all undrawn letters of credit issued with respect to the HVF II Facility and, if applicable, the Interim Fleet Financing Facility shall be cancelled.  The (i) HVF Trustee, HVF II Trustee, the HVF II

Lenders, and (ii) to the extent applicable, the HVIF Trustee, and the Interim Fleet Financing Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by HVF, HVF II, HVIF, the Debtors or the Reorganized Debtors.

### 9. HVF III Fleet Financing

On or prior to the Effective Date, the Debtors may form a non-Debtor bankruptcy remote subsidiary or subsidiaries of Hertz Corp. to issue the HVF III asset-backed securitization facility and/or securities.  Simultaneously with the repayment in full of the HVF II Notes and, to the extent applicable, the Interim Fleet Financing Notes, the Debtors may use any of the vehicles in the HVF II Facility and, to the extent applicable, the Interim Fleet Financing Facility and/or the equity with respect to the HVF II Facility and, to the extent applicable, the Interim Fleet Financing Facility to support any facility or securities issued by HVF III.  The Debtors shall consult with the Plan Sponsors with respect to the terms of HVF III with such terms subject to the Plan Sponsor Consent Rights.

### 10. General Unsecured Claim and General Unsecured Elective Claim Recoveries

On or prior to the Effective Date, the Debtors shall establish and fund the General Unsecured Recovery Cash Pool Account with Cash in an amount equal to the General Unsecured Recovery Cash Pool Amount to fund the recoveries provided to Allowed General Unsecured Claims and Allowed General Unsecured Elective Claims.

As set forth in Article III.6 of the Plan no Holder of an Allowed General Unsecured Claim shall receive a recovery in excess of seventy (70%) percent of the amount of its Allowed General Unsecured Claim.  To the extent Allowed General Unsecured Claims and Allowed General Unsecured Elective Claims against the Debtors are less than $[547,000,000] such that the Pro Rata distribution of the General Unsecured Recovery Cash Pool Amount, after accounting for distribution to General Unsecured Elective Claims and application of insurance coverage, would result in a more than seventy (70%) percent recovery to Holders of Allowed General Unsecured Claims, the Distribution Agent may return any excess amount in the General Unsecured Recovery Cash Pool Account to the Reorganized Debtors.  The Distribution Agent may use its discretion to return excess amounts from the General Unsecured Recovery Cash Pool Account to the Reorganized Debtors; provided, that in no instance shall it return Cash to the Reorganized Debtors from the General Unsecured Recovery Cash Account such that the amount of Cash in the General Unsecured Recovery Cash Account would not be sufficient to pay Disputed General Unsecured Claims and Allowed General Unsecured Claims seventy (70%) percent of the asserted amount of such Disputed General Unsecured Claims and Allowed General Unsecured Claims.

The General Unsecured Recovery Cash Pool Account (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors; (ii) shall be held in trust to fund distributions on account of Allowed Unsecured Funded Debt Claims and Allowed General Unsecured Claims, as provided herein; and (iii) shall not be encumbered by any Liens, Claims, or Interests in any way (whether on account of the New Reorganized Debt or otherwise).

All parties to the Plan shall (i) treat the General Unsecured Recovery Cash Pool Account as a "disputed ownership fund" within the meaning of Treasury Regulations Section 1.468B-9(b)(1)

for U.S. federal income tax purposes, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All taxes imposed on assets or income of the General Unsecured Recovery Cash Pool Account will be payable from the assets of the General Unsecured Recovery Cash Pool.

### 11. Intercompany Claim Settlement

The entry of the Confirmation Order and the treatment accorded to General Unsecured Creditors pursuant to the Plan shall constitute a settlement pursuant to section 1123(b)(3) of all disputes relating to the Intercompany Claims and the allocation of value among the various Debtors.  The treatment of General Unsecured Claims as set forth herein conclusively resolves any such.

### 12. HHN Restructuring

On the Effective Date, (i) the Backstop Parties shall purchase the HHN Notes Guarantee Claim from the Holders of such Claim for $533,073,500, (ii) all of the HHN Subscription Rights shall be deemed to have been transferred to the Backstop Parties, pro rata based on their respective Backstop Commitment, and (iii) the Backstop Parties shall purchase all Reorganized Hertz Parent Interests issuable in connection with the HHN Subscription Rights.

Pursuant to the restructuring implementation deed entered into in connection with the Scheme of Arrangement, the primary obligations under the HHN Notes will be exchanged for, and each Holder of HHN Notes will receive, New HHN Notes in the principal amount of $237,031,500.

### 13. International Vehicle Financing Claims

On or prior to the Effective Date, as part of the restructuring of the business of HHN and its European subsidiaries, the Debtors shall cause the European Vehicle Financing Entities to enter into and consummate the European ABS Restructuring Settlement.  The entry of the Confirmation Order shall (i) constitute approval and authorization for the Debtors to perform their obligations under the European ABS Restructuring Settlement under Rule 9019 of the Bankruptcy Rules, (ii) approve the complete release of the Lombard Vehicle Financing Facility Guarantee, the European ABS Performance Guarantees and any claims related thereto, including the Lombard Facility Guarantee Claims and the European ABS Performance Guarantee Claims and (iii) the irrevocable disallowance of all such claims, which shall be permanently removed from the Claims Register.

On or prior to the Effective Date, as part of the restructuring of the business of Hertz Australia and its subsidiaries, the Debtors shall cause Hertz Australia and the Australian Financing Entity to enter into and consummate the Australian ABS Restructuring Settlement.  The entry of the Confirmation Order shall (i) constitute approval and authorization for the Debtors to perform their obligations under the Australian ABS Restructuring Settlement under Rule 9019 of the Bankruptcy Rules, (ii) approve the complete release of the Australian Performance Guarantee and any claims related thereto, including any Australian Performance Guarantee Claims, and (iii) the irrevocable disallowance of all such claims, which shall be permanently removed from the Claims Register.

AMERICAS 106663920

### 14. Corporate Existence

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal law, or other non-bankruptcy law).

### 15. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action (including, without express or implied limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), all Executory Contracts and Unexpired Leases assumed, but not assigned, by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 16. Cancellation of Existing Securities

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Effective Date (i) the Prepetition Debt Documents and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed canceled, discharged and of no force or effect, except, with respect to the Prepetition Debt Documents, as applicable, as necessary to (a) enforce the rights, Claims and interests of the First Lien Agent, the Second Lien Notes Agent, the Unsecured Notes Trustees, the 7.000% Unsecured Promissory Notes Trustee, as applicable, and any predecessor thereof vis-a-vis parties other than the Released Parties, (b) allow the receipt of and to make distributions under the Plan and the subsequent distribution of such amounts in accordance with the terms of the Prepetition Debt Documents, as

79

applicable, and (c) preserve any rights of (1) the First Lien Agent and any predecessor thereof as against any money or property distributable to Holders of First Lien Claims, including any priority in respect of payment, (2) the Second Lien Note Trustee and any predecessor thereof as against any money or property distributable to Holders of Second Lien Note Claims, (3) the 5.500% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 5.500% Unsecured Notes Claims, (4) the 6.000% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 6.000% Unsecured Notes Claims, (5) the 6.250% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 6.250% Unsecured Notes Claims, (6) the 7.000% Unsecured Promissory Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 7.000% Unsecured Promissory Notes Claims, and (7) the 7.125% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 7.125% Unsecured Notes Claims; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided that notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall also continue in effect to allow each of the First Lien Agent, the Second Lien Note Trustee, the Unsecured Notes Trustees, and the 7.000% Unsecured Promissory Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, without limitation, to enforce the respective obligations owed to such parties under the Plan.

Subsequent to the performance by: (i) the First Lien Agent of its obligations under the Plan, the First Lien Agent and its respective agents shall be relieved of all further duties and responsibilities related to the First Lien Loan Documents upon the occurrence of the Effective Date, except with respect to such other rights of the First Lien Agent that, pursuant to the First Lien Loan Documents, survive the termination of the First Lien Loan Documents; (ii) the Second Lien Note Trustee of its obligations under the Plan, the Second Lien Note Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the Second Lien Loan Documents upon the occurrence of the Effective Date, except with respect to such other rights of the Second Lien Note Trustee that, pursuant to the Second Lien Loan Documents, survive the termination of the Second Lien Loan Documents; (iii) the 5.500% Unsecured Notes Trustee of its obligations under the Plan, the 5.500% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 5.500% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 5.500% Unsecured Notes Trustee that, pursuant to the 5.500% Unsecured Notes Documents, survive the termination of the 5.500% Unsecured Notes Documents; (iv) the 6.000% Unsecured Notes Trustee of its obligations under the Plan, the 6.000% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 6.000% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 6.000% Unsecured Notes Trustee that, pursuant to the 6.000% Unsecured Notes Documents, survive the termination of the 6.000% Unsecured Notes Documents; (v) the 6.250% Unsecured Notes Trustee of its

AMERICAS 106663920

obligations under the Plan, the 6.250% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 6.250% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 6.250% Unsecured Notes Trustee that, pursuant to the 6.250% Unsecured Notes Documents, survive the termination of the 6.250% Unsecured Notes Documents; (vi) the 7.000% Unsecured Promissory Notes Trustee of its obligations under the Plan, the 7.000% Unsecured Promissory Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 7.000% Unsecured Promissory Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 7.000% Unsecured Promissory Notes Trustee that, pursuant to the 7.000% Unsecured Promissory Notes Documents, survive the termination of the 7.000% Unsecured Promissory Notes Documents; (vii) the 7.125% Unsecured Notes Trustee of its obligations under the Plan, the 7.125% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 7.125% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 7.125% Unsecured Notes Trustee that, pursuant to the 7.125% Unsecured Notes Documents, survive the termination of the 7.125% Unsecured Notes Documents.

If the record Holder of any of the Second Lien Notes or Unsecured Notes is DTC or its nominee or another securities depository or custodian thereof, and such Second Lien Notes or Unsecured Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Second Lien Notes or Unsecured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

The commitments and obligations, if any, of the DIP Lender to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 17. Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable (i) the issuance of the Reorganized Hertz Parent Interests; (ii) the selection and appointment of the directors and officers for Reorganized Hertz Parent and the other Reorganized Debtors; (iii) implementation of the Restructuring Transactions; and (iv) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon

AMERICAS 106663920

the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Hertz Parent and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Hertz Parent, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, directors, or officers of the Debtors, Reorganized Hertz Parent, or the other Reorganized Debtors.  On or before the Effective Date, as applicable, the appropriate officers of the Debtors, Reorganized Hertz Parent, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of Reorganized Hertz Parent and the other Reorganized Debtors, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by Article IV.Q of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 18. New Organizational Documents

To the extent required under the Plan, or applicable non-bankruptcy law, on the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors will File such New Organizational Documents as are required to be Filed with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents, and the Reorganized Debtors may File their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents. Additionally, on the Effective Date, each recipient of Reorganized Hertz Parent Interests will be deemed to be a party to the New Shareholders Agreement, and the Reorganized Hertz Parent Interests will be subject to the Reorganized Hertz Parent Organizational Documents.

### 19. Reorganized Hertz Parent and Reorganized Hertz Corp. Board

As of the Effective Date, except as set forth in Article IV.S of the Plan, all directors, managers, and other members of existing boards or governance bodies of Hertz Parent and Hertz Corp., as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the new boards of directors for Reorganized Hertz Parent and Reorganized Hertz Corp.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Hertz Parent and Reorganized Hertz Corp.  To the extent any such director or officer of the Reorganized Hertz Parent and Reorganized Hertz Corp. is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such direct or officer.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the Employment Agreements (assumed and assigned to the Reorganized Debtors subject to the Plan Sponsor Consent Rights), and other constituent documents of the Reorganized Debtors.  The selection of directors and officers of Reorganized Hertz Parent and Reorganized Hertz Corp. shall

AMERICAS 106663920

be selected commensurate with ownership levels, with the Plan Sponsors having appointment rights with respect to a majority of each board and approval rights with respect to a minority of each board.

### 20. Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance,  transfer or exchange of any securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the Exit Facility Documents, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

### 21. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement.  The Reorganized Debtors (in consultation with the Plan Sponsors) shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity not released pursuant to Article VIII.D of the Plan; including, but not limited to, the Specified Non-Released Parties discussed in Section II.J.3 of this Disclosure Statement**.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Causes of Action against it.   Unless such Causes of Action against any Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Causes of Action shall be expressly reserved by the Debtors or the Reorganized Debtors, as applicable, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or

otherwise) or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.

### 22. Insurance Policies and Surety Bonds

#### (a) Director and Officer Liability Insurance

All of the unexpired D&O Liability Insurance Policies that the Debtors are party to, any extensions, renewals, or replacements thereof, and any agreements, documents, or instruments relating thereto, shall be treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies and any agreements, documents, or instruments relating thereto with respect to the Debtors' directors, managers, officers, and employees, as applicable, who served in such capacity at any time on or prior to the Effective Date pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies and any agreements, documents, or instruments relating thereto.

On or before the Effective Date, the Debtors, on behalf of the Reorganized Debtors will obtain the Tail D&O Policy.

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any director, officer, manager, and employee insurance policies (including the "tail policy") in effect on the Effective Date, including the Tail D&O Policy, with respect to conduct occurring prior thereto, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies and related documents, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be Filed.

Nothing in the Plan or the Confirmation Order shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurer or (b) any rights or obligations of the Debtors or the Reorganized Debtors arising out of or under any Insurance Policy. The Insurers, the Debtors, and Reorganized Debtors, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds and the

84

Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.  Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control. For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan.

Further, for the avoidance of doubt, nothing in this Article IV.V is intended or shall be construed to preclude otherwise applicable principles of res judicata or collateral estoppel from being applied against any Insurer with respect to any issue that is actually litigated by such Insurer as part of its objections, if any, to Confirmation or as part of any contested matter or adversary proceeding filed by such Insurer in conjunction with or related to Confirmation.

**(b) Other Insurance Policies**

Each of the Debtors' Insurance Policies and any agreements, documents, or instruments relating thereto, in existence as of the Effective Date shall be treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, each Insurance Policy to which a Debtor is a party as of the Effective Date shall be Reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the applicable Reorganized Debtor pursuant to section 365 of the Bankruptcy Code and Article V of the Plan, unless such Insurance Policy (i) was rejected by the Debtors pursuant to an order of the Bankruptcy Court, (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing, or (iii) previously assumed by a Final Order.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of such unexpired Insurance Policies.

Nothing in the Plan shall affect, impair or prejudice the rights of the Insurers, the insureds, the Debtors, and the Reorganized Debtors, as applicable, under the insurance policies in any manner, and such Insurers, the insureds, the Debtors, and Reorganized Debtors, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds, and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date.

**(c) Surety Bonds**

On the Effective Date, (i) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Reorganized Debtors, (ii) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Reorganized Debtor and will survive and remain unaffected by entry of the Confirmation Order, and (iii) the Reorganized Debtors shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, in the ordinary course of business. The applicable Reorganized Debtors will continue to pay all premiums and other amounts due, including loss adjustment expenses, on the existing surety bonds as they become due prior to the execution and issuance of new surety bonds. Surety bond providers shall have the discretion to replace (or issue name-change riders with

AMERICAS 106663920

respect to) any existing surety bonds or related general agreements of indemnity with new surety bonds and related general agreements of indemnity on the same terms and conditions provided in the applicable existing surety bonds or related general agreements of indemnity.

### 23. Management Equity Incentive Plan

On the Effective Date, equity grants under the Management Equity Incentive Plan shall be reserved for certain of the directors, officers, and employees of the Reorganized Debtors on terms acceptable to the Reorganized Hertz Parent Board with respect to [5.0-10.0%] of the fully diluted equity of Reorganized Hertz Parent, as disclosed pursuant to the Plan Supplement.    The Management Equity Incentive Plan shall be approved at the first meeting of the Reorganized Hertz Parent Board, without any further action by the Bankruptcy Court.

### 24. Employee Obligations

Except as (i) otherwise provided in the Plan or Plan Supplement; (ii) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (iii) was rejected by the Debtors pursuant to a Bankruptcy Court order; or (iv) is the subject of a motion to reject pending on the date of the Confirmation Hearing, the Reorganized Debtors shall honor the Debtors' Employee Obligations and, to the extent not already satisfied, the Debtors' Employee Obligations shall become obligations of the Reorganized Debtors in accordance with their terms.  To the extent the Employee Obligations are executory contracts and (i) such executory contracts are not identified on the Rejected Executory Contracts and Unexpired Leases Schedule, (ii) were not previously rejected by a Final Order, pursuant to section 365 and 1123 of the Bankruptcy Code, or (iii) are not the subject of a motion to reject pending on the date of the Confirmation Hearing, each will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; provided, that, the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the above-listed written contracts, agreements, policies, programs and plans.    Notwithstanding anything else set forth in this paragraph, the cure provisions of Article V.C of the Plan shall apply to any Employee Obligation arising from an Executory Contract assumed in accordance with the provisions of Article V of the Plan.

Employee Obligations include any written contracts, agreements, policies, programs, and plans (as from time to time amended or restated) applicable to employees or directors for regular compensation (including wages, salary, commissions, and incentives), bonus programs approved by the Bankruptcy Court pursuant to the 2020 EIP Order and the 2021 KEIP/EIP Order, expense reimbursements, vacation and sick leave benefits, employee and retiree health care, vision, and dental benefits, employee and retiree life insurance benefits, disability insurance benefits, accidental death and dismemberment insurance benefits, qualified retirement programs, employee relocation programs, employee and director vehicle use policies, commuter benefits, adoption assistance benefits, employee, director, and retiree discount programs, and other employee welfare plan benefits in effect immediately prior to the Effective Date.  For the avoidance of doubt, the Employee Obligations do not include any contracts, agreements, arrangements, letters, policies, programs, or plans (as from time to time amended or restated) for deferred compensation, non-qualified retirement benefits, severance, or other employment termination benefits.

86

On the Effective Date, subject to the Plan Sponsor Consent Right, each Employment Agreement will be deemed assumed and shall become obligations of the Reorganized Debtors in accordance with their terms.

Notwithstanding anything to the contrary in the Plan, as of the Effective Date, any provision of an Employee Obligation that provides for equity-based awards, including any termination-related provisions with respect to equity-based awards, shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding anything to the contrary in the Plan, in accordance with section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to honor all retiree benefits, as such term is defined in section 1114(a) of the Bankruptcy Code, as and to the extent required by the agreements giving rise to such obligations.

### 25. Defined Benefit Qualified Pension Plans of Hertz and Non-Debtor Affiliate Puerto Ricancars, Inc.

PBGC is a wholly-owned United States government corporation and agency created under Title IV of ERISA to administer the federal pension insurance program and to guarantee the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. Debtor The Hertz Corporation sponsors The Hertz Corporation Account Balance Defined Benefit Pension Plan (defined in the Plan as the "Defined Benefit Plan"), which is covered by Title IV of ERISA.  The Hertz Corporation also administers two plans that are covered by Title IV of ERISA and are sponsored by its non-debtor affiliate, Puerto Ricancars, Inc.: (1) the Retirement Plan for Employees of Puerto Ricancars, Inc. and Related Companies Residing in the Commonwealth of Puerto Rico (the "**PR Pension Plan**"), and (2) the Retirement Plan for Employees of Puerto Ricancars, Inc. and Related Companies Residing in St. Thomas U.S. Virgin Islands (the "**VI Pension Plan**" and, together with the Defined Benefit Plan and PR Pension Plan, the "**Pension Plans**").  PBGC asserts that the other Debtors are each members of The Hertz Corporation and Puerto Ricancars, Inc.'s controlled group, as defined in 29 U.S.C. § 1301(a)(14).

Under the Plan the Debtors and Reorganized Debtors will continue and assume the Pension Plans to the extent of their respective obligations under the Pension Plans and applicable law.  The distress termination provisions of 29 U.S.C. § 1341(c) or the provisions for PBGC initiation of 29 U.S.C. § 1342(a) govern termination of the Pension Plans.  However, if any of the Pension Plans were to terminate, the PBGC asserts that the sponsor of the terminated Pension Plan and all members of its controlled group are jointly and severally liable for the unfunded benefit liabilities of the terminated Pension Plan.  PBGC has asserted estimated contingent claims against each of the Debtors for unfunded benefit liabilities in the amount of approximately $130.6 million for the Hertz Pension Plan, $1.3 million for the PR Pension Plan, and $102,000 for the VI Pension Plan. PBGC has asserted that these termination liability claims are entitled to priority under 11 U.S.C. § 507(a)(2) and (a)(8) in unliquidated amounts.  The Debtors and Reorganized Debtors reserve all rights relating to any asserted liability, including but not limited to the validity, priority, and amount of such claims.

PBGC asserts that the sponsors of the Pension Plans and all other members of their controlled group are obligated to pay the contributions necessary to satisfy the minimum funding standards

AMERICAS 106663920

under sections 412 and 430 of Title 26 of the United States Code (the "**Internal Revenue Code**") and sections 302 and 303 of ERISA.  PBGC has asserted an unliquidated claim against each of the Debtors for any unpaid required minimum contributions owed to the Pension Plans.  PBGC has asserted that the claim for required minimum contributions owed is entitled to priority under 11 U.S.C. § 507(a)(2) and (a)(5) in the amounts of the unpaid contributions.  The Debtors and Reorganized Debtors reserve all rights relating to any asserted liability, including but not limited to the validity, priority, and amount of such claims.

PBGC asserts that the sponsors of the Pension Plans and all other members of their controlled group are jointly and severally liable to PBGC for all premium obligations owed to the Pension Plans.  PBGC has asserted a claim against each of the Debtors for unpaid statutory premiums, if any, owed to PBGC on behalf of the Pension Plans in an unliquidated amount.  The Debtors and Reorganized Debtors reserve all rights relating to any asserted liability, including but not limited to the validity, priority, and amount of such claims.

If any of the Pension Plans terminate in a distress or PBGC-initiated termination during the course of the bankruptcy proceeding, PBGC has asserted that the sponsor of the terminated Pension Plan and its controlled group are liable to PBGC for a termination premium at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7).  PBGC asserts that if a Pension Plan is terminated prior to confirmation of the Plan, the obligation to PBGC for termination premiums does not exist until after the Plan is confirmed and the Debtors have exited bankruptcy.  PBGC asserts that, under these circumstances, termination premiums are not a dischargeable claim or debt within the meaning of the Bankruptcy Code.  PBGC estimates that the amounts of the termination premium liability would total approximately $84 million for the Defined Benefit Plan, $259,000 for the PR Pension Plan, and $49,000 for the VI Pension Plan. The Debtors and Reorganized Debtors reserve all rights relating to any asserted liability, including but not limited to the validity, priority, and amount of such claims.

On the Effective Date the Reorganized Debtors shall assume and continue to maintain the Pension Plans in accordance with their terms (as such terms may be amended from time to time) and applicable non-bankruptcy law (and the Reorganized Debtors reserve all rights thereunder).

After the Effective Date, the Reorganized Debtors shall, in the ordinary course of their business, as and to the extent required by the Pension Plans' governing documents and in accordance with applicable non-bankruptcy law:  (i) satisfy the minimum funding requirements under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083; (ii) pay all required premiums, if any, owed to PBGC under 29 U.S.C. §§ 1306 and 1307, for the Pension Plans under ERISA or the Internal Revenue Code; and (iii) administer the Pension Plans in accordance with the applicable provisions of ERISA and the Internal Revenue Code (and the Reorganized Debtors reserve all rights thereunder).

Since the Plan provides that the Reorganized Debtors will continue the Pension Plans, PBGC and the Debtors agree that all Proofs of Claim filed by PBGC shall be deemed withdrawn on the Effective Date without incurring liability in the bankruptcy.

No provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve the Reorganized Debtors, their

AMERICAS 106663920

successors, or individuals from liabilities or requirements imposed under any law or regulatory provision with respect to the Pension Plans or from claims of the PBGC with respect to the Pension Plans. PBGC and the Pension Plans will not be enjoined or precluded from enforcing such liability with respect to the Pension Plans as a result of any provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code.

### 26. Workers' Compensation Programs

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance. All Proofs of Claims on account of workers' compensation shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided that* nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

### 27. Collective Bargaining Agreements

On or prior to the Effective Date, and subject to the occurrence of the Effective Date, the Reorganized Debtors shall assume the Collective Bargaining Agreements.

### E. Treatment of Executory Contracts and Unexpired Leases

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (i) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (ii) have been previously rejected by a Final Order; (iii) have been previously assumed or assumed and assigned by a Final Order; (iv) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (v) the Debtors have, as of the Confirmation Date, received authority to reject pursuant to an order of the Bankruptcy Court and which the effective date of such rejection is after the Effective Date; (vi) providing for payment of severance or other benefits to former employees of the Debtors (other than retiree benefits within the meaning of such term in section 1114(a) of the Bankruptcy Code); and (vii) solely with a Donlen Debtor, which to the extent not previously assumed by a Final Order shall be deemed to be rejected; provided, that the Debtors reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause. Notwithstanding anything to the contrary contained in the Plan, the Plan Support Agreement shall be assumed by the Debtors on the Effective Date pursuant to the Plan. Notwithstanding anything to the contrary contained herein, to the extent not already

89

approved by the Court, all assumptions, assumptions and assignments, or rejection shall be subject to the Plan Sponsor Consent.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contracts and Unexpired Leases Schedule, the Collective Bargaining Agreement Schedule, and the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  The Debtors are authorized to abandon any of the Debtors' personal property at or on the leased premises subject to an Unexpired Lease rejected pursuant to the Plan, and the counterparties to rejected leases may dispose of any such personal property remaining at or on the leased premises following the applicable lease rejection date.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease).  Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors with any such disposition to be deemed effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti-assignment," "change of control," consent right or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

## 2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease.  **Any Claims arising from the rejection of an Executory Contract or**

**Unexpired Lease not Filed within such time will be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**.  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims or General Unsecured Elective Claims and shall be treated in accordance with <u>Article III.B.6 and Article III.B.7</u> of the Plan, and such claims may be objected to in accordance with the Plan.

### 3.   Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the cure amount set forth on the Assumed Executory Contracts or Unexpired Leases Schedule or the Collective Bargaining Agreement Schedule, as applicable, for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or the Reorganized Debtors, as applicable, may otherwise agree.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable; provided that, nothing herein shall prevent the Reorganized Debtors from paying any Cure Claim despite the failure of the relevant counterparty to File such request for payment of such Cure Claim.

Unless otherwise provided by an order of the Bankruptcy Court, on or before the date on which the relevant Plan Supplement is Filed, the Debtors shall File the Assumed Executory Contracts and Unexpired Leases Schedule and cause such schedule or notices of proposed assumption and proposed amounts of Cure Claims to be served by overnight mail on counterparties to Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan that are identified in such Plan Supplement.  Any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed, served and actually received by the Debtors no later than the deadline to object to Confirmation of the Plan.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption and to the applicable cure amount.

**Any party that fails to timely object to the assumption of the Executory Contracts or Unexpired Leases (including the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed) and**

AMERICAS 106663920

**the applicable cure amount listed on the Assumed Executory Contracts and Unexpired Leases Schedule or the Collective Bargaining Agreement Schedule as set forth in the paragraph above shall be forever barred, estopped, and enjoined from disputing the cure amount set forth on the Assumed Executory Contracts and Unexpired Lease Schedule or the Collective Bargaining Agreement Schedule (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.**

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease; provided that the Debtors or the Reorganized Debtors, as applicable, will remain obligated to pay any accrued but unbilled amounts under any such assumed Executory Contract or Unexpired Lease to the extent that such unbilled amounts were not due to be billed prior to the date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable cure amount.

### 4. Assumption Dispute Resolution

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or the cure payments required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "**Assumption Dispute**") shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (the "Adjourned Cure Dispute"); *provided that* the Reorganized Debtors may settle any Adjourned

AMERICAS 106663920

Cure Dispute after the Effective Date without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

## 5.  Indemnification Obligations

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, unless such obligation (i) was rejected by the Debtors pursuant to a Final Order or (ii) is the subject of a motion to reject that is pending as of the date of the Confirmation Hearing.  Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

## 6.  Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, and not assigned to a non-Debtor Entity, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of its operations.  Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

## 7.  Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

## 8.  Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumed Executory Contracts and Unexpired Leases Schedule or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  For the avoidance of doubt, the Debtors reserve all rights with respect to any Causes of Action or other right with respect to any Executory Contract or Unexpired Lease.

AMERICAS 106663920

### 9.   Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)

If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## F.   Provisions Governing Distributions

### 1.   Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Initial Distribution Date (or, if a Claim is not an Allowed Claim on the Initial Distribution Date, on the next Quarterly Distribution Date following the date that such Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), except with respect to General Unsecured Claims, the Distribution Agent shall make initial distributions under the Plan on account of each Holder of an Allowed Claim in the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

With respect to Holders of General Unsecured Claims, the Distribution Agent may make partial distributions on account of Allowed General Unsecured Claims before all General Unsecured Claims are Allowed to account for the future Allowance of Disputed General Unsecured Claims. With respect to General Unsecured Claims that are Allowed as of the Effective Date, the amount of the Effective Date distribution will be calculated as if each Disputed General Unsecured Claim in Class 6 were Allowed equal to the lesser amount of (a) the asserted amount of such Claim and (b) the amount estimated by the Bankruptcy Court in accordance with Article VII.D of the Plan, if applicable.  On each Quarterly Distribution Date, the Distribution Agent shall make additional Pro Rata distributions to Holders of Allowed General Unsecured Claims until such Claims have received the maximum recovery available to Holders of General Unsecured Claims under the Plan.

### 2.   Special Rules for Distributions to Holders of Disputed Claims and Interests

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the Debtors or the Reorganized Debtors, (i) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (ii) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on account of the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Disputed Claims have been Allowed or expunged.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a

94

Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

### 3. Rights and Powers of Distribution Agent

#### (a) Powers of the Distribution Agent

The Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof. The Distribution Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of any creditor pools created hereunder for all taxable periods through the date on which final distributions are made.

#### (b) Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including any taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent shall be paid in Cash by the Reorganized Debtors.

### 4. Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### (a) Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. For the avoidance of doubt, the Distribution Record Date shall not apply to the First Lien Claims, Second Lien Note Claims, Unsecured Funded Debt Claims, the Holders of which shall receive a distribution in accordance with this Article VI and, as applicable, the customary procedures of DTC on or as soon as practicable after the Effective Date.

#### (b) Delivery of Distributions

##### (i) Quarterly Distribution Date

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, but in any event, no later than thirty (30) days after each Quarterly Distribution Date, the Distribution Agent shall make the distributions required to be made on account of Allowed Claims under the Plan on such date. No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.A of the Plan.

AMERICAS 106663920

### (ii) Delivery of Distributions On Account of First Lien Claims

All distributions to Holders of First Lien Claims shall be deemed completed when made to (or at the direction of) the First Lien Agent, which shall be deemed to be the Holder of all First Lien Claims for purposes of distributions to be made hereunder. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the First Lien Agent shall cause such distributions to be made to or on behalf of such Holders in accordance with the First Lien Credit Agreement. If the First Lien Agent is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the First Lien Agent's cooperation, shall make such distributions to the extent practicable to do so. The First Lien Agent shall have no duties or responsibilities relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a First Lien Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.

### (iii) Delivery of Distributions on Account of Second Lien Note Claims

All distributions to Holders of Second Lien Note Claims shall be deemed completed when made to (or at the direction of) the Second Lien Note Trustee, which shall be deemed to be the Holder of all Second Lien Note Claims for purposes of distributions to be made hereunder, and the Second Lien Note Trustee shall hold or direct such distributions for the benefit of the Holders of Second Lien Note Claims. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the Second Lien Note Trustee shall arrange to deliver such distributions to be made to or on behalf of such Holders in accordance with the Second Lien Note Indenture. If the Second Lien Note Trustee is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the Second Lien Note Trustee's cooperation, shall make such distributions to the extent practicable to do so. The Second Lien Note Trustee shall have no duties or responsibilities relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a Second Lien Note Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.

### (iv) Delivery of Distributions on Account of Unsecured Notes Claims

*5.500% Unsecured Notes Claims*. All distributions to Holders of 5.500% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 5.500% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 5.500% Unsecured Notes Claims for purposes of distributions to be made hereunder; *provided that* non-Cash consideration shall not be distributed in the name of the 5.500% Unsecured Notes Trustee. As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the 5.500% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 5.500% Unsecured Notes Indenture.

*6.000% Unsecured Notes Claims*. All distributions to Holders of 6.000% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 6.000% Unsecured Notes

AMERICAS 106663920

Trustee, which shall be deemed to be the Holder of all 6.000% Unsecured Notes Claims for purposes of distributions to be made hereunder; *provided that* non-Cash consideration shall not be distributed in the name of the 6.000% Unsecured Notes Trustee.  As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the 6.000% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 6.000% Unsecured Notes Indenture.

*6.250% Unsecured Notes Claims*.  All distributions to Holders of 6.250% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 6.250% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 6.250% Unsecured Notes Claims for purposes of distributions to be made hereunder; *provided that* non-Cash consideration shall not be distributed in the name of the 6.250% Unsecured Notes Trustee.  As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the 6.250% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 6.250% Unsecured Notes Indenture.

*7.125% Unsecured Notes Claims*.  All distributions to Holders of 7.125% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 7.125% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 7.125% Unsecured Notes Claims for purposes of distributions to be made hereunder; *provided that* non-Cash consideration shall not be distributed in the name of the 7.125% Unsecured Notes Trustee.  As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the 7.125% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 7.125% Unsecured Notes Indenture.

*7.000% Unsecured Promissory Notes Claims*.  All distributions to Holders of 7.000% Unsecured Promissory Notes Claims shall be deemed completed when made to (or at the direction of) the 7.000% Unsecured Promissory Notes Trustee, which shall be deemed to be the Holder of all 7.000% Unsecured Promissory Notes Claims for purposes of distributions to be made hereunder; *provided that* non-Cash consideration shall not be distributed in the name of the 7.000% Unsecured Promissory Notes Trustee.  As soon as practicable in accordance with the requirements set forth in Article VI of the Plan, the 7.000% Unsecured Promissory Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 7.000% Unsecured Promissory Notes Indenture.

If any of the applicable Unsecured Notes Trustees are unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the cooperation of the applicable Unsecured Notes Trustee shall make such distributions to the extent practicable to do so.  The Unsecured Notes Trustees shall have no duties or responsibilities relating to any form of distribution that is not DTC eligible.  The Unsecured Notes Trustees, and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a Unsecured Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Unsecured Notes Trustees may transfer or direct the transfer of such distributions directly through facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of Unsecured Note Claims to the extent consistent with the customary practices of DTC.

### (v) Delivery of Distributions on Account of the HHN Notes Guaranty Claims

Following the purchase of the HHN Notes Guarantee Claims by the Plan Sponsors pursuant to Article IV.L of the Plan all distributions to Holders of HHN Notes Guaranty Claims shall be deemed completed when made to (or at the direction of) the Plan Sponsors, which shall be deemed to be the Holder of all HHN Notes Guaranty Claims for purposes of distributions to be made hereunder.

### (vi) Delivery of Distributions on Account of ALOC Facility Claims

All distributions to Holders of ALOC Facility Claims shall be deemed completed when made to (or at the direction of) the ALOC Facility Agent, which shall be deemed to be the Holder of all ALOC Facility Claims for purposes of distributions to be made hereunder; provided that non-Cash consideration shall not be distributed in the name of the ALOC Facility Agent.  As soon as practicable in accordance with the requirements set forth in this Article VI of the Plan, the ALOC Facility Agent shall cause such distributions to or on behalf of such Holders to be made in accordance with ALOC Facility Documents.

### (vii) Delivery of Distributions on Account of Allowed General Unsecured Claims and Allowed General Unsecured Elective Claims

The Distribution Agent shall make distributions to Holders of Allowed General Unsecured Claims and Allowed General Unsecured Elective Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided that the address for each Holder of an Allowed Unsecured Claim or Allowed General Unsecured Elective Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder or the address provided to the Distribution Agent by the Holder in writing after the Effective Date, or, if no Proof of Claim has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

### (c) No Fractional Subscription Rights

No fractional Subscription Rights shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of Subscription Rights that are not a whole number, such Subscription Rights, as applicable, shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number, and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof.  The total number of Subscription Rights to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

### (d) Minimum Distribution

No Cash payment of less than $100 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

AMERICAS 106663920

**(e) Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution.  After such date, all unclaimed property or interests in property shall be redistributed Pro Rata as provided under the Plan (it being understood that, for purposes of Article VI.D.2.d.5. of the Plan, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed) and all other unclaimed property or interests in property shall revert to the Reorganized Debtors without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, state, or other jurisdiction's escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (iii) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

**5. Securities Registration Exemption**

All shares of Reorganized Hertz Parent Interests issued under the Plan, other than to the Backstop Parties pursuant to the Rights Offering and the Backstop Parties Direct Equity Investment (and otherwise pursuant to the Rights Offering to the extent an exemption under section 1145 of the Bankruptcy Code is not available), will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. Shares of Reorganized Hertz Parent Interests issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable federal, state, or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The Reorganized Hertz Parent Interests issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (ii) will, subject to the New Shareholders Agreement and the Reorganized Hertz Parent Organizational Documents, be freely tradable and transferable by any holder thereof that (a) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, (c) has not acquired the Reorganized Hertz Parent Interests from an "affiliate" within one year of such transfer, and (d) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.  Reorganized Hertz Parent Interests issued to Holders of Unsecured Funded Debt Claims in exchange for such Claims, shall be issued in reliance on section 1145 of the Bankruptcy Code.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

AMERICAS 106663920

[To the extent an exemption under section 1145 of the Bankruptcy Code is not available, the issuance and sale, as applicable, of the Reorganized Hertz Parent Interests issued to the Backstop Parties pursuant to the Rights Offering and the Backstop Parties Direct Equity Investment (and otherwise pursuant to the Rights Offering to the extent an exemption under section 1145 of the Bankruptcy Code is not available) and/or the Management Equity Incentive Plan are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D thereunder.  Such Securities will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws.  Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.]

The Rights Offering Procedures shall set forth limitations on the number of Holders Allowed Unsecured Funded Debt Claims that may exercise Subscription Rights such that the total number of holders of Reorganized Hertz Parent Interests following the Effective Date shall be less than [●] holders such that the Reorganized Hertz Parent Interests shall not be a class of securities that is required to be registered under Section 12 of the Exchange Act.  The Reorganized Debtor Organizational Documents shall contain restrictions on transfer in order to ensure that the Reorganized Hertz Parent Interests shall not subsequently be held by a number of holders that would require such class of securities to be registered under the Exchange Act.

### 6. Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, Reorganized Hertz Parent, the other Reorganized Debtors, and the Distribution Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Reorganized Debtors and the Distribution Agent may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim provide any information necessary to allow the distributing party to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority.  If the Reorganized Debtors or the Distribution Agent make such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtors and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

AMERICAS 106663920

### 7.  Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as allowed in the Plan.

### 8.  No Postpetition or Default Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition and default interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 9.  Setoffs and Recoupment

Except as otherwise expressly provided in the Plan, the Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim they may have against the Holder of such Claim.  In no event shall any Holders of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless (i) the Debtors have consented; and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### 10.  Claims Paid or Payable by Third Parties

#### (a)  Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

#### (b)  Claims Payable by Insurers

Plan Distributions to each holder of an Allowed Insured Claim against any Debtor shall be made in accordance with the treatment provided under the Plan for the Class in which such Allowed

AMERICAS 106663920

Insured Claim is classified; except, that there shall be deducted from any Plan Distribution on account of an Insured Claim, for purposes of calculating the Allowed amount of such Claim, the amount of any insurance proceeds actually received by such holder in respect of such Allowed Insured Claim.  Nothing in Section VI.J.2 of the Plan shall constitute a waiver of any Claim, right, or Cause of Action the Debtors or their Estates may hold against any Person, including any Insurer. Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge any Insurer from any obligations to any Person under applicable law or any Insurance Policies or any rights to pursue and receive any recovery from an Insurer under the Insurance Policies.

### (c) Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan or this Disclosure Statement constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such Insurers.

## G.  Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

### 1.  Allowance of Claims

After the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim.

### 2.  Claims and Interests Administration Responsibilities

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors and the Distribution Agent shall have the authority (i) to File, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.U of the Plan.

### 3.  ADR Procedures

Designated Claims shall be subject to and resolved in accordance with the ADR Procedures, attached to the Plan as Exhibit A, and incorporated herein by reference.  If the ADR Procedures are terminated with respect to a Designated Claim, the Reorganized Debtors or the Distribution

Agent, as applicable, shall have until the Claim Objection Deadline or, if the Claim Objection Deadline has passed, one hundred and eighty (180) days from the date of termination of the ADR Procedures with respect to such Claim to file and serve an objection to such Claim.

**4. Estimation of Claims**

Before or after the Effective Date, except as otherwise set forth in the ADR Procedures, the Debtors, the Distribution Agent, or the Reorganized Debtors, as applicable, and in consultation with the Plan Sponsors, may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

If the Debtors determine, in their reasonable discretion and in consultation with the Committee and the Plan Sponsors, that (i) one or more Disputed General Unsecured Claims are capable of estimation by the Bankruptcy Court, (ii) estimation will materially improve Effective Date distributions to Holders of Allowed General Unsecured Claims, (iii) administration of the ADR Procedures with respect to such claims is not reasonably likely to lead to an efficient and successful resolution of such Claim, and (iv) estimation is otherwise in the best interests of the Estates, the Debtors shall file one or more motions to estimate such Disputed General Unsecured Claims, which motion(s) shall be filed and noticed to be heard by the Bankruptcy Court before the Effective Date (or such other date as determined by the Bankruptcy Court).

**5. Adjustment to Claims Register Without Objection**

Any duplicate Claim or Interest or any Claims (Filed or scheduled) or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors upon stipulation or any agreement in writing, including, without limitation, email correspondence, between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

AMERICAS 106663920

### 6.  Time to File Objections to Claims

Any objections to a Claim shall be Filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

### 7.  Disallowance of Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

All Proofs of Claim Filed on account of an Employee Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Entities elect to honor such Obligation, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or otherwise agreed by the Debtors or the Reorganized Debtors (as applicable), any and all Proofs of Claim Filed after the applicable Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless the Bankruptcy Court shall have determined by a Final Order, on or before the Confirmation Hearing, that cause exists to extend the Claims Bar Date as to such Proof of Claim on the basis of excusable neglect.**

### 8.  Amendments to Proofs of Claims

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim or Proof of Claims Filed after the Effective Date shall be deemed Disallowed in full and expunged without any further action or notice to the Bankruptcy Court.

### 9.  Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged

AMERICAS 106663920

notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim is no longer contingent.

### 10. No Distributions Pending Allowance

Except as otherwise set forth in the Plan, if (i) an objection to a Claim or portion thereof is Filed or (ii) the Claim has elected to participate in the ADR Procedures, no payment or distribution provided under the Plan shall be made on account of such Disputed Claims or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

### 11. Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date.

### 12. Single Satisfaction of Claims

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one hundred 100 percent of the underlying Allowed Claim plus applicable interest, if any.

## H.  Settlement, Release, Injunction, and Related Provisions

### 1.  Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  The compromises, settlements, and releases described in the Plan shall be deemed nonseverable from each other and from all other terms of the Plan.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of

AMERICAS 106663920

the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

### 2.   Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any Claims for withdrawal liability that relate to services performed by employees of the Debtors before the Effective Date or that arise from a termination of employment, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.   The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

### 3.   Releases by the Debtors

**The Plan provides for a release of the Released Parties by the Debtors, their Estates, and Reorganized Debtors, and certain related persons with respect to certain matters as described in the immediately succeeding paragraph.  The Released Parties are each of the following in their capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) each of the Debtors' Estates; (iv) the Plan Sponsors; (v) the Backstop Parties; and (vi) with respect to each of the foregoing Entities in clauses (i) through (iv), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in its capacity as such; <u>provided</u>, <u>that</u> notwithstanding anything set forth above, the Clawback Defendants, Accenture LLP, the Herc Parties (solely with respect to Claims arising from the**

AMERICAS 106663920

Herc Documents), and the Donlen Debtors and their direct and indirect subsidiaries (solely with respect to Claims arising from the Donlen Documents) shall not be Released Parties. Notwithstanding the foregoing, any Person or Entity that opts out of the releases shall not be a Released Party.

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, except as otherwise set forth in the Plan, as of the Effective Date, the Debtors and their Estates, the Reorganized Debtors and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, DIP Financing, Interim Fleet Financing Facility, DFLF Facility, Canada Fleet Financing Facility, Donlen Sale, HHN Restructuring, including the Scheme of Arrangement and the Bifurcation Motion, the Commitment Letter, the Backstop Commitment Term Sheet, the Donlen Canada Securitization Facility, the Australian Securitization Facility, the formulation, preparation, dissemination, negotiation of the Plan, the Disclosure Statement, the Plan Support Agreement, the Backstop Commitment Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in <u>Article VIII.C</u> of the Plan shall not release (i) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Definitive Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 4.   Releases by Holders of Claims and Interests

The Plan provides for a release of the Released Parties by the Releasing Parties with respect to certain matters as described in the immediately succeeding paragraph.  The Releasing Parties are each of the following in their capacity as such: (i) [the Plan Sponsors]; (ii) all Holders of Unimpaired Claims or Interests who do not File a timely objection to the third party releases provided for in <u>Article VIII.D</u> of the Plan (<u>provided</u> <u>that</u>, for the avoidance of doubt, Holders of Unimpaired Claims or Interests that timely file an objection to the third

AMERICAS 106663920

party releases provided pursuant to <u>Article VIII.D</u> of the Plan shall not be Releasing Parties); (iii) all Holders of Administrative Expense Claims and Priority Tax Claims that do not hold Claims or Interests in any Class that do not File a timely objection to the third party releases provided for in <u>Article VIII.D</u> of the Plan (<u>provided</u>, <u>that</u>, for the avoidance of doubt, Holders of Administrative Expense Claims and Priority Tax Claims that do not hold Claims or Interests in any Class that timely File an objection to the third party releases provided pursuant to <u>Article VIII.D</u> of the Plan shall not be Releasing Parties); (iv) all Holders of Claims or Interests that vote to accept the Plan; (v) all Holders of Claims or Interests that are entitled to vote on the Plan who abstain from voting on the Plan and that do not affirmatively opt out of the third party releases provided for in <u>Article VIII.D</u> of the Plan by checking the box on the applicable Ballot or form indicating that they opt not to grant such releases in the Plan submitted on or before the Voting Deadline; (vi) all Holders of Claims or Interests that are entitled to vote on the Plan who vote to reject the Plan and do not affirmatively opt out of the third party releases provided for in <u>Article VIII.D</u> of the Plan by checking the box on the applicable Ballot or form indicating that they opt not to grant such releases in the Plan submitted on or before the Voting Deadline; (vii) all Holders of Claims that elect to be treated as a General Unsecured Elective Claim; and (viii) with respect to each of the foregoing Entities in clauses (i) through (vii), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in its capacity as such.

As of the Effective Date, for good and valuable consideration, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, DIP Financing, Interim Fleet Financing Facility, DFLF Facility, Canada Fleet Financing Facility, Donlen Sale, HHN Restructuring, including the Scheme of Arrangement and the Bifurcation Motion, the Commitment Letter, the Backstop Commitment Term Sheet, the Donlen Canada Securitization Facility, the Australian Securitization Facility, the formulation, preparation, dissemination, or negotiation of the Plan, the Disclosure Statement, the Plan Support Agreement, the Backstop Commitment Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the

Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing,  the releases set forth in <u>Article VIII.D</u> of the Plan shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (ii) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Definitive Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 5.   Exculpation

The Plan provides for an exculpation of the Exculpated Parties with respect to certain Causes of Action as described in the immediately succeeding paragraph.  The Exculpated Parties are each of the following in their capacity as such: (i) the Debtors; (ii) each of the Debtors' respective directors and officers serving after the Petition Date; (iii) the Committee; (iv) each of the Committee Members, solely in its capacity as Committee Members; (v) the Plan Sponsors; (vi) the Backstop Parties; and (vii) with respect to each of the foregoing Entities in clauses (i) through (vi), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, officers, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in its capacity as such; <u>provided</u>, <u>that</u> with respect to the Plan Sponsors and the Backstop Parties, any exculpations afforded under the Plan or Confirmation Order shall be granted only to the extent provided for pursuant to section 1125(e) of the Bankruptcy Code.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission from the Petition Date to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, in whole or in part, the Debtors, the formulation, preparation, dissemination, negotiation, of the Plan, the Disclosure Statement, the Plan Support Agreement, the Backstop Commitment Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon Consummation of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not,

and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

6. **Injunction**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR DISTRIBUTIONS REQUIRED TO BE PAID OR DELIVERED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE VIII.C</u> OR <u>ARTICLE VIII.D</u> OF THE PLAN, SHALL BE DISCHARGED PURSUANT TO <u>ARTICLE VIII.B</u> OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO <u>ARTICLE VIII.E</u> OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO <u>ARTICLE VIII.E</u> OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH THE TERMS OF THE PLAN EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

Under applicable law, a debtor's release of certain parties, such as the Debtors' release of the Released Parties, is appropriate where, without limitation:  (a) there is an identity of interest between the debtor and the third party, such that a suit against the released non-debtor party is, at core, a suit against the debtor or will deplete assets of the estate; (b) there is a substantial

contribution by the non-debtor of assets to the reorganization; (c) the injunction is essential to the reorganization; (d) there is overwhelming creditor support for the injunction; or (e) the chapter 11 plan will pay all or substantially all of the claims affected by the injunction. *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citation omitted). Importantly, these factors are "neither exclusive nor are they a list of conjunctive requirements," but "[i]nstead, they are helpful in weighing the equities of the particular case after a fact-specific review." *Id.* (citations omitted). Further, a chapter 11 plan may provide for a release of third-party claims against non-debtors, such as the releases provided for in <u>Article VIII.D</u> of the Plan, where such releases are consensual. *Id.* at 304–06. In addition, exculpation is appropriate where it applies to estate fiduciaries. *Id.* at 306. Finally, an injunction is appropriate where it is necessary to the reorganization and fair pursuant to section 105(a) of the Bankruptcy Code. *In re W.R. Grace & Co.*, 475 B.R. 34, 107 (D. Del. 2012) (citing *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011)).

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue Confirmation of the Plan. In addition, the Debtors believe the releases provided for in <u>Article VIII.D</u> of the Plan are entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 304-06; *In re Washington Mut. Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011). The Debtors will be prepared to meet their burden to establish the bases for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of the Confirmation of the Plan.

### 7. Subordination Rights

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, any of the intercreditor agreements with respect to the Prepetition Debt Documents or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan. Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Reorganized Debtors and their respective property, and the Claim and Interest Holders and is fair, equitable and reasonable.

AMERICAS 106663920

### 8.  Release of Liens

Except (i) with respect to the Liens securing (a) the New Reorganized Debt, and (b) to the extent elected by the Debtors, with respect to an Allowed Other Secured Claim in accordance with <u>Article III.B.2</u> of the Plan; or (ii) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

### I.   Conditions Precedent to Consummation of the Plan

### 1.   Conditions Precedent to the Effective Date

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to <u>Article IX.B</u> of the Plan):

> 1.     the Bankruptcy Court shall have entered the Disclosure Statement Order and approved the Rights Offering Procedures, and solicitation procedures and other materials related to the Plan, in form and substance consistent with the Plan Support Agreement and otherwise reasonably acceptable to the Debtors, subject to the Plan Sponsor Consent Rights;

> 2.     the Bankruptcy Court shall have entered the Confirmation Order, in form and substance materially consistent with the Plan and otherwise reasonably acceptable to the Debtors, subject to the Plan Sponsor Consent Rights, and such order shall not have been stayed pending appeal;

> 3.     the Backstop Commitment Agreement shall have been approved by the Bankruptcy Court and shall remain in full force and effect, all conditions shall have been satisfied thereunder or waived by the parties to the Backstop Commitment Agreement, and there shall be no breach that would give rise to the right to terminate the Backstop Commitment Agreement for which notice has been given in accordance with the terms thereof (with all conditions precedent thereto having been satisfied or waived);

> 4.     the Plan Support Agreement shall be in full force and effect with respect to the Debtors and the Plan Sponsors;

> 5.     the Definitive Documents shall contain terms and conditions consistent in all material respects with the Plan, Backstop Commitment Agreement, and the Plan Support Agreement or otherwise acceptable to the Debtors and Plan Sponsors;

> 6.     the Backstop Parties shall have purchased the Minimum Backstop Parties Reorganized Equity Allocation and own not less than 51% of the Reorganized Hertz Parent

AMERICAS 106663920

Interests on a fully-diluted basis, including after taking into account any dilution for the issuance of Reorganized Hertz Parent Interests on account of the Management Equity Incentive Plan;

7.    the Rights Offering shall have been consummated and shall have been conducted in accordance with the Rights Offering Procedures;

8.    the Backstop Parties shall have purchased the Backstop Amount, if any;

9.    the Professional Fee Escrow shall have been established and funded in Cash in accordance with Article II.E.3;

10.    the Transaction Expenses shall have been paid in full in Cash through and including the Effective Date;

11.    the General Unsecured Recovery Cash Pool Account shall have been established and funded in Cash in accordance with Article IV.J;

12.    the Debtors shall have caused HVF II to repay in full in Cash the then-outstanding obligations with respect to the HVF II Notes and all HVF Administrative Claims shall have been released;

13.    the HVF III Documents shall have been executed and delivered by each Entity party thereto and HVF shall have issued the indebtedness contemplated thereby;

14.    the conditions precedent to the entry into the HVF III Documents shall have been satisfied, waived, or shall be contemporaneously with the occurrence of the Effective Date;

15.    the Exit Facility Documents shall have been executed and delivered by each Entity party thereto and the Debtors shall have issued the indebtedness contemplated thereby;

16.    the conditions precedent to entry into the New Reorganized Debt shall have been satisfied, waived, or shall be satisfied contemporaneously with the occurrence of the Effective Date;

17.    all outstanding undrawn letters of credit under the First Lien LC Facilities, not otherwise discharged pursuant to the Restructuring Transactions, shall have been replaced, backstopped, or cash collateralized and all First Lien LC Claims with respect to such undrawn letters of credit shall be terminated and released;

18.    the Debtors shall have obtained the Tail D&O Policy; and

19.    all conditions precedent to the issuance of the Reorganized Hertz Parent Interests, other than any conditions related to the occurrence of the Effective Date, shall have occurred.

AMERICAS 106663920

### 2. Waiver of Conditions

[The conditions to the Effective Date of the Plan set forth in <u>Article IX</u> of the Plan may be waived only if waived in writing by the Debtors and the Plan Sponsors, except that <u>Article IX.A.7</u> of the Plan and <u>Article IX.A.8</u> of the Plan may be waived solely by the Debtors or the Backstop Parties, as applicable, if the reason for the failure of such conditions is the result in whole or in part of a breach of the Backstop Parties or the Debtors, as applicable, of their obligations, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.]

### 3. Substantial Consummation

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

### 4. Committee Complaint

Upon entry of the Confirmation Order, the Committee Complaint shall be held in abeyance and all deadlines and hearings in respect thereof shall be tolled *sine die* pending the Effective Date. The tolling of all deadlines and hearings set out in the preceding sentence shall apply to any and all pending and contemplated actions involving Released Parties and Releasing Parties that would otherwise be released pursuant to the Plan on the Effective Date.

Upon the occurrence of the Effective Date, the Committee Complaint shall be deemed voluntarily dismissed with prejudice and notice of said dismissal shall be filed on the docket of the adversary proceeding related thereto.

### 5. Effect of Non-Occurrence of Conditions to the Effective Date

If the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## J. Modification, Revocation, or Withdrawal of the Plan

### 1. Modification and Amendments

The Debtors reserve the right to modify the Plan, subject to the Plan Sponsor Consent Rights, and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors, subject to the Plan Sponsor Consent Rights, expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any

inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### 2. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### 3. Effect of Confirmation

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date the findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing.  Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if stated as findings of fact.

### 4. Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, in accordance with the preceding sentence, or if Confirmation and Consummation do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the non-Debtor subsidiaries.

### K. Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

AMERICAS 106663920

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to (i) the assumption or assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, cure costs pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (ii) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, the schedule of Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to Article V of the Plan; and (iii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in <u>Article VIII</u> of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

AMERICAS 106663920

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K.1 of the Plan;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

20.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order concluding or closing the Chapter 11 Cases; and

25.     enforce the compromise, settlement, injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection, or dispute resolution clause that refers disputes to a court other than the Bankruptcy Court and any disputes concerning documents contained in the Plan Supplement that contain such clauses shall be governed in accordance with the provisions of such documents.

### L.  Miscellaneous Provisions

#### 1.  Immediate Binding Effect

Subject to <u>Article IX.A</u> of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, or the Confirmation Order and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

#### 2.  Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

#### 3.  Payment of Statutory Fees

All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees in full in Cash when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of quarterly fees.

#### 4.  Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with <u>Article IX.A</u> of the Plan. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

AMERICAS 106663920

## 5. Transaction Expenses

The Transaction Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid prior to or during the course of the Chapter 11 Cases in accordance with the terms of the Plan Support Agreement or any Final Order of the Bankruptcy Court) without any requirement: (i) to file a fee application with the Bankruptcy Court; (ii) for review or approval by the Bankruptcy Court or any other party (other than the Debtors); or (iii) to provide itemized time detail; provided, that the applicable advisors will provide additional detail as reasonably requested by the Debtors.  All Transaction Expenses to be paid on the Effective Date shall be estimated as of the Effective Date and summary invoices evidencing such amounts shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; provided that any estimates provided shall not be considered an admission or limitation with respect to such Transaction Expenses.

In addition, the Debtors and Reorganized Debtors (as applicable) shall continue to pay Transaction Expenses related to implementation, consummation, and defense of the Plan and Restructuring Transactions after the Effective Date when due and payable in the ordinary course without any requirement: (i) to file a fee application with the Bankruptcy Court; (ii) for review or approval by the Bankruptcy Court or any other party; or (iii) to provide itemized time detail.

## 6. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## 7. Service of Documents

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

| | |
|---|---|
| Debtors: | Hertz Global Holdings, Inc.<br>8501 Williams Road<br>Estero, Florida 33982<br>Attn. M. David Galainena<br>dave.galainena@hertz.com |
| | with copies to: |
| Counsel to Debtors | White & Case LLP<br>Southeast Financial Center<br>200 South Biscayne Boulevard, Suite 4900<br>Miami, Florida 33131<br>Attn. Thomas E Lauria; Matthew Brown<br>tlauria@whitecase.com<br>mbrown@whitecase.com |

119

AMERICAS 106663920

- and -

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attn. David Turetsky
david.turetsky@whitecase.com

- and -

Richards, Layton & Finger, PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn. John Knight and Brett M. Haywood
knight@rlf.com
haywood@rlf.com

Counsel to Plan Sponsors                Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn.: Stephen E. Hessler, P.C.
shessler@kirkland.com

- and –

Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Attn.: AnnElyse Scarlett Gains
annelyse.gains@kirkland.com

## 8.  Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 9.  Entire Agreement

The Plan, Plan Supplement, Confirmation Order, supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

120

AMERICAS 106663920

### 10. Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; *provided, that,* at the request of the Debtors (in consultation with the Plan Sponsors), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors and the Plan Sponsors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent from the Debtors; and (iii) nonseverable and mutually dependent.

### 11. Dissolution of Committee

On the Effective Date, the Committee and any other official committees appointed in the Chapter 11 Cases will dissolve; *provided that*, following the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or applications, and any relief related thereto, for compensation by Professionals and requests for Allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (ii) any appeals of the Confirmation Order or other appeal to which the Committee is a party.  Upon the dissolution of the Committee, the Committee Members and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

### 12. Expedited Tax Determination

The Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors for all taxable periods through the Effective Date.

### 13. Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

### 14. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in

those agreements, in which case the governing law of such agreement shall control); provided, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in the State of Delaware shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

### 15. Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.  Any conversion required to convert foreign currency to United States dollars shall be done using the applicable exchange rates on the Petition Date.

### 16. Reference to the Debtors or the Reorganized Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

### 17. Controlling Document

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

<div align="center">

## V.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

</div>

The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan of reorganization, or a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (ii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.  Continuation of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such alternative plan might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of the Debtors' assets.

Alternatively, if the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell some or all of their assets under section 363 of the Bankruptcy Code.  Holders of Secured Claims would be entitled to credit bid on any property to

AMERICAS 106663920

which their security interest attaches to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by Holders of Secured Claims would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for Holders of Claims than what they would receive under the Plan.

## B.  Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which circumstance a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to Holders of Claims in accordance with the priorities established by the Bankruptcy Code.

As demonstrated in the liquidation analysis attached hereto as **Exhibit F** (the "**Liquidation Analysis**"), the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an orderly liquidation of the Debtors' assets as required by chapter 7, including the loss of going concern value in the Debtors' businesses.

## VI.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAW

### A.  Section 1145 Securities

All shares of Reorganized Hertz Parent Interests issued under the Plan, other than to the Backstop Parties pursuant to the Rights Offering and the Backstop Parties Direct Equity Investment or otherwise pursuant to the Rights Offering to the extent an exemption under section 1145 of the Bankruptcy Code is not available, will be issued without registration under the Securities Act or any similar federal, state, or local law.  Shares of Reorganized Hertz Parent Interests issued to Holders of Unsecured Funded Debt Claims pursuant to the Rights Offering as set forth in Article III.B.5 of the Plan may be issued in reliance upon section 1145 of the Bankruptcy Code to the extent available and, if so issued, will be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable federal, state, or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  Subject to the transfer restrictions described in Section VI.C below, any Reorganized Hertz Parent Interests issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (ii) will, subject to the New Shareholders Agreement and the Reorganized Hertz Parent Organizational Documents, be freely tradable and transferable by any holder thereof that (a) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, (c) has not acquired the Reorganized Hertz Parent Interests from an

AMERICAS 106663920

"affiliate" within one year of such transfer, and (d) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (iv) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale provisions of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, the availability of current public information with respect to the issuer, and certain other conditions, including those under the New Shareholders Agreement and the Reorganized Hertz Parent Organizational Documents. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

## B.  Private Placement

The issuance and sale (as applicable) of the Reorganized Hertz Parent Interests, including, but not limited to, to the Backstop Parties pursuant to the Rights Offering and the Backstop Parties Direct Equity Investment, otherwise pursuant to the Rights Offering to the extent an exemption under section 1145 of the Bankruptcy Code is not available and/or pursuant to the Management Equity Incentive Plan are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder (the "**4(a)(2) Securities**").  Such Securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as the resale provisions of Rule 144 of the Securities Act, in each case subject to the New Shareholders Agreement and the Reorganized Hertz Parent Organizational Documents, including the transfer restrictions set forth below in Section VI.C.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the ninety (90) days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

AMERICAS 106663920

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available.  An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144).  Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

Generally, Rule 144 provides that: (1) a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period if there is not current public information regarding the issuer at the time of the sale; and (2) an affiliate may sell restricted or other securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer, and also may sell restricted or other securities after a one-year holding period whether or not there was current public information regarding the issuer at the time of the sale, provided that in each case the affiliate otherwise complies with the volume, manner of sale and notice requirements of Rule 144.  If current public information regarding the issuer is not available, the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date.  Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, nonaffiliated holders of 4(a)(2) Securities would be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the filing an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

Additionally, the transferability of Reorganized Hertz Parent Interests will be limited by the New Shareholder Agreement and the Reorganized Hertz Parent Organizational Documents to ensure compliance with applicable securities laws and reporting requirements, as described below in "C. Restrictions on Rights Offering Participants and on Transfer."

* * * * *

*Legends.*  To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing the Reorganized Hertz Parent Interests held by holders of 10% or more of the outstanding Reorganized Hertz Parent Interests, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, and all Reorganized

AMERICAS 106663920

Hertz Parent Interests issued in the Rights Offering will bear a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities.  The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.  All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

Notwithstanding anything contained in the Plan to the contrary, each recipient of the Reorganized Hertz Parent Interests issued pursuant to the Plan will be deemed to be a party to the New Shareholders Agreement, and such Reorganized Hertz Parent Interests will be subject to the Reorganized Hertz Parent Organizational Documents.  Without limiting the forgoing, on the Effective Date, holders of the Reorganized Hertz Parent Interests will become parties to the New

AMERICAS 106663920

Shareholders Agreement and the Reorganized Hertz Parent Organizational Documents, which shall govern (among other things) the relative rights of holders of Reorganized Hertz Parent Interests.

### C. Restrictions on Rights Offering Participants and on Transfer

The Rights Offering Procedures shall set forth limitations on the number of Holders Allowed Unsecured Funded Debt Claims that may exercise Subscription Rights such that the total number of holders of Reorganized Hertz Parent Interests following the Effective Date shall be less than [●] holders such that the Reorganized Hertz Parent Interests shall not be a class of securities that is required to be registered under Section 12 of the Exchange Act. The New Organizational Documents shall contain restrictions on transfer in order to ensure that the Reorganized Hertz Parent Interests shall not subsequently be held by a number of holders that would require such class of securities to be registered under the Exchange Act.

### VII.
### CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or who are deemed to reject to Plan, or to holders of Existing Hertz Parent Equity Interests, or to Debtors that are not "United States persons" within the meaning of Section 7701(a)(30) of the Code.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect and available on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (including non-U.S. persons, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes.

AMERICAS 106663920

Unless otherwise indicated, this discussion assumes that all Unsecured Funded Debt Claims, General Unsecured Claims, and General Unsecured Elective Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their respective forms, and that the fair market value of each share to be issued in Reorganized Hertz Parent to Rights Offering parties will be consistent with Plan Equity Value as of the Effective Date.

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances.  All holders of Claims and Interests are urged to consult their tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan.***

### A.  Consequences to the Debtors

For U.S. federal income tax purposes, each of the Debtors  (other than Debtors that are not "United States persons" within the meaning of Section 7701(a)(30) of the Code) is a member of an affiliated group of corporations (or is a disregarded entity wholly-owned by members of such group) of which Hertz Parent is the common parent and which files a single consolidated U.S. federal income tax return (the "**Tax Group**").   The Debtors estimate that the Tax Group had approximately $1.2 billion of consolidated net operating losses ("**NOLs**") as of December 31, 2020.  Subject to on-going review, the Debtors believe that the aggregate tax basis in their assets (other than stock of members of the Tax Group) is less than fair market value.  In addition a portion of the Debtors' interest expense for the 2021 taxable year may be subject to disallowance and carry forward under new section 163(j) of the Tax Code.  The amount of any such NOLs and other tax attributes remain subject to adjustment for completion of the Debtors' tax returns and filings, audit, and/or future adjustment by the Company or taxing authorities.

As discussed below, in connection with the Plan, the Debtors' anticipate that their tax attributes (in particular, NOLs and, potentially, tax basis in other assets or credits) will be reduced, and that the subsequent utilization of certain tax attributes (such as any NOLs, capital losses, tax credits, and disallowed interest expense carryforward allocable to dates through the Effective Date) will be restricted subject to future limitations as an offset against taxable income.

### 1.  Cancellation of Debt

In general, the Tax Code provides that a corporate debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan.  The amount of COD incurred is generally the amount by which the adjustment issue price of the indebtedness discharged exceeds the value of any consideration given in exchange therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes.  If advantageous, a corporate debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Under applicable Treasury Regulations, the reduction in certain tax attributes occurs under consolidated return principles, as in the case of the Debtors who are members of the Tax Group.  Any reduction in tax attributes in respect of COD

generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.

In connection with the implementation of the Plan, the Debtors are expected to incur a significant amount of COD for U.S. federal income tax purposes, with an attendant reduction in tax attributes (NOLs and other tax attributes that may include tax basis in assets, but in the case of tax basis reductions, only to the extent such tax basis exceeds the amount of the respective Debtor's liabilities, as determined for these purposes, immediately after the Effective Date).

### 2.  Limitation of NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards and certain other tax attributes (including any disallowed interest expense) allocable to periods prior to the Effective Date ("**Pre-Change Losses**") may be subject to certain limitations resulting from a change in ownership.  Any such limitation applies in addition to, and not in lieu of, any attribute reduction that results from COD incurred in connection with the Plan.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally are subject to an annual limitation.  The Debtors expect that the issuance of Reorganized Hertz Parent Interests pursuant to the Plan will constitute an ownership change of the Tax Group for this purpose.

### (a) General Annual Limitation

In general, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is equal to the product of (A) the fair market value of the stock of the corporation (or common parent of the consolidated group) *immediately before* the ownership change (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs.  For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.  Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

Under certain circumstances, the annual limitation otherwise computed may be increased if the corporation (or consolidated group) has an overall built-in gain in its assets at the time of the ownership change.  Significantly, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, under applicable IRS guidance, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual

129

allowance.  Currently, the Debtors anticipate that the Tax Group will be in a net unrealized built-in gain position on the Effective Date.

If the corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to recognized built-in gains).

**(b) Special Bankruptcy Exception**

An exception to the foregoing annual limitation rules generally applies when shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan.  Under this exception, a debtor's Pre-Change Losses are not subject to the annual limitation.  However, if this exception applies, the debtor's Pre-Change Losses generally will be recomputed as if no interest deductions were allowable for indebtedness converted into stock for the taxable year inclusive of the effective date and the three prior years.  Also, if the reorganized debtor thereafter undergoes another "ownership change" within two years, the annual limitation with respect to such later ownership change could be zero, effectively precluding any future use of their Pre-Change Losses.  A debtor that qualifies for this exception may, if it so desires, elect not to have the exception apply and instead remain subject to the annual limitation described above. The Debtors do not currently expect to qualify for this exception.

**B.  Consequences to Holders of Certain Claims**

This summary discusses the U.S. federal income tax consequences to holders of Unsecured Funded Debt Claims, General Unsecured Claims, and General Unsecured Elective Claims.  Unless otherwise noted, the discussion below applies only to U.S. Holders.  As used herein, the term "U.S. Holder" means a beneficial owner of Unsecured Funded Debt Claims, General Unsecured Claims, or General Unsecured Elective Claims that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

AMERICAS 106663920

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Unsecured Funded Debt Claims, General Unsecured Claims, or General Unsecured Elective Claims the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

The following discussion does not necessarily apply to holders who have Claims in more than one class relating to the same underlying obligation (such as where the underlying obligation is classified as partially secured and partially unsecured). Such holders should consult their tax advisor regarding the effect of such dual status obligations on the federal income tax consequences of the Plan to them.

### 1.    Holders of Class 5 – Unsecured Funded Debt Claims

Pursuant to the Plan, each U.S. Holder of an Unsecured Funded Debt Claim will receive, in exchange for surrendering its Unsecured Funded Debt Claim, (i) its pro rata share of the Unsecured Funded Debt Cash Amount and (ii) the Subscription Rights. Subject to the discussion below regarding the possible restructuring of the Plan in a manner that could facilitate a tax-deferred exchange of an Unsecured Funded Debt Claim for a Reorganized Hertz Parent Interest, each U.S. Holder generally will realize gain or loss in an amount equal to the difference between (i) the sum of (x) the U.S. Holder's pro rata share of the Unsecured Funded Debt Cash Amount and (y) the fair market value of the U.S. Holder's Subscription Rights as determined on the Effective Date, and (ii) its adjusted tax basis in the surrendered Unsecured Funded Debt Claim.

A U.S. Holder's adjusted tax basis in the surrendered Unsecured Funded Debt Claim generally will equal the cost of the Unsecured Funded Debt Claim, decreased by any amortizable bond premium in respect of the Unsecured Funded Debt Claim which has been previously taken into account. In addition, if a U.S. Holder has elected to include market discount in income as it accrues (as described below), then the U.S. Holder's tax basis in an Unsecured Funded Debt Claim will be increased by any market discount previously included in gross income.

It is possible that modifications will be made to the Plan that could result in holders of Unsecured Funded Debt Claims being able to exchange (or being treated, for federal income tax purposes as exchanging) some or all of these claims for a Reorganized Hertz Parent Interest in an exchange that is part of a "plan of reorganization" pursuant to Section 368(a) of the Tax Code. To the extent that such a holder makes such an exchange, such exchange might be treated, as tax-deferred for such holder for federal income tax purposes, except to the extent of the cash received in such an exchange.

A U.S. holder generally will not recognize taxable gain or loss on the acquisition of our Reorganized Hertz Parent Interest upon exercise of a Subscription Right. The U.S. holder's tax basis in the Reorganized Hertz Parent Interest received upon exercise of the Subscription Right generally will be an amount equal to the sum of (i) the U.S. Holder's initial tax basis in the Subscription Right (that is, its fair market value on the Effective Date) and (ii) the exercise price of the Subscription Right. It is unclear whether the U.S. Holder's holding period in the Reorganized

AMERICAS 106663920

Hertz Parent Interests received upon exercise of the Subscription Rights will begin on the date following the date of exercise or on the date of exercise; in either case, the holding period will not include the period during which the U.S. Holder held the Subscription Rights. If a Subscription Right is allowed to lapse unexercised, a U.S. Holder generally will recognize a capital loss equal to such holder's tax basis in the Subscription Right.

### 2. Holders of Classes 6 and 7 – General Unsecured Claims and General Unsecured Elective Claims

Pursuant to the Plan, each U.S. Holder of a General Unsecured Claim will receive its pro rata share of the General Unsecured Creditor Cash Pool Amount in exchange for surrendering its General Unsecured Claim. Each U.S. Holder of a General Unsecured Elective Claim will receive payment in full in cash up to a maximum potential amount of $[●].

In either case, each U.S. Holder generally will recognize gain or loss in an amount equal to the difference between the amount of cash received and its adjusted tax basis in the surrendered General Unsecured Claim or General Unsecured Elective Claim, as the case may be.

A U.S. Holder's adjusted tax basis in the surrendered General Unsecured Claim or General Unsecured Elective Claim generally will equal the cost of the Claim (or income recognized with respect thereto), decreased by any amortizable bond premium in respect of the Claim which has been previously taken into account. In addition, if a U.S. Holder has elected to include market discount in income as it accrues (as described below), then the U.S. Holder's tax basis in a Claim will be increased by any market discount previously included in gross income.

### C. Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction.

A holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. A holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the holder's adjusted tax basis in its Claim is less than the adjusted issue price of such Claim by at least a *de minimis* amount. Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

AMERICAS 106663920

### D.  Distributions in Discharge of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income).  Conversely, a U.S. Holder may be entitled to recognize a loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.  Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of a Claim is generally allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to any Claim for accrued but unpaid interest.  There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

### E.  Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a refund or credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  Holders of Claims should consult their tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

U.S. Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  U.S. Holders of Claims should consult their tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

AMERICAS 106663920

*The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder's circumstances and income tax situation. All Holders of Claims and Interests are urged to consult their tax advisors concerning the federal, state, local, and other tax consequences applicable under the Plan.*

## VIII.
## SOLICITATION AND VOTING PROCEDURES

The solicitation procedures attached to the Disclosure Statement Order (the "**Solicitation Procedures**"), which are incorporated into this Disclosure Statement by reference and summarized below, will be used to collect and tabulate votes on the Plan. The Disclosure Statement Order establishing the Solicitation Procedures should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan. In the event of any conflict between the Solicitation Procedures and this Disclosure Statement, the Solicitation Procedures will control.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER, AND THE SOLICITATION PROCEDURES ATTACHED AS EXHIBIT I THERETO, FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A. Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of Claims and Interests against a Debtor are entitled to vote on a chapter 11 plan. The table in Article I.C of this Disclosure Statement provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim or Interest) under the Plan.

The Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Class 5 (Unsecured Funded Debt Claims) and Class 6 (General Unsecured Claims) (together, the "**Voting Classes**"). The Holders of Claims in the Voting Classes (the "**Voting Creditors**") are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims and Interests in Classes 1, 2, 3, 4, 7, 8, 9, 10, and 11. Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection filed with the Bankruptcy Court on or before the Solicitation Date, are not entitled to vote to accept or reject the Plan pending the occurrence of a Resolution Event (as defined in the Solicitation Procedures), *provided that* a holder of a Claim that is the subject of a pending objection on a "reclassify" or "reduce and allow" basis shall receive a Solicitation

AMERICAS 106663920

Package (as defined below) and be entitled to vote such Claim in the reclassified priority or reduced amount contained in such objection absent a further order of the Bankruptcy Court.

As set forth in the Disclosure Statement Order and the Solicitation Procedures, Holders of Claims who seek to have their Claims temporarily allowed by the Bankruptcy Court for voting purposes must file on the docket and serve on parties entitled to receive service thereof a motion pursuant to Bankruptcy Rule 3018(a) seeking such relief *so as to be actually received* no later than [●], 2021, however, such Holder's Ballot shall not be counted unless temporarily allowed by the Bankruptcy Court for voting purposes pursuant to an order entered prior to **[●], 2021.**

### B. Solicitation Package

The package of materials (the "**Solicitation Package**") sent to Voting Classes contains:

1.      a cover letter (the "**Cover Letter**"), in substantially the form annexed to the Disclosure Statement Order as **Exhibit [●]** describing the contents of the Solicitation Package, providing instructions to obtain access electronically, free of charge, to the Plan, Disclosure Statement and Disclosure Statement Order at the Debtors' restructuring website, and instructions for obtaining, free of charge, paper or flash drive copies of the materials provided in electronic format by contacting the Solicitation Agent, and urging the holders of Claims in each of the Voting Classes to vote to accept the Plan;

2.      the *Notice of Hearing to Consider Confirmation of the Joint Chapter 11 Plan Filed by the Debtors and Related Voting and Objection Deadlines*, substantially in the form annexed to the Disclosure Statement Order as **Exhibit [●]** (the "**Confirmation Hearing Notice**");

3.      this Disclosure Statement with all exhibits that have been filed with the Bankruptcy Court before the Solicitation Date, including the Plan;

4.      the Disclosure Statement Order, including the Solicitation Procedures;

5.      an applicable Ballot, substantially in the form of one of the ballots attached to the Disclosure Statement Order as Exhibits [●]-[●] (each, a "**Ballot**") with return instructions and a return envelope, as applicable; and

6.      any other materials ordered by the Bankruptcy Court to be included as part of the Solicitation Package.

For the avoidance of doubt, the Solicitation Agent shall serve the following components of the Solicitation Package on each Holder of a Claim in a Voting Class in paper format by first class mail: item 1 (Cover Letter), item 2 (Confirmation Hearing Notice), and item 5 (an applicable Ballot, with return instructions and a return envelope).  The Cover Letter will direct the recipient to access the remaining components of the Solicitation Package via the Debtors' restructuring website at https://restructuring.primeclerk.com/hertz.  Additionally, the Cover Letter, the Ballots and the Notices of Non-Voting Status (as defined in the Solicitation Procedures) will each prominently display a Quick Response Barcode ("**QR Code**"), which, when scanned using the camera of a smart phone or tablet will automatically direct the user to the solicitation section of

the Debtors' restructuring website where all of the documents contained in the Solicitation Packages, including the Plan and Disclosure Statement, will be located.

### C.  Voting Record Date

The Voting Record Date for determining which Holders of Claims are entitled to vote on the Plan and receive the Solicitation Package in accordance with the solicitation procedures is [●], 2021 at 4:00 p.m. (prevailing Eastern Time).

If you are entitled to vote to accept or reject the Plan, one or more Ballot(s) has been enclosed in your Solicitation Package for the purpose of voting on the Plan.  Please vote and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s).  The applicable administrative agent or indenture trustee under any debt documents will not vote on behalf of its respective beneficial holders of securities.  Such beneficial holders must vote in the manner set forth in Section IV.D of the Solicitation Procedures.

You should carefully review (1) the Plan, (2) this Disclosure Statement, (3) the Disclosure Statement Order, (4) the Confirmation Hearing Notice, and (5) the detailed instructions accompanying your Ballot(s) prior to voting on the Plan.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

After carefully reviewing these materials, including the detailed instructions accompanying your Ballot(s), please indicate your acceptance or rejection of the Plan by completing the Ballot(s).  All votes to accept or reject the Plan with respect to any Class of Claims entitled to vote on the Plan must be cast by properly submitting the duly completed and executed form of Ballot designated for such Class.  Holders of Claims voting on the Plan should complete and sign the Ballot(s) in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan."  In order for your vote to be counted, you must complete and return your Ballot(s) in accordance with the instructions accompanying your Ballot(s) on or before the Voting Deadline.  Each Ballot has been coded to reflect the Class of Claims it represents.  Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you.  If Ballot(s), are not actually received by the Solicitation Agent by the Voting Deadline, they will not be counted.

### D.  Voting on the Plan

The Voting Deadline is [●], 2021 at 4:00 p.m. (prevailing Eastern Time).  **In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are actually received by the Debtors' Solicitation Agent on or before the Voting Deadline:**

<div style="border:1px solid black">

**DELIVERY OF BALLOTS**

The Hertz Corporation Ballot Processing Center
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

In addition, to submit your Ballot via the Solicitation
Agent's online portal, please visit
https://cases.primeclerk.com/Hertz.
Click on the "Submit E-Ballot" section of the website and
follow the instructions to submit your ballot.

</div>

Special procedures are set forth in the Disclosure Statement Order and Solicitation Procedures for beneficial holders who hold securities through a broker, dealer, commercial bank, trust company, or other agent or nominee ("**Nominee**").  If you received a Solicitation Package addressed to or sent from your Nominee, please return your Ballot to your Nominee allowing enough time for your Nominee to cast your vote on a Ballot or Master Ballot before the Voting Deadline.  Additionally, special procedures apply for any Claims Filed by a purported class representative or its counsel (the "**Purported Class Counsel**") on behalf of more than one claimant or for a putative class (each, a "**Class Action Claim**").  Please review the Disclosure Statement Order and Solicitation Procedures for further information concerning such special voting instructions.

### E.  Ballots Not Counted

**No ballot will be counted if, among other things:** (1) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder of such Claim; (2) any ballot cast by any Entity that does not hold a Claim in a Voting Class; (3) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed by the Voting Record Date; (4) any Ballot cast in respect of a Claim that is subject to an objection pending as of the Voting Record Date (unless resolved pursuant to a Resolution Event in accordance with the Disclosure Statement Order and Solicitation Procedures), (5) any unsigned Ballot or Ballot lacking an original signature (for the avoidance of doubt, a Ballot submitted via the Solicitation Agent's online balloting portal shall be deemed an original signature); (6) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; (7) any ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein; and (8) any ballot not actually received by the Solicitation Agent by the Voting Deadline.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

AMERICAS 106663920

<div style="border:1px solid">

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION ORDER VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT AT:**
**Telephone:  (877) 428-4661 (domestic toll free) or +1 (929) 955-3421 (international)**
**E-mail:  hertzballots@primeclerk.com with "Hertz" in the subject line.**

**Any Ballot Received After the Voting Deadline Or Otherwise Not in Compliance with the Solicitation Order Will Not Be Counted.**

</div>

## IX.
## FACTORS TO CONSIDER BEFORE VOTING

Before voting to accept or reject the Plan, Holders of Claims or Interests entitled to vote should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.  Documents filed with the SEC may contain important risk factors that differ from those discussed below and include additional risk factors.  Such risk factors are incorporated as if fully set forth herein and are a part of this Disclosure Statement.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

### A.  Risks Relating to the Debtors' Business Operations and Financial Condition

### 1.  Continued Disruptions Caused by the COVID-19 Outbreak

COVID-19 continues to rapidly evolve and the Debtors cannot anticipate the length and severity of the effects of COVID-19 with any certainty.  The extent to which COVID-19 continues to adversely impact the Debtors' business will depend on future developments that are highly uncertain, such as the following: the ultimate severity of the disease; the duration of the outbreak or future outbreaks; the efficacy of a vaccine rollout in the places that the Debtors operate; travel restrictions imposed by governments or businesses in the markets in which the Debtors operate; the duration and scope of business closures or business disruptions; changes in customer travel preferences and demand; the impact of increasing unemployment on discretionary spending; the length of time it takes for rental pricing and volume and normal economic conditions to return; technology disruptions; the Debtors' relationships with and the availability of vehicles from vehicle manufacturers; the Debtors' liquidity position; the development of effective vaccines or treatments; and the effectiveness of actions taken to contain the disease and future outbreaks.  The impacts of COVID-19 could include those areas described below:

- *Changes in the Debtors' revenues, profitability and customer demand in the Debtors revenues, profitability and customer demand*: the Debtors' revenues and profitability have been negatively impacted during 2020 and this trend is expected to continue for the 2021 fiscal year.  The Debtors have experienced a high level of rental cancellations and a significant decline in forward bookings due to the decreased customer demand and other

AMERICAS 106663920

economic factors. Historically, the Debtors have generated a majority of their rental revenues from on-airport locations, which makes their rental car business sensitive to any decreases in air travel. Although the Debtors believe that renting a vehicle will continue to be a safe alternative and have implemented certain procedures to mitigate the impact of COVID-19, they cannot predict when or if customer demand will return to pre-COVID-19 levels.

- *Changes to the Debtors' liquidity*:  The Debtors incur ongoing costs, which they cannot reduce in line with the significant reduction in revenues that they have experienced as a result of COVID-19.  Such costs include monthly fleet rental costs under the HVF Master Lease Agreement, facility rentals and concessions, debt service and labor costs.  These costs require significant liquidity generated by operations or access to additional financing.  If COVID-19 continues to have a significant negative impact on the Debtors' cash flow from operations and they cannot access the capital markets, the Debtors may not be able to generate sufficient liquidity to cover their costs.

- *The Debtors' peak season*: The second and third quarters of the year have historically been the strongest quarters for the Debtors' vehicle rental business due to increased levels of leisure travel.  COVID-19 disrupted the Debtors' business in the second and third quarters of 2020 and is expected to continue to disrupt the Debtors' business unless it is eradicated in 2021. These disruptions have significantly impacted the Debtors' results of operations, financial condition, liquidity and cash flows.

- *The Debtors' workforce*: COVID-19 has caused the Company to furlough approximately 20,000 employees worldwide and terminate approximately 11,000 employees in the Company's U.S. rental car segment and U.S. corporate operations, the majority of which were previously furloughed, in an effort to reduce our operating costs.  This reduction in the Debtors' operating costs could create risks including, but not limited to, the Debtors' ability to manage the size of their workforce given uncertain future economic conditions and the ability to operate locations in affected jurisdictions.  Additionally, the Debtors may incur additional costs as a result of workforce reductions or suffer from employee morale issues. The Debtors may also be unable to timely respond to a business recovery due to reductions in our workforce already enacted.

### 2.  Reductions in Levels of Business and Leisure Travel

The vehicle rental industry is particularly affected by reductions in business and leisure travel, especially with respect to levels of airline passenger traffic.  Reductions in levels of air travel, whether caused by general economic conditions, airfare increases (e.g., capacity reductions or increases in fuel costs borne by commercial airlines) or other events (e.g., work stoppages, military conflicts, terrorist incidents, natural disasters, epidemic diseases, or the response of governments to any of these events) could materially adversely affect the Debtors.  In particular, the Debtors derive a substantial proportion of their revenues from key leisure destinations in the U.S., including Florida, Hawaii, California, New York and Texas, and Europe and the level of travel to these destinations is dependent upon the ability and willingness of consumers to travel on vacation and the effect of economic cycles on consumers' discretionary travel, including shortages of fuel and increases or volatility in fuel costs.  In 2020 and as a result of COVID-19, business and leisure

travel were adversely affected and the Debtors results of operations, financial condition, liquidity and cash flows were materially adversely affected.

### 3. Competition

Price is one of the primary competitive factors in the vehicle rental market and technology has enabled cost-conscious customers, including business travelers, to compare rates available from rental companies more easily.  If the Debtors increase pricing, their competitors, some of whom may have greater resources and better access to capital than the Debtors, may seek to compete aggressively on the basis of pricing.  In addition, the Debtors' competitors may reduce prices in order to, among other things, attempt to gain a competitive advantage, capture market share or compensate for declines in rental activity.  Additionally, pricing in the vehicle rental industry is impacted by the supply of vehicles available for rent.  Any significant fluctuations in the supply of rental vehicles available in the market due to an unexpected decrease in demand, or actions taken by the Debtors' competitors, could negatively affect the Debtors' pricing, operating plans or results of operations if the Debtors are unable to adjust the size of their rental fleet in response to fluctuations in supply and demand.  The Debtors also compete with non-traditional companies for vehicle rental market share, including auto manufacturers, ride-hailing and car sharing companies and other competitors in the mobility industry.  To the extent the Debtors do not react appropriately to their competition or optimize their revenue and pricing strategies, they may experience sub-optimal pricing decisions, sub-optimal asset utilization, poor customer satisfaction, lost revenue and other unfavorable consequences which may materially adversely affect their revenues and results of operations, financial condition, liquidity and cash flows.

### 4. Seasonal Nature of Business

Certain significant components of the Debtors' expenses are fixed in the short-term, including minimum concession fees, real estate taxes, rent, insurance, utilities, facility-related expenses, the costs of operating the Debtors' information technology systems and minimum staffing costs. Seasonal changes in the Debtors' revenues do not affect those fixed expenses, typically resulting in higher profitability in periods when the Debtors' revenues are higher.  The second and third quarters of the year have historically been the strongest quarters for the Debtors' vehicle rental business due to increased levels of leisure travel.  The Debtors control certain of their costs, including fleet arrangements and availability, to manage seasonal variations in demand.  Any circumstance, occurrence or situation that disrupts rental activity during these critical periods could have a material adverse effect on the Debtors' results of operations, financial condition, liquidity and cash flows due to a significant change in revenue.  In 2020, the Debtors' peak rental season was materially affected by COVID-19 and they experienced a significant reduction in demand. This disruption in rental activity resulted in a material adverse effect on the Debtors' results of operations, financial condition, liquidity and cash flows.

### 5. Increased Vehicle Cost

Certain of the Debtors vehicles ("**Program Vehicles**") are purchased under repurchase or guaranteed depreciation programs with vehicle manufacturers.  The Debtors sell other vehicles ("**Non-Program Vehicles**") through various sales channels in the used vehicle market, including auctions, dealer direct sales and retail lots through their car sales program, and have an increased

risk that the net amount realized upon the disposition of the vehicle will be less than its estimated residual value at such time. Any decrease in residual values of the Debtors' Non-Program Vehicles could result in a substantial loss on the sale of such vehicles or accelerated depreciation while the Debtors own the vehicles, which can materially adversely affect the results of operations, financial condition, liquidity and cash flows.

While Program Vehicles generally cost more than comparable Non-Program Vehicles, the use of program vehicles enables the Debtors to forecast their depreciation expense with more precision. Using Program Vehicles is also useful in managing the Debtors' seasonal peak demand for vehicles because the Debtors may be able to sell certain Program Vehicles shortly after having acquired them at a higher value than what the Debtors could for a similar Non-Program Vehicle at that time. If there were fewer Program Vehicles in the Debtors rental operations, these benefits would diminish and they would bear increased risk related to residual value. In addition, the related depreciation on the Debtors vehicles and their flexibility to reduce the number of vehicles used in the Debtors rental operations by returning vehicles sooner than originally expected without the risk of loss in the event of an economic downturn or to respond to changes in rental demand would be reduced.

The market for used vehicles is subject to economic factors, such as demand, consumer interests, pricing of new car models, fuel costs and other general economic conditions and may not produce stable vehicle prices in the future. A reduction in residual values for vehicles in the Debtors' rental fleet could cause them to sustain a substantial loss on the sale of vehicles or require them to depreciate those vehicles at a higher rate. The Debtors' vehicle costs could increase due to any reduction in the market value of the Debtors' vehicles, which could materially adversely affect their results of operations, financial condition, liquidity and cash flows.

### 6.  Environmental Laws and Regulations

The Debtors are subject to federal, state, local and foreign environmental laws and regulations in connection with their operations, including with respect to the ownership and operation of tanks for the storage of petroleum products, such as gasoline, diesel fuel and motor and used oils. The Debtors cannot guarantee that the tanks will at all times remain free from leaks or that the use of these tanks will not result in significant spills or leakage. If a leak or a spill occurs, it is possible that the resulting costs of cleanup, investigation and remediation, as well as any resulting fines, could be significant. Compliance with existing or future environmental laws and regulations may require material expenditures or otherwise have a material adverse effect on their consolidated financial condition, results of operations, liquidity, or cash flows.

The U.S. Congress and other legislative and regulatory authorities in the U.S. and internationally have considered, and will likely continue to consider, numerous measures related to climate change and greenhouse gas emissions. Should rules establishing limitations on greenhouse gas emissions or rules imposing fees on entities deemed to be responsible for greenhouse gas emissions become effective, demand for the Debtors' services could be affected, the Debtors' vehicle, and/or other, costs could increase, and the Debtors' business could be adversely affected.

### 7.  Union-Represented Employees

Active labor contracts covering the terms of employment for the Company's union-represented employees in the U.S. (including those in the U.S. territories) are presently in effect, primarily with the International Brotherhood of Teamsters and the International Association of Machinists. These contracts are renegotiated periodically and the Debtors anticipate renegotiating labor contracts with approximately 57% of these employees in 2021.  Failure to negotiate a new labor agreement when required could result in a work stoppage.  Although the Debtors believe that their labor relations have generally been good, it is possible that they could become subject to additional work rules imposed by agreements with labor unions, or that work stoppages or other labor disturbances could occur in the future.  In addition, the Debtors' non-union-represented workforce has been subject to unionization efforts in the past, and the Debtors could be subject to future unionization, which could lead to increases in their operating costs and/or constraints on their operating flexibility.

## B.  Certain Bankruptcy Law Considerations

### 1.  Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes vote in favor of the Plan or the requirements for "cram down" are met with respect to any Class that rejects or is deemed to reject the Plan, the Bankruptcy Court may exercise discretion as a court of equity and choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions Holders of Claims or Interests would ultimately receive with respect to their Claims or Interests in a subsequent plan of reorganization or otherwise.

### 2.  Non-Consensual Confirmation

If any impaired class of Claims or Interests does not accept or is deemed not to accept a plan of reorganization, a Bankruptcy Court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  If any Class votes to reject or is deemed to reject the Plan, then these requirements must be satisfied with respect to such rejecting Class.  The Debtors believe that the Plan satisfies these requirements.

### 3.  Financial Projections

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized Debtors based on certain assumptions, as set forth in **Exhibit E** hereto.  The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, demand for the Reorganized Debtors' products, inflation, and other unanticipated market and economic conditions. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or additional or continued health pandemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

The Debtors' projections reflect the projected impact of value-creating programs. However, the Debtors cannot state with certainty that such value-creating programs will achieve their targeted results

### 4.  Allowed Claims Could Exceed Estimates

There can be no assurance that the Allowed amount of Claims participating in distributions will not be significantly more than projected, which in turn, could cause the value of distributions to Holders of Allowed Claims to be reduced. The Debtors intend to use alternative dispute resolution procedures to resolve a significant amount of claims against the estate. The ultimate disposition of the claims subject to those procedures is uncertain and may be greater than expected. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results and total amount of claims against the Debtors' estates. Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and feasibility analysis, and the variation may be material.

### 5.  U.S. Federal Income Tax Risks

For a discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to Holders of certain Claims and Interests, see Section VII of this Disclosure Statement.

### 6.  Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX.A of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 7.   Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### 8.   Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 9.   The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Interests as those proposed in the Plan.

### 10. Continued Risk Upon Confirmation

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals. Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund

144

the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 11. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 12. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes. The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 13. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### C. Factors Relating to Securities to Be Issued

### 1. Significant Holders of Reorganized Hertz Parent Interests

The Plan Sponsors are expected to acquire a significant ownership interest in the Reorganized Hertz Parent Interests issued pursuant to the Plan. Those entities may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors, control the appointment of a majority of the board of directors, and approve significant mergers and other material corporate transactions.

AMERICAS 106663920

### 2. Interests Subordinated to the Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the Reorganized Hertz Parent Interests would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the Reorganized Hertz Parent Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all applicable holders of debt have been paid in full.

### 3. Dividends

The Reorganized Debtors may determine not pay any dividends on the Reorganized Hertz Parent Interests.  In such circumstances, the success of an investment in the Reorganized Debtors will depend entirely upon any future appreciation in the value of the Reorganized Hertz Parent Interests.  There is, however, no guarantee that the Reorganized Hertz Parent Interests will appreciate in value or even maintain its initial implied valuation.

### 4. Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies

To the extent Reorganized Hertz Parent Interests issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such Reorganized Hertz Parent Interests shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act. Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period.  An affiliate may resell restricted securities after the applicable holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  The Debtors currently do not expect that the current public information requirement will be met when the six-month holding period expires, and, as a result, holders of restricted securities should expect to be required to hold their restricted securities for at least one year. Holders of Reorganized Hertz Parent Interests who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities.  Resale restrictions are discussed in more detail in Article VI of this Disclosure Statement and additional important securities law disclosures are provided in Article II.B hereof.

AMERICAS 106663920

### D.  Factors Relating to the Rights Offering

**1.  Reorganized Hertz Parent Interests issued pursuant to the Rights Offering may be issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D under the Securities Act, If Applicable**

Because the issuance of Reorganized Hertz Parent Interests will not have been registered under the Securities Act or applicable state securities laws, and in the event such issuance does not benefit from the exemption from registration afforded by section 1145 of the Bankruptcy Code, the Reorganized Hertz Parent Interests in the Rights Offering will be subject to transfer restrictions under applicable securities laws.

**2.  The Election to Receive Cash May Not Have an Equivalent Value to the Alternative Treatment for Holders of Allowed Unsecured Funded Debt Claims.**

As set forth in the Plan, a Holder of Allowed Unsecured Funded Debt Claims that is not a qualified institutional buyer is entitled to make an election to receive a cash payment in an amount equal to 70% of its Allowed Unsecured Funded Debt Claim in lieu of receiving Reorganized Hertz Parent Interests by participating in the Rights Offering and either (i) paying the exercise price of the Subscription Rights by cash or (ii) contributing its Allowed Unsecured Funded Debt Claims, which Claim shall be valued at 70% of its Allowed Unsecured Funded Debt Claim determined at Plan Equity Value.  While the cash election affords Holders the opportunity to receive cash in lieu of Reorganized Hertz Parent Interests in the Rights Offering that may be of uncertain value, there can be no assurance that the cash received pursuant to the cash election will be commensurate with the value of the Reorganized Hertz Parent Interests that they are foregoing or are not permitted to receive if such Holder is not a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act.

**3.  Holders of Unsecured Funded Debt Claims That Elect to Receive Reorganized Hertz Parent Interests Through the Rights Offering May Not Be Permitted to Participate in the Rights Offering**

A Holder of Unsecured Funded Debt Claims will be permitted to participate in the Rights Offering only if such Holder is a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act.  If such Holder is not a "qualified institutional buyer," the Holder will be required to either make the cash election and receive cash in lieu of Reorganized Hertz Parent Interests or transfer or sell its Unsecured Funded Debt Claims (along with related Subscription Rights) to another party.  In addition, the Rights Offering Procedures will set forth limitations on the number of Holders of Allowed Unsecured Funded Debt Claims that may exercise Subscription Rights such that the total number of holders of Reorganized Hertz Parent Interests following the Effective Date shall be less than [●] holders such that the Reorganized Hertz Parent Interests shall not be a class of securities that is required to be registered under Section 12 of the Exchange Act.  If a Holder is not permitted to participate in the Rights Offering due to this limitation, such Holder will receive cash in lieu of Reorganized Hertz Parent Interests.

AMERICAS 106663920

**4.    Holders of Unsecured Funded Debt Claims That Receive Reorganized Hertz Parent Interests in the Rights Offering Will Be Subject to Additional Transfer Restrictions**

The Rights Offering Procedures will set forth limitations on the number of Holders Allowed Unsecured Funded Debt Claims that may exercise Subscription Rights such that the total number of holders of Reorganized Hertz Parent Interests following the Effective Date shall be less than [●] holders such that the Reorganized Hertz Parent Interests shall not be a class of securities that is required to be registered under Section 12 of the Exchange Act.  In addition, the New Organizational Documents will contain restrictions on transfer in order to ensure that the Reorganized Hertz Parent Interests shall not subsequently be held by a number of holders that would require such class of securities to be registered under the Exchange Act.

**5.    The Debtors Could Modify the Rights Offering Procedures.**

The Debtors may modify the Rights Offering Procedures to among other things, include additional procedures, as needed, to administer the Rights Offering and comply with applicable law. Such modifications may adversely affect the rights of Rights Offering Participants.

**6.    The Debtors Do Not Intend to Offer to Register or to Exchange the Reorganized Hertz Parent Interests in a Registered Exchange Offer**.

The Reorganized Hertz Parent Interests will not be registered under the Securities Act or any state securities laws and, subject to the discussion in <u>Article VI</u> of this Disclosure Statement and additional important securities law disclosures provided in <u>Article II.B</u> hereof, unless so registered, may not be re-offered or re-sold except pursuant to an exemption from the registration requirements of the Securities Act and applicable state securities laws.  The Debtors do not intend to register the Reorganized Hertz Parent Interests under the Securities Act or to offer to exchange the Reorganized Hertz Parent Interests in an exchange offer registered under the Securities Act. As a result, the Reorganized Hertz Parent Interests may be transferred or re-sold only in transactions exempt from the securities registration requirements of federal and applicable state laws.  In addition, the Debtors do not intend to be subject to the reporting requirements of the Exchange Act, and Holders of Reorganized Hertz Parent Interests will not be entitled to any information except as expressly required by any new shareholders agreement.  To the extent that any Reorganized Hertz Parent Interests issued under the Plan is covered by section 1145 of the Bankruptcy Code, it may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; <u>provided</u>, <u>however</u>, shares of such securities will not be freely tradable if, at the time of transfer, the Holder is an "affiliate" (as defined in Rule 144(a)(1) under the Securities Act) of the Reorganized Hertz and has not been such an "affiliate" within ninety days of such transfer.  Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.  Resales by Persons who receive Reorganized Hertz Parent Interests pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Persons would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

AMERICAS 106663920

7.   **The Reorganized Hertz Parent Interests Will Not Be Listed On Any Securities Exchange and a Market For the Reorganized Hertz Parent Interests May Not Develop**

The Reorganized Hertz Parent Interests will be a new issuance of securities and there will be no established market for those securities. The Debtors do not intend for the Reorganized Hertz Parent Interests to be registered under the Exchange Act or to apply for the Reorganized Hertz Parent Interests to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system.  You may not be able to sell your Reorganized Hertz Parent Interests at a particular time or at favorable prices. As a result, the Debtors cannot assure you as to the liquidity of any trading market for the Reorganized Hertz Parent Interests. Accordingly, you may be required to bear the financial risk of your ownership of the Reorganized Hertz Parent Interests indefinitely. If a trading market were to develop, future trading prices of the Reorganized Hertz Parent Interests may be volatile and will depend on many factors, including: (a) the Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar securities.

## E.   Additional Factors

### 5.   Debtors Could Withdraw the Plan

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

### 6.   Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 7.   No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 8.   No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

AMERICAS 106663920

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**9.  No Admission Made**

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

<div align="center">

**X.**
**CONFIRMATION OF THE PLAN**

</div>

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the Holders of Claims and Interests impaired under the Plan; and (C) feasible.

**A.  Acceptance of the Plan**

The Bankruptcy Code defines "acceptance" of a plan by a class of (i) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan and (ii) Interests as acceptance by interest Holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.  Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.  The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of claims or interests

<div align="center">

150

</div>

in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**.  Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**.  Either (a) each Holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**.  Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the Holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

### B.  Best Interests Test

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accepts the Plan or (2) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is customarily referred to as the "best interests" test.  The Debtors believe that the value of any distributions to Holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Plan.

### C.  Feasibility

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor under the Plan.

### D.  Notices and Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Confirmation Hearing is scheduled

AMERICAS 106663920

for [●], 2021 at [●] (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the local rules of the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefor, and must be Filed with the Bankruptcy Court and served upon all of the below parties in accordance with the Bankruptcy Rules and the local rules of the Bankruptcy Court.

**If to the Debtors, to:**
Hertz Global Holdings, Inc.
8501 Williams Road
Estero, Florida 33982
Attn. M. David Galainena
dave.galainena@hertz.com

White & Case LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900

Miami, Florida 33131
Attn. Thomas E Lauria; Matt Brown
tlauria@whitecase.com
mbrown@whitecase.com

—and—

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attn. David Turetsky
david.turetsky@whitecase.com

—and—

Richards, Layton & Finger, PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn. John Knight and Brett M. Haywood
knight@rlf.com
haywood@rlf.com

**If to the Creditors' Committee, to:**
Benesch, Friedlander, Coplan & Aronoff LLP
222 Delaware Avenue, Suite 801
Attn. Jennifer R. Hoover; Kevin M. Capuzzi; John C. Gentile
jhoover@beneschlaw.com
kcapuzzi@beneschlaw.com
jgentile@beneschlaw.com

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY   10036
Attn. Thomas Mayer; Amy Caton; Alice Byowitz
tmayer@kramerlevin.com
acaton@kramerlevin.com
abyowitz@kramerlevin.com

AMERICAS 106663920

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

AMERICAS 106663920

## XI.
## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of Claims in Classes 5 and 6 to vote in favor thereof.

Dated: March 1, 2021
       Wilmington, Delaware

                          Respectfully submitted,

                          HERTZ GLOBAL HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

                          */s/ DRAFT*_____

                          Name: M. David Galainena
                          Title:  Authorized Officer

AMERICAS 106663920