Exhibit G

**Plan Support Agreement**

AMERICAS 107036903

EXECUTION VERSION

**THIS PLAN SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED, AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 OR 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON THE PARTIES HERETO.  THIS PLAN SUPPORT AGREEMENT IS CONFIDENTIAL AND SUBJECT TO CONFIDENTIALITY AGREEMENTS AND HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 ITS STATE AND FEDERAL EQUIVALENTS.**

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT, dated as of April 3, 2021 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, together with all exhibits attached hereto and incorporated herein, this "**Agreement**") is entered into by and among: (i) The Hertz Corporation ("**Hertz**"), a corporation incorporated in the State of Delaware, and its affiliated debtors and debtors-in-possession (collectively with Hertz, the "**Company**" or the "**Debtors**") in the Chapter 11 Cases (as defined below) pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"); (ii)(a) one or more funds associated with Centerbridge Partners, L.P. ("**Centerbridge**"), (b) one or more funds associated with Warburg Pincus LLC ("**WP**"), and (c) Dundon Capital Partners LLC ("**Dundon**" and, together with Centerbridge and WP, the "**PE Sponsors**"); (iii) the undersigned in their capacity as owners and/or beneficial owners[1] (or managers or advisors of funds or accounts that are beneficial owners) of Claims against the Debtors, including Claims in respect of the following obligations of Hertz (the "**Initial Consenting Noteholders**" and, together with the PE Sponsors, the "**Plan Sponsors**"): (a) the 6.25% Senior Notes due 2022; (b) the 5.50% Senior Notes due 2024; (c) the 7.125% Senior Notes due 2026; (d) the 6.00% Senior Notes due 2028; and (e) the obligations under that certain Credit Agreement, dated as of December 13, 2019, as amended, supplemented or otherwise modified from time to time (the Claims under clauses (a) through (e) above, collectively, the "**Senior Notes/ALOC Claims**" and, the holders thereof, the "**Unsecured Noteholders**"); (iv) the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**") upon executing the joinder attached as **Exhibit A** hereto (the "**Committee Joinder**"); and (v) any additional Unsecured Noteholders (the "**Additional Consenting Noteholders**" and, together with the Initial Consenting Noteholders, the "**Consenting Noteholders**")) and any owners or beneficial owners of any other Claims against or Interests in any of the Debtors (collectively, the "**Consenting Claimholders**"), in each case, that execute the joinder attached as **Exhibit B** hereto (the "**Consenting Claimholder Joinder**").

---

[1]    As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Claims against any of the Debtors or Interests in any of the Debtors or the rights to acquire such Claims or Interests.

The Company and the Plan Sponsors and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "**Parties**" and individually as a "**Party**."  As used herein, (i) "**Requisite Consenting Noteholders**" means, at any relevant time, the Consenting Noteholders holding at least 67% in principal amount of the Senior Notes/ALOC Claims held by all Consenting Noteholders and (ii) "**Requisite Commitment Parties**" means, at any relevant time, the Requisite Consenting Noteholders and each of the PE Sponsors.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan (as defined below).

## RECITALS

**WHEREAS**, on May 22, 2020, the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), which are being jointly administered under the caption *In re The Hertz Corporation, et al.*, Case No. 20-11218 (MFW) (the "**Chapter 11 Cases**") in the Bankruptcy Court;

**WHEREAS**, in connection with the Chapter 11 Cases, the Parties have engaged in good faith, arm's length negotiations regarding the terms of the proposed restructuring of the Debtors' indebtedness and other obligations (such restructuring and any related transactions, the "**Restructuring**") pursuant to an amended version of the Debtors' proposed chapter 11 plan of reorganization attached as **Exhibit C** hereto (as may be further amended, supplemented, or otherwise modified in accordance with its terms, the "**Plan**");

**WHEREAS**, to effectuate the Restructuring, in accordance with, and pursuant to, this Agreement and the Commitment Documents, (i) the Reorganized Debtors will issue new common stock ("**Reorganized Equity**"), of which 48.2% will be issued to Unsecured Noteholders under the Plan as set forth in the Term Sheet and 51.8% (the "**Offered Stock**") will be issued at a purchase price, based on a common equity valuation of $4,223 million (the "**Offering Purchase Price**"); (ii) each of the PE Sponsors will commit, severally and not jointly, to purchase its shares of Offered Stock at the Offering Purchase Price, in the aggregate amount of $565 million; (iii) the Initial Consenting Creditors shall commit, severally and not jointly, to (a) exercise subscription rights to purchase shares of Offered Stock at the Offering Purchase Price in the aggregate amount of $1,390,674,614 representing the Ad Hoc Group of Hertz Bondholders' (the "**Ad Hoc Group**") aggregate pro rata share of the Creditor Allocation (as defined in the Term Sheet) as of March 29, 2021; and (iv) the Unsecured Noteholders holding Unsecured Notes that were not held by members of the Ad Hoc Group as of March 29, 2021 will be offered subscription rights to purchase the remaining shares of Offered Stock, representing a purchase price of up to $232,325,386 in the aggregate in cash (the "**Rights Offering Amount**"), which offering will be backstopped by the Initial Consenting Noteholders; (v) the Reorganized Debtors will issue, and each of Centerbridge and WP will each commit to purchase, severally and not jointly, its shares of Convertible Preferred Stock, in each case, on terms and conditions that are consistent with this Agreement and otherwise acceptable to the Requisite Commitment Parties; and (v) certain of the Plan Sponsors will provide financing to Hertz International Ltd. (the "**New HIL Facility**") in accordance with the terms set out in the Commitment Letter attached hereto as **Exhibit D** (the "**HIL Facility Commitment Letter**");

**WHEREAS**, the Parties desire to express to each other their mutual support and

2

commitment in respect of the matters discussed in this Agreement and the Plan.

<strong><u>AGREEMENT</u></strong>

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.        Conditions to Effectiveness**.

This Agreement shall become effective as to, and binding upon, each of the undersigned Parties on the date and at the time upon which all of the following conditions have been satisfied in accordance with this Agreement (such date, the "**<u>Agreement Effective Date</u>**"):

(a)        counsel to the Company shall have received executed counterparts to this Agreement by each of (i) the PE Sponsors and (ii) Initial Consenting Noteholders holding at least 80% in principal amount of the Senior Notes/ALOC Claims;

(b)        counsel to the Initial Consenting Noteholders shall have received executed counterparts to this Agreement by each of (i) the Debtors and (ii) the PE Sponsors; and

(c)        counsel to the PE Sponsors shall have received executed counterparts to this Agreement by each of (i) the Debtors and (ii) Initial Consenting Noteholders holding at least 80% in principal amount of the Senior Notes/ALOC Claims.

Notwithstanding the occurrence of the Agreement Effective Date, this Agreement contemplates that (i) the Committee may become a Party upon execution and delivery of the Committee Joinder to counsel to each of the other Parties and at such time (the "**<u>Committee Effective Date</u>**") the Committee shall become obligated under this Agreement, and (ii) one or more Additional Consenting Noteholders or Consenting Claimholders may become Parties upon execution and delivery of counterpart signature pages of this Agreement or the Consenting Claimholder Joinder to counsel to each other Party and at such time (a "**<u>Consenting Claimholder Effective Date</u>**") any such Additional Consenting Noteholder or Consenting Claimholder shall become obligated under this Agreement.  If (a) the Committee does not become a Party or there is a subsequent Termination Date (as defined in <u>Section 8</u> hereof) with respect to the Committee, (1) any and all provisions of this Agreement referencing the "Committee" are, and shall continue to be, in full force and effect with respect to the Parties as if such provisions were written without reference to such term and (2) this Agreement shall be in full force and effect with respect to each Party other than the Committee, (b) no Additional Consenting Noteholders become a Party, any and all provisions of this Agreement referencing "Additional Consenting Noteholders" are, and shall continue to be, in full force and effect with respect to the Parties as if such provisions were written without reference to such term, or (c) no Consenting Claimholders become a Party or there is a subsequent Termination Date (defined in <u>Section 8</u>) with respect to each Consenting Claimholder, (1) any and all provisions of this Agreement referencing "Consenting Claimholder" are, and shall continue to be, in full force and effect with respect to the Parties as if such provisions were written without reference to such term and (2) this Agreement shall be in full force and effect with respect to each Party other than the Consenting Claimholders.

**Section 2.        Exhibits Incorporated by Reference**.  Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits hereto.  In the event of any inconsistency between this Agreement and the exhibits attached hereto, this Agreement (without reference to such exhibits) shall govern.

**Section 3.        Definitive Documents**.  The definitive documents governing the Restructuring shall consist of the following and any other material document contemplated by the Parties needed or utilized to implement, govern, or consummate the Restructuring (collectively, the "**Definitive Documents**"):

(a)        the disclosure statement (and all exhibits and other documents and instruments related thereto) with respect to the Plan (the "**Disclosure Statement**");

(b)        the Equity Purchase and Commitment Agreement attached as **Exhibit E**  hereto (as may be further amended, supplemented, or otherwise modified in accordance with its terms, the "**EPCA**") and all schedules, annexes and exhibits thereto, together with the Rights Offering Procedures (collectively, the "**Commitment Documents**");

(c)        the order approving the Disclosure Statement, including the form of ballots and other solicitation materials in respect of the Plan (the "**Disclosure Statement Order**" and, such solicitation materials, the "**Solicitation Materials**");

(d)        the Plan, Plan Supplement, and all documents, annexes, schedules, exhibits, amendments, modifications, or supplements thereto, or other documents contained therein, including any schedules of assumed or rejected contracts;

(e)        the order confirming the Plan (the "**Confirmation Order**"), and any pleadings filed by the Debtors in support of the Bankruptcy Court's entry of the Confirmation Order;

(f)        the definitive documents governing the Exit Term Loan Credit Facility, the Exit Revolving Credit Facility, the HVF III Facility, and any amendments to any existing European vehicle financing agreements deemed necessary by the Company (in consultation with the Requisite Commitment Parties) to achieve its proposed business plan in accordance with the Restructuring (the "**Exit Facility Documents**");

(g)        the documents or agreements relating to the issuance of the Convertible Preferred Stock and the Reorganized Equity (including the Offered Stock);

(h)        the new organizational or other governance documents of the Reorganized Debtors, including the ultimate parent corporation of the Reorganized Debtors;

(i)        any employment agreements relating to any executive officer of the ultimate parent corporation of the Reorganized Debtors;

(j)        the motions filed by the Debtors seeking approval of each of the above (if applicable); and

(k)    any order approving any of the above not otherwise noted.

The Definitive Documents not executed or not in a form attached to this Agreement as of the Agreement Effective Date remain subject to negotiation and, upon completion, all Definitive Documents shall (a) reflect and contain the terms, conditions, representations, warranties, and covenants set forth in this Agreement (including the exhibits and annexes hereto), as they may be modified, amended, or supplemented in accordance with Section 9 hereof, and (b) otherwise be in form and substance acceptable to the Debtors and the Requisite Commitment Parties.

**Section 4.    Milestones**.  The following milestones (the "**Milestones**") shall apply to this Agreement, which in each case can be extended in writing by the Requisite Commitment Parties (electronic mail among counsel is sufficient):

(a)    by no later than the date that is ten (10) days from the Agreement Effective Date, the Debtors shall file, in form and substance in accordance with Section 3 hereof, (i) the Plan and (ii) one or more motions seeking approval of (A) the Disclosure Statement, (B) solicitation and voting procedures for the Plan, and (C) the Commitment Documents (including payment of related premiums, fees and expenses, and related forms);

(b)    by no later than May 1, 2021, the Bankruptcy Court shall have entered, in form and substance in accordance with Section 3 hereof, (i) the Disclosure Statement Order and (ii) an order approving (A) the Commitment Documents, and (B) payment by the Debtors of related premiums, fees and expenses as required under the Commitment Documents;

(c)    by no later than June 30, 2021, the Bankruptcy Court shall have entered the Confirmation Order; and

(d)    by no later than July 31, 2021, the Effective Date of the Plan shall have occurred (the "**Effective Date Deadline**").

**Section 5.    Commitments of the Parties**.

(a)    Plan Sponsors', Committee's, Consenting Claimholders', and Additional Consenting Noteholders' Commitments. Each of the Plan Sponsors, the Committee, the Consenting Claimholders, and the Additional Consenting Noteholders agree, severally and not jointly, during the period beginning on the Agreement Effective Date and ending on the Termination Date (defined in Section 8) applicable to such Party (such period, the "**Effective Period**"), to:

(1)    cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the other Parties and use commercially reasonable and good faith efforts to pursue, support, obtain additional support for, solicit, implement, confirm, and consummate the Restructuring, the Commitment Documents, and the Plan, and to execute and take all actions contemplated thereby and as reasonably necessary, or as may be required by order of the Bankruptcy Court, to support and achieve consummation of the Restructuring;

(2)    not, directly or indirectly, (i) object to, delay, impede, or take any other

5

action to interfere with the acceptance, implementation, or consummation of the Restructuring (including the payment in full of all administrative, priority, and secured claims) or (ii) solicit, propose, file, support, consent to, encourage, take any action in furtherance of or vote for any Alternative Transaction[2] (but without limiting the consent, approval, or termination rights provided in this Agreement); *provided*, *however*, that nothing herein shall prohibit the Consenting Noteholders, the Committee, and the Consenting Claimholders from discussing with the Debtors any unsolicited Alternative Transaction Proposal in accordance with <u>Section 5(f)(24)</u> hereof, so long as any communications in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, or impeding the Restructuring contemplated by the Plan;

(3)     not, directly or indirectly, file any pleading with the Bankruptcy Court or otherwise support, encourage, seek, solicit, pursue, initiate, assist, join or participate in any challenge to the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the First Lien Claims or Second Lien Claims or any liens or collateral securing such First Lien Claims or Second Lien Claims;

(4)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in the Plan or in this Agreement, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(5)     except to the extent expressly contemplated under the Plan or this Agreement, not exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or Interests in any of the Debtors that it owns or has beneficial ownership of, and any other claims against any direct or indirect subsidiaries of the Debtors that are not Debtors;

(6)     negotiate in good faith upon reasonable request of the Debtors, the PE Sponsors, or the Requisite Consenting Noteholders in connection with any modifications to the Restructuring that improve the tax efficiency of the Restructuring for the Debtors, the PE Sponsors and/or the Consenting Noteholders;

(7)     promptly (but in any event within three (3) business days) notify the Debtors in writing of the occurrence, or failure to occur, of any event of which such Party has actual knowledge and with respect to which such occurrence or failure would likely cause (i) any

---

[2]     "**Alternative Transaction**" means any transaction with respect to a plan of reorganization or liquidation, dissolution, winding up, liquidation, reorganization, workout, merger, consolidation, business combination, joint venture, partnership, sale of material assets or equity interests of the Company and its Subsidiaries taken as a whole, or restructuring involving the Debtors, without the prior written consent of the Requisite Commitment Parties that competes with or renders the Restructuring or the Plan unable to be consummated on the terms set forth in the Plan and this Agreement, or would reasonably be expected to materially frustrate the purposes of the Restructuring, the Plan or this Agreement, in each case, excluding any transaction contemplated by (i) that certain Stock and Asset Purchase Agreement, dated November 25, 2020, by and among Hertz Global Holdings, Inc., Donlen Corporation, each of the subsidiaries of Donlen Corporation listed on Schedule I thereto, and Freedom Acquirer LLC (as such agreement is in effect as of the date hereof), or (ii) the Commitment Documents.

6

representation of such Party contained in this Agreement to be untrue or inaccurate in any material respect, (ii) any covenant of such Party contained in this Agreement not to be satisfied in any material respect, or (iii) any condition precedent contained in the Plan or this Agreement related to the obligations of such Party to not occur or become impossible to satisfy; *provided* that no Party shall be obligated to report the breach or potential breach of any other Party in order to comply with this Section 5(a)(7); and

(8)     execute and deliver such other instruments and perform such acts, in addition to the matters specified herein, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court in connection with the Plan, from time to time, to effect the Restructuring, as applicable.

Notwithstanding the foregoing, nothing in this Section 5(a) shall require the Plan Sponsors to incur any expenses (other than Fees (as defined below)), liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements, that could result in expenses (other than Fees), liabilities or other obligations to any such Party, other than as specifically stated in the Commitment Documents; *provided* that, for the avoidance of doubt, the Debtors shall be required to reimburse Fees as set forth in Section 10 of this Agreement.

(b)     The foregoing Section 5(a) will not limit any of the Plan Sponsors' rights:

(1)     under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case provided that such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, the Plan, or the Commitment Documents and do not hinder, delay or prevent consummation of the Restructuring;

(2)     to consult with the Debtors or any other party in interest in the Chapter 11 Cases; *provided* that such action is not inconsistent with this Agreement, the Plan, or the Commitment Documents and does not hinder, delay or prevent consummation of the Restructuring; or

(3)     to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Definitive Documents.

(c)     Plan Sponsors' Additional Commitments.  In addition to the commitments set forth in Section 5(a) hereof, the Plan Sponsors further agree, severally and not jointly:

(1)     with respect to the PE Sponsors only, pursuant to and in accordance with the EPCA, to commit, severally and not jointly, to purchase (x) shares of Offered Stock at the Offering Purchase Price in the aggregate amount of $565 million and (y) shares of Convertible Preferred Stock at a purchase price of $385 million in the aggregate in cash, in each case, on terms and conditions that are consistent with the Term Sheet and otherwise acceptable to the Debtors and the Requisite Commitment Parties;

(2)     with respect to the Plan Sponsors party to the HIL Facility Commitment

Letter to provide financing to HIL in the form of the HIL Facility in accordance with the HIL Facility Commitment Letter;

(3)    with respect to the Initial Consenting Noteholders only, pursuant to and in accordance with the EPCA, to commit, severally and not jointly, to exercise the subscription rights distributed pursuant to the Plan to purchase shares of Offered Stock at the Offering Purchase Price in the aggregate amount of $1,390,674,614 representing the Ad Hoc Group's aggregate pro rata share of the Creditor Allocation as of March 29, 2021 and backstop the purchase of any unsubscribed portion of the Rights Offering Amount on terms and conditions to be set forth in the Commitment Documents;

(4)    to submit drafts to the Debtors of any public press release that discloses the existence or terms of this Agreement, the EPCA, the Plan, or any other Definitive Document (or any amendment to any of the foregoing) and afford the Debtors a reasonable opportunity to comment on such documents and disclosures; and

(5)    to the extent a Plan Sponsor is or becomes an owner or beneficial owner of any Claims against or Interests in any of the Debtors, (i) following the commencement of solicitation of the Plan and receipt of the Solicitation Materials and the Ballot(s) and so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, including its receipt of the Disclosure Statement following approval of such by the Bankruptcy Court under section 1125 of the Bankruptcy Code, (A) timely vote or cause to vote any and all Claims against or Interests in any of the Debtors that it owns or has beneficial ownership of to accept the Plan by delivering its duly executed and completed Ballot(s) accepting the Plan on a timely basis and (B) to the extent it is permitted to elect whether to opt out (or to opt in, as applicable), of the releases set forth in the Plan, elect not to opt out (or to opt in, as applicable) of the releases set forth in the Plan by timely delivering its duly executed and completed Ballots indicating such election (which opt out shall only be in the Plan Sponsors' capacity as a Claim holder against the Debtors), and (ii) thereafter, not change or withdraw (or cause to be changed or withdrawn) any such vote or election; *provided* that, notwithstanding anything to the contrary in any Solicitation Materials, such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Party at any time if this Agreement is terminated with respect to such Party (it being understood by the Parties that any modification of the Plan that results in a termination of this Agreement by any Party pursuant to Section 8 hereof shall entitle such Party an opportunity to change its vote in accordance with section 1127(d) of the Bankruptcy Code).

(d)    Consenting Claimholders' and Additional Consenting Noteholders' Additional Commitments.  In addition to the commitments set forth in Section 5(a) hereof, the Consenting Claimholders and Additional Consenting Noteholders further agree to: (i) following the commencement of solicitation of the Plan and receipt of the Solicitation Materials and the Ballot(s) and so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, including its receipt of the Disclosure Statement following approval of such by the Bankruptcy Court under section 1125 of the Bankruptcy Code, (A) timely vote or cause to vote any and all Claims against or Interests in any of the Debtors that it owns or has beneficial ownership of to accept the Plan by delivering its duly

8

executed and completed Ballot(s) accepting the Plan on a timely basis and (B) to the extent it is permitted to elect whether to opt out (or to opt in, as applicable), of the releases set forth in the Plan, elect not to opt out (or to opt in, as applicable), of the releases set forth in the Plan by timely delivering its duly executed and completed Ballots indicating such election, and (ii) thereafter, not change or withdraw (or cause to be changed or withdrawn) any such vote or election; *provided* that, notwithstanding anything to the contrary in any Solicitation Materials, such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Party at any time if this Agreement is terminated with respect to such Party (it being understood by the Parties that any modification of the Plan that results in a termination of this Agreement by any Party pursuant to <u>Section 8</u> hereof shall entitle such Party an opportunity to change its vote in accordance with section 1127(d) of the Bankruptcy Code).

(e)    <u>Committee's Additional Commitments</u>.  In addition to the commitments set forth in <u>Section 5(a)</u> hereof, the Committee further agrees to:

(1)    use commercially reasonable efforts to encourage each Holder of Unsecured Claims against the Debtors, including each Committee member, to (i) following the commencement of solicitation of the Plan and receipt of the Solicitation Materials (including the Ballot(s)) and so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, including its receipt of the Disclosure Statement following approval of such by the Bankruptcy Court under section 1125 of the Bankruptcy Code, (A) timely vote or cause to be voted any Claims against or Interests in any of the Debtors that it owns or has beneficial ownership of to accept the Plan by delivering its duly executed and completed Ballot(s) accepting the Plan on a timely basis and (B) to the extent any such Committee member is permitted to elect whether to opt out (or to opt in, as applicable), of the releases set forth in the Plan, elect not to opt out (or to opt in, applicable) of the releases set forth in the Plan by timely delivering its duly executed and completed Ballot(s) indicating such election; and (ii) thereafter, not change or withdraw (or cause to be changed or withdrawn) any such vote or election so long as this Agreement has not been terminated with respect to the Committee;

(2)    file in the Chapter 11 Cases, and deliver to counsel to the Debtors to include in the Solicitation Materials, a letter of the Committee's unanimous support for the Plan and the Committee's recommendation that holders of unsecured Claims against the Debtors vote to accept the Plan and to not opt out (or to opt in, as applicable), of the Plan releases, to the extent applicable; and

(3)    stay all litigation (including *The Official Committee of Unsecured Creditors v. Barclays Bank PLC, et al.*, Adv. Pro. No. 20-50842 (Bankr. D. Del. 2020) (MFW), which shall be dismissed with prejudice as of the Effective Date of the Plan), any contested motions, and discovery or the pursuit of any actual or potential claims and causes of action pending against, or subject to tolling agreements with, the Debtors, any holders of First Lien Claims, or any holders of Second Lien Claims or the pursuit to obtain standing to pursue such litigation or any such claims and causes of action.

(f)    <u>Debtors' Commitments</u>.  Each Debtor agrees to, severally and not jointly:

9

(1)    within one business day of the Agreement Effective Date, (a) file the Plan in the form of an amended version of the proposed plan of reorganization filed at [Docket No. 3500] in the Chapter 11 Cases and (b) file a copy of this Agreement as an exhibit to the Disclosure Statement;

(2)    to the extent reasonably practicable and subject to the terms hereof and subject to the impact and requirements of the Chapter 11 Cases, cooperate and coordinate activities with the other Parties and use commercially reasonable and good faith efforts to pursue, support, solicit, implement, confirm, and consummate the Restructuring, the Commitment Documents, and the Plan, and to execute and take all actions contemplated hereby and thereby and as reasonably necessary, or as may be required by order of the Bankruptcy Court, to support and achieve confirmation of the Plan and consummation of the Restructuring in accordance with, and within the time frames contemplated by, this Agreement;

(3)    pay and reimburse all Fees in accordance with this Agreement;

(4)    commence solicitation of votes to accept or reject the Plan as soon as reasonably practicable following the approval of the Disclosure Statement and Solicitation Materials by the Bankruptcy Court;

(5)    use commercially reasonable efforts to obtain any and all regulatory and/or third party approvals necessary to consummate the Plan;

(6)    execute and deliver each Definitive Document once agreed by all parties thereto and finalized;

(7)    provide advance initial draft copies of each Definitive Document and any pleading relating to the Plan, the Disclosure Statement, plan exclusivity, assumption or rejection of material executory contracts and unexpired leases, or key employee incentive or retention plan to counsel for the Plan Sponsors no later than three (3) calendar days prior to the date when the Company intends to file such pleading or Definitive Document with the Bankruptcy Court and consult in good faith with such counsel regarding the form and substance of any such filing, in each case to the extent reasonably practicable or otherwise as soon as reasonably practicable prior to such filing;

(8)    timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (i) directing the appointment of a trustee or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, (ii) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, or (iv) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of the Plan;

(9)    timely oppose any motion, application, or request filed with the Bankruptcy Court seeking approval of any Alternative Transaction;

(10)   timely oppose any objections filed with the Bankruptcy Court with respect to (A) approval of the Disclosure Statement or (B) confirmation of the Plan;

(11)    comply in all material respects with applicable laws (including making or using commercially reasonable efforts to obtain all required material consents and/or appropriate filings or registrations with, notifications to, or authorizations, consents, or approvals of any regulatory or governmental authority) and paying all income and other material taxes as they become due and payable (except to the extent nonpayment thereof is permitted by the Bankruptcy Code; *provided* that, to the extent any taxes have not been paid because of the relief afforded by the Bankruptcy Code and are not being contested with adequate reserves having been established in accordance with GAAP, the anticipated payment of such taxes pursuant to the Plan is reflected in the financial information provided to the Plan Sponsors);

(12)    negotiate in good faith upon reasonable request of the PE Sponsors or the Requisite Consenting Noteholders in connection with any modifications to the Restructuring that improve the tax efficiency of the Restructuring for the Debtors, the PE Sponsors and/or the Consenting Noteholders;

(13)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Requisite Commitment Parties;

(14)    provide prompt written notice to counsel to each of the Plan Sponsors (electronic mail among counsel being sufficient) of (i) the occurrence, or failure to occur, of any event of which the Debtors have actual knowledge and which such occurrence or failure would likely cause (A) any representation of the Debtors contained in this Agreement to be untrue or inaccurate in any material respect, (B) any covenant of the Debtors contained in this Agreement not to be satisfied in any material respect or (C) any condition precedent contained in the Plan or this Agreement not to occur or become impossible to satisfy, (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring, (iii) receipt of any written notice from any governmental body in connection with this Agreement or the Restructuring, and (iv) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Debtors, threatened against the Debtors, relating to or involving or otherwise affecting in any material respect the Restructuring, including governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened); *provided* that no Debtor shall be obligated to report the breach or potential breach by any other Party in order to comply with this Section 5(f)(14);

(15)    seek to cause the Confirmation Order to become effective and enforceable immediately upon its entry and to seek to have the period in which an appeal thereto must be filed commence immediately upon its entry;

(16)    comply in all material respects with the terms and conditions of the DIP Facility (as defined in the DIP Order) and the final orders and amendments related thereto such that the DIP Lenders (as defined in the DIP Order) do not accelerate the DIP Loans

(as defined in the DIP Order);

(17)    provide counsel to each of the Plan Sponsors with any reporting received by the Committee, or the DIP Lenders pursuant to the Order (I) Authorizing the Debtors to Obtain Debtor-in-Possession Financing and Granting Liens and Superpriority Administrative Claims and (II) Granting Related Relief [Docket No. 1661] (the "**DIP Order**") or any of the DIP Loan Documents (as defined in the DIP Order) on the same schedule as the Committee or the DIP Lenders, as applicable, receive such reporting, confer with each of the Plan Sponsors and their respective Representatives[3], as reasonably requested, on operational matters and the general status of ongoing operations, and provide each of the Plan Sponsors with any information reasonably requested regarding the Debtors (subject to any applicable confidentiality obligations) and reasonable access to management and advisors of the Debtors during normal business hours for the purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs; provided that the Debtors shall not be required to provide any information or access that the Debtors reasonably believe would violate applicable law, including antitrust laws and data protection laws, or the terms of any applicable contract (including confidentiality obligations) or cause forfeiture of any attorney-client privilege or an expectation of client confidence or any other rights to any evidentiary privilege;

(18)    not object to, impede or take any other action (including filing any pleading) that is materially inconsistent with, or is intended or is likely to materially interfere with, acceptance or implementation of the Restructuring;

(19)    not (i) enter into, adopt or materially amend any employment agreements or any compensation or incentive plans (including equity arrangements) with respect to employees with the title of Senior Vice President or higher or (ii) increase in any manner the compensation or benefits (including severance) of any employees with the title of Senior Vice President or higher, in each case without the prior written consent of the Requisite Commitment Parties;

(20)    not seek to amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documents in a manner that is materially inconsistent with this Agreement or the Plan without the prior written consent of the Requisite Commitment Parties;

(21)    promptly adjourn *sine die* the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry Into and Performance Under, European Settlement and Restructuring Embodied in Noteholder Lockup Agreement* [Docket. No. 2280, which motion shall be deemed withdrawn with prejudice as of the Effective Date;

(22)    promptly following the Agreement Effective Date, cause each of its officers, directors, employees and Subsidiaries to, and use their reasonable best efforts to cause their other respective Representatives to, immediately cease and terminate any

---

[3] "**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives acting on behalf of such Person.

ongoing solicitations, discussions, and negotiations with respect to any Alternative Transaction;

(23)    not pursue, solicit, encourage, enter into, or otherwise seek to implement any restructuring of the HHN Notes that does not treat the HHN Notes held by a Party hereto the same as the HHN Notes held by any other Person; and

(24)    not to, and shall instruct and direct its respective Representatives not to, other than to inform any Person of the provisions of this Section 5(f)(24), directly or indirectly, initiate, solicit, engage in or participate in any discussions, inquiries or negotiations in connection with any proposal, expression of interest or offer relating to an Alternative Transaction, afford access to the business, properties, assets, books or records of or provide any non-public information relating to the Debtors or any of their Subsidiaries to, otherwise cooperate in any way with, or knowingly assist, participate in, facilitate or encourage any effort by any Person that is seeking to make, or has made, an Alternative Transaction Proposal (as defined below); *provided* that, if, notwithstanding the foregoing, following the Agreement Effective Date, the Debtors or any of their Subsidiaries receive a bona fide proposal, expression of interest or offer (whether written or unwritten) for an Alternative Transaction (an "**Alternative Transaction Proposal**") from any Person not solicited in violation of this Section 5(f)(24), the Board of Directors of the Company (the "**Company Board**") (or a committee thereof) may, directly or indirectly through the Company's Representatives (i) contact any Person that has made an unsolicited Alternative Transaction Proposal (and its advisors) for the purpose of clarifying the proposal and any terms thereof and the likelihood of consummation, so as to determine whether such proposal constitutes, or could reasonably be expected to lead to, a Superior Proposal (as defined below) or (ii) if the Company Board shall have determined in good faith and, after considering the advice of its outside counsel and independent financial advisor, that such Alternative Transaction Proposal, constitutes, or could reasonably be expected to result in, a transaction that: (x) would be in the best interests of the Company and its creditors and equity holders as a whole, and (y) would reasonably be expected to be superior to the Company and its creditors and equity holders in comparison to the transactions contemplated under this Agreement, the Commitment Documents, and the Plan (a "**Superior Transaction**") and, in either case, that failure of the Company Board to pursue such Alternative Transaction Proposal would reasonably be expected to result in a breach of the Company Board's fiduciary duties under applicable Laws (a "**Superior Proposal**"), the Company may, in response to such Superior Proposal: (x) furnish non-public information in response to a request therefor by such Person if such Person has executed and delivered to the Company a confidentiality agreement (a copy of which shall be provided to each of the Plan Sponsors within 24 hours of execution thereof) on terms no less favorable than any confidentiality agreements entered into with any Plan Sponsor and if the Company also promptly (and in any event within 24 hours after the time such information is provided to such Person) makes such information available to the Plan Sponsors, to the extent not previously provided to the Plan Sponsors; and (y) engage or participate in discussions and negotiations with such Person regarding such Superior Proposal; *provided further*, that, subject to applicable confidentiality restrictions and the conditions upon which the proposal was submitted, (i) the Company shall provide (A) notice of all Alternative Transaction Proposals (whether oral or written) to each of the Plan

13

Sponsors and their respective counsel within 24 hours after the time of receipt of such Alternative Transaction Proposal and (B) a copy of each written Alternative Transaction Proposal or summary of each such oral Alternative Transaction Proposal and (ii) the Company shall also notify each of the Plan Sponsors promptly if the Company Board determines that an Alternative Transaction Proposal is a Superior Proposal (and the rationale therefor) no later than 24 hours following such determination.  To the extent the Company is prohibited from giving notice of any Alternative Transaction Proposal to any Plan Sponsor due to a confidentiality restriction or condition upon which such proposal was submitted, the Company shall use its commercially reasonable efforts to obtain relief from such restriction or condition as promptly as practicable in order to comply with its obligations under this <u>Section 5(f)(24)</u>.  Additionally, if the Company Board determines that an Alternative Transaction Proposal is a Superior Proposal, the Company shall inform the Plan Sponsors promptly upon the Company's receipt of definitive documents to implement such Superior Proposal.

(g)    Each Consenting Unsecured Noteholder, Consenting Claimholder and, to the extent it owns or beneficially owns Claims against or Interests in any of the Debtors, each Plan Sponsor, has entered into this Agreement on account of all Claims against or Interests in any of the Debtors that it owns or beneficially owns (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Claims against and Interests in any of the Debtors that it owns or beneficially owns.

**Section 6.    Transfers of Claims**.

(a)    <u>Restrictions on Transfers</u>.  Each Plan Sponsor, Consenting Claimholder, and Consenting Noteholder agrees that such Plan Sponsor, Consenting Claimholder, or Consenting Noteholder shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of, directly or indirectly, in whole or in part (each, a "**Transfer**"), any Claims against any of the Debtors that it owns or has beneficial ownership of, or any option thereon or any right or interest therein (including granting any proxies, depositing any of its Claims into a voting trust or entering into a voting agreement with respect to any of its Claims), unless, subject in all cases to the terms and conditions set forth in the EPCA, the transferee thereof either (i) is a Plan Sponsor, Consenting Claimholder, or Consenting Noteholder (provided that written notice of such transfer shall be provided to counsel to the Debtors and the Plan Sponsors (or in the case of a Transfer by a Party other than any PE Sponsor of Senior Notes/ALOC Claims, counsel to the Initial Consenting Noteholders) within two (2) business days after the consummation of such transfer) or (ii) prior to, or contemporaneous with, such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Claimholder or Consenting Noteholder and to be bound by all of the terms of this Agreement applicable to a Consenting Claimholder or Consenting Noteholder, as applicable (including with respect to any and all Claims against or Interests in any of the Debtors), by executing a Consenting Claimholder Joinder and delivering an executed copy thereof within two (2) business days after such execution, to counsel to the Debtors (and in the case of a Transfer by a Party other than any PE Sponsor of Senior Notes/ALOC Claims, counsel to the Initial Consenting Noteholders), in which event the transferee (a "**Permitted Transferee**") shall be deemed to be a Consenting Claimholder or Consenting Noteholder, as applicable, hereunder to the extent of such transferred rights and obligations.  Any transfer made while this Agreement remains in effect in

violation of this provision shall be void *ab initio*. Notwithstanding anything to the contrary in this Section 6, any Consenting Noteholder may transfer any Claims other than Senior Notes/ALOC Claims against the Debtors without the requirement that the transferee be or become subject to this Agreement provided that such Consenting Noteholder entered into a trade with such transferee with respect to such Claims prior to the effectiveness of this Agreement and such trade remains unsettled as of the effectiveness of this Agreement.

(b)      Qualified Marketmaker Exclusion.  Notwithstanding anything the contrary herein, (i) a Party may transfer any Claims against the Debtors to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become a Party only if such Qualified Marketmaker has purchased such Claims against the Debtors with a view to immediate resale of such Claims (by purchase, sale, assignment, transfer, participation or otherwise) as soon as reasonably practicable, and in no event later than three (3) business days after its acquisition and, in any event, prior to the Distribution Record Date, of such Claims, to a Permitted Transferee; and (ii) to the extent that a Party is acting in its capacity as a Qualified Marketmaker, it may transfer or participate any right, title, or interest in any Claims against the Debtors that the Qualified Marketmaker acquires from a holder of Claims who is not a Party without the requirement that the transferee be a Permitted Transferee.  For the avoidance of doubt, any entity that acquires Claims against the Debtors in its capacity as a Qualified Marketmaker and does not resell such Claims within three (3) business days after its acquisition thereof and, in any event, prior to the Distribution Record Date, must become a Party to this Agreement by executing a Consenting Claimholder Joinder and delivering an executed copy thereof within two (2) business days after the expiration of such period, to counsel to the Debtors (and in the case of a Transfer by a Party other than any PE Sponsor of Senior Notes/ALOC Claims, counsel to the Initial Consenting Noteholders).  For these purposes, a "**Qualified Marketmaker**" means an entity that: (a) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers Claims against the Company and its affiliates (including debt securities or other debt) or enter into with customers long and short positions in Claims against the Company and its affiliates (including debt securities or other debt), in its capacity as a dealer or market maker in such Claims against the Company and its affiliates; and (b) is in fact regularly in the business of making a market in Claims against issuers or borrowers (including debt securities or other debt).

(c)      Additional Claims.  This Agreement shall in no way be construed to preclude the Plan Sponsors or any Consenting Claimholder or Consenting Noteholder from acquiring additional Claims against any of the Debtors; *provided* that, upon any such acquisition of Claims, (i) such Plan Sponsor, Consenting Noteholder (other than a Consenting Noteholder that acquires Senior Notes/ALOC Claims) or Consenting Claimholder shall promptly notify (in no event later than two (2) business days thereafter) counsel to each other Party and (ii) each Plan Sponsor, Consenting Claimholder or Consenting Noteholder agrees (x) that any additional acquired Claims shall be subject to this Agreement and (y) to vote such Claims or Interests in a manner consistent with Section 5 hereof, as applicable.

(d)      Reporting.  Counsel to the Initial Consenting Noteholders shall report the aggregate and individual holdings of Senior Notes/ALOC Claims of all Consenting Noteholders on the Friday of each week and upon reasonable request of any Debtor or any of the Plan Sponsors (electronic mail among counsel being sufficient).

15

**Section 7.        Representations and Warranties**.

(a)        <u>Mutual Representations and Warranties</u>. Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the Agreement Effective Date (or as of the date such Party executes a Committee Joinder or Consenting Claimholder Joinder, as applicable), subject in the case of the Debtors to any required approval by the Bankruptcy Court:

(1)        <u>Power and Authority</u>. Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(2)        <u>No Conflict</u>. The execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(3)        <u>No Consent or Approval</u>. The execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings (i) as may be necessary and/or required by the U.S. Securities and Exchange Commission or (ii) with respect to the Plan Sponsors, that are set forth in clauses (a) or (b) of Section 5.5 of the EPCA; and

(4)        <u>Enforceability</u>. This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)        <u>Additional Representations of Consenting Claimholders and Consenting Noteholders</u>. Each Consenting Claimholder and each Consenting Noteholder, severally and not jointly, represents and warrants to the other Parties that, as of its respective Consenting Claimholder Effective Date or the Agreement Effective Date, as applicable, such Consenting Claimholder or Consenting Noteholder: (1) (A) is the owner or beneficial owner (or manager or advisor of funds or accounts that are beneficial owner) of the aggregate principal amount of Claims against any of the Debtors, as applicable, set forth below its name on the signature page hereto or to its Joinder, as applicable and does not own or beneficially own any other Claims against any of the Debtors, and/or (B) has, with respect to the beneficial owner(s) of such Claims, as applicable, (i) sole investment or voting discretion with respect to such Claims, (ii) full power and authority

16

to vote on and consent to matters concerning such Claims, or to exchange, assign, and Transfer such Claims, and (iii) full power and authority to bind or act on the behalf of, such beneficial owner(s); and (2) with respect to each Consenting Noteholder, although none of the Parties intends that this Agreement should constitute (and they each believe it does not constitute) an offering of securities, such Consenting Noteholder is either (A) a qualified institutional buyer, as defined in Rule 144A of the Securities Act of 1933, as amended (the "**Securities Act**") or (B) a non-U.S. Person in offshore transaction complying with Rule 903 or Rule 904 of Regulation S under the Securities Act and who also is an "institutional account" within the meaning of FINRA Rule 4512(c).  To the extent a Party is both a Consenting Claimholder and a Consenting Noteholder, it makes the foregoing representations and warranties in each such capacity.

   **Section 8.    Termination Events**.

   (a)    <u>PE Sponsor and Consenting Noteholder Termination Events</u>.  This Agreement may be terminated (i) with respect to any PE Sponsor, by such PE Sponsor and (ii) with respect to the Consenting Noteholders, by the Requisite Consenting Noteholders, in each case, by delivering to the other Parties one (1) business day's written notice in accordance with <u>Section 11(l)</u> hereof, upon the occurrence of any of the following events, in each case after the Agreement Effective Date; *provided*, *however*, that neither any PE Sponsor nor the Requisite Consenting Noteholders may seek to terminate this Agreement based upon a breach of this Agreement by any Debtor arising primarily out of any such PE Sponsor's or any Consenting Noteholder's own actions, respectively:

      (1)    the breach by any Debtor of any obligation, commitment, agreement, representation, warranty, covenant, or other provision contained in this Agreement in any material respect, which breach (i) would materially and adversely impede or interfere with the overall acceptance, implementation, or consummation of the Restructuring on the terms and conditions set forth in this Agreement and the Plan and (ii) remains uncured for a period of five (5) business days after the receipt by the other Parties of written notice of such breach from the terminating PE Sponsors or Requisite Consenting Noteholders, as applicable, other than with respect to any breach that is incurable, for which no cure period shall be required or apply; *provided* that a breach by any individual Initial Consenting Noteholder, solely with respect to <u>Sections 5(c)(1), 5(c)(2), and 5(c)(3)</u> hereof, may be cured by any combination of non-breaching Initial Consenting Noteholders agreeing to increase the amount of their commitments by the amount of the breaching Initial Consenting Noteholder's commitment within ten (10) business days after receipt by the Initial Consenting Noteholders of written notice of such breach;

      (2)    the termination of this Agreement in accordance with this <u>Section 8(a)</u> by any PE Sponsor or the Requisite Consenting Noteholders or in accordance with <u>Section 8(d)</u> by the Debtors;

      (3)    the Bankruptcy Court approves or authorizes an Alternative Transaction or any of the Debtors (i) enters into any Contract (as defined in the EPCA) providing for the consummation of any Alternative Transaction, (ii) files any motion or application seeking authority to propose, join in or participate in the formation of any actual or proposed Alternative Transaction, or (iii) publicly announces its intention to take any such action listed in this <u>Section 8(a)(3)</u> or to materially breach its obligations under <u>Section 5(f)(24)</u>

hereof;

(4)    the failure by the Debtors to meet any of the Milestones as a result of the failure by any Debtor to use commercially reasonable efforts to reach such Milestone, unless such Milestone is extended in accordance with Section 4 hereof;

(5)    the issuance by any governmental authority (including any regulatory authority or any court of competent jurisdiction) of any injunction, judgment, decree, charge, ruling or order that, in each case, would have an adverse effect on a material provision of this Agreement or a material portion of the Restructuring or the Plan or a material adverse effect on the Debtors' businesses, unless the Debtors have sought a stay of such injunction, judgment, decree, charge, ruling, or order within fifteen (15) business days after the date of such issuance, and such injunction, judgment, decree, charge, ruling, or order is reversed or vacated within twenty (20) business days after the date of such issuance;

(6)    an examiner (other than an independent fee examiner) with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, a trustee, or a receiver shall have been appointed in the Chapter 11 Cases;

(7)    the Debtors withdraw the Plan or the Bankruptcy Court enters an order denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein; *provided* that, for the avoidance of doubt, no Party shall have the right to terminate this Agreement pursuant to this Section 8(a)(7) if the Bankruptcy Court denies confirmation of the Plan subject only to the making of ministerial, administrative, or immaterial modifications to the Plan;

(8)    the (i) conversion of one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Requisite Commitment Parties;

(9)    (i) any of the Definitive Documents, after completion, contain terms, conditions, representations, warranties, or covenants that are materially inconsistent with the terms of this Agreement, (ii) any of the Definitive Documents shall have been materially amended or modified in a manner rendering such Definitive Document materially inconsistent with the terms of this Agreement, in each case, without the consent of the Requisite Commitment Parties in accordance with their approval rights under this Agreement and the Plan, or (iii) in the case of a Definitive Document that is also an order (including the Confirmation Order), such order shall have been reversed, vacated or modified in a manner materially inconsistent with this Agreement, without the prior written consent of the Requisite Commitment Parties, unless the Debtors have sought a stay of the order causing such reversal, vacatur or modification within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance;

(10)    any Debtor files a motion or application (or a series of motions or

applications) seeking authority to sell in a single sale, or in a series of sales that in the aggregate would constitute, all or a material portion of its assets or equity interests without the prior written consent of the Requisite Commitment Parties;

(11)    the Debtors file a motion seeking authority to enter into post-petition DIP financing without the prior written consent of the Requisite Commitment Parties;

(12)    the Bankruptcy Court enters an order granting relief from the automatic stay imposed by Bankruptcy Code section 362 authorizing any party to proceed with regard to any material asset of the Debtors and such relief has a material adverse effect on the Restructuring;

(13)    the Debtors materially breach their obligations under Section 5(f)(24) of this Agreement;

(14)    the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Debtors have sought a stay of such relief within seven (7) business days after the date of such issuance, and such order is stayed reversed or vacated within fourteen (14) business days after the date of such issuance; or

(15)    all conditions to effectiveness or closing in the EPCA are not satisfied or waived by the Effective Date Deadline, in accordance therewith, which date may be extended in writing by the Requisite Commitment Parties (electronic mail among counsel being sufficient); *provided* that the right to terminate this Agreement under this Section 8(a)(15) shall not be available to any Party if any Plan Sponsor is then in material breach of the EPCA and such breach proximately caused the failure of the Plan to go effective by the Effective Date Deadline.

(b)    <u>Consenting Claimholder Termination Events</u>.  This Agreement may be terminated by any Consenting Claimholder, with respect to itself only, upon one (1) business day's written notice thereof by such terminating Consenting Claimholder to the other Parties in accordance with Section 11(l) hereof, upon the occurrence of any of the following events, in each case after the applicable Consenting Claimholder Effective Date:

(1)    the treatment of such Consenting Claimholder's Claims in the Plan is adversely and materially modified from that specified in the Plan filed by the Debtors as of the applicable Consenting Claimholder Effective Date; or

(2)    the Debtors file or explicitly support an Alternative Transaction that proposes treatment of such Consenting Claimholder's Claims that adversely deviates, in any material manner, from the treatment specified in the Plan filed by the Debtors as of the applicable Consenting Claimholder Effective Date.

(c)    <u>Committee Termination Events</u>.  This Agreement may be terminated by the Committee, with respect to itself only, upon one (1) business day's written notice thereof by the Committee to the other Parties in accordance with Section 11(l) hereof, upon the occurrence of

any of the following events, in each case after the Committee Effective Date:

(1)    the treatment of the unsecured Claims in the Plan is adversely and materially modified from that specified in the Plan filed by the Debtors as of the Committee Effective Date;

(2)    any of the Debtors or the Plan Sponsors proposes or explicitly supports any Alternative Transaction that proposes treatment of unsecured Claims against the Debtors that adversely deviates, in any material manner, from the treatment specified in the Plan filed by the Debtors as of the Committee Effective Date; or

(3)    the Committee determines, based upon advice of outside counsel, in good faith, that, as a result of unforeseen circumstances, not directly or indirectly caused, solicited, or encouraged by the Committee, there exists a strong likelihood of obtaining a substantially superior recovery for holders of unsecured Claims against the Debtors than that which is proposed under the Plan and, as a result of such likelihood, the Committee would be breaching its fiduciary duty to creditors in continuing to support the Restructuring; provided that, for purposes of considering whether any potential recovery is substantially superior, the Committee shall consider the reasonably expected cost of obtaining such additional recoveries and the risk of foregoing the treatment of holders of unsecured Claims against the Debtors under the Plan, including the risk of implementing and closing the Alternative Transaction.

(d)    <u>Debtor Termination Events</u>.  This agreement may be terminated with respect to all Parties upon one (1) business day's written notice thereof by the Debtors to the other Parties in accordance with <u>Section 11(l)</u> hereof, upon the occurrence of any of the following events, in each case after the Agreement Effective Date; *provided*, *however*, that the Debtors may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of the Debtors' own actions in material breach of this Agreement:

(1)    the breach by the Plan Sponsors of any obligation, commitment, agreement, representation, warranty, covenant, or other provision contained in this Agreement in any material respect, which breach (i) would materially and adversely impede or interfere with the overall acceptance, implementation, or consummation of the Restructuring on the terms and conditions set forth in this Agreement and the Plan and (ii) remains uncured for a period of five (5) business days after the receipt by the other Parties of written notice of such breach from the Debtors, other than with respect to any breach that is incurable, for which no cure period shall be required or apply; *provided* that a breach by any individual Initial Consenting Noteholder, solely with respect to <u>Sections 5(c)(1), 5(c)(2), and 5(c)(3)</u> hereof, may be cured by any combination of non-breaching Initial Consenting Noteholders agreeing to increase the amount of their commitments by the amount of the breaching Initial Consenting Noteholder's commitment within ten (10) business days after receipt by the Initial Consenting Noteholders of written notice of such breach;

(2)    the termination of this Agreement in accordance with its terms by any of the Plan Sponsors;

20

(3)     the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction (including the Bankruptcy Court), of any statute, regulation, ruling or order declaring this Agreement or any material portion hereof to be unenforceable or enjoining or otherwise restricting the consummation of a material portion of the Restructuring, which action remains uncured for a period of ten (10) business days after the receipt by the Parties of written notice of such event;

(4)     the Company Board determines in good faith, based upon advice of outside counsel, that proceeding with the Restructuring contemplated herein and in the Plan, and confirmation and consummation of the Plan, would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided* that the Debtors shall give prompt written notice to counsel to the Plan Sponsors of any determination in accordance with this Section 8(d)(4) (electronic mail among counsel being sufficient);

(5)     the Bankruptcy Court enters an order denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein; *provided* that, for the avoidance of doubt, the Debtors shall not have the right to terminate this Agreement pursuant to this Section 8(d)(5) if the Bankruptcy Court denies confirmation of the Plan subject only to the making of ministerial, administrative or immaterial modifications to the Plan;

(6)     the Bankruptcy Court (or other court of competent jurisdiction) enters an order (i) directing the appointment of an examiner (other than an independent fee examiner) with expanded powers or a trustee in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, or (iv) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement;

(7)     the Plan Sponsors propose or explicitly support any Alternative Transaction without the prior written consent of the Debtors that has a material adverse effect on the consummation of the Restructuring;

(8)     the Effective Date of the Plan has not occurred by the Effective Date Deadline;

(9)     all conditions to effectiveness or closing in the EPCA are not satisfied or waived by the Effective Date Deadline, which date may be extended in writing by counsel to the Debtors (electronic mail among counsel being sufficient); *provided* that the right to terminate this Agreement under this Section 8(d)(9) shall not be available to the Debtors if any Debtor is then in material breach of the EPCA and such breach proximately caused the failure of the Plan to go effective by the Effective Date Deadline; or

(10)     the termination of the EPCA in accordance with its terms.

(e)     Mutual Termination; Automatic Termination.  This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among (i) each of the Debtors and (ii) the Requisite Commitment Parties.  Notwithstanding anything in this

Agreement to the contrary, this Agreement shall terminate automatically without any further required action or notice upon the occurrence of the Effective Date of the Plan and either the expiration of the appeal period with respect to the Confirmation Order if no appeals are filed or, if any appeal of the Confirmation Order is filed, the conclusion of such appeal.

(f)      Effect of Termination.   The date on which termination of this Agreement is effective with respect to any Party in accordance with this Section 8 shall be referred to as a "**Termination Date**" with respect to such Party.  Upon the occurrence of a Termination Date, the applicable Parties' obligations under this Agreement shall be terminated effective immediately, and the Parties, subject to such termination in accordance with this Section 8, shall be released from all commitments, undertakings, and agreements hereunder; *provided, however*, that each of the following shall survive any such termination: (i) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims, (ii) this Section 8, and (iii) Section 11 hereof.  Notwithstanding anything in this Agreement to the contrary, if the Debtors terminate this Agreement pursuant to Section 8(d)(4) hereof and the Requisite Consenting Noteholders consent to be bound by this Agreement notwithstanding such termination, (i) the Debtors' and the Consenting Noteholders' obligations under this Agreement shall continue to be valid and binding on the Debtors and the Consenting Noteholders solely as to each other and (ii) all references to the Requisite Commitment Parties shall be deemed to refer to the Requisite Consenting Noteholders.

(g)      Automatic Stay.   Unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and termination of this Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of a Termination Event shall result in the automatic termination of this Agreement with respect to each Party for which this Agreement would terminate if the Parties having the right to terminate this Agreement (the "**Requisite Notice Parties**") were permitted to provide notice of such occurrence in accordance with this Agreement, upon the date that is five (5) days following such occurrence, unless the Requisite Notice Parties waive such Termination Event in writing.  The Debtors acknowledge and agree, and shall not dispute, that the giving of notice of the termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Debtors hereby waive, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice and their right to assert a contrary position in the Chapter 11 Cases, if any, with respect to the foregoing); provided, however, that nothing herein shall prejudice any Party's rights to argue that the delivery of a notice of default or termination was not otherwise proper under the terms of this Agreement.

**Section 9.      Amendments and Waivers**.  The terms and conditions of this Agreement, including any exhibits, annexes or schedules to this Agreement, may not be waived, modified, amended, or supplemented without the prior written consent of (i) each of the Debtors, (ii) the Requisite Commitment Parties, (iii) subject to the occurrence of the Committee Effective Date and solely with respect to any rights or obligations of the Committee under Sections 5(a), 5(e), 8(c), and 9 hereof, the Committee, and (iv) subject to the occurrence of the Consenting Claimholder Effective Date and solely with respect to any rights or obligations of the Consenting Claimholders under Sections 5(a), 5(d), 8(b), and 9 hereof, the Consenting Claimholders holding a majority of the principal amount of the Claims against the Debtors that all Consenting Claimholders hold at

the time of such waiver, modification, amendment, or supplement.  Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 9 shall be ineffective and void *ab initio* as to any non-consenting Party affected thereby.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by a Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy by such Party.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.  Any consent or waiver contemplated in this Agreement may be provided by electronic mail from counsel to the relevant Parties.

Section 10.    **Fees and Expenses**.  The Debtors shall promptly pay or reimburse, as and when required under either the EPCA or the Plan, all reasonable and documented out-of-pocket fees (including success fees, transaction fees or similar fees) of: (i) Milbank LLP, as counsel to the PE Sponsors, (ii) Perella Weinberg Partners LP, as financial advisor to the PE Sponsors, (iii) one local counsel to the PE Sponsors, (iv) Willkie Farr & Gallagher LLP and Young Conaway Stargatt & Taylor LLP, as legal counsel to the Ad Hoc Group, (v) Ducera Partners LLC, as financial advisors to the Ad Hoc Group, and (vi) any other accountants and other professionals, advisors and consultants retained by the PE Sponsors or the Ad Hoc Group with the prior written consent of the Company, in each case, to implement the Restructuring (regardless of when such fees are or were incurred) (the "**Fees**").  To the extent not paid or reimbursed under the EPCA or otherwise by the Debtors before the Effective Date, the Plan shall provide for the payment in full in cash on the Effective Date of any unpaid Fees. The Fees shall be payable by the Debtors without any requirement to (x) file retention or fee applications, (y) provide notice to any Person other than the Debtors, or (z) provide itemized time detail to the Debtors or any other Person; *provided* that the applicable advisors will provide additional detail as reasonably requested by the Debtors.

Section 11.    **Miscellaneous**.

(a)    Entire Agreement.  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral, or written, among the Parties (or any subset thereof) with respect thereto.

(b)    Headings.  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

(c)    Governing Law; Submission to Jurisdiction; Forum Selection.  This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflicts of law principles thereof.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court and, to the extent the Bankruptcy Court is determined to not have jurisdiction, in the United States District Court for the Southern District of New York or any New York State court located in New York County (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement:

(a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto.

(d)     Trial by Jury Waiver.  Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or related to this Agreement or the transactions contemplated hereby.

(e)     Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(f)     Interpretation and Rules of Construction.  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.  Each Party was represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel and, therefore, waive the application of any law, regulation, holding or rule of construction (i) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (ii) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation" and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or."  "Writing," "written," and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent or other information shall be provided "in writing" shall include e-mail.  Any reference to "business day" means any day other than a Saturday, a Sunday, or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to a day means a calendar day.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

(g)     Successors and Assigns.  Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective successors, permitted assigns, heirs, executors, administrators, and Representatives.

(h)     No Third-Party Beneficiaries.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

(i)     Relationship Among Parties.  Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint, (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; and (iv) none of the Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, including as a result of this Agreement or the Restructuring contemplated herein (other than the fiduciary duties of the Committee to Holders of unsecured Claims against any of the Debtors).

(j)     Reservation of Rights.  If the Restructuring is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring, or determine the payment of damages to which a Party may be entitled under this Agreement.

(k)     Specific Performance; Remedies Cumulative.  This Agreement is intended as a binding commitment enforceable in accordance with its terms.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy for any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

(l)     Notices.  All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier, or by registered or certified mail (return receipt requested) to the following addresses or electronic mail addresses:

(1)     If to the Company, to:

The Hertz Corporation
8501 Williams Road
Estero, Florida 33928
Attention: M. David Galainena
Email: dave.galainena@hertz.com

25

*with a copy to:*

White & Case LLP
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Attention: Thomas E Lauria; Matthew Brown
Email: tlauria@whitecase.com; mbrown@whitecase.com

*and*

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attention: David Turetsky; Andrew Zatz
Email: david.turetsky@whitecase.com; azatz@whitecase.com

    (2)    If to the PE Sponsors, to the electronic mail addresses set forth below such Party's signature, with copies to:

Milbank LLP
55 Hudson Yards
New York, NY 10003
Attention: Gerard Uzzi; Nelly Almeida
Email: guzzi@milbank.com; nalmeida@milbank.com

    (3)    If to the Initial Consenting Noteholders, to the electronic mail addresses set forth below such Party's signature (or as directed by any Permitted Transferee thereof), as the case may be, with copies to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention: Rachel C. Strickland
Email: rstrickland@willkie.com

    (4)    If to the Committee:

Kramer Levin Naftalis & Frankel LLP
1177 Sixth Avenue
New York, NY 10036
Attention:  Amy Caton
              Thomas Moers Mayer
Email: acaton@kramerlevin.com
tmayer@kramerlevin.com

Any notice given by delivery, mail, or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine, or electronic mail (as

applicable) confirmation of transmission.

(m)     <u>Acknowledgment</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

(n)     <u>Independent Analysis</u>.  Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

(o)     <u>Debtors' Fiduciary Obligations</u>.  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement, the Plan, or anything included in any Definitive Document shall require any Debtor or any board of directors, board of managers, or similar governing body of any Debtor, after consulting with counsel, to take any action or to refrain from taking any action with respect to this Agreement, the Plan, or the Restructuring to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction pursuant to such exercise of fiduciary duties shall not be deemed to constitute a breach of this Agreement; *provided* that the Debtors shall give prompt written notice to counsel to the Plan Sponsors (electronic mail among counsel being sufficient) of any determination made under this <u>Section 11(o)</u>.

*[Remainder of Page Intentionally Left Blank]*

27

DocuSign Envelope ID: 99337EE6-891C-4B41-976F-8093F0AAD905

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**Hertz Global Holdings, Inc.**

By:
Name: M. David Galainena
Title: Executive Vice President, General Counsel and Secretary

**The Hertz Corporation**

By:
Name:  M. David Galainena
Title: Executive Vice President, General Counsel and Secretary

**CMGC Canada Acquisition ULC (CCAA)**

By:
Name:  M. David Galainena
Title: Vice President, General Counsel and Secretary

**Dollar Rent A Car, Inc.**

By:
Name:  M. David Galainena
Title: Vice President, General Counsel and Secretary

[Signature Page to Plan Support Agreement]

**Dollar Thrifty Automotive Group Canada, Inc.**

By:

Name:  M. David Galainena

Title: Vice President, General Counsel and
Secretary

**Dollar Thrifty Automotive Group, Inc.**

By:

Name:  M. David Galainena

Title: Vice President, General Counsel and
Secretary

**DTG Canada Corp.**

By:

Name:  M. David Galainena

Title: Vice President, General Counsel and
Secretary

**DTG Operations, Inc.**

By:

Name:  M. David Galainena

Title: Vice President, General Counsel and
Secretary

**DTG Supply, LLC**

By:    DTG Operations, Inc.,
       Its sole member and manager

By: _____
Name: M. David Galainena
Title: Vice President, General Counsel and
Secretary

**Firefly Rent A Car, LLC**

By:    The Hertz Corporation,
       Its sole member and manager

By: _____
Name: M. David Galainena
Title: Executive Vice President, General Counsel
and Secretary

**Hertz Aircraft, LLC**

By:    The Hertz Corporation,
       Its sole member and manager

By: _____
Name: M. David Galainena
Title: Executive Vice President, General Counsel
and Secretary

**Hertz Canada Limited**

By: 
Name:  M. David Galainena
Title: Vice President, General Counsel and
Secretary

**Hertz Car Sales, LLC**

By:     The Hertz Corporation,
        Its sole member and manager

By: 
Name:  M. David Galainena
Title: Executive Vice President, General Counsel
and Secretary

**Hertz Global Services Corporation**

By: 
Name:  M. David Galainena
Title: Vice President, General Counsel and
Secretary

**Hertz Local Edition Corp.**

By: 
Name:  M. David Galainena
Title: Vice President, General Counsel and
Secretary

**Hertz Local Edition Transporting, Inc.**

By:

Name:  M. David Galainena

Title: Vice President, General Counsel and Secretary


**Hertz System, Inc.**

By:

Name:  M. David Galainena

Title: Vice President, General Counsel and Secretary


**Hertz Technologies, Inc.**

By:

Name:  M. David Galainena

Title: Vice President, General Counsel and Secretary


**Hertz Transporting, Inc.**

By:

Name:  M. David Galainena

Title: Vice President, General Counsel and Secretary

**Rental Car Group Company, LLC**

By:     The Hertz Corporation,
        Its sole member and manager

By:     _____
Name:  M. David Galainena
Title: Executive Vice President, General Counsel
and Secretary


**Rental Car Intermediate Holdings, LLC**

By:     Hertz Global Holdings, Inc.,
        Its sole member and manager

By:     _____
Name:  M. David Galainena
Title: Executive Vice President, General Counsel
and Secretary


**Smartz Vehicle Rental Corporation**

By:     _____
Name:  M. David Galainena
Title: Vice President, General Counsel and
Secretary


**Thrifty Car Sales, Inc.**

By:     _____
Name:  M. David Galainena
Title: Vice President, General Counsel and
Secretary


[Signature Page to Plan Support Agreement]

**Thrifty Rent-A-Car System, LLC**

By:     Thrifty, LLC,
        Its Sole member/manager
        By:   Dollar Thrifty Automotive Group, Inc.,
              Its Sole Member/Manager

By:
Name: M. David Galainena
Title: Vice President, General Counsel and
Secretary


**Thrifty, LLC**

By:     Dollar Thrifty Automotive Group, Inc.,
        Its sole member and manager

By:
Name: M. David Galainena
Title: Vice President, General Counsel and
Secretary


**TRAC Asia Pacific, Inc.**

By:
Name:  M. David Galainena
Title: Vice President, General Counsel and
Secretary

**SellerCo Fleet Leasing, Ltd.**

By: _____

Name:  M. David Galainena

Title:  President


**SellerCo Corporation**

By: _____

Name:  M. David Galainena

Title:  President and Chief Executive Officer


**SellerCo FSHCO Company**

By: _____

Name:  M. David Galainena

Title:  President and Chief Executive Officer


**SellerCo Mobility Solutions, Inc.**

By: _____

Name:  M. David Galainena

Title:  Chairman of the Board and President

**CENTERBRIDGE CAPITAL PARTNERS IV, L.P.**

By:    Centerbridge Associates IV, L.P., its General Partner

By:    CCP IV Cayman GP Ltd., its General Partner

By:_____
Name:
Title:


Notice Address:

Centerbridge Partners, LP.
375 Park Avenue
New York, New York 10152

Attention: The Office of the General Counsel
Email:  legalnotices@centerbridge.com

**WARBURG PINCUS (CALLISTO) GLOBAL GROWTH (CAYMAN), L.P.**

By:    Warburg Pincus (Cayman) Global Growth GP, L.P., its general partner

By:    Warburg Pincus (Cayman) Global Growth GP LLC, its general partner

By:    Warburg Pincus Partners II (Cayman), L.P., its managing member

By:    Warburg Pincus (Bermuda) Private Equity GP Ltd., its general partner

By:_____

Name: Steven Glenn

Title: Authorised Signatory

**WARBURG PINCUS (EUROPA) GLOBAL GROWTH (CAYMAN), L.P.**

By:    Warburg Pincus (Cayman) Global Growth GP, L.P., its general partner

By:    Warburg Pincus (Cayman) Global Growth GP LLC, its general partner

By:    Warburg Pincus Partners II (Cayman), L.P., its managing member

By:    Warburg Pincus (Bermuda) Private Equity GP Ltd., its general partner

By:_____

Name: Steven Glenn

Title: Authorised Signatory

**WARBURG PINCUS GLOBAL GROWTH-B (CAYMAN), L.P.**

By:    Warburg Pincus (Cayman) Global Growth GP, L.P., its general partner

By:    Warburg Pincus (Cayman) Global Growth GP LLC, its general partner

By:    Warburg Pincus Partners II (Cayman), L.P., its managing member

By:    Warburg Pincus (Bermuda) Private Equity GP Ltd., its general partner

By:_____

Name: Steven Glenn

Title: Authorised Signatory

**WARBURG PINCUS GLOBAL GROWTH-E (CAYMAN), L.P.**

By:    Warburg Pincus (Cayman) Global Growth GP, L.P., its general partner

By:    Warburg Pincus (Cayman) Global Growth GP LLC, its general partner

By:    Warburg Pincus Partners II (Cayman), L.P., its managing member

By:    Warburg Pincus (Bermuda) Private Equity GP Ltd., its general partner

By:_____

Name: Steven Glenn

Title: Authorised Signatory

**WARBURG PINCUS GLOBAL GROWTH PARTNERS (CAYMAN), L.P.**

By:    Warburg Pincus (Cayman) Global Growth GP, L.P., its general partner

By:    Warburg Pincus (Cayman) Global Growth GP LLC, its general partner

By:    Warburg Pincus Partners II (Cayman), L.P., its managing member

By:    Warburg Pincus (Bermuda) Private Equity GP Ltd., its general partner

By:_____

Name: Steven Glenn

Title: Authorised Signatory

**WP GLOBAL GROWTH PARTNERS (CAYMAN), L.P.**

By:    Warburg Pincus (Cayman) Global Growth GP, L.P., its general partner

By:    Warburg Pincus (Cayman) Global Growth GP LLC, its general partner

By:    Warburg Pincus Partners II (Cayman), L.P., its managing member

By:    Warburg Pincus (Bermuda) Private Equity GP Ltd., its general partner

By:_____

Name: Steven Glenn

Title: Authorised Signatory

Notice Address:
450 Lexington Ave
New York, NY 10017

Attention: General Counsel
Email: notices@warburgpincus.com

**DUNDON CAPITAL PARTNERS, LLC**

By: _____

Name:  Tom Dundon

Title:  Chairman and Managing Partner

Notice Address:

Dundon Capital Partners, LLC
2100 Ross Ave Ste 550
Dallas, TX, 75201-6765

Attention: Tom Dundon
Email: td@dundon.co

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**400 CAPITAL CREDIT OPPORTUNITIES MASTER FUND LTD**

By: 400 Capital Management LLC, as investment manager

By: _____
Name: Christopher Hentemann
Title: Managing Partner and Chief Investment officer

**BOSTON PATRIOT MILK ST LLC**

By: 400 Capital Management LLC, as investment manager

By: _____
Name: Christopher Hentemann
Title: Managing Partner and Chief Investment officer

**400 CAPITAL TX COF I LP**

By: 400 Capital Management LLC, as investment manager

By: _____
Name: Christopher Hentemann
Title: Managing Partner and Chief Investment officer

*[Signature Page to the Plan Support Agreement]*

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**683 CAPITAL PARTNERS, LP**

By: _____

Name: Joseph Patt

Title: Member of the General Partner

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

AEGON USA INVESTMENT MANAGEMENT, LLC

By: _Derek Thoms_ _____
     999077A072B843C...
     Name: Derek Thoms
     Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Banc of America Credit Products, Inc. executes this Agreement and signature page solely on behalf of the US Distressed & Special Situations Group and its managed positions.  This signature in no way binds any other line of business, activities or positions at Bank of America Credit Products, Inc. or any of its affiliates or subsidiaries.  In the event the terms of this signature are not accepted, the signature shall be deemed null and void ab initio

By: *Austin Penland*
    Name:  Austin Penland
    Title:  AVP

---

[1] Such principal amount is calculated after giving effect to the closing of all of Banc of America Credit Products' open and unsettled First Lien Facilities Claims trades as of the effective date hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

BofA Securities Inc. executes this Agreement and signature page solely on behalf of the US Distressed & Special Situations Group and its managed positions.  This signature in no way binds any other line of business, activities or positions at BofA Securities Inc. or any of its affiliates or subsidiaries. In the event the terms of this signature are not accepted, the signature shall be deemed null and void ab initio

By:    _____

     Name:   Vincenzo Ruocco
     Title:    Director

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

BREAN ASSET MANAGEMENT, LLC

By:_____

Name:  Patrick L. Marano, Jr.
Title:    General Counsel & CCO

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Canso Investment Counsel Ltd. acting in its capacity as portfolio manager for and on behalf of certain managed accounts**

By: _____
    Name: Joe Morin
    Title: Portfolio Manager

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Carronade Capital Master, LP
By: Carronade Capital GP, LLC, its general partner

By: _____

Name: Dan Gropper
Title:   Managing Member

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

CarVal Investors LP, on behalf of
Funds it manages

By: _____

Name: Ryan Morrell

Title: Managing Director

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Cetus Capital VI, L.P.

By:_____

Name:   Richard Maybaum
Title:   Managing Director

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Littlejohn Opportunities Master Fund LP

By:_____

Name:  Richard Maybaum
Title:   Managing Director

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

OFM II, L.P.

By:_____

Name:   Richard Maybaum
Title:    Managing Director

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER
CVC Global Credit Opportunities Master Fund LP
acting by its general partner,
CVC Global Credit Opportunities Fund GP, LLC
acting by its sole member,
CVC Credit Partners, LLC
By:_____ _____

Name:  Scott Bynum

Title:   Authorised signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

D. E. Shaw Galvanic Portfolios, L.L.C.

By: _____

Name:  Shi Nisman
Title:    Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

Deutsche Bank Securities Inc. ("DB") is engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the obligations set forth in this Agreement shall only apply to the trading desk(s) and/or business group(s) of DB as further set forth in this signature page, and shall not apply to any other affiliate, trading desk or business group of DB.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

DEUTSCHE BANK SECURITIES INC.
(solely with respect to the Distressed Products Group)

By:_____
    Name:   Shawn Faurot
    Title:   Managing Director

By:_____
    Name:   Joanne Adkins
    Title:   Managing Director

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Diameter Master Fund LP
By: Diameter Capital Partners LP, its Investment Manager

By: _____

Name:  Shailini Rao
Title:   General Counsel and CCO

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Diameter Dislocation Master Fund LP
By: Diameter Capital Partners LP, its Investment Manager

By: _____

Name:  Shailini Rao
Title:     General Counsel and CCO

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

The Calvert Fund-Calvert High Yield Bond Fund

By: _____

Name: Steve Concannon
Title: Vice President

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

EATON VANCE TRUST COMPANY
COLLECTIVE INVESTMENT TRUST FOR EMPLOYEE BENEFIT PLANS - HIGH YIELD FUND

By: _____
        Name: Steve Concannon
        Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

EATON VANCE CORP

By: _____

Name: Steve Concannon
Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Eaton Vance Global Income Builder Fund

By: _____
    Name: Steve Concannon
    Title: Vice President

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

EATON VANCE TRUST COMPANY COMMON TRUST FUND - HIGH YIELD COMMON TRUST FUND

By:_____

Name: Steve Concannon
Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

High Income Opportunities Portfolio

By: _____

Name: Steve Concannon
Title: Vice President

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Eaton Vance Income Fund of Boston

By: _____

Name: Steve Concannon
Title: Vice President

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Eaton Vance Limited Duration Income Fund

By: _____

Name: Steve Concannon
Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Eaton Vance Multi-Asset Credit Fund

By: _____

    Name: Steve Concannon
    Title: Vice President

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Eaton Vance Trust Company Multi-Asset Credit Fund II, a separate trust fund of Eaton Vance Trust Company Collective Investment Trust for Employee Benefit Plans III

By: _____

Name: Steve Concannon
Title: Vice President

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

EATON VANCE MULTI-ASSET CREDIT FUND

II, LLC

By: _____

Name: Steve Concannon
Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Southeastern Pennsylvania Transportation Authority

By: _____

Name: Steve Concannon
Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

                                  INITIAL CONSENTING NOTEHOLDER

                                  The Regents of the University of California

By: _____

                                  Name: Steve Concannon
                                  Title: Vice President

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

NSP - Monticello Minnesota Retail Qualified Trust

By: _____

Name: Steve Concannon
Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

NSP - Minnesota Prairie I Retail Qualified Trust

By: _____

Name: Steve Concannon
Title: Vice President

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

NSP - Minnesota Prairie II Retail Qualified Trust

By: _____

    Name: Steve Concannon
    Title: Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

FARMSTEAD CAPITAL MANAGEMENT, LLC
AND ITS AFFILIATES

By: _____
Name: MICHAEL SCOTT
Title: MANAGING MEMBER

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**FIDELITY ADVISOR SERIES II: Fidelity Advisor Strategic Income Fund**

By: _____
  Name: Chris Maher
  Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

DocuSign Envelope ID: 40C28CD4-05C3-4FC6-97B5-5EA655BDD186

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity Securities Fund:  Fidelity Blue Chip Growth Fund**

By: _____
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity Management Trust Company:  Fidelity Blue Chip Growth Commingled Pool**

By: _____
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

DocuSign Envelope ID: 40C28CD4-05C3-4FC9-97B5-5EA655BDD186

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity Securities Fund:  Fidelity Flex Large Cap Growth Fund**

By: _____
Name: Chris Maher
Title: Authorized Signatory

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity Securities Fund:  Fidelity Blue Chip Growth K6 Fund**

By: _Chris Maher_____
E597100C8C7345D
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**FIDELITY SUMMER STREET TRUST:**
**Fidelity Capital & Income Fund**

By: _Chris Maher_____
    E597109C8C7345D...
    Name: Chris Maher
    Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity Investments Canada ULC: Fidelity Blue Chip Growth Institutional Trust**

By: _Chris Maher_
     E597109C8C7345D...
Name: Chris Maher
Title: Authorized Signatory

DocuSign Envelope ID: 40C28CD4-05C3-4FC6-97BF-5EA655BDD186

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity Canadian Balanced Fund, by Fidelity Investments Canada ULC as Trustee**

By: _____

Name: Chris Maher

Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity American High Yield Fund, by Fidelity Investments Canada ULC as Trustee**

By: _____
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity Distressed Opportunities Master Fund I, LP, by Fidelity Management & Research Company LLC as Investment Manager**

By: _Chris Maher_
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity Funds SICAV / Fidelity Funds – US High Yield**

By: _Chris Maher_
E597109C8C7345D...
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity Securities Fund:  Fidelity Series Blue Chip Growth Fund**

By: _Chris Maher_
            E597109C8C73345D

Name: Chris Maher

Title: Authorized Signatory

DocuSign Envelope ID: 40C28CD4-05C3-4FC9-97B5-5EA655BDD186

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Japan Trustee Services Bank, LTD. Re: Fidelity Strategic Income Fund (Mother) By Fidelity Management & Research Company as Sub-Advisor**

By: _____

Name: Chris Maher

Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**FIDELITY SUMMER STREET TRUST:**
**Fidelity Global High Income Fund**

By: _Chris Maher_
    ———————————————————
    E597109C8C7345D...
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**FMR Capital, Inc. High Income 1 Pilot Portfolio - Po** 5028

By: _____

Name: Chris Maher

Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**FMR Capital, Inc. High Income 2 Pilot Portfolio - Portfolio Number 5559**

By: _Chris Maher_____

Name: Chris Maher

Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**FIDELITY CENTRAL INVESTMENT PORTFOLIOS LLC: Fidelity High Income Central Fund**

By: _____
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Master Trust Bank Of Japan Ltd. Re: Fidelity US High Yield Mother Fund, by Fidelity Management & Research Company as Investment Manager**

By: _____
        *Chris Maher*
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Japan Trustee Services Bank, Ltd. Re: Fidelity High Yield Bond Open Mother Fund, by Fidelity Management & Research Company as Investment Manager**

By: _Chris Maher_
    E597109C8C7345D...

Name: Chris Maher

Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**FIDELITY ADVISOR SERIES I: Fidelity Advisor High Income Advantage Fund**

By: _Chris Maher_
_____
    E597100C8C7345D...
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

DocuSign Envelope ID: 40C28CD4-05C3-4FC9-97BF-5EA655BDD186

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Pension Reserves Investment Trust Fund, by Fidelity Institutional Asset Management Trust Company as Investment Manager**

By: _____
      Name: Chris Maher
      Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**Fidelity Institutional Asset Management Trust Company:  FIAM Target Date Blue Chip Growth Commingled Pool**

By: _Chris Maher_ _____
    E597109C8C7345D...
Name: Chris Maher
Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

**VARIABLE INSURANCE PRODUCTS FUND V: Strategic Income Portfolio**

By: _Chris Maher_____

Name: Chris Maher

Title: Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

J.P. MORGAN INVESTMENT MANAGEMENT INC. AND JPMORGAN CHASE BANK, N.A. ("Signatory"), solely as investment adviser and/or trustee on behalf of certain discretionary accounts and/or funds it manages.

By executing this agreement, Signatory, solely as investment advisor and/or trustee on behalf of certain discretionary funds and/or accounts it manages, binds only itself, and itself only in that capacity, and not any other affiliate of JPMorgan Chase & Co., or any of its or their respective business units, subsidiaries or affiliates (including any desk or business unit thereof), and no such affiliate shall be deemed to be bound by the terms of this agreement by virtue of Signatory's execution of this agreement. Moreover, Signatory shall have no obligation to cause any of its affiliates to take or refrain from taking any action.

By: _____

Name: Greg Seketa

Title: Executive Director

*Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

**J.P. MORGAN SECURITIES LLC\*, with respect to only its North America Credit Trading Group**

By: _____
    Name:  Brian M. Ercolani
    Title:   Operations Manger

\*This signature page to the Plan Support Agreement (the "Agreement") applies only to the North America Credit Trading group of J.P. Morgan Securities LLC ("CTG") and the Senior Notes Claims ("Notes") held by such group. Accordingly, the terms "Initial Consenting Noteholders", "Consenting Noteholders", "Consenting Claimholder", "Unsecured Noteholders", "Requisite Consenting Noteholders", "Plan Sponsors", "Party", and "Parties" for all purposes of the Agreement mean and refer only to CTG and such business unit's holdings of the Notes. For the avoidance of doubt, the Agreement does not apply to (i) loans, claims, securities, notes, other obligations or any other interests in the Debtors that may be held, acquired or sold by, or any activities, services or businesses conducted or provided by, any other group or business unit within, or affiliate of, J.P. Morgan Securities LLC, (ii) any credit facilities to which JPMorgan Chase & Co. or any of its affiliates ("Morgan") is a party in effect as of the date hereof, (iii) any new credit facility, amendment to an existing credit facility, or debt or equity securities offering involving Morgan, (iv) any direct or indirect principal activities undertaken by any Morgan entity engaged in the venture capital, private equity or mezzanine businesses, or portfolio companies in which they have investments, (v) any ordinary course sales and trading activity undertaken by employees who are not a member of CTG, (vi) any Morgan entity or business engaged in providing private banking or investment management services, or (vii) any loans, notes, or claims that may be beneficially owned by non-affiliated clients of J.P. Morgan Securities LLC or  any of its affiliates or for which Morgan acts in a fiduciary capacity.

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

King Street Capital Management, L.P.

By:_____    _____

Name: _____
Title:    Authorized Signatory

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Livello Capital Special Opportunities Master Fund LP

By: _Joseph Salama_

Name: Joseph Salama

Title: chief financial officer

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Lord, Abbett & Co. LLC, as investment adviser on behalf of certain accounts it manages

By:_____
Name: Steven Rocco
Title:  Member & Director of Taxable Fixed Income

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

                                            INITIAL CONSENTING NOTEHOLDER


By:_____
      Name:
      Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER
MILLENNIUM CMM, LTD.
By: Millennium International Management LP, its Investment Manager

By: _____
    Name:  Mark Meskin
    Title:   Chief Trading Officer



*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Moore Global Investments, LLC by Moore Capital Management, LP
Its Investment Manager

By: _____

Name:    James Kaye

Title:    Vice President

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Morgan Stanley & Co., LLC, solely on behalf of its New York distressed trading desk, and not on behalf of any of its other trading desks, business units, divisions or affiliates

By: _____

Name:    Brian McGowan
Title:    Managing Director

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Nomura Corporate Research and Asset Management Inc. as investment adviser on behalf of certain funds and accounts

By: _____

     Name: Stephen Kotsen
     Title: Managing Director

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

                                    INITIAL CONSENTING NOTEHOLDER
                                        One Fin Capital Master Fund LP
                                        By: One Fin Capital Management LP
                                           Its Investment Advisor

By:_____

                                        Name:   MayKao Manisone
                                        Title:    CFO

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

**P. SCHOENFELD ASSET MANAGEMENT LP,** as investment advisor on behalf of certain funds and managed accounts

By:_____

      Name: Dhananjay Pai
      Title: President & Chief Operating Officer

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

SUNRISE PARTNERS LIMITED PARTNERSHIP

By: _____

Name: Douglas W. Ambrose

Title: Executive Vice President of
Paloma Partners Management Company,
general partner of
Sunrise Partners Limited Partnership

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Pentwater Capital Management LP

By: _____

Name: David M Zirin

Title: Chief Operating Officer

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Capital Ventures International
By: Susquehanna Advisory Group, Inc., its authorized agent
By: _____
Name: Kathy Hurley
Title: Assistant Vice President

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

Warlander Partners, LP

By: *Matthew Tuminello*
Name: Matt Tuminello
Title:  CFO

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

**INITIAL CONSENTING NOTEHOLDER**
Wexford Spectrum Trading Limited, Wexford Catalyst Trading Limited, Debello Trading Limited, Wexford Focused Trading Limited
By: Wexford Capital LP, the Manager of the funds

By: _____

    Name: Arthur Amron
    Title: Partner and General Counsel

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER
WHITEBOX RELATIVE VALUE PARTNERS, LP

DocuSigned by:

_Luke Harris_

By: _____

Name: Luke Harris
Title:  General Counsel
         Whitebox Advisors LLC

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER
WHITEBOX MULTI-STRATEGY PARTNERS, LP

By: _____
      Luke Harris

Name: Luke Harris
Title:  General Counsel
        Whitebox Advisors LLC

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

                            INITIAL CONSENTING NOTEHOLDER
                            WHITEBOX GT FUND, LP


                            DocuSigned by:

                    By: _____Luke Harris_____
                            E65261B17E32A1E...
                        Name: Luke Harris
                        Title:  General Counsel
                                Whitebox Advisors LLC

*[Signature Page to the Plan Support Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their representative officers thereunto duly authorized, as of the date first written above.

Agreed to and accepted:

INITIAL CONSENTING NOTEHOLDER

PANDORA SELECT PARTNERS, LP

By: _____

              *Luke Harris*

     Name: Luke Harris

     Title: General Counsel

             Whitebox Advisors LLC

*[Signature Page to the Plan Support Agreement]*

**Exhibit A**

**Form of Committee Joinder**

Pursuant to this joinder agreement (the "**Committee Joinder**"), the undersigned official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**") acknowledges that it has read and understands the Plan Support Agreement (the "**Agreement**"), dated as of April 3, 2021, by and among (i) The Hertz Corporation ("**Hertz**"), a corporation incorporated in the State of Delaware, and its affiliated debtors and debtors-in-possession (collectively with Hertz, the "**Company**" or the "**Debtors**") in the Chapter 11 Cases (as defined below) pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"); (ii)(a) one or more funds associated with Centerbridge Partners, L.P., ("**Centerbridge**"), (b) one or more funds associated with Warburg Pincus LLC ("**WP**"), and (c) Dundon Capital Partners LLC ("**Dundon**" and, together with Centerbridge and WP, the "**PE Sponsors**"); (iii) the beneficial owners[4] (or managers or advisors of funds or accounts that are beneficial owners) of Claims in respect of the following obligations of Hertz party thereto as of the Agreement Effective Date (the "**Initial Consenting Noteholders**" and, together with the PE Sponsors, the "**Plan Sponsors**"): (a) the 6.25% Senior Notes due 2022; (b) the 5.50% Senior Notes due 2024; (c) the 7.125% Senior Notes due 2026; (d) the 6.00% Senior Notes due 2028; and (e) the obligations under that certain Credit Agreement, dated as of December 13, 2019, as amended, supplemented or otherwise modified from time to time (the Claims under clauses (a) through (e) above, collectively, the "**Senior Notes/ALOC Claims**" and, the holders thereof, the "**Unsecured Noteholders**"); (iv) the Committee upon executing this Committee Joinder; and (v) any additional Unsecured Noteholders (the "**Additional Consenting Noteholders**" and, together with the Initial Consenting Noteholders, the "**Consenting Noteholders**") and any owners or beneficial owners of any other Claims against any of the Debtors (collectively, the "**Consenting Claimholders**"), in each case, that execute the joinder attached as **Exhibit B** to the Agreement (the "**Consenting Claimholder Joinder**"). Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

1.    <u>Agreement to be Bound</u>. The Committee hereby agrees to be bound by all of the terms of the Agreement (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Committee shall hereafter be deemed to be a Party for all purposes under the Agreement.

2.    <u>Representations and Warranties.</u>  The Committee hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, the Committee makes, as of the date hereof, the representations and warranties set forth in <u>Section 7</u> of the Agreement to each other Party.

3.    <u>Governing Law.</u>  This Committee Joinder shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflicts of law principles thereof. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this

---

[4]    As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Claims against or Interests in any of the Debtors or the rights to acquire such Claims or Interests.

Committee Joinder in the Bankruptcy Court and, to the extent the Bankruptcy Court is determined to not have jurisdiction, in the United States District Court for the Southern District of New York or any New York State court located in New York County (the "**Chosen Courts**"), and solely in connection with claims arising under this Committee Joinder: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto.

IN WITNESS WHEREOF, the Committee has caused this Committee Joinder to be executed as of the date first written above.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN *IN RE THE HERTZ CORPORATION, ET AL.*, CASE NO. 20-11218 (MFW) (BANKR. D. DEL.)

By: _____

Name:

Title:   Counsel to the Official Committee of
         Unsecured Creditors

## Exhibit B

### Form of Consenting Noteholder/Claimholder Joinder

Pursuant to this joinder agreement (the "**Consenting Claimholder Joinder**"), the undersigned holder of Claims against any of the Debtors (the "**Joining Party**") acknowledges that it has read and understands the Plan Support Agreement (the "**Agreement**"), dated as of April 3, 2021, by and among (i) The Hertz Corporation ("**Hertz**"), a corporation incorporated in the State of Delaware, and its affiliated debtors and debtors-in-possession (collectively with Hertz, the "**Company**" or the "**Debtors**") in the Chapter 11 Cases (as defined below) pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"); (ii)(a) one or more funds associated with Centerbridge Partners, L.P. ("**Centerbridge**"), (b) one or more funds associated with Warburg Pincus LLC ("**WP**"), and (c) Dundon Capital Partners LLC ("**Dundon**" and, together with Centerbridge and WP, the "**PE Sponsors**"); (iii) the beneficial owners[5] (or managers or advisors of funds or accounts that are beneficial owners) of claims in respect of the following obligations of Hertz party thereto as of the Agreement Effective Date (the "**Initial Consenting Noteholders**" and, together with the PE Sponsors, the "**Plan Sponsors**"): (a) the 6.25% Senior Notes due 2022; (b) the 5.50% Senior Notes due 2024; (c) the 7.125% Senior Notes due 2026; (d) the 6.00% Senior Notes due 2028; and (e) the obligations under that certain Credit Agreement, dated as of December 13, 2019, as amended, supplemented or otherwise modified from time to time (the Claims under clauses (a) through (e) above, collectively, the "**Senior Notes/ALOC Claims**" and, the holders thereof, the "**Unsecured Noteholders**"); (iv) the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**") upon executing the joinder attached as **Exhibit A** to the Agreement (the "**Committee Joinder**"); and (v) any additional Unsecured Noteholders (the "**Additional Consenting Noteholders**" and, together with the Initial Consenting Noteholders, the "**Consenting Noteholders**") and any owners or beneficial owners of any other Claims against any of the Debtors (collectively, the "**Consenting Claimholders**"), in each case, that execute this Consenting Noteholder/Claimholder Joinder. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

1.     <u>Agreement to be Bound</u>.  The undersigned Additional Consenting Noteholder or Consenting Claimholder (as applicable, the "**Joining Party**") hereby agrees to be bound by all of the terms of the Agreement (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement.

2.     <u>Representations and Warranties.</u>  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the Claims against any of the Debtors identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in <u>Section 7</u> of the Agreement to each other Party.

---

[5]     As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Claims against or Interests in any of the Debtors or the rights to acquire such Claims or Interests.

3.    <u>Governing Law.</u>    This Consenting Noteholder/Claimholder Joinder shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflicts of law principles thereof. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Consenting Claimholder Joinder in the Bankruptcy Court and, to the extent the Bankruptcy Court is determined to not have jurisdiction, in the United States District Court for the Southern District of New York or any New York State court located in New York County (the "**<u>Chosen Courts</u>**"), and solely in connection with claims arising under this Consenting Claimholder Joinder: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto.

4.    <u>Notice.</u>    All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile:
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Consenting Claimholder Joinder to be executed as of the date first written above.

[Consenting Claimholder / Additional Noteholder]

By: _____
Name:
Title:

Claims (principal amount):

**<u>Exhibit C</u>**

**Plan**

### Exhibit D

**HIL Facility Commitment Letter**

EXECUTION COPY

CONFIDENTIAL

April 3, 2021

Hertz International Ltd.
c/o The Hertz Corporation
8501 Williams Road
Estero, Florida 33928

Commitment Letter
€250 Million Term Loan Facility

Ladies and Gentlemen:

You have advised the Lenders (as defined in the Term Sheet (as defined below)) party hereto (the "Commitment Parties", "we", "us" or "our") that Hertz International Ltd. (the "Company" or "you") is seeking a €250,000,000 term loan facility (the "HIL Facility") to be used to fund new vehicle fleet purchases by certain indirect European subsidiaries of the Company and any debt service payments made in connection with the HIL Facility.  Capitalized terms used but not defined herein are used with the meanings assigned to them on the Schedules, Annexes and Exhibits attached hereto (such Schedules, Annexes and Exhibits, together with this letter, collectively, this "Commitment Letter").

1.      Commitments

        The HIL Facility shall be available on the terms and conditions set forth herein and in the Term Sheet.  Each Commitment Party is pleased to advise the Company of its several, but not joint, commitment (the "Commitments") to fund the principal amount of the HIL Facility set forth opposite its name on Schedule 1 hereto, on the terms set forth in the Term Sheet attached hereto as Exhibit A (the "Term Sheet"), and subject solely to the satisfaction or waiver by the Commitment Parties of the closing conditions expressly set forth in the Term Sheet.

2.      Fees

        As consideration for the Commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid on the date when due and payable the nonrefundable compensation described in the Term Sheet, on the terms and subject to the conditions expressly set forth therein.

3.      Information

You hereby represent and warrant that (a) all written information concerning you and your subsidiaries and your and their respective businesses (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "Projections") and information of a general economic or industry specific nature) (the "Information") that has been or will be made available to us by you or your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact

necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements are made and (b) the Projections that have been or may be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based on assumptions that you believe to be reasonable at the time made and at the time furnished to us; it being understood and agreed that such Projections are not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond your control, and that actual results during the period or periods covered by any such Projections may differ from the projected results and such differences may be material and that no assurance can be given that the projected results will be realized. You agree that if, at any time prior to the Closing Date, you become aware that any of the representations and warranties in the preceding sentence are incorrect, when taken as a whole, in any material respect if the Information were being furnished and such representations and warranties in the first sentence of this paragraph were being made at such time, then you will promptly supplement the Information so that such representations and warranties, as supplemented, are correct, when taken as a whole, in all material respects, under those circumstances; provided that any such supplement shall cure any breach of such representations and warranties. The Commitment Parties will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof and do not assume responsibility for the accuracy or completeness of the Information or Projections.

4.    Conditions

Notwithstanding anything in this Commitment Letter, the definitive documentation relating to the HIL Facility (the "HIL Facility Documents"; the date of such definitive documentation and the initial funding, the "Closing Date") or any other letter, agreement or other undertaking concerning the financing of the transactions contemplated hereby to the contrary, the Commitments of the Commitment Parties hereunder are subject solely to the satisfaction (or waiver by the Commitment Parties) of the following conditions: (a) the execution by you of the HIL Facility Documents, initially prepared by counsel to the Company in accordance with the Term Sheet; (b) the representations and warranties made therein being true and correct in all material respects; and (c) the conditions expressly set forth in the Term Sheet.

5.    Indemnification and Expenses

You agree (a) to indemnify and hold harmless each Commitment Party, its affiliates and controlling persons and the respective directors, officers, employees, partners, advisors, agents and other representatives of each of the foregoing and their respective successors (each, an "indemnified person") from and against any and all actual losses, claims, damages, liabilities and expenses, joint or several, to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the transactions contemplated hereby or the contemplated use of proceeds thereof or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any indemnified person is a party thereto or whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person within thirty days of written demand (together with reasonable backup documentation) for any reasonable, documented and invoiced out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (but limited, in the case of legal fees and expenses, to (a) one firm of counsel for Centerbridge Partners, L.P. and Dundon Capital Partners, LLC and their respective indemnified persons taken as a whole and, if reasonably necessary, one firm of local counsel in each appropriate jurisdiction (which may be a single firm for multiple jurisdictions) for all such Commitment Parties and indemnified persons taken as a whole (and, in the case of an actual or reasonably perceived conflict of interest where the indemnified person(s) affected by such conflict informs you of such conflict and retains their own counsel, of another firm of counsel for all such affected indemnified person(s) taken

2

as a whole) and (b) one firm of counsel for all other Commitment Parties and their respective indemnified persons taken as a whole and, if reasonably necessary, one firm of local counsel in each appropriate jurisdiction (which may be a single firm for multiple jurisdictions) for all such Commitment Parties and indemnified persons taken as a whole (and, in the case of an actual or reasonably perceived conflict of interest where the indemnified person(s) affected by such conflict informs you of such conflict and retains their own counsel, of another firm of counsel for all such affected indemnified person(s) taken as a whole)); provided, that the foregoing indemnity will not, as to any indemnified person, apply to (A) losses, claims, damages, liabilities or related expenses to the extent they are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (x) the willful misconduct, bad faith or gross negligence of such indemnified person (or its Related Persons (as defined below)) or (y) a material breach of the obligations of such indemnified person or any of its Related Parties under this Commitment Letter or the HIL Facility or (B) any settlement entered into by such indemnified person (or any of such indemnified person's Related Persons) without your prior written consent (such consent not to be unreasonably withheld, delayed or conditioned); provided, further, that the foregoing indemnity will apply to any such settlement in the event that you were offered the ability to assume the defense of the action that was the subject matter of such settlement and elected not to assume such defense and any settlement entered into with your prior written consent, and (b) only if the Closing Date occurs, to reimburse each Commitment Party for all reasonable, documented  and invoiced out-of-pocket expenses (including, but not limited to, reasonable, documented and invoiced out-of-pocket due diligence expenses, and reasonable, documented and invoiced out-of-pocket fees, charges and disbursements of (x) one outside counsel to Centerbridge Partners, L.P. and Dundon Capital Partners, LLC (taken as a whole) and to the extent reasonably necessary, one local counsel in each appropriate jurisdiction for all such Commitment Parties (taken as a whole) and (y) one outside counsel to all other Commitment Parties (taken as a whole) and to the extent reasonably necessary, one local counsel in each appropriate jurisdiction for all such Commitment Parties (taken as a whole)), in each case, incurred in connection with the HIL Facility and any related documentation (including this Commitment Letter and the HIL Facility Documents) on the Closing Date (but only to the extent that same occurs).  None of the indemnified persons or you or any of your affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the HIL Facility or the transactions contemplated hereby; provided that nothing contained in this sentence shall limit your indemnification and reimbursement obligations to the extent expressly set forth herein.  For purposes hereof, a "Related Person" of any indemnified person means (1) its affiliates and controlling persons, (2) the respective directors, officers, employees or partners of such indemnified person or any of its controlling person or controlled affiliates and (3) the respective advisors, agents and other representatives of such indemnified person or any of its controlling person or controlled affiliates, in the case of this clause (3), acting at the instructions of such indemnified person.

Without the prior written consent of any indemnified person (which consent shall not be unreasonably withheld or delayed) (it being understood that the withholding of consent due to non-satisfaction of any of the conditions described in clauses (i) and (ii) of this sentence shall be deemed reasonable), you shall not effectuate any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such indemnified person unless such settlement (i) includes an unconditional release of such indemnified person in form and substance reasonably satisfactory to such indemnified person from all liability or claims that are the subject matter of such Proceeding and (ii) does not include any statement as to or any admission of fault, culpability, wrongdoing or a failure to act by or on behalf of any indemnified person.

6.    <u>Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities</u>

You acknowledge that each Commitment Party and its affiliates may be providing debt financing, equity capital or other services (including, without limitation, investment banking and financial advisory services, securities trading, hedging, financing and brokerage activities and financial planning and benefits counseling) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise.  The Commitment Parties will not use confidential information obtained from you or your respective affiliates and representatives by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you in connection with their performance of services for other companies, and the Commitment Parties will not furnish any such information to other companies.  You also acknowledge that the Commitment Parties have no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained from other companies.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and us is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, (b) we, on the one hand, and you, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on our part, (c) in connection therewith and with the process leading to the transactions contemplated by this Commitment Letter, the Commitment Parties and their affiliates (as the case may be) are acting solely as a principal and not as agents or fiduciaries of you or any other person, (d) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (e) you have consulted legal, accounting, regulatory and tax advisors to the extent you deemed appropriate and you are not relying on any Commitment Party for such advice, (f) you have been advised that we and our affiliates are engaged in a broad range of transactions that may involve interests that differ from your and your affiliates' interests and that we and our affiliates have no obligation to disclose such interests and transactions to you and your affiliates by virtue of any fiduciary, advisory or agency relationship and (g) no Commitment Party nor its affiliates has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by the Commitment Parties and the Company.

You further acknowledge and agree that you are responsible for making your own independent judgment with respect to the transactions contemplated by this Commitment Letter and the process leading thereto.  You waive, to the fullest extent permitted by law, any claims you may have against any Commitment Party for breach of fiduciary duty or alleged breach of fiduciary duty and agree that no Commitment Party shall have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.

7.    <u>Confidentiality</u>

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of its terms shall be disclosed to any other person except (a) to your affiliates and your and your affiliates' respective officers, directors (or comparable persons), employees, affiliates, attorneys, accountants, agents, consultants, advisors and other representatives on a confidential basis, (b) in any legal, judicial or administrative proceeding or other compulsory process or as otherwise required by applicable law, rule or regulation or as requested by a governmental authority (in which case you agree to inform us promptly thereof prior to such disclosure to the extent practicable and not prohibited by law, rule, regulation or other legal process), including as may be required to obtain court approval in connection with any act or

4

obligation contemplated by this Commitment Letter or the transactions contemplated hereby, (c) in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter or any HIL Facility Documents, (d) upon notice to the Commitment Parties in connection with any public filing requirement you are legally obligated to satisfy and (e) the aggregate fee amounts paid or payable hereunder may be disclosed in financial statements.

Further, each party hereto agrees that the Company shall not disclose to any Commitment Party, and no Commitment Party shall be entitled to receive, Schedule 1 hereto, except as the information therein relates to such Commitment Party's respective commitment. For the avoidance of doubt, Schedule 1 may be share with the legal and financial advisors for the Commitment Parties on a strictly confidential, "professional eyes' only" basis.

Each of the Commitment Parties and their respective affiliates shall use all information provided to them by you or your affiliates or on behalf of you or your affiliates or by any of your or their representatives hereunder or in connection with the HIL Facility solely for the purpose of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; provided that nothing herein shall prevent any Commitment Party from disclosing any such information (i) pursuant to the order of any court or administrative agency or in any legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case such Commitment Party agrees (except with respect to any audit or examination conducted by accountants or any regulatory authority exercising examination or regulatory authority) to inform you promptly thereof prior to such disclosure to the extent practicable and not prohibited by law, rule, regulation or other legal process), (ii) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or any of its affiliates, (iii) to the extent that such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or its Representatives (as defined below) in breach of this Commitment Letter, (iv) to any Commitment Party's affiliates, and its and such affiliates' respective employees, directors, officers, legal counsel, independent auditors, professionals and other experts, advisors or agents (collectively, "Representatives") who need to know such information in connection with the transactions contemplated by the Commitment Letter and are informed of the confidential nature of such information and instructed to keep such information of this type confidential, provided that the applicable Commitment Party shall be responsible for its Representatives' compliance with this paragraph, (v) for purposes of establishing a "due diligence" defense, (vi) to the extent that such information is or was received by such Commitment Party from a third party that is not to such Commitment Party's knowledge subject to confidentiality obligations to you or your affiliates, (vii) to the extent that such information is independently developed by such Commitment Party without the use of confidential information provided by or on behalf of you or any of your affiliates or representatives or (viii) to potential participants, assignees or potential counterparties to any swap, credit insurance or derivative transaction relating to the Company or any of its subsidiaries or any of its or their respective obligations, in each case, who agree to be bound by the confidentiality and use restrictions hereof (or language substantially similar to this paragraph). The provisions of this paragraph shall automatically terminate and be superseded by the confidentiality provisions to the extent covered in the HIL Facility Documents upon the initial funding thereunder and shall in any event automatically terminate one (1) year following the date of this Commitment Letter.

You hereby acknowledge that certain of the Commitment Parties are or may be "public side" lenders (i.e., lenders that wish to receive exclusively information and documentation that is (i) with respect to you or your subsidiaries, publicly available (or could be derived from publicly available information) or (ii) is not material with respect to you or your subsidiaries or your or their respective securities for purposes of United States federal and state securities laws (such information and documents, "Public Lender Information")). Any information and documentation that is not Public Lender Information is referred to

5

herein as "Private Lender Information." You agree that you shall use commercially reasonable efforts to not provide Private Lender Information directly to a Commitment Party or any of its internal Representatives, without the prior written consent (which may include e-mail) of the applicable Commitment Party.

8.    <u>Miscellaneous</u>

This Commitment Letter shall not be assignable by any party hereto (except by any Commitment Party (A) to one or more of its affiliates, affiliated or managed funds, separately managed accounts or co-investors, (B) to any other Commitment Party or to any affiliates, affiliated or managed funds, separately managed accounts or co-investors of another Commitment Party or (C) to any other person, <u>provided</u> that, in each case, each Commitment Party shall not be released from its assigned portion of the Commitment until its assigned portion of the HIL Facility is funded in accordance with the terms hereof) without the prior written consent of each Commitment Party or you, as applicable (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein, except to the extent that you and we otherwise agree in writing, and is not intended to create a fiduciary relationship among the parties hereto. Unless you otherwise agree in writing or the Commitments have been validly assigned in accordance herewith, each Commitment Party shall retain exclusive control over all rights and obligations with respect to its Commitment in respect of the HIL Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Closing Date and the initial funding under the HIL Facility have occurred. The Commitment Parties reserve the right to allocate, in whole or in part, to their respective affiliates, affiliated or managed funds, separately managed accounts or co-investors certain fees payable to the Commitment Parties in such manner as such Commitment Parties and their respective affiliates, affiliated or managed funds, separately managed accounts or co-investors may agree in their sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party (or, to the extent provided herein, with the consent of the Required Commitment Parties). This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or other electronic transmission (e.g., "<u>pdf</u>" or "<u>tif</u>") shall be effective as delivery of a manually executed counterpart hereof. The words "execution", "execute", "signed", "signature", and words of like import in or related to this letter agreement or any document to be signed in connection with this Commitment Letter shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by us, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. This Commitment Letter is the only agreement that has been entered into among us and you with respect to the HIL Facility and set forth the entire understanding of the parties with respect thereto. Subject to the limitations set forth in this Commitment Letter, each Commitment Party may perform the duties and activities described hereunder through any of its affiliates. This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

Each of the parties hereto (and, to the extent the benefits herein are accepted by such persons and entities, each other indemnified person) irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive general jurisdiction of any New York State court or Federal court of the United States of America, in each case, sitting in the Borough of Manhattan in New York City and any appellate court from any thereof, over any suit, action or proceeding arising out of or relating to the transactions contemplated hereby, this Commitment Letter or the performance of services hereunder or thereunder or for recognition or enforcement of any judgment and agrees that all claims in respect of any such action or proceeding shall be heard and determined in such court, and (b) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  You and we agree that service of any process, summons, notice or document by hand or nationally recognized overnight courier service addressed to any of the parties hereto at the applicable addresses above shall be effective service of process for any suit, action or proceeding brought in any such court.  You and we hereby irrevocably and unconditionally waive, to the fullest extent you and we may legally and effectively do so, any objection to the laying of venue of any such suit, action or proceeding brought in any court in accordance with clause (a) of the first sentence of this paragraph and any claim that any such suit, action or proceeding has been brought in any inconvenient forum and agree not to plead or claim the same.  YOU AND WE (AND, TO THE EXTENT THE BENEFITS HEREIN ARE ACCEPTED BY SUCH PERSONS AND ENTITIES, EACH OTHER INDEMNIFIED PERSON) HEREBY IRREVOCABLY WAIVE (TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW) TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THE TRANSACTIONS, THIS COMMITMENT LETTER OR THE PERFORMANCE OF OBLIGATIONS HEREUNDER.

Each Commitment Party hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), it is required to obtain, verify and record information that identifies the Company, which information includes names, addresses, tax identification numbers and other information that will allow each Commitment Party and each Lender to identify the Company in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective for each  Commitment Party, each Lender and each prospective Lender.

The indemnification, jurisdiction, waiver of jury trial, service of process, venue, governing law, sharing of information, no agency or fiduciary duty, and confidentiality provisions contained herein shall remain in full force and effect regardless of whether the HIL Facility Documents shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; provided, that your obligations under this Commitment Letter (other than (a) the confidentiality obligations, which shall terminate in accordance with their respective terms and (b) your understandings and agreements regarding no agency or fiduciary duty) shall automatically terminate and be superseded by the provisions of the HIL Facility Documents upon the Closing Date.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter by returning to us an executed counterpart by the Company of this Commitment Letter not later than 11:59 p.m., New York City time, on April 3, 2021.  This Commitment Letter will automatically expire at such time if we have not received such executed counterpart in accordance with the preceding sentence.  In the event that the initial borrowing under the HIL Facility does not occur on or before the Expiration Date (as defined below), then this Commitment Letter and the Commitments hereunder shall automatically terminate unless we shall, in our sole discretion, agree in writing to an extension.  "Expiration Date" means the earlier of (i) 11:59 p.m., New York City time, on May 14, 2021 and (ii) the Closing Date.

Very truly yours,

DUNDON CAPITAL PARTNERS, LLC

By
DocuSigned by:

*Tom Dundon*

50E4B8CB62D24B0...

Name: Tom Dundon
Title: Chairman and Managing Partner

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

**CANSO INVESTMENT COUNSEL LTD**. in its
Capacity as Portfolio manager acting for and on
behalf of certain managed accounts


By _____
    Name:  Joe Morin
    Title:  Portfolio Manager

[HIL Facility Commitment Letter Signature Page]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

D. E. Shaw Composite Fund, L.L.C.

By _____
    Name:   Shi Nisman
    Title:   Authorized Signatory

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,


FIDELITY ADVISOR SERIES II: FIDELITY
ADVISOR STRATEGIC INCOME FUND

By _____
      Name: Chris Maher
      Title: Authorized Signatory

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

FIDELITY SUMMER STREET TRUST: FIDELITY
CAPITAL & INCOME FUND

By _____

Name: Chris Maher

Title: Authorized Signatory

DocuSign Envelope ID: CF37BEDD-4D59-4C27-B756-6A5F229E5E6A

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

FIDELITY DISTRESSED OPPORTUNITIES
MASTER FUND I, LP, BY FIDELITY
MANAGEMENT & RESEARCH COMPANY LLC AS
INVESTMENT MANAGER

By _____
Name: Chris Maher
Title: Authorized Signatory

DocuSign Envelope ID: CF37BEDD-4D59-4C27-B756-6A5F229E5E6A

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

FIDELITY SUMMER STREET TRUST: FIDELITY
GLOBAL HIGH INCOME FUND

By _____
Name: Chris Maher
Title: Authorized Signatory

[HIL Facility Commitment Letter Signature Page]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

FIDELITY CENTRAL INVESTMENT PORTFOLIOS LLC: FIDELITY HIGH INCOME CENTRAL FUND

By _____
Name: Chris Maher
Title: Authorized Signatory

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

FIDELITY ADVISOR SERIES I: FIDELITY
ADVISOR HIGH INCOME ADVANTAGE FUND

By _____

Name: Chris Maher

Title: Authorized Signatory

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

VARIABLE INSURANCE PRODUCTS FUND V:
STRATEGIC INCOME PORTFOLIO

By _____
Name: Chris Maher
Title: Authorized Signatory

[HIL Facility Commitment Letter Signature Page]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

King Street Capital Management, L.P.

By _____

Name: Howard Baum
Title: Authorized Signatory

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

MARATHON ASSET MANAGEMENT, LP ACTING
ON BEHALF OF ONE OR MORE INVESTMENT
FUNDS MANAGED AND/OR ADVISED BY
MARATHON ASSET MANAGEMENT, LP


By _____
    Name:  Jeff Jacob
    Title:    Authorized Signatory

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

Pentwater Capital Management LP

By _____
Name: David M. Zirin
Title: Chief Operating Officer

Accepted and agreed to as of
the date first above written:

HERTZ INTERNATIONAL LTD.

By:
Name: M. David Galainena
Title: Vice President, General Counsel and Secretary

<u>Schedule 1</u>

The entities listed on this Schedule 1 include their respective affiliates and their and their respective affiliates' accounts, funds and investment vehicles advised or managed by any of them.


[Redacted]

**EXHIBIT A**

Term Sheet

EXECUTION COPY

TERM SHEET FOR HIL FACILITY

**Summary of Key Terms**

| | |
|---|---|
| **Borrower** | HIL |
| **Lender** | Each of the entities set forth on the Schedule 1 to the Commitment Letter to which this Term Sheet is attached |
| **Principal amount** | €250,000,000 |
| **Loan structure** | Direct lending delayed draw term loan facility to be offered on a bilateral basis by the Lender to the Borrower, available in one or more drawings in minimum amounts not less than €20,000,000 |
| **Utilisation Date** | Initial draw by the Borrower to be made within 14 days after satisfaction of the Loan CPs |
| **Maturity/repayment** | Unspent funds in the collateral account described below should be repaid to the Lender and the Loan should mature upon the earlier to occur of (a) the effective date of the Debtors' Chapter 11 plan and (b) August 30, 2021<br><br>The Loan is anticipated to be repaid in full out of the proceeds of the fund-raising under the Debtors' Chapter 11 plan<br><br>In the event that the Company Board (as defined in the Plan Support Agreement) authorizes The Hertz Corporation and/or its affiliates to accept and pursue bankruptcy court approval of an Alternative Transaction (as defined in the Plan Support Agreement), the Loan shall be repaid in full within 10 business days of such termination |
| **Interest** | Quarterly interest payable in cash |
| **Interest Rate** | 6.5% per annum |
| **Prepayment Fee** | Voluntarily prepayable at the election of the Borrower<br><br>Any voluntary or mandatory prepayment shall be subject to call protection at 102.5% |
| **Exit Fee** | A fee of 2.5% of the principal amount of the Loans repaid at maturity |
| **Security** | Loan to benefit from first and senior lien over assets of the Borrower, including a general business charge. General business charge to exclude collateral over the Hertz IP or brand, but to cover all the Borrower's rights to payments and receipts |

| | |
|---|---|
| | under all existing agreements relating to the use of Hertz's IP with third parties and with HHN and its subsidiaries |
| **Use of proceeds** | The Loan proceeds shall be held by the Borrower in a collateral account in which the Lender shall have a first and senior lien and shall be permitted to make disbursements directly to OEMs to fund the equity needed for the purchase of vehicles by HHN in amounts and at times that are consistent with the 2021 fleet plan |
| **Commitment fee** | Commitment fee of 2.5% of the principal amount of the full commitment to be paid by the Borrower to the Lender on the closing date |
| **Loan CPs** | • Entry of orders by the US Bankruptcy Court approving (a) the Equity Purchase and Commitment Agreement and related documents to which the Lender (or an affiliate) is a party; and (b) the disclosure statement with respect to the Debtors' Chapter 11 plan<br>• Confirmation from the Lombard and European ABS Lender that their respective facilities are open and available on terms acceptable to the Debtors and the Lender<br>• Execution of definitive documentation for the Facility consistent with this Term Sheet and otherwise acceptable to the Lender and the Debtors<br>• Delivery of customary opinions and officer's certificates and the delivery of all documents and the making of any filings required by the security documents to perfect the first priority lien of the Lender |
| **Covenants** | No financial covenants<br><br>Standard affirmative and negative covenants to include: prohibiting the Borrower from transferring or encumbering its assets or changing the terms upon which it interacts with other Hertz group companies in connection with the IP rights in a way that is unfavourable to the Borrower, or entering into material non-ordinary course transactions |
| **Transferability** | Cannot be assigned without Borrower consent prior to an event of default |

**<u>Exhibit E</u>**

**EPCA**