## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| | Case No. 20-11218 (MFW) |
| The Hertz Corporation, *et al.*,[1] | (Jointly Administered) |
| Debtors. | **Re: Docket Nos. 2913, 3496, 3497, 3501, 3599, 3603, 3765, 3766, 3771, 3772, 3773, 3783, & 3855** |
| | **Hr'g Date: April 16, 2021 at 10:30 a.m. (ET)** |

### DEBTORS' OMNIBUS REPLY IN SUPPORT OF REQUEST FOR APPROVAL OF DISCLOSURE STATEMENT MOTION [D.I. 3496] AND EPCA MOTION [D.I. 3497]

The debtors and debtors in possession (collectively, the "**Debtors**," and together with their non-Debtor affiliates, the "**Company**") in the above-captioned chapter 11 cases ("**Chapter 11 Cases**") hereby file this omnibus reply (the "**Reply**") in support of (a) their request for approval of their proposed Disclosure Statement (as defined below) and other relief sought in the *Debtors' Motion for Entry of an Order (i) Approving the Disclosure Statement and the Form and Manner of Notice, (ii) Approving Plan Solicitation and Voting Procedures, (iii) Approving Forms of Ballots, (iv) Approving Form, Manner, and Scope of Confirmation Notices, (v) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan, and (vi) Granting Related Relief* [D.I. 3496] (the "**DS Motion**"); and (b) the *Debtors' Motion For Entry of an Order (i) Authorizing Entry into Equity Purchase and Commitment Agreement, (ii) Allowing the HHN Notes Guarantee Claims, and (iii) Authorizing*

---

[1]    The last four digits of The Hertz Corporation's tax identification number are 8568. The location of the debtors' service address is 8501 Williams Road, Estero, FL 33928. Due to the large number of debtors in these chapter 11 cases, which are jointly administered for procedural purposes, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at https://restructuring.primeclerk.com/hertz.

*the Debtors to Grant the HHN Notes Guarantee Confirmations* [D.I. 3497] (the "**EPCA Motion**").

Parties filed the following objections to the DS Motion (the "**DS Objections**") and/or to the EPCA Motion (the "**EPCA Objection**" and collectively with the DS Objections, the "**Objections**"):[2]

- *Limited Objection of FACT, Inc. and Its Member Franchisees to Disclosure Statement and Solicitation Motion* [D.I. 3765] (the "**FACT Objection**") filed by FACT, Inc. ("**FACT**") and certain unidentified members of FACT who are purported parties to franchise agreements with The Hertz Corporation or another Debtor (collectively with FACT, the "**Franchisee Objectors**");

- *Limited Objection of the Retired Executive Group to Disclosure Statement and Solicitation Motion* [D.I. 3766] (the "**REG Objection**") filed by the self-styled "Retired Executive Group" (the "**REG**");

- *The Ad Hoc Committee of Shareholders' Omnibus Objection to Approval of (i) Disclosure Statement for Second Amended Joint Plan of Reorganization of the Hertz Corporation and Its Debtor Affiliates and (ii) Termination Fee and Expense Reimbursement Under Equity Purchase and Commitment Agreement* [D.I. 3772] (the "**Equity AHG Objection**") filed by the self-styled "Ad Hoc Committee of Shareholders" (the "**Equity AHG**"); and

- *United States Trustee's Objection to Debtors' Motion For Entry of an Order (i) Approving the Disclosure Statement and The Form and Manner of Notice, (ii) Approving Plan Solicitation and Voting Procedures, (iii) Approving Forms Of Ballots, (iv) Approving Form, Manner, and Scope of Confirmation Notices, (v) Establishing Certain Deadlines In Connection With Approval Of The Disclosure Statement and Confirmation of the Plan, and (vi) Granting Related Relief* [D.I. 3855] (the "**UST Objection**") filed by the United States Trustee for the District of Delaware (the "**UST**").

---

[2]     In addition to the Objections, reservations of rights with respect to the DS Motion (the "**Reservations of Rights**," and together with the Objections, the "**Responses**") were filed by the administrative and collateral agent (the "**First Lien Agent**") with respect to the Debtors' first lien debt (the "**First Lien Agent**") [D.I. 3769] (the "**1L Agent RoR**"), the ad hoc group of the Debtors' first lien lenders that has appeared in these chapter 11 cases (the "**First Lien Ad Hoc Group**"), [D.I. 3771] (the "**1L AHG RoR**"), and the indenture trustee and collateral agent with respect to the Debtors' second lien debt (the "**Second Lien Note Trustee**"), [D.I. 3227] (the "**2L Agent RoR**"). The Disclosure Statement includes comments received from the First Lien Agent, 1L AHG, and the Second Lien Note Trustee, which are detailed in the Reply Chart attached hereto as **Exhibit A**. The Debtors do not believe that any further response to these Reservations of Rights is required, but reserve all rights.

In support of the Reply, the Debtors refer to (i) *Declaration of William Q. Derrough in Support of the Debtors' Motion for Entry of an Order (I) Authorizing Entry Into Equity Purchase And Commitment Agreement, (II) Allowing The HHN Notes Guarantee Claims And (III) Authorizing The Debtors To Grant The HHN Notes Guarantee Confirmations* [D.I. 749] (the "**Derrough Declaration**" or "**Derrough Decl.**") and (ii) the *Supplemental Declaration of William Q. Derrough in Support of the Debtors' Motion for Entry of an Order (I) Authorizing Entry Into Equity Purchase And Commitment Agreement, (II) Allowing The HHN Notes Guarantee Claims And (III) Authorizing The Debtors To Grant The HHN Notes Guarantee Confirmations* (the "**Supplemental Derrough Declaration**" or "**Supp. Derrough Decl.**") filed substantially contemporaneously herewith, and state as follows:

## PRELIMINARY STATEMENT

1.      Since filing their initial chapter 11 plan and disclosure statement more than a month ago, the Debtors and their professionals have continued to work to develop, build consensus around, and enhance a plan that maximizes value.  As a result, the Debtors are now poised to commence solicitation (and are seeking this Court's authority to do so) of an amended plan that is supported by the Official Committee of Unsecured Creditors (the "**Committee**") and incorporates a fully committed proposal to invest $2.57 billion of equity capital by Centerbridge Partners, L.P., Warburg Pincus LLC, Dundon Capital Partners, LLC, and an ad hoc group of holders of more than 85% of the Debtors' Unsecured Funded Debt (together, the "**Plan Sponsors**").[3]  The Plan would pay senior claims in full, deliver substantial cash recoveries to the

---

[3]      Where the context requires, each capitalized term used but not otherwise defined in this Reply has the meaning ascribed to it in the *Disclosure Statement for Modified Second Amended Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and Its Debtor Affiliates* [D.I. 3783] (as may subsequently be modified, the "**Disclosure Statement**"), including as incorporated by reference to the *Modified Second Amended Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and Its*

RLF1 25114190v.1

Debtors' general unsecured creditors, and provide the Debtors' unsecured debtholders with common equity in the Reorganized Debtors and Subscription Rights to purchase additional common equity.  The Debtors would emerge from Chapter 11 with a significantly delivered balance sheet, including no corporate debt on their European businesses and $1.3 billion of corporate term loan debt, and a new ABS facility to fund the purchase of new vehicles for use in their U.S. rental car business.

2.      The Plan and the widespread consensus support for it are products of an open marketing process in which the Debtors have dealt with all interested parties.  As is evident from the change in proposed sponsorship since the initial version of the Plan was filed, the Debtors have not "played favorites," and instead have successfully pushed potential sponsors to deliver the best proposals possible.

3.      With all of that said, it remains critical that the Debtors continue to move their plan process forward, and expeditiously.  The now "hot" equity and debt markets which have provided the billions of committed financing needed to fund the Debtors' restructuring may turn "cold" with the passage of time.  Furthermore, the Debtors must continue to build momentum to exit chapter 11 during the busy summer season and avoid a potential loss in value that could occur through an extension of these Chapter 11 Cases.  Indeed, although the Debtors have successfully worked to build value using the tools of chapter 11, delays in emergence may negatively impact the Debtors' bookings, harm the Debtors' customer and vendor relationships, and interfere with the Company's ability to acquire necessary fleet for 2022.  The Debtors therefore remain focused on a targeted June exit from chapter 11.

---

*Debtor Affiliates* [D.I. 3783] ((as may subsequently be modified, the "**Plan**"), and the Equity Purchase and Commitment Agreement attached as Exhibit A to the *Notice of Filing of Revised Equity Purchase and Commitment Agreement* [D.I. 3603], as applicable.

4

4.      Given the foregoing, it is unsurprising that the Debtors received only a limited number of responses to their proposed form of Disclosure Statement.  Numerous parties in interest, including the UST, the Committee, the First Lien Agent, the First Lien Ad Hoc Group, the Second Lien Notes Trustee, the ad hoc group of Second Lien Lenders, the 7.000% Unsecured Promissory Notes Trustee, the Pension Benefit Guaranty Corporation, and various sureties and landlords provided comments to the Disclosure Statement on an informal basis.  The Debtors' professionals, through numerous calls and emails, engaged with these parties regarding their concerns, with the objective of accommodating all reasonable requests.  The small number of objections actually filed to the Disclosure Statement reflects the success that the Debtors and their various stakeholders had in resolving issues efficiently and constructively through this informal process.

5.      As noted above, the Debtors received only four Objections.  The Debtors have resolved two of those Objections—the FACT Objection and the REG Objection (the "**Resolved Objections**")—through agreed changes to the Plan, Disclosure Statement, Proposed Order to the Disclosure Statement, as well as agreed language to be inserted in the proposed Confirmation Order.  As of the time of filing, only two Objections remain outstanding: those of the Equity AHG and the UST.[4]

---

[4]      Attached hereto as Exhibit A is a chart (the "**Reply Chart**") identifying each of the Objections as well as the Reservations of Rights and the parties' resolution or the Debtors' responses thereto.  The Reply Chart outlines the agreed resolution of the Resolved Objections.  In addition to the modifications to the Plan and Disclosure Statement to resolve certain formal and informal objections and responses, the Debtors have made substantial modifications to the Proposed DS Order; the exhibits to the Proposed DS Order (including the Solicitation Procedures, Ballots, and Notices); and the EPCA Oder.  It is anticipated that a copy of the revised Proposed DS Order (the "**Revised Proposed DS Order**") will be filed on the date hereof, which will include the revised Solicitation Procedures, Ballots, and Notices as Exhibits thereto.  It is also anticipated that a copy of the revised proposed EPCA Order will also be filed on the date hereof (the "**Revised Proposed EPCA Order**").

6.      Neither of the remaining Objections warrants denying the DS Motion or the EPCA Motion.  The Equity AHG bases its objection on the unsupported notion that the Debtors are solvent, rendering the Plan unconformable because it returns no value to the Debtors' existing equity holders.  In addition to providing no evidence to support its solvency claim (and thus conceding that the information in the Disclosure Statement provides adequate disclosure), the Equity AHG ignores that courts have consistently held that valuation disputes are properly resolved only at confirmation and not at the disclosure statement stage.

7.      The Equity AHG also asks the Court to deny the Termination Fee and Expense Reimbursement (each as defined below) proposed in the EPCA Motion until such time as "the Debtors have exhausted all meaningful options for plan sponsorship."  Equity AHG Obj. at 3. This argument also misses the mark.  The EPCA was heavily negotiated and is the product of an open plan sponsorship process that has already lasted several months.   Moreover, the Termination Fee and Expense Reimbursement are reasonable and customary terms, and the Debtors' agreement to them is a reasonable exercise of the Debtors' sound business judgement that confers substantial benefits.   Notably, these provisions are critical to secure the Plan Sponsors' commitments to provide $2.57 billion of equity financing needed to fund the Restructuring Transactions and significant recoveries to creditors under the Plan.

8.      The UST Objection, centered on the third-party releases (the "**Releases**") included in the Plan, also prematurely asserts an objection that is appropriately handled in connection with Confirmation, and not earlier.  On the substance, which need not be addressed at this time, the UST misinterprets the Releases as being applicable to classes that are deemed to reject the Plan—which they are not—and fails to overcome the weight of authority confirming that consensual third-party releases, like the Releases, are appropriate where holders of claims or

6

interests are provided with the informed opportunity to opt out of such releases, but fail to do so. The Debtors respectfully submit that the Court should follow the routine practice in this District of granting such consensual third-party releases in connection with Confirmation and overrule the UST's objection at this stage.

9.     Accordingly, the Debtors respectfully request that the Court (i) overrule the unresolved DS Objections on the merits and enter the Revised Proposed DS Order; and (ii) overrule the Equity AHG's EPCA Objection and enter the Revised Proposed EPCA Order.

## **REPLY**

### I.     The Disclosure Statement Meets the Applicable Standard for Approval

10.     Pursuant to section 1125 of the Bankruptcy Code, the proponent of a chapter 11 plan must provide holders of impaired claims and interests entitled to vote on a plan with "adequate information" regarding the plan. *See* 11 U.S.C. § 1125(a)(1). Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11.     The determination of whether a disclosure statement contains adequate information focuses on the facts and circumstances of each case. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (citing H.R. Rep. No. 595, 97th Cong., 1st Sess. 266 (1977)) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *see also The Bank of N.Y., Mellon Tr. Co. v. Leonard Becker* (*In re Lower Bucks Hosp.*), 488 B.R. 303, 317 (Bankr. E.D. Pa. 2013) ("What constitutes 'adequate information' is determined on a case-by-case basis,

with the ultimate determination within the discretion of the bankruptcy court.") (citing *Tex. Extrusion Corp. v. Lockheed Corp.* (*In re Tex. Extrusion Corp.*), 844 F.2d 1142, 1156–57 (5th Cir. 1988)).

12.     Even where "a disclosure statement could have included more information, . . . a disclosure statement need not be perfect and may be approved if the information is reasonable in the circumstances." *In re Price Funeral Home, Inc.*, No. 08-04816-8-ATS, 2008 Bankr. LEXIS 3462, at *5 (Bankr. E.D.N.C. Dec. 12, 2008).

13.     In its section 1125 inquiry, the Court need not consider specialized issues that a particular creditor may wish to raise with respect to a plan, nor is a debtor required to explain why its chapter 11 plan is superior to other, hypothetical plans.  *See* 11 U.S.C. § 1125(a)(1) ("[A]dequate information need not include such information about any other possible or proposed plan.").  Further, the "adequate information" standard does not require that a disclosure statement include information about every aspect of a debtor's business, its proposed plan, or claims asserted against the debtor.  Rather, as expressed in the statute, "adequate information" is limited to "information of a kind, and in sufficient detail, as far as is reasonably practicable . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125.

A.  **The Disclosure Statement Provides Adequate Information As Required By Section 1125 of the Bankruptcy Code**

14.     Courts have identified categories of information that generally should be included in a disclosure statement, while acknowledging that certain categories of information that are necessary in one case may be omitted in another.  *See In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170-71 (Bankr.

8

S.D. Ohio 1988).   The Disclosure Statement contains adequate information in each of those categories:

- The Debtors' corporate history and structure, business operations, and prepetition capital structure and indebtedness (Section II);

- Events leading up to the Chapter 11 Cases, including the Debtors' pre-bankruptcy restructuring negotiations and significant events in the Chapter 11 Cases (Section III);

- The classification and treatment of Claims and Interests under the Plan, including which Classes are entitled to vote and how to vote on the Plan (Art. IV.C);

- Releases contemplated by the Plan that are integral to the Restructuring Transactions and overall settlement of Claims pursuant to the Plan (Section IV.H);

- Certain important effects of Confirmation of the Plan (Section IV.J.2);

- Certain securities law matters with respect to the Plan (Section VI);

- Certain U.S. federal income tax consequences of the Plan (Section VII);

- Certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Section IX); and

- The statutory requirements for Confirmation of the Plan (Section X).

15.     Notably, the Equity AHG fails to identify **any** category of information required by case law or statute that the Debtors have failed to disclose—there is none.

### B.  The Equity AHG's Objection Lacks Merit and Should Be Overruled

#### 1.  The Equity AHG Has Failed to Meet the Extraordinary Burden of Proving the Plan Is "Patently Unconfirmable"

16.     "The question whether a plan meets requirements for confirmation is usually answered at confirmation hearings."  *Phoenix Petroleum*, 278 B.R. at 394.  As such, disclosure statement objections based on plan confirmability are disfavored and ordinarily not entertained at the disclosure statement hearing.  *See In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr.

S.D. Ohio 1990) ("[T]he Court will not look behind the disclosure statement to decide [confirmation] issues at the hearing on the adequacy of the disclosure statement."). Indeed, courts recognize that adjudicating confirmation issues at this stage would effectively convert disclosure statement hearings into confirmation hearings without the benefit of the evidentiary record necessary to determine confirmation issues. *See, e.g.*, *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988) ("[C]are must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing, due process considerations are protected and objections are restricted to those defects that could not be cured by voting[.]"); *see also In re Quigley Co.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007) (noting that questions existed regarding good faith, improper voter manipulation, and voter designation but finding that such questions were, nevertheless, "confirmation issues that require an evidentiary hearing," and approving the debtor's disclosure statement).

17.     While a very limited exception exists in cases "where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable," *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012), a plan is "patently unconfirmable" only "where (1) confirmation defects [cannot] be overcome by creditor voting results and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *Id.* at 155; *see also In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987) ("[T]he objections considered must be limited to defects which could not be overcome by creditor voting results and must also concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing."). The patently unconfirmable standard thus requires an objecting party to prove, as a

matter of law, that the plan "is so fatally flawed that confirmation is impossible." *In re U.S. Brass Corp.*, 194 B.R. 420, 428 (Bankr. E.D. Tex. 1996).  The Equity AHG has failed to meet this high burden.

> ### a. The Equity AHG's Opinion of Value Raises a Fact Issue that Cannot Establish that the Plan Is Unconfirmable as a Matter of Law

18.     The Equity AHG argues that the Plan is patently unconfirmable—and the Disclosure Statement thus cannot be approved—because it treats equity holders unfairly and provides outsized recoveries to holders of certain unsecured claims.   Equity AHG Objection ¶¶ 8-24.  As noted above, the Third Circuit's "patently unconfirmable" standard applies only where the purported "defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing."  *In re Am. Capital Equip.*, LLC, 688 F.3d at 155.  Both of the grounds for the Equity AHG's contention that the Plan is "patently unconfirmable" are based on the Equity AHG's unsupported opinion of value.   Valuation necessarily entails questions of fact.  *See VFB Ltd. Liab. Co. v. Campbell Soup Co*., 482 F.3d 624, 631-32 (3d Cir. 2007) ("The value of a business is a mixed question of fact and law . . . .").  Therefore, valuation, which has not been fully developed (as the Equity AHG itself argues) and is in dispute (as evidenced by the Equity AHG Objection), cannot serve as the basis for a disclosure statement objection.

19.     Indeed, bankruptcy courts within this District and elsewhere consistently hold that valuation disputes are properly reserved for confirmation.  *See In re RMH Franchise Holdings, Inc.*, Case No. 18-11092 (BLS) Hr'g Tr. at 49:2-51:5, 140:5-22 (Bankr. D. Del. Oct. 12, 2018) (approving disclosure statement over valuation-related objections and reserving such issues for plan confirmation); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) Hr'g Tr. at 36:13-14, 42:7-18, 45:13-23, 49:11-50:4, 51:25-52:1 (Bankr. D. Del. July 20, 2018) (explaining that disputes

with respect to valuation are "confirmation issues" rather than "disclosure" issues); *In re Calpine Corp.*, No. 05-60200 (BRL), 2007 Bankr. LEXIS 3420, at *3-4 (Bankr. S.D.N.Y. Oct. 4, 2007) (noting that court will determine the debtor's enterprise value based on the evidence presented at the confirmation hearing, not earlier); *In re Chemtura Corp.*, Case No. 09-11233 (REG), Hr'g Tr., at 78:3-14   (Bankr. S.D.N.Y. July 29, 2010) (noting in its disclosure statement approval bench ruling that "the equity committee's positions as to the debtors' solvency . . . are likely to be at issue with plan confirmation or otherwise down the road, I need not and don't determine the merits of those positions today.").

**b.  The Equity AHG Fails to Show Any "Confirmation Defects"**

20.    Further, the Equity AHG fails to identify any "confirmation defect" that renders the Plan unconfirmable.  Notably, the Equity AHG fails to identify any precedent in which a court declined to approve a disclosure statement for either of the reasons it alleges.  Rather, the Equity AHG relies on authorities involving fraud and bad faith—a far cry from the valuation dispute at issue here.  *See In re Phx. Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (declining to approve disclosure statement because the debtors had "misled" voters into believing the estate could "distribute assets to creditors which it is not legally entitled to distribute"); *In re Am. Capital Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012) (affirming bankruptcy court decision not to approve disclosure statement where plan had been proposed in bad faith).  The other authority that the Equity AHG relies on, *In re Quigley Co.*, is even further afield.  There, Judge Bernstein overruled creditor claims of confirmation defects (which were based on alleged misclassification of claims) and approved the disclosure statement.  *In re Quigley Co.*, 377 B.R. 110, 119 (Bankr. S.D.N.Y. 2007).

21.     The Equity AHG's failure to find any authority supporting its position is unsurprising: as discussed below, courts have repeatedly found that valuation objections are properly handled at plan confirmation, not the disclosure statement stage.

### 2. The Equity AHG's Objection that the Disclosure Statement Fails to Provide Adequate Information Has No Basis

22.     The Equity AHG's arguments that additional information on valuation is necessary to provide "adequate information" and that the Debtors must explain why they selected the Plan Sponsor's proposal over that of the Initial Plan Sponsors fail for at least three reasons.

23.     *First*, the revised Disclosure Statement, which the Debtors anticipate filing prior to the April 16, 2021 hearing on the DS Motion (the "**Hearing**"), will include a valuation analysis prepared by Moelis & Company LLC attached as Exhibit E thereto.  *See* Disclosure Statement, § I.G.1 & Ex. E.  The Equity AHG will have ample time to vet that valuation and be heard on the matter in due course at Confirmation.  Further, to provide additional disclosure regarding the view of the AHG Group and the basis of its opinion, the Debtors will add to the revised Disclosure Statement (a) charts showing the trading prices of (i) the Existing Hertz Parent Interests and (ii) the Unsecured Notes since the Petition Date as new Exhibit N; and (b) the following statement:[5]

> A purported "Ad Hoc Committee of Shareholders" has appeared in these Chapter 11 Cases and, in a filed objection to the Debtors' request for approval of this Disclosure Statement [D.I. 3772], expressed the opinion that the Debtors are solvent such that value should be distributed on account of Existing Hertz Parent Interests under the Plan.  The "Ad Hoc Committee of Shareholders" bases its opinion, at least in part, on the recent trading prices of the Existing Hertz Parent Interests and Unsecured Notes and during the

---

[5]     Language inserted in the revised Disclosure Statement that the Debtors anticipate filing in advance of the Hearing will be substantially as shown in this Reply.

course of these Chapter 11 Cases.  Charts illustrating those trading prices are included as **Exhibit N** to this Disclosure Statement.

The Debtors disagree with the view of the "Ad Hoc Committee of Shareholders" that the Debtors are solvent.  In addition to the Valuation Analysis showing that the Debtors are insolvent, the Debtors have conducted an open and competitive process for the sale of the equity in the Reorganized Debtors.  Through the course of this process, the Debtors received no proposal from any potential plan sponsor, including the Initial Plan Sponsors, that would yield proceeds sufficient to make distributions on account of Existing Hertz Parent Interests.

Disclosure Statement, § I.G.1.  All parties in interest will therefore have notice of the Equity

AHG's concerns and the general basis for those concerns when they consider whether to vote to

accept or reject the Plan.[6]

24.     Moreover, while the Equity AHG makes several arguments regarding valuation

(all of which, as discussed above, are properly raised at the plan confirmation rather than the

disclosure statement stage), it does not present *any* of its own evidence regarding valuation.

Instead, the Equity AHG premises its objection *entirely* on information provided by the Debtors

in the Disclosure Statement.  The Equity AHG's apparent ability to make its case while relying

solely on the Debtors' disclosure belies its claim that the Debtors' disclosure is insufficient.

25.     ***Second***, although the revised Disclosure Statement will include a valuation

analysis, the Court may approve the Disclosure Statement even without any valuation of the

Debtors.  *See* 11 U.S.C. § 1125(b) ("The court may approve a disclosure statement without a

valuation of the debtor or an appraisal of the debtor's assets."); *In re Calpine Corp.*, 2007 Bankr.

---

[6]     Contrary to the Equity AHG's suggestion that existing shareholders were excluded from the plan negotiation process, *see* Equity AHG Obj., ¶ 4, the Debtors' plan process has been open to all comers and the Debtors have cooperatively engaged with those who made inquiries.  Indeed, the Debtors provided dataroom access to a group of equity holders that requested it.  The Equity AHG never requested dataroom access or expressed any interest to the Debtors in investing the Reorganized Debtors, despite these highly publicized Chapter 11 Cases making it readily apparent to any potential investors that the Debtors have been "in play" since the Petition Date.  Instead, the Equity AHG waited until the deadline to object to a Disclosure Statement—which has been on file in various iterations for more than a month—to announce their presence through an objection.

LEXIS 3420, at *3-4 (rejecting the equity committee's argument that because the debtors failed to provide a firm projected enterprise value of the reorganized entity, the disclosure statement lacked adequate disclosure); *In re Keisler*, No. 08-34321, 2009 Bankr. LEXIS 1814, at *12 (Bankr. E.D. Tenn. June 29, 2009) ("[V]aluation is not a necessary component in the determination of whether a disclosure statement contains adequate information. . . . All remaining questions concerning the valuation . . . are strictly confirmation issues."); *In re El Comandante Mgmt. Co., LLC*, No. 04-10938 (ESL), 2006 Bankr. LEXIS 3820, at *17–18 (Bankr. D.P.R. Mar. 3, 2006) ("[T]he court may approve a disclosure statement without a valuation of debtors' assets.").

26.    ***Third***, the Debtors have no obligation in their Disclosure Statement to expand upon the terms of potential competing plans or provide detailed reasoning regarding why, in the exercise of their business judgment, they determined the current plan construct is superior to such alternative proposals.  Indeed, section 1125(a)(1) of the Bankruptcy Code plainly states that "adequate information need ***not include such information about any other possible or proposed plan***."  11 U.S.C. § 1125(a) (emphasis added); *see also In re Brandon Mill Farms, Ltd.,* 37 Bankr. 190, 192 (N.D. Ga. 1984) ("the disclosure statement is intended to assist the creditors in evaluating the plan on its face rather than to promote a comparison among various proposed plans").  However, to be clear, the chapter 11 process has resulted in a proposal from the Plan Sponsors that the Debtors, including their board, ultimately determined is the Debtors' best option.  As described in the Disclosure Statement, during the course of the last five months, the Debtors actively solicited proposals from potential plan sponsors without preference or favor.  Disclosure Statement, § III.Z.  They received alternate plan proposals from the Ad Hoc Group of Unsecured Noteholders, the Initial Plan Sponsors, and the current Plan Sponsors and

15

initially selected the Initial Plan Sponsors' proposal. *Id.* Through this competitive back-and-forth, the current Plan Sponsors have improved their proposal resulting in the Plan described in the Disclosure Statement that is now before the Court. This disclosure is more than adequate to describe the circumstances surrounding the Debtors' selection of the Plan Sponsors. To the extent the Equity AHG wants additional information, it may seek it through discovery in connection with confirmation of the Plan. The Equity AHG cites no authority entitling it to receive such information from the Disclosure Statement, much less holding that a Disclosure Statement must provide such information to be approved.

### C. The UST Objection Should Be Overruled Because It Is Premature and the Third-Party Consensual Releases Are Consistent with Applicable Law

27.     The Plan provides for consensual third-party releases of all voting parties and holders of unimpaired claims. It also provides ample opportunity for such parties to evaluate and opt out of the releases by checking the opt-out box and timely and properly returning their ballot. Nonetheless, the UST objects to these fair and standard releases.

28.     As a threshold matter, although asserted as an objection to the Solicitation Procedures, the UST Objection is a quintessential confirmation issue that the Court should not consider at the Hearing. *See In re GUE Liquidation Cos., Inc.*, No. 19-11240 (LSS) (Bankr. D. Del. Oct. 23, 2019) Hr'g Tr. at 60:20–62:23 (stating that issues related to releases would be determined at confirmation, not disclosure statement hearing); *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 3, 2018) Hr'g Tr. at 199:9-13 (declining to rule on appropriateness of releases at the hearing, as such issues are "classically [for] a confirmation hearing"); *In re Molycorp, Inc.*, Case No. 15-11357 (CSS) (Bankr. D. Del. Jan. 8, 2016) Hr'g Tr. at 67:12–15 (noting that potential issues with releases should be dealt with at confirmation).

29.     Additionally, the UST premises its objection in part on a misunderstanding of the Releases.  Specifically, the UST mistakenly asserts that the Plan's third-party releases apply to holders of claims or interests in classes that are deemed to reject the Plan.  *See* UST Obj. ¶ 22. That is not correct.  The Plan's definition of "Releasing Party"[7] does not include holders of claims or interests in Impaired, non-voting classes that are deemed to reject the Plan.

30.     Regardless, as the Debtors will seek to argue at confirmation if the UST continues to press its objection, the third-party releases are appropriate and provide for a clear opt-out mechanism that should be approved by the Court.  Holders of claims in class 5 (Unsecured Funded Debt Claims) and class 7 (General Unsecured Claims) are entitled to vote to accept or reject the Plan and, thus, may opt out of the third party releases contained in the Plan by

---

[7]     Pursuant to the Plan, "*Releasing Party*" means each of the following in their capacity as such: (i) the Plan Sponsors; (ii) the Backstop Investors; (iii) the Unsecured Notes Trustees; (iv) the 7.000% Unsecured Promissory Notes Trustee; (v) the ABS Released Parties; (vi) the Plan Support Parties; (vii) all Holders of Unimpaired Claims or Interests who do not File a timely objection to the third party releases provided for in Article VIII.D (provided that, for the avoidance of doubt, Holders of Unimpaired Claims or Interests that timely file an objection to the third party releases provided pursuant to Article VIII.D shall not be Releasing Parties); (viii) all Holders of Administrative Expense Claims and Priority Tax Claims that do not hold Claims or Interests in any Class that do not File a timely objection to the third party releases provided for in Article VIII.D of the Plan (provided, that, for the avoidance of doubt, Holders of Administrative Expense Claims and Priority Tax Claims that do not hold Claims or Interests in any Class that timely File an objection to the third party releases provided pursuant to Article VIII.D shall not be Releasing Parties); (ix) all Holders of Claims or Interests that vote to accept the Plan; (x) all Holders of Claims or Interests that are entitled to vote on the Plan who abstain from voting on the Plan and that do not affirmatively opt out of the third party releases provided for in Article VIII.D of the Plan by checking the box on the applicable Ballot indicating that they opt not to grant such releases in the Plan submitted on or before the Voting Deadline; (xi) all Holders of Claims or Interests that are entitled to vote on the Plan who vote to reject the Plan and do not affirmatively opt out of the third party releases provided for in Article VIII.D by checking the box on the applicable Ballot indicating that they opt not to grant such releases in the Plan submitted on or before the Voting Deadline; and (xii) with respect to each of the foregoing Entities in clauses (i) through (xi), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in its capacity as such.

checking the opt-out box on the appropriate ballot. The Ballots and Confirmation Hearing Notice, among other documents, conspicuously state the third-party releases and describe the opt-out mechanism to any party that is entitled, and may decide, to opt out of those releases. All voting creditors will receive comprehensive and detailed notice of the third-party release provisions, their impact on creditors and creditors' rights, the opportunity to opt out, and the right to object to confirmation of the Plan. Similarly, creditors holding claims that are paid in full and deemed to have accepted the Plan (including administrative and priority claims) will receive a notice that includes the release in conspicuous writing and states that the release will be granted unless the claimholder objects.

31.    Courts in this jurisdiction routinely approve third-party releases where, as here, they give a creditor in a voting class the opportunity to opt out of releases by checking a box on a ballot or creditors that are deemed to accept the Plan with an opportunity to opt out of the releases. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 305-06 (Bankr. D. Del. 2013) (approving ballots that had an opt-out mechanism for third-party releases); *see also In re Chaparral Energy Inc.*, Case No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) [D.I. 237] (confirming plan that provided an opportunity for parties presumed to accept to affirmatively elect to "opt out").

32.    Indeed, the majority view in this District is that third-party releases are both consensual and appropriate where holders of claims or interests are provided with the informed opportunity to opt out of such releases, but take no such action. *See, e.g.*, *In re Chaparral Energy Inc.*, Case No. 20-11947 (MFW) (Bankr. D. Del. Oct. 1, 2020) [D.I. 237] (confirming plan that permitted holders of claims that voted to reject or abstained from voting to check a box on ballot opting out of third party releases); *In re Skillsoft Corporation*, Case No. 20-11532

(MFW) (Bankr. D. Del. Aug. 6, 2020) [D.I. 274] (same); *In re Z Gallerie, LLC*, Case No. 19-10488 (LSS) (Bankr. D. Del. June 14, 2019) Hr'g Tr. 48:9-11 ("With respect to third-party releases I'm prepared to find that they are consensual because of the opt-out box in the ballots."); *In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) [D.I. 238] (approving third-party releases with objection opt-out mechanism); *In re Panda Temple Power, LLC,* Case No. 17-10839 (LSS) (Bankr. D. Del. Jan. 23, 2018) [D.I. 559] (same).

33.    The UST cites to *In re Emerge Energy Services LP*, Case No. 19-11563, 2019 Bankr. LEXIS 3717 (Bankr. D. Del. Dec. 5, 2019), *In re Washington Mutual, Inc.*, 442 B.R. 314 (Bankr. D. Del. 2011), and *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) for the proposition that silence may not be construed as consent to a plan's third-party release provisions.  Reliance on these cases is inapposite.  In *Emerge*, for example, this Court took a "minority" position in holding that one class of claims and one class of shareholders were not deemed to have consented to third-party releases by their failure to opt-out.  Those classes, however, received "no distribution under the Plan and no previous dealing between the parties [were] in evidence."  *See In re Emerge*, Bankr. LEXIS at \*54.  Here, by contrast, parties that receive no distribution and are deemed to reject are not releasing parties.

34.    More importantly, the decisions cited by the UST primarily rely solely upon traditional contract law principles to reach their conclusion.  *See In re Emerge Energy Services LP*, 2019 Bankr. LEXIS 3717, at \*53 (Bankr. D. Del. Dec. 5, 2019) ("For the Court to infer consent from the nonresponsive creditors and equity holders, the Debtors must show under basic contract principles that the Court may construe silence as acceptance . . . ."); *In re Washington Mutual, Inc.*, 442 B.R. at 352 ("[A]ny such release must be based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan)."); *In re Coram Healthcare*

*Corp.*, 315 B.R. at 336 ("[A] Plan is a contract that may bind those who vote in favor of it. Therefore, to the extent creditors or shareholders voted in favor of the Trustee's Plan, which provides for the releases of claims they may have against the Noteholders, they are bound by that.") (internal citations omitted).

35.    A chapter 11 plan, however, is not an ordinary contract.  *See In re Frontier Ins. Grp., Inc.*, 585 B.R. 685, 693 (Bankr. S.D.N.Y. 2018) ("References to chapter 11 plans as contracts or agreements—while useful for purposes of interpreting plans . . . are only by analogy, however.  The binding effect of a chapter 11 plan is in fact premised on statutory and common law claim preclusion."), *aff'd*, 598 B.R. 87 (S.D.N.Y. 2019).   Unlike a traditional contract, a chapter 11 plan is signed only by the proponents of the plan, yet has the power to bind thousands of non-signatories by virtue of section 1141 of the Bankruptcy Code.  *See* 11 U.S.C. § 1141(a) ("Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan."); *see also Protarga, Inc. v. Webb (In re Protarga, Inc.)*, 329 B.R. 451, 478 (Bankr. D. Del. 2005) ("[T]he Plan . . . pursuant to § 1141(a), is binding on all creditors . . . .").

36.    Accordingly, the Court need not, and should not, look solely to basic contract law to answer the question of whether a party consented to plan provisions in the bankruptcy context. Rather, section 1141(a) of the Bankruptcy Code provides an alternative basis for binding holders of claims and interests to a plan's provisions—including third-party releases contained therein—

if such party in interest receives proper notice but fails to object to confirmation of the plan.  *See*

11 U.S.C. § 1141(a) (providing that a confirmed plan binds, among others, "any creditor . . .

whether or not the claim or interest of such creditor . . . is impaired under the plan . . . ."); *see In*

*re Platinum Oil Props., LLC*, 465 B.R. 621, 638 (Bankr. D.N.M. 2011) ("A confirmed Chapter

11 plan is binding on all parties described in 11 U.S.C. § 1141(a) who received proper notice . . .

.  In fact, confirmation binds creditors and other parties in interest even if those parties have not

accepted the plan . . . 'even if it had a different understanding of [the plan's terms] or did not

realize their effect.'") (*quoting In re K.D. Co.*, 254 B.R. 480, 491 (B.A.P. 10th Cir. 2000)); *see*

*also In re Tops Holding II Corp.*, Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018)

Hr'g Tr. 39:18-19 (determining that section 1141(a) of the Bankruptcy Code provides "the

source for the deemed consent," and holding that a similar opt-out mechanism was sufficient to

imply consent).

37.    In bankruptcy, silence *is* deemed consent and binds a silent creditor to a plan

because section 1141(a) of the Bankruptcy Code obligates parties in interests to object to and

overcome plan provisions with which they take issue.  As this Court has noted, in approving

releases that required an opt-out for unimpaired creditors, "being required to take an action in

order to protect one's rights is not a novel concept, either in civil litigation or in the bankruptcy

context."  *In re Southeastern Grocers, LLC*, Case No. 18-10700 (MFW) (Bankr. D. Del. May 14,

2018), Hr'g Tr. at 37:5-8; *see id.* Hr'g Tr. at 23:13-18 ("[T]here are many instances where a

party's required to file a response.  And if the party does not, that is deemed to be consent to the

request.  Why is this different?  There was a notice given to all unimpaireds requiring them to

object if they had an objection specifically to the releases.  Why is that not consent?").

38.     Recently, in the *Melinta Therapeutics* cases, the Court adopted this reasoning in approving the third-party releases and, in so doing, held that section 1141 of the Bankruptcy Code is more compelling than the contractual arguments raised in the decisions cited by the UST.  *See In re Melinta Therapeutics, Inc.*, Case No. 19-12748 (LSS) (Bankr. D. Del. Apr. 2, 2020) Hr'g Tr. 120:8-14 ("[A]s I said during our argument here, [the 1141 argument is] compelling to me and more compelling than the contractual argument.  So, until I hear a real response to the 1141 argument, that is where my thinking is; that 1141 binds creditors to a plan and creditors need to, therefore, speak up and object to release provisions, like they need to other provisions.").  Thus, although courts may certainly analyze and approve third-party releases issues within traditional conceptions of contract law, an alternative basis for approving consensual releases under a bankruptcy plan exists where, as here, parties are being given adequate notice of the third party release provisions, the alternatives of failing to properly opt out are clearly explained, and the party fails to do so.

39.     The Debtors intend to further establish the appropriateness of the third-party releases at the Confirmation Hearing, but, at this stage, the Court should overrule the UST Objection to the third-party releases as it relates to approval of the Disclosure Statement and Solicitation Procedures.

## II.     The Expense Reimbursement and Termination Payment under the EPCA Are Actual and Necessary Costs of Preserving the Estates

40.     Like the Plan, the EPCA is the product of hard fought, good faith, arm's-length negotiations.  After filing the EPCA Motion on March 29, 2021, the Debtors continued to negotiate with the Initial Plan Sponsors and the PE Sponsors concerning entry into an agreement that would backstop the significant outlay of capital required to fund their emergence from these Chapter 11 Cases.  On April 3, 2021, the Debtors ultimately entered into a revised form of the

Equity Purchase and Commitment Agreement (the "**EPCA**"),[8] which represents the most competitive backstop and equity commitment offer available to the Debtors as of the date of this Reply.

41.     The EPCA provides for over $2.5 billion in committed capital, which is necessary to consummate the Debtors' restructuring, and delivers certainty that the Debtors will be able to fund their exit from these Chapter 11 Cases.  Specifically, pursuant to the EPCA the Plan Sponsors have committed to ensure that the Debtors' $1.6 billion rights offering will be fully funded.  Further, Centerbridge, Warburg Pincus and Dundon will provide new money investments in the Reorganized Debtors through (i) the direct purchase of an aggregate of $565 million of Reorganized Hertz Parent Common Interests, and (ii) the direct purchase of an aggregate of $385 million of preferred stock, in the amounts set forth in the EPCA.  EPCA §§ 2.2, 2.3; Disclosure Statement at 9; Supp. Derrough Decl. ¶ 4.  These amounts are essential to funding distributions under the Plan and ensuring that the Debtors are able to emerge from these Chapter 11 Cases in time for the important summer travel season.  Derrough Decl. ¶¶ 13-14; Supp. Derrough Decl. ¶ 4.  Without the EPCA, the Debtors' path to emergence would be uncertain and the unnecessary delay in concluding these Chapter 11 Cases would increase expenses ultimately borne by the estates.  Supp. Derrough Decl. ¶ 4.  Moreover, the new money commitments provided for by the EPCA are necessary to ensure that the Debtors have sufficient liquidity to fund their post-emergence operations and achieve the financial projections upon which the Plan is based.  Derrough Decl. ¶¶ 12-14; Supp. Derrough Decl. ¶ 4.

---

[8]     The Equity Purchase and Commitment Agreement that the Debtors seek authority to enter into is available as Exhibit A to the *Notice of Filing of Revised Equity Purchase and Commitment Agreement* [D.I. 3603].

42.     In consideration for the significant benefits to the estates provided by the Plan Sponsors pursuant to the EPCA, the Debtors agreed to the 3% Termination Fee[9] and Expense Reimbursement.[10]  These fees and expenses were negotiated at arms'-length and were required by both prospective plan sponsor groups at all times throughout the negotiations.   Supp. Derrough Decl. ¶¶ 5-6.   Such fees were ultimately agreed to by the Debtors as they were necessary to compensate the Plan Sponsors for the financial risk they are undertaking in committing to fund in up to $2.573 billion at the Debtors' emergence from chapter 11.

43.     Both the Expense Reimbursement and the Termination Payment are "actual and necessary" costs of preserving the estates and permitted under section 503(b) of the Bankruptcy Code.[11]  The Plan Sponsors required such fees in order to make the $2.5 billion commitment

---

[9]     Within three business days following consummation of an Alternative Transaction (as defined in the EPCA) and in the event of termination of the EPCA in the manner and circumstances described therein as triggering a termination payment, the Debtors shall pay Warburg Pincus LLC 10.7%, Centerbridge Partners, L.P. 10.7%, Dundon Capital Partners 15.6%, and the ad hoc group of holders of the Debtors' Unsecured Funded Debt (such holders, the "**Initial Consenting Noteholders**") 63.0% of a cash termination payment equal to $77,200,000 (the "**Termination Payment**").  EPCA § 9.5.  The Initial Consenting Noteholders' portion of the Termination Payment shall be allocated as set forth on Schedule 1 to the EPCA.  *Id.*  The Termination Payment equates to 3% of the total commitments under the EPCA.

[10]     The EPCA provides that the Company will pay (or will cause the Debtors to pay) the reasonable and documented out-of-pocket fees and expenses incurred on behalf of the Equity Commitment Parties (defined therein) in connection with the due diligence, investigation, negotiation, execution and performance of any transactions contemplated under the EPCA, the Chapter 11 Cases, the Plan Support Agreement or the Plan regardless of when such fees were incurred (such payment obligations, the "**Expense Reimbursement**").  EPCA §3.1(a). The accrued portion of the Expense Reimbursement is payable as soon as reasonably practicable following entry of the EPCA Approval Order, and thereafter shall be paid within 10 business days of receipt by the Debtors of an applicable summary invoice, with the final payment to be made contemporaneously with Closing.  EPCA §3.1(b).  Alternatively, the Expense Reimbursement is also payable upon the valid termination of the EPCA in the circumstances described in the EPCA as Expense Reimbursement triggers.  *Id.*

[11]     The Equity AHG confuses the standard applicable to the Debtors' request for authority to pay the Expense Reimbursement.  The controlling standard for the use of estate property outside the ordinary course of business is the business judgment standard.  11 U.S.C. §363(b); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999).  The "actual and necessary" standard under 503(b) that the Equity AHG advances applies only to the Debtors' request to allow the Expense Reimbursement as an administrative expense, ***not*** to their request to make the Expense Reimbursement payments contemplated by the EPCA.  In any event, even if the "actual and

provided under the EPCA and because that commitment benefits the Debtors' estates by providing the Debtors' with a viable path to emergence with significant recoveries to creditors. The Equity AHG does not (and cannot) dispute that such funds are necessary to preserve the estate.  Further, no alternative proposal was available to the Debtors that did not involve such customary and market-based fees.  Supp. Derrough Decl. ¶ 6; *see In re O'Brien Envtl. Energy, Inc.,* 181 F.3d 537 (3d Cir. 1999) (a break fee may be necessary to preserve value of the estate by "inducing a bid that otherwise would not have been made and without which bidding would have been limited").[12]   Moreover, the Termination Payment is payable only following the consummation of an Alternative Transaction, and thus involves no cash cost to the estate unless a better offer is accepted.[13]  EPCA § 9.5.  Additionally, there is no backstop fee or commitment premium associated with the EPCA, which is common in other comparable agreements. Derrough Decl. ¶ 17; EPCA Motion ¶ 27, n. 12.  Thus, when viewed in light of the "totality of the circumstances," as required by the authority on which the Equity AHG relies, the fees and expenses provided under the EPCA are entirely reasonable, necessary and should be approved. *In re Energy Future Holdings Corp.*, 904 F.3d at 314 (taking into account all relevant circumstances to determine "whether the proposed fee's potential benefits to the estate outweigh any potential harms.").  Indeed, failure to approve the EPCA on its agreed terms would

---

necessary" standard applied to the Expense Reimbursement payments, as it does with respect to payment of the Termination Payment, the Debtors would meet that standard for the reasons set forth herein and in the EPCA Motion.  EPCA Motion ¶¶ 29-30.  The Equity AHG does not dispute that the business judgment standard controls with respect to the Debtors' request for authority to enter into the EPCA.

[12]     Contrary to the Equity AHG's suggestion, the holding in *O'Brien* is not adverse as that case involved a *retrospective* request for break fee after an auction and thus, unlike here, was the break-fee was not a pre-requisite to securing the bid.

[13]     In this regard the holding in *EFH* is readily distinguishable as in that case a break fee was denied only where it carried a perverse incentive that would force the Debtors to terminate the agreement and leave them "in a worse off position – desperate to accept an alternative transaction." *In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3d Cir. 2018).

25

jeopardize the availability of the capital necessary for the Debtors to fund distributions under the Plan and emerge from these Chapter 11 Cases.

44.     Since the Equity AHG does not and cannot dispute that entry into the EPCA is a sound exercise of the Debtors' business judgment under section 363(b) of the Bankruptcy Code, it instead seeks to attack the EPCA, asserting five arguments as to why the Termination Payment and Expense Reimbursement are not actual and necessary costs of preserving the estate under 503(b) of the Bankruptcy Code.  All fail.

45.     *First*, the Equity AHG suggests that Termination Payment and Expense Reimbursement were not necessary to induce the Plan Sponsors to enter into the EPCA because the Plan Sponsors attempted to outbid the Initial Plan Sponsors "even without a termination fee or expense reimbursement."   Equity AHG Obj. ¶ 41.   This is incorrect.   As noted, both prospective plan sponsor groups at all times required the reimbursement of all their reasonable expenses and a termination fee of at least 3% of the commitments to be provided under the EPCA.  Derrough Decl. ¶ 16; Supp. Derrough Decl. ¶ 6.  Indeed, both prospective plan sponsors initially requested a 5% termination payment.  *Id.*

46.     Moreover, the fees associated with the EPCA are customary and well-within the range associated with similar transactions.  Indeed, the Termination Payment contemplated by the EPCA is lower than comparable rights offering transactions, where median and average termination payments associated with comparable transactions typically represent approximately 6% of the total commitment amount.  *See* Supp. Derrough Decl. Ex. A.  Additionally, the Termination Payment is consistent with fees associated with sales of substantially all of a debtor's assets under section 363 of the Bankruptcy Code, which is analogous here given that through the commitments provided by the EPCA, the Plan Sponsors will ultimately acquire

26

significant equity stakes in the Reorganized Debtors. *Id.* Similarly, debtors routinely reimburse backstopping parties all reasonable and documented expenses incurred by the Plan Sponsors in an uncapped amount. *Id.*[14]

47.   ***Second***, the Equity AHG suggests that the Expense Reimbursement is not justified because the EPCA negotiations have concluded and thus no inducement is necessary for the Equity AHG to enter into the EPCA. Equity AHG Obj. ¶ 42. This argument fails to take into

---

[14]   *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del. Nov. 16, 2020) [D.I. 1241] (approving reimbursement of all reasonable and documented fees and expenses incurred before, on or after the date of the backstop commitment agreement); *In re Ultra Petroleum Corp.*, No. 20-32631 (MI) (Bankr. S.D. Tex. Aug. 22, 2020) [D.I. 610, 736] (approving reimbursement of all accrued and unpaid backstop expenses incurred up to and including the date of the confirmation order, the effective date, or the date of termination, as the case may be); *In re Am. Commercial Lines Inc.*, No. 20-30982 (MI) (Bankr. S.D. Tex. Mar. 3, 2020) [D.I. 193] (approving expense reimbursement of all of the reasonable and documented fees and expenses incurred by the parties before, on or after the date of the backstop commitment agreement related to the restructuring); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019) [D.I. 368] (approving reimbursement of all reasonable and documented fees and out-of-pocket expenses, whether incurred directly or on behalf and regardless of whether such fees and expenses are incurred before or after the petition date); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. Sept. 21, 2018) [D.I. 1040] (approving expense reimbursement, to the extent not otherwise paid in connection with the chapter 11 cases); *In re Peabody Energy Corp.*, No. 16-42529 (BSS) (Bankr. E.D. Mo. Jan. 31, 2017) [D.I. 2282] (approving expense reimbursement of all reasonably incurred and documented out-of-pocket costs and expenses incurred in connection with the debtors' chapter 11 cases after the petition date); *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. June 7, 2010) [D.I. 3427] (approving reimbursement of the documented out-of-pocket costs and expenses reasonably incurred by each investor obligated under the plan support agreement to support the plan); *In re Aleris International, Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Mar. 15, 2010) [D.I. 1662] (approving reimbursement of all reasonable out-of-pocket expenses with respect to the transactions contemplated in the equity commitment agreement and all the proceedings related to such transactions); *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 11, 2010) [D.I. 3940] (approving reimbursement of the fees and expenses reasonably incurred in connection with the transaction contemplated in the equity commitment agreement); *In re Premier Int'l Holdings*, No. 09-12019 (CSS) (Bankr. D. Del. Dec. 18, 2009) [D.I. 1235] (approving reimbursement of reasonable and documented fees, expenses, disbursements and charges of the backstop purchasers incurred previously or in the future relating to the exploration and discussion of the restructuring of the debtors, alternative financing structures to the backstop commitment or to the preparation and negotiation of the backstop commitment agreement, the plan, the offering procedures, the new common stock term sheet, the plan documents or the postconfirmation organizational documents); *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y. Jan. 12, 2007) [D.I. 6589] (approving reimbursement of out-of-pocket costs and expenses reasonably incurred on or before the effective date in connection with the transaction contemplated in the equity purchase and commitment agreement and the chapter 11 cases and other proceedings related to such transactions).

account the history of the Debtors' negotiations and the considerable expenses incurred by the Plan Sponsors to date. While it is correct that after the EPCA Motion was filed the Debtors negotiated and finalized the EPCA with the Plan Sponsors, the Plan Sponsors had incurred considerable expense prior to that point, and thus required the Expense Reimbursement as a condition of entering into the EPCA. Supp. Derrough Decl. ¶ 7. This work included a diligence exercise, including researching the value of the Debtors, and the negotiation of the Plan and EPCA. *Id*. Additionally, there is still much to be done to consummate the transactions provided for by the EPCA and the Plan. Expense reimbursements and break fees are customary to induce backstopping parties to reserve capital for a significant period of time and bear the risk that the Plan is not consummated. Derrough Decl. ¶ 16; Supp. Derrough Decl. ¶ 5. That is especially true here, where the amount of committed capital exceeds $2.5 billion. Supp. Derrough Decl. ¶ 5. Accordingly, the Plan Sponsors insisted on the Expense Reimbursement and Termination Payment as a condition of entering into the EPCA. *Id.*

48. ***Third***, the Equity AHG's argument that the Plan Sponsors need no inducement to enter into the EPCA because the transaction would "guarantee them a massive windfall" is misguided. The Termination Payment is necessary to compensate the Plan Sponsors only in a scenario where the transactions contemplated by the EPCA are not consummated. The Termination Payment imposes no cash costs on the Debtors if the Debtors consummate the Plan. By contrast, the Termination Payment becomes payable only following entry by the Debtors into an Alternative Transaction (as defined in the EPCA). *See* EPCA §§ 9.1-9.3, 9.5. Indeed, if the Debtors pursue such an Alternative Transaction then the Termination Payment will have served

one of the key purposes articulated in *O'Brien* case relied upon the Equity AHG, which is to promote "more competitive bidding."[15]  *In re O'Brien Envtl. Energy, Inc.,* 181 F.3d at 537.

49.     **Fourth**, while the AHG argues that it is necessary for the Debtors to prove that the Plan Sponsors would withdraw their proposal absent the Termination Fee and Expense Reimbursement, that is not the standard under the cases upon which the Equity AHG relies. Equity AHG Obj. ¶ 42.  Instead, the required showing is that those fees and expenses induced an offer that "otherwise would not have been made."  *In re O'Brien Envtl. Energy, Inc*., 181 F.3d at 537; *In re Energy Future Holdings Corp*., 904 F.3d 298, 313-14 (3d Cir. 2018); *In re Worldspace, Inc.,* No. 08-12412 (PJW), 2010 Bankr. LEXIS 4119, at \*12 (Bankr. D. Del. June 2, 2010) (approving break-up fee because, among other reasons, the "break-up fee is an essential inducement and condition of [b]uyer's entry into, and continuing obligations under, the APA"); *In re Women First Healthcare, Inc*. 332 B.R. 115, 121 (Bankr. D. Del. 2005) (Walrath, J.) (allowing break-up fee where unsuccessful bidder's efforts produced a higher offer and conferred benefit on the estate).  As set forth above, the Debtors have carried their burden because at all times the various plan sponsor groups both required the reimbursement of their reasonable fees and a termination fee of at least 3% of the commitments under the EPCA, and were not willing to provide the significant commitment provided under the EPCA without these standard inducements.  Supra ¶ 45.

50.     **Fifth**, the Equity AHG argues that the Expense Reimbursement should be limited to those fees and expenses incurred in connection with the Plan and the Plan Sponsors' proposal. Equity AHG Obj. ¶ 42.  However, courts have routinely permitted the reimbursement of fees

---

[15]     The Debtors do not respond to the Equity AHG's valuation arguments here because, as set forth above, such issues are premature prior to Plan confirmation.

incurred by a creditor more broadly in a chapter 11 case in connection with the approval of a backstop or sale agreement.  See *In re 24 Hour Fitness Worldwide, Inc*., No. 20-11558 (KBO) (Bankr. D. Del. Nov. 16, 2020) [D.I. 1241] (approving reimbursement of all reasonable and documented fees and expenses incurred before, on or after the date of the backstop commitment agreement); *In re Ultra Petroleum Corp*., No. 20-32631 (MI) (Bankr. S.D. Tex. Aug. 22, 2020) [D.I. 610, 736] (approving reimbursement of all accrued and unpaid backstop expenses incurred up to and including the date of the confirmation order, the effective date, or the date of termination, as the case may be); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. May 15, 2019) [D.I. 368] (approving reimbursement of all reasonable and documented fees and out-of-pocket expenses, whether incurred directly or on behalf and regardless of whether such fees and expenses are incurred before or after the petition date); *In re Peabody Energy Corp.*, No. 16-42529-399 (Bankr. E.D. Mo. Jan. 31, 2017) [D.I. 2282] (approving expense reimbursement of all reasonably incurred and documented out-of-pocket costs and expenses incurred in connection with the debtors' chapter 11 cases after the petition date).

## **CONCLUSION**

WHEREFORE, the Debtors request that the Court (i) overrule the DS Objections and approve the Disclosure Statement, as modified prior to the Hearing and subject to such further modifications presented by the Debtors to, or ordered by, the Court at the Hearing, (ii) enter the Revised Proposed DS Order, (iii) overrule the Equity AHG's objection to the EPCA Motion, grant the EPCA Motion, and enter the Revised Proposed EPCA Order, and (iv) grant such other and further relief as the Court deems just and proper.

Dated: April 14, 2021

*/s/ Brett M. Haywood*

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Brett M. Haywood (No. 6166)
Christopher M. De Lillo (No. 6355)
J. Zachary Noble (No. 6689)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Collins@rlf.com
Knight@rlf.com
Haywood@rlf.com
DeLillo@rlf.com
Noble@rlf.com

—and—

**WHITE & CASE LLP**

Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone:     (305) 371-2700
tlauria@whitecase.com
mbrown@whitecase.com

J. Christopher Shore (admitted *pro hac vice*)
David M. Turetsky (admitted *pro hac vice*)
Kathryn Sutherland-Smith (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone:     (212) 819-8200
cshore@whitecase.com
david.turetsky@whitecase.com
kathryn.sutherland.smith@whitecase.com

Jason N. Zakia (admitted *pro hac vice*)
Laura E. Baccash (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, IL 60606
Telephone:     (312) 881-5400
jzakia@whitecase.com
laura.baccash@whitecase.com

Ronald K. Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
Andrew Mackintosh (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone:     (213) 620-7700
rgorsich@whitecase.com
aaron.colodny@whitecase.com
amackintosh@whitecase.com
doah.kim@whitecase.com

*Co-Counsel to the Debtors and*
*Debtors-in-Possession*