```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2
                                          .
 3   IN RE:                               .  Chapter 11
                                          .  Case No.: 20-11218 (MFW)
 4   THE HERTZ CORPORATION,               .
     et al.,                              .  (Jointly Administered)
 5                                        .
                                          .  Courtroom
 6               Debtors.                 .  824 Market Street
                                          .  Wilmington, Delaware 19801
 7                                        .
                                          .  April 16, 2021
 8   . . . . . . . . . . . . . . . .      .  10:31 a.m.

 9                    TRANSCRIPT OF ZOOM HEARING
                 BEFORE THE HONORABLE MARY F. WALRATH
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12   For the Debtors:          Brett M. Haywood, Esquire
                               RICHARDS, LAYTON & FINGER, P.A.
13                             One Rodney Square
                               920 North King Street
14                             Wilmington, Delaware 19801

15                             -and-

16                             Thomas E. Lauria, Esquire
                               WHITE & CASE, LLP
17                             200 South Biscayne Boulevard
                               Suite 4900
18                             Miami, Florida 33131

19   (APPEARANCES CONTINUED)

20   Electronically
     Recorded By:              Mandy Bartkowski, ECRO
21
     Transcription Service:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             Telephone: (302) 654-8080
                               E-Mail:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording:
25   transcript produced by transcription service.
```

1  APPEARANCES (CONTINUED):

2  For the Debtors:              J. Christopher Shore, Esquire
                                 WHITE & CASE, LLP
3                                1221 Avenue of the Americas
                                 New York, New York 10020

4

5  For the Ad Hoc
   Committee of
6  Shareholders:                 Andrew K. Glenn, Esquire
                                 GLENN AGRE BERGMAN & FUENTES, LLP
7                                55 Hudson Yards
                                 20th Floor
8                                New York, New York 10001

9  For U.S. Bank National
   Association:                  Richard C. Pedone, Esquire
10                               NIXON PEABODY, LLP
                                 100 Summer Street
11                               Boston, Massachusetts 02110

12 For GAMCO Investors
   and its Affiliates:           Andrew J. Entwistle, Esquire
13                               ENTWISTLE & CAPPUCCI, LLP
                                 Frost Bank Tower
14                               401 Congress Avenue
                                 Suite 1170
15                               Austin, Texas 78701

16 For the Official
   Committee of Unsecured
17 Creditors of The Hertz
   Corporation, *et al.*:        Amy Caton, Esquire
18                               KRAMER LEVIN NAFTALIS & FRANKEL, LLP
                                 1177 Avenue of the Americas
19                               New York, New York 10036

20 For the Ad Hoc
   Noteholder Group:             Rachel C. Strickland, Esquire
21                               WILLKIE FARR & GALLAGHER, LLP
                                 787 Seventh Avenue
22                               New York, New York 10019

23

24

25

1  | APPEARANCES (CONTINUED):

2  | For Knighthead Capital
   | Management, LLC and
3  | Certares Opportunities:    Stephen E. Hessler, Esquire
   |                           KIRKLAND & ELLIS, LLP
4  |                           601 Lexington Avenue
   |                           New York, New York 10022
5  |

6  | For the Trustee:          Linda Richenderfer, Esquire
   |                           OFFICE OF THE UNITED STATES TRUSTEE
7  |                           J. Caleb Boggs Federal Building
   |                           844 King Street
8  |                           Suite 2207, Lockbox 35
   |                           Wilmington, Delaware 19801
9  | For Retired Executive
10 | Groups:                   Mark Minuti, Esquire
   |                           SAUL EWING ARNSTEIN & LEHR, LLP
11 |                           1201 North Market Street
   |                           Suite 2300
12 |                           Wilmington, Delaware 19899

13 | For Enrico Moretti:       Adam J. Gutride, Esquire
   |                           GUTRIDE SAFIER, LLP
14 |                           100 Pine Street
   |                           Suite 1250
15 |                           San Francisco, California 94111

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

1                              INDEX

2  MOTIONS:                                              PAGE

3  Agenda
   Item 27:   [Sealed] Enrico Moretti's Motion for Entry      66
4             of an Order Applying Bankruptcy Rule 7023 to
              His Class Proof of Claim and Certifying the
5             Classes and Subclasses
              [Docket No. 1943 – filed November 25, 2020]
6
   Agenda
7  Item 28:   Debtors' Motion for Entry of an Order (i)        7
              Approving the Disclosure Statement and the
8             Form and Manner of Notice, (ii) Approving
              Plan Solicitation and Voting Procedures,
9             (iii) Approving Forms of Ballots, (iv)
              Approving Form, Manner, and Scope of
10            Confirmation Notices, (v) Establishing
              Certain Deadlines in Connection with
11            Approval of the Disclosure Statement and
              Confirmation of the Plan, and (vi) Granting
12            Related Relief
              [Docket No. 3496 – filed March 29, 2021]
13
              Court's Ruling:                                 50
14

15 Agenda
   Item 31:   Status of Class Claims Mediations to Date        6
16

17 Transcriptionist's Certificate                             71

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 10:31 a.m.)

2              THE COURT:  Good morning.  This is Judge Walrath,

3    and we're here in the Hertz case, so I'm going to turn it

4    over to counsel for the debtor to start us off.

5              MR. HAYWOOD:  Good morning, Your Honor.

6              For the record, Brett Haywood of Richards Layton,

7    on behalf of the debtors.  Thank you for hearing us this

8    morning.

9              We'd also like to thank the Court and its staff

10   for entering many of the orders we submitted under

11   certification this week.  And as Your Honor will see from the

12   amended agenda we filed this morning, that has cleared the

13   way for presentation of a handful of matters today.

14             First, we have a hearing on approval of the

15   debtors' disclosure statement, solicitation procedures,

16   rights offering procedures, and equity purchase and

17   commitment agreement.

18             And, second, we have a hearing on certain class

19   claims matters.  First, we'd like to provide the Court with a

20   brief status update regarding certain class remediation

21   sheets, and then conclude with Mr. Moretti's class claim

22   motion.

23             And if it pleases the Court, I will turn things

24   over to Mr. Tom Lauria now, from the White & Case firm.

25             THE COURT:  Okay.  Thank you.

1              MR. LAURIA:  Good morning, Your Honor.

2              Tom Lauria with White & Case.  I'm counsel to the

3    debtors.  I'm here with a number of my colleagues this

4    morning.  I'm not going to name names, but you may be hearing

5    from multiple parties during the course of the proceedings.

6              With respect to the order of proceedings, the one

7    thing I'd like to do first, perhaps, is ask my partner, Chris

8    Shore, to address the Moretti matter.  My understanding is

9    there may be some late-breaking news there that will allow us

10   to then turn to what I see is the main event; approval of the

11   equity purchase and commitment agreement and consideration of

12   the disclosure statement.

13             THE COURT:  All right.  Mr. Shore?

14             MR. SHORE:  Actually, Your Honor, we -- I don't

15   know why my video is not up.  Sorry.  I didn't have my video

16   on.

17             Your Honor, Chris Shore from White & Case.

18   Actually, we have nothing to report at this point -- we may

19   later are -- but why don't we go ahead with the disclosure

20   statement and then we can come back, do a status update, and

21   then the Moretti motion.

22             THE COURT:  All right.  Thank you.

23             Back to Mr. Lauria.

24             MR. LAURIA:  Thank you, Your Honor.

25             So, what I'd like to do, Your Honor, is start with

1  the equity purchase and commitment agreement and then turn to

2  the disclosure statement.  I think there's going to be live

3  testimony, with respect to the approval of the EPCA and there

4  are certainly a number of disputes there.

5          I think the disclosure statement is largely going

6  to be an administrative discussion to walk the Court through

7  the changes and modifications that we've made to the plan and

8  disclosure statement over the last few days, make sure the

9  Court understands them, and then I think we have two topics

10  to discuss; quite frankly, neither one of which appears to me

11  to be a disclosure objection, but more a party's expressing

12  their displeasure with the plan.

13          So, if that works for the Court, I'll go forward.

14          THE COURT:  You may.

15          MR. LAURIA:  Thank you, Your Honor.

16          With respect to the motion for approval of the

17  equity purchase and commitment agreement, let me start by

18  saying that this is an agreement pursuant to which

19  Centerbridge, Warburg Pincus, and Dundon Capital, and a group

20  of the company's unsecured noteholders, who happen to hold

21  about 87 percent of the approximately $2.7 billion of such

22  notes, have agreed to invest directly or through a backstop,

23  the investment of approximately $2.6 billion of capital into

24  the company as equity.  Is it called the equity purchase and

25  commitment agreement, and we have creatively and lovingly

1  called it the "EPCA" and for ease of reference, that's how

2  I'm going to refer to it this morning.

3          Approval of the EPCA marks another important

4  milestone in the debtors' effort under uncertain and

5  certainly unprecedented circumstances, to exit Chapter 11 in

6  a timely fashion as a stronger, better-capitalized company

7  than it was just 10 months ago when it entered Chapter 11,

8  and in doing so, to maximize stakeholder recoveries.

9          After spending the first five months of the case

10 working to stabilize the business, to make sure that it had

11 the liquidity that it needed to operate as a going concern,

12 we spent the next five months, through to today, thoughtfully

13 and methodically developing and implementing a plan for the

14 company's Chapter 11 exit.

15         We started this process with a simple question:

16 When should we exit?

17         The answer from all points and all corners was

18 crisp and clear:  by the end of the second quarter of 2021.

19         There were four primary drivers.  One, doing so

20 would relieve the company of the burdens and inefficiencies

21 of the Chapter 11 process going into its most important

22 quarter, Q3 2021, when it generates the highest revenues with

23 the highest margins.

24         Number two, doing so would permit the company to

25 obtain new ABS financing needed to place orders for its 2022

1  fleet, and without that, the company could easily be pushed

2  to the back of the line with the OEMs, which could result in

3  having a fleet that is both, too small and too old to be

4  competitive, not only in 2022, but also in 2023.  This could

5  imperil the business plan and the stakeholder value that it

6  drives.

7         Number three, doing so would end the substantial

8  cost of Chapter 11 administration, allowing the company to

9  devote all of its resources to its business, buying, renting,

10  and selling cars.

11         And number four, finally, doing so was doable.

12  Looking at things at the end of October in 2020, an exit in

13  seven months seemed reasonably achievable if we worked hard

14  and had a plan.

15         So, with that objective in mind, we built a

16  timeline for milestones to achieve it.  June 30 would be the

17  exit.  To do that, we needed to have a confirmation order

18  between June 1 and June 15th.  To get to confirmation, we

19  needed to end voting and objections between May 15th and May

20  30th.

21         To do that, we had to start soliciting between

22  April 14th and April 30th.  To do that, we had to file a plan

23  and disclosure statement between February 15th and March 1st.

24  To do that, we had to have a deal of some kind between

25  January 15th and February 15th.  To do that, we needed to

1  open the doors for diligence in December, and we needed to

2  sit down in November with our key parties and stakeholders

3  and build consensus around this approach.  We needed to

4  finish a three-year plan, and we needed to populate a data

5  room for people to do their diligence.

6         When we were through with that, needing to exit

7  required, very broadly stated, two things.  Number one,

8  funding to make the payments required to exit and for post-

9  petition operation of the business, and number two, creditor

10 support.

11        Remarkably, we are here today with both of those

12 things.  We have today, commitments under the EPCA for $2.6

13 billion of new equity capital.  $950 million of that will be

14 provided by the third-party sponsorship group:  Centerbridge,

15 Warburg, and Dundon, and approximately $1.62 billion will be

16 provided by our unsecured noteholders through a fully

17 backstopped rights offering made available to all holders of

18 funded, unsecured debt.

19        We also have in hand this morning, fully executed

20 commitments for $9.8 billion of exit financing.  That

21 includes a $1.3 billion term loan, a $1.5 revolver, and a new

22 $7 billion ABS financing for the purchase of vehicles through

23 2022 and '23.  That's a grand total of $12.4 billion of fully

24 committed capital to fund our exit from Chapter 11.

25        This capital drives the following results.  It's

1  really quite amazing.  All administrative and priority

2  claims, including what we anticipate to be $1.25 billion

3  drawn under our DIP financing, will be paid in cash in full.

4  All first and second lien debt will be paid in cash in full.

5  All obligations owed under our prepetition and post-petition

6  ABS financings will be paid in cash in full.  All of our

7  European debt will be paid in cash in full.

8           Our funded unsecured debt will receive a recovery

9  valued at 75 cents on the dollar and our general unsecured

10 claims, the so-called GUCs, will receive an 85 cent recovery

11 in cash.  This transaction is based on a total enterprise

12 value of approximately $5.5 billion.

13          Your Honor, you would not believe the path that we

14 have taken to get here.  In early February, believe it or

15 not, just two months ago, all additional expressions of

16 interest reflected a TDV in the mid three-billion-dollar

17 range.

18          By March 1, we picked up an initial sponsor, who

19 we had gotten up to a TDV of $4.8 billion.  In late March,

20 after competition improved the proposals of the two primary

21 competitors, we declared a jump ball.  A week later, with the

22 two proposals substantially identical from all financial and

23 economic perspectives, we went with the Centerbridge Group

24 proposal, because it had garnered the support of 87 percent

25 of our unsecured creditors, promising a consensual path to

1  confirmation.

2          But we didn't stop.  In early April, we modified

3  and improved the plan twice to obtain the support of our

4  unsecured creditors committee, which is evidenced by the plan

5  support agreement the committee executed with the company and

6  the sponsors earlier this week.

7          All of this puts the company in an excellent

8  position to exit Chapter 11 in a timely fashion and to be a

9  strong competitor going forward.  We will exit with $1.3

10 billion of corporate debt.  That compares to over $6 billion

11 of corporate debt, prior to COVID in Chapter 11.  That also

12 compares to $4 billion of corporate debt at our main

13 competitor, Avis.

14         We will have over $2 billion of global liquidity,

15 compared to only about a billion dollars of liquidity when

16 you file for Chapter 11 relief.  We will have no corporate

17 debt in Europe, while we work to fix that business, and we

18 will have a new ABS to fund our fleet needs for 2022 and

19 2023.

20         Amazingly, on a fully blended basis, all of that

21 debt, $9.8 billion is going to pay out at about a 2.1 percent

22 interest rate.  I've never seen a company exit Chapter 11

23 with those kinds of terms.  And, importantly, our exit will

24 be on time, which is critical to capturing the value that

25 drives the deal.

1           This outcome, all of these benefits, all of this

2    goodness is driven by the EPCA, which we seek authority to

3    enter into today.  Under the EPCA, just to set the record

4    straight, the sponsorship group is going to provide a total

5    of $950 million of equity capital.  That's going to be in the

6    form of $385 million of preferred and $565 million of common.

7           The unsecured noteholders are going to provide a

8    backstop of an additional $1.62 billion.  That obligation or

9    that commitment is fully backstopped by 37 holders of the

10   company's unsecured notes and it's going to be offered an

11   exact, identical terms to all of the other unsecured

12   debtholders.

13          The total is $2.6 billion.  There are no fees.

14   There are no disproportioned allocations.

15          There is a small discount, about 6.7 percent, to

16   the new money, but that discount is being made available to

17   all unsecured funded debtholders.  I don't know if I've ever

18   seen that before.

19          We've all seen backstop rights offering, high

20   fees, disproportionate allegations, and punitive conversion

21   rights or premiums that diminish the recovery of other

22   creditors to the advantage of the sponsorship group.  That is

23   not the case here, under the EPCA.

24          Your Honor, there are no objections to the

25   material terms of the EPCA, which is quite amazing.  It is a

1  very detailed, lengthy document.  The fact that it's been

2  vetted and we have no objections to the material business

3  terms is, in and of itself, (indiscernible).

4           We do, however, have one objection that was filed

5  by a group of purported shareholders of the company, and that

6  objection is limited to blocking the break-up fee and the

7  expense reimbursement.  Now, I say "purported shareholders"

8  because prior to about 45 minutes ago, this group had not

9  filed a Bankruptcy Rule 2019 statement, identifying the

10 members of the group and what their holdings were.

11          They did, however, file a 2019 just about 45

12 minutes ago and what it indicates is that this group holds,

13 in the aggregate, about 10 percent of the company's issued

14 and outstanding common shares.  Now, those shares have been

15 trading on the order of a dollar to $1.10 a share, meaning

16 that their total investment in this company is something on

17 the order of $15 million.  That stands against the billions

18 of dollars of debt that are held by our creditors and that

19 stand to get a substantial recovery, if not payment in full,

20 under the plan.

21          So, the issues raised by the objection are really

22 three.  Does entry into the break-up fee and the

23 reimbursement, constitute a proper exercise of the company's

24 business judgment?

25          As we believe the evidence will show, this was the

1  consequence of a competitive process.  Both parties demanded

2  a break-up fee and, indeed, both of them demanded a break-up

3  fee that was substantially higher than the one that was

4  ultimately agreed to.

5          Number two, is the quantum of the break-up fee

6  appropriate?

7          We believe the record will show that it's

8  consistent with, and smack dab in the middle of prior

9  precedent.

10          And number three, does the break-up fee constitute

11  a reasonable and necessary expense of administration of these

12  Chapter 11 cases?

13          We believe it clearly is because it is only

14  payable from the proceeds of an alternative transaction.  The

15  record will establish that all three of these boxes have been

16  checked.

17          Now, that is where I would have stopped in terms

18  of starting this hearing, but I have to go on.  I need to

19  bring to the Court's attention one other matter.  At 5:00

20  p.m. yesterday, I received a confidential, three-page deck

21  that set forth an outline for an alternative proposed

22  transaction.

23          This deck was provided to me by Knighthead and

24  Certares, who were the initial proposed plan sponsors, and

25  who failed to become the ultimate plan sponsors, because they

1   couldn't deliver commitments of their funding.  They couldn't

2   get to definitive documents.  And they were unable to garner

3   creditor support for their proposal.

4           The termsheet that we received included no

5   evidence of funding, it was not documented, and it raised a

6   number of critical questions, and, quite frankly, it faces

7   significant skepticism from the company.

8           The equity group who's involved in the proposal

9   has not sent me or anybody at the company, a single call,

10  text, email, or regular mail, about anything related to this

11  case.  The only communications that we received from them is

12  their notice of appearance filed about two weeks ago, and

13  their objection to the matters before the Court this morning.

14          They've made no inquiries about the company and

15  the process.  They have never attempted to obtain an NDA or

16  to obtain confidential information about the company.  And

17  until early this morning, they had never made a proposal.

18          It's very hard to assess what their motive is, but

19  it's reflected by the terms of their proposal, which

20  certainly isn't to deliver equity value to the company's

21  shareholders, and I'm going to get to that in a moment.

22          And with respect to Knighthead and Certares, as I

23  mentioned before, who was in the pole position to being the

24  plan sponsor, they lost it because they were unable to

25  satisfy to the company that they had the funding to go

1  forward with the deal.  They were not yet to definitive

2  documentation.  And they couldn't get creditor support.

3          What they put in front of us at five o'clock

4  yesterday, was certainly not a proposal capable of being

5  accepted.

6          THE COURT:  Well, at this point, I'm not sure

7  we're going to get into the details of that, but I do have a

8  question that you can answer, and that is, does approval of

9  the break-up fee termination, termination fee, or expense

10  reimbursement affect, in any way, or do any of the matters

11  that you're asking me to approve today, affect, in any way,

12  the debtors' ability to exercise its fiduciary duty to

13  consider and, if appropriate, switch to another plan sponsor?

14          MR. LAURIA:  Well, let me break that down into two

15  parts, Your Honor.  Number one, I think we've established by

16  the record in this case that we have no problem pivoting to

17  get what's best for the estate and its stakeholders.  We've

18  already done that once between March 1st and today.

19          And I can assure you that this Board understands

20  its fiduciary duties and that we will work with it to assist

21  the directors in assessing this alternative proposal and

22  determining if it is a superior proposal, and if it is, we

23  will pivot to it.

24          As this Court knows, I think Claire's is a recent

25  example, Bankruptcy Rule 3019 allows the debtor to modify the

1    plan after the disclosure statement has been approved.  And

2    if it's appropriate to do so here, we will do so, and we will

3    pivot.  Just as was the debtors' representation to the Court

4    in Claire's, where the disclosure statement was, in fact,

5    approved and the financing was, in fact, approved.

6              The second part of the answer, what approval of

7    the EPCA will do is raise the bar for a competing proposal to

8    be determined to be superior.  This is the protection that we

9    provide to our stalking horse, to our current plan sponsor to

10   get them to the table, to get them to commit the $2.6

11   billion, that is the engine in this plan.

12             THE COURT:  And that bar is the $77 million,

13   approximately?

14             MR. LAURIA:  Correct.  And, Your Honor, just to

15   put it in context, the transaction that Knighthead and

16   Certares, with the support of the equity holders has put

17   forward, contemplates a TDV and additional debt on the

18   company of about $7 billion.

19             So, $70 million of a break-up fee is about 1

20   percent.  Think of going to the car dealership, since we're

21   talking about cars, and buying a car for $40,000, and at the

22   end you learn that the actual price is $40,600.  It's a one

23   and a half percent increase.

24             Do you walk away or do you buy the car?

25             If you want the car, you buy it.  And if the 600

1  scares you away, you probably didn't want it in the first

2  place.

3        So, yeah, the price goes up by a point.  Instead

4  of buying at 100, you're going to buy, if you're going to

5  buy, at 101, but it does not interfere in any way with our

6  drive to get the best deal we can for this company and to not

7  compromise the exit.  I think even the alternative sponsors

8  would concede that if delay from Chapter 11 were to occur in

9  any material sense, that significant value would be lost and

10  that the transaction, even the one that we have before us

11  today, might no longer make sense.

12        So, what I wanted to mention to the Court was,

13  following receipt of this document, this three-page deck at

14  five o'clock yesterday, we called an emergency meeting of the

15  Finance Committee and the Board.  We wanted to conform to our

16  obligations under the plan support agreement, so as not to

17  jeopardize the existing deal, and yet, we wanted to also make

18  sure that we were still fulfilling our fiduciary duties.

19        We did it by the book.  We went through the

20  proposal.  The Finance Committee concluded that it was a

21  *bona fide* expression of interest and instructed the advisors

22  to pursue that proposal, to ask questions, to seek clarity,

23  and to try to get it approved so we could bring it back to

24  the full Board for a determination of whether or not it

25  constitutes a superior transaction or could become one;

1  however, the Finance Committee also determined that it was

2  not enough to delay or jeopardize the existing deal.

3           Now, my intention was to stop there and not get

4  into the substance of the proposal, but I woke up this

5  morning to two little items in my inbox that I think the

6  Court should be made aware of.  Number one, a full sleeve of

7  documents reflecting the proposed alternative deal -- I

8  haven't opened that and I don't know what they say, except

9  for Item 2 in my inbox, an email from a reporter at *The Wall*

10 *Street Journal*, who had been briefed on the terms of the

11 alternative proposal and was seeking comment from the

12 company.  So, this had become, Your Honor, a classic

13 (indiscernible), an eleventh-hour, uninvited, competing

14 proposal leaked to the press.

15          We don't discuss matters before the Court with the

16 media, and so that email was not returned.  We do discuss

17 them with the Court, and I'd like to give the Court a sense

18 of the issues that the alternative proposal raises --

19          THE COURT:  I don't want to get into that.  You

20 have reflected that the debtor has exercised -- still

21 maintains its fiduciary duty and has exercised that in

22 connection with, so far in connection with the

23 counterproposal that has been received.  And I fully expect

24 that the debtor will review, in full, the documents that have

25 been received at this hour.

1          But I don't think today is the day for anyone to

2    be vetting what the debtors should be doing, really, in its

3    fiduciary duty in the first instance.  In the event that it

4    is a *bona fide* offer and should be considered, rather than

5    the current offer, there is a mechanism, as you suggest, to

6    consider that, to pivot to that proposal, and proceed with a

7    plan containing that proposal.

8          At this stage, I don't think anything more.  We're

9    not at a confirmation hearing stage.

10          MR. GLENN:  Your Honor, may I be heard very

11   briefly?

12          THE COURT:  Yes.

13          MR. LAURIA:  Your Honor very good, Your Honor, but

14   if I may just conclude?

15          THE COURT:  Oh, okay.

16          MR. LAURIA:  So, we do, in the face of that, want

17   to go forward with the request for approval of the EPCA.  We

18   think it establishes a floor for the outcome in these cases,

19   a familiar that is a fantastic floor.  It's obviously on a

20   high floor in a tower, if you think about it in that way.

21          But we will remain open to, and we will work

22   tirelessly, I can assure you, on behalf of the company, the

23   Board of Directors, the rest of my team, and the Moelis team,

24   to see if we can get a still better result for this company

25   and its stakeholders.

1              THE COURT:  All right.

2              MR. LAURIA:  So, we'll hand it over to whoever

3    wants to make comments, and then my partner, Jason Zakia,

4    will present the evidence.

5              THE COURT:  All right.  Mr. Glenn?

6              MR. GLENN:  Thank you, Your Honor.

7              For the record, Andrew Glenn, Glenn Agre Bergman &

8    Fuentes, on behalf of the ad hoc committee.  Thank you very

9    much for allowing me to speak.

10             Your Honor, we are the sole objector, I believe,

11   to this break-up fee and I'd like to give the Court a little

12   background.  I'd like to start with what point that Mr.

13   Lauria made, which is that the market for this company is

14   dynamic and it has changed dramatically in the short period

15   of time that Mr. Lauria, I believe, has articulated.  That

16   has inured to the benefit of all of our clients, all the

17   stakeholders of this company.

18             But the simple facts are these.  The company

19   selected its stalking horse, the Dundon-Centerbridge proposal

20   only two weeks ago, okay.  Mr. Lauria attacks my clients for

21   doing what is customarily is not done in these cases by

22   equity committees.

23             We filed an objection.  We're here to fight this

24   break-up fee, because we think it's the wrong thing to do,

25   but at the same time, we have been working with the

1  Knighthead Group to come up with something better.  And this
2  isn't even close.  It's $700 million better.

3          Now, I understand that Your Honor has heard that
4  the company has exercised its fiduciary duties through a
5  consideration of the proposal, but I'd like to make something
6  very clear.  The Centerbridge proposal does not require Your
7  Honor to approve their break-up fee or the disclosure
8  statement today.  That deadline is May 1st.

9          Last night, and I don't know exactly when it was;
10  Mr. Hessler, counsel to the Knighthead, can give you the
11  exact chronology -- the formal, fully committed, fully
12  financed proposal was provided to Mr. Lauria.  Now, this
13  wasn't some "lie in wait" kind of scenario where people were,
14  you know, strategically waiting until the last second.

15          We have been working -- I personally have been
16  working 24 hours a day with the Kirkland firm to bring this
17  together.  In a time of those two weeks, Knighthead has come
18  up with a billion dollars of additional capital.  That
19  doesn't happen overnight.  That doesn't happen in a week.
20  We've all been working tirelessly to do what this process
21  requires, which is to bring to the Court the best possible
22  alternative.

23          This alternative will pay the general unsecured
24  creditors in full.  It will provide shareholders with
25  investment legs, but you don't have to take my word for it,

1  Judge, because what the right thing to do here, which will

2  prejudice no one, is to adjourn this hearing for some short

3  period of time, to next week, so that people who have

4  questions about the viability of the proposal, Mr. Hessler,

5  Mr. Wagner, the head of Knighthead Capital, will be available

6  to answer them.

7          This is not fly-by-night operation proposed order

8  by my group of shareholders.  We have joined with Knighthead,

9  Certares.  Apollo Capital, I believe, has put forward $2.5

10  billion of committed financing for this proposal.

11          So, there's no prejudice to the company by

12  delaying this hearing for a short period of time, but I can

13  say that while $77 million may be a small amount under the

14  guise of a transaction that's valued at 6.2, that $70 million

15  represents 70 percent of the incremental value given to the

16  general unsecured creditors, to cite one example.

17          So, I don't understand why we're going forward

18  today.  If they need more time to review it, no one is

19  foreclosing that.  The commitment is not expiring tomorrow or

20  next week; it's available.

21          The Centerbridge proposal does not expire next

22  week, so while they may be cynical, skeptical of this

23  proposal, that's their prerogative, but given the late-

24  breaking nature of this proposal, I don't think it's prudent

25  to steam ahead when we all will have wasted $77 million, if

1    what we believe is true, that this is the best proposal by

2    $700 million is correct.

3          I believe there are others on this line that would

4    agree with me, but I just want to say, Judge, so many people

5    have been working so hard to bring this to you, to bring this

6    to the investing public, and we shouldn't be penalized for

7    that, and, certainly, Knighthead shouldn't be penalized no

8    that.

9          I don't know what's going to happen going forward

10   if this break-up fee is approved, but I do know that $77

11   million is (audio interference) and it's proven that

12   Knighthead was always better than Centerbridge.

13          Thank you very much.

14          THE COURT:  Does anybody else wish to be heard on

15   the suggestion that we adjourn for a week?

16          MR. PEDONE:  Yes, Your Honor.

17          Richard Pedone.  I'm counsel to U.S. Bank, as

18   indenture trustee.  U.S. Bank, as bond trustee, and the 7

19   percent bonds, which are not guaranteed.

20          Your Honor, we support a short adjournment.  The

21   committee in this case has executed an RSA.  The debtors have

22   executed an RSA.  And all parties need to evaluate the

23   documents to determine whether they should exercise their

24   fiduciary out.  And we would support a short adjournment so

25   that that can be exercised without a loss of (indiscernible)

1  this new deal in hand.  So, we support a short adjournment,

2  please, Your Honor.  Thank you.

3             THE COURT:  All right.

4             UNIDENTIFIED:  (Indiscernible.)

5             MS. CATON:  Excuse me, Your Honor?

6             THE COURT:  Please, let me hear from Mr.

7  Entwistle.

8             MR. ENTWISTLE:  Thank you, Your Honor.  I

9  appreciate it.

10            As you know, we represent GAMCO in this case and

11  have since its inception.  We have not seen, yet, the

12  proposal that Mr. Glenn submitted today and it's really the

13  first that we've heard of it; on the other hand, I know him

14  well and we'll get copies of those materials after the

15  hearing.

16            But, as you know, we've been advocating for the

17  rights of equity since the beginning.  We do think that there

18  are significant issues here related to the timing of the

19  exit.  I take with all do you want, Mr. Lauria's comment

20  about why they would like to exit for the summertime, but,

21  obviously, as you know, this company at its exit is really

22  more, and its progress is really more related to what's

23  happening with the pandemic at this point, than it is with

24  the company being in bankruptcy are not being in bankruptcy.

25            We'd like to see the opportunity available, if it

1  is available, for equity to recover something here, in

2  whatever form that may be, as we go through this process.

3  And the opportunity to have a dialogue around that issue, it

4  certainly seems as Mr. Glenn and Mr. Pedone pointed out, that

5  there is no prejudice to any constituency, if the Court were

6  to indulge in a short adjournment so, at least, Mr. Lauria

7  and the Board can consider the full documentation.

8           One of the big concerns I heard from Mr. Lauria

9  was that the Knighthead proposal, in its prior form, had not

10 been fully committed.  I heard Mr. Glenn suggest that it is

11 now fully committed.

12          And I think for the Board to fully exercise its

13 fiduciary obligations, an adjournment for a week would give

14 them an opportunity to do that.  They certainly seem to be

15 working hard, and we all would be better served to have an

16 understanding of what the company's actual position is on

17 that.

18          I recognize that's not truly a disclosure issue,

19 but on the other hand, to go out and start soliciting under a

20 plan this week, you know, that is likely or potentially

21 likely to be substantially different a week from now, seems

22 to me not to be the most prudent course and the short

23 adjournment is warranted.

24          Thank you, Your Honor, for your time.

25          THE COURT:  Thank you.

1          There was another party that wished to be heard.

2          MS. CATON:  Yes.  Good morning, Your Honor.

3          It's (indiscernible) Amy Caton from Kramer Levin

4    on behalf of the unsecured creditors committee.  And I'm

5    going to break up my statement, similarly, to what Mr.

6    Lauria's is, which is to talk about the regular stuff that

7    the committee talked about in terms of explaining our views

8    on the deal that was reached and then our view on the

9    adjournment.

10          So, first, when the debtors' plan was filed with

11   the Court a couple of weeks ago, it give general unsecured

12   creditors 75 cents for general unsecured claims, and it had a

13   number of deficiencies, and that's from the committee's

14   perspective.

15          And we worked with the debtors and Centerbridge,

16   Warburg, and Dundon, the plan sponsors to try our best to

17   improve treatment of unsecured creditors, not just with us,

18   but with everyone, in our opinion.  And so, what this

19   resulted in was we increased cash recoveries for the GUCs

20   from $410 million to $448 million, so that the current

21   projected recovery is 82 cents and a 7 percent increase in

22   recoveries.

23          And we also gained independent oversight over the

24   claims management by a committee appointed claims

25   administrator that is going to help us manage the potential

1  delusion of the claims pool, and that administrator will have

2  control over claims that are over a million dollars and will

3  also consultation rights, with respect to other assets of

4  allowance and the disallowance of claims.

5          The proceeds of certain lawsuits that are held by

6  the debtors are now going to be allocated to the general

7  unsecured creditors' bucket to try to maintain that projected

8  82 cent recovery.  So, we think that we were able to

9  substantially shore up the treatment of the general unsecured

10 claims, to make sure that they're doing as well as possible

11 under this particular plan.

12         And for the bonds, we negotiated to allow all

13 holders to participate in the rights offering, not just large

14 institutional holders, and we pushed for additional changes

15 to help increase the value of the equity, including adopting

16 a (indiscernible) reorganization, make an exchange of old

17 notes for equity and non-passable transactions, which we

18 think is incredibly important.

19         So, we negotiated these changes with one offer on

20 the table, and as the unsecured creditors committee, I just

21 want to say our members take very seriously their fiduciary

22 duty to represent all creditors, and it's really our job to

23 get the best recovery for all unsecured creditors.

24         And so, we heard repeatedly from our numbers, you

25 know, we know that there's a potential other offer out there,

1  Knighthead and Certares were the original stalking horse

2  offer, and let's try our best to get this to the best-and-

3  final offer and get this -- keep this auction open for as

4  long as possible.  But as of this week, we didn't have

5  another offer on the table, and so we signed a joinder to the

6  debtors' plan.

7           So, yesterday evening, and I guess it was at one

8  o'clock in the morning, like everyone else, we received the

9  full documentation behind this additional proposal to -- for

10  a new plan.  And what I will say about it is that it adds an

11  additional 18 cents in recovery for unsecured claims and it's

12  a full cashout of the unsecured notes.

13          So, on its face, with respect to what we're seeing

14  in front of us, not having reviewed the offer, it does

15  contain a substantially better recovery for unsecured

16  creditors.  But in order to really determine whether it's a

17  superior offer, you would need to allow us to potentially

18  exit our joinder.  We need time to review the details of the

19  documents that were sent to us and understand whether the

20  financing is really there, what happens with respect to

21  feasibility.  We need time for all of that.

22          So, I guess the question for us today is, should

23  the Court go ahead and approve the disclosure statement and

24  the break-up fee, and that's really what we're talking about

25  here, is the $77 million break-up fee and fees.

1             And I think, counsel for the equity correctly

2    pointed out that that is a large proportion of what the

3    increase that would go to unsecured creditors.  I certainly

4    hope that Knighthead and Certares increase their offer, you

5    know, but I'm not sure what they're going to do.

6             So, in accordance with our joinder, what I would

7    say is, would the committee prefer some additional time to

8    review this offer, and to go back to Mr. Lauria's analogy

9    kick the tires on it and see if it truly works before we pay

10   a break-up fee?

11            Yes, we would.  If the Court were to delay entry

12   of the order until sometime next week, we don't believe this

13   would create a breach of the TSA, and it doesn't create any

14   delay in terms of solicitation.  So, that's where we stand

15   today from the committee's perspective.

16            Thank you, Your Honor.

17            THE COURT:  Thank you.

18            MS. STRICKLAND:  Your Honor, may I be heard?

19            THE COURT:  Yes.  You are?

20            MS. STRICKLAND:  Good morning.  Rachel Strickland

21   from Willkie, Farr & Gallagher.  I represent the ad hoc

22   committee of bondholders in these cases.

23            It our clients represent 87 percent of the

24   unsecured bonds, which also correspond to over 70 percent of

25   all of the unsecured claims in the cases.  As is not

 1  uncommon, our clients also have substantial holdings in other

 2  parts of the capital structure, and are far and away the

 3  largest creditors and stakeholders, including the

 4  stakeholders in these cases.

 5          Our clients have been productively working with

 6  the company and the committee since the petition date, trying

 7  to maximize the value, and we were involved with the company,

 8  both, on an restricted and an unrestricted basis.  Our

 9  clients did go to the company and request nondisclosure

10  agreements and entered into the company's rules and framework

11  for proceeding.

12          And the rules and the framework that the company

13  set forth were all designed to make sure that come June of

14  this year, they could timely exit Chapter 11 to take

15  advantage of the car-purchasing cycle that is necessary for

16  the industry.  And as such, when the company entered into its

17  first plan support agreement and filed a plan with Knighthead

18  and Certares, they advised all that were interested, all that

19  approached them that they were going to stick to their

20  timetable and that in order for the company to feel

21  comfortable exercising their fiduciary-out, they were going

22  to need a committee proposal that was not only nominally

23  committed, they want equity commitment letters, they wanted

24  equity commitment agreements.  They wanted to make sure that

25  even with respect to financing their nondebtor affiliates in

1  Europe, that they had imminent bridge financing that would be

2  committed and made available to them, and that all the

3  various components that they needed to make sure that the

4  enterprise would be stable, that the enterprise could attract

5  exit financing at affordable rates, that their rating

6  agencies would be using the capital structure on a *pro forma*

7  basis and in favorable light, and they gave us, and they gave

8  everyone else involved in the process, including Knighthead

9  and Certares, the same set of rules.

10         And when we came to them, we said, we think you

11  should abandon the plan that's on file and switch it

12  something else, their initial reaction was, No, you haven't

13  shown us that you have gotten the company to a firm, stable

14  footing that enables us to keep our timeline.  And the most

15  they were willing to do was to file in the public domain,

16  something that said, we're considering alternative proposals

17  and if somebody hits the mark, the Board will do what it must

18  as a fiduciary and select the appropriate proposal.

19         They did do that two weeks ago, and it's true that

20  that proposal, which our client fully supports that and are

21  also investing the lion's share of the money is, in

22  bankruptcy speak, putting their money where their mouth is,

23  and it contains a customary break-up fee and expense

24  reimbursement.

25         I say "customary" only lightly, in the sense that

1  it's approximately half of what such fees typically are in

2  the market.  And, candidly, that's because Tom Lauria, White

3  & Case, and Moelis, beat every plan sponsor down at every

4  opportunity.

5          It is also my first time, and I'm sad in some ways

6  to say it, to say that our clients are supporting

7  (indiscernible) and lots of other requirements that the

8  company had in order to make sure that they had the very best

9  proposal.  And while as new investors, our clients perhaps

10 would have liked to have made a bit more money, as the

11 largest stakeholders have heard, they are very glad that the

12 professionals, the Board, and the management team are

13 stewarding the ship in a way that maximizes the value of

14 Hertz and gets it out of Chapter 11 on time, because,

15 ultimately, the inability to purchase cars in a timely way is

16 what led to the Chapter 11 to begin with.

17         So, I understand that there are a handful of large

18 institutions that hold a relatively small amount of equity in

19 these cases that would like to throw a Hail Mary pass, and if

20 it comes together exactly as they say and promise it will, I

21 have no doubt, having dealt with the company for all this

22 time, that they will switch horses.

23         But the proposal that was popped, in order for the

24 proposal to be before you, also contains a break-up fee and

25 expense reimbursement, because that's normal.  And when we

1   came and looked at the situation, we decided we wanted to buy

2   the car and the $600 wasn't going to stop us.  And given the

3   time and the resources that Knighthead and Certares, and now

4   Apollo, had spent on this, I assume that they, too, if they

5   like this deal as much as they say they do, and it comes

6   together and the Board is interested in favorably considering

7   their proposal, we'll still buy the car.  So, I think the

8   chilling effect is overblown.

9          What is not overblown is the necessity of getting

10  out on time and keeping the wheels in motion.  That was the

11  requirement that was placed on our clients and we support

12  that very much.  And we have the most to lose.  We are not

13  outsiders looking at this as an investment opportunity.  We

14  are very much stakeholders in these cases and the largest one

15  that supports the relief that's before you today, and think

16  that suggestions that $77 million, even though that sounds,

17  to me, like a very big number, is not a big number at all in

18  the context of these cases.

19         So, unless Your Honor has questions for me, that's

20  what I wanted to say.

21             THE COURT:  No, thank you.

22             Does anybody else want to chime in here?

23             MR. HESSLER:  Yes, Your Honor.  May I be heard?

24             THE COURT:  Yes.  Mr. Hessler?

25             MR. LAURIA:  Your Honor, I would express an

1  objection.

2              Mr. Hessler, I believe, is counsel to the proposed

3  alternative bidders.  He's not representing a creditor or a

4  shareholder in the case and he certainly didn't file an

5  objection to the EPCA motion, and so I really think it's

6  inappropriate.

7              THE COURT:  Well --

8              MR. LAURIA:  And (indiscernible), Your Honor, we

9  said that we're not going to talk about the terms of the

10  competing deal.

11              THE COURT:  Well, I don't want to hear the terms

12  of the competing deal, and if that's what Mr. Hessler wants

13  to comment on, I won't, but I have an analogous situation in

14  363 cases, allowed or held that a competing bidder has

15  standing to be heard, but only on procedures for considering

16  competing bids, and I'll limit Mr. Hessler's comments to

17  that, if he wants to be heard on it.

18              MR. HESSLER:  Thank you very much, Your Honor.

19              I appreciate the opportunity to speak on behalf of

20  our clients, which, for the record, are many Knighthead

21  Capital Management, LLC, and Certares Opportunities, LLC.

22              Your Honor, we are very mindful of exclusivity and

23  we are very mindful of your instruction not to get into a,

24  here's what our bid says, please grant some relief.

25              I do think it would be helpful for the Court, if I

 1  may, to provide some context at a high level where we are

 2  today and how we got here, because I do think some of that

 3  context is either missing or, perhaps, lost in what has been

 4  said about our client thus far.  So, that is what I would

 5  endeavor to do this morning, Your Honor, and if I approach

 6  the line where you don't want me to go --

 7            THE COURT:  I'll cut you off.  Don't worry.

 8            MR. HESSLER:  I understand and I will heed that

 9  instruction.  But, Your Honor, again, some context here.  So

10  Knighthead Capital Management LLC and Certares Opportunities

11  LLC.  Very importantly, it is entirely accurate and reflected

12  in the record, we're appearing today as the prior plan

13  sponsor.  The first plan of reorganization filed by the

14  debtors on March 2nd, we are reflected in that, our clients

15  as well as our firm.  I feel there's a narrative that has

16  been offered to the Court this morning that late yesterday

17  afternoon or late last night, suddenly we collectively showed

18  up and tried to up-end things at the last minute.

19            So I just think it is important to have that

20  reminder.  We were the original plan sponsor; the company

21  opted to move to a different plan sponsor.  We want to regain

22  the position as plan sponsor, but we did not show up

23  yesterday, Your Honor, as the record reflects.

24            Our clients, Knighthead and Certares -- who are

25  the primary proponents of our plan, but I'll reference some

1   other important parties in a moment -- they are quite

2   obviously very, very well-known entities in the travel and

3   distressed investing space.  They are obviously incredibly

4   well-known entities to the company.  Again, I don't mean to

5   bang on this, to belabor this, but as referenced by the fact

6   that we were the original plan sponsors.  Countless meetings

7   with the company, thousands of hours with the company and its

8   professionals and other stakeholders in the case over the

9   course of many months, we did not show up yesterday.

10         We are, Your Honor, at present pursuing a proposal

11   that does include meaningful participation by the ad hoc

12   equity committee group, that is accurate.  It is, however,

13   very incomplete to present to the Court that what happened

14   yesterday is an equity committee showed up out of nowhere

15   with a proposal.  This is a Knighthead/Certares proposal --

16   again, with the participation of the ad hoc equity committee

17   group, but their participation is reflective of the changing

18   circumstances of this case.

19         And, Your Honor, from our perspective, we actually

20   think today is really good news for the estate.  Quite

21   obviously, an active auction has broken out, right?  We were

22   prior plan sponsor, there is one (indiscernible) today, he

23   would like to become a plan sponsor also.

24         The point has been made repeatedly, but I really

25   do think it's the central issue before the Court when

1   contemplating whether or not to approve the breakup fee

2   today, there is an active auction underway.  The competing

3   proposal, the existing proposal, the (indiscernible) Wargur

4   Dundon proposal -- and if I'm not using the correct

5   nomenclature, somebody else can correct that -- that does not

6   expire for two weeks.  There is time for there to be

7   additional diligence by the unsecured creditors committee, by

8   the company, by the other stakeholders in this case about the

9   counterproposal that is presently before the company.

10          Your Honor, this is not, as Mr. Lauria intimated,

11  the typical example of somebody shows up at the last second

12  with a bare and flimsy proposal.  We have provided thousands

13  of pages of documents to the company; we've also provided

14  those to the UCC that have executed financing agreements for

15  a full payout plan.  Again, Your Honor, I'm not intending to

16  go into this, but --

17          THE COURT:  Well, that's fine, that's enough.

18          MR. HESSLER:  I just want to reflect, that record

19  is before the stakeholders in this case, and I believe there

20  are probably other stakeholders that want an opportunity to

21  do additional diligence.  Your Honor, we would be willing to

22  come back on Monday, we would be willing to come this

23  afternoon.  We believe that the packet of materials that we

24  have provided to the companies and stakeholders in this case

25  give the debtor, if it is inclined, to pivot immediately and

1  can proceed on our plan.  I really have to emphasize that.

2  This is not a request please give us a month to show off our

3  financing.  I mean, the statements that are being made about

4  delay or jeopardize the existing deal, we need to make sure

5  the company is out of Chapter 11 (indiscernible) our clients

6  -- again, the existing, preexisting plan sponsors

7  overwhelmingly show that all.

8          We will be ready to come back to this Court as

9  quickly as, for instance, the UCC and other stakeholders are

10  able to assure the Court that they had time to do this.  Our

11  financing is set, Your Honor, our materials have been

12  provided in full.  We don't need more time except we want to

13  be able to interact with the stakeholders.  And I do believe,

14  Your Honor, putting a $75 million breakup fee plus expense

15  reimbursement, we could make arguments about a significant

16  number, an insignificant number, it does come from the

17  recoveries that would otherwise be available for creditors in

18  a full payoff plan and it's not necessary for that to be

19  approved today, Your Honor.  We will come back before Your

20  Honor as soon as this afternoon.

21          And we're actually sort of scratching our head a

22  little bit as to why perhaps the company's finance committee,

23  why the -- even the ad hoc bondholder committee represented

24  by the Strickland (indiscernible) why they wouldn't want a

25  brief amount of time to further diligent what we have

1  otherwise provided.

2          So we're not asking for a delay, we're not looking

3  for an opportunity to shore up our proposal, we want the

4  opportunity for all stakeholders to become fully educated

5  about our whole payout plan, and we'll be back before Your

6  Honor as soon as everyone is prepared to have that audience.

7  But putting a 75 -- or potentially greater when you put

8  expense reimbursement -- putting a tax on moving forward to

9  preserve an existing plan that does not expire for two weeks

10  by its own terms, we just don't think that's necessary.

11          And the last point I would like to make, Your

12  Honor, we didn't wait until last night.  We have been in this

13  case for months.  And also you've heard reference to because

14  of the plan support agreement, because that the bondholder

15  committee executed alongside the company, because of the

16  joinder that the UCC filed, there are significant

17  restrictions on the party's ability to engage with us, and so

18  we're trying to navigate those restrictions.

19          We did not wait until the last second, we've been

20  here since the beginning, and we are ready, Your Honor, to

21  present that to the Court at the appropriate time.  And

22  because the finance committee didn't have an opportunity to

23  interact directly with our client last night, we would

24  request the opportunity to have that dialogue with the

25  company and with the stakeholders before an $80 million tax

1  on unsecured creditors is attached to our proposal.

2        Thank you, Your Honor.  I'm very happy to answer

3  any further questions.

4        THE COURT:  No, thank you.

5        Anybody else want to be heard?  Mr. Lauria, do you

6  want to respond then?

7        MR. LAURIA:  Yes, Your Honor.  Thank you.  I'm

8  going to make a handful of points here.

9        Number one, why is this different than the last

10  time we pivoted?  The last time we pivoted there were no

11  documents, there was not a PSA, and, most importantly, we

12  were four months away from our exit.  We had time to change

13  our mind.

14        Now, the important thing is, we changed our mind

15  without slowing down the process.  We kept moving.  We didn't

16  go from the Knighthead/Certares plan to the (indiscernible)

17  plan to the Centerbridge plan and change the deadlines, push

18  things out.  We held onto today through all that process.  It

19  was a ton of work in a six-week period and we made a huge

20  amount of progress, but we held everybody's feet to the fire.

21  We said April 16th is the date because that's the date we

22  need to begin the exit process if we're going to get out by

23  the end of June, and that's still true today.

24        Number two.  I've heard a lot of commentary about

25  the sponsor's timing and it should not be a driver, but at

1  this point the sponsor's timing is not the driver; the driver

2  is the company's timing.  We are driving an exit process.  I

3  think everybody would tell you that we have been merciless in

4  holding people's feet to the fire and we intend to continue

5  doing so.

6           The fact of the matter is, if we get the

7  disclosure statement ordered today and we move forward, it's

8  going to take between ten days and two weeks for the

9  solicitation materials to be properly prepared and sent out.

10 As we push back, the timing of that solicitation pushes back.

11 And as we push the commencement of solicitation back, we push

12 voting back, and if we push voting back, confirmation and so

13 on and so forth, the next thing you know we're bleeding into

14 Q3.  We need to preserve our cushion in the timeline for the

15 end, not use it all at the beginning.

16          Number two -- number three.  What has not been

17 mentioned by anybody is that the current plan sponsors have

18 agreed to solve a problem we have with our Europe operation.

19 In Europe, we have a company that is, although liquid, cash-

20 starved for the financing it needs to purchase vehicles for

21 2021 -- forget 2022 and 2023, to be able to operate in 2021.

22 Because we can't wait until confirmation for that to happen,

23 we have arranged for financing to come in on a bridge loan

24 basis from the sponsorship group that will come in Monday or

25 Tuesday of next week to permit our European business to

1  immediately begin purchasing and taking delivery of vehicles

2  that we need to have delivered before we anticipate exiting

3  from Chapter 11.  If we delay, we're putting that financing

4  at risk and we're putting that business at risk.

5          And as this Court knows, we have worked so hard to

6  keep that business out of some series of foreign liquidation

7  proceedings or try to put the square peg in the round hole

8  and put it into Chapter 11 in the U.S. and hope that we can

9  hold it together, and we know we have a solution that gets us

10  to the finish line without that happening.  Delay puts that

11  at risk.

12          Number four.  We have established a great deal of

13  momentum around our plan process.  We've shown our ability to

14  be nimble, to change direction when we have to, to get more

15  value to improve the plan and we'll continue to do so, but we

16  don't want to give up the momentum that we've created.

17          And I want to emphasize, counsel has made a

18  representation about how quickly they'll be ready to come

19  back, this afternoon, tomorrow, Monday, Tuesday, they've sent

20  us a phone book volume of documents.  Those documents just to

21  review them and to have comments on them is going to take

22  some number of days and when we send them back, just like

23  we're not going to say yes to what they sent us, they're not

24  going to say yes to what we sent them.  And there will be a

25  process of going back and forth and, I can assure the Court

1  from past experience that process is going to take ten days

2  or two weeks.

3          So that's ten days or two weeks that we're

4  prepared to invest to make sure that we're doing what's best

5  for the company, but it's not ten days or two weeks that we

6  should delay the process, interfere with the momentum that

7  we've created in moving this case forward.

8          Point number five.  I want to make clear that the

9  idea of approval is somehow a barrier to the company's

10  ability or anybody else's ability to determine if the

11  alternative proposal is a superior proposal or can be made

12  into one, it doesn't.  To make clear and as the documents

13  make clear, our fiduciary duty continues, as does the

14  committee's, to do what we and they believe is in the best

15  interest in our case of the entire estate and in the case of

16  the committee for unsecured creditors.  We have worked with

17  them to get where we are and we will work with them to get

18  where we need to be in fact this alternative proposal is

19  superior and we will deliver it.  To suggest that approval

20  today prevents that is a non sequitur.

21          Number six.  Things have been great, the debt has

22  been trading up, the stock hasn't, raises questions about

23  efficient market theory and what does it really for the value

24  of a company.  I don't know.  Courts have taken different

25  views of whether or not the trading price of debt or a

1  security is meaningful as evidence of value, it may be, it

2  may not be.  What we do know is securities go up, securities

3  go down.

4          At the beginning of this case, the unsecured bonds

5  were trading less than 20 cents, so today they're trading at

6  or near par.  I don't know what's going to happen tomorrow or

7  next week or next month that can change that and I don't

8  think that we should permit this case to be the proverbial

9  dog chasing its tail, keeping an eye on what's happening in

10 the market as a driver of our process.

11          What I do know from past experience, not only in

12 other cases but in this case, is that we were driven into

13 bankruptcy by a used car market that was so bad that we had

14 to hundreds of millions of dollars into the ABS structure

15 back in March and April and May to avoid defaulting the ABS.

16 We couldn't afford it; we ended up in Chapter 11.

17          Within two months of getting into Chapter 11, the

18 price of used cars spiked up so dramatically that we were

19 able to pay down our ABS obligations at a far greater level

20 and at a far superior pace than what anybody anticipated.

21 We're responders to the market, we all are, let's not lose

22 sight of that, and the market entails uncertainty.

23          Point seven.  As fiduciaries to this estate, our

24 job as much as anything is to eliminate when possible or at

25 least mitigate risk.  We have a transaction on the table that

1  we need to lock in, to make binding, so that we can go

2  forward in confident to know that that is the floor, that it

3  can't worse than that --

4          (Background voice)

5          THE COURT:  Mr. Glenn, can you mute yourself?  Or

6  who is not muted?  Mandy?

7          Go ahead, Mr. Lauria.

8          MR. LAURIA:  Excuse me, Your Honor.  We think

9  we're doing what we need to do and what we should do as good

10  fiduciaries for all of the stakeholders here to mitigate and

11  eliminate risk by going forward.  We assure the Court that if

12  there's a better deal to do, we'll figure out a way to get it

13  done.

14          The final point I want to make is a general one

15  about process.  We've all been through this before where

16  debtors work hard with a variety of different potential

17  purchasers or sponsors to get one to come to the front and

18  make a great proposal that serves as the stalking horse for

19  potential alternatives.  If we develop a pattern of not

20  providing protection to those people as a consequence of 11th

21  hour counterproposals -- and I heard Mr. Hessler say he was

22  here for a long time, he was, but they left and they came

23  back last night.

24          How do we keep the process working in the next

25  case and the case after that when we put somebody in the

1   sponsorship position, they sign NDAs, they restrict

2   themselves, they invest hundreds if not thousands of hours,

3   they put billions of dollars of capital at risk, and they

4   could be shoved aside without any protection whatsoever if

5   somebody shows up at the last minute with something that they

6   say -- we haven't had a chance to validate -- it's a better

7   deal.  It really undermines the process, a process that we

8   all rely on to maximize value in Chapter 11 cases.

9        And so, Your Honor, what I'd ask that we be given

10  the opportunity to do is put our evidence into the record.

11  Mr. Derrough at Moelis is prepared to add supplemental

12  testimony on a live basis addressing the issues raised by the

13  counterproposal and the basis for the company's determination

14  to proceed without delay in the face of that.  And I think,

15  on the basis of that record, then the Court can decide the

16  right thing to do.

17        MR. GLENN:  Your Honor, may I briefly respond?

18        THE COURT:  Yes, Mr. Glenn.

19        MR. GLENN:  Thank you.  Sorry, my dogs were going

20  a little crazy there.

21        So I think the critical thing is this, Judge, I

22  think the question really is -- I think you've heard from Mr.

23  Hessler, you've heard from the constituents, and the question

24  we're talking about here is what is the prejudice of one

25  week.  Now, Mr. Lauria fears that it will take longer than

1   that, I'm confident that it won't.  But I do know that if he

2   insists and Your Honor insists that we get this done in a

3   week and the penalty of that is we must go forward, I think

4   that's something that would be appropriate.  But I do think

5   that there's been no prejudice articulated for the specific

6   adjournment that I've requested, that Ms. Caton, the estate

7   fiduciary whose clients who are at stake, their economic

8   interests are at stake based on that breakup fee being

9   approved.

10          So, you know, I laud Mr. Lauria for running a

11  process that's kept people's feet to the fire and that is an

12  important thing, but the most important thing, the reason

13  we're all here, is to ensure that we've maximized value and

14  ensure that looking back we don't regret decisions that we've

15  made.  And to my mind, if we wait -- if we don't wait a week

16  and this breakup fee is approved, I think there's a serious

17  risk of value deterioration.  By contrast, if we do wait,

18  I've heard, I don't think the Court has heard anything that

19  indicates that that week is going to cause any prejudice to

20  any stakeholder here.

21          Thank you.

22          THE COURT:  Well, let me suggest this.  I'm not

23  prepared to hear the testimony that the debtor offers of Mr.

24  Derrough because I think a short continuance is best for the

25  estate.  I think that the debtor should in the exercise of

1  its fiduciary duty have the opportunity to review what has

2  been presented, and to allow Mr. Derrough and the other

3  professionals the debtor has hired to review that proposal.

4  If it is not a better deal for whatever reason, we can

5  proceed with a consideration of the documents.  But I agree

6  that approval of the breakup fee today may kill proceeding

7  with any review of the proposals.

8         But I will say this, that if in fact a different

9  proposal is approved, that does not preclude approval of a

10  breakup fee at all.  And I have done and in fact have

11  approved breakup fees after an auction when I would not

12  approve them before the auction because there were in fact

13  already competing bidders.  And I considered the full record

14  as to what evidence the losing bidder who is requesting the

15  breakup fee presents as to what benefit they provided to the

16  estate and found there was full authority for the Court to

17  approve a breakup fee under 503, notwithstanding that there

18  were other bidders.

19         However, I think it is important to address I

20  think what may be the only remaining objection to the

21  disclosure statement, which is the opt-out-opt-in issue, so

22  that the debtor is prepared, if it pivots or if it doesn't

23  pivot, to have a final disclosure statement ready for

24  approval at the continued hearing date.  But before I do

25  that, let me tell you, I have time next week.  I want to give

 1  all the parties sufficient time to deal with what may result.

 2  I have time Monday, Wednesday; I can fit you in Thursday.

 3           You do have something in Hertz on Thursday.  Is

 4  that still on, the false police report issue?

 5           MR. HAYWOOD:  Your Honor --

 6           THE COURT:  I could do the 22nd at 2 o'clock.

 7  Yes, Mr. Haywood?

 8           MR. HAYWOOD:  Yes, that's right.  Those are

 9  certain disputes relating to the false police report claims.

10           THE COURT:  Will it take the entire afternoon, Mr.

11  Haywood, do you think?

12           MR. HAYWOOD:  Your Honor, that I don't know, but I

13  will be happy to check and get back to the Court as soon as

14  possible.

15           MR. SHORE:  Your Honor, this is Chris Shore.  I'll

16  be handling that matter; I do not believe it will take the

17  full time.

18           THE COURT:  Well, that morning I have a

19  confirmation hearing at 10:30.  I just have an omnibus at

20  11:30.  So, if you need that time, I can probably schedule

21  this hearing for noon and then that may give you enough time,

22  if that's the best time for the parties, but let me hear

23  input.

24           MR. LAURIA:  Your Honor, if I may.  I guess the

25  22nd is Thursday.  I've got a bit of a dilemma here because

1  I've got a problem in Europe that I've got to address.  And

2  so I'd really like to move the hearing up earlier in the

3  week, at least Wednesday, so that we have an opportunity to

4  get to some sort of conclusion, so that we can hopefully know

5  that we have the financing coming into our European business

6  to keep it going.

7           THE COURT:  Well, that was the first I had heard

8  about the European financing issue but do the parties -- I

9  need to look at my Wednesday calendar.

10      (Pause)

11          THE COURT:  Well, another confirmation at 10:30,

12  an omnibus at 11:30, I don't know what would be on.  The

13  afternoon on Wednesday has matters that typically come off --

14  oh, I'm sorry, the 11:30 is off.

15          So we could probably start at 11:30 and again go

16  through the lunch hour.  And the 2 o'clocks will probably

17  come off as well.  They're in Chapter 7 business cases.  So I

18  could continue it to Wednesday at 11:30.  Does that work for

19  all of the other parties?

20          MS. CATON:  Yes, Your Honor.  Thank you.

21          THE COURT:  I hear no objection.

22          MR. GLENN:  Yes, Your Honor.  Thank you.

23          THE COURT:  Well, let's talk about the disclosure

24  statement issue, the one issue.  I think with this

25  continuance and the fact that the disclosure statement now

 1 | includes the enterprise value information, I think that
 2 | generally addresses all the issues that the ad hoc equity
 3 | group had raised, but let me confirm that with Mr. Glenn.
 4 |      MR. GLENN:  Yes, Your Honor, we're -- the main
 5 | event is the breakup fee.  We appreciate the additional
 6 | disclosure, we reserve rights with respect to it, but that's
 7 | not our focus.  So we're fine with the disclosure statement
 8 | being approved subject to potentially, you know, a disclosure
 9 | about this, you know, bid process as it unfolds.  But,
10 | subject to that, we have no further objections.
11 |      THE COURT:  I'm sure Mr. Lauria can pivot quickly
12 | if there's a need for additional information in the
13 | disclosure statement on what happens between now and
14 | Wednesday.
15 |      MR. GLENN:  I'm confident that that's so.  Thank
16 | you.
17 |      THE COURT:  Okay.  So, Mr. Lauria, who is going to
18 | deal with the U.S. Trustee's objection on the opt-in-opt-out
19 | language?
20 |      MR. LAURIA:  Your Honor, I think I'll go ahead and
21 | try to tackle that.
22 |      THE COURT:  Okay.
23 |      MR. LAURIA:  If you can give me a moment to --
24 |      THE COURT:  Find those notes?
25 |      MR. LAURIA:  Yes, right.

1          THE COURT:  I'll go find mine as well.

2     (Pause)

3          THE COURT:  Okay, disclosure statement.

4          MR. LAURIA:  Your Honor, the U.S. Trustee has

5    characterized her objection as an objection to the

6    solicitation procedures more than a disclosure statement

7    objection and she asserts that because the releases in the

8    plan are structured as an opt-out that they are

9    nonconsensual, and that instead we should be required to have

10   opt-in releases for non-debtors in order to cure what she

11   views as a defect.

12          The fact is that this structure, that is the opt-

13   out release structure, has been approved by other courts,

14   including this Court, and in the Southeastern Grocers case

15   and in the Chaparral Energy case, and I believe Softscale

16   Corporation as well.

17          THE COURT:  Well, before you go further, I note

18   that your reference to Chaparral and Softscale particularly

19   are to just the bare confirmation orders, and I know that

20   your local counsel and you know that I do not accept that as

21   precedent.

22          But let me go further and tell you that both of

23   those cases were prepackaged cases where there was a combined

24   disclosure statement and confirmation hearing.  So I didn't

25   have the opportunity to address whether opt-in-opt-out was

1  appropriate before the materials went out for vote.  But I

2  also know that in Softscale over 80 percent of eligible

3  creditors actually voted and agreed to the opt-in -- excuse

4  me, did not opt out.

5            So isn't this a completely different case?

6            MR. LAURIA:  They're distinguishable.  I would say

7  that in all cases -- and in fact I think this is the ruling

8  in TK Holdings -- that the appropriateness of the release is

9  really a classic confirmation issue, not a disclosure

10  statement issue.

11            THE COURT:  Given your timeline, don't you want to

12  know that if we get to confirmation that I'm not going to

13  say, you blew it, you should have had an opt-in and,

14  therefore, we have to re-solicit on that basis?

15            MR. LAURIA:  Well, I presumed that the consequence

16  would be, if the Court were to determine that that was the

17  confirmation flaw, that the releases would be ineffectual.

18            THE COURT:  Completely?

19            MR. LAURIA:  And that would be a consequence that

20  we would have to live with -- or we'd have to determine that

21  we could live with at the time, if that's where we get with a

22  full and proper record on confirmation.  I don't think that

23  that's where we will get, but we understand -- we wouldn't

24  think that this ends the plan, it just ends the releases.

25            THE COURT:  And your plan sponsors are all

1  agreeable to that?

2          MR. LAURIA:  I'm not here to tell you that anybody

3  is agreeing to anything today.  It would be kind of spoiling

4  the soup to, you know, make a representation like that on

5  behalf of anyone, but I presume that the ruling would be

6  limited to the releases, not to the plan itself.  And I also

7  note that we have a case where, as the case currently stands,

8  a substantial amount of our creditors are unimpaired, they're

9  getting paid in full.  So I'm not sure --

10          THE COURT:  That's an issue.

11          MR. LAURIA:  Right.  And we've got 87 percent of

12  the bonds agreeing to support the plan, including the

13  releases.  So we may be talking about a very small sliver of

14  people who really are outside the scope of the release if the

15  Court determines that the mechanic for getting it is

16  inappropriate.

17          And I guess, you know, again, we'd have to look at

18  whether or not that's something that people can live with,

19  but, you know, having been through these exercises a number

20  of times, we find ways to solve problems.

21          THE COURT:  As opposed to just changing the

22  mechanism now.

23          MR. LAURIA:  Well, here's the problem.  If we ask

24  people to affirmatively opt in, we put ourselves at the risk

25  of the people who don't even go to the trouble of voting, the

1  people who are unimpaired and don't have to vote, and so we

2  have a -- we create a risk, through inadvertence, really,

3  more than anything, we lose a significant amount of releases

4  where people probably don't care, and I don't think that's in

5  the best interest of the estate or the process.

6          THE COURT:  Well, but I know that many of my

7  colleagues and many other courts disagree with me, but I

8  think my ruling in WaMu is the accurate one for third party

9  releases -- not for debtor releases, but for third party

10  releases.  And I know that you have argued that this is

11  allowed by the bankruptcy code and common law, it is not a

12  contract issue.  But given the language in the bankruptcy

13  code, and specifically 524, that a plan doesn't release

14  others, I'm not sure reliance on the bankruptcy code gets you

15  to third party releases.

16          I really think this has to be an affirmative

17  agreement by a creditor that they're willing to agree to

18  release non-debtors.  And, again, not the exculpation, which

19  is appropriate to parties who participate in a plan and

20  participate in on behalf of the debtor and fiduciaries, those

21  are not what we're dealing with.  And we're really not

22  dealing, I think, with those who are unimpaired.  Those who

23  are unimpaired and get paid in full, they're out of it.  By

24  operation of the plan, I'm not concerned with that, unless

25  the U.S. Trustee is pressing that.  I think they didn't press

1   that point, but let me hear from the U.S. Trustee if I'm

2   wrong on that.

3         MS. RICHENDERFER:  Thank you, Your Honor.  Linda

4   Richenderfer on behalf of the United States Trustee.

5         Your last point is correct, Your Honor.  That's

6   why my remarks I'm about to give and the items that were

7   raised in our objection were focused on the ballots

8   themselves where the opt-out was provided.  The concern is

9   the impaired classes, in particular those who are voting on

10  the plan.

11        And Mr. Lauria may mention that there might be

12  just a small sliver of people that would be affected by this.

13  Your Honor, in a case where you start with billions of

14  dollars of debt, a small sliver can be an important number of

15  15 to 20,000 claims, and these claimants are going to be your

16  consumers and also your employees.  This is not just a case

17  about big vendors or bondholders; this is also a case where

18  there are a lot of claims raised by individuals.  And they're

19  going to get a package that says you're getting 82 cents on

20  the dollar, they're not going to read any further, or they're

21  not going to get the package at all or they're not going to

22  open up.  And so those are just the practical effects of not

23  requiring an opt-in.

24        And I think Your Honor has already picked up on

25  the fact, the U.S. Trustee at this point in time is not

1  raising any issues regarding the four corners of the release

2  itself.  That will be dealt with and I will be briefing that

3  at the time of confirmation.  Right now we have a plan where

4  debtors are saying we're getting consensual third party

5  releases and the way we're getting them is through opt-out

6  provisions in these ballots.

7          And so, Your Honor, this is an issue to deal with

8  at this point because Your Honor has been very clear in past

9  cases that's not how you get a consensual third party

10  release, it must be an opt-in.

11          I'm glad Your Honor --

12          THE COURT:  Well, let me clarify.  I think we're

13  dealing with the opt-out for those who don't vote.  For those

14  who vote, yeah, I mean, that's clear what their choice is.

15          MS. RICHENDERFER:  Right.  Correct, Your Honor,

16  it's for those who don't vote.  And we don't know why they

17  don't vote.  We don't know if they're abstaining, we don't

18  know if they didn't get it, we don't know if they didn't

19  understand.

20          I'm glad Your Honor raised the point about your

21  view concerning references to prior orders of this Court or

22  any other court.  I personally was involved in Chaparral and

23  it was a prepack, and I will tell you that all of -- I

24  checked it the other day, I went back and looked at the

25  confirmation order, all of the unsecured creditors were

1   getting a hundred percent in that case.  So I did not think

2   anything more needed to be said about that.

3          Again, now is the time to do it and it doesn't

4   take much to change a couple lines on that document to go to

5   the opt-in, especially now that we've got some time.  And

6   Your Honor also has been supported by Judge Owens, so you're

7   not alone anymore -- who knows what Judge Stickles will be

8   doing in the future, but you're not alone.

9          THE COURT:  Well, I've been alone for so long --

10  but I welcome support from others, though, on this, I think,

11  narrow issue.

12         So, Mr. Lauria, I really think that now is the

13  time to change it and you do need to change it, again, for

14  only those entitled to vote and who do not vote -- I mean, an

15  opt-in makes it clear what those who vote intend and it also

16  makes it clear that those who do not vote are not being bound

17  by any third party release -- they are bound by the other

18  terms of the plan that deal with the debtor and its

19  representatives.

20         MR. LAURIA:  Just to be clear, the limitation does

21  not apply to the debtor and its fiduciaries, the directors,

22  employees, agents, et cetera, we're talking about third

23  parties?

24         THE COURT:  Correct.  Only third party releases,

25  yes.

1          MR. LAURIA:  All right.  Your Honor, I understand

2   the Court's ruling and maybe there's no point in beating a

3   dead horse here.  I will just note, having been a survivor of

4   WaMu, that that case involved very extraordinary and unique

5   circumstances that they're hard to say should be broadly

6   applied to every case.  We certainly haven't had any fact

7   patterns here that are even remotely comparable to what

8   happened there.

9          THE COURT:  I agree, there were lots of reasons,

10  other reasons, facts in the case that gave me pause with

11  respect to third party releases.  And there have been no

12  suggestions here that any of the third parties who are

13  seeking a release acted in any way like any of the parties in

14  WaMu.  I agree with you, Mr. Lauria, and thank you for

15  raising that.

16         MR. LAURIA:  Thank you.  We will take the Court's

17  guidance.  We may come back with some additional thoughts on

18  the topic, but we'll certainly take the Court's guidance here

19  and see what we can do to make sure that we give the parties

20  who are helping us get this done the protections that I think

21  are appropriate under the circumstances.

22         THE COURT:  Okay.

23         MS. RICHENDERFER:  Your Honor, if I could just

24  clarify.  I thought Your Honor just ruled that opt-in was the

25  manner in which the third party releases would be given by

1  impaired parties.  I just want to make sure so that when I am

2  dealing with debtors over the next intervening days and

3  looking at versions that we implement what Your Honor ruled.

4  I'm a little concerned that Mr. Lauria is trying to leave a

5  little wiggle room.

6         THE COURT:  Well, that is my ruling, but I will

7  leave Mr. Lauria to make the change.

8         MS. RICHENDERFER:  Okay.  Thank you, Your Honor.

9         THE COURT:  And since I'm not approving the

10 disclosure statement today, I'll look for those changes

11 before Wednesday.

12        MR. LAURIA:  Thank you.

13        THE COURT:  As well as any other changes that may

14 be appropriate given the debtor proceeding to exercise its

15 fiduciary duty.

16        What else do we have then left on?  Mr. Haywood, I

17 think (indiscernible) --

18        MR. HAYWOOD:  Yes, Your Honor.

19        THE COURT:  -- or Mr. Shore.  Okay.

20        MR. HAYWOOD:  Yeah, I'll (indiscernible) Mr.

21 Shore.

22        MR. SHORE:  Thank you, Your Honor.  As Mr. Lauria

23 said at the beginning, but we're kind of moving around on

24 this one claim objection, what I'd like to do is the

25 following.  We have on the calendar next just a status update

1  on where we are with the class proofs of claims and the

2  resolution of mediation issues.  I'd like to get that on the

3  record because it involves kind of all the creditors, so that

4  they can know what the state of play is.  Then there's been a

5  request that we take a short adjournment after that, and we

6  can see whether or not we're going to proceed today or

7  whether we're going to adjourn to next week or adjourn to the

8  next omnibus to allow potential -- further statement

9  discussions to occur, if that's acceptable.

10          THE COURT:  All right.  Well, before we do, I know

11  that there was debtors' motion for the rights offering

12  procedures to which there was no objection.  I've not entered

13  that order yet, but is it appropriate to enter that, Mr.

14  Lauria, at this time given where we are, or should I hold

15  that?

16          MR. LAURIA:  I think you should hold it, Your

17  Honor.

18          THE COURT:  Okay.  Thank you.

19          All right, go ahead, Mr. Shore, you can proceed

20  with your status.

21          MR. SHORE:  Sure.  And then maybe we take a ten-

22  minute break after that and we can communicate with chambers

23  as to whether we're going to adjourn or we're going to come

24  back on.

25          I'd like to, while everybody is on the Zoom then,

1   start by going back to October 21, 2020, which was the bar

2   date for non-governmental creditors.  As we've told the Court

3   before, 18 individual or group of claimants filed proofs of

4   claims on behalf of persons or entities other than

5   themselves, what we came to call the representative actions.

6   Those 18 groups of claims aggregated in the billions of

7   dollars of general unsecured or priority claims.  As the

8   Court also knows, with the assistance of the UCC, we

9   developed a set of mediation procedures that state all

10  litigation with respect to these 18 groups of claims, pending

11  a mediation to see if we couldn't get to an agreed allowance

12  of specific claim amounts.

13          It was important then and maybe even more

14  important today as we have a (indiscernible) plan for

15  unsecureds that we got our arms around those billions of

16  dollars of claims.  And, look, it's going to be the same

17  issue if this is an equity plan.  Those were numbers that

18  needed to be addressed.

19          As the Court has seen, since approving those

20  mediation procedures the program has been a near total

21  success.  Of the 18 representative action claims, all but one

22  has been resolved.  To date, the Court has approved 13

23  settlements and signed 9019 approval orders, to which no

24  party in interest objected.  The settlements range from

25  allowed claims in the tens of thousands of dollars to seven

1 figures, either in general unsecured or priority claims.

2        Two of the remaining five of the original 18 are

3 subject to pending motions that are on the file with the

4 Court.  Today is the objection deadline, we have not yet

5 received any objections and, if we don't, we'll file a COC.

6 That would leave three.

7        One settlement of the remaining three was just a

8 withdrawal by the claimant of the class claim.  That left

9 two.  The one remaining one, other than Mr. Moretti's claims,

10 we have agreed.  We're still finalizing the terms of the

11 settlement agreement and the 9019 motion, we anticipate

12 getting that on file soon, which would leave just the

13 remaining claims.

14        In actuality, the remaining claim is really 30

15 proofs of claim filed by Professor Enrico Moretti on behalf

16 of himself and similarly situated individuals against various

17 debtors.  He did file on November 25th a motion under Rule

18 7023 seeking to certify a class, which is Docket 1943.  And,

19 though not listed on the claims forms and the objection -- or

20 the reply he filed to our objection, he clarified that he

21 believed the aggregate claims to be about -- or to exceed

22 $100 million.

23        And that's the next item on the agenda, but before

24 we get there I'd like to note that Your Honor's mediation

25 order presaged that we might not go 18 for 18 and it dictates

1   what happens next.  The order is Docket 2450.

2          Paragraph 3 has put on hold all 7023 motions sine

3   die pending the mediation process.  And then paragraph 16

4   deals with what we do when we get to unsettled actions.  It

5   references that if there is an unsettled mediation, we would

6   file, the debtors would file a limited omnibus objection that

7   the claims of any unnamed member of those -- in this case

8   those 30 proofs of claims, are untimely under the bar date

9   order because the lead claimant lacked authority to file the

10  proof of claim on his or her behalf.  It was a limited issue

11  that we put up before the Court, that's the objection up

12  today.

13          And, just to be clear, that's going to lead to one

14  of two results.  Paragraph 17 of the order says that if the

15  Court rules that pursuant to the terms of this bar date order

16  the claims are not timely for the unnamed class members, the

17  lead claimant or the class members may seek relief from the

18  bar date order.  So we were going to go one of two ways after

19  today, either there's going to have to be a subsequent motion

20  to seek relief from the bar date order, either by the lead

21  claimant or by individual members of the class, and then

22  paragraph 18 says that if the Court finds that the claims

23  were properly filed, Mr. Safier and I are going to have a

24  discussion about putting on the 7023 motion back on calendar

25  and getting that resolved.

1          So, as I explained when we set this process up, as

2    part of the give and take back and forth, we essentially have

3    bifurcated the 7023 motion.  The only thing we're going to

4    address today is the comparison of the bar date order to the

5    proofs of claim that were filed on behalf of similarly

6    situated individuals.  That's the benefit personally I got

7    for going 17 for 18 is I get to argue this issue, which is

8    one I really care about.

9          So, with that, if we could take a maybe ten-minute

10   recess and we can come back to you either ready to argue that

11   motion or we'll advise the Court that for various reasons,

12   not attributable to anybody and not to be used against

13   anybody, we're just going to kick it to another hearing to

14   see if we can't get to 18 for 18.

15          THE COURT:  Okay.  I'm amenable to a short break.

16          Does counsel for Mr. Moretti have anything to add?

17          I hear nothing.

18          MR. GUTRIDE:  Your Honor, good morning -- or --

19          THE COURT:  There you are.

20          MR. GUTRIDE:  Good afternoon your time.

21          I am Adam Gutride.  I'm one of the counsel for Mr.

22   Moretti.

23          We are also amenable to the short recess, and we

24   will defer our clients on copies of the merits that Mr. Shore

25   has discussed.

1          THE COURT:  Okay.  Well, I note that it's 12:10,

2  our time.

3          How long do the parties want to take?

4          MR. SHORE:  If, since it sounds like we're going

5  to need to circulate and dial in and people get on the phone,

6  if we could have until 12:30, that may make it more likely

7  that we can do this without asking Her Honor for more time.

8          THE COURT:  Well, let's say 12:45.

9          MR. SHORE:  Thank you, Your Honor.

10          THE COURT:  Then, we'll recess this matter.

11          There's nothing else on the agenda, Mr. Haywood?

12          MR. HAYWOOD:  No, I don't believe so, Your Honor.

13          THE COURT:  All right.  Then, let's take a recess

14  on this last remaining matter until 12:45, and only those

15  parties involved in it need to come back.  But it will be the

16  same sign-in information, okay.

17          COUNSEL:  Thank you, Your Honor.

18          THE COURT:  We'll stand in recess.

19      (Recess taken at 12:12 p.m.)

20      (Proceedings resumed at 12:46 p.m.)

21          THE COURT:  All right.  Good afternoon.

22          This is Judge Walrath.  We're here in the

23  continued part of the Hertz matter and I'll turn it over to

24  counsel for the debtor.

25          Mr. Shore, where are we?

1        MR. SHORE:  Thank you, Your Honor.

2        After having discussed the matter with plaintiff's

3  counsel and with the UCC, we would like to push pause for a

4  bit.  I'll personally apologize to you.  I know it's not

5  great that when Your Honor is prepared for a hearing and you

6  come in and then we push the hearing at the last second, but

7  we really do want an opportunity to see if we can get the 18

8  for 18.

9        THE COURT:  Well, I never want to interfere with

10  any party's efforts to resolve it, rather than make me make a

11  decision.  I'll make a decision if you want me to, but --

12        MR. SHORE:  Thank you, Your Honor.

13        We do need some time because, obviously, based

14  upon the last interaction with the Court on the first part of

15  the agenda, there's going to be a lot going on in the next

16  week to 10 days, but for various scheduling reasons, we

17  really can't bridge to the next omnibus.

18        What we'd like to do is see if Your Honor has May

19  10th, May 13th, or May 14th for a setting.  There is no more

20  than two hours to address this.  I'd like to be able to hold

21  it to one -- I'm not sure we can -- so, I don't want to jam

22  your schedule up too much, but any one of those three days

23  works for each of the involved parties.

24        THE COURT:  All right.  Let me check with Ms. Capp

25  before I commit.

1          Okay.  Let's go for May 13th at 10:30.

2          MR. SHORE:  Very good, Your Honor.

3          THE COURT:  And I'll reserve two hours, you think,

4     or three?

5          MR. SHORE:  I think two will be enough, Your

6     Honor.

7          THE COURT:  All right.  Then we'll reserve two

8     hours, then, for this matter.

9          MR. SHORE:  All right.  Thank you very much.

10          We'll be in touch with chambers with any updates

11    before then, if necessary.

12          THE COURT:  Okay.  And I think we are done for the

13    day and we can stand adjourned.  Thank you.

14          COUNSEL:  Thank you, Your Honor.

15       (Proceedings concluded at 12:49 p.m.)

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2                I certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of my

5      knowledge and ability.

6

7

8

9      /s/ William J. Garling                     April 16, 2021

10     William J. Garling, CET**D-543

11     Certified Court Transcriptionist

12     For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25