**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| The Hertz Corporation, *et al.*,[1] | Case No. 20-11218 (MFW) |
| Debtors. | (Jointly Administered) |

## THIRD AMENDED JOINT CHAPTER 11 PLAN OF
## REORGANIZATION OF THE HERTZ CORPORATION AND ITS DEBTOR AFFILIATES

WHITE & CASE LLP
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700

J. Christopher Shore (admitted *pro hac vice*)
David M. Turetsky (admitted *pro hac vice*)
Andrew T. Zatz (admitted *pro hac vice*)
Andrea Amulic (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200

Jason N. Zakia (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 881-5400

Roberto J. Kampfner (admitted *pro hac vice*)
Ronald K. Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
Andrew Mackintosh (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700

*Attorneys for the Debtors*
*and Debtors in Possession*

Dated: May 12, 2021

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Brett M. Haywood (No. 6166)
Christopher M. De Lillo (No. 6355)
J. Zachary Noble (No. 6689)
One Rodney Square
920 N. King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700

---

[1] The last four digits of The Hertz Corporation's tax identification number are 8568.  The location of the debtors' service address is 8501 Williams Road, Estero, FL 33928.  Due to the large number of debtors in these chapter 11 cases, which are jointly administered for procedural purposes only, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at https://restructuring.primeclerk.com/hertz.

**TABLE OF CONTENTS**

Page

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ............................................................................................................... 1
    A.    Defined Terms ....................................................................................................................... 1
    B.    Rules of Interpretation ........................................................................................................ 35
    C.    Computation of Time .......................................................................................................... 36
    D.    Governing Law .................................................................................................................... 36
    E.    Consultation, Information, Notice, and Consent Rights ..................................................... 36
    F.    Reference to Monetary Figures ........................................................................................... 36
    G.    Reference to the Debtors or the Reorganized Debtors ....................................................... 37
    H.    Controlling Document ......................................................................................................... 37

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ......................................... 37
    A.    Administrative Claims ........................................................................................................ 37
    B.    DIP Claims .......................................................................................................................... 38
    C.    HVF Master Lease Administrative Claims ......................................................................... 39
    D.    Postpetition Fleet Financing Administrative Claims .......................................................... 39
    E.    Professional Fee Claims ...................................................................................................... 39
    F.    Priority Tax Claims ............................................................................................................. 40

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................. 41
    A.    Summary of Classification .................................................................................................. 41
    B.    Treatment of Claims and Interests ...................................................................................... 42
    C.    Special Provision Governing Unimpaired Claims .............................................................. 48
    D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ...... 49
    E.    Elimination of Vacant Classes ............................................................................................ 49
    F.    Separate Classification of Other Secured Claims ............................................................... 49
    G.    Voting Classes; Presumed Acceptance by Non-Voting Classes ........................................ 49
    H.    Controversy Concerning Impairment .................................................................................. 49

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ................................................. 49
    A.    No Substantive Consolidation ............................................................................................. 49
    B.    Restructuring Transactions; Effectuating Documents ........................................................ 49
    C.    Sources of Consideration for Plan Distributions ................................................................ 50
    D.    New Money Investment ....................................................................................................... 50
    E.    Issuance and Distribution of Reorganized Hertz Parent Common Interests and Preferred
        Stock ................................................................................................................................... 52
    F.    New Reorganized Corporate Debt ...................................................................................... 52
    G.    Replacement of First Lien Letters of Credit ...................................................................... 52
    H.    HVF II and Interim Fleet Financing Settlement ................................................................. 53
    I.    HVF III Fleet Financing ...................................................................................................... 54
    J.    General Unsecured Claim Recoveries ................................................................................. 55
    K.    Intercompany Claim Settlement ......................................................................................... 56
    L.    HHN Restructuring .............................................................................................................. 56
    M.    New Registration Rights Agreement ................................................................................... 57
    N.    International Vehicle Financing Claims ............................................................................... 57
    O.    Corporate Existence ............................................................................................................ 57
    P.    Vesting of Assets in the Reorganized Debtors ................................................................... 57
    Q.    Cancellation of Existing Securities ..................................................................................... 58
    R.    Corporate Action ................................................................................................................. 60
    S.    New Organizational Documents .......................................................................................... 60
    T.    Reorganized Hertz Parent and Reorganized Hertz Corp. Board ........................................ 61

U. Exemption from Certain Taxes and Fees ........................................................................61
V. Preservation of Causes of Action ..................................................................................61
W. Insurance Policies and Surety Bonds ............................................................................63
X. Management Equity Incentive Plan ...............................................................................64
Y. Employee Obligations ...................................................................................................64
Z. Workers' Compensation Programs .................................................................................66
AA. Collective Bargaining Agreements ...............................................................................66
BB. Plan Support Agreement and Equity Purchase Agreement ...........................................66

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............66
A. Assumption and Rejection of Executory Contracts and Unexpired Leases ..................66
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ...................67
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .................68
D. Assumption Dispute Resolution ....................................................................................69
E. Indemnification Obligations ..........................................................................................70
F. Contracts and Leases Entered into After the Petition Date ...........................................70
G. Modifications, Amendments, Supplements, Restatements, or Other Agreements .........70
H. Reservation of Rights ....................................................................................................70
I. Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4) ......................70

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................71
A. Timing and Calculation of Amounts to Be Distributed ................................................71
B. Special Rules for Distributions to Holders of Disputed Claims and Interests ..............71
C. Rights and Powers of Distribution Agent ......................................................................72
D. Rights and Powers of the GUC Oversight Administrator ..............................................72
E. Delivery of Distributions and Undeliverable or Unclaimed Distributions ...................74
F. Securities Registration Exemption .................................................................................78
G. Compliance with Tax Requirements ..............................................................................79
H. Allocations .....................................................................................................................80
I. No Postpetition or Default Interest on Claims ..............................................................80
J. Setoffs and Recoupment ................................................................................................80
K. Claims Paid or Payable by Third Parties .......................................................................80

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
         DISPUTED CLAIMS .....................................................................................................82
A. Allowance of Claims ......................................................................................................82
B. Claims and Interests Administration Responsibilities ...................................................83
C. ADR Procedures .............................................................................................................83
D. Estimation of Claims ......................................................................................................83
E. Adjustment to Claims Register Without Objection ........................................................84
F. Time to File Objections to Claims ..................................................................................84
G. Disallowance of Claims ..................................................................................................84
H. Amendments to Proofs of Claim ....................................................................................85
I. Reimbursement or Contribution .....................................................................................85
J. No Distributions Pending Allowance .............................................................................85
K. Distributions After Allowance .......................................................................................85
L. Single Satisfaction of Claims .........................................................................................85

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ............86
A. Compromise and Settlement of Claims, Interests, and Controversies ..........................86
B. Discharge of Claims and Termination of Interests ........................................................86
C. Releases by the Debtors ..................................................................................................87
D. Releases by Holders of Claims and Interests .................................................................87
E. Exculpation .....................................................................................................................88
F. Injunction ........................................................................................................................88
G. Subordination Rights.......................................................................................................89
H. Release of Liens ..............................................................................................................89

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ........................................ 90

    A.    Conditions Precedent to the Effective Date ........................................................... 90

    B.    Waiver of Conditions .......................................................................................... 91

    C.    Substantial Consummation ................................................................................. 91

    D.    Committee Complaint .......................................................................................... 91

    E.    Bifurcation Motion .............................................................................................. 92

    F.    Effect of Non-Occurrence of Conditions to the Effective Date .......................... 92

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ...................... 92

    A.    Modification and Amendments ............................................................................ 92

    B.    Effect of Confirmation on Modifications ........................................................... 93

    C.    Effect of Confirmation ....................................................................................... 93

    D.    Revocation or Withdrawal of the Plan ............................................................... 93

ARTICLE XI. RETENTION OF JURISDICTION ................................................................................... 93

ARTICLE XII. MISCELLANEOUS PROVISIONS ................................................................................. 95

    A.    Immediate Binding Effect ................................................................................... 95

    B.    Additional Documents ........................................................................................ 96

    C.    Payment of Statutory Fees ................................................................................. 96

    D.    Reservation of Rights ......................................................................................... 96

    E.    Transaction Expenses ......................................................................................... 96

    F.    Successors and Assigns ....................................................................................... 97

    G.    Service of Documents ......................................................................................... 97

    H.    Term of Injunctions or Stays .............................................................................. 98

    I.    Entire Agreement ............................................................................................... 98

    J.    Nonseverability of Plan Provisions .................................................................... 98

    K.    Dissolution of Committee ................................................................................... 98

    L.    Expedited Tax Determination ............................................................................ 99

**EXHIBITS**

New Warrant Term Sheet……………………………………………………………………Exhibit A

**INTRODUCTION**

The Hertz Corporation and its Debtor Affiliates hereby propose this *Third Amended Joint Plan of Reorganization*. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bankruptcy Code. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Although proposed jointly for administrative purposes, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, RULE 3019 OF THE BANKRUPTCY RULES, AND ARTICLE X OF THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, SUPPLEMENT, REVOKE, OR WITHDRAW THE PLAN PRIOR TO ITS CONSUMMATION.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*2020 EIP Order*" means the *Order Authorizing and Approving the Debtors Employee Incentive Plan* [Docket No. 1560].

2.    "*2021 KEIP/EIP Order*" means the *Order Authorizing and Approving the Debtors' (i) 2021 Key Employee Incentive Plan and (ii) 2021 Employee Incentive Plan* [Docket No. 2793].

3.    "*5.500% Unsecured Noteholders*" means the Holders of the 5.500% Unsecured Notes from time to time, in their capacity as such.

4.    "*5.500% Unsecured Notes*" means the 5.500% senior notes due 2024 issued pursuant to the 5.500% Unsecured Notes Indenture.

5.    "*5.500% Unsecured Notes Claims*" means all Claims against any Debtor arising from or based upon the 5.500% Unsecured Notes or any other 5.500% Unsecured Notes Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding amount as of the Petition Date was in the aggregate amount equal to $800,000,000.00.

6.    "*5.500% Unsecured Notes Documents*" means, collectively, the 5.500% Unsecured Notes Indenture, the 5.500% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the 5.500% Unsecured Notes.

7.    "*5.500% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of September 22, 2016, for

1

the 5.500% Unsecured Notes by and among Hertz Corp., as the issuer, the Subsidiary Guarantors, as guarantors, and the 5.500% Unsecured Notes Trustee.

8.    "*5.500% Unsecured Notes Trustee*" means Wells Fargo Bank, N.A., in its capacity as trustee under the 5.500% Unsecured Notes Indenture, including any successor thereto.

9.    "*6.000% Unsecured Noteholders*" means Holders of the 6.000% Unsecured Notes from time to time, in their capacity as such.

10.    "*6.000% Unsecured Notes*" means the 6.000% senior notes due 2028 issued pursuant to the 6.000% Unsecured Notes Indenture.

11.    "*6.000% Unsecured Notes Claims*" means all Claims against any Debtor arising from or based upon the 6.000% Unsecured Notes or any other 6.000% Unsecured Notes Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding amount as of the Petition Date was in the aggregate amount equal to $900,000,000.00.

12.    "*6.000% Unsecured Notes Documents*" means, collectively, the 6.000% Unsecured Notes Indenture, the 6.000% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the 6.000% Unsecured Notes.

13.    "*6.000% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of November 25, 2019, for the 6.000% Unsecured Notes by and among Hertz Corp., as the issuer, the Subsidiary Guarantors, as guarantors, and the 6.000% Unsecured Notes Trustee.

14.    "*6.000% Unsecured Notes Trustee*" means Wells Fargo Bank, N.A., in its capacity as trustee under the 6.000% Unsecured Notes Indenture, including any successor thereto.

15.    "*6.250% Unsecured Noteholders*" means Holders of the 6.250% Unsecured Notes from time to time, in their capacity as such.

16.    "*6.250% Unsecured Notes*" means the 6.250% senior notes due 2022 issued pursuant to the 6.250% Unsecured Notes Indenture.

17.    "*6.250% Unsecured Notes Claims*" means all Claims against any Debtor arising from or based upon the 6.250% Unsecured Notes or any other 6.250% Unsecured Notes Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding amount as of the Petition Date was in the aggregate amount equal to $500,000,000.00.

18.    "*6.250% Unsecured Notes Documents*" means, collectively, the 6.250% Unsecured Notes Indenture, the 6.250% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the 6.250% Unsecured Notes.

19.    "*6.250% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of October 16, 2012, for the 6.250% Unsecured Notes by and among Hertz Corp., as the issuer, the Subsidiary Guarantors, as guarantors, and the 6.250% Unsecured Notes Trustee.

20.    "*6.250% Unsecured Notes Trustee*" means Wells Fargo Bank, N.A., in its capacity as trustee under the 6.250% Unsecured Notes Indenture, including any successor thereto.

21. "*7.000% Unsecured Promissory Noteholders*" means Holders of the 7.000% Unsecured Promissory Notes from time to time, in their capacity as such.

22. "*7.000% Unsecured Promissory Notes*" means the 7.000% senior notes due 2028 issued pursuant to the 7.000% Unsecured Promissory Notes Indenture.

23. "*7.000% Unsecured Promissory Notes Claims*" means all Claims against any Debtor arising from or based upon the 7.000% Unsecured Promissory Notes or any other 7.000% Unsecured Promissory Notes Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding amount as of the Petition Date was in the aggregate amount equal to $28,274,393.81.

24. "*7.000% Unsecured Promissory Notes Documents*" means, collectively, the 7.000% Unsecured Promissory Notes Indenture, the 7.000% Unsecured Promissory Notes, and all related agreements and documents executed by any of the Debtors in connection with the 7.000% Unsecured Promissory Notes.

25. "*7.000% Unsecured Promissory Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of December 1, 1994, for the 7.000% Unsecured Promissory Notes by and among Hertz Corp., as the issuer, the Subsidiary Guarantors, as guarantors, and the 7.000% Unsecured Promissory Notes Trustee.

26. "*7.000% Unsecured Promissory Notes Trustee*" means U.S. Bank National Association, in its capacity as trustee under the 7.000% Unsecured Notes Indenture, including any successor thereto.

27. "*7.000% Unsecured Promissory Notes Trustee's Fees*" means, collectively, to the extent not previously paid in connection with the Chapter 11 Cases, the reasonable and documented fees, costs, and expenses (including, without limitation, legal fees) incurred by the 7.000% Unsecured Promissory Notes Trustee that are required to be paid under the 7.000% Unsecured Promissory Notes Documents.

28. "*7.125% Unsecured Noteholders*" means Holders of the 7.125% Unsecured Notes from time to time, in their capacity as such.

29. "*7.125% Unsecured Notes*" means the 7.125% senior notes due 2026 issued pursuant to the 7.125% Unsecured Notes Indenture.

30. "*7.125% Unsecured Notes Claims*" means all Claims against any Debtor arising from or based upon the 7.125% Unsecured Notes or any other 7.125% Unsecured Notes Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding amount as of the Petition Date was in the aggregate amount equal to $500,000,000.00.

31. "*7.125% Unsecured Notes Documents*" means, collectively, the 7.125% Unsecured Notes Indenture, the 7.125% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the 7.125% Unsecured Notes.

32. "*7.125% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of August 1, 2019, for the 7.125% Unsecured Notes by and among Hertz Corp., as the issuer, the Subsidiary Guarantors, as guarantors, and the 7.125% Unsecured Notes Trustee.

33.     "*7.125% Unsecured Notes Trustee*" means Wells Fargo Bank, N.A., in its capacity as trustee under the 7.125% Unsecured Notes Indenture, including any successor thereto.

34.     "*ABS Released Parties*" shall have the meaning ascribed to such term the Second Interim HVF Master Lease Settlement Order.

35.     "*Ad Hoc Equity Committee*" means the ad hoc group of certain shareholders, in its capacity as such, represented by Glenn Agre Bergman & Fuentes LLP identified in the *Amended Verified Statement of Glenn Agre Bergman & Fuentes LLP Pursuant to Bankruptcy Rule 2019* [Docket No. 4078].

36.     "*Administrative Claim*" means a Claim against any of the Debtors for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, or commissions for services rendered after the Petition Date; (ii) Professional Fee Claims; (iii) Substantial Contribution Claims; (iv) fees and charges payable to the U.S. Trustee pursuant to Section 1930 of the Judicial Code; (v) postpetition Intercompany Claims, (vi) DIP Claims, (vii) HVF Master Lease Administrative Claims; (viii) Canadian Fleet Financing Administrative Claims; and (ix) Interim Fleet Financing Administrative Claims.

37.     "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order, including the Claims Bar Date Order.

38.     "*Administrative Claims Objection Deadline*" means the first Business Day that is one-hundred and eighty (180) days after the Effective Date; provided that such date may be extended by the Bankruptcy Court at the Reorganized Debtors' request.

39.     "*ADR Procedures*" means the alternative dispute resolution procedures as amended, supplemented, or modified from time to time and filed in connection with the Plan Supplement. For the avoidance of doubt, such procedures shall not apply to any dispute involving the Plan Sponsors, if any, and shall be in form and substance reasonably acceptable to the Plan Sponsors in good faith. For the avoidance of doubt, prior to the Effective Date, ADR Procedures refers to those procedures approved by the Bankruptcy Court on April 13, 2021 [Docket No. 3835] and after the Effective Date, the ADR Procedures in the Plan Supplement.

40.     "*Affiliate*" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

41.     "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein, such Claim or Interest (or any portion thereof) that is not Disallowed and (i) with respect to which no objection to the allowance thereof or request for estimation has been Filed or such Claim or Interest has not been designated for participation in the ADR Procedures on or before the Claims Objection Deadline, Administrative Claims Objection Deadline, or the expiration of such other applicable period fixed by the Bankruptcy Court, (ii) that has been expressly Allowed under the Plan, any stipulation approved by the Bankruptcy Court, or a Final Order of the Bankruptcy Court; (iii) is both not Disputed and either (a) evidenced by a Proof of Claim timely Filed in accordance with the Claims Bar Date Order (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed) or (b) listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (iv) is allowed

by a Final Order, or (v) is compromised, settled, or otherwise resolved to by (a) the Debtors and (b) the holder of such Claim or Interest; provided, that, except as otherwise expressly provided herein, the amount of any Allowed Claim or Allowed Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code. Except as otherwise expressly specified in the Plan (including with respect to First Lien Claims and Second Lien Note Claims) or any Final Order, and except to the extent such interest is Allowed pursuant to section 506(b) of the Bankruptcy Code, the amount of an Allowed Claim shall not include interest or any premium on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow," "Allowance," and "Allowing" shall have correlative meanings.

42.    "*ALOC Credit Agreement*" means that certain Credit Agreement (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of December 13, 2019, by and among Hertz Corp., the lenders party thereto, and Goldman Sachs Mortgage Company, as administrative agent and issuing lender, as may be amended, modified, or amended and restated from time to time.

43.    "*ALOC Facility*" means the letter of credit facility provided pursuant to the ALOC Credit Agreement.

44.    "*ALOC Facility Agent*" means Goldman Sachs Mortgage Company solely in its capacity as administrative agent for the ALOC Facility.

45.    "*ALOC Facility Claims*" means all Claims against any Debtor arising from or based upon letters of credit issued pursuant to the ALOC Credit Agreement or any other ALOC Facility Documents, including accrued but unpaid interest, costs, fees, and indemnities.

46.    "*ALOC Facility Documents*" means the ALOC Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the ALOC Facility.

47.    "*Amarillo*" means CK Amarillo LP.

48.    "*Apollo*" means Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by it or its Affiliates.

49.    "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and/or Unexpired Leases filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Plan Sponsors in good faith, as may be amended, modified, or supplemented by the Debtors from time to time, that will be assumed by the Reorganized Debtors pursuant to the Plan; provided, that the Assumed Executory Contracts and Unexpired Leases Schedule

does not need to include Executory Contracts and/or Unexpired Leases that have been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date.

50.    "*Australian ABS Restructuring Settlement*" means the restructuring of the Australian Securitization Facility on terms and conditions reasonably acceptable to the Debtors, the Plan Sponsors, Hertz Australia, the Australian Financing Entity, and the requisite consenting lenders from time to time party to the Australian Securitization Facility Documents, which restructuring and settlement shall include the complete release and disallowance of the Australian Performance Guarantee and any claims related thereto, including the Australian Performance Guarantee Claim.

51.    "*Australian Financing Entity*" means HA Fleet Pty Ltd (ACN 126 115 204).

52.    "*Australian Performance Guarantee*" means the guarantee and indemnity granted by Hertz Corp. pursuant to that certain THC Guarantee and Indemnity, dated as of July 12, 2016.

53.    "*Australian Performance Guarantee Claim*" means any Claim against Hertz Corp. pursuant to the Australian Performance Guarantee.

54.    "*Australian Securitization Facility*" means the fleet financing facility, dated December 7, 2010, between, among others, the Australian Financing Entity and Citibank, N.A., as Administrative Agent, as amended, varied, amended and restated or extended from time to time, including pursuant the Master Amendment and Restatement Deed dated as of July 12, 2016, entered into between, among others, the Australian Financing Entity, Westpac Banking Corporation, and P.T. Limited, and as amended by the Amendment Deed dated as of September 23, 2019, entered into between, among others, the Australian Financing Entity, Westpac Banking Corporation and P.T. Limited.

55.    "*Australian Securitization Facility Documents*" means all related agreements and documents executed by Hertz Corp., Hertz Australia, the Australian Financing Entity, or any of its non-Debtor Affiliates in connection with the Australian Securitization Facility.

56.    "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors and any recovery, subordination, or other remedies that may be brought by or on behalf of the Debtors and their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including under sections 502, 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, chapter 5 of the Bankruptcy Code, or applicable non-bankruptcy law.

57.    "*Ballot*" means the form(s) distributed to holders of Claims entitled to vote on the Plan to indicate their acceptance or rejection of the Plan and to make an election with respect to the releases by Holders of Claims and Interests provided by Article VIII.D.

58.    "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Cases.

59.    "*Bankruptcy Court*" means (i) the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases; (ii) to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code; or (iii) such other court as may have jurisdiction over the Chapter 11 Cases or any aspect thereof to the extent of such jurisdiction.

60.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

61.    "*Bifurcation Motion*" means the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry Into, and Performance Under, European Settlement and Restructuring Embodied in Noteholder Lock-Up Agreement: (A) Settling Guarantee Claims, (B) Allowing Replacement U.S. Unsecured Claims, (C) Providing for the Issuance of Non-Contingent Debt Instrument, (D) Authorizing Sale of Replacement U.S. Unsecured Claims Pursuant to Sale Procedures, Including Authorizing Hertz Global Holdings, Inc. to Act as Agent to Market and Sell Such Claims and the Appointment of Moelis & Company LLC to Act as the Intermediary in Connection Therewith, (E) Authorizing Hertz System Inc. to Enter Into or Amend Certain Intellectual Property and License and Sublicense Agreements, and (F) Modifying Automatic Stay with Respect to European Noteholder Lock-Up Agreement and (II) Granting Related Relief* [Docket No. 2280].

62.    "*BNY Canada*" means BNY Trust Company of Canada.

63.    "*Bondholder Subscription Rights*" means the subscription rights distributed to Holders of Allowed Unsecured Funded Debt Claims to participate in the Rights Offering solely to the extent the Rights Offering is not fully subscribed and funded by Holders of Existing Hertz Parent Interests, offered in accordance with the Equity Commitment Agreement and the Rights Offering Procedures.

64.    "*Business Day*" means any day, other than a Saturday, Sunday, or "*legal holiday*" (as defined in Bankruptcy Rule 9006(a)), or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

65.    "*Canadian Fleet Financing Administrative Claims*" means any and all Administrative Claims arising under or related to the Canadian Fleet Financing Debtor Documents.

66.    "*Canadian Fleet Financing Back-Up Agent Agreement*" means that certain Back-Up Disposition Agent Agreement dated as of September 14, 2014, by and among Fiserv Automotive Solutions, Inc., Hertz Canada, DTAG Canada and the Canadian Trustee, as amended from time to time.

67.    "*Canadian Fleet Financing Base Indenture*" means that certain Base Indenture dated as of September 14, 2015 by and among TCL Funding, as issuer, Hertz Canada and DTAG Canada, as co-servicers, HCVP, HC Limited, DTGC, as securitization entities, certain Committed Note Purchasers, Certain Conduit Investors, Certain Funding Agents for the Investor Groups (each as defined therein) and BNY Canada, as trustee.

68.    "*Canadian Fleet Financing Debtor Documents*" means the Canadian Fleet Financing Indenture, the Canadian Fleet Financing Servicing Agreement, the Canadian Fleet Financing Back-Up Agent Agreement, the Canadian Fleet Financing Performance Guarantee, and any other agreements, instruments and documents executed by the Debtors in connection therewith.

69.    "*Canadian Fleet Financing Documents*" means the Canadian Fleet Financing Debtor Documents, the Canadian Fleet Financing Notes and any other agreements, instruments and documents executed in connection therewith.

70.    "*Canadian Fleet Financing Facility*" means the asset-backed securitization facility issued pursuant to the Canadian Fleet Financing Documents.

71.     "*Canadian Fleet Financing Indenture*" means the Canadian Fleet Financing Base Indenture and the Canadian Fleet Financing Supplemental Indenture.

72.     "*Canadian Fleet Financing Notes*" means the Series 2021-A Variable Funding Rental Car Asset Backed Notes issued under the Canadian Fleet Financing Indenture.

73.     "*Canadian Fleet Financing Performance Guarantee*" means the Performance Guarantee dated as of September 14, 2014 issued by Hertz Corp. for the benefit of the Canadian Trustee in connection with the Canadian Fleet Financing Servicing Agreement and the Canadian Fleet Financing Back-Up Agent Agreement.

74.     "*Canadian Fleet Financing Servicing Agreement*" means that certain Servicing Agreement dated as of September 14, 2015, by among Hertz Canada, DTAG Canada, HC Limited, TCL Funding, DTAC, and the Canadian Trustee, as amended from time to time.

75.     "*Canadian Fleet Financing Supplemental Indenture*" means the Series 2021-A Supplement dated as of January 27, 2021 to the Canadian Fleet Financing Base Indenture.

76.     "*Canadian Trustee*" means BNY Canada acting in its capacity as Trustee under the Canadian Fleet Financing Indenture.

77.     "*Cash*" means the legal tender of the United States of America or equivalents thereof.

78.     "*Cash Collateral Orders*" means the (i) *Agreed Interim Order (I) Authorizing Use of Cash Collateral and (II) Granting Adequate Protection and Related Relief to Prepetition Secured Parties* [Docket No. 204], (ii) *Second Agreed Order (I) Authorizing Use of Cash Collateral and (II) Granting Adequate Protection and Related Relief to Prepetition Secured Parties* [Docket No. 559] and (iii) *Third Agreed Order (I) Authorizing Use of Cash Collateral and (II) Granting Adequate Protection and Related Relief to Prepetition Secured Parties* [Docket No. 1131], each as amended, supplemented, or modified from time to time.

79.     "*Casualty Superpriority Administrative Expense Claim*" means the superpriority administrative expense claims of the HVF Trustee pursuant to the Interim HVF Master Lease Settlement Orders in an amount equal to all payments on account of a Casualty (as defined in the HVF Master Lease Agreement) accrued under the HVF Master Lease Agreement plus interest thereon from the date such amount would be payable under the HVF Master Lease Agreement at the one-month LIBOR Rate (as defined in the HVF Master Lease Agreement) plus 5.50%.

80.     "*Cause of Action*" means any action, claim, proceeding, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guarantee, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity;  (ii) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity; (iii) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Interests; provided, that notwithstanding anything to the contrary herein, such right with respect to GUC Administrator Claims shall be controlled

solely by the GUC Oversight Administrator; (iv) any Claim pursuant to section 362 of the Bankruptcy Code; (v) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (vi) any Avoidance Actions.

81.    "*Certares*" means certain funds and accounts managed or advised by Certares Opportunities LLC or one of its Affiliates.

82.    "*Chapter 11 Cases*" means (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (ii) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court under Chapter 11 Case, Number 20-11218 (MFW).

83.    "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

84.    "*Claims and Noticing Agent*" means Prime Clerk LLC, the claims, noticing, and solicitation agent retained by the Debtors pursuant to the *Order Authorizing the Appointment of Prime Clerk LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date* [Docket No. 183].

85.    "*Claims Bar Date*" means October 21, 2020 at 5:00 p.m. (prevailing Eastern Time) or other applicable date(s) designated by the Bankruptcy Court as the last date(s) for filing a Proof of Claim against the Debtors.

86.    "*Claims Bar Date Order*" means the *Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, and Approving the Form and Manner of Notice Thereof* [Docket No. 1240], entered by the Bankruptcy Court on September 9, 2020, as amended, modified, or supplemented by order of the Bankruptcy Court from time to time.

87.    "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (i) one hundred and eighty (180) days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court upon a motion by the Reorganized Debtors Filed on or before the day that is one hundred and eighty (180) days after the Effective Date.

88.    "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

89.    "*Class*" means a category of Holders of Claims or Interests as set forth in <u>Article III</u> pursuant to section 1122(a) of the Bankruptcy Code.

90.    "*Class Action Claim*" means any Claim scheduled or filed by a purported class representative or its counsel on behalf of one or more claimant.

91.    "*Clawback Defendants*" means (i) Mark Frissora; (ii) John Jeffrey Zimmerman; and (iii) Scott Sider.

92.    "*Collective Bargaining Agreements*" means all the collective bargaining agreements of the Debtors.

93.    "*Collective Bargaining Agreement Schedule*" means the schedule of cure amounts due on account of the Debtors' Collective Bargaining Agreements, as may be amended by the Debtors.

94.    "*Commitment Letter*" means the letter between the Debtors and the Plan Sponsors (other than Apollo) dated March 2, 2021.

95.    "*Committee*" means the statutory committee of unsecured creditors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee, pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 392] on June 11, 2020, as may be reconstituted from time to time.

96.    "*Committee Complaint*" means the *Complaint* Filed by the Committee in the adversary proceeding styled *The Official Committee of Unsecured Creditors v. Barclays Bank PLC and BOKF, N.A.* (under Adversary Proceeding Number 20-50842 (MFW)).

97.    "*Committee Members*" means, each in its capacity as a member of the Committee, (i) American Automobile Association, Inc.; (ii) Janice Dawson; (iii) International Brotherhood of Teamsters;[2] (iv) Pension Benefit Guaranty Corporation; (v) Sirius XM Radio Inc.; (vi) Southwest Airlines Co.; (vii) U.S. Bank National Association; and (viii) Wells Fargo Bank, N.A.

98.    "*Company*" means, collectively, the (i) Debtors; and (ii) their direct and indirect non-Debtor subsidiaries.

99.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

100.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

101.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

102.    "*Confirmation Order*" means the order of the Bankruptcy Court, confirming the Plan pursuant to section 1129 of the Bankruptcy Code that is consistent with this Plan, and which shall be in form and substance acceptable to the Plan Sponsors in good faith.

103.    "*Consenting Investor Provision*" shall have the meaning set forth in the Plan Support Agreement.

104.    "*Consummation*" means the occurrence of the Effective Date.

105.    "*Cure Claim*" means a monetary Claim in an amount, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) at the time such contract or lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

106.    "*D&O Liability Insurance Policies*" means, collectively, all insurance policies (including any "tail policy") issued at any time, whether expired or unexpired, to any of the Debtors for certain

_____
[2] The International Brotherhood of Teamsters is a Member in its capacity as representative for Local Unions 20, 25, 79, 89, 104, 114, 117, 118, 150, 175, 206, 222, 272, 299, 305, 317, 327, 355, 385, 399, 431, 449, 455, 481, 492, 495, 528, 529, 541, 618, 641, 665, 667, 682, 745, 769, 781, 813, 830, 853, 856, 886, 901, 922, 926, 931, 986, 988 and 996, and their respective members.

liabilities of the Debtors and/or their current or former directors, managers, and officers, and all agreements, documents or instruments related thereto, including the Tail D&O Policy.

107.    "*Debtors*" means, collectively, (i) Hertz Corp.; (ii) Hertz Global Holdings, Inc.; (iii) Thrifty Rent-A-Car System, LLC; (iv) Thrifty, LLC; (v) Dollar Thrifty Automotive Group, Inc.; (vi) Firefly Rent A Car LLC; (vii) CMGC Canada Acquisition ULC; (viii) Hertz Aircraft, LLC; (ix) Dollar Rent A Car, Inc.; (x) Dollar Thrifty Automotive Group Canada Inc.; (xi) Donlen Corporation; (xii) Donlen FSHCO Company; (xiii) Hertz Canada Limited; (xiv) Donlen Mobility Solutions, Inc.; (xv) DTG Canada Corp.; (xvi) DTG Operations, Inc.; (xvii) Hertz Car Sales LLC; (xviii) DTG Supply, LLC; (xix) Hertz Global Services Corporation; (xx) Hertz Local Edition Corp.; (xxi) Hertz Local Edition Transporting, Inc.; (xxii) Donlen Fleet Leasing Ltd.; (xxiii) Hertz System, Inc.; (xxiv) Smartz Vehicle Rental Corporation; (xxv) Thrifty Car Sales, Inc.; (xxvi) Hertz Technologies, Inc.; (xxvii) TRAC Asia Pacific, Inc.; (xxviii) Hertz Transporting, Inc.; (xxix) Rental Car Group Company, LLC; and (xxx) Rental Car Intermediate Holdings, LLC.

108.    "*Defined Benefit Plan*" means The Hertz Corporation Account Balance Defined Benefit Pension Plan.

109.    "*Definitive Documents*" has the meaning set forth in the Plan Support Agreement.

110.    "*Designated Claim*" means any disputed, unliquidated, or contingent Claim selected by the Debtors, the Reorganized Debtors, the GUC Oversight Administrator, or the Distribution Agent, as applicable, for resolution through the ADR Procedures.

111.    "*DFLF Facility*" means the asset-backed securitization facility entered into in connection with the *Order (I) Authorizing Certain Debtors to Enter Into Securitization Documents, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket. No. 1489].

112.    "*DIP Agent*" means Barclays Bank PLC, in its capacity as Administrative Agent and Collateral Agent under the DIP Credit Agreement, including any successor thereto.

113.    "*DIP Claims*" means any Claim in respect of any DIP Obligations (as defined in the DIP Order) owed by the Debtors under the DIP Order.

114.    "*DIP Credit Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of October 30, 2020, by and among Hertz Corp., as borrower, the DIP Lenders, the DIP Agent, and Barclays Bank PLC as Joint Bookrunner, as approved by the DIP Order, and as the same may be amended, modified, or amended and restated from time to time in accordance with its terms.

115.    "*DIP Financing*" means the postpetition financing facility issued pursuant to the DIP Credit Agreement and the DIP Order, consisting of a $1,650,000,000.00 senior secured multiple draw term loan credit facility.

116.    "*DIP Lenders*" means, collectively, the Lenders (as defined in the DIP Credit Agreement), the Issuing Bank (as defined in the DIP Credit Agreement) and any other DIP Secured Party (as defined in the DIP Order).

117.    "*DIP Loan Documents*" has the meaning set forth in the DIP Order.

118.    "*DIP Order*" means the *Order (I) Authorizing the Debtors to Obtain Debtor-in-Possession Financing and Granting Liens and Superpriority Administrative Claims and (II) Granting Related Relief* [Docket No. 1661] as amended, supplemented, or modified from time to time.

119.    "*Disallowed*" means any Claim, or any portion thereof, that (i) has been disallowed by Final Order or settlement; (ii) is listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed, deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law; or (iii) is not listed on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law.  "Disallow" and "Disallowance" shall have correlative meanings.

120.    "*Disclosure Statement*" means (i) the *Disclosure Statement for the Fourth Modified Second Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and Its Debtor Affiliates*, dated as of April 22, 2021 (as amended, modified or supplemented from time to time in accordance with its terms), including all exhibits and schedules thereto and references therein that relate to the Plan that are prepared and distributed in accordance with applicable law and (ii) any supplement, amendment, or modification thereto which shall be in form and substance reasonably acceptable to the Plan Sponsors in good faith.

121.    "*Disclosure Statement Order*" means that certain *Order (I) Approving the Proposed Disclosure Statement and Form and Manner Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan, and (V) Granting Related Relief* entered by the Bankruptcy Court on April 22, 2021 [Docket No. 4111] (as amended, modified, or supplemented from time to time with any such amendments, modifications, or supplements in form and substance acceptable to the Plan Sponsors in good faith).

122.    "*Disputed*" means, with respect to a Claim or Interest, a Claim (or portion thereof) that is not yet Allowed or Disallowed.

123.    "*Distribution Agent*" means, as applicable, the Entity or Entities selected by the Debtors or the Reorganized Debtors, in consultation with the Plan Sponsors, to make or to facilitate distributions pursuant to the Plan and, with respect to General Unsecured Claims, the GUC Oversight Administrator.

124.    "*Distribution Agent Claims*" means any Claim that is not a GUC Administrator Claim.

125.    "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which, unless otherwise specified, shall be 5:00 p.m. prevailing Eastern Time on the date of the Confirmation Hearing; provided, that the Distribution Record Date shall not apply to the First Lien Claims, Second Lien Note Claims, Unsecured Funded Debt Claims, and the HHN Notes Guarantee Claims, the Holders of which shall receive a distribution in accordance with Article VI of the Plan and, as applicable, the customary procedures of DTC and Euroclear.

126.    "*Donlen Canada Securitization Facility*" means the asset-backed securitization facility issued by non-Debtor Donlen Canada Fleet Funding LP.

127.    "*Donlen Debtors*" means (i) Donlen Corporation; (ii) Donlen FSHCO Company; (iii) Donlen Mobility Solutions, Inc.; and (iv) Donlen Fleet Leasing Ltd.

128.    "*Donlen Documents*" means the documents executed in connection with the Donlen Sale.

129.    "*Donlen Sale*" means the sale of substantially all of the assets of the Donlen Debtors.

130.    "*DTAC*" means DTC Car Rental Partnership Limited.

131.    "*DTAG Canada*" means Debtor Dollar Thrifty Automotive Group Canada Inc.

132.    "*DTC*" means The Depository Trust Company.

133.    "*ECA Approval Order*" means an Order of the Bankruptcy Court that is not stayed (under Bankruptcy Rule 6004(h) or otherwise) that (i) authorizes the Debtors to enter into and perform under the Equity Commitment Documents, and (ii) provides that the termination payment, expense reimbursement, and the indemnification provisions contained therein shall constitute Allowed Administrative Expense Claims of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall be payable by the Debtors as provided in the Equity Commitment Documents without further Order of the Bankruptcy Court.

134.    "*Effective Date*" means, with respect to the Plan, the date that is a Business Day on which (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (iii) the Plan is declared effective by the Debtors.  Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

135.    "*Eligible Existing Hertz Shareholders*" means each Holder of an Allowed Existing Hertz Parent Interest on the Record Date (as such terms are defined in the Rights Offering Procedures) that is either (i) an "accredited investor" within the meaning of Rule 501 Regulation D under the Securities Act or (ii) a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, as certified in accordance with the Rights Offering Procedures.

136.    "*Eligible Unsecured Funded Debt Holder*" means each Holder of an Allowed Unsecured Funded Debt Claim on the Record Date (as such terms are defined in the Rights Offering Procedures) that is either (i) an "accredited investor" within the meaning of Rule 501 Regulation D under the Securities Act or (ii) a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, as certified in accordance with the Rights Offering Procedures.

137.    "*Employee Obligations*" means any written contracts, agreements, policies, programs, and plans (as from time to time amended or restated) applicable to employees or directors for regular compensation (including wages, salary, commissions, and incentives), bonus programs approved by the Bankruptcy Court pursuant to the 2020 EIP Order and the 2021 KEIP/EIP Order, expense reimbursements, vacation and sick leave benefits, employee and retiree health care, vision, and dental benefits, employee and retiree life insurance benefits, disability insurance benefits, accidental death and dismemberment insurance benefits, qualified retirement programs, employee relocation programs, employee and director vehicle use policies, commuter benefits, adoption assistance benefits, employee, director, and retiree discount programs, and other employee welfare plan benefits in effect immediately prior to the Effective Date.  For the avoidance of doubt, the term "Employee Obligations" does not include any contracts, agreements, arrangements, letters, policies, programs, or plans (as from time to

time amended or restated) for deferred compensation, non-qualified retirement benefits, severance, or other employment termination benefits.

138. "*Employment Agreements*" means the existing employment agreement by and between certain employees of the Debtor and the Debtors identified in the Plan Supplement, each of which shall be assumed on the Effective Date, subject to the consent of the Plan Sponsors.

139. "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

140. "*Equity Commitment*" means the purchase of Reorganized Hertz Parent Common Interests and Preferred Stock by the Equity Commitment Parties under the Equity Commitment Agreement.

141. "*Equity Commitment Agreement*" means that certain Equity Commitment and Stock Purchase Agreement, dated as of May 2, 2021, by and among Hertz Parent, the other Debtors party thereto, and the Equity Commitment Parties, as the same may be amended, modified, or amended and restated from time to time in accordance with its terms, setting forth, among other things, the terms and conditions of (i) the New Money Investment, (ii) the Rights Offering, and (iii) the commitments and investment by the Ad Hoc Equity Committee and related fees.

142. "*Equity Commitment Documents*" means the Equity Commitment Agreement together with all schedules, annexes and exhibits thereto.

143. "*Equity Commitment Parties*" means, collectively, the parties purchasing Reorganized Hertz Parent Common Interests and Preferred Stock under the Equity Commitment Agreement, including Apollo and Amarillo.

144. "*ERISA*" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

145. "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code.

146. "*Euroclear*" means Euroclear S.A./N.V., as operator of the Euroclear system.

147. "*European ABS Facility*" means that certain €600,000,000.00 asset-backed securitization facility originally dated September 25, 2018 between (among others) International Fleet Financing No. 2 B.V. as Issuer, Credit Agricole Corporate and Investment Bank as European ABS Facility Administrative Agent and BNP Paribas Trust Corporation UK Limited as Issued Security Trustee.

148. "*European ABS Facility Documents*" means all related agreements and documents executed by Hertz Corp. or any of its non-Debtor Affiliates in connection with the European ABS Facility.

149. "*European ABS Performance Guarantees*" means (i) that certain THC Guarantee and Indemnity, dated as of September 25, 2018, between Hertz Corp., Stuurgroep Fleet (Netherlands) B.V., RAC Finance S.A.S., Hertz Fleet Limited, Stuurgroep Fleet (Netherlands) B.V. Spanish Branch, and BNP Paribas Trust Corporation UK Limited, as issued security trustee and fleetco security trustee, and (ii) that certain German Fleetco THC Indemnity, dated September 25, 2018, between Hertz Corp., Hertz Fleet

14

Limited, BNP Paribas Trust Corporation UK Limited, as issued security trustee and fleetco security trustee, and certain entities named as beneficiaries therein.

150.    "*European ABS Performance Guarantee Claim*" means all Claims against Hertz Corp. pursuant to the European ABS Performance Guarantees or otherwise arising from the European ABS Facility or the European ABS Facility Documents.

151.    "*European ABS Restructuring Settlement*" means the restructuring of the Lombard Vehicle Financing Facility and the European ABS Facility on terms and conditions acceptable to the Debtors, the European Vehicle Financing Entities and the requisite consenting lenders from time to time party to the Lombard Vehicle Financing Facility and the European ABS Facility, which restructuring and settlement shall include the complete release and disallowance of the Lombard Financing Facility Guarantee, the European ABS Performance Guarantee and any claims related thereto, including the Lombard Vehicle Financing Facility Guarantee Claims and European ABS Performance Guarantee Claims.

152.    "*European Vehicle Financing Entities*" means (i) Hertz (U.K.) Limited; and (ii) the non-Debtor Affiliates of Hertz Corp. party to the European ABS Facility Documents.

153.    "*Exculpated Parties*" means each of the following in their capacity as such: (i) the Debtors; (ii) each of the Debtors' respective directors and officers serving after the Petition Date; (iii) the Committee; (iv) each of the Committee Members, solely in its capacity as a Committee Member; (v) each of the Plan Sponsors; (vi) each of the Equity Commitment Parties; (vii) the Unsecured Notes Trustees; (viii) the 7.000% Unsecured Promissory Notes Trustee; and (ix) with respect to each of the foregoing Entities in clauses (i) through (viii), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, officers, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in its capacity as such; provided, that with respect to the Plan Sponsors, the Equity Commitment Parties, the Unsecured Notes Trustees, and the 7.000% Unsecured Promissory Notes Trustee, any exculpations afforded under the Plan or Confirmation Order shall be granted only to the extent provided for pursuant to section 1125(e) of the Bankruptcy Code.

154.    "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

155.    "*Existing Hertz Parent Interests*" means all Interests in (or against) Hertz Parent.

156.    "*Exit Agent*" means, collectively, in their respective capacities as such, the administrative and collateral agents with respect to the Exit Credit Agreement including any successors thereto.

157.    "*Exit Credit Agreement*" means the credit agreement to be entered into in connection with the Exit Term Loan Facility and the Exit Revolving Credit Facility (including any guarantee agreements, pledge and collateral agreements, and other security documents), which shall be materially consistent with the Plan and which shall be in form and substance acceptable to the Debtors and the Plan Sponsors in good faith.

158.    "*Exit Facility Documents*" means the Exit Credit Agreement and such other financing documents to be entered into in connection with the Exit Term Loan Facility and Exit Revolving Credit Facility (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements

and other security documents), which shall be materially consistent with the Plan and otherwise acceptable to the Debtors and the Plan Sponsors in good faith.

159. "*Exit Revolving Credit Facility*" means a senior secured revolving credit facility in an aggregate commitment amount of $1,500,000,000.00 (as such amount may be adjusted with the consent of the Debtors and the Plan Sponsors), with the capacity for the issuance of letters of credit, secured by a first Lien on substantially all assets of Hertz Corp. and the Subsidiary Guarantors (except Donlen Corporation), which shall be on prevailing market terms, materially consistent with the Plan, and otherwise acceptable to the Debtors and the Plan Sponsors.

160. "*Exit Term Loan Facility*" means a senior secured credit facility in a principal amount of $1,300,000,000.00 (as such amount may be adjusted with the consent of the Debtors and the Plan Sponsors), secured by a first Lien on substantially all assets of Hertz Corp and the Subsidiary Guarantors (except Donlen Corporation), which shall be on prevailing market terms, materially consistent with the Plan, and otherwise acceptable to the Debtors and the Plan Sponsors.

161. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

162. "*File,*" "*Filed,*" or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, with the Claims and Noticing Agent.

163. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that, the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, the local rules of the Bankruptcy Court or applicable non-bankruptcy law, may be Filed relating to such order shall not prevent such order from being a Final Order.

164. "*First Interim HVF Master Lease Settlement Order*" means the *Order Temporarily Resolving Certain Matters Related to the Master Lease Agreement, Setting A Schedule for Further Litigation Related Thereto in 2021 and Adjourning Hearing on the Debtors' Motion for Order Rejecting Certain Unexpired Vehicle Leases Effective* Nunc Pro Tunc *to June 11, 2020 Pursuant to Sections 105 and 365(a) of the Bankruptcy Code [Docket No. 390] Sine Die* [Docket No. 805].

165. "*First Lien Agent*" means Barclays Bank PLC, in its capacity as administrative agent, collateral agent, and common collateral agent under the First Lien Credit Agreement, the First Lien Standalone LC Agreement, and the other First Lien Loan Documents, including any successor thereto.

166. "*First Lien Claims*" means all (i) First Lien Term Loan Claims; (ii) First Lien Revolving Loan Claims; (iii) First Lien Hedge Claims; (iv) First Lien LC Claims; and (v) any Claims against the Debtors not duplicative of the foregoing clauses (i) – (iv), due, owing, and payable to the First Lien Agent, First Lien Lenders, or their professionals pursuant to the Cash Collateral Orders, including any professionals' fees and expenses.

167.    "*First Lien Credit Agreement*" means that certain Credit Agreement (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of June 30, 2016, by and among Hertz Corp., the Subsidiary Borrowers (as such term is defined in the First Lien Credit Agreement) party thereto, as borrowers, the First Lien Agent, and the lenders party thereto.

168.    "*First Lien Donlen Paydown Amount*" means the Cash proceeds received from the Donlen Sale that are applied to the First Lien Claims pursuant to the DIP Order and DIP Credit Agreement.

169.    "*First Lien Hedge Agreements*" means all Hedge Agreements (as such term is defined in the First Lien Credit Agreement).

170.    "*First Lien Hedge Claims*" means all Claims against any Debtor arising from or based upon the First Lien Hedge Agreements, including all accrued but unpaid interest, costs, fees, and indemnities, in an aggregate amount equal to approximately $2,312,987.44.

171.    "*First Lien LC Claims*" means all (i) First Lien Revolving LC Claims, and (ii) First Lien Standalone LC Facility Claims.

172.    "*First Lien Lenders*" means, collectively, the lenders under the First Lien Loan Documents.

173.    "*First Lien Loan Documents*" means (i) the First Lien Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the First Lien Credit Agreement, and (ii) the First Lien Standalone LC Agreement and all related agreements and documents executed by any of the Debtors in connection with the First Lien Standalone LC Agreement.

174.    "*First Lien Revolving LC Claims*" means all Claims against any Debtor arising from or based upon the letters of credit issued under the First Lien Credit Agreement, including all accrued but unpaid interest at the applicable rate, costs, fees, and indemnities.

175.    "*First Lien Revolving LC Facility*" means the letter of credit facility provided pursuant to the First Lien Credit Agreement.

176.    "*First Lien Revolving Loan Claims*" means all Claims against any Debtor arising from or based upon the revolving loans issued pursuant to the First Lien Credit Agreement or any other First Lien Loan Document, including all accrued but unpaid interest at the applicable rate, costs, fees, and indemnities, which principal outstanding as of the Petition Date was in the aggregate amount equal to $615,000,000.00.

177.    "*First Lien Standalone LC Agreement*" means that certain Letter of Credit Agreement (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of November 2, 2017, by and among Hertz Corp., as applicant, and Barclays Bank PLC, as administrative agent and collateral agent.

178.    "*First Lien Standalone LC Facility*" means the letter of credit facility provided pursuant to the First Lien Standalone LC Agreement.

179.    "*First Lien Standalone LC Facility Claims*" means all Claims against any Debtor arising from or based upon letters of credit issued under the First Lien Standalone LC Agreement or any other

First Lien Standalone LC Facility Documents, including accrued but unpaid interest at the applicable rate, costs, fees, and indemnities.

180.    "*First Lien Standalone LC Facility Documents*" means the First Lien Standalone LC Agreement and all related agreements and documents executed by any of the Debtors in connection with the First Lien Standalone LC Facility.

181.    "*First Lien Term Loan Claims*" means all Claims against any Debtor arising from or based upon the term loans issued pursuant to the First Lien Credit Agreement or any other First Lien Term Loan Document, including all accrued but unpaid interest at the applicable rate, costs, fees, and indemnities, which principal outstanding as of the Petition Date was in the aggregate amount equal to approximately $656,250,000.00.

182.    "*General Unsecured Claim*" means any Unsecured Claim, against any Debtor, other than (i) Administrative Claims; (ii) Priority Tax Claims; (iii) Other Priority Claims; (iv) Intercompany Claims; (v) Unsecured Funded Debt Claims; and (vi) HHN Notes Guarantee Claims; provided, however, that, notwithstanding anything to the contrary herein, to the extent that a Holder of a General Unsecured Claim against a Debtor holds any joint and several liability Claims, guarantee Claims, or other similar Claims against any other Debtors arising from or relating to the same obligations or liability as such General Unsecured Claim, such Holder shall only be entitled to a distribution on one General Unsecured Claim against the Debtors in full and final satisfaction of all such Claims.

183.    "*General Unsecured Recovery Cash Pool Account*" means a segregated account to be funded on or after the Effective Date in accordance with Article IV.J.

184.    "*General Unsecured Recovery Cash Pool Amount*" means Cash in the amount of $550,000,000.00, to be distributed in accordance with Article IV.J, to fund distributions to Holders of Allowed General Unsecured Claims.

185.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

186.    "*GUC Administrator Claim Related Action*" means a Cause of Action (other than an Avoidance Action) to the extent such Cause of Action may be asserted as a defense in respect of a GUC Administrator Claim.

187.    "*GUC Administrator Claims*" means any Disputed General Unsecured Claim in a claimed amount in excess of $1,000,000.00, other than such claims agreed to by the Debtors and the Committee.

188.    "*GUC Oversight Administrator*" means the individual appointed by the Committee in accordance with Article VI.D. of the Plan that shall be identified in the Plan Supplement.

189.    "*GUC Oversight Administrator Costs*" means the reasonable and documented costs and expenses of the GUC Oversight Administrator, including the reasonable professionals' fees and expenses; provided that the Reorganized Debtors and the Plan Sponsors shall be permitted to challenge the reasonableness of the fees and expenses before the Bankruptcy Court.

190.    "*GUC Settlement Procedures*" means the procedures governing the rights, and duties of the GUC Oversight Administrator with respect to the objection to, estimation, Allowance of, or

distribution mechanics in respect of, General Unsecured Claims to be filed as part of the Plan Supplement, which shall be reasonably acceptable to the Debtors, the Committee, and the Plan Sponsors.

191. "*HC Limited*" means HC Limited Partnership.

192. "*HCVP*" means Hertz Canada Vehicles Partnership.

193. "*Herc Documents*" means that certain Separation and Distribution Agreement, dated as of June 30, 2016, between Hertz Parent and Herc Holding Inc. and all other documents executed in connection therewith or related thereto.

194. "*Herc Parties*" means Herc Holding Inc. and any of its Affiliates, successors, or assigns.

195. "*Hertz Australia*" means Hertz Australia Pty. Limited (ACN 004 407 087).

196. "*Hertz Corp.*" means The Hertz Corporation.

197. "*Hertz Canada*" means Hertz Canada Limited.

198. "*Hertz Parent*" means Hertz Global Holdings, Inc.

199. "*HHN*" means Hertz Holdings Netherlands B.V. or any Entity into which Hertz Holdings Netherlands B.V. merges prior to the Effective Date, including Hertz Holdings Netherlands II B.V.

200. "*HHN 4.125% Unsecured Notes*" means the senior notes due 2021 issued pursuant to the HHN 4.125% Unsecured Notes Indenture.

201. "*HHN 4.125% Unsecured Notes Documents*" means, collectively, the HHN 4.125% Unsecured Notes Indenture, the HHN 4.125% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the HHN 4.125% Unsecured Notes.

202. "*HHN 4.125% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of September 22, 2016, for the HHN 4.125% Unsecured Notes by and among HHN and HUK, as co-issuers, Hertz Corp., as Parent Guarantor, the subsidiary guarantors from time to time parties thereto, as guarantors, Wilmington Trust SP Services (London) Limited, solely in its capacity as trustee, Deutsche Bank AG, London Branch, as Paying Agent and Deutsche Bank Luxembourg S.A., as Registrar, Transfer Agent and Authenticating Agent.

203. "*HHN 5.500% Unsecured Notes*" means the senior notes due 2023 issued pursuant to the HHN 5.500% Unsecured Notes Indenture.

204. "*HHN 5.500% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of March 23, 2018, for the HHN 5.500% Unsecured Notes by and among HHN and HUK, as co-issuers, Hertz Corp., as Parent Guarantor, the subsidiary guarantors from time to time parties thereto, as guarantors, Wilmington Trust SP Services (London) Limited, solely in its capacity as trustee, Deutsche Bank AG, London Branch, as Paying Agent and Deutsche Bank Luxembourg S.A., as Registrar, Transfer Agent and Authenticating Agent.

205.    "*HHN 5.500% Unsecured Notes Documents*" means, collectively, the HHN 5.500% Unsecured Notes Indenture, the HHN 5.500% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the HHN 5.500% Unsecured Notes.

206.    "*HHN Notes*" means (i) the HHN 4.125% Unsecured Notes and (ii) the HHN 5.500% Unsecured Notes.

207.    "*HHN Notes Documents*" means (i) the HHN 5.500% Unsecured Notes Documents and (ii) the HHN 4.125% Unsecured Notes Documents.

208.    "*HHN Notes Guarantee Claims*" means, collectively, all Claims against Hertz Corp. and the Subsidiary Guarantors arising from or related to the HHN Notes Documents, including their guarantee of the HHN 4.125% Unsecured Notes and the HHN 5.500% Unsecured Notes.

209.    "*HHN Notes Indentures*" means, collectively, (i) the HHN 4.125% Unsecured Notes Indenture and (ii) the HHN 5.00% Unsecured Notes Indenture.

210.    "*HHN Notes Paying Agent*" means Deutsche Bank AG, London Branch, in its capacity as paying agent under each series of the HHN Notes, including any successor thereto.

211.    "*HHN Notes Trustee*" means Wilmington Trust SP Services (London) Limited, in its capacity as trustee under each series of the HHN Notes, including any successor thereto.

212.    "*HHN Notes Trustee Charging Lien*" means any Lien or other priority of payment to which the HHN Notes Trustee is entitled under the HHN Notes Documents against distributions to be made to Holders of HHN Notes Guarantee Claims for payment of any HHN Notes Trustee Fees and Expenses.

213.    "*HHN Notes Trustee Fees and Expenses*" means the reasonable and documented fees, costs, and expenses incurred by the HHN Notes Trustee that are required to be paid under the HHN Notes Documents.

214.    "*HHN Restructuring*" means the restructuring described in Article IV.L, infra, and any other related transactions in connection therewith.

215.    "*HIL*" means Hertz International Limited.

216.    "*HIL Facility*" means the direct lending facility provided by certain of the Plan Sponsors or their affiliates to HIL prior to the Effective Date.

217.    "*Holder*" means an Entity holding a Claim or an Interest, as applicable, each solely in its capacity as such.

218.    "*HUK*" means Hertz U.K. Receivables Ltd.

219.    "*HVF*" means Hertz Vehicle Financing LLC.

220.    "*HVF II*" means Hertz Vehicle Financing II LP.

221.    "*HVF II Base Indenture*" means that certain Amended and Restated Base Indenture (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of October 31, 2014, between HVF II, the HVF II Trustee.

222.    "*HVF II Collateral*" means the collateral as defined in the HVF II Base Indenture, the HVF II Group I Supplement, and the HVF II Series Supplements.

223.    "*HVF II Collateral Agency Agreement*" means the Fourth Amended and Restated Collateral Agency Agreement (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of November 25, 2013, between HVF, Hertz General Interest, LLC, DTG Operations, Inc., Hertz Corp., the financing sources party thereto from time to time, the beneficiaries party thereto from time to time, and the grantors party thereto from time to time.

224.    "*HVF II Facility*" means the asset-backed securitization facility issued pursuant to the HVF II Facility Documents.

225.    "*HVF II Facility Documents*" means the HVF II Base Indenture, the HVF II Group I Supplement, the HVF II Series Supplements, the HVF II Notes and all other documents related to the HVF II Notes or the HVF II Collateral.

226.    "*HVF II Group I Supplement*" means that certain Amended and Restated Group I Supplement to the HVF II Base Indenture, dated as of October 31, 2014 (as amended by Amendment No. 1 thereto, dated as of June 17, 2015, and as further amended, modified or supplemented from time to time, exclusive of Series Supplements), between HVF II and the HVF II Trustee.

227.    "*HVF II Lenders*" means the Holders of the HVF II Notes.

228.    "*HVF II MTN Series Supplements*" means collectively, the HVF II Series 2015-3 Supplement, the HVF II Series 2016-2 Supplement, the HVF II Series 2016-4 Supplement, the HVF II Series 2017-1 Supplement, the HVF II Series 2017-2 Supplement, the HVF II Series 2018-1 Supplement, the HVF II Series 2018-2 Supplement, the HVF II Series 2018-3 Supplement, the HVF II Series 2019-1 Supplement, the HVF II Series 2019-2 Supplement, and the HVF II Series 2019-3 Supplement.

229.    "*HVF II Notes*" means the Rental Car Asset Backed Notes issued by HVF II and authenticated by or on behalf of the HVF II Trustee pursuant to the HVF II Series Supplements.

230.    "*HVF II Notes Repayment Date*" has the meaning set forth in <u>Article IV.H</u>.

231.    "*HVF II Obligations*" means the non-contingent contractual obligations arising under or with respect to the HVF II Notes, including such amounts payable pursuant to the waterfalls in Article VII of the Series 2013-G1 Supplement, Article V of the HVF II VFN Supplement, Article V of each of the MTN Series Supplements and Article VII of the HVF II Group I Supplement, collateral agent fees payable pursuant to Section 5.8 of the HVF II Collateral Agency Agreement, and any other amounts under the HVF Facility Documents or HVF II Facility Documents that would be payable in Cash in an ordinary course repayment and termination of such facilities.

232.    "*HVF II Refinancing Steps Document*" means a document to be filed with the Plan Supplement that describes the sequence of transactions required to refinance the HVF II Facility and HVIF Facility, if applicable, and provide payment in full of the HVF II Obligations and HVIF Obligations, if applicable.

233.    "*HVF II Series 2015-3 Supplement*" means the Series 2015-3 Supplement to the HVF II Group I Supplement, dated as of October 7, 2015, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

234.    "*HVF II Series 2016-2 Supplement*" means the Series 2016-2 Supplement to the HVF II Group I Supplement, dated as of February 11, 2016, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

235.    "*HVF II Series 2016-4 Supplement*" means the Series 2016-4 Supplement to the HVF II Group I Supplement, dated as of June 8, 2016, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

236.    "*HVF II Series 2017-1 Supplement*" means the Series 2017-1 Supplement to the HVF II Group I Supplement, dated as of September 20, 2017, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

237.    "*HVF II Series 2017-2 Supplement*" means the Series 2017-2 Supplement to the HVF II Group I Supplement, dated as of September 20, 2017, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

238.    "*HVF II Series 2018-1 Supplement*" means the Series 2018-1 Supplement to the HVF II Group I Supplement, dated as of January 24, 2018, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

239.    "*HVF II Series 2018-2 Supplement*" means the Series 2018-2 Supplement to the HVF II Group I Supplement, dated as of June 27, 2018, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

240.    "*HVF II Series 2018-3 Supplement*" means the Series 2018-3 Supplement to the HVF II Group I Supplement, dated as of June 27, 2018, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

241.    "*HVF II Series 2019-1 Supplement*" means the Series 2019-1 Supplement to the HVF II Group I Supplement, dated as of February 6, 2019, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

242.    "*HVF II Series 2019-2 Supplement*" means the Series 2019-2 Supplement to the HVF II Group I Supplement, dated as of May 29, 2019, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

243.    "*HVF II Series 2019-3 Supplement*" means the Series 2019-3 Supplement to the HVF II Group I Supplement, dated as of November 26, 2019, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

244.    "*HVF II Series Supplements*" means collectively, the HVF II VFN Supplement and the HVF II MTN Series Supplements.

245.    "*HVF II Trustee*" means The Bank of New York Mellon Trust Company, N.A., solely in its role as trustee under the HVF II Indenture.

246.    "*HVF II VFN Supplement*" means that certain Sixth Amended and Restated Series 2013-A Supplement to the HVF II Group I Supplement, dated as of February 21, 2020, by and among Deutsche Bank AG, New York Branch, HVF II, the HVF II Trustee, Hertz Corp., certain committed note purchasers party thereto from time to time, certain conduit investors party thereto from time to time, and certain funding agents for the investor groups party thereto from time to time.

247. "*HVF III*" means a new asset backed securitization facility to issue notes to fund its purchase of vehicles to be used in the Debtors and Reorganized Debtors' rental car business, which shall be materially consistent with the Plan and otherwise in form and substance acceptable to the Debtors and the Plan Sponsors in good faith.

248. "*HVF III Documents*" means the financing documents to be entered into in connection with the HVF III (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents), which shall be materially consistent with the Plan and otherwise acceptable to the Debtors and the Plan Sponsors in good faith.

249. "*HVF Base Indenture*" means the Fourth Amended and Restated Base Indenture (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of November 25, 2013, between HVF and the HVF Trustee.

250. "*HVF Claims*" means any Claims against any Debtor or any Affiliate of a Debtor pursuant to, arising out of, or related to the HVF Master Lease Agreement, any other HVF Facility Document, or any HVF II Facility Document, including any HVF Master Lease Administrative Claim.

251. "*HVF Facility Documents*" means the HVF Base Indenture, the Series 2013-G1 Supplement, the Series 2013-G1 Note, the HVF Master Lease Agreement, and all other documents related to the Series 2013-G1 Note or the Series 2013-G1 Collateral.

252. "*HVF Indenture*" means collectively the HVF Base Indenture and the Series 2013-G1 Supplement.

253. "*HVF Master Lease Administrative Claims*" means any Claim against the Debtors under the HVF Master Lease Agreement that arose after the Petition Date and is owed but unpaid pursuant to the HVF Master Lease Agreement, including the Casualty Superpriority Administrative Expense Claim.

254. "*HVF Master Lease Agreement*" is that certain Amended and Restated Master Motor Vehicle Operating Lease and Servicing Agreement (Series 2013-G1) dated as of October 31, 2014 (as amended by Amendment No. 1 thereto, dated as of February 22. 2017, and as further amended, modified or supplemented from time to time), by and among HVF, in its capacity as lessor, Hertz Corp., in its capacity as lessee, in its capacity as servicer and in its capacity as guarantor, DTG Operations, Inc., in its capacity as lessee and those permitted leases from time to time becoming lessees thereunder.

255. "*HVF Trustee*" means The Bank of New York Mellon Trust Company, N.A., solely in its capacity as trustee under the HVF Indenture.

256. "*HVIF*" means Hertz Vehicle Interim Financing, LLC.

257. "*HVIF Administrative Agent*" means Deutsche Bank AG, New York Branch, as administrative agent under the Interim Fleet Financing Facility.

258. "*HVIF Obligations*" means the non-contingent contractual obligations with respect to the Interim Fleet Financing Facility Documents, including the Interim Fleet Financing Notes.

259. "*HVIF Trustee*" means The Bank of New York Mellon Trust Company, N.A., as Trustee and Securities Intermediary under the Interim Fleet Financing Facility Documents.

260.    "*Impaired*" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

261.    "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors and officers that are currently employed by, or serving on the board of directors of, any of the Debtors as of the date immediately prior to the Effective Date, and the employees, attorneys, accountants, investment bankers, and other professionals and agents that are currently employed by any of the Debtors as of the date immediately prior to the Effective Date, each of the foregoing solely in their capacity as such.

262.    "*Ineligible Existing Hertz Shareholder*" means each Holder of an Allowed Existing Hertz Parent Interest on the Record Date (as such terms are defined in the Rights Offering Procedures) that is not an Eligible Existing Hertz Shareholder.

263.    "*Initial Allowed GUC Claim List*" means a list to be delivered by the Debtors to the GUC Oversight Administrator on or before the Effective Date setting forth (i) all of the General Unsecured Claims that the Debtors have concluded (in consultation with the Committee) should be Allowed as of such date and (ii) the undisputed portion of any Disputed General Unsecured Claims which the Debtors have reviewed and determined (in consultation with the Committee) such amount is undisputed prior to the Effective Date.

264.    "*Initial Distribution Date*" means the date on which the Reorganized Debtors or the Distribution Agent shall make initial distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date.

265.    "*Initial GUC Distribution*" means a Cash distribution on the Effective Date or as soon thereafter as practicable to the Holders of General Unsecured Claims identified as Allowed or partially undisputed on the Initial GUC Allowed Claim List in an amount equal to eighty-two percent (82%) of the Allowed amount of such Allowed General Unsecured Claim (or Allowed undisputed portion thereof).

266.    "*Insurance Policies*" means any and all known and unknown insurance policies or contracts that have been issued at any time to, or that provide coverage in any capacity to, the Debtors or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the first named insured, a named insured or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, and all agreements, documents or instruments related thereto, including but not limited to, the D&O Liability Insurance Policies and/or any agreements with third-party administrators.

267.    "*Insurance Programs*" has the meaning ascribed to such term in the *Order (I) Authorizing Assumption of the Insurance Program with the Chubb Companies, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 898].

268.    "*Insured Claim*" means any Claim against a Debtor for which any Debtor is entitled to coverage, indemnification, reimbursement, contribution or other payment under an Insurance Policy.

269.    "*Insurer*" means any company or other entity that issued any Insurance Policies, any third-party administrators of claims against the Debtors or asserted under the Insurance Policies, and any respective predecessors and/or affiliates thereof.

270.    "*Intercompany Claims*" means, collectively, (i) Intercompany Debtor Claims and (ii) Intercompany Subsidiary Claims.

271.    "*Intercompany Debtor Claims*" means any Claim held by a Debtor against any other Debtor.

272.    "*Intercompany Interest*" means an Interest held by a Debtor in another Debtor or a non-Debtor subsidiary.

273.    "*Intercompany Subsidiary Claims*" means any Claim of a non-Debtor direct or indirect subsidiary of Hertz Parent against any Debtor.

274.    "*Intercreditor Agreement*" means that certain intercreditor agreement (as amended, restated, supplemented, or otherwise modified from time to time) dated as of June 6, 2017, by and between the First Lien Agent and the Second Lien Note Trustee.

275.    "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security, and any Subordinated 510(b) Interests.

276.    "*Interim Fleet Financing Administrative Claims*" means any and all Administrative Claims arising under or related to the Interim Fleet Financing Debtor Facility Documents.

277.    "*Interim Fleet Financing Back-Up Administrative Agreement*" means that certain HVIF Back-Up Administrative Agreement dated as of January 22, 2021 by and among Hertz Corp., HVIF, Lord Securities Corporation and the HVIF Trustee.

278.    "*Interim Fleet Financing Back-Up Disposition Agent Agreement*" means that certain HVIF Back-Up Disposition Agreement dated as of January 22, 2021 by and among defi AUTO, LLC, Hertz Corp., and the HVIF Trustee.

279.    "*Interim Fleet Financing Base Indenture*" means that certain Base Indenture (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of November 25, 2020 between HVIF, Hertz Corp., the HVIF Administrative Agent, Apollo Capital Management, L.P., the holders of the Interim Fleet Financing Notes and the HVIF Trustee.

280.    "*Interim Fleet Financing Debtor Facility Documents*" means the Interim Fleet Financing Indenture, the Interim Fleet Financing Supplemental Indenture, the Interim Fleet Financing Facility Master Lease Agreement, the Interim Fleet Financing Back-Up Administrative Agreement, the Interim Fleet Financing Back-Up Disposition Agent Agreement and any other agreements, documents and instruments executed by any Debtor in connection therewith.

281.    "*Interim Fleet Financing Facility*" means the asset-backed securitization facility issued pursuant to the Interim Fleet Financing Facility Documents.

Case 20-11218-MFW    Doc 4667    Filed 05/12/21    Page 30 of 107

282.    "*Interim Fleet Financing Facility Documents*" means the Interim Fleet Financing Debtor Documents, the Interim Fleet Financing Notes and any other agreements, instruments and documents executed in connection therewith.

283.    "*Interim Fleet Financing Facility Master Lease Agreement*" means that certain Master Motor Vehicle Operating Lease and Servicing Agreement (HVIF) dated as of November 25, 2020 among HVIF, Hertz Corp. and DTG Operations, Inc.

284.    "*Interim Fleet Financing Indenture*" means, collectively, the Interim Fleet Financing Base Indenture and Series 2020-1 Supplement.

285.    "*Interim Fleet Financing Lenders*" means the Holders of the Interim Fleet Financing Notes.

286.    "*Interim Fleet Financing Notes*" means the Series 2020-1 notes issued pursuant to the 2020-1 Series Supplement.

287.    "*Interim Fleet Financing Supplemental Indenture*" means the Series 2020-1 Supplement to the Interim Fleet Financing Base Indenture.

288.    "*Interim HVF Master Lease Settlement Orders*" means the First Interim HVF Master Lease Settlement Order and the Second Interim HVF Master Lease Settlement Order.

289.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

290.    "*Knighthead*" means certain funds and accounts managed or advised by Knighthead Capital Management, LLC or one of its Affiliates.

291.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

292.    "*Lombard Vehicle Financing Facility Agreement*" means that certain agreement relating to the vehicle funding facilities (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated February 7, 2013, by and between Hertz (U.K.) Limited and Lombard North Central Plc.

293.    "*Lombard Vehicle Financing Facility*" means the vehicle funding facility issued pursuant to the Lombard Vehicle Financing Facility Documents.

294.    "*Lombard Vehicle Financing Facility Documents*" means, collectively, the Lombard Vehicle Financing Facility Agreement, the Lombard Vehicle Financing Facility Guarantee, and all related agreements and documents executed by any of the Debtors in connection with the Lombard Vehicle Financing Facility Agreement.

295.    "*Lombard Vehicle Financing Facility Guarantee*" means that certain Guarantee (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated February 7, 2013, by Hertz Corp. in favor of Lombard North Central Plc with respect to the Lombard Vehicle Financing Facility Agreement.

296.    "*Lombard Vehicle Financing Facility Guarantee Claims*" means all Claims of a Debtor arising from or related to the Lombard Vehicle Financing Facility Documents.

297.    "*Management Equity Incentive Plan*" means the post-Effective Date management equity incentive plan implemented and approved by the Reorganized Hertz Parent Board in accordance with the MIP Term Sheet.

298.    "*MIP Term Sheet*" means the term sheet describing the terms and conditions of the Management Equity Incentive Plan, which shall be reasonably acceptable to the Plan Sponsors.

299.    "*New Money Investment*" means Cash in an amount equal to $5,915,941,666.67.

300.    "*New Organizational Documents*" means the Reorganized Hertz Parent Organizational Documents and Reorganized Debtor Organizational Documents, including the New Registration Rights Agreement, which shall be acceptable to the Debtors and the Plan Sponsors.

301.    "*New Registration Rights Agreement*" means the registration rights agreement or other similar agreement with respect to Reorganized Hertz Parent, which shall be acceptable to the Debtors and the Plan Sponsors.

302.    "*New Reorganized Corporate Debt*" means the Exit Term Loan Facility and the Exit Revolving Credit Facility.

303.    "*New Warrants*" means the warrants referenced in the term sheet attached as **Exhibit A** hereto.

304.    "*New Warrants Agreement*" means that certain agreement providing for, among other things, the issuance of the New Warrants by the Reorganized Debtors, which shall contain terms and conditions consistent with the term sheet attached as **Exhibit A** hereto and shall otherwise be in form and substance reasonably acceptable to the Plan Sponsors and the Debtors.

305.    "*Non-Obligor Debtors*" means (i) Hertz Global Holding, Inc.; (ii) CMGC Canada Acquisition ULC; (iii) Hertz Aircraft, LLC; (iv) Donlen FSHCO Company; (v) Hertz Canada Limited; (vi) Donlen Mobility Solutions, Inc.; and (vii) Donlen Fleet Leasing Ltd.

306.    "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim; or (ii) a Priority Tax Claim.

307.    "*Other Secured Claim*" means any Secured Claim against any Debtor, including any Secured Tax Claim, other than a (i) First Lien Claim; (ii) Second Lien Note Claim; and (iii) DIP Claim, unless otherwise classified in Article III.B.

308.    "*PBGC*" means Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and agency created under Title IV of ERISA.

309.    "*Pension Plans*" means collectively, (i) the Defined Benefit Plan, (ii) Retirement Plan for the Employees of Puerto Ricancars, Inc. and Related Companies Residing in the Commonwealth of Puerto Rico, and (iii) Retirement Plan for Employees of Puerto Ricancars, Inc. and Related Companies Residing in St. Thomas, U.S. Virgin Islands.

310.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

311.    "*Petition Date*" is May 22, 2020.

312.    "*Plan*" means this *Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and its Debtor Affiliates* (including the Plan Supplement and all exhibits hereto and thereto), as the same may be amended, modified, supplemented or amended and restated from time to time.

313.    "*Plan Sponsors*" means each of (i) Apollo, (ii) Knighthead, and (iii) Certares.

314.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each of which shall be in form and substance materially consistent with this Plan, the Plan Support Agreement and the Equity Commitment Documents, and otherwise acceptable to the Plan Sponsors and the Debtors, as may be amended, modified, or supplemented from time to time, including, as applicable (i) Reorganized Hertz Parent Organizational Documents; (ii) Reorganized Hertz Corp. Organizational Documents; (iii) the Rejected Executory Contracts and Unexpired Leases Schedule; (iv) the Assumed Executory Contracts and Unexpired Leases Schedule; (v) the identity of the members of the Reorganized Hertz Parent Board and executive management for Hertz Parent; (vi) the identity of the members of the Reorganized Hertz Corp. Board and executive management for Hertz Corp.; (vii) Schedule of Retained Causes of Action; (viii) the MIP Term Sheet; (ix) the Exit Credit Agreement; (x) the New Registration Rights Agreement; (xi) the Restructuring Transactions Memorandum; (xii) the ADR Procedures; (xii) the GUC Settlement Procedures; (xiii) the certificates of designation and other documents governing the Preferred Stock; and (xiv) the HVF II Refinancing Steps Document.  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (i) through (xiv), as applicable.  The Debtors shall be entitled to amend such documents in accordance with their respective terms and <u>Article X</u> of this Plan through and including the Effective Date subject to the consent of the Plan Sponsors.

315.    "*Plan Support Agreement*" means that certain Plan Support Agreement by and among Hertz Parent and each of the Debtors identified on the signature pages thereto and the Equity Commitment Parties, as the same may be amended, modified, supplemented, or amended and restated from time to time in accordance with its terms.

316.    "*Plan Support Party*" means any party that executes a joinder to the Plan Support Agreement.

317.    "*Preferred Stock*" means the new preferred stock issued to certain Equity Commitment Parties pursuant to the Equity Commitment Documents.

318.    "*Prepetition Debt Documents*" means, collectively, the (i) First Lien Loan Documents, (ii) Second Lien Note Documents, (iii) the Unsecured Notes Documents, (iv) the ALOC Facility Documents, (v) the Lombard Vehicle Financing Facility Documents, (vi) the 7.000% Unsecured Promissory Notes Documents, (vii) the European ABS Documents, and (viii) any guarantee of the HHN Notes by the Debtors.

319.    "*Prepetition KERP Program*" means the Key Employee Retention Letter Agreements executed on or about May 2020.

320.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

321.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

28

322.    "*Professional*" means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

323.    "*Professional Fee Claims*" means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date through the Effective Date.

324.    "*Professional Fee Claims Estimate*" means the aggregate unpaid Professional Fee Claims through the Effective Date as estimated in accordance with Article II.E.2.

325.    "*Professional Fee Escrow*" means an escrow account established and funded pursuant to Article II.E.3.

326.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

327.    "*Quarterly Distribution Date*" means the first Business Day after the end of each quarterly calendar period (*i.e.*, March 31, June 30, September 30, and December 31 of each calendar year) occurring after the Effective Date.

328.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

329.    "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, included in the Plan Supplement in consultation with the Committee, as may be amended by the Debtors from time to time in consultation with the Committee, and which shall be in form and substance acceptable to the Plan Sponsors in good faith.

330.    "*Released Party*" means each of the following in their capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) each of the Debtors' Estates; (iv) each of the Plan Sponsors; (v) the Committee; (vi) each of the Committee Members, solely in its capacity as a Committee Member; (vii) each of the Equity Commitment Parties; (viii) the Unsecured Notes Trustees; (ix) the 7.000% Unsecured Promissory Notes Trustee; (x) the ABS Released Parties; (xi) the Plan Support Parties; and (xii) with respect to each of the foregoing Entities in clauses (i) through (xi), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in its capacity as such; provided, that notwithstanding anything set forth above, (a) the Clawback Defendants, (b) Accenture LLP and its Affiliates, (c) the Herc Parties (solely with respect to Claims arising from the Herc Documents), (d) the Donlen Debtors and their direct and indirect subsidiaries (solely with respect to Claims arising from the Donlen Documents), and (e) the Specified Prepetition KERP Participants, solely with respect to amounts owed pursuant to the terms of the Prepetition KERP Program, shall not be Released Parties.  Notwithstanding the foregoing, any Person or Entity that opts out of the releases shall not be a Released Party.

331.    "*Releasing Party*" means each of the following in their capacity as such: (i) each of the Plan Sponsors; (ii) each of the Equity Commitment Parties; (iii) the Unsecured Notes Trustees; (iv) the 7.000% Unsecured Promissory Notes Trustee; (v) the ABS Released Parties; (vi) the Plan Support Parties; (vii) all Holders of Unimpaired Claims or Interests who do not File a timely objection to the third party releases provided for in Article VIII.D (provided that, for the avoidance of doubt, Holders of Unimpaired Claims or Interests that timely file an objection to the third party releases provided pursuant to Article VIII.D shall not be Releasing Parties); (viii) all Holders of Administrative Expense Claims and Priority Tax Claims that do not hold Claims or Interests in any Class that do not File a timely objection to the third party releases provided for in Article VIII.D of the Plan (provided, that, for the avoidance of doubt, Holders of Administrative Expense Claims and Priority Tax Claims that do not hold Claims or Interests in any Class that timely File an objection to the third party releases provided pursuant to Article VIII.D shall not be Releasing Parties); (ix) all Holders of Claims or Interests that vote to accept the Plan; (x) all Holders of Claims or Interests that are entitled to vote on the Plan who vote to reject the Plan and do not affirmatively opt out of the third party releases provided for in Article VIII.D by checking the box on the applicable Ballot indicating that they opt not to grant such releases in the Plan submitted on or before the Voting Deadline; and (xi) with respect to each of the foregoing Entities in clauses (i) through (x), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in its capacity as such.

332.    "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including Reorganized Hertz Parent and Reorganized Hertz Corp.

333.    "*Reorganized Debtor Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each Reorganized Debtor, all in form and substance acceptable to the Debtors and the Plan Sponsors in good faith.

334.    "*Reorganized Hertz Corp.*" means reorganized Hertz Corp., or any successors thereto, by merger, consolidation, or otherwise on or after the Effective Date.

335.    "*Reorganized Hertz Corp. Board*" means the initial board of directors of Reorganized Hertz Corp. as identified in the Plan Supplement.

336.    "*Reorganized Hertz Corp. Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of Reorganized Hertz Corp., which forms shall be included in the Plan Supplement all in form and substance acceptable to the Debtors, and which shall be in form and substance acceptable to the Plan Sponsors in good faith.

337.    "*Reorganized Hertz Parent*" means reorganized Hertz Global Holdings, Inc., a Delaware corporation, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

338.    "*Reorganized Hertz Parent Board*" means the initial board of directors of Reorganized Hertz Parent, as identified in the Plan Supplement; provided, that at least a majority of the directors shall be appointed by the Plan Sponsors (other than Apollo).

339.    "*Reorganized Hertz Parent Common Interests*" means the single class of common stock of Reorganized Hertz Parent to be issued upon Consummation of the Plan.

340.    "*Reorganized Hertz Parent Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of Reorganized Hertz Parent, which forms shall be included in the Plan Supplement all in form and substance acceptable to the Debtors, and which shall be in form and substance acceptable to the Plan Sponsors in good faith.

341.    "*Requisite Consenting Investors*" shall have the meaning set forth in the Plan Support Agreement.

342.    "*Restructuring*" means the restructuring of the existing debt and other obligations of the Debtors and their non-Debtor Affiliates on the terms and conditions set forth in the Plan and Plan Supplement and consistent in all respects with the Plan Support Agreement and Equity Commitment Documents.

343.    "*Restructuring Transactions*" shall have the meaning set forth in Article IV.B hereof.

344.    "*Restructuring Transactions Memorandum*" means the memorandum outlining as necessary certain of the steps the Debtors and/or Reorganized Debtors shall take to implement the Restructuring Transactions and HHN Restructuring as set forth in the Plan and Plan Supplement which shall be consistent in all respects with the Plan and Equity Commitment Agreement.

345.    "*Rights Offering*" means that certain offering of rights pursuant to which each Holder of an Allowed Existing Hertz Parent Common Interests is entitled to receive Shareholder Subscription Rights to acquire, to the extent it is an Eligible Existing Hertz Shareholder, its Pro Rata share of $1,635,000,000.00 in Reorganized Hertz Parent Common Interests and each Holder of an Allowed Unsecured Funded Debt Claim is entitled to receive Bondholder Subscription Rights to acquire, to the extent it is an Eligible Unsecured Funded Debt Holder, its Pro Rata Share of the amount of such $1,635,000,000.00 in Reorganized Hertz Parent Common Interests not acquired by Holders of Allowed Existing Hertz Parent Common Interests after taking into account all exercised Shareholder Subscription Rights, all in accordance with the Equity Commitment Agreement and the Rights Offering Procedures.

346.    "*Rights Offering Backstop Commitment*" shall have the meaning set forth in the Stock Purchase Agreement.

347.    "*Rights Offering Procedures*" means, collectively, the procedures governing and for the implementation of the Rights Offering in a form acceptable to the Debtors and the Plan Sponsors, consistent with the Plan Support Agreement and the Equity Commitment Documents, and approved by the Bankruptcy Court.

348.    "*Schedule of Retained Causes of Action*" means a schedule of retained Causes of Action filed in connection with the Plan Supplement, in form and substance acceptable to the Debtors and the Plan Sponsors.

349.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors on August 11, 2020 [Docket Nos. 964-1023] pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as amended on November 21, 2020 [Docket

Nos. 1824, 1826-1880, 1882, 1884-1886, 1889] and April 14, 2021 [Docket Nos. 3892-3896], as the same may be further amended, modified, or supplemented from time to time.

350.    "*SEC*" means the United States Securities and Exchange Commission.

351.    "*Second Interim HVF Master Lease Settlement Order*" means the *Second Order Resolving Certain Matters Related to the HVF II Master Lease Agreement* [Docket No. 2489].

352.    "*Second Lien Indenture Trustee Fees*" means, collectively, to the extent not previously paid in connection with the Chapter 11 Cases, the reasonable and documented fees (including, without limitation, legal fees), costs, and expenses incurred by the Second Lien Note Trustees that are required to be paid under the Second Lien Note Documents.

353.    "*Second Lien Note Claims*" means all Claims against any Debtor arising from or based upon the Second Lien Note Indenture or any other Second Lien Note Document, which principal outstanding as of the Petition Date was in the aggregate amount equal to approximately $350,000,000.00, plus all accrued but unpaid interest (including postpetition interest) at the applicable rate, costs, fees, indemnities, Second Lien Indenture Trustee Fees, and any Claims against the Debtors not duplicative of the foregoing, due, owing, and payable to the Second Lien Note Trustee, the Holders of Second Lien Note Claims, or their professionals pursuant to the Cash Collateral Order, including any professionals' fees and expenses.

354.    "*Second Lien Note Documents*" means the Second Lien Note Indenture and all related agreements and documents, including any collateral agreements, executed by any of the Debtors in connection with the Second Lien Note Indenture.

355.    "*Second Lien Note Indenture*" means that certain Indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of June 6, 2017, by and among Hertz Corp., as issuer, and the Second Lien Note Trustee.

356.    "*Second Lien Notes*" means the senior secured second priority notes issued by Hertz Corp. pursuant to the Second Lien Notes Indenture.

357.    "*Second Lien Note Trustee*" means BOKF, National Association, in its capacity as successor trustee and collateral agent under the Second Lien Note Indenture and the other Second Lien Note Documents, including any successor thereto.

358.    "*Second Lien Note Trustee Charging Lien*" means any Lien or other priority of payment to which the Second Lien Note Trustee is entitled under the Second Lien Note Indenture, or any ancillary documents, instruments, or agreements, against distributions to be made to Holders of Claims for payment of any Second Lien Indenture Trustee Fees.

359.    "*Secured*" means, when referring to a Claim, a Claim secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, in each case, as determined pursuant to section 506(a) of the Bankruptcy Code.

360. "*Secured Tax Claim*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

361. "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

362. "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

363. "*Senior Management Group*" means (i) Paul Stone, (ii) Kenny Cheung, (iii) M. David Galainena, (iv) Opal Perry, (v) Darren Arrington, (vi) Eric Leef, (vii) Laura Suenon Nestar, (viii) Joseph McPherson, (ix) Jeffrey Adams, (x) Robert Massengill, and (xi) Jayesh Patel.

364. "*Series 2013-G1 Collateral*" means the collateral defined in the Series 2013-G1 Supplement.

365. "*Series 2013-G1 Note*" means the Series 2013-G1 Variable Funding Rental Car Asset Backed Note issued by HVF and authenticated by or on behalf of the HVF Trustee pursuant to the Series 2013-G1 Supplement.

366. "*Series 2013-G1 Supplement*" means the Amended and Restated Series 2013-G1 Supplement to the HVF Base Indenture, dated as of October 31, 2014, between HVF and the HVF Trustee, as amended from time to time.

367. "*Shareholder Subscription Rights*" means the subscription rights distributed to Holders of Allowed Existing Hertz Parent Interests to participate in the Rights Offering offered in accordance with the Equity Commitment Agreement and the Rights Offering Procedures.

368. "*Shareholder Subscription Rights Auction*" means that certain auction conducted in accordance with the Rights Offering Procedures pursuant to which holders of Existing Hertz Parent Interests that are not Eligible Existing Hertz Shareholders may elect to have their Shareholder Subscription Rights sold pursuant to a competitive auction process.

369. "*Specified Causes of Action*" means the following Causes of Action: (i) *The Hertz Corporation v. Accenture LLP*, Case No. 19-3508 (S.D.N.Y.); (ii) *The Hertz Corporation v. Frissora et al.*, Case No. 2:19-cv-08927 (D.N.J.); (iii) *Hertz Global Holdings, Inc. v. National Union Fire Insurance of Pittsburgh and U.S. Specialty Insurance Company*, Case No. 19-06957 (S.D.N.Y.); and (iv) all Claims and Causes of Action against any Specified Prepetition KERP Participants solely with respect to amounts owed pursuant to the Prepetition KERP Program.

370. "*Specified Prepetition KERP Participants*" means any individual that (i) received a payment on account of the Prepetition KERP Program, (ii) is required by the terms of the Prepetition KERP Program to return all or a portion of the payment to the Debtors, and (iii) as of April 13, 2021, has failed to repay such amount to the Debtors.

371. "*Subordinated 510(b) Interests*" means any Claim related to any Interests against any Debtor that is subject to Section 510(b) of the Bankruptcy Code, whether arising from rescission of a purchase or sale of an Interest in the Debtors or an Affiliate of the Debtors, for damages arising from such transaction, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, or otherwise.

372.    "*Subscription Rights*" means, collectively, (i) the Shareholder Subscription Rights and (ii) the Bondholder Subscription Rights.

373.    "*Subsidiary Guarantors*" means Debtors (i) Thrifty Rent-A-Car System, LLC; (ii) Thrifty, LLC; (iii) Dollar Thrifty Automotive Group, Inc.; (iv) Firefly Rent A Car LLC; (v) Dollar Rent A Car, Inc.; (vi) Donlen Corporation; (vii) DTG Operations, Inc.; (viii) Hertz Car Sales LLC; (ix) DTG Supply, LLC; (x) Hertz Global Services Corporation; (xi) Hertz Local Edition Corp.; (xii) Hertz Local Edition Transporting, Inc.; (xiii) Hertz System, Inc.; (xiv) Smartz Vehicle Rental Corporation; (xv) Thrifty Car Sales, Inc.; (xvi) Hertz Technologies, Inc.; (xvii) TRAC Asia Pacific, Inc.; (xviii) Hertz Transporting, Inc.; and (xix) Rental Car Group Company, LLC.

374.    "*Substantial Contribution Claim*" means a Claim for compensation or reimbursement of costs and expenses relating to services rendered in making a substantial contribution in the Chapter 11 Cases pursuant to section 503(b)(3), (4), or (5) of the Bankruptcy Code.

375.    "*Tail D&O Policy*" means an insurance policy that provides sufficient liability insurance coverage for the six-year period following the Effective Date for the benefit of the Debtors' current and former directors, managers, officers, and employees on terms no less favorable to the directors, managers, officers, and employees than the Debtors' existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date, which is acceptable to the Debtors and of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.

376.    "*TCL Funding*" means TCL Funding Limited Partnership.

377.    "*Transaction Expenses*" means, collectively, all reasonable and documented out-of-pocket fees (including success fees, transaction fees, or similar fees) and expenses (including travel costs and expenses) of (i) Kirkland & Ellis LLP, (ii) Paul, Weiss, Rifkind, Wharton & Garrison, LLP, (iii) Klehr Harrison Harvey Branzburg LLP, (iv) Morris, Nichols, Arsht & Tunnell LLP, (v) Alvarez & Marsal Corporate Performance Improvement, LLC, (vi) Guggenheim Securities, LLC, (vii) Glenn Agre Bergman & Fuentes LLP, (vii) Pericles Capital Advisors, LLC, and (viii) any other accountants, financial advisors and other professionals, advisors, and consultants retained by the Plan Sponsors, Amarillo, or the Ad Hoc Equity Committee with the consent of the Debtors (such consent not to be unreasonably withheld), in each case solely to the extent incurred on behalf of the Plan Sponsors to implement the Restructuring Transactions.

378.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

379.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

380.    "*Unimpaired*" means, with respect to a Claim or a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

381.    "*Unsecured*" means, with respect to any Claim, any Claim that is not a Secured Claim, including, for the avoidance of doubt, (i) Unsecured Funded Debt Claims; (ii) HHN Notes Guarantee Claims; and (iii) General Unsecured Claims.

382.    "*Unsecured Funded Debt Claims*" means (i) the Unsecured Notes Claims, and (ii) the ALOC Facility Claims.

383.    "*Unsecured Noteholders*" means, collectively, (i) the 5.500% Unsecured Noteholders; (ii) the 6.000% Unsecured Noteholders; (iii) the 6.250% Unsecured Noteholders; and (iv) the 7.125% Unsecured Noteholders, each from time to time, in their capacity as such.

384.    "*Unsecured Notes*" means, collectively, (i) the 5.500% Unsecured Notes, (ii) the 6.000% Unsecured Notes, (iii) the 6.250% Unsecured Notes, and (iv) the 7.125% Unsecured Notes.

385.    "*Unsecured Notes Claims*" means, collectively, (i) the 5.500% Unsecured Note Claims; (ii) the 6.000% Unsecured Note Claims; (iii) the 6.250% Unsecured Note Claims; and (iv) the 7.125% Unsecured Note Claims.

386.    "*Unsecured Notes Documents*" means, collectively, (i) the 5.500% Unsecured Note Documents; (ii) the 6.000% Unsecured Note Documents; (iii) the 6.250% Unsecured Note Documents; and (iv) the 7.125% Unsecured Note Documents.

387.    "*Unsecured Notes Trustees*" means, collectively, (i) the 5.500% Unsecured Notes Trustee; (ii) the 6.000% Unsecured Notes Trustee; (iii) the 6.250% Unsecured Notes Trustee; and (iv) the 7.125% Unsecured Note Trustee.

388.    "*Unsecured Notes Trustees' Fees*" means, collectively, to the extent not previously paid in connection with the Chapter 11 Cases, the reasonable and documented fees, costs, and expenses (including, without limitation, legal fees) incurred by the Unsecured Notes Trustees that are required to be paid under the Unsecured Notes Documents.

389.    "*Unsubscribed Shares*" shall have the meaning ascribed to such term in the Equity Commitment Agreement.

390.    "*Voting Deadline*" means 4:00 p.m. (prevailing Eastern Time) on June 1, 2021, as specifically set forth in the Disclosure Statement Order, which is the deadline for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

B.    *Rules of Interpretation*

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy

Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (xii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Reorganized Debtors (in consultation with the Plan Sponsors), in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (xiv) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time*

        Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.      *Governing Law*

        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in the State of Delaware shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

E.      *Consultation, Information, Notice, and Consent Rights*

        Any and all consultation, information, notice, and consent rights of the Plan Sponsors, the Equity Commitment Parties, and the Committee set forth in the Plan Support Agreement, the Equity Commitment Agreement, or any Definitive Document, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, shall be incorporated herein by this reference and shall be fully enforceable as if stated herein.

        Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Plan Support Agreement, Equity Commitment Agreement, other Definitive Document, or herein shall not impair such rights or obligations.

F.      *Reference to Monetary Figures*

        All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.  Any conversion required to convert foreign currency to United States dollars shall be done using the applicable exchange rates on the Petition Date.

G.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

H.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, (i) Administrative Claims, including DIP Claims, HVF Master Lease Administrative Claims, Professional Fee Claims, Canadian Fleet Financing Administrative Claims, Interim Fleet Financing Administrative Claims, and postpetition Intercompany Claims, and (ii) Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in <u>Article III</u>.

A.      *Administrative Claims*

Except with respect to Professional Fee Claims, DIP Claims, HVF Master Lease Administrative Claims, Canadian Fleet Financing Administrative Claims, Interim Fleet Financing Administrative Claims, and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; <u>provided</u>, <u>that</u> if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, including postpetition rent owed pursuant to assumed Unexpired Leases, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

Except as otherwise provided in this <u>Article II.A</u> or the Claims Bar Date Order, and except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, HVF Master Lease Administrative Claims, or Transaction Expenses, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; <u>provided</u>, <u>that</u> the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business, including postpetition rent owed pursuant to assumed Unexpired Leases.

The Reorganized Debtors, in consultation with the Plan Sponsors, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.  The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any Administrative Claim no later than

the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

B.    *DIP Claims*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the aggregate amount of the then outstanding DIP Obligations (as defined in the DIP Order), including (i) the principal amount outstanding under the DIP Financing on such date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued and unpaid fees, expenses, and indemnification obligations payable under the DIP Loan Documents, including, the reasonable and documented fees and expenses of the attorneys and other advisors (including financial advisors) of the DIP Agent and the DIP Lenders to the extent provided in the DIP Loan Documents. Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall be indefeasibly paid in full, in Cash, by the Debtors on the Effective Date or such later date as the DIP Claims become due and payable pursuant to any agreement such Holder and the Debtors or the Reorganized Debtors. Distributions to Holders of DIP Claims shall be deemed completed when made to (or at the direction of) the DIP Agent, which shall be deemed to be the Holder of such Claims for purposes of distributions to be made hereunder. Once received by the DIP Agent, distributions shall be made as soon as practicable to the Holders of Allowed DIP Claims in accordance with the DIP Credit Agreement. Contemporaneously with the foregoing payment, the DIP Financing and the DIP Loan Documents shall be deemed canceled, all commitments under the DIP Loan Documents shall be deemed terminated, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Financing shall automatically terminate, all obligations of the Debtors or the Reorganized Debtors, as applicable, arising out of or related to the DIP Claims shall be automatically discharged and released and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders. The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors; provided, that any provisions of the "DIP Loan Documents" (as such term is defined in the DIP Order) governing the DIP Financing facility that by their terms survive the payoff and termination of such facility shall survive in accordance with the terms of such DIP Loan Documents. Notwithstanding anything to the contrary in this paragraph, the DIP Loan Documents shall survive to the extent necessary to preserve any rights of the DIP Agent (i) as against any money or property distributable to the Holders of DIP Claims, including any priority in respect of payment and (ii) to appear and be heard in the Chapter 11 Cases or in any proceeding relating to the Debtors in the Bankruptcy Court or any other court to enforce the respective obligations owed to the DIP Agent under the Plan.

Subsequent to the performance by the DIP Agent of its obligations under the Plan, the DIP Agent and its respective agents shall be relieved of all further duties and responsibilities related to the DIP Loan Documents upon the occurrence of the Effective Date, except with respect to such other rights and obligations of the DIP Agent (if any) that, pursuant to the express terms of the DIP Loan Documents, survive the termination of the DIP Loan Documents.

C.    *HVF Master Lease Administrative Claims*

The payment of the HVF II Obligations on the HVF II Notes Repayment Date shall constitute the full and final satisfaction, settlement, release, and discharge of each HVF Master Lease Administrative Claim against the Debtors.

D.    *Postpetition Fleet Financing Administrative Claims*

Each Reorganized Debtor shall assume all of its obligations under the Canadian Fleet Financing Debtor Documents to the extent of such obligations and, as of the Effective Date, such obligations shall become obligations of such Reorganized Debtor as provided in the Canadian Fleet Financing Debtor Documents according to their terms and shall be Unimpaired. Upon such assumption, all of the Canadian Fleet Financing Administrative Claims shall be deemed satisfied in full, including any Administrative Claims granted under section 364(c) of the Bankruptcy Code.

To the extent HVIF does not repay in full in Cash the then-outstanding obligations with respect to the Interim Fleet Financing Notes pursuant to Article IV.H of this Plan, each Reorganized Debtor shall assume all of its obligations under the Interim Fleet Financing Debtor Facility Documents to the extent of such obligations and, as of the Effective Date, such obligations shall become obligations of such Reorganized Debtor as provided in the Interim Fleet Financing Debtor Facility Documents according to their terms and shall be Unimpaired. Upon such assumption, all of the Interim Fleet Financing Administrative Claims shall be deemed satisfied in full, including any Administrative Claims granted under section 364(c) of the Bankruptcy Code.

E.    *Professional Fee Claims*

1.    Final Fee Applications

All final requests for allowance and payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court. Any objections to Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of final requests for allowance and payment of Professional Fee Claims.

2.    Professional Fee Claims Estimate

Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services compensable by the Debtors' Estates before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date; provided, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors, in consultation with the Plan Sponsors, shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

3.      Professional Fee Escrow

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash based on their evaluation of the Professional Fee Claims Estimates, and no Liens, Claims, or Interests shall encumber the Professional Fee Escrow in any way (whether on account of the New Reorganized Corporate Debt, or otherwise).  The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (ii) shall be held in trust for the Professionals and for no other Person or Entity until all Professional Fee Claims have been irrevocably paid in full; provided, that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors. Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; provided that the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow by the Reorganized Debtors without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

4.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors, the Distribution Agent, and the GUC Oversight Administrator (solely with respect to the GUC Oversight Administrator Costs, subject to the terms of this Plan), as applicable.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention, compensation for services rendered, or reimbursement for expenses incurred on or after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

F.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree (whether before or after the Effective Date) to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Summary of Classification*

All Claims and Interests, except for Administrative Claims, including DIP Claims, Canadian Fleet Financing Administrative Claims, Interim Fleet Financing Administrative Claims, HVF Master Lease Administrative Claims, Professional Fee Claims, Priority Tax Claims, Transaction Expenses, and postpetition Intercompany Claims are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests pursuant to the Plan is as set forth below. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.B. hereof.  The Plan shall constitute a separate Plan for each of the Debtors.  For all purposes under the Plan, each Class contains a sub-Class for each Debtor: (i) Classes 3, 4, 5, and 6 shall be vacant for each Debtor other than Hertz Corp., the Subsidiary Guarantors and Rental Car Intermediate Holdings, LLC, and (ii) Class 11 shall be vacant for each Debtor other than Hertz Parent.  Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Applicable Entities | Claim / Interest | Status | Voting Rights |
|---|---|---|---|---|
| 1 | Each Debtor | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Each Debtor | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | First Lien Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

| Class | Applicable Entities | Claim / Interest | Status | Voting Rights |
|-------|---------------------|------------------|--------|---------------|
| 4 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | Second Lien Note Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | Unsecured Funded Debt Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 6 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | HHN Notes Guarantee Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Each Debtor | General Unsecured Claims | Impaired | Entitled to Vote |
| 8 | Each Debtor | Prepetition Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed to Reject) |
| 9 | RESERVED | N/A | N/A | N/A |
| 10 | Each Debtor | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 11 | Hertz Parent | Existing Hertz Parent Interests | Impaired | Entitled to Vote |

B.    *Treatment of Claims and Interests*

    1.    Class 1 – Other Priority Claims

        a.    *Classification*: Class 1 consists of all Other Priority Claims against each Debtor.

        b.    *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to a less

42

favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).

c.    *Voting*: Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claim are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

a.    *Classification*: Class 2 consists of all Other Secured Claims against each Debtor.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each such Holder shall receive at the applicable Debtor's, or the applicable Reorganized Debtor's, discretion:

(i)    payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, payment shall be made in accordance with its terms in the ordinary course);

(ii)    Reinstatement of such Holder's Allowed Other Secured Claim;

(iii)    the applicable Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or

(iv)    such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

c.    *Voting*: Class 2 is Unimpaired under the Plan.  Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 - First Lien Claims

a.    *Classification*: Class 3 consists of all First Lien Claims against (i) Hertz Corp.; (ii) the Subsidiary Guarantors; and (iii) Rental Car Intermediate Holdings, LLC.

b.    *Allowance*: First Lien Claims shall be Allowed against Hertz Corp. and each Subsidiary Guarantor in the amount of $1,271,932,486.00, minus the First Lien Donlen Paydown Amount, plus letters of credit drawn after the Petition Date, plus the First Lien Hedge Claims, plus all accrued and unpaid interest (at the

43

non-default rate for Eurocurrency Loans (as defined in the First Lien Credit Agreement) and not including any interest on obligations to cash collateralize letters of credit, in each case, unless the Bankruptcy Court orders otherwise, including with respect to the applicable interest rate), costs, and fees, in each case owed under the First Lien Loan Documents, from the Petition Date through the Effective Date as required to render the First Lien Claims Unimpaired.

c.    *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed First Lien Claim shall receive payment in full, in Cash, of the unpaid portion of its liquidated Allowed First Lien Claim on the Effective Date and with respect to any unliquidated Claim with respect to undrawn letters of credit shall retain all legal and equitable rights with respect to such Claims until such letters of credit are released.

d.    *Voting*: Class 3 is Unimpaired under the Plan.  Each Holder of an Allowed First Lien Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed First Lien Claims are not entitled to vote to accept or reject the Plan.

4.    Class 4 – Second Lien Note Claims

a.    *Classification*: Class 4 consists of all Second Lien Note Claims against (i) Hertz Corp. and (ii) the Subsidiary Guarantors.

b.    *Allowance*: Second Lien Note Claims shall be Allowed against Hertz Corp. and each Subsidiary Guarantor in the amount of $362,750,694.00 plus all accrued and unpaid interest (including interest accruing after the Petition Date), Second Lien Indenture Trustee Fees, costs, and other fees, in each case owed under the Second Lien Note Documents, from the Petition Date through the Effective Date as required to render the Second Lien Note Claims Unimpaired.

c.    *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Second Lien Note Claim shall receive payment in full, in Cash of the Allowed amount of such Claim against Hertz Corp. and the Subsidiary Guarantors.

d.    *Voting*: Class 4 is Unimpaired under the Plan.  Each Holder of an Allowed Second Lien Note Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Second Lien Note Claims are not entitled to vote to accept or reject the Plan.

5.      Class 5 – Unsecured Funded Debt Claims

    a.      *Classification*: Class 5 consists of all Unsecured Funded Debt Claims against (i) Hertz Corp.; (ii) the Subsidiary Guarantors; and (iii) solely with respect to ALOC Facility Claims, Rental Car Intermediate Holdings, LLC.

    b.      *Allowance*:

        (i)      Unsecured Notes Claims shall be Allowed against Hertz Corp and the Subsidiary Guarantors in the amounts set forth below:

| Unsecured Funded Debt Claim | Allowed Amount |
|---|---|
| 5.500% Unsecured Note Claims | $804,522,222.00 |
| 6.000% Unsecured Note Claims | $926,700,000.00 |
| 6.250% Unsecured Note Claims | $503,211,806.00 |
| 7.125% Unsecured Note Claims | $511,083,333.00 |

        in each case, plus all accrued and unpaid interest at the applicable rate, costs, and other fees, in each case to the extent owed and Allowed from the Petition Date through the Effective Date as required to render the Unsecured Note Claims Unimpaired.

        (ii)      ALOC Facility Claims shall be Allowed against Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC only to the extent determined by the Bankruptcy Court and in no instance in more than an amount equal to the letters of credit drawn with respect to the ALOC Facility as of the Effective Date plus all accrued and unpaid interest at the applicable rate, costs, and other fees, in each case to the extent owed and Allowed, from the Petition Date through the Effective Date as required to render the ALOC Facility Claims Unimpaired.

    c.      *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Unsecured Funded Debt Claim against Hertz Corp., the Subsidiary Guarantors, and, as applicable, Rental Car Intermediate Holdings, LLC, shall receive payment in full, in Cash of the Allowed amount of such Claim.

    d.      *Voting*: Class 5 is Unimpaired under the Plan.  Each Holder of an Allowed Unsecured Funded Debt Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Unsecured Funded Debt Claims are not entitled to vote to accept or reject the Plan.

6.    Class 6 – HHN Notes Guarantee Claims

   a.    *Classification*: Class 6 consists of all HHN Notes Guarantee Claims against (i) Hertz Corp.; (ii) the Subsidiary Guarantors; and (iii) Rental Car Intermediate Holdings, LLC.

   b.    *Allowance*: The HHN Notes Guarantee Claims shall be Allowed against Hertz Corp., each Subsidiary Guarantor, and Rental Car Intermediate Holdings, LLC in an aggregate amount of $790,105,000.00 plus any accrued and outstanding interest, premiums, and fees, including the HHN Notes Trustee Fees and Expenses, in each case owed under the HHN Notes Documents, from the Petition Date through the Effective Date to the extent required to render the HHN Notes Guarantee Claims Unimpaired.

   c.    *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of an Allowed HHN Notes Guarantee Claim shall receive payment in full, in Cash, of the Allowed amount of such Claim against Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC.

   d.    *Voting*: Class 6 is Unimpaired under the Plan.  Each Holder of an Allowed HHN Notes Guarantee Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed HHN Notes Guarantee Claims are not entitled to vote to accept or reject the Plan.

7.    Class 7 – General Unsecured Claims

   a.    *Classification*: Class 7 consists of all General Unsecured Claims against a Debtor.

   b.    *Allowance*:  The 7.000% Unsecured Promissory Note Claims shall be Allowed against Hertz Corp. in an aggregate amount of $28,274,393.81, plus any other amounts that may be Allowed by the Bankruptcy Court.  The allowance of all other General Unsecured Claims will be determined pursuant to the terms of this Plan, the Bankruptcy Code, and other applicable law.

   c.    *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of an Allowed General Unsecured Claim against a Debtor shall receive the greater of (i) its Pro Rata share of the General Unsecured Recovery Cash Pool Amount (plus any proceeds received on account of the Specified Causes of Action) and (ii) an amount of Cash equal to eighty-two (82%) percent of the Allowed amount of such General Unsecured Claim, without regard to the particular Debtor against which such Claim is Allowed; provided, that, no Holder of an Allowed General Unsecured Claim shall receive a recovery that exceeds one hundred (100%) percent of the Allowed amount of its General Unsecured Claim.

      d.      *Voting*: Class 7 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

8.      Class 8 – Prepetition Intercompany Claims

      a.      *Classification*: Class 8 consists of all prepetition Intercompany Claims.

      b.      *Treatment*: Each prepetition Intercompany Claim shall be, at the option of Debtors or Reorganized Debtors as applicable (in consultation with the Plan Sponsors), either:

          (i)      Reinstated; or

          (ii)      canceled and released without any distribution on account of such Claims;

          provided, however, that Intercompany Claims of HIRE (Bermuda) Limited against Hertz Corp. shall be Reinstated.

      c.      *Voting*: Holders of Claims in Class 8 are conclusively presumed to have accepted the Plan or deemed to have rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively.  Therefore, such Holders are not entitled to vote or accept or reject the Plan.

9.      Class 9 - RESERVED

10.      Class 10 – Intercompany Interests

      a.      *Classification*:  Class 10 consists of all Intercompany Interests held by a Debtor in another Debtor.

      b.      *Treatment*: Intercompany Interests shall be Reinstated so as to maintain the organizational structure of the Debtors as such structure exists on the Effective Date unless implementation of the Restructuring requires otherwise.

      c.      *Voting*: Class 10 is Unimpaired under the Plan.  Each Holder of an Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.      Class 11 – Existing Hertz Parent Interests

      a.      *Classification*: Class 11 consists of all Existing Hertz Parent Interests.

      b.      *Treatment*: Except to the extent that a Holder of an Allowed Existing Hertz Parent Interest agrees to a similar or less favorable treatment of such Interest, on the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Interest, each Holder of an Allowed Existing Hertz Parent Interest shall receive:

(i) Cash in an amount equal to $1.53 per share of Existing Hertz Parent Interests held by such Holder; and

(ii) its Pro Rata share of:

  (1) three (3%) percent of total Reorganized Hertz Parent Common Interests, subject to dilution on account of the Management Equity Incentive Plan and New Warrants; and

  (2) the New Warrants; *provided* that an Eligible Existing Hertz Shareholder may elect to receive its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights instead of New Warrants by timely exercising such Subscription Rights in accordance with the Rights Offering Procedures prior to the Subscription Expiration Deadline (as defined in the Rights Offering Procedures); *provided*, *further* that any holder of Existing Hertz Parent Interests that is not an Eligible Existing Hertz Shareholder may elect prior to the Subscription Rights Expiration Deadline to have its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights sold pursuant to the Shareholder Subscription Rights Auction and receive its Pro Rata share of proceeds of the Shareholder Subscription Rights Auction instead of New Warrants.

 c. *Voting*: Class 11 is Impaired under the Plan. Each Holder of an Existing Hertz Parent Interest is entitled to vote to accept or reject the Plan.

C. *Special Provision Governing Unimpaired Claims*

  Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or otherwise Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or otherwise Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights and defenses with respect to any Reinstated Claim or otherwise Unimpaired Claim may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. **Notwithstanding anything in this paragraph to the contrary, and subject to the obligations of the First Lien Agent, Second Lien Note Trustee, and HHN Notes Trustee set forth in this Plan, the Debtors hereby acknowledge and agree that any Claim, Cause of Action, right of setoff, or other legal or equitable defense of the Debtors with respect to the First Lien Claims, the Second Lien Note Claims, and the HHN Notes Guarantee Claims that may exist as of the Effective Date or may have existed as of the Petition Date shall be released upon the payment in full of the Allowed First Lien Claims, Allowed Second Lien Note Claims, and Allowed HHN Notes Guarantee**

**Claims, respectively, pursuant to this Plan.** Nothing in the previous sentence shall release or otherwise impair the obligations of the First Lien Agent, the First Lien Lenders, the Second Lien Note Trustee, or the Holders of Second Lien Note Claims to release Liens or collateral as required by the Plan.

D.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.      *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.      *Separate Classification of Other Secured Claims*

Each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under this Plan.

G.      *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

H.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.      *No Substantive Consolidation*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

B.      *Restructuring Transactions; Effectuating Documents*

Prior to, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may take any and all actions as may be necessary or appropriate in the Debtors' reasonable discretion to effectuate the Restructuring Transactions described in, approved by, contemplated by, or necessary to effectuate the Plan, in accordance with the Plan Support Agreement, including: (i) the execution and

delivery of any New Organizational Documents, including any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, arrangement, continuance, dissolution, sale, purchase, or liquidation, in each case, containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of the New Organizational Documents, including any appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (v) the execution, delivery, and filing of the Exit Facility Documents; (vi) the execution and delivery of the HVF III Documents; (vii) the implementation of the HHN Restructuring and execution and delivery of any documents in connection therewith, (viii) the solicitation and implementation of the Rights Offering, (ix) the execution, delivery, and filing of the New Warrants, and (x) all other actions that the Debtors determine to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan (collectively, the "**Restructuring Transactions**"). The Restructuring Transactions shall be structured in a manner that takes into account the tax position of creditors, the Plan Sponsors, and the Reorganized Debtors.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

C.    *Sources of Consideration for Plan Distributions*

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtors shall fund distributions under the Plan with (i) Cash on hand; (ii) Cash proceeds from the New Money Investment; and (iii) the proceeds of the Exit Term Loan Facility.

D.    *New Money Investment*

    1.    Plan Sponsor Direct Equity Investment

On the Effective Date, in accordance with the Equity Commitment Documents and subject to the terms and conditions thereof, the Equity Commitment Parties shall fund the New Money Investment in exchange for Reorganized Hertz Parent Common Interests and Preferred Stock. As more fully set forth in the Equity Commitment Documents, the Equity Commitment Parties shall purchase an aggregate of (i) up to $4,415,941,666.67 of Reorganized Hertz Parent Common Interests and (ii) up to $1,500,000,000.00 of Preferred Stock (in each case subject to adjustment pursuant to the terms of the Equity Commitment Documents). Of the Reorganized Hertz Parent Common Interests to be purchased pursuant to the Equity Commitment Agreement, Amarillo will fund up to $1,987,000,000.00, which shall account for more than 42% of total Reorganized Hertz Parent Common Interests, after accounting for any dilution as set forth in the Equity Commitment Documents but subject to dilution on account of the Management Equity Incentive Plan and New Warrants. Additionally, certain of the Equity Commitment Parties shall receive premiums in an aggregate amount of $163,500,000.00 of Reorganized Hertz Parent Common Interests, as more fully set forth in the Equity Commitment Documents. The foregoing allocations may be adjusted before the Effective Date solely in accordance with the Equity Commitment Documents.

2.    <u>Rights Offering</u>

Following approval by the Bankruptcy Court of the Disclosure Statement and the Rights Offering Procedures, Hertz Parent shall conduct the Rights Offering in accordance with the Rights Offering Procedures and Equity Commitment Documents.  Instead of receiving New Warrants, each Holder of Existing Hertz Parent Interests may elect to be issued Shareholder Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its Pro Rata allocation of the Rights Offering to the extent it is an Eligible Existing Hertz Shareholder.  Such election shall be made if and when such Eligible Existing Hertz Shareholder exercises such Subscription Rights pursuant to the terms of the Rights Offering Procedures.  Each Holder of Allowed Unsecured Funded Debt Claims shall be issued Bondholder Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its Pro Rata allocation of the Rights Offering to the extent any such amounts remain unsubscribed and unfunded by Holders of Allowed Existing Hertz Parent Interests and the applicable Holder of an Allowed Unsecured Funded Debt Claim is an Eligible Unsecured Funded Debt Holder.  Any transfer of an Existing Hertz Parent Interest or Unsecured Funded Debt Claim shall include the applicable Subscription Rights.  In the event there are any Bondholder Subscription Rights available for distribution to Eligible Unsecured Funded Debt Holders, as a condition to and upon seeking to exercise such Bondholder Subscription Rights, the applicable Eligible Unsecured Funded Debt Holder shall be deemed to have released and irrevocably waived (and shall deliver a written waiver and release to that effect to the Debtors) any right to receive payment of any amounts on account of its Allowed Unsecured Funded Debt Claim (including interest, costs, fees, premiums, or any "make-whole" amounts) that exceeds the aggregate amount of the principal of such Unsecured Funded Debt Claim, interest accrued, but unpaid as of the Petition Date at the non-default rate, and postpetition interest accrued, but unpaid as of the Effective Date at the Federal Judgment Rate (and such release and waiver shall remain effective notwithstanding any failure by any Eligible Unsecured Funded Debt Holder to properly exercise such Bondholder Subscription Rights in accordance with the Rights Offering Procedures, including by failing to timely deliver the applicable purchase price).

The consummation of the Rights Offering is conditioned on the satisfaction or waiver (in accordance with the Equity Commitment Agreement) of all conditions specified in the terms of the Equity Commitment Documents.

Each Ineligible Existing Hertz Shareholder may elect prior to the Subscription Rights Expiration Deadline to have its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights sold pursuant to the Shareholder Subscription Rights Auction by submitting such election in accordance with the Rights Offering Procedures.  Such election shall include a minimum price at which such Ineligible Existing Hertz Shareholder will agree to sell its Subscription Rights (each a "**Minimum Auction Price**").

In addition to exercising their Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights, each Eligible Existing Hertz Shareholder may elect prior to the Subscription Rights Expiration Deadline to purchase available Shareholder Subscription Rights at the Shareholder Subscription Rights Auction by submitting such election in accordance with the Rights Offering Procedures.  Any such election will include the maximum amount and price per Shareholder Subscription Right such Eligible Existing Hertz Shareholder is willing to purchase at the Shareholder Subscription Rights Auction.  The Shareholder Subscription Rights Auction will conclude prior to the Effective Date in accordance with the Rights Offering Procedures.  If an Ineligible Existing Hertz Shareholder is unable to sell its Subscription Rights because its Minimum Auction Price is not met, such Ineligible Existing Hertz Shareholders shall be deemed to have elected to receive New Warrants instead of Subscription Rights and shall receive such New Warrants as provided in the Plan.

E.    *Issuance and Distribution of Reorganized Hertz Parent Common Interests and Preferred Stock*

The issuance of the Reorganized Hertz Parent Common Interests, Preferred Stock, and the New Warrants (including any shares of Reorganized Hertz Parent Common Interests issuable upon the valid conversion or exercise, as applicable, of the foregoing) in accordance with the Rights Offering Procedures and Equity Commitment Documents, the New Warrants Agreement, and this Plan shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

Any Entities' acceptance of Reorganized Hertz Parent Common Interests and Preferred Stock shall be deemed to be its agreement to be bound by the Reorganized Debtor Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms.  The Reorganized Debtor Organizational Documents, as applicable, shall be binding on all Entities receiving, and all holders of, the Reorganized Hertz Parent Common Interests and Preferred Stock (and their respective successors and assigns), whether any such Reorganized Hertz Parent Common Interests and Preferred Stock are received or to be received on or after the Effective Date, in each case, pursuant to the Plan and regardless of whether such Entity executes or delivers a signature page to the Reorganized Debtor Organizational Documents.

All of the shares of Reorganized Hertz Parent Common Interests and Preferred Stock and all of the New Warrants (including any shares of Reorganized Hertz Parent Common Interests issuable upon the valid conversion or exercise, as applicable, of the foregoing) issued pursuant to the Plan shall be, to the extent applicable, duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the Reorganized Hertz Parent Common Interests, Preferred Stock, and New Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

F.    *New Reorganized Corporate Debt*

The Reorganized Debtors shall issue the New Reorganized Corporate Debt and provide any related guarantees, and the New Reorganized Corporate Debt will be made available to the Reorganized Debtors, pursuant to and subject to the terms and conditions set forth in the Exit Facility Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the New Reorganized Corporate Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to issue and incur the New Reorganized Corporate Debt and related guarantees, including the Exit Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the New Reorganized Corporate Debt.

G.    *Replacement of First Lien Letters of Credit*

On or prior to the Effective Date, the Debtors shall replace or backstop the outstanding and undrawn letters of credit issued pursuant to the First Lien Revolving LC Facility and the First Lien Standalone LC Facility with letters of credit issued pursuant to the Exit Facility Documents, or otherwise cash collateralize such letters of credit.  Contemporaneously therewith, all outstanding undrawn letters of credit issued under the First Lien Revolving LC Facility and First Lien Standalone LC Facility shall be

deemed canceled for purposes of the First Lien Revolving LC Facility or First Lien Standalone LC Facility, as applicable.

H.      *HVF II and Interim Fleet Financing Settlement*

On or prior to the Effective Date, the Debtors shall cause HVF II to repay in full in Cash the then-outstanding HVF II Obligations (such date, the "**HVF II Notes Repayment Date**"), with the proceeds of a new asset backed securitization facility, including the HVF III asset-backed securitization facility, and/or securities to be issued by a newly formed non-Debtor bankruptcy remote subsidiary of Hertz Corp. On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall pay all unpaid amounts accrued pursuant to paragraph 9 of the Second Interim HVF Master Lease Settlement Order through the HVF II Notes Repayment Date, provided, that prior to the payment of any such amounts the applicable Entities shall have complied with paragraph 10 of the Second Interim HVF Master Lease Settlement Order.  Notwithstanding anything to the contrary herein, the obligations with respect to the HVF II Notes shall be determined solely pursuant to the terms of the HVF II Facility Documents and HVF Facility Documents, including, that such obligations shall include, to the extent outstanding and without causing a double recovery on account of more than one payment being made with respect to such obligations, all accrued and unpaid (i) Class A Monthly Default Interest Amounts, Class B Monthly Default Interest Amounts, Class C Monthly Default Interest Amounts and Class D Monthly Default Interest Amounts (as each such term is defined in the HVF II VFN Supplement), pursuant to Section 5.2(f) of the HVF II VFN Supplement or otherwise and (ii) Class A Deficiency Amounts, Class B Deficiency Amounts, Class C Deficiency Amounts and Class D Deficiency Amounts and all interest accrued on such Class A Deficiency Amounts, Class B Deficiency Amounts, Class C Deficiency Amounts and Class D Deficiency Amounts, pursuant to the applicable HVF II MTN Series Supplement, provided, for the avoidance of doubt, that each of (A) the Forbearance Fee payable pursuant to Section 4(g) of that certain HVF II Series 2013-A Forbearance Agreement dated May 4, 2020 (the "Forbearance Agreement") and (B) the Administrative Agent Fee payable pursuant to that certain Administrative Agent Fee Letter entered into in connection with the Forbearance Agreement, dated May 4, 2020, by and among the agent under the HVF II VFN Supplement and Hertz Vehicle Financing II LP shall in each case be deemed to be an obligation with respect to the HVF II Notes.  Not later than three (3) Business Days following a written request by the Debtor (email sufficient), the HVF Trustee shall provide a payoff statement detailing all amounts owed by the category specified in the HVF II Facility Documents.

On or prior to the Effective Date, the Debtors may cause HVIF to repay in full in Cash the then-outstanding HVIF Obligations with the proceeds of a new asset-backed securitization facility, including the HVF III asset-backed securitization facility, and/or securities to be issued by a newly formed non-Debtor bankruptcy remote subsidiary of Hertz Corp. or Reorganized Hertz Parent, as applicable.  To the extent HVIF does not repay in full in Cash the HVIF Obligations, the Debtors shall assume all of their obligations with respect to the Interim Fleet Financing Facility pursuant to Article II.D, supra.

The Debtors shall consult with the Plan Sponsors with respect to the terms of the repayment of the HVF II Notes and the Interim Fleet Financing Notes and such terms shall be in form and substance acceptable to the Plan Sponsors in good faith.

The payment of the HVF II Obligations and, to the extent applicable, payment of the HVIF Obligations, in full shall constitute the full and final satisfaction, settlement, release, and discharge of each HVF Claim and, to the extent applicable, each Interim Fleet Financing Administrative Claim against the Debtors, including any Administrative Claims granted under section 364(c) of the Bankruptcy Code. Contemporaneously with the foregoing payment, (i) the HVF II Notes, the Series 2013-G1 Note, and, to the extent applicable, the Interim Fleet Financing Notes shall be deemed canceled; (ii) the HVF Facility Documents, the HVF II Facility Documents, and, to the extent applicable, the Interim Fleet Financing

Facility Documents shall be deemed terminated (except if utilized for HVF III), (iii) all Liens on property of HVF, HVF II, or, to the extent applicable, HVIF arising out of or related to the Series 2013-G1 Note, the HVF II Notes, or, to the extent applicable, the Interim Fleet Financing Notes shall automatically terminate, and all collateral subject to such applicable Liens shall be automatically released, in each case without further action by the HVF Trustee, HVF II Trustee, the HVF II Lenders, the HVIF Trustee, and the Interim Fleet Financing Lenders; and (iv) all undrawn letters of credit issued with respect to the HVF II Facility and, if applicable, the Interim Fleet Financing Facility shall be cancelled.  The (i) HVF Trustee, HVF II Trustee, and the HVF II Lenders, and (ii) to the extent applicable, the HVIF Trustee, and the Interim Fleet Financing Lenders, shall, at the expense of the Debtors or Reorganized Debtors, as applicable, take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by HVF, HVF II, HVIF, the Debtors or the Reorganized Debtors.  The Debtors or Reorganized Debtors, as applicable, shall use commercially reasonable efforts to cause HVF, HVF II and, to the extent applicable, HVIF, to execute and provide to the HVF Trustee, the HVF II Trustee, the HVF II Lenders and, to the extent applicable, the HVIF Trustee and the Interim Fleet Financing Lenders, customary documentation in connection with the repayment of the HVF II Notes and, to the extent applicable, the Interim Fleet Financing Notes, that is reasonably satisfactory to the HVF Trustee, the HVF II Trustee and the ABS Lenders (as defined in the Second Interim HVF Master Lease Settlement Order), and, to the extent applicable, the HVIF Trustee and the Interim Fleet Financing Lenders, and to execute and provide such other documentation and take such other actions as may be reasonably requested by the HVF Trustee, the HVF II Trustee and the ABS Lenders (as defined in the Second Interim HVF Master Lease Settlement Order) and/or, to the extent applicable, the HVIF Trustee and the Interim Fleet Financing Lenders, in connection with the repayment of the HVF II Notes, and, to the extent applicable, the Interim Fleet Financing Notes.

**Upon the occurrence of the HVF II Notes Repayment Date and subject to the release and discharge of each HVF Claim, the HVF II Notes, and the Series 2013-G1 Note, each of the Debtors, on behalf of themselves and their parents, subsidiaries, affiliates, shareholders, agents, representatives, predecessors-in-interest, nominees, managers, members, partners, officers, directors, employees, advisors, and each of their respective successors and assigns shall be deemed to release, remise and forever discharge the Debtors and the ABS Released Parties, solely in their respective capacities under the HVF II Facility, HVF II Facility Documents, and HVF Facility Documents, as applicable, of and from any and all debts, losses, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, claims, counterclaims, controversies, disputes, obligations, judgments, rights, damages, costs, losses, expenses, liens, or liabilities of any and every nature or description whatsoever, both at law or in equity, whether asserted or unasserted, express or implied, known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, which arose at any time through the HVF II Notes Repayment Date, arising out of or related to the HVF II Facility.  Notwithstanding anything to the contrary in the foregoing, nothing in this Article IV.H shall release any ABS Released Party from Claims or Causes of Action arising from an act or omission that constitutes fraud, willful misconduct, or gross negligence.**

Notwithstanding anything herein to the contrary, including Article XII.I., the stipulations and releases set forth in paragraph 11 of the Second Interim HVF Master Lease Settlement Order shall remain in full force and effect.

I.      *HVF III Fleet Financing*

On or prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, may form a non-Debtor bankruptcy remote subsidiary or subsidiaries of Hertz Corp. or Reorganized Hertz Parent, as applicable, to issue the HVF III asset-backed securitization facility and/or securities.  Simultaneously with the payment of the HVF II Obligations in full, as described in Article IV.H., and, to the extent applicable,

the payment of the HVIF Obligations in full, the Debtors may use any of the vehicles in the HVF II Facility and, to the extent applicable, the Interim Fleet Financing Facility and/or the equity with respect to the HVF II Facility and, to the extent applicable, the Interim Fleet Financing Facility to support any facility or securities issued by HVF III. The Debtors shall consult with the Plan Sponsors with respect to the terms of HVF III with such terms in form and substance acceptable to the Plan Sponsors in good faith. Further, the Debtors, in the issuance of the HVF III asset-backed securitization facility and/or securities, shall comply with the obligations set forth in paragraph 12 of the Second Interim HVF Master Lease Settlement Order.

J.      *General Unsecured Claim Recoveries*

On or prior to the Effective Date, the Debtors shall establish and fund the General Unsecured Recovery Cash Pool Account with Cash in an amount equal to the General Unsecured Recovery Cash Pool Amount and any proceeds received on account of the Specified Causes of Action to fund the recoveries on account of Allowed General Unsecured Claims. If, from time to time, following the Effective Date, the Reorganized Debtors and the GUC Oversight Administrator each agree, in accordance with the GUC Settlement Procedures (or the Bankruptcy Court otherwise determines), that the amounts on deposit in the General Unsecured Recovery Cash Pool Account will be insufficient to provide recoveries of at least eighty-two (82%) percent of (i) Allowed General Unsecured Claims that have not yet received such recovery and/or (ii) the estimated Allowed amount of unpaid disputed General Unsecured Claims (or disputed portion thereof, if applicable), then the Reorganized Debtors shall deposit additional Cash into the General Unsecured Recovery Cash Pool Account in an amount agreed upon by the Reorganized Debtors and the GUC Oversight Administrator (or otherwise determined by the Bankruptcy Court) so as to ensure that the General Unsecured Recovery Cash Pool Account has sufficient funds to provide, on the Quarterly Distribution Date following such determination, an eighty-two (82%) percent distribution on account of (i) Allowed General Unsecured Claims that have not yet received such recovery and (ii) the estimated Allowed amount of each such unpaid disputed General Unsecured Claim (or disputed portion thereof, if applicable). Procedures for the payment of such additional funds shall be set forth in the GUC Settlement Procedures. Any dispute with respect to any such payment shall be resolved by the Bankruptcy Court.

The Specified Causes of Action shall be preserved for the benefit of Holders of General Unsecured Claims as set forth in this Article IV.J and shall be pursued by the GUC Oversight Administrator pursuant to Article VI.D, infra. All proceeds received on account of the Specified Causes of Action shall be deposited in the General Unsecured Recovery Cash Pool Account and distributed pursuant to the terms of this Plan; provided, that to the extent that there are no remaining Disputed General Unsecured Claims and Holders of Allowed General Unsecured Claims have received a one hundred (100%) percent recovery from the General Unsecured Recovery Cash Pool Account prior to the liquidation of a Specified Cause of Action, any proceeds received on account of such Specified Cause of Action shall be paid to the Reorganized Debtors.

As set forth in Article III.B.7, supra, no Holder of an Allowed General Unsecured Claim shall receive a recovery in excess of one hundred (100%) percent of the amount of its Allowed General Unsecured Claim. To the extent Allowed General Unsecured Claims against the Debtors are less than $550,000,000.00 such that the Pro Rata distribution of the General Unsecured Recovery Cash Pool Amount, after accounting for the application of insurance coverage, would result in a more than a one hundred (100%) percent recovery to Holders of Allowed General Unsecured Claims, the GUC Oversight Administrator shall return any excess amount in the General Unsecured Recovery Cash Pool Account to the Reorganized Debtors. Notwithstanding the foregoing, in no instance shall the GUC Oversight Administrator return Cash to the Reorganized Debtors from the General Unsecured Recovery Cash Pool Account such that the amount of Cash in the General Unsecured Recovery Cash Pool Account would not

be sufficient to pay Disputed General Unsecured Claims and Allowed General Unsecured Claims one hundred (100%) percent of the asserted amount of such Disputed General Unsecured Claims and Allowed General Unsecured Claims.

The General Unsecured Recovery Cash Pool Account (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors; (ii) shall be held in trust to fund distributions on account of Allowed General Unsecured Claims, as provided herein; and (iii) shall not be encumbered by any Liens, Claims, or Interests in any way (whether on account of the New Reorganized Corporate Debt or otherwise).

All parties to the Plan shall (i) treat the General Unsecured Recovery Cash Pool Account as a "disputed ownership fund" within the meaning of Treasury Regulations Section 1.468B-9(b)(1) for U.S. federal income tax purposes, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All taxes imposed on assets or income of the General Unsecured Recovery Cash Pool Account will be payable from the assets of the General Unsecured Recovery Cash Pool.

K.    *Intercompany Claim Settlement*

The entry of the Confirmation Order and the treatment accorded to General Unsecured Creditors pursuant to this Plan shall constitute a settlement pursuant to section 1123(b)(3) of all disputes relating to the Intercompany Claims and the allocation of value among the various Debtors.

L.    *HHN Restructuring*

On the Effective Date, the Debtors shall make the cash payment provided as treatment for the HHN Notes Guarantee Claims pursuant to Article III.B.6 of this Plan to the HHN Notes Trustee and/or HHN Notes Paying Agent.  Pursuant to this Plan, such cash payment shall be applied *pro rata* to the HHN Notes based on the principal and interest outstanding at the time of such cash payment.  The HHN Notes Trustee and/or HHN Notes Paying Agent shall then, to the extent required, convert such cash payment to Euros using the European Central Bank reference rate published on the date that the HHN Notes Trustee and/or HHN Notes Paying Agent received such payment and apply such amount to the then outstanding principal and interest due in respect of each series of HHN Notes as set forth in the allocation provided by the Plan.  Such payment on account of the HHN Notes Guarantee Claims is not, and shall not be deemed to constitute, a prepayment (voluntary or otherwise) under the HHN Notes Indentures or otherwise and shall remain subject to the HHN Notes Trustee Charging Lien on the terms set forth in the HHN Notes Indentures.

Upon the occurrence of the Effective Date, immediately after the payments in respect of the HHN Notes Guarantee Claims have been made pursuant to the Plan, HHN shall redeem the HHN Notes for a Cash payment equal to (a) the principal and interest due in respect of the HNN Notes on the date of such payment, minus (b) the amount paid to the HHN Notes Trustee and/or HHN Notes Paying Agent in respect of the HHN Notes Guarantee Claim pursuant to the Plan, plus (c) any unpaid interest remaining through the date of payment to the beneficial holders of the HHN Notes, any unpaid HHN Notes Trustee Fees and any premiums, prepayment penalties, and make-whole payments due in respect of the HHN Notes calculated solely upon the difference between the amounts set forth in clause (a) and clause (b) above.  Such payments with respect to the HHN Notes Guarantee Claims and HHN Notes shall constitute a complete satisfaction and release of all Claims and obligations with respect to the HHN Note Documents.

On the Effective Date, the Debtors shall make an equity contribution to HIL in an amount sufficient to repay the HIL Facility and cause HIL to repay the HIL Facility.

M.     *New Registration Rights Agreement*

On the Effective Date, the Reorganized Debtors shall execute and deliver the New Registration Rights Agreement and take all actions required by the New Registration Rights Agreement, subject to and in accordance with the terms and conditions of the Plan Support Agreement and the Equity Commitment Agreement.

N.     *International Vehicle Financing Claims*

On or prior to the Effective Date, as part of the restructuring of the business of HHN and its European subsidiaries, the Debtors shall cause the European Vehicle Financing Entities to enter into and consummate the European ABS Restructuring Settlement.  The entry of the Confirmation Order shall (i) constitute approval and authorization for the Debtors to perform their obligations under the European ABS Restructuring Settlement under Bankruptcy Rule 9019, (ii) approve the complete release of the Lombard Vehicle Financing Facility Guarantee, the European ABS Performance Guarantees and any claims related thereto, including the Lombard Facility Guarantee Claims and the European ABS Performance Guarantee Claims, and (iii) approve the irrevocable disallowance of all such claims, which shall be permanently removed from the Claims Register.

On or prior to the Effective Date, as part of the restructuring of the business of Hertz Australia and its subsidiaries, the Debtors shall cause Hertz Australia and the Australian Financing Entity to enter into and consummate the Australian ABS Restructuring Settlement.  The entry of the Confirmation Order shall (i) constitute approval and authorization for the Debtors to perform their obligations under the Australian ABS Restructuring Settlement under Bankruptcy Rule 9019, (ii) approve the complete release of the Australian Performance Guarantee and any claims related thereto, including any Australian Performance Guarantee Claims, and (iii) approve the irrevocable disallowance of all such claims, which shall be permanently removed from the Claims Register.

O.     *Corporate Existence*

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal law, or other non-bankruptcy law).

P.     *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan (including in the GUC Settlement Procedures), or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all the Debtors' Causes of Action (including, without express or implied limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), all Executory Contracts and Unexpired Leases assumed, but not assigned, by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor

subsidiaries, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action (other than GUC Administrator Claims, GUC Administrator Claim Related Actions, or Specified Causes of Action, which shall be subject to the rights of the GUC Oversight Administrator) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject to the consultation rights of the GUC Oversight Administrator set forth in the GUC Settlement Procedures with respect to compromising or settling Claims or Causes of Action arising prior to the Effective Date.

Q.    *Cancellation of Existing Securities*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Effective Date (i) the Prepetition Debt Documents and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed canceled, discharged and of no force or effect, without further action or approval of the Bankruptcy Court, the Debtors, or any Holder and the First Lien Agent, the Second Lien Note Trustee, the Unsecured Notes Trustees and the 7.000% Unsecured Promissory Notes Trustee and their respective agents, successors and assigns shall each be automatically and fully released and discharged of and from all duties as applicable under the respective Prepetition Debt Documents, except, as applicable, as necessary to (a) enforce the rights, Claims and interests of the First Lien Agent, the Second Lien Note Trustee, the Unsecured Notes Trustees, the 7.000% Unsecured Promissory Notes Trustee, and, as applicable, and any predecessor thereof vis-a-vis parties other than the Released Parties, (b) allow the receipt of and distributions under the Plan and, as applicable, the subsequent distribution of such amounts in accordance with the respective terms of the Prepetition Debt Documents and (c) preserve any rights of (1) the First Lien Agent and any predecessor thereof as against any money or property distributable to Holders of First Lien Claims, including any priority in respect of payment, (2) the Second Lien Note Trustee and any predecessor thereof as against any money or property distributable to Holders of Second Lien Note Claims, (3) the 5.500% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 5.500% Unsecured Notes Claims, (4) the 6.000% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 6.000% Unsecured Notes Claims, (5) the 6.250% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 6.250% Unsecured Notes Claims, (6) the 7.000% Unsecured Promissory Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 7.000% Unsecured Promissory Notes Claims, and (7) the 7.125% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 7.125% Unsecured Notes Claims; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; <u>provided</u> <u>that</u> notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall also continue in effect to allow each of the First Lien Agent, the Second Lien Note Trustee, the Unsecured Notes Trustees, and the 7.000% Unsecured Promissory Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding

58

in the Bankruptcy Court or any other court, including, without limitation, to enforce the respective obligations owed to such parties under the Plan.

Subsequent to the performance by: (i) the First Lien Agent of its obligations under the Plan, the First Lien Agent and its respective agents shall be relieved of all further duties and responsibilities related to the First Lien Loan Documents upon the occurrence of the Effective Date, except with respect to such other rights of the First Lien Agent that, pursuant to the First Lien Loan Documents, survive the termination of the First Lien Loan Documents; (ii) the Second Lien Note Trustee of its obligations under the Plan, the Second Lien Note Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the Second Lien Note Documents upon the occurrence of the Effective Date, except with respect to such other rights of the Second Lien Note Trustee that, pursuant to the Second Lien Note Documents, survive the termination of the Second Lien Note Documents; (iii) the 5.500% Unsecured Notes Trustee of its obligations under the Plan, the 5.500% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 5.500% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 5.500% Unsecured Notes Trustee that, pursuant to the 5.500% Unsecured Notes Documents, survive the termination of the 5.500% Unsecured Notes Documents; (iv) the 6.000% Unsecured Notes Trustee of its obligations under the Plan, the 6.000% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 6.000% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 6.000% Unsecured Notes Trustee that, pursuant to the 6.000% Unsecured Notes Documents, survive the termination of the 6.000% Unsecured Notes Documents; (v) the 6.250% Unsecured Notes Trustee of its obligations under the Plan, the 6.250% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 6.250% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 6.250% Unsecured Notes Trustee that, pursuant to the 6.250% Unsecured Notes Documents, survive the termination of the 6.250% Unsecured Notes Documents; (vi) the 7.000% Unsecured Promissory Notes Trustee of its obligations under the Plan, the 7.000% Unsecured Promissory Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 7.000% Unsecured Promissory Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 7.000% Unsecured Promissory Notes Trustee that, pursuant to the 7.000% Unsecured Promissory Notes Documents, survive the termination of the 7.000% Unsecured Promissory Notes Documents; and (vii) the 7.125% Unsecured Notes Trustee of its obligations under the Plan, the 7.125% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 7.125% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 7.125% Unsecured Notes Trustee that, pursuant to the 7.125% Unsecured Notes Documents, survive the termination of the 7.125% Unsecured Notes Documents.

If the record Holder of any of the Second Lien Notes or Unsecured Notes is DTC or its nominee or another securities depository or custodian thereof, and such Second Lien Notes or Unsecured Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Second Lien Notes or Unsecured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

The commitments and obligations, if any, of each DIP Lender to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Loan Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect solely in connection with such cancellations, terminations, satisfactions, releases or discharges. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

R.      *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable (i) the issuance of the Reorganized Hertz Parent Common Interests, Preferred Stock, and New Warrants; (ii) the selection and appointment of the directors and officers for Reorganized Hertz Parent and the other Reorganized Debtors; (iii) implementation of the Restructuring Transactions; and (iv) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Hertz Parent and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Hertz Parent, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, directors, or officers of the Debtors, Reorganized Hertz Parent, or the other Reorganized Debtors. On or before the Effective Date, as applicable, the appropriate officers of the Debtors, Reorganized Hertz Parent, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of Reorganized Hertz Parent and the other Reorganized Debtors, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by this Article IV.R shall be effective notwithstanding any requirements under non-bankruptcy law.

S.      *New Organizational Documents*

To the extent required under the Plan, or applicable non-bankruptcy law, on the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors will File such New Organizational Documents as are required to be Filed with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents, and the Reorganized Debtors may File their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents. Additionally, on the Effective Date, each recipient of Reorganized Hertz Parent Common Interests and Preferred Stock will be subject to the Reorganized Hertz Parent Organizational Documents.

The New Organizational Documents shall not contain any prohibitions on any of the Reorganized Debtors becoming a publicly listed company.

T.    *Reorganized Hertz Parent and Reorganized Hertz Corp. Board*

As of the Effective Date, except as set forth in this Article IV.T, all directors, managers, and other members of existing boards or governance bodies of Hertz Parent and Hertz Corp., as applicable, shall cease to hold office or have any authority from and after such time unless such individuals are selected to hold positions pursuant to the applicable governing body or documents with respect to the Reorganized Debtors.

The Reorganized Hertz Parent Board and Reorganized Hertz Corp. Board shall have at least seven (7) members.  All members shall be selected in accordance with generally accepted best practices for large institutional investors in public companies.  The composition of the board shall comply with applicable stock exchange and SEC independence requirements and directors shall have relevant industry, financial and operational backgrounds.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Hertz Parent and Reorganized Hertz Corp.  To the extent any such director or officer of the Reorganized Hertz Parent and Reorganized Hertz Corp. is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such direct or officer.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the Employment Agreements (assumed and assigned to the Reorganized Debtors, subject to the reasonable consent of the Plan Sponsors), and other constituent documents of the Reorganized Debtors.   The selection of directors and officers of Reorganized Hertz Parent and Reorganized Hertz Corp. shall be disclosed in the Plan Supplement, and at least a majority of the directors shall be appointed by the Plan Sponsors (other than Apollo).

U.    *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance,  transfer or exchange of any securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the Exit Facility Documents, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

V.    *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all of the Debtors' Causes of Action, whether arising before or after the Petition Date, including any Causes of Action specifically enumerated in the Plan Supplement; provided, that the Specified Causes of Action and GUC Administrator Claim Related Actions shall be preserved for the benefit of General Unsecured Creditors to the extent provided in Article IV.J and, following the

occurrence of the Effective Date, pursued by the GUC Oversight Administrator as set forth in <u>Article VI.D</u>  The Reorganized Debtors (in consultation with the Plan Sponsors) shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, except the Specified Causes of Action and the GUC Administrator Claim Related Actions, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  The GUC Oversight Administrator (in consultation with the Reorganized Debtors and the Plan Sponsors and to the extent provided in <u>Article IV.J</u>) shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment the Specified Causes of Action and GUC Administrator Claim Related Actions, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action, except the Specified Causes of Action and GUC Administrator Claim Related Actions which shall be brought by the GUC Oversight Administrator as set forth in <u>Article IV.J</u>, <u>Article VI.D.</u>, and <u>Article VII.B</u>, against any Entity not released pursuant to <u>Article VIII.C</u>.**

Notwithstanding the foregoing, prior to the occurrence of the Effective Date, the Debtors shall have the unfettered ability to prosecute, mediate, and settle the Specified Causes of Action; <u>provided</u>, <u>that</u> Committee consent shall be required prior to entering into any such settlement of a Specified Cause of Action.  To the extent the Debtors enter into any such settlement the proceeds of such Specified Cause of Action shall be deposited in the General Unsecured Recovery Cash Pool Account and distributed pursuant to <u>Article IV.J</u>, <u>supra</u>, and the provisions of this Plan.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the GUC Oversight Administrator, as applicable, shall not pursue any and all available Causes of Action against it.  Unless such Causes of Action against any Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Causes of Action shall be expressly reserved by the Debtors, the Reorganized Debtors, or the GUC Oversight Administrator, as applicable, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

The Reorganized Debtors or the GUC Oversight Administrator, as applicable, reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.

**Notwithstanding anything to the contrary contained in this <u>Article IV.V.</u>, on the Effective Date, all Avoidance Actions with respect to trade vendors that continue to do business with the Reorganized Debtors and that are not specifically identified in the Schedule of Retained Causes of Action shall be released by the Debtors.**

W.    *Insurance Policies and Surety Bonds*

    1.    <u>Director and Officer Liability Insurance</u>

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees, as applicable, who served in such capacity at any time on or prior to the Effective Date pursuant to sections 105 and 365 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the D&O Liability Insurance Policies.

On or before the Effective Date, the Debtors, on behalf of the Reorganized Debtors, will obtain the Tail D&O Policy.

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on the Effective Date, including the Tail D&O Policy, with respect to conduct occurring prior thereto, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date, *provided* that nothing in this paragraph shall preclude a reduction in the amount of available policy proceeds under the D&O Liability Insurance Policies through payment of claims under any D&O Liability Insurance Policies to or on behalf of the Debtors or the Reorganized Debtors.

Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies and related documents, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan and no Proof of Claim need be Filed with respect thereto.

    2.    <u>Assumption of Insurance Policies</u>

On the Effective Date, each Insurance Policy shall be assumed by the applicable Reorganized Debtor pursuant to sections 105 and 365 of the Bankruptcy Code, unless such Insurance Policy (i) was rejected by the Debtors pursuant to an order of the Bankruptcy Court, or (ii) is the subject of a motion to reject pending on the date of the Confirmation Hearing. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors assumption of each of such Insurance Policies

    3.    <u>Insurance Neutrality</u>

Nothing in the Plan or the Confirmation Order, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurer or (b) any rights or obligations of the Debtors or the Reorganized Debtors arising out of or under any Insurance Policy. The Insurers, the Debtors, and Reorganized Debtors, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date. Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control. For the avoidance of doubt, nothing contained in

the Plan or the Confirmation Order shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order.

    4.   <u>Surety Bonds</u>

On the Effective Date, (i) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Reorganized Debtors; (ii) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Reorganized Debtor and will survive and remain unaffected by entry of the Confirmation Order; and (iii) the Reorganized Debtors shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, in the ordinary course of business. Without diminution of the foregoing, the applicable Reorganized Debtors will continue to pay all premiums and other amounts due, including loss adjustment expenses, on the existing surety bonds as they become due prior to the release or discharge of such surety bonds. Surety bond providers shall have the discretion to replace (or issue name-change riders with respect to) any existing surety bonds or related general agreements of indemnity with new surety bonds and related general agreements of indemnity on the same terms and conditions provided in the applicable existing surety bonds or related general agreements of indemnity. Nothing in the Plan or Confirmation Order shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of the Debtors or any surety bond provider with respect to any unexpired surety bond agreement or related indemnification or collateral agreement.

X.   *Management Equity Incentive Plan*

On or as soon as reasonably practical following the Effective Date, the Reorganized Hertz Parent Board will adopt and implement the Management Equity Incentive Plan, which shall provide for not less than 5% of Reorganized Hertz Parent Common Interests to be reserved for directors, officers, and employees of the Reorganized Debtors in accordance with the MIP Term Sheet and as otherwise determined by the Reorganized Hertz Parent Board.

Y.   *Employee Obligations*

Except as (i) otherwise provided in the Plan or Plan Supplement; (ii) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (iii) was rejected by the Debtors pursuant to a Bankruptcy Court order; or (iv) is the subject of a motion to reject pending on the date of the Confirmation Hearing, the Reorganized Debtors shall honor the Debtors' Employee Obligations and, to the extent not already satisfied, the Debtors' Employee Obligations shall become obligations of the Reorganized Debtors in accordance with their terms. To the extent the Employee Obligations are executory contracts and (i) such executory contracts are not identified on the Rejected Executory Contracts and Unexpired Leases Schedule, (ii) were not previously rejected by a Final Order, pursuant to section 365 and 1123 of the Bankruptcy Code, or (iii) are not the subject of a motion to reject pending on the date of the Confirmation Hearing, each will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; *provided*, that, the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the above-listed written contracts, agreements, policies, programs and plans. Notwithstanding anything else set forth in this paragraph, the cure provisions of Article V.C hereof shall apply to any Employee Obligation arising from an Executory Contract assumed in accordance with the provisions of Article V hereof.

Notwithstanding anything to the contrary in the foregoing paragraph, the Reorganized Debtors shall assume, continue, and maintain in all respects, and shall not in any way reduce or diminish, the

bonus programs approved by the Bankruptcy Court pursuant to the 2020 EIP Order and the 2021 KEIP/EIP Order in accordance with the respective terms of such programs, including by timely paying all awards earned by the participants therein in accordance with the terms thereof.

On the Effective Date, each Employment Agreement will be deemed assumed and shall become obligations of the Reorganized Debtors in accordance with their terms.

Notwithstanding anything to the contrary in this Plan, as of the Effective Date, any provision of an Employee Obligation that provides for equity-based awards, including any termination-related provisions with respect to equity-based awards, shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding anything to the contrary in this Plan, the Reorganized Debtors shall continue and assume the Pension Plans to the extent of their respective obligations under the Pension Plans and applicable law, including, as applicable, (i) the minimum funding standards in 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 and (ii) the premiums under 29 U.S.C. §§ 1306 and 1307. All Proofs of Claim filed by the PBGC with respect to the Pension Plans shall be deemed withdrawn on the Effective Date. No provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve the Reorganized Debtors, their successors, or individuals from liabilities or requirements imposed under any law or regulatory provision with respect to the Pension Plans or from claims of the PBGC with respect to the Pension Plans. The PBGC and the Pension Plans will not be enjoined or precluded from enforcing such liability with respect to the Pension Plans as a result of any provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code.

Notwithstanding anything to the contrary in this Plan, in accordance with section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to honor all retiree benefits, as such term is defined in section 1114(a) of the Bankruptcy Code, as and to the extent required by the agreements giving rise to such obligations.

On the Effective Date, each severance plan of the Debtors in existence immediately prior to the Effective Date, including (i) the Amended and Restated Hertz Global Holdings, Inc. Severance Plan for Senior Executives, and (ii) the Amended and Restated Hertz Global Holdings, Inc. Severance Plan for Vice Presidents, shall be terminated in accordance with its terms. Entry of the Confirmation Order shall constitute authorization for such termination without further action by any of the Debtors, the Debtors' board of directors or any committee thereof, or any officer or other employee of the Debtors, or any delegee of any of the foregoing. To the extent any severance plan constitutes an Executory Contract deemed rejected pursuant to Article V.A hereof, termination of such severance plan in accordance with its terms pursuant to this paragraph shall be deemed to have occurred immediately prior to such rejection. Notwithstanding the foregoing, on and subject to the occurrence of the Effective Date, the Reorganized Debtors (a) shall covenant, agree, and undertake, as obligations of the Reorganized Debtors, that in the event that any individual who is part of the Senior Management Group is terminated by the Reorganized Debtors without cause within twelve (12) months following the Effective Date, the Reorganized Debtors shall, within thirty (30) days following such termination, pay such terminated individual a single lump-sum cash payment equal to two (2) times the value of such terminated individual's annual base compensation (i.e., base salary and non-variable benefits) and (b) shall adopt and implement such other plans, policies, or other agreements with respect to employee severance for certain of the Reorganized Debtors' other employees on terms to be determined by the Reorganized Debtors and acceptable to the Plan Sponsors or Reorganized Hertz Parent Board in good faith.

Z.      *Workers' Compensation Programs*

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtors operate or the Debtors previously operated; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance policies and programs.  All Proofs of Claim filed by the Debtors' current or former employees on account of workers' compensation claims shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for herein; provided, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

AA.     *Collective Bargaining Agreements*

On or prior to the Effective Date, and subject to the occurrence of the Effective Date, the Reorganized Debtors shall assume all of the Debtors' unexpired collective bargaining agreements.

BB.     *Plan Support Agreement and Equity Purchase Agreement*

To the extent not previously approved pursuant to an order of the Bankruptcy Court authorizing the Debtors' entry into the Plan Support Agreement and the Equity Purchase Agreement, entry into each of the Plan Support Agreement and the Equity Purchase Agreement shall be authorized by the Bankruptcy Court pursuant to the Confirmation Order, and the Debtors shall continue to perform thereunder and comply therewith in all respects through and including the Effective Date.

# ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (i) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (ii) have been previously rejected by a Final Order; (iii) have been previously assumed or assumed and assigned by a Final Order; (iv) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (v) which the Debtors have, as of the Confirmation Date, received authority to reject pursuant to an order of the Bankruptcy Court with the effective date of such rejection is after the Effective Date; (vi) provide for payment of severance or other benefits to former employees of the Debtors (other than retiree benefits within the meaning of such term in section 1114(a) of the Bankruptcy Code), whether in the form of a plan or individual agreement; and (vii) are solely with a Donlen Debtor, which to the extent not previously assumed by a Final Order shall be deemed to be rejected; provided, that, nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan or agreement referenced in the immediately preceding clauses constitutes an Executory Contract; and provided further, that the Debtors reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause.  The terms of any Final Order entered by the Bankruptcy Court prior to the entrance of the Confirmation Order that

66

provide for the assumption and assignment of nonresidential real property shall control over the terms of the Plan and Confirmation Order.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contracts and Unexpired Leases Schedule, the Collective Bargaining Agreements, and the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. The Debtors are authorized to abandon any of the Debtors' personal property at or on the leased premises subject to an Unexpired Lease rejected pursuant to the Plan, and the counterparties to rejected leases may dispose of any such personal property remaining at or on the leased premises following the applicable lease rejection date.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may be modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, in consultation with the GUC Oversight Administrator and subject to its right to object under applicable law, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti-assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, and shall not be entitled to distribution from the General Unsecured Recovery Cash Pool Account, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory**

**Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**.  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with <u>Article III.B.7</u>, and such claims may be objected to in accordance with this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, no later than three (3) Business Days following the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the cure amount set forth on the Assumed Executory Contracts or Unexpired Leases Schedule or the Collective Bargaining Agreement Schedule, as applicable, for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or the Reorganized Debtors, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order.  Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable.

Unless otherwise provided by an order of the Bankruptcy Court, the Debtors shall use reasonable best efforts to file an initial Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule no later than twenty-eight (28) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Plan.  Further, the Debtors shall file their list of Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule no later than fourteen (14) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Plan, which shall supersede the initial schedule if any such initial schedule is filed.  The Debtors shall cause all Filed Assumed Executory Contracts and Unexpired Leases Schedules and Rejected Executory Contracts and Unexpired Leases Schedules or notices of proposed assumption, proposed amounts of Cure Claims, and proposed rejections to be served by first class mail on counterparties to Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to the Plan that are identified in such schedule.  The Debtors may supplement or modify the Assumed Executory Contract and Unexpired Leases Schedule or Rejected Executory Contracts and Unexpired Leases Schedule up to one (1) Business Day prior to the Confirmation Hearing.  Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed, served and actually received by the Debtors by the later of (1) the Confirmation Objection Deadline or (2) with respect to any Executory Contract or Unexpired Lease that is added to the Assumed Executory Contract and Unexpired Leases Schedule after the date that is fourteen (14) days prior to the Confirmation Objection Deadline, the date that is fourteen (14) days following the filing of the relevant supplement to the Assumed Executory Contract and Unexpired Leases Schedule.  The rejection of any Executory Contract or Unexpired Lease listed on such schedules shall be subject to the Committee's right to object under applicable law.

**Any party that fails to timely object to the assumption of its Executory Contract or Unexpired Lease (including the ability of the applicable Reorganized Debtor or assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claim listed**

on the Assumed Executory Contracts and Unexpired Leases Schedule or the Collective Bargaining Agreement Schedule as set forth in the paragraph above, shall be (i) deemed to have consented to the assumption of its Executory Contract or Unexpired Lease and to such Cure Claim and (ii) forever barred, estopped, and enjoined from disputing the amount of the Cure Claim set forth on the Assumed Executory Contracts and Unexpired Leases Schedule or the Collective Bargaining Agreement Schedule (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claim as set forth in the Plan Supplement, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease; *provided, that* the Debtors or the Reorganized Debtors, as applicable, will remain obligated to pay any accrued but unbilled amounts under any such assumed Executory Contract or Unexpired Lease to the extent that such unbilled amounts were not due to be billed prior to the date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claim.

D.     *Assumption Dispute Resolution*

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "**Assumption Dispute**") shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; *provided, that* the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors (in consultation with the Committee) may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assignment.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (the "**Adjourned Cure Dispute**"); *provided, that* the Reorganized Debtors, in consultation with the GUC Oversight Administrator and subject to its right to object under applicable law, may settle any Adjourned Cure Dispute after the Effective Date without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

E.     *Indemnification Obligations*

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, unless such obligation (i) was rejected by the Debtors pursuant to a Final Order or (ii) is the subject of a motion to reject that is pending as of the date of the Confirmation Hearing.  Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

F.     *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, and not assigned to a non-Debtor Entity, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of its operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

G.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.     *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumed Executory Contracts and Unexpired Leases Schedule or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  For the avoidance of doubt, the Debtors reserve all rights with respect to any Causes of Action or other right with respect to any Executory Contract or Unexpired Lease.

I.     *Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)*

If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Initial Distribution Date (or, if a Claim is not an Allowed Claim on the Initial Distribution Date, on the next Quarterly Distribution Date following the date that such Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), except with respect to General Unsecured Claims, the Distribution Agent shall make initial distributions under the Plan on account of each Holder of an Allowed Claim in the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

The GUC Oversight Administrator shall be authorized by the Confirmation Order to make some or all of the Initial GUC Distribution in Cash at its discretion and in accordance with the GUC Settlement Procedures. Further, the GUC Oversight Administrator may make partial distributions on account of Allowed General Unsecured Claims before all General Unsecured Claims are Allowed to account for the future Allowance of Disputed General Unsecured Claims after the Effective Date. If, at any time, a portion of a General Unsecured Claim is disputed and a portion is undisputed, the undisputed portion shall be deemed Allowed as set forth in the GUC Settlement Procedures for all purposes under the Plan and the GUC Oversight Administrator shall make partial payments with respect to any undisputed portion of a Disputed Claim as provided in this paragraph and the GUC Settlement Procedures. All references in the Plan to Allowed General Unsecured Claims or the Allowed amount of General Unsecured Claims shall be deemed to include references to the undisputed portion of partially disputed General Unsecured Claims. On each Quarterly Distribution Date, the GUC Oversight Administrator may (and, to the extent set forth in the GUC Settlement Procedures, shall) make additional Pro Rata distributions to Holders of Allowed General Unsecured Claims until such Claims have received the maximum recovery available to Holders of General Unsecured Claims under the Plan. If a General Unsecured Claim (or a portion thereof) becomes an Allowed General Unsecured Claim after the Effective Date, the GUC Oversight Administrator shall, on the first Quarterly Distribution Date following the date that such General Unsecured Claim (or portion thereof) becomes an Allowed General Unsecured Claim, make a cash distribution in respect of such Allowed General Unsecured Claim (or the newly Allowed portion thereof, as applicable) as and to the extent set forth in the Plan; provided, that such distribution shall not be less than the higher of (i) eighty-two (82%) percent of such Allowed General Unsecured Claim (or the newly Allowed portion thereof) and (ii) the cumulative percentage recovery received by Allowed General Unsecured Claims on the Initial Allowed GUC Claim List as of (and through) such Quarterly Distribution Date; provided, further, that, notwithstanding anything to the contrary in this Article VI.A, the obligations of the Reorganized Debtors under this Plan shall only obligate the Reorganized Debtors to deposit additional funds in the General Recovery Cash Pool Account so as to ensure an eighty-two (82%) percent distribution on account of all Allowed General Unsecured Claims.

B.    *Special Rules for Distributions to Holders of Disputed Claims and Interests*

Except as set forth in Article VI.A above with respect to Allowed General Unsecured Claims or as otherwise agreed by the Debtors or the Reorganized Debtors (i) no partial payments and no partial

distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (ii) other than a Holder of a Claim in Class 7, any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on account of the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Disputed Claims have been Allowed or expunged.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

C.    *Rights and Powers of Distribution Agent*

    1.    <u>Rights and Powers of the Distribution Agent</u>

    Subject to <u>Article VI.D.</u>, <u>infra</u>, the Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby, including, subject to the express written consent and direction of the Second Lien Note Trustee and with the cooperation of the Second Lien Note Trustee, distributions on account of the Second Lien Note Claims, subject in all respects to the right of the Second Lien Note Trustee Charging Lien against such distributions; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  The Distribution Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of any creditor pools created hereunder for all taxable periods through the date on which final distributions are made.

    2.    <u>Expenses Incurred On or After the Effective Date</u>

    Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including any taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent may be paid in Cash by the Reorganized Debtors.

D.    *Rights and Powers of the GUC Oversight Administrator*

    1.    <u>Appointment of the GUC Oversight Administrator</u>

    The Committee shall appoint, as of the Effective Date, a GUC Oversight Administrator.  The selection of the GUC Oversight Administrator shall be reasonably acceptable to the Debtors and the Plan Sponsors.  Upon the resolution of all disputed General Unsecured Claims, the GUC Oversight Administrator shall be released and discharged of and from further authority, duties, responsibilities and obligations relating to and arising from and in connection with the Chapter 11 Cases.

    2.    <u>Rights and Powers of the GUC Oversight Administrator</u>

    The GUC Oversight Administrator shall be deemed a Distribution Agent under the Plan and shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions with respect to Allowed General Unsecured Claims; (iii) employ professionals to represent it with respect to its responsibilities; (iv) prosecute the Specified Causes of Action subject to <u>Article IV.J</u>, <u>supra</u>; (v) control the allowance of

the GUC Administrator Claims (including through control of GUC Administrator Claim Related Actions) pursuant to the GUC Settlement Procedures and this Plan and in consultation with the Reorganized Debtors; (vi) make distributions to Holders of Allowed General Unsecured Claims from the General Unsecured Recovery Cash Pool Account pursuant to the terms of this Plan; (vii) take the actions provided in the ADR Procedures; (viii) exercise the consultation rights regarding General Unsecured Claims other than GUC Administrator Claims provided in the GUC Settlement Procedures; and (ix) exercise such other powers as may be vested in the GUC Oversight Administrator by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the GUC Oversight Administrator and the Reorganized Debtors to be necessary and proper to implement the provisions hereof.  Without limiting any of the foregoing, the GUC Oversight Administrator may, but is not required, to seek an Order from the Bankruptcy Court with respect to its rights, powers, and duties.

The GUC Oversight Administrator shall expeditiously resolve all GUC Administrator Claims in a cost-effective manner consistent with the GUC Settlement Procedures and this Plan.  The Reorganized Debtors shall provide the GUC Oversight Administrator with a spreadsheet of all known GUC Administrator Claims, which shall include the Filed amounts.  The Reorganized Debtors shall cooperate in good faith with the GUC Oversight Administrator and shall provide the GUC Oversight Administrator with reasonable access to information regarding the GUC Administrator Claims and the Specified Causes of Action.  The GUC Oversight Administrator shall consult with the Reorganized Debtor before settling, allowing, or objecting to a GUC Administrator Claim.  If the GUC Oversight Administrator files an objection to a GUC Administrator Claim, the Reorganized Debtors may appear and be heard with respect to such objection.

To the extent there are no Disputed General Unsecured Claims and the Holders of Allowed General Unsecured Claims have received a one hundred (100%) percent recovery from the General Unsecured Recovery Cash Pool Account prior to the liquidation of a Specified Cause of Action, the Reorganized Debtors shall assume control of the prosecution of such Specified Cause of Action and any proceeds received on account of such Specified Cause of Action shall be paid to the Reorganized Debtors.

The GUC Oversight Administrator shall provide the Reorganized Debtors with quarterly reports containing (1) the balance of the General Unsecured Recovery Cash Pool Account, (2) the status of the GUC Administrator Claims, (3) the status of the Specified Causes of Action, and (4) the amount of any recoveries received on account of the Specified Causes of Action.  The Reorganized Debtors shall provide the GUC Oversight Administrator with such reasonable reporting regarding General Unsecured Claims as set forth in the GUC Settlement Procedures.

      3.     Payment of Fees and Expenses

The GUC Oversight Administrator may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the rights, powers, and duties provided above.  The GUC Oversight Administrator Costs, including reasonable professional fees, shall be paid by the Reorganized Debtors up to the amount of $2,000,000.00 within 30 days of receipt of an invoice.  The Reorganized Debtors may make such payment without further notice or approval from the Bankruptcy Court.  To the extent the GUC Oversight Administrator Costs exceed $2,000,000.00, such amounts may be paid from the General Unsecured Recovery Cash Pool Account.

E.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

    1.      <u>Record Date for Distribution</u>

        On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  For the avoidance of doubt, the Distribution Record Date shall not apply to the First Lien Claims, Second Lien Note Claims, Unsecured Funded Debt Claims, and HHN Notes Guarantee Claims, the Holders of which shall receive a distribution in accordance with this <u>Article VI</u> and, as applicable, the customary procedures of DTC or Euroclear, as applicable, on or as soon as practicable after the Effective Date.

    2.      <u>Delivery of Distributions</u>

        a.      Quarterly Distribution Date

        On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, but in any event, no later than thirty (30) days after each Quarterly Distribution Date, the Distribution Agent shall make the distributions required to be made on account of Allowed Claims under the Plan on such date.  No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with <u>Article VI.A</u>.

        b.      Delivery of Distributions On Account of First Lien Claims

        All distributions to Holders of First Lien Claims shall be deemed completed when made to (or at the direction of) the First Lien Agent, which shall be deemed to be the Holder of all First Lien Claims for purposes of distributions to be made hereunder.  As soon as practicable in accordance with the requirements set forth in this <u>Article VI</u>, the First Lien Agent shall cause such distributions to be made to or on behalf of such Holders in accordance with the First Lien Credit Agreement.  If the First Lien Agent is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the First Lien Agent's cooperation, shall make such distributions to the extent practicable to do so.  The First Lien Agent shall have no duties or responsibilities relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a First Lien Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.

        c.      Delivery of Distributions on Account of Second Lien Note Claims

        All distributions made under the Plan on account of the Allowed Claims of the Holders of Second Lien Note Claims shall be made to or at the direction of the Second Lien Note Trustee for further distribution to the Holders of Allowed Claims under the terms of the Second Lien Note Indenture, including those provisions relating to the surrender and cancellation of the Second Lien Notes.

        All distributions to Holders of Second Lien Note Claims shall be deemed completed when made to (or at the direction of) the Second Lien Note Trustee, which shall be deemed to be the Holder of all Second Lien Note Claims for purposes of distributions to be made hereunder, and the Second Lien Note Trustee shall hold or direct such distributions for the benefit of the Holders of Second Lien Note Claims. As soon as practicable in accordance with the requirements set forth in this <u>Article VI</u>, the Second Lien Note Trustee shall arrange to deliver such distributions to be made to or on behalf of such Holders in

accordance with the Second Lien Note Indenture. The Second Lien Note Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of the Second Lien Note Claims, to the extent consistent with the customary practices of DTC. For the avoidance of doubt, such distributions shall be subject to the Second Lien Note Trustee Charging Liens. If the Second Lien Note Trustee is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the Second Lien Note Trustee's cooperation, shall make such distributions to the extent practicable to do so. The Second Lien Note Trustee shall have no duties or responsibilities relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a Second Lien Note Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Second Lien Note Trustee shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

Regardless of whether distributions to Holders of Second Lien Note Claims are made by the Second Lien Note Trustee, or by the Distribution Agent at the reasonable direction of the Second Lien Note Trustee, the Second Lien Note Trustee Charging Lien shall attach to such distributions in the same manner as if such distributions were made through the Second Lien Note Trustee.

d.    Delivery of Distributions on Account of Unsecured Notes Claims

(i)    All distributions to Holders of 5.500% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 5.500% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 5.500% Unsecured Notes Claims for purposes of distributions to be made hereunder; provided that non-Cash consideration shall not be distributed in the name of the 5.500% Unsecured Notes Trustee. As soon as practicable in accordance with the requirements set forth in this Article VI, the 5.500% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 5.500% Unsecured Notes Indenture.

(ii)    All distributions to Holders of 6.000% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 6.000% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 6.000% Unsecured Notes Claims for purposes of distributions to be made hereunder; provided that non-Cash consideration shall not be distributed in the name of the 6.000% Unsecured Notes Trustee. As soon as practicable in accordance with the requirements set forth in this Article VI, the 6.000% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 6.000% Unsecured Notes Indenture.

(iii)    All distributions to Holders of 6.250% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 6.250% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 6.250% Unsecured Notes Claims for purposes of distributions to be made hereunder; provided that non-Cash consideration shall not be distributed in the name of the 6.250% Unsecured Notes Trustee. As soon as practicable in accordance with the requirements set forth in this Article VI the 6.250% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 6.250% Unsecured Notes Indenture.

(iv)    All distributions to Holders of 7.125% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 7.125% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 7.125% Unsecured Notes Claims for purposes of distributions to be made hereunder; provided that non-Cash consideration shall not be distributed in the name of the 7.125% Unsecured Notes Trustee. As soon as practicable in accordance with the requirements set forth in

this Article VI, the 7.125% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 7.125% Unsecured Notes Indenture.

(v)     If any of the applicable Unsecured Notes Trustees are unable to make, or consent to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the cooperation of the applicable Unsecured Notes Trustee shall make such distributions to the extent practicable to do so.  The Unsecured Notes Trustees shall have no duties or responsibilities relating to any form of distribution that is not DTC eligible.  The Unsecured Notes Trustees, and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a Unsecured Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Unsecured Notes Trustees may transfer or direct the transfer of such distributions directly through facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of Unsecured Note Claims to the extent consistent with the customary practices of DTC.

e.     Delivery of Distributions on Account of 7.000% Unsecured Promissory Notes Claims

All distributions to Holders of 7.000% Unsecured Promissory Notes Claims shall be deemed completed when made to (or at the direction of) the 7.000% Unsecured Promissory Notes Trustee, which shall be deemed to be the Holder of all 7.000% Unsecured Promissory Notes Claims for purposes of distributions to be made hereunder.  As soon as practicable in accordance with the requirements set forth in this Article VI, the 7.000% Unsecured Promissory Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 7.000% Unsecured Promissory Notes Indenture.

f.     Delivery of Distributions on Account of the HHN Notes Guarantee Claims

All distributions made under the Plan on account of the Allowed HHN Notes Guarantee Claims shall be made as directed by the Plan for further distribution to Holders of Allowed Claims under the HHN Notes Indentures, including those provisions relating to the surrender and cancellation of the HHN Notes.  If the record Holder of any of the HHN Notes is Euroclear or its nominees or another securities depository or custodian thereof, and such HHN Notes are represented by a global security held by or on behalf of Euroclear or such other securities depository or custodian, then each such Holder of the HHN Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by Eurcoclear or such other securities depository or custodian thereof.

All distributions to Holders of HHN Notes Guarantee Claims shall be deemed completed when made to (or at the direction of) the HHN Notes Paying Agent in accordance with the HHN Notes Documents, who shall be deemed to be the Holder of all HHN Notes and HHN Notes Guarantee Claims for purposes of distributions to be made hereunder.  As soon as practicable in accordance with the requirements set forth in this Article VI, the HHN Notes Paying Agent shall cause such distributions to or on behalf of such Holders to be made in accordance with the HHN Notes Indentures.

If the HHN Notes Paying Agent is unable to make, or consent to the Reorganized Debtors or HHN making, such distributions, the Reorganized Debtors or HHN, with the cooperation of the HHN Notes Paying Agent shall make such distributions to the extent practicable to do so.  The HHN Notes Paying Agent shall have no duties or responsibilities relating to any form of distribution that is not Euroclear eligible.  The HHN Notes Paying Agent, and the Debtors, the Reorganized Debtors or HHN, as

applicable, shall seek the cooperation of Euroclear so that any distribution on account of HHN Notes Guarantee Claims or Claims against HHN that is held in the name of, or by a nominee of, Euroclear, shall be made through the facilities of Euroclear on the Effective Date or as soon as practicable thereafter. The HHN Notes Paying Agent may transfer or direct the transfer of such distributions directly through facilities of Euroclear (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of HHN Notes Guarantee Claims to the extent consistent with the customary practices of Euroclear. For the avoidance of doubt, such distributions shall be subject to the HHN Notes Trustee Charging Lien as set forth in the HHN Notes Indenture. Regardless of the fact that distributions to Holders of HHN Notes Guarantee Claims are made by the HHN Notes Paying Agent, the HHN Notes Trustee Charging Lien shall attach to such distributions in the same manner as if such distributions were made through the HHN Notes Trustee. Neither the HHN Notes Trustee nor the HHN Notes Paying Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

g.      Delivery of Distributions on Account of ALOC Facility Claims

All distributions to Holders of ALOC Facility Claims shall be deemed completed when made to (or at the direction of) the ALOC Facility Agent, which shall be deemed to be the Holder of all ALOC Facility Claims for purposes of distributions to be made hereunder; provided, that non-Cash consideration shall not be distributed in the name of the ALOC Facility Agent. As soon as practicable in accordance with the requirements set forth in this Article VI, the ALOC Facility Agent shall cause such distributions to or on behalf of such Holders to be made in accordance with ALOC Facility Documents.

h.      Delivery of Distributions on Account of Allowed General Unsecured Claims

The Distribution Agent shall make distributions to Holders of Allowed General Unsecured Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided, that the address for each Holder of an Allowed General Unsecured Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder or the address provided to the Distribution Agent by the Holder in writing after the Effective Date, or, if no Proof of Claim has been Filed, the address set forth in the Schedules. If a Holder holds more than one General Unsecured Claim, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

3.      No Fractional Shares, Subscription Rights, or New Warrants

No fractional Subscription Rights, shares of Reorganized Hertz Parent Common Interests or Preferred Stock, or New Warrants shall be distributed, and no Cash shall be distributed in lieu of such fractional shares or rights. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of Subscription Rights, Reorganized Hertz Parent Common Interests, Preferred Stock, or New Warrants that are not a whole number, such shares or rights, as applicable, shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number, and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of Subscription Rights, Reorganized Hertz Parent Common Interests, Preferred Stock, and New Warrants in each case, to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

4.      Minimum Distribution.

No Cash payment of less than $50.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

5.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution.  After such date, all unclaimed property or interests in property shall be redistributed Pro Rata to the Holders of Allowed Claims in the applicable Class of claims as the applicable initial Holder to which such unclaimed property or interests in property were distributed subject to the terms and conditions governing distributions in the Plan (it being understood that, for purposes of this Article VI.E.5, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed), notwithstanding any applicable federal, provincial, state, or other jurisdiction's escheat, abandoned, or unclaimed property laws to the contrary, and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.  For the avoidance of doubt, any unclaimed property or interests in property with respect to General Unsecured Claims shall be returned to the General Unsecured Recovery Cash Pool Account and distributed in accordance with Article III.B.7, Article IV.J, and Article VI.A. of this Plan.

Notwithstanding anything set forth in this Article VI.E.5, any unclaimed or undeliverable distribution of New Warrants or any portion thereof shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable or such distribution is deemed unclaimed property pursuant to this Article VI.E.5. To the extent an unclaimed or undeliverable distribution is New Warrants, such New Warrants shall be deemed cancelled. Upon such cancellation, the Interest of any Holder of Class 11 Interests or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal, provincial, state, or other jurisdiction's escheat, abandoned, or unclaimed property laws to the contrary

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Reorganized Debtors or the GUC Oversight Administrator of an intent to accept a particular distribution; (iii) responded to the Debtors' or Reorganized Debtors' or GUC Oversight Administrator's requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

F.      *Securities Registration Exemption*

The New Warrants issued under the Plan and the New Warrants Agreement (and shares of Reorganized Hertz Parent Common Interests issuable upon the valid exercise of the New Warrants) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. Shares of Reorganized Hertz Parent Common Interests and New Warrants (and shares of Reorganized Hertz Parent Common Interests issuable upon the valid exercise of the New Warrants) issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable federal, state, or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The Reorganized Hertz Parent Common Interests and New Warrants (and shares of Reorganized Hertz Parent Common Interests issuable upon the valid exercise of the New Warrants) issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (ii) will, subject to the Reorganized Hertz Parent Organizational Documents, and with respect to the New Warrants, the New Warrants Agreement, be freely tradable and transferable by any holder thereof that (a) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an

"affiliate" within 90 days of such transfer, (c) has not acquired the Reorganized Hertz Parent Common Interests or New Warrants from an "affiliate" within one year of such transfer, and (d) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

The issuance and sale, as applicable, of the Reorganized Hertz Parent Common Interests and Preferred Stock issued to the Equity Commitment Parties, Eligible Unsecured Funded Debt Holders, and Eligible Existing Hertz Shareholders are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D thereunder. Such Securities will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws. Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The Reorganized Hertz Parent Common Interests, Preferred Stock, and New Warrants may be made eligible for clearance and trading through the book entry facilities of DTC, subject to restrictions on transfer, including any restrictions under the applicable nonbankruptcy law, on or as promptly as practicable after the Effective Date, and the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of the Reorganized Hertz Parent Common Interests, the Preferred Stock, or New Warrants, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Hertz Parent Common Interests, Preferred Stock, or New Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Reorganized Hertz Parent Common Interest, the Preferred Stock, the New Warrants or shares of Reorganized Hertz Parent Common Interests issuable upon the valid conversion or exercise, as applicable, of the foregoing are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

G.      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, Reorganized Hertz Parent, the other Reorganized Debtors, and the Distribution Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions

made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Reorganized Debtors and the Distribution Agent may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim provide any information necessary to allow the distributing party to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority.  If the Reorganized Debtors or the Distribution Agent make such a request and the holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtors and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

H.    *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest to the extent Allowed herein.

I.    *No Postpetition or Default Interest on Claims*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition and default interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

J.    *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors, the Reorganized Debtors, or the GUC Oversight Administrator (in consultation with the Reorganized Debtors) solely with respect to GUC Administrator Claims, Specified Causes of Action, or GUC Administrator Claim Related Actions, as applicable, may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless (i) the Debtors have consented; and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.  Notwithstanding anything set forth in this paragraph, any set off right with respect to an assumed Executory Contract or Unexpired Lease shall be governed by applicable non-bankruptcy law, including the terms of such assumed Executory Contract or Unexpired Lease.

K.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from

a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

    2.    <u>Claims Payable by Insurers</u>

Distributions under the Plan to each holder of an Allowed Insured Claim against any Debtor shall be made in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified; except, that there shall be deducted from any distribution under the Plan on account of an Insured Claim, for purposes of calculating the Allowed amount of such Claim, the amount of any insurance proceeds actually received by such holder in respect of such Allowed Insured Claim. Nothing in this Section VI.K.2 shall constitute a waiver of any Claim, right, or Cause of Action the Debtors or their Estates may hold against any Person, including any Insurer.  Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge (i) any Insurer from any obligations to any Person under applicable law or (ii) any Insurance Policies or any rights to pursue and receive any recovery from an Insurer under the Insurance Policies.

    3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions under the Plan to Holders of Allowed Claims and/or payments by Insurers of Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

    4.    <u>Chubb Insurance Contracts</u>

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, Plan Supplement, the Plan Support Agreement, the Confirmation Order, any agreement or order related to post-petition or exit financing, any bar date notice or claim objection, any document related to the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, confers Bankruptcy Court jurisdiction, grants an injunction, discharge or release, or requires a party to opt out of or object to any releases):

(a) nothing alters, modifies or otherwise amends the terms and conditions of the Insurance Program (including any agreement to arbitrate disputes and any provisions regarding the provision, maintenance, use, nature and priority of the Chubb Collateral), except that on and after the Effective Date, the Reorganized Debtors jointly and severally shall assume the Insurance Program in its entirety pursuant to sections 105 and 365 of the Bankruptcy Code;

(b) nothing releases or discharges (i) Chubb's security interests and liens on the Chubb Collateral and (ii) the claims of the Chubb Companies arising from or pursuant to the Insurance Program and such claims are actual and necessary expenses of the Debtors' estates (or the Reorganized Debtors, as applicable) and shall be paid in full in the ordinary course of business, whether as an Allowed Administrative Claim under section 503(b)(1)(A) of the Bankruptcy Code or otherwise, regardless of when such amounts are or shall become liquidated, due or paid, without the need or requirement for Chubb to file or serve a request, motion, or application for

81

payment of or proof of any Proof of Claim, Cure Claim (or any objection to cure amounts/notices), or Administrative Claim (and further and for the avoidance of doubt, any Claims Bar Date or Administrative Claims Bar Date shall not be applicable to the Chubb Companies);

(c) the Debtors or the Reorganized Debtors, as applicable shall not sell, assign, or otherwise transfer the Insurance Program (or the proceeds thereof), including, but not limited to, under section 363 of the Bankruptcy Code except with the express written permission of the Chubb Companies; and

(d) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit:  (I) claimants with valid workers' compensation claims or direct action claims against the Chubb Companies under applicable non-bankruptcy law to proceed with their claims; (II) the Chubb Companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (A) all workers' compensation claims covered by the Insurance Program, (B) all claims where a claimant asserts a direct claim against the Chubb Companies under applicable law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Article VIII of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) the Chubb Companies to draw against any or all of the Chubb Collateral and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) to the Chubb Companies and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Program, in such order as the Chubb Companies may determine; and (IV) subject to the terms of the Insurance Program and/or applicable non-bankruptcy law, the Chubb Companies to (i) cancel any policies under the Insurance Program, and (ii) take other actions relating to the Insurance Program (including effectuating a setoff), to the extent permissible under applicable non-bankruptcy law, each in accordance with the terms of the Insurance Program.

Terms used in this Article VI.K.4, but not defined in the Plan shall have the meaning attributed to them in that certain *Order (I) Authorizing Assumption of the Insurance Program, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* entered by the Bankruptcy Court on August 5, 2020 [Docket No. 898]; for the avoidance of doubt, (i) the term Insurance Program includes, but is not limited to, the Insurance Policies issued or entered into by any of the Chubb Companies; and (ii) the term Insurers shall include the Chubb Companies.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors and (solely regarding GUC Administrator Claims and GUC Administrator Claim Related Actions) the GUC Oversight Administrator on behalf of the Reorganized Debtors, shall have and retain any and all rights and defenses that the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim.

B.    *Claims and Interests Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors and the Distribution Agent shall have the authority (i) to File, withdraw, or litigate to judgment objections to Distribution Agent Claims; (ii) to settle or compromise any Disputed Distribution Agent Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, subject to the consultation rights of the GUC Oversight Administrator provided in the GUC Settlement Procedures.

Notwithstanding anything to the contrary in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the GUC Oversight Administrator, in consultation with the Reorganized Debtors, shall have the authority (i) to File, withdraw, or litigate to judgment objections to GUC Administrator Claims, including litigating, settling, or compromising GUC Administrator Claims Related Actions related thereto; and (ii) to settle or compromise any Disputed GUC Administrator Claim without any further notice to or action, order, or approval by the Bankruptcy Court.

For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor and (solely regarding GUC Administrator Claims) the GUC Oversight Administrator on behalf of the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.V.

C.    *ADR Procedures*

Designated Claims shall be subject to and resolved in accordance with the ADR Procedures, incorporated herein by reference.  If the ADR Procedures are terminated with respect to a Designated Claim, the Reorganized Debtors, the Distribution Agent, or the GUC Oversight Administrator as applicable, shall have until the Claims Objection Deadline or, if the Claims Objection Deadline has passed, one hundred and eighty (180) days from the date of termination of the ADR Procedures with respect to such Claim to file and serve an objection to such Claim.

D.    *Estimation of Claims*

Before or after the Effective Date, except as otherwise set forth in the ADR Procedures, the Debtors (in consultation with the Committee and the Plan Sponsors), the Distribution Agent, the Reorganized Debtors, or the GUC Oversight Administrator, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection; provided, that, for the avoidance of doubt, no Claim or Interest Allowed under this Plan shall be considered a Disputed Claim or Disputed Interest.  In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors, the Reorganized Debtors, or the GUC Oversight Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting

the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

If the Debtors determine, in their reasonable discretion and in consultation with the Committee and the Plan Sponsors, that (i) one or more Disputed General Unsecured Claims are capable of estimation by the Bankruptcy Court, (ii) estimation will materially improve Effective Date distributions to Holders of Allowed General Unsecured Claims, (iii) administration of the ADR Procedures with respect to such claims is not reasonably likely to lead to an efficient and successful resolution of such Claim, and (iv) estimation is otherwise in the best interests of the Estates, the Debtors shall file one or more motions to estimate such Disputed General Unsecured Claims, which motion(s) shall be filed and noticed to be heard by the Bankruptcy Court before the Effective Date (or such other date as determined by the Bankruptcy Court).

E.      *Adjustment to Claims Register Without Objection*

Any duplicate Claim or Interest, any Claim (filed or scheduled) or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, or the GUC Oversight Administrator, as applicable, upon stipulation or any agreement in writing, including, without limitation, email correspondence, between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, but in the case of General Unsecured Claims, with notice to the GUC Oversight Administrator.

F.      *Time to File Objections to Claims*

Any objections to a Claim shall be Filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

G.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

All Proofs of Claim Filed on account of an Employee Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such Obligation, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or otherwise agreed by (1) the Debtors or the Reorganized Debtors, in consultation with the GUC Oversight Administrator with respect to**

**Claims that would be Distribution Agent Claims, or (2) the GUC Oversight Administrator with respect to Claims that would be GUC Administrator Claims, any and all Proofs of Claim Filed after the applicable Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless the Bankruptcy Court shall have determined by a Final Order, on or before the Confirmation Hearing, that cause exists to extend the Claims Bar Date as to such Proof of Claim on the basis of excusable neglect.**

H.    *Amendments to Proofs of Claim*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors (subject to the consultation rights of the GUC Oversight Administrator regarding General Unsecured Claims under the GUC Settlement Procedures), and any such new or amended Claim or Proof of Claim Filed after the Effective Date shall be deemed Disallowed in full and expunged without any further action or notice to the Bankruptcy Court; <u>provided</u>, that the filing of an unauthorized amendment shall not affect the underlying Claim or Proof of Claim.    Nothing in this paragraph shall remove any claimant's ability to seek leave from the Bankruptcy Court to amend a Claim or Proof of Claim.

I.    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim is no longer contingent.

J.    *No Distributions Pending Allowance*

Except as otherwise set forth herein, if (i) an objection to a Claim or portion thereof is Filed or (ii) the Claim has elected to participate in the ADR Procedures, no payment or distribution provided under the Plan shall be made on account of such Disputed Claims or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

K.    *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.    As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date.

L.    *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and, other than with respect to General Unsecured Claims, such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.    Notwithstanding the foregoing, in no case shall the

aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one hundred (100) percent of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.      *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any Claims for withdrawal liability that relate to services performed by employees of the Debtors before the Effective Date or that arise from a termination of employment, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan. Any default or "*event of default*" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.    *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, the Debtors and their Estates, the Reorganized Debtors and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, DIP Financing, Equity Commitment, Interim Fleet Financing Facility, DFLF Facility, Canada Fleet Financing Facility, HVF Facility Documents, HVF II Facility, HVF II Facility Documents, Donlen Sale, HHN Restructuring, HIL Facility, the Commitment Letter, the Donlen Canada Securitization Facility, the Australian Securitization Facility, the Lombard Vehicle Financing Facility, the Second Lien Note Documents, the formulation, preparation, dissemination, negotiation of the Plan, the Disclosure Statement, the Plan Support Agreement, the Equity Commitment Documents, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in this <u>Article VIII.C</u> shall not release (i) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Definitive Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

D.    *Releases by Holders of Claims and Interests*

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, DIP Financing, Equity Commitment, Interim Fleet Financing Facility, DFLF Facility, Canada Fleet Financing Facility, HVF Facility Documents, HVF II Facility, HVF II Facility Documents, Donlen Sale, HHN Restructuring, HIL Facility, the Commitment Letter, the Donlen Canada Securitization Facility, the Australian Securitization Facility, the Lombard Vehicle Financing Facility, the Second Lien Note Documents, the formulation, preparation, dissemination, or negotiation of the Plan, the Disclosure Statement,

the Plan Support Agreement, the Equity Commitment Documents, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing,  the releases set forth in this <u>Article VIII.D</u> shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, (ii) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Definitive Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (iii) except as set forth in this Plan, releasing any obligation of HHN, HUK, or any of HHN's non-Debtor subsidiaries under the HHN Notes Documents.

E.  *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission from the Petition Date to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, in whole or in part, the Debtors, DIP Financing, Equity Commitment, Interim Fleet Financing Facility, DFLF Facility, Canada Fleet Financing Facility, HVF II Facility, Donlen Sale, HHN Restructuring, HIL Facility, the Donlen Canada Securitization Facility, the Australian Securitization Facility, the Lombard Vehicle Financing Facility, the formulation, preparation, dissemination, negotiation, of the Plan, the Disclosure Statement, the Plan Support Agreement, the Equity Commitment Documents, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon Consummation of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

F.  *Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR DISTRIBUTIONS REQUIRED TO BE PAID OR DELIVERED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO <u>ARTICLE VIII.C</u> OR <u>ARTICLE VIII.D</u>, SHALL BE DISCHARGED PURSUANT TO <u>ARTICLE VIII.B</u> OF THE

**PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO <u>ARTICLE VIII.E</u>, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO <u>ARTICLE VIII.E</u> WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH THE TERMS OF THIS PLAN EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.**

G.      *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, any of the intercreditor agreements with respect to the Prepetition Debt Documents or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan. Nothing in the Plan shall release or otherwise impair any subordination agreement between creditors, including the First Lien Agent's rights to enforce any subordination agreement against the Second Lien Note Trustee pursuant to Bankruptcy Code section 510 or any such subordination agreement and the rights and defenses of the Second Lien Note Trustee related to any such enforcement.

H.      *Release of Liens*

Except (i) with respect to the Liens securing (a) the New Reorganized Corporate Debt, and (b) to the extent elected by the Debtors with respect to an Allowed Other Secured Claim in accordance with <u>Article III.B.2</u>; or (ii) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of

such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to Article IX.B):

1.    the Bankruptcy Court shall have entered the Disclosure Statement Order and approved the Rights Offering Procedures, solicitation procedures, and other materials related to the Plan, in form and substance consistent with the Plan Support Agreement and the Equity Commitment Documents and otherwise reasonably acceptable to the Debtors and the Plan Sponsors;

2.    the Bankruptcy Court shall have entered the ECA Approval Order, which order shall not have been stayed pending appeal, in form and substance consistent with the Equity Commitment Documents and otherwise reasonably acceptable to the Plan Sponsors;

3.    the Equity Commitment Documents shall have been executed and delivered by each Entity party thereto and shall remain in full force and effect, all conditions shall have been satisfied thereunder or waived by the parties to the Equity Commitment Agreement, and there shall be no breach that would give rise to the right to terminate the Equity Commitment Agreement for which notice has been given in accordance with the terms thereof, and, contemporaneously with the occurrence of the Effective Date, the Debtors shall have issued the Reorganized Hertz Parent Common Interests and Preferred Stock to the Equity Commitment Parties;

4.    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance materially consistent with the Plan and otherwise reasonably acceptable to the Debtors and the Plan Sponsors and such order shall not have been stayed pending appeal;

5.    the Plan Support Agreement shall be in full force and effect with respect to the Debtors and the Plan Sponsors;

6.    the Definitive Documents shall contain terms and conditions consistent in all material respects with the Plan, the Equity Commitment Documents, and the Plan Support Agreement or otherwise acceptable to the Debtors and the Plan Sponsors;

7.    each of the Equity Commitment Parties, or its respective affiliates or related funds, (or their replacements consistent with the terms of the Equity Commitment Documents) shall have purchased its respective allocation of the Preferred Stock and Reorganized Hertz Parent Common Interests consistent with the terms of the Equity Commitment Documents;

8.    the Rights Offering, conducted in accordance with the Rights Offering Procedures, shall have been consummated;

9.    the Equity Commitment Parties shall have purchased the Unsubscribed Shares, if any;

10.    the Professional Fee Escrow shall have been established and funded in Cash in accordance with Article II.E.3;

11.    the Transaction Expenses, then known or submitted to the Debtors shall have been paid in full in Cash through and including the Effective Date;

12.    the General Unsecured Recovery Cash Pool Account shall have been established and funded in Cash in accordance with Article IV.J;

13.    the Debtors shall have caused HVF II to pay the then-outstanding HVF II Obligations in full in Cash in the sequence set forth in the HVF II Refinancing Steps Document;

14.    the HVF III Documents shall have been executed and delivered by each Entity party thereto and shall be effective;

15.    the conditions precedent to the entry into the HVF III Documents shall have been satisfied, waived, or shall be contemporaneously with the occurrence of the Effective Date;

16.    the Exit Facility Documents shall have been executed and delivered by each Entity party thereto and shall be effective;

17.    the conditions precedent to entry into the New Reorganized Corporate Debt shall have been satisfied, waived, or shall be satisfied contemporaneously with the occurrence of the Effective Date;

18.    the Debtors shall have obtained the Tail D&O Policy;

19.    the Debtors shall have designated a portion of the New Money Investment to be used for the purpose of paying all obligations under the HIL Facility in full in Cash in accordance with the terms thereof; and

20.    all conditions precedent to the issuance of the Reorganized Hertz Parent Common Interests and Preferred Stock, other than any conditions related to the occurrence of the Effective Date, shall have occurred.

B.    *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this Article IX may be waived only if waived in writing by the Debtors, the Plan Sponsors and, to the extent such conditions relate to a Consenting Investor Provision, the Requisite Consenting Investors, except that Article IX.A.3, IX.A.7, IX.A.8, and IX.A.9, may be waived solely by (i) the Debtors or (ii) the Plan Sponsors and, to the extent such conditions relate to a Consenting Investor Provision, the Requisite Consenting Investors, as applicable, if the reason for the failure of such conditions is the result in whole or in part of a breach of the Equity Commitment Parties or the Debtors, as applicable, of their obligations, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

C.    *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

D.    *Committee Complaint*

Upon entry of the Confirmation Order, the Committee Complaint shall be held in abeyance and all deadlines and hearings in respect thereof shall be tolled *sine die* pending the Effective Date.  The

tolling of all deadlines and hearings set out in the preceding sentence shall apply to any and all pending and contemplated actions involving Released Parties and Releasing Parties that would otherwise be released pursuant to the Plan on the Effective Date.

Upon the occurrence of the Effective Date, the Committee Complaint shall be deemed voluntarily dismissed with prejudice and notice of said dismissal shall be filed on the docket of the adversary proceeding related thereto.

E.      *Bifurcation Motion*

The Bifurcation Motion shall be held in abeyance and all deadlines and hearings in respect thereof shall be tolled *sine die* pending the Effective Date.  The tolling of all deadlines and hearings set out in the preceding sentence shall apply to any and all pending and contemplated actions involving Released Parties and Releasing Parties that would otherwise be released pursuant to the Plan on the Effective Date.

Nothing herein shall prevent the Debtors from withdrawing the Bifurcation Motion at any time. Upon the occurrence of the Effective Date, the Bifurcation Motion shall be deemed voluntarily dismissed with prejudice and notice of said dismissal shall be filed on the docket in the Chapter 11 Cases.

F.      *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to the consent of the Plan Sponsors and any other applicable consent rights set forth in the Plan Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan.  Subject to the consent of the Plan Sponsors and any other applicable consent rights set forth in the Plan Support Agreement and subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  The Debtors have the right to amend the treatment of any Class under the Plan other than Class 7 General Unsecured Claims as permitted by the Bankruptcy Code and Bankruptcy Rules; provided, that any such amendment shall not adversely affect in any way the recovery to the Class 7 General Unsecured Claims.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Effect of Confirmation*

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date the findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing. Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if stated as findings of fact.

D.    *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, in accordance with the preceding sentence, or if Confirmation and Consummation do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the non-Debtor subsidiaries.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.    Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease,

93

Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (ii) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, the schedule of Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to Article V; and (iii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4. adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to Causes of Action;

7. adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, including any order sought by the GUC Oversight Administrator with respect to its rights, powers, and duties set forth in the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9. enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K.1;

14. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16. adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

20.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the release or exculpation provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order concluding or closing the Chapter 11 Cases;

25.     hear and determine any disputes between the GUC Oversight Administrator and the Reorganized Debtors; and

26.     enforce the compromise, settlement, injunction, release, and exculpation provisions set forth in Article VIII.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement or other Definitive Documents that have a jurisdictional, forum selection, or dispute resolution clause that requires actions to be brought in a court other than the Bankruptcy Court and any disputes concerning documents contained in the Plan Supplement or any Definitive Document that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees*

All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees in full in Cash when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

D.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with Article IX.A hereof.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.    *Transaction Expenses*

The Transaction Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid prior to or during the course of the Chapter 11 Cases) pursuant to the terms of the Equity Commitment Agreement without any requirement: (i) to file a fee application with the Bankruptcy Court; (ii) for review or approval by the Bankruptcy Court or any other party (other than the Debtors); (iii) to comply with any guidelines of the U.S. Trustee; or (iv) to provide itemized time detail; provided, that the applicable advisors will provide additional detail as reasonably requested by the Debtors.  All Transaction Expenses to be paid on the Effective Date shall be estimated as of the Effective Date and summary invoices evidencing such amounts shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; provided that any estimates provided shall not be considered an admission or limitation with respect to such Transaction Expenses.  The Transaction Expenses are Allowed in full as Administrative Claims and shall not be subject to the Administrative Claims Bar Date.

On the Effective Date, the Debtors shall pay in full and in Cash the Unsecured Notes Trustees' Fees and the 7.000% Unsecured Promissory Notes Trustee's Fees.[3]

---

[3] Notwithstanding anything to the contrary herein, to the extent not paid as Transaction Expenses, the 7.000% Unsecured Promissory Notes Trustee reserves all rights to seek payment of the 7.000% Unsecured Promissory Notes Trustee's Fees as a General Unsecured Claim or other Claim.

F.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

| | |
|---|---|
| Debtors | Hertz Global Holdings, Inc.<br>8501 Williams Road<br>Estero, Florida 33982<br>Attn.: M. David Galainena<br>dave.galainena@hertz.com |
| | <u>with copies to</u>: |
| Counsel to Debtors | White & Case LLP<br>Southeast Financial Center<br>200 South Biscayne Boulevard, Suite 4900<br>Miami, Florida 33131<br>Attn.: Thomas E Lauria; Matthew Brown<br>tlauria@whitecase.com<br>mbrown@whitecase.com |
| | - and - |
| | White & Case LLP<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Attn: David Turetsky<br>david.turetsky@whitecase.com |
| | - and - |
| | Richards, Layton & Finger, PA<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801<br>Attn: John Knight; Brett M. Haywood<br>knight@rlf.com<br>haywood@rlf.com |
| Counsel to Certares, Knighthead, and Amarillo | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn: Stephen E. Hessler, P.C.<br>shessler@kirkland.com |

|                    | - and -                                                                                                                                                                                              |
|--------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                    | Kirkland & Ellis LLP<br>300 N LaSalle Dr,<br>Chicago, IL 60654<br>Attn: John R. Luze<br>john.luze@kirkland.com                                                                                        |
| Counsel to Apollo  | Paul, Weiss, Rifkind,<br>Wharton & Garrison, LLP<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Attn: Jeffrey D. Saferstein,<br>Kyle J. Kimpler<br>jsaferstein@paulweiss.com<br>kkimpler@paulweiss.com |

H.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.    *Entire Agreement*

The Plan, Plan Supplement, and Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

J.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; provided, that at the request of the Debtors (in consultation with the Plan Sponsors), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors and the Plan Sponsors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent from the Debtors; and (iii) nonseverable and mutually dependent.

K.    *Dissolution of Committee*

On the Effective Date, the Committee and any other official committees appointed in the Chapter 11 Cases will dissolve; provided that, following the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or

applications, and any relief related thereto, for compensation by Professionals and requests for Allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals of the Confirmation Order or other appeal to which the Committee is a party; and (iii) matters relating to the initial distribution of General Unsecured Claims (if such initial distribution is not made on the Effective Date).  The Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expense relating to actions of the Committee after the Effective Date taken with respect to the foregoing limited purposes subject to a maximum aggregate amount to be agreed by the Debtors, Committee, and Plan Sponsors and identified in the Plan Supplement.  Upon the dissolution of the Committee, the Committee Members and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

L.      *Expedited Tax Determination*

The Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors for all taxable periods through the Effective Date.

*[Remainder of page intentionally left blank.]*

Respectfully submitted, as of May 12, 2021

Hertz Global Holdings, Inc.
The Hertz Corporation
The Debtors

By: _____
Name:    M. David Galainena
Title:      General Counsel

**EXHIBIT A**
**New Warrant Term Sheet[4]**

| | |
|---|---|
| **Issuer:** | Reorganized Hertz Parent (the "<u>Issuer</u>"). |
| **Participants:** | All Existing Hertz Shareholders other than Eligible Existing Hertz Shareholders that elect to receive Shareholder Subscription Rights in lieu of the New Warrants in accordance with the Plan on a Pro Rata basis (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests). |
| **Security:** | New Warrants to purchase Reorganized Hertz Parent Common Interest representing up to 18.0% of the aggregate number of Reorganized Hertz Parent Common Interests issued and outstanding on the Effective Date (with such percentage reduced proportionally to account for Holders of Existing Hertz Parent Interests that elect to receive the Shareholder Subscription Rights in accordance with the Plan and calculated after giving effect to the issuance of all Reorganized Hertz Parent Common Interest issuable upon exercise of New Warrants (the "<u>Warrant Shares</u>")), subject to dilution on account of (i) the Management Incentive Plan (which will reserve Reorganized Hertz Parent Common Interests, on a fully diluted basis (assuming full exercise of the New Warrants)), and (ii) the terms described under "Anti-Dilution/Adjustments" below with respect to any other issuances of Reorganized Hertz Parent Common Interests on or following the Effective Date (other than pursuant to the Plan). |
| | The New Warrants shall be allocated among the Holders in proportion to their relative holdings of Existing Hertz Parent Interests as set forth in the Plan.  For the avoidance of doubt, the Reorganized Hertz Parent Common Interests for which the Warrants are exercisable will be of the same class that is issued as Reorganized Hertz Parent Common Interests pursuant to the Plan. |
| | The New Warrants will not be subject to any redemption or call by Reorganized Hertz Parent. |
| **Exercise Price:** | The exercise price (as the same may be adjusted from time to time, the "<u>Exercise Price</u>") for each Warrant Share shall be equal to (i) a total equity value of $6,500,000,000 of the Issuer ("<u>Strike Equity Value</u>") <u>divided</u> by (ii) the number of Reorganized Hertz Parent Common Interests issued under the Plan on the Effective Date. |
| | The New Warrants may be exercised by the holders on a cashless basis. |

---

[4]    Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the *Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and its Debtor Affiliates* to which this term sheet is attached as **<u>Exhibit A</u>**.

**Transfers:** The New Warrants shall be freely transferable, subject only to applicable securities laws and the restrictions on transfers and sales of New Warrants and Reorganized Hertz Parent Common Interest set forth in the Plan Supplement (which transfer and sale restrictions shall be limited to restrictions on transfers and sales (i) to competitors, (ii) that the Issuer has previously notified would result in Reorganized Hertz Parent being subject to reporting requirements under the Securities and Exchange Act of 1934, as amended, if it is not already subject to such requirements as of any applicable time of determination, (iii) restrictions necessary to preserve any favorable tax attributes of Reorganized Hertz Parent, as determined in good faith by the Reorganized Hertz Parent Board and (iv) such other transfer restrictions to be set forth in the organizational documents of Reorganized Hertz Parent, which shall be consistent with the terms of this Term Sheet and the Plan.

**Expiration Date:** Thirty (30) years from the Effective Date.

**Anti-Dilution/Adjustments:** The New Warrants shall be subject to anti-dilution protection regarding the Exercise Price and number of Reorganized Hertz Parent Common Interests to be issued upon the exercise of the New Warrants in the event of (a) any stock dividends, stock distributions, stock splits, reverse stock splits, stock subdivisions, consolidations, exchanges, reclassifications, combinations, or other similar transactions, (b) mergers, consolidations, sale of all or substantially all of the Company's assets to another Person, tender offers, exchange offers, recapitalizations, capital reorganizations or similar structural transactions, or (c) subject to customary exceptions, issuances of equity interests below fair market value.

Upon a change-of-control transaction resulting in all or a part of the consideration paid to or exchanged for Reorganized Hertz Parent Common Interests consisting of cash, property or other assets or securities other than listed and registered securities, the holders of New Warrants would be entitled to value protection through a customary Black-Scholes protection provision.

**New Warrant Agreement:** The New Warrants will be subject to the New Warrants Agreement, which shall set forth the rights described herein and other customary terms and conditions. The New Warrants Agreement shall be governed by the laws of the State of Delaware and may not be amended without the consent of (i) holders holding at least 50.01% of the New Warrants and (ii) Reorganized Hertz Parent. Notwithstanding the foregoing, any amendment that materially and adversely affects any right of a holder of a New Warrant under the New Warrants Agreement relative to the other Holders shall require the consent of such affected New Warrant holder.

3

The New Warrant Agreement will also provide that (i) Reorganized Hertz Parent will be required to reserve for issuance a sufficient number of shares of Reorganized Hertz Parent Common Interests to allow for the full exercise of the New Warrants, (ii) Reorganized Hertz Parent will be required to use its reasonable best efforts to cause the warrants to be listed on the same stock exchange, if any, on which the Reorganized Hertz Parent Common Interests may be listed, and (iii) related party transactions with any of the Plan Sponsors or their Affiliates must be on terms no less favorable to Reorganized Hertz Parent or the applicable subsidiary than terms that would be obtained by Reorganized Hertz Parent or the such subsidiary from a disinterested third party on an arm's length basis, subject to customary exceptions, including for transactions that are approved by a majority of the disinterested directors of Reorganized Hertz Parent