*SOLICITATION VERSION*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| The Hertz Corporation, *et al.*,[1] | Case No. 20-11218 (MFW) |
| Debtors. | (Jointly Administered) |

### SUPPLEMENT TO DISCLOSURE STATEMENT FOR FIRST MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE HERTZ CORPORATION AND ITS DEBTOR AFFILIATES

**WHITE & CASE LLP**
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700

J. Christopher Shore (admitted *pro hac vice*)
David M. Turetsky (admitted *pro hac vice*)
Andrew T. Zatz (admitted *pro hac vice*)
Andrea Amulic (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200

Jason N. Zakia (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 881-5400

Roberto J. Kampfner (admitted *pro hac vice*)
Ronald K. Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
Andrew Mackintosh (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Brett M. Haywood (No. 6166)
Christopher M. De Lillo (No. 6355)
J. Zachary Noble (No. 6689)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700

*Attorneys for the Debtors and Debtors in Possession*

Dated: May 14, 2021

---

[1]    The last four digits of The Hertz Corporation's tax identification number are 8568.  The location of the debtors' service address is 8501 Williams Road, Estero, FL 33928.  Due to the large number of debtors in these chapter 11 cases, which are jointly administered for procedural purposes only, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at: https://restructuring.primeclerk.com/hertz.

Table of Contents

Page

I.     INTRODUCTION.................................................................................................... 1
II.    SUBSEQUENT DEVELOPMENTS IN THE CHAPTER 11 CASES
       PERTAINING TO THE DEBTORS' PLAN OF REORGANIZATION .............. 5
       A.    FURTHER COMPETITION IN PLAN SPONSORSHIP HAS RESULTED
             IN A CHANGE IN PLAN SPONSORS .................................................... 5
       B.    NEW AGREEMENTS CONCERNING SUPPORT FOR AND
             IMPLEMENTATION OF THE PLAN ...................................................... 7
       C.    THE NEW PLAN SPONSORS.................................................................. 7
III.   OVERVIEW OF THE PLAN ................................................................................. 8
IV.    SUPPLEMENTAL DISCLOSURE WITH RESPECT TO  CERTAIN
       MODIFICATIONS TO THE PLAN....................................................................... 13
       A.    MODIFICATIONS TO THE RELEASE PROVISIONS............................ 13
             1.    Releases by the Debtors ................................................................13
             2.    Releases by Holders of Claims and Interests .......................................14
             3.    Exculpation....................................................................................14
       B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS 14
             1.    Revised Treatment of Certain Claims and Interests ............................14
       C.    MEANS FOR IMPLEMENTATION OF THE PLAN................................. 21
             1.    Certain Revisions Relating to Unimpairment of General
                   Unsecured Claims..........................................................................21
             2.    Distributions on Account of Allowed Claims Will Be Paid from
                   the Reorganized Debtors' General Funds ...........................................22
             3.    Plan Sponsor Direct Equity Investment ...............................................22
             4.    Rights Offering...............................................................................24
             5.    The Reorganized Debtor Organizational Documents ..........................28
             6.    Reorganized Hertz Parent and Reorganized Hertz Corp. Board ..........28
             7.    Additional Tax Matters....................................................................29
V.     SOLICITATION AND VOTING PROCEDURES ................................................. 29
VI.    CONCLUSION AND RECOMMENDATION ...................................................... 30

**EXHIBITS**

EXHIBIT A:   Plan
EXHIBIT B:   Plan Support Agreement
EXHIBIT C:   Equity Purchase Agreement

i

**I.**
**INTRODUCTION**

On May 22, 2020, The Hertz Corporation and certain of its affiliates, the debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), each commenced a case (collectively, the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors continue to operate their business as debtors and debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

The Debtors' proposal for the reorganization of their business is set forth in the *First Modified Third Amended Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and Its Debtor Affiliates* dated May 14, 2021 (the "**Plan**") attached hereto as **Exhibit A**. This proposal differs, as set forth below, from the proposal set forth in the *Fourth Modified Second Amended Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and Its Debtor Affiliates* dated April 22 (the "**Prior Plan**") as to which the Debtors have already begun soliciting votes.

**THE TREATMENT PROPOSED FOR CERTAIN HOLDERS OF CLAIMS OR INTERESTS UNDER THE PLAN IS BETTER THAN THAT PROPOSED UNDER THE PRIOR PLAN. NO HOLDER OF A CLAIM OR INTEREST WILL RECEIVE TREATMENT UNDER THE PLAN THAT IS LESS FAVORABLE THAN WAS PROPOSED UNDER THE PRIOR PLAN. UNDER THE PLAN, ALL CREDITORS WILL BE PAID IN FULL TO THE EXTENT OF THE ALLOWED AMOUNTS OF THEIR RESPECTIVE CLAIMS OR HAVE THEIR CLAIMS REINSTATED. DIFFERENCES IN TREATMENT OF CLASSES BETWEEN THE PLAN AND THE PRIOR PLAN ARE SUMMARIZED AS FOLLOWS:[2]**

| Class | Summary of Prior Plan Treatment of Allowed Claims/Interests | Summary of Revised Plan Treatment of Allowed Claims/Interests |
|---|---|---|
| 5. Unsecured Funded Debt Claims | Pro Rata share of 48.2% of the Reorganized Hertz Parent Common Interests plus warrants. 75% estimated recovery. | *100% payment in Cash*. |
| 7. General Unsecured Claims | Pro Rata Share of $550 million plus proceeds of the Specified Causes of Action. 100% estimated recovery subject to diminution for Allowed Claims above estimates with no guaranteed minimum recovery. | *100% payment in Cash or Reinstatement*. |
| 8. Prepetition Intercompany Claims | Either reinstated or canceled and released without any distribution according to claimant and/or discretion of Reorganized Debtors in consultation with Plan Sponsors. | *Reinstatement or treatment as agreed by the applicable Debtors or Reorganized Debtors in consultation with the Plan Sponsors*. |
| 11. Existing Hertz Parent Interests | Pro Rata share of 10-year warrants for 10% of the equity in the Reorganized Debtors. | *Cash in the amount of $1.53 per share, plus Pro Rata shares of (a) 3% of the Reorganized Hertz* |

---

[2] This summary is a general summary of changes and treatment only. Further detail with respect to treatment of Claims and Interests under the Plan is contained in Section IV.B.1 of this Supplemental Disclosure.

1

| Class | Summary of Prior Plan Treatment of Allowed Claims/Interests | Summary of Revised Plan Treatment of Allowed Claims/Interests |
|---|---|---|
| | | *Parent Common Interests and (b) either (i) 30-year warrants for 18% of the equity in the Reorganized Debtors struck at an equity value of $6.5 billion, or (ii) rights to participate in a $1.635 billion offering for approximately 35% of Reorganized Hertz Parent Common Interests at a per share price based on a total equity value of approximately $4.7 billion.* |

This document (the "**Supplemental Disclosure**") is a supplement to the *Disclosure Statement for Fourth Modified Second Amended Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and Its Debtor Affiliates* [D.I. 4130] (the "**Disclosure Statement**"). Where the context requires, each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the Plan, or, if not defined therein, in the Disclosure Statement.

The purpose of this Supplemental Disclosure is to apprise holders of Claims against and Interests in the Debtors of (i) certain developments in the Chapter 11 Cases since the Bankruptcy Court approved the Disclosure Statement and authorized the Debtors to solicit votes to accept or reject the Prior Plan, and (ii) certain changes to the Plan relative to the Prior Plan that the Debtors believe may be material to certain Holders of Interests in determining whether to vote to accept or reject the Plan. As a consequence of the revised treatment under the Plan outlined above and more fully described herein, only Holders of Class 11 – Existing Hertz Parent Interests are entitled to vote on the Plan.

This Supplemental Disclosure supplements the Disclosure Statement. By this Supplemental Disclosure, the Debtors do not intend to, and do not, update all information contained in the Disclosure Statement or describe all differences between the Plan and the Prior Plan. Rather, the Debtors update, or otherwise furnish, only such information as they believe is necessary to enable a hypothetical Holder who is typical of Holders of Class 11 – Existing Hertz Parent Interests to make an informed judgment about how to vote on the Plan. The information provided in this Supplemental Disclosure is provided solely for the purposes of soliciting acceptances of the Plan and should not be relied upon for any purposes other than to determine whether and how to vote on the Plan. Without limiting the generality of the foregoing, the contents of this Supplemental Disclosure should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

**THIS SUPPLEMENTAL DISCLOSURE AND THE DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETIES BY THE PLAN. IN THE EVENT OF A CONFLICT BETWEEN THE TERMS OF THE PLAN, ON THE ONE HAND, AND THIS SUPPLEMENTAL DISCLOSURE OR THE DISCLOSURE STATEMENT, ON THE OTHER, THE TERMS OF THE PLAN SHALL CONTROL. IN THE EVENT OF A**

AMERICAS 107163401

CONFLICT BETWEEN THE TERMS OF THIS SUPPLEMENTAL DISCLOSURE AND THE DISCLOSURE STATEMENT, THE TERMS OF THIS SUPPLEMENTAL DISCLOSURE SHALL CONTROL.

The statements and financial information contained in this Supplemental Disclosure have been made as of the date of this Supplemental Disclosure unless otherwise specified.  Holders of Claims and Interests reviewing this Supplemental Disclosure should not assume at the time of such review that there have been no changes in the facts set forth in this Supplemental Disclosure since the date of this Supplemental Disclosure.

Each Holder of a Class 11 – Existing Hertz Parent Interests should carefully review the Plan, the Disclosure Statement, and this Supplemental Disclosure in their entireties.  Neither the Disclosure Statement nor this Supplemental Disclosure constitutes legal, business, financial, or tax advice. Any Person desiring any such advice should consult with their own advisors.

No representations concerning the Debtors or the value of their property have been authorized by the Debtors other than as set forth in this Supplemental Disclosure, the Disclosure Statement, and the documents attached thereto.  Any information, representations, or inducements made to obtain an acceptance of the Plan which are other than as set forth in, or inconsistent with the information contained in, this Supplemental Disclosure, the Disclosure Statement, the documents attached thereto, or the Plan should not be relied upon by any Holder of a Claim or Interest.

With respect to contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Supplemental Disclosure does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver, but rather as a statement made in the context of settlement negotiations under Rule 408 of the Federal Rules of Evidence.

The financial information contained in or incorporated by reference into this Supplemental Disclosure has not been audited, unless specifically indicated otherwise.

VOTING ON THE PLAN IS CURRENTLY UNDERWAY.  IF YOU HAVE ALREADY VOTED TO ACCEPT THE PRIOR PLAN YOUR VOTE TO ACCEPT, TO THE EXTENT YOUR CLASS IS NOT OTHERWISE DEEMED TO ACCEPT THE PLAN, SHALL BE TREATED AS A VOTE TO ACCEPT THE PLAN BECAUSE NO HOLDER OF A CLAIM OR INTEREST WILL RECEIVE TREATMENT UNDER THE PLAN THAT IS LESS FAVORABLE THAN THAT PROPOSED UNDER THE PRIOR PLAN.

IF YOU HAVE ALREADY VOTED ON THE PLAN AND WISH TO CHANGE YOUR VOTE YOU MAY DO SO BY SUBMITTING A BALLOT TO THE DEBTORS' SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE, WHICH REMAINS JUNE 1, 2021 AT 4:00 P.M. (PREVAILING EASTERN TIME).

THE SOLICITATION PROCEDURES AND THE DATES AND DEADLINES SET FORTH IN THE DISCLOSURE STATEMENT ORDER CONTINUE TO GOVERN THE SOLICITATION OF VOTES ON THE PLAN AND ARE NOT CHANGED BY THIS SUPPLEMENTAL DISCLOSURE.  HOWEVER, HOLDERS OF CLASS 5 – UNSECURED FUNDED DEBT CLAIMS AND CLASS 7 – GENERAL UNSECURED CLAIMS SHALL BE DEEMED TO ACCEPT THE PLAN AND SHALL NOT BE ENTITLED TO VOTE THEREON.  AS A RESULT, THEY WILL ALSO BE DEEMED BY THE PLAN TO HAVE CONSENTED TO RELEASES CONTAINED IN THE PLAN UNLESS SUCH HOLDERS OBJECT.  THEREFORE, TO THE EXTENT THAT ANY

3

**HOLDER OF A CLASS 5 – UNSECURED FUNDED DEBT CLAIM OR CLASS 7 – GENERAL UNSECURED CLAIM WISHES TO NOT PROVIDE RELEASES AS SET FORTH IN THE PLAN, SUCH HOLDER MUST TIMELY OBJECT TO THE RELEASES PROVIDED IN ARTICLE VIII.D OF THE PLAN.**

As provided in the Disclosure Statement and the Disclosure Statement Order, you may submit your Ballot via mail at the address listed below or online at the Prime Clerk website listed below. **In order to be counted as votes to accept or reject the Plan, all Ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are actually received by the Solicitation Agent on or before the Voting Deadline:**

**Delivery of Ballots by Mail:**

The Hertz Corporation Ballot Processing Center
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

**Delivery of Ballots Online:**

To submit your Ballot via the Solicitation Agent's online portal, please
visit https://cases.primeclerk.com/Hertz. Click on the "Submit E-Ballot"
section of the website and follow the instructions to submit your ballot.

Special procedures are set forth in the Disclosure Statement Order and Solicitation Procedures for beneficial holders who hold securities through a broker, dealer, commercial bank, trust company, or other agent or nominee ("**Nominee**"). If you received a Solicitation Package addressed to or sent from your Nominee, please return your Ballot to your Nominee allowing enough time for your Nominee to cast your vote on a Ballot or Master Ballot before the Voting Deadline. Please review the Disclosure Statement Order and Solicitation Procedures for further information concerning such special voting instructions.

The Confirmation Hearing will commence on June 10, 2021, at 10:30 a.m. (prevailing Eastern Time), before the Honorable Mary F. Walrath, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.

The Debtors or the Bankruptcy Court may continue the Confirmation Hearing from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the Master Service List and the entities who have filed an objection to the Plan. The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

The Confirmation Objection Deadline is June 1, 2021, at 4:00 p.m. (prevailing Eastern Time). All objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties-in-interest in accordance with the Disclosure Statement Order so that they are received on or before the Confirmation Objection Deadline.

The Plan, the Disclosure Statement, this Supplemental Disclosure, the Disclosure Statement Order, and the Plan Supplement and exhibits, once filed, and other documents and materials related thereto may be obtained by: (a) calling the Debtors' toll-free restructuring hotline at (877) 428-4661 (domestic toll-free) or +1 (929) 955-3421 (international), (b) accessing the

4

Debtors' restructuring website at https://restructuring.primeclerk.com/hertz/, (c) writing to The Hertz Corporation Ballot Processing Center, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165, or (d) emailing hertzinfo@primeclerk.com (with 'Hertz' in the subject line).  You may also access from these materials for a fee via PACER at http://www.deb.uscourts.gov/.

## II.
## SUBSEQUENT DEVELOPMENTS IN THE CHAPTER 11 CASES PERTAINING TO THE DEBTORS' PLAN OF REORGANIZATION

### A.  FURTHER COMPETITION IN PLAN SPONSORSHIP HAS RESULTED IN A CHANGE IN PLAN SPONSORS

As set forth in the Disclosure Statement, the Debtors began the process of negotiating a chapter 11 plan in November of 2020.  At the time of the Disclosure Statement, the Prior Plan, sponsored by an investor group led by Centerbridge Partners, L.P., Warburg Pincus LLC, and Dundon Capital Partners, LLC (the "**PE Sponsors**") and the Initial Consenting Noteholders (referred to in the Prior Plan with the PE Sponsors as the "Plan Sponsors" and herein as the "**Prior Plan Sponsors**") represented the highest and best restructuring transaction available to the Debtors.  However, the Debtors remained entitled, subject to limitations contained in the "Plan Support Agreement" as defined in the Disclosure Statement (the "**Prior Plan Support Agreement**") and the Stock Purchase Agreement, to consider alternative plan proposals.

At the time that the Bankruptcy Court approved the Disclosure Statement, an investor group led by Certares Opportunities LLC and its affiliates ("**Certares**") and Knighthead Capital Management, LLC and its affiliates ("**Knighthead**") continued to express interest in sponsoring the Debtors' emergence from chapter 11 protection, with substantial investment from one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by Apollo Capital Management, L.P. or its affiliates (collectively, "**Apollo**").  Certares and Knighthead are referred to in the Disclosure Statement as the "Initial Plan Sponsors" and are referred to, together with Apollo, herein and in the Plan as the "**Plan Sponsors**."

In order to preserve their projected schedule for Confirmation and emergence from chapter 11 protection, the Debtors filed a motion with the Bankruptcy Court [D.I. 4208] (the "**Bidding Procedures Motion**") to create a timeline and structure around subsequent plan proposals.  The Bankruptcy Court approved by the Bidding Procedures Motion by order dated April 28, 2021 [D.I. 4310] (the "**Bidding Procedures Order**").  The Bidding Procedures Order fixed (a) May 2, 2021 as the deadline for the Plan Sponsors to submit an "Alternative Qualified Proposal" to the Debtors; (b) two days subsequent to receipt of any such "Alternative Qualified Proposal" as the deadline for the Debtors to determine if it constitutes a "Superior Transaction" within the meaning of such term in the Stock Purchase Agreement, (c) three days subsequent to any such determination by the Debtors for the Prior Plan Sponsors to indicate whether they intend to make a counteroffer to any such "Superior Transaction," (d) May 10, 2021 as the date of an auction, as necessary, to determine the highest and best proposal for a chapter 11 plan (the "**Auction**"), (e) May 11, 2021 as the deadline for the Debtors to file any proposed supplemental solicitation materials in respect of a revised chapter 11 plan, (f) May 12, 2021 as the deadline for objections to approval of the "Successful Bidder" and any proposed supplemental solicitation materials, and (g) May 14, 2021 as the date of the hearing before the Bankruptcy Court to consider approval of, among other things,

5

the Debtors' exercise of their business judgment in their determination of the "Successful Bidder" and any proposed supplemental solicitation materials and procedures.

In accordance with the Bidding Procedures Order, the Debtors received an unsolicited plan proposal from the Plan Sponsors on May 2, 2021, including related documentation and exit financing commitments. On May 4, 2021, the Board of Directors of Hertz Parent and Hertz Corp. concluded, in good faith and after considering the advice of their outside counsel and independent financial advisors, that the May 2 proposal was a Superior Proposal as defined in the Prior Plan Support Agreement and the Stock Purchase Agreement. The Debtors provided a notice of, and rationale for, such determination to the Prior Plan Sponsors on May 4, 2021 along with copies of the related documents. On May 7, 2021, the Prior Plan Sponsors notified the Debtors of their intention to make a counter-proposal to the Plan Sponsors' May 2 proposal.

Accordingly, beginning on May 10, 2021, the Debtors conducted the Auction in accordance with the Bidding Procedures Order. The Auction continued into May 11, 2021. After multiple rounds of bidding over the course of approximately 20 hours, the Debtors assessed the last bid from each of the Prior Plan Sponsors and the Plan Sponsors as being substantially equivalent. The Debtors thereafter requested that the competing sponsorship groups submit their best and final bids. Each competing sponsorship group timely submitted a bid in response to the Debtors' request. The Finance Committee, and then the full Board of Directors, of Hertz Parent and Hertz Corp., in consultation with the Debtors' independent legal and financial advisors, analyzed these bids and concluded, approximately 32 hours after the commencement of the Auction, that the bid submitted by the Plan Sponsors was superior and determined that the Plan Sponsors were the "Successful Bidder." On May 12, 2021, the Debtors notified the Bankruptcy Court of such determination and submitted forms of a revised chapter 11 plan and supplemental disclosure to the Bankruptcy Court describing the salient terms of the Plan Sponsors' bid for approval.

Subsequent to that filing, the Debtors, with the consent of the Plan Sponsors, made further modifications to the Plan Sponsors' bid to further improve treatment for holders of Class 7 – General Unsecured Claims and Class 8 – Prepetition Intercompany Claims. The terms of the revised bid, including such improved treatment for Holders of Class 7 – General Unsecured Claims and Class 8 – Prepetition Intercompany Claims, are embodied in the Plan attached hereto as **Exhibit A**.

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERIES AVAILABLE TO CREDITORS AND INTEREST HOLDERS AND URGE ALL HOLDERS ENTITLED TO VOTE THEREON (I.E., HOLDERS OF CLASS 11 – EXISTING HERTZ PARENT INTERESTS) TO VOTE TO ACCEPT THE PLAN.**

**Please note that the Debtors may seek Confirmation of a modified Plan (regardless of its sponsorship) without resoliciting votes on such modified Plan in accordance with Bankruptcy Rule 3019 so long as the Plan, as modified, does not "adversely change" the treatment of any Claim or Interest relative to the treatment for such Claim or Interest contemplated under the Plan. In such a case, votes to accept the Plan shall be deemed to constitute votes to accept the modified Plan.**

6

### B.  NEW AGREEMENTS CONCERNING SUPPORT FOR AND IMPLEMENTATION OF THE PLAN

The Prior Plan Support Agreement and the Stock Purchase Agreement described in the Disclosure Statement have been terminated.  In their places, the Debtors have entered into a new Plan Support Agreement (referred to herein and in the Plan as the "**Plan Support Agreement**") with the Plan Sponsors and a new Equity Purchase Agreement with Apollo, CK Amarillo LP ("**Amarillo**") (an entity affiliated with Certares and Knighthead), and certain other Equity Commitment Parties that have agreed to invest, directly or through a backstop, in the Reorganized Debtors.

A true and correct copy of the Plan Support Agreement, exclusive of signature pages, is attached hereto as **Exhibit B**.  Pursuant to the Plan Support Agreement the parties thereto have agreed to take certain actions to support the prosecution and consummation of the Plan on the terms and conditions set forth in the Plan Support Agreement.

Among other things, the Plan Support Agreement establishes certain milestones for the prosecution and consummation of the Plan, including fixing (i) May 31, 2021 as the outside date for obtaining Bankruptcy Court approval of the Commitment Documents, (ii) June 30, 2021 as the outside date for obtaining Confirmation of the Plan, and (iii) July 31, 2021 as the outside date for consummating the Plan (in each case subject to the right of the Requisite Commitment Parties (as such term is defined in the Plan Support Agreement) to extend in their discretion).

A true and correct copy of the Equity Purchase Agreement, exclusive of signature pages, is attached hereto as **Exhibit C**.  Pursuant to the Equity Purchase Agreement, (i) Apollo has agreed to purchase or otherwise syndicate $1.5 billion of Preferred Stock; (ii) Amarillo has agreed to purchase $1.987 billion of Reorganized Hertz Parent Common Interests; and (iii) other Equity Commitment Parties, including Apollo, have agreed to purchase, in the aggregate, $794 million of Reorganized Hertz Parent Common Interests.  In addition, certain Equity Commitment Parties, including Apollo, have agreed to backstop the Rights Offering totaling $1.635 billion of Reorganized Hertz Parent Common Interests to be offered first to eligible holders of Existing Hertz Parent Interests and then, if not fully subscribed, to eligible Holders of Unsecured Funded Debt Claims.  Relating to the Equity Purchase Agreement, Hertz Corp. has also entered into a letter agreement with Apollo (attached to the Equity Purchase Agreement as Annex B) pursuant to which Hertz Corp. will, upon the date that the Preferred Stock is issued, pay Apollo Global Securities, LLC ("**AGS**") an advisory fee for capital markets advisory, syndication, structuring, and additional services provided by AGS for the benefit of Apollo.

As a consequence of the termination of the Stock Purchase Agreement, upon the Effective Date of the Plan the Debtors will be obligated to pay the Prior Plan Sponsors a Termination Payment in the amount of $77,200,000 plus certain expenses pursuant to the terms of the Stock Purchase Agreement as approved by the Bankruptcy Court on April 22, 2021 [D.I. 4116].  On May 6, 2021, a purported "Ad Hoc Committee of Shareholders" filed a notice of appeal with respect to such order.  Such committee has agreed to dismiss the appeal in the Plan Support Agreement.

### C.  THE NEW PLAN SPONSORS

With their combined investment experience in alternative investments, complex restructurings and the travel and leisure industry, the Plan Sponsors are each uniquely qualified to support the Debtors emergence from chapter 11 protection.

7

Apollo Global Management, Inc. (together with its subsidiaries) is a leading global alternative investment manager with assets under management of approximately $461 billion as of March 31, 2021 in credit, private equity and real assets funds.

Established in 2008, Knighthead is a leading credit-investment management firm with $5.5 billion of assets under management.  Knighthead's credit platform combines bottom-up fundamental research with top-down macro analysis to seek investment opportunities across capital structures. Most recently, Knighthead led transformational financings in restructuring proceedings for PCG and LATAM Airlines Group and most recently, in partnership with Certares, in Azul Brazilian Airlines.  With an experienced team of investment professionals, specializing in credit analysis, sourcing, trading and restructuring, Knighthead is prepared to work with the Debtors' management to realize their vision for a modern mobility company.

Certares is a private investment platform dedicated to investing in the travel, tourism and hospitality sectors with approximately $4.5 billion of assets under management, making Certares a significant player in the global travel industry. Certares' investments include American Express Global Business Travel, Internova Group, Liberty TripAdvisor, consisting of its subsidiary TripAdvisor, and others, creating opportunities to drive distribution, scale and supplier relationships for the Reorganized Debtors through collaboration.

The Debtors believe these and potential additional strategic and commercial opportunities associated with a partnership with Certares and Knighthead could meaningfully increase the value of the Reorganized Debtors.

## III.
## OVERVIEW OF THE PLAN

The Plan is premised on an implied total enterprise value of the Reorganized Debtors of approximately $6.929 billion.  This amount exceeds the going concern equity value ascribed to the Reorganized Debtors in the Valuation Analysis attached as Exhibit E to the Disclosure Statement. The Debtors believe that the investment-backed value implied by the Plan following a robust marketing process and competitive auction is the best available indicator of value of the Reorganized Debtors.

The transactions set forth in the Plan result in an implied Plan Equity Value for the common stock of Hertz Global Holdings, Inc., the parent corporation of the Debtors ("**Hertz Parent**"), of approximately $4.721 billion.  The new preferred stock of Hertz Parent is referred to in the Plan as the Preferred Stock and the new common stock of Hertz Parent is referred to in the Plan as the Reorganized Hertz Parent Common Interests.  The warrants of Hertz Parent are referred to in the Plan as the New Warrants.

The Plan contemplates a recapitalization of the Debtors through a combination of the issuance of new debt and equity capital, and treatment of existing Claims against and Interests in the Debtors pursuant to the Plan.

Under the Plan, the Reorganized Debtors will issue new Reorganized Hertz Parent Common Interests, as follows (subject to dilution from equity reserved or granted under the Management Equity Incentive Plan and issuable upon exercise of New Warrants):

- not less than 42% will be purchased by Amarillo for $1.987 billion;

8

- approximately 3% will be issued Pro Rata to holders of Existing Hertz Parent Interests pursuant to the Plan;

- approximately 17% will be purchased by other Equity Commitment Parties, including Apollo, for an aggregate amount of $794 million;

- approximately 35% will be offered pursuant to the Rights Offering, for an aggregate purchase prices of $1.635 billion, *first* to certain Holders of Exiting Hertz Parent Interests (i.e., those which are Eligible Existing Hertz Shareholders), and *second*, if not fully subscribed and funded by Eligible Existing Hertz Shareholders, to certain Holders of Class 5 – Unsecured Funded Debt Claims (i.e., those which are Eligible Unsecured Funded Debt Holders), in each case restricted to (i) "accredited investors" within the meaning of Rule 501 Regulation D under the Securities Act, or (ii) "qualified institutional buyers" within the meaning of Rule 144A of the Securities Act.  The Rights Offering will be conducted at the same per share purchase prices for the investment made by the Plan Sponsors, which is based on an equity value of approximately $4.7 billion.  The Rights Offering will be fully backstopped by certain of the Equity Commitment Parties; and

- approximately 3% will be distributed to certain Equity Commitment Parties that agreed to backstop the rights offering.

The Plan also provides for the issuance of $1.5 billion of Preferred Stock that will be purchased or otherwise syndicated by Apollo.  The Preferred Stock is further described in the term sheet attached to the Equity Purchase Agreement as Annex A (the "**Preferred Stock Term Sheet**").  The Preferred Stock will accrue dividends, payable in cash or in kind as specified in the Preferred Stock Term Sheet, at a rate beginning at 9% per annum for the first two years following the Effective Date and, if not earlier redeemed, resetting semi-annually, and later annually, on the terms set forth in the Preferred Stock Term Sheet.

Like the Prior Plan, the Plan also provides for the Reorganized Debtors to obtain a $1.3 billion senior secured term loan to fund Plan distributions and a $1.5 billion revolving credit facility to fund the Reorganized Debtors' working capital needs.

The transactions set forth in the Plan will raise approximately $7.216 billion in Cash proceeds, comprised of the following approximate amounts:

- $2.781 billion from the direct purchase of Reorganized Hertz Parent Common Interests by the Equity Commitment Parties;

- $1.635 billion from the purchase of stock pursuant to the Rights Offering;

- $1.500 billion from the purchase or other syndication of Preferred Stock by Apollo (subject to a 2% discount or upfront fee); and

- $1.300 billion in proceeds from the Exit Term Loan Facility.

The funds generated by these transactions will be used, in part, to provide the following distributions to Holders of Allowed Claims:

- Payment in full of Allowed Administrative Claims, including all amounts due in respect of the Debtors' DIP Financing, cure costs arising from the assumption of Executory

9

Contracts and Unexpired Leases, Section 503(b)(9) Claims, and accrued and unpaid professional fees;

- Payment in full of Allowed Claims arising from the Debtors' prepetition first lien facilities;

- Payment in full of Allowed Claims arising under the Debtors' prepetition second lien notes;

- Payment in full of Allowed Other Secured Claims and Claims entitled to priority under section 507(a) of the Bankruptcy Code;

- Payment in full of Allowed Unsecured Funded Debt Claims against the Debtors;

- Payment in full of Allowed Claims on account of the Debtors' guarantee of the HHN Notes; and

- Payment in full or Reinstatement of Allowed General Unsecured Claims against the Debtors.

Further, Holders of Allowed Existing Hertz Parent Interests shall receive on account of such Interests (a) Cash in an amount equal to $1.53 per share of Existing Hertz Parent Interests, and (b) their Pro Rata share of (i) 3% of the total Reorganized Hertz Parent Common Interests, subject to dilution on account of the Management Equity Incentive Plan and New Warrants; and (ii) the New Warrants; *provided* that an Eligible Existing Hertz Shareholder may elect to receive its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights.

The Plan provides recoveries to unsecured creditors and equity holders significantly in excess of what they would receive in a liquidation of the Debtors if the Plan were not consummated. In the Debtors' business judgment, the Plan is superior to any alternative restructuring transaction available to the Debtors. **The Debtors urge all Holders of Class 11 – Existing Hertz Parent Interests to vote to accept the Plan.**

Treatment of Claims and Interests under the Plan is the same as under the Prior Plan *except for* the treatment of Class 5 – Unsecured Funded Debt Claims, Class 7 – General Unsecured Claims, Class 8 – Prepetition Intercompany Claims, and Class 11 – Existing Hertz Parent Interests. The following table provides a summary of the classification and treatment of such Class 5 – Unsecured Funded Debt Claims, Class 7 – General Unsecured Claims, Class 8 – Prepetition Intercompany Claims, and Class 11 – Existing Hertz Parent Interests under the Plan and is qualified in its entirety by reference to the Plan:

10

| Class and Designation | Applicable Entities | Impairment / Voting | Treatment Under the Plan | Est'd Allowed Amount/ Approx. Percentage Recovery | Est'd Recovery in Ch. 7[3] |
|---|---|---|---|---|---|
| 5. (Unsecured Funded Debt Claims)[4] | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | Unimpaired **Not Entitled to Vote** | Each Holder of an Allowed Unsecured Funded Debt Claim against Hertz Corp., the Subsidiary Guarantors, and, as applicable, Rental Car Intermediate Holdings, LLC, shall receive payment in full, in Cash of the Allowed amount of such Claim. | Est. Allowed Amount: $2.75 billion (plus the amount of letters of credit drawn with respect to the ALOC Facility on the Effective Date), plus all accrued and unpaid interest at the applicable rate, costs, and other fees, in each case to the extent owed and Allowed from the Petition Date through the Effective Date as required to render the Unsecured Note Claims Unimpaired. As further described in Section IV.B.1(a) of this Supplemental Disclosure, Holders of Class 5 – Unsecured Funded Debt Claims intend to pursue full recovery on account of such Claims. The Reorganized Debtors shall pay the full Allowed amount of the Class 5 – Unsecured Funded Debt Claims as may be determined by the Bankruptcy Court. Est. % Recovery: 100% | 0-1% |
| 7. (General Unsecured Claims) | Each Debtor | Unimpaired **Not Entitled to Vote** | Each Holder of an Allowed General Unsecured Claim against a Debtor shall (at the option of the applicable Debtor or Reorganized Debtor (in consultation with the Plan Sponsors)) either (a) be Reinstated, or (b) receive payment in full, in Cash of the Allowed amount of such Claim. | Est. Allowed Amount: $547 million Est. Recovery: 100% | 0-1% |

---

[3]    Estimated liquidation recoveries listed in this chart are on a consolidated basis. However, potential liquidation recoveries vary on a debtor-by-debtor basis. More detail on projected debtor-by-debtor recoveries in a hypothetical chapter 7 liquidation is provided in the Liquidation Analysis attached to the Disclosure Statement as Exhibit E.

[4]    Unsecured Funded Debt Claims do not include 7.000% Unsecured Promissory Notes Claims, which are classified as Class 7 – General Unsecured Claims.

11

AMERICAS 107163401

| Class and Designation | Applicable Entities | Impairment / Voting | Treatment Under the Plan | Est'd Allowed Amount/ Approx. Percentage Recovery | Est'd Recovery in Ch. 7[3] |
|---|---|---|---|---|---|
| 8. (Prepetition Intercompany Claims) | Each Debtor | Unimpaired **Not Entitled to Vote** | Each prepetition Intercompany Claim shall be Reinstated or shall receive such treatment as may be mutually agreed by the applicable Debtors or Reorganized Debtors in consultation with the Plan Sponsors. | Est. Allowed Amount: TBD  Est. Recovery: 100% | 0-1% |
| 11. (Existing Hertz Parent Interests) | Hertz Parent | Impaired **Entitled to Vote** | Each Holder of an Allowed Existing Hertz Parent Interest shall receive Cash in an amount equal to $1.53 per share of Existing Hertz Parent Interests held by such Holder. In addition, (i) each Holder of an Allowed Existing Hertz Parent Interest shall receive its Pro Rata Share of (a) three (3%) percent of total Reorganized Hertz Parent Common Interests, subject to dilution on account of the Management Equity Incentive Plan and the New Warrants; and (b) the New Warrants; *provided* that an Eligible Existing Hertz Shareholder may elect to receive its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights instead of New Warrants by timely exercising such Subscription Rights in accordance with the Rights Offering Procedures prior to the Subscription Expiration Deadline (as defined in the Rights Offering Procedures); *provided*, *further* that any holder of Existing Hertz Parent Interests that is not an Eligible Existing Hertz Shareholder may elect prior to the Subscription Rights Expiration Deadline to have its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights sold pursuant to the Shareholder Subscription Rights Auction and receive its Pro Rata share of | Est. Allowed Amount: Approximately 156 million shares  Est. % Recovery: N/A | 0% |

12

AMERICAS 107163401

| Class and Designation | Applicable Entities | Impairment / Voting | Treatment Under the Plan | Est'd Allowed Amount/ Approx. Percentage Recovery | Est'd Recovery in Ch. 7[3] |
|---|---|---|---|---|---|
| | | | proceeds of the Shareholder Subscription Rights Auction instead of New Warrants. | | |

## IV.
## SUPPLEMENTAL DISCLOSURE WITH RESPECT TO CERTAIN MODIFICATIONS TO THE PLAN

The Plan differs from the Prior Plan in certain respects. A comparison document showing all differences between the Plan and the Prior Plan is filed with the Bankruptcy Court at Docket No. 4755 (the "**Plan Redline**") and is accessible through the Debtors' restructuring website, https://restructuring.primeclerk.com/hertz/. The discussion below and otherwise contained in this Supplemental Disclosure is not intended to, and does not, describe all differences between the Plan and the Prior Plan. Rather, the Debtors intend to highlight only those changes that they believe would be relevant to a hypothetical Holder typical of Holders of Interests within the Class entitled to vote on the Plan in making an informed judgment about how to vote on the Plan. Holders Interests entitled to vote on the Plan that have already reviewed the Prior Plan are urged to review the Plan Redline in order to identify the full scope of changes between the Plan and the Prior Plan. All Holders of Interests entitled to vote on the Plan are urged to review the Plan in its entirety.

### A. MODIFICATIONS TO THE RELEASE PROVISIONS

The change in sponsorship of the Plan relative to the sponsorship of the Prior Plan necessitated certain changes to the release and exculpation provisions contained in Article VIII of the Plan, including changes to the identities of the Released Parties and Releasing Parties and changes to the specific matters with respect to which the releases apply. **THESE CHANGES AFFECT ALL HOLDERS THAT HAVE GRANTED, OR WILL GRANT, OR ARE DEEMED, OR WILL BE DEEMED, TO HAVE GRANTED RELEASES UNDER THE PLAN.**

**AS FURTHER DESCRIBED BELOW, HOLDERS OF CLASS 5 – UNSECURED FUNDED DEBT CLAIMS AND CLASS 7 – GENERAL UNSECURED CLAIMS ARE UNIMPAIRED UNDER THE PLAN (IN CONTRAST TO THE PRIOR PLAN PURSUANT TO WHICH THEY WERE IMPAIRED) AND THEREFORE WILL BE DEEMED TO HAVE GRANTED THE RELEASES PROVIDED IN ARTICLE VIII.D OF THE PLAN UNLESS THEY OBJECT TO SUCH RELEASES.**

#### 1. Releases by the Debtors

**As in the Prior Plan, Article VIII.C of the Plan provides for a release of the Released Parties by the Debtors, their Estates, and the Reorganized Debtors, and certain related persons with respect to the matters identified in Article VIII.C of the Plan. The definition of Released Parties is modified in the Plan to include the new Plan Sponsors (in place of the Prior Plan Sponsors) and the Equity Commitment Parties (in place of those Persons identified in the Prior Plan as the "Backstop Investors").**

AMERICAS 107163401

The matters with respect to which the Released Parties are to be released pursuant to **Article VIII.C** of the Plan are expanded in the Plan to specifically include (i) the Equity Commitment, (ii) the Commitment Letter, (iii) the Equity Commitment Documents, and (iv) any Definitive Document.

2. **Releases by Holders of Claims and Interests**

As in the Prior Plan, **Article VIII.D** of the Plan provides for a release of the Released Parties by the Releasing Parties with respect to the matters as described in **Article VIII.D** of the Plan. The definition of Released Parties is modified in the Plan to include the new Plan Sponsors (in place of the Prior Plan Sponsors) and the Equity Commitment Parties (in place of those Persons identified in the Prior Plan as the "Backstop Investors").

The matters with respect to which the Releasing Parties are to release the Released Parties pursuant to **Article VIII.D** of the Plan are expanded in the Plan to specifically include (i) the Equity Commitment, (ii) the Commitment Letter, (iii) the Equity Commitment Documents, and (iv) any Definitive Document.

3. **Exculpation**

As in the Prior Plan, **Article VIII.E** of the Plan provides for the exculpation of the Exculpated Parties with respect to the matters identified in **Article VIII.E** of the Plan. The definition of Exculpated Parties is modified in the Plan to include the new Plan Sponsors (in place of the Prior Plan Sponsors) and the Equity Commitment Parties (in place of those Persons identified in the Prior Plan as the "Backstop Investors").

The matters with respect to which the Exculpated Parties are to be exculpated pursuant to **Article VIII.E** of the Plan are expanded in the Plan to specifically include (i) the Equity Commitment, (ii) the Equity Commitment Documents, and (iii) any Definitive Document.

B. **CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

1. **Revised Treatment of Certain Claims and Interests**

As noted above, treatment of Claims and Interests under the Plan is the same as under the Prior Plan *except for* the treatment of Class 5 – Unsecured Funded Debt Claims, Class 7 – General Unsecured Claims, and Class 11 – Existing Hertz Parent Interests. The following describes the classification and treatment of such Class 5 – Unsecured Funded Debt Claims, Class 7 – General Unsecured Claims, and Class 11 – Existing Hertz Parent Interests under the Plan and is qualified in its entirety by reference to the Plan:

(a) **Class 5 – Unsecured Funded Debt Claims**

Class 5 consists of all Unsecured Funded Debt Claims i.e., all Claims constituting (x) Unsecured Note Claims, (y) HHN Notes Guarantee Claims, and (z) ALOC Facility Claims against (i) Hertz Corp.; (ii) the Subsidiary Guarantors; and (iii) solely with respect to ALOC Facility Claims, Rental Car Intermediate Holdings, LLC.[5]

---

[5] Unsecured Funded Debt Claims do not include 7.000% Unsecured Promissory Notes Claims, which are classified as Class 7 – General Unsecured Claims.

14

AMERICAS 107163401

Unsecured Notes Claims shall be Allowed against Hertz Corp. and the Subsidiary Guarantors in the following amounts:

| Unsecured Funded Debt Claim | Allowed Amount |
|---|---|
| 5.500% Unsecured Note Claims<br>*CUSIP 428040CS6* | $804,522,222 |
| 6.000% Unsecured Note Claims<br>*CUSIP 428040CZ0* | $926,700,000 |
| 6.250% Unsecured Note Claims<br>*CUSIP 428040CN7* | $503,211,806 |
| 7.125% Unsecured Note Claims<br>*CUSIP 428040CY3* | $511,083,333 |

in each case, plus all accrued and unpaid interest at the applicable rate, costs, and other fees, in each case to the extent owed and Allowed from the Petition Date through the Effective Date as required to render the Unsecured Funded Debt Claims Unimpaired.

ALOC Facility Claims shall be Allowed against Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC, only to the extent determined by the Bankruptcy Court and in no instance in more than an amount equal to the letters of credit drawn with respect to the ALOC Facility as of the Effective Date plus all accrued and unpaid interest at the applicable rate, costs, and other fees, in each case to the extent owed and Allowed, from the Petition Date through the Effective Date as required to render the ALOC Facility Claims Unimpaired.

The ad hoc group of certain Holders of Unsecured Notes identified in the *Fourth Amended Verified Statement of Willkie Farr & Gallagher LLP and Young Conaway Stargatt and Taylor LLP Pursuant to Bankruptcy Rule 2019* [D.I. 4448] as may be supplemented and/or amended from time to time and the Unsecured Notes Trustees assert entitlement to postpetition interest at the contract rate and makewhole premiums under the Unsecured Notes Documents. The Debtors agree that Confirmation or consummation of the Plan will not render these issues moot, equitably or otherwise. Pursuant to <u>Article III.B.5</u> of the Plan, those amounts (to the extent determined by the Bankruptcy Court to constitute an Allowed Claim) will have to be paid in full in Cash whenever determined. If the Unsecured Notes Trustees litigate regarding these amounts, the costs of that litigation may be substantial. The Unsecured Notes Trustees or the ad hoc group reserve their rights, if any, to seek payment of reasonable fees and expenses and court costs in connection with such litigation. Nothing in the Plan, including Confirmation or consummation thereof, impairs any such right of any party to seek such fees and, to the extent such fees are determined by the Bankruptcy Court to constitute an Allowed Claim, the Debtors will be obligated to pay them in full in Cash. The Debtors and Reorganized Debtor reserve their rights to object to the allowance and payment of fees, interest, premiums, and other amounts described in this paragraph.

On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Unsecured Funded Debt Claim against Hertz Corp., the Subsidiary Guarantors, and, as applicable, Rental Car Intermediate Holdings, LLC, shall receive payment in full, in Cash of the Allowed amount of such Claim. **Such treatment represents an improvement in treatment relative to treatment afforded Holders of Allowed Class 5 – Unsecured Funded Debt Claims under the Prior Plan.**

15

**In contrast to the Prior Plan, Class 5 is now Unimpaired under the Plan.** Each Holder of an Allowed Unsecured Funded Debt Claim is therefore conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and Holders of Allowed Unsecured Funded Debt Claims are not entitled to vote to accept or reject the Plan.

### i.    Effect of Revised Plan Treatment on Releases

As noted above, because Holders of Class 5 – Unsecured Funded Debt Claims are now Unimpaired under the Plan, they will be deemed Releasing Parties and deemed to grant the releases provided in Article VIII.D of the Plan unless they timely file an objection to such releases.

### ii.    Supplemental Tax Considerations Relevant to a Hypothetical Typical U.S. Holder of Class 5 – Unsecured Funded Debt Claims

By virtue of the changed treatment under the Plan, the discussion in Section VII.B.1 of the Disclosure Statement is no longer applicable to Holders of Class 5 – Unsecured Funded Debt Claims. Pursuant to the Plan, each U.S. Holder of an Unsecured Funded Debt Claim will receive a Cash payment equal to the full Allowed amount of such Claim. In addition, each Holder of an Allowed Unsecured Funded Debt Claim is entitled to receive Bondholder Subscription Rights to acquire, to the extent it is an Eligible Unsecured Funded Debt Holder, its Pro Rata Share of the amount of $1,635,000,000.00 in Reorganized Hertz Parent Common Interests not acquired by Holders of Allowed Existing Hertz Parent Common Interests after taking into account all exercised Shareholder Subscription Rights, all in accordance with the Equity Commitment Agreement and the Rights Offering Procedures.

A U.S. Holder generally will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of Cash received and the fair market value of any Bondholder Subscription Rights received and (ii) its adjusted tax basis in the surrendered Claim. A U.S. Holder's adjusted tax basis in the surrendered Claim generally will equal the cost of the Claim (or income recognized with respect thereto), decreased by any amortizable bond premium in respect of the Claim which has been previously taken into account. In addition, if a U.S. Holder has elected to include market discount in income as it accrues, then the U.S. Holder's tax basis in a Claim will be increased by any market discount previously included in gross income.

### (b) Class 7 – General Unsecured Claims

Class 7 consists of all General Unsecured Claims against a Debtor; i.e., any Unsecured Claim, against any Debtor (including Claims on account of the 7.000% Unsecured Promissory Notes (CUSIP 428040BJ7)), other than (i) Administrative Claims; (ii) Priority Tax Claims; (iii) Other Priority Claims; (iv) Intercompany Claims; (v) Unsecured Funded Debt Claims; and (vi) HHN Notes Guarantee Claims.

The 7.000% Unsecured Promissory Note Claims shall be Allowed against Hertz Corp. in an aggregate amount of $28,274,393.81, plus any other amounts that may be Allowed by the Bankruptcy Court to the extent required to render the 7.000% Unsecured Promissory Notes Unimpaired. The allowance of all other General Unsecured Claims will be determined pursuant to the terms of this Plan, the Bankruptcy Code, and other applicable law so as to render such claims Unimpaired.

On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder

16

of an Allowed General Unsecured Claim against a Debtor shall (at the option of the applicable Debtor or Reorganized Debtor (in consultation with the Plan Sponsors)) either (a) be Reinstated, or (b) receive payment in full, in Cash, of the Allowed amount of such Claim.

"Reinstatement" is defined in the Plan as the treatment provided for in section 1124(2) of the Bankruptcy Code.  Section 1124(2) of the Bankruptcy Code provides that a class of claims may be Unimpaired under a plan if, notwithstanding any contractual right to acceleration following a default, the debtor (a) cures, subject to certain exceptions, any defaults, (b) reinstates the maturity of the claim as it existed before the default, (c) compensates the holder of the claim for any damages incurred as a result of any reasonable reliance on such contractual right, (d) subject to certain limitations, compensates the holder for any actual pecuniary loss incurred as a result of its failure to perform any nonmonetary obligation, and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim entitles the holder thereof.

**Such treatment represents an improvement in treatment relative to treatment afforded Holders of Allowed Class 7 – General Unsecured Claims under the Prior Plan.**

Class 7 is Unimpaired under the Plan.  Each Holder of a General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

### i.    Supplemental Tax Considerations Relevant to a Hypothetical Typical U.S. Holder of Class 7 – General Unsecured Claims

By virtue of the changed treatment under the Plan, the discussion in Section VII.B.2 of the Disclosure Statement is no longer applicable to Holders of Class 7 – General Unsecured Claims. Pursuant to the Plan, each Holder of an Allowed General Unsecured Claim will receive payment in full, in Cash, of the Allowed amount of such General Unsecured Claim.

Each U.S. Holder generally will recognize gain or loss in an amount equal to the difference between the amount of Cash received and its adjusted tax basis in the surrendered Allowed General Unsecured Claim.

A U.S. Holder's adjusted tax basis in the surrendered Allowed General Unsecured Claim generally will equal the cost of the Claim (or income recognized with respect thereto), decreased by any amortizable bond premium in respect of the Claim which has been previously taken into account. In addition, if a U.S. Holder has elected to include market discount in income as it accrues (as described below), then the U.S. Holder's tax basis in a Claim will be increased by any market discount previously included in gross income.

### (c)  Class 8 – Prepetition Intercompany Claims

Class 8 consists of all prepetition Intercompany Claims.

Each prepetition Intercompany Claim shall be Reinstated or shall receive such treatment as may be mutually agreed by the applicable Debtors or Reorganized Debtors in consultation with the Plan Sponsors.

Holders of Claims in Class 8 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote or accept or reject the Plan.

17

AMERICAS 107163401

**Such treatment represents an improvement in treatment relative to treatment afforded certain Holders of Allowed Class 8 – Prepetition Intercompany under the Prior Plan and no change in treatment afforded other Holders of Allowed Class 8 – Prepetition Intercompany under the Prior Plan.**

### (d) Class 11 – Existing Hertz Parent Interests

Class 11 consists of all Existing Hertz Parent Interests; i.e., all Interests in (or against) Hertz Parent.

Except to the extent that a Holder of an Allowed Existing Hertz Parent Interest agrees to a similar or less favorable treatment of such Interest, on the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Interest, each Holder of an Allowed Existing Hertz Parent Interest shall receive:

(i)     Cash in an amount equal to $1.53 per share of Existing Hertz Parent Interests held by such Holder;

(ii)     its Pro Rata share of:

     (1) three (3%) percent of total Reorganized Hertz Parent Common Interests, subject to dilution on account of the Management Equity Incentive Plan and New Warrants; and

     (2) the New Warrants; *provided* that an Eligible Existing Hertz Shareholder may elect to receive its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights instead of New Warrants by timely exercising such Subscription Rights in accordance with the Rights Offering Procedures prior to the Subscription Expiration Deadline (as defined in the Rights Offering Procedures); *provided, further* that any holder of Existing Hertz Parent Interests that is not an Eligible Existing Hertz Shareholder may elect prior to the Subscription Rights Expiration Deadline to have its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights sold pursuant to the Shareholder Subscription Rights Auction and receive its Pro Rata share of proceeds of the Shareholder Subscription Rights Auction instead of New Warrants.

**Such treatment represents an improvement in treatment relative to treatment afforded Holders of Allowed Class 11 – Existing Hertz Parent Interests under the Prior Plan.**

Class 11 is Impaired under the Plan and is entitled to vote to accept or reject the Plan.

### i.    Certain Information Regarding the New Warrants

The New Warrants are thirty-year warrants to purchase, in the aggregate, Reorganized Hertz Parent Common Interests representing up to 18.0% of the aggregate number of Reorganized Hertz Parent Interests issued and outstanding on the Effective Date pursuant to the terms of the New Warrants Agreement. A term sheet for the New Warrants Agreement is attached to the Plan as Exhibit A. The New Warrants will be subject to dilution on account of the equity issued pursuant to the Management Equity Incentive Plan. The New Warrants will have an exercise price to be set based on a total equity value of $6.5 billion. The New Warrants will enjoy anti-dilution protection

18

AMERICAS 107163401

regarding the exercise price and number of Reorganized Hertz Parent Common Interests to be issued upon the exercise of the New Warrants in the event of (a) any stock dividends, stock distributions, stock splits, reverse stock splits, stock subdivisions, consolidations, exchanges, reclassifications, combinations, or other similar transactions, (b) mergers, consolidations, sale of all or substantially all of the Company's assets to another Person, tender offers, exchange offers, recapitalizations, capital reorganizations or similar structural transactions, or (c) subject to customary exceptions, issuances of equity interests below fair market value.  Upon a change-of-control transaction resulting in all or a part of the consideration paid to or exchanged for Reorganized Hertz Parent Common Interests consisting of Cash, property or other assets or securities other than listed and registered securities, the holders of New Warrants would be entitled to value protection through a customary Black-Scholes protection provision.  The holders of New Warrants distributed by Reorganized Hertz Parent shall not be attributed any ownership of Reorganized Hertz Parent Common Interests on account of such New Warrants for the purposes of calculating any future dividends, distributions, or participation pursuant to any New Organizational Documents until the exercise of the New Warrants in accordance with their terms, provided, however, that the New Warrants Agreement will provide certain protections for holders of New Warrants.  On the Effective Date, Reorganized Hertz Parent will enter into and consummate the transactions contemplated by the New Warrants Agreement (including issuing the New Warrants), which will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person or Entity (other than as expressly required by the New Warrants Agreement and the New Warrants, as applicable).

Using a Black-Scholes valuation, the Plan Equity Value of $4.721 billion, and a volatility range of 50-65%, the value of the New Warrants is estimated at $730 million to $797 million.  Using a midpoint volatility of 57.5%, the value of the New Warrants is estimated at $769 million, which equates to $4.92 per share.

Using an equity value of $5.221 billion, which reflects the highest value at which any of the Equity Commitment Parties are investing, the value of the New Warrants is estimated at $814 million to $885 million.  Using a midpoint volatility of 57.5%, the value of the New Warrants under this approach is estimated at $855 million, which equates to $5.47 per share.

### ii.    Supplemental Tax Considerations Relevant to a Hypothetical Typical U.S. Holder of Class 11 – Existing Hertz Parent Interests

By virtue of the changed treatment under the Plan, the discussion in Section VII.F of the Disclosure Statement is no longer applicable to Holders of Class 11 – Existing Hertz Parent Interests. Pursuant to the Plan, each U.S. Holder of an Allowed Existing Hertz Parent Interest will receive the treatment described in Section IV.B.1(c), above, i.e., (a) $1.53 per share of Existing Hertz Parent Interests held by such Holder and (b) its Pro Rata share of (i) 3% of the Reorganized Hertz Common Interests (subject to dilution on account of the Management Equity Incentive Plan and New Warrants), and (ii) the New Warrants (subject to the right to elect to receive Shareholder Subscription Rights and/or the proceeds thereof pursuant to an auction conducted in accordance with the Rights Offering Procedures, in each case according to the Holder's status as an Eligible Existing Hertz Shareholder or an Ineligible Existing Hertz Shareholder).

AMERICAS 107163401

### 1.   U.S. Holders

Pursuant to the Plan, each U.S. Holder of an Allowed Existing Hertz Parent Interest will receive, in exchange for surrendering its Allowed Existing Hertz Parent Interest, (i) cash, (ii) Reorganized Hertz Parent Common Interests and (iii) New Warrants or Shareholder Subscription Rights (or the proceeds of sale thereof).  The Company intends to take the position that such exchange constitutes a "reorganization" under Section 368(a) of the Tax Code and the New Warrants and Shareholder Subscription Rights are treated as "stock" or "securities" for purposes of Section 368(a) of the Tax Code, and unless explicitly stated otherwise, this Section IV.B.1.c shall assume the exchange will constitute a "reorganization" under Section 368(a) of the Tax Code and the New Warrants and Shareholder Subscription Rights are treated as "stock" or "securities" for purposes of Section 368(a) of the Tax Code.  Accordingly, although any gain will be recognized to the extent of the cash received, a U.S. Holder generally should not otherwise recognize gain or loss on the exchange of its Allowed Existing Hertz Parent Interest.

If, as intended, the exchange constitutes a "reorganization" under Section 368(a) of the Tax Code, a U.S. Holder's tax basis in its Reorganized Hertz Parent Common Interests and New Warrants (or Shareholder Subscription Rights) (provided the Warrants (or Rights) qualify as "stock" or "securities" under Section 368 of the Tax Code) would equal its basis in its surrendered Allowed Existing Hertz Parent Interest (increased by any gain recognized and reduced by the cash received), and such basis would be allocated to its Reorganized Hertz Parent Common Interests and New Warrants (or Shareholder Subscription Rights) in proportion to their relative fair market values.  If there is a "reorganization" under Section 368(a) of the Tax Code but the New Warrants (or Shareholder Subscription Rights) do not qualify as "stock" or "securities" under Section 368 of the Tax Code, a U.S. Holder's tax basis in its Reorganized Hertz Parent Common Interests received would equal its basis in its surrendered Allowed Existing Hertz Parent Interest, increased by any gain recognized in the exchange and decreased by the amount of Cash and the fair market value of the New Warrants (or Shareholder Subscription Rights).  A U.S. Holder's adjusted tax basis in the surrendered Allowed Existing Hertz Parent Interest generally will equal the historical cost of the Allowed Existing Hertz Parent Interest.

A U.S. Holder generally will not recognize taxable gain or loss on the acquisition of our Reorganized Hertz Parent Common Interests upon exercise of a New Warrant (or Shareholder Subscription Right).  The U.S. Holder's tax basis in the Reorganized Hertz Parent Common Interests received upon exercise of the New Warrant (or Shareholder Subscription Right) generally will be an amount equal to the sum of (i) the U.S. Holder's initial tax basis in the New Warrant (or Shareholder Subscription Right) (that is, the portion of historical basis in the surrendered Allowed Existing Hertz Parent Interest allocated to the Warrant (or Right) as described in the previous paragraph (assuming the Warrant (or Right) qualifies as a "stock" or "security" for purposes of Section 368 of the Tax Code) or its fair market value on the Effective Date (if the Warrant (or Right) fails to qualify as a "stock" or "security" for purposes of Section 368 of the Tax Code), and (ii) the exercise price of the New Warrant (or Shareholder Subscription Right).  It is unclear whether the U.S. Holder's holding period in the Reorganized Hertz Parent Common Interests received upon exercise of the New Warrants (or Shareholder Subscription Rights) will begin on the date following the date of exercise or on the date of exercise; in either case, the holding period will not include the period during which the U.S. Holder held the Warrant (or Right) or the Allowed Existing Hertz Parent Interest.  If a Warrant (or Right) is allowed to lapse unexercised, a

AMERICAS 107163401

U.S. Holder generally will recognize a capital loss equal to such Holder's tax basis in the Warrant (or Right).

If, contrary to the assumption stated at the beginning of this Section IV.B.1.c.ii, the exchange does not constitute a "reorganization" under Section 368(a) of the Tax Code, then each U.S. Holder generally will realize gain or loss in an amount equal to the difference between (i) sum of the cash received and the fair market value, as determined on the Effective Date, of the U.S. Holder's share of (y) the Reorganized Hertz Parent Common Interests and (z) the New Warrants (or Shareholder Subscription Rights), and (ii) its adjusted tax basis in the surrendered Allowed Existing Hertz Parent Interest.

## 2. Non-U.S. Holders

A Non-U.S. Holder will not be subject to U.S. federal income tax on gain recognized on the receipt or sale or other disposition (or upon the exercise of, as applicable) such holder's Reorganized Hertz Parent Common Interests, Shareholder Subscription Rights or New Warrants unless:

- the gain is "effectively connected" with the conduct of such holder's trade or business in the United States, and the gain is attributable to a permanent establishment maintained by such holder in the United States if that is required by an applicable income tax treaty as a condition for subjecting such holder to United States taxation on a net income basis,

- such holder is an individual that has been present in the United States for 183 or more days in the taxable year of the sale and certain other conditions exist, or

- Reorganized Hertz Parent is or has been a "United States real property holding corporation" for federal income tax purposes.

Under certain circumstances, corporate Non-U.S. Holders also may be subject to an additional "branch profits tax" at 30% rate (or lower if you are eligible for the benefits of an income tax treaty that provides for a lower rate) to the extent of any "effectively connected" gains recognized. Reorganized Hertz Parent has not been, is not and does not anticipate becoming a United States real property holding corporation for U.S. federal income tax purposes.

## C. MEANS FOR IMPLEMENTATION OF THE PLAN

### 1. Certain Revisions Relating to Unimpairment of General Unsecured Claims

By virtue of the changed treatment under the Plan, discussion in the Disclosure Statement regarding the treatment of Class 7 – General Unsecured Claims, including Section I.H of the Disclosure Statement, is no longer applicable.

Under the Revised Plan, Holders of Allowed Class 7 – General Unsecured Claims will be paid in full, in Cash, from the Reorganized Debtors' general funds after such time as their Claims become Allowed Claims, but, in any event, not sooner than the Effective Date of the Plan. Recoveries on account of Class 7 – General Unsecured Claims will no longer be paid from the General Unsecured Recovery Cash Pool Account nor limited in any respect by the General Unsecured Recovery Cash Pool Amount as described in the Disclosure Statement. Accordingly, recoveries on account of Class 7 – General Unsecured Claims will not be affected by the aggregate Allowed amount of Class 7 – General Unsecured Claims relative to the Debtors' estimates thereof.

21

Given the full Cash payment to Holders of Allowed Class 7 – General Unsecured Claims, the role of the GUC Oversight Administrator has been eliminated from the Plan.  The Debtors and the Reorganized Debtors, as applicable, will have the right to object to all Class 7 – General Unsecured Claims that are not Allowed Claims and there will be no special GUC Settlement Procedures unique to Class 7 – General Unsecured Claims.  The procedures applicable to resolution of disputes concerning Claims and Interests, generally, shall apply to resolution of Disputed Class 7 – General Unsecured Claims.  The Distribution Agent responsible for making distributions to Holders of all other Allowed Claims and Interests shall be responsible for making distributions on account of Class 7 – General Unsecured Claims and the procedures applicable to distributions on account of Claims, generally, shall apply to distributions on account of Class 7 – General Unsecured Claims.

## 2. Distributions on Account of Allowed Claims Will Be Paid from the Reorganized Debtors' General Funds

As noted above, Holders of Allowed Class 7 – General Unsecured Claims will be paid from the Reorganized Debtors' general funds and not from the General Unsecured Recovery Cash Pool Account.  Similarly, the Specified Causes of Action will not serve as source of recovery exclusive to Holders of Allowed Class 7 – General Unsecured Claims.  Rather, the applicable Reorganized Debtor that holds the Claim under each Specified Cause of Action shall be entitled to prosecute or settle such Specified Cause of action in accordance with its rights under applicable non-bankruptcy law or other rights provided under the Plan.  Further, undeliverable or unclaimed distributions shall revert to the Reorganized Debtors and not be paid Pro Rata to other Holders of Claims within the Class with respect to which the undeliverable or unclaimed distributions were made.

## 3. Plan Sponsor Direct Equity Investment

On the Effective Date, in accordance with the Equity Commitment Documents and subject to the terms and conditions thereof, the Equity Commitment Parties shall fund the New Money Investment in exchange for Reorganized Hertz Parent Common Interests and Preferred Stock.  As more fully set forth in the Equity Commitment Documents, the Equity Commitment Parties shall purchase an aggregate of (i) up to $4,415,941,666.67 of Reorganized Hertz Parent Common Interests and (ii) up to $1,500,000,000.00 of Preferred Stock (in each case subject to adjustment pursuant to the terms of the Equity Commitment Documents).  Of the Reorganized Hertz Parent Common Interests to be purchased pursuant to the Equity Commitment Agreement, Amarillo will fund up to $1,987,000,000.00, which shall account for more than 42% of total Reorganized Hertz Parent Common Interests, after accounting for any dilution as set forth in the Equity Commitment Documents but subject to dilution on account of the Management Equity Incentive Plan and New Warrants.  Additionally, certain of the Equity Commitment Parties shall receive premiums in an aggregate amount of $163,500,000.00 of Reorganized Hertz Parent Common Interests, as more fully set forth in the Equity Commitment Documents.  The foregoing allocations may be adjusted before the Effective Date solely in accordance with the Equity Commitment Documents.

### (a) Information Relating to the Preferred Stock

The Plan provides that the Reorganized Hertz Parent will issue, and Apollo will purchase, or otherwise syndicate, shares of preferred stock (i.e., the Preferred Stock) for an aggregate purchase price of $1,500 million, subject to a 2% discount or an upfront fee.  The material terms of the Preferred Stock are set forth in the Preferred Stock Term Sheet attached to the Equity Purchase Agreement as Annex A.

22

Among other things, the Preferred Stock will bear a dividend that varies according to (i) the period in which it accrues and/or (ii) whether the dividend is paid in cash or in kind.  For example, for dividends accrued prior to the second anniversary of the Effective Date, the dividend is 9.00% per annum regardless of whether it is paid in cash or in kind.  However, for dividends accrued after the second anniversary of the Effective Date but prior to the third anniversary of the Effective Date, the dividend is 7.00% per annum if paid in cash or 9.00% per annum if paid in kind.  If not earlier redeemed, the dividend rates increase thereafter (a) semi-annually through the fifth anniversary of the Effective Date and (b) annually thereafter.

The Preferred Stock shall be redeemable by the Reorganized Debtors at any time, in whole or in part, by paying the Redemption Price (as defined in the Preferred Stock Term Sheet), which, in general terms, requires payment of the greater of (y) full amount of the Preferred Stock plus accrued dividends, and (z) an amount providing a guaranteed minimum return as calculated pursuant to the Preferred Stock Term Sheet.

Upon a liquidation of the Reorganized Debtors, holders of Preferred Stock would be entitled to require redemption of the Preferred Stock at the then-applicable Redemption Price.  In the event of a liquidation, the Preferred Stock would recover from the Reorganized Debtors' assets prior to the common stock of the Reorganized Debtors.  Holders of Preferred Stock are not otherwise entitled to require redemption of the Preferred Stock.

In connection with the Preferred Stock, the Reorganized Debtors will be required to obtain the prior written consent of those investors holding a majority of the value of the Preferred Stock to take certain actions detailed in the Preferred Stock Term Sheet and shall be subject to certain compliance obligations as detailed in the Preferred Stock Term Sheet.

### i.    Certain Risks Relating to the Preferred Stock

Notwithstanding discussion in the Disclosure Statement to the contrary, because the Preferred Stock is not convertible to Reorganized Hertz Parent Common Interests, Reorganized Hertz Parent Common Interests are not subject to dilution on account of the Preferred Stock.  However, the terms of the Preferred Stock introduce additional risks not described in the Disclosure Statement.

*Dividends Will Accrue on the Preferred Stock*.  The Preferred Stock will accrue dividends at the rates specified in the Preferred Stock Term Sheet, beginning at 9% per annum for the first two years following the Effective Date and adjusting thereafter on the schedule specified in the Preferred Stock Term Sheet.  Dividends on the Preferred Stock are payable, as specified in the Preferred Stock Term Sheet, in cash or in kind.  If paid in kind, such accrual will increase the value of Preferred Stock outstanding as well as the future dividend obligations as a result of compounding.  Cash payment of dividends will reduce the Reorganized Debtors' cash available to meet other obligations.

*The Redemption Price of the Preferred Stock May Exceed the Original Purchase Price Plus Dividends*.  The Reorganized Debtors are entitled to redeem the Preferred Stock at any time and may be obligated to redeem the Preferred Stock in the event of a liquidation.  The redemption price will be set by a formula set forth in the Preferred Stock Term Sheet, which generally entitles investors in the Preferred Stock to an overall return of approximately 30% on their investment.  Depending upon when the redemption occurs, the redemption price of the Preferred Stock may exceed the original purchase price of the Preferred Stock plus paid and/or accrued dividends.

23

#### 4. Rights Offering

Hertz Parent shall conduct the Rights Offering in accordance with the Rights Offering Procedures and Equity Commitment Documents. Instead of receiving New Warrants, each Holder of Existing Hertz Parent Interests may elect to be issued Shareholder Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its Pro Rata allocation of the Rights Offering to the extent it is an Eligible Existing Hertz Shareholder. Such election shall be made if and when such Eligible Existing Hertz Shareholder exercises such Subscription Rights pursuant to the terms of the Rights Offering Procedures. Each Holder of Allowed Unsecured Funded Debt Claims shall be issued Bondholder Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its Pro Rata allocation of the Rights Offering to the extent any such amounts remain unsubscribed and unfunded by Holders of Allowed Existing Hertz Parent Interests and the applicable Holder of an Allowed Unsecured Funded Debt Claim is an Eligible Unsecured Funded Debt Holder. Any transfer of an Existing Hertz Parent Interest or Unsecured Funded Debt Claim shall include the applicable Subscription Rights. **IN THE EVENT THERE ARE ANY BONDHOLDER SUBSCRIPTION RIGHTS AVAILABLE FOR DISTRIBUTION TO ELIGIBLE UNSECURED FUNDED DEBT HOLDERS, AS A CONDITION TO AND UPON SEEKING TO EXERCISE SUCH BONDHOLDER SUBSCRIPTION RIGHTS BY SIGNING THE SUBSCRIPTION FORM AND DELIVERING IT TO THE SUBSCRIPTION AGENT OR TENDERING THROUGH DTC, AS APPLICABLE, THE APPLICABLE ELIGIBLE UNSECURED FUNDED DEBT HOLDER SHALL, SUBJECT TO THE ENTRY OF THE CONFIRMATION ORDER, BE DEEMED TO HAVE RELEASED AND IRREVOCABLY WAIVED ANY RIGHT TO RECEIVE PAYMENT OF ANY AMOUNTS ON ACCOUNT OF ANY OF ITS ALLOWED UNSECURED FUNDED DEBT CLAIM ACTUALLY TENDERED IN THE RIGHTS OFFERING (INCLUDING INTEREST, COSTS, FEES, PREMIUMS, OR ANY "MAKE-WHOLE" AMOUNTS) THAT EXCEEDS THE AGGREGATE AMOUNT OF THE PRINCIPAL OF SUCH UNSECURED FUNDED DEBT CLAIM, INTEREST ACCRUED, BUT UNPAID AS OF THE PETITION DATE AT THE NON-DEFAULT RATE, AND POSTPETITION INTEREST ACCRUED, BUT UNPAID AS OF THE EFFECTIVE DATE AT THE FEDERAL JUDGMENT RATE (AND SUCH RELEASE AND WAIVER SHALL REMAIN EFFECTIVE NOTWITHSTANDING ANY FAILURE BY ANY ELIGIBLE UNSECURED FUNDED DEBT HOLDER TO PROPERLY EXERCISE SUCH BONDHOLDER SUBSCRIPTION RIGHTS IN ACCORDANCE WITH THE RIGHTS OFFERING PROCEDURES, INCLUDING BY FAILING TO TIMELY DELIVER THE APPLICABLE PURCHASE PRICE). THE FOREGOING RELEASE SHALL BE EFFECTIVE EVEN IF ALL AVAILABLE SUBSCRIPTION RIGHTS ARE EXERCISED BY HOLDERS OF EXISTING HERTZ PARENT INTERESTS, AND THERE ARE NO SUBSCRIPTION RIGHTS AVAILABLE FOR HOLDERS OF ALLOWED UNSECURED FUNDED DEBT CLAIMS. IF A HOLDER OF ALLOWED UNSECURED FUNDED DEBT CLAIMS DETERMINES TO TENDER SOME, BUT NOT ALL OF ITS ALLOWED UNSECURED FUNDED DEBT CLAIMS, THE FOREGOING RELEASE SHALL ONLY BE EFFECTIVE AS TO THOSE ALLOWED FUNDED DEBT CLAIMS ACTUALLY TENDERED IN THE RIGHTS OFFERING. ADDITIONALLY, IF A HOLDER OF UNSECURED FUNDED DEBT CLAIMS THAT IS NOT AN "ACCREDITED INVESTOR" OR A "QUALIFIED INSTITUTIONAL BUYER" (AND THEREFORE, NOT AN ELIGIBLE UNSECURED FUNDED DEBT HOLDER) SIGNS THE SUBSCRIPTION FORM AND DELIVERS IT TO THE SUBSCRIPTION AGENT (OR TENDERS ITS**

AMERICAS 107163401

**UNSECURED FUNDED DEBT CLAIMS, AS APPLICABLE), THE DEBTORS MAY TAKE THE POSITION THAT SUCH HOLDER HAS PROVIDED THE ABOVE DESCRIBED WAIVER EVEN IF SUCH HOLDER WAS INELIGIBLE TO EXERCISE BONDHOLDER SUBSCRIPTION RIGHTS.**

The consummation of the Rights Offering is conditioned on the satisfaction or waiver (in accordance with the Equity Commitment Agreement) of all conditions specified in the terms of the Equity Commitment Documents.

Each Ineligible Existing Hertz Shareholder may elect prior to the Subscription Rights Expiration Deadline to have its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights sold pursuant to the Shareholder Subscription Rights Auction by submitting such election in accordance with the Rights Offering Procedures. Such election shall include a minimum price at which such Ineligible Existing Hertz Shareholder will agree to sell its Subscription Rights (each a "**Minimum Auction Price**") and will be irrevocable.

In addition to exercising their Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights, each Eligible Existing Hertz Shareholder may elect prior to the Subscription Rights Expiration Deadline to purchase available Shareholder Subscription Rights at the Shareholder Subscription Rights Auction by submitting such election in accordance with the Rights Offering Procedures. Any such election will include the maximum amount and price per Shareholder Subscription Right such Eligible Existing Hertz Shareholder is willing to purchase at the Shareholder Subscription Rights Auction. The Shareholder Subscription Rights Auction will conclude prior to the Effective Date in accordance with the Rights Offering Procedures. If an Ineligible Existing Hertz Shareholder is unable to sell its Subscription Rights because its Minimum Auction Price is not met, such Ineligible Existing Hertz Shareholders shall be deemed to have elected to receive New Warrants instead of Subscription Rights and shall receive such New Warrants as provided in the Plan.

**The Debtors are not making any representation as to the value, if any, of the Subscription Rights. Prior to making a decision as to whether or not to exercise Shareholder Subscription Rights or Bondholder Subscription Rights, Holders of Existing Hertz Parent Interests and Holders of Unsecured Funded Debt Claims should make their own determination as to the value of such subscription rights or should consult with their advisors as to such value.**

### (a) Securities Registration Exemptions

The New Warrants issued under the Plan and the New Warrants Agreement (and shares of Reorganized Hertz Parent Common Interests issuable upon the valid exercise of the New Warrants) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. Shares of Reorganized Hertz Parent Common Interests and New Warrants (and shares of Reorganized Hertz Parent Common Interests issuable upon the valid exercise of the New Warrants) issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable federal, state, or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The Reorganized Hertz Parent Common Interests and New Warrants (and shares of Reorganized Hertz Parent Common Interests issuable upon the valid exercise of the New Warrants) issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule

25

144(a)(3) under the Securities Act; and (ii) will, subject to the Reorganized Hertz Parent Organizational Documents, and with respect to the New Warrants, the New Warrants Agreement, be freely tradable and transferable by any holder thereof that (a) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, (c) has not acquired the Reorganized Hertz Parent Common Interests or New Warrants from an "affiliate" within one year of such transfer, and (d) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

The issuance and sale, as applicable, of the Preferred Stock and the Reorganized Hertz Parent Common Interests issued to (i) the Equity Commitment Parties, or (ii) the Eligible Unsecured Funded Debt Holders and Eligible Existing Hertz Shareholders pursuant to the Rights Offering will be made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D thereunder (the "**4(a)(2) Securities**").  Such Securities will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws.  Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

### i.    Certain Information Concerning 4(a)(2) Securities

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met.  These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer, or after a six-month holding period if the issuer has been subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act for 90 days at the time of sale.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available, or after a six-month holding period if the issuer has been subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act for 90 days at the time of sale.  An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's

AMERICAS 107163401

transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, nonaffiliated holders of 4(a)(2) Securities would be required to hold their 4(a)(2) Securities for at least one year or six months, as applicable and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the filing an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

* * * * *

*Legends*. To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing (i) the Preferred Stock, (ii) the Reorganized Hertz Parent Common Interests issued pursuant to the Rights Offering, (iii) the Reorganized Hertz Parent Common Interests issued to the Equity Commitment Parties, and (iv) the Reorganized Hertz Parent Common Interests held by holders of 10% or more of the outstanding Reorganized Hertz Parent Common Interests, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE

27

AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

### 5. The Reorganized Debtor Organizational Documents

Any Entities' acceptance of Reorganized Hertz Parent Common Interests and Preferred Stock, whether pursuant to the Plan, the Rights Offering, or otherwise, shall be deemed to be its agreement to be bound by the Reorganized Debtor Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The Reorganized Debtor Organizational Documents, as applicable, shall be binding on all Entities receiving, and all holders of, the Reorganized Hertz Parent Common Interests and Preferred Stock (and their respective successors and assigns), whether any such Reorganized Hertz Parent Common Interests and Preferred Stock are received or to be received on or after the Effective Date, in each case, pursuant to the Plan and regardless of whether such Entity executes or delivers a signature page to the Reorganized Debtor Organizational Documents.

### 6. Reorganized Hertz Parent and Reorganized Hertz Corp. Board

As of the Effective Date, except as set forth in Article IV.S of the Plan, all directors, managers, and other members of existing boards or governance bodies of Hertz Parent and Hertz Corp., as applicable, shall cease to hold office or have any authority from and after such time unless such individuals are selected to hold positions pursuant to the applicable governing body or documents with respect to the Reorganized Debtors.

The Reorganized Hertz Parent Board and Reorganized Hertz Corp. Board shall have at least seven (7) members. All members shall be selected in accordance with generally accepted best practices for large institutional investors in public companies. The composition of the board shall comply with applicable stock exchange and SEC independence requirements and directors shall have relevant industry, financial and operational backgrounds.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Hertz Parent and Reorganized Hertz Corp. To the extent any such director or officer of the Reorganized Hertz Parent and Reorganized Hertz Corp. is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such direct or officer. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the Employment Agreements (assumed and assigned to the Reorganized Debtors, subject to the reasonable consent of the Plan Sponsors), and other constituent documents of the Reorganized Debtors. The selection of directors and officers of Reorganized Hertz Parent and Reorganized Hertz Corp. shall be disclosed in the

AMERICAS 107163401

Plan Supplement, and at least a majority of the directors shall be appointed by the Plan Sponsors (other than Apollo).

### 7. Additional Tax Matters

By virtue of the changed treatment under the Plan, Section IV.D.30 of the Disclosure Statement, entitled "Additional Tax Matters," is no longer applicable.  It is intended that the receipt by the Holders of Allowed Existing Hertz Parent Interests of Cash, Reorganized Hertz Parent Common Interests and either New Warrants or Shareholder Subscription Rights (or the proceeds of sale thereof) in exchange for their Allowed Existing Hertz Parent Interests be treated as a "reorganization" under Section 368(a) of the Tax Code, and that the Plan constitute a "plan of reorganization" under Treasury Regulations section 1.368-2(g).

## V.
## SOLICITATION AND VOTING PROCEDURES

The Solicitation Procedures and the dates and deadlines related to solicitation and confirmation of the Plan set forth in the Disclosure Statement and Disclosure Statement Order remain unchanged. However, Class 5 – Unsecured Funded Debt Claims and Class 7 –General Unsecured Claims are Unimpaired under the Plan and therefore each Holder of a Class 5 – Unsecured Funded Debt Claim and Class 7 –General Unsecured Claim shall be (i) deemed to accept the Plan, and (ii) deemed a "Releasing Party" that will grant the releases provided in Article VIII.D of the Plan *unless* such holder timely files an objection to such releases.

Holders of Class 11 – Existing Hertz Parent Interests (the "**Voting Class**") remain entitled to vote to accept or reject the Plan.  Members of the Voting Class are urged to review this Supplemental Disclosure, as well as the Plan, Disclosure Statement, and Disclosure Statement Order.

Members of the Voting Class who are entitled to vote on the Plan and have not submitted a Ballot should review and consider these materials prior to submitting a Ballot and use the Ballot previously furnished to them in the Solicitation Package to vote on the Plan.

**All Ballots cast will be treated as Ballots to accept or reject the Plan, including Ballots cast prior to the date of this Supplemental Disclosure.  Therefore, any member of the Voting Class that has already voted and does <u>not</u> wish to change their vote does <u>not</u> need to take any further action to vote on the Plan.**

**Any member of the Voting Class that has submitted a Ballot and <u>does</u> wish to make changes to their previously submitted Ballot should contact the Solicitation Agent at (877)428-4661 (Domestic Toll-Free) or +1(929) 955-3421 (International) or Hertzballots@primeclerk.com (with 'Hertz' in the subject line) to request a new Ballot or a new E-Ballot ID#.  Beneficial Holders of Class 11 – Existing Hertz Parent Interests, should contact their Nominee for more information on how to submit their changes to their previously submitted Ballot so that their votes can be properly reflected on the Master Ballot and the Master Ballot is actually received by the Solicitation Agent on or before June 1, 2021 at 4:00 p.m. (prevailing Eastern Time).  THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

AMERICAS 107163401

## VI.
## <u>CONCLUSION AND RECOMMENDATION</u>

The Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of Interests in Class 11 to vote in favor thereof.

Dated: May 14, 2021
      Wilmington, Delaware

Respectfully submitted,

HERTZ GLOBAL HOLDINGS, INC. AND ITS AFFILIATED DEBTORS

Name: M. David Galainena
Title:   Authorized Officer

30

<u>Exhibit A</u>

**Plan**

AMERICAS 107163401

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| The Hertz Corporation, *et al.*,[1] | Case No. 20-11218 (MFW) |
| Debtors. | (Jointly Administered) |

**FIRST MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF THE HERTZ CORPORATION AND ITS DEBTOR AFFILIATES**

WHITE & CASE LLP
Thomas E Lauria (admitted *pro hac vice*)
Matthew C. Brown (admitted *pro hac vice*)
200 South Biscayne Boulevard, Suite 4900
Miami, FL 33131
Telephone: (305) 371-2700

J. Christopher Shore (admitted *pro hac vice*)
David M. Turetsky (admitted *pro hac vice*)
Andrew T. Zatz (admitted *pro hac vice*)
Andrea Amulic (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200

Jason N. Zakia (admitted *pro hac vice*)
111 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 881-5400

Roberto J. Kampfner (admitted *pro hac vice*)
Ronald K. Gorsich (admitted *pro hac vice*)
Aaron Colodny (admitted *pro hac vice*)
Andrew Mackintosh (admitted *pro hac vice*)
Doah Kim (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700

*Attorneys for the Debtors*
*and Debtors in Possession*

Dated: May 14, 2021

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
John H. Knight (No. 3848)
Brett M. Haywood (No. 6166)
Christopher M. De Lillo (No. 6355)
J. Zach Noble (No. 6689)
One Rodney Square
910 N. King Street
Wilmington, DE 19801
Telephone:  (302) 651-7700

---

[1]     The last four digits of The Hertz Corporation's tax identification number are 8568.  The location of the debtors' service address is 8501 Williams Road, Estero, FL 33928.  Due to the large number of debtors in these chapter 11 cases, which are jointly administered for procedural purposes only, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at https://restructuring.primeclerk.com/hertz.

**TABLE OF CONTENTS**

Page

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ........................................................................................ 1
- A. Defined Terms ............................................................................................ 1
- B. Rules of Interpretation ............................................................................. 34
- C. Computation of Time ............................................................................... 34
- D. Governing Law ......................................................................................... 35
- E. Consultation, Information, Notice, and Consent Rights ........................... 35
- F. Reference to Monetary Figures ................................................................ 35
- G. Reference to the Debtors or the Reorganized Debtors ............................. 35
- H. Controlling Document .............................................................................. 35

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS ....................... 36
- A. Administrative Claims ............................................................................. 36
- B. DIP Claims ............................................................................................... 37
- C. HVF Master Lease Administrative Claims .............................................. 37
- D. Postpetition Fleet Financing Administrative Claims ................................ 37
- E. Professional Fee Claims ........................................................................... 38
- F. Priority Tax Claims .................................................................................. 39

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........ 39
- A. Summary of Classification ....................................................................... 39
- B. Treatment of Claims and Interests ........................................................... 41
- C. Special Provision Governing Unimpaired Claims ................................... 46
- D. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................. 47
- E. Elimination of Vacant Classes ................................................................. 47
- F. Separate Classification of Other Secured Claims ..................................... 47
- G. Voting Classes; Presumed Acceptance by Non-Voting Classes ............... 47
- H. Controversy Concerning Impairment ....................................................... 47

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .............................. 47
- A. No Substantive Consolidation .................................................................. 47
- B. Restructuring Transactions; Effectuating Documents ............................. 48
- C. Sources of Consideration for Plan Distributions ..................................... 48
- D. New Money Investment ........................................................................... 48
- E. Issuance and Distribution of Reorganized Hertz Parent Common Interests and Preferred Stock ........ 50
- F. New Reorganized Corporate Debt ............................................................ 50
- G. Replacement of First Lien Letters of Credit ............................................ 51
- H. HVF II and Interim Fleet Financing Settlement ...................................... 51
- I. HVF III Fleet Financing ........................................................................... 53
- J. Intercompany Claim Settlement ............................................................... 53
- K. HHN Restructuring ................................................................................... 53
- L. New Registration Rights Agreement ........................................................ 53
- M. International Vehicle Financing Claims ................................................... 54
- N. Corporate Existence ................................................................................. 54
- O. Vesting of Assets in the Reorganized Debtors ......................................... 54
- P. Cancellation of Existing Securities .......................................................... 55
- Q. Corporate Action ...................................................................................... 57
- R. New Organizational Documents ............................................................... 57
- S. Reorganized Hertz Parent and Reorganized Hertz Corp. Board .............. 57
- T. Exemption from Certain Taxes and Fees ................................................. 58
- U. Preservation of Causes of Action ............................................................ 58
- V. Insurance Policies and Surety Bonds ....................................................... 59
- W. Management Equity Incentive Plan .......................................................... 60

| X. | Employee Obligations | 60 |
| Y. | Workers' Compensation Programs | 62 |
| Z. | Collective Bargaining Agreements | 62 |
| AA. | Plan Support Agreement and Equity Purchase Agreement | 62 |

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........... 62
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 62 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 64 |
| C. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 64 |
| D. | Assumption Dispute Resolution | 65 |
| E. | Indemnification Obligations | 66 |
| F. | Contracts and Leases Entered into After the Petition Date | 66 |
| G. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 66 |
| H. | Reservation of Rights | 66 |
| I. | Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4) | 67 |

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ........... 67
| A. | Timing and Calculation of Amounts to Be Distributed | 67 |
| B. | Special Rules for Distributions to Holders of Disputed Claims and Interests | 67 |
| C. | Rights and Powers of Distribution Agent | 67 |
| D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 68 |
| E. | Securities Registration Exemption | 72 |
| F. | Compliance with Tax Requirements | 73 |
| G. | Allocations | 74 |
| H. | No Postpetition or Default Interest on Claims | 74 |
| I. | Setoffs and Recoupment | 74 |
| J. | Claims Paid or Payable by Third Parties | 74 |

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ........... 76
| A. | Allowance of Claims | 76 |
| B. | Claims and Interests Administration Responsibilities | 76 |
| C. | ADR Procedures | 77 |
| D. | Estimation of Claims | 77 |
| E. | Adjustment to Claims Register Without Objection | 77 |
| F. | Time to File Objections to Claims | 78 |
| G. | Disallowance of Claims | 78 |
| H. | Amendments to Proofs of Claim | 78 |
| I. | Reimbursement or Contribution | 78 |
| J. | No Distributions Pending Allowance | 79 |
| K. | Distributions After Allowance | 79 |
| L. | Single Satisfaction of Claims | 79 |

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ........... 79
| A. | Compromise and Settlement of Claims, Interests, and Controversies | 79 |
| B. | Discharge of Claims and Termination of Interests | 80 |
| C. | Releases by the Debtors | 80 |
| D. | Releases by Holders of Claims and Interests | 81 |
| E. | Exculpation | 81 |
| F. | Injunction | 82 |
| G. | Subordination Rights | 83 |
| H. | Release of Liens | 83 |

ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ........... 83
| A. | Conditions Precedent to the Effective Date | 83 |
| B. | Waiver of Conditions | 85 |
| C. | Substantial Consummation | 85 |
| D. | Committee Complaint | 85 |

E.    Bifurcation Motion..................................................................................................85
F.    Effect of Non-Occurrence of Conditions to the Effective Date ...........................85

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ......................86
A.    Modification and Amendments...............................................................................86
B.    Effect of Confirmation on Modifications...............................................................86
C.    Effect of Confirmation ...........................................................................................86
D.    Revocation or Withdrawal of the Plan ..................................................................86

ARTICLE XI. RETENTION OF JURISDICTION ...............................................................................87

ARTICLE XII. MISCELLANEOUS PROVISIONS ............................................................................89
A.    Immediate Binding Effect.......................................................................................89
B.    Additional Documents ............................................................................................89
C.    Payment of Statutory Fees .....................................................................................89
D.    Reservation of Rights.............................................................................................89
E.    Transaction Expenses ............................................................................................90
F.    Successors and Assigns..........................................................................................90
G.    Service of Documents .............................................................................................90
H.    Term of Injunctions or Stays..................................................................................91
I.    Entire Agreement ...................................................................................................92
J.    Nonseverability of Plan Provisions.......................................................................92
K.    Dissolution of Committee .......................................................................................92
L.    Expedited Tax Determination.................................................................................92

**EXHIBITS**

New Warrant Term Sheet………………………………………………………………….Exhibit A

**INTRODUCTION**

The Hertz Corporation and its Debtor Affiliates hereby propose this *First Modified Third Amended Joint Plan of Reorganization*. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Bankruptcy Code. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Although proposed jointly for administrative purposes, the Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, RULE 3019 OF THE BANKRUPTCY RULES, AND ARTICLE X OF THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, SUPPLEMENT, REVOKE, OR WITHDRAW THE PLAN PRIOR TO ITS CONSUMMATION.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*2020 EIP Order*" means the *Order Authorizing and Approving the Debtors Employee Incentive Plan* [Docket No. 1560].

2.      "*2021 KEIP/EIP Order*" means the *Order Authorizing and Approving the Debtors' (i) 2021 Key Employee Incentive Plan and (ii) 2021 Employee Incentive Plan* [Docket No. 2793].

3.      "*5.500% Unsecured Noteholders*" means the Holders of the 5.500% Unsecured Notes from time to time, in their capacity as such.

4.      "*5.500% Unsecured Notes*" means the 5.500% senior notes due 2024 issued pursuant to the 5.500% Unsecured Notes Indenture.

5.      "*5.500% Unsecured Notes Claims*" means all Claims against any Debtor arising from or based upon the 5.500% Unsecured Notes or any other 5.500% Unsecured Notes Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding amount as of the Petition Date was in the aggregate amount equal to $800,000,000.00.

6.      "*5.500% Unsecured Notes Documents*" means, collectively, the 5.500% Unsecured Notes Indenture, the 5.500% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the 5.500% Unsecured Notes.

7.      "*5.500% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of September 22, 2016, for the

1

5.500% Unsecured Notes by and among Hertz Corp., as the issuer, the Subsidiary Guarantors, as guarantors, and the 5.500% Unsecured Notes Trustee.

8.    "*5.500% Unsecured Notes Trustee*" means Wells Fargo Bank, N.A., in its capacity as trustee under the 5.500% Unsecured Notes Indenture, including any successor thereto.

9.    "*6.000% Unsecured Noteholders*" means Holders of the 6.000% Unsecured Notes from time to time, in their capacity as such.

10.    "*6.000% Unsecured Notes*" means the 6.000% senior notes due 2028 issued pursuant to the 6.000% Unsecured Notes Indenture.

11.    "*6.000% Unsecured Notes Claims*" means all Claims against any Debtor arising from or based upon the 6.000% Unsecured Notes or any other 6.000% Unsecured Notes Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding amount as of the Petition Date was in the aggregate amount equal to $900,000,000.00.

12.    "*6.000% Unsecured Notes Documents*" means, collectively, the 6.000% Unsecured Notes Indenture, the 6.000% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the 6.000% Unsecured Notes.

13.    "*6.000% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of November 25, 2019, for the 6.000% Unsecured Notes by and among Hertz Corp., as the issuer, the Subsidiary Guarantors, as guarantors, and the 6.000% Unsecured Notes Trustee.

14.    "*6.000% Unsecured Notes Trustee*" means Wells Fargo Bank, N.A., in its capacity as trustee under the 6.000% Unsecured Notes Indenture, including any successor thereto.

15.    "*6.250% Unsecured Noteholders*" means Holders of the 6.250% Unsecured Notes from time to time, in their capacity as such.

16.    "*6.250% Unsecured Notes*" means the 6.250% senior notes due 2022 issued pursuant to the 6.250% Unsecured Notes Indenture.

17.    "*6.250% Unsecured Notes Claims*" means all Claims against any Debtor arising from or based upon the 6.250% Unsecured Notes or any other 6.250% Unsecured Notes Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding amount as of the Petition Date was in the aggregate equal to $500,000,000.00.

18.    "*6.250% Unsecured Notes Documents*" means, collectively, the 6.250% Unsecured Notes Indenture, the 6.250% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the 6.250% Unsecured Notes.

19.    "*6.250% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of October 16, 2012, for the 6.250% Unsecured Notes by and among Hertz Corp., as the issuer, the Subsidiary Guarantors, as guarantors, and the 6.250% Unsecured Notes Trustee.

20.    "*6.250% Unsecured Notes Trustee*" means Wells Fargo Bank, N.A., in its capacity as trustee under the 6.250% Unsecured Notes Indenture, including any successor thereto.

21.     "*7.000% Unsecured Promissory Noteholders*" means Holders of the 7.000% Unsecured Promissory Notes from time to time, in their capacity as such.

22.     "*7.000% Unsecured Promissory Notes*" means the 7.000% senior notes due 2028 issued pursuant to the 7.000% Unsecured Promissory Notes Indenture.

23.     "*7.000% Unsecured Promissory Notes Claims*" means all Claims against any Debtor arising from or based upon the 7.000% Unsecured Promissory Notes or any other 7.000% Unsecured Promissory Notes Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding amount as of the Petition Date was in the aggregate amount equal to $28,274,393.81.

24.     "*7.000% Unsecured Promissory Notes Documents*" means, collectively, the 7.000% Unsecured Promissory Notes Indenture, the 7.000% Unsecured Promissory Notes, and all related agreements and documents executed by any of the Debtors in connection with the 7.000% Unsecured Promissory Notes.

25.     "*7.000% Unsecured Promissory Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of December 1, 1994, for the 7.000% Unsecured Promissory Notes by and among Hertz Corp., as the issuer, the Subsidiary Guarantors, as guarantors, and the 7.000% Unsecured Promissory Notes Trustee.

26.     "*7.000% Unsecured Promissory Notes Trustee*" means U.S. Bank National Association, in its capacity as trustee under the 7.000% Unsecured Notes Indenture, including any successor thereto.

27.     "*7.000% Unsecured Promissory Notes Trustee's Fees*" means, collectively, to the extent not previously paid in connection with the Chapter 11 Cases, the reasonable and documented fees, costs, and expenses (including, without limitation, legal fees) incurred by the 7.000% Unsecured Promissory Notes Trustee that are required to be paid under the 7.000% Unsecured Promissory Notes Documents.

28.     "*7.125% Unsecured Noteholders*" means Holders of the 7.125% Unsecured Notes from time to time, in their capacity as such.

29.     "*7.125% Unsecured Notes*" means the 7.125% senior notes due 2026 issued pursuant to the 7.125% Unsecured Notes Indenture.

30.     "*7.125% Unsecured Notes Claims*" means all Claims against any Debtor arising from or based upon the 7.125% Unsecured Notes or any other 7.125% Unsecured Notes Document, including all accrued but unpaid interest, costs, fees, and indemnities, which principal outstanding amount as of the Petition Date was in the aggregate amount equal to $500,000,000.00.

31.     "*7.125% Unsecured Notes Documents*" means, collectively, the 7.125% Unsecured Notes Indenture, the 7.125% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the 7.125% Unsecured Notes.

32.     "*7.125% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of August 1, 2019, for the 7.125% Unsecured Notes by and among Hertz Corp., as the issuer, the Subsidiary Guarantors, as guarantors, and the 7.125% Unsecured Notes Trustee.

33.     "*7.125% Unsecured Notes Trustee*" means Wells Fargo Bank, N.A., in its capacity as trustee under the 7.125% Unsecured Notes Indenture, including any successor thereto.

3

34.    "*ABS Released Parties*" shall have the meaning ascribed to such term the Second Interim HVF Master Lease Settlement Order.

35.    "*Ad Hoc Equity Committee*" means the ad hoc group of certain shareholders, in its capacity as such, represented by Glenn Agre Bergman & Fuentes LLP identified in the *Amended Verified Statement of Glenn Agre Bergman & Fuentes LLP Pursuant to Bankruptcy Rule 2019* [Docket No. 4078].

36.    "*Administrative Claim*" means a Claim against any of the Debtors for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors, including wages, salaries, or commissions for services rendered after the Petition Date; (ii) Professional Fee Claims; (iii) Substantial Contribution Claims; (iv) fees and charges payable to the U.S. Trustee pursuant to Section 1930 of the Judicial Code; (v) postpetition Intercompany Claims, (vi) DIP Claims, (vii) HVF Master Lease Administrative Claims; (viii) Canadian Fleet Financing Administrative Claims; and (ix) Interim Fleet Financing Administrative Claims.

37.    "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order, including the Claims Bar Date Order.

38.    "*Administrative Claims Objection Deadline*" means the first Business Day that is one-hundred and eighty (180) days after the Effective Date; provided that such date may be extended by the Bankruptcy Court at the Reorganized Debtors' request.

39.    "*ADR Procedures*" means the alternative dispute resolution procedures as amended, supplemented, or modified from time to time and filed in connection with the Plan Supplement. For the avoidance of doubt, such procedures shall not apply to any dispute involving the Plan Sponsors, if any, and shall be in form and substance reasonably acceptable to the Plan Sponsors in good faith. For the avoidance of doubt, prior to the Effective Date, ADR Procedures refers to those procedures approved by the Bankruptcy Court on April 13, 2021 [Docket No. 3835] and after the Effective Date, the ADR Procedures in the Plan Supplement.

40.    "*Affiliate*" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code as if such Entity was a debtor in a case under the Bankruptcy Code.

41.    "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein, such Claim or Interest (or any portion thereof) that is not Disallowed and (i) with respect to which no objection to the allowance thereof or request for estimation has been Filed or such Claim or Interest has not been designated for participation in the ADR Procedures on or before the Claims Objection Deadline, Administrative Claims Objection Deadline, or the expiration of such other applicable period fixed by the Bankruptcy Court, (ii) that has been expressly Allowed under the Plan, any stipulation approved by the Bankruptcy Court, or a Final Order of the Bankruptcy Court; (iii) is both not Disputed and either (a) evidenced by a Proof of Claim timely Filed in accordance with the Claims Bar Date Order (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed) or (b) listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (iv) is allowed by a Final Order, or (v) is compromised, settled, or otherwise resolved to by (a) the Debtors and (b) the holder of such Claim or Interest; provided, that, except as otherwise expressly provided herein, the amount of any Allowed Claim or Allowed Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b),

4

503(b) and 506 of the Bankruptcy Code. Except as otherwise expressly specified in the Plan (including with respect to First Lien Claims and Second Lien Note Claims) or any Final Order, and except to the extent such interest is Allowed pursuant to section 506(b) of the Bankruptcy Code, the amount of an Allowed Claim shall not include interest or any premium on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow," "Allowance," and "Allowing" shall have correlative meanings.

42. "*ALOC Credit Agreement*" means that certain Credit Agreement (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of December 13, 2019, by and among Hertz Corp., the lenders party thereto, and Goldman Sachs Mortgage Company, as administrative agent and issuing lender, as may be amended, modified, or amended and restated from time to time.

43. "*ALOC Facility*" means the letter of credit facility provided pursuant to the ALOC Credit Agreement.

44. "*ALOC Facility Agent*" means Goldman Sachs Mortgage Company solely in its capacity as administrative agent for the ALOC Facility.

45. "*ALOC Facility Claims*" means all Claims against any Debtor arising from or based upon letters of credit issued pursuant to the ALOC Credit Agreement or any other ALOC Facility Documents, including accrued but unpaid interest, costs, fees, and indemnities.

46. "*ALOC Facility Documents*" means the ALOC Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the ALOC Facility.

47. "*Amarillo*" means CK Amarillo LP.

48. "*Apollo*" means Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by it or its Affiliates.

49. "*Assumed Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and/or Unexpired Leases filed as part of the Plan Supplement, which shall be in form and substance acceptable to the Plan Sponsors in good faith, as may be amended, modified, or supplemented by the Debtors from time to time, that will be assumed by the Reorganized Debtors pursuant to the Plan; provided, that the Assumed Executory Contracts and Unexpired Leases Schedule does not need to include Executory Contracts and/or Unexpired Leases that have been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date.

50. "*Australian ABS Restructuring Settlement*" means the restructuring of the Australian Securitization Facility on terms and conditions reasonably acceptable to the Debtors, the Plan Sponsors,

Hertz Australia, the Australian Financing Entity, and the requisite consenting lenders from time to time party to the Australian Securitization Facility Documents, which restructuring and settlement shall include the complete release and disallowance of the Australian Performance Guarantee and any claims related thereto, including the Australian Performance Guarantee Claim.

51. "*Australian Financing Entity*" means HA Fleet Pty Ltd (ACN 126 115 204).

52. "*Australian Performance Guarantee*" means the guarantee and indemnity granted by Hertz Corp. pursuant to that certain THC Guarantee and Indemnity, dated as of July 12, 2016.

53. "*Australian Performance Guarantee Claim*" means any Claim against Hertz Corp. pursuant to the Australian Performance Guarantee.

54. "*Australian Securitization Facility*" means the fleet financing facility, dated December 7, 2010, between, among others, the Australian Financing Entity and Citibank, N.A., as Administrative Agent, as amended, varied, amended and restated or extended from time to time, including pursuant the Master Amendment and Restatement Deed dated as of July 12, 2016, entered into between, among others, the Australian Financing Entity, Westpac Banking Corporation, and P.T. Limited, and as amended by the Amendment Deed dated as of September 23, 2019, entered into between, among others, the Australian Financing Entity, Westpac Banking Corporation and P.T. Limited.

55. "*Australian Securitization Facility Documents*" means all related agreements and documents executed by Hertz Corp., Hertz Australia, the Australian Financing Entity, or any of its non-Debtor Affiliates in connection with the Australian Securitization Facility.

56. "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors and any recovery, subordination, or other remedies that may be brought by or on behalf of the Debtors and their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including under sections 502, 544, 545, 547, 548, 549, 550, 551, 553(b) and 724(a) of the Bankruptcy Code, chapter 5 of the Bankruptcy Code, or applicable non-bankruptcy law.

57. "*Ballot*" means the form(s) distributed to holders of Claims entitled to vote on the Plan to indicate their acceptance or rejection of the Plan and to make an election with respect to the releases by Holders of Claims and Interests provided by Article VIII.D.

58. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Cases.

59. "*Bankruptcy Court*" means (i) the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases; (ii) to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code; or (iii) such other court as may have jurisdiction over the Chapter 11 Cases or any aspect thereof to the extent of such jurisdiction.

60. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

61.     "*Bifurcation Motion*" means the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry Into, and Performance Under, European Settlement and Restructuring Embodied in Noteholder Lock-Up Agreement: (A) Settling Guarantee Claims, (B) Allowing Replacement U.S. Unsecured Claims, (C) Providing for the Issuance of Non-Contingent Debt Instrument, (D) Authorizing Sale of Replacement U.S. Unsecured Claims Pursuant to Sale Procedures, Including Authorizing Hertz Global Holdings, Inc. to Act as Agent to Market and Sell Such Claims and the Appointment of Moelis & Company LLC to Act as the Intermediary in Connection Therewith, (E) Authorizing Hertz System Inc. to Enter Into or Amend Certain Intellectual Property and License and Sublicense Agreements, and (F) Modifying Automatic Stay with Respect to European Noteholder Lock-Up Agreement and (II) Granting Related Relief* [Docket No. 2280].

62.     "*BNY Canada*" means BNY Trust Company of Canada.

63.     "*Bondholder Subscription Rights*" means the subscription rights distributed to Holders of Allowed Unsecured Funded Debt Claims to participate in the Rights Offering solely to the extent the Rights Offering is not fully subscribed and funded by Holders of Existing Hertz Parent Interests, offered in accordance with the Equity Commitment Agreement and the Rights Offering Procedures.

64.     "*Business Day*" means any day, other than a Saturday, Sunday, or "*legal holiday*" (as defined in Bankruptcy Rule 9006(a)), or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

65.     "*Canadian Fleet Financing Administrative Claims*" means any and all Administrative Claims arising under or related to the Canadian Fleet Financing Debtor Documents.

66.     "*Canadian Fleet Financing Back-Up Agent Agreement*" means that certain Back-Up Disposition Agent Agreement dated as of September 14, 2014, by and among Fiserv Automotive Solutions, Inc., Hertz Canada, DTAG Canada and the Canadian Trustee, as amended from time to time.

67.     "*Canadian Fleet Financing Base Indenture*" means that certain Base Indenture dated as of September 14, 2015 by and among TCL Funding, as issuer, Hertz Canada and DTAG Canada, as co-servicers, HCVP, HC Limited, DTGC, as securitization entities, certain Committed Note Purchasers, Certain Conduit Investors, Certain Funding Agents for the Investor Groups (each as defined therein) and BNY Canada, as trustee.

68.     "*Canadian Fleet Financing Debtor Documents*" means the Canadian Fleet Financing Indenture, the Canadian Fleet Financing Servicing Agreement, the Canadian Fleet Financing Back-Up Agent Agreement, the Canadian Fleet Financing Performance Guarantee, and any other agreements, instruments and documents executed by the Debtors in connection therewith.

69.     "*Canadian Fleet Financing Documents*" means the Canadian Fleet Financing Debtor Documents, the Canadian Fleet Financing Notes and any other agreements, instruments and documents executed in connection therewith.

70.     "*Canadian Fleet Financing Facility*" means the asset-backed securitization facility issued pursuant to the Canadian Fleet Financing Documents.

71.     "*Canadian Fleet Financing Indenture*" means the Canadian Fleet Financing Base Indenture and the Canadian Fleet Financing Supplemental Indenture.

72.    "*Canadian Fleet Financing Notes*" means the Series 2021-A Variable Funding Rental Car Asset Backed Notes issued under the Canadian Fleet Financing Indenture.

73.    "*Canadian Fleet Financing Performance Guarantee*" means the Performance Guarantee dated as of September 14, 2014 issued by Hertz Corp. for the benefit of the Canadian Trustee in connection with the Canadian Fleet Financing Servicing Agreement and the Canadian Fleet Financing Back-Up Agent Agreement.

74.    "*Canadian Fleet Financing Servicing Agreement*" means that certain Servicing Agreement dated as of September 14, 2015, by and among Hertz Canada, DTAG Canada, HC Limited, TCL Funding, DTAC, and the Canadian Trustee, as amended from time to time.

75.    "*Canadian Fleet Financing Supplemental Indenture*" means the Series 2021-A Supplement dated as of January 27, 2021 to the Canadian Fleet Financing Base Indenture.

76.    "*Canadian Trustee*" means BNY Canada acting in its capacity as Trustee under the Canadian Fleet Financing Indenture.

77.    "*Cash*" means the legal tender of the United States of America or equivalents thereof.

78.    "*Cash Collateral Orders*" means the (i) *Agreed Interim Order (I) Authorizing Use of Cash Collateral and (II) Granting Adequate Protection and Related Relief to Prepetition Secured Parties* [Docket No. 204], (ii) *Second Agreed Order (I) Authorizing Use of Cash Collateral and (II) Granting Adequate Protection and Related Relief to Prepetition Secured Parties* [Docket No. 559] and (iii) *Third Agreed Order (I) Authorizing Use of Cash Collateral and (II) Granting Adequate Protection and Related Relief to Prepetition Secured Parties* [Docket No. 1131], each as amended, supplemented, or modified from time to time.

79.    "*Casualty Superpriority Administrative Expense Claim*" means the superpriority administrative expense claims of the HVF Trustee pursuant to the Interim HVF Master Lease Settlement Orders in an amount equal to all payments on account of a Casualty (as defined in the HVF Master Lease Agreement) accrued under the HVF Master Lease Agreement plus interest thereon from the date such amount would be payable under the HVF Master Lease Agreement at the one-month LIBOR Rate (as defined in the HVF Master Lease Agreement) plus 5.50%.

80.    "*Cause of Action*" means any action, claim, proceeding, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guarantee, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, or franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity;  (ii) any Claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity; (iii) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Interests; (iv) any Claim pursuant to section 362 of the Bankruptcy Code; (v) any claim or defense, including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (vi) any Avoidance Actions.

8

81. "*Certares*" means certain funds and accounts managed or advised by Certares Opportunities LLC or one of its Affiliates.

82. "*Chapter 11 Cases*" means (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (ii) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court under Chapter 11 Case, Number 20-11218 (MFW).

83. "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

84. "*Claims and Noticing Agent*" means Prime Clerk LLC, the claims, noticing, and solicitation agent retained by the Debtors pursuant to the *Order Authorizing the Appointment of Prime Clerk LLC as Claims and Noticing Agent* Nunc Pro Tunc *to the Petition Date* [Docket No. 183].

85. "*Claims Bar Date*" means October 21, 2020 at 5:00 p.m. (prevailing Eastern Time) or other applicable date(s) designated by the Bankruptcy Court as the last date(s) for filing a Proof of Claim against the Debtors.

86. "*Claims Bar Date Order*" means the *Order Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, and Approving the Form and Manner of Notice Thereof* [Docket No. 1240], entered by the Bankruptcy Court on September 9, 2020, as amended, modified, or supplemented by order of the Bankruptcy Court from time to time.

87. "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (i) one hundred and eighty (180) days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court upon a motion by the Reorganized Debtors Filed on or before the day that is one hundred and eighty (180) days after the Effective Date.

88. "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

89. "*Class*" means a category of Holders of Claims or Interests as set forth in <u>Article III</u> pursuant to section 1122(a) of the Bankruptcy Code.

90. "*Class Action Claim*" means any Claim scheduled or filed by a purported class representative or its counsel on behalf of one or more claimant.

91. "*Clawback Defendants*" means (i) Mark Frissora; (ii) John Jeffrey Zimmerman; and (iii) Scott Sider.

92. "*Collective Bargaining Agreements*" means all the collective bargaining agreements of the Debtors.

93. "*Collective Bargaining Agreement Schedule*" means the schedule of cure amounts due on account of the Debtors' Collective Bargaining Agreements, as may be amended by the Debtors.

94. "*Commitment Letter*" means the letter between the Debtors and the Plan Sponsors (other than Apollo) dated March 2, 2021.

95. "*Committee*" means the statutory committee of unsecured creditors, appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee, pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 392] on June 11, 2020, as may be reconstituted from time to time.

96. "*Committee Complaint*" means the *Complaint* Filed by the Committee in the adversary proceeding styled *The Official Committee of Unsecured Creditors v. Barclays Bank PLC and BOKF, N.A.* (under Adversary Proceeding Number 20-50842 (MFW)).

97. "*Committee Members*" means, each in its capacity as a member of the Committee, (i) American Automobile Association, Inc.; (ii) Janice Dawson; (iii) International Brotherhood of Teamsters;[2] (iv) Pension Benefit Guaranty Corporation; (v) Sirius XM Radio Inc.; (vi) Southwest Airlines Co.; (vii) U.S. Bank National Association; and (viii) Wells Fargo Bank, N.A.

98. "*Company*" means, collectively, the (i) Debtors; and (ii) their direct and indirect non-Debtor subsidiaries.

99. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

100. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

101. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

102. "*Confirmation Order*" means the order of the Bankruptcy Court, confirming the Plan pursuant to section 1129 of the Bankruptcy Code that is consistent with this Plan, and which shall be in form and substance acceptable to the Plan Sponsors in good faith.

103. "*Consenting Investor Provision*" shall have the meaning set forth in the Plan Support Agreement.

104. "*Consummation*" means the occurrence of the Effective Date.

105. "*Cure Claim*" means a monetary Claim in an amount, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) at the time such contract or lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

106. "*D&O Liability Insurance Policies*" means, collectively, all insurance policies (including any "tail policy") issued at any time, whether expired or unexpired, to any of the Debtors for certain liabilities of the Debtors and/or their current or former directors, managers, and officers, and all agreements, documents or instruments related thereto, including the Tail D&O Policy.

---

[2] The International Brotherhood of Teamsters is a Member in its capacity as representative for Local Unions 20, 25, 79, 89, 104, 114, 117, 118, 150, 175, 206, 222, 272, 299, 305, 317, 327, 355, 385, 399, 431, 449, 455, 481, 492, 495, 528, 529, 541, 618, 641, 665, 667, 682, 745, 769, 781, 813, 830, 853, 856, 886, 901, 922, 926, 931, 986, 988 and 996, and their respective members.

10

107.   "*Debtors*" means, collectively, (i) Hertz Corp.; (ii) Hertz Global Holdings, Inc.; (iii) Thrifty Rent-A-Car System, LLC; (iv) Thrifty, LLC; (v) Dollar Thrifty Automotive Group, Inc.; (vi) Firefly Rent A Car LLC; (vii) CMGC Canada Acquisition ULC; (viii) Hertz Aircraft, LLC; (ix) Dollar Rent A Car, Inc.; (x) Dollar Thrifty Automotive Group Canada Inc.; (xi) Donlen Corporation; (xii) Donlen FSHCO Company; (xiii) Hertz Canada Limited; (xiv) Donlen Mobility Solutions, Inc.; (xv) DTG Canada Corp.; (xvi) DTG Operations, Inc.; (xvii) Hertz Car Sales LLC; (xviii) DTG Supply, LLC; (xix) Hertz Global Services Corporation; (xx) Hertz Local Edition Corp.; (xxi) Hertz Local Edition Transporting, Inc.; (xxii) Donlen Fleet Leasing Ltd.; (xxiii) Hertz System, Inc.; (xxiv) Smartz Vehicle Rental Corporation; (xxv) Thrifty Car Sales, Inc.; (xxvi) Hertz Technologies, Inc.; (xxvii) TRAC Asia Pacific, Inc.; (xxviii) Hertz Transporting, Inc.; (xxix) Rental Car Group Company, LLC; and (xxx) Rental Car Intermediate Holdings, LLC.

108.   "*Defined Benefit Plan*" means The Hertz Corporation Account Balance Defined Benefit Pension Plan.

109.   "*Definitive Documents*" has the meaning set forth in the Plan Support Agreement.

110.   "*Designated Claim*" means any disputed, unliquidated, or contingent Claim selected by the Debtors, the Reorganized Debtors, or the Distribution Agent, as applicable, for resolution through the ADR Procedures.

111.   "*DFLF Facility*" means the asset-backed securitization facility entered into in connection with the *Order (I) Authorizing Certain Debtors to Enter Into Securitization Documents, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket. No. 1489].

112.   "*DIP Agent*" means Barclays Bank PLC, in its capacity as Administrative Agent and Collateral Agent under the DIP Credit Agreement, including any successor thereto.

113.   "*DIP Claims*" means any Claim in respect of any DIP Obligations (as defined in the DIP Order) owed by the Debtors under the DIP Order.

114.   "*DIP Credit Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of October 30, 2020, by and among Hertz Corp., as borrower, the DIP Lenders, the DIP Agent, and Barclays Bank PLC as Joint Bookrunner, as approved by the DIP Order, and as the same may be amended, modified, or amended and restated from time to time in accordance with its terms.

115.   "*DIP Financing*" means the postpetition financing facility issued pursuant to the DIP Credit Agreement and the DIP Order, consisting of a $1,650,000,000.00 senior secured multiple draw term loan credit facility.

116.   "*DIP Lenders*" means, collectively, the Lenders (as defined in the DIP Credit Agreement), the Issuing Bank (as defined in the DIP Credit Agreement) and any other DIP Secured Party (as defined in the DIP Order).

117.   "*DIP Loan Documents*" has the meaning set forth in the DIP Order.

118.   "*DIP Order*" means the *Order (I) Authorizing the Debtors to Obtain Debtor-in-Possession Financing and Granting Liens and Superpriority Administrative Claims and (II) Granting Related Relief* [Docket No. 1661] as amended, supplemented, or modified from time to time.

11

119.    "*Disallowed*" means any Claim, or any portion thereof, that (i) has been disallowed by Final Order or settlement; (ii) is listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed, deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law; or (iii) is not listed on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely Filed under applicable law.  "Disallow" and "Disallowance" shall have correlative meanings.

120.    "*Disclosure Statement*" means (i) the *Disclosure Statement for the Fourth Modified Second Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and Its Debtor Affiliates*, dated as of April 22, 2021 (as amended, modified or supplemented from time to time in accordance with its terms), including all exhibits and schedules thereto and references therein that relate to the Plan that are prepared and distributed in accordance with applicable law and (ii) any supplement, amendment, or modification thereto which shall be in form and substance reasonably acceptable to the Plan Sponsors in good faith.

121.    "*Disclosure Statement Order*" means that certain *Order (I) Approving the Proposed Disclosure Statement and Form and Manner Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan, and (V) Granting Related Relief* entered by the Bankruptcy Court on April 22, 2021 [Docket No. 4111] (as amended, modified, or supplemented from time to time with any such amendments, modifications, or supplements in form and substance acceptable to the Plan Sponsors in good faith).

122.    "*Disputed*" means, with respect to a Claim or Interest, a Claim (or portion thereof) that is not yet Allowed or Disallowed.

123.    "*Distribution Agent*" means, as applicable, the Entity or Entities selected by the Debtors or the Reorganized Debtors, in consultation with the Plan Sponsors, to make or to facilitate distributions pursuant to the Plan.

124.    "*Distribution Record Date*" means the date for determining which Holders of Allowed Claims are eligible to receive distributions under the Plan, which, unless otherwise specified, shall be 5:00 p.m. prevailing Eastern Time on the date of the Confirmation Hearing; provided, that the Distribution Record Date shall not apply to the First Lien Claims, Second Lien Note Claims, Unsecured Funded Debt Claims, and the HHN Notes Guarantee Claims, the Holders of which shall receive a distribution in accordance with Article VI of the Plan and, as applicable, the customary procedures of DTC and Euroclear.

125.    "*Donlen Canada Securitization Facility*" means the asset-backed securitization facility issued by non-Debtor Donlen Canada Fleet Funding LP.

126.    "*Donlen Debtors*" means (i) Donlen Corporation; (ii) Donlen FSHCO Company; (iii) Donlen Mobility Solutions, Inc.; and (iv) Donlen Fleet Leasing Ltd.

127.    "*Donlen Documents*" means the documents executed in connection with the Donlen Sale.

128.    "*Donlen Sale*" means the sale of substantially all of the assets of the Donlen Debtors.

12

129.    "*DTAC*" means DTC Car Rental Partnership Limited.

130.    "*DTAG Canada*" means Debtor Dollar Thrifty Automotive Group Canada Inc.

131.    "*DTC*" means The Depository Trust Company.

132.    "*ECA Approval Order*" means an Order of the Bankruptcy Court that is not stayed (under Bankruptcy Rule 6004(h) or otherwise) that (i) authorizes the Debtors to enter into and perform under the Equity Commitment Documents, and (ii) provides that the termination payment, expense reimbursement, and the indemnification provisions contained therein shall constitute Allowed Administrative Expense Claims of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall be payable by the Debtors as provided in the Equity Commitment Documents without further Order of the Bankruptcy Court.

133.    "*Effective Date*" means, with respect to the Plan, the date that is a Business Day on which (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (iii) the Plan is declared effective by the Debtors.  Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

134.    "*Eligible Existing Hertz Shareholders*" means each Holder of an Allowed Existing Hertz Parent Interest on the Record Date (as such terms are defined in the Rights Offering Procedures) that is either (i) an "accredited investor" within the meaning of Rule 501 Regulation D under the Securities Act or (ii) a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, as certified in accordance with the Rights Offering Procedures.

135.    "*Eligible Unsecured Funded Debt Holder*" means each Holder of an Allowed Unsecured Funded Debt Claim on the Record Date (as such terms are defined in the Rights Offering Procedures) that is either (i) an "accredited investor" within the meaning of Rule 501 Regulation D under the Securities Act or (ii) a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, as certified in accordance with the Rights Offering Procedures.

136.    "*Employee Obligations*" means any written contracts, agreements, policies, programs, and plans (as from time to time amended or restated) applicable to employees or directors for regular compensation (including wages, salary, commissions, and incentives), bonus programs approved by the Bankruptcy Court pursuant to the 2020 EIP Order and the 2021 KEIP/EIP Order, expense reimbursements, vacation and sick leave benefits, employee and retiree health care, vision, and dental benefits, employee and retiree life insurance benefits, disability insurance benefits, accidental death and dismemberment insurance benefits, qualified retirement programs, employee relocation programs, employee and director vehicle use policies, commuter benefits, adoption assistance benefits, employee, director, and retiree discount programs, and other employee welfare plan benefits in effect immediately prior to the Effective Date.  For the avoidance of doubt, the term "Employee Obligations" does not include any contracts, agreements, arrangements, letters, policies, programs, or plans (as from time to time amended or restated) for deferred compensation, non-qualified retirement benefits, severance, or other employment termination benefits.

137.    "*Employment Agreements*" means the existing employment agreement by and between certain employees of the Debtor and the Debtors identified in the Plan Supplement, each of which shall be assumed on the Effective Date, subject to the consent of the Plan Sponsors.

138.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

139.    "*Equity Commitment*" means the purchase of Reorganized Hertz Parent Common Interests and Preferred Stock by the Equity Commitment Parties under the Equity Commitment Agreement.

140.    "*Equity Commitment Agreement*" means that certain Equity Commitment and Stock Purchase Agreement, dated as of May 2, 2021, by and among Hertz Parent, the other Debtors party thereto, and the Equity Commitment Parties, as the same may be amended, modified, or amended and restated from time to time in accordance with its terms, setting forth, among other things, the terms and conditions of (i) the New Money Investment, (ii) the Rights Offering, and (iii) the commitments and investment by the Ad Hoc Equity Committee and related fees.

141.    "*Equity Commitment Documents*" means the Equity Commitment Agreement together with all schedules, annexes and exhibits thereto.

142.    "*Equity Commitment Parties*" means, collectively, the parties purchasing Reorganized Hertz Parent Common Interests and Preferred Stock under the Equity Commitment Agreement, including Apollo and Amarillo.

143.    "*ERISA*" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

144.    "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 of the Bankruptcy Code.

145.    "*Euroclear*" means Euroclear S.A./N.V., as operator of the Euroclear system.

146.    "*European ABS Facility*" means that certain €600,000,000.00 asset-backed securitization facility originally dated September 25, 2018 between (among others) International Fleet Financing No. 2 B.V. as Issuer, Credit Agricole Corporate and Investment Bank as European ABS Facility Administrative Agent and BNP Paribas Trust Corporation UK Limited as Issued Security Trustee.

147.    "*European ABS Facility Documents*" means all related agreements and documents executed by Hertz Corp. or any of its non-Debtor Affiliates in connection with the European ABS Facility.

148.    "*European ABS Performance Guarantees*" means (i) that certain THC Guarantee and Indemnity, dated as of September 25, 2018, between Hertz Corp., Stuurgroep Fleet (Netherlands) B.V., RAC Finance S.A.S., Hertz Fleet Limited, Stuurgroep Fleet (Netherlands) B.V. Spanish Branch, and BNP Paribas Trust Corporation UK Limited, as issued security trustee and fleetco security trustee, and (ii) that certain German Fleetco THC Indemnity, dated September 25, 2018, between Hertz Corp., Hertz Fleet Limited, BNP Paribas Trust Corporation UK Limited, as issued security trustee and fleetco security trustee, and certain entities named as beneficiaries therein.

149.    "*European ABS Performance Guarantee Claim*" means all Claims against Hertz Corp. pursuant to the European ABS Performance Guarantees or otherwise arising from the European ABS Facility or the European ABS Facility Documents.

150.    "*European ABS Restructuring Settlement*" means the restructuring of the Lombard Vehicle Financing Facility and the European ABS Facility on terms and conditions acceptable to the Debtors, the European Vehicle Financing Entities and the requisite consenting lenders from time to time party to the Lombard Vehicle Financing Facility and the European ABS Facility, which restructuring and settlement shall include the complete release and disallowance of the Lombard Financing Facility

14

Guarantee, the European ABS Performance Guarantee and any claims related thereto, including the Lombard Vehicle Financing Facility Guarantee Claims and European ABS Performance Guarantee Claims.

151. "*European Vehicle Financing Entities*" means (i) Hertz (U.K.) Limited; and (ii) the non-Debtor Affiliates of Hertz Corp. party to the European ABS Facility Documents.

152. "*Exculpated Parties*" means each of the following in their capacity as such: (i) the Debtors; (ii) each of the Debtors' respective directors and officers serving after the Petition Date; (iii) the Committee; (iv) each of the Committee Members, solely in its capacity as a Committee Member; (v) each of the Plan Sponsors; (vi) each of the Equity Commitment Parties; (vii) the Unsecured Notes Trustees, (viii) the 7.000% Unsecured Promissory Notes Trustee; and (ix) with respect to each of the foregoing Entities in clauses (i) through (viii), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, officers, predecessors, successors, and assigns, subsidiaries, and each of their respective current and former officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in its capacity as such; provided, that with respect to the Plan Sponsors, the Equity Commitment Parties, the Unsecured Notes Trustees, and the 7.000% Unsecured Promissory Notes Trustee, any exculpations afforded under the Plan or Confirmation Order shall be granted only to the extent provided for pursuant to section 1125(e) of the Bankruptcy Code.

153. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

154. "*Existing Hertz Parent Interests*" means all Interests in (or against) Hertz Parent.

155. "*Exit Agent*" means, collectively, in their respective capacities as such, the administrative and collateral agents with respect to the Exit Credit Agreement including any successors thereto.

156. "*Exit Credit Agreement*" means the credit agreement to be entered into in connection with the Exit Term Loan Facility and the Exit Revolving Credit Facility (including any guarantee agreements, pledge and collateral agreements, and other security documents), which shall be materially consistent with the Plan and which shall be in form and substance acceptable to the Debtors and the Plan Sponsors in good faith.

157. "*Exit Facility Documents*" means the Exit Credit Agreement and such other financing documents to be entered into in connection with the Exit Term Loan Facility and Exit Revolving Credit Facility (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents), which shall be materially consistent with the Plan and otherwise acceptable to the Debtors and the Plan Sponsors in good faith.

158. "*Exit Revolving Credit Facility*" means a senior secured revolving credit facility in an aggregate commitment amount of $1,500,000,000.00 (as such amount may be adjusted with the consent of the Debtors and the Plan Sponsors), with the capacity for the issuance of letters of credit, secured by a first Lien on substantially all assets of Hertz Corp. and the Subsidiary Guarantors (except Donlen Corporation), which shall be on prevailing market terms, materially consistent with the Plan, and otherwise acceptable to the Debtors and the Plan Sponsors.

159. "*Exit Term Loan Facility*" means a senior secured credit facility in a principal amount of $1,300,000,000.00 (as such amount may be adjusted with the consent of the Debtors and the Plan Sponsors),

secured by a first Lien on substantially all assets of Hertz Corp and the Subsidiary Guarantors (except Donlen Corporation), which shall be on prevailing market terms, materially consistent with the Plan, and otherwise acceptable to the Debtors and the Plan Sponsors.

160.    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

161.    "*File,*" "*Filed,*" or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, with the Claims and Noticing Agent.

162.    "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, that, the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, the local rules of the Bankruptcy Court or applicable non-bankruptcy law, may be Filed relating to such order shall not prevent such order from being a Final Order.

163.    "*First Interim HVF Master Lease Settlement Order*" means the *Order Temporarily Resolving Certain Matters Related to the Master Lease Agreement, Setting A Schedule for Further Litigation Related Thereto in 2021 and Adjourning Hearing on the Debtors' Motion for Order Rejecting Certain Unexpired Vehicle Leases Effective* Nunc Pro Tunc *to June 11, 2020 Pursuant to Sections 105 and 365(a) of the Bankruptcy Code [Docket No. 390] Sine Die* [Docket No. 805].

164.    "*First Lien Agent*" means Barclays Bank PLC, in its capacity as administrative agent, collateral agent, and common collateral agent under the First Lien Credit Agreement, the First Lien Standalone LC Agreement, and the other First Lien Loan Documents, including any successor thereto.

165.    "*First Lien Claims*" means all (i) First Lien Term Loan Claims; (ii) First Lien Revolving Loan Claims; (iii) First Lien Hedge Claims; (iv) First Lien LC Claims; and (v) any Claims against the Debtors not duplicative of the foregoing clauses (i) – (iv), due, owing, and payable to the First Lien Agent, First Lien Lenders, or their professionals pursuant to the Cash Collateral Orders, including any professionals' fees and expenses.

166.    "*First Lien Credit Agreement*" means that certain Credit Agreement (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of June 30, 2016, by and among Hertz Corp., the Subsidiary Borrowers (as such term is defined in the First Lien Credit Agreement) party thereto, as borrowers, the First Lien Agent, and the lenders party thereto.

167.    "*First Lien Donlen Paydown Amount*" means the Cash proceeds received from the Donlen Sale that are applied to the First Lien Claims pursuant to the DIP Order and DIP Credit Agreement.

168.    "*First Lien Hedge Agreements*" means all Hedge Agreements (as such term is defined in the First Lien Credit Agreement).

16

169.    "*First Lien Hedge Claims*" means all Claims against any Debtor arising from or based upon the First Lien Hedge Agreements, including all accrued but unpaid interest, costs, fees, and indemnities, in an aggregate amount equal to approximately $2,312,987.44.

170.    "*First Lien LC Claims*" means all (i) First Lien Revolving LC Claims, and (ii) First Lien Standalone LC Facility Claims.

171.    "*First Lien Lenders*" means, collectively, the lenders under the First Lien Loan Documents.

172.    "*First Lien Loan Documents*" means (i) the First Lien Credit Agreement and all related agreements and documents executed by any of the Debtors in connection with the First Lien Credit Agreement, and (ii) the First Lien Standalone LC Agreement and all related agreements and documents executed by any of the Debtors in connection with the First Lien Standalone LC Agreement.

173.    "*First Lien Revolving LC Claims*" means all Claims against any Debtor arising from or based upon the letters of credit issued under the First Lien Credit Agreement, including all accrued but unpaid interest at the applicable rate, costs, fees, and indemnities.

174.     "*First Lien Revolving LC Facility*" means the letter of credit facility provided pursuant to the First Lien Credit Agreement.

175.    "*First Lien Revolving Loan Claims*" means all Claims against any Debtor arising from or based upon the revolving loans issued pursuant to the First Lien Credit Agreement or any other First Lien Loan Document, including all accrued but unpaid interest at the applicable rate, costs, fees, and indemnities, which principal outstanding as of the Petition Date was in the aggregate amount equal to $615,000,000.00.

176.    "*First Lien Standalone LC Agreement*" means that certain Letter of Credit Agreement (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of November 2, 2017, by and among Hertz Corp., as applicant, and Barclays Bank PLC, as administrative agent and collateral agent.

177.    "*First Lien Standalone LC Facility*" means the letter of credit facility provided pursuant to the First Lien Standalone LC Agreement.

178.    "*First Lien Standalone LC Facility Claims*" means all Claims against any Debtor arising from or based upon letters of credit issued under the First Lien Standalone LC Agreement or any other First Lien Standalone LC Facility Documents, including accrued but unpaid interest at the applicable rate, costs, fees, and indemnities.

179.    "*First Lien Standalone LC Facility Documents*" means the First Lien Standalone LC Agreement and all related agreements and documents executed by any of the Debtors in connection with the First Lien Standalone LC Facility.

180.    "*First Lien Term Loan Claims*" means all Claims against any Debtor arising from or based upon the term loans issued pursuant to the First Lien Credit Agreement or any other First Lien Term Loan Document, including all accrued but unpaid interest at the applicable rate, costs, fees, and indemnities, which principal outstanding as of the Petition Date was in the aggregate amount equal to approximately $656,250,000.00.

181.    "*General Unsecured Claim*" means any Unsecured Claim, against any Debtor, other than (i) Administrative Claims; (ii) Priority Tax Claims; (iii) Other Priority Claims; (iv) Intercompany Claims;

(v) Unsecured Funded Debt Claims; and (vi) HHN Notes Guarantee Claims; provided, however, that, notwithstanding anything to the contrary herein, to the extent that a Holder of a General Unsecured Claim against a Debtor holds any joint and several liability Claims, guarantee Claims, or other similar Claims against any other Debtors arising from or relating to the same obligations or liability as such General Unsecured Claim, such Holder shall only be entitled to a distribution on one General Unsecured Claim against the Debtors in full and final satisfaction of all such Claims.

182.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

183.    "*HC Limited*" means HC Limited Partnership.

184.    "*HCVP*" means Hertz Canada Vehicles Partnership.

185.    "*Herc Documents*" means that certain Separation and Distribution Agreement, dated as of June 30, 2016, between Hertz Parent and Herc Holding Inc. and all other documents executed in connection therewith or related thereto.

186.    "*Herc Parties*" means Herc Holding Inc. and any of its Affiliates, successors, or assigns.

187.    "*Hertz Australia*" means Hertz Australia Pty. Limited (ACN 004 407 087).

188.    "*Hertz Corp.*" means The Hertz Corporation.

189.    "*Hertz Canada*" means Hertz Canada Limited.

190.    "*Hertz Parent*" means Hertz Global Holdings, Inc.

191.    "*HHN*" means Hertz Holdings Netherlands B.V. or any Entity into which Hertz Holdings Netherlands B.V. merges prior to the Effective Date, including Hertz Holdings Netherlands II B.V.

192.    "*HHN 4.125% Unsecured Notes*" means the senior notes due 2021 issued pursuant to the HHN 4.125% Unsecured Notes Indenture.

193.    "*HHN 4.125% Unsecured Notes Documents*" means, collectively, the HHN 4.125% Unsecured Notes Indenture, the HHN 4.125% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the HHN 4.125% Unsecured Notes.

194.    "*HHN 4.125% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of September 22, 2016, for the HHN 4.125% Unsecured Notes by and among HHN and HUK, as co-issuers, Hertz Corp., as Parent Guarantor, the subsidiary guarantors from time to time parties thereto, as guarantors, Wilmington Trust SP Services (London) Limited, solely in its capacity as trustee, Deutsche Bank AG, London Branch, as Paying Agent and Deutsche Bank Luxembourg S.A., as Registrar, Transfer Agent and Authenticating Agent.

195.    "*HHN 5.500% Unsecured Notes*" means the senior notes due 2023 issued pursuant to the HHN 5.500% Unsecured Notes Indenture.

196.    "*HHN 5.500% Unsecured Notes Indenture*" means that certain indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of March 23, 2018, for the HHN 5.500% Unsecured Notes by and among HHN and HUK, as co-issuers, Hertz Corp., as Parent

18

Guarantor, the subsidiary guarantors from time to time parties thereto, as guarantors, Wilmington Trust SP Services (London) Limited, solely in its capacity as trustee, Deutsche Bank AG, London Branch, as Paying Agent and Deutsche Bank Luxembourg S.A., as Registrar, Transfer Agent and Authenticating Agent.

197. "*HHN 5.500% Unsecured Notes Documents*" means, collectively, the HHN 5.500% Unsecured Notes Indenture, the HHN 5.500% Unsecured Notes, and all related agreements and documents executed by any of the Debtors in connection with the HHN 5.500% Unsecured Notes.

198. "*HHN Notes*" means (i) the HHN 4.125% Unsecured Notes and (ii) the HHN 5.500% Unsecured Notes.

199. "*HHN Notes Documents*" means (i) the HHN 5.500% Unsecured Notes Documents and (ii) the HHN 4.125% Unsecured Notes Documents.

200. "*HHN Notes Guarantee Claims*" means, collectively, all Claims against Hertz Corp. and the Subsidiary Guarantors arising from or related to the HHN Notes Documents, including their guarantee of the HHN 4.125% Unsecured Notes and the HHN 5.500% Unsecured Notes.

201. "*HHN Notes Indentures*" means, collectively, (i) the HHN 4.125% Unsecured Notes Indenture and (ii) the HHN 5.00% Unsecured Notes Indenture.

202. "*HHN Notes Paying Agent*" means Deutsche Bank AG, London Branch, in its capacity as paying agent under each series of the HHN Notes, including any successor thereto.

203. "*HHN Notes Trustee*" means Wilmington Trust SP Services (London) Limited, in its capacity as trustee under each series of the HHN Notes, including any successor thereto.

204. "*HHN Notes Trustee Charging Lien*" means any Lien or other priority of payment to which the HHN Notes Trustee is entitled under the HHN Notes Documents against distributions to be made to Holders of HHN Notes Guarantee Claims for payment of any HHN Notes Trustee Fees and Expenses.

205. "*HHN Notes Trustee Fees and Expenses*" means the reasonable and documented fees, costs, and expenses incurred by the HHN Notes Trustee that are required to be paid under the HHN Notes Documents.

206. "*HHN Restructuring*" means the restructuring described in Article IV.K, infra, and any other related transactions in connection therewith.

207. "*HIL*" means Hertz International Limited.

208. "*HIL Facility*" means the direct lending facility provided by certain of the Plan Sponsors or their affiliates to HIL prior to the Effective Date.

209. "*Holder*" means an Entity holding a Claim or an Interest, as applicable, each solely in its capacity as such.

210. "*HUK*" means Hertz U.K. Receivables Ltd.

211. "*HVF*" means Hertz Vehicle Financing LLC.

212. "*HVF II*" means Hertz Vehicle Financing II LP.

19

213.    "*HVF II Base Indenture*" means that certain Amended and Restated Base Indenture (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of October 31, 2014, between HVF II, the HVF II Trustee.

214.    "*HVF II Collateral*" means the collateral as defined in the HVF II Base Indenture, the HVF II Group I Supplement, and the HVF II Series Supplements.

215.    "*HVF II Collateral Agency Agreement*" means the Fourth Amended and Restated Collateral Agency Agreement (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of November 25, 2013, between HVF, Hertz General Interest, LLC, DTG Operations, Inc., Hertz Corp., the financing sources party thereto from time to time, the beneficiaries party thereto from time to time, and the grantors party thereto from time to time.

216.    "*HVF II Facility*" means the asset-backed securitization facility issued pursuant to the HVF II Facility Documents.

217.    "*HVF II Facility Documents*" means the HVF II Base Indenture, the HVF II Group I Supplement, the HVF II Series Supplements, the HVF II Notes and all other documents related to the HVF II Notes or the HVF II Collateral.

218.    "*HVF II Group I Supplement*" means that certain Amended and Restated Group I Supplement to the HVF II Base Indenture, dated as of October 31, 2014 (as amended by Amendment No. 1 thereto, dated as of June 17, 2015, and as further amended, modified or supplemented from time to time, exclusive of Series Supplements), between HVF II and the HVF II Trustee.

219.    "*HVF II Lenders*" means the Holders of the HVF II Notes.

220.    "*HVF II MTN Series Supplements*" means collectively, the HVF II Series 2015-3 Supplement, the HVF II Series 2016-2 Supplement, the HVF II Series 2016-4 Supplement, the HVF II Series 2017-1 Supplement, the HVF II Series 2017-2 Supplement, the HVF II Series 2018-1 Supplement, the HVF II Series 2018-2 Supplement, the HVF II Series 2018-3 Supplement, the HVF II Series 2019-1 Supplement, the HVF II Series 2019-2 Supplement, and the HVF II Series 2019-3 Supplement.

221.    "*HVF II Notes*" means the Rental Car Asset Backed Notes issued by HVF II and authenticated by or on behalf of the HVF II Trustee pursuant to the HVF II Series Supplements.

222.    "*HVF II Notes Repayment Date*" has the meaning set forth in Article IV.H.

223.    "*HVF II Obligations*" means the non-contingent contractual obligations arising under or with respect to the HVF II Notes, including such amounts payable pursuant to the waterfalls in Article VII of the Series 2013-G1 Supplement, Article V of the HVF II VFN Supplement, Article V of each of the MTN Series Supplements and Article VII of the HVF II Group I Supplement, collateral agent fees payable pursuant to Section 5.8 of the HVF II Collateral Agency Agreement, and any other amounts under the HVF Facility Documents or HVF II Facility Documents that would be payable in Cash in an ordinary course repayment and termination of such facilities.

224.    "*HVF II Refinancing Steps Document*" means a document to be filed with the Plan Supplement that describes the sequence of transactions required to refinance the HVF II Facility and HVIF Facility, if applicable, and provide payment in full of the HVF II Obligations and HVIF Obligations, if applicable.

20

225. "*HVF II Series 2015-3 Supplement*" means the Series 2015-3 Supplement to the HVF II Group I Supplement, dated as of October 7, 2015, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

226. "*HVF II Series 2016-2 Supplement*" means the Series 2016-2 Supplement to the HVF II Group I Supplement, dated as of February 11, 2016, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

227. "*HVF II Series 2016-4 Supplement*" means the Series 2016-4 Supplement to the HVF II Group I Supplement, dated as of June 8, 2016, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

228. "*HVF II Series 2017-1 Supplement*" means the Series 2017-1 Supplement to the HVF II Group I Supplement, dated as of September 20, 2017, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

229. "*HVF II Series 2017-2 Supplement*" means the Series 2017-2 Supplement to the HVF II Group I Supplement, dated as of September 20, 2017, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

230. "*HVF II Series 2018-1 Supplement*" means the Series 2018-1 Supplement to the HVF II Group I Supplement, dated as of January 24, 2018, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

231. "*HVF II Series 2018-2 Supplement*" means the Series 2018-2 Supplement to the HVF II Group I Supplement, dated as of June 27, 2018, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

232. "*HVF II Series 2018-3 Supplement*" means the Series 2018-3 Supplement to the HVF II Group I Supplement, dated as of June 27, 2018, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

233. "*HVF II Series 2019-1 Supplement*" means the Series 2019-1 Supplement to the HVF II Group I Supplement, dated as of February 6, 2019, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

234. "*HVF II Series 2019-2 Supplement*" means the Series 2019-2 Supplement to the HVF II Group I Supplement, dated as of May 29, 2019, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

235. "*HVF II Series 2019-3 Supplement*" means the Series 2019-3 Supplement to the HVF II Group I Supplement, dated as of November 26, 2019, by and among HVF II, Hertz Corp., and the HVF II Trustee, as amended from time to time.

236. "*HVF II Series Supplements*" means collectively, the HVF II VFN Supplement and the HVF II MTN Series Supplements.

237. "*HVF II Trustee*" means The Bank of New York Mellon Trust Company, N.A., solely in its role as trustee under the HVF II Indenture.

21

238.     "*HVF II VFN Supplement*" means that certain Sixth Amended and Restated Series 2013-A Supplement to the HVF II Group I Supplement, dated as of February 21, 2020, by and among Deutsche Bank AG, New York Branch, HVF II, the HVF II Trustee, Hertz Corp., certain committed note purchasers party thereto from time to time, certain conduit investors party thereto from time to time, and certain funding agents for the investor groups party thereto from time to time.

239.     "*HVF III*" means a new asset backed securitization facility to issue notes to fund its purchase of vehicles to be used in the Debtors and Reorganized Debtors' rental car business, which shall be materially consistent with the Plan and otherwise in form and substance acceptable to the Debtors and the Plan Sponsors in good faith.

240.     "*HVF III Documents*" means the financing documents to be entered into in connection with the HVF III (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements and other security documents), which shall be materially consistent with the Plan and otherwise acceptable to the Debtors and the Plan Sponsors in good faith.

241.     "*HVF Base Indenture*" means the Fourth Amended and Restated Base Indenture (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of November 25, 2013, between HVF and the HVF Trustee.

242.     "*HVF Claims*" means any Claims against any Debtor or any Affiliate of a Debtor pursuant to, arising out of, or related to the HVF Master Lease Agreement, any other HVF Facility Document, or any HVF II Facility Document, including any HVF Master Lease Administrative Claim.

243.     "*HVF Facility Documents*" means the HVF Base Indenture, the Series 2013-G1 Supplement, the Series 2013-G1 Note, the HVF Master Lease Agreement, and all other documents related to the Series 2013-G1 Note or the Series 2013-G1 Collateral.

244.     "*HVF Indenture*" means collectively the HVF Base Indenture and the Series 2013-G1 Supplement.

245.     "*HVF Master Lease Administrative Claims*" means any Claim against the Debtors under the HVF Master Lease Agreement that arose after the Petition Date and is owed but unpaid pursuant to the HVF Master Lease Agreement, including the Casualty Superpriority Administrative Expense Claim.

246.     "*HVF Master Lease Agreement*" is that certain Amended and Restated Master Motor Vehicle Operating Lease and Servicing Agreement (Series 2013-G1) dated as of October 31, 2014 (as amended by Amendment No. 1 thereto, dated as of February 22. 2017, and as further amended, modified or supplemented from time to time), by and among HVF, in its capacity as lessor, Hertz Corp., in its capacity as lessee, in its capacity as servicer and in its capacity as guarantor, DTG Operations, Inc., in its capacity as lessee and those permitted leases from time to time becoming lessees thereunder.

247.     "*HVF Trustee*" means The Bank of New York Mellon Trust Company, N.A., solely in its capacity as trustee under the HVF Indenture.

248.     "*HVIF*" means Hertz Vehicle Interim Financing, LLC.

249.     "*HVIF Administrative Agent*" means Deutsche Bank AG, New York Branch, as administrative agent under the Interim Fleet Financing Facility.

250.    "*HVIF Obligations*" means the non-contingent contractual obligations with respect to the Interim Fleet Financing Facility Documents, including the Interim Fleet Financing Notes.

251.    "*HVIF Trustee*" means The Bank of New York Mellon Trust Company, N.A., as Trustee and Securities Intermediary under the Interim Fleet Financing Facility Documents.

252.    "*Impaired*" means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

253.    "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors and officers that are currently employed by, or serving on the board of directors of, any of the Debtors as of the date immediately prior to the Effective Date, and the employees, attorneys, accountants, investment bankers, and other professionals and agents that are currently employed by any of the Debtors as of the date immediately prior to the Effective Date, each of the foregoing solely in their capacity as such.

254.    "*Ineligible Existing Hertz Shareholder*" means each Holder of an Allowed Existing Hertz Parent Interest on the Record Date (as such terms are defined in the Rights Offering Procedures) that is not an Eligible Existing Hertz Shareholder.

255.    "*Initial Distribution Date*" means the date on which the Reorganized Debtors or the Distribution Agent shall make initial distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date.

256.    "*Insurance Policies*" means any and all known and unknown insurance policies or contracts that have been issued at any time to, or that provide coverage in any capacity to, the Debtors or any predecessor, subsidiary, or past or present Affiliate of the Debtors, as an insured (whether as the first named insured, a named insured or an additional insured), or otherwise alleged to afford the Debtors insurance coverage, and all agreements, documents or instruments related thereto, including but not limited to, the D&O Liability Insurance Policies and/or any agreements with third-party administrators.

257.    "*Insurance Programs*" has the meaning ascribed to such term in the *Order (I) Authorizing Assumption of the Insurance Program with the Chubb Companies, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 898].

258.    "*Insured Claim*" means any Claim against a Debtor for which any Debtor is entitled to coverage, indemnification, reimbursement, contribution or other payment under an Insurance Policy.

259.    "*Insurer*" means any company or other entity that issued any Insurance Policies, any third-party administrators of claims against the Debtors or asserted under the Insurance Policies, and any respective predecessors and/or affiliates thereof.

260.    "*Intercompany Claims*" means, collectively, (i) Intercompany Debtor Claims and (ii) Intercompany Subsidiary Claims.

261.    "*Intercompany Debtor Claims*" means any Claim held by a Debtor against any other Debtor.

262.    "*Intercompany Interest*" means an Interest held by a Debtor in another Debtor or a non-Debtor subsidiary.

263.    "*Intercompany Subsidiary Claims*" means any Claim of a non-Debtor direct or indirect subsidiary of Hertz Parent against any Debtor.

264.    "*Intercreditor Agreement*" means that certain intercreditor agreement (as amended, restated, supplemented, or otherwise modified from time to time) dated as of June 6, 2017, by and between the First Lien Agent and the Second Lien Note Trustee.

265.    "*Interest*" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in any Debtor (including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "*stock*" or a similar security, and any Subordinated 510(b) Interests.

266.    "*Interim Fleet Financing Administrative Claims*" means any and all Administrative Claims arising under or related to the Interim Fleet Financing Debtor Facility Documents.

267.    "*Interim Fleet Financing Back-Up Administrative Agreement*" means that certain HVIF Back-Up Administrative Agreement dated as of January 22, 2021 by and among Hertz Corp., HVIF, Lord Securities Corporation and the HVIF Trustee.

268.    "*Interim Fleet Financing Back-Up Disposition Agent Agreement*" means that certain HVIF Back-Up Disposition Agreement dated as of January 22, 2021 by and among defi AUTO, LLC, Hertz Corp., and the HVIF Trustee.

269.    "*Interim Fleet Financing Base Indenture*" means that certain Base Indenture (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated as of November 25, 2020 between HVIF, Hertz Corp., the HVIF Administrative Agent, Apollo Capital Management, L.P., the holders of the Interim Fleet Financing Notes and the HVIF Trustee.

270.    "*Interim Fleet Financing Debtor Facility Documents*" means the Interim Fleet Financing Indenture, the Interim Fleet Financing Supplemental Indenture, the Interim Fleet Financing Facility Master Lease Agreement, the Interim Fleet Financing Back-Up Administrative Agreement, the Interim Fleet Financing Back-Up Disposition Agent Agreement and any other agreements, documents and instruments executed by any Debtor in connection therewith.

271.    "*Interim Fleet Financing Facility*" means the asset-backed securitization facility issued pursuant to the Interim Fleet Financing Facility Documents.

272.    "*Interim Fleet Financing Facility Documents*" means the Interim Fleet Financing Debtor Documents, the Interim Fleet Financing Notes and any other agreements, instruments and documents executed in connection therewith.

273.    "*Interim Fleet Financing Facility Master Lease Agreement*" means that certain Master Motor Vehicle Operating Lease and Servicing Agreement (HVIF) dated as of November 25, 2020 among HVIF, Hertz Corp. and DTG Operations, Inc.

274.    "*Interim Fleet Financing Indenture*" means, collectively, the Interim Fleet Financing Base Indenture and Series 2020-1 Supplement.

275.    "*Interim Fleet Financing Lenders*" means the Holders of the Interim Fleet Financing Notes.

276.    "*Interim Fleet Financing Notes*" means the Series 2020-1 notes issued pursuant to the 2020-1 Series Supplement.

277.    "*Interim Fleet Financing Supplemental Indenture*" means the Series 2020-1 Supplement to the Interim Fleet Financing Base Indenture.

278.    "*Interim HVF Master Lease Settlement Orders*" means the First Interim HVF Master Lease Settlement Order and the Second Interim HVF Master Lease Settlement Order.

279.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

280.    "*Knighthead*" means certain funds and accounts managed or advised by Knighthead Capital Management, LLC or one of its Affiliates.

281.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

282.    "*Lombard Vehicle Financing Facility Agreement*" means that certain agreement relating to the vehicle funding facilities (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated February 7, 2013, by and between Hertz (U.K.) Limited and Lombard North Central Plc.

283.    "*Lombard Vehicle Financing Facility*" means the vehicle funding facility issued pursuant to the Lombard Vehicle Financing Facility Documents.

284.    "*Lombard Vehicle Financing Facility Documents*" means, collectively, the Lombard Vehicle Financing Facility Agreement, the Lombard Vehicle Financing Facility Guarantee, and all related agreements and documents executed by any of the Debtors in connection with the Lombard Vehicle Financing Facility Agreement.

285.    "*Lombard Vehicle Financing Facility Guarantee*" means that certain Guarantee (as the same may have been amended, modified, supplemented, or amended and restated from time to time), dated February 7, 2013, by Hertz Corp. in favor of Lombard North Central Plc with respect to the Lombard Vehicle Financing Facility Agreement.

286.    "*Lombard Vehicle Financing Facility Guarantee Claims*" means all Claims of a Debtor arising from or related to the Lombard Vehicle Financing Facility Documents.

287.    "*Management Equity Incentive Plan*" means the post-Effective Date management equity incentive plan implemented and approved by the Reorganized Hertz Parent Board in accordance with the MIP Term Sheet.

25

288.    "*MIP Term Sheet*" means the term sheet describing the terms and conditions of the Management Equity Incentive Plan, which shall be reasonably acceptable to the Plan Sponsors.

289.    "*New Money Investment*" means Cash in an amount equal to $5,915,941,666.67.

290.    "*New Organizational Documents*" means the Reorganized Hertz Parent Organizational Documents and Reorganized Debtor Organizational Documents, including the New Registration Rights Agreement, which shall be acceptable to the Debtors and the Plan Sponsors.

291.    "*New Registration Rights Agreement*" means the registration rights agreement or other similar agreement with respect to Reorganized Hertz Parent, which shall be acceptable to the Debtors and the Plan Sponsors.

292.    "*New Reorganized Corporate Debt*" means the Exit Term Loan Facility and the Exit Revolving Credit Facility.

293.    "*New Warrants*" means the warrants referenced in the term sheet attached as **Exhibit A** hereto.

294.    "*New Warrants Agreement*" means that certain agreement providing for, among other things, the issuance of the New Warrants by the Reorganized Debtors, which shall contain terms and conditions consistent with the term sheet attached as **Exhibit A** hereto and shall otherwise be in form and substance reasonably acceptable to the Plan Sponsors and the Debtors.

295.    "*Non-Obligor Debtors*" means (i) Hertz Global Holding, Inc.; (ii) CMGC Canada Acquisition ULC; (iii) Hertz Aircraft, LLC; (iv) Donlen FSHCO Company; (v) Hertz Canada Limited; (vi) Donlen Mobility Solutions, Inc.; and (vii) Donlen Fleet Leasing Ltd.

296.    "*Other Priority Claim*" means any Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim; or (ii) a Priority Tax Claim.

297.    "*Other Secured Claim*" means any Secured Claim against any Debtor, including any Secured Tax Claim, other than a (i) First Lien Claim; (ii) Second Lien Note Claim; and (iii) DIP Claim, unless otherwise classified in Article III.B.

298.    "*PBGC*" means Pension Benefit Guaranty Corporation, a wholly-owned United States government corporation and agency created under Title IV of ERISA.

299.    "*Pension Plans*" means collectively, (i) the Defined Benefit Plan, (ii) Retirement Plan for the Employees of Puerto Ricancars, Inc. and Related Companies Residing in the Commonwealth of Puerto Rico, and (iii) Retirement Plan for Employees of Puerto Ricancars, Inc. and Related Companies Residing in St. Thomas, U.S. Virgin Islands.

300.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

301.    "*Petition Date*" is May 22, 2020.

302.    "*Plan*" means this *First Modified Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and its Debtor Affiliates* (including the Plan Supplement and all exhibits hereto

and thereto), as the same may be amended, modified, supplemented or amended and restated from time to time.

303.    "*Plan Sponsors*" means each of (i) Apollo, (ii) Knighthead, and (iii) Certares.

304.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each of which shall be in form and substance materially consistent with this Plan, the Plan Support Agreement and the Equity Commitment Documents, and otherwise acceptable to the Plan Sponsors and the Debtors, as may be amended, modified, or supplemented from time to time, including, as applicable (i) Reorganized Hertz Parent Organizational Documents; (ii) Reorganized Hertz Corp. Organizational Documents; (iii) the Rejected Executory Contracts and Unexpired Leases Schedule; (iv) the Assumed Executory Contracts and Unexpired Leases Schedule; (v) the identity of the members of the Reorganized Hertz Parent Board and executive management for Hertz Parent; (vi) the identity of the members of the Reorganized Hertz Corp. Board and executive management for Hertz Corp.; (vii) Schedule of Retained Causes of Action; (viii) the MIP Term Sheet; (ix) the Exit Credit Agreement; (x) the New Registration Rights Agreement; (xi) the Restructuring Transactions Memorandum; (xii) the ADR Procedures; (xii) the certificates of designation and other documents governing the Preferred Stock; and (xiii) the HVF II Refinancing Steps Document.  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (i) through (xiii), as applicable.  The Debtors shall be entitled to amend such documents in accordance with their respective terms and Article X of this Plan through and including the Effective Date subject to the consent of the Plan Sponsors.

305.    "*Plan Support Agreement*" means that certain Plan Support Agreement by and among Hertz Parent and each of the Debtors identified on the signature pages thereto and the Equity Commitment Parties, as the same may be amended, modified, supplemented, or amended and restated from time to time in accordance with its terms.

306.    "*Plan Support Party*" means any party that executes a joinder to the Plan Support Agreement.

307.    "*Preferred Stock*" means the new preferred stock issued to certain Equity Commitment Parties pursuant to the Equity Commitment Documents.

308.    "*Prepetition Debt Documents*" means, collectively, the (i) First Lien Loan Documents, (ii) Second Lien Note Documents, (iii) the Unsecured Notes Documents, (iv) the ALOC Facility Documents, (v) the Lombard Vehicle Financing Facility Documents, (vi) the 7.000% Unsecured Promissory Notes Documents, (vii) the European ABS Documents, and (viii) any guarantee of the HHN Notes by the Debtors.

309.    "*Prepetition KERP Program*" means the Key Employee Retention Letter Agreements executed on or about May 2020.

310.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

311.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that respective Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan, as applicable.

312.    "*Professional*" means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services

27

rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

313.   "*Professional Fee Claims*" means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date through the Effective Date.

314.   "*Professional Fee Claims Estimate*" means the aggregate unpaid Professional Fee Claims through the Effective Date as estimated in accordance with Article II.E.2.

315.   "*Professional Fee Escrow*" means an escrow account established and funded pursuant to Article II.E.3.

316.   "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

317.   "*Quarterly Distribution Date*" means the first Business Day after the end of each quarterly calendar period (*i.e.*, March 31, June 30, September 30, and December 31 of each calendar year) occurring after the Effective Date.

318.   "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

319.   "*Rejected Executory Contracts and Unexpired Leases Schedule*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, included in the Plan Supplement, as may be amended by the Debtors from time to time, and which shall be in form and substance acceptable to the Plan Sponsors in good faith.

320.   "*Released Party*" means each of the following in their capacity as such: (i) the Debtors; (ii) the Reorganized Debtors; (iii) each of the Debtors' Estates; (iv) each of the Plan Sponsors; (v) the Committee; (vi) each of the Committee Members, solely in its capacity as a Committee Member; (vii) each of the Equity Commitment Parties; (viii) the Unsecured Notes Trustees; (ix) the 7.000% Unsecured Promissory Notes Trustee; (x) the ABS Released Parties; (xi) the Plan Support Parties; and (xii) with respect to each of the foregoing Entities in clauses (i) through (xi), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in its capacity as such; provided, that notwithstanding anything set forth above, (a) the Clawback Defendants, (b) Accenture LLP and its Affiliates, (c) the Herc Parties (solely with respect to Claims arising from the Herc Documents), (d) the Donlen Debtors and their direct and indirect subsidiaries (solely with respect to Claims arising from the Donlen Documents), and (e) the Specified Prepetition KERP Participants, solely with respect to amounts owed pursuant to the terms of the Prepetition KERP Program, shall not be Released Parties. Notwithstanding the foregoing, any Person or Entity that opts out of the releases shall not be a Released Party.

321.   "*Releasing Party*" means each of the following in their capacity as such: (i) each of the Plan Sponsors; (ii) each of the Equity Commitment Parties; (iii) the Unsecured Notes Trustees; (iv) the 7.000% Unsecured Promissory Notes Trustee; (v) the ABS Released Parties; (vi) the Plan Support Parties;

28

(vii) all Holders of Unimpaired Claims or Interests who do not File a timely objection to the third party releases provided for in Article VIII.D (provided that, for the avoidance of doubt, Holders of Unimpaired Claims or Interests that timely file an objection to the third party releases provided pursuant to Article VIII.D shall not be Releasing Parties); (viii) all Holders of Administrative Expense Claims and Priority Tax Claims that do not hold Claims or Interests in any Class that do not File a timely objection to the third party releases provided for in Article VIII.D of the Plan (provided, that, for the avoidance of doubt, Holders of Administrative Expense Claims and Priority Tax Claims that do not hold Claims or Interests in any Class that timely File an objection to the third party releases provided pursuant to Article VIII.D shall not be Releasing Parties); (ix) all Holders of Claims or Interests that vote to accept the Plan; (x) all Holders of Claims or Interests that are entitled to vote on the Plan who vote to reject the Plan and do not affirmatively opt out of the third party releases provided for in Article VIII.D by checking the box on the applicable Ballot indicating that they opt not to grant such releases in the Plan submitted on or before the Voting Deadline; and (xi) with respect to each of the foregoing Entities in clauses (i) through (x), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, representatives, and other professionals, each in its capacity as such.

322.    "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including Reorganized Hertz Parent and Reorganized Hertz Corp.

323.    "*Reorganized Debtor Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each Reorganized Debtor, all in form and substance acceptable to the Debtors and the Plan Sponsors in good faith.

324.    "*Reorganized Hertz Corp.*" means reorganized Hertz Corp., or any successors thereto, by merger, consolidation, or otherwise on or after the Effective Date.

325.    "*Reorganized Hertz Corp. Board*" means the initial board of directors of Reorganized Hertz Corp. as identified in the Plan Supplement.

326.    "*Reorganized Hertz Corp. Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of Reorganized Hertz Corp., which forms shall be included in the Plan Supplement all in form and substance acceptable to the Debtors, and which shall be in form and substance acceptable to the Plan Sponsors in good faith.

327.    "*Reorganized Hertz Parent*" means reorganized Hertz Global Holdings, Inc., a Delaware corporation, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

328.    "*Reorganized Hertz Parent Board*" means the initial board of directors of Reorganized Hertz Parent, as identified in the Plan Supplement; provided, that at least a majority of the directors shall be appointed by the Plan Sponsors (other than Apollo).

329.    "*Reorganized Hertz Parent Common Interests*" means the single class of common stock of Reorganized Hertz Parent to be issued upon Consummation of the Plan.

29

330.    "*Reorganized Hertz Parent Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of Reorganized Hertz Parent, which forms shall be included in the Plan Supplement all in form and substance acceptable to the Debtors, and which shall be in form and substance acceptable to the Plan Sponsors in good faith.

331.    "*Requisite Consenting Investors*" shall have the meaning set forth in the Plan Support Agreement.

332.    "*Restructuring*" means the restructuring of the existing debt and other obligations of the Debtors and their non-Debtor Affiliates on the terms and conditions set forth in the Plan and Plan Supplement and consistent in all respects with the Plan Support Agreement and Equity Commitment Documents.

333.    "*Restructuring Transactions*" shall have the meaning set forth in Article IV.B hereof.

334.    "*Restructuring Transactions Memorandum*" means the memorandum outlining as necessary certain of the steps the Debtors and/or Reorganized Debtors shall take to implement the Restructuring Transactions and HHN Restructuring as set forth in the Plan and Plan Supplement which shall be consistent in all respects with the Plan and Equity Commitment Agreement.

335.    "*Rights Offering*" means that certain offering of rights pursuant to which each Holder of an Allowed Existing Hertz Parent Common Interests is entitled to receive Shareholder Subscription Rights to acquire, to the extent it is an Eligible Existing Hertz Shareholder, its Pro Rata share of $1,635,000,000.00 in Reorganized Hertz Parent Common Interests and each Holder of an Allowed Unsecured Funded Debt Claim is entitled to receive Bondholder Subscription Rights to acquire, to the extent it is an Eligible Unsecured Funded Debt Holder, its Pro Rata Share of the amount of such $1,635,000,000.00 in Reorganized Hertz Parent Common Interests not acquired by Holders of Allowed Existing Hertz Parent Common Interests after taking into account all exercised Shareholder Subscription Rights, all in accordance with the Equity Commitment Agreement and the Rights Offering Procedures.

336.    "*Rights Offering Backstop Commitment*" shall have the meaning set forth in the Stock Purchase Agreement.

337.    "*Rights Offering Procedures*" means, collectively, the procedures governing and for the implementation of the Rights Offering in a form acceptable to the Debtors and the Plan Sponsors, consistent with the Plan Support Agreement and the Equity Commitment Documents, and approved by the Bankruptcy Court.

338.    "*Schedule of Retained Causes of Action*" means a schedule of retained Causes of Action filed in connection with the Plan Supplement, in form and substance acceptable to the Debtors and the Plan Sponsors.

339.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors on August 11, 2020 [Docket Nos. 964-1023] pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as amended on November 21, 2020 [Docket Nos. 1824, 1826-1880, 1882, 1884-1886, 1889] and April 14, 2021 [Docket Nos. 3892-3896], as the same may be further amended, modified, or supplemented from time to time.

340.    "*SEC*" means the United States Securities and Exchange Commission.

30

341.    "*Second Interim HVF Master Lease Settlement Order*" means the *Second Order Resolving Certain Matters Related to the HVF II Master Lease Agreement* [Docket No. 2489].

342.    "*Second Lien Indenture Trustee Fees*" means, collectively, to the extent not previously paid in connection with the Chapter 11 Cases, the reasonable and documented fees (including, without limitation, legal fees), costs, and expenses incurred by the Second Lien Note Trustees that are required to be paid under the Second Lien Note Documents.

343.    "*Second Lien Note Claims*" means all Claims against any Debtor arising from or based upon the Second Lien Note Indenture or any other Second Lien Note Document, which principal outstanding as of the Petition Date was in the aggregate amount equal to approximately $350,000,000.00, plus all accrued but unpaid interest (including postpetition interest) at the applicable rate, costs, fees, indemnities, Second Lien Indenture Trustee Fees, and any Claims against the Debtors not duplicative of the foregoing, due, owing, and payable to the Second Lien Note Trustee, the Holders of Second Lien Note Claims, or their professionals pursuant to the Cash Collateral Order, including any professionals' fees and expenses.

344.    "*Second Lien Note Documents*" means the Second Lien Note Indenture and all related agreements and documents, including any collateral agreements, executed by any of the Debtors in connection with the Second Lien Note Indenture.

345.    "*Second Lien Note Indenture*" means that certain Indenture (as the same may have been amended, modified, or supplemented from time to time), dated as of June 6, 2017, by and among Hertz Corp., as issuer, and the Second Lien Note Trustee.

346.    "*Second Lien Notes*" means the senior secured second priority notes issued by Hertz Corp. pursuant to the Second Lien Notes Indenture.

347.    "*Second Lien Note Trustee*" means BOKF, National Association, in its capacity as successor trustee and collateral agent under the Second Lien Note Indenture and the other Second Lien Note Documents, including any successor thereto.

348.    "*Second Lien Note Trustee Charging Lien*" means any Lien or other priority of payment to which the Second Lien Note Trustee is entitled under the Second Lien Note Indenture, or any ancillary documents, instruments, or agreements, against distributions to be made to Holders of Claims for payment of any Second Lien Indenture Trustee Fees.

349.    "*Secured*" means, when referring to a Claim, a Claim secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, in each case, as determined pursuant to section 506(a) of the Bankruptcy Code.

350.    "*Secured Tax Claim*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

351.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

31

352.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

353.    "*Senior Management Group*" means (i) Paul Stone, (ii) Kenny Cheung, (iii) M. David Galainena, (iv) Opal Perry, (v) Darren Arrington, (vi) Eric Leef, (vii) Laura Suenon Nestar, (viii) Joseph McPherson, (ix) Jeffrey Adams, (x) Robert Massengill, and (xi) Jayesh Patel.

354.    "*Series 2013-G1 Collateral*" means the collateral defined in the Series 2013-G1 Supplement.

355.    "*Series 2013-G1 Note*" means the Series 2013-G1 Variable Funding Rental Car Asset Backed Note issued by HVF and authenticated by or on behalf of the HVF Trustee pursuant to the Series 2013-G1 Supplement.

356.    "*Series 2013-G1 Supplement*" means the Amended and Restated Series 2013-G1 Supplement to the HVF Base Indenture, dated as of October 31, 2014, between HVF and the HVF Trustee, as amended from time to time.

357.    "*Shareholder Subscription Rights*" means the subscription rights distributed to Holders of Allowed Existing Hertz Parent Interests to participate in the Rights Offering offered in accordance with the Equity Commitment Agreement and the Rights Offering Procedures.

358.    "*Shareholder Subscription Rights Auction*" means that certain auction conducted in accordance with the Rights Offering Procedures pursuant to which holders of Existing Hertz Parent Interests that are not Eligible Existing Hertz Shareholders may elect to have their Shareholder Subscription Rights sold pursuant to a competitive auction process.

359.    "*Specified Prepetition KERP Participants*" means any individual that (i) received a payment on account of the Prepetition KERP Program, (ii) is required by the terms of the Prepetition KERP Program to return all or a portion of the payment to the Debtors, and (iii) as of April 13, 2021, has failed to repay such amount to the Debtors.

360.    "*Subordinated 510(b) Interests*" means any Claim related to any Interests against any Debtor that is subject to Section 510(b) of the Bankruptcy Code, whether arising from rescission of a purchase or sale of an Interest in the Debtors or an Affiliate of the Debtors, for damages arising from such transaction, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim, or otherwise.

361.    "*Subscription Rights*" means, collectively, (i) the Shareholder Subscription Rights and (ii) the Bondholder Subscription Rights.

362.    "*Subsidiary Guarantors*" means Debtors (i) Thrifty Rent-A-Car System, LLC; (ii) Thrifty, LLC; (iii) Dollar Thrifty Automotive Group, Inc.; (iv) Firefly Rent A Car LLC; (v) Dollar Rent A Car, Inc.; (vi) Donlen Corporation; (vii) DTG Operations, Inc.; (viii) Hertz Car Sales LLC; (ix) DTG Supply, LLC; (x) Hertz Global Services Corporation; (xi) Hertz Local Edition Corp.; (xii) Hertz Local Edition Transporting, Inc.; (xiii) Hertz System, Inc.; (xiv) Smartz Vehicle Rental Corporation; (xv) Thrifty Car Sales, Inc.; (xvi) Hertz Technologies, Inc.; (xvii) TRAC Asia Pacific, Inc.; (xviii) Hertz Transporting, Inc.; and (xix) Rental Car Group Company, LLC.

363.    "*Substantial Contribution Claim*" means a Claim for compensation or reimbursement of costs and expenses relating to services rendered in making a substantial contribution in the Chapter 11 Cases pursuant to section 503(b)(3), (4), or (5) of the Bankruptcy Code.

32

364.    "*Tail D&O Policy*" means an insurance policy that provides sufficient liability insurance coverage for the six-year period following the Effective Date for the benefit of the Debtors' current and former directors, managers, officers, and employees on terms no less favorable to the directors, managers, officers, and employees than the Debtors' existing director, officer, manager, and employee coverage and with an available aggregate limit of liability upon the Effective Date, which is acceptable to the Debtors and of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.

365.    "*TCL Funding*" means TCL Funding Limited Partnership.

366.    "*Transaction Expenses*" means, collectively, all reasonable and documented out-of-pocket fees (including success fees, transaction fees, or similar fees) and expenses (including travel costs and expenses) of  (i) Kirkland & Ellis LLP, (ii) Paul, Weiss, Rifkind, Wharton & Garrison, LLP, (iii) Klehr Harrison Harvey Branzburg LLP, (iv) Morris, Nichols, Arsht & Tunnell LLP, (v) Alvarez & Marsal Corporate Performance Improvement, LLC, (vi) Guggenheim Securities, LLC, (vii) Glenn Agre Bergman & Fuentes LLP, (vii) Pericles Capital Advisors, LLC, and (viii) any other accountants, financial advisors and other professionals, advisors, and consultants retained by the Plan Sponsors, Amarillo, or the Ad Hoc Equity Committee with the consent of the Debtors (such consent not to be unreasonably withheld), in each case solely to the extent incurred on behalf of the Plan Sponsors to implement the Restructuring Transactions.

367.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

368.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

369.    "*Unimpaired*" means, with respect to a Claim or a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

370.    "*Unsecured*" means, with respect to any Claim, any Claim that is not a Secured Claim, including, for the avoidance of doubt, (i) Unsecured Funded Debt Claims; (ii) HHN Notes Guarantee Claims; and (iii) General Unsecured Claims.

371.    "*Unsecured Funded Debt Claims*" means (i) the Unsecured Notes Claims, and (ii) the ALOC Facility Claims.

372.    "*Unsecured Noteholders*" means, collectively, (i) the 5.500% Unsecured Noteholders; (ii) the 6.000% Unsecured Noteholders; (iii) the 6.250% Unsecured Noteholders; and (iv) the 7.125% Unsecured Noteholders, each from time to time, in their capacity as such.

373.    "*Unsecured Notes*" means, collectively, (i) the 5.500% Unsecured Notes, (ii) the 6.000% Unsecured Notes, (iii) the 6.250% Unsecured Notes, and (iv) the 7.125% Unsecured Notes.

374.    "*Unsecured Notes Claims*" means, collectively, (i) the 5.500% Unsecured Note Claims; (ii) the 6.000% Unsecured Note Claims; (iii) the 6.250% Unsecured Note Claims; and (iv) the 7.125% Unsecured Note Claims.

375.    "*Unsecured Notes Documents*" means, collectively, (i) the 5.500% Unsecured Note Documents; (ii) the 6.000% Unsecured Note Documents; (iii) the 6.250% Unsecured Note Documents; and (iv) the 7.125% Unsecured Note Documents.

376. "*Unsecured Notes Trustees*" means, collectively, (i) the 5.500% Unsecured Notes Trustee; (ii) the 6.000% Unsecured Notes Trustee; (iii) the 6.250% Unsecured Notes Trustee; and (iv) the 7.125% Unsecured Note Trustee.

377. "*Unsecured Notes Trustees' Fees*" means, collectively, to the extent not previously paid in connection with the Chapter 11 Cases, the reasonable and documented fees, costs, and expenses (including, without limitation, legal fees) incurred by the Unsecured Notes Trustees that are required to be paid under the Unsecured Notes Documents.

378. "*Unsubscribed Shares*" shall have the meaning ascribed to such term in the Equity Commitment Agreement.

379. "*Voting Deadline*" means 4:00 p.m. (prevailing Eastern Time) on June 1, 2021, as specifically set forth in the Disclosure Statement Order, which is the deadline for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

B.    *Rules of Interpretation*

For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) except as otherwise provided herein, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (iv) unless otherwise specified herein, all references herein to "Articles" are references to Articles of the Plan or hereto; (v) unless otherwise stated herein, the words "herein," "hereof," and "hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (vi) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (vii) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (viii) unless otherwise specified, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan; (ix) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (x) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (xi) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like as applicable; (xii) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (xiii) any immaterial effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Reorganized Debtors (in consultation with the Plan Sponsors), in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (xiv) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur

34

pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in the State of Delaware shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

E.      *Consultation, Information, Notice, and Consent Rights*

Any and all consultation, information, notice, and consent rights of the Plan Sponsors, the Equity Commitment Parties, and the Committee, if any, set forth in the Plan Support Agreement, the Equity Commitment Agreement, or any Definitive Document, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, shall be incorporated herein by this reference and shall be fully enforceable as if stated herein.

Failure to reference the rights referred to in the immediately preceding paragraph as such rights relate to any document referenced in the Plan Support Agreement, Equity Commitment Agreement, other Definitive Document, or herein shall not impair such rights or obligations.

F.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.  Any conversion required to convert foreign currency to United States dollars shall be done using the applicable exchange rates on the Petition Date.

G.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

H.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, (i) Administrative Claims, including DIP Claims, HVF Master Lease Administrative Claims, Professional Fee Claims, Canadian Fleet Financing Administrative Claims, Interim Fleet Financing Administrative Claims, and postpetition Intercompany Claims, and (ii) Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III.

A.     *Administrative Claims*

Except with respect to Professional Fee Claims, DIP Claims, HVF Master Lease Administrative Claims, Canadian Fleet Financing Administrative Claims, Interim Fleet Financing Administrative Claims, and Priority Tax Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash (i) if such Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date; or (ii) if such Administrative Claim is not Allowed as of the Effective Date, upon entry of an order of the Bankruptcy Court Allowing such Claim, or as soon as reasonably practicable thereafter; provided, that if an Allowed Administrative Claim arises from liabilities incurred by the Debtors' Estates in the ordinary course of business after the Petition Date, including postpetition rent owed pursuant to assumed Unexpired Leases, such Claim shall be paid in accordance with the terms and conditions of the particular transaction giving rise to such Claim in the ordinary course.

Except as otherwise provided in this Article II.A or the Claims Bar Date Order, and except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, HVF Master Lease Administrative Claims, or Transaction Expenses, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date; provided, that the Administrative Claims Bar Date does not apply to Professional Fee Claims or Administrative Claims arising in the ordinary course of business, including postpetition rent owed pursuant to assumed Unexpired Leases.

The Reorganized Debtors, in consultation with the Plan Sponsors, may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.  The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

B.      *DIP Claims*

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to the aggregate amount of the then outstanding DIP Obligations (as defined in the DIP Order), including (i) the principal amount outstanding under the DIP Financing on such date; (ii) all interest accrued and unpaid thereon through and including the date of payment; and (iii) all accrued and unpaid fees, expenses, and indemnification obligations payable under the DIP Loan Documents, including, the reasonable and documented fees and expenses of the attorneys and other advisors (including financial advisors) of the DIP Agent and the DIP Lenders to the extent provided in the DIP Loan Documents.  Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall be indefeasibly paid in full, in Cash, by the Debtors on the Effective Date or such later date as the DIP Claims become due and payable pursuant to any agreement such Holder and the Debtors or the Reorganized Debtors.  Distributions to Holders of DIP Claims shall be deemed completed when made to (or at the direction of) the DIP Agent, which shall be deemed to be the Holder of such Claims for purposes of distributions to be made hereunder. Once received by the DIP Agent, distributions shall be made as soon as practicable to the Holders of Allowed DIP Claims in accordance with the DIP Credit Agreement. Contemporaneously with the foregoing payment, the DIP Financing and the DIP Loan Documents shall be deemed canceled, all commitments under the DIP Loan Documents shall be deemed terminated, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Financing shall automatically terminate, all obligations of the Debtors or the Reorganized Debtors, as applicable, arising out of or related to the DIP Claims shall be automatically discharged and released and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders.  The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Reorganized Debtors; provided, that any provisions of the "DIP Loan Documents" (as such term is defined in the DIP Order) governing the DIP Financing facility that by their terms survive the payoff and termination of such facility shall survive in accordance with the terms of such DIP Loan Documents.  Notwithstanding anything to the contrary in this paragraph, the DIP Loan Documents shall survive to the extent necessary to preserve any rights of the DIP Agent (i) as against any money or property distributable to the Holders of DIP Claims, including any priority in respect of payment and (ii) to appear and be heard in the Chapter 11 Cases or in any proceeding relating to the Debtors in the Bankruptcy Court or any other court to enforce the respective obligations owed to the DIP Agent under the Plan.

Subsequent to the performance by the DIP Agent of its obligations under the Plan, the DIP Agent and its respective agents shall be relieved of all further duties and responsibilities related to the DIP Loan Documents upon the occurrence of the Effective Date, except with respect to such other rights and obligations of the DIP Agent (if any) that, pursuant to the express terms of the DIP Loan Documents, survive the termination of the DIP Loan Documents.

C.      *HVF Master Lease Administrative Claims*

The payment of the HVF II Obligations on the HVF II Notes Repayment Date shall constitute the full and final satisfaction, settlement, release, and discharge of each HVF Master Lease Administrative Claim against the Debtors.

D.      *Postpetition Fleet Financing Administrative Claims*

Each Reorganized Debtor shall assume all of its obligations under the Canadian Fleet Financing Debtor Documents to the extent of such obligations and, as of the Effective Date, such obligations shall

37

become obligations of such Reorganized Debtor as provided in the Canadian Fleet Financing Debtor Documents according to their terms and shall be Unimpaired.  Upon such assumption, all of the Canadian Fleet Financing Administrative Claims shall be deemed satisfied in full, including any Administrative Claims granted under section 364(c) of the Bankruptcy Code.

To the extent HVIF does not repay in full in Cash the then-outstanding obligations with respect to the Interim Fleet Financing Notes pursuant to Article IV.H of this Plan, each Reorganized Debtor shall assume all of its obligations under the Interim Fleet Financing Debtor Facility Documents to the extent of such obligations and, as of the Effective Date, such obligations shall become obligations of such Reorganized Debtor as provided in the Interim Fleet Financing Debtor Facility Documents according to their terms and shall be Unimpaired.  Upon such assumption, all of the Interim Fleet Financing Administrative Claims shall be deemed satisfied in full, including any Administrative Claims granted under section 364(c) of the Bankruptcy Code.

E.      *Professional Fee Claims*

1.      Final Fee Applications

All final requests for allowance and payment of Professional Fee Claims must be Filed with the Bankruptcy Court no later than the first Business Day that is forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.  Any objections to Professional Fee Claims shall be Filed and served no later than twenty-one (21) days after the filing of final requests for allowance and payment of Professional Fee Claims.

2.      Professional Fee Claims Estimate

Professionals shall estimate in good faith their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services compensable by the Debtors' Estates before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date; provided, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors, in consultation with the Plan Sponsors, shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.

3.      Professional Fee Escrow

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash based on their evaluation of the Professional Fee Claims Estimates, and no Liens, Claims, or Interests shall encumber the Professional Fee Escrow in any way (whether on account of the New Reorganized Corporate Debt, or otherwise).  The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (ii) shall be held in trust for the Professionals and for no other Person or Entity until all Professional Fee Claims have been irrevocably paid in full; provided, that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors.  Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; provided that the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow by the Reorganized Debtors without any further notice to, action, order, or approval of the Bankruptcy Court or by any other Entity.

4.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, on and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Reorganized Debtors and the Distribution Agent, as applicable.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention, compensation for services rendered, or reimbursement for expenses incurred on or after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the applicable Debtor agree (whether before or after the Effective Date) to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Summary of Classification*

All Claims and Interests, except for Administrative Claims, including DIP Claims, Canadian Fleet Financing Administrative Claims, Interim Fleet Financing Administrative Claims, HVF Master Lease Administrative Claims, Professional Fee Claims, Priority Tax Claims, Transaction Expenses, and postpetition Intercompany Claims are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests pursuant to the Plan is as set forth below. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.B. hereof. The Plan shall constitute a separate Plan for each of the Debtors.  For all purposes under the Plan, each Class contains a sub-Class for each Debtor: (i) Classes 3, 4, 5, and 6 shall be vacant for each Debtor other than Hertz Corp., the Subsidiary Guarantors and Rental Car Intermediate Holdings, LLC, and (ii) Class 11

39

shall be vacant for each Debtor other than Hertz Parent.  Voting tabulations for recording acceptances or rejections of the Plan shall be conducted on a Debtor-by-Debtor basis as set forth above.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Applicable Entities | Claim / Interest | Status | Voting Rights |
|---|---|---|---|---|
| 1 | Each Debtor | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Each Debtor | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | First Lien Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | Second Lien Note Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | Unsecured Funded Debt Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 6 | Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC | HHN Notes Guarantee Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 7 | Each Debtor | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 8 | Each Debtor | Prepetition Intercompany Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

40

| Class | Applicable Entities | Claim / Interest | Status | Voting Rights |
|---|---|---|---|---|
| 9 | RESERVED | N/A | N/A | N/A |
| 10 | Each Debtor | Intercompany Interests | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 11 | Hertz Parent | Existing Hertz Parent Interests | Impaired | Entitled to Vote |

B. *Treatment of Claims and Interests*

1. <u>Class 1 – Other Priority Claims</u>

    a. *Classification*: Class 1 consists of all Other Priority Claims against each Debtor.

    b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Priority Claim, each such Holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms in the ordinary course).

    c. *Voting*: Class 1 is Unimpaired under the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claim are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 – Other Secured Claims</u>

    a. *Classification*: Class 2 consists of all Other Secured Claims against each Debtor.

    b. *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim and the applicable Debtor prior to the Effective Date, or after the Effective Date, such Holder and the applicable Reorganized Debtor agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Other Secured Claim, each such Holder shall receive at the applicable Debtor's, or the applicable Reorganized Debtor's, discretion:

        (i) payment in full in Cash of the unpaid portion of such Holder's Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, payment shall be made in accordance with its terms in the ordinary course);

41

(ii)     Reinstatement of such Holder's Allowed Other Secured Claim;

(iii)    the applicable Debtor's interest in the collateral securing such Holder's Allowed Other Secured Claim; or

(iv)     such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

c.    *Voting*: Class 2 is Unimpaired under the Plan.  Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.    Class 3 - First Lien Claims

a.    *Classification*: Class 3 consists of all First Lien Claims against (i) Hertz Corp.; (ii) the Subsidiary Guarantors; and (iii) Rental Car Intermediate Holdings, LLC.

b.    *Allowance*: First Lien Claims shall be Allowed against Hertz Corp. and each Subsidiary Guarantor in the amount of $1,271,932,486.00, minus the First Lien Donlen Paydown Amount, plus letters of credit drawn after the Petition Date, plus the First Lien Hedge Claims, plus all accrued and unpaid interest (at the non-default rate for Eurocurrency Loans (as defined in the First Lien Credit Agreement) and not including any interest on obligations to cash collateralize letters of credit, in each case, unless the Bankruptcy Court orders otherwise, including with respect to the applicable interest rate), costs, and fees, in each case owed under the First Lien Loan Documents, from the Petition Date through the Effective Date as required to render the First Lien Claims Unimpaired.

c.    *Treatment*:  On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed First Lien Claim shall receive payment in full, in Cash, of the unpaid portion of its liquidated Allowed First Lien Claim on the Effective Date and with respect to any unliquidated Claim with respect to undrawn letters of credit shall retain all legal and equitable rights with respect to such Claims until such letters of credit are released.

d.    *Voting*: Class 3 is Unimpaired under the Plan.  Each Holder of an Allowed First Lien Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed First Lien Claims are not entitled to vote to accept or reject the Plan.

4.    Class 4 – Second Lien Note Claims

a.    *Classification*: Class 4 consists of all Second Lien Note Claims against (i) Hertz Corp. and (ii) the Subsidiary Guarantors.

b.    *Allowance*: Second Lien Note Claims shall be Allowed against Hertz Corp. and each Subsidiary Guarantor in the amount of $362,750,694.00 plus all accrued and unpaid interest (including interest accruing after the Petition Date), Second Lien Indenture Trustee Fees, costs, and other fees, in each case owed under the Second

42

Lien Note Documents, from the Petition Date through the Effective Date as required to render the Second Lien Note Claims Unimpaired.

c.  *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Second Lien Note Claim shall receive payment in full, in Cash of the Allowed amount of such Claim against Hertz Corp. and the Subsidiary Guarantors.

d.  *Voting*: Class 4 is Unimpaired under the Plan. Each Holder of an Allowed Second Lien Note Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Second Lien Note Claims are not entitled to vote to accept or reject the Plan.

5.  Class 5 – Unsecured Funded Debt Claims

a.  *Classification*: Class 5 consists of all Unsecured Funded Debt Claims against (i) Hertz Corp.; (ii) the Subsidiary Guarantors; and (iii) solely with respect to ALOC Facility Claims, Rental Car Intermediate Holdings, LLC.

b.  *Allowance*:

(i)  Unsecured Notes Claims shall be Allowed against Hertz Corp and the Subsidiary Guarantors in the amounts set forth below:

| Unsecured Funded Debt Claim | Allowed Amount |
|---|---|
| 5.500% Unsecured Note Claims | $804,522,222.00 |
| 6.000% Unsecured Note Claims | $926,700,000.00 |
| 6.250% Unsecured Note Claims | $503,211,806.00 |
| 7.125% Unsecured Note Claims | $511,083,333.00 |

in each case, plus all accrued and unpaid interest at the applicable rate, costs, and other fees, in each case to the extent owed and Allowed from the Petition Date through the Effective Date as required to render the Unsecured Note Claims Unimpaired.

(ii)  ALOC Facility Claims shall be Allowed against Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC only to the extent determined by the Bankruptcy Court and in no instance in more than an amount equal to the letters of credit drawn with respect to the ALOC Facility as of the Effective Date plus all accrued and unpaid interest at the applicable rate, costs, and other fees, in each case to the extent owed and Allowed, from the Petition Date through the Effective Date as required to render the ALOC Facility Claims Unimpaired.

43

c.   *Treatment*: On the Effective Date, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claim, each Holder of an Allowed Unsecured Funded Debt Claim against Hertz Corp., the Subsidiary Guarantors, and, as applicable, Rental Car Intermediate Holdings, LLC, shall receive payment in full, in Cash of the Allowed amount of such Claim.

d.   *Voting*: Class 5 is Unimpaired under the Plan.   Each Holder of an Allowed Unsecured Funded Debt Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, Holders of Allowed Unsecured Funded Debt Claims are not entitled to vote to accept or reject the Plan.

6.   Class 6 – HHN Notes Guarantee Claims

a.   *Classification*: Class 6 consists of all HHN Notes Guarantee Claims against (i) Hertz Corp.; (ii) the Subsidiary Guarantors; and (iii) Rental Car Intermediate Holdings, LLC.

b.   *Allowance*: The HHN Notes Guarantee Claims shall be Allowed against Hertz Corp., each Subsidiary Guarantor, and Rental Car Intermediate Holdings, LLC in an aggregate amount of $790,105,000.00 plus any accrued and outstanding interest, premiums, and fees, including the HHN Notes Trustee Fees and Expenses, in each case owed under the HHN Notes Documents, from the Petition Date through the Effective Date to the extent required to render the HHN Notes Guarantee Claims Unimpaired.

c.   *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of an Allowed HHN Notes Guarantee Claim shall receive payment in full, in Cash, of the Allowed amount of such Claim against Hertz Corp., the Subsidiary Guarantors, and Rental Car Intermediate Holdings, LLC.

d.   *Voting*: Class 6 is Unimpaired under the Plan.   Each Holder of an Allowed HHN Notes Guarantee Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, Holders of Allowed HHN Notes Guarantee Claims are not entitled to vote to accept or reject the Plan.

7.   Class 7 – General Unsecured Claims

a.   *Classification*: Class 7 consists of all General Unsecured Claims against a Debtor.

a.   *Allowance*:  The 7.000% Unsecured Promissory Note Claims shall be Allowed against Hertz Corp. in an aggregate amount of $28,274,393.81, plus any other amounts that may be Allowed by the Bankruptcy Court to the extent required to render the 7.000% Unsecured Promissory Notes Unimpaired.  The allowance of all other General Unsecured Claims will be determined pursuant to the terms of

44

this Plan, the Bankruptcy Code, and other applicable law so as to render such Claims Unimpaired.

b.    *Treatment*: On the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Claims, each Holder of an Allowed General Unsecured Claim against a Debtor shall (at the option of the applicable Debtor or Reorganized Debtor (in consultation with the Plan Sponsors): (i) be Reinstated or (ii) receive payment in full, in Cash of the Allowed amount of such Claim.

c.    *Voting*: Class 7 is Unimpaired under the Plan. Each Holder of a General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan.

8.    <u>Class 8 – Prepetition Intercompany Claims</u>

a.    *Classification*: Class 8 consists of all prepetition Intercompany Claims.

b.    *Treatment*: Each prepetition Intercompany Claim shall be Reinstated or shall received such treatment as may be mutually agreed by the applicable Debtors or Reorganized Debtors in consultation with the Plan Sponsors; <u>provided</u>, <u>however</u>, that the Intercompany Claims of HIRE (Bermuda) Limited against Hertz Corp. shall be Reinstated.

c.    *Voting*: Holders of Claims in Class 8 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote or accept or reject the Plan.

9.    <u>Class 9 - RESERVED</u>

10.    <u>Class 10 – Intercompany Interests</u>

a.    *Classification*: Class 10 consists of all Intercompany Interests held by a Debtor in another Debtor.

b.    *Treatment*: Intercompany Interests shall be Reinstated so as to maintain the organizational structure of the Debtors as such structure exists on the Effective Date unless implementation of the Restructuring requires otherwise.

c.    *Voting*: Class 10 is Unimpaired under the Plan. Each Holder of an Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

11.    <u>Class 11 – Existing Hertz Parent Interests</u>

a.    *Classification*: Class 11 consists of all Existing Hertz Parent Interests.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Existing Hertz Parent Interest agrees to a similar or less favorable treatment of such Interest, on the

Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Interest, each Holder of an Allowed Existing Hertz Parent Interest shall receive:

(i)    Cash in an amount equal to $1.53 per share of Existing Hertz Parent Interests held by such Holder; and

(ii)    its Pro Rata share of:

(1)    three (3%) percent of total Reorganized Hertz Parent Common Interests, subject to dilution on account of the Management Equity Incentive Plan and New Warrants; and

(2)    the New Warrants; *provided* that an Eligible Existing Hertz Shareholder may elect to receive its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights instead of New Warrants by timely exercising such Subscription Rights in accordance with the Rights Offering Procedures prior to the Subscription Expiration Deadline (as defined in the Rights Offering Procedures); *provided*, *further* that any holder of Existing Hertz Parent Interests that is not an Eligible Existing Hertz Shareholder may elect prior to the Subscription Rights Expiration Deadline to have its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights sold pursuant to the Shareholder Subscription Rights Auction and receive its Pro Rata share of proceeds of the Shareholder Subscription Rights Auction instead of New Warrants.

c.    *Voting*: Class 11 is Impaired under the Plan. Each Holder of an Existing Hertz Parent Interest is entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or otherwise Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or otherwise Unimpaired Claims; and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired by the Plan. Except as otherwise specifically provided in the Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights and defenses with respect to any Reinstated Claim or otherwise Unimpaired Claim may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. **Notwithstanding anything in this paragraph to the contrary, and subject to the obligations of the First Lien Agent, Second Lien Note Trustee, and HHN Notes Trustee set forth in**

46

**this Plan, the Debtors hereby acknowledge and agree that any Claim, Cause of Action, right of setoff, or other legal or equitable defense of the Debtors with respect to the First Lien Claims, the Second Lien Note Claims, and the HHN Notes Guarantee Claims that may exist as of the Effective Date or may have existed as of the Petition Date shall be released upon the payment in full of the Allowed First Lien Claims, Allowed Second Lien Note Claims, and Allowed HHN Notes Guarantee Claims, respectively, pursuant to this Plan.** Nothing in the previous sentence shall release or otherwise impair the obligations of the First Lien Agent, the First Lien Lenders, the Second Lien Note Trustee, or the Holders of Second Lien Note Claims to release Liens or collateral as required by the Plan.

D.   *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.   *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.   *Separate Classification of Other Secured Claims*

Each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under this Plan.

G.   *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

H.   *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.   *No Substantive Consolidation*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

B.      *Restructuring Transactions; Effectuating Documents*

Prior to, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may take any and all actions as may be necessary or appropriate in the Debtors' reasonable discretion to effectuate the Restructuring Transactions described in, approved by, contemplated by, or necessary to effectuate the Plan, in accordance with the Plan Support Agreement, including: (i) the execution and delivery of any New Organizational Documents, including any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, arrangement, continuance, dissolution, sale, purchase, or liquidation, in each case, containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of the New Organizational Documents, including any appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) such other transactions that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (v) the execution, delivery, and filing of the Exit Facility Documents; (vi) the execution and delivery of the HVF III Documents; (vii) the implementation of the HHN Restructuring and execution and delivery of any documents in connection therewith, (viii) the solicitation and implementation of the Rights Offering, (ix) the execution, delivery, and filing of the New Warrants, and (x) all other actions that the Debtors determine to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan (collectively, the "**Restructuring Transactions**").  The Restructuring Transactions shall be structured in a manner that takes into account the tax position of creditors, the Plan Sponsors, and the Reorganized Debtors.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

C.      *Sources of Consideration for Plan Distributions*

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtors shall fund distributions under the Plan with (i) Cash on hand; (ii) Cash proceeds from the New Money Investment; and (iii) the proceeds of the Exit Term Loan Facility.

D.      *New Money Investment*

1.      Plan Sponsor Direct Equity Investment

On the Effective Date, in accordance with the Equity Commitment Documents and subject to the terms and conditions thereof, the Equity Commitment Parties shall fund the New Money Investment in exchange for Reorganized Hertz Parent Common Interests and Preferred Stock.  As more fully set forth in the Equity Commitment Documents, the Equity Commitment Parties shall purchase an aggregate of (i) up to $4,415,941,666.67 of Reorganized Hertz Parent Common Interests and (ii) up to $1,500,000,000.00 of Preferred Stock (in each case subject to adjustment pursuant to the terms of the Equity Commitment Documents).  Of the Reorganized Hertz Parent Common Interests to be purchased pursuant to the Equity Commitment Agreement, Amarillo will fund up to $1,987,000,000.00, which shall account for more than 42% of total Reorganized Hertz Parent Common Interests, after accounting for any dilution as set forth in the Equity Commitment Documents but subject to dilution on account of the Management Equity Incentive Plan and New Warrants.  Additionally, certain of the Equity Commitment Parties shall receive premiums

48

in an aggregate amount of $163,500,000.00 of Reorganized Hertz Parent Common Interests, as more fully set forth in the Equity Commitment Documents. The foregoing allocations may be adjusted before the Effective Date solely in accordance with the Equity Commitment Documents.

> 2. Rights Offering

Following approval by the Bankruptcy Court of the Disclosure Statement and the Rights Offering Procedures, Hertz Parent shall conduct the Rights Offering in accordance with the Rights Offering Procedures and Equity Commitment Documents. Instead of receiving New Warrants, each Holder of Existing Hertz Parent Interests may elect to be issued Shareholder Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its Pro Rata allocation of the Rights Offering to the extent it is an Eligible Existing Hertz Shareholder. Such election shall be made if and when such Eligible Existing Hertz Shareholder exercises such Subscription Rights pursuant to the terms of the Rights Offering Procedures. Each Holder of Allowed Unsecured Funded Debt Claims shall be issued Bondholder Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its Pro Rata allocation of the Rights Offering to the extent any such amounts remain unsubscribed and unfunded by Holders of Allowed Existing Hertz Parent Interests and the applicable Holder of an Allowed Unsecured Funded Debt Claim is an Eligible Unsecured Funded Debt Holder. Any transfer of an Existing Hertz Parent Interest or Unsecured Funded Debt Claim shall include the applicable Subscription Rights. In the event there are any Bondholder Subscription Rights available for distribution to Eligible Unsecured Funded Debt Holders, as a condition to and upon seeking to exercise such Bondholder Subscription Rights, by signing the Subscription Form and delivering it to the Subscription Agent or tendering through DTC, as applicable, the applicable Eligible Unsecured Funded Debt Holder shall, subject to the entry of the Confirmation Order, be deemed to have released and irrevocably waived any right to receive payment of any amounts on account of any of its Allowed Unsecured Funded Debt Claim actually tendered in the Rights Offering (including interest, costs, fees, premiums, or any "make-whole" amounts) that exceeds the aggregate amount of the principal of such Unsecured Funded Debt Claim, interest accrued, but unpaid as of the Petition Date at the non-default rate, and postpetition interest accrued, but unpaid as of the Effective Date at the Federal Judgment Rate (and such release and waiver shall remain effective notwithstanding any failure by any Eligible Unsecured Funded Debt Holder to properly exercise such Bondholder Subscription Rights in accordance with the Rights Offering Procedures, including by failing to timely deliver the applicable purchase price).

The consummation of the Rights Offering is conditioned on the satisfaction or waiver (in accordance with the Equity Commitment Agreement) of all conditions specified in the terms of the Equity Commitment Documents.

Each Ineligible Existing Hertz Shareholder may elect prior to the Subscription Rights Expiration Deadline to have its Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights sold pursuant to the Shareholder Subscription Rights Auction by submitting such election in accordance with the Rights Offering Procedures. Such election shall include a minimum price at which such Ineligible Existing Hertz Shareholder will agree to sell its Subscription Rights (each a "**Minimum Auction Price**").

In addition to exercising their Pro Rata (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests) share of the Shareholder Subscription Rights, each Eligible Existing Hertz Shareholder may elect prior to the Subscription Rights Expiration Deadline to purchase available Shareholder Subscription Rights at the Shareholder Subscription Rights Auction by submitting such election in accordance with the Rights Offering Procedures. Any such election will include the maximum amount and price per Shareholder Subscription Right such Eligible Existing Hertz Shareholder is willing to purchase at the Shareholder Subscription Rights Auction. The Shareholder Subscription Rights Auction

49

will conclude prior to the Effective Date in accordance with the Rights Offering Procedures. If an Ineligible Existing Hertz Shareholder is unable to sell its Subscription Rights because its Minimum Auction Price is not met, such Ineligible Existing Hertz Shareholders shall be deemed to have elected to receive New Warrants instead of Subscription Rights and shall receive such New Warrants as provided in the Plan.

E.      *Issuance and Distribution of Reorganized Hertz Parent Common Interests and Preferred Stock*

The issuance of the Reorganized Hertz Parent Common Interests, Preferred Stock, and the New Warrants (including any shares of Reorganized Hertz Parent Common Interests issuable upon the valid conversion or exercise, as applicable, of the foregoing) in accordance with the Rights Offering Procedures and Equity Commitment Documents, the New Warrants Agreement, and this Plan shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

Any Entities' acceptance of Reorganized Hertz Parent Common Interests and Preferred Stock shall be deemed to be its agreement to be bound by the Reorganized Debtor Organizational Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The Reorganized Debtor Organizational Documents, as applicable, shall be binding on all Entities receiving, and all holders of, the Reorganized Hertz Parent Common Interests and Preferred Stock (and their respective successors and assigns), whether any such Reorganized Hertz Parent Common Interests and Preferred Stock are received or to be received on or after the Effective Date, in each case, pursuant to the Plan and regardless of whether such Entity executes or delivers a signature page to the Reorganized Debtor Organizational Documents.

All of the shares of Reorganized Hertz Parent Common Interests and Preferred Stock and all of the New Warrants (including any shares of Reorganized Hertz Parent Common Interests issuable upon the valid conversion or exercise, as applicable, of the foregoing) issued pursuant to the Plan shall be, to the extent applicable, duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the Reorganized Hertz Parent Common Interests, Preferred Stock, and New Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

F.      *New Reorganized Corporate Debt*

The Reorganized Debtors shall issue the New Reorganized Corporate Debt and provide any related guarantees, and the New Reorganized Corporate Debt will be made available to the Reorganized Debtors, pursuant to and subject to the terms and conditions set forth in the Exit Facility Documents.

Confirmation shall be deemed approval of the issuance and incurrence of the New Reorganized Corporate Debt (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations and guarantees to be incurred and fees paid in connection therewith), and to the extent not approved by the Bankruptcy Court previously, the Reorganized Debtors shall be authorized to execute and deliver those documents necessary or appropriate to issue and incur the New Reorganized Corporate Debt and related guarantees, including the Exit Facility Documents, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule, or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Debtors may deem to be necessary to consummate the New Reorganized Corporate Debt.

G.      *Replacement of First Lien Letters of Credit*

On or prior to the Effective Date, the Debtors shall replace or backstop the outstanding and undrawn letters of credit issued pursuant to the First Lien Revolving LC Facility and the First Lien Standalone LC Facility with letters of credit issued pursuant to the Exit Facility Documents, or otherwise cash collateralize such letters of credit.  Contemporaneously therewith, all outstanding undrawn letters of credit issued under the First Lien Revolving LC Facility and First Lien Standalone LC Facility shall be deemed canceled for purposes of the First Lien Revolving LC Facility or First Lien Standalone LC Facility, as applicable.

H.      *HVF II and Interim Fleet Financing Settlement*

On or prior to the Effective Date, the Debtors shall cause HVF II to repay in full in Cash the then-outstanding HVF II Obligations (such date, the "**HVF II Notes Repayment Date**"), with the proceeds of a new asset backed securitization facility, including the HVF III asset-backed securitization facility, and/or securities to be issued by a newly formed non-Debtor bankruptcy remote subsidiary of Hertz Corp.  On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall pay all unpaid amounts accrued pursuant to paragraph 9 of the Second Interim HVF Master Lease Settlement Order through the HVF II Notes Repayment Date, provided, that prior to the payment of any such amounts the applicable Entities shall have complied with paragraph 10 of the Second Interim HVF Master Lease Settlement Order. Notwithstanding anything to the contrary herein, the obligations with respect to the HVF II Notes shall be determined solely pursuant to the terms of the HVF II Facility Documents and HVF Facility Documents, including, that such obligations shall include, to the extent outstanding and without causing a double recovery on account of more than one payment being made with respect to such obligations, all accrued and unpaid (i) Class A Monthly Default Interest Amounts, Class B Monthly Default Interest Amounts, Class C Monthly Default Interest Amounts and Class D Monthly Default Interest Amounts (as each such term is defined in the HVF II VFN Supplement), pursuant to Section 5.2(f) of the HVF II VFN Supplement or otherwise and (ii) Class A Deficiency Amounts, Class B Deficiency Amounts, Class C Deficiency Amounts and Class D Deficiency Amounts and all interest accrued on such Class A Deficiency Amounts, Class B Deficiency Amounts, Class C Deficiency Amounts and Class D Deficiency Amounts, pursuant to the applicable HVF II MTN Series Supplement, provided, for the avoidance of doubt, that each of (A) the Forbearance Fee payable pursuant to Section 4(g) of that certain HVF II Series 2013-A Forbearance Agreement dated May 4, 2020 (the "**Forbearance Agreement**") and (B) the Administrative Agent Fee payable pursuant to that certain Administrative Agent Fee Letter entered into in connection with the Forbearance Agreement, dated May 4, 2020, by and among the agent under the HVF II VFN Supplement and Hertz Vehicle Financing II LP shall in each case be deemed to be an obligation with respect to the HVF II Notes.  Not later than three (3) Business Days following a written request by the Debtor (email sufficient), the HVF Trustee shall provide a payoff statement detailing all amounts owed by the category specified in the HVF II Facility Documents.

On or prior to the Effective Date, the Debtors may cause HVIF to repay in full in Cash the then-outstanding HVIF Obligations with the proceeds of a new asset-backed securitization facility, including the HVF III asset-backed securitization facility, and/or securities to be issued by a newly formed non-Debtor bankruptcy remote subsidiary of Hertz Corp. or Reorganized Hertz Parent, as applicable.  To the extent HVIF does not repay in full in Cash the HVIF Obligations, the Debtors shall assume all of their obligations with respect to the Interim Fleet Financing Facility pursuant to Article II.D, supra.

The Debtors shall consult with the Plan Sponsors with respect to the terms of the repayment of the HVF II Notes and the Interim Fleet Financing Notes and such terms shall be in form and substance acceptable to the Plan Sponsors in good faith.

The payment of the HVF II Obligations and, to the extent applicable, payment of the HVIF Obligations, in full shall constitute the full and final satisfaction, settlement, release, and discharge of each

51

HVF Claim and, to the extent applicable, each Interim Fleet Financing Administrative Claim against the Debtors, including any Administrative Claims granted under section 364(c) of the Bankruptcy Code. Contemporaneously with the foregoing payment, (i) the HVF II Notes, the Series 2013-G1 Note, and, to the extent applicable, the Interim Fleet Financing Notes shall be deemed canceled; (ii) the HVF Facility Documents, the HVF II Facility Documents, and, to the extent applicable, the Interim Fleet Financing Facility Documents shall be deemed terminated (except if utilized for HVF III), (iii) all Liens on property of HVF, HVF II, or, to the extent applicable, HVIF arising out of or related to the Series 2013-G1 Note, the HVF II Notes, or, to the extent applicable, the Interim Fleet Financing Notes shall automatically terminate, and all collateral subject to such applicable Liens shall be automatically released, in each case without further action by the HVF Trustee, HVF II Trustee, the HVF II Lenders, the HVIF Trustee, and the Interim Fleet Financing Lenders; and (iv) all undrawn letters of credit issued with respect to the HVF II Facility and, if applicable, the Interim Fleet Financing Facility shall be cancelled. The (i) HVF Trustee, HVF II Trustee, and the HVF II Lenders, and (ii) to the extent applicable, the HVIF Trustee, and the Interim Fleet Financing Lenders, shall, at the expense of the Debtors or Reorganized Debtors, as applicable, take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by HVF, HVF II, HVIF, the Debtors or the Reorganized Debtors. The Debtors or Reorganized Debtors, as applicable, shall use commercially reasonable efforts to cause HVF, HVF II and, to the extent applicable, HVIF, to execute and provide to the HVF Trustee, the HVF II Trustee, the HVF II Lenders and, to the extent applicable, the HVIF Trustee and the Interim Fleet Financing Lenders, customary documentation in connection with the repayment of the HVF II Notes and, to the extent applicable, the Interim Fleet Financing Notes, that is reasonably satisfactory to the HVF Trustee, the HVF II Trustee and the ABS Lenders (as defined in the Second Interim HVF Master Lease Settlement Order), and, to the extent applicable, the HVIF Trustee and the Interim Fleet Financing Lenders, and to execute and provide such other documentation and take such other actions as may be reasonably requested by the HVF Trustee, the HVF II Trustee and the ABS Lenders (as defined in the Second Interim HVF Master Lease Settlement Order) and/or, to the extent applicable, the HVIF Trustee and the Interim Fleet Financing Lenders, in connection with the repayment of the HVF II Notes, and, to the extent applicable, the Interim Fleet Financing Notes.

**Upon the occurrence of the HVF II Notes Repayment Date and subject to the release and discharge of each HVF Claim, the HVF II Notes, and the Series 2013-G1 Note, each of the Debtors, on behalf of themselves and their parents, subsidiaries, affiliates, shareholders, agents, representatives, predecessors-in-interest, nominees, managers, members, partners, officers, directors, employees, advisors, and each of their respective successors and assigns shall be deemed to release, remise and forever discharge the Debtors and the ABS Released Parties, solely in their respective capacities under the HVF II Facility, HVF II Facility Documents, and HVF Facility Documents, as applicable, of and from any and all debts, losses, demands, actions, causes of action, suits, accounts, covenants, contracts, agreements, claims, counterclaims, controversies, disputes, obligations, judgments, rights, damages, costs, losses, expenses, liens, or liabilities of any and every nature or description whatsoever, both at law or in equity, whether asserted or unasserted, express or implied, known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, which arose at any time through the HVF II Notes Repayment Date, arising out of or related to the HVF II Facility. Notwithstanding anything to the contrary in the foregoing, nothing in this Article IV.H shall release any ABS Released Party from Claims or Causes of Action arising from an act or omission that constitutes fraud, willful misconduct, or gross negligence.**

Notwithstanding anything herein to the contrary, including Article XII.I., the stipulations and releases set forth in paragraph 11 of the Second Interim HVF Master Lease Settlement Order shall remain in full force and effect.

52

I.      *HVF III Fleet Financing*

On or prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, may form a non-Debtor bankruptcy remote subsidiary or subsidiaries of Hertz Corp. or Reorganized Hertz Parent, as applicable, to issue the HVF III asset-backed securitization facility and/or securities.  Simultaneously with the payment of the HVF II Obligations in full, as described in Article IV.H., and, to the extent applicable, the payment of the HVIF Obligations in full, the Debtors may use any of the vehicles in the HVF II Facility and, to the extent applicable, the Interim Fleet Financing Facility and/or the equity with respect to the HVF II Facility and, to the extent applicable, the Interim Fleet Financing Facility to support any facility or securities issued by HVF III.  The Debtors shall consult with the Plan Sponsors with respect to the terms of HVF III with such terms in form and substance acceptable to the Plan Sponsors in good faith.  Further, the Debtors, in the issuance of the HVF III asset-backed securitization facility and/or securities, shall comply with the obligations set forth in paragraph 12 of the Second Interim HVF Master Lease Settlement Order.

J.      *Intercompany Claim Settlement*

The entry of the Confirmation Order and the treatment accorded to General Unsecured Creditors pursuant to this Plan shall constitute a settlement pursuant to section 1123(b)(3) of all disputes relating to the Intercompany Claims and the allocation of value among the various Debtors.

K.      *HHN Restructuring*

On the Effective Date, the Debtors shall make the cash payment provided as treatment for the HHN Notes Guarantee Claims pursuant to Article III.B.6 of this Plan to the HHN Notes Trustee and/or HHN Notes Paying Agent.  Pursuant to this Plan, such cash payment shall be applied *pro rata* to the HHN Notes based on the principal and interest outstanding at the time of such cash payment.  The HHN Notes Trustee and/or HHN Notes Paying Agent shall then, to the extent required, convert such cash payment to Euros using the European Central Bank reference rate published on the date that the HHN Notes Trustee and/or HHN Notes Paying Agent received such payment and apply such amount to the then outstanding principal and interest due in respect of each series of HHN Notes as set forth in the allocation provided by the Plan. Such payment on account of the HHN Notes Guarantee Claims is not, and shall not be deemed to constitute, a prepayment (voluntary or otherwise) under the HHN Notes Indentures or otherwise and shall remain subject to the HHN Notes Trustee Charging Lien on the terms set forth in the HHN Notes Indentures.

Upon the occurrence of the Effective Date, immediately after the payments in respect of the HHN Notes Guarantee Claims have been made pursuant to the Plan, HHN shall redeem the HHN Notes for a Cash payment equal to (a) the principal and interest due in respect of the HNN Notes on the date of such payment, minus (b) the amount paid to the HHN Notes Trustee and/or HHN Notes Paying Agent in respect of the HHN Notes Guarantee Claim pursuant to the Plan, plus (c) any unpaid interest remaining through the date of payment to the beneficial holders of the HHN Notes, any unpaid HHN Notes Trustee Fees and any premiums, prepayment penalties, and make-whole payments due in respect of the HHN Notes calculated solely upon the difference between the amounts set forth in clause (a) and clause (b) above.  Such payments with respect to the HHN Notes Guarantee Claims and HHN Notes shall constitute a complete satisfaction and release of all Claims and obligations with respect to the HHN Note Documents.

On the Effective Date, the Debtors shall make an equity contribution to HIL in an amount sufficient to repay the HIL Facility and cause HIL to repay the HIL Facility.

L.      *New Registration Rights Agreement*

On the Effective Date, the Reorganized Debtors shall execute and deliver the New Registration Rights Agreement and take all actions required by the New Registration Rights Agreement, subject to and

in accordance with the terms and conditions of the Plan Support Agreement and the Equity Commitment Agreement.

M.      *International Vehicle Financing Claims*

On or prior to the Effective Date, as part of the restructuring of the business of HHN and its European subsidiaries, the Debtors shall cause the European Vehicle Financing Entities to enter into and consummate the European ABS Restructuring Settlement.  The entry of the Confirmation Order shall (i) constitute approval and authorization for the Debtors to perform their obligations under the European ABS Restructuring Settlement under Bankruptcy Rule 9019, (ii) approve the complete release of the Lombard Vehicle Financing Facility Guarantee, the European ABS Performance Guarantees and any claims related thereto, including the Lombard Facility Guarantee Claims and the European ABS Performance Guarantee Claims, and (iii) approve the irrevocable disallowance of all such claims, which shall be permanently removed from the Claims Register.

On or prior to the Effective Date, as part of the restructuring of the business of Hertz Australia and its subsidiaries, the Debtors shall cause Hertz Australia and the Australian Financing Entity to enter into and consummate the Australian ABS Restructuring Settlement.  The entry of the Confirmation Order shall (i) constitute approval and authorization for the Debtors to perform their obligations under the Australian ABS Restructuring Settlement under Bankruptcy Rule 9019, (ii) approve the complete release of the Australian Performance Guarantee and any claims related thereto, including any Australian Performance Guarantee Claims, and (iii) approve the irrevocable disallowance of all such claims, which shall be permanently removed from the Claims Register.

N.      *Corporate Existence*

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the New Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall continue to exist as a Reorganized Debtor and as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, federal law, or other non-bankruptcy law).

O.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all the Debtors' Causes of Action (including, without express or implied limitation, all Causes of Action identified in the Schedule of Retained Causes of Action), all Executory Contracts and Unexpired Leases assumed, but not assigned, by any of the Debtors, and any property acquired by any of the Debtors, including Interests held by the Debtors in non-Debtor subsidiaries, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of

54

Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

P.      *Cancellation of Existing Securities*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Effective Date (i) the Prepetition Debt Documents and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed canceled, discharged and of no force or effect, without further action or approval of the Bankruptcy Court, the Debtors, or any Holder and the First Lien Agent, the Second Lien Note Trustee, the Unsecured Notes Trustees and the 7.000% Unsecured Promissory Notes Trustee and their respective agents, successors and assigns shall each be automatically and fully released and discharged of and from all duties as applicable under the respective Prepetition Debt Documents, except, as applicable, as necessary to (a) enforce the rights, Claims and interests of the First Lien Agent, the Second Lien Note Trustee, the Unsecured Notes Trustees, the 7.000% Unsecured Promissory Notes Trustee, and, as applicable, and any predecessor thereof vis-a-vis parties other than the Released Parties, (b) allow the receipt of and distributions under the Plan and, as applicable, the subsequent distribution of such amounts in accordance with the respective terms of the Prepetition Debt Documents and (c) preserve any rights of (1) the First Lien Agent and any predecessor thereof as against any money or property distributable to Holders of First Lien Claims, including any priority in respect of payment, (2) the Second Lien Note Trustee and any predecessor thereof as against any money or property distributable to Holders of Second Lien Note Claims, (3) the 5.500% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 5.500% Unsecured Notes Claims, (4) the 6.000% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 6.000% Unsecured Notes Claims, (5) the 6.250% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 6.250% Unsecured Notes Claims, (6) the 7.000% Unsecured Promissory Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 7.000% Unsecured Promissory Notes Claims, and (7) the 7.125% Unsecured Notes Trustee and any predecessor thereof as against any money or property distributable to Holders of the 7.125% Unsecured Notes Claims; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided that notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall also continue in effect to allow each of the First Lien Agent, the Second Lien Note Trustee, the Unsecured Notes Trustees, and the 7.000% Unsecured Promissory Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, without limitation, to enforce the respective obligations owed to such parties under the Plan.

Subsequent to the performance by: (i) the First Lien Agent of its obligations under the Plan, the First Lien Agent and its respective agents shall be relieved of all further duties and responsibilities related to the First Lien Loan Documents upon the occurrence of the Effective Date, except with respect to such other rights of the First Lien Agent that, pursuant to the First Lien Loan Documents, survive the termination of the First Lien Loan Documents; (ii) the Second Lien Note Trustee of its obligations under the Plan, the Second Lien Note Trustee and its respective agents shall be relieved of all further duties and responsibilities

related to the Second Lien Note Documents upon the occurrence of the Effective Date, except with respect to such other rights of the Second Lien Note Trustee that, pursuant to the Second Lien Note Documents, survive the termination of the Second Lien Note Documents; (iii) the 5.500% Unsecured Notes Trustee of its obligations under the Plan, the 5.500% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 5.500% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 5.500% Unsecured Notes Trustee that, pursuant to the 5.500% Unsecured Notes Documents, survive the termination of the 5.500% Unsecured Notes Documents; (iv) the 6.000% Unsecured Notes Trustee of its obligations under the Plan, the 6.000% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 6.000% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 6.000% Unsecured Notes Trustee that, pursuant to the 6.000% Unsecured Notes Documents, survive the termination of the 6.000% Unsecured Notes Documents; (v) the 6.250% Unsecured Notes Trustee of its obligations under the Plan, the 6.250% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 6.250% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 6.250% Unsecured Notes Trustee that, pursuant to the 6.250% Unsecured Notes Documents, survive the termination of the 6.250% Unsecured Notes Documents; (vi) the 7.000% Unsecured Promissory Notes Trustee of its obligations under the Plan, the 7.000% Unsecured Promissory Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 7.000% Unsecured Promissory Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 7.000% Unsecured Promissory Notes Trustee that, pursuant to the 7.000% Unsecured Promissory Notes Documents, survive the termination of the 7.000% Unsecured Promissory Notes Documents; and (vii) the 7.125% Unsecured Notes Trustee of its obligations under the Plan, the 7.125% Unsecured Notes Trustee and its respective agents shall be relieved of all further duties and responsibilities related to the 7.125% Unsecured Notes Documents upon the occurrence of the Effective Date, except with respect to such other rights of the 7.125% Unsecured Notes Trustee that, pursuant to the 7.125% Unsecured Notes Documents, survive the termination of the 7.125% Unsecured Notes Documents.

If the record Holder of any of the Second Lien Notes or Unsecured Notes is DTC or its nominee or another securities depository or custodian thereof, and such Second Lien Notes or Unsecured Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Second Lien Notes or Unsecured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

The commitments and obligations, if any, of each DIP Lender to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Loan Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect solely in connection with such cancellations, terminations, satisfactions, releases or discharges. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

Q.      *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable (i) the issuance of the Reorganized Hertz Parent Common Interests,  Preferred Stock, and New Warrants; (ii) the selection and appointment of the directors and officers for Reorganized Hertz Parent and the other Reorganized Debtors; (iii) implementation of the Restructuring Transactions; and (iv) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized Hertz Parent and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized Hertz Parent, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security Holders, directors, or officers of the Debtors, Reorganized Hertz Parent, or the other Reorganized Debtors.  On or before the Effective Date, as applicable, the appropriate officers of the Debtors, Reorganized Hertz Parent, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of Reorganized Hertz Parent and the other Reorganized Debtors, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.Q shall be effective notwithstanding any requirements under non-bankruptcy law.

R.      *New Organizational Documents*

To the extent required under the Plan, or applicable non-bankruptcy law, on the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors will File such New Organizational Documents as are required to be Filed with the applicable Secretary of State and/or other applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents, and the Reorganized Debtors may File their respective certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.  Additionally, on the Effective Date, each recipient of Reorganized Hertz Parent Common Interests and Preferred Stock will be subject to the Reorganized Hertz Parent Organizational Documents.

The New Organizational Documents shall not contain any prohibitions on any of the Reorganized Debtors becoming a publicly listed company.

S.      *Reorganized Hertz Parent and Reorganized Hertz Corp. Board*

As of the Effective Date, except as set forth in this Article IV.S, all directors, managers, and other members of existing boards or governance bodies of Hertz Parent and Hertz Corp., as applicable, shall cease to hold office or have any authority from and after such time unless such individuals are selected to hold positions pursuant to the applicable governing body or documents with respect to the Reorganized Debtors.

The Reorganized Hertz Parent Board and Reorganized Hertz Corp. Board shall have at least seven (7) members.  All members shall be selected in accordance with generally accepted best practices for large institutional investors in public companies.  The composition of the board shall comply with applicable stock exchange and SEC independence requirements and directors shall have relevant industry, financial and operational backgrounds.

57

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any person proposed to serve on the initial board of directors of Reorganized Hertz Parent and Reorganized Hertz Corp.  To the extent any such director or officer of the Reorganized Hertz Parent and Reorganized Hertz Corp. is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such direct or officer.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, the Employment Agreements (assumed and assigned to the Reorganized Debtors, subject to the reasonable consent of the Plan Sponsors), and other constituent documents of the Reorganized Debtors.  The selection of directors and officers of Reorganized Hertz Parent and Reorganized Hertz Corp. shall be disclosed in the Plan Supplement, and at least a majority of the directors shall be appointed by the Plan Sponsors (other than Apollo).

T.      *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance,  transfer or exchange of any securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, (iv) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the Exit Facility Documents, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

U.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all of the Debtors' Causes of Action, whether arising before or after the Petition Date, including any Causes of Action specifically enumerated in the Plan Supplement.  The Reorganized Debtors (in consultation with the Plan Sponsors) shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.  **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action**.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Causes of Action against it.  Unless such Causes of Action against any Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Causes of Action shall be expressly reserved by the Debtors or the Reorganized Debtors, as applicable, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion,

estoppel (judicial, equitable, or otherwise), or laches, shall apply to any Cause of Action upon, after, or as a consequence of Confirmation or the occurrence of the Effective Date.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.

**Notwithstanding anything to the contrary contained in this <u>Article IV.U.</u>, on the Effective Date, all Avoidance Actions with respect to trade vendors that continue to do business with the Reorganized Debtors and that are not specifically identified in the Schedule of Retained Causes of Action shall be released by the Debtors.**

V.    *Insurance Policies and Surety Bonds*

1.    <u>Director and Officer Liability Insurance</u>

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees, as applicable, who served in such capacity at any time on or prior to the Effective Date pursuant to sections 105 and 365 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the D&O Liability Insurance Policies.

On or before the Effective Date, the Debtors, on behalf of the Reorganized Debtors, will obtain the Tail D&O Policy.

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on the Effective Date, including the Tail D&O Policy, with respect to conduct occurring prior thereto, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date, *provided* that nothing in this paragraph shall preclude a reduction in the amount of available policy proceeds under the D&O Liability Insurance Policies through payment of claims under any D&O Liability Insurance Policies to or on behalf of the Debtors or the Reorganized Debtors.

Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies and related documents, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan and no Proof of Claim need be Filed with respect thereto.

2.    <u>Assumption of Insurance Policies</u>

On the Effective Date, each Insurance Policy shall be assumed by the applicable Reorganized Debtor pursuant to sections 105 and 365 of the Bankruptcy Code, unless such Insurance Policy (i) was rejected by the Debtors pursuant to an order of the Bankruptcy Court, or (ii) is the subject of a motion to reject pending

on the date of the Confirmation Hearing.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors assumption of each of such Insurance Policies

### 3. Insurance Neutrality

Nothing in the Plan or the Confirmation Order, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurer or (b) any rights or obligations of the Debtors or the Reorganized Debtors arising out of or under any Insurance Policy.  The Insurers, the Debtors, and Reorganized Debtors, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date. Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control.  For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order.

### 4. Surety Bonds

On the Effective Date, (i) all of the Debtors' obligations and commitments to any surety bond providers shall be deemed reaffirmed by the Reorganized Debtors; (ii) surety bonds and related indemnification and collateral agreements entered into by any Debtor will be vested and performed by the applicable Reorganized Debtor and will survive and remain unaffected by entry of the Confirmation Order; and (iii) the Reorganized Debtors shall be authorized to enter into new surety bond agreements and related indemnification and collateral agreements, or to modify any such existing agreements, in the ordinary course of business.  Without diminution of the foregoing, the applicable Reorganized Debtors will continue to pay all premiums and other amounts due, including loss adjustment expenses, on the existing surety bonds as they become due prior to the release or discharge of such surety bonds. Surety bond providers shall have the discretion to replace (or issue name-change riders with respect to) any existing surety bonds or related general agreements of indemnity with new surety bonds and related general agreements of indemnity on the same terms and conditions provided in the applicable existing surety bonds or related general agreements of indemnity.  Nothing in the Plan or Confirmation Order shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying the rights or obligations of the Debtors or any surety bond provider with respect to any unexpired surety bond agreement or related indemnification or collateral agreement.

### W. *Management Equity Incentive Plan*

On or as soon as reasonably practical following the Effective Date, the Reorganized Hertz Parent Board will adopt and implement the Management Equity Incentive Plan, which shall provide for not less than 5% of Reorganized Hertz Parent Common Interests to be reserved for directors, officers, and employees of the Reorganized Debtors in accordance with the MIP Term Sheet and as otherwise determined by the Reorganized Hertz Parent Board.

### X. *Employee Obligations*

Except as (i) otherwise provided in the Plan or Plan Supplement; (ii) identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (iii) was rejected by the Debtors pursuant to a Bankruptcy Court order; or (iv) is the subject of a motion to reject pending on the date of the Confirmation Hearing, the Reorganized Debtors shall honor the Debtors' Employee Obligations and, to the extent not already satisfied, the Debtors' Employee Obligations shall become obligations of the Reorganized Debtors in accordance with their terms.  To the extent the Employee Obligations are executory contracts and (i)

such executory contracts are not identified on the Rejected Executory Contracts and Unexpired Leases Schedule, (ii) were not previously rejected by a Final Order, pursuant to section 365 and 1123 of the Bankruptcy Code, or (iii) are not the subject of a motion to reject pending on the date of the Confirmation Hearing, each will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof; *provided*, that, the consummation of the Restructuring Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the above-listed written contracts, agreements, policies, programs and plans.  Notwithstanding anything else set forth in this paragraph, the cure provisions of Article V.C hereof shall apply to any Employee Obligation arising from an Executory Contract assumed in accordance with the provisions of Article V hereof.

Notwithstanding anything to the contrary in the foregoing paragraph, the Reorganized Debtors shall assume, continue, and maintain in all respects, and shall not in any way reduce or diminish, the bonus programs approved by the Bankruptcy Court pursuant to the 2020 EIP Order and the 2021 KEIP/EIP Order in accordance with the respective terms of such programs, including by timely paying all awards earned by the participants therein in accordance with the terms thereof.

On the Effective Date, each Employment Agreement will be deemed assumed and shall become obligations of the Reorganized Debtors in accordance with their terms.

Notwithstanding anything to the contrary in this Plan, as of the Effective Date, any provision of an Employee Obligation that provides for equity-based awards, including any termination-related provisions with respect to equity-based awards, shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding anything to the contrary in this Plan, the Reorganized Debtors shall continue and assume the Pension Plans to the extent of their respective obligations under the Pension Plans and applicable law, including, as applicable, (i) the minimum funding standards in 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 and (ii) the premiums under 29 U.S.C. §§ 1306 and 1307.  All Proofs of Claim filed by the PBGC with respect to the Pension Plans shall be deemed withdrawn on the Effective Date.  No provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve the Reorganized Debtors, their successors, or individuals from liabilities or requirements imposed under any law or regulatory provision with respect to the Pension Plans or from claims of the PBGC with respect to the Pension Plans.  The PBGC and the Pension Plans will not be enjoined or precluded from enforcing such liability with respect to the Pension Plans as a result of any provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code.

Notwithstanding anything to the contrary in this Plan, in accordance with section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to honor all retiree benefits, as such term is defined in section 1114(a) of the Bankruptcy Code, as and to the extent required by the agreements giving rise to such obligations.

On the Effective Date, each severance plan of the Debtors in existence immediately prior to the Effective Date, including (i) the Amended and Restated Hertz Global Holdings, Inc. Severance Plan for Senior Executives, and (ii) the Amended and Restated Hertz Global Holdings, Inc. Severance Plan for Vice Presidents, shall be terminated in accordance with its terms.  Entry of the Confirmation Order shall constitute authorization for such termination without further action by any of the Debtors, the Debtors' board of directors or any committee thereof, or any officer or other employee of the Debtors, or any delegee of any of the foregoing.  To the extent any severance plan constitutes an Executory Contract deemed rejected pursuant to Article V.A hereof, termination of such severance plan in accordance with its terms pursuant to this paragraph shall be deemed to have occurred immediately prior to such rejection.

61

Notwithstanding the foregoing, on and subject to the occurrence of the Effective Date, the Reorganized Debtors (a) shall covenant, agree, and undertake, as obligations of the Reorganized Debtors, that in the event that any individual who is part of the Senior Management Group is terminated by the Reorganized Debtors without cause within twelve (12) months following the Effective Date, the Reorganized Debtors shall, within thirty (30) days following such termination, pay such terminated individual a single lump-sum cash payment equal to two (2) times the value of such terminated individual's annual base compensation (i.e., base salary and non-variable benefits) and (b) shall adopt and implement such other plans, policies, or other agreements with respect to employee severance for certain of the Reorganized Debtors' other employees on terms to be determined by the Reorganized Debtors and acceptable to the Plan Sponsors or Reorganized Hertz Parent Board in good faith.

Y.      *Workers' Compensation Programs*

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtors operate or the Debtors previously operated; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance policies and programs.  All Proofs of Claim filed by the Debtors' current or former employees on account of workers' compensation claims shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for herein; provided, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

Z.      *Collective Bargaining Agreements*

On or prior to the Effective Date, and subject to the occurrence of the Effective Date, the Reorganized Debtors shall assume all of the Debtors' unexpired collective bargaining agreements.

AA.     *Plan Support Agreement and Equity Purchase Agreement*

To the extent not previously approved pursuant to an order of the Bankruptcy Court authorizing the Debtors' entry into the Plan Support Agreement and the Equity Purchase Agreement, entry into each of the Plan Support Agreement and the Equity Purchase Agreement shall be authorized by the Bankruptcy Court pursuant to the Confirmation Order, and the Debtors shall continue to perform thereunder and comply therewith in all respects through and including the Effective Date.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that (i) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (ii) have been previously rejected by a Final Order; (iii) have been previously assumed or assumed and assigned by a Final Order; (iv) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; (v) which the Debtors have, as of the Confirmation Date, received authority to reject pursuant to an order of the Bankruptcy Court with the

effective date of such rejection is after the Effective Date; (vi) provide for payment of severance or other benefits to former employees of the Debtors (other than retiree benefits within the meaning of such term in section 1114(a) of the Bankruptcy Code), whether in the form of a plan or individual agreement; and (vii) are solely with a Donlen Debtor, which to the extent not previously assumed by a Final Order shall be deemed to be rejected; provided, that, nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan or agreement referenced in the immediately preceding clauses constitutes an Executory Contract; and provided further, that the Debtors reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause. The terms of any Final Order entered by the Bankruptcy Court prior to the entrance of the Confirmation Order that provide for the assumption and assignment of nonresidential real property shall control over the terms of the Plan and Confirmation Order.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions and rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contracts and Unexpired Leases Schedule, the Collective Bargaining Agreements, and the Rejected Executory Contracts and Unexpired Leases Schedule, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. The Debtors are authorized to abandon any of the Debtors' personal property at or on the leased premises subject to an Unexpired Lease rejected pursuant to the Plan, and the counterparties to rejected leases may dispose of any such personal property remaining at or on the leased premises following the applicable lease rejection date.

Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti-assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Restructuring Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, and (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.7, and such claims may be objected to in accordance with this Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, no later than three (3) Business Days following the Effective Date, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. The Reorganized Debtors may settle any Cure Claim on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the cure amount set forth on the Assumed Executory Contracts or Unexpired Leases Schedule or the Collective Bargaining Agreement Schedule, as applicable, for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or the Reorganized Debtors, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claim, as applicable.

Unless otherwise provided by an order of the Bankruptcy Court, the Debtors shall use reasonable best efforts to file an initial Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule no later than twenty-eight (28) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Plan. Further, the Debtors shall file their list of Assumed Executory Contracts and Unexpired Leases Schedule and Rejected Executory Contracts and Unexpired Leases Schedule no later than fourteen (14) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Plan, which shall supersede the initial schedule if any such initial schedule is filed. The Debtors shall cause all Filed Assumed Executory Contracts and Unexpired Leases Schedules and Rejected Executory Contracts and Unexpired Leases Schedules or notices of proposed assumption, proposed amounts of Cure Claims, and proposed rejections to be served by first class mail on counterparties to Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to the Plan that are identified in such schedule. The Debtors may supplement or modify the Assumed Executory Contract and Unexpired Leases Schedule or Rejected Executory Contracts and Unexpired Leases Schedule up to one (1) Business Day prior to the Confirmation Hearing. Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan

64

must be Filed, served and actually received by the Debtors by the later of (1) the Confirmation Objection Deadline or (2) with respect to any Executory Contract or Unexpired Lease that is added to the Assumed Executory Contract and Unexpired Leases Schedule after the date that is fourteen (14) days prior to the Confirmation Objection Deadline, the date that is fourteen (14) days following the filing of the relevant supplement to the Assumed Executory Contract and Unexpired Leases Schedule.

**Any party that fails to timely object to the assumption of its Executory Contract or Unexpired Lease (including the ability of the applicable Reorganized Debtor or assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claim listed on the Assumed Executory Contracts and Unexpired Leases Schedule or the Collective Bargaining Agreement Schedule as set forth in the paragraph above, shall be (i) deemed to have consented to the assumption of its Executory Contract or Unexpired Lease and to such Cure Claim and (ii) forever barred, estopped, and enjoined from disputing the amount of the Cure Claim set forth on the Assumed Executory Contracts and Unexpired Leases Schedule or the Collective Bargaining Agreement Schedule (including a cure amount of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.**

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claim as set forth in the Plan Supplement, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease; provided, that the Debtors or the Reorganized Debtors, as applicable, will remain obligated to pay any accrued but unbilled amounts under any such assumed Executory Contract or Unexpired Lease to the extent that such unbilled amounts were not due to be billed prior to the date of assumption. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claim.

D.    *Assumption Dispute Resolution*

In the event of a timely Filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "**Assumption Dispute**") shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided, that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (the "**Adjourned Cure Dispute**").

E.      *Indemnification Obligations*

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, unless such obligation (i) was rejected by the Debtors pursuant to a Final Order or (ii) is the subject of a motion to reject that is pending as of the date of the Confirmation Hearing.  Each Indemnification Obligation shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

F.      *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, and not assigned to a non-Debtor Entity, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of its operations.  Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

G.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

H.      *Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Assumed Executory Contracts and Unexpired Leases Schedule or the Rejected Executory Contracts and Unexpired Leases Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.  For the avoidance of doubt, the Debtors reserve all rights with respect to any Causes of Action or other right with respect to any Executory Contract or Unexpired Lease.

66

I.      *Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)*

If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Initial Distribution Date (or, if a Claim is not an Allowed Claim on the Initial Distribution Date, on the next Quarterly Distribution Date following the date that such Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter), the Distribution Agent shall make initial distributions under the Plan on account of each Holder of an Allowed Claim in the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in <u>Article VII.</u>  Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Special Rules for Distributions to Holders of Disputed Claims and Interests*

Except as otherwise agreed by the Debtors and the Reorganized Debtors with respect to Allowed General Unsecured Claims or as otherwise agreed by the Debtors or the Reorganized Debtors (i) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (ii) other than a Holder of a Claim in Class 7, any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on account of the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or the Disputed Claims have been Allowed or expunged.  Any dividends or other distributions arising from property distributed to Holders of Allowed Claims in a Class and paid to such Holders under the Plan shall also be paid, in the applicable amounts, to any Holder of a Disputed Claim in such Class that becomes an Allowed Claim after the date or dates that such dividends or other distributions were earlier paid to Holders of Allowed Claims in such Class.

C.      *Rights and Powers of Distribution Agent*

1.      <u>Rights and Powers of the Distribution Agent</u>

Except as otherwise agreed by the Debtors and the Reorganized Debtors, the Distribution Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all distributions contemplated hereby, including, subject to the express written consent and direction of the Second Lien Note Trustee and with the cooperation of the Second Lien Note Trustee, distributions on account of the Second Lien Note Claims, subject in all respects to the right of the Second Lien Note Trustee Charging Lien against such distributions; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  The Distribution Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy

67

Code for all returns filed for or on behalf of any creditor pools created hereunder for all taxable periods through the date on which final distributions are made.

2.      Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Distribution Agent on or after the Effective Date (including any taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Distribution Agent may be paid in Cash by the Reorganized Debtors.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall be authorized and entitled, but not required, to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  For the avoidance of doubt, the Distribution Record Date shall not apply to the First Lien Claims, Second Lien Note Claims, Unsecured Funded Debt Claims, and HHN Notes Guarantee Claims, the Holders of which shall receive a distribution in accordance with this Article VI and, as applicable, the customary procedures of DTC or Euroclear, as applicable, on or as soon as practicable after the Effective Date.

2.      Delivery of Distributions

a.      Quarterly Distribution Date

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, but in any event, no later than thirty (30) days after each Quarterly Distribution Date, the Distribution Agent shall make the distributions required to be made on account of Allowed Claims under the Plan on such date. No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.A.

b.      Delivery of Distributions On Account of First Lien Claims

All distributions to Holders of First Lien Claims shall be deemed completed when made to (or at the direction of) the First Lien Agent, which shall be deemed to be the Holder of all First Lien Claims for purposes of distributions to be made hereunder.  As soon as practicable in accordance with the requirements set forth in this Article VI, the First Lien Agent shall cause such distributions to be made to or on behalf of such Holders in accordance with the First Lien Credit Agreement.  If the First Lien Agent is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the First Lien Agent's cooperation, shall make such distributions to the extent practicable to do so.  The First Lien Agent shall have no duties or responsibilities relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a First Lien Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.

c.      Delivery of Distributions on Account of Second Lien Note Claims

All distributions made under the Plan on account of the Allowed Claims of the Holders of Second Lien Note Claims shall be made to or at the direction of the Second Lien Note Trustee for further distribution to the Holders of Allowed Claims under the terms of the Second Lien Note Indenture, including those provisions relating to the surrender and cancellation of the Second Lien Notes.

68

All distributions to Holders of Second Lien Note Claims shall be deemed completed when made to (or at the direction of) the Second Lien Note Trustee, which shall be deemed to be the Holder of all Second Lien Note Claims for purposes of distributions to be made hereunder, and the Second Lien Note Trustee shall hold or direct such distributions for the benefit of the Holders of Second Lien Note Claims. As soon as practicable in accordance with the requirements set forth in this Article VI, the Second Lien Note Trustee shall arrange to deliver such distributions to be made to or on behalf of such Holders in accordance with the Second Lien Note Indenture. The Second Lien Note Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of the Second Lien Note Claims, to the extent consistent with the customary practices of DTC. For the avoidance of doubt, such distributions shall be subject to the Second Lien Note Trustee Charging Liens. If the Second Lien Note Trustee is unable to make, or consents to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the Second Lien Note Trustee's cooperation, shall make such distributions to the extent practicable to do so. The Second Lien Note Trustee shall have no duties or responsibilities relating to any form of distribution that is not DTC eligible and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a Second Lien Note Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Second Lien Note Trustee shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

Regardless of whether distributions to Holders of Second Lien Note Claims are made by the Second Lien Note Trustee, or by the Distribution Agent at the reasonable direction of the Second Lien Note Trustee, the Second Lien Note Trustee Charging Lien shall attach to such distributions in the same manner as if such distributions were made through the Second Lien Note Trustee.

d.      Delivery of Distributions on Account of Unsecured Notes Claims

(i)      All distributions to Holders of 5.500% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 5.500% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 5.500% Unsecured Notes Claims for purposes of distributions to be made hereunder; provided that non-Cash consideration shall not be distributed in the name of the 5.500% Unsecured Notes Trustee. As soon as practicable in accordance with the requirements set forth in this Article VI, the 5.500% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 5.500% Unsecured Notes Indenture.

(ii)      All distributions to Holders of 6.000% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 6.000% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 6.000% Unsecured Notes Claims for purposes of distributions to be made hereunder; provided that non-Cash consideration shall not be distributed in the name of the 6.000% Unsecured Notes Trustee. As soon as practicable in accordance with the requirements set forth in this Article VI, the 6.000% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 6.000% Unsecured Notes Indenture.

(iii)      All distributions to Holders of 6.250% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 6.250% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 6.250% Unsecured Notes Claims for purposes of distributions to be made hereunder; provided that non-Cash consideration shall not be distributed in the name of the 6.250% Unsecured Notes Trustee. As soon as practicable in accordance with the requirements set forth in this Article VI the 6.250% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 6.250% Unsecured Notes Indenture.

69

(iv)    All distributions to Holders of 7.125% Unsecured Notes Claims shall be deemed completed when made to (or at the direction of) the 7.125% Unsecured Notes Trustee, which shall be deemed to be the Holder of all 7.125% Unsecured Notes Claims for purposes of distributions to be made hereunder; provided that non-Cash consideration shall not be distributed in the name of the 7.125% Unsecured Notes Trustee. As soon as practicable in accordance with the requirements set forth in this Article VI, the 7.125% Unsecured Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 7.125% Unsecured Notes Indenture.

(v)    If any of the applicable Unsecured Notes Trustees are unable to make, or consent to the Reorganized Debtors making, such distributions, the Reorganized Debtors, with the cooperation of the applicable Unsecured Notes Trustee shall make such distributions to the extent practicable to do so. The Unsecured Notes Trustees shall have no duties or responsibilities relating to any form of distribution that is not DTC eligible. The Unsecured Notes Trustees, and the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of a Unsecured Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Unsecured Notes Trustees may transfer or direct the transfer of such distributions directly through facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of Unsecured Note Claims to the extent consistent with the customary practices of DTC.

e.    Delivery of Distributions on Account of 7.000% Unsecured Promissory Notes Claims

All distributions to Holders of 7.000% Unsecured Promissory Notes Claims shall be deemed completed when made to (or at the direction of) the 7.000% Unsecured Promissory Notes Trustee, which shall be deemed to be the Holder of all 7.000% Unsecured Promissory Notes Claims for purposes of distributions to be made hereunder. As soon as practicable in accordance with the requirements set forth in this Article VI, the 7.000% Unsecured Promissory Notes Trustee shall cause such distributions to or on behalf of such Holders to be made in accordance with the 7.000% Unsecured Promissory Notes Indenture.

f.    Delivery of Distributions on Account of the HHN Notes Guarantee Claims

All distributions made under the Plan on account of the Allowed HHN Notes Guarantee Claims shall be made as directed by the Plan for further distribution to Holders of Allowed Claims under the HHN Notes Indentures, including those provisions relating to the surrender and cancellation of the HHN Notes. If the record Holder of any of the HHN Notes is Euroclear or its nominees or another securities depository or custodian thereof, and such HHN Notes are represented by a global security held by or on behalf of Euroclear or such other securities depository or custodian, then each such Holder of the HHN Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by Eurcoclear or such other securities depository or custodian thereof.

All distributions to Holders of HHN Notes Guarantee Claims shall be deemed completed when made to (or at the direction of) the HHN Notes Paying Agent in accordance with the HHN Notes Documents, who shall be deemed to be the Holder of all HHN Notes and HHN Notes Guarantee Claims for purposes of distributions to be made hereunder. As soon as practicable in accordance with the requirements set forth in this Article VI, the HHN Notes Paying Agent shall cause such distributions to or on behalf of such Holders to be made in accordance with the HHN Notes Indentures.

If the HHN Notes Paying Agent is unable to make, or consent to the Reorganized Debtors or HHN making, such distributions, the Reorganized Debtors or HHN, with the cooperation of the HHN Notes

Paying Agent shall make such distributions to the extent practicable to do so.  The HHN Notes Paying Agent shall have no duties or responsibilities relating to any form of distribution that is not Euroclear eligible.  The HHN Notes Paying Agent, and the Debtors, the Reorganized Debtors or HHN, as applicable, shall seek the cooperation of Euroclear so that any distribution on account of HHN Notes Guarantee Claims or Claims against HHN that is held in the name of, or by a nominee of, Euroclear, shall be made through the facilities of Euroclear on the Effective Date or as soon as practicable thereafter. The HHN Notes Paying Agent may transfer or direct the transfer of such distributions directly through facilities of Euroclear (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of HHN Notes Guarantee Claims to the extent consistent with the customary practices of Euroclear.  For the avoidance of doubt, such distributions shall be subject to the HHN Notes Trustee Charging Lien as set forth in the HHN Notes Indenture.  Regardless of the fact that distributions to Holders of HHN Notes Guarantee Claims are made by the HHN Notes Paying Agent, the HHN Notes Trustee Charging Lien shall attach to such distributions in the same manner as if such distributions were made through the HHN Notes Trustee.  Neither the HHN Notes Trustee nor the HHN Notes Paying Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

g.      Delivery of Distributions on Account of ALOC Facility Claims

All distributions to Holders of ALOC Facility Claims shall be deemed completed when made to (or at the direction of) the ALOC Facility Agent, which shall be deemed to be the Holder of all ALOC Facility Claims for purposes of distributions to be made hereunder; provided, that non-Cash consideration shall not be distributed in the name of the ALOC Facility Agent.  As soon as practicable in accordance with the requirements set forth in this Article VI, the ALOC Facility Agent shall cause such distributions to or on behalf of such Holders to be made in accordance with ALOC Facility Documents.

h.      Delivery of Distributions on Account of Allowed General Unsecured Claims

The Distribution Agent shall make distributions to Holders of Allowed General Unsecured Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records as of the date of any such distribution; provided, that the address for each Holder of an Allowed General Unsecured Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder or the address provided to the Distribution Agent by the Holder in writing after the Effective Date, or, if no Proof of Claim has been Filed, the address set forth in the Schedules.  If a Holder holds more than one General Unsecured Claim, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

3.      No Fractional Shares, Subscription Rights, or New Warrants

No fractional Subscription Rights, shares of Reorganized Hertz Parent Common Interests or Preferred Stock, or New Warrants shall be distributed, and no Cash shall be distributed in lieu of such fractional shares or rights. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of Subscription Rights, Reorganized Hertz Parent Common Interests, Preferred Stock, or New Warrants that are not a whole number, such shares or rights, as applicable, shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number, and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of Subscription Rights, Reorganized Hertz Parent Common Interests, Preferred Stock, and New Warrants in each case, to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

4. <u>Minimum Distribution.</u>

No Cash payment of less than $50.00 shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

5. <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; <u>provided</u>, <u>that</u> such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the time of such distribution. After such date, all unclaimed property or interests in property shall be property of the Reorganized Debtors, notwithstanding any applicable federal, provincial, state, or other jurisdiction's escheat, abandoned, or unclaimed property laws to the contrary, and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred. For the avoidance of doubt, any unclaimed property or interests in property with respect to General Unsecured Claims shall be returned to the Reorganized Debtors.

Notwithstanding anything set forth in this <u>Article VI.D.5</u>, any unclaimed or undeliverable distribution of New Warrants or any portion thereof shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable or such distribution is deemed unclaimed property pursuant to this <u>Article VI.D.5</u>. To the extent an unclaimed or undeliverable distribution is New Warrants, such New Warrants shall be deemed cancelled. Upon such cancellation, the Interest of any Holder of Class 11 Interests or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal, provincial, state, or other jurisdiction's escheat, abandoned, or unclaimed property laws to the contrary

A distribution shall be deemed unclaimed if a Holder has not (i) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (ii) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (iii) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (iv) taken any other action necessary to facilitate such distribution.

E. *Securities Registration Exemption*

The New Warrants issued under the Plan and the New Warrants Agreement (and shares of Reorganized Hertz Parent Common Interests issuable upon the valid exercise of the New Warrants) will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. Shares of Reorganized Hertz Parent Common Interests and New Warrants (and shares of Reorganized Hertz Parent Common Interests issuable upon the valid exercise of the New Warrants) issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable federal, state, or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. The Reorganized Hertz Parent Common Interests and New Warrants (and shares of Reorganized Hertz Parent Common Interests issuable upon the valid exercise of the New Warrants) issued pursuant to section 1145 of the Bankruptcy Code (i) will not be a "restricted security" as defined in Rule 144(a)(3) under the Securities Act; and (ii) will, subject to the Reorganized Hertz Parent Organizational Documents, and with respect to the New Warrants, the New Warrants Agreement, be freely tradable and transferable by any holder thereof that (a) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, (c) has not acquired the Reorganized Hertz Parent Common Interests or New Warrants from an "affiliate"

within one year of such transfer, and (d) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

The issuance and sale, as applicable, of the Reorganized Hertz Parent Common Interests and Preferred Stock issued to the Equity Commitment Parties, Eligible Unsecured Funded Debt Holders, and Eligible Existing Hertz Shareholders are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D thereunder.  Such Securities will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws.  Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The Reorganized Hertz Parent Common Interests, Preferred Stock, and New Warrants may be made eligible for clearance and trading through the book entry facilities of DTC, subject to restrictions on transfer, including any restrictions under the applicable nonbankruptcy law, on or as promptly as practicable after the Effective Date, and the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of the Reorganized Hertz Parent Common Interests, the Preferred Stock, or New Warrants, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the Reorganized Hertz Parent Common Interests, Preferred Stock, or New Warrants are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Reorganized Hertz Parent Common Interest, the Preferred Stock, the New Warrants or shares of Reorganized Hertz Parent Common Interests issuable upon the valid conversion or exercise, as applicable, of the foregoing are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

F.    *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, Reorganized Hertz Parent, the other Reorganized Debtors, and the Distribution Agent, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made

under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

The Reorganized Debtors and the Distribution Agent may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim provide any information necessary to allow the distributing party to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority. If the Reorganized Debtors or the Distribution Agent make such a request and the holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtors and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

G.    *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest to the extent Allowed herein.

H.    *No Postpetition or Default Interest on Claims*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition and default interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

I.    *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors, the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim they may have against the Holder of such Claim. In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless (i) the Debtors have consented; and (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding anything set forth in this paragraph, any set off right with respect to an assumed Executory Contract or Unexpired Lease shall be governed by applicable non-bankruptcy law, including the terms of such assumed Executory Contract or Unexpired Lease.

J.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

A Claim shall be reduced in full, and such Claim shall be Disallowed without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall repay, return or deliver any distribution held by or transferred

74

to the Holder to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.    Claims Payable by Insurers

Distributions under the Plan to each holder of an Allowed Insured Claim against any Debtor shall be made in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified; except, that there shall be deducted from any distribution under the Plan on account of an Insured Claim, for purposes of calculating the Allowed amount of such Claim, the amount of any insurance proceeds actually received by such holder in respect of such Allowed Insured Claim. Nothing in this Section VI.K.2 shall constitute a waiver of any Claim, right, or Cause of Action the Debtors or their Estates may hold against any Person, including any Insurer. Pursuant to section 524(e) of the Bankruptcy Code, nothing in the Plan shall release or discharge (i) any Insurer from any obligations to any Person under applicable law or (ii) any Insurance Policies or any rights to pursue and receive any recovery from an Insurer under the Insurance Policies.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions under the Plan to Holders of Allowed Claims and/or payments by Insurers of Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any rights or defenses, including coverage defenses, held by such Insurers.

4.    Chubb Insurance Contracts

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, Plan Supplement, the Plan Support Agreement, the Confirmation Order, any agreement or order related to post-petition or exit financing, any bar date notice or claim objection, any document related to the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, confers Bankruptcy Court jurisdiction, grants an injunction, discharge or release, or requires a party to opt out of or object to any releases):

(a) nothing alters, modifies or otherwise amends the terms and conditions of the Insurance Program (including any agreement to arbitrate disputes and any provisions regarding the provision, maintenance, use, nature and priority of the Chubb Collateral), except that on and after the Effective Date, the Reorganized Debtors jointly and severally shall assume the Insurance Program in its entirety pursuant to sections 105 and 365 of the Bankruptcy Code;

(b) nothing releases or discharges (i) Chubb's security interests and liens on the Chubb Collateral and (ii) the claims of the Chubb Companies arising from or pursuant to the Insurance Program and such claims are actual and necessary expenses of the Debtors' estates (or the Reorganized Debtors, as applicable) and shall be paid in full in the ordinary course of business, whether as an Allowed Administrative Claim under section 503(b)(1)(A) of the Bankruptcy Code or otherwise, regardless of when such amounts are or shall become liquidated, due or paid, without the need or requirement for Chubb to file or serve a request, motion, or application for payment of or proof of any Proof of Claim, Cure Claim (or any objection to cure amounts/notices), or Administrative Claim (and further and for the avoidance of doubt, any Claims Bar Date or Administrative Claims Bar Date shall not be applicable to the Chubb Companies);

75

(c) the Debtors or the Reorganized Debtors, as applicable shall not sell, assign, or otherwise transfer the Insurance Program (or the proceeds thereof), including, but not limited to, under section 363 of the Bankruptcy Code except with the express written permission of the Chubb Companies; and

(d) the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit:  (I) claimants with valid workers' compensation claims or direct action claims against the Chubb Companies under applicable non-bankruptcy law to proceed with their claims; (II) the Chubb Companies to administer, handle, defend, settle, and/or pay, in the  ordinary course of business and without further order of the Bankruptcy Court, (A) all workers' compensation claims covered by the Insurance Program, (B) all claims where a claimant asserts a direct claim against the Chubb Companies under applicable law, or an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Article VIII of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) the Chubb Companies to draw against any or all of the Chubb Collateral and to hold the proceeds thereof as security for the obligations of the Debtors (and the Reorganized Debtors, as applicable) to the Chubb Companies and/or apply such proceeds to the obligations of the Debtors (and the Reorganized Debtors, as applicable) under the applicable Insurance Program, in such order as the Chubb Companies may determine; and (IV) subject to the terms of the Insurance Program and/or applicable non-bankruptcy law, the Chubb Companies to (i) cancel any policies under the Insurance Program, and (ii) take other actions relating to the Insurance Program (including effectuating a setoff), to the extent permissible under applicable non-bankruptcy law, each in accordance with the terms of the Insurance Program.

Terms used in this Article VI.J.4, but not defined in the Plan shall have the meaning attributed to them in that certain *Order (I) Authorizing Assumption of the Insurance Program, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* entered by the Bankruptcy Court on August 5, 2020 [Docket No. 898]; for the avoidance of doubt, (i) the term Insurance Program includes, but is not limited to, the Insurance Policies issued or entered into by any of the Chubb Companies; and (ii) the term Insurers shall include the Chubb Companies.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses that the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim.

B.      *Claims and Interests Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors and the Distribution Agent shall have the authority (i) to File, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such

settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to Article IV.U.

C.       *ADR Procedures*

Designated Claims shall be subject to and resolved in accordance with the ADR Procedures, incorporated herein by reference.  If the ADR Procedures are terminated with respect to a Designated Claim, the Reorganized Debtors, or the Distribution Agent, as applicable, shall have until the Claims Objection Deadline or, if the Claims Objection Deadline has passed, one hundred and eighty (180) days from the date of termination of the ADR Procedures with respect to such Claim to file and serve an objection to such Claim.

D.       *Estimation of Claims*

Before or after the Effective Date, except as otherwise set forth in the ADR Procedures, the Debtors (in consultation with the Plan Sponsors), the Distribution Agent, or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection; provided, that, for the avoidance of doubt, no Claim or Interest Allowed under this Plan shall be considered a Disputed Claim or Disputed Interest.  In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors, or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

If the Debtors determine, in their reasonable discretion and in consultation with the Plan Sponsors, that (i) one or more Disputed General Unsecured Claims are capable of estimation by the Bankruptcy Court, (ii) estimation will materially improve Effective Date distributions to Holders of Allowed General Unsecured Claims, (iii) administration of the ADR Procedures with respect to such claims is not reasonably likely to lead to an efficient and successful resolution of such Claim, and (iv) estimation is otherwise in the best interests of the Estates, the Debtors shall file one or more motions to estimate such Disputed General Unsecured Claims, which motion(s) shall be filed and noticed to be heard by the Bankruptcy Court before the Effective Date (or such other date as determined by the Bankruptcy Court).

E.       *Adjustment to Claims Register Without Objection*

Any duplicate Claim or Interest, any Claim (filed or scheduled) or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims

77

Register by the Debtors or the Reorganized Debtors, as applicable, upon stipulation or any agreement in writing, including, without limitation, email correspondence, between the parties in interest without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

F.      *Time to File Objections to Claims*

Any objections to a Claim shall be Filed on or before the Claims Objection Deadline, as such deadline may be extended from time to time.

G.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

All Proofs of Claim Filed on account of an Employee Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such Obligation, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or otherwise agreed by the Debtors or the Reorganized Debtors, any and all Proofs of Claim Filed after the applicable Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless the Bankruptcy Court shall have determined by a Final Order, on or before the Confirmation Hearing, that cause exists to extend the Claims Bar Date as to such Proof of Claim on the basis of excusable neglect.**

H.      *Amendments to Proofs of Claim*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Proof of Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim or Proof of Claim Filed after the Effective Date shall be deemed Disallowed in full and expunged without any further action or notice to the Bankruptcy Court; provided, that the filing of an unauthorized amendment shall not affect the underlying Claim or Proof of Claim.  Nothing in this paragraph shall remove any claimant's ability to seek leave from the Bankruptcy Court to amend a Claim or Proof of Claim.

I.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent such Claim is contingent as of the time of allowance or disallowance, such Claim shall be  forever Disallowed and expunged notwithstanding

78

section 502(j) of the Bankruptcy Code, unless before the Confirmation Date: (i) such Claim has been adjudicated as non-contingent; or (ii) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim is no longer contingent.

J.       *No Distributions Pending Allowance*

Except as otherwise set forth herein, if (i) an objection to a Claim or portion thereof is Filed or (ii) the Claim has elected to participate in the ADR Procedures, no payment or distribution provided under the Plan shall be made on account of such Disputed Claims or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

K.       *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date.

L.       *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and, other than with respect to General Unsecured Claims, such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one hundred (100) percent of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.       *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

79

B.      *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any Claims for withdrawal liability that relate to services performed by employees of the Debtors before the Effective Date or that arise from a termination of employment, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept the Plan.  Any default or "*event of default*" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Effective Date, the Debtors and their Estates, the Reorganized Debtors and each of their respective current and former Affiliates (with respect to non-Debtors, to the extent permitted by applicable law), on behalf of themselves and their respective Estates, including, without limitation, any successor to the Debtors or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, DIP Financing, Equity Commitment, Interim Fleet Financing Facility, DFLF Facility, Canada Fleet Financing Facility, HVF Facility Documents, HVF II Facility, HVF II Facility Documents, Donlen Sale, HHN Restructuring, HIL Facility, the Commitment Letter, the Donlen Canada Securitization Facility, the Australian Securitization Facility, the Lombard Vehicle Financing Facility, the Second Lien Note Documents, the formulation, preparation, dissemination, negotiation of the Plan, the Disclosure Statement, the Plan Support Agreement, the Equity Commitment Documents, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the**

releases set forth in this <u>Article VIII.C</u> shall not release (i) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, or (ii) any post-Effective Date obligations of any party or Entity under the Plan, the Definitive Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

D.      *Releases by Holders of Claims and Interests*

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, DIP Financing, Equity Commitment, Interim Fleet Financing Facility, DFLF Facility, Canada Fleet Financing Facility, HVF Facility Documents, HVF II Facility, HVF II Facility Documents, Donlen Sale, HHN Restructuring, HIL Facility, the Commitment Letter, the Donlen Canada Securitization Facility, the Australian Securitization Facility, the Lombard Vehicle Financing Facility, the Second Lien Note Documents, the formulation, preparation, dissemination, or negotiation of the Plan, the Disclosure Statement, the Plan Support Agreement, the Equity Commitment Documents, any Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing,  the releases set forth in this <u>Article VIII.D</u> shall not be construed as (i) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, (ii) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Definitive Documents, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (iii) except as set forth in this Plan, releasing any obligation of HHN, HUK, or any of HHN's non-Debtor subsidiaries under the HHN Notes Documents.

E.      *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission from the Petition Date to the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, in whole or in part, the Debtors, DIP Financing, Equity Commitment, Interim Fleet Financing Facility, DFLF Facility, Canada Fleet Financing Facility, HVF II Facility, Donlen Sale, HHN Restructuring, HIL Facility, the Donlen Canada Securitization Facility, the Australian Securitization Facility, the Lombard Vehicle Financing Facility, the formulation, preparation, dissemination, negotiation, of the Plan, the Disclosure Statement, the Plan Support Agreement, the Equity Commitment Documents, any

81

**Definitive Document, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties have, and upon Consummation of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

F.      *Injunction*

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR DISTRIBUTIONS REQUIRED TO BE PAID OR DELIVERED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII.C OR ARTICLE VIII.D, SHALL BE DISCHARGED PURSUANT TO ARTICLE VIII.B OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII.E, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO ARTICLE VIII.E WITH RESPECT TO THE EXCULPATED PARTIES): (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT IN ACCORDANCE WITH THE TERMS OF THIS PLAN EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.**

82

G.    *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, any of the intercreditor agreements with respect to the Prepetition Debt Documents or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan.  Nothing in the Plan shall release or otherwise impair any subordination agreement between creditors, including the First Lien Agent's rights to enforce any subordination agreement against the Second Lien Note Trustee pursuant to Bankruptcy Code section 510 or any such subordination agreement and the rights and defenses of the Second Lien Note Trustee related to any such enforcement.

H.    *Release of Liens*

Except (i) with respect to the Liens securing (a) the New Reorganized Corporate Debt, and (b) to the extent elected by the Debtors with respect to an Allowed Other Secured Claim in accordance with Article III.B.2; or (ii) as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and the holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or occur in conjunction with the occurrence of the Effective Date (or shall be waived pursuant to Article IX.B):

1.    the Bankruptcy Court shall have entered the Disclosure Statement Order and approved the Rights Offering Procedures, solicitation procedures, and other materials related to the Plan, in form and substance consistent with the Plan Support Agreement and the Equity Commitment Documents and otherwise reasonably acceptable to the Debtors and the Plan Sponsors;

2.    the Bankruptcy Court shall have entered the ECA Approval Order, which order shall not have been stayed pending appeal, in form and substance consistent with the Equity Commitment Documents and otherwise reasonably acceptable to the Plan Sponsors;

3.    the Equity Commitment Documents shall have been executed and delivered by each Entity party thereto and shall remain in full force and effect, all conditions shall have been satisfied thereunder or waived by the parties to the Equity Commitment Agreement, and there shall be no breach that would give rise to the right to terminate the Equity Commitment Agreement for which notice has been given in accordance with the terms thereof, and, contemporaneously with the occurrence of the Effective Date, the Debtors shall have issued the Reorganized Hertz Parent Common Interests and Preferred Stock to the Equity Commitment Parties;

83

4.      the Bankruptcy Court shall have entered the Confirmation Order, in form and substance materially consistent with the Plan and otherwise reasonably acceptable to the Debtors and the Plan Sponsors and such order shall not have been stayed pending appeal;

5.      the Plan Support Agreement shall be in full force and effect with respect to the Debtors and the Plan Sponsors;

6.      the Definitive Documents shall contain terms and conditions consistent in all material respects with the Plan, the Equity Commitment Documents, and the Plan Support Agreement or otherwise acceptable to the Debtors and the Plan Sponsors;

7.      each of the Equity Commitment Parties, or its respective affiliates or related funds, (or their replacements consistent with the terms of the Equity Commitment Documents) shall have purchased its respective allocation of the Preferred Stock and Reorganized Hertz Parent Common Interests consistent with the terms of the Equity Commitment Documents;

8.      the Rights Offering, conducted in accordance with the Rights Offering Procedures, shall have been consummated;

9.      the Equity Commitment Parties shall have purchased the Unsubscribed Shares, if any;

10.     the Professional Fee Escrow shall have been established and funded in Cash in accordance with Article II.E.3;

11.     the Transaction Expenses, then known or submitted to the Debtors shall have been paid in full in Cash through and including the Effective Date;

12.     the Debtors shall have caused HVF II to pay the then-outstanding HVF II Obligations in full in Cash in the sequence set forth in the HVF II Refinancing Steps Document;

13.     the HVF III Documents shall have been executed and delivered by each Entity party thereto and shall be effective;

14.     the conditions precedent to the entry into the HVF III Documents shall have been satisfied, waived, or shall be contemporaneously with the occurrence of the Effective Date;

15.     the Exit Facility Documents shall have been executed and delivered by each Entity party thereto and shall be effective;

16.     the conditions precedent to entry into the New Reorganized Corporate Debt shall have been satisfied, waived, or shall be satisfied contemporaneously with the occurrence of the Effective Date;

17.     the Debtors shall have obtained the Tail D&O Policy;

18.     the Debtors shall have designated a portion of the New Money Investment to be used for the purpose of paying all obligations under the HIL Facility in full in Cash in accordance with the terms thereof; and

84

19.     all conditions precedent to the issuance of the Reorganized Hertz Parent Common Interests and Preferred Stock, other than any conditions related to the occurrence of the Effective Date, shall have occurred.

B.     *Waiver of Conditions*

The conditions to the Effective Date of the Plan set forth in this Article IX may be waived only if waived in writing by the Debtors, the Plan Sponsors and, to the extent such conditions relate to a Consenting Investor Provision, the Requisite Consenting Investors, except that Article IX.A.3, IX.A.7, IX.A.8, and IX.A.9, may be waived solely by (i) the Debtors or (ii) the Plan Sponsors and, to the extent such conditions relate to a Consenting Investor Provision, the Requisite Consenting Investors, as applicable, if the reason for the failure of such conditions is the result in whole or in part of a breach of the Equity Commitment Parties or the Debtors, as applicable, of their obligations, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan, subject to the terms of the Bankruptcy Code and the Bankruptcy Rules.

C.     *Substantial Consummation*

"Substantial consummation" of the Plan, as defined by section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

D.     *Committee Complaint*

Upon entry of the Confirmation Order, the Committee Complaint shall be held in abeyance and all deadlines and hearings in respect thereof shall be tolled *sine die* pending the Effective Date.  The tolling of all deadlines and hearings set out in the preceding sentence shall apply to any and all pending and contemplated actions involving Released Parties and Releasing Parties that would otherwise be released pursuant to the Plan on the Effective Date.

Upon the occurrence of the Effective Date, the Committee Complaint shall be deemed voluntarily dismissed with prejudice and notice of said dismissal shall be filed on the docket of the adversary proceeding related thereto.

E.     *Bifurcation Motion*

The Bifurcation Motion shall be held in abeyance and all deadlines and hearings in respect thereof shall be tolled *sine die* pending the Effective Date.  The tolling of all deadlines and hearings set out in the preceding sentence shall apply to any and all pending and contemplated actions involving Released Parties and Releasing Parties that would otherwise be released pursuant to the Plan on the Effective Date.

Nothing herein shall prevent the Debtors from withdrawing the Bifurcation Motion at any time. Upon the occurrence of the Effective Date, the Bifurcation Motion shall be deemed voluntarily dismissed with prejudice and notice of said dismissal shall be filed on the docket in the Chapter 11 Cases.

F.     *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (ii) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.      *Modification and Amendments*

Subject to the consent of the Plan Sponsors and any other applicable consent rights set forth in the Plan Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan. Subject to the consent of the Plan Sponsors and any other applicable consent rights set forth in the Plan Support Agreement and subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. The Debtors have the right to amend the treatment of any Class under the Plan other than Class 7 General Unsecured Claims as permitted by the Bankruptcy Code and Bankruptcy Rules; provided, that any such amendment shall not adversely affect in any way the recovery to the Class 7 General Unsecured Claims.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Effect of Confirmation*

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued on the Confirmation Date the findings of fact and conclusions of law as though made after due deliberation and upon the record at the Confirmation Hearing. Upon entry of the Confirmation Order, any and all findings of fact in the Plan shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if stated as findings of fact.

D.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, in accordance with the preceding sentence, or if Confirmation and Consummation do not occur, then (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests, (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or the non-Debtor subsidiaries, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the non-Debtor subsidiaries.

86

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or Allowance of Claims or Interests; provided that, for the avoidance of doubt, the Bankruptcy Court's retention of jurisdiction with respect to such matters shall not preclude the Debtors or the Reorganized Debtors, as applicable, from seeking relief from any other court, tribunal, or other legal forum of competent jurisdiction with respect to such matters;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to (i) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (ii) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, the schedule of Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to Article V; and (iii) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      adjudicate controversies, if any, with respect to distributions to Holders of Allowed Claims;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J.1;

14.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

20.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the release or exculpation provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

22.     enforce all orders previously entered by the Bankruptcy Court;

23.     hear any other matter not inconsistent with the Bankruptcy Code;

24.     enter an order concluding or closing the Chapter 11 Cases; and

25.     enforce the compromise, settlement, injunction, release, and exculpation provisions set forth in Article VIII.

Notwithstanding the foregoing, the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement or other Definitive Documents that have a jurisdictional,

forum selection, or dispute resolution clause that requires actions to be brought in a court other than the Bankruptcy Court and any disputes concerning documents contained in the Plan Supplement or any Definitive Document that contain such clauses shall be governed in accordance with the provisions of such documents.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, on the Effective Date, upon the effectiveness of the Plan, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors. All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees*

All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date.  On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees in full in Cash when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to File a Proof of Claim or any other request for payment of quarterly fees.

D.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order in accordance with Article IX.A hereof.  Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.      *Transaction Expenses*

The Transaction Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid prior to or during the course of the Chapter 11 Cases) pursuant to the terms of the Equity Commitment Agreement without any requirement: (i) to file a fee application with the Bankruptcy Court; (ii) for review or approval by the Bankruptcy Court or any other party (other than the Debtors); (iii) to comply with any guidelines of the U.S. Trustee; or (iv) to provide itemized time detail; provided, that the applicable advisors will provide additional detail as reasonably requested by the Debtors.   All Transaction Expenses to be paid on the Effective Date shall be estimated as of the Effective Date and summary invoices evidencing such amounts shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; provided that any estimates provided shall not be considered an admission or limitation with respect to such Transaction Expenses.   The Transaction Expenses are Allowed in full as Administrative Claims and shall not be subject to the Administrative Claims Bar Date.

On the Effective Date, the Debtors shall pay in full and in Cash the Unsecured Notes Trustees' Fees and the 7.000% Unsecured Promissory Notes Trustee's Fees.[3]

F.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

Debtors                                     Hertz Global Holdings, Inc.
                                            8501 Williams Road
                                            Estero, Florida 33982
                                            Attn.: M. David Galainena
                                            dave.galainena@hertz.com

                                            with copies to:

Counsel to Debtors                          White & Case LLP
                                            Southeast Financial Center
                                            200 South Biscayne Boulevard, Suite 4900
                                            Miami, Florida 33131
                                            Attn.: Thomas E Lauria; Matthew Brown
                                            tlauria@whitecase.com
                                            mbrown@whitecase.com

---

[3]      Notwithstanding anything to the contrary herein, to the extent not paid as Transaction Expenses, (a) the 7.000% Unsecured Promissory Notes Trustee reserves all rights to seek payment of the 7.000% Unsecured Promissory Notes Trustee's Fees as a General Unsecured Claims or other Claim, and (b) the Unsecured Notes Trustees reserve all rights to seek payment of the Unsecured Notes' Trustees' Fees as a Class 5 Claim or other Claim.

|  | - and - |
|--|--|
|  | White & Case LLP<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Attn: David Turetsky<br>david.turetsky@whitecase.com |
|  | - and - |
|  | Richards, Layton & Finger, PA<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801<br>Attn: John Knight; Brett M. Haywood<br>knight@rlf.com<br>haywood@rlf.com |
| Counsel to Certares, Knighthead, and Amarillo | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn: Stephen E. Hessler, P.C.<br>shessler@kirkland.com |
|  | - and - |
|  | Kirkland & Ellis LLP<br>300 N LaSalle Dr,<br>Chicago, IL 60654<br>Attn: John R. Luze<br>john.luze@kirkland.com |
| Counsel to Apollo | Paul, Weiss, Rifkind,<br>Wharton & Garrison, LLP<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Attn: Jeffrey D. Saferstein,<br>Kyle J. Kimpler<br>jsaferstein@paulweiss.com<br>kkimpler@paulweiss.com |

H.  *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement*

The Plan, Plan Supplement, and Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

J.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; provided, that at the request of the Debtors (in consultation with the Plan Sponsors), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors and the Plan Sponsors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without consent from the Debtors; and (iii) nonseverable and mutually dependent.

K.      *Dissolution of Committee*

On the Effective Date, the Committee and any other official committees appointed in the Chapter 11 Cases will dissolve; provided that, following the Effective Date, the Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (i) Claims and/or applications, and any relief related thereto, for compensation by Professionals and requests for Allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (ii) any appeals of the Confirmation Order or other appeal to which the Committee is a party. The Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expense relating to actions of the Committee after the Effective Date taken with respect to the foregoing limited purposes subject to a maximum aggregate amount to be agreed by the Debtors, Committee, and Plan Sponsors and identified in the Plan Supplement.  Upon the dissolution of the Committee, the Committee Members and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases and shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

L.      *Expedited Tax Determination*

The Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors for all taxable periods through the Effective Date.

*[Remainder of page intentionally left blank.]*

Respectfully submitted, as of May 14, 2021

Hertz Global Holdings, Inc.
The Hertz Corporation
The Debtors

By:
Name:    M. David Galainena
Title:    General Counsel

**EXHIBIT A**
**New Warrant Term Sheet[4]**

**Issuer:**

Reorganized Hertz Parent (the "Issuer").

**Participants:**

All Existing Hertz Shareholders other than Eligible Existing Hertz Shareholders that elect to receive Shareholder Subscription Rights in lieu of the New Warrants in accordance with the Plan on a Pro Rata basis (based on Existing Hertz Parent Interests held by all Holders of Existing Hertz Parent Interests).

**Security:**

New Warrants to purchase Reorganized Hertz Parent Common Interest representing up to 18.0% of the aggregate number of Reorganized Hertz Parent Common Interests issued and outstanding on the Effective Date (with such percentage reduced proportionally to account for Holders of Existing Hertz Parent Interests that elect to receive the Shareholder Subscription Rights in accordance with the Plan and calculated after giving effect to the issuance of all Reorganized Hertz Parent Common Interest issuable upon exercise of New Warrants (the "Warrant Shares")), subject to dilution on account of (i) the Management Incentive Plan (which will reserve Reorganized Hertz Parent Common Interests, on a fully diluted basis (assuming full exercise of the New Warrants)), and (ii) the terms described under "Anti-Dilution/Adjustments" below with respect to any other issuances of Reorganized Hertz Parent Common Interests on or following the Effective Date (other than pursuant to the Plan).

The New Warrants shall be allocated among the Holders in proportion to their relative holdings of Existing Hertz Parent Interests as set forth in the Plan. For the avoidance of doubt, the Reorganized Hertz Parent Common Interests for which the Warrants are exercisable will be of the same class that is issued as Reorganized Hertz Parent Common Interests pursuant to the Plan.

The New Warrants will not be subject to any redemption or call by Reorganized Hertz Parent.

**Exercise Price:**

The exercise price (as the same may be adjusted from time to time, the "Exercise Price") for each Warrant Share shall be equal to (i) a total equity value of $6,500,000,000 of the Issuer ("Strike Equity Value") divided by (ii) the number of Reorganized Hertz Parent Common Interests issued under the Plan on the Effective Date.

The New Warrants may be exercised by the holders on a cashless basis.

---

[4]   Capitalized terms used herein and not otherwise defined shall have the meaning given to them in the *First Modified Third Amended Joint Chapter 11 Plan of Reorganization of The Hertz Corporation and its Debtor Affiliates* to which this term sheet is attached as **Exhibit A**.

| | |
|---|---|
| **Transfers:** | The New Warrants shall be freely transferable, subject only to applicable securities laws and the restrictions on transfers and sales of New Warrants and Reorganized Hertz Parent Common Interest set forth in the Plan Supplement (which transfer and sale restrictions shall be limited to restrictions on transfers and sales (i) to competitors, (ii) that the Issuer has previously notified would result in Reorganized Hertz Parent being subject to reporting requirements under the Securities and Exchange Act of 1934, as amended, if it is not already subject to such requirements as of any applicable time of determination, (iii) restrictions necessary to preserve any favorable tax attributes of Reorganized Hertz Parent, as determined in good faith by the Reorganized Hertz Parent Board and (iv) such other transfer restrictions to be set forth in the organizational documents of Reorganized Hertz Parent, which shall be consistent with the terms of this Term Sheet and the Plan. |
| **Expiration Date:** | Thirty (30) years from the Effective Date. |
| **Anti-Dilution/Adjustments:** | The New Warrants shall be subject to anti-dilution protection regarding the Exercise Price and number of Reorganized Hertz Parent Common Interests to be issued upon the exercise of the New Warrants in the event of (a) any dividends or distributions (including cash, equity, indebtedness, convertible equity or other assets), stock splits, reverse stock splits, stock subdivisions, consolidations, exchanges, reclassifications, combinations, or other similar transactions, (b) mergers, consolidations, sale of all or substantially all of the Company's assets to another Person, tender offers, exchange offers, recapitalizations, capital reorganizations or similar structural transactions, or (c) subject to customary exceptions, issuances of equity interests below fair market value. |
| | Upon a change-of-control transaction resulting in all or a part of the consideration paid to or exchanged for Reorganized Hertz Parent Common Interests consisting of cash, property or other assets or securities other than listed and registered securities, the holders of New Warrants would be entitled to value protection through a customary Black-Scholes protection provision. |
| **New Warrant Agreement:** | The New Warrants will be subject to the New Warrants Agreement, which shall set forth the rights described herein and other customary terms and conditions. The New Warrants Agreement shall be governed by the laws of the State of Delaware and may not be amended without the consent of (i) holders holding at least 50.01% of the New Warrants and (ii) Reorganized Hertz Parent. Notwithstanding the foregoing, any amendment that materially and adversely affects any right of a holder of a New Warrant under the New Warrants Agreement relative to the other Holders shall require the consent of such affected New Warrant holder. |

3

The New Warrant Agreement will also provide that (i) Reorganized Hertz Parent will be required to reserve for issuance a sufficient number of shares of Reorganized Hertz Parent Common Interests to allow for the full exercise of the New Warrants, (ii) Reorganized Hertz Parent will be required to use its reasonable best efforts to cause the warrants to be listed on the same stock exchange, if any, on which the Reorganized Hertz Parent Common Interests may be listed, and (iii) related party transactions with any of the Plan Sponsors or their Affiliates must be on terms no less favorable to Reorganized Hertz Parent or the applicable subsidiary than terms that would be obtained by Reorganized Hertz Parent or the such subsidiary from a disinterested third party on an arm's length basis, subject to customary exceptions, including for transactions that are approved by a majority of the disinterested directors of Reorganized Hertz Parent

Case 20-11218-MFW   Doc 4759   Filed 05/14/21   Page 134 of 304

Exhibit B

**Plan Support Agreement**

AMERICAS 107163401

*Execution Version*

**THIS PLAN SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED, AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 OR 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON THE PARTIES HERETO. THIS PLAN SUPPORT AGREEMENT IS CONFIDENTIAL AND SUBJECT TO CONFIDENTIALITY AGREEMENTS AND HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 ITS STATE AND FEDERAL EQUIVALENTS.**

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT, dated as of May 14, 2021 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, together with all exhibits attached hereto and incorporated herein, this "**Agreement**") is entered into by and among: (i) The Hertz Corporation ("**Hertz**"), a corporation incorporated in the State of Delaware, and its affiliated debtors and debtors-in-possession (collectively with Hertz, the "**Company**" or the "**Debtors**") in the Chapter 11 Cases (as defined below) pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"); (ii) (a) one or more funds associated with Knighthead Capital Management, LLC ("**Knighthead**"), (b) one or more funds associated with Certares Opportunities LLC ("**Certares**"), and (c) the investment funds, separate accounts, and other entities owned (in whole or in part), controlled, or managed by Apollo Capital Management, L.P. or its affiliates that are signatories to this Agreement ("**Apollo**" and, together with Knighthead and Certares, the "**PE Sponsors**"); (iii) the undersigned in their capacity as owners and/or beneficial owners[1] (or managers or advisors of funds or accounts that are beneficial owners) of Interests in Hertz Global Holdings, Inc. ("**Hertz Parent**") or that have otherwise provided backstop and/or investment commitments under the EPCA (the "**Consenting Investors**" and, together with the PE Sponsors, the "**Plan Sponsors**"); (iv) the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**") upon executing the joinder attached as **Exhibit A** hereto (the "**Committee Joinder**"); and (v) any additional owners or beneficial owners of Claims against or Interests in any of the Debtors (the "**Additional Consenting Stakeholders**") that execute the joinder attached as **Exhibit B** hereto (the "**Consenting Stakeholder Joinder**").

The Company and the Plan Sponsors and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "**Parties**" and individually as a "**Party**." As used herein, (i) "**Requisite Consenting Investors**" means, at any

---

[1]    As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Claims against or Interests in any of the Debtors or the rights to acquire such Claims or Interests.

relevant time, the Consenting Investors holding at least (a) 66.7% in amount of the Interests in Hertz Parent held by all Consenting Investors, at any relevant time and (b) 66.7%% of the commitments (including rights offering backstop commitments and direct investment commitments) to purchase Reorganized Equity (as defined below) under the EPCA held by all Consenting Investors and (ii) "**Requisite Commitment Parties**" means, at any relevant time, the Requisite Consenting Investors and each of the PE Sponsors. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan (as defined below).

## RECITALS

**WHEREAS**, on May 22, 2020, the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), which are being jointly administered under the caption *In re The Hertz Corporation, et al.*, Case No. 20-11218 (MFW) (the "**Chapter 11 Cases**") in the Bankruptcy Court;

**WHEREAS**, in connection with the Chapter 11 Cases, the Parties have engaged in good faith, arm's length negotiations regarding the terms of the proposed restructuring of the Debtors' indebtedness and other obligations (such restructuring and any related transactions, the "**Restructuring**") pursuant to an amended version of the Debtors' proposed chapter 11 plan of reorganization attached as **Exhibit C** hereto (as may be further amended, supplemented, or otherwise modified in accordance with its terms, the "**Plan**");

**WHEREAS**, to effectuate the Restructuring, in accordance with, and pursuant to, this Agreement and the Commitment Documents (as defined below), (i) the Reorganized Debtors will make distributions of cash and Subscription Rights to participate in the Rights Offering pursuant to the Plan and issue new common stock ("**Reorganized Equity**") to the PE Sponsors, Consenting Investors, and holders of Claims against and Interests in the Company that validly exercise Subscription Rights, in each case in a manner consistent with the Plan and the Equity Purchase and Commitment Agreement attached as **Exhibit D** hereto (as may be further amended, supplemented, or otherwise modified in accordance with its terms, the "**EPCA**") and (ii) each of the PE Sponsors and the Consenting Investors will commit, severally and not jointly, to purchase the Reorganized Equity and Preferred Stock on the terms set forth in the EPCA and Plan;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in this Agreement and the Plan.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.**    **Conditions to Effectiveness**.

This Agreement shall become effective as to, and binding upon, each of the undersigned Parties on the date and at the time upon which all of the following conditions have been satisfied

2

in accordance with this Agreement (such date, the "**Agreement Effective Date**"):

(a)     counsel to the Company shall have received executed counterparts to this Agreement by each of (i) the PE Sponsors and (ii) the Consenting Investors;

(b)     counsel to the Consenting Investors shall have received executed counterparts to this Agreement by each of (i) the Debtors and (ii) the PE Sponsors;

(c)     counsel to the PE Sponsors shall have received executed counterparts to this Agreement by each of (i) the Debtors and (ii) Consenting Investors; and

(d)     the Existing Plan Support Agreement[2] and the Existing Equity Purchase and Commitment Agreement[3] shall each have been terminated by the Debtors, and the financing commitments for the Exit Term Loan Facility, the Exit Revolving Credit Facility, and HVF III (each as defined in the Plan) shall have been modified or replaced so that such facilities may be entered into in connection with the Restructuring;

Notwithstanding the occurrence of the Agreement Effective Date, this Agreement contemplates that (i) the Committee may become a Party upon execution and delivery of the Committee Joinder to counsel to each of the other Parties and at such time (the "**Committee Effective Date**") the Committee shall become obligated under this Agreement and (ii) one or more Additional Consenting Stakeholders may become Parties upon execution and delivery of counterpart signature pages of this Agreement or the Consenting Stakeholder Joinder to counsel to each other Party and at such time (a "**Consenting Stakeholder Effective Date**") any such Additional Consenting Stakeholder shall become obligated under this Agreement. If (a) the Committee does not become a Party or there is a subsequent Termination Date (as defined in Section 8 hereof) with respect to the Committee, (1) any and all provisions of this Agreement referencing the "Committee" are, and shall continue to be, in full force and effect with respect to the Parties as if such provisions were written without reference to such term and (2) this Agreement shall be in full force and effect with respect to each Party other than the Committee or (b) no Additional Consenting Stakeholders become a Party, any and all provisions of this Agreement referencing "Additional Consenting Stakeholders" are, and shall continue to be, in full force and effect with respect to the Parties as if such provisions were written without reference to such term.

**Section 2.     Exhibits Incorporated by Reference**. Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits hereto. In the event of any inconsistency between this

---

[2]     "**Existing Plan Support Agreement**" means that certain Plan Support Agreement, dated as of April 3, 2021, among (i) the Debtors, (ii) one or more funds associated with Centerbridge Partners, L.P. ("**Centerbridge**"), (iii) one or more funds associated with Warburg Pincus LLC ("**WP**"), (iv) Dundon Capital Partners LLC ("**Dundon**"), (v) the owners and/or beneficial owners (or managers or advisors of funds or accounts that are beneficial owners) of certain Claims against the Debtors that are signatory thereto (the "**Initial Consenting Noteholders**"), (vi) the Committee, and (vii) any additional holder of certain Claims against the Debtors that executes a joinder thereto.

[3]     "**Existing Equity Purchase and Commitment Agreement**" means that certain Equity Purchase and Commitment Agreement, dated as of April 3, 2021, among Hertz Global Holdings, Inc., WP, Centerbridge, Dundon and the Initial Consenting Noteholders signatory thereto.

3

Agreement and the exhibits attached hereto, this Agreement (without reference to such exhibits) shall govern.

Section 3. **Definitive Documents**. The definitive documents governing the Restructuring shall consist of the following and any other material document contemplated by the Parties needed or utilized to implement, govern, or consummate the Restructuring (collectively, the "**Definitive Documents**"):

(a) the disclosure statement or any supplement thereto (and all exhibits and other documents and instruments related thereto) with respect to the Plan (the "**Disclosure Statement**");

(b) the EPCA and all schedules, annexes and exhibits thereto, together with the Rights Offering Procedures (collectively, the "**Commitment Documents**");

(c) the order approving the Disclosure Statement or approving any supplement thereto, including the form of ballots and other solicitation materials in respect of the Plan (the "**Disclosure Statement Order**" and, such solicitation materials, the "**Solicitation Materials**");

(d) the Plan, Plan Supplement, and all documents, annexes, schedules, exhibits, amendments, modifications, or supplements thereto, or other documents contained therein, including any schedules of assumed or rejected contracts;

(e) the order confirming the Plan (the "**Confirmation Order**"), and any pleadings filed by the Debtors in support of the Bankruptcy Court's entry of the Confirmation Order;

(f) the definitive documents governing the Exit Term Loan Credit Facility, the Exit Revolving Credit Facility, HVF III, and any amendments to any existing European vehicle financing agreements deemed necessary by the Company (in consultation with the Requisite Commitment Parties) to achieve its proposed business plan in accordance with the Restructuring (the "**Exit Facility Documents**");

(g) the documents or agreements relating to the issuance of the Preferred Stock and the Reorganized Equity;

(h) the new organizational or other governance documents of the Reorganized Debtors, including the ultimate parent corporation of the Reorganized Debtors;

(i) any employment agreements relating to any executive officer of the ultimate parent corporation of the Reorganized Debtors;

(j) the motions filed by the Debtors seeking approval of each of the above (if applicable); and

(k) any order approving any of the above not otherwise noted.

The Definitive Documents not executed or not in a form attached to this Agreement as of the Agreement Effective Date remain subject to negotiation and, upon completion, all Definitive Documents shall (a) reflect and contain the terms, conditions, representations, warranties, and

4

covenants set forth in this Agreement (including the exhibits and annexes hereto), as they may be modified, amended, or supplemented in accordance with Section 9 hereof, and (b) otherwise be in form and substance acceptable to the Debtors and the PE Sponsors (and, to the extent of any provisions in such Definitive Document that are Consenting Investor Provisions (as defined below), the Requisite Consenting Investors).

Section 4.    Milestones. The following milestones (the "**Milestones**") shall apply to this Agreement, which in each case can be extended in writing by the Requisite Commitment Parties (electronic mail among counsel is sufficient):

(a)    by no later than the date that is ten (10) days from the Agreement Effective Date, the Debtors shall file, in form and substance in accordance with Section 3 hereof, (i) the Plan and (ii) one or more motions seeking approval of the Commitment Documents (including payment of related premiums, fees and expenses, and related forms);

(b)    by no later than May 31, 2021, the Bankruptcy Court shall have entered, in form and substance in accordance with Section 3 hereof, an order approving (i) the Commitment Documents, and (ii) payment by the Debtors of related premiums, fees and expenses as required under the Commitment Documents;

(c)    by no later than June 30, 2021, the Bankruptcy Court shall have entered the Confirmation Order; and

(d)    by no later than July 31, 2021, the Effective Date of the Plan shall have occurred (the "**Effective Date Deadline**").

Section 5.    **Commitments of the Parties**.

(a)    Plan Sponsors', Committee's, and Additional Consenting Stakeholders' Commitments. Each of the Plan Sponsors, the Committee (upon the occurrence of the Committee Effective Date and solely with respect to Sections 5(a)(1), 5(a)(2)(i), 5(a)(3)-(4), and 5(a)(6)-(8)), and the Additional Consenting Stakeholders agree, severally and not jointly, during the period beginning on the Agreement Effective Date and ending on the Termination Date (defined in Section 8) applicable to such Party (such period, the "**Effective Period**"), to:

(1)    cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the other Parties and use commercially reasonable and good faith efforts to pursue, support, obtain additional support for, solicit, implement, confirm, and consummate the Restructuring, the Commitment Documents, and the Plan, and to execute and take all actions contemplated thereby and as reasonably necessary, or as may be required by order of the Bankruptcy Court, to support and achieve consummation of the Restructuring; *provided* that, for the avoidance of doubt, seeking the allowance of any interest, costs, and other fees owing on the First Lien Claims, Second Lien Claims or General Unsecured Claims shall not be inconsistent with this Agreement;

(2)    not, directly or indirectly, (i) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring (including the payment in full of all administrative, priority, and secured

5

claims) or (ii) solicit, propose, file, support, consent to, encourage, take any action in furtherance of or vote for any Alternative Transaction[4] (but without limiting the consent, approval, or termination rights provided in this Agreement); *provided*, *however*, that nothing herein shall prohibit the Plan Sponsors, the Committee, and the Additional Consenting Stakeholders from discussing with the Debtors any unsolicited Alternative Transaction Proposal in accordance with Section 5(f)(24) hereof, so long as any communications in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering, or impeding the Restructuring contemplated by the Plan;

(3)     not, directly or indirectly, file any pleading with the Bankruptcy Court or otherwise support, encourage, seek, solicit, pursue, initiate, assist, join or participate in any challenge to the validity, enforceability, perfection or priority of, or any action seeking avoidance, claw-back, recharacterization or subordination of, any portion of the First Lien Claims or Second Lien Claims or any liens or collateral securing such First Lien Claims or Second Lien Claims; *provided* that, notwithstanding the foregoing, all Parties' rights are reserved to challenge, propose or support the rate and/or amount of any interest, costs, and other fees allowable as First Lien Claims or Second Lien Claims in accordance with the Bankruptcy Code from the Petition Date through the Effective Date;

(4)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in the Plan or in this Agreement, negotiate in good faith appropriate additional or alternative provisions to address any such impediment;

(5)     except to the extent expressly contemplated under the Plan or this Agreement, not exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or Interests in any of the Debtors that it owns or has beneficial ownership of, and any other claims against any direct or indirect subsidiaries of the Debtors that are not Debtors;

(6)     negotiate in good faith upon reasonable request of the Debtors, the PE Sponsors, the Requisite Consenting Investors and, upon the occurrence of the Committee Effective Date, the Committee in connection with any modifications to the Restructuring that improve the tax efficiency of the Restructuring for the Debtors, the PE Sponsors, the Consenting Investors, and/or the Committee;

---

[4]     "**Alternative Transaction**" means any transaction with respect to a plan of reorganization or liquidation, dissolution, winding up, liquidation, reorganization, workout, merger, consolidation, business combination, joint venture, partnership, sale of material assets or equity interests of the Company and its Subsidiaries taken as a whole, or restructuring involving the Debtors, without the prior written consent of the Requisite Commitment Parties that competes with or renders the Restructuring or the Plan unable to be consummated on the terms set forth in the Plan and this Agreement, or would reasonably be expected to materially frustrate the purposes of the Restructuring, the Plan or this Agreement, in each case, excluding any transaction contemplated by (i) that certain Stock and Asset Purchase Agreement, dated November 25, 2020, by and among Hertz Global Holdings, Inc., Donlen Corporation, each of the subsidiaries of Donlen Corporation listed on Schedule I thereto, and Freedom Acquirer LLC (as such agreement is in effect as of the date hereof), or (ii) the Commitment Documents.

6

(7)      promptly (but in any event within three (3) business days) notify the Debtors in writing of the occurrence, or failure to occur, of any event of which such Party has actual knowledge and with respect to which such occurrence or failure would likely cause (i) any representation of such Party contained in this Agreement to be untrue or inaccurate in any material respect, (ii) any covenant of such Party contained in this Agreement to not be satisfied in any material respect, or (iii) any condition precedent contained in the Plan or this Agreement related to the obligations of such Party to not occur or become impossible to satisfy; *provided* that no Party shall be obligated to report the breach or potential breach of any other Party in order to comply with this Section 5(a)(7);

(8)      execute and deliver such other instruments and perform such acts, in addition to the matters specified herein, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court in connection with the Plan, from time to time, to effect the Restructuring, as applicable; and

(9)      with respect to the Plan Sponsors and, upon the occurrence of the Committee Effective Date, the Committee, use commercially reasonable efforts to (A) consult in good faith with the Committee regarding the form and substance of any material amendment, supplement, waiver or other modification to or under (or deviation from) the Plan, the Rights Offering Procedures, any other Definitive Document or this Agreement (each, a "Material Modification") as soon as reasonably practicable, (B) provide the Committee drafts of any Material Modification no later than five (5) Business Days prior to the date the Company intends to file such Material Modification with the Bankruptcy Court, to the extent reasonably practicable, and (C) provide the Committee at least five (5) days advance notice of all other amendments, supplements, waivers or other modifications to or under (or deviations from) the Definitive Documents or this Agreement, to the extent reasonably practicable.

Notwithstanding the foregoing, nothing in this Section 5(a) shall require the Plan Sponsors to incur any expenses (other than Fees (as defined below)), liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements, that could result in expenses (other than Fees), liabilities or other obligations to any such Party, other than as specifically stated in the Commitment Documents; *provided* that, for the avoidance of doubt, the Debtors shall be required to reimburse Fees as set forth in Section 10 of this Agreement.

For the avoidance of doubt, (i) the obligations under this Agreement applicable to the Committee shall not be construed to bind any individual member of the Committee in its individual capacity, and (ii) the obligations under this Agreement that are applicable to an individual member of the Committee that has separately executed this Agreement or a joinder to this Agreement shall not be construed to bind the Committee. All members of the Committee reserve and retain their individual rights, whatever they may be, with respect to this Agreement and any motions filed before the Bankruptcy Court.

(b)      The foregoing Section 5(a) will not limit any of the Plan Sponsors' rights:

(1)      under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in

7

order to be heard concerning any matter arising in the Chapter 11 Cases, in each case provided that such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, the Plan, or the Commitment Documents and do not hinder, delay or prevent consummation of the Restructuring;

(2)　to consult with the Debtors or any other party in interest in the Chapter 11 Cases; *provided* that such action is not inconsistent with this Agreement, the Plan, or the Commitment Documents and does not hinder, delay or prevent consummation of the Restructuring; or

(3)　to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Definitive Documents.

(c)　<u>Plan Sponsors' Additional Commitments</u>. In addition to the commitments set forth in <u>Section 5(a)</u> hereof, the Plan Sponsors further agree, severally and not jointly:

(1)　pursuant to and in accordance with the EPCA, to commit, severally and not jointly, to purchase the Preferred Stock and Reorganized Equity on the terms set forth in the EPCA;

(2)　in the case of Knighthead and Certares, to provide financing to refinance or replace the HIL Facility on substantially the same terms as set forth in the Credit Agreement, dated as of April 23, 2021, among HIL, as Borrower, the lenders party thereto, and Wilmington Trust, National Association, as Administrative Agent or more Debtor-friendly terms, which financing shall be available promptly upon Bankruptcy Court approval of the Commitment Documents;

(3)　to submit drafts to the Debtors of any public press release that discloses the existence or terms of this Agreement, the EPCA, the Plan, or any other Definitive Document (or any amendment to any of the foregoing) and afford the Debtors a reasonable opportunity to comment on such documents and disclosures;

(4)　to the extent a Plan Sponsor is or becomes an owner or beneficial owner of any Claims against or Interests in any of the Debtors, (i) following the commencement of solicitation of the Plan and receipt of the Solicitation Materials and the Ballot(s) and so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, including its receipt of the Disclosure Statement following approval of such by the Bankruptcy Court under section 1125 of the Bankruptcy Code, (A) timely vote or cause to vote any and all Claims against or Interests in any of the Debtors that it owns or has beneficial ownership of to accept the Plan by delivering its duly executed and completed Ballot(s) accepting the Plan on a timely basis and (B) to the extent it is permitted to elect whether to opt out (or to opt in, as applicable), of the releases set forth in the Plan, elect not to opt out (or to opt in, as applicable) of the releases set forth in the Plan by timely delivering its duly executed and completed Ballots indicating such election (which opt out shall only be in the Plan Sponsors' capacity as a Claim holder against the Debtors), and (ii) thereafter, not change or withdraw (or cause to be changed or withdrawn) any such vote or election; *provided* that, notwithstanding

8

anything to the contrary in any Solicitation Materials, such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Party at any time if this Agreement is terminated with respect to such Party (it being understood by the Parties that any modification of the Plan that results in a termination of this Agreement by any Party pursuant to Section 8 hereof shall entitle such Party an opportunity to change its vote in accordance with section 1127(d) of the Bankruptcy Code); and

(5)    solely with respect to the Consenting Investors, dismiss with prejudice the appeal filed by the Ad Hoc Committee of Shareholders of the *Order (I) Authorizing Entry into Equity Purchase and Commitment Agreement, (II) Allowing the HHN Notes Guarantee Claims, and (III) Authorizing the Debtors to Grant the HHN Notes Guarantee Confirmations* [D.I. 4116].

(d)    Additional Consenting Stakeholders' Additional Commitments. In addition to the commitments set forth in Section 5(a) hereof, the Additional Consenting Stakeholders further agree to: (i) following the commencement of solicitation of the Plan and receipt of the Solicitation Materials and the Ballot(s) and so long as its vote has been solicited in a manner sufficient to comply with the requirements of sections 1125 and 1126 of the Bankruptcy Code, including its receipt of the Disclosure Statement following approval of such by the Bankruptcy Court under section 1125 of the Bankruptcy Code, (A) timely vote or cause to vote any and all Claims against or Interests in any of the Debtors that it owns or has beneficial ownership of to accept the Plan by delivering its duly executed and completed Ballot(s) accepting the Plan on a timely basis and (B) to the extent it is permitted to elect whether to opt out (or to opt in, as applicable), of the releases set forth in the Plan, elect not to opt out (or to opt in, as applicable), of the releases set forth in the Plan by timely delivering its duly executed and completed Ballots indicating such election, and (ii) thereafter, not change or withdraw (or cause to be changed or withdrawn) any such vote or election; *provided* that, notwithstanding anything to the contrary in any Solicitation Materials, such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Party at any time if this Agreement is terminated with respect to such Party (it being understood by the Parties that any modification of the Plan that results in a termination of this Agreement by any Party pursuant to Section 8 hereof shall entitle such Party an opportunity to change its vote in accordance with section 1127(d) of the Bankruptcy Code).

(e)    Committee's Additional Commitments. Upon occurrence of the Committee Effective Date, in addition to the commitments enumerated in Section 5(a) hereof, the Committee further agrees to:

(1)    support the Restructuring, the Plan, and consummation of the transactions described in the Definitive Documents, including by (i) delivering a draft two (2) business days prior to the Disclosure Statement hearing, filing in the Chapter 11 Cases, and delivering to counsel to the Debtors to include in the Solicitation Materials, a letter of the Committee's support for the Plan and the Committee's recommendation that holders of unsecured Claims against the Debtors vote to accept the Plan; and (ii) not objecting to or otherwise directly or indirectly interfering with the Debtors' plan exclusivity;

(2)    not solicit, propose, file, support, consent to, encourage, or take any action in furtherance of any Alternative Transaction (but without limiting the consent, approval,

9

or termination rights provided in the Agreement); *provided*, however, notwithstanding anything to the contrary in this Agreement, if, following the Agreement Effective Date, the Committee or any Debtor receives a bona fide written proposal, expression of interest or offer for an Alternative Transaction (an "Alternative Transaction Committee Proposal") from any Person not solicited in violation of this Section 3(d)(ii) or, to the Committee's actual knowledge, Section 5(f)(24) of this Agreement, the Committee may, directly or indirectly through its Representatives, (i) contact any Person that has made an unsolicited Alternative Transaction Committee Proposal (and its advisors) for the purpose of clarifying the proposal and any terms thereof and whether it could reasonably be expected to meet the standards set forth in clauses (x), (y) and (z) of this Section 5(e)(2), so as to determine whether such proposal constitutes, or could reasonably be expected to lead to, a Superior Committee Proposal (as defined below) or (ii) if the Committee shall have determined in good faith and, after considering the advice of its counsel and independent financial advisor(s), that (A) such Alternative Transaction Committee Proposal, constitutes, or could reasonably be expected to result in, a transaction that: (x) would be in the best interests of holders of unsecured Claims against the Debtors, (y) would reasonably be expected to provide each class of unsecured creditors either treatment sufficient to unimpair the Claims in such class or to provide distributions with a value materially in excess of the distributions provided to such class under the transactions contemplated under this Agreement and (z) is at least as feasible and as likely to achieve confirmation and consummation as the transactions contemplated under this Agreement (a "Superior Committee Transaction") and, (B) in any case, that failure of the Committee to pursue such Alternative Transaction Committee Proposal would reasonably be expected to result in a breach of the Committee's fiduciary duties under applicable laws (a "Superior Committee Proposal"), the Committee may, in response to such Superior Committee Proposal, engage or participate in discussions and negotiations with such Person, the Debtors and/or the Plan Sponsors regarding such Superior Committee Proposal; *provided, further*, that, subject to any confidentiality restrictions under which the proposal was submitted, (i) the Committee shall provide (A) notice of each Alternative Transaction Committee Proposal to the Company and each of the Plan Sponsors within 24 hours after the time of receipt of such Alternative Transaction Committee Proposal and (B) a copy of each written Alternative Transaction Committee Proposal, (ii) the Committee shall also notify the Company and each of the Plan Sponsors promptly if the Committee determines that an Alternative Transaction Committee Proposal is a Superior Committee Proposal (and the rationale therefore) no later than 24 hours following such determination, and (iii) if the Committee determines that an Alternative Transaction Committee Proposal is a Superior Committee Proposal, the Committee shall inform counsel to the Company and the Plan Sponsors promptly upon the Committee's receipt of definitive documents to implement such Superior Committee Proposal. Upon a receipt of a notice from the Committee pursuant to the preceding clause (ii) of its determination that an Alternative Transaction Committee Proposal is a Superior Committee Proposal, the Company and / or Plan Sponsors shall have five (5) Business Days to notify the Committee if they disagree with such determination and include in such notice the basis for such disagreement. If the Company and Plan Sponsors do not provide such notice, then such Alternative Transaction Committee Proposal shall be deemed a Superior Committee Proposal for purposes of this Agreement;

      (3)     stay all litigation (including *The Official Committee of Unsecured Creditors*

*v. Barclays Bank PLC, et al.*, Adv. Pro. No. 20-50842 (Bankr. D. Del. 2020) (MFW), which shall be dismissed with prejudice as of the Effective Date of the Plan), any contested motions, and discovery or the pursuit of any actual or potential claims and causes of action pending against, or subject to tolling agreements with, the Debtors, any holders of First Lien Claims, or any holders of Second Lien Claims or the pursuit to obtain standing to pursue such litigation or any such claims and causes of action; and

(4)    not object to the *Mandatory Payment Notice for the Donlen Sale* [Docket No. 3684] or the distribution of funds as contemplated therein.

The obligations of the Committee under this Agreement shall not limit any of the Committee's rights (i) under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case provided that such appearance and the positions advocated in connection therewith are not inconsistent with the Agreement or the Plan and do not hinder, delay or prevent consummation of the Restructuring; (ii) to consult with the Debtors or any other party in interest in the Chapter 11 Cases; *provided* that such action is not inconsistent with this Agreement or the Plan and does not hinder, delay or prevent consummation of the Restructuring; or (iii) to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the Definitive Documents by or on behalf of itself or any class of unsecured creditors. Notwithstanding anything to the contrary in the Agreement, nothing in the Agreement, the Plan, or anything included in any Definitive Document shall prevent the Committee from taking any action which is aimed at preserving the estimated 100% recovery for Allowed General Unsecured Claims under the Plan, including reviewing, analyzing, defending, objecting and/or responding to any motion, issue or claim that arises in connection with the Chapter 11 Cases that may directly or indirectly impact that estimated recovery. For the avoidance of doubt, the Committee is permitted to take into account the interests of all unsecured Claims against the Debtors in connection with actions taken pursuant to this Agreement.

(f)    <u>Debtors' Commitments</u>. Each Debtor agrees to, severally and not jointly:

(1)    within one business day of the Agreement Effective Date, (a) file the Plan in the form of an amended version of the proposed plan of reorganization filed at [Docket No. 4077] in the Chapter 11 Cases and (b) file a copy of this Agreement;

(2)    to the extent reasonably practicable and subject to the terms hereof and subject to the impact and requirements of the Chapter 11 Cases, cooperate and coordinate activities with the other Parties and use commercially reasonable and good faith efforts to pursue, support, solicit, implement, confirm, and consummate the Restructuring, the Commitment Documents, and the Plan, and to execute and take all actions contemplated hereby and thereby and as reasonably necessary, or as may be required by order of the Bankruptcy Court, to support and achieve confirmation of the Plan and consummation of the Restructuring in accordance with, and within the time frames contemplated by, this Agreement;

(3)    pay and reimburse all Fees in accordance with this Agreement;

11

(4)      if necessary under applicable law, commence solicitation of votes to accept or reject the Plan as soon as reasonably practicable following the approval of the Disclosure Statement and Solicitation Materials by the Bankruptcy Court;

(5)      use commercially reasonable efforts to obtain any and all regulatory and/or third party approvals necessary to consummate the Plan;

(6)      execute and deliver each Definitive Document once agreed by all parties thereto and finalized;

(7)      provide advance initial draft copies of each Definitive Document and any pleading relating to the Plan, the Disclosure Statement, plan exclusivity, assumption or rejection of material executory contracts and unexpired leases, or key employee incentive or retention plan to counsel for each of the Plan Sponsors and, upon the occurrence of the Committee Effective Date, the Committee no later than three (3) calendar days prior to the date when the Company intends to file such pleading or Definitive Document with the Bankruptcy Court and consult in good faith with such counsel regarding the form and substance of any such filing, in each case to the extent reasonably practicable or otherwise as soon as reasonably practicable prior to such filing;

(8)      timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (i) directing the appointment of a trustee or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, (ii) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, or (iv) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of the Plan;

(9)      timely oppose any motion, application, or request filed with the Bankruptcy Court seeking approval of any Alternative Transaction;

(10)      timely oppose any objections filed with the Bankruptcy Court with respect to (A) approval of the Disclosure Statement or (B) confirmation of the Plan;

(11)      comply in all material respects with applicable laws (including making or using commercially reasonable efforts to obtain all required material consents and/or appropriate filings or registrations with, notifications to, or authorizations, consents, or approvals of any regulatory or governmental authority) and paying all income and other material taxes as they become due and payable (except to the extent nonpayment thereof is permitted by the Bankruptcy Code; *provided* that, to the extent any taxes have not been paid because of the relief afforded by the Bankruptcy Code and are not being contested with adequate reserves having been established in accordance with GAAP, the anticipated payment of such taxes pursuant to the Plan is reflected in the financial information provided to the Plan Sponsors);

(12)      negotiate in good faith upon reasonable request of the PE Sponsors, the Requisite Consenting Investors or, upon the occurrence of the Committee Effective Date, the Committee in connection with any modifications to the Restructuring that improve the tax efficiency of the Restructuring for the Debtors, the PE Sponsors, the Consenting

12

Investors, and/or the Committee;

(13)   to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Requisite Commitment Parties and, upon the occurrence of the Committee Effective Date, the Committee;

(14)   provide prompt written notice to counsel to each of the Plan Sponsors and, upon the occurrence of the Committee Effective Date, the Committee (electronic mail among counsel being sufficient) of (i) the occurrence, or failure to occur, of any event of which the Debtors have actual knowledge and which such occurrence or failure would likely cause (A) any representation of the Debtors contained in this Agreement to be untrue or inaccurate in any material respect, (B) any covenant of the Debtors contained in this Agreement not to be satisfied in any material respect or (C) any condition precedent contained in the Plan or this Agreement not to occur or become impossible to satisfy, (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring, (iii) receipt of any written notice from any governmental body in connection with this Agreement or the Restructuring, and (iv) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Debtors, threatened against the Debtors, relating to or involving or otherwise affecting in any material respect the Restructuring, including governmental or third-party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened); *provided* that no Debtor shall be obligated to report the breach or potential breach by any other Party in order to comply with this Section 5(f)(14);

(15)   seek to cause the Confirmation Order to become effective and enforceable immediately upon its entry and to seek to have the period in which an appeal thereto must be filed commence immediately upon its entry;

(16)   comply in all material respects with the terms and conditions of the DIP Facility (as defined in the DIP Order) and the final orders and amendments related thereto such that the DIP Lenders (as defined in the DIP Order) do not accelerate the DIP Loans (as defined in the DIP Order);

(17)   provide counsel to each of the Plan Sponsors and, upon the occurrence of the Committee Effective Date, the Committee with any reporting received by the DIP Lenders pursuant to the Order (I) Authorizing the Debtors to Obtain Debtor-in-Possession Financing and Granting Liens and Superpriority Administrative Claims and (II) Granting Related Relief [Docket No. 1661] (the "**DIP Order**") or any of the DIP Loan Documents (as defined in the DIP Order) on the same schedule as the Committee or the DIP Lenders, as applicable, receive such reporting, confer with each of the Plan Sponsors and their

respective Representatives[5], as reasonably requested, on operational matters and the general status of ongoing operations, and provide each of the Plan Sponsors with any information reasonably requested regarding the Debtors (subject to any applicable confidentiality obligations) and reasonable access to management and advisors of the Debtors during normal business hours for the purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs; provided that the Debtors shall not be required to provide any information or access that the Debtors reasonably believe would violate applicable law, including antitrust laws and data protection laws, or the terms of any applicable contract (including confidentiality obligations) or cause forfeiture of any attorney-client privilege or an expectation of client confidence or any other rights to any evidentiary privilege;

(18)    not object to, impede or take any other action (including filing any pleading) that is materially inconsistent with, or is intended or is likely to materially interfere with, acceptance or implementation of the Restructuring;

(19)    not (i) enter into, adopt or materially amend any employment agreements or any compensation or incentive plans (including equity arrangements) with respect to employees with the title of Senior Vice President or higher or (ii) increase in any manner the compensation or benefits (including severance) of any employees with the title of Senior Vice President or higher, in each case without the prior written consent of the PE Sponsors;

(20)    not seek to amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documents in a manner that is materially inconsistent with this Agreement or the Plan without the prior written consent of the PE Sponsors (and, to the extent any such amendment or modification relates to any of the Consenting Investor Provisions (as defined below) in the Definitive Documents, the Requisite Consenting Investors);

(21)    withdraw or amend the Debtors' motions filed in the Bankruptcy Court seeking approval of entry into the commitment and fee letters related to the Exit Term Loan Facility, the Exit Revolving Credit Facility, and HVF III to reflect the terms agreed in connection with the Restructuring;

(22)    promptly following the Agreement Effective Date, cause each of its officers, directors, employees and Subsidiaries to, and use their reasonable best efforts to cause their other respective Representatives to, immediately cease and terminate any ongoing solicitations, discussions, and negotiations with respect to any Alternative Transaction;

(23)    not to settle or otherwise agree to the allowance of (a) any Claims related to interest, costs, fees, premiums, or "make whole" amounts arising on and from the Petition

---

[5]    "**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives acting on behalf of such Person.

14

Date through the Effective Date (except a settlement or agreement approved by the Bankruptcy Court prior to the Agreement Effective Date) with respect to the First Lien Claims, Second Lien Note Claims, Unsecured Funded Debt Claims, or HHN Notes Guarantee Claims, or (b) any General Unsecured Claim in an allowed amount in excess of $1,000,000.00 (except a settlement or agreement approved by the Bankruptcy Court prior to the Agreement Effective Date), in each case without the prior written consent of each of the PE Sponsors and shall consult with the PE Sponsors with respect to any objection to any such Claims (other than with respect to any PE Sponsor that owns or is the beneficial owner of a Claim that is the subject of such objection);

(24)    not to, and shall instruct and direct its respective Representatives not to, other than to inform any Person of the provisions of this Section 5(f)(24), directly or indirectly, initiate, solicit, engage in or participate in any discussions, inquiries or negotiations in connection with any proposal, expression of interest or offer relating to an Alternative Transaction, afford access to the business, properties, assets, books or records of or provide any non-public information relating to the Debtors or any of their Subsidiaries to, otherwise cooperate in any way with, or knowingly assist, participate in, facilitate or encourage any effort by any Person that is seeking to make, or has made, an Alternative Transaction Proposal (as defined below); *provided* that, if, notwithstanding the foregoing, following the Agreement Effective Date, the Debtors or any of their Subsidiaries receive a bona fide proposal, expression of interest or offer (whether written or unwritten) for an Alternative Transaction (an "**Alternative Transaction Proposal**") from any Person not solicited in violation of this Section 5(f)(24), the Board of Directors of the Company (the "**Company Board**") (or a committee thereof) may, directly or indirectly through the Company's Representatives (i) contact any Person that has made an unsolicited Alternative Transaction Proposal (and its advisors) for the purpose of clarifying the proposal and any terms thereof and the likelihood of consummation, so as to determine whether such proposal constitutes, or could reasonably be expected to lead to, a Superior Proposal (as defined below) or (ii) if the Company Board shall have determined in good faith and, after considering the advice of its outside counsel and independent financial advisor, that such Alternative Transaction Proposal, constitutes, or could reasonably be expected to result in, a transaction that: (x) would be in the best interests of the Company and its creditors and equity holders as a whole, and (y) would reasonably be expected to be superior to the Company and its creditors and equity holders in comparison to the transactions contemplated under this Agreement, the Commitment Documents, and the Plan (a "**Superior Transaction**") and, in either case, that failure of the Company Board to pursue such Alternative Transaction Proposal would reasonably be expected to result in a breach of the Company Board's fiduciary duties under applicable Laws (a "**Superior Proposal**"), the Company may, in response to such Superior Proposal: (x) furnish non-public information in response to a request therefor by such Person if such Person has executed and delivered to the Company a confidentiality agreement (a copy of which shall be provided to each of the Plan Sponsors within 24 hours of execution thereof) on terms no less favorable than any confidentiality agreements entered into with any Plan Sponsor and if the Company also promptly (and in any event within 24 hours after the time such information is provided to such Person) makes such information available to the Plan Sponsors, to the extent not previously provided to the Plan Sponsors; and (y) engage or participate in discussions and negotiations with such Person regarding such Superior

15

Proposal; *provided further*, that, subject to applicable confidentiality restrictions and the conditions upon which the proposal was submitted, (i) the Company shall provide (A) notice of all Alternative Transaction Proposals (whether oral or written) to each of the Plan Sponsors and their respective counsel within 24 hours after the time of receipt of such Alternative Transaction Proposal and (B) a copy of each written Alternative Transaction Proposal or summary of each such oral Alternative Transaction Proposal and (ii) the Company shall also notify each of the Plan Sponsors promptly if the Company Board determines that an Alternative Transaction Proposal is a Superior Proposal (and the rationale therefor) no later than 24 hours following such determination. To the extent the Company is prohibited from giving notice of any Alternative Transaction Proposal to any Plan Sponsor due to a confidentiality restriction or condition upon which such proposal was submitted, the Company shall use its commercially reasonable efforts to obtain relief from such restriction or condition as promptly as practicable in order to comply with its obligations under this Section 5(f)(24). Additionally, if the Company Board determines that an Alternative Transaction Proposal is a Superior Proposal, the Company shall inform the Plan Sponsors promptly upon the Company's receipt of definitive documents to implement such Superior Proposal; and

(25)    upon occurrence of the Committee Effective Date, (A) consult in good faith with the Committee regarding the form and substance of any material amendment, supplement, waiver or other modification to or under (or deviation from) the Plan, the Rights Offering Procedures, any other Definitive Document or this Agreement (each, a "Material Modification") as soon as reasonably practicable, (B) provide the Committee drafts of any Material Modification no later than five (5) Business Days prior to the date the Company intends to file such Material Modification with the Bankruptcy Court, to the extent reasonably practicable, and (C) provide the Committee at least five (5) days advance notice of all other amendments, supplements, waivers or other modifications to or under (or deviations from) the Definitive Documents or this Agreement, to the extent reasonably practicable.

(g)    Moretti Settlement.  Upon the occurrence of the Committee Effective Date, the Debtors agree that they shall timely pursue, and the Committee and Plan Sponsors hereby agree that they shall support, a full and final settlement under Federal Bankruptcy Rule 9019 of all Claims related to or arising under the action *Moretti v. The Hertz Corporation et al.*, Case No. 14-cv-00469-LPS (D. Del.), pursuant to which all such Claims shall be Allowed in the aggregate amount of $20,000,000.00 and treated as General Unsecured Claims in accordance with the Plan on terms and conditions that are substantially similar to other class action settlements that have resulted in General Unsecured Claims in the Chapter 11 Cases.

(h)    Each Consenting Investor, Additional Consenting Stakeholder, and, to the extent it owns or beneficially owns Claims against or Interests in any of the Debtors, each Plan Sponsor, has entered into this Agreement on account of all Claims against or Interests in any of the Debtors that it owns or beneficially owns (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Claims against and Interests in any of the Debtors that it owns or beneficially owns.

16

**Section 6.      Transfers of Claims**.

(a)      <u>Restrictions on Transfers</u>. Each Plan Sponsor, Consenting Investor, and Additional Consenting Stakeholder agrees that such Plan Sponsor, Consenting Investor, or Additional Consenting Stakeholder shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of, directly or indirectly, in whole or in part (each, a "**Transfer**"), any Claims against or Interests in any of the Debtors that it owns or has beneficial ownership of, or any option thereon or any right or interest therein (including granting any proxies, depositing any of its Claims or Interests into a voting trust or entering into a voting agreement with respect to any of its Claims or Interests), unless, subject in all cases to the terms and conditions set forth in the EPCA, the transferee thereof either (i) is a Plan Sponsor, Consenting Investor, or Additional Consenting Stakeholder (provided that written notice of such transfer shall be provided to counsel to the Debtors and the Plan Sponsors within two (2) business days after the consummation of such transfer) or (ii) prior to, or contemporaneous with, such Transfer, agrees in writing for the benefit of the Parties to become an Additional Consenting Stakeholder and to be bound by all of the terms of this Agreement applicable to an Additional Consenting Stakeholder, as applicable (including with respect to any and all Claims against or Interests in any of the Debtors), by executing a Consenting Stakeholder Joinder and delivering an executed copy thereof within two (2) business days after such execution, to counsel to the Debtors, in which event the transferee (a "**Permitted Transferee**") shall be deemed to be an Additional Consenting Stakehodler, as applicable, hereunder to the extent of such transferred Claims or Interests. Any transfer made while this Agreement remains in effect in violation of this provision shall be void *ab initio*.

(b)      <u>Qualified Marketmaker Exclusion</u>. Notwithstanding anything the contrary herein, (i) a Party may transfer any Claims against or Interests in the Debtors to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become a Party only if such Qualified Marketmaker has purchased such Claims against or Interests in the Debtors with a view to immediate resale of such Claims or Interests (by purchase, sale, assignment, transfer, participation or otherwise) as soon as reasonably practicable, and in no event later than three (3) business days after its acquisition and, in any event, prior to the Distribution Record Date, of such Claims or Interests, to a Permitted Transferee; and (ii) to the extent that a Party is acting in its capacity as a Qualified Marketmaker, it may transfer or participate any right, title, or interest in any Claims against or Interests in the Debtors that the Qualified Marketmaker acquires from a holder of Claims or Interests who is not a Party without the requirement that the transferee be a Permitted Transferee. For the avoidance of doubt, any entity that acquires Claims against or Interests in the Debtors in its capacity as a Qualified Marketmaker and does not resell such Claims within three (3) business days after its acquisition thereof and, in any event, prior to the Distribution Record Date, must become a Party to this Agreement by executing a Consenting Stakeholder Joinder and delivering an executed copy thereof within two (2) business days after the expiration of such period, to counsel to the Debtors and the Plan Sponsors. For these purposes, a "**Qualified Marketmaker**" means an entity that: (a) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers Claims against or Interests in the Company and its affiliates (including debt securities or other debt) or enter into with customers long and short positions in Claims against or Interests in the Company and its affiliates (including debt securities or other debt), in its capacity as a dealer or market maker in such Claims against or Interests in the Company and its affiliates; and (b) is in fact regularly in the business of making a market in Claims against

17

or Interests in issuers or borrowers (including debt securities or other debt).

(c)     Additional Claims. This Agreement shall in no way be construed to preclude the Plan Sponsors or any Additional Consenting Stakeholder from acquiring additional Claims against or Interests in any of the Debtors; *provided* that, upon any such acquisition of Claims or Interests, (i) such Plan Sponsor or Additional Consenting Stakeholder shall promptly notify (in no event later than two (2) business days thereafter) counsel to each other Party and (ii) each Plan Sponsor or Additional Consenting Stakeholder agrees (x) that any additional acquired Claims or Interests shall be subject to this Agreement and (y) to vote such Claims or Interests in a manner consistent with Section 5 hereof, as applicable.

**Section 7.     Representations and Warranties**.

(a)     Mutual Representations and Warranties. Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct and complete as of the Agreement Effective Date (or as of the Committee Effective Date or the date such Party executes a Consenting Stakeholder Joinder, as applicable), subject in the case of the Debtors to any required approval by the Bankruptcy Court:

(1)     Power and Authority. Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(2)     No Conflict. The execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(3)     No Consent or Approval. The execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings (i) as may be necessary and/or required by the U.S. Securities and Exchange Commission or (ii) with respect to the Plan Sponsors, that are set forth in clauses (a) or (b) of Section 5.5 of the EPCA; and

(4)     Enforceability. This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

18

(b)      Additional Representations of Consenting Investors and Additional Consenting Stakeholders. Each Consenting Investor and Additional Consenting Stakeholder, severally and not jointly, represents and warrants to the other Parties that, as of its respective Consenting Stakeholder Effective Date or the Agreement Effective Date, as applicable, such Consenting Investor or Additional Consenting Stakeholder: (1) (A) is the owner or beneficial owner (or manager or advisor of funds or accounts that are beneficial owner) of the aggregate principal amount of Claims against or Interests in any of the Debtors, as applicable, set forth below its name on the signature page hereto or to its Joinder, as applicable and does not own or beneficially own any other Claims against or Interests in any of the Debtors, and/or (B) has, with respect to the beneficial owner(s) of such Claims or Interests, as applicable, (i) sole investment or voting discretion with respect to such Claims or Interests, (ii) full power and authority to vote on and consent to matters concerning such Claims or Interests, or to exchange, assign, and Transfer such Claims or Interests, and (iii) full power and authority to bind or act on the behalf of, such beneficial owner(s); and (2) with respect to each Consenting Investor and Additional Consenting Stakeholder, although none of the Parties intends that this Agreement should constitute (and they each believe it does not constitute) an offering of securities, such Consenting Investor or Additional Consenting Stakeholder is either (A) a qualified institutional buyer, as defined in Rule 144A of the Securities Act of 1933, as amended (the "**Securities Act**") or (B) a non-U.S. Person in offshore transaction complying with Rule 903 or Rule 904 of Regulation S under the Securities Act and who also is an "institutional account" within the meaning of FINRA Rule 4512(c).

**Section 8.      Termination Events**.

(a)      Plan Sponsor Termination Events. This Agreement may be terminated (i) with respect to any PE Sponsor, by such PE Sponsor and (ii) with respect to the Consenting Investors, by the Requisite Consenting Investors, in each case, by delivering to the other Parties one (1) business day's written notice in accordance with Section 11(l) hereof, upon the occurrence of any of the following events, in each case after the Agreement Effective Date; *provided*, *however*, that neither any PE Sponsor nor the Requisite Consenting Investors may seek to terminate this Agreement based upon a breach of this Agreement by any Debtor arising primarily out of any such PE Sponsor's or any Consenting Investor's own actions, respectively:

(1)      the breach by any Debtor of any obligation, commitment, agreement, representation, warranty, covenant, or other provision contained in this Agreement in any material respect, which breach (i) would materially and adversely impede or interfere with the overall acceptance, implementation, or consummation of the Restructuring on the terms and conditions set forth in this Agreement and the Plan and (ii) remains uncured for a period of five (5) business days after the receipt by the other Parties of written notice of such breach from the terminating Plan Sponsor, other than with respect to any breach that is incurable, for which no cure period shall be required or apply;

(2)      the termination of this Agreement in accordance with this Section 8(a) by any PE Sponsor or the Requisite Consenting Investors or in accordance with Section 8(d) by the Debtors;

(3)      the Bankruptcy Court approves or authorizes an Alternative Transaction or any of the Debtors (i) enters into any Contract (as defined in the EPCA) providing for the

19

consummation of any Alternative Transaction, (ii) files any motion or application seeking authority to propose, join in or participate in the formation of any actual or proposed Alternative Transaction, or (iii) publicly announces its intention to take any such action listed in this Section 8(a)(3) or to materially breach its obligations under Section 5(f)(24) hereof;

(4)     the failure by the Debtors to meet any of the Milestones as a result of the failure by any Debtor to use commercially reasonable efforts to reach such Milestone, unless such Milestone is extended in accordance with Section 4 hereof;

(5)     the issuance by any governmental authority (including any regulatory authority or any court of competent jurisdiction) of any injunction, judgment, decree, charge, ruling or order that, in each case, would have an adverse effect on a material provision of this Agreement or a material portion of the Restructuring or the Plan or a material adverse effect on the Debtors' businesses, unless the Debtors have sought a stay of such injunction, judgment, decree, charge, ruling, or order within fifteen (15) business days after the date of such issuance, and such injunction, judgment, decree, charge, ruling, or order is reversed or vacated within twenty (20) business days after the date of such issuance;

(6)     an examiner (other than an independent fee examiner) with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, a trustee, or a receiver shall have been appointed in the Chapter 11 Cases;

(7)     the Debtors withdraw the Plan or the Bankruptcy Court enters an order denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein; *provided* that, for the avoidance of doubt, no Party shall have the right to terminate this Agreement pursuant to this Section 8(a)(7) if the Bankruptcy Court denies confirmation of the Plan subject only to the making of ministerial, administrative, or immaterial modifications to the Plan;

(8)     the (i) conversion of one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the PE Sponsors;

(9)     (i) any of the Definitive Documents, after completion, contain terms, conditions, representations, warranties, or covenants that are materially inconsistent with the terms of this Agreement, (ii) any of the Definitive Documents shall have been materially amended or modified in a manner rendering such Definitive Document materially inconsistent with the terms of this Agreement, in each case, without the consent of the PE Sponsors or the Requisite Consenting Investors, as applicable, in accordance with their approval rights under this Agreement and the Plan, or (iii) in the case of a Definitive Document that is also an order (including the Confirmation Order), such order shall have been reversed, vacated or modified in a manner materially inconsistent with this Agreement, without the prior written consent of the PE Sponsors and, to the extent the Consenting Investors have a consent right with respect to such Definitive Document, the

20

Requisite Consenting Investors, unless the Debtors have sought a stay of the order causing such reversal, vacatur or modification within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance;

(10)    any Debtor files a motion or application (or a series of motions or applications) seeking authority to sell in a single sale, or in a series of sales that in the aggregate would constitute, all or a material portion of its assets or equity interests without the prior written consent of the PE Sponsors;

(11)    the Debtors file a motion seeking authority to enter into post-petition DIP financing without the prior written consent of the PE Sponsors;

(12)    the Bankruptcy Court enters an order granting relief from the automatic stay imposed by Bankruptcy Code section 362 authorizing any party to proceed with regard to any material asset of the Debtors and such relief has a material adverse effect on the Restructuring;

(13)    the Debtors materially breach their obligations under Section 5(f)(24) of this Agreement;

(14)    the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Debtors have sought a stay of such relief within seven (7) business days after the date of such issuance, and such order is stayed reversed or vacated within fourteen (14) business days after the date of such issuance; or

(15)    all conditions to effectiveness or closing in the EPCA are not satisfied or waived by the Effective Date Deadline, in accordance therewith, which date may be extended in writing by the Requisite Commitment Parties (electronic mail among counsel being sufficient); *provided* that the right to terminate this Agreement under this Section 8(a)(15) shall not be available to any Party if any Plan Sponsor is then in material breach of the EPCA and such breach proximately caused the failure of the Plan to go effective by the Effective Date Deadline.

(b)    Additional Consenting Stakeholder Termination Events. This Agreement may be terminated by any Additional Consenting Stakeholder, with respect to itself only, upon one (1) business day's written notice thereof by such terminating Additional Consenting Stakeholder to the other Parties in accordance with Section 11(l) hereof, upon the occurrence of any of the following events, in each case after the applicable Consenting Stakeholder Effective Date:

(1)    the treatment of such Additional Consenting Stakeholder's Claims in the Plan is adversely and materially modified from that specified in the Plan filed by the Debtors as of the applicable Consenting Stakeholder Effective Date; or

(2)    the Debtors file or explicitly support an Alternative Transaction that proposes treatment of such Additional Consenting Stakeholder's Claims that adversely

21

deviates, in any material manner, from the treatment specified in the Plan filed by the Debtors as of the applicable Consenting Stakeholder Effective Date.

(c)    Committee Termination Events. This Agreement may be terminated by the Committee, with respect to itself only, upon one (1) business day's written notice thereof by the Committee to the other Parties in accordance with Section 11(l) hereof, upon the occurrence of any of the following events, in each case after the Committee Effective Date, and with respect to the events enumerated in Sections 8(c)(1)-(7), if the Committee determines in good faith that the occurrence of such Committee Termination Event has had, or is reasonably likely to have, a material adverse effect on the rights, interests or treatment of the Committee or any class of unsecured creditors:

(1)    the termination of this Agreement in accordance with Section 8(a) by any PE Sponsor or the Requisite Consenting Investors or in accordance with Section 8(d) by the Debtors;

(2)    the issuance by any governmental authority (including any regulatory authority or any court of competent jurisdiction) of any injunction, judgment, decree, charge, ruling or order that, in each case, would have an adverse effect on a material provision of this Agreement or a material portion of the Restructuring or the Plan or a material adverse effect on the Debtors' businesses, unless the Debtors have sought a stay of such injunction, judgment, decree, charge, ruling, or order within fifteen (15) business days after the date of such issuance, and such injunction, judgment, decree, charge, ruling, or order is reversed or vacated within twenty (20) business days after the date of such issuance;

(3)    an examiner (other than an independent fee examiner) with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, a trustee, or a receiver shall have been appointed in the Chapter 11 Cases;

(4)    the Debtors withdraw the Plan or the Bankruptcy Court enters an order denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein; *provided* that, for the avoidance of doubt, no Party shall have the right to terminate this Agreement pursuant to this Section 8(c)(4) if the Bankruptcy Court denies confirmation of the Plan subject only to the making of ministerial, administrative, or immaterial modifications to the Plan;

(5)    the Bankruptcy Court enters an order granting relief from the automatic stay imposed by Bankruptcy Code section 362 authorizing any party to proceed with regard to any material asset of the Debtors and such relief has a material adverse effect on the Restructuring;

(6)    the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring, unless the Debtors have sought a stay of such relief within seven (7) business days after the date of such issuance, and such order is stayed

22

reversed or vacated within fourteen (14) business days after the date of such issuance;

(7)    the termination of the EPCA in accordance with its terms;

(8)    the treatment of the unsecured Claims in the Plan for any class of unsecured creditors is materially and adversely modified or otherwise materially and adversely deviates from that specified in the Plan;

(9)    the Committee determines in good faith, based upon advice of counsel, that, in light of a Superior Committee Proposal received in compliance with Section 5(e)(2) of this Agreement, continuing to support the Restructuring would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided* that, for purposes of considering whether any potential treatment or distribution would reasonably be expected to satisfy the standards set forth in clauses (x), (y) and (z) of Section 5(e)(2), the Committee shall consider the reasonably expected cost and delay of obtaining such treatment or distribution and the risk of forgoing the treatment of holders of unsecured Claims against the Debtors under the Plan, including the risk of implementing and closing the Superior Committee Proposal; and *provided*, *further*, that the Committee shall give prompt written notice to counsel to the Debtors and Plan Sponsors of any determination in accordance with this Section 8(c)(7) (electronic mail among counsel being sufficient);

(10)    any of the Debtors or the Plan Sponsors proposes or explicitly supports any Alternative Transaction that proposes treatment for any class of unsecured creditors that materially and adversely deviates from the treatment specified in the Plan;

(11)    any Definitive Document is amended, submitted, modified, or supplemented or any provisions contained therein are waived in a manner that materially and adversely affects the rights, interests or treatment of the Committee or any class of unsecured creditors, as compared to such treatment as set out in the Plan, the Rights Offering Procedures or this Agreement, without the consent of the Committee, and such amendment remains in effect for five (5) Business Days after the Committee transmits a written notice to the other Parties;

(12)    this Agreement is amended, supplemented or modified (or a waiver granted thereunder) without the prior written consent of the Committee and the Committee determines in good faith that such amendment, supplement or waiver has a material and adverse effect on the rights, interests or treatment of the Committee or any class of unsecured creditors;

(13)    the breach by any Debtor or Plan Sponsor of any obligation, commitment agreement, representation, warranty, covenant, or other provision contained in this Agreement in any material respect, which breach (i) would materially and adversely affect the rights, interest or treatment of the Committee or any class of unsecured creditors and (ii) remains uncured for a period of five (5) business days after the receipt by the other Parties of written notice of such breach from the Committee, other than a breach that is incurable, for which no cure period shall be required or apply;

(14)    any Debtor files a motion or application (or a series of motions or

23

applications) seeking authority to sell in a single sale, or in a series of sales that in the aggregate would constitute, all or a material portion of its assets or equity interests without the prior written consent of the Committee;

(15)    the Confirmation Order has not been entered by the Bankruptcy Court by November 22, 2021; or

(16)    the Effective Date shall not have occurred by January 1, 2022.

(d)    Debtor Termination Events. This agreement may be terminated with respect to all Parties upon one (1) business day's written notice thereof by the Debtors to the other Parties in accordance with Section 11(l) hereof, upon the occurrence of any of the following events, in each case after the Agreement Effective Date; *provided*, *however*, that the Debtors may not seek to terminate this Agreement based upon a breach of this Agreement by any other Party arising primarily out of the Debtors' own actions in material breach of this Agreement:

(1)    the breach by any of the Plan Sponsors of any obligation, commitment, agreement, representation, warranty, covenant, or other provision contained in this Agreement in any material respect, which breach (i) would materially and adversely impede or interfere with the overall acceptance, implementation, or consummation of the Restructuring on the terms and conditions set forth in this Agreement and the Plan and (ii) remains uncured for a period of five (5) business days after the receipt by the other Parties of written notice of such breach from the Debtors, other than with respect to any breach that is incurable, for which no cure period shall be required or apply;

(2)    the termination of this Agreement in accordance with its terms by any of the Plan Sponsors;

(3)    the issuance, promulgation, or enactment by any governmental entity, including any regulatory or licensing authority or court of competent jurisdiction (including the Bankruptcy Court), of any statute, regulation, ruling or order declaring this Agreement or any material portion hereof to be unenforceable or enjoining or otherwise restricting the consummation of a material portion of the Restructuring, which action remains uncured for a period of ten (10) business days after the receipt by the Parties of written notice of such event;

(4)    the Company Board determines in good faith, based upon advice of outside counsel, that proceeding with the Restructuring contemplated herein and in the Plan, and confirmation and consummation of the Plan, would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided* that the Debtors shall give prompt written notice to counsel to the Plan Sponsors of any determination in accordance with this Section 8(d)(4) (electronic mail among counsel being sufficient);

(5)    the Bankruptcy Court enters an order denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein; *provided* that, for the avoidance of doubt, the Debtors shall not have the right to terminate this Agreement pursuant to this Section 8(d)(5) if the Bankruptcy Court denies confirmation of the Plan subject only to the making of ministerial, administrative or

24

immaterial modifications to the Plan;

(6)     the Bankruptcy Court (or other court of competent jurisdiction) enters an order (i) directing the appointment of an examiner (other than an independent fee examiner) with expanded powers or a trustee in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, or (iv) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement;

(7)     any of the Plan Sponsors propose or explicitly support any Alternative Transaction without the prior written consent of the Debtors that has a material adverse effect on the consummation of the Restructuring;

(8)     the Effective Date of the Plan has not occurred by the Effective Date Deadline;

(9)     all conditions to effectiveness or closing in the EPCA are not satisfied or waived by the Effective Date Deadline, which date may be extended in writing by counsel to the Debtors (electronic mail among counsel being sufficient); *provided* that the right to terminate this Agreement under this Section 8(d)(9) shall not be available to the Debtors if any Debtor is then in material breach of the EPCA and such breach proximately caused the failure of the Plan to go effective by the Effective Date Deadline; or

(10)     the termination of the EPCA in accordance with its terms.

(e)     Mutual Termination; Automatic Termination. This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among (i) each of the Debtors and (ii) the PE Sponsors. Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically without any further required action or notice upon the occurrence of the Effective Date of the Plan and either the expiration of the appeal period with respect to the Confirmation Order if no appeals are filed or, if any appeal of the Confirmation Order is filed, the conclusion of such appeal.

(f)     Effect of Termination. The date on which termination of this Agreement is effective with respect to any Party in accordance with this Section 8 shall be referred to as a "**Termination Date**" with respect to such Party. Upon the occurrence of a Termination Date, the applicable Parties' obligations under this Agreement shall be terminated effective immediately, and the Parties, subject to such termination in accordance with this Section 8, shall be released from all commitments, undertakings, and agreements hereunder; *provided, however*, that each of the following shall survive any such termination: (i) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims, (ii) this Section 8, and (iii) Section 11 hereof.

(g)     Automatic Stay. Unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and termination of this Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, the occurrence of a Termination Event shall result in the automatic termination of this Agreement with respect to each Party for which this Agreement would terminate if the Parties having the right to

25

terminate this Agreement (the "**Requisite Notice Parties**") were permitted to provide notice of such occurrence in accordance with this Agreement, upon the date that is five (5) days following such occurrence, unless the Requisite Notice Parties waive such Termination Event in writing. The Debtors acknowledge and agree, and shall not dispute, that the giving of notice of the termination of this Agreement by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Debtors hereby waive, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice and their right to assert a contrary position in the Chapter 11 Cases, if any, with respect to the foregoing); provided, however, that nothing herein shall prejudice any Party's rights to argue that the delivery of a notice of default or termination was not otherwise proper under the terms of this Agreement.

**Section 9.        Amendments and Waivers**.

(a)        The terms and conditions of this Agreement, including any exhibits, annexes or schedules to this Agreement, may not be waived, modified, amended, or supplemented without the prior written consent of (i) each of the Debtors, (ii) the PE Sponsors (and, to the extent any such amendment would reduce the Rights Offering Backstop Commitment (as defined in the EPCA) or Direct Investment Portion (as defined in the EPCA) of any Consenting Investor or reduce the Backstop Fee (as defined in the EPCA) payable to any Consenting Investor, change the form of payment of the Backstop Fee payable to any Consenting Investor from Common Stock (as defined in the EPCA), delays beyond the Closing Date (as defined in the EPCA) the date on which payment of the Backstop Fee is paid to any Consenting Investor, or otherwise materially and adversely affects the economic interests of the Consenting Investors (collectively, the "**Consenting Investor Provisions**"), the Requisite Consenting Investors), (iii) subject to the occurrence of the Committee Effective Date and solely with respect to any rights or obligations of the Committee under Sections 5(a), 5(e), 8(c), and 9 hereof, the Committee, *provided*, for the avoidance of doubt, that none of this Agreement, the Plan or the Rights Offering Procedures may be amended, supplemented, modified or waived without the prior written consent of the Committee, to the extent such amendment, supplement, modification or waiver affects the rights or obligations of the Committee or materially impairs distributions under the Plan to any class of unsecured creditors, and (iv) subject to the occurrence of the Consenting Stakeholder Effective Date and solely with respect to any rights or obligations of the Additional Consenting Stakeholder under Sections 5(a), 5(d), 8(b), and 9 hereof, the Additional Consenting Stakeholders holding a majority of the principal amount of the Claims against the Debtors that all Additional Consenting Stakeholders hold at the time of such waiver, modification, amendment, or supplement. Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 9 shall be ineffective and void *ab initio* as to any non-consenting Party affected thereby. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by a Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy by such Party. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law. Any consent or waiver contemplated in this Agreement may be provided by electronic mail from counsel to the relevant Parties.

26

(b)   The Requisite Consenting Investors shall not agree to any amendment to this Agreement, the EPCA or the Plan related to a Consenting Investor Provision that is disproportionately materially and economically adverse to any individual Consenting Investor unless the obligations and commitments thereunder of any such Consenting Investor that does not consent to such amendment are immediately terminated by the Debtors, the other Consenting Investors and the Plan Sponsors.

**Section 10.    Fees and Expenses**. The Debtors shall promptly pay or reimburse, as and when required under either the EPCA or the Plan, all reasonable and documented out-of-pocket fees (including success fees, transaction fees or similar fees) of: (i) Kirkland & Ellis LLP, as counsel to Knighthead and Certares, (ii) Paul, Weiss, Rifkind, Wharton & Garrison LLP, as counsel to Apollo, (iii) Klehr Harrison Harvey Branzburg LLP, as Delaware counsel to the PE Sponsors, (iv) Guggenheim Securities, LLC, as investment banker to Knighthead and Certares, (v) Alvarez & Marsal Corporate Performance Improvement, LLC, as financing advisor to Knighthead and Certares, (vi) Glenn Agre Bergman & Fuentes LLP, as counsel to the Consenting Investors, (vii) Morris, Nichols, Arsht & Tunnell LLP, as Delaware counsel to the Consenting Investors, (viii) Pericles Capital Advisors, LLC, as financial advisor to the Consenting Investors, and (ix) any other accountants and other professionals, advisors and consultants retained by the PE Sponsors with the prior written consent of the Company, in each case, to implement the Restructuring (regardless of when such fees are or were incurred) (the "**Fees**"). To the extent not paid or reimbursed under the EPCA or otherwise by the Debtors before the Effective Date, the Plan shall provide for the payment in full in cash on the Effective Date of any unpaid Fees. The Fees shall be payable by the Debtors without any requirement to (x) file retention or fee applications, (y) provide notice to any Person other than the Debtors, or (z) provide itemized time detail to the Debtors or any other Person; *provided* that the applicable advisors will provide additional detail as reasonably requested by the Debtors.

**Section 11.    Miscellaneous**.

(a)   Entire Agreement. This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral, or written, among the Parties (or any subset thereof) with respect thereto, including the Existing Plan Support Agreement, that certain Joinder Agreement in Respect of Plan Support Agreement, dated as of April 14, 2021, and that certain Supplement to Joinder Agreement in Respect of Plan Support Agreement dated as of April 14, 2021 (each of which, for the avoidance of doubt, shall no longer be in effect).

(b)   Headings. The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

(c)   Governing Law; Submission to Jurisdiction; Forum Selection. This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflicts of law principles thereof. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court and, to the extent the Bankruptcy Court is determined to not have jurisdiction, in the United States District Court for the

27

Southern District of New York or any New York State court located in New York County (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto.

(d)     Trial by Jury Waiver. Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or related to this Agreement or the transactions contemplated hereby.

(e)     Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been authorized and empowered to execute and deliver this Agreement on behalf of said Party.

(f)     Interpretation and Rules of Construction. This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof. Each Party was represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel and, therefore, waive the application of any law, regulation, holding or rule of construction (i) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (ii) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel. Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation" and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or." "Writing," "written," and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent or other information shall be provided "in writing" shall include e-mail. Any reference to "business day" means any day other than a Saturday, a Sunday, or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to a day means a calendar day. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

(g)     Successors and Assigns. Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their

28

respective successors, permitted assigns, heirs, executors, administrators, and Representatives.

(h)     No Third-Party Beneficiaries. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

(i)     Relationship Among Parties. Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Agreement shall be several, not joint, (ii) no Party shall have any responsibility by virtue of this Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement; and (iv) none of the Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, including as a result of this Agreement or the Restructuring contemplated herein (other than the fiduciary duties of the Committee to Holders of unsecured Claims against any of the Debtors).

(j)     Reservation of Rights. If the Restructuring is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring, or determine the payment of damages to which a Party may be entitled under this Agreement.

(k)     Specific Performance; Remedies Cumulative. This Agreement is intended as a binding commitment enforceable in accordance with its terms. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy for any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party. Notwithstanding anything contained in this Agreement to the contrary, specific performance and injunctive or other equitable relief and the right to terminate this Agreement in accordance with the terms and provisions thereof shall be the sole and exclusive remedies for any breach of this Agreement by the Committee, and no Party (or any other person) shall be entitled to monetary damages for any breach by the Committee of any provision of this Agreement.

(l)     Notices. All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier, or by registered or certified mail (return receipt requested) to the following addresses or electronic mail addresses:

(1)     If to the Company, to:

29

The Hertz Corporation
8501 Williams Road
Estero, Florida 33928
Attention: M. David Galainena
Email: dave.galainena@hertz.com

*with a copy to:*

White & Case LLP
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Attention: Thomas E Lauria; Matthew Brown
Email: tlauria@whitecase.com; mbrown@whitecase.com

*and*

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attention: David Turetsky; Andrew Zatz
Email: david.turetsky@whitecase.com; azatz@whitecase.com

(2)    If to Knighthead or Certares, to the electronic mail addresses set forth below such Party's signature, with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn.: Stephen E. Hessler, P.C.
shessler@kirkland.com

*and*

Kirkland & Ellis LLP
300 North LaSalle Dr.
Chicago, IL 60654
Attn.: John R. Luze
john.luze@kirkland.com

(3)    If to Apollo, to the electronic mail addresses set forth below such Party's signature, with copies to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn.: Jeffrey D. Saferstein, Kyle J. Kimpler
jsaferstein@paulweiss.com; kkimpler@paulweiss.com

(4)     If to the Consenting Investors, to the electronic mail addresses set forth below such Party's signature, with copies to:

> Glenn Agre Bergman & Fuentes LLP
> 55 Hudson Yards
> 20th Floor
> New York, New York 10001
> Attn: Andrew Glenn
> aglenn@glennagre.com

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission.

(m)     <u>Acknowledgment</u>. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

(n)     <u>Independent Analysis</u>. Each Party hereby confirms that its decision to execute this Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

(o)     <u>Debtors' Fiduciary Obligations</u>. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement, the Plan, or anything included in any Definitive Document shall require any Debtor or any board of directors, board of managers, or similar governing body of any Debtor, after consulting with counsel, to take any action or to refrain from taking any action with respect to this Agreement, the Plan, or the Restructuring to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction pursuant to such exercise of fiduciary duties shall not be deemed to constitute a breach of this Agreement; *provided* that the Debtors shall give prompt written notice to counsel to each of the Plan Sponsors (electronic mail among counsel being sufficient) of any determination made under this <u>Section 11(o)</u>.

[*Remainder of Page Intentionally Left Blank*]

31

**Exhibit B**

**Form of Committee Joinder**

Pursuant to this joinder agreement (the "**Committee Joinder**"), the undersigned official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**") acknowledges that it has read and understands the Plan Support Agreement (the "**Agreement**"), dated as of May 14, 2021, by and among (i) The Hertz Corporation ("**Hertz**"), a corporation incorporated in the State of Delaware, and its affiliated debtors and debtors-in-possession (collectively with Hertz, the "**Company**" or the "**Debtors**") in the Chapter 11 Cases (as defined below) pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"); (ii)(a) one or more funds associated with Knighthead Capital Management, LLC ("**Knighthead**"), (b) one or more funds associated with Certares Opportunities LLC ("**Certares**"), and (c) Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, or managed by it or its affiliates ("**Apollo**" and, together with Knighthead and Certares, the "**PE Sponsors**"); (iii) the Parties thereto in their capacity as owners and/or beneficial owners[6] (or managers or advisors of funds or accounts that are beneficial owners) of Interests in Hertz Global Holdings, Inc. ("**Hertz Parent**") or that have otherwise provided backstop and/or investment commitments under the EPCA (the "**Consenting Investors**" and, together with the PE Sponsors, the "**Plan Sponsors**"); (iv) the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**") upon executing this Committee Joinder; and (v) any additional owners or beneficial owners of Claims against or Interests in any of the Debtors (the "**Additional Consenting Stakeholders**") that execute a Consenting Stakeholder Joinder. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

1.    Agreement to be Bound.  The Committee hereby agrees to be bound by all of the terms of the Agreement (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Committee shall hereafter be deemed to be a Party for all purposes under the Agreement.

2.    Representations and Warranties.  The Committee hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, the Committee makes, as of the date hereof, the representations and warranties set forth in Section 7 of the Agreement to each other Party, replacing each reference therein to the Agreement with references to this Committee Joinder.

3.    References to Agreement.  All references to the "Agreement" or to "Plan Support Agreement" in the Plan Support Agreement (including, for the avoidance of doubt, in this Committee Joinder) shall be deemed to refer to the Plan Support Agreement as amended and supplemented by this Committee Joinder.

4.    Effectiveness.  This Committee Joinder shall be effective on the date upon which

---

[6]    As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Claims against or Interests in any of the Debtors or the rights to acquire such Claims or Interests.

1

the Committee shall have executed and delivered the signature page of this Joinder to counsel to each of the Debtors and the Plan Sponsors (the "Joinder Effective Date"). For purposes of the Agreement, the Joinder Effective Date shall be deemed the Committee Effective Date.

5.    Governing Law.    This Committee Joinder shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflicts of law principles thereof. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Committee Joinder in the Bankruptcy Court and, to the extent the Bankruptcy Court is determined to not have jurisdiction, in the United States District Court for the Southern District of New York or any New York State court located in New York County (the "**Chosen Courts**"), and solely in connection with claims arising under this Committee Joinder: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto.

6.    Notice.    All notices and other communications given or made pursuant to the Agreement shall be sent to the Committee at:

> Kramer Levin Naftalis & Frankel LLP
> 1177 Sixth Avenue
> New York, NY 10036
> Attention: Amy Caton
>                Thomas Moers Mayer
>                Alice Byowitz
> Email: acaton@kramerlevin.com
> tmayer@kramerlevin.com
> abyowitz@kramerlevin.com

IN WITNESS WHEREOF, the Committee has caused this Committee Joinder to be executed as of the date first written above.

OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN *IN RE THE HERTZ CORPORATION, ET AL.*, CASE NO.  20-11218 (MFW) (BANKR. D. DEL.)


By: _____
Name:
Title:  Counsel to the Official Committee of Unsecured Creditors

**Exhibit B**

**Form of Consenting Stakeholder Joinder**

Pursuant to this joinder agreement (the "**Consenting Stakeholder Joinder**"), the undersigned holder of Claims against any of the Debtors (the "**Joining Party**") acknowledges that it has read and understands the Plan Support Agreement (the "**Agreement**"), dated as of May 14, 2021, by and among (i) The Hertz Corporation ("**Hertz**"), a corporation incorporated in the State of Delaware, and its affiliated debtors and debtors-in-possession (collectively with Hertz, the "**Company**" or the "**Debtors**") in the Chapter 11 Cases (as defined below) pending in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"); (ii)(a) one or more funds associated with Knighthead Capital Management, LLC ("**Knighthead**"), (b) one or more funds associated with Certares Opportunities LLC ("**Certares**"), and (c) Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, or managed by it or its affiliates ("**Apollo**" and, together with Knighthead and Certares, the "**PE Sponsors**"); (iii) the Parties thereto in their capacity as owners and/or beneficial owners[7] (or managers or advisors of funds or accounts that are beneficial owners) of Interests in Hertz Global Holdings, Inc. ("**Hertz Parent**") or that have otherwise provided backstop and/or investment commitments under the EPCA (the "**Consenting Investors**" and, together with the PE Sponsors, the "**Plan Sponsors**"); (iv) the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "**Committee**"); and (v) any additional owners or beneficial owners of Claims against or Interests in any of the Debtors (the "**Additional Consenting Stakeholders**") that execute this Consenting Stakeholder Joinder. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

1.      Agreement to be Bound. The undersigned Additional Consenting Stakeholder (the "**Joining Party**") hereby agrees to be bound by all of the terms of the Agreement (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement.

2.      Representations and Warranties. The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the Claims against any of the Debtors identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 7 of the Agreement to each other Party.

3.      Governing Law. This Consenting Stakeholder Joinder shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflicts of law principles thereof. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Consenting Stakeholder Joinder in the Bankruptcy Court and, to the extent the

---

[7]      As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Claims against or Interests in any of the Debtors or the rights to acquire such Claims or Interests.

B-1

Bankruptcy Court is determined to not have jurisdiction, in the United States District Court for the Southern District of New York or any New York State court located in New York County (the "**Chosen Courts**"), and solely in connection with claims arising under this Consenting Stakeholder Joinder: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto.

4.    Notice.    All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile:
EMAIL:

B-2

IN WITNESS WHEREOF, the Joining Party has caused this Consenting Stakeholder Joinder to be executed as of the date first written above.

[Consenting Stakeholder]


By: _____
Name:
Title:

Claims (principal amount):

**<u>Exhibit C</u>**

**Plan**

**<u>Exhibit D</u>**

**EPCA**

Exhibit C

**Equity Purchase Agreement**

AMERICAS 107163401

**EXECUTION VERSION**

EQUITY PURCHASE AND COMMITMENT AGREEMENT

AMONG

HERTZ GLOBAL HOLDINGS, INC.

AND

THE EQUITY COMMITMENT PARTIES HERETO

Dated as of May 14, 2021

TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ............................................................................................ **2**
    Section 1.1    Definitions .................................................................................. 2
    Section 1.2    Construction ............................................................................. 16

**ARTICLE II EQUITY COMMITMENT** ..................................................................... **16**
    Section 2.1    Direct Investment Commitment................................................ 16
    Section 2.2    Equity Commitment Party Default; Replacement of Defaulting Equity Commitment Party........................................................... 17
    Section 2.3    Escrow Account Funding.......................................................... 18
    Section 2.4    Closing...................................................................................... 18
    Section 2.5    Designation and Assignment Rights......................................... 19
    Section 2.6    The Rights Offerings; Subscription Rights.............................. 21
    Section 2.7    Rights Offerings Backstop Commitments ................................ 21

**ARTICLE III EXPENSE REIMBURSEMENT** .......................................................... **22**
    Section 3.1    Expense Reimbursement........................................................... 22

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY** ......................... **23**
    Section 4.1    Organization and Qualification................................................ 23
    Section 4.2    Corporate Power and Authority ............................................... 24
    Section 4.3    Execution and Delivery; Enforceability................................... 24
    Section 4.4    Authorized and Issued Equity Interests ................................... 25
    Section 4.5    Issuance.................................................................................... 25
    Section 4.6    No Conflict .............................................................................. 25
    Section 4.7    Consents and Approvals ........................................................... 25
    Section 4.8    Financial Statements ................................................................ 26
    Section 4.9    Company SEC Documents ....................................................... 26
    Section 4.10    Absence of Certain Changes .................................................... 26
    Section 4.11    No Violation; Compliance with Laws ...................................... 27
    Section 4.12    Legal Proceedings.................................................................... 27
    Section 4.13    Labor Relations........................................................................ 27
    Section 4.14    Intellectual Property and Data Privacy .................................... 27
    Section 4.15    Title to Real and Personal Property.......................................... 28
    Section 4.16    No Undisclosed Relationships .................................................. 28
    Section 4.17    Licenses and Permits ............................................................... 29
    Section 4.18    Environmental........................................................................... 29
    Section 4.19    Tax Matters .............................................................................. 29
    Section 4.20    Employee Benefit Plans............................................................ 31
    Section 4.21    Internal Control and Disclosure Controls ................................ 32
    Section 4.22    Material Contracts.................................................................... 32
    Section 4.23    No Unlawful Payments ............................................................ 32
    Section 4.24    Compliance with Money Laundering and Sanctions Laws ................................ 32
    Section 4.25    No Broker's Fees ..................................................................... 33
    Section 4.26    Insurance.................................................................................. 33

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE EQUITY COMMITMENT PARTIES** ................................................................ **33**
    Section 5.1    Organization ............................................................................ 33
    Section 5.2    Organizational Power and Authority ....................................... 33

TABLE OF CONTENTS (cont'd)

Section 5.3    Execution and Delivery; Enforceability .......................................... 33
Section 5.4    No Conflict .................................................................................. 34
Section 5.5    Consents and Approvals .............................................................. 34
Section 5.6    No Registration ........................................................................... 34
Section 5.7    Purchasing Intent ........................................................................ 34
Section 5.8    Sophistication; Investigation ....................................................... 34
Section 5.9    No Broker's Fees ......................................................................... 35
Section 5.10   Sufficient Funds .......................................................................... 35
Section 5.11   Legal Proceedings ....................................................................... 35
Section 5.12   Additional Securities Law Matters ............................................... 35

**ARTICLE VI ADDITIONAL COVENANTS** ........................................................ **36**
Section 6.1    Orders Generally ......................................................................... 36
Section 6.2    Confirmation Order; Plan and Disclosure Statement ................... 36
Section 6.3    Conduct of Business .................................................................... 36
Section 6.4    Severance Obligations ................................................................ 39
Section 6.5    Access to Information .................................................................. 39
Section 6.6    Financial Information ................................................................... 40
Section 6.7    Commercially Reasonable Efforts ............................................... 40
Section 6.8    Company Organizational and Other Documents ......................... 41
Section 6.9    Use of Proceeds .......................................................................... 41
Section 6.10   Share Legend .............................................................................. 41
Section 6.11   Governmental Approval .............................................................. 42
Section 6.12   Alternative Transactions ............................................................. 44
Section 6.13   Reorganized Company ................................................................ 45
Section 6.14   Directors and Officers Indemnity. ............................................. 45
Section 6.15   Tax Treatment ............................................................................. 46
Section 6.16   AGS Engagement Letter .............................................................. 46
Section 6.17   HIL Facility ................................................................................ 46

**ARTICLE VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES** ................................ **46**
Section 7.1    Conditions to the Obligations of the Equity Commitment Parties ...................... 46
Section 7.2    Waiver of Conditions to Obligations of Equity Commitment Parties ................ 48
Section 7.3    Conditions to the Obligations of the Debtors ........................... 48
Section 7.4    Waiver of Conditions to the Obligations of the Debtors ................... 49
Section 7.5    Condition to the Funding of the Direct Investment Preferred Commitments ............... 50
Section 7.6    Waiver of Condition to Funding of Direct Investment Preferred Commitments ............. 50

**ARTICLE VIII INDEMNIFICATION AND CONTRIBUTION** .................................................... **50**
Section 8.1    Indemnification Obligations ....................................................... 50
Section 8.2    Indemnification Procedure .......................................................... 50
Section 8.3    Settlement of Indemnified Claims ............................................... 51
Section 8.4    Contribution ................................................................................ 51
Section 8.5    Treatment of Indemnification Payments ...................................... 52
Section 8.6    No Survival .................................................................................. 52

**ARTICLE IX TERMINATION** ................................................................................ **52**
Section 9.1    Consensual Termination .............................................................. 52

TABLE OF CONTENTS (cont'd)

Page

| | | | |
|---|---|---|---|
| Section 9.2 | Termination by the Plan Sponsors | | 52 |
| Section 9.3 | Termination by the Company | | 54 |
| Section 9.4 | Effect of Termination | | 55 |
| **ARTICLE X GENERAL PROVISIONS** | | | **56** |
| Section 10.1 | Notices | | 56 |
| Section 10.2 | Assignment; Third Party Beneficiaries | | 58 |
| Section 10.3 | Prior Negotiations; Entire Agreement | | 58 |
| Section 10.4 | Governing Law; Venue | | 59 |
| Section 10.5 | Waiver of Jury Trial | | 59 |
| Section 10.6 | Counterparts | | 59 |
| Section 10.7 | Waivers and Amendments; Rights Cumulative; Consent | | 59 |
| Section 10.8 | Headings | | 60 |
| Section 10.9 | Several Liability; Specific Performance | | 60 |
| Section 10.10 | Damages | | 60 |
| Section 10.11 | Publicity | | 61 |
| Section 10.12 | Settlement Discussions | | 61 |
| Section 10.13 | No Recourse | | 61 |
| Section 10.14 | Company Disclosure Schedules | | 62 |
| Section 10.15 | Disclosures | | 62 |

## ANNEXES

| | |
|---|---|
| Annex A | Terms of Preferred Stock |
| Annex B | AGS Engagement Letter |
| Annex C | Plan |
| Annex D | Form of Rights Offering Procedures |
| Annex E | Form of "VCOC" Letter |

## SCHEDULES

| | |
|---|---|
| Schedule 1 | Equity Commitment Schedule |
| Schedule 2 | Ad Hoc Equity Committee |
| Schedule 6.17 | HIL Debt Commitment Parties |
| Company Disclosure Schedules | |

**EQUITY PURCHASE AND COMMITMENT AGREEMENT**

THIS EQUITY PURCHASE AND COMMITMENT AGREEMENT (this "**Agreement**"), dated as of May 14, 2021, is made by and among Hertz Global Holdings, Inc. (including as debtor in possession and a reorganized debtor, as applicable) (the "**Company**"), on the one hand, and the Equity Commitment Parties, on the other hand.  The Company and the Equity Commitment Parties are referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."  Capitalized terms that are used but not otherwise defined in this Agreement shall have the meanings given to them in Section 1.1 hereof or, if not defined therein, shall have the meanings given to them in the Plan.

**RECITALS**

WHEREAS, the Company, certain funds and accounts managed or advised by Knighthead Capital Management, LLC or one of its Controlled Affiliates ("**Knighthead**") and certain funds and accounts managed or advised by Certares Opportunities LLC or one of its Controlled Affiliates ("**Certares**" and, together with Knighthead and CK Amarillo LP, a Delaware limited partnership that is an Equity Commitment Party formed by Certares and Knighthead ("**Amarillo LP**"), collectively, the "**Common Equity Plan Sponsors**"), Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by it or its Affiliates (the "**Preferred Equity Plan Sponsor**" and, together with the Common Equity Plan Sponsors, the "**Plan Sponsors**") are, substantially contemporaneously with the execution of this Agreement, entering into a Plan Support Agreement (together with all exhibits thereto, as may be amended, supplemented or otherwise modified from time to time, the "**Plan Support Agreement**"), and, with the Company, desire to support the restructuring of the Debtors' indebtedness and other obligations pursuant to the Plan in the Company's jointly-administered voluntary cases, styled as *In re The Hertz Corporation., et al.*, Case No. 20-11218 (the "**Chapter 11 Cases**") that are pending under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as it may be amended from time to time, the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), implementing the terms and conditions of the Restructuring Transactions;

WHEREAS, pursuant to the Plan and this Agreement, and in accordance with the Rights Offering Procedures, as a source of funding for the Restructuring Transactions, the Company will conduct a Rights Offering (as defined below) that will provide Eligible Existing Hertz Shareholders and Eligible Unsecured Funded Debt Holders (each as defined in the Plan) with the right to purchase Common Stock (as defined below) of the Reorganized Company issued on the Effective Date; and

WHEREAS, pursuant to the Plan and subject to the terms and conditions contained in this Agreement, as a source of funding for the Restructuring Transactions, the Company has agreed to sell and issue to, and each Direct Equity Investor has agreed to subscribe for and purchase, on a several and not joint basis, its Direct Investment Portion of (a) 277,119,437 shares of common stock of the Reorganized Company (the "**Common Stock**") and (b) 1,500,000 shares of Series A Preferred Stock of the Reorganized Company, having the rights described in Annex A hereto (the "**Preferred Stock**" and together with the Common Stock, the "**Shares**").

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, the Company and the Equity Commitment Parties (acting severally and not jointly) hereby agree as follows:

1

## ARTICLE I

## DEFINITIONS

**Section 1.1**    **_Definitions_**.  Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below:

"**Ad Hoc Equity Committee**" means the Parties identified on Schedule 2.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by or is under common Control with such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made; provided that for purposes of this Agreement, neither any Equity Commitment Party nor any Related Purchaser shall be deemed an Affiliate of the Company or any of its Subsidiaries solely by being a Party to this Agreement and performing its obligations hereunder; provided that none of the Seller Entities or Acquired Subsidiaries (each as defined in the Donlen Purchase Agreement) shall constitute Affiliates of the Company for purposes of Article IV; provided further that (i) other than the Common Equity Plan Sponsors with respect to Amarillo LP, and any Related Purchaser of any Equity Commitment Party, none of the Equity Commitment Parties or their respective Affiliates, Affiliated Funds or Related Purchasers shall constitute Affiliates, Affiliated Funds or Related Purchasers of any other Equity Commitment Party by virtue of this Agreement or the transactions contemplated hereby; (ii) none of the direct or indirect, current or future limited partners or other equity financing sources of Amarillo LP (other than Knighthead or Certares and their Affiliates) or their respective Affiliates shall constitute Affiliates, Affiliated Funds or Related Purchasers of any of the Plan Sponsors; and (iii) other than for purposes of Section 6.5, Article IX, Section 10.11, Section 10.13, Section 10.15 and clause (vi) of the definition of Material Adverse Effect, in no event shall any of the Equity Commitment Parties or Plan Sponsors or their respective Affiliates, Affiliated Funds or Related Purchasers be considered an Affiliate of any portfolio company or investment fund affiliated with Apollo Global Management, Inc. nor shall any portfolio company or investment fund affiliated with Apollo Global Management, Inc. be considered to be an Affiliate of any of the Equity Commitment Parties or Plan Sponsors.  "**Affiliated**" has a correlative meaning.

"**Affiliated Fund**" means any investment fund (including sub-fund), other entity or account the primary investment manager to which is a Plan Sponsor, an Equity Commitment Party or an Affiliate thereof.

"**Agreement**" has the meaning set forth in the preamble.

"**AGS Engagement Letter**" means the Letter Agreement in the form attached hereto as Annex B.

"**Alternative Transaction**" means any transaction with respect to a plan of reorganization or liquidation, dissolution, winding up, merger, consolidation, business combination, joint venture, partnership, sale of material assets or equity interests of the Company and its Subsidiaries taken as a whole, or any other restructuring involving the Debtors without the prior written consent of the Plan Sponsors that renders the Restructuring or the Plan unable to be consummated on the terms set forth in the Plan and this Agreement, or would reasonably be expected to materially frustrate the economic and legal effects of the Restructuring, the Plan or this Agreement, in each case excluding the transactions contemplated by the Donlen Purchase Agreement and any transaction permitted by Section 6.3(b) or Section 6.3(b) of the Company Disclosure Schedules.

2

"**Alternative Transaction Proposal**" has the meaning set forth in Section 6.12(b).

"**Amarillo LP**" has the meaning set forth in the Recitals.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity, whether domestic or foreign, having jurisdiction pursuant to the Antitrust Laws, and "**Antitrust Authority**" means any of them.

"**Antitrust Laws**" means the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law, whether domestic or foreign, governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

"**Applicable Consent**" has the meaning set forth in Section 4.7.

"**Available Shares**" means the Direct Investment Shares, Rights Offering Shares and Unsubscribed Shares that any Equity Commitment Party fails to purchase as a result of an Equity Commitment Party Default.

"**Backstop Investor**" means the Parties identified on Schedule 1 hereto that have a Rights Offering Backstop Commitment set forth across from such Party on Schedule 1 hereto in the column labeled "Rights Offering Backstop Commitment" (subject to the transfer provisions of Section 2.5 hereof).

"**Backstop Percentage**" means, with respect to any Backstop Investor at any time, the percentage obtained by dividing the Rights Offering Backstop Commitment of such Backstop Investor as set forth on Schedule 1 hereto in the column labeled "Rights Offering Backstop Commitment" at such time by the Rights Offering Backstop Amount at such time.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court.

"**beneficial ownership**" means, the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Claims (as defined in the Plan Support Agreement) against or Interests (as defined in the Plan Support Agreement) in any of the Debtors or the rights to acquire such Claims or Interests.

"**Burdensome Condition**" has the meaning set forth in Section 6.11(f).

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Certificate of Designation**" means that certain Series A Preferred Stock Certificate of Designation setting forth the terms governing the Preferred Stock, which shall be consistent with the Plan

3

and this Agreement, including the terms set forth in Annex A hereto (the "**Preferred Stock Term Sheet**"), and otherwise in form and substance acceptable to the Company and the Plan Sponsors.

"**CFIUS**" means the interagency Committee on Foreign Investment in the United States.

"**CFIUS Parties**" means the Persons making a CFIUS filing in connection with the transactions contemplated hereby, including with respect to the direct or indirect investments being made into or through Amarillo LP in connection therewith.

"**CFIUS Statute**" means Section 721 of the Defense Production Act of 1950, as amended by the Foreign Investment Risk Review Modernization Act of 2018, as it may be further amended, modified, supplemented or replaces from time to time and including all applicable regulations and interim rules promulgated thereunder.

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Closing**" has the meaning set forth in Section 2.4(a).

"**Closing Date**" has the meaning set forth in Section 2.4(a).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Common Equity Commitment Percentage**" means, with respect to any Equity Commitment Party, the total amount of such Equity Commitment Party's Direct Investment Common Commitments as a proportion of the Direct Investment Common Commitments of all Equity Commitment Parties, determined as of the relevant measurement date.

"**Common Equity Plan Sponsors**" has the meaning set forth in the Recitals.

"**Common Per Share Purchase Price**" means $10.00; provided that, with respect to the Direct Equity Investor marked with "*" in Schedule 1 hereto, the Common Per Share Purchase Price means $11.08.

"**Common Stock**" has the meaning set forth in the Recitals.

"**Company**" has the meaning set forth in the preamble.

"**Company Benefit Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA, whether or not subject to ERISA), other than a foreign plan or a Multiemployer Plan, established by, maintained or contributed to or required to be contributed to by any Debtor or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of their respective ERISA Affiliates.

"**Company Board**" has the meaning set forth in Section 6.12(b).

"**Company Disclosure Schedules**" means the disclosure schedules delivered by the Company to the Equity Commitment Parties on the date of this Agreement.

"**Company Organizational Documents**" means collectively, the organizational documents of the Company, including any certificate of formation or incorporation, applicable charter, articles of incorporation, limited liability company agreement, bylaws, Certificate of Designation or any similar documents, each of which shall be consistent with the Plan and this Agreement, and in form and

4

substance reasonably acceptable to the Plan Sponsors and the Company and in the case of the Certificate of Designation, which shall also be consistent with the Preferred Stock Term Sheet and otherwise in form and substance acceptable to the Plan Sponsors and the Company.

"**Company SEC Documents**" means all of the registration statements, prospectuses, reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Company.

"**Confirmation Order**" means a Final Order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Contract**" means any binding agreement, contract or instrument, whether oral or written, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, but excluding the Plan.

"**Control**" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or agency or otherwise.  "**Controlled**" has a correlative meaning.

"**COVID-19 Measures**" means any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester or any other Law, Order, directive, guidelines or recommendations by any Governmental Entity, or any Company policies in furtherance thereof, in connection with or in response to COVID-19, and any reasonable actions taken or planned to be taken in response thereto.

"**D&O Indemnified Persons**" has the meaning set forth in Section 6.14.

"**Debtors**" means, collectively (i) the Hertz Corp.; (ii) the Company; (iii) Thrifty Rent-A-Car System, LLC; (iv) Thrifty, LLC; (v) Dollar Thrifty Automotive Group, Inc.; (vi) Firefly Rent A Car LLC; (vii) CMGC Canada Acquisition ULC; (viii) Hertz Aircraft, LLC; (ix) Dollar Rent A Car, Inc.; (x) Dollar Thrifty Automotive Group Canada Inc.; (xi) Donlen Corporation; (xii) Donlen FSHCO Company; (xiii) Hertz Canada Limited; (xiv) Donlen Mobility Solutions, Inc.; (xv) DTG Canada Corp.; (xvi) DTG Operations, Inc.; (xvii) Hertz Car Sales LLC; (xviii) DTG Supply, LLC; (xix) Hertz Global Services Corporation; (xx) Hertz Local Edition Corp.; (xxi) Hertz Local Edition Transporting, Inc.; (xxii) Donlen Fleet Leasing Ltd.; (xxiii) Hertz System, Inc.; (xxiv) Smartz Vehicle Rental Corporation; (xxv) Thrifty Car Sales, Inc.; (xxvi) Hertz Technologies, Inc.; (xxvii) TRAC Asia Pacific, Inc.; (xxviii) Hertz Transporting, Inc.; (xxix) Rental Car Group Company, LLC; and (xxx) Rental Car Intermediate Holdings, LLC; provided that none of the Seller Entities or Acquired Subsidiaries (each as defined in the Donlen Purchase Agreement) shall constitute Debtors, for the purpose of Article IV and Article VI.

"**Defaulting Equity Commitment Party**" means, in respect of an Equity Commitment Party Default that is continuing, the applicable defaulting Equity Commitment Party.

"**DIP Facility**" means the post-petition financing facility issued pursuant to the DIP Credit Agreement and the DIP Order, consisting of a $1,650,000,000 senior secured multiple draw term loan credit facility.

5

"**Direct Equity Investor**" means each Person identified as a Direct Equity Investor on Schedule 1 hereto.

"**Direct Investment Commitment**" has the meaning set forth in Section 2.1.

"**Direct Investment Common Amount**" means $2,780,941,666.67.

"**Direct Investment Common Commitments**" means Direct Investment Commitments with respect to Direct Investment Common Shares. For the avoidance of doubt, from and after the date hereof until the earlier of the Effective Date and termination of this Agreement, except as permitted by Section 2.2(c), the Company shall not obtain any additional commitments to purchase Common Stock other than the Direct Investment Common Commitments, the Rights Offering Equity Commitments and the Rights Offering Backstop Commitments.

"**Direct Investment Common Shares**" means a number of shares of Common Stock equal to the Direct Investment Common Amount divided by the Common Per Share Purchase Price that is applicable to each Direct Equity Investor.

"**Direct Investment Portion**" means, with respect to each Direct Equity Investor, the number of Direct Investment Common Shares and Direct Investment Preferred Shares ascribed to such Direct Equity Investor on Schedule 1 hereto.

"**Direct Investment Preferred Amount**" means $1,500,000,000.

"**Direct Investment Preferred Commitments**" means Direct Investment Commitments with respect to Direct Investment Preferred Shares.

"**Direct Investment Preferred Shares**" means a number of shares of Preferred Stock equal to the Direct Investment Preferred Amount divided by the Preferred Per Share Initial Stated Value.

"**Direct Investment Shares**" means the Direct Investment Common Shares and the Direct Investment Preferred Shares.

"**Disclosure Statement**" has the meaning set forth in the Plan Support Agreement.

"**Disclosure Statement Order**" means that certain *Order (I) Approving the Proposed Disclosure Statement and Form and Manner Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing, (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan, and (V) Granting Related Relief* entered by the Bankruptcy Court on April 22, 2021 [Docket No. 4111] (as amended, modified, or supplemented from time to time with any such amendments, modifications, or supplements in form and substance reasonably acceptable to the Plan Sponsors in good faith).

"**Donlen Purchase Agreement**" means that certain Stock and Asset Purchase Agreement, dated as of November 25, 2020, as amended, by and among, the Company, Donlen Corporation and each of the subsidiaries of Donlen as set forth therein and Freedom Acquirer LLC.

"**Effective Date**" means the date upon which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the consummation of the transactions contemplated by this Agreement and the effectiveness of the Plan have been satisfied or are waived in accordance with the terms hereof and

6

thereof, as the case may be, and (c) the Restructuring and the other transactions to occur on such date pursuant to the Plan become effective or are consummated.

"**Emergency Event**" means (a) any epidemic, pandemic, disease outbreak, or public health crisis including outbreaks or additional waves of outbreaks of any contagious diseases (including influenza, COVID-19 or any variation thereof), cyberattacks, terrorism, cyberterrorism, force majeure events or "acts of God", or (b) any other Event that threatens health, safety or the environment.

"**Emergency Response**" means any reasonable emergency or immediate remedial or protective action taken or determined or committed to be taken by the Company or any of its Subsidiaries, that is, in their good faith reasonable determination in the best interests of the Company and its Subsidiaries, as applicable, in response to any Emergency Event.

"**End Date**" has the meaning set forth in Section 9.2(b)(i).

"**Environmental Laws**" means all Laws relating to pollution, protection of the environment, or the preservation or reclamation of natural resources.

"**EPCA Approval Obligations**" means the obligations of the Company and the other Debtors under this Agreement and the EPCA Approval Order.

"**EPCA Approval Order**" means an Order of the Bankruptcy Court that is not stayed (under Bankruptcy Rule 6004(h) or otherwise) that (a) authorizes the Company (on behalf of itself and the other Debtors) to enter into and perform under this Agreement, including all exhibits and other attachments, and the AGS Engagement Letter, and (b) provides that the Expense Reimbursement and the indemnification provisions contained herein, and the fees, expenses and indemnification obligations under the AGS Engagement Letter, shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and shall be payable by the Debtors as provided in this Agreement without further Order of the Bankruptcy Court.

"**Equity Commitment**" has the meaning set forth in Section 2.1(a).

"**Equity Commitment Party**" means each Direct Equity Investor and each Backstop Investor.

"**Equity Commitment Party Default**" means the failure by any Equity Commitment Party to (a) deliver and pay in accordance with Section 2.3(b) the aggregate Per Share Purchase Price for the Direct Investment Shares such Equity Commitment Party is obligated to purchase pursuant to its Direct Investment Commitment, (b) exercise all Subscription Rights and purchase all Rights Offering Shares pursuant to its Rights Offering Equity Commitment in accordance with Section 2.7(a), or (c) deliver and pay in accordance with Section 2.3(b) the aggregate Common Per Share Purchase Price for the Common Stock such Equity Commitment Party is obligated to purchase pursuant to its Rights Offering Backstop Commitment.

"**Equity Commitment Party Replacement**" shall have the meaning set forth in Section 2.2(a).

"**Equity Commitment Party Replacement Period**" shall have the meaning set forth in Section 2.2(a).

"**Equity Commitment Percentage**" means, with respect to any Equity Commitment Party, the total amount of such Equity Commitment Party's Equity Commitment as a proportion of the Equity Commitments of all Equity Commitment Parties, determined as of the relevant measurement date.  For Direct Investment Preferred Shares, the Equity Commitment Percentage will be based on the Preferred Per Share Initial Stated Value thereof.

"**Equity Commitment Schedule**" means Schedule 1 to this Agreement, as amended, supplemented or otherwise modified from time to time in accordance with this Agreement.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with any of the Debtors, is, or at any relevant time during the past six years was, treated as a single employer under any provision of Section 414 of the Code.

"**Escrow Account**" has the meaning set forth in Section 2.3(b).

"**Escrow Account Funding Date**" has the meaning set forth in Section 2.3(b).

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Existing Equity Commitment Party Purchaser**" has the meaning set forth in Section 2.5(b).

"**Exit ABS Facilities**" means an asset-backed securitization facility that will refinance (i) the HVF II Facility and (ii) the Interim Fleet Financing Facility (unless the Company elects not to refinance the Interim Fleet Financing Facility prior to the Closing, which election the Company shall be permitted to make with the consent of the Plan Sponsors, such consent not to be unreasonably withheld), which facility shall be consistent with the Plan, the Plan Support Agreement and this Agreement, and otherwise in form and substance acceptable to the Company and the Plan Sponsors.

"**Exit Revolving Credit Facility**" means a senior secured revolving credit facility in an aggregate commitment amount of no more than $1,500,000,000 (as such amount may be adjusted with the approval of the Company and the Plan Sponsors), with the capacity for the issuance of letters of credit, secured by a first Lien on substantially all assets of the reorganized Hertz Corp. and the Subsidiary Guarantors thereunder (except Donlen Corporation and its Subsidiaries), which shall be consistent with the Plan, the Plan Support Agreement and this Agreement and otherwise in form and substance acceptable to the Company and the Plan Sponsors.  Notwithstanding anything to the contrary, the Exit Revolving Credit Facility shall be arranged by the Debtors with the full engagement of the Common Equity Plan Sponsors. For the avoidance of doubt, the Plan Sponsors, with advance written notice (which may be by email) to the Debtors, shall not be restricted from communicating with any potential financing sources or their advisors so long as the Company or its advisors are provided a reasonable opportunity to participate in any such communication.

"**Exit Term Loan Facility**" means a senior secured term credit facility in a principal amount of $1,300,000,000 (as such amount may be adjusted with the approval of the Company and the Plan Sponsors), secured by a first Lien on substantially all assets of the reorganized Hertz Corp. and the

8

Subsidiary Guarantors thereunder (except Donlen Corporation and its Subsidiaries), which shall be consistent with the Plan, the Plan Support Agreement and this Agreement, and otherwise in form and substance acceptable to the Company and the Plan Sponsors. Notwithstanding anything to the contrary, the Exit Term Loan Facility shall be arranged by the Debtors with the full engagement of the Common Equity Plan Sponsors. For the avoidance of doubt, the Plan Sponsors, with advance written notice (which may be by email) to the Debtors, shall not be restricted from communicating with any potential financing sources or their advisors so long as the Company or its advisors are provided a reasonable opportunity to participate in any such communication.

"**Expense Reimbursement**" has the meaning set forth in Section 3.1(a).

"**Filing Party**" has the meaning set forth in Section 6.11(b).

"**Final Order**" means, as applicable, an Order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the Order could be appealed or from which certiorari could be sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such Order, or has otherwise been dismissed with prejudice; provided, however, that the possibility of a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or local rules of the Bankruptcy Court, may be filed relating to such Order shall not prevent such Order from being a Final Order.

"**Financial Reports**" has the meaning set forth in Section 6.6.

"**Financial Statements**" has the meaning set forth in Section 4.8.

"**Form 10-K**" has the meaning set forth in Section 4.8.

"**Funding Notice**" has the meaning set forth in Section 2.3(a).

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Entity**" means any federal, municipal, state, provincial, territorial, local or foreign governmental or quasi-governmental, administrative, taxing or regulatory authority, department, agency, board, bureau, official, commission, body or other similar authority or instrumentality (including any self-regulatory authority, securities exchange, court or similar tribunal).

"**Hazardous Materials**" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas, of any nature subject to regulation under any Environmental Law.

"**Hertz Corp.**" means The Hertz Corporation.

"**HIL Debt Commitment Parties**" means those parties set forth on Schedule 6.17.

"**HIL Debt Financing**" has the meaning set forth in Section 6.17.

9

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended from time to time.

"**Indemnified Claim**" has the meaning set forth in Section 8.2.

"**Indemnified Person**" has the meaning set forth in Section 8.1.

"**Indemnifying Party**" has the meaning set forth in Section 8.1.

"**Intellectual Property Rights**" has the meaning set forth in Section 4.14(b).

"**IRS**" means the United States Internal Revenue Service.

"**Joint Filing Party**" has the meaning set forth in Section 6.11(c).

"**Joint Notice**" means a joint voluntary notice submitted by the CFIUS Parties to CFIUS or, if required by CFIUS, a declaration followed by a joint voluntary notice submitted by the CFIUS Parties.

"**Kirkland & Ellis**" means Kirkland & Ellis LLP.

"**Knowledge of the Company**" means the actual knowledge, after reasonable inquiry, of Paul E. Stone, Kungyu ("Kenny") Cheung, Scott Massengill and M. David Galainena.

"**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Entity.

"**Legal Proceedings**" has the meaning set forth in Section 4.12.

"**Legend**" has the meaning set forth in Section 6.10.

"**Lien**" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"**Losses**" has the meaning set forth in Section 8.1.

"**Marketing Period**" means the first period of twenty (20) consecutive days after entry of the Confirmation Order during which the Exit ABS Facilities is marketed to potential investors.

"**Material Adverse Effect**" means any Event which individually, or in the aggregate, has had or would reasonably be expected to have a material adverse effect on (a) the business, assets, liabilities, properties, results of operations or condition (financial or otherwise) of the Company and its Subsidiaries, taken as a whole, or (b) the ability of the Company and its Subsidiaries, taken as a whole, to perform their obligations under, or to consummate the transactions contemplated by, this Agreement, including the Rights Offering, in each case except to the extent it results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after December 31, 2020 in global, national or regional political conditions, any natural disasters, man-made disasters, epidemics, pandemics, disease outbreaks, or public health crises including outbreaks or additional waves of outbreaks of any contagious diseases (including influenza, COVID-19 or any variation thereof), hostilities, acts of war (whether or not declared), sabotage, civil unrest, cyberattacks, terrorism, cyberterrorism, military actions, national emergencies or force majeure events or "acts of God", or any escalation or material worsening thereof any change in the

general business, market, financial or economic conditions affecting the industries, regions and markets in which the Company or its Subsidiaries operate, including any change in the United States or applicable foreign economies or securities, commodities or financial markets; (ii) any changes after the date hereof in applicable Law or GAAP, or in the interpretation or enforcement thereof; (iii) the execution, announcement or performance of this Agreement or the other Transaction Agreements or the transactions contemplated hereby or thereby (including any act or omission of the Company and its Subsidiaries to operate as expressly required or prohibited, as applicable, by the Plan Support Agreement or this Agreement or consented to or required by the Plan Sponsors in writing); (iv) changes in the market price or trading volume of the claims or equity or debt securities of the Company and its Subsidiaries (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) the filing or pendency of the Chapter 11 Cases; (vi) any action taken by the Plan Sponsors or their respective Affiliates with respect to the Company or any of its Subsidiaries (including through such Persons' participation in the Chapter 11 Cases); (vii) the occurrence of an Equity Commitment Party Default; (viii) any matters expressly disclosed in the Company Disclosure Schedules, Company SEC Documents filed from and after December 31, 2020 through the date hereof (excluding disclosures contained in the "Forward-Looking Statements" or "Risk Factors" sections thereof, or any other statements that are similarly predictive, cautionary or forward looking in nature) or the Disclosure Statement as filed on or prior to the date hereof; and (ix) failure of the Company or any of its Subsidiaries to meet any internal or published projections, forecasts, estimates or predictions (but not the underlying facts giving rise to such departure unless such facts are otherwise excluded pursuant to the clauses contained in this definition); provided that the exceptions in clauses (i) or (ii) shall not apply to the extent that such Event is materially and disproportionately adverse to the Company and its Subsidiaries, taken as a whole, as compared to other companies in the industries, markets or geographies in which the Company and its Subsidiaries operate.

"**Material Contracts**" means (a) all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which any of the Debtors is a party or (b) solely for purposes of Section 4.22 (and not for purposes of Section 6.3) any Contracts to which any of the Debtors is a party that is likely to reasonably involve consideration payable by the Debtor of more than $20,000,000, in the aggregate, over the twelve month period from the date hereof, has a term of greater than one year and is not cancelable without material penalty on not more than thirty (30) days' notice.

"**Money Laundering Laws**" has the meaning set forth in Section 4.24(a).

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any of the Debtors or any ERISA Affiliate is making or accruing an obligation to make contributions, has within any of the preceding six plan years made or accrued an obligation to make contributions, or each such plan with respect to which any such entity has any actual or contingent liability or obligation.

"**New Registration Rights Agreement**" means a registration rights agreement, which shall be consistent with the Plan and this Agreement and otherwise in form and substance acceptable to the Company and the Common Equity Plan Sponsors.

"**New Reorganized Debt**" means the Exit Term Loan Facility, the Exit Revolving Credit Facility and the Exit ABS Facilities, in each case, as set forth in the Plan.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"**Outside Date**" has the meaning set forth in Section 9.2(b)(i).

11

"**Party**" has the meaning set forth in the preamble.

"**Paul, Weiss**" has the meaning set forth in Section 3.1(a).

"**PCAOB**" has the meaning set forth in Section 4.8.

"**Per Share Purchase Price**" means the Preferred Per Share Purchase Price and the Common Per Share Purchase Price, as the case may be.

"**Permitted Liens**" means (a) Liens for Taxes that (i) are not yet delinquent, (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto in accordance with GAAP or (iii) the nonpayment of which is permitted or required by the Bankruptcy Code; (b) landlord's, operator's, vendors', carriers', warehousemen's, mechanics', materialmen's, repairmen's and other similar Liens for labor, materials or supplies provided with respect to any Real Property or personal property incurred in the ordinary course of business and as otherwise not prohibited under this Agreement, for amounts that do not detract from the value of, or impair the use of, the Real Property or personal property of the Debtors in a manner which is material to the Company and its Subsidiaries taken as a whole, or, if for amounts that do so detract from the value of, or impair the use of, the Real Property or personal property of the Debtors, if such Lien is being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (c) zoning, building codes and other land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such Real Property; provided that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Real Property; (d) easements, covenants, conditions, minor encroachments, rights of way, restrictions and other similar matters adversely affecting title to any Real Property and other title defects and encumbrances that do not or would not impair, in a manner material to the Company and its Subsidiaries taken as a whole, the use or occupancy of such Real Property or the operation of the Debtors' business and all matters disclosed in the real property records of the counties (or equivalent) in which the Real Property or any portion thereof is located; (e) Liens granted under any Contracts with respect to any Real Property or personal property incurred in the ordinary course of business and that do not, in a manner material to the Company and its Subsidiaries taken as a whole, detract from the value of, or impair the use of, any of the Real Property or personal property of any of the Debtors; (f) Liens granted in connection with the New Reorganized Debt and any Lien permitted by the New Reorganized Debt; (g) Liens listed on Section 1.1 of the Company Disclosure Schedules; and (h) Liens that, pursuant to the Confirmation Order, will not survive beyond the Effective Date.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, association, trust, Governmental Entity or other entity or organization.

"**Plan**" means the Debtors' joint plan of reorganization, in the form attached hereto as Annex C, to be approved by the Confirmation Order, including the Plan Supplement and all material documents, annexes, schedules, exhibits, amendments, modifications, or supplements thereto, as may be amended, supplemented, or modified from time to time in accordance with its terms and with the Plan Support Agreement and in a manner that is consistent with the Plan, the Plan Support Agreement, this Agreement, and otherwise in form and substance acceptable to the Company and the Plan Sponsors.

"**Plan Sponsors**" has the meaning set forth in the Recitals.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, filed with the Bankruptcy Court, each of which shall be in form and

substance materially consistent with the Plan, the Plan Support Agreement, and otherwise acceptable to the Company and the Plan Sponsors, as may be amended, modified, or supplemented from time to time.

"**Plan Support Agreement**" has the meaning set forth in the Recitals.

"**Pre-Closing Period**" has the meaning set forth in Section 6.3.

"**Preferred Equity Commitment Percentage**" means, with respect to any Equity Commitment Party, the total amount of such Equity Commitment Party's Direct Investment Preferred Commitments as a proportion of the Direct Investment Preferred Commitments of all Equity Commitment Parties, determined as of the relevant measurement date.

"**Preferred Equity Plan Sponsor**" has the meaning set forth in the Recitals.

"**Preferred Per Share Initial Stated Value**" means $1,000.00.

"**Preferred Per Share Purchase Price**" means $980.00.

"**Preferred Stock**" has the meaning set forth in the Recitals.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any of the Debtors, together with, in each case, all beneficial easements, hereditaments and appurtenances relating thereto, and all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Related Party**" means, with respect to any Person, (a) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, controlling Persons, member, manager or stockholder of such Person and (b) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing.

"**Related Purchaser**" means any Affiliate of a Plan Sponsor or an Equity Commitment Party or any Affiliated Fund of such Plan Sponsor or Equity Commitment Party (in each case, other than any portfolio company of such Plan Sponsor, Equity Commitment Party or its Affiliates).

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating.  "**Released**" has a correlative meaning.

"**Reorganized Company**" means reorganized Hertz Global Holding, Inc., or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

"**Replacing Equity Commitment Party**" has the meaning set forth in Section 2.2(a).

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, investment bankers, attorneys, accountants, advisors and other representatives acting on behalf of such Person.

"**Required Common Amount**" means the sum of (i) the Direct Investment Common Amount plus (ii) the lesser of (x) the aggregate amount for which Subscription Rights are exercised in accordance with the Rights Offering and (y) the Rights Offering Backstop Amount.

"**Restructuring**" has the meaning set forth in the Plan Support Agreement.

13

"**Restructuring Transactions**" means, collectively, the transactions contemplated by the Plan and the Plan Support Agreement.

"**Rights Offering**" means the offering of rights pursuant to which Eligible Existing Hertz Shareholders and Eligible Unsecured Funded Debt Holders (each as defined in the Plan) are entitled to receive Subscription Rights to acquire Common Stock substantially on the terms reflected in the Plan, the Plan Support Agreement and this Agreement, and in accordance with the Rights Offering Procedures, in an aggregate amount (calculated based on the Common Per Share Purchase Price) not exceeding the Rights Offering Amount.

"**Rights Offering Amount**" means an amount equal to $1,635,000,000.

"**Rights Offering Backstop Amount**" means $1,635,000,000.

"**Rights Offering Backstop Commitment**" has the meaning set forth in Section 2.7(b).

"**Rights Offering Commitment Purchasers**" has the meaning set forth in Section 2.5(d)(ii).

"**Rights Offering Equity Commitment**" has the meaning set forth in Section 2.7(a).

"**Rights Offering Expiration Time**" means the time and the date on which the rights offering subscription forms must be duly delivered to the Rights Offering Subscription Agent in accordance with the Rights Offering Procedures.

"**Rights Offering Participants**" means those Persons who duly subscribe for Rights Offering Shares in accordance with the Rights Offering Procedures.

"**Rights Offering Procedures**" means the procedures with respect to the Rights Offering that are approved by the Bankruptcy Court, which procedures shall be substantially in the form and substance attached as Annex D, and otherwise acceptable to the Plan Sponsors and the Company.

"**Rights Offering Shares**" means the Common Stock distributed pursuant to and in accordance with the Rights Offering Procedures in the Rights Offering.

"**Rights Offering Subscription Agent**" means Prime Clerk LLC, in its capacity as subscription agent pursuant to the Rights Offering Procedures.

"**Rights Offering Subscription Price**" means the subscription price for Rights Offering Shares offered in the Rights Offering pursuant to the Rights Offering Procedures, which shall equal the Common Per Share Purchase Price.

"**Sanctions**" has the meaning set forth in Section 4.24(a).

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Senior Management Team**" means (i) Jeffery Adams, (ii) Darren Arrington, (iii) Kenney Cheung, (iv) M. David Galainena, (v) Eric Leef, (vi) Scott Massengill, (vii) Joseph McPherson, (viii) Jayesh Patel, (ix) Opal Gay Perry, (x) Paul Stone, and (xi) Laura Suenon Nestar (Smith).

14

"**Shares**" has the meaning set forth in the Recitals.

"**Subscription Rights**" means the subscription rights to purchase Rights Offering Shares in accordance with the Rights Offering Procedures.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, joint venture or other legal entity as to which such Person (either alone or through or together with any other Subsidiary), (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body, or (c) has the power to direct the business and policies; provided that none of the Seller Entities or Acquired Subsidiaries (each as defined in the Donlen Purchase Agreement) shall constitute Subsidiaries of the Company, for the purpose of Article IV.

"**Superior Proposal**" has the meaning set forth in Section 6.12(b).

"**Superior Transaction**" means a transaction that the Company Board determines in good faith, based on the advice of its financial and legal advisors: (x) would be in the best interests of the Company and its creditors and equity holders as a whole, and (y) would reasonably be expected to be superior to the Company and its creditors and equity holders in comparison to the transactions contemplated under this Agreement and the Plan.

"**Tax Return**" means any return, declaration, election, disclosure, report, claim for refund, statement or information report or filing with respect to Taxes, including any schedules attached thereto and including any amendment thereof.

"**Taxes**" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, escheat, abandoned and unclaimed property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other mandatory governmental charges of any kind whatsoever paid to a Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group, as transferee or successor, by Contract, as withholding agent, or otherwise.

"**Transaction Agreements**" has the meaning set forth in Section 4.2(a).

"**Transfer**" means to sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire any current or future interest). "**Transfer**" used as a noun has a correlative meaning.

"**Unsubscribed Shares**" means the Common Stock offered pursuant to the Rights Offering to Eligible Existing Hertz Shareholders and Eligible Unsecured Funded Debt Holders (each as defined in the Plan) that have not been duly purchased in exchange for a cash payment in the Rights Offering by Eligible Existing Hertz Shareholders and Eligible Unsecured Funded Debt Holders (each as defined in the Plan) in accordance with the Rights Offering Procedures and the Plan.

"**VCOC Letter**" means the "VCOC" letter in the form attached hereto as Annex E.

15

"**willful or intentional breach**" has the meaning set forth in Section 9.4.

**Section 1.2**    *Construction*.  In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(c)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(d)    the words "hereof", "herein", "hereto" and "hereunder", and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement;

(e)    the term "this Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented;

(f)    the term "or" shall not be exclusive;

(g)    "include", "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words;

(h)    references to "day" or "days" are to calendar days;

(i)    references to "the date hereof" means the date of this Agreement;

(j)    unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time; and

(k)    references to "dollars" or "$" refer to currency of the United States of America, unless otherwise expressly provided.

**ARTICLE II**

**EQUITY COMMITMENT**

**Section 2.1**    *Direct Investment Commitment.*

(a)    On and subject to the terms and conditions hereof, each Direct Equity Investor agrees, severally (in accordance with its Direct Investment Portion) and not jointly, to purchase (the "**Direct Investment Commitment**"), and the Company agrees to sell to such Direct Equity Investor, at the Closing, its Direct Investment Portion of the Direct Investment Shares for the aggregate applicable Per Share Purchase Price.  For purposes of this Agreement, an Equity Commitment Party's Direct Investment Commitment, Rights Offering Equity Commitment and Rights Offering Backstop Commitment is referred to as its "**Equity Commitment**".

16

**Section 2.2**     *Equity Commitment Party Default; Replacement of Defaulting Equity Commitment Party.*

(a)     Upon the occurrence of an Equity Commitment Party Default, the Equity Commitment Parties (other than any Defaulting Equity Commitment Party) shall have the right and opportunity (but not the obligation), within ten (10) Business Days after receipt of written notice from the Company to all non-defaulting Equity Commitment Parties of such Equity Commitment Party Default (such ten (10) Business Day period, the "**Equity Commitment Party Replacement Period"),** to make arrangements for one or more of the Equity Commitment Parties and their respective Related Purchasers who agree to be bound by this Agreement (other than the Defaulting Equity Commitment Party) to purchase all or any portion of the Available Shares (such purchase, an **"Equity Commitment Party Replacement")** on the terms and subject to the conditions set forth in this Agreement and in such amounts as may be agreed upon by all of the Equity Commitment Parties and their respective Related Purchasers electing to purchase all or any portion of the Available Shares, or, if no such agreement is reached, based upon the relative applicable Equity Commitment Percentages of any such Equity Commitment Parties (other than any Defaulting Equity Commitment Party) (such Equity Commitment Parties and Related Purchasers the "**Replacing Equity Commitment Parties**").  Any Available Shares purchased by a Replacing Equity Commitment Party (and any commitment and applicable aggregate Per Share Purchase Price associated therewith) shall be included, among other things, in the determination of (x) the Unsubscribed Shares required to be purchased by such Replacing Equity Commitment Party for all purposes hereunder and (y) the Equity Commitment Percentage of such Replacing Equity Commitment Party for purposes of Section 2.3(a) and Section 3.1.  If an Equity Commitment Party Default occurs, the Outside Date shall be delayed only to the extent necessary to allow for the Equity Commitment Party Replacement to be completed within the Equity Commitment Party Replacement Period.

(b)     Notwithstanding anything in this Agreement to the contrary, if an Equity Commitment Party is a Defaulting Equity Commitment Party, it shall not be entitled to any of the Expense Reimbursement or indemnification provided, or to be provided, under or in connection with this Agreement or any of the amounts payable pursuant to Section 2.4(d); provided that to the extent that (i) a Replacing Equity Commitment Party satisfies an Equity Commitment Party Default with an Equity Commitment Party Replacement in accordance with Section 2.2(a) and (ii) such Defaulting Equity Commitment Party would have otherwise been entitled to any of the amounts payable pursuant to Section 2.4(d), such Replacing Equity Commitment Party shall be entitled to such amounts.  To the extent any such Defaulting Equity Commitment Party has received any Expense Reimbursement in accordance with this Agreement, such Defaulting Equity Commitment Party shall return such amounts to the Company promptly following such default.

(c)     If all or any portion of the Available Shares are not purchased by the Equity Commitment Parties and their respective Related Purchasers (other than the Defaulting Equity Commitment Party) during the Equity Commitment Party Replacement Period, the Company has the right, but not the obligation, within 30 Business Days following expiration of the Equity Commitment Party Replacement Period, to issue and sell to one or more Persons the remaining portion of the Available Shares of the Defaulting Equity Commitment Party without the consent of any of the Plan Sponsors.  Following the issuance and sale of any Available Shares in accordance with Section 2.2(b) or this Section 2.2(c), the Parties shall revise and update Schedule 1 hereto to reflect any changes in the identity of the Equity Commitment Parties, their Equity Commitments and their Equity Commitment Percentages.

(d)     For the avoidance of doubt, notwithstanding anything to the contrary set forth herein, no provision of this Agreement shall relieve any Defaulting Equity Commitment Party from liability hereunder, or limit the availability of the remedies of any other Party in connection with any such Defaulting Equity Commitment Party's Equity Commitment Party Default.

17

### Section 2.3     *Escrow Account Funding*.

(a)     No later than the tenth (10th) day following the Rights Offering Expiration Time, the Rights Offering Subscription Agent shall, on behalf of the Company, deliver to each Backstop Investor a written notice (the "**Funding Notice")** setting forth (i) the number of Rights Offering Shares elected to be purchased by the Rights Offering Participants, and the aggregate Rights Offering Subscription Price therefor; (ii) the aggregate number of Unsubscribed Shares, if any, and the aggregate Common Per Share Purchase Price therefor; (iii) the Backstop Investor's Backstop Percentage and the aggregate number of Unsubscribed Shares (based upon such Backstop Percentage) to be issued and sold by the Company to such Backstop Investor in accordance with Section 2.7(b), and the aggregate Common Per Share Purchase Price therefor; (iv) the aggregate amount of Equity Commitments satisfied as of such time and the percentage of the Equity Commitment Percentage represented thereby; and (v) subject to the last sentence of Section 2.3(b), the Escrow Account, to which such Backstop Investor shall deliver and pay the aggregate Common Per Share Purchase Price for such Backstop Investor's Backstop Percentage of the Unsubscribed Shares required to be purchased by such Backstop Investor in accordance with Section 2.7(b) and, if applicable, the aggregate Rights Offering Subscription Price for the Rights Offering Shares such Equity Commitment Party has subscribed for in the Rights Offering.  The Company shall promptly direct the Rights Offering Subscription Agent to provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Equity Commitment Party may reasonably request.  For the avoidance of doubt, in no event shall the aggregate amount paid by any Backstop Investor pursuant to this Section 2.3(a) with respect to its Rights Offering Backstop Commitment exceed an amount equal to (i) such Backstop Investor's Backstop Percentage multiplied by (ii) the Rights Offering Backstop Amount.

(b)     No later than the Business Day immediately preceding the Closing Date or such earlier date agreed with the Plan Sponsors pursuant to the escrow agreement satisfactory to the Plan Sponsors and the Company, each acting reasonably, which earlier date shall not be earlier than the fourth (4th) Business Day following expiration of the Marketing Period or more than three (3) Business Days prior to the planned Closing Date (the "**Escrow Account Funding Date**"), each Equity Commitment Party shall deliver and pay an amount equal to the sum of (i) the aggregate Common Per Share Purchase Price for the Rights Offering Shares pursuant to such Equity Commitment Party's Rights Offering Equity Commitment (if any) plus (ii) the aggregate Common Per Share Purchase Price for the Unsubscribed Shares to be purchased in accordance with Section 2.7(b) pursuant to such Equity Commitment Party's Rights Offering Backstop Commitment plus (iii) the aggregate Per Share Purchase Price for the Common Stock and Preferred Stock to be purchased pursuant to such Equity Commitment Party's Direct Investment Commitment, by wire transfer of immediately available funds in U.S. dollars into the escrow account (the "**Escrow Account**") designated in such escrow agreement in satisfaction of such Equity Commitment Party's Equity Commitment and its obligations to fully exercise its Subscription Rights.  For the avoidance of doubt, the obligations of each Equity Commitment Party pursuant to this paragraph shall be several and not joint.  If this Agreement is validly terminated, all amounts deposited by each Equity Commitment Party in the Escrow Account shall be returned to such Equity Commitment Party in accordance with the terms of the escrow agreement.

### Section 2.4     *Closing*.

(a)     Subject to Article VII, unless otherwise mutually agreed in writing between the Company and the Plan Sponsors, the closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place electronically, at 10:00 a.m. New York City time, on the Effective Date. The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**". Notwithstanding the foregoing, if the Marketing Period has not ended at the time the Closing would otherwise occur pursuant hereto, then the Closing will occur on the earlier of (i) any Business Day during

18

the Marketing Period specified by the Company on no less than two (2) Business Days' prior written notice to the Equity Commitment Parties and (ii) the first (1st) Business Day following the final day of the Marketing Period (subject, in the case of each of (i) and (ii), to the satisfaction or waiver (to the extent permitted hereunder) of all of the conditions set forth in Article VII, other than those conditions that by their nature can be satisfied only on the Closing Date, but subject to the satisfaction or waiver (to the extent permitted hereunder) of such conditions).

(b)    At the Closing, the funds held in the Escrow Account shall, as applicable, be released and utilized in accordance with the Plan.

(c)    At the Closing, the Company will issue the applicable Rights Offering Shares, the Unsubscribed Shares and the Direct Investment Shares to each Equity Commitment Party (or to its designee in accordance with Section 2.5) against payment of the aggregate Per Share Purchase Price for such applicable Rights Offering Shares, the Unsubscribed Shares and the Direct Investment Shares purchased by such Equity Commitment Party, in satisfaction of such Equity Commitment Party's Equity Commitment. The entry of any Rights Offering Shares, the Unsubscribed Shares and Direct Investment Shares to be delivered pursuant to this Section 2.4(c) into the account of an Equity Commitment Party pursuant to the Company's book entry procedures and delivery to such Equity Commitment Party of an account statement reflecting the book entry of such Rights Offering Shares, the Unsubscribed Shares and Direct Investment Shares shall be deemed delivery of such Rights Offering Shares, the Unsubscribed Shares and Direct Investment Shares for purposes of this Agreement. Notwithstanding anything to the contrary in this Agreement, all Rights Offering Shares, the Unsubscribed Shares and Direct Investment Shares will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by the Company on behalf of the Company. The Shares to be issued pursuant to the Rights Offering and this Agreement shall be, or shall be eligible to be, issued, transferred or held through the facilities of The Depository Trust Company.

(d)    At the Closing, the Company shall issue to each Backstop Investor or its designee, as a backstop fee (the "**Backstop Fee**") in respect of such Backstop Investor's Rights Offering Backstop Commitment, a number of shares of Common Stock equal to the quotient of (1) the product of (A) 10%, *multiplied* by (B) the aggregate Backstop Percentage of such Backstop Investor, *multiplied* by (C) the Rights Offering Backstop Amount, *divided* by (2) the Common Per Share Purchase Price. The Backstop Fee payable to the Preferred Equity Plan Sponsor and its Related Purchasers shall be determined based on the Backstop Percentage of such Persons as reflected on Schedule 1 attached hereto as of the date hereof and shall not be affected by any adjustments to the relevant Backstop Percentage thereafter. For Tax purposes, unless otherwise required by a change in applicable Law or contrary determination (as defined in Section 1313(a) of the Code), the parties hereto agree to treat the Backstop Fee (i) as premium paid by the Company to the Backstop Investors in exchange for the issuance of a put right to the Company with respect to the Unsubscribed Shares and (ii) as not subject to withholding tax under Sections 1441 and 1442 of the Code and not take any tax position inconsistent with the positions described in clauses (i) and (ii).

### Section 2.5    *Designation and Assignment Rights*.

(a)    Each Equity Commitment Party shall have the right to instruct, by written notice to the Company no later than two (2) Business Days prior to the Closing Date, that all or any portion of its Direct Investment Shares or Unsubscribed Shares, as applicable, to be issued pursuant to its Equity Commitment, be issued in the name of, and delivered to one or more of its Related Purchasers upon receipt by the Company of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and signed by such Equity Commitment Party and the applicable Related Purchaser, (ii) specify the number of Direct Investment Shares and Unsubscribed Shares to be delivered to or issued in the name of each such Related Purchaser, and (iii) contain a confirmation by each such Related

19

Purchaser of the accuracy of the representations made by the applicable Equity Commitment Party under this Agreement as applied to such Related Purchaser; provided that no such designation pursuant to this Section 2.5(a) shall relieve any Equity Commitment Party from any of its obligations under this Agreement.

(b)    Subject to Section 2.5(c), each Common Equity Plan Sponsor shall have the right to Transfer all or any portion of its Equity Commitment, in each case to any other Equity Commitment Party or such other Equity Commitment Party's Related Purchaser (each, an "**Existing Equity Commitment Party Purchaser**") or any other Person (other than a Prohibited Transferee (as defined in the Preferred Stock Term Sheet)); provided that (i) any such Existing Equity Commitment Party Purchaser shall be an Equity Commitment Party or its Related Purchaser as of immediately prior to such Transfer, (ii) the transferring Equity Commitment Party and Existing Equity Commitment Party Purchaser or such other Person shall have duly executed and delivered to the Company written notice of such Transfer, and (iii) such Existing Equity Commitment Party Purchaser or such other Person shall deliver to the Company a joinder to this Agreement, in a form reasonably acceptable to the Company, pursuant to which such Person agrees to be fully bound by this Agreement (if it is not already so fully bound) and contains a confirmation of the accuracy of the representations made by each Equity Commitment Party under this Agreement as applied to such Person.  Notwithstanding anything to the contrary, any Transfer under this Section 2.5(b) to a Person who is not a Plan Sponsor, unless otherwise consented to by the Company in writing, shall not relieve the applicable Common Equity Plan Sponsor of such Transferred obligations under this Agreement until such amount is funded by the transferee on or prior to the Closing Date.

(c)    Notwithstanding anything to the contrary in this Section 2.5, no Common Equity Plan Sponsor shall be entitled to assign or Transfer (x) more than twenty-five percent (25%) of its Equity Commitments (disregarding for this purpose any Direct Investment Preferred Commitments) or (y) any of its Direct Investment Preferred Commitments, in either case to any Person(s) (other than to another Common Equity Plan Sponsor or its Related Purchasers) without the prior written consent of the Company and the Preferred Equity Plan Sponsor.  Notwithstanding the foregoing, in no event shall the aggregate Equity Commitments in respect of Common Stock held, directly or indirectly, by the Common Equity Plan Sponsors be less than 42% of the Common Stock issued or to be issued as of the Closing.

(d)    (i) Each Equity Commitment Party that is not a Common Equity Plan Sponsor shall have the right to Transfer all or any portion of its Equity Commitment to any Existing Equity Commitment Party Purchaser or other Person (other than a Prohibited Transferee (as defined in the Preferred Stock Term Sheet)), provided that (A) the Transferring Equity Commitment Party and such Person shall provide written notice to the Company of such Transfer and (B) such Existing Equity Commitment Party Purchaser or other Person shall deliver to the Company a joinder to this Agreement, in a form reasonably acceptable to the Company, pursuant to which such Existing Equity Commitment Party Purchaser or other Person agrees to be fully bound by this Agreement (if it is not already so fully bound) and contains a confirmation of the accuracy of the representations made by each Equity Commitment Party under this Agreement as applied to such Person.  Any Transfer under this Section 2.5(d)(i) to a Person who is not a Plan Sponsor, unless otherwise consented to by the Company in writing, shall not relieve the applicable Equity Commitment Party of such Transferred obligations until such amount is funded by the transferee on or prior to the Closing Date. (ii) Each Equity Commitment Party that is not a Common Equity Plan Sponsor shall have the right to Transfer all or any portion of its Rights Offering Equity Commitment to any Person (each a "**Rights Offering Commitment Purchaser**"); provided that (A) the transferring Equity Commitment Party and the Rights Offering Commitment Purchaser shall provide written notice to the Company of such Transfer, (B) the Rights Offering Commitment Purchaser shall deliver to the Company a joinder to this Agreement, pursuant to which the Rights Offering Commitment Purchaser agrees to be fully bound by this Agreement (if it is not already so fully bound) and contains a confirmation of the accuracy of the representations made by each Equity Commitment Party under this Agreement as applied to such Rights Offering Commitment Purchaser; and (C) unless otherwise consented to by the Company in writing, such Transfer shall not relieve

20

the transferring Equity Commitment Party of such Transferred obligations under this Agreement, except to the extent such obligations are actually satisfied by the applicable Rights Offering Commitment Purchaser.

(e)      Each Equity Commitment Party that is not a Common Equity Plan Sponsor shall have the right to Transfer all or any portion of its Rights Offering Backstop Commitment to any Common Equity Plan Sponsor; provided that the transferring Equity Commitment Party shall provide written notice to the Company of such Transfer.  Any Transfer permitted under this Section 2.5(e) to a Common Equity Plan Sponsor shall not relieve the transferring Equity Commitment Party of such Transferred obligations under this Agreement without the prior written consent of the Company, except to the extent such obligations are actually satisfied by the applicable transferee Common Equity Plan Sponsor.

(f)      Other than as expressly set forth in this Section 2.5, no Equity Commitment Party shall be permitted to Transfer all or any portion of its Subscription Rights or Equity Commitment.  Any Transfer made (or attempted to be made) in violation of this Agreement shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Company or any Equity Commitment Party, and shall not create (or be deemed to create) any obligation or liability of any other Equity Commitment Party or any Debtor to the purported transferee or limit, alter or impair any agreements, covenants, or obligations of the proposed transferor under this Agreement.  After the Closing, nothing in this Agreement shall limit or restrict in any way the ability of any Equity Commitment Party (or any permitted transferee thereof) to Transfer any of the Shares or any interest therein; provided that any such Transfer shall be made pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable securities Laws and in accordance with the New Registration Rights Agreement.

### Section 2.6      *The Rights Offerings; Subscription Rights*.

(a)      On and subject to the terms and conditions hereof, the Company shall conduct the Rights Offering pursuant to and in accordance with the Rights Offering Procedures, this Agreement and the Plan.

(b)      If requested by the Plan Sponsors or the Backstop Investors, from time to time prior to the Rights Offering Expiration Time (and any permitted extensions thereto), the Company shall notify, or cause the Rights Offering Subscription Agent to notify, within two (2) Business Days of receipt of such request by the Company, the Plan Sponsors and the Backstop Investors of the aggregate number of Subscription Rights known by the Company or the Rights Offering Subscription Agent to have been exercised pursuant to the Rights Offering as of the most recent practicable time before such request.  The Rights Offering will be conducted, and the Rights Offering Shares issued, in reliance upon the exemption from registration provided in Section 4(a)(2) of the Securities Act.  The offer and sale of the Unsubscribed Shares purchased by the Backstop Investors pursuant to this Agreement will be conducted in reliance upon the exemption from registration under Section 4(a)(2) of the Securities Act.

### Section 2.7      *Rights Offerings Backstop Commitments*.

(a)      On and subject to the terms and conditions hereof, each Backstop Investor agrees, severally and not jointly, to exercise (and cause any of its Related Purchasers to exercise) all Subscription Rights that are issued to it (or such Related Purchaser) pursuant to the Rights Offering, and duly purchase all Rights Offering Shares issuable to it (or such Related Purchaser) pursuant to such exercise, in accordance with the Rights Offering Procedures and this Agreement, and agrees to fund the aggregate Rights Offering Subscription Price therefor in accordance with Section 2.3(b) notwithstanding anything to the contrary in the Rights Offering Procedures; provided that any Backstop Investor that breaches its obligations hereunder shall be liable to each Backstop Investor that has not so defaulted, and to the Company, as a result of any

21

such breach of its obligations hereunder.  The obligations of each Backstop Investor to duly purchase all Rights Offering Shares issuable to it as described in this Section 2.7(a) shall be referred to as such Equity Commitment Party's "**Rights Offering Equity Commitment**".

(b)    On and subject to the terms and conditions hereof, each Backstop Investor agrees, severally (in accordance with its Backstop Percentage) and not jointly, to purchase, and the Company agrees to sell to such Backstop Investor, at the Closing, the number of Unsubscribed Shares equal to (i) such Backstop Investor's Backstop Percentage multiplied by (ii) the aggregate number of Unsubscribed Shares, rounded among the Backstop Investors solely to avoid fractional shares as the Plan Sponsors may determine in their sole discretion for the aggregate Common Per Share Purchase Price for all such Unsubscribed Shares; provided that in no event shall (x) the aggregate amount paid by the Backstop Investors pursuant to Section 2.7(a) or this Section 2.7(b) exceed the Rights Offering Backstop Amount or (y) the aggregate amount paid by any Backstop Investor pursuant to Section 2.7(a) and this Section 2.7(b) exceed an amount equal to (i) such Backstop Investor's Backstop Percentage multiplied by (ii) the Rights Offering Backstop Amount.  In no event shall any rounding pursuant to the immediately preceding sentence reduce the aggregate commitment of such Backstop Investors or the aggregate number of Unsubscribed Shares to be issued.  The obligations of each Backstop Investor to purchase its Backstop Percentage of the Unsubscribed Shares as described in this Section 2.7(b) shall be referred to as such Backstop Investor's "**Rights Offering Backstop Commitment**".

## ARTICLE III

## EXPENSE REIMBURSEMENT

### Section 3.1    *Expense Reimbursement*.

(a)    In accordance with and subject to the entry of the EPCA Approval Order, and subject to the terms of this Agreement, the Company shall or shall cause the Debtors to pay or reimburse, in accordance with Section 3.1(b) below and without duplication, all reasonable and documented out-of-pocket fees (including success fees, transaction fees or similar fees) and expenses (including travel costs and expenses) of (i) Kirkland & Ellis as counsel to the Common Equity Plan Sponsors, (ii) Alvarez & Marsal Corporate Performance Improvement, LLC as advisor to the Common Equity Plan Sponsors, (iii) Guggenheim Securities, LLC, as financial advisor to the Common Equity Plan Sponsors, (iv) Morris, Nichols, Arsht & Tunnell LLP as funds counsel to the Common Equity Plan Sponsors, (v) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("**Paul, Weiss**") as counsel to the Preferred Equity Plan Sponsor, (vi) Morgan, Lewis & Bockius LLP as regulatory counsel to the Preferred Equity Plan Sponsor, (vii)  Glenn Agre Bergman & Fuentes LLP, as advisor to the Ad Hoc Equity Committee, (viii) Pericles Capital Advisors LLC, as financial advisor to the Ad Hoc Equity Committee through its broker-dealer affiliate, Odeon Capital Group, LLC, (ix) one local counsel to the Equity Commitment Parties as reasonably required in each applicable jurisdiction and (x) any other professionals, advisors, or experts retained from time to time with the prior written consent of the Company by or on behalf of the Plan Sponsors or the other Equity Commitment Parties, incurred in connection with the Chapter 11 Cases, including to implement the Restructuring Transactions, in each case incurred on behalf of such Person in connection with the due diligence investigation, negotiation, execution and performance of any transaction (including any applicable filing or similar fees required to be paid in any applicable jurisdiction) contemplated by this Agreement (including in connection with the enforcement by such Equity Commitment Party of its rights hereunder), the Chapter 11 Cases, the Plan Support Agreement or the Plan, regardless of when such fees are or were incurred (such payment obligations in clauses (i) through (x), "**Expense Reimbursement**").

(b)    The Expense Reimbursement accrued and unpaid through the date on which the EPCA Approval Order is entered shall be paid in accordance with the EPCA Approval Order as promptly

22

as reasonably practicable after the date of the entry of the EPCA Approval Order.  The Expense Reimbursement incurred thereafter shall be payable by the Debtors within ten (10) Business Days from receipt of the applicable summary invoice in accordance with the EPCA Approval Order; provided that the Debtors' final payment shall be made contemporaneously with the Closing or following the valid termination of this Agreement pursuant to Article IX other than Section 9.2(b)(i), Section 9.2(b)(iv), Section 9.2(b)(vi), Section 9.3(a), Section 9.3(b), Section 9.3(f), Section 9.3(g) or Section 9.3(i) in each case in accordance with this Section 3.1; provided that if the Expense Reimbursement becomes payable following the valid termination of this Agreement pursuant to this sentence, the unpaid portion of the Expense Reimbursement through the date of termination shall be payable in cash to the Equity Commitment Parties by the later of two (2) Business Days following such valid termination and two (2) Business Days after the date the Equity Commitment Parties deliver to the Company in writing, reasonable documentation evidencing the costs and expenses included in the Expense Reimbursement; provided further that if this Agreement is terminated pursuant to Section 9.3(b), then, notwithstanding anything in the foregoing to the contrary, the Debtors' final Expense Reimbursement for expenses accrued and unpaid through the date of such termination shall be made following the termination of this Agreement in accordance with its terms to all Equity Commitment Parties who are not in breach of this Agreement.  For the avoidance of doubt, the Debtors may pay the Expense Reimbursement without any requirement: (i) of any professionals to file a fee application with the Bankruptcy Court; (ii) for review or approval by the Bankruptcy Court or any other party (other than the Debtors); or (iii) to provide itemized time detail by such professionals; provided that the applicable advisors will provide additional detail as reasonably requested by the Debtors.  The Expense Reimbursement shall, pursuant to the EPCA Approval Order, constitute allowed administrative expenses against each of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code. For the avoidance of doubt, the amount payable pursuant to this Section 3.1 shall be determined without duplication of any recovery under the Plan Support Agreement or the Plan. In no event shall any Equity Commitment Party be entitled to the payment of Expense Reimbursement more than once.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except (i) as set forth in the corresponding section of the Company Disclosure Schedules or (ii) as disclosed in the Company SEC Documents filed with the SEC on or after January 1, 2020 and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system prior to the date hereof (excluding the exhibits, annexes and schedules thereto, any disclosures contained in the "Forward-Looking Statements" or "Risk Factors" sections thereof, or any other statements that are similarly predictive, cautionary or forward looking in nature), the Company and the other Debtors, jointly and severally, hereby represent and warrant to the Equity Commitment Parties (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

*Section 4.1        Organization and Qualification*.  Each of the Debtors (a) is a duly organized and validly existing corporation, limited liability company or limited partnership, as the case may be, and, if applicable, in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its incorporation or organization, except in the case of any Subsidiary of the Hertz Corp., where such failure would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (b) has the corporate or other applicable power and authority to own, lease or operate its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (c) except where the failure to have such authority or qualification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications.

23

**Section 4.2** *Corporate Power and Authority*.

(a)      The Company has, subject to entry of the EPCA Approval Order, the Order approving the Rights Offering Procedures and the Confirmation Order, the requisite corporate power and authority (i) (A) to enter into, execute and deliver this Agreement and to perform the EPCA Approval Obligations and (B) to perform each of its other obligations hereunder and (ii) subject to entry of the Disclosure Statement Order, to consummate the transactions contemplated herein and in the Plan, to enter into, execute and deliver all agreements to which it will be a party as contemplated by this Agreement and the Plan (this Agreement, the Plan, the Disclosure Statement, the Plan Support Agreement, the Rights Offering Procedures, the New Reorganized Debt, and such other agreements and any Plan Supplements or documents referred to herein or therein or hereunder or thereunder, collectively, the "**Transaction Agreements**") and to perform its obligations under each of the Transaction Agreements (other than this Agreement). Subject to the receipt of the foregoing Orders, as applicable, the execution and delivery of this Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated hereby and thereby have been or will be duly authorized by all requisite corporate action on behalf of the Company, and no other corporate proceedings on the part of the Company are or will be necessary to authorize this Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated hereby or thereby.

(b)      Subject to entry of the EPCA Approval Order, the Disclosure Statement Order and the Confirmation Order, each of the other Debtors has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver each Transaction Agreement to which such other Debtor is a party and to perform its obligations thereunder. Subject to entry of the EPCA Approval Order, the Disclosure Statement Order and the Confirmation Order, the execution and delivery of the Transaction Agreements to which such Debtor is party and the consummation of the transactions contemplated thereby have been or will be duly authorized by all requisite action (corporate or otherwise) on behalf of each other Debtor party thereto, and no other proceedings on the part of any other Debtor party thereto are or will be necessary to authorize the Transaction Agreements to which such Debtor is party or to consummate the transactions contemplated thereby.

**Section 4.3** *Execution and Delivery; Enforceability*. Subject to the entry of the EPCA Approval Order, the Disclosure Statement Order and the Confirmation Order, as applicable, this Agreement will have been and each other Transaction Agreement will be, duly executed and delivered by the Company and, to the extent applicable, each of the other Debtors party thereto. Upon entry of the EPCA Approval Order, the Disclosure Statement Order and, as applicable, the Confirmation Order, and assuming due and valid execution and delivery hereof by the Equity Commitment Parties, the EPCA Approval Obligations will constitute the valid and legally binding obligations of the Company enforceable against the Company in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity. Upon entry of the EPCA Approval Order and assuming due and valid execution and delivery of this Agreement and the other Transaction Agreements by the Equity Commitment Parties and, to the extent applicable, any other parties hereof and thereof, each of the obligations of the Company and, to the extent applicable, the other Debtors hereunder and thereunder will constitute the valid and legally binding obligations of the Company and, to the extent applicable, the other Debtors, enforceable against the Company and, to the extent applicable, the other Debtors, in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other similar Laws now or hereafter in effect relating to creditor's rights generally and subject to general principles of equity.

**Section 4.4**     **_Authorized and Issued Equity Interests_**.

(a)     On the Closing Date, the authorized capital of the Company shall be consistent with the terms of the Plan, the Plan Support Agreement and Disclosure Statement and the Shares shall be consistent with the terms of the Plan, the Plan Support Agreement and the Disclosure Statement.  Except as set forth in the Plan or the Disclosure Statement, on the Closing Date no shares of capital stock or other equity securities or voting interest in the Company will have been issued, reserved for issuance or be outstanding.

(b)     Except as described in this Section 4.4 and except as set forth in the Company Organizational Documents, and this Agreement, as of the Closing Date, none of the Debtors will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates the Debtors to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, any of the Debtors or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, any of the Debtors, (ii) obligates any of the Debtors to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, (iii) restricts the Transfer of any shares of capital stock of any of the Debtors (other than any restrictions, subject to the approval of the Plan Sponsors, included in the New Reorganized Debt or any corresponding pledge agreement) or (iv) relates to the voting of any equity interests in any of the Debtors.

**Section 4.5**     **_Issuance_**.  Subject to the entry of the EPCA Approval Order, the Disclosure Statement Order, and the Confirmation Order, the Shares to be issued hereunder and pursuant to the Plan will, when issued and delivered on the Closing Date in exchange for the aggregate Per Share Purchase Price, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, Liens (other than Transfer restrictions imposed hereunder or under the Company Organizational Documents or by applicable Law), preemptive rights, subscription and similar rights (other than any rights set forth in the Company Organizational Documents).

**Section 4.6**     **_No Conflict_**.  Assuming the consents described in Section 4.7 are obtained, the execution and delivery by the Company and, as applicable, any other Debtor, of this Agreement, the Plan and the other Transaction Agreements, the compliance by the Company and, as applicable, any other Debtor, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (a) conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any Contract to which a Debtor is a party, (b) result in any violation of the provisions of any of the Debtors' organizational documents (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or the Company's or any Debtor's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases), or (c) result in any violation of any Law or Order applicable to any Debtor or any of their properties, except in each of the cases described in clause (a) or (c) for any conflict, breach, modification, violation, default, acceleration or Lien which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**Section 4.7**     **_Consents and Approvals_**.  No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over any of the Debtors or any of their properties (each, an "**Applicable Consent**") is required for the execution and delivery by the Company and, to the extent relevant, the other Debtors, of this Agreement, the Plan and the other

Transaction Agreements, the compliance by the Company and, to the extent relevant, the other Debtors, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except for (a) the entry of the EPCA Approval Order authorizing the Company to execute and deliver this Agreement and perform the EPCA Approval Obligations, (b) entry of the Disclosure Statement Order, (c) entry by the Bankruptcy Court, or any other court of competent jurisdiction, of Orders as may be necessary in the Chapter 11 Cases from time-to-time; (d) the entry of the Confirmation Order, (e) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws or, if and as required or otherwise deemed advisable by the relevant Parties after good faith discussions, under the CFIUS Statute or any similar foreign investment (or foreign direct investment (FDI)) Laws in connection with the transactions contemplated by this Agreement, (f) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" Laws in connection with the purchase of the Direct Investment Shares, Rights Offering Shares and Unsubscribed Shares by the Equity Commitment Parties; and (g) any Applicable Consents that, if not made or obtained, would not reasonably be expected to be, individually or in the aggregate, material and adverse to the Company and its Subsidiaries taken as a whole.

**Section 4.8     *Financial Statements*.**  The financial statements filed with the SEC as a part of the Company's Annual Report on Form 10-K for the year ended December 31, 2020 (the "**Form 10-K**") present fairly in all material respects the consolidated financial position of the Company and its Subsidiaries as of the dates indicated and the results of their operations, changes in stockholders' equity and cash flows for the periods specified (the "**Financial Statements**").  Such Financial Statements have been prepared in conformity with generally accepted accounting principles as applied in the United States applied on a consistent basis throughout the periods involved, except as may be expressly stated in the related notes thereto.  PricewaterhouseCoopers LLP and Ernst & Young LLP, each of which has expressed its opinion with respect to the Financial Statements (which term as used in this Agreement includes the related notes thereto) filed with the Form 10-K, is (i) an independent registered public accounting firm as required by the Securities Act, the Exchange Act, and the rules of the Public Company Accounting Oversight Board **("PCAOB"),** (ii) in compliance with the applicable requirements relating to the qualification of accountants under Rule 2-01 of Regulation S-X under the Securities Act and (iii) a registered public accounting firm as defined by the PCAOB whose registration has not been suspended or revoked and who has not requested such registration to be withdrawn.  The Company and its Subsidiaries have no liabilities, obligations, or commitments required by GAAP to be disclosed or reflected or reserved on the balance sheet of the Company included in the Financial Statements other than (a) those which are adequately reflected or reserved against in the Financial Statements; (b) those which have been incurred in the ordinary course of business since the date of the Financial Statements; (c) any obligation or commitment arising out of or incurred in connection with this Agreement, the Plan, the Plan Support Agreement or the Restructuring Transaction or (d) that have not resulted in and are not reasonably expected to result in a Material Adverse Effect.

**Section 4.9     *Company SEC Documents*.**  Since January 1, 2020, the Company has filed with or furnished to the SEC all reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) required to be filed or furnished to the SEC.  As of their respective dates, and giving effect to any amendments or supplements thereto filed prior to the date hereof, each of the Company SEC Documents materially complied with the requirements of the Exchange Act or the Securities Act applicable to such Company SEC Documents.  There are no material comments to the Company SEC Documents raised by the SEC that remain unresolved as of the date hereof.

**Section 4.10     *Absence of Certain Changes*.**  Since December 31, 2020 to the date of this Agreement, except as disclosed in any filing with the Bankruptcy Court prior to the date hereof, no Event has occurred or exists which has, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

26

***Section 4.11*** *No Violation; Compliance with Laws*. (a) The Company is not in violation of its certificate of incorporation, charter or bylaws, and (b) no other Debtor is in violation of its respective certificate of incorporation or formation, charter, bylaws, limited liability company operating agreement or similar organizational document in any material respect. None of the Debtors is or has been at any time since January 1, 2019 in violation of any Law or Order, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

***Section 4.12*** *Legal Proceedings*. Other than the Chapter 11 Cases and any claim, adversary proceedings or contested matters commenced in connection therewith, (a) there are no legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings ("**Legal Proceedings**") pending or, to the Knowledge of the Company, threatened to which any of the Debtors is a party or to which any property of any of the Debtors is the subject, and (b) to the Knowledge of the Company, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Legal Proceeding, in each case that in any manner draws into question the validity or enforceability of this Agreement, the Plan or the other Transaction Agreements or that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

***Section 4.13*** *Labor Relations*. Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are no labor disputes pending, or to the Knowledge of the Company, threatened in writing against any of the Debtors.

***Section 4.14*** *Intellectual Property and Data Privacy*.

(a) Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each (i) trademark and service mark registrations and applications, (ii) copyright registrations, (iii) domain name registrations and (iv) patents and patent applications, in each case, that are owned by one of the Debtors, are subsisting, valid, in full force and effect and have not expired or been cancelled, abandoned or otherwise terminated, and the payment of all renewal and maintenance fees and expenses in respect thereof, and all filings related to renewal and maintenance, have been duly and timely made.

(b) Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each of the Debtors owns, possesses, or can acquire on reasonable terms, the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, and domain names (collectively, **"Intellectual Property Rights"**) that are necessary for the operation of their respective businesses, (ii) upon the consummation of the transactions contemplated by this Agreement, all Intellectual Property Rights owned by the Debtors that are necessary for the operation of their respective businesses as presently conducted shall survive and be available for use in the same manner and on substantially the same terms as of immediately prior to the date hereof, (iii) to the Knowledge of the Company, none of the Debtors is interfering with, infringing upon, misappropriating or otherwise violating in any material respect any valid Intellectual Property Rights of any Person, (iv) no claim or litigation regarding any of the foregoing that is (or would be) reasonably expected to have a Material Adverse Effect is pending or, to the Knowledge of the Company, threatened in writing, (v) to the Knowledge of the Company, no third party is misappropriating or infringing any Intellectual Property Rights owned by the Debtors, and (vi) to the Knowledge of the Company, no Intellectual Property Right owned by the Debtors is subject to any outstanding Order, judgment, decree or stipulation restricting or limiting in any material respect the use or licensing thereof by the Debtors.

27

(c)      Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each of the Debtors complies in all material respects with applicable Law, as well as its own rules, policies, and procedures, relating to privacy, data protection and the collection, retention, protection and use of personal information collected, used or held for use by it and its Subsidiaries, (ii) each of the Debtors complies in all material respects with the applicable Payment Card Industry Data Security Standard with respect to any payment card data that it and its Subsidiaries has collected or handled, (iii) each of the Debtors complies in all material respects with all Material Contracts under which a Debtor is a party to or bound by relating to privacy, data protection and the collection, retention, protection and use of personal information collected, used or held for use by a Debtor and (iv) no claim or litigation regarding any of the foregoing that is (or would be) reasonably expected to have a Material Adverse Effect is pending or, to the Knowledge of the Company, threatened in writing.  To the Knowledge of the Company, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there have been no security breaches in the information technology systems of any of the Debtors.

**Section 4.15      *Title to Real and Personal Property*.**

(a)      Property.  Each of the Debtors has valid title to its properties and assets (including, for the avoidance of doubt, its vehicles, if applicable), in each case, except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their respective currently intended purposes, and except where the failure (or failures) to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided, however, the enforceability of leases with respect to any such leased Real Properties or leased personal property may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditor's rights generally or general principles of equity, including the Chapter 11 Cases.

(b)      Leased Property.  Each of the Debtors is in compliance with all obligations under all leases with respect to leased Real Property to which it is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and none of the Debtors has received written notice of any good faith claim asserting that such leases are not in full force and effect, except leases for Real Property in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except as set forth in the Company Disclosure Schedules, none of the Debtors has received written notice of any claim that has been asserted by anyone adverse to the rights of the Debtors under any leases for Real Property mentioned above or affecting the rights of the Debtors to the continued possession of the leased premises under any such lease except for such claim that would not reasonably be expected have, individually or in the aggregate, a Material Adverse Effect.

**Section 4.16      *No Undisclosed Relationships*.**  Other than Contracts or other direct or indirect relationships between or among the Company and any of its Subsidiaries, there are no Contracts or other direct or indirect relationships existing as of the date hereof between or among any of the Debtors, on the one hand, and any director, officer or any Person or group (as such term is defined under the Exchange Act) holding more than five percent (5%) of the issued and outstanding stock of the Company and that as of the date hereof has made a filing under Schedule 13(d) or Schedule 13(g) pursuant to the Exchange Act in respect of the Company's securities, on the other hand, that are required by the Exchange Act to be described in the Company's SEC Documents and that are not so described, except for the transactions contemplated by the Transaction Agreements.  A correct and complete copy of any Contract existing as of the date hereof between or among any of the Debtors, on the one hand, and any director, officer or any Person or group (as such term is defined under the Exchange Act) holding more than five percent (5%) of

the issued and outstanding stock of the Company and that as of the date hereof has made a filing under Schedule 13(d) or Schedule 13(g) pursuant to the Exchange Act in respect of the Company's securities that is required by the Exchange Act to be described in the Company's SEC Documents is filed as an exhibit to the Form 10-K.

*Section 4.17   Licenses and Permits*.  The Debtors possess all licenses, permits and other authorizations issued by the appropriate Governmental Entities that are necessary to the conduct of the business of the Debtors, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Since January 1, 2019, none of the Debtors (a) has received written notice of any revocation or modification of any such license, certificate, permit or authorization from the applicable Governmental Entity with authority with respect thereto, or (b) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

*Section 4.18   Environmental*.  (a) Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, since January 1, 2019, no written notice, claim, demand, request for information, Order, complaint or penalty has been received by any of the Debtors, and there are no Legal Proceedings pending or, to the Knowledge of the Company, threatened in writing which allege a violation of or liability under any applicable Environmental Laws, in each case relating to any of the Debtors, (b) except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each Debtor has received and maintained in full force and effect, all permits, licenses and other approvals required under applicable Environmental Law, in each case to the extent necessary for its operations to comply with all applicable Environmental Laws and is, and since January 1, 2019, to the Knowledge of the Company, has been, in compliance with the terms of such permits, licenses and other approvals and with all applicable Environmental Laws, (c) to the actual Knowledge of the Company, no Hazardous Material is located at, on or under any property currently owned, operated or leased by any of the Debtors that would reasonably be expected to give rise to any cost, liability or obligation of any of the Debtors under any applicable Environmental Laws, other than costs, liabilities or obligations related to asset retirement obligations incurred or anticipated to be incurred pursuant to Environmental Laws or costs, liabilities or obligations that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (d) since December 31, 2019, no Hazardous Material has been Released, generated, owned, treated, stored or handled by any of the Debtors, and no Hazardous Material has been transported to or Released at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of any of the Debtors under any applicable Environmental Laws other than costs, liabilities, or obligations related to asset retirement obligations incurred or anticipated to be incurred pursuant to Environmental Laws or costs, liabilities or obligations that would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Notwithstanding the generality of any other representations and warranties in this Agreement, the representations and warranties in this Section 4.18 constitute the sole and exclusive representations and warranties in this Agreement with respect to any environmental, health or safety matters, including any arising under or relating to Environmental Laws or Hazardous Materials.

*Section 4.19   Tax Matters*.

(a)   Each of the Debtors and their Subsidiaries has timely filed or caused to be timely filed all U.S. federal, state, provincial, local and non-U.S. income and other material Tax Returns required to have been filed by it, and each such Tax Return is true and correct in all material respects;

(b)   Each of the Debtors and their Subsidiaries has timely paid or caused to be timely paid all income and other material Taxes (whether or not shown to be due and payable on its Tax Returns)

29

with respect to all Tax periods or portions thereof ending on or before the date hereof (except Taxes to the extent the non-payment thereof is permitted by the Bankruptcy Code; provided that, to the extent any Taxes have not been paid either because of the relief afforded by the Bankruptcy Code or because such Taxes are being contested, the anticipated payment of such Taxes pursuant to the Plan or any reserve for such Taxes is reflected in the financial information provided to the Plan Sponsors), and each of the Debtors and their Subsidiaries has properly collected and remitted sales, use and similar Taxes;

(c) As of the date hereof, with respect to the Debtors and their Subsidiaries, other than in connection with the Chapter 11 Cases, (i) no claims for deficiency have been asserted in writing by a Governmental Entity with respect to any income or other material Taxes, which claims have not been satisfied, settled or withdrawn; (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes or Tax Returns have been given or requested; (iii) there is no currently outstanding audit, assessment, dispute, examination or claim concerning any Tax liability or Tax Returns by, and no written notification of intention to examine has been received from, the IRS or any other Governmental Entity;

(d) Neither the Debtors nor any of their Subsidiaries has entered into any agreement with the IRS or any Governmental Entity that will bind, or otherwise affect, any material Tax of any Debtor or any Subsidiary thereof after the Closing Date;

(e) All material Taxes that the Debtors and their Subsidiaries were required by Law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid or remitted to the proper authorities to the extent due and payable;

(f) There are no material Liens with respect to Taxes upon any of the assets or properties of the Debtors and their Subsidiaries, other than Permitted Liens;

(g) The unpaid Taxes of the Debtors and their Subsidiaries do not exceed the reserves for Tax liability set forth on the Financial Statements of the Debtors and their Subsidiaries as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Debtors and their Subsidiaries;

(h) Neither the Debtors nor any of their Subsidiaries currently is, or has been in the last three (3) years (and, to the Knowledge of the Company, prior to the last three (3) years), a party to any Tax allocation, Tax sharing, Tax indemnity, Tax reimbursement agreement or arrangement. During the period following the June 30, 2016 distribution of Hertz Global Holdings, Inc.'s stock from HERC Holdings, Inc., neither the Debtors and their Subsidiaries: (i) has been a member of a group filing any consolidated, combined, unitary or similar group under applicable state, local or non-U.S. Law (other than the current group the common parent of which is the Company) nor (ii) has any liability for the Taxes of any Person (other than the Company) under Treasury Regulations Section 1.1502-6 (or any similar provision of Law), as a transferee or successor, by Contract, or otherwise;

(i) Neither the Debtors nor any their Subsidiaries has (i) deferred its obligation to pay any Tax, or delayed its obligation to file any Tax Return pursuant to any COVID-19 Measure that remains unpaid (whether or not due) or not filed, nor (ii) deferred the withholding of any Taxes under any COVID-19 Measure;

(j) The Debtors and their Subsidiaries: (i) have not participated in or have any liability or obligation with respect to any "listed transaction" within the meaning of Section 6707A(c)(2) of the Code and as set forth in Treasury Regulations Section 1.6011-4(b)(2); (ii) in the previous three (3) years have not been a party to (or distributed the stock of another Person or had its stock distributed by another

30

Person in) a transaction that was purported or intended to be governed by Section 355 or Section 361 of the Code; nor (iii) is a party to a gain recognition agreement under Section 367 of the Code (or any similar provision of Law);

(k)     None of the Debtors nor any Subsidiary thereof will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in, or use of an improper, method of accounting for a taxable period beginning on or prior to the Closing Date, (ii) any agreement (including a "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or non-U.S. Law)) executed with the IRS or any Governmental Entity on or prior to the Closing Date, (iii) installment sale or open transaction disposition made on or prior to the Closing Date, (iv) prepaid amount received or deferred revenue accrued on or prior to the Closing Date, or (v) any material item of income that accrued for financial accounting purposes (taking into account any differences between book and Tax income) in a period prior to the Closing Date;

(l)     None of the Debtors nor any Subsidiary thereof has made any election pursuant to Section 965(h) of the Code; and

(m)     None of the Debtors nor any Subsidiary thereof has been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

### Section 4.20     *Employee Benefit Plans*.

(a)     None of the Debtors nor any of their ERISA Affiliates sponsor, maintain, contribute to, or has an obligation to contribute to, or has in the last five (5) years sponsored, maintained or contributed to, or had an obligation to contribute to, any Multiemployer Plan or a single employer defined benefit pension plan that is subject to Title IV of ERISA.  Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, no condition exists that could reasonably be expected to result in any liability to the Debtors under Title IV of ERISA.

(b)     Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect to the Debtors, there are no pending, or to the Knowledge of the Company, threatened in writing claims, sanctions, actions or lawsuits, asserted or instituted against any Company Benefit Plan or any Person as fiduciary or sponsor of any Company Benefit Plan, in each case other than claims for benefits in the normal course.

(c)     None of the Company Benefit Plans obligates any Debtor to provide, nor has any Debtor promised or agreed to provide, retiree or post-employment health or life insurance or benefits, other than as required under Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code or any similar Law for which the covered Person pays the full cost of coverage.

(d)     Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, all compensation and benefit arrangements of the Debtors and all Company Benefits Plans comply and have complied in both form and operation with their terms and all applicable Laws and legal requirements.  None of the Debtors, has any obligation to provide any individual with a "gross up" or similar payment in respect of any Taxes that may become payable under Section 409A or 4999 of the Code.

(e)     Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, all liabilities (including all employer contributions and payments

31

required to have been made by any of the Debtors) under or with respect to any compensation or benefit arrangement of any of the Debtors have been properly accounted for in the Company's Financial Statements in accordance with GAAP.

(f)    Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, (i) each of the Debtors has complied and is currently in compliance with all Laws and legal requirements in respect of personnel, employment and employment practices; (ii) all service providers of each of the Debtors are correctly classified as employees, independent contractors, or otherwise for all purposes (including any applicable Tax and employment policies or Law); and (iii) the Debtors have not and are not engaged in any unfair labor practice.

Section 4.21    *Internal Control and Disclosure Controls*.  The Company has established and maintains disclosure controls and procedures (as defined in Rules 13a-15 and 15d-15 under the Exchange Act), which (i) are designed to ensure that material information relating to the Company, including its consolidated Subsidiaries, is made known to the Company's principal executive officer and its principal financial officer by others within those entities, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared; (ii) have been evaluated by management of the Company for effectiveness as of the end of the Company's most recent fiscal quarter; and (iii) are effective in all material respects to perform the functions for which they were established. Since the end of the Company's most recent audited fiscal year, there have been no significant deficiencies or material weaknesses in the Company's internal control over financial reporting (whether or not remediated) and no change in the Company's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting. The Company is not aware of any change in its internal control over financial reporting that has occurred during its most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

Section 4.22    *Material Contracts*.  Except as set forth in the Company Disclosure Schedules and other than as a result of a rejection motion filed by any of the Debtors in the Chapter 11 Cases, no Material Contracts have been terminated and all Material Contracts are enforceable by and against the Debtors party thereto and, to the Knowledge of the Company, each other party thereto (except where the failure to be enforceable does not constitute, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect), and, since January 1, 2019, no written notice to terminate, in whole or a material portion thereof, any Material Contract has been delivered to any of the Debtors (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect).  Other than as a result of the filing of the Chapter 11 Cases or any rejection motion filed by any of the Debtors in the Chapter 11 Cases, none of the Debtors nor, to the Knowledge of the Company, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 4.23    *No Unlawful Payments*.  Since January 1, 2016, none of the Debtors, nor to the Knowledge of the Company, any of their respective directors, officers or, to the Knowledge of the Company, employees has, in any material respect: (a) used any funds of any of the Debtors for any unlawful contribution, gift, entertainment or other unlawful expense, in each case for the purpose of corruptly influencing any foreign governmental official; (b) made any direct or indirect unlawful payment to any foreign government official or employee from corporate funds; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended; or (d) made any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

Section 4.24    *Compliance with Money Laundering and Sanctions Laws*.

32

(a)      The operations of the Company and the Debtors are and, since January 1, 2019, have been at all times conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Debtors operate (and the rules and regulations promulgated thereunder) and any related or similar applicable Laws (collectively, the "**Money Laundering Laws**") and in all material respects with applicable financial or economic sanctions administered or enforced by any relevant Governmental Entity, including the Office of Foreign Assets Control of the U.S. Department of the Treasury ("**Sanctions**").  None of the Company or the Debtors or any of their respective Subsidiaries or any of the respective officers, directors or, to the Knowledge of the Company or the Debtors, employees of the Company, the Debtors or the respective Subsidiaries of the Company and the Debtors is the subject or target of any Sanctions.  No Legal Proceeding by or before any Governmental Entity or any arbitrator involving any of Company or the Debtors with respect to Money Laundering Laws or Sanctions is pending or, to the Knowledge of the Company, threatened.

**Section 4.25      *No Broker's Fees***.  None of the Debtors is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Equity Commitment Parties for a brokerage commission, finder's fee or like payment in connection with this Agreement or any transactions contemplated hereby.

**Section 4.26      *Insurance***.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) Debtors have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses; and (b) the Debtors have no reason to believe that they will not be able to renew their existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE EQUITY COMMITMENT PARTIES

Each Equity Commitment Party, severally and not jointly, represents and warrants, as to itself only, as of the date of this Agreement and as of the Closing Date as set forth below.

**Section 5.1      *Organization***.  The Equity Commitment Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization.

**Section 5.2      *Organizational Power and Authority***.  The Equity Commitment Party has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and each other Transaction Agreement to which the Equity Commitment Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Transaction Agreements.

**Section 5.3      *Execution and Delivery; Enforceability***.  This Agreement and each other Transaction Agreement to which the Equity Commitment Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by the Equity Commitment Party and (b) upon entry of the EPCA Approval Order and assuming due and valid execution and delivery hereof and thereof by the Company and the other Debtors (as applicable), will constitute valid and legally binding obligations of the Equity Commitment Party, enforceable against the Equity Commitment Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency,

33

reorganization or other similar Laws limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 5.4    *No Conflict*.  Assuming that the consents referred to in clauses (a) and (b) of Section 5.5 are obtained, the execution and delivery by the Equity Commitment Party of this Agreement and each other Transaction Agreement to which the Equity Commitment Party is a party, the compliance by the Equity Commitment Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in breach, modification, termination or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which the Equity Commitment Party is party or is bound or to which any of the property or assets or the Equity Commitment Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of the Equity Commitment Party and (c) will not result in any material violation of any Law or Order applicable to the Equity Commitment Party or any of its properties, except in each of the cases described in clauses (a) or (c), for any conflict, breach, modification, termination, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact the Equity Commitment Party's performance of its obligations under this Agreement.

Section 5.5    *Consents and Approvals*.  No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over the Equity Commitment Party or any of its properties is required for the execution and delivery by the Equity Commitment Party of this Agreement and each other Transaction Agreement to which the Equity Commitment Party is a party, the compliance by the Equity Commitment Party with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except (a) any consent, approval, authorization, Order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact the Equity Commitment Party's performance of its obligations under this Agreement and each other Transaction Agreement to which the Equity Commitment Party is a party and (b) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws or any foreign direct investment Laws or any similar foreign investment Laws in connection with the transactions contemplated by this Agreement and each other Transaction Agreement, other than the CFIUS Statute.

Section 5.6    *No Registration*.  The Equity Commitment Party understands that (a) the Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of the Equity Commitment Party's representations as expressed herein or otherwise made pursuant hereto, and (b) the Shares cannot be resold by the Equity Commitment Party unless subsequently registered under the Securities Act or an exemption from registration is available.

Section 5.7    *Purchasing Intent*.  The Equity Commitment Party is acquiring the Shares for its own account or accounts or funds over which it holds voting discretion, not otherwise as a nominee or agent, and not otherwise with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and the Equity Commitment Party has no present intention of selling, granting any other participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

Section 5.8    *Sophistication; Investigation*.  The Equity Commitment Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits

34

and risks of its investment in the Shares.  The Equity Commitment Party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act.  The Equity Commitment Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time).  The Equity Commitment Party has independently evaluated the merits and risks of its decision (including consulting its own legal, Tax, economic and other advisors) to enter into this Agreement, acknowledges that it has reviewed and understands the terms and of the Preferred Stock, and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of any of the Debtors or any other person or any of their Representatives.

Section 5.9     *No Broker's Fees*.  None of the Equity Commitment Parties, any Related Purchaser, or their respective Affiliated Funds is a party to any Contract with any Person that would give rise to a valid claim against any of the Debtors for a brokerage commission, finder's fee or like payment in connection with this Agreement or any of the transactions contemplated hereby.

Section 5.10     *Sufficient Funds*.

(a)     The Equity Commitment Party has and shall maintain through the Closing, access to sufficient available cash funds (in the form of limited partner capital commitments and/or fund-level credit facilities) to perform all of its obligations under this Agreement, including the ability to fully exercise all Subscription Rights that are issued to it pursuant to the Rights Offering, and fully fund such Equity Commitment Party's Equity Commitment.

(b)     The Equity Commitment Party acknowledges that its obligations under this Agreement and the other Transaction Agreements are not conditioned in any manner upon its obtaining financing.

Section 5.11     *Legal Proceedings*.  Other than as may exist or arise in the Chapter 11 Cases, there are no Legal Proceedings pending or, to the knowledge of the Equity Commitment Party, threatened in writing, to which the Equity Commitment Party or any of its Subsidiaries is a party or to which any property of the Equity Commitment Party or any of its Subsidiaries is the subject, in each case that will (or would be reasonably likely to) prohibit, delay, or adversely impact the Equity Commitment Party's performance of its obligations under this Agreement or the other agreements contemplated hereunder.

Section 5.12     *Additional Securities Law Matters*.

(a)     The Equity Commitment Party has been advised by the Company that the Shares to be purchased pursuant to this Agreement are characterized as "restricted securities" under the Securities Act inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that the Equity Commitment Party must continue to bear the economic risk of the investment in such securities unless the offer and sale of such securities is subsequently registered under the Securities Act and all applicable state or foreign securities or "Blue Sky" Laws or an exemption from such registration is available.

(b)     The Equity Commitment Party (i) is either a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act or an "accredited investor" within the meaning of Rule 501(a) of the Securities Act and (ii) has the knowledge, skill and experience in business, financial and investment matters so that the undersigned is capable of evaluating the merits, risks and consequences of an investment in any Shares and is able to bear the economic risk of loss of such investment, including the

35

complete loss of such investment.  The Equity Commitment Party further represents that it fully understands the limitations on Transfer and restrictions on sales and other dispositions set forth in this Agreement.

**ARTICLE VI**

**ADDITIONAL COVENANTS**

**Section 6.1**      **_Orders Generally_**.  The Company and the Equity Commitment Parties shall use their respective commercially reasonable efforts, consistent with the Plan and the Plan Support Agreement (including the milestones contained therein), to (a) obtain the entry of the EPCA Approval Order, the Disclosure Statement Order, the Order approving the Rights Offering Procedures, and the Confirmation Order, and (b) cause the EPCA Approval Order, the Disclosure Statement Order and the Confirmation Order to become Final Orders (and request that such Orders become effective immediately upon entry by the Bankruptcy Court pursuant to a waiver of Rules 3020 and 6004(h) of the Bankruptcy Rules, as applicable), in each case, as soon as reasonably practicable, consistent with the Bankruptcy Code, the Bankruptcy Rules and the Plan Support Agreement following the filing of the respective motion seeking entry of such Orders.  The Company shall, to the extent reasonably practicable, provide Kirkland & Ellis and Paul, Weiss, no later than three (3) calendar days prior to filing with the Bankruptcy Court, to the extent reasonably practicable, copies of the proposed motions seeking entry of the EPCA Approval Order, the Disclosure Statement Order, the Order approving the Rights Offering Procedures, and the Confirmation Order, any other Order necessary or otherwise sought to effectuate the Restructuring and the EPCA Approval Order, the Disclosure Statement Order, the Order approving the Rights Offering Procedures, and the Confirmation Order must be consistent with the Plan Support Agreement, the Plan and this Agreement and otherwise in form and substance acceptable to the Plan Sponsors and the Company.  Any material amendments, modifications, changes, or supplements to the EPCA Approval Order, Disclosure Statement Order, Confirmation Order, the Order approving the Rights Offering Procedures, any other Order necessary or otherwise sought to effectuate the Restructuring and any of the motions seeking entry of such Orders, must be consistent with the Plan Support Agreement, the Plan and this Agreement and otherwise in form and substance acceptable to the Plan Sponsors and the Company.

**Section 6.2**      **_Confirmation Order; Plan and Disclosure Statement_**.  The Debtors and the Equity Commitment Parties shall use their respective commercially reasonable efforts to obtain entry of the Confirmation Order consistent with the Plan Support Agreement.  The Company shall promptly provide to Kirkland & Ellis and Paul, Weiss, and in no event later than three (3) calendar days prior to filing with the Bankruptcy Court to the extent reasonably practicable, a copy of any proposed amendment, modification, supplement or change to the Plan or the Disclosure Statement, and a reasonable opportunity to review and comment on such documents during such three (3) calendar day period, and the Plan and the Disclosure Statement and each such amendment, modification, supplement or change to the Plan or the Disclosure Statement must be consistent with the Plan Support Agreement, the Plan and this Agreement and otherwise in form and substance acceptable to the Plan Sponsors and the Company.  The Company shall promptly provide to Kirkland & Ellis and Paul, Weiss, and in no event later than three (3) calendar days prior to filing with the Bankruptcy Court, a copy of the proposed Confirmation Order (together with copies of any briefs, pleadings and motions related thereto), a reasonable opportunity to review and comment on such Order, briefs, pleadings and motions during such three (3) calendar day period, and such Order, briefs, pleadings and motions must be consistent with the Plan Support Agreement, the Plan and this Agreement and otherwise in form and substance acceptable to the Plan Sponsors and the Company.

**Section 6.3**      **_Conduct of Business_**.

(a)      Except (1) as expressly required by the terms of this Agreement, the Plan Support Agreement, the Plan or any other Transaction Agreement, (2) as set forth on Section 6.3 of the Company

36

Disclosure Schedules, (3) as required by applicable Law or Order to which the Company or any of its Subsidiary is bound or as required by any Governmental Entity, including as required by any Order of the Bankruptcy Court (provided that no Debtor may petition for, seek, request or move for an Order of the Bankruptcy Court or authorize, support or direct any other Person to petition, seek, request or move for, an Order of the Bankruptcy Court that would circumvent the requirements of this Section 6.3), (4) in connection with, in the Company's reasonable discretion, any reasonable and prudent COVID-19 Measures (and provided that action taken pursuant to this clause (4) shall not materially and adversely affect the Company and its Subsidiaries, taken as a whole), (5) in connection with the taking of any Emergency Response, or (6) with the prior written consent of the Plan Sponsors, during the period from the date of this Agreement to the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with its terms (the "**Pre-Closing Period"),** the Company shall, and shall cause each of the other Debtors to, carry on its business in the ordinary course of business in all material respects (including with respect to fleet optimization and working capital) (taking into account in each case (A) the fact that the Chapter 11 Cases have commenced, (B) the fact that the business of the Debtors will be operated while in bankruptcy) including by using commercially reasonable efforts to: (i) preserve intact its businesses, (ii) preserve its material relationships with customers, vendors, suppliers, licensors, licensees, distributors and others having material business dealings with any of the Debtors in connection with their business, (iii) keep available the services of its officers and employees and (iv) file Company SEC Documents within the time periods required under the Exchange Act, in each case in accordance with ordinary course practice.

(b)        Except (i) as expressly required by the terms of this Agreement, the Plan Support Agreement, the Plan or any other Transaction Agreement, (ii) as set forth on Section 6.3 of the Company Disclosure Schedules, (iii) as required by applicable Law or Order to which the Company or any of its Subsidiaries is bound or as required by any Governmental Entity, including as required by any Order of the Bankruptcy Court (provided that no Debtor may petition for, seek, request or move for an Order of the Bankruptcy Court or authorize, support or direct any other Person to petition, seek, request or move for, an Order of the Bankruptcy Court that would circumvent the requirements of this Section 6.3), (iv) in connection with, in the Company's reasonable discretion, any reasonable COVID-19 Measures, (v) in connection with the taking of any Emergency Response, or (vi) with the prior written consent of the Plan Sponsors (which consent shall not be unreasonably withheld, conditioned or delayed), during the Pre-Closing Period the Debtors shall not, and shall cause their Subsidiaries not to:

(i)        enter into, or amend, modify, terminate (other than an expiration at the end of its term), waive any rights under, supplement, restate or make any other change to, any Material Contract or assume or reject any Material Contract in connection with the Chapter 11 Cases (other than any Material Contracts that are otherwise addressed by clause (iii) below),

(ii)        make any material amendment to any organizational documents of the Company or any of its Subsidiaries that would reasonably be expected to adversely affect the Equity Commitment Parties or the transactions contemplated by this Agreement,

(iii)        (x) enter into, or make any amendment, modification, waiver, supplement or other change to, any employment agreement with respect to an employee of any Debtor with a title of senior vice president or higher to which any of the Debtors is a party, (y) increase the base salary of any non-officer employee of any Debtor entitled to an annual base salary of less than $250,000 by more than 10%, provided that this clause shall not prevent the Debtors from entering into any employment Contract with any employee in the ordinary course of business, or (z) increase the annual base salary payable or to become payable by a Debtor to any of its respective officers or any employees entitled to compensation in excess of $250,000 by more than 5%, excluding (A) in the case of clause

37

(y) and (z), any incentive compensation payable under a plan approved by the Bankruptcy Court prior to the date hereof; provided that such incentive compensation was permitted under the terms of such plan as in effect on the date hereof, and (B) in the case of clause (y) any incentive compensation payments in the ordinary course of business and consistent with past practice,

(iv)     terminate the employment of any employee of the Debtors having an annual base salary in excess of $250,000 without cause,

(v)     (i) enter into, adopt or materially amend any employment agreements or any compensation or incentive plans (including equity arrangements) with respect to employees with the title of Senior Vice President or higher or (ii) increase in any manner the compensation or benefits (including severance) of any employees with the title of Senior Vice President or higher,

(vi)     enter into, or make any amendment, modification, waiver, supplement or other change to, any Contract (other than an employment agreement or indemnification agreement) between any Debtor, on the one hand, and any director or officer of the Company or any of its Subsidiaries or greater than five percent (5%) beneficial owner of any equity interests in the Company, on the other hand,

(vii)     commence any Legal Proceeding seeking damages in an amount in excess of $10,000,000,

(viii)     except as set forth on Section 6.3(b)(viii) of the Company Disclosure Schedules, make any modification of existing rights under or enter into any settlement regarding a breach, infringement, misappropriation or dilution of any material intellectual property of any Debtor (other than the resolution of any claims that are part of the Chapter 11 Cases),

(ix)     make any payment, discharge, settlement or compromise (or the offer to settle or compromise) any pending Legal Proceeding, which (x) requires payment by a Debtor (exclusive of attorney's fees) in excess of $10,000,000 in the aggregate or (y) which imposes restrictions on the operations of any Debtor,

(x)     make or commit to make any non-fleet capital expenditures other than consistent with past practice in an amount not exceeding $25,000,000 in the aggregate in any fiscal quarter,

(xi)     change the financial accounting policies or procedures or methods of reporting income, deductions or other material items for financial accounting purposes, except as required by changes in GAAP, SEC rules or applicable Law, or as permitted by GAAP, SEC rules or applicable Law in connection with the Company's emergence from operating as a debtor-in-possession pursuant to the Bankruptcy Code,

(xii)     (a) sell, lease, license, transfer, exchange or swap, mortgage or otherwise encumber (including securitizations) or subject to any Lien (other than Permitted Liens) or otherwise dispose of any portion of material properties or assets (other than vehicle fleet) having a fair market value in excess of $25,000,000 in the aggregate (except Liens that exist or become effective pursuant to existing financing arrangements and the transactions contemplated by the Donlen Purchase Agreement sales of rental car operations to

franchisees in an amount not to exceed $25,000,000 (excluding the value of the related fleet) for any individual transaction) or (b) acquire any material properties or assets having a fair market value in excess of $25,000,000 (excluding vehicle fleet) in the aggregate,

(xiii)    make any material change to existing insurance policies and programs or otherwise fail to maintain, with financially responsible insurance companies, insurance in such amounts and against such risks and losses as is maintained by it at present,

(xiv)    make or change any material Tax election (other than making ordinary course Tax elections that must be made to comply with standard Tax compliance obligations in the ordinary course of business),

(xv)    enter into any Tax sharing agreement, Tax allocation agreement or Tax indemnity agreement (other than any commercial agreements or Contracts not primarily related to Tax or any agreements among or between only the Company and/or any of its Subsidiaries),

(xvi)    settle or compromise any audit, assessment or other proceeding or claim for refund, in each case, relating to a material amount of Taxes,

(xvii)    enter into any closing agreement or other binding written agreement with, or apply for any ruling from, any Governmental Entity with respect to any material Taxes,

(xviii)    file any material Tax Return (in a manner that is not consistent with past practice and only to the extent in accordance with applicable Tax Law) or amend any Tax Return for income or other material Taxes, or

(xix)    make any change in a Tax accounting period or any change in any income or other material method of Tax accounting (other than making ordinary course method of Tax accounting method choices pertaining to the depreciation expense of the Debtors).

(c)    Except as otherwise provided in this Agreement, nothing in this Agreement shall give the Equity Commitment Parties, directly or indirectly, any right to control or direct the operations of the Debtors.  Prior to the Closing Date, the Debtors shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision of the business of the Debtors.

Section 6.4    *Severance Obligations*.  On and subject to the occurrence of the Effective Date, the Reorganized Debtors (a) shall covenant, agree, and undertake, as obligations of the Reorganized Debtors, that in the event that any individual who is part of the Senior Management Team is terminated by the Reorganized Debtors without cause within the twelve (12) months immediately following the Effective Date, the Reorganized Debtors shall, by not later than thirty (30) days after such termination, pay such terminated individual a single lump-sum cash payment equal to two (2) times the value of such terminated individual's annual base compensation (i.e., base salary and non-variable benefits), and (b) shall adopt and implement such other plans, policies, or agreements with respect to employee severance (if any) on terms to be determined by the Reorganized Debtors.

Section 6.5    *Access to Information*.

(a)    Subject to applicable Law and COVID-19 Measures, upon reasonable notice during the Pre-Closing Period, the Debtors shall (x) afford the Plan Sponsors and their Representatives upon request reasonable access, during normal business hours and without unreasonable disruption or

39

interference with the business or operations of the Company and its Subsidiaries, except as would be imprudent or impossible in light of any Emergency Event, to the Debtors' employees, properties, books, Contracts and records and (y) furnish promptly to such Parties all reasonable information concerning the Debtors' business, properties and personnel as may reasonably be requested by any such Party; provided that the Company and its Subsidiaries shall not be required to provide any information or access that the Company reasonably believes would violate applicable Laws or Orders, including Antitrust Laws and data protection Laws, or the terms of any applicable Contracts (including confidentiality obligations to a third party if the Company shall have used its commercially reasonable efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure) or cause forfeiture of any attorney-client privilege or an expectation of client confidence or any other rights to any evidentiary privilege.  The Plan Sponsors shall utilize commercially reasonable security measures in collecting, using and storing Debtors' information, and accessing Debtors' systems.  All requests for information and access made in accordance with this Section 6.5 shall be directed to an executive officer of the Company or such Person as may be designated by the Company's executive officers.

(b)      Information to be obtained by any Equity Commitment Party and its Representatives in connection with the transactions contemplated by this Agreement shall be subject to the provisions of the relevant confidentiality agreement by and between the Company and the applicable Equity Commitment Party (or if such Equity Commitment Party is not party to a confidentiality agreement, the relevant confidentiality agreement by and between the Company and the Common Equity Plan Sponsors, which shall continue in full force and effect through the Closing notwithstanding any terms to the contrary contained therein, and such Equity Commitment Party agrees to be bound by the terms of such confidentiality agreements as if it were a party thereto).

**Section 6.6      *Financial Information*.**  During the Pre-Closing Period, the Company shall deliver to Kirkland & Ellis, Paul, Weiss and Guggenheim Securities, LLC (or other counsel and financial advisors to the Equity Commitment Parties or the designated Related Purchasers), all statements and reports the Company is required to deliver to the lender under the DIP Facility as of the date hereof (the "**Financial Reports**") on a confidential basis and on the same schedule as the lenders under the DIP Facility receive such Financial Reports.  Neither any waiver by the parties to the DIP Facility of their right to receive the Financial Reports nor any amendment or termination of the DIP Facility shall limit the Company's obligation to deliver the Financial Reports to the Equity Commitment Parties in accordance with the terms of this Agreement.

**Section 6.7      *Commercially Reasonable Efforts*.**

(a)      Without in any way limiting any other respective obligation of the Company or the Equity Commitment Parties in this Agreement, each Party shall use (and the Company shall cause the other Debtors to use, and the Equity Commitment Parties shall cause each applicable Related Purchaser to use) commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Plan, including using commercially reasonable efforts in:

(i)      timely preparing and filing all necessary notices, reports and other filings of such Person and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Entity;

(ii)      cooperating with the defense of any Legal Proceedings in any way challenging (A) this Agreement, the Plan, the New Registration Rights Agreement, or any

40

other Transaction Agreement, (B) the EPCA Approval Order, the Disclosure Statement Order, or the Confirmation Order, or (C) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining Order entered by any Governmental Entity or the Bankruptcy Court vacated or reversed; and

(iii)    working together in good faith to finalize the Company Organizational Documents, the New Registration Rights Agreement, the Transaction Agreements and all other documents relating thereto for timely inclusion in the Plan Supplement.

(b)    Subject to applicable Laws or applicable rules relating to the exchange of information and in accordance with the Plan Support Agreement, the Parties shall have the right to review in advance, and to the extent practicable each will consult with the others on all of the information relating to Equity Commitment Parties or Related Purchasers or the Company and any of its Subsidiaries, as the case may be, and any of their respective Subsidiaries or Related Purchasers or the Equity Commitment Parties, that appears in any filing made with, or written materials submitted to, any third party and/or Governmental Entity in connection with the transactions contemplated by this Agreement or the Plan; provided, however, that the Equity Commitment Parties are not required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy Court.  In exercising the foregoing rights, the Parties shall act as reasonably and as promptly as practicable.

(c)    Nothing contained in this Section 6.7 shall limit the ability of an Equity Commitment Party, in furtherance of its obligations to consummate and make effective the transactions contemplated by this Agreement, the Plan Support Agreement and the Plan, to consult with the Company, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Cases to the extent not inconsistent with the Plan Support Agreement, the Plan, this Agreement, or any other Transaction Agreement.  For the avoidance of doubt, nothing contained in this Section 6.7 or elsewhere in this Agreement shall limit any party in asserting or contesting the Allowed amount of any Claim under the Plan, including with respect to any interest (or rate of interest) thereon.

**Section 6.8**    ***Company Organizational and Other Documents***.  The Plan will provide that on the Effective Date, the Company Organizational Documents will be duly authorized, approved, adopted and in full force and effect.  Forms of the Company Organizational Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement or an amendment thereto.

**Section 6.9**    ***Use of Proceeds***.  The Debtors will apply the proceeds from the sale of the Shares for the purposes identified in the Disclosure Statement, the Plan Support Agreement and the Plan.

**Section 6.10**    ***Share Legend***.  Each certificate evidencing Shares issued hereunder shall be stamped or otherwise imprinted with a legend (the "**Legend**") in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

In the event that any such Shares are uncertificated, such Shares shall be subject to a restrictive notation substantially similar to the Legend in the share ledger or other appropriate records maintained by the Company or agent and the term "**Legend**" shall include such restrictive notation.  The Company shall

41

remove the Legend (or restrictive notation, as applicable) set forth above from the certificates evidencing any such shares (or the share register or other appropriate Company records, in the case of uncertified shares), upon request, at any time after the restrictions described in such Legend cease to be applicable, including, as applicable, when such shares may be sold under Rule 144 of the Securities Act. The Company may reasonably request such opinions, certificates or other evidence that such restrictions no longer apply as a condition to removing the Legend.

### Section 6.11    *Governmental Approval*.

(a)    Each Party agrees to (i) make (and, in the case of an Equity Commitment Party, cause each of its Related Purchasers to make) any filings, notifications, notices or submissions (or, if required by any Antitrust Authority, any drafts thereof) under the HSR Act and any other Antitrust Laws, the CFIUS Statute, if and as required or otherwise deemed advisable after good faith discussions between the relevant Parties, or any similar Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement (including with respect to the direct or indirect investments being made into or through Amarillo LP in connection therewith) as soon as reasonably practicable (and with respect to any filings required pursuant to the HSR Act, no later than ten (10) Business Days following the date hereof), (ii) promptly furnish (and, in the case of an Equity Commitment Party, cause each of its Related Purchasers to furnish) any documents or information reasonably requested by any Antitrust Authority or, if applicable, CFIUS and (iii) subject to Section 6.11(f), take (and, in the case of an Equity Commitment Party, cause each of its Related Purchasers to take) all actions necessary to obtain the required consents from any Antitrust Authority, including antitrust clearance under the HSR Act and under any other Antitrust Law, the CFIUS Statute, any foreign investment (or foreign direct investment (FDI)), or similar Laws as promptly as practicable.

(b)    The Company and each Equity Commitment Party agree, and each Equity Commitment Party agrees to cause each its Related Purchaser that will be party to a filing or submission pursuant to any Antitrust Law, the CFIUS Statute or any similar Laws to (i) notify to the relevant Governmental Entity any transaction contemplated by this Agreement, the Plan or the other Transaction Agreements (each Equity Commitment Party and each such Related Purchaser, a "**Filing Party**") and (ii) to reasonably cooperate with each other as to the appropriate time of filing such notification and its content. The Company shall and each Equity Commitment Party shall, and shall cause each of its related Filing Parties to, to the extent permitted by applicable Law: (i) promptly notify each other of, and if in writing, furnish each other with copies of (or, in the case of substantive oral communications, advise each other orally) of any substantive communications from or with any Antitrust Authority, or any other Governmental Entity under the CFIUS Statute or any similar Law; (ii) not participate in any meeting with any Antitrust Authority, or any other Governmental Entity under the CFIUS Statute or any similar Law unless it consults with each other Filing Party and the Company, as applicable, in advance and, to the extent permitted by the Antitrust Authority, or any other Governmental Entity under the CFIUS Statute or any similar Law and applicable Law, give each other Filing Party and the Company, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party and the Company, as applicable, with copies of all substantive correspondence and communications between such Filing Party or the Company and the Antitrust Authority, or any other Governmental Entity under the CFIUS Statute or any similar Law; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the Antitrust Authority, or any other Governmental Entity under the CFIUS Statute or any similar Law; and (v) not withdraw its filing, if any, under the HSR Act, any Antitrust Law, the CFIUS Statute or any similar Laws without the prior written consent of the Plan Sponsors and the Company.

(c)    Should a Filing Party that will be party to a filing or submission under any Antitrust Laws, the CFIUS Statute or any similar Law need to submit such filing or submission jointly with one or

more other Filing Parties or the Company (each, a "**Joint Filing Party**"), each Equity Commitment Party shall and shall cause such other applicable Joint Filing Party to promptly notify each other Joint Filing Party of, and if in writing, furnish, at the applicable Party's discretion where such correspondence includes information concerning or regarding other Joint Filing Parties, each other Joint Filing Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with any Antitrust Authority or, if applicable, CFIUS or any other Governmental Entity in connection with the Joint Notice or any similar Law.

(d)    The communications contemplated by this Section 6.11 may be made by the Company or a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards.  The obligations in this Section 6.11 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Agreement, the Plan or the other Transaction Agreements and shall not apply to any Filing Party that is not a party to the notified transaction.

(e)    Each Equity Commitment Party shall and shall cause each related Filing Party to take all actions requested by any Antitrust Authority, or necessary to resolve any objections that may be asserted by any Antitrust Authority, with respect to the transactions contemplated by this Agreement or the Plan under any Antitrust Law.  Without limiting the generality of the foregoing, each Equity Commitment Party shall and shall cause each related Filing Party to:

(i)    at its sole cost, comply with all restrictions and conditions, if any, imposed or requested by any Antitrust Authority with respect to Antitrust Laws in connection with granting any necessary clearance or terminating any applicable waiting period including (1) agreeing to sell, divest, hold separate, license, cause a third party to acquire, or otherwise dispose of, any Subsidiary, operations, divisions, businesses, product lines, customers or assets contemporaneously with or after the Closing and regardless as to whether a third party purchaser has been identified or approved prior to the Closing, (2) taking or committing to take such other actions that may limit such Filing Party's freedom of action with respect to, or its ability to retain, one or more of its operations, divisions, businesses, products lines, customers or assets, and (3) entering into any Order, consent decree or other agreement to effectuate any of the foregoing;

(ii)    terminate any Contract or other business relationship as may be required to obtain any necessary clearance of any Antitrust Authority or to obtain termination of any applicable waiting period under any Antitrust Laws;

(iii)    oppose fully and vigorously any request for, the entry of, and seek to have vacated or terminated, any Order or ruling of any Antitrust Authority that could restrain, prevent or delay the Closing, including by defending through litigation, any action asserted by any Person in any court or before any Antitrust Authority and by exhausting all avenues of appeal, including appealing properly any adverse decision or Order by any Antitrust Authority, it being understood that the costs and expenses of all such actions shall be borne by the relevant Filing Party.

(f)    Notwithstanding anything to the contrary set forth in this Section 6.11 or other provision of this Agreement, no Equity Commitment Party or Filing Party shall be required to take any action, make any undertaking, or agree to any remedy or condition that: (i) would be reasonably expected to be material in relation to the value of the Company and its Subsidiaries, taken as a whole, (ii) materially affects such Person's ability to own and control the Company, (iii) would reasonably be expected to have a material adverse effect on such Person's (A) business, (B) financial condition, (C) results of operations,

43

or (D) ownership, control, or operation over its businesses and assets or (iv) requires the sale, divestiture, holding separate, licensing, acquisition by a third party, or other disposition of, or any material portion with respect to, any portfolio company of any Equity Commitment Party, Filing Party or any of their respective Subsidiaries (each of clauses (i) - (iv), a "**Burdensome Condition**").

(g)    Notwithstanding the above, this Section 6.11 (with the exception of Section 6.11(b)(iv)) shall not apply to any Affiliates or associates of the "Oaktree" Equity Commitment Parties set forth on Schedule 1 and will apply only to the ultimate parent entities of such "Oaktree" Equity Commitment Parties.

### Section 6.12    *Alternative Transactions*.

(a)    Subject to the other provisions of this Section 6.12, from the date of this Agreement until the earlier of the termination of this Agreement in accordance with its terms and the Closing Date, (i) the Company shall, shall cause each of its officers, directors, employees and Subsidiaries to, and shall use their reasonable best efforts to cause their other respective Representatives to, immediately cease and terminate any ongoing solicitations, discussions and negotiations with respect to any Alternative Transaction, and (ii) each of the Debtors and their Subsidiaries shall not, and shall instruct and direct their respective Representatives not to, other than to inform any Person of the provisions of this Section 6.12, directly or indirectly, initiate, solicit, engage in or participate in any discussions, inquiries or negotiations in connection with any proposal, expression of interest or offer relating to an Alternative Transaction, afford access to the business, properties, assets, books or records of or provide any non-public information relating to the Debtors or any of their Subsidiaries to, otherwise cooperate in any way with, or knowingly assist, participate in, facilitate or encourage any effort by any Person that is seeking to make, or has made, an Alternative Transaction Proposal.  It is agreed that any violation of the restrictions on the Debtors set forth in this Section 6.12 by the Debtors or any of their Subsidiaries or any Representatives thereof shall be a material breach of this Section 6.12 by the Debtors.

(b)    Notwithstanding the foregoing clause (a), if following the date of this Agreement the Debtors or any of their Subsidiaries receive a bona fide proposal, expression of interest or offer (whether written or unwritten) for an Alternative Transaction (an "**Alternative Transaction Proposal**") from any Person not solicited in violation of this Section 6.12 the Board of Directors of the Company (the "**Company Board**") (or a committee thereof) may, directly or indirectly through the Company's Representatives (i) contact any Person that has made an unsolicited Alternative Transaction Proposal (and its advisors) for the purpose of clarifying the proposal and any terms thereof and the likelihood of consummation, so as to determine whether such proposal constitutes, or could reasonably be expected to lead to, a Superior Proposal (as defined below) or (ii) if the Company Board shall have determined in good faith and after considering the advice of its outside counsel and independent financial advisor, that such Alternative Transaction Proposal, constitutes, or could reasonably be expected to result in, a Superior Transaction and that failure of the Company Board to pursue such Alternative Transaction Proposal would reasonably be expected to result in a breach of the Company Board's fiduciary duties under applicable Laws (a "**Superior Proposal**"), the Company may, in response to such Superior Proposal: (x) furnish non-public information in response to a request therefor by the Person that has submitted such unsolicited Superior Proposal if such Person has executed and delivered to the Company a confidentiality agreement (a copy of which shall be provided to the Equity Commitment Parties within 24 hours of execution thereof) on terms no less favorable than any confidentiality agreements entered into with any Plan Sponsor and if the Company also promptly (and in any event within 24 hours after the time such information is provided to such Person) makes such information available to the Equity Commitment Parties, to the extent not previously provided to the Equity Commitment Parties; and (y) engage or participate in discussions and negotiations with such Person regarding such Superior Proposal.  Subject to applicable confidentiality restrictions and the conditions upon which the proposal was submitted, the Company shall provide (i) notice of all Alternative Transaction

44

Proposals (whether oral or written) to the Equity Commitment Parties, Kirkland & Ellis and Paul, Weiss within twenty-four (24) hours after the time of receipt of such Alternative Transaction Proposal and (ii) a copy of each such written Alternative Transaction Proposal or summary of each such oral Alternative Transaction Proposal. The Company shall also notify the Equity Commitment Parties promptly if the Company Board determines that an Alternative Transaction Proposal is a Superior Proposal, and in no event later than 24 hours following such determination.

**Section 6.13** **Reorganized Company**. The Parties shall work together in good faith and use commercially reasonable efforts to structure and implement the Restructuring Transactions in a tax-efficient and cost-effective manner for the Debtors and the Equity Commitment Parties. The Equity Commitment Parties may request at any time prior to the Disclosure Statement hearing that the Company be (1) organized in a different form or jurisdiction or (2) that a Person other than the Company serve as the parent entity of the Debtors, the issuer of the Shares and the issuer of equity interests in the Rights Offering; provided that, nothing in this Section 6.13 shall require the Company or any of its Affiliates to take any actions that would reasonably be likely to delay the consummation of the Plan or impede consummation of the Plan.

**Section 6.14** **Directors and Officers Indemnity.**

(a)    Each Common Equity Plan Sponsor shall cause the Reorganized Company to ensure, and the Company immediately following the Effective Date shall ensure, that all rights to indemnification now existing in favor of any individual who, at the date hereof or at the Effective Date, is a director or officer of any non-debtor Subsidiary of the Company or who, at the request of the Company, served as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise of any non-debtor Subsidiary of the Company (collectively, with such individual's heirs, executors or administrators, the "**D&O Indemnified Persons**") as provided in the respective organizational or similar governing documents and indemnification agreements to which any non-debtor Subsidiary of the Company is a party, shall survive the Effective Date and shall continue in full force and effect for a period of not less than six (6) years from the Effective Date and that the indemnification agreements and the provisions with respect to indemnification and limitations on liability set forth in such organizational or other governing documents shall not be amended, repealed or otherwise modified; provided that in the event any claim or claims are asserted or made within such six (6) year period, all rights to indemnification in respect of any such claim or claims shall continue until final disposition of any and all such claims. Neither the Company nor any of its Subsidiaries shall settle, compromise or consent to the entry of judgment in any action, proceeding or investigation or threatened action, proceeding or investigation without the prior written consent of such Indemnified Person.

(b)    Prior to or at the Closing, the Company will obtain, maintain and fully pay for irrevocable "tail" insurance policies naming the D&O Indemnified Persons as direct beneficiaries with a claims period of at least six (6) years from the Closing Date from an insurance carrier with the same or better credit rating as the existing directors' and officers' liability insurance policies as applicable to the Company and its Subsidiaries as of immediately prior to the Closing (the "**Existing D&O Policies**") in an amount and scope at least as favorable in the aggregate as the Existing D&O Policies in effect immediately prior to Closing with respect to matters existing or occurring at or prior to the Closing Date. The Company will not, or will cause its Subsidiaries to not, cancel or change such insurance policies in any respect.

(c)    Notwithstanding any other provisions hereof, the obligations of the Common Equity Plan Sponsors and the Company and its Subsidiaries contained in this Section 6.14 shall be binding upon the successors and assigns of such Common Equity Plan Sponsors and the Company and its Subsidiaries. In the event the Company or any of its Subsidiaries or any of their respective successors or assigns, (i) consolidates with or merges into any other Person or (ii) transfers all or substantially all of its

45

properties or assets to any Person, then, and in each case, proper provision shall be made so that the successors and assigns of the Company or such Subsidiary, as the case may be, honor the indemnification and other obligations set forth in this Section 6.14.

(d)        The obligations of the Common Equity Plan Sponsors and the Company and its Subsidiaries under this Section 6.14 shall survive the Closing and shall not be terminated or modified in such a manner as to affect adversely any Indemnified Person to whom this Section 6.14 applies without the consent of such affected Indemnified Person (it being expressly agreed that the Indemnified Persons to whom this Section 6.14 applies shall be third-party beneficiaries of this Section 6.14, each of whom may enforce the provisions of this Section 6.14).

Section 6.15        *Tax Treatment*.  The Parties agree that the Company shall not treat as a dividend for U.S. federal income tax purposes any amount in respect of the Preferred Stock owned by an Equity Commitment Party on account of the accrual of dividends at the Dividend Rate (as defined in the Certificate of Designation), unless and until such dividends are declared and paid in cash, and shall not file any Tax Return inconsistent with such treatment unless otherwise required by a change in Law or by the IRS or another Governmental Entity following an audit or examination.

Section 6.16        *AGS Engagement Letter*.  Substantially concurrent with its execution of this Agreement, each of the Company and the Common Equity Plan Sponsors shall execute and deliver the AGS Engagement Letter to Apollo Global Securities, LLC.

Section 6.17        *HIL Facility*.  On or prior to the execution of this Agreement, the HIL Debt Commitment Parties (a) shall provide debt financing in an aggregate amount of €250 million (the "**HIL Debt Financing**"), (b) shall (and shall cause its Affiliates to) take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transactions contemplated by the definitive documents related to the HIL Debt Financing consistent with the terms of this Agreement, such definitive documents and the Plan and (c) shall execute and deliver the definitive documents related to the HIL Debt Financing to the Company.

## ARTICLE VII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1        *Conditions to the Obligations of the Equity Commitment Parties*.  The obligations of the Equity Commitment Parties to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with Section 7.2) the satisfaction of the following conditions prior to or at the Closing:

(a)        EPCA Approval Order.  The Bankruptcy Court shall have entered the EPCA Approval Order consistent with the Plan, the Plan Support Agreement and this Agreement and otherwise in form and substance acceptable to the Plan Sponsors, and such Order shall be a Final Order.

(b)        Disclosure Statement Order.  The Bankruptcy Court shall have entered the Disclosure Statement Order consistent with the Plan, the Plan Support Agreement and this Agreement and otherwise in form and substance acceptable to the Plan Sponsors, and such Order shall be a Final Order.

(c)        Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order consistent with the Plan, the Plan Support Agreement and this Agreement and otherwise in form and substance satisfactory to the Plan Sponsors, and such Order shall be a Final Order.

(d)  Plan.  The conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the Closing and conditions the satisfaction of which requires the taking of action by the Equity Commitment Parties) set forth in the Plan shall have been satisfied or waived (other than such conditions that, by their terms, are to be satisfied as of the occurrence of the Effective Date of the Plan) in accordance with the terms of the Plan.

(e)  Effective Date.  The Effective Date shall have occurred, or shall be deemed to have occurred, concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(f)  Expense Reimbursement.  The Debtors shall have paid, or will pay concurrently with the Closing, all Expense Reimbursements accrued through the Closing Date pursuant to Section 3.1; provided that invoices for such Expense Reimbursement must have been received by the Debtors at least three (3) Business Days prior to the Closing Date in order to be required to be paid on the Closing Date.

(g)  **Governmental Approvals.**  (i) All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement, including with respect to the direct or indirect investments being made into or through Amarillo LP in connection therewith, shall have terminated or expired and (ii) all authorizations, approvals, consents or clearances under such Antitrust Laws or otherwise required by Governmental Entities in connection with the transactions contemplated by this Agreement, including with respect to the direct or indirect investments being made into or through Amarillo LP in connection therewith (for the avoidance of doubt, not including any filing made pursuant to the CFIUS Statute, as CFIUS clearance under the CFIUS Statute shall not be a condition to Closing) shall have been obtained, and no such authorizations, approvals, consents or clearances shall have imposed any Burdensome Conditions.

(h)  No Legal Impediment to Issuance.  No Law or Order shall have become effective or been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement;

(i)  Representations and Warranties.

(i)  The representations and warranties of the Debtors contained in Section 4.10 (Absence of Certain Changes) shall be true and correct in all respects on and as of the date hereof and the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(ii)  The representations and warranties of the Debtors contained in Sections 4.1 (Organization and Qualification), 4.2 (Corporate Power and Authority), 4.3 (Execution and Delivery; Enforceability), 4.4 (Authorized and Issued Equity Interests), 4.5 (Issuance), and 4.25 (No Broker's Fees) shall be true and correct in all material respects on and as of the date hereof and the Closing Date(except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(iii)  The representations and warranties of the Debtors contained in Article IV of this Agreement other than those referred to in clauses (i) and (ii) above shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the date hereof and the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which

47

shall be true and correct only as of the specified date), except where the failure to be so true and correct does not constitute, individually or in the aggregate, a Material Adverse Effect.

(j)    Covenants.  The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance on or prior to the Closing Date.

(k)    Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred, and there shall not exist, any Event that constitutes a Material Adverse Effect.

(l)    Officer's Certificate.  The Equity Commitment Parties shall have received on and as of the Closing Date a certificate signed on behalf of the Company by an executive vice president of the Company (solely in such officer's capacity as such and not in such officer's personal capacity, and without personal liability) certifying that the conditions set forth in Sections 7.1(i) (Representations and Warranties) and 7.1(j) (Covenants) have been satisfied.

(m)    Plan Support Agreement.  The Plan Support Agreement shall not have been terminated with respect to the Company in accordance with its terms.

(n)    New Registration Rights Agreement; Company Organizational Documents.

(i)    The New Registration Rights Agreement shall have been executed by the Company.

(ii)    The Company Organizational Documents (including, for the avoidance of doubt, the Certificate of Designation) shall become effective concurrent with the Closing.

(iii)    The Company shall have delivered a "VCOC" letter (the "**VCOC Letter**") substantially in the form attached as Annex E.

(o)    New Reorganized Debt.  The agreements providing for the New Reorganized Debt shall become effective concurrent with the Closing, shall be for the amount set forth for the applicable New Reorganized Debt in the Plan, and shall otherwise be in form and substance substantially consistent with the Plan Support Agreement and the Plan (provided that to the extent inconsistent with the Plan Support Agreement or this Agreement, the terms provided thereunder shall be acceptable to the Plan Sponsors), and all conditions precedent to the extension of credit thereunder shall have been satisfied or waived in accordance with their respective terms.

Section 7.2    *Waiver of Conditions to Obligations of Equity Commitment Parties*.  All or any of the conditions set forth in Section 7.1 may only be waived in whole or in part with respect to the Equity Commitment Parties by a written instrument executed by the Plan Sponsors in their sole discretion and if so waived, the Equity Commitment Parties shall be bound by such waiver.

Section 7.3    *Conditions to the Obligations of the Debtors*.  The obligations of the Debtors to consummate the transactions contemplated hereby is subject to (unless waived by the Company) the satisfaction of each of the following conditions:

(a)    EPCA Approval Order.  The Bankruptcy Court shall have entered the EPCA Approval Order consistent with the Plan, the Plan Support Agreement and this Agreement and otherwise

consistent with the Plan, the Plan Support Agreement and this Agreement and otherwise in form and substance acceptable to the Company and such Order shall be a Final Order.

(b)    Disclosure Statement Order.  The Bankruptcy Court shall have entered the Disclosure Statement Order consistent with the Plan, the Plan Support Agreement and this Agreement and otherwise in form and substance acceptable to the Company, and such Order shall be a Final Order.

(c)    Confirmation Order.  The Bankruptcy Court shall have entered the Confirmation Order consistent with the Plan, the Plan Support Agreement and this Agreement and otherwise in form and substance acceptable to the Company, and such Order shall be a Final Order.

(d)    Effective Date.  The Effective Date shall have occurred, or shall be deemed to have occurred, concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan and in the Confirmation Order.

(e)    Plan.  The conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the Closing and conditions the satisfaction of which requires the taking of action by the Company or its Subsidiaries) set forth in the Plan shall have been satisfied or waived (other than such conditions that, by their terms, are to be satisfied as of the occurrence of the Effective Date of the Plan) in accordance with the terms of the Plan.

(f)    Governmental Approvals.  All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under such Antitrust Laws or otherwise required by such Governmental Entities in connection with the transactions contemplated by this Agreement shall have been obtained.

(g)    No Legal Impediment to Issuance.  No Law or Order shall have become effective or been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the transactions contemplated by this Agreement.

(h)    Representations and Warranties.  The representations and warranties of the Equity Commitment Parties shall be true and correct in all respects on and as of the date hereof and of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct would not, individually or in the aggregate, prevent or materially impede the Equity Commitment Parties from consummating the transactions contemplated by this Agreement.

(i)    Covenants.  The Equity Commitment Parties shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance on or prior to the Closing Date.

(j)    Plan Support Agreement.  The Plan Support Agreement shall not have been terminated with respect to the Plan Sponsors in accordance with its terms.

**Section 7.4    *Waiver of Conditions to the Obligations of the Debtors*.**  All or any of the conditions set forth in Section 7.3 may be waived in whole or in part with respect to all Debtors by a written instrument executed by the Company in its sole discretion and if so waived, all Debtors shall be bound by such waiver.

49

*Section 7.5    **Condition to the Funding of the Direct Investment Preferred Commitments***.  The obligations of the Equity Commitment Parties holding Direct Investment Preferred Commitments to fund such Direct Investment Preferred Commitments in accordance with the terms hereof shall be subject to (unless waived in accordance with Section 7.6) the Company receiving aggregate proceeds of at least the Required Common Amount from the issuance of Shares of Common Stock to Common Equity Plan Sponsors, Backstop Investors, Rights Offering Participants or their respective transferees in accordance with Section 2.5 substantially concurrently with the Closing.

*Section 7.6    **Waiver of Condition to Funding of Direct Investment Preferred Commitments***.  The condition set forth in Section 7.5 may only be waived in whole or in part with respect to the applicable Equity Commitment Parties by a written instrument executed by the Preferred Equity Plan Sponsor in its sole discretion and if so waived, all Equity Commitment Parties having Direct Investment Preferred Commitments shall be bound by such waiver.

## ARTICLE VIII

## INDEMNIFICATION AND CONTRIBUTION

*Section 8.1    **Indemnification Obligations***.  Following the entry of the EPCA Approval Order, the Company and the other Debtors (the "**Indemnifying Parties**" and each, an "**Indemnifying Party**") shall, jointly and severally, indemnify and hold harmless each Equity Commitment Party, Related Purchaser and their respective Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling Persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses but other than Taxes of the Indemnified Person arising out of a claim asserted by a third-party (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, the Plan or the transactions contemplated hereby and thereby, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the other Debtors, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented out-of-pocket (with such documentation subject to redaction to preserve attorney client and work product privileges) legal (including attorneys' fees and expenses) or other third-party expenses actually incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to any Indemnified Person to the extent arising from a material breach by any Equity Commitment Party of this Agreement or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

*Section 8.2    **Indemnification Procedure***.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding that is the subject of indemnification set forth in Section 8.1 (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against any the Indemnifying Party in respect thereof, promptly notify the Indemnifying Party in writing of the commencement thereof; provided that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to

such Indemnified Person otherwise than on account of this Article VIII.  In case any such Indemnified Claims are brought against any Indemnified Person and the Indemnified Person notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; provided that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person (it being understood that White & Case LLP shall be counsel acceptable to such Indemnified Persons), the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable documented out-of-pocket costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within ten (10) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.  Notwithstanding anything herein to the contrary, but subject to Section 6.3, the Company and its Subsidiaries shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company and its Subsidiaries.

Section 8.3    *Settlement of Indemnified Claims*.  The Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).  If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Article VIII.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

Section 8.4    *Contribution*.    If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to

51

indemnification pursuant to Section 8.1, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

> **Section 8.5**    ***Treatment of Indemnification Payments***.    All amounts paid by an Indemnifying Party to an Indemnified Person under this Article VIII shall, to the extent permitted by applicable Law, be treated as adjustments to the aggregate Per Share Purchase Price for all Tax purposes. The provisions of this Article VIII are an integral part of the transactions contemplated by this Agreement and without these provisions the Equity Commitment Parties would not have entered into this Agreement. The EPCA Approval Order shall provide that the obligations of the Company under this Article VIII shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code and are payable without further Order of the Bankruptcy Court, and that the Company may comply with the requirements of this Article VIII without further Order of the Bankruptcy Court.

> **Section 8.6**    ***No Survival***.    All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing except for covenants and agreements that by their terms are to be satisfied after the Closing, which covenants and agreements shall survive until satisfied in accordance with their terms.

## ARTICLE IX

## TERMINATION

> **Section 9.1**    ***Consensual Termination***.    This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Company and the Plan Sponsors.

> **Section 9.2**    ***Termination by the Plan Sponsors***.

(a)    [Reserved].

(b)    This Agreement may be terminated by any of the Plan Sponsors upon written notice to the Company and the Equity Commitment Parties, upon the occurrence of any of the Events set forth in this Section 9.2(b), in each case after the Effective Date; subject to the rights of the Plan Sponsors to fully and unconditionally waive, in writing, on a prospective or retroactive basis, the occurrence of such Event; provided, however, that the Plan Sponsors may not seek to terminate this Agreement based upon a breach of this Agreement by any Debtor if such breach arises primarily out of such Plan Sponsor's own actions:

> (i)    the Closing Date has not occurred by 11:59 p.m., New York City time on August 31, 2021 (as it may be extended pursuant to this Section 9.2(b)(i), the "**Outside Date**"); provided that the Outside Date may be waived or extended with the prior written approval of counsel to the Plan Sponsors but not beyond 5:00 p.m., New York City time on September 30, 2021 the ("**End Date**"); provided that the right to terminate this Agreement under this Section 9.2(b)(i) shall not be available to any Plan Sponsor if such Plan Sponsor materially breached this Agreement in a manner that proximately caused the

52

failure of the Closing to occur prior to such date; provided further that the right to terminate this Agreement pursuant to this Section 9.2(b)(i) shall not be available to the Plan Sponsors if the Company has initiated proceedings prior to the End Date to specifically enforce this Agreement which proceedings are still pending; provided further, however, that in the event the Marketing Period has commenced but has not completed as of the Outside Date, the Outside Date shall be extended until the first (1st) Business Day after the then-scheduled expiration date of the Marketing Period;

(ii)     any Debtor files, or publicly announces that it will file, or joins in or supports, any plan of reorganization other than the Plan, or files with the Bankruptcy Court any motion or application seeking authority to sell all or a material portion of the assets of the Company and its Subsidiaries (taken as a whole), in each case, without the prior written consent of the Plan Sponsors, except as permitted by Section 6.3 or Section 6.3 of the Company Disclosure Schedules;

(iii)     (A) the Company or the other Debtors shall have breached any representation, warranty, covenant or other agreement made by the Company or the other Debtors in this Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Section 7.1(i) (Representations and Warranties), Section 7.1(j) (Covenants) or Section 7.1(k) (Material Adverse Effect) not to be satisfied, (B) the Plan Sponsors shall have delivered written notice of such breach or inaccuracy to the Company, (C) such breach or inaccuracy is not cured by the Company or the other Debtors by the tenth (10th) Business Day after receipt of such notice, and (D) as a result of such failure to cure, any condition set forth in Section 7.1(i) (Representations and Warranties), Section 7.1(j) (Covenants) or Section 7.1(k) (Material Adverse Effect) is not capable of being satisfied; provided that, this Agreement may not be terminated by the Plan Sponsors pursuant to this Section 9.2(b)(iii) if any Equity Commitment Party is then in willful or material breach of this Agreement;

(iv)     any Law or final and non-appealable Order shall have been enacted, adopted or issued after the date of this Agreement by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements, in a way that cannot be remedied by the Company in a manner acceptable to the Plan Sponsors; provided that the right to terminate this Agreement under this Section 9.2(b)(iv) shall not be available to the Equity Commitment Parties if any Equity Commitment Parties shall not have used its commercially reasonable efforts to contest such Order prior to its becoming permanent;

(v)     the (i) conversion of one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Plan Sponsors;

(vi)     the Bankruptcy Court enters an Order granting relief from the automatic stay imposed by Bankruptcy Code section 362 authorizing any party to proceed with regard to any material asset of the Debtors and such relief has a material adverse effect on the Restructuring;

(vii)     an examiner (other than an independent fee examiner) with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, a trustee, or a receiver shall have been appointed in the Chapter 11 Cases;

(viii)     (A) the Debtors have materially breached their obligations under Section 6.12 (Alternative Transactions); (B) the Bankruptcy Court approves or authorizes an Alternative Transaction; (C) any of the Debtors enters into any Contract providing for the consummation of any Alternative Transaction or files any motion or application seeking authority to propose, join in or participate in the formation of, any actual or proposed Alternative Transaction; or (D) the Company publicly announces its intention to take any such action listed in sub-clauses (A), (B) or (C) of this subsection;

(ix)     any of the EPCA Approval Order, the Order approving the Rights Offering Procedures, the Disclosure Statement Order, or the Confirmation Order is terminated, reversed, stayed, dismissed or vacated, by the Bankruptcy Court, or any such Order is modified or amended by the Bankruptcy Court after entry without the prior written consent of the Plan Sponsors in a manner that prevents or prohibits the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements in a way that cannot be remedied by the Company in a manner acceptable to the Plan Sponsors (and such action has not been reversed or vacated within ten (10) calendar days after its issuance);

(x)     the date the Company publicly announces that it has withdrawn or abandoned the Plan; or

(xi)     the Bankruptcy Court enters an Order denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein; provided that, for the avoidance of doubt, the Plan Sponsors shall not have the right to terminate this Agreement pursuant to this Section 9.2(b)(xi) if the Bankruptcy Court denies confirmation of the Plan subject only to the making of ministerial, administrative or immaterial modifications to the Plan.

### Section 9.3     *Termination by the Company*.

This Agreement may be terminated by the Company upon written notice to the Plan Sponsors upon the occurrence of any of the following Events, subject to the rights of the Company to fully and unconditionally waive, in writing, on a prospective or retroactive basis the occurrence of such Event; provided, however, that the Company may not seek to terminate this Agreement based upon a breach of this Agreement by any Equity Commitment Party which arises primarily out of the Company's own actions in material breach of this Agreement:

(a)     any Law or final and non-appealable Order shall have been enacted, adopted or issued after the date of this Agreement by any Governmental Entity that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Transaction Agreements in a way that cannot be remedied by the Equity Commitment Parties in a manner acceptable to the Company; provided that the termination right in this Section 9.3(a) shall not be available to the Company if the Company shall not have used its commercially reasonable efforts to contest such Order prior to its becoming permanent;

(b)     (i) any Equity Commitment Party shall have breached any representation, warranty, covenant or other agreement made by such Equity Commitment Party in this Agreement or any

54

such representation or warranty shall have become inaccurate and such breach or inaccuracy would cause a condition set forth in Section 7.3(h) (Representations and Warranties) or Section 7.3(i) (Covenants) not to be satisfied, (ii) the Company shall have delivered written notice of such breach or inaccuracy to the Equity Commitment Parties, (iii) such breach or inaccuracy is not cured by the Equity Commitment Parties by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure, any condition set forth in Section 7.3(h) (Representations and Warranties) or Section 7.3(i) (Covenants) is not capable of being satisfied; provided that the Company shall not have the right to terminate this Agreement pursuant to this Section 9.3(b) if it is then in willful or intentional breach of this Agreement;

(c)     the Company Board determines in good faith, based upon advice of outside counsel, that proceeding with the Restructuring contemplated herein and in the Plan, and confirmation and consummation of the Plan, would be inconsistent with the exercise of its fiduciary duties under applicable Law; provided that the Debtors shall give prompt written notice to Kirkland & Ellis and Paul, Weiss of any determination in accordance with this Section 9.3(c) (electronic mail among counsel being sufficient);

(d)     the Bankruptcy Court enters an Order denying confirmation of the Plan, the effect of which would render the Plan incapable of consummation on the terms set forth herein; provided that, for the avoidance of doubt, the Debtors shall not have the right to terminate this Agreement pursuant to this Section 9.3(d) if the Bankruptcy Court denies confirmation of the Plan subject only to the making of ministerial, administrative or immaterial modifications to the Plan;

(e)     the Bankruptcy Court (or other court of competent jurisdiction) enters an Order (i) directing the appointment of an examiner (other than an independent fee examiner) with expanded powers or a trustee in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, or (iv) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement;

(f)     the Plan Sponsors propose or explicitly support any Alternative Transaction without the prior written consent of the Debtors that has a material adverse effect on the consummation of the Restructuring;

(g)     any of the EPCA Approval Order, the Disclosure Statement Order, the Confirmation Order or the Order approving the Rights Offering Procedures is terminated, reversed, stayed, dismissed or vacated, by the Bankruptcy Court, or any such Order is modified or amended by the Bankruptcy Court after entry without the prior written consent of the Company in a manner that prevents or prohibits the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements in a way that cannot be remedied in a manner acceptable to the Company (and such action has not been reversed or vacated within ten (10) calendar days after its issuance);

(h)     the Plan Support Agreement is terminated with respect to any Plan Sponsor in accordance with its terms; or

(i)     the Closing Date has not occurred by the End Date; provided that the right to terminate this Agreement under this Section 9.3(i) shall not be available to the Company hereto if it materially breached this Agreement in a manner that proximately caused the failure of the Closing to occur prior to such date; provided further that the right to terminate this Agreement pursuant to this Section 9.3(i) shall not be available to the Company if any Equity Commitment Party has initiated proceedings prior to the End Date to specifically enforce this Agreement which proceedings are still pending.

Section 9.4     Effect of Termination.  Upon termination of this Agreement pursuant to this Article IX, this Agreement shall forthwith become void and there shall be no further obligations or

55

liabilities on the part of the Parties or any of their respective direct or indirect equityholders, controlling Persons, partners, members, managers, stockholders, directors, officers, employees, Affiliates, agents or other Representatives or any of the foregoing's successors or assigns; provided that (i) the obligations of the Debtors to pay the Expense Reimbursement pursuant to Article III and to satisfy their indemnification obligations pursuant to Article VIII shall survive the termination of this Agreement and shall remain in full force and effect, in each case, until such obligations have been satisfied, (ii) the provisions set forth in this Section 9.4, Article VIII and Article X shall survive the termination of this Agreement in accordance with their terms and (iii) subject to Section 10.10 (Damages), nothing in this Section 9.4 shall relieve any Party from liability for its actual fraud with intent to deceive, gross negligence or any willful or intentional breach of this Agreement.  For purposes of this Agreement, "**willful or intentional breach**" means a breach of this Agreement that is a consequence of an act undertaken by the breaching Party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement. Notwithstanding anything to the contrary in this Agreement, in the event of a valid termination as set forth in this Article IX, each Equity Commitment Party acknowledges and agrees that the payment of the Expense Reimbursement in accordance with the terms hereof, together with any rights of the Equity Commitment Parties (or other Persons) pursuant to provisions of this Agreement that survive termination pursuant to clauses (i) and (ii) of Section 9.4, shall be its sole and exclusive remedy, at Law and in equity or otherwise, against the Debtors.

## ARTICLE X

## GENERAL PROVISIONS

**Section 10.1    Notices**.  All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via email (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as may be specified by like notice):

(a)    If to the Company or any of the other Debtors:

Hertz Global Holdings, Inc.
8501 Williams Road
Estero, Florida 33928
Attention: M. David Galainena
Email: dave.galainena@hertz.com

*with copies (which shall not constitute notice) to*:

White & Case LLP
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Attention: Thomas E. Lauria
Email:  tlauria@whitecase.com

56

and

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020
Attention: Gregory Pryor and Adam Cieply
Email:  gpryor@whitecase.com
        adam.cieply@whitecase.com

(b)     If to the Common Equity Plan Sponsors:

CK Amarillo LP
c/o Certares Management LLC
350 Madison Avenue, 8th Floor
New York, NY 10017
Attention:  Thomas LaMacchia, Managing Director and General Counsel
Email:  tom.lamacchia@certares.com

and

CK Amarillo LP
c/o Knighthead Capital Management, LLC
280 Park Avenue, 22nd Floor
New York, NY  10017
Attention: Laura L. Torrado, General Counsel
Email:  ltorrado@knighthead.com

*with a copy (which shall not constitute notice) to*:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Stephen Hessler, Tim Cruickshank and AnnElyse Scarlett Gains
Email:  shessler@kirkland.com
        tim.cruickshank@kirkland.com
        annelyse.gains@kirkland.com

and

Kirkland & Ellis LLP
300 North La Salle
Chicago, IL 60654
Attention: Steve Toth
Email:  steve.toth@kirkland.com

57

(c)    If to the Preferred Equity Plan Sponsor:

c/o Apollo Global Management, Inc.
9 West 57th Street
New York, NY 10019
Attention: Joseph D. Glatt, General Counsel
Email: jglatt@apollo.com

*with a copy (which shall not constitute notice) to*:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attention: John Scott, Gregory Ezring, Jeffrey Saferstein and Brian Janson
Email:  jscott@paulweiss.com
           gezring@paulweiss.com
           jsaferstein@paulweiss.com
           bjanson@paulweiss.com

(d)    If to any other Equity Commitment Party, the address set forth on Schedule 1 attached hereto.

**Section 10.2    *Assignment; Third Party Beneficiaries*.**  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Person (whether by operation of Law or otherwise) without the prior written consent of the Company and the Plan Sponsors, and any purported assignment in violation of this Section 10.2 shall be void *ab initio* provided that each Equity Commitment Party may, without the consent of any other Party, assign its rights and obligations under this Agreement (including its right to purchase the Shares), in whole or in part, (x) in accordance with Section 2.5 or (y) to one or more of its Affiliates or Affiliated Funds; provided further that no such assignment under clause (y) shall relieve the relevant Equity Commitment Party of its obligations under this Agreement.  Except as expressly provided in Section 6.14 with respect to D&O Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person any rights or remedies under this Agreement other than the Parties. Notwithstanding anything to the contrary herein, each Party hereto recognizes, acknowledges and agrees that this Agreement binds only the desk or business unit that executes this Agreement and shall not be binding on any other desk, business unit or affiliate, unless such desk, business unit or affiliate separately becomes a Party hereto.

**Section 10.3    *Prior Negotiations; Entire Agreement*.**

(a)    This Agreement (including the agreements attached as Exhibits to and the documents and instruments referred to in this Agreement) and the Plan Support Agreement constitute the entire agreement of the Parties and supersede all prior agreements, arrangements or understandings, whether written or oral, among the Parties (or any subset thereof) with respect to the subject matter of this Agreement, except that the Parties hereto acknowledge that any confidentiality agreements heretofore executed among the Parties will each continue in full force and effect.

(b)    Notwithstanding anything to the contrary in the Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Plan by any Equity Commitment Party, nothing contained in the Plan (including any amendments, supplements or modifications thereto) or Confirmation

58

Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Equity Commitment Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with Section 10.7.

Section 10.4    *Governing Law; Venue*.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO SUCH STATE'S CHOICE OF LAW PROVISIONS WHICH WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREES FOR ITSELF THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER ARISING UNDER, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, OR IF THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION TO HEAR SUCH ACTION, SUIT OR PROCEEDING, ANY STATE OR FEDERAL COURT LOCATED IN DELAWARE COUNTY, DELAWARE, AND BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH OF THE PARTIES IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING.  THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OF PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED.

Section 10.5    *Waiver of Jury Trial*.  EACH PARTY HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY JURISDICTION IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE AMONG THE PARTIES UNDER THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR OTHERWISE.

Section 10.6    *Counterparts*.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the Parties and delivered to each other Party (including via facsimile or other electronic transmission), it being understood that each Party need not sign the same counterpart.

Section 10.7    *Waivers and Amendments; Rights Cumulative; Consent*.    This Agreement may be amended, restated, modified, or changed only by a written instrument signed by the Company (on behalf of itself and the other Debtors) and each of the Plan Sponsors; provided that, in addition to the consents described above, any amendment, restatement, modification, or change that:

(a)    adversely affects one or more Direct Equity Investors or Backstop Investors (in each case, solely in their capacity as such) in a manner disproportionate to its effect on the other Direct Equity Investors or Backstop Investors, respectively, (solely in their respective capacity as such with respect to the same class of stock (Common Stock or Preferred Stock)) (taking into account the relative size of their respective commitments) shall not be effective without the prior written consent of Direct Equity Investors or Backstop Investors, respectively, holding a majority of the aggregate respective Commitments held by such affected Direct Equity Investors or Backstop Investors, respectively;

59

(b)        changes the Rights Offering Backstop Commitment or Direct Investment Portion of any Equity Commitment Party shall not be effective without the prior written consent of such Equity Commitment Party; or

(c)        reduces the Backstop Fee payable to any Equity Commitment Party, changes the form of payment of the Backstop Fee payable to any Equity Commitment Party from Common Stock, or delays beyond the Closing Date the date on which payment of the Backstop Fee is to be paid to any Equity Commitment Party not be effective without the prior written consent of such Equity Commitment Party.

The terms and conditions of this Agreement may be waived (i) by the Company only by a written instrument executed by the Company (on behalf of itself and the other Debtors) and (ii) by the Equity Commitment Parties only by a written instrument executed by each of the Plan Sponsors; underline provided that clauses (a) through (c) above shall apply *mutatis mutandis* to such waiver. No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement. Except as otherwise provided in this Agreement, the rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any Party otherwise may have at law or in equity. For the avoidance of doubt, nothing in this Agreement shall affect or otherwise impair the rights, including consent rights, of the Equity Commitment Parties under the Plan Support Agreement or any other Transaction Agreement.

**Section 10.8    *Headings***. The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

**Section 10.9    *Several Liability; Specific Performance***. For the avoidance of doubt, all obligations of the Equity Commitment Parties hereunder are several, and not joint, in nature. In no event shall any Equity Commitment Party be required hereunder to purchase any Shares of Common Stock or Preferred Stock in excess of the number of Direct Investment Common Shares, Direct Investment Preferred Shares and its Backstop Percentage of the Rights Offering Backstop Amount ascribed to such Equity Commitment Party, and in no event shall any Party hereto seek equitable or other relief inconsistent with the foregoing. Subject in all respects to the foregoing, the Parties agree that irreparable damage would occur if any provision of this Agreement were not performed by any Party subject thereto in accordance with the terms hereof and that the Parties shall be entitled to equitable relief against such non-performing Party, including an injunction or injunctions or Orders for specific performance to prevent breaches of this Agreement by such non-performing Party and to enforce specifically the terms and provisions of this Agreement applicable to such non-performing Party, in addition to any other remedy to which they are entitled at law or in equity. Each Party irrevocably waives any right it may have to require the obtaining, furnishing or posting of any bond or similar instrument in connection with the foregoing. Unless otherwise expressly stated in this Agreement (including in this Section 10.9), no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a Party from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

**Section 10.10    *Damages***. Notwithstanding anything to the contrary in this Agreement, (i) none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits and (ii) in no event shall the aggregate liability of any Equity Commitment Party for claims hereunder exceed the amount of its Equity Commitment hereunder.

60

**Section 10.11    *Publicity*.**  At all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Company and the Equity Commitment Parties shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement, except as required by or reasonably necessary to comply with applicable Law (including (x) the Bankruptcy Code, Bankruptcy Rules, and applicable local rules of the Bankruptcy Court to the extent reasonably necessary to obtain entry of the EPCA Approval Order, Disclosure Statement Order or Confirmation Order and (y) in any filing made by the Company or the Debtors with the Bankruptcy Court and as may be necessary or appropriate in the good faith determination of the Company or its Representatives to obtain Bankruptcy Court approval of the transactions contemplated hereby), Orders of the Bankruptcy Court or the rules or regulations of any applicable securities exchange, and except for disclosure of matters that become a matter of public record as a result of the Chapter 11 Cases and any filings or notices related thereto; provided that nothing in this Agreement shall restrict or prohibit (a) the Company, the Equity Commitment Parties or their respective Affiliates from making any announcement to their respective employees, customers and other business relations to the extent that such announcement consists solely of, or is otherwise consistent in all material respects with previous press releases, public disclosures or public statements made by any Party in accordance with this Agreement, including in investor conference calls, SEC filings, Q&As or other publicly disclosed statements or documents, in each case, to the extent such disclosure is still accurate in all material respects (and not misleading).

**Section 10.12    *Settlement Discussions*.**  This Agreement and the transactions contemplated herein are part of a proposed settlement of a dispute among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring, or determine the payment of damages to which a Party may be entitled under this Agreement.

**Section 10.13    *No Recourse*.**  Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's Affiliates, or any of such Party's Affiliates' respective Related Parties in each case other than the Parties to this Agreement and each of their respective successors and permitted assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, that nothing in this Section 10.13 shall relieve or otherwise limit the liability of any Party or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments (to the extent the applicable Person is a signatory to such documents or instruments).  For the avoidance of doubt, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with this Agreement or the transactions contemplated hereby except against any of the Parties or their respective successors and permitted assigns, as applicable.

In furtherance of the foregoing, prior to the earlier of (x) the Effective Date and (y) a termination of this Agreement pursuant to Article IX, neither the Company, the Debtors, nor any of their Affiliates or any of their respective direct or indirect general or limited partners, managers, officers, directors, employees, Representatives or agents may assert any claim against the Equity Commitment

61

Parties in connection with this Agreement or the transactions contemplated hereby (other than a claim seeking an order of specific performance in the circumstances provided for in Section 10.9), it being understood that this Agreement will terminate automatically and immediately upon the assertion of any such claim.

Section 10.14    *Company Disclosure Schedules*.  It is expressly understood and agreed that (a) the disclosure of any fact or item in any section of the Company Disclosure Schedules shall be deemed disclosure with respect to any other Section or subsection of this Agreement or the Company Disclosure Schedules to which its relevance is reasonably apparent on its face, (b) the disclosure of any matter or item in the Company Disclosure Schedules shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement, and (c) the mere inclusion of an item in the Company Disclosure Schedules as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has resulted in and would reasonably be expected to result in a Material Adverse Effect.

Section 10.15    *Disclosures*.  In the ordinary course of their respective business, the Equity Commitment Parties and their Affiliates may actively engage in commodities trading or trade the debt and equity securities (or related derivative securities) and financial instruments (including bank loans and other obligations) of the Company and other companies which may be the subject of the arrangements contemplated by this Agreement for their own account and may at any time hold long and short positions in such securities and financial instruments.  In particular, the Preferred Equity Plan Sponsor is a significant creditor of the Company and its Subsidiaries in the Chapter 11 Cases, having positions in its pre-petition term loan facility, asset-backed securities (including a right of first offer in respect of certain future asset-backed security financings), debtor-in-possession financing and other securities and instruments.  For the avoidance of doubt, all rights of the Equity Commitment Parties under such agreements or instruments are reserved, and nothing in this Agreement shall affect the rights of the Equity Commitment Parties thereunder. The Equity Commitment Parties or their Affiliates may also co-invest with, or make direct investments in, funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of the Company or other companies which may be the subject of the arrangements contemplated by this Agreement or engage in commodities trading with any thereof. Although the Equity Commitment Parties and their Affiliates in the course of such other activities and relationships may acquire information about the transactions contemplated by this Agreement or other entities and Persons which may be the subject of the financing contemplated by this Agreement, the Equity Commitment Parties and their Affiliates shall have no obligation to disclose such information, or the fact that the Equity Commitment Parties and their Affiliates are in possession of such information, to the Company or any other person or entity, or to use such information on behalf of the Company or any other person or entity.

The Equity Commitment Parties and their Affiliates are involved in a broad range of transactions and may have economic interests that conflict with those of the Company and its Subsidiaries. The Company agrees that the Equity Commitment Parties will act under this Agreement as independent contractors and that nothing in this Agreement or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Equity Commitment Parties and the Company, the Company's shareholders or other equity holders or the Company's and their respective Affiliates.  The Company acknowledges and agrees that (a) the transactions contemplated by this Agreement are arm's-length commercial transactions between the Equity Commitment Parties, on the one hand, and the Company, on the other, (b) in connection therewith and with the process leading to such transaction each of the Equity Commitment Parties is acting solely as a principal and not as an agent or fiduciary of the Company, the Company's management, shareholders or other equity holders, creditors or any other person or entity, (c) the Equity Commitment Parties have not assumed an advisory or fiduciary

62

responsibility or any other obligation in favor of the Company with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether any of the Equity Commitment Parties or any of their Affiliates has advised or is currently advising the Company on other matters) except the obligations expressly set forth in this Agreement and (d) the Company has consulted its own legal Tax, accounting, regulatory and financial advisors to the extent the Company deemed appropriate.  Furthermore, without limiting any provision set forth herein, the Company waives, to the fullest extent permitted by law, any claims it may have against the Equity Commitment Parties or their Affiliates for breach of fiduciary duty or alleged breach of fiduciary duty for acts or omissions occurring prior to the Closing and agrees that the Equity Commitment Parties and their Affiliates shall have no liability (whether direct or indirect) to the Company in respect of such a fiduciary duty or to any person or entity asserting a fiduciary duty claim on behalf of or in right of the Company, including its stockholders or other equity holders, employees or creditors for acts or omissions occurring prior to the Closing.  The Company further acknowledges and agrees that it are responsible for making its own independent judgment with respect to such transactions and the process leading thereto.  The Equity Commitment Parties and their respective Affiliates do not provide Tax, accounting or legal advice.

[*Signature Page Follows*]

63

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

HERTZ GLOBAL HOLDINGS, INC.

By: _____
      Name:
      Title:

[*Signature page to Equity Purchase and Commitment Agreement*]

[OTHER EQUITY COMMITMENT PARTIES]

By: _____
      Name:
      Title:

[*Signature page to Equity Purchase and Commitment Agreement*]

**Annex A**

**Terms of Preferred Stock**

ANNEX A

Shares of Preferred Stock
Summary of Principal Terms and Conditions[1]

| | |
|---|---|
| **Issuer** | Hertz Global Holdings, Inc., a Delaware corporation and a debtor and debtor-in-possession in a Chapter 11 case currently pending in the United States Bankruptcy Court for the District of Delaware, docketed as Case No. 20-11218 (MFW) (Jointly Administered), as reorganized pursuant to the Plan (the "Issuer"). |
| **Security; Stated Value** | A newly-created series of cumulative perpetual non-convertible preferred stock issued by the Issuer (the "Preferred Stock") having, as of the Closing Date, an aggregate initial stated value of $1,500,000,000 (the "Direct Investment Preferred Amount") and an initial stated value per share of $1,000.  From and after the Closing Date, the stated value of the Preferred Stock shall increase by the amount of any Compounded Dividends (as defined below) (the "Stated Value").  The purchase price paid by the Investors for the Preferred Stock on the Closing Date shall be the initial Stated Value thereof net of any applicable Purchase Discount/Upfront Fee described below. |
| | The "Accrued Stated Value" will be an amount equal to the sum of (i) the then-current Stated Value plus (ii) any accrued but unpaid Preferred Dividends (as defined below), pro-rated for the elapsed portion of the applicable semi-annual period. |
| **Investors** | A syndicate of institutions assembled by one or more affiliates of Apollo Capital Management, L.P. ("ACM") in its or their sole discretion, including one or more funds, accounts or other clients managed by ACM or its affiliates, but excluding any Prohibited Transferee (as defined below) (such institutions, collectively, the "Investors"); provided, that prior to the Closing, any Investor may only transfer its Direct Investment Preferred Commitment in accordance with the Purchase Agreement. |
| **Priority, Preference and Ranking** | The Preferred Stock shall have a payment priority, liquidation preference and ranking senior to any other class or series of equity securities of the Issuer. |
| **Use of Proceeds** | The proceeds of the issuance of Preferred Stock will be used, together with cash on hand and the proceeds of certain debt and equity financings contemplated by the Plan, to retire certain outstanding indebtedness of the Issuer and its subsidiaries in accordance with the Plan and to pay fees and expenses in connection with the consummation of the Plan.  Any excess proceeds shall be used by the Issuer and its subsidiaries for working capital and general corporate purposes. |

---

[1]    Capitalized terms used but not defined in this Annex 1 shall have the meanings set forth in the Equity Purchase and Commitment Agreement (the "Purchase Agreement") to which this Summary of Principal Terms and Conditions is attached.

1

**Purchase Discount/Upfront Fee**

2.00% of the initial Stated Value of the Preferred Stock on the Closing Date, which the Investors shall be permitted, in their discretion, to take in the form of a discount to the purchase price of the Preferred Stock or as an upfront fee (the "Purchase Discount/Upfront Fee").

**Dividends**

(a) Shares of Preferred Stock shall accrue a dividend, payable semi-annually in arrears (with the first dividend paid on the six month anniversary of the Closing Date), in an amount equal to (x) the applicable Dividend Rate (as defined below) multiplied by (y) the then-current Stated Value (each such dividend, whether or not declared, a "Preferred Dividend").

(b) The Preferred Dividend shall accrue on a daily basis from the Closing Date, shall be computed on the basis of a 365-day year and the actual days elapsed and shall be payable or capitalized, as applicable, on the last business day of each semi-annual period. Except as described in the penultimate sentence of this paragraph, for each semi-annual period, the Issuer shall pay the Preferred Dividend in cash; provided, that all or any portion of the Preferred Dividend will only be paid in cash when, as and if declared by the board of directors of the Issuer and to the extent permitted by Law. Unless all of the Preferred Dividend in respect of a semi-annual period is declared by the board of directors of the Issuer and paid in cash, the portion of the Preferred Dividend that is not declared and paid in cash shall automatically be accreted to, and increase, the Stated Value effective on the last business day of each applicable semi-annual period (such amounts, "Compounded Dividends") and such increase in Stated Value shall itself thereafter accrue dividends in accordance with clause (a) above. For the avoidance of doubt, failure to pay any Preferred Dividend in cash after the 42-month anniversary of the Closing Date shall constitute a "Non-Compliance Event" and shall be subject to the provisions set forth under such heading herein.

"Dividend Rate" shall mean, subject to the provisions described under "Non-Compliance Events" below, (i) with respect to a Preferred Dividend accrued on or prior to the second anniversary of the Closing Date, 9.00% per annum, (ii) with respect to a Preferred Dividend accrued after the second anniversary of the Closing Date and on or prior to the third anniversary of the Closing Date, (a) for any portion of the Preferred Dividend paid in cash, 7.00% per annum and (b) for any portion of the Preferred Dividend paid as a Compounded Dividend, 9.00% per annum, (iii) with respect to the Preferred Dividend accrued after the third anniversary of the Closing Date and on or prior to the 42-month anniversary of the Closing Date, (a) for any portion of the Preferred Dividend paid in cash, 8.00% per annum and (b) for any portion of the Preferred Dividend paid as a Compounded Dividend, 10.00% per annum, (iv) with respect to the Preferred Dividend accrued after the 42-month anniversary of the Closing Date and on or prior to the fourth anniversary of the Closing Date, 9.00% per annum, (v) with respect to the Preferred Dividend accrued after the fourth anniversary of the Closing Date and on or prior to the 54 month anniversary of the Closing Date, 10.00% per annum, (vi) with respect to the Preferred Dividend accrued after the 54-

2

month anniversary of the Closing Date and on or prior to the fifth anniversary of the Closing Date, 11.00% per annum and (vii) with respect to a Preferred Dividend accrued after the fifth anniversary of the Closing Date, an amount equal to the sum of (a) 13.00% per annum and (b) the product of (x) 2.00% per annum multiplied by (y) the number of whole years elapsed since the fifth anniversary of the Closing Date through and including such dividend payment date; provided that each of the foregoing rates shall be increased by 6.00% per annum at any time that the funded corporate Indebtedness of the Issuer, the OpCo Borrower and its restricted subsidiaries exceeds $3,300,000,000 (the "Indebtedness Step-Up").

**Call Protection**

The Issuer may redeem the Preferred Stock in whole or in part at any time (and from time to time), in cash, at the Redemption Price (as defined below) in effect as of the redemption date.

The "Redemption Price" means the greater of (x) 100.00% of the then current Accrued Stated Value of the Preferred Stock being redeemed and (y) the amount necessary, if any, to result in a MOIC (as defined below) of 1.30x with respect to the Preferred Stock being redeemed.

"MOIC" shall mean with respect to a share of Preferred Stock, a multiple on invested capital equal to the quotient determined by dividing (A) the sum of (w) the aggregate amount of all Preferred Dividends made in cash with respect to such share of Preferred Stock on or prior to the applicable date of determination (other than any dividends paid in cash in respect of any Step-Up (as defined below)) plus (x) the ratable portion of any original issue discount or upfront fees paid to the Investors on the Closing Date (but excluding the advisory fee payable pursuant to that certain Engagement Letter between Apollo Global Securities, LLC and The Hertz Corporation dated May 2, 2021) allocable to such share of Preferred Stock plus (y) 100% of the Accrued Stated Value of such share of Preferred Stock (other than any Accrued Stated Value attributable to any Step-Up) plus (z) any premium paid with respect to such share of Preferred Stock by (B) $1,000.

(a) Any partial redemption of the Preferred Stock will be in amounts of shares with no less than $250.0 million aggregate Accrued Stated Value as of the time of such redemption (unless the aggregate then current aggregate Accrued Stated Value of the Preferred Stock is equal to or less than $250.0 million, in which case any such redemption will redeem all of the then outstanding Preferred Stock).

(b) The Issuer and its subsidiaries shall make any such redemptions or any other repurchases of the Preferred Stock only on a pro rata basis.

**Liquidation Redemption**

In the event of any liquidation, dissolution or winding up of the Issuer, the Issuer shall be required to offer to redeem all of the outstanding Preferred Stock in cash at the then-applicable Redemption Price.

**No Mandatory Redemption**

The Investors shall not have the right to require the Issuer to offer to redeem all or a portion of the Preferred Stock.

3

| | |
|---|---|
| **Information Rights** | The Investors will be entitled to customary information rights to be mutually agreed (but in any event to include all recurring financial information and material notices furnished to the lenders under the Exit Revolving Credit Facility or the Exit Term Loan Facility (or, in each case, any indebtedness incurred to refinance the same) (collectively, the "Exit Facilities") on the same schedule as the lenders under the Exit Facilities receive such information).  Upon request, the Preferred Equity Plan Sponsor shall be entitled to receive any information provided to the Issuer's board of directors, subject to customary exceptions and limitations.  In addition, the Preferred Equity Plan Sponsor will be entitled to customary inspection rights (which inspections shall be consistent with and permitted no less frequently than the inspection rights under the Exit Facilities and subject to customary limitations and exceptions). |
| **Voting Rights** | Investors will have no voting rights, except as required by Law (including Section 1123(a)(6) of the U.S. Bankruptcy Code) or as set forth under "Protective Provisions" or "Non-Compliance Events" below. |
| **Protective Provisions** | Without the prior written consent of the holders of a majority of the Stated Value of the outstanding shares of Preferred Stock (the "Preferred Majority Holders"): |

    i.    the Issuer shall not amend, alter or repeal any provisions of its certificate of incorporation or by-laws in a manner that adversely affects the rights, preferences or privileges of the Preferred Stock;

    ii.    the Issuer shall not liquidate, dissolve or wind up its business and affairs;

    iii.    the Issuer shall not create, authorize or issue (by reclassification or otherwise) any equity security having rights, preferences or privileges ranking senior to the Issuer's common stock issued on the Closing Date (other than the Preferred Stock issued on the Closing Date), or any security convertible into or exchangeable for any such equity security; provided that the Issuer shall be permitted to issue equity securities having rights, preferences or privileges ranking senior to the Issuer's common stock to the extent the proceeds thereof are to be applied substantially contemporaneously to the redemption in full in cash of the Preferred Stock in accordance with the terms hereof (and provided that all shares of Preferred Stock shall be redeemed in connection therewith);

    iv.    the Issuer shall not create, authorize or issue any additional shares of Preferred Stock or any series thereof;

    v.    the Issuer shall not consummate any asset sales (including the issuance or sale of any equity securities of a subsidiary to a third party) other than certain ordinary course exceptions to be mutually agreed. The Issuer shall not allow The Hertz Corporation (the "OpCo Borrower") nor any of its restricted subsidiaries to make any asset sales, subject to exceptions

4

consistent with the exceptions set forth in the Exit Facilities as in effect on the Closing Date (it being understood that the definitive documentation governing the Preferred Stock shall include an "asset sale sweep" provision substantially consistent with the definitive documentation governing the Exit Facilities in effect as of the Closing Date, which shall require that the Issuer and its restricted subsidiaries redeem the Preferred Stock with excess net cash proceeds of asset sales to the extent (i) such proceeds are not applied to reinvestment in the business or satisfaction of funded debt obligations within the periods specified under the Exit Facilities as in effect on the Closing Date and (ii) such payment is permitted under the Exit Facilities at such time);

vi.     the Issuer and its restricted subsidiaries shall be prohibited from entering into or modifying any transaction or agreement with an affiliate of the Issuer (other than transactions among the Issuer and its restricted subsidiaries), unless at on terms no less favorable to the Issuer or such subsidiary than would be obtained by the Issuer or such subsidiary from an unrelated third party on an arm's length basis, subject to certain exceptions consistent with the exceptions under the Exit Facilities as in effect on the Closing Date (including for transactions approved by a majority of disinterested directors);

vii.    the Issuer shall not merge or consolidate with, or dispose of all or substantially all of its assets to, any other person;

viii.   the Issuer and its restricted subsidiaries shall not be permitted to (i) pay dividends or other distributions on any equity interests of the Issuer (other than the Preferred Stock) or its restricted subsidiaries (other than any dividends to the Issuer to allow the Issuer to pay dividends on the Preferred Stock), or (ii) repurchase or redeem any securities having rights, preferences or privileges ranking junior to the Preferred Stock (including common stock) (clauses (i) and (ii), collectively, "Restricted Payments"); provided, however, the Issuer and its restricted subsidiaries shall be permitted to make additional customary Restricted Payments to be mutually agreed (including repurchases of common stock or options from present or former officers, directors or employees, expense reimbursements and permitted tax payments consistent with the terms of the Exit Facilities in effect on the Closing Date), which in any event shall include the ordinary course exceptions set forth in the Exit Facilities as in effect on the Closing Date;

ix.     the Issuer shall not be permitted to make Investments (defined in a manner consistent with the Exit Facilities as in effect on the Closing Date), other than ordinary course Investments to be mutually agreed. The Issuer shall not permit the OpCo Borrower or its restricted subsidiaries to make Investments, other than Investments that are permitted by the Exit Facilities as in effect on the Closing Date;

5

x.    the Issuer shall not incur any Indebtedness (defined in a manner consistent with the Exit Facilities as in effect on the Closing Date) other than ordinary course Indebtedness to be mutually agreed. The Issuer shall not allow the OpCo Borrower nor any of its restricted subsidiaries to incur any Indebtedness, nor issue any series of preferred stock, except Indebtedness of the OpCo Borrower and its restricted subsidiaries permitted under the Exit Facilities as in effect on the Closing Date (including, without limitation, unlimited Indebtedness subject to the Unsecured Ratio Incurrence Test, as defined in the Exit Facilities as in effect on the Closing Date); and

xi.    the Issuer and its restricted subsidiaries shall continue to engage in business of the same general type as conducted by the Issuer and its restricted subsidiaries on the Closing Date, taken as a whole.

The definitive documentation governing the Preferred Stock shall include provisions governing designation of "unrestricted" subsidiaries consistent with those under the Exit Facilities as in effect as of the Closing Date.

For the avoidance of doubt, references herein to the Exit Facilities as in effect on the Closing Date shall be deemed to refer to the terms of the Exit Facilities reflected in the commitment letter dated as of the date hereof executed by and between the OpCo Borrower and the commitment parties party thereto. To the extent that any of the baskets in the Exit Facilities are adjusted downward or eliminated as a result of the exercise of any "flex" rights with respect thereto or otherwise, the corresponding baskets (if any) in the definitive documentation governing the Preferred Stock shall be correspondingly reduced or eliminated.

| | |
|---|---|
| **Non-Compliance Events and Forced Exit Transaction** | Following the occurrence and during the continuance of any "Non-Compliance Event": |

(i)    The Stated Value of the Preferred Stock shall accrete by an additional 0.50% per month (a "Non-Compliance Step-Up" and, together with an Indebtedness Step-Up, the "Step-Ups");

(ii)    Commencing on the 30th day of a Non-Compliance Event, the Issuer's governing documents shall provide that the size of the Issuer's board of directors shall be automatically increased by 50% (rounded upward, if necessary, due to an odd number of initial directors)[2], and the newly created vacancies shall be filled by the Issuer's board of directors

---

[2] For example, if the Issuer's board of directors was previously comprised of six directors, it shall be increased to nine directors.

6

from nominees proposed by the Preferred Majority Holders (which shall propose two nominees for each such vacancy);

(iii)   Commencing on the later to occur of (x) the 60th day of a Non-Compliance Event and (y) the end of the Relief Period under, and as defined in, the Exit Facilities as in effect on the Closing Date, the Issuer will initiate a process to consummate (each, a "Forced Exit Transaction"):

   a.   An underwritten public offering of shares of common stock of the Issuer, or other capital raise by the Issuer, in each case the net cash proceeds of which shall be used to redeem the Preferred Stock in accordance with the terms hereof; or

   b.   a sale as a result of which the Issuer shall have sufficient cash on hand to redeem the Preferred Stock in accordance with the terms hereof (and the net cash proceeds of which shall be so applied);

   provided that the Issuer shall not be permitted to consummate any Forced Exit Transaction without the consent of the Preferred Majority Holders to the extent that the proceeds thereof would be insufficient to redeem the Preferred Stock in full in cash in accordance with the terms hereof;

(iv)   Commencing on the 270th day of a Non-Compliance Event:

   a.   The Issuer's governing documents shall provide that the size of the Issuer's board of directors shall be automatically further increased so that the number of directors shall be double the number of directors as of immediately before the first increase relating to such Non-Compliance Event plus one additional director, and the newly created vacancies shall be filled by the Issuer's board of directors from nominees proposed by the Preferred Majority Holders (which shall propose two nominees for each such vacancy) (the "Majority Board Proposal Right");

   b.   The board of directors of the Issuer, as reconstituted pursuant to clause (a) above, shall, to the extent the Relief Period is no longer in effect, pursue a Forced Exit Transaction and shall take all actions consistent with their fiduciary duties necessary to consummate such a transaction (provided that the Issuer shall not be permitted to consummate any Forced Exit Transaction without the consent of the Preferred Majority Holders to the extent that the proceeds thereof would be insufficient

7

to redeem the Preferred Stock in full in cash in accordance with the terms hereof); and

c. Shares of Preferred Stock shall be entitled to vote with the shares of common stock of the Issuer on an "as-if" converted basis, and shall be treated by the Issuer's governing documents as holding 51% of the then-outstanding voting capital stock of the Issuer; provided that to the extent such voting of shares of Preferred Stock is not permitted by applicable rules of the stock exchange on which the common stock of the Issuer is listed, the Issuer and the Preferred Majority Holders shall cooperate reasonably and in good faith to implement an alternate arrangement that most closely approximates the foregoing (collectively, the "Majority Voting Right").

To the extent that more than one Non-Compliance Event shall be continuing at any time, the above-described periods shall commence on the date of the first Non-Compliance Event and shall continue until such time as all Non-Compliance Events have been cured or waived.

Each holder of Preferred Stock shall have the rights and remedies set forth in the definitive documentation governing the Preferred Stock, and rights and remedies under applicable law or at equity.

"Non-Compliance Event" shall mean, subject, as appropriate, to customary cure rights and grace periods to be mutually agreed (but in no event more restrictive than those set forth in the Exit Facilities as in effect on the Closing Date):

a. Failure to pay (i) each Preferred Dividend in cash following the 42-month anniversary of the Closing Date, (ii) any Preferred Dividend when due or (iii) any redemption premium when due;

b. Failure to comply with any of the "Protective Provisions" described above;

c. The occurrence of a Change of Control (to be defined in a manner consistent with the definition thereof under the Exit Facilities as in effect on the Closing Date);

d. Insolvency events (to be consistent with the corresponding events of default under the Exit Facilities as in effect on the Closing Date); and

e. Other customary defaults (including with respect to inaccuracy of representations and warranties) (to be consistent with the corresponding events of default under the Exit Facilities as in effect on the Closing Date).

8

From and after the 87-month anniversary of the Closing Date, to the extent any shares of Preferred Stock remain outstanding and irrespective of whether a Non-Compliance Event shall have occurred and be continuing, the Preferred Majority Holders shall be entitled to the Non-Compliance Step-Up, the Majority Board Proposal Right and the Majority Voting Right, and the Issuer shall initiate a process to promptly consummate a Forced Exit Transaction.

**Board Rights**

Without limitation of the terms described above under "Non-Compliance Events", for so long as ACM and its affiliates own at least 50% of the shares of Preferred Stock then outstanding, ACM and its affiliates shall have the right to appoint (i) one observer to the Issuer's board of directors (and not to any committee thereof) and (ii) one director to the Issuer's board of directors.  These rights shall be non-transferrable without the consent of the Issuer.

**Documentation**

The definitive documentation for the Preferred Stock shall be consistent with the terms set forth herein and otherwise reasonably acceptable to the parties hereto.

**Transfer of the Preferred Stock**

(a)  Subject to compliance with applicable securities laws, shares of Preferred Stock will be transferable by the holders thereof to any person other than a Prohibited Transferee and the Issuer will recognize and register any such transfer on its books.

(b)  The Issuer will use commercially reasonable efforts to cooperate with the holders of the Preferred Stock in connection with such transfer, including providing reasonable and customary information (i) in connection with any such holder's marketing efforts or any such potential transferee's due diligence (subject to customary confidentiality restrictions) or (ii) in order to comply with applicable securities laws.

"Prohibited Transferees" means (i) the financial institutions and other entities that have been specified by the Issuer in writing to the Investors on or prior to the date of its execution of the Purchase Agreement and reasonably acceptable to the Investors, and (ii) bona fide competitors of the Issuer and its subsidiaries specified by the Issuer in writing to the Investors on or prior to the date of its execution of the Purchase Agreement (the list of which may be updated by the Issuer from time to time with respect to additional bona fide competitors).

**Expense Reimbursement; Indemnification**

The definitive documentation governing the Preferred Stock will include customary expense reimbursement and indemnification provisions to be mutually agreed.

**Fiduciary Duties**

This Annex 1 is not intended to, and will not be deemed to, impose any obligation or duty on any party or any of their respective affiliates or representatives (including any duty of good faith, care, loyalty or other fiduciary duty, in each case, whether express or implied).

**Counsel to Investors**

Paul, Weiss, Rifkind, Wharton & Garrison LLP.

9

**Tax Treatment**  The Issuer and the Investors will cooperate in good faith to agree on appropriate terms in the definitive documentation governing the Preferred Stock to avoid the application of Section 305(c) of the Code to any accrued Preferred Dividends.

**Annex B**

**AGS Engagement Letter**

*PRIVATE & CONFIDENTIAL*

# APOLLO

**Apollo Global Securities, LLC**
**9 West 57th Street**
**37th Floor**
**New York, NY 10019**
**(212) 822-0598**

May [●], 2021

The Hertz Corporation
8501 Williams Road
Estero, Florida 33928
Attention: Kenny Cheung

Ladies and Gentlemen,

1.      Reference is made to the Equity Purchase and Commitment Agreement, dated as of the date hereof (the "***Purchase Agreement***"), by and among Hertz Global Holdings, Inc., a Delaware corporation, Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by it or its affiliates (the "***Preferred Equity Plan Sponsor***"), and the other Equity Commitment Parties from time to time party thereto.  Terms used but not defined in this letter agreement (the "***Letter Agreement***") shall have the meanings assigned thereto in Purchase Agreement.



3.      You agree that, once paid, the Advisory Fee payable hereunder will not be refundable under any circumstances.  The Advisory Fee payable hereunder will be paid in U.S. Dollars in immediately available funds and shall not be subject to reduction by way of setoff or counterclaim.  In addition, such payment shall be made without deduction for any taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any national, state or local tax authority (except as required by applicable law), or (if so required by applicable law) will be grossed up by you for such amounts, except to the extent that such deduction, charge or withholding has arisen because of any matter relating to the identity, organization or jurisdiction of AGS.  All fees received by AGS hereunder may be shared among AGS and its affiliates as AGS may determine in its sole discretion.  You agree that your obligations under this Letter Agreement in respect of the Advisory Fee shall survive the purchase of the Direct Investment Preferred Shares by the Preferred Equity Plan Sponsor and the other Investors.

4.      The Common Equity Plan Sponsors and the Company shall each provide commercially reasonably assistance to AGS in connection with AGS's syndication efforts of the Direct Investment Preferred Shares (the "***Syndication***") until the 30th day following the Closing Date, including assisting AGS with the

preparation of customary offering documents and materials, including private placement memoranda, information memoranda and packages, investor presentations and similar documents and materials, including the execution and delivery of reasonable and customary representation and authorization letters in connection therewith. AGS acknowledges that the Investors and their affiliates will be subject to certain restrictions on transferring Direct Investment Preferred Shares set forth in the definitive documentation governing the Direct Investment Preferred Shares and agrees that nothing in this Letter Agreement supersedes or renders ineffective such restrictions.

5.     Notwithstanding anything to the contrary contained herein, AGS agrees not to syndicate any portion of the Preferred Stock to Prohibited Transferees.

6.     You and the Common Equity Plan Sponsors each agree, at our request, to use commercially reasonable efforts to assist us in the preparation of a version of customary marketing and informational materials and presentations that may be used in connection with the Syndication that will consist exclusively of information and documentation that is (i) publicly available or (ii) not material with respect to you or your subsidiaries or any of their respective securities for purposes of United States Federal and state securities laws (all such information and documentation being "***Public Purchaser Information***"). You and the Common Equity Plan Sponsors each acknowledge and agree that, subject to the confidentiality provisions of this Letter Agreement, the following documents may be distributed to purchasers of the Direct Investment Preferred Shares wishing to receive only Public Purchaser Information: (a) drafts that are not marked confidential and final definitive documentation with respect to the Direct Investment Preferred Shares; (b) administrative materials prepared by us for the purchasers of the Direct Investment Preferred Shares (such as meeting invitations for purchasers of the Direct Investment Preferred Shares, allocations and funding and closing memoranda); and (c) notification of changes in the previously disclosed terms of the Direct Investment Preferred Shares. You also agree to use commercially reasonable efforts to identify that portion of any other Information (as defined below) to be distributed to "***public side***" purchasers of the Direct Investment Preferred Shares (*i.e.*, purchasers of the Direct Investment Preferred Shares that do not wish to receive material non-public information with respect to you or your subsidiaries or any of their respective securities).

7.     You hereby represent that (a) all written factual information (other than forward looking information and information of a general economic or industry specific nature) (the "***Information***") regarding the Company or any of its Subsidiaries that has been or will be made available to us by you or any of your officers or employees on your behalf specifically for inclusion in the Public Purchaser Information, does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein (giving effect to all supplements and updates provided thereto), in the light of the circumstances under which they were made, not misleading and (b) forward-looking information regarding the Company or any of its Subsidiaries that has been or will be made available to us by you or any of your officers or employees on your behalf specifically for inclusion in the Public Purchaser Information have been or will be prepared in good faith based upon assumptions that you believe to be reasonable at the time made and at the time such forward-looking information is made available to us; it being understood by the purchasers of the Direct Investment Preferred Shares that such forward-looking information is as to future events and are not to be viewed as facts, such forward-looking information is subject to significant uncertainties and contingencies and that actual results during the period or periods covered by any such forward-looking information may differ significantly from the projected results, and that no assurance can be given that the projected results will be realized. In structuring the Direct Investment Preferred Shares, we will be entitled to use and rely on the Information without responsibility for independent verification thereof.

8.     You agree to indemnify and hold harmless AGS and its affiliates, and the respective officers, directors, employees, agents, controlling persons, members and representatives of each of the foregoing

and their respective successors and assigns (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, liabilities and expenses, joint or several, to which any such Indemnified Person may become subject arising out of or in connection with any actual or threatened claim, actions, suits, inquiries, litigation, investigation or proceeding by a third party arising out of or in connection with the Syndication (any such matters being referred to as "***Indemnified Matters***" and any such claim, actions, suits, inquiries, litigation, investigation or proceeding, a "***Proceeding***") relating to any of the foregoing, regardless of whether any such Indemnified Person is a party thereto (and regardless of whether such matter is initiated by you, your equity holders, creditors or any other third party or by any of their respective subsidiaries or affiliates), and to reimburse each such Indemnified Person promptly upon demand for any reasonable documented out-of-pocket legal expenses incurred in connection with investigating or defending any of the foregoing and other reasonable documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing or in connection with the enforcement of any provision of this Letter Agreement; *provided* that the foregoing indemnity will not, as to any Indemnified Person, apply to (A) losses, claims, damages, liabilities or related expenses (i) to the extent they are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Person or any of such Indemnified Person's Affiliates or any of its or their respective officers, directors, employees, agents, controlling persons, members or Representatives (collectively, such Indemnified Person's "***Related Persons***"), (ii) arising out of a material breach by such Indemnified Person (or any of such Indemnified Person's Related Persons) of its obligations under this Letter Agreement (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (iii) arising out of any Proceeding that does not involve an act or omission of you or any of your affiliates and that is brought by an Indemnified Person against any other Indemnified Person, or (B) any settlement entered into by such Indemnified Person (or any of such Indemnified Person's Related Persons) without your written consent (such consent not to be unreasonably withheld, delayed or conditioned). The indemnification provided for in this paragraph with respect to the Indemnified Matters shall be the sole indemnification available from the Company or its Affiliates for such Indemnified Matters. The Indemnified Persons shall not be entitled to, and shall not seek, any indemnification under the Purchase Agreement for such Indemnified Matters.

9.        None of the Indemnified Persons or (except solely as a result of your indemnification obligations set forth above to the extent an Indemnified Person is found so liable) you, or any of your affiliates or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Letter Agreement, the Syndication, except as provided in the definitive documentation governing the Direct Investment Preferred Shares. You shall not, without the prior written consent of each applicable Indemnified Person (which consent, except with respect to a settlement including a statement of the type referred to in clause (b) below, shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Person unless such settlement (a) includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability on claims that are the subject matter of such Proceedings, (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person and (c) includes customary confidentiality and non-disparagement agreements.

10.      You acknowledge that we may be providing debt financing, equity capital or other services to other companies in respect of which you may have conflicting interests regarding the transactions described herein or otherwise. You acknowledge that we do not have any obligation to use in connection with the transactions contemplated by this Letter Agreement, or to furnish to you, confidential information obtained by us from other companies.

11.     You further acknowledge and agree that (a) AGS will act as an independent contractor and no fiduciary, advisory or agency relationship between you and us is intended to be or has been created in respect of any of the transactions contemplated by this Letter Agreement, irrespective of whether we have advised or are advising you on other matters, (b) AGS is acting solely as a principal and not as an agent of yours hereunder and AGS, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of us, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Letter Agreement, (d) you have been advised that we are engaged in a broad range of transactions that may involve interests that differ from your interests (including as described in the Purchase Agreement) and that we do not have any obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship and (e) you waive, to the fullest extent permitted by law, any claims you may have arising out of or in connection with this Letter Agreement, the Syndication against us for breach of fiduciary duty or alleged breach of fiduciary duty and agree that we shall not have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.  AGS is not advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction and AGS shall have no responsibility or liability to you with respect thereto.

12.     The Company agrees that the provisions of paragraph 2 of this Letter Agreement (the "***Confidential Information***") are confidential, and, except as otherwise agreed to in writing by AGS, as required by law or judicial process, shall not be disclosed by you to any person or entity other than your representatives who reasonably need to be made aware of the Confidential Information and who agree to keep the Confidential Information confidential.  If the Company determines that it is required by law or judicial process to disclose the Confidential Information, it shall consult AGS regarding such disclosure and seek confidential treatment for such portions of the disclosure or filing as may be reasonably requested by AGS. If you are required to disclose the Confidential Information in the Chapter 11 Cases, you will first seek entry of an order, reasonably satisfactory to AGS, authorizing you to file the Confidential Information with such redactions as AGS may reasonably request, and that an unredacted copy of this Letter Agreement may only be disclosed to the Bankruptcy Court, the U.S. Trustee (as defined in the Plan) and the legal and financial advisors to any statutory committee appointed in the Chapter 11 Cases.

13.     We shall use all non-public information received by us and our affiliates in connection with this Letter Agreement, the Syndication solely for the purposes of negotiating, evaluating and consulting on the transactions contemplated hereby and thereby and providing the services that are the subject of this Letter Agreement and not for any other purpose.  We shall treat confidentially, together with the terms and substance of this Letter Agreement, all such information; *provided, however*, that we shall be permitted to disclose such information (a) to rating agencies, (b) to any prospective purchasers of the Direct Investment Preferred Shares who have agreed to be bound by the confidentiality and non-use restrictions of this paragraph (provided that you shall be an express third-party beneficiary of such agreements entitled to enforce such confidentiality and non-use restrictions), (c) in any legal, judicial, administrative proceeding or other compulsory process or otherwise as required by applicable law or regulations (in which case we shall promptly notify you, in advance, to the extent permitted by law so that you may seek an appropriate protective order or other appropriate remedy (at your sole cost and expense)), (d) upon the request or demand of any regulatory authority having or asserting jurisdiction over us or our respective affiliates (in which case we shall promptly notify you, in advance, to the extent permitted by law so that you may seek an appropriate protective order or other appropriate remedy (at your sole cost and expense)), (e) to our affiliates, the limited partners of funds managed by the Preferred Equity Plan Sponsor and our, our affiliates' and such limited partners' respective representatives who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential (and we shall be fully responsible for such parties' breach of this paragraph), (f) to any of our affiliates and

their representatives (*provided* that any such affiliate or representative is advised of its obligation to retain such information as confidential, and we shall be fully responsible for our affiliates' and their representatives' breach of this paragraph) to be utilized solely in connection with rendering services to you in connection with the proposed transaction, (g) to the extent any such information becomes publicly available other than by reason of disclosure by us, our Affiliates or any of our respective Representatives in breach of this Letter Agreement, (h) to the extent that such information is received by us from a third party that is not, to our knowledge (after reasonable inquiry), subject to confidentiality obligations owing to you or any of your affiliates or related parties, (i) to the extent that such information is independently developed by us without use of or reference to the information provided to us, (j) for purposes of establishing a "due diligence" defense (in which case we shall promptly notify you, in advance, to the extent permitted by law) or (k) to the extent that such information was already in our possession prior to any duty or other undertaking of confidentiality entered into by us or any of our Affiliates in connection with the proposed transaction or is independently developed by us.

14.    THIS LETTER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO SUCH STATE'S CHOICE OF LAW PROVISIONS WHICH WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS LETTER AGREEMENT, EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY AGREES FOR ITSELF THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER ARISING UNDER, ARISING OUT OF, OR IN CONNECTION WITH THIS LETTER AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN THE BANKRUPTCY COURT, OR IF THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION TO HEAR SUCH ACTION, SUIT OR PROCEEDING, ANY STATE OR FEDERAL COURT LOCATED IN DELAWARE COUNTY, DELAWARE, AND BY EXECUTING AND DELIVERING THIS LETTER AGREEMENT, EACH OF THE PARTIES IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. THE PARTIES HEREBY AGREE THAT MAILING OF PROCESS OR OTHER PAPERS IN CONNECTION WITH ANY SUCH ACTION OF PROCEEDING TO AN ADDRESS PROVIDED IN WRITING BY THE RECIPIENT OF SUCH MAILING, OR IN SUCH OTHER MANNER AS MAY BE PERMITTED BY LAW, SHALL BE VALID AND SUFFICIENT SERVICE THEREOF AND HEREBY WAIVE ANY OBJECTIONS TO SERVICE ACCOMPLISHED IN THE MANNER HEREIN PROVIDED. IN ENFORCING ITS RIGHTS HEREUNDER FOR ANY BREACH OF THIS LETTER AGREEMENT, THE PARTIES ACKNOWLEDGE THAT THE OTHER PARTY WILL BE ENTITLED TO SEEK ANY FORM OF EQUITABLE RELIEF INCLUDING, WITHOUT LIMITATION, INJUNCTIVE RELIEF, WITHOUT POSTING OF ANY BOND OR OTHER SECURITY AS WELL AS THE RIGHT TO PURSUE ANY AND ALL OTHER RIGHTS AND REMEDIES (AND RECOVER ANY AND ALL DAMAGES (EXCEPT AS EXPRESSLY SET FORTH HEREIN)) AVAILABLE AT LAW OR IN EQUITY. THE PARTIES HERETO HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT, AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. THE PARTIES HERETO HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS LETTER AGREEMENT.

15.     AGS hereby notifies the Company that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "*Act*") and normal policies and practices, AGS is required to obtain, verify and record certain information and documentation.

16.     The provisions of Section 2.5 (Designation and Assignment Rights) of the Purchase Agreement shall apply to this Letter Agreement *mutatis mutandis*.

17.     This Letter Agreement may be executed in counterparts, each of which shall be deemed an original and all which counterparts shall constitute one and the same document.  Delivery of an executed signature page of this Letter Agreement by facsimile or electronic (including "PDF") transmission shall be effective as delivery of a manually executed counterpart hereof.

18.     Notwithstanding any provision of this Letter Agreement to the contrary, the obligations of the Company in this Letter Agreement shall not be a condition to the obligations of any Equity Commitment Party under the Purchase Agreement and any breach by the Company or any of its Affiliates or Representative of this Letter Agreement or the inaccuracy of any representation or warranty of the Company hereunder, shall not cause the failure of any condition, covenant or agreement under the Purchase Agreement.  It is understood and agreed by the parties hereto that the obligations of the Equity Commitment Parties to fund their commitments under the Purchase Agreement are solely conditioned on and subject to the terms and conditions of the Purchase Agreement.

[Signature Pages to Follow]

Sincerely,

APOLLO GLOBAL SECURITIES, LLC


By:_____
Name:
Title:

[Signature Page to Letter Agreement]

AGREED AND ACCEPTED
AS OF THE FIRST DATE WRITTEN ABOVE.

THE HERTZ CORPORATION


By:_____
Name:
Title:


**SOLELY WITH RESPECT TO PARAGRAPHS 4 AND 6 HEREOF:**


KNIGHTHEAD CAPITAL MANAGEMENT, LLC


By: _____
    Name:
    Title:


CERTARES OPPORTUNITIES LLC


By: _____
    Name:
    Title:


[Signature Page to Letter Agreement]

**Annex C**
**Plan**

*To be filed under separate cover.*

**<u>Annex D</u>**
**Form of Rights Offering Procedures**

*To be filed under separate cover.*

**Annex E**
**Form of "VCOC" Letter**

**HERTZ GLOBAL HOLDINGS, INC.**

[_____], 2021

**CK Amarillo LP**
c/o Knightshead Capital Management, LLC
280 Park Avenue, 22nd Floor
New York, New York 10017
and
c/o Centares Management LLC
350 Madison Avenue, 8th Floor
New York, New York 10017

Re:     <u>VCOC Management Rights</u>

Ladies and Gentlemen:

On behalf of Hertz Global Holdings, Inc. (the "<u>Company</u>"), we write this letter to confirm our agreement that, immediately upon the direct or indirect debt or equity investment by CK Amarillo LP (the "<u>Investor</u>") in the Company and for so long as the Investor continues to hold, directly or indirectly, any debt or equity investment in the Company (the "<u>Interests</u>"), the Investor will be entitled to the following contractual management rights, in addition to any rights to which the Investor may be entitled to pursuant to any other agreements.

1.      The Company shall provide the Investor or its representative (its "<u>Representative</u>") with true and correct copies of all documents, reports, financial data and other information regarding the Company and each of its subsidiaries (each, a "<u>Subsidiary</u>") as the Investor may reasonably request. Additionally, the Investor shall have the independent right to send its Representative to visit and inspect any of the properties of the Company, to examine its books and records and to take copies and extracts therefrom, and to discuss its affairs, finances and accounts with its officers, employees and public accountants, all at such times as the Investor may reasonably request.

2.      The Investor shall be entitled to consult with and advise the Company's management with respect to matters relating to the business and affairs of the Company and its Subsidiaries, including the Company's proposed annual operating plans. The Company's management will meet with the Investor at the Company's facilities and at regular intervals during each year at mutually agreeable times for such consultation and advice and to review progress in achieving said plans.

3.      The Company shall deliver to the Investor (and/or its Representative) any information concerning the Company and its Subsidiaries reasonably requested by the Investor or its Representative, including, without limitation, any information, including estimates, required for the preparation by the Investor of its own financial and tax reporting arising out of or related to their ownership of the Interests.

4.      The Company shall (i) inform the Investor or its Representative sufficiently in advance with respect to any significant actions of the Company (including, without limitation,

CK Amarillo LP
[_____], 2021
Page 2 of 2

extraordinary dividends, mergers, acquisitions or dispositions of assets, issuances of significant amounts of debt or equity and material amendments to the organizational documents of the Company), (ii) provide the Investor or its Representative with the opportunity to consult with the Company or its respective officers, employees or advisers with respect to such actions, at such times as the Investor or its Representative shall reasonably request, and (iii) provide any additional information reasonably necessary for the Investor to independently exercise its rights under this paragraph.

5.      The Company shall provide the Investor or its designated Representative with such other rights of information and consultation as may reasonably be determined by the Investor to be necessary to qualify its investment in the Company as a "venture capital investment" for purposes of the United States Department of Labor Regulation published at 29 C.F.R. 2510.3-101 (the "Plan Asset Regulation").

The Company agrees to cause its management to consider, in good faith, the recommendations of the Investor or its designated Representative in connection with the matters on which it is consulted as described above. If the Company engages in a restructuring or similar transaction, then any resulting entity or entities shall be subject to the terms of this letter agreement.

The Company acknowledges and agrees that this letter agreement shall be interpreted with the understanding that the Investor intends the rights obtained under this letter agreement to provide "management rights" within the meaning of the Plan Asset Regulation and shall be construed in good faith by the Company. The parties agree that if legal counsel for the Investor reasonably concludes that, due to changes after the date hereof in applicable law or the interpretation, the rights granted hereby should be altered to preserve the qualification of the Investor's investment in the Company as a "venture capital investment" for purposes of ERISA, the parties hereto will negotiate in good faith such amendments to this letter agreement as are reasonably necessary to effect such alterations.

The rights described herein shall terminate and be of no further force or effect, with respect to the Investor, upon the Investor and its affiliates no longer holding, directly or indirectly, any Interests.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.*]

KE 76565119.1

Very truly yours,

**HERTZ GLOBAL HOLDINGS, INC.**

By:    _____
Name:  _____
Title:   _____


Acknowledged and agreed,

**CK OPPORTUNITIES FUND I, L.P.**

By:    CK OPPORTUNITIES GP, LLC
Its:    General Partner


By:    _____
Name:  _____
Title:   _____

By:    _____
Name:  _____
Title:   _____

**CK OPPORTUNITIES FUND II, L.P.**

By:    CK OPPORTUNITIES GP, LLC
Its:    General Partner


By:    _____
Name:  _____
Title:   _____

By:    _____
Name:  _____
Title:   _____

## Schedule 1

### Equity Commitment Schedule

<table>
<tr><td colspan="4"><strong>Direct Equity Commitment</strong></td></tr>
<tr>
<td></td>
<td><strong>Direct Equity Investor</strong><br>(<em>"*" subject to the proviso to "Common Per Share Purchase Price"</em>)</td>
<td><strong>Direct Investment Portion</strong><br>(<strong>except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below</strong>)</td>
<td><strong>Address for Notices</strong></td>
</tr>
<tr>
<td>1.</td>
<td>CK Amarillo LP</td>
<td>$1,987,000,000</td>
<td><em>See Section 10.1(b)</em>.</td>
</tr>
<tr>
<td>2.</td>
<td>Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by it or its affiliates</td>
<td>A number of shares of Preferred Stock having an aggregate initial stated value of $1,500,000,000<br><br>A number of shares of Common Stock having an aggregate purchase price equal to $100,000,000</td>
<td><em>See Section 10.1(c)</em>.</td>
</tr>
<tr>
<td>3.</td>
<td>Two Seas Global (Master) Fund LP</td>
<td>$7,500,000</td>
<td>Sina Toussi<br>Two Seas Capital<br>32 Elm Street, 3rd floor<br>Rye NY 10580<br>917-536-6028<br>Stoussi@twoseascap.com</td>
</tr>
<tr>
<td>4.</td>
<td>Two Seas Duration Litigation Opportunities Fund LLC</td>
<td>$5,000,000</td>
<td>Sina Toussi<br>Two Seas Capital<br>32 Elm Street, 3rd floor<br>Rye NY 10580<br>917-536-6028<br>Stoussi@twoseascap.com</td>
</tr>
</table>

| | Direct Equity Commitment | | |
|---|---|---|---|
| | **Direct Equity Investor** <br> (*"\*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** <br> (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 5. | Alta Fundamental Advisers Master L.P. | $1,229,800 | Alta Fundamental Advisers LLC <br> 1500 Broadway <br> Suite 704 <br> New York, NY 10036 <br> Attention: Scott Pritchard <br> Telephone: (212) 319-1778 <br> Email: operations@altafundamental.com |
| 6. | Blackwell Partners LLC – Series A | $7,974,200 | Alta Fundamental Advisers LLC <br> 1500 Broadway <br> Suite 704 <br> New York, NY 10036 <br> Attention: Scott Pritchard <br> Telephone: (212) 319-1778 <br> Email: operations@altafundamental.com |
| 7. | Star V Partners LLC | $3,796,000 | Alta Fundamental Advisers LLC <br> 1500 Broadway <br> Suite 704 <br> New York, NY 10036 <br> Attention: Scott Pritchard <br> Telephone: (212) 319-1778 <br> Email: operations@altafundamental.com |

| | Direct Equity Commitment | | |
|---|---|---|---|
| | **Direct Equity Investor** <br> (*"*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** <br> (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 8. | Alta Fundamental Advisers SP LLC | $500,000 | Alta Fundamental Advisers LLC <br> 1500 Broadway <br> Suite 704 <br> New York, NY 10036 <br> Attention: Scott Pritchard <br> Telephone: (212) 319-1778 <br> Email: operations@altafundamental.com |
| 9. | Discovery Global Opportunity Master Fund, Ltd. | $30,000,000 | Discovery Capital Management, LLC <br> 20 Marshall Street, Suite 310 <br> South Norwalk, CT 06854 <br> Attention: Adam Schreck <br> Telephone: 203 956 7953 <br> Email: compliance@discap.com |
| 10. | Boothbay Absolute Return Strategies, LP | $1,750,000 | Fourworld Capital Management <br> 7 World Trade Center, Floor 46 <br> New York, NY 10007 <br> Attention: John Addis <br> Email: john@fourworldcapital.com |
| 11. | Boothbay Diversified Alpha Master Fund LP | $1,750,000 | Fourworld Capital Management <br> 7 World Trade Center, Floor 46 <br> New York, NY 10007 <br> Attention: John Addis <br> Email: john@fourworldcapital.com |

| | Direct Equity Commitment | | |
| --- | --- | --- | --- |
| | **Direct Equity Investor** (*"*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 12. | FourWorld Global Opportunities Fund, Ltd. | $4,000,000 | Fourworld Capital Management 7 World Trade Center, Floor 46 New York, NY 10007 Attention: John Addis Email: john@fourworldcapital.com |
| 13. | FourWorld Event Opportunities Fund, LP | $500,000 | Fourworld Capital Management 7 World Trade Center, Floor 46 New York, NY 10007 Attention: John Addis Email: john@fourworldcapital.com |
| 14. | FourWorld Special Opportunities Fund, LLC | $4,000,000 | Fourworld Capital Management 7 World Trade Center, Floor 46 New York, NY 10007 Attention: John Addis Email: john@fourworldcapital.com |
| 15. | Cadence Hill Opportunity Fund LP | $175,000 | Fourworld Capital Management 7 World Trade Center, Floor 46 New York, NY 10007 Attention: John Addis Email: john@fourworldcapital.com |

| | **Direct Equity Commitment** | | |
|---|---|---|---|
| | **Direct Equity Investor** (*"*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 16. | Jefferies Strategic Investments, LLC | $4,000,000 | FourSixThree Capital LP 520 Madison Avenue, 19th Floor New York, NY 10022 Attention: William Kelly Telephone: (646) 805-5402 Email: bill@463cap.com |
| 17. | FourSixThree Master Fund, LP | $1,000,000 | FourSixThree Capital LP 520 Madison Avenue, 19th Floor New York, NY 10022 Attention: William Kelly (646) 805-5402 bill@463cap.com |
| 18. | Glenview Capital Partners, L.P. | $1,297,000 | Glenview Capital Management 767 Fifth Avenue, 44th Floor New York, NY 10153 Attention: Jonathan Danziger Telephone: 212.323.6567 Email: jdanziger@glenviewcapital.com |
| 19. | Glenview Institutional Partners, L.P. | $3,131,000 | Glenview Capital Management 767 Fifth Avenue, 44th Floor New York, NY 10153 Attention: Jonathan Danziger Telephone: 212.323.6567 Email: jdanziger@glenviewcapital.com |

| | **Direct Equity Commitment** | | |
|---|---|---|---|
| | **Direct Equity Investor** ("*" *subject to the proviso to "Common Per Share Purchase Price")* | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 20. | Glenview Capital Master Fund, Ltd. | $9,343,000 | Glenview Capital Management 767 Fifth Avenue, 44th Floor New York, NY 10153 Attention: Jonathan Danziger Telephone: 212.323.6567 Email: jdanziger@glenviewcapital.com |
| 21. | Glenview Capital Opportunity Fund, L.P. | $11,692,000 | Glenview Capital Management 767 Fifth Avenue, 44th Floor New York, NY 10153 Attention: Jonathan Danziger Telephone: 212.323.6567 Email: jdanziger@glenviewcapital.com |
| 22. | Glenview Offshore Opportunity Master Fund, Ltd. | $9,537,000 | Glenview Capital Management 767 Fifth Avenue, 44th Floor New York, NY 10153 Attention: Jonathan Danziger Telephone: 212.323.6567 Email: jdanziger@glenviewcapital.com |
| 23. | Hampton Road Capital Master Fund LP | — | Hampton Road Capital Management LP One Greenwich Plaza, 3rd Floor Greenwich, CT 06830 Attention: Ken Palumbo, President & COO Telephone: 203-608-3150 Email: kpalumbo@hamptonroad.com |

| | Direct Equity Commitment | | |
|---|---|---|---|
| | **Direct Equity Investor**<br>(*"*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion**<br>**(except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below)** | **Address for Notices** |
| 24. | Hein Park Capital Management LP | $14,229,406 | Hein Park Capital Management<br>888 7th Avenue, 4th Floor<br>New York, NY 10106<br>Attention: Jay Schoenfarber<br>jschoenfarber@heinpark.com<br>(212) 299-4790 |
| 25. | JSCC Holdings LLC | $6,770,594 | Hein Park Capital Management<br>888 7th Avenue, 4th Floor<br>New York, NY 10106<br>Attention: Jay Schoenfarber<br>jschoenfarber@heinpark.com<br>(212) 299-4790 |
| 26. | Jefferies LLC | $8,000,000 | Jefferies LLC<br>520 Madison Avenue, 3rd Floor<br>New York, New York 10022<br>Attention:  Bill McLaughlin |
| 27. | Oaktree Opportunities Fund XI Holdings (Delaware), L.P. | $75,700,000 | c/o Oaktree Capital Management, L.P.<br>333 South Grand Ave, 28th floor<br>Los Angeles, CA 90071<br>Attention:  Steve Tesoriere<br>Kaj Vazales<br>Jordan Mikes |

| | **Direct Equity Commitment** | | |
| --- | --- | --- | --- |
| | **Direct Equity Investor** (*"\*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 28. | Oaktree Opportunities Fund Xb Holdings (Delaware), L.P. | $13,400,000 | c/o Oaktree Capital Management, L.P. 333 South Grand Ave, 28th floor Los Angeles, CA 90071 Attention: Steve Tesoriere Kaj Vazales Jordan Mikes |
| 29. | Oaktree Value Opportunities Fund Holdings, L.P. | $20,000,000 | c/o Oaktree Capital Management, L.P. 333 South Grand Ave, 28th floor Los Angeles, CA 90071 Attention: Steve Tesoriere Kaj Vazales Jordan Mikes |
| 30. | Oaktree Value Equity Holdings, L.P. | $10,000,000 | c/o Oaktree Capital Management, L.P. 333 South Grand Ave, 28th floor Los Angeles, CA 90071 Attention: Steve Tesoriere Kaj Vazales Jordan Mikes |
| 31. | Oaktree Phoenix Investment Fund, L.P. | $2,000,000 | c/o Oaktree Capital Management, L.P. 333 South Grand Ave, 28th floor Los Angeles, CA 90071 Attention: Steve Tesoriere Kaj Vazales Jordan Mikes |

78

| | Direct Equity Commitment | | |
|---|---|---|---|
| | **Direct Equity Investor** (*"\*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 32. | Rubric Capital Master Fund LP | $58,771,500 | Rubric Capital Management LP 155 East 44th St, Suite 1630 New York, NY 10017 Email: brian@rubriccapital.com josh@rubriccapital.com |
| 33. | BEMAP Master Fund Ltd | $8,141,250 | Rubric Capital Management LP 155 East 44th St, Suite 1630 New York, NY 10017 Email: brian@rubriccapital.com josh@rubriccapital.com |
| 34. | Blackstone CSP-MST FMAP Fund | $8,087,250 | Rubric Capital Management LP 155 East 44th St, Suite 1630 New York, NY 10017 Email: brian@rubriccapital.com josh@rubriccapital.com |
| 35. | Highbridge Tactical Credit Master Fund, L.P. | $10,666,666.67 | Highbridge Tactical Credit Master Fund, L.P. c/o Highbridge Capital Management, LLC 277 Park Avenue, 23rd Floor New York, NY 10172 Attention: Damon Meyer, Ian Scime |

| | Direct Equity Commitment | | |
|---|---|---|---|
| | **Direct Equity Investor** (*"\*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 36. | MSD Credit Opportunity Master Fund, L.P. | $15,000,000 | MSD Credit Opportunity Master Fund, L.P. c/o MSD Partners, L.P. 645 Fifth Avenue, 21st Floor New York, NY 10022 Attention: Scott Segal, Simon Crocker, Ken Gerold Email: ssegal@msdpartners.com, scrocker@msdpartners.com, kgerold@msdpartners.com |
| 37. | HG Vora Special Opportunities Master Fund, Ltd. | $100,000,000 | HG Vora Capital Management, LLC 330 Madison Avenue, 20th floor New York, NY 10017. Attention: Mandy Lam and Philip Garthe Email: mlam@hgvora.com and pgarthe@hgvora.com |
| 38. | Sachem Head LP | $29,525,000 | Sachem Head Capital Management LP 250 West 55th Street, 34th Floor New York, NY 10019 Attention: Michael Adamski Telephone: 212.714.3314 Email: michael@sachemhead.com |

| | Direct Equity Commitment | | |
|---|---|---|---|
| | **Direct Equity Investor** <br> (*"*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** <br> **(except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below)** | **Address for Notices** |
| 39. | Sachem Head Master LP | $20,475,000 | Sachem Head Capital Management LP <br> 250 West 55th Street, 34th Floor <br> New York, NY 10019 <br> Attention: Michael Adamski <br> Telephone: 212.714.3314 <br> Email: michael@sachemhead.com |
| 40. | Honeycomb Master Fund LP | $20,000,000 | Honeycomb Asset Management LP <br> 645 Madison Avenue, 17th floor <br> New York, NY 10022 <br> Telephone: 646-883-1105 <br> Attention: Vick Sandhu <br> Email: operations@honeycombam.com |
| 41. | Arrow Partners LP | $15,000,000 | Arrow Capital Management, LLC <br> 499 Park Avenue <br> New York, NY 10022 <br> Attention: Mal Serure, Amy Wolf <br> Telephone: 212-243-7338 <br> Facsimile: 212-243-2195 <br> Email: ms@arrowinv.com, <br> aw@arrowinv.com |

81

| | **Direct Equity Commitment** | | |
|---|---|---|---|
| | **Direct Equity Investor** (**"*" subject to the proviso to "Common Per Share Purchase Price"**) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 42. | Arrow Offshore LTD | $5,000,000 | Arrow Capital Management, LLC<br>499 Park Avenue<br>New York, NY 10022<br>Attention:  Mal Serure, Amy Wolf<br>Telephone: 212-243-7338<br>Facsimile: 212-243-2195<br>Email: ms@arrowinv.com,<br>aw@arrowinv.com |
| 43. | Mariner Atlantic Multi-Strategy Master Fund, Ltd. | $19,750,000 | Mariner Investment Group, LLC<br>299 Park Avenue—12th Floor<br>New York, NY  10171<br>Attention:  John Kelty<br>Telephone:  (212) 880-9209<br>Email: jkelty@marinercapital.com |
| 44. | Mariner Glen Oaks Master Fund, L.P. | $250,000 | Mariner Investment Group, LLC<br>500 Mamaroneck Avenue, Suite 101<br>Harrison, NY 10528<br>Attention:  John Kelty<br>Email: jkelty@marinercapital.com |
| 45. | Scopia Long QP LLC | $5,075,000 | Scopia Capital Management LP<br>152 West 57th Street, 33rd Floor<br>New York, NY 10019<br>Attention: Aaron Morse, COO<br>Email: amorse@scopia.com |

| | Direct Equity Commitment | | |
|---|---|---|---|
| | **Direct Equity Investor** (*"\*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 46. | Scopia International Master Fund LP | $3,491,000 | Scopia Capital Management LP 152 West 57th Street, 33rd Floor New York, NY 10019 Attention: Aaron Morse, COO Email: amorse@scopia.com |
| 47. | Scopia PX LLC | $2,289,000 | Scopia Capital Management LP 152 West 57th Street, 33rd Floor New York, NY 10019 Attention: Aaron Morse, COO Email: amorse@scopia.com |
| 48. | Scopia PX International Master Fund LP | $5,280,000 | Scopia Capital Management LP 152 West 57th Street, 33rd Floor New York, NY 10019 Attention: Aaron Morse, COO Email: amorse@scopia.com |
| 49. | 405 MSTV I LP | $3,175,000 | Scopia Capital Management LP 152 West 57th Street, 33rd Floor New York, NY 10019 Attention: Aaron Morse, COO Email: amorse@scopia.com |
| 50. | Prelude Opportunity Fund, LP | $5,690,000 | Scopia Capital Management LP 152 West 57th Street, 33rd Floor New York, NY 10019 Attention: Aaron Morse, COO Email: amorse@scopia.com |

| | Direct Equity Commitment | | |
|---|---|---|---|
| | **Direct Equity Investor** (*"*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 51. | AG Credit Solutions Non-ECI Master Fund, L.P. | — | AG Credit Solutions Non-ECI Master Fund LP<br>c/o: Angelo, Gordon & Co., L.P.<br>245 Park Ave, 24th Floor<br>New York, NY 10167<br>Email: CFAX@angelogordon.com<br>AGCSFAdmin@angelogordon.com<br>qui.dang@bnymellon.com<br>CLOAdmin@angelogordon.com |
| 52. | AG Cataloochee, L.P. | — | AG Cataloochee, L.P.<br>c/o: Angelo, Gordon & Co., L.P.<br>245 Park Ave, 24th Floor<br>New York, NY 10167<br>Email: CFAX@angelogordon.com<br>AGCSFAdmin@angelogordon.com<br>Nadia.Mubashir@bnymellon.com<br>CLOAdmin@angelogordon.com |
| 53. | AG Corporate Credit Opportunities Fund, L.P. | — | AG Corporate Credit Opportunities Fund LP<br>c/o: Angelo, Gordon & Co., L.P.<br>245 Park Ave, 24th Floor<br>New York, NY 10167<br>Email: CFAX@angelogordon.com<br>AGCSFAdmin@angelogordon.com<br>Minasan.vo@bnymellon.com<br>CLOAdmin@angelogordon.com |

| | Direct Equity Commitment | | |
|---|---|---|---|
| | **Direct Equity Investor** (*"*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 54. | AG Centre Street Partnership, L.P. | — | AG Centre Street Partnership LP c/o Angelo Gordon & Co. 245 Park Ave, 24th Floor New York, NY 10167 Attn: Chad Hanover, Bryan Rush, CLO Admin Email: Notices.AGCENTRESTREET@virtusllc.com brush@angelogordon.com CLOAdmin@angelogordon.com |
| 55. | AG MM,L.P. | — | AG MM, L.P. c/o: Angelo, Gordon & Co., L.P. 245 Park Ave, 24th Floor New York, NY 10167 Email: CFAX@angelogordon.com AGCSFAdmin@angelogordon.com qui.dang@bnymellon.com CLOAdmin@angelogordon.com |

85

| | **Direct Equity Commitment** | | |
|---|---|---|---|
| | **Direct Equity Investor** ("*" *subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 56. | AG Capital Solutions SMA One, L.P. | — | AG Capital Solutions SMA One, L.P. c/o: Angelo, Gordon & Co., L.P. 245 Park Ave, 24th Floor New York, NY 10167 mail:  CFAX@angelogordon.com AGCSFAdmin@angelogordon.com qui.dang@bnymellon.com CLOAdmin@angelogordon.com |
| 57. | AG Super Fund Master, L.P. | | AG Super Fund Master, L.P. c/o: Angelo, Gordon & Co., L.P. 245 Park Ave, 24th Floor New York, NY 10167 Email:  CFAX@angelogordon.com AGCSFAdmin@angelogordon.com april.travis@bnymellon.com CLOAdmin@angelogordon.com |
| 58. | Point72 Associates, LLC | — | Point72 Associates, LLC c/o Point72 Asset Management, L.P. 72 Cummings Point Road Stamford, CT 06902 Attention: Jason Colombo Email: Jason.Colombo@point72.com |

86

| | Direct Equity Commitment | | |
|---|---|---|---|
| | **Direct Equity Investor** (*"\*" subject to the proviso to "Common Per Share Purchase Price"*) | **Direct Investment Portion** (except as otherwise noted, a number of shares of Common Stock having an aggregate purchase price set forth below) | **Address for Notices** |
| 59. | CPV Holdings, LLC | — | CPV Holdings, LLC c/o Cohen Private Ventures 55 Hudson Yards New York, NY 10001 Attention: Andrew B. Cohen and David Schaffer Email: Andrew.Cohen@CohenPV.com and David.Schaffer@point72.com |
| 60. | Drawbridge Special Opportunities Fund LP* | $100,000,000 | c/o Fortress Investment Group LLC 1345 Avenue of the Americas, 46TH Fl New York, NY, 10105 Attention: Michael A. Polidoro Email: MPolidoro@Fortress.com |

| | **Rights Offering Backstop Commitment** | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 1. | CK Amarillo LP | $275,000,000 | *See Section 10.1(b)*. |
| 2. | Apollo Capital Management, L.P., on behalf of one or more investment funds, separate accounts, and other entities owned (in whole or in part), controlled, managed, and/or advised by it or its affiliates | $200,000,000 | *See Section 10.1(c)*. |
| 3. | Two Seas Global (Master) Fund LP | $15,000,000 | Sina Toussi<br>Two Seas Capital<br>32 Elm Street, 3rd floor<br>Rye NY 10580<br>(917) 536-6028<br>Stoussi@twoseascap.com |
| 4. | Two Seas Duration Litigation Opportunities Fund LLC | $10,000,000 | Sina Toussi<br>Two Seas Capital<br>32 Elm Street, 3rd floor<br>Rye NY 10580<br>(917) 536-6028<br>Stoussi@twoseascap.com |
| 5. | Alta Fundamental Advisers Master L.P. | $1,229,800 | Alta Fundamental Advisers LLC<br>1500 Broadway<br>Suite 704<br>New York, NY 10036<br>Attention: Scott Pritchard<br>Telephone: (212) 319-1778<br>Email: operations@altafundamental.com |

| | Rights Offering Backstop Commitment | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 6. | Blackwell Partners LLC – Series A | $7,974,200 | Alta Fundamental Advisers LLC<br>1500 Broadway<br>Suite 704<br>New York, NY 10036<br>Attention: Scott Pritchard<br>Telephone: (212) 319-1778<br>Email: operations@altafundamental.com |
| 7. | Star V Partners LLC | $3,796,000 | Alta Fundamental Advisers LLC<br>1500 Broadway<br>Suite 704<br>New York, NY 10036<br>Attention: Scott Pritchard<br>Telephone: (212) 319-1778<br>Email: operations@altafundamental.com |
| 8. | Alta Fundamental Advisers SP LLC | $500,000 | Alta Fundamental Advisers LLC<br>1500 Broadway<br>Suite 704<br>New York, NY 10036<br>Attention: Scott Pritchard<br>Telephone: (212) 319-1778<br>Email: operations@altafundamental.com |
| 9. | Discovery Global Opportunity Master Fund, Ltd. | $20,000,000 | Discovery Capital Management, LLC<br>20 Marshall Street, Suite 310<br>South Norwalk, CT 06854<br>Attention: Adam Schreck<br>Telephone: 203 956 7953<br>Email: compliance@discap.com |

| | Rights Offering Backstop Commitment | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 10. | Boothbay Absolute Return Strategies, LP | $3,500,000 | Fourworld Capital Management<br>7 World Trade Center, Floor 46<br>New York, NY 10007<br>Attention: John Addis<br>Email: john@fourworldcapital.com |
| 11. | Boothbay Diversified Alpha Master Fund LP | $3,500,000 | Fourworld Capital Management<br>7 World Trade Center, Floor 46<br>New York, NY 10007<br>Attention: John Addis<br>Email: john@fourworldcapital.com |
| 12. | FourWorld Global Opportunities Fund, Ltd. | $8,000,000 | Fourworld Capital Management<br>7 World Trade Center, Floor 46<br>New York, NY 10007<br>Attention: John Addis<br>Email: john@fourworldcapital.com |
| 13. | FourWorld Event Opportunities Fund, LP | $1,000,000 | Fourworld Capital Management<br>7 World Trade Center, Floor 46<br>New York, NY 10007<br>Attention: John Addis<br>Email: john@fourworldcapital.com |
| 14. | FourWorld Special Opportunities Fund, LLC | $6,716,666.67 | Fourworld Capital Management<br>7 World Trade Center, Floor 46<br>New York, NY 10007<br>Attention: John Addis<br>Email: john@fourworldcapital.com |

| | Rights Offering Backstop Commitment | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 15. | Cadence Hill Opportunity Fund LP | $350,000 | Fourworld Capital Management<br>7 World Trade Center, Floor 46<br>New York, NY 10007<br>Attention: John Addis<br>Email: john@fourworldcapital.com |
| 16. | Jefferies Strategic Investments, LLC | $20,000,000 | FourSixThree Capital LP<br>520 Madison Avenue, 19th Floor<br>New York, NY 10022<br>Attention: William Kelly<br>Telephone: (646) 805-5402<br>bill@463cap.com |
| 17. | FourSixThree Master Fund, LP | $5,000,000 | FourSixThree Capital LP<br>520 Madison Avenue, 19th Floor<br>New York, NY 10022<br>Attention: William Kelly<br>Telephone: (646) 805-5402<br>bill@463cap.com |
| 18. | Glenview Capital Partners, L.P. | $4,262,000 | Glenview Capital Management<br>767 Fifth Avenue, 44th Floor<br>New York, NY 10153<br>Attention: Jonathan Danziger<br>Telephone: 212.323.6567<br>jdanziger@glenviewcapital.com |

| | Rights Offering Backstop Commitment | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 19. | Glenview Institutional Partners, L.P. | $10,286,000 | Glenview Capital Management<br>767 Fifth Avenue, 44th Floor<br>New York, NY 10153<br>Attention: Jonathan Danziger<br>Telephone: 212.323.6567<br>jdanziger@glenviewcapital.com |
| 20. | Glenview Capital Master Fund, Ltd | $30,698,000 | Glenview Capital Management<br>767 Fifth Avenue, 44th Floor<br>New York, NY 10153<br>Attention: Jonathan Danziger<br>Telephone: 212.323.6567<br>jdanziger@glenviewcapital.com |
| 21. | Glenview Capital Opportunity Fund, L.P. | $38,417,000 | Glenview Capital Management<br>767 Fifth Avenue, 44th Floor<br>New York, NY 10153<br>Attention: Jonathan Danziger<br>Telephone: 212.323.6567<br>jdanziger@glenviewcapital.com |
| 22. | Glenview Offshore Opportunity Master Fund, Ltd. | $31,337,000 | Glenview Capital Management<br>767 Fifth Avenue, 44th Floor<br>New York, NY 10153<br>Attention: Jonathan Danziger<br>Telephone: 212.323.6567<br>jdanziger@glenviewcapital.com |

| | Rights Offering Backstop Commitment | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 23. | Hampton Road Capital Master Fund LP | $5,000,000 | Hampton Road Capital Management LP<br>One Greenwich Plaza, 3rd Floor<br>Greenwich, CT 06830<br>Attention: Ken Palumbo, President & COO<br>Telephone: 203-608-3150<br>kpalumbo@hamptonroad.com |
| 24. | Jefferies Strategic Investments, LLC | $25,000,000 | Hampton Road Capital Management LP<br>One Greenwich Plaza, 3rd Floor<br>Greenwich, CT 06830<br>Attention: Ken Palumbo, President & COO<br>Telephone: 203-608-3150<br>kpalumbo@hamptonroad.com |
| 25. | Hein Park Master Fund LP | $12,874,224 | Hein Park Capital Management<br>888 7th Avenue, 4th Floor<br>New York, NY 10106<br>Attention: Jay Schoenfarber<br>jschoenfarber@heinpark.com<br>(212) 299-4790 |
| 26. | JSCC Holdings LLC | $6,125,776 | Hein Park Capital Management<br>888 7th Avenue, 4th Floor<br>New York, NY 10106<br>Attention: Jay Schoenfarber<br>jschoenfarber@heinpark.com<br>(212) 299-4790 |

| | Rights Offering Backstop Commitment | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 27. | Jefferies LLC | $7,000,000 | Jefferies LLC<br>520 Madison Avenue, 3rd Floor<br>New York, New York 10022<br>Attention: Bill McLaughlin |
| 28. | Oaktree Opportunities Fund XI Holdings (Delaware), L.P. | $131,800,000 | c/o Oaktree Capital Management, L.P.<br>333 South Grand Ave, 28th floor<br>Los Angeles, CA 90071<br>Attention: Steve Tesoriere<br>Kaj Vazales<br>Jordan Mikes |
| 29. | Oaktree Opportunities Fund Xb Holdings (Delaware), L.P. | $23,300,000 | c/o Oaktree Capital Management, L.P.<br>333 South Grand Ave, 28th floor<br>Los Angeles, CA 90071<br>Attention: Steve Tesoriere<br>Kaj Vazales<br>Jordan Mikes |
| 30. | Oaktree Value Opportunities Fund Holdings, L.P. | $20,000,000 | c/o Oaktree Capital Management, L.P.<br>333 South Grand Ave, 28th floor<br>Los Angeles, CA 90071<br>Attention: Steve Tesoriere<br>Kaj Vazales<br>Jordan Mikes |
| 31. | Oaktree Value Equity Holdings, L.P. | $6,000,000 | c/o Oaktree Capital Management, L.P.<br>333 South Grand Ave, 28th floor<br>Los Angeles, CA 90071<br>Attention: Steve Tesoriere<br>Kaj Vazales<br>Jordan Mikes |

| | Rights Offering Backstop Commitment | | |
| --- | --- | --- | --- |
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 32. | Oaktree Phoenix Investment Fund, L.P. | $2,000,000 | c/o Oaktree Capital Management, L.P.<br>333 South Grand Ave, 28th floor<br>Los Angeles, CA 90071<br>Attention:  Steve Tesoriere<br>Kaj Vazales<br>Jordan Mikes |
| 33. | Rubric Capital Master Fund LP | $58,771,500 | Rubric Capital Management LP<br>155 East 44th St, Suite 1630<br>New York, NY 10017<br>brian@rubriccapital.com<br>josh@rubriccapital.com |
| 34. | BEMAP Master Fund Ltd | $8,141,250 | Rubric Capital Management LP<br>155 East 44th St, Suite 1630<br>New York, NY 10017<br>brian@rubriccapital.com<br>josh@rubriccapital.com |
| 35. | Blackstone CSP-MST FMAP Fund | $8,087,250 | Rubric Capital Management LP<br>155 East 44th St, Suite 1630<br>New York, NY 10017<br>brian@rubriccapital.com<br>josh@rubriccapital.com |
| 36. | Highbridge Tactical Credit Master Fund, L.P. | $9,333,333.33 | Highbridge Tactical Credit Master Fund, L.P.<br>c/o Highbridge Capital Management, LLC<br>277 Park Avenue, 23rd Floor<br>New York, NY 10172<br>Attention: Damon Meyer, Ian Scime |

| | **Rights Offering Backstop Commitment** | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 37. | MSD Credit Opportunity Master Fund, L.P. | $25,000,000 | MSD Credit Opportunity Master Fund, L.P. c/o MSD Partners, L.P. 645 Fifth Avenue, 21st Floor New York, NY 10022 Attention: Scott Segal, Simon Crocker, Ken Gerold ssegal@msdpartners.com, scrocker@msdpartners.com, kgerold@msdpartners.com |
| 38. | HG Vora Special Opportunities Master Fund, Ltd. | $150,000,000 | HG Vora Capital Management, LLC 330 Madison Avenue, 20th floor New York, NY 10017. Attention: Mandy Lam and Philip Garthe Email: mlam@hgvora.com and pgarthe@hgvora.com |
| 39. | Sachem Head LP | $59,050,000 | Sachem Head Capital Management LP 250 West 55th Street, 34th Floor New York, NY 10019 Attention: Michael Adamski Telephone: 212.714.3314 Email: michael@sachemhead.com |
| 40. | Sachem Head Master LP | $40,950,000 | Sachem Head Capital Management LP 250 West 55th Street, 34th Floor New York, NY 10019 Attention: Michael Adamski Telephone: 212.714.3314 Email: michael@sachemhead.com |

| | Rights Offering Backstop Commitment | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 41. | Mariner Atlantic Multi-Strategy Master Fund, Ltd. | $24,000,000 | Mariner Investment Group, LLC<br>299 Park Avenue—12th Floor<br>New York, NY  10171<br>Attention:  John Kelty<br>Telephone:  (212) 880-9209<br>Email: jkelty@marinercapital.com |
| 42. | Mariner Glen Oaks Master Fund, L.P. | $1,000,000 | Mariner Investment Group, LLC<br>500 Mamaroneck Avenue, Suite 101<br>Harrison, NY 10528<br>Attention:  John Kelty<br>Email: jkelty@marinercapital.com |
| 43. | Caspian Select Credit Master Fund, Ltd. | $34,157,412 | 10 East 53rd Street<br>35th Floor<br>New York, NY 10022<br>Email:  Legal@caspianlp.com |
| 44. | Caspian SC Holdings, L.P. | $4,983,717 | 10 East 53rd Street<br>35th Floor<br>New York, NY 10022<br>Email:  Legal@caspianlp.com |
| 45. | Caspian Focused Opportunities Fund, L.P. | $3,736,517 | 10 East 53rd Street<br>35th Floor<br>New York, NY 10022<br>Email:  Legal@caspianlp.com |
| 46. | Spring Creek Capital, LLC | $7,122,354 | 10 East 53rd Street<br>35th Floor<br>New York, NY 10022<br>Email:  Legal@caspianlp.com |

| | Rights Offering Backstop Commitment | | |
| --- | --- | --- | --- |
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 47. | VR Global Partners, L.P. | $15,000,000 | VR Global Partners, L.P.<br>Niddry Lodge<br>First Floor, Suite 111<br>51 Holland Street<br>London W8 7JB<br>United Kingdom<br>Attention: Jae Chung and Altaf Mackeen<br>Email: jchung@vr-capita..com;<br>amackeen@vr-capital.com |
| 48. | Scopia Long QP LLC | $3,335,000 | Scopia Capital Management LP<br>152 West 57th Street, 33rd Floor<br>New York, NY 10019<br>Attention: Aaron Morse, COO<br>Email: amorse@scopia.com |
| 49. | Scopia International Master Fund LP | $2,294,000 | Scopia Capital Management LP<br>152 West 57th Street, 33rd Floor<br>New York, NY 10019<br>Attention: Aaron Morse, COO<br>Email: amorse@scopia.com |
| 50. | Scopia PX LLC | $1,504,000 | Scopia Capital Management LP<br>152 West 57th Street, 33rd Floor<br>New York, NY 10019<br>Attention: Aaron Morse, COO<br>Email: amorse@scopia.com |

| | | Rights Offering Backstop Commitment | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 51. | Scopia PX International Master Fund LP | $3,470,000 | Scopia Capital Management LP<br>152 West 57th Street, 33rd Floor<br>New York, NY 10019<br>Attention: Aaron Morse, COO<br>Email: amorse@scopia.com |
| 52. | 405 MSTV I LP | $2,087,000 | Scopia Capital Management LP<br>152 West 57th Street, 33rd Floor<br>New York, NY 10019<br>Attention: Aaron Morse, COO<br>Email: amorse@scopia.com |
| 53. | Prelude Opportunity Fund, LP | $2,310,000 | Scopia Capital Management LP<br>152 West 57th Street, 33rd Floor<br>New York, NY 10019<br>Attention: Aaron Morse, COO<br>Email: amorse@scopia.com |
| 54. | AG Credit Solutions Non-ECI Master Fund, L.P. | $69,257,000 | AG Credit Solutions Non-ECI Master Fund LP<br>c/o: Angelo, Gordon & Co., L.P.<br>245 Park Ave, 24th Floor<br>New York, NY 10167<br>Email: CFAX@angelogordon.com<br>AGCSFAdmin@angelogordon.com<br>qui.dang@bnymellon.com<br>CLOAdmin@angelogordon.com |

| | Rights Offering Backstop Commitment | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 55. | AG Cataloochee, L.P. | $10,537,000 | AG Cataloochee, L.P.<br>c/o: Angelo, Gordon & Co., L.P.<br>245 Park Ave, 24th Floor<br>New York, NY 10167<br>Email:  CFAX@angelogordon.com<br>AGCSFAdmin@angelogordon.com<br>Nadia.Mubashir@bnymellon.com<br>CLOAdmin@angelogordon.com |
| 56. | AG Corporate Credit Opportunities Fund, L.P. | $6,488,000 | AG Corporate Credit Opportunities Fund LP<br>c/o: Angelo, Gordon & Co., L.P.<br>245 Park Ave, 24th Floor<br>New York, NY 10167<br>Email:  CFAX@angelogordon.com<br>AGCSFAdmin@angelogordon.com<br>Minasan.vo@bnymellon.com<br>CLOAdmin@angelogordon.com |
| 57. | AG Centre Street Partnership, L.P. | $8,808,000 | AG Centre Street Partnership LP<br>c/o Angelo Gordon & Co.<br>245 Park Ave, 24th Floor<br>New York, NY 10167<br>Attn: Chad Hanover, Bryan Rush, CLO Admin<br>Email:<br>Notices.AGCENTRESTREET@virtusllc.com<br>brush@angelogordon.com<br>CLOAdmin@angelogordon.com |

100

| | Rights Offering Backstop Commitment | | |
| --- | --- | --- | --- |
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 58. | AG MM,L.P. | $5,454,000 | AG MM, L.P.<br>c/o: Angelo, Gordon & Co., L.P.<br>245 Park Ave, 24th Floor<br>New York, NY 10167<br>Email: CFAX@angelogordon.com<br>AGCSFAdmin@angelogordon.com<br>qui.dang@bnymellon.com<br>CLOAdmin@angelogordon.com |
| 59. | AG Capital Solutions SMA One, L.P. | $11,514,000 | AG Capital Solutions SMA One, L.P.<br>c/o: Angelo, Gordon & Co., L.P.<br>245 Park Ave, 24th Floor<br>New York, NY 10167<br>mail: CFAX@angelogordon.com<br>AGCSFAdmin@angelogordon.com<br>qui.dang@bnymellon.com<br>CLOAdmin@angelogordon.com |
| 60. | AG Super Fund Master, L.P. | $12,942,000 | AG Super Fund Master, L.P.<br>c/o: Angelo, Gordon & Co., L.P.<br>245 Park Ave, 24th Floor<br>New York, NY 10167<br>Email: CFAX@angelogordon.com<br>AGCSFAdmin@angelogordon.com<br>april.travis@bnymellon.com<br>CLOAdmin@angelogordon.com |

| | **Rights Offering Backstop Commitment** | | |
|---|---|---|---|
| | **Backstop Investor** | **Rights Offering Backstop Commitment** | **Address for Notices** |
| 61. | Point72 Associates, LLC | $10,000,000 | Point72 Associates, LLC<br>c/o Point72 Asset Management, L.P.<br>72 Cummings Point Road<br>Stamford, CT 06902<br>Attention: Jason Colombo<br>Email: Jason.Colombo@point72.com |
| 62. | CPV Holdings, LLC | $100,000,000 | CPV Holdings, LLC<br>c/o Cohen Private Ventures<br>55 Hudson Yards<br>New York, NY 10001<br>Attention: Andrew B. Cohen and David Schaffer<br>Email: Andrew.Cohen@CohenPV.com and David.Schaffer@point72.com |

## Schedule 2

## Ad Hoc Equity Committee

| Name[1] | Address | Approximate Number of Shares | Other Disclosable Economic Interests |
|---|---|---|---|
| Discovery Capital Management | 20 Marshall Street, Suite 310<br><br>South Norwalk, CT 06854 | 4,500,000 | None |
| FourSixThree Capital LP on behalf of funds and affiliates it manages | 520 Madison Avenue,<br><br>Floor 19<br><br>New York, NY 10022 | 500,000 | None |
| Funds managed, advised or controlled by Alta Fundamental Advisers LLC | 1500 Broadway, Suite 704<br><br>New York, NY 10036 | 1,000,000 | None |
| Funds managed by Glenview Capital Management, LLC | 767 Fifth Avenue, 44th Floor<br><br>New York, NY 10153 | 4,506,849 | 6.250% Unsecured Notes due 2022: $1,000,000<br><br>5.500% Unsecured Notes due 2024: $9,000,000 |
| Funds managed by Hein Park Capital Management LP | 888 7th Avenue, 4th Floor<br><br>New York, NY 10106 | 3,274,447 | 2021 Senior Notes: €18,661,000<br><br>Term Loan: $17,570,523<br><br>Revolver: $5,752,902.50 |
| Hampton Road Capital Management LP | One Greenwich Plaza<br><br>Greenwich, CT 06830 | 250,000 | None |

---

[1]    Each entity on this **Schedule 2** is listed either in its principal capacity or in its capacity as agent, investment advisor, or investment manager for certain investment funds or accounts or their respective subsidiaries that hold disclosable economic interests in relation to the Debtors.

| | | | |
|---|---|---|---|
| Rubric Capital Management LP on behalf of certain funds and accounts it manages or sub-manages | 155 East 44th St, Suite 1630<br><br>New York, NY 10017 | 650,000 | None |
| Two Seas Capital LP for and on behalf of Two Seas Global (Master) Fund LP and affiliated funds | 32 Elm Place, 3rd Floor<br><br>Rye, NY 10580 | 1,445,343 | None |
| Funds managed, advised or controlled by FourWorld Capital Management, LLC | 7 World Trade Center, Floor 46<br><br>New York, NY 10007 | 910,000 | None |
| Jefferies LLC | 520 Madison Ave<br><br>New York, NY 10022 | 114,890 | 4.125% Unsecured Notes: €1,519,000<br><br>5.500% Unsecured Notes: €866,000<br><br>General Unsecured Claims against The Hertz Corp.: $559,859 |

104

## Schedule 6.17

### HIL Debt Commitment Parties

CK Opportunities Fund, I, LP