# EXHIBIT 2

RICHARD LIVINGSTON

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| KELLY A. GRADY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NOVEMBER TERM, 2015 |
| | : | |
| vs. | : | |
| | : | NO. 151103380 |
| | : | |
| THE HERTZ CORPORATION; HERTZ | : | |
| RENT-A-CAR PHILADELPHIA INTL. | : | |
| AIRPORT; JOHN DOE(s), | : | |
| | : | |
| Defendant. | | |

- - -

Oral sworn testimony of RICHARD

LIVINGSTON, held at ZANARAS REPORTING & VIDEO, 1845

Walnut Street, Suite 938, Philadelphia, Pennsylvania,

taken on Tuesday, October 4, 2016, commencing at 10:08

a.m., before Lynda DiGrazio-Smith, a NJ Certified

Court Reporter (Lic. #30XI002212), Certified Livenote

Reporter, Licensed CaseViewNet Realtime Provider and

Notary Public for the State of New Jersey.


ZANARAS REPORTING & VIDEO

Registered Professional Reporters

1845 Walnut Street, Suite 9382112 Bay Avenue

Philadelphia, PA 19103        Ocean City, NJ 08226

215.790.7857                877.GO.DEPOS

RICHARD LIVINGSTON

Page 53

1            THE WITNESS:  Yeah.  I can't tell

2    you.  I just don't know.

3    BY MR. MALOFIY:

4        Q.   So you recall you being the person

5    required to go to court from May 2010, until a

6    certain point.  Then it was Mr. Graeber; right?

7        A.   Yes.  Right.

8        Q.   And then it was a Mr. Lomis?

9        A.   Yes.

10        Q.   Or was there someone else?

11        A.   No.  Mr. Lomis.

12        Q.   Okay.  What's Mr. Lomis's title?

13        A.   Assistant corporate security manager.

14        Q.   How long has he been at Hertz?

15        A.   Since February of 2016.

16        Q.   Okay.  Mr. Graeber is still with Hertz?

17        A.   No.

18        Q.   Or no?

19        A.   He's not.

20        Q.   When did he stop -- did he no longer --

21    was he no longer employed at Hertz after

22    February 2016?

23        A.   No.  He was not.  He left somewhere in

24    the summer.  I am going to say July of 2015.  Again,

RICHARD LIVINGSTON

Page 54

1    that's an approximate.

2              Q.   I understand.  Why did he leave?

3              A.   He got laid off.

4              Q.   Okay.  Do you understand the

5    circumstances regarding his being laid off?

6              A.   My understanding was, it was just a

7    corporate decision to lay off a large group of

8    people at that time for cost savings.

9              Q.   Okay.  What was his role?

10             A.   Assistant corporate security manager.

11             Q.   So they laid him off and they hired on

12   another corporate security manager roughly six

13   months later?

14             A.   Yes.

15             Q.   What was the reason for that?

16             A.   They found out that they made a mistake

17   in laying him off.

18             Q.   Did they ask for him to come back?

19             A.   They did.

20             Q.   And what was his response?

21             A.   He's already obtained other employment.

22             Q.   Do you know where he's now employed?

23             A.   With the federal government, but I don't

24   know exactly what the job is.

RICHARD LIVINGSTON

Page 108

1          A.    I'd be at the airport.

2          Q.    So which police officers would you give

3    it to?

4          A.    Whoever arrived to take the report.

5          Q.    How would they know to pick up a report?

6          A.    I'd call them on the phone.

7          Q.    So first, you would receive this theft

8    package from Oklahoma City?

9          A.    Right.

10         Q.    You wouldn't review the theft package.

11   Correct?

12         A.    I'd look at it to make sure that

13   everything is in order.

14         Q.    What does that mean?  All the pieces of

15   the sandwich are there?

16         A.    The dates are right and everything

17   was -- there's numerous copies of the same

18   information.  Make sure everything is correct on it.

19         Q.    How would you determine if it's correct,

20   if you didn't have the factual knowledge relating to

21   it?

22         A.    Well, I can look at all the pages on

23   that and make sure that they have it throughout the

24   report is the same.

RICHARD LIVINGSTON

Page 109

1          Q.    You would look through the report for

2     basic typos.  Is that right?

3          A.    In most cases, yes.

4          Q.    Would you do any other determination,

5     other than looking for typos within the theft

6     package itself?

7          A.    No.

8          Q.    Would you check any Hertz systems?

9          A.    No.

10          Q.    Okay.  So your investigation or your

11     review of the theft package was solely strictly the

12     pages contained within the theft package itself?

13          A.    That's correct.

14          Q.    So then once you received it, how would

15     you receive it?  E-mail?  Fax?

16          A.    At one time it was faxed, now it's

17     e-mailed.

18          Q.    Okay.  How many of these things do you

19     receive a day?

20                MR. WOLF:  At what point?

21     BY MR. MALOFIY:

22          Q.    At any point.  Does it change?

23          A.    I don't receive any anymore.

24          Q.    Why not?

RICHARD LIVINGSTON

Page 115

1    was the car stolen, yes.

2           Q.   Okay.  Would they ask you questions or

3    do the interview at that point?

4           A.   No.  They would not interview me.

5           Q.   What's the form?  7548?

6           A.   I'm sorry?

7           Q.   Are you familiar with the 75 --

8           A.   I'm not -- yeah, the 48 is what

9    Philadelphia uses.

10          Q.   Yes.

11          A.   Yes.

12          Q.   You're familiar with that form?

13          A.   Yes.

14          Q.   Do you recall being interviewed by the

15   police, when you turned in the theft package?

16          A.   No.

17          Q.   No.  When you put in the theft package,

18   what were the checks done to confirm the information

19   was correct?  When I say, What were the checks done,

20   I mean what, as the corporate security manager, did

21   you do to confirm that the information was true,

22   accurate and correct, if anything?

23          A.   I went through the form to make sure

24   that everything was in order.

RICHARD LIVINGSTON

Page 116

1          Q.    When you say, Everything was --

2          A.    Well, for example, for the State, you

3    need like a certified mailing, make sure that the

4    mailing was included in the theft report.

5          Q.    Besides, I mean, from my testimony, it

6    sounds like you didn't do anything as far as checks

7    and balances, to confirm the information was

8    correct, other than making sure the pieces in the

9    theft package were there?

10         A.    Right.

11         Q.    And then, also, checking for typos.   Is

12   that accurate?

13              MR. WOLF:  Well, I'll just object to

14   his testimony speaks for itself.  And it's not

15   counsel's characterization of the testimony.

16              MR. MALOFIY:  Well, there's no

17   characterization there.  It was crystal clear.

18              MR. WOLF:  The record will speak for

19   itself.

20              MR. MALOFIY:  Right.  And I can ask a

21   question and build it with foundation with prior

22   facts for prior things he's testified to.

23   BY MR. MALOFIY:

24         Q.    Now, my understanding, sir, is that when

RICHARD LIVINGSTON

Page 117

1    you received this theft package, your testimony is

2    that you didn't do any independent investigation,

3    other than looking at the package itself and then

4    you would check to see if there were typos --

5            A.    Right.  My company would --

6            Q.    -- and make sure -- hold on a second.

7            A.    I'm sorry.

8            Q.    And make sure that the different parts

9    that were supposed to comprise the theft package

10   were there.  Correct?

11           A.    Yes.

12           Q.    Okay.  What parts are supposed to

13   comprise the theft package?

14           A.    Well, what the police actually require,

15   which is a certified mailing.

16           Q.    Okay.  What else?

17           A.    Car information.

18           Q.    What else?

19           A.    That's probably just about it.

20           Q.    Okay.

21           A.    They might require more in court, but...

22           Q.    Now, it says here, Submitted DNR 14 A,

23   do you know what that means, on this Exhibit 32,

24   page 3?

RICHARD LIVINGSTON

Page 137

1    Q.   You'd agree with me that -- oh, you

2  don't even know if 1805 was charged on Ms. Grady's

3  card.  Correct?

4    A.   I'm sorry?

5    Q.   I am going back to page 4 of 16 of

6  Exhibit 32.  You don't even know if 1805 was charged

7  on the card, correct, on Ms. Grady's card?

8    A.   No.  I do not.

9    Q.   But it says it here.  Correct?

10   A.   Okay.

11   Q.   I'm reading that correctly; right?

12  Credit card authorization would be 1805?

13   A.   That's the estimated charge, yes.

14   Q.   Okay.

15   A.   I don't know if that was charged to the

16  card or not.

17   Q.   Now, you did no investigation to

18  determine whether or not it was charged to the card?

19   A.   Absolutely not.

20   Q.   Okay.  Let's go to page 7 of 16.

21       Before I do that -- strike that.

22       Am I correct that page 4, 5 and 6 are

23  part of the Hertz contract?

24   A.   Yes.

RICHARD LIVINGSTON

Page 195

1       A.   No.  No.  You have mechanics.  You have

2   mechanic bays.  You have probably ten mechanic bays

3   in the back of the building.  Maintenance, but I

4   don't deal with them.  Most of the people there are

5   on a regional basis.

6       Q.   Okay.  Besides you in, you know,

7   corporate security and besides Mr. Lomis,

8   Mr. Graeber, Mr. -- who you already identified

9   yourself, is there anyone else that's involved in

10  corporate security or vehicle location tracking?

11      A.   For the Philadelphia area?

12      Q.   Yeah.

13      A.   No.

14      Q.   And that would be at all relevant times

15  that we're talking about.  Correct?

16      A.   Yes.

17      Q.   Is it your testimony that you don't go

18  to the location and question any of the Hertz

19  employees when you receive a theft package?

20      A.   That's my testimony, yes.

21      Q.   Why?

22      A.   Because I mean the package has been

23  completed, all the reports have been reviewed, I

24  guess, by OKC.  And my marching orders are to report

RICHARD LIVINGSTON

Page 196

1    the car stolen when I get the -- again, I do look at

2    it for everything being accurate, as far as I can

3    tell, within the report itself.

4            Q.   Yeah.  But you don't do any independent

5    investigation?

6            A.   I do not.

7            Q.   You don't do any check?

8            A.   I do not.

9            Q.   How far away is your office from the

10   Philadelphia Hertz office?

11           A.   From the airport?

12           Q.   Yeah.  Philadelphia Airport Hertz

13   office?

14           A.   Half a mile, three-quarters of a mile.

15           Q.   So how long would it take you to get

16   there by car?

17           A.   Five minutes.

18           Q.   Okay.  Is it your testimony that when

19   you receive a theft package that deals with the

20   Philadelphia Hertz Airport location, you wouldn't go

21   and speak to individuals there regarding the theft

22   package?

23                MR. WOLF:  Asked and answered, but

24   you can answer.

RICHARD LIVINGSTON

Page 197

1               THE WITNESS:  In reference to?

2    BY MR. MALOFIY:

3            Q.    Receiving a theft package and doing any

4    kind of inquiry, you wouldn't do that normally?

5               MR. WOLF:  Asked and answered, but

6    you can answer.

7               THE WITNESS:  A conversion has

8    nothing to do with the people that wrote the

9    contract or anything like that.  No, I would not.

10   BY MR. MALOFIY:

11           Q.    Would you have to speak to the rental

12   representative who was?

13           A.    I don't know who -- what are you talking

14   about as far as a rental representative.

15           Q.    The person who rented the car to the

16   renter.

17           A.    All right.

18           Q.    Did you ever speak to them in regards to

19   a theft or a conversion or a stolen vehicle?

20           A.    Possibly if there was fraudulent

21   paperwork submitted to them, I might.

22           Q.    But it wouldn't be your practice to do

23   that.  Correct?  To enter --

24           A.    Not in the normal course of business

RICHARD LIVINGSTON

Page 205

1          A.   I have never been deposed for Hertz.

2          Q.   Okay.  Are you aware of any lawsuits

3    against Hertz for improperly reporting a car stolen

4    when it was not?

5          A.   I am not.

6          Q.   Okay.  Have you ever complained that the

7    Hertz computer systems are not -- strike that.

8               Do you have access to phone logs to

9    determine when a renter called in?

10         A.   I do not.

11         Q.   Do you have access to any kind of logs

12   that determine the contacts the renter had with

13   Hertz?

14         A.   Do not.

15               MR. MALOFIY:  I want to take a half

16   hour break for lunch and finish up?

17               MR. WOLF:  Do you need a break?

18               THE WITNESS:  I need to go.

19               MR. WOLF:  Let's finish.

20               MR. MALOFIY:  We're going to be a few

21   hours.

22               MR. WOLF:  A few more hours?

23               MR. MALOFIY:  Absolutely.  Yeah.  I

24   got a lot of documents to go through.  If you want a

RICHARD LIVINGSTON

Page 215

1    changes between the contract and that sheet.  What

2    exactly transpired to make that happen, I don't

3    know.

4         Q.   Okay.  At any point would -- as a

5    corporate security manager or anyone in your

6    division of one other person, I mean -- I don't mean

7    to make that --

8         A.   It is all right.

9         Q.   -- let me strike that.

10             As a corporate security manager for

11   Hertz for this area or anyone working with you or

12   for you, would they have done any independent

13   investigation in to what payments are made with the

14   car before filing a police report?

15        A.   Not on my side of the fence.  On OKC's

16   side possibly.

17        Q.   Okay.

18        A.   We're still the same company.  I just

19   don't know what they do, possibly do to investigate

20   that further.

21        Q.   That's one of the questions I had.  Who

22   does this investigation if you don't, the corporate

23   security manager?

24        A.   As far as I know, vehicle control does

RICHARD LIVINGSTON

Page 216

1    all that paperwork.

2         Q.   Well, you said paperwork --

3         A.   Well --

4         Q.   -- what do you mean by that?

5         A.   Whatever they do to glean the

6    information that they put down in the theft package.

7         Q.   Do you know how that process is done?

8         A.   I do not.

9         Q.   If you don't know, who would know?

10        A.   Vehicle control would know.

11        Q.   Do you know if someone is testifying

12   from vehicle control?

13        A.   I do not know.

14        Q.   Did anyone from vehicle control talk to

15   you in regards to this case?

16        A.   No.

17        Q.   Did anyone from Hertz internally talk to

18   you in regards to this case?

19        A.   No.

20        Q.   Do you know anyone in vehicle control or

21   investigation that does the investigations for

22   vehicle control?

23        A.   All vehicle control does different tasks

24   within it but I don't know who does what.

Page 374

1    recovered the vehicle?

2         A.   They know it.  They had to take it out

3    of the system.

4         Q.   Did you ever tell police that Ms. Grady

5    was -- were you aware that Ms. Grady was released?

6         A.   I didn't even know she was arrested.

7         Q.   So you didn't know she was detained?

8         A.   Correct.

9         Q.   What procedure was in place to notify

10   the police that Ms. Grady had made a payment of

11   $2,000?

12        A.   It has no bearing on the case

13   whatsoever.

14        Q.   I didn't ask --

15        A.   There's no procedure.

16        Q.   I didn't ask you --

17        A.   There's no procedure --

18        Q.   -- whether or not it's your judgment --

19             MR. WOLF:  He's answering the

20   question.

21             THE WITNESS:  -- in place.

22   BY MR. MALOFIY:

23        Q.   Let me ask it again so we have a clean

24   answer.  What procedure was in place at Hertz to

RICHARD LIVINGSTON

Page 375

1    inform the police that Hertz had made a charge that

2    went through on her bank for $2,500 days before the

3    report of the car stolen, which was not included in

4    the theft package or any information previously

5    provide to the police?

6         A.    There is no procedure in place because

7    it's not relevant.

8         Q.    So it's Hertz's position that payment

9    for a vehicle, pursuant to an agreement with Hertz,

10   is not relevant to prosecuting a young lady for a

11   theft of a vehicle?

12        A.    Hertz is only trying to recover even a

13   fraction of their loss from them not having the car

14   back when it was contracted to be back.

15        Q.    Isn't it true that she had an agreement

16   to the end of July and she paid the $2,500 pursuant

17   to that agreement?

18        A.    As far as the paperwork I see, no.

19        Q.    Why was the $2,500 paid to Hertz by Ms.

20   Grady on the same credit card and on the same rental

21   contract?

22             MR. WOLF:   Same objection.  That's

23   been noted throughout the course of today.  He's

24   already testified he has nothing to do with billing.

RICHARD LIVINGSTON

Page 376

1    He doesn't know it.  Joe Jaussi is the proper

2    individual to be answering that question.

3                   It's outside this witness' area of

4    expertise.

5    BY MR. MALOFIY:

6         Q.   I'm asking the context of corporate

7    security and also notifying the correct law

8    enforcement of changes to the facts and the scenario

9    relating to a criminal complaint filed on behalf of

10   Hertz against a renter.  That's the context the

11   question is being asked.

12        A.   Money paid prior to the car being stolen

13   is strictly a contractual thing prior to.  After

14   it's reported stolen, it becomes restitution.

15        Q.   Where in any of the documents do you see

16   the updated information that Hertz had received a

17   payment of $2,500?

18        A.   I haven't seen it in any of the

19   documents there.  That's because it is not relevent.

20                   MR. WOLF:  Relevant.

21                   MR. MALOFIY:  I understand.

22                   THE WITNESS:  Thank you.

23   BY MR. MALOFIY:

24        Q.   Where in the documentation do you see

RICHARD LIVINGSTON

Page 377

1    anywhere where Ms. Grady kept in constant contact

2    with Hertz?

3         A.    I don't.

4         Q.    Okay.  And what investigation did you

5    do, if any, to determine whether or not she was in

6    constant contact with Hertz during the course of the

7    rental?

8         A.    I personally didn't.  I imagine the OKC

9    did, but I can't...

10        Q.    You don't know that information.

11   Correct, sir?

12        A.    That's correct.

13        Q.    All right.  And you don't know what OKC

14   did; right?

15        A.    I don't know what exact steps they took,

16   no.

17        Q.    Right.  And as you came here today and

18   also the discovery you produced, you didn't produce

19   the actual procedure to follow in regards to the

20   theft.  Correct?

21        A.    That was my mistake, I apologize.

22             MR. WOLF:  We have already been over

23   this.

24             MR. MALOFIY:  And you will supplement