# EXHIBIT 4

```
                                                                    1

 1             IN THE COURT OF COMMON PLEAS
         FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
 2                  CIVIL TRIAL DIVISION
                          - - -
 3
     KELLY GRADY,                    : NOVEMBER TERM, 2015
 4              Plaintiff            :
           vs.                       :
 5                                   :
     THE HERTZ CORPORATION;          :
 6   HERTZ RENT-A-CAR PHILADELPHIA   :
     INTL AIRPORT,                   :
 7              Defendants           : NO. 3380

 8                          - - -

 9            Thursday, September 14, 2017
                  **Afternoon Session**
10
                          - - -
11
                     Courtroom 475
12                     City Hall
                Philadelphia, Pennsylvania
13
                          - - -
14
     BEFORE:  THE HONORABLE PAULA A. PATRICK, J., and a
15           Jury

16                        - - -

17

18

19

20

21

22

23

24

25
```

*Danielle O'Connor, RPR, CRR 215-683-8023*

```
                                    2
1   APPEARANCES:

2      FRANCIS ALEXANDER, LLC
       BY:  FRANCIS MALOFIY, ESQUIRE
3           ALFRED JOSEPH FLUEHR, ESQUIRE
       280 N. Providence Road
4      Media, PA  19063
       Counsel for Plaintiff
5
       EDELSTEIN LAW, LLP
6      BY:  JAY L. EDELSTEIN, ESQUIRE
            CHRISTOPHER LEEDS, ESQUIRE
7      230 S. Broad Street, Suite 900
       Philadelphia, PA  19102
8      Counsel for the Defendants
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
              Danielle O'Connor, RPR, CRR 215-683-8023
```

```
                                    3
1            INDEX

2
   WITNESS              DR   CR   RDR   RCR
3
   Julie Wilkerson      --    4    55    56
4
   John Cocklin         57   64    --    --
5  (Voir Dire)

6  John Cocklin         68   97    --    --

7
8
9
10
...
25
              Danielle O'Connor, RPR, CRR 215-683-8023
```

```
                                    4
1                    - - -
2             (The following occurred in open court
3    outside the presence of the jury:)
4                    - - -
5             THE COURT:  Is there anything we need
6    to discuss before the jury comes in?
7             MR. MALOFIY:  No, Your Honor.
8             THE COURT:  Are you sure?
9             MR. MALOFIY:  Yes, Your Honor.
10                   - - -
11            (Whereupon, the jury entered the
12   courtroom at 1:22 p.m.)
13                   - - -
14            THE COURT:  Welcome back, ladies and
15   gentlemen.  We'll proceed now with the
16   cross-examination of the Hertz representative.
17            MR. MALOFIY:  Thank you.
18            May I proceed, Your Honor?
19            THE COURT:  Yes, go ahead.
20            MR. MALOFIY:  Thank you.
21                   - - -
22   CROSS-EXAMINATION
23                   - - -
24   BY MR. MALOFIY:
25   Q.   A few questions.  And thank you for being
              Danielle O'Connor, RPR, CRR 215-683-8023
```

```
                                    5
1    here.  I know you were here the whole time.
2             My understanding is you flew in from
3    Florida.  Are you from Oklahoma or Florida?  I'm
4    confused.
5    A.   I'm from Oklahoma.  I do work down in Florida.
6    Q.   Okay.  I see.  A few things.
7             You would agree as the corporate
8    designee here on behalf of the Hertz Corporation
9    that prior to a report to the police -- and if a
10   report is made, you would agree with me that it must
11   be true?
12   A.   Correct, yes.
13   Q.   And you'd agree with me that it must be
14   accurate?
15   A.   Yes.
16   Q.   And you'd agree with me that it also must be
17   correct?
18   A.   Yes.
19   Q.   And would you also agree with me that if
20   there's omissions in the facts, that there's a duty
21   that Hertz corrects those omissions?
22   A.   Yes.
23   Q.   Did Hertz do that in this case?
24            MR. EDELSTEIN:  Objection, Your Honor.
25            THE COURT:  Overruled.  She can
              Danielle O'Connor, RPR, CRR 215-683-8023
```

Case ID: 150703380
Control No.: 17093136

## Page 6

1  answer.
2  THE WITNESS: I'm not sure what
3  omissions you're talking about.
4  BY MR. MALOFIY:
5  Q.  Do you believe there were any omissions in the
6  information provided to the police, yes or no?
7  A.  At what time?
8  Q.  At any time.
9  A.  We gave them what we had at -- what
10  information we had. We handed the theft report off
11  to the police, the information that we had, and then
12  that was given to the police. And what they did
13  from there is up to them.
14  Q.  Do you believe if there's -- I think you
15  testified if there's omitted facts, they should be
16  corrected, correct?
17  A.  Yes.
18  Q.  Eventually did Hertz become aware of
19  additional facts in regards to Ms. Grady's rental
20  that should have been provided to the police?
21  A.  Which facts?
22  Q.  Well, the payment of 2400.
23  A.  That was actually in the theft package. The
24  police had that information.
25  Q.  The police had that information?

Danielle O'Connor, RPR, CRR 215-683-8023

## Page 7

1  A.  Yes, it's in the billing page of the theft
2  package.
3  Q.  What page is that, ma'am?
4  A.  We went over it this morning.
5  MR. MALOFIY: Court's indulgence.
6  (Pause.)
7  MR. MALOFIY: I need the date on this.
8  BY MR. MALOFIY:
9  Q.  Ma'am, do you know when this was completed,
10  this document that you had reviewed with counsel?
11  A.  It's on there.
12  Q.  Okay.
13  A.  July the 12th, 2013. It says, "process date."
14  MR. EDELSTEIN: You're writing on my
15  document.
16  MR. MALOFIY: I don't mean to do that.
17  That's why...
18  MR. EDELSTEIN: Okay.
19  BY MR. MALOFIY:
20  Q.  I want to go to something, ma'am.
21  This was July the 12th you said it was
22  created?
23  A.  July the 12th, 2013, I believe is when it said
24  the rental was closed. We had to close the rental
25  out --

Danielle O'Connor, RPR, CRR 215-683-8023

## Page 8

1  Q.  Yes.
2  A.  -- in order to report it stolen.
3  Q.  I understand. If I could make sure? Let me
4  confirm that, ma'am.
5  MR. MALOFIY: Can I approach the
6  witness?
7  THE COURT: Ginelle, can you give that
8  to the witness?
9  THE WITNESS: So it says "date, time
10  posted, July 12th, 2013, at 12:34 p.m."
11  BY MR. MALOFIY:
12  Q.  Okay.
13  A.  We closed it back to May 31st, because that's
14  all the authorization we got at time of rent. And
15  it says right there, "bill to auth plus 15 percent
16  Vehicle Control, Alicia Brown."
17  Q.  I see.
18  MR. MALOFIY: Can I have that document
19  back?
20  BY MR. MALOFIY:
21  Q.  Can we put up P-6? That document was created
22  on 7/12, correct?
23  A.  What?
24  Q.  7/12, that was your testimony, correct?
25  A.  When the rental was closed, correct.

Danielle O'Connor, RPR, CRR 215-683-8023

## Page 9

1  Q.  And when the payment went down, I'd like to
2  blow this up for the benefit of the jury and also
3  for Ms. Wilkerson -- Mrs. Wilkerson or Ms.?
4  A.  Mrs. Wilkerson.
5  Q.  Mrs. Wilkerson, my apologies.
6  The payment was put through and Hertz
7  was paid 2445 on 7/15, correct?
8  A.  Right. So we closed it and it went through
9  the process to force charge through the bank.
10  Q.  Isn't it a fact that the car was paid?
11  A.  No.
12  Q.  It wasn't?
13  A.  It wasn't paid in full.
14  Q.  Well, I'm sorry --
15  MR. MALOFIY: Objection.
16  MR. EDELSTEIN: Objection to what?
17  THE COURT: Okay. But you asked the
18  question, so now she answered it.
19  BY MR. MALOFIY:
20  Q.  The car -- let's be clear. Hertz received
21  1805, correct?
22  A.  At time of rent we received 1805
23  authorization.
24  Q.  Did Hertz receive and put in their bank
25  account $1805, yes or no?

Danielle O'Connor, RPR, CRR 215-683-8023

## Page 10

**1   A.** Yes. But then we force charged 2,444.94
**2** cents, but the car wasn't actually picked up
**3** until -- we didn't recover our car until September
**4** 11th, 2013.
**5   Q.** That's a different issue, when you recovered
**6** your car. We can move to that and I will. But
**7** let's go to the payment.
**8**           You don't dispute that you received --
**9** Hertz put in their bank account $1805, correct?
**10  A.** Correct.
**11  Q.** And you don't dispute that Hertz put in Hertz'
**12** bank account $2,444.94, correct?
**13  A.** Correct.
**14  Q.** And you don't dispute that when you produce
**15** this theft package and the report to the police that
**16** was completed on 7/12, correct?
**17  A.** Correct, but --
**18  Q.** Hold on.
**19  A.** But it wasn't paid in full.
**20  Q.** And this payment was 7/15/2013, days later,
**21** correct?
**22  A.** It has to go through the process.
**23  Q.** Is that correct, ma'am?
**24  A.** Yes.
**25  Q.** Yes, it is correct.

## Page 11

**1   A.** But it still wasn't paid in full.
**2   Q.** I think what we're going at is because you
**3** didn't receive it until September --
**4**           THE COURT: Counsel, do you want to go
**5**    into that? Because I made a ruling on that
**6**    earlier.
**7**           MR. MALOFIY: Fair enough, Your Honor.
**8**           THE COURT: It's up to you if you want
**9**    to go into it.
**10** BY MR. MALOFIY:
**11  Q.** Let's be clear. OnStar, correct, was called?
**12  A.** They were called, but not by Hertz.
**13  Q.** When OnStar was called, did Hertz know where
**14** their vehicle was?
**15  A.** Not at that time.
**16  Q.** Oh, Hertz --
**17  A.** The police had to notify us.
**18  Q.** Well, Hertz actually spoke to the police on
**19** 7/22, correct?
**20  A.** Correct.
**21  Q.** You don't dispute that Hertz representatives
**22** spoke to the police in regards to Ms. Grady's
**23** rental, correct?
**24  A.** And told her she wasn't authorized to keep the
**25** car.

## Page 12

**1   Q.** Hold on a second. They also told her she did
**2** not steal the car, correct?
**3   A.** That's what they said.
**4   Q.** Are you disputing what they said, Trooper
**5** Kemmerling?
**6   A.** No, no.
**7   Q.** So you accept the representation from Trooper
**8** Kemmerling and the state police report that said
**9** Hertz had said the car was not stolen, correct?
**10  A.** Correct. But he let -- he did not let her
**11** take our car and our asset. And Trooper Kemmerling
**12** also told her she could be -- Philadelphia PD might
**13** go after her.
**14  Q.** Well, he said "might," and there's dispute as
**15** to that and that's for the jury to decide.
**16  A.** Okay.
**17  Q.** Let me move to something else.
**18**           You admit and you accept the
**19** representation that Hertz said the car was not
**20** stolen, correct, on that day? On 7/22, when a Hertz
**21** representative was contacted, Hertz said the car was
**22** not stolen?
**23  A.** Someone at Hertz said that, yes.
**24  Q.** Who was that?
**25  A.** I have no idea.

## Page 13

**1   Q.** Well, if there was a call and there was a
**2** situation and someone called the number, they would
**3** have called up and it would have got directed right
**4** to you, right?
**5   A.** That's correct, but they weren't directed
**6** right to me.
**7   Q.** And was it you who said the car was not stolen
**8** or was it someone else?
**9   A.** It was not me.
**10  Q.** Well, where are the notes to indicate who said
**11** that, ma'am?
**12  A.** There are no notes because we don't know who
**13** said that.
**14  Q.** I'm sorry?
**15  A.** I don't know who said that.
**16  Q.** Did you ask?
**17  A.** Ask who?
**18  Q.** Well, ask anyone at Hertz who said that.
**19  A.** No.
**20  Q.** Did you do that?
**21  A.** No.
**22  Q.** You could have done that, right?
**23  A.** I could have.
**24  Q.** You could have got an e-mail, put a global
**25** message out to everyone in the corporate global --

## Page 14

1 Hertz corporate global and said, I need to know who
2 said that, that is a serious matter, I have to
3 testify in court under oath; you could have done
4 that, right?
5 **A.    Well, we didn't actually have our car back at**
6 **that time.**
7 Q.    No, no.  I'm asking before you took the stand
8 today, before you testified to this jury, you could
9 have sent an e-mail to everyone at Hertz saying, I
10 need this information, who spoke to the police
11 officers on this date and said Ms. Grady was
12 authorized, correct?
13 **A.    Someone at Hertz could have said that, yes.**
14 Q.    But you didn't do that as you took the stand
15 here today, correct?
16 **A.    No.**
17 Q.    And you don't have any notes in your system to
18 indicate -- you don't have any notes in your system
19 that records that phone call where the Hertz
20 representative said it, right?
21 **A.    Well, first of all, they don't document what**
22 **Hertz representative they spoke to in the notes at**
23 **the police, nor do they say what phone call they**
24 **called.  So it's a little difficult for me to**
25 **understand who Officer Kemmerling called and who he**

## Page 15

1 **exactly spoke to.  Usually, we would get that**
2 **information if they spoke to us.**
3 Q.    But Trooper Kemmerling testified he spoke to
4 Hertz, he called the number, was routed to the 800,
5 gave the information on the contract and that would
6 have gone, you said, to I believe it was Oklahoma
7 City Vehicle Control, correct?
8 **A.    Correct.**
9 Q.    That's where it should have gone, correct?
10 **A.    Where it should have gone.**
11 Q.    And if it should have gone in the right place
12 and things happened the right way, they should have
13 filed procedure and that phone call should have been
14 documented in the notes, correct?
15 **A.    Correct.**
16 Q.    And it wasn't, correct?
17 **A.    But Officer Kemmerling didn't say what phone**
18 **number he called.**
19 Q.    And it wasn't documented in the notes,
20 correct?
21 **A.    Correct.**
22 Q.    Thank you.  Now, let me get to another point.
23 Ms. Grady brought her phone record in this case,
24 TD -- excuse me -- Bank record, correct?
25 **A.    Yes.**

## Page 16

1 Q.    Are you familiar with bank statements?
2 **A.    Yes.**
3 Q.    You are.  Do you work with them?
4 **A.    No, I don't work with them.**
5 Q.    You're familiar with them?
6 **A.    Yes.**
7 Q.    Have you seen them before?
8 **A.    Yes.**
9 Q.    Now, does Hertz have a bank account?
10 **A.    Yes.**
11 Q.    It does.  Who does it bank with?
12 **A.    I can't give you the exact name.**
13 Q.    Well, you could have done an investigation and
14 looked at Hertz' bank statements to determine and
15 confirm the 1805 and the $2445, correct?
16 **A.    It's actually on the document we already**
17 **presented to you this morning.**
18 Q.    The one before the charges went through,
19 correct?
20 **A.    The 1805, when she rented, and then when we**
21 **closed out the contract on July 12th, the force**
22 **charge is the two charges.**
23 Q.    I understand.  We'll get to the force charge
24 in a minute.  You could have brought your bank
25 records here today.  You're here as a fact witness

## Page 17

1 for Hertz.  You're here as a corporate designee to
2 bind the corporation; do you understand that?
3 **A.    Yes.**
4 Q.    And you're here and what you say binds the
5 corporation to Hertz.
6         Did Hertz bring any corporate bank
7 statements here today to go over and look at the
8 bank's statement to determine what was paid or what
9 was not?
10 **A.    Well --**
11 Q.    Yes, it did or no, it didn't, ma'am, and then
12 you can explain.
13 **A.    It's in the theft package what was billed.**
14 **The 1805 and the 2444 are actually on the closed --**
15 Q.    I'm sorry.  Maybe I'm not clear.  My question
16 was a little different.
17         Did you bring the bank records to this
18 court here today, yes or no?
19 **A.    No, we have securities.  I can't just pop up a**
20 **bank record.**
21 Q.    We asked for it in discovery I'll represent as
22 an officer of the court.
23         MR. EDELSTEIN:  Objection, Your Honor.
24         THE COURT:  You object to that?
25         MR. EDELSTEIN:  I object to that

## Page 18

1  editorialization, yes.
2  THE COURT: All right. It's
3  sustained.
4  MR. EDELSTEIN: The jury has heard it,
5  so it doesn't matter.
6  BY MR. MALOFIY:
7  Q. Let me go to Exhibit 13.
8  MR. MALOFIY: Do you have that, Mr.
9  Segal?
10 BY MR. MALOFIY:
11 Q. Now, do you know who Kenneth Graeber is?
12 A. **The assistant corporate security at the time.**
13 Q. Of where?
14 A. **Hertz, Philadelphia.**
15 Q. Did you ever speak to him?
16 A. Yes.
17 Q. You know who he is, right?
18 A. Yes.
19 Q. Do you know he gave an interview in this case?
20 A. Yes.
21 Q. Did you review that interview?
22 A. Yes.
23 Q. It says here, the interview was taken, if I'm
24 not mistaken, on 7/23/2013. Do you see that?
25 A. Yes.

*Danielle O'Connor, RPR, CRR 215-683-8023*

## Page 19

1  Q. Now, if you go down here, it says --
2  MR. MALOFIY: And if you go to the
3  second page, Mr. Segal, blow this portion up
4  for the benefit of the jury. Bring that up.
5  BY MR. MALOFIY:
6  Q. When he was questioned by the police officer,
7  Officer Ianoconne took the stand here, the question
8  was asked of Kenneth Graeber: "How much of a
9  payment was received from the renter?
10 "ANSWER: We received 1805 for the
11 contracted rental and a deposit."
12 MR. EDELSTEIN: Judge --
13 BY MR. MALOFIY:
14 Q. Do you see --
15 MR. EDELSTEIN: Just for the record,
16 although I have no problem with the actual
17 question, the questions are being asked of --
18 as to what the actual statement says, not as to
19 what the officer said when he was in the
20 courtroom --
21 THE COURT: Okay.
22 MR. EDELSTEIN: -- as I understand it.
23 MR. MALOFIY: That's correct.
24 MR. EDELSTEIN: Okay.
25 THE COURT: All right.

*Danielle O'Connor, RPR, CRR 215-683-8023*

## Page 20

1  BY MR. MALOFIY:
2  Q. Do you see that?
3  A. **What was the question?**
4  Q. It says here in the interview that was
5  conducted by and between Officer Ianoconne and
6  Kenneth Graeber, who's the assistant corporate
7  security manager of the Philadelphia branch at the
8  time, correct?
9  A. Yes.
10 Q. And the question was asked of him in his
11 interview on 7/23/2013: "How much of a payment was
12 received from the renter, Question.
13 "ANSWER: We received 1805 for the
14 contracted rental and a deposit."
15 Do you see that?
16 A. Yes.
17 Q. Why wasn't any additional information provided
18 to Officer Ianoconne?
19 A. **It was. The whole theft package was given to**
20 **him.**
21 Q. The theft package you showed does not have the
22 payment of 2445, ma'am; isn't that correct?
23 A. **No, it does.**
24 Q. It was made on 7/12, ma'am; isn't that true?
25 A. **Yes, but the interview was 7/23.**

*Danielle O'Connor, RPR, CRR 215-683-8023*

## Page 21

1  Q. Right, but you don't have the payment --
2  there's no -- there's no indication that the
3  additional 2445 was paid by Ms. Grady before a
4  police interview was taken, correct?
5  A. **It was in the theft package that Mr. Graeber**
6  **handed to the detective questioning him.**
7  Q. What you showed me is as identifying 2445 was
8  the rate that Ms. Grady was supposed to get; isn't
9  that correct?
10 A. **No.**
11 Q. It's not?
12 A. **20 --**
13 Q. Isn't it true that the payment was on 7/15, we
14 just looked at that on TD Bank records, you didn't
15 dispute that, ma'am, right?
16 A. **Right. It was closed out on 7/12 and it went**
17 **through the cycle as a force charge on 7/15.**
18 Q. Right. So why didn't -- Officer Ianoconne,
19 why wasn't he provided with that information in the
20 interview?
21 A. **He was provided the theft package.**
22 Q. The theft package did not identify a payment,
23 ma'am.
24 A. **In the theft package, there does have the 1805**
25 **in the payment. If he had looked at the theft**

*Danielle O'Connor, RPR, CRR 215-683-8023*

## Page 22

**package, it was right there.**
Q. Let me go to another -- I understand your testimony. But let's go to something else so we can make this clear. Exhibit 3 --
  MR. EDELSTEIN: Your Honor, let me just object to that editorialization again. It's clear. She testified that the theft package showed it. So whether it's clear to Mr. Malofiy --
  THE COURT: Objection is sustained. Her testimony is what it is.
  MR. EDELSTEIN: We're supposed to do this without editorializing.
  THE COURT: We're supposed to, correct.
  MR. MALOFIY: Mr. Edelstein has done it quite a bit.
  THE COURT: You didn't object.
  MR. MALOFIY: I know I didn't. I was giving him some leeway. I thought he would do the same.
  MR. EDELSTEIN: I appreciate it, and I'll give you some leeway.
BY MR. MALOFIY:
Q. If we could go to Exhibit 3, paragraph 20.

## Page 23

Let me see it real quick.
  Did you review interrogatories that were signed under oath in this case, verified answers to interrogatories?
A. No.
Q. You didn't. Let me go to Exhibit 3. These were the interrogatories that were propounded upon Hertz. Could we pull that up for the jury?
  Can you see that, ma'am?
A. Yes.
Q. Now, to be clear, these were the interrogatories in this case, these are the answers from Hertz.
  You didn't have a chance to review these?
A. I did see that. I'm sorry.
Q. And it said here on 20: "Describe in detail all payments, including date, time, amount, and payment method Kelly Grady made for the rental of the Chevy Yukon." Do you see that?
A. Yes.
Q. And the answer was: "One payment on April 17th, 2013, at 1:57 p.m. for 1805 to a Visa card ending in 0583." Do you see that?
A. Yes.

## Page 24

Q. Isn't it true that Hertz also received a payment of 2445 --
  MR. EDELSTEIN: Objection, Your Honor. There's testimony it was a force charge, not a payment made by Ms. Grady.
  MR. MALOFIY: I would appreciate if the witness testified.
  THE COURT: He objected based upon a characterization of the question. You just have to rephrase the question.
BY MR. MALOFIY:
Q. Ma'am, isn't it true that this Answer 20 did not identify all the payments that Hertz had received in regards to Ms. Grady's rental?
  MR. EDELSTEIN: Just note my objection. That wasn't the question that was asked, Your Honor.
  THE COURT: Overruled. Go ahead.
  THE WITNESS: So we received one payment that she authorized of 1805, the other payment of $2400 and some change was a force charge.
BY MR. MALOFIY:
Q. Let me ask you something about force charge. You received the payment, did you not?

## Page 25

A. We didn't receive any authorization from TD Bank, so she has up to six months to dispute the charge.
Q. You received the payment, ma'am, correct?
A. Yes.
Q. You received the payment and did Ms. Grady ever deny that charge?
A. No.
Q. And did Ms. Grady ever send you a letter to corporate saying I deny this charge?
A. No.
Q. And did you have any evidence whatsoever that she called up and she said no, this charge can't go through?
A. She would dispute the charge with her bank, not with Hertz.
Q. I'm asking if she called Hertz and you have any evidence whatsoever in this world to say she ever disputed that charge?
A. She didn't dispute with Hertz. She would have to dispute with her credit card company.
Q. And you have nothing in Hertz' file to indicate she disputed this in any way, shape, or form, correct?
A. That's correct.

Case ID: 130403380
Control No.: 17093136

26

1  Q.   So, to be clear, you would agree -- you would
2  agree with me that Hertz received 1805 on 4/27/2013,
3  correct?
4  A.   **As an authorization, correct.**
5  Q.   And she provided you her credit card when she
6  initially rented the car, correct?
7  A.   **At time of rent.**
8  Q.   She did that?
9  A.   **Yes.**
10 Q.   Did she ever withdraw her authorization to
11 you, yes or no?
12 A.   **No.**
13 Q.   Have you ever had billing issues or
14 communications issues as Hertz has had with its bank
15 or with someone else's bank?
16 A.   **Yes, we have billing issues.**
17 Q.   Sometimes there's problems with banks talking
18 to other people's banks and there's issues, correct?
19 A.   **Correct.**
20 Q.   You don't dispute that, that's not unusual,
21 that there might be a problem with a wire or
22 communications between the two banking institutions,
23 correct?
24 A.   **No, not at all.**
25 Q.   Did you do any investigation to determine --

Danielle O'Connor, RPR, CRR 215-683-8023

27

1  I'll withdraw the question.
2        Let me move forward to this:  My
3  understanding, if I understand your testimony
4  correctly, is that if someone calls in and the card
5  isn't -- you call it Block status?
6  A.   **Yes, it's blocked in Pick Up status.**
7  Q.   And it would go right to you or someone in
8  your office, correct?
9  A.   **In the Vehicle Control area.**
10 Q.   How many people are in that office?
11 A.   **Seventy.**
12 Q.   Seventy people?
13 A.   **Yes.**
14 Q.   That's a lot of people handling this.  How
15 many cars does Hertz have?
16 A.   **Currently or in 2013?**
17 Q.   Let's go with 2013.
18 A.   **At the time we had approximately 700,000 cars.**
19 Q.   700,000?
20 A.   **Uh-huh, in North America.**
21 Q.   And, you know, my understanding, and correct
22 me if I'm wrong, is that you've worked for Vehicle
23 Control for over ten years; is that correct?
24 A.   **Yes.**
25 Q.   And my understanding also is that you're the

Danielle O'Connor, RPR, CRR 215-683-8023

28

1  supervisor?
2  A.   **Yes.**
3  Q.   And my understanding also, it's actually part
4  of your job to make sure those overdue vehicle
5  investigations are done properly, correct?
6  A.   **Yes.**
7  Q.   And it's your job to manage a fleet of
8  $700,000 cars?
9  A.   **Yes.**
10 Q.   And, basically, you regulate all the stealing
11 off of Hertz' lot?
12 A.   **Well, we handle four different types of**
13 **thefts.**
14 Q.   Well, that's one type -- any type of theft,
15 you represent the stealing off of Hertz' property?
16 A.   **Yes.**
17 Q.   I'm a little confused as to what factual
18 knowledge you have about this case.  I know you're
19 testifying here as a corporate designee, but I have
20 a few questions for you.
21 A.   **Okay.**
22 Q.   Do you recall ever speaking to Ms. Grady?
23 A.   **No.**
24 Q.   Would you remember speaking to Ms. Grady if
25 you did?

Danielle O'Connor, RPR, CRR 215-683-8023

29

1  A.   **It would be in the notes.**
2  Q.   Ma'am, you didn't bring any notes here today,
3  did you?
4  A.   **I did.**
5  Q.   Do you have the notes of the police officer?
6  A.   **I have the theft package --**
7  Q.   I'm asking --
8  A.   **-- with the notes.**
9  Q.   -- when the police officer called on 7/22 and
10 let this young lady go, do you have notes of that
11 conversation in your records?
12 A.   **No.**
13 Q.   No, you don't.  Sometimes notes aren't taken,
14 correct?
15 A.   **Correct.**
16 Q.   In this case you've heard the testimony of
17 Joseph Jaussi, it was read in, correct?
18 A.   **Yes.**
19 Q.   He said the records were purged in regards to
20 Ms. Grady.  Do you remember that?
21 A.   **Yes.**
22 Q.   Do you dispute his testimony which was under
23 oath and bound the Hertz Corporation?
24 A.   **Well, it's the definition --**
25 Q.   I would ask for a yes --

Danielle O'Connor, RPR, CRR 215-683-8023

Case ID: 151103380
Control No.: 17093136

## Page 30

1  A.     -- definition of purged.
2           MR. EDELSTEIN: Objection, Your Honor.
3      He asked the question.
4  BY MR. MALOFIY:
5  Q.     Do you dispute it, ma'am, yes or no, and then
6  you can explain?
7           MR. EDELSTEIN: Your Honor, he asked
8      the open-ended question.
9           THE COURT: He did. So that's
10     sustained. Rephrase the question. What you
11     just asked is fine.
12 BY MR. MALOFIY:
13 Q.     Ma'am, do you dispute Joseph Jaussi's
14 testimony that the records were purged, yes or no?
15 A.     No. Can I give the definition of purged,
16 though?
17 Q.     I think it's subjective to a degree, but maybe
18 your counsel can follow up with you.
19 A.     Sure.
20 Q.     You see hundreds of packages every day,
21 correct, hundreds of theft packages?
22 A.     Yes.
23 Q.     And I think you were testifying that in the
24 months of -- in the months of July and the summer
25 months, it gets real busy?

## Page 31

1  A.     Yes.
2  Q.     Real busy?
3  A.     During the summer months.
4  Q.     And I imagine when someone calls on the phone
5  and they're trying to get ahold of a representative,
6  then they get routed to another department, that
7  would happen, right?
8  A.     Right.
9  Q.     And then they would sit on the phone for a
10 long time and they get routed to another department
11 because you're very busy, right?
12 A.     We're busy, but when we have a theft that
13 comes through, it's routed to us. We have someone
14 available to take those calls.
15 Q.     You're supposed to have someone available,
16 correct?
17 A.     We do have someone available.
18 Q.     Okay.
19 A.     It's a theft package. It's our asset, we want
20 it back.
21 Q.     So your goal in this instance was to get your
22 asset back, correct?
23 A.     Correct.
24 Q.     On 7/22, you knew that your asset was no
25 longer with Ms. Grady, correct?

## Page 32

1  A.     We didn't have it back.
2  Q.     I'm asking you, did you know, yes or no, that
3  your asset was no longer with Ms. Grady on 7/22?
4  A.     Somebody at Hertz did.
5  Q.     Right. Now, who at Hertz knew?
6  A.     I'm not sure, because the police officer
7  didn't tell me what phone number or who he spoke to.
8  Q.     Well, you mean the police officer -- you mean
9  there's no notes here today that indicate that,
10 correct?
11 A.     Correct.
12 Q.     You do what, about a hundred theft packages
13 per day; is that about right?
14 A.     Some days.
15 Q.     So in the course of you've been sitting here,
16 maybe 400, 500 theft packages went out, correct?
17 A.     Yes.
18 Q.     Basically, this is a mechanical process, you
19 pretty much just approve them?
20 A.     No.
21 Q.     No?
22 A.     No.
23 Q.     Isn't it sort of automated, or you actually do
24 a hundred theft packages a day that are this big? I
25 mean --

## Page 33

1  A.     So every night that I left here, I went back
2  to my hotel and reviewed theft packages, page by
3  page by page.
4  Q.     You did?
5  A.     I did.
6  Q.     How many did you review since you've been
7  here?
8  A.     About 380.
9  Q.     I see. Now, let's be clear, you're here to
10 testify as to the policies and procedures of Hertz
11 Rental Car Corporation, correct?
12 A.     Yes.
13 Q.     And you're here also to discuss this policy
14 W7-02, correct?
15 A.     Yes.
16 Q.     Are you familiar with that policy?
17 A.     Yes.
18 Q.     And you're familiar with that policy because
19 that's a policy that you work with, correct?
20 A.     Yes.
21 Q.     And that's a policy which basically regulates
22 all the stealing off of Hertz' lot, correct?
23 A.     Yes.
24 Q.     Did you help draft that?
25 A.     No.

Case ID: 190103380
Control No.: 17093136

## Page 34

1  Q.  You didn't.  Who helped draft that document?
2  A.  **Corporate counsel.**
3  Q.  Lawyers?
4  A.  Yes.
5  Q.  I see.  Are you technically an officer of the
6  Hertz Corporation?
7  A.  No.
8  Q.  Are you just strictly an employee?
9  A.  **I am an employee.**
10 Q.  So no officers of the Hertz Corporation came
11 to this court today, correct, or at any point during
12 this trial, correct?
13 A.  No.
14 Q.  Any board members came?
15 A.  No.
16         MR. MALOFIY:  And can we pull up
17     W7-02?  Mr. Segal, do you know that number?  Is
18     it P-9?  Thank you.
19 BY MR. MALOFIY:
20 Q.  You're familiar with this document, correct?
21 A.  Yes.
22         MR. MALOFIY:  I want to go up here and
23     I want to blow up -- right here, let's blow
24     this up, Mr. Segal.
25 BY MR. MALOFIY:

## Page 35

1  Q.  Mrs. Wilkerson, can you see that?
2  A.  Yes.
3         MR. MALOFIY:  Thank you, Mr. Segal.
4     Can we elevate that?
5  BY MR. MALOFIY:
6  Q.  "Executive summary, this worldwide procedure
7  applies to the rent-a-car division of the Hertz
8  Corporation and includes requirements for reporting
9  vehicle thefts and conversions."  Did I read that
10 correctly?
11 A.  Yes.
12 Q.  It says:  "All vehicle theft and conversions
13 must be documented on a theft recovery vehicle
14 report."  Did I read that correctly?
15 A.  Yes.
16 Q.  Then it says:  "All vehicle thefts from
17 customers must also be documented on the vehicle
18 theft from customer report."  Did I read that
19 correctly?
20 A.  Yes.
21 Q.  And here's what I'm getting at and where I'm
22 going with this, it says near the last line:
23 "Location, maintenance, area, country, head office,
24 and OKC management must ensure compliance with this
25 procedure."  Do you see that?

## Page 36

1  A.  Yes.
2  Q.  Is it your job to ensure compliance with this
3  procedure?
4  A.  Yes.
5  Q.  And you're the person in charge of 700,000
6  cars to make sure as the regulator that these cars
7  and these -- excuse me -- procedures are followed,
8  correct?
9  A.  Correct.
10 Q.  Now, when it says "location," that means in
11 this instance the Philadelphia location, correct?
12 A.  Correct.
13 Q.  Just to make this clear, this here says:
14 "W7-02 RAC, reporting vehicle thefts and
15 conversions, August 21st, 2009."  Did I read that
16 correctly?
17 A.  Yes.
18 Q.  That's the policy in effect at the time Ms.
19 Grady was arrested and policy in effect at the time
20 of 2013-2014, correct?
21 A.  Yes.
22 Q.  The purpose of this standard operating
23 procedure, correct, was to provide requirements for
24 reporting thefts, conversions, or the disappearance
25 of Hertz vehicles, correct?

## Page 37

1  A.  Correct.
2         MR. MALOFIY:  Pull that back, Mr.
3     Segal.  Can we go to the next page?  Page 3 --
4     page 4.  Excuse me.  With the court's
5     indulgence?  Try page 5.  There also.
6  BY MR. MALOFIY:
7  Q.  All right.  You're intimately familiar with
8  this whole theft package correct -- excuse me, this
9  whole theft procedure, correct?
10 A.  Yes.
11 Q.  You use it on a daily basis?
12 A.  Yes.
13 Q.  In fact, this is a procedure that you follow
14 to make sure that innocent people aren't wrongfully
15 arrested for accidental reporting to the police,
16 correct?
17 A.  Correct.
18 Q.  And it's important these policies and
19 procedures are followed by Hertz Corporation,
20 correct?
21 A.  Correct.
22 Q.  And if Hertz doesn't follow this problem --
23 this procedure, that would be a failure on the part
24 of Hertz, correct?
25 A.  Correct.

## Page 38

1  MR. MALOFIY: Now, I'd like to blow up
2  17 for the benefit of the jury.
3  BY MR. MALOFIY:
4  Q. "Corporate/country security manager
5  investigations, every theft conversion disappearance
6  must be promptly investigated by the
7  corporate/country security manager responsible for
8  the location" --
9      MR. MALOFIY: Can you highlight
10  "location," Mr. Segal?
11 BY MR. MALOFIY:
12 Q. -- "from which the related theft vehicle
13 report is filed." In this instance, the location
14 would be Philadelphia, correct?
15 A. Correct.
16 Q. Now, it goes on to say -- and I want to
17 highlight this, too, Mr. Segal -- "all employees are
18 required to cooperate fully with such an
19 investigation." Did I read that correctly?
20 A. Yes.
21 Q. Now, it also says there must be promptly
22 investigated. Do you see that?
23 A. Yes.
24 Q. Now, in this instance --
25     MR. EDELSTEIN: You sound like Darth

## Page 39

1  Vader.
2      MR. MALOFIY: I do, really? Do I need
3  new batteries? I'm sorry.
4      Is it okay?
5  BY MR. MALOFIY:
6  Q. In this instance, you've heard the testimony
7  of Richard Livingston, correct?
8  A. Yes.
9  Q. And Richard Livingston is, I believe,
10 currently, the corporate security manager, not the
11 assistant security manager of Philadelphia, but the
12 corporate security manager of Philadelphia, correct?
13 A. Yes.
14 Q. You've worked with him many times, correct?
15 A. Yes.
16 Q. Now, Mr. Livingston testified under oath that
17 he does no investigation whatsoever at the local
18 level. Did you hear that?
19 A. **I heard that, but he does check, check to make**
20 **sure that the VIN is correct, check to make sure**
21 **that there's no movement, or check to make sure that**
22 **the car hasn't been returned.**
23 Q. I'm sorry. Do a typo check on the VIN. What
24 else?
25 A. **Make sure that there's no further movement on**

## Page 40

1  the vehicle.
2  Q. Uh-huh.
3  A. **And then make sure that the car has not been**
4  **returned. He has to make sure the car has hot been**
5  **returned.**
6  Q. Returned?
7  A. **Returned. By the renter.**
8  Q. How would he do that?
9  A. **He goes into the system and check.**
10 Q. What system, ma'am?
11 A. **His vehicle movement system.**
12 Q. Oh, I see. Well, if he didn't do that, that
13 would be a failure, correct?
14 A. Yes.
15 Q. And he would not be following Hertz' policies
16 and procedures, correct?
17 A. Correct.
18 Q. Now, let me go to Mr. Livingston's deposition
19 testimony which was read into the record. And I'm
20 going to go to page P8-54, top right-hand quadrant,
21 which is page 215.
22     MR. MALOFIY: Mr. Segal, I got some
23 psychedelic thing going on on my computer.
24 Okay. Thank you.
25     Now, if we could, for the benefit of

## Page 41

1  Mrs. Wilkerson, could we blow up 10 to 16,
2  lines 10 through 16 on page 215?
3  BY MR. MALOFIY:
4  Q. Question was asked: "As a corporate security
5  manager for Hertz for this area or anyone working
6  with you or for you, would they have done any
7  independent investigation and what payments are made
8  with the car before filing a police report?
9      His answer: "No, not on my side of
10 the fence."
11     Should he have checked to see if any
12 additional payments were made on that car?
13 A. **Mr. Livingston didn't report this car stolen.**
14 Q. I'm just asking you, he said specifically,
15 ma'am, he's the manager of Philadelphia, right,
16 security manager?
17 A. Correct.
18 Q. And he still is the security manager, correct?
19 A. **Right, but he also --**
20 Q. Hold on. He was the very big guy.
21     MR. EDELSTEIN: She's answering the
22 question, Your Honor.
23     THE COURT: She was.
24     THE WITNESS: It's okay.
25 BY MR. MALOFIY:

Case ID: 190703380
Control No.: 17093136

## Page 42

**Q.** I'm sorry. I stepped on your words. Go ahead.
**A.** Go ahead. What's the question?
**Q.** Mr. Livingston is the awfully big guy, he's like 7 feet tall, right?
**A.** Yes.
**Q.** He's the corporate security manager for Hertz Rental Car Corporation here in Philadelphia, correct?
**A.** Correct.
**Q.** Now, it says here that the question was asked of him or anyone working for him or working with him, if they did any check and his response was no, not on his side of the fence. Do you see that?
**A.** I do see that.
**Q.** Now, you just testified that he would have checked the computer system of some sort, right?
**A.** He should have checked the computer system.
**Q.** If he failed to check the computer system, he would have failed to follow the policies and procedures of Hertz which must be followed, correct, ma'am?
**A.** Correct. But he also in the thing that you read, testimony that you read, it said he didn't file police reports.

*Danielle O'Connor, RPR, CRR 215-683-8023*

## Page 43

**Q.** Ma'am, Mr. Livingston is the head of a two-man department, correct?
**A.** Correct.
**Q.** Let's be clear. It's him and one other person, right?
**A.** Yes.
**Q.** And that one other person was Mr. Graeber, correct?
**A.** At the time, yes.
**Q.** And then Mr. Graeber was let go. Do you remember why?
**A.** Yes.
**Q.** He was let go why?
**A.** I'm not sure.
**Q.** He was let go, according to Mr. Livingston's testimony, because Hertz wanted to cut costs. Do you remember that?
**A.** No.
  MR. MALOFIY: Well, let's pull it up.
  MR. EDELSTEIN: We'll stipulate that was the testimony, Judge.
BY MR. MALOFIY:
**Q.** Hertz --
  THE COURT: It's been stipulated to. All right.

*Danielle O'Connor, RPR, CRR 215-683-8023*

## Page 44

BY MR. MALOFIY:
**Q.** Hertz Corporation wanted to cut the costs so they let Mr. Graeber go, correct?
**A.** If you say so, yes.
**Q.** And by doing so, they're basically cutting costs at the local investigation at the local level to prevent innocent people from being wrongfully accused of car theft, correct?
  MR. EDELSTEIN: Objection, Your Honor.
  THE COURT: Sustained.
BY MR. MALOFIY:
**Q.** Ma'am, does Hertz global -- excuse me, Hertz Corporation, are they able to do a local investigation on every case?
**A.** Well, that's the reason why we have Oklahoma City specialized in doing the investigation. We have specialized people that work for us and also that's why we hire the private investigator to go out and assist us and also get the repossession company involved, to show what investigation we need to do. We work hand-in-hand with both of those companies. We try to do our due diligence before we report a car stolen.
**Q.** How many theft reports have come out of Philadelphia?

*Danielle O'Connor, RPR, CRR 215-683-8023*

## Page 45

  MR. EDELSTEIN: When?
BY MR. MALOFIY:
**Q.** After daily basis in 2013-2014, ma'am.
**A.** A lot.
**Q.** A lot?
**A.** Yes.
**Q.** And what would you say?
**A.** Maybe 2000.
**Q.** Do you know -- excuse me. Mr. Livingston testified that he's gone into court and handled about 400 of these and he's never done a local investigation to determine the truth and veracity of those theft packages?
**A.** No, I didn't know that.
**Q.** And that would be falling well below the standard of care even by Hertz' own policies and procedures?
  MR. EDELSTEIN: Objection to the leading conclusion.
  THE COURT: Sustained. You have to rephrase.
  MR. MALOFIY: I'll rephrase it. Thank you.
BY MR. MALOFIY:
**Q.** That would fall well below the policies and

*Danielle O'Connor, RPR, CRR 215-683-8023*

46

1  procedures of even Hertz Corporate policies,
2  correct?
3  **A.**  Yes.
4  **Q.**  Do you think it's acceptable for 400 cases to
5  go to court and no local investigation to be done
6  whatsoever?
7             MR. EDELSTEIN:  Objection, Your Honor.
8  The testimony was that Mr. Livingston didn't
9  actually do it, not no investigation was done.
10            THE COURT:  Overruled.  I'll let her
11  answer.
12            THE WITNESS:  Yeah.  We have
13  investigated it.  We investigate each overdue
14  renter.  Each theft is investigated.
15            MR. MALOFIY:  Ma'am, read back my
16  question for the witness, please.  Sorry.
17                       - - -
18            (Whereupon, the court reporter read
19  the record as requested.)
20                       - - -
21            THE WITNESS:  By Mr. Livingston?
22  BY MR. MALOFIY:
23  **Q.**  By the two people in that office who handle
24  the 400 cases that went to court and no local
25  investigation was done, that's what I'm referring

47

1  to, ma'am.
2  **A.**  **There is some investigation being done.**
3  **Q.**  Check for typos and the VIN number, correct?
4  **A.**  **And movement.**
5  **Q.**  On the system, right, on the computer system?
6  **A.**  Yes.
7  **Q.**  Let's go to that computer system right now.
8  Let's talk about that.
9          Now, you indicated that it was Mr.
10 Graeber who made the police report on behalf of
11 Hertz to Detective -- to Officer Ianoconne, he was
12 the one who gave the interview, correct?
13 **A.**  Correct.
14 **Q.**  And it wasn't Mr. Livingston?
15 **A.**  Correct.
16 **Q.**  Both those two people work in one office,
17 correct?
18 **A.**  Yes.
19 **Q.**  And Mr. Graeber answers to Mr. Livingston,
20 correct?
21 **A.**  Correct.
22 **Q.**  Now, let's go to combination 8 of P-3, which
23 is the interrogatory, the question to defendant and
24 the answer of defendant's.  Can we pull that combo
25 up for the benefit of the jury and also for Ms.

48

1  Wilkerson -- Mrs. Wilkerson, excuse me, ma'am.
2           It says here, 8, this was a question
3  posed to Hertz Corporation:  "Identify the computer
4  systems that the Hertz employees identified in the
5  immediately preceding interrogatory consulted while
6  on the phone with the police on July 22nd, 2013, and
7  what information was on that system regarding Ms.
8  Grady."
9           The answer:  "Objection.  This
10 interrogatory assumes a computer system was
11 consulted with during Mr. Graeber's conversation
12 with Officer Brighter.  Mr. Graeber" -- I'd like to
13 highlight this, Mr. Segal -- "Mr. Graeber did not
14 utilize any computer system while speaking with
15 Officer Brighter on July 22nd, 2013."  Do you see
16 that, ma'am?
17 **A.**  Yes, I see it.
18 **Q.**  And these sworn interrogatories, where we
19 asked whether or not a computer system was used, the
20 sworn answers verified answers from Hertz
21 Corporation by Mr. Livingston was that no computer
22 system was used?
23           MR. EDELSTEIN:  Objection, Your Honor.
24 BY MR. MALOFIY:
25 **Q.**  Do you understand that?

49

1           MR. EDELSTEIN:  The question in the
2  interrogatory was what was used while on the
3  phone with the police.  That's the question.
4           MR. MALOFIY:  I'm asking a follow-up
5  question, not this specific question, but a
6  follow-up question.
7           THE WITNESS:  So basically --
8           THE COURT:  No, I have to rule on the
9  objection.
10          The objection at this time is
11 sustained only because you can't change what
12 the interrogatories are saying.  If it's a
13 separate question, that's fine.
14          MR. MALOFIY:  I'm asking a follow-up
15 question, a different question.  I already
16 asked that question.  Maybe the confusion is on
17 the screen.  So we can block that out now.
18 Thank you.
19 BY MR. MALOFIY:
20 **Q.**  Isn't it true that Mr. Graeber utilized no
21 computer system whatsoever in regards to before he
22 reported this to the police?
23 **A.**  **No.  It actually says "while speaking."  So**
24 **while he was speaking to the detective, he wasn't on**
25 **the computer system.  That's the verbiage in what**

Case ID: 150103380
Control No.: 17093136

50

1  you just read me.
2          MR. MALOFIY: Let me be more specific
3      with the court's indulgence.
4          Let me move to 21, combo 21. Do you
5      have that, Mr. Segal?
6  BY MR. MALOFIY:
7  Q.    You looked at the questions which we
8  propounded upon Hertz, which we served on Hertz and
9  the answers, correct?
10 A.    Yes.
11 Q.    And you saw that Mr. Livingston had signed
12 these under oath, correct?
13 A.    Yes.
14 Q.    We had asked of Hertz Corporation: "Describe
15 in detail all actions/steps taken and communications
16 the Hertz manager identified in the complaint as
17 filing the August 2013 police report regarding Kelly
18 Grady." That's Ken Graeber, correct?
19 A.    Yes.
20 Q.    So let's read this again: "Describe in detail
21 all actions/steps taken and communications the Hertz
22 manager" -- I'll insert Ken Graeber -- "took before
23 reporting the Chevy Yukon stolen on around July
24 22nd, 2013, including identifying all employees he
25 communicated with and the contents of the

            Danielle O'Connor, RPR, CRR 215-683-8023

51

1  communication, identifying all employees he
2  communicated with and the contents of the
3  communication." I think that was twice. I
4  apologize if I read that twice. I think it was
5  written twice. "Identifying all computer systems he
6  consulted and the program names and reasons for
7  doing so."
8          MR. MALOFIY: Highlight this bottom
9      line, "identifying all computer systems he
10     consulted and the program names and reasons for
11     doing so."
12 BY MR. MALOFIY:
13 Q.    The answer, there was an objection lodged.
14 And then it said: "The police report was not filed
15 by a Hertz manager in August 2013. Mr. Graeber
16 reviewed the rental contract, investigation
17 performed, and had communications with individuals
18 in Hertz' Vehicle Control Department in Oklahoma
19 City, Oklahoma. A theft package was put together
20 and reported to the airport police." Do you see
21 that?
22 A.    Yes.
23 Q.    Now, it doesn't identify all computer systems
24 he consulted and the program names and reason for
25 doing so, does it?

            Danielle O'Connor, RPR, CRR 215-683-8023

52

1  A.    No, but he was on the phone with Hertz Vehicle
2  Control.
3  Q.    I'm just asking you, verified answer said that
4  that was produced in discovery.
5  A.    Okay.
6  Q.    Right, ma'am?
7  A.    Yes.
8  Q.    And even if he was on the phone, he didn't
9  consult any computer systems, right?
10 A.    Well, we're speaking about it over the phone.
11 Q.    But he personally did not consult any computer
12 systems, correct?
13 A.    No, he didn't put his fingers on the keyboard.
14 Q.    And then a day after this, he went to the
15 police and told them the only payment was 1805,
16 correct?
17 A.    In a deposit, yes.
18 Q.    Ma'am, I'm going to put this back up to you,
19 this document. Do you see that document?
20 A.    Yes.
21 Q.    Now, you say, oh, the 2445 was identified on a
22 document, right?
23 A.    Yes.
24 Q.    And you'd agree that that document was created
25 7/12/13, correct?

            Danielle O'Connor, RPR, CRR 215-683-8023

53

1  A.    Yes.
2  Q.    And you agree the payment went through on
3  7/15, three days later, correct?
4  A.    Yes, correct.
5  Q.    And you'd agree with me that wasn't actually
6  the payment identified, it was what was owed,
7  correct?
8  A.    No.
9  Q.    Doesn't it indicate what was owed and not what
10 was paid on 7/12, ma'am?
11 A.    No.
12 Q.    What does it say?
13 A.    It says that we had to close the vehicle out
14 to 5/31/2013 because we didn't have anymore
15 authorization. It's on this form right here.
16 Q.    I'm sorry. Maybe my question wasn't clear. I
17 asked you a different question.
18         Isn't it true that it doesn't show
19 that the payment of 2445 was made on that document?
20 A.    Yeah, it shows it was --
21 Q.    It was owed?
22 A.    It was owed at the time.
23 Q.    And it was not paid, correct?
24 A.    Not on 7/12.
25 Q.    Right. And three days later it was paid,

            Danielle O'Connor, RPR, CRR 215-683-8023

Case ID: 150803380
Control No.: 17093136

## Page 54

1 correct, ma'am?
2 A. Not in full.
3 Q. Ma'am, I'm asking you was 2445 paid, yes or
4 no?
5 A. Yes.
6 Q. And that information was never updated to the
7 police, correct?
8 A. No.
9 Q. It was not corrected, correct? It was not
10 updated to the police, correct?
11 A. They had the information.
12 Q. I'm asking you if the information that it was
13 paid was updated to the police, yes or no?
14 A. The police actually have the theft package and
15 this was in the theft package.
16 Q. Ma'am, you just identified that that is not a
17 payment for 2445, it's what is owed. Do you
18 understand the difference between --
19 A. Yes.
20 Q. -- money in your bank account --
21 A. Yes.
22 Q. -- and what is owed to you? It's the
23 difference between an asset and a liability, right?
24 A. Yes.
25 Q. Okay. Understand the difference?

## Page 55

1 A. Yes.
2 Q. You deal with this every day?
3 A. Yes.
4 Q. So let's be clear. The police didn't know
5 2445 was paid before they signed an affidavit of
6 probable cause allowing Ms. Grady to be arrested,
7 correct? Correct, ma'am?
8 A. Correct.
9         MR. MALOFIY: No further questions.
10        THE COURT: Any redirect?
11        MR. EDELSTEIN: Just two. I promise.
12            - - -
13        REDIRECT EXAMINATION
14            - - -
15 BY MR. EDELSTEIN:
16 Q. Mr. Graeber, the assistant corporate manager
17 who worked for Mr. Livingston --
18 A. Yes.
19 Q. -- he did the investigation?
20 A. Yes.
21 Q. And he would have -- in an effort to find car
22 movement, how would he have determined that, meaning
23 was the car back in Hertz' possession?
24 A. Yes, so he would have gone into a specialized
25 system that shows all cars that have been checked in

## Page 56

1 or have an idle sighting at the location to prove
2 that the car was back in Hertz' possession.
3 Q. And, again, when did the car come back to your
4 possession?
5 A. September 11th, 2013.
6         MR. EDELSTEIN: Thank you. That's all
7 I have.
8         THE COURT: Anything else, Counsel?
9         MR. MALOFIY: No. One second, Your
10 Honor. Court's indulgence.
11        (Pause.)
12            - - -
13        RECROSS-EXAMINATION
14            - - -
15 BY MR. MALOFIY:
16 Q. Help my confusion. Did you actually fly in
17 from Florida?
18 A. I -- yes.
19 Q. You flew in from Florida to here?
20 A. I took a special route, yes.
21        MR. MALOFIY: No further questions.
22        THE COURT: Anything else?
23        MR. EDELSTEIN: No, Your Honor.
24        THE COURT: Thank you, ma'am. Watch
25 your step.

## Page 57

1            - - -
2        (Witness excused.)
3            - - -
4         THE COURT: Who's your next witness?
5         MR. EDELSTEIN: Mr. Cocklin.
6         THE COURT: That's the expert.
7 Step up.
8         THE COURT CRIER: State your full
9 name.
10        THE WITNESS: John Cocklin,
11 C-O-C-K-L-I-N.
12            - - -
13        ...JOHN COCKLIN, having been duly
14 sworn/affirmed, was examined and testified as
15 follows:
16            - - -
17        THE COURT: Your witness.
18            - - -
19 DIRECT EXAMINATION ON VOIR DIRE
20            - - -
21 BY MR. EDELSTEIN:
22 Q. Good afternoon, Mr. Cocklin.
23 A. Good afternoon.
24 Q. How are you today?
25 A. Okay.

Danielle O'Connor, RPR, CRR 215-683-8023

Case ID: 151103380
Control No.: 17093136