# EXHIBIT 12

1

<pre>
1              UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF DELAWARE
2
                               .   Chapter 11
3   IN RE:                     .
                               .   Case No. 20-11218 (MFW)
4   THE HERTZ CORPORATION, et al.,   .
                               .   (Jointly Administered)
5                   Debtors.   .
    _____.
6   THE HERTZ CORPORATION, et al.,   .
                               .
7              Plaintiffs.     .   Adv. Pro. No. 20-50761
                               .
8        v.                    .   Courtroom No. 3
                               .   824 Market Street
9   HANNAH AYOUB, et al.,      .   Wilmington, Delaware 19801
                               .
10             Defendants.     .   April 22, 2021
    . . . . . . . . . . . . . . . .   2:00 P.M.
11

12              TRANSCRIPT OF TELEPHONIC HEARING
           BEFORE THE HONORABLE MARY F. WALRATH
13              UNITED STATES BANKRUPTCY JUDGE

14  TELEPHONIC APPEARANCES:

15
    For the Debtors:        Mark D. Collins, Esquire
16                          Robert J. Stearn, Jr., Esquire
                            John H. Knight, Esquire
17                          Brett M. Haywood, Esquire
                            Christopher M. De Lillo, Esquire
18                          J. Zachary Noble, Esquire
                            RICHARDS, LAYTON & FINGER, P.A.
19                          One Rodney Square
                            920 N. King Street
20                          Wilmington, DE 19801

21  Audio Operator:         Mandy Bartkowski, ECRO

22  Transcription Company:  Reliable
                            1007 N. Orange Street
23                          Wilmington, Delaware 19801
                            (302)654-8080
24                          Email:  gmatthews@reliable-co.com

25
    Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.
</pre>

```
 1   TELEPHONIC APPEARANCES (continued):

 2   For the Debtors:          Thomas E Lauria, Esquire
                               Matthew C. Brown, Esquire
 3                             WHITE & CASE LLP
                               200 South Biscayne Boulevard
 4                             Suite 4900
                               Miami, Florida 33131
 5
                               - and -
 6
                               J. Christopher Shore, Esquire
 7                             David M. Turetsky, Esquire
                               Andrea Amulic, Esquire
 8                             Samuel P. Hershey, Esquire
                               1221 Avenue of the Americas
 9                             New York, New York 10020

10                             - and -

11                             Jason N. Zakia, Esquire
                               111 South Wacker Drive
12                             Chicago, Illinois 60606

13                             - and -

14                             Ronald K. Gorsich, Esquire
                               Aaron Colodny, Esquire
15                             Andrew Mackintosh, Esquire
                               Doah Kim, Esquire
16                             555 South Flower Street, Suite 2700
                               Los Angeles, California 90071
17
     For False Police Report   Albert Ciardi, Esquire
18   Plaintiffs:               CIARDI, CIARDI & ASTIN LLP
                               1204 N. King Street
19                             919 N. Market Street, Suite 700
                               Wilmington, Delaware 19801
20
     For the Committee:        Philip Bentley, Esquire
21                             KRAMER LEVIN NAFTALIS & FRANKEL LLP
                               1177 Avenue of the Americas
22                             New York, New York 10036

23

24

25
```

MATTERS GOING FORWARD:

1. Motion of False Police Report Plaintiffs for Relief from Automatic Stay [Docket No. 589 – filed June 25, 2020]

2. Motion of False Police Report Claimants No. 2 for Relief from Automatic Stay [Docket No. 2593 – filed February 2, 2021]

3. Debtors' Motion for Preliminary Injunctive Relief [Adv. Case No. 20-50761 (MFW) – Docket No. 2 – filed July 17, 2020]

**Ruling:  30**


EXHIBITS:                           ID    Rec'd

Declarations of Samuel P.  Hershey

Declarations of Albert Ciardi

1       (Proceedings commenced at 2:00 p.m.)

2               THE COURT:  Alright, good afternoon.  This is

3   Judge Walrath.  We're here in the Hertz case on the false

4   police report matters.

5               So I will turn this over to whoever wants to lead

6   us off.

7               MR. DELILLO:  Good afternoon, Your Honor.  Chris

8   DeLillo, Richards Layton & Finger, on behalf of the debtors.

9               Can Your Honor hear me okay?

10              THE COURT:  I can.

11              MR. DELILLO:  Thank you.

12              Thank you, Your Honor, for making time for the

13  debtors today. I know it's been a long time since we last saw

14  you.

15              On today's agenda, as you noted, are three

16  motions; two stay relief motions filed by different groups of

17  false police report plaintiffs represented by Mr. Ciardi,

18  then the debtors' preliminary injunction motion filed in the

19  adversary proceeding of the false police report plaintiffs.

20              As we informed Ms. Capp, the parties have

21  discussed and agreed to proceed without live testimony today,

22  and only on the declarations and argument.

23              Accordingly, before turning things over to Mr.

24  Ciardi we would like to move the debtors' declarations into

25  evidence.  Those declarations are, in the main chapter of the

1  case, the transmittal declaration of Samuel Hershey filed at

2  Docket No. 763 in Adversary Proceeding No. 20-50761; the

3  three transmittal declarations of Mr. Hersey filed at Docket

4  Nos. 5, 13, and 16; and the declaration of David Galainena

5  filed at Adversary Docket No. 32.  Mr. Galainena is available

6  today should Your Honor have any questions.  Other than that

7  the parties have agreed to proceed without live testimony.

8           THE COURT:  Just to clarify, the Hershey one is in

9  the Adversary Docket Nos. 13 and 16?

10           MR. DELILLO:  Sorry, 5, 13, and 16, Your Honor.

11           THE COURT:  Okay.  Thank you.

12           Alright, Mr. Ciardi?

13           MR. CIARDI:  Thank you, Your Honor.  Thank you for

14  letting me proceed without Mr. Atkins being present today. I

15  don't think he would be a pretty sight right now, but he is

16  recovering.

17           THE COURT:  Good.

18           MR. CIARDI:  We would -- also, we have a series of

19  declarations, mostly from me, Your Honor, that we would move

20  into evidence.  I would like to do all of that, though, at

21  the end of my presentation as I go through them unless Your

22  Honor would prefer that we identify them all now.

23           THE COURT:  Yeah, identify them now so I know what

24  the record is.

25           MR. CIARDI:  Okay.  So, Your Honor, there is my

1  declaration that was filed on August 4th, 2020 at Docket No.

2  895 with all exhibits.  There is the sealed declaration that

3  was filed recently at -- unfortunately, I don't have the

4  docket number, Your Honor, but it was filed about three weeks

5  ago, it's a supplemental declaration, and it is dated March

6  29th, 2021.  Those would be the two declarations that we

7  would be relying upon.

8            THE COURT:  Alright.  And all of those

9  declarations will be incorporated and made part of the record

10 by the party's agreement.

11        (Declarations received into evidence)

12            MR. CIARDI:  Thank you, Your Honor.

13            May I proceed, Your Honor?

14            THE COURT:  You may.

15            MR. CIARDI:  Thank you.

16            So the movants, Your Honor, are moving on --

17 there's two motions for relief and one motion for a

18 preliminary injunction.  The motions for relief, which are,

19 I'll just say, one and two, combined total 131 plaintiffs.

20 Those 131 plaintiffs, Your Honor, equates to approximately

21 2,005 days in jail and 32,000 and growing days of

22 prosecutions.  The declarations of those individual

23 plaintiffs are included in my two declarations as well as the

24 complaint from the -- the complaints are attached to our

25 original motion for relief.  The factual underpinnings are

1  set forth in the motion for relief.

2          Before I address, in a very brief fashion, some of

3  the more egregious examples of what we're dealing with -- and

4  this, Your Honor, is going to the first factor under Rexine.

5  I want to be clear that as to the factual declarations and

6  the declarations of my clients as to the harm that was done

7  and the actions that the complaints that we seek to file to

8  address there has been no factual dispute or counter

9  declaration that disputes any of the underlying facts of our

10 complaints.

11          They're our declarations by Hertz with regard to

12 the delay, and the joining of officers, resources, and the

13 time and money, but there is nothing that disputes the

14 policies that Hertz has in place.  There is nothing that

15 disputes the effect of those policies.  There is nothing that

16 disputes the impact of those policies or lack of

17 implementation of those policies on my clients or the fact

18 that there are 2,005 days in jail and 32,000 days of

19 prosecutions.

20          So there is nothing that counters that element

21 under the Rexine factors which is, is there a probability

22 here of success on the merits which is, I think, the last of

23 the Rexine factors, but the ones we're starting with.  There

24 is nothing here that disputes that.

25          To give the court just a very brief idea of the

1  types of situations, in the first motion for relief there is

2  a plaintiff, Hannah Ayoub, and this is a prepetition claim.

3  He rented a truck, extended it multiple times from the

4  Wilmington, Delaware location, has phone recordings of him

5  extending the rental, and then Hertz calling him back the

6  next day and saying he didn't extend.  There is evidence that

7  Hertz erased the rental extensions.  He was arrested and

8  spent several months in jail, and then all the charges were

9  dropped.

10          I want to just stop there for one moment on this

11  first one because Hertz doesn't show up at the prosecutions.

12  Hertz doesn't withdraw once they know that the prosecution

13  shouldn't be ongoing.  They don't pursue these.

14          THE COURT:  They're not disputing your

15  allegations.  So do we need to get into all 131 claims?

16          MR. CIARDI:  No, Your Honor.

17          THE COURT:  Okay.

18          MR. CIARDI:  I was trying to give you a flavor for

19  why these are not -- these aren't slip and falls, they're not

20  accident cases.

21          THE COURT:  I understand.

22          MR. CIARDI:  They're -- I think they rise to a

23  different level, but, Your Honor, I can move past all that if

24  Your Honor would prefer.  I know Your Honor has spent a lot

25  of time with Hertz yesterday and over the last week.  I want

1  to be clear, we are not trying to interfere with the

2  reorganization process.  And so let me start with we are --

3  we understand that a plan, some plan, will hopefully be

4  confirmed and effective by the end of June.  We are thrilled

5  that right now the numbers are at 82 percent for the

6  unsecured creditors.  That is all wonderful news.  We don't

7  want to interfere with that process.

8         To the extent Your Honor is considering granting

9  our motion today we would even agree that that relief would

10  be effective on the effective date of the plan so that there

11  would be no delay or impediment to Hertz's management

12  focusing on confirmation and Hertz's management focusing on

13  what they need to focus on to confirm the plan.  But after

14  that, after we hit the effective date and the plan is

15  confirmed what we don't want to be is bound into the ABR

16  process.  We will be opting out of it.  We're not going to be

17  agreeing to any releases under the plan.  So we're going to

18  be opting out of all of that.  And we don't want to be bound

19  by the plan injunction.

20         I think that this is a good time to then address

21  why I was explaining the types of cases we have because these

22  are personal injury cases, Your Honor.  They are false

23  imprisonment, false arrest cases.  They are, therefore, not

24  under 28 U.S.C. 157(b)(5), the types of cases that this court

25  should hear.  And this court shouldn't be hearing 131 false

1    arrest cases.   That is not where this court's time and effort

2    should be.   A State Court or many different State Court's

3    should be handling the prosecution and the ultimate outcome

4    of these cases.

5            I understand that that may mean that we come back

6    to this court with the number for payment and that we may be

7    seeking theta from the insurance coverage, but this court

8    shouldn't be aware of the rights of the plaintiffs, these

9    types of cases are adjudicated.

10           Now we have cited in our initial brief, and I'm

11   not going to repeat the entire argument, but the

12   (indiscenrible0 decision, the Gawker Media decision, and,

13   frankly, the decisions cited by Hertz in Residential Capital

14   would all support that these types of cases would not be

15   within this court's, I don't want to say jurisdiction because

16   the court's don't really use that, but this court's venue for

17   decision.

18           And the reason for that is these are physical harm

19   cases.   They are not business torts.   They are not commercial

20   disputes.   They are not the types of cases that are addressed

21   normally in the proof of claim process.   Our clients were

22   arrested, all of them were arrested, handcuffed, and had

23   involvement in some fashion with the criminal justice system.

24   Some of those stays in jail were a few days, some were six

25   and a half months.   People lost cars, homes, families, jobs.

1  These aren't your typical commercial disputes that would be

2  addressed in the proof of claim process.

3        So one of the reasons why we are seeking relief

4  from the stay, albeit it can be effective on June 30th, Your

5  Honor, when the plan goes effective, is because those are the

6  appropriate forum to address these types of disputes.

7        Let's tie it back then to why there is really no

8  prejudice to the debtor at that point.  If we wait till June

9  30th to grant relief, and that would also clear us from the

10  plan injunction, the  issue of record taint, and, you know,

11  distraction of debtors' management, and impediments to the

12  plan; those all go away.  They're not valid arguments at that

13  point in time.

14        Attached to my second declaration is a complete

15  analysis of the insurance policies that we received from

16  Hertz.  Each of the policy years, the commercial liability is

17  approximately $200 million.  There is a $5 million fronting

18  policy, then there is an umbrella policy, and then there is a

19  series of policies that go after that.

20        And while, yes, the  debtor has a self-insured

21  retention on the umbrella policies that part can be

22  addressed, as part of the proof of the claim, that the

23  debtors may have to put up some of that money, but the $5

24  million policy that obligation is from the carrier directly.

25  Each one of them is a prepetition policy and to the extent

1  that the fronting carrier has a claim over against Hertz that

2  $5 million, again under cases cited in our brief, is another

3  -- it's an unsecured claim in the debtors' unsecured pool.

4         All that means is the debtor is trading, at least

5  with regard to the fronting policy, $5 million of unsecured

6  claims by my clients for $5 million of claims by the fronting

7  carrier.  Then you've got the umbrella which is self-insured.

8  Then you have a series of staff policies after that all laid

9  out in the -- in my second declaration, Your Honor, which

10 would indicate that even if we use a conservative estimate of

11 days in jail and the value that has been given to different

12 days in jail by different courts, somewhere between $35 and

13 $75,000 a day which, frankly, seemed extremely low.  Even if

14 you took a middle ground of somewhere close to $50,000 a day

15 at $100 million we are certainly under the amount of

16 insurance coverage that the debtors have available to it.

17 There will be no prejudice to the debtors either in insurance

18 coverage for defense or in payment for those claims.

19        So, Your Honor, if we look at this from a timing

20 perspective and solving for the debtors' desire to get out of

21 bankruptcy and not have its management distracted, a June

22 30th effective date for relief solves that problem.  It

23 eliminates that defense by the debtor.  There is no prejudice

24 to the plan from a funding or dollar standpoint.  It's a plan

25 that has a set dollar amount available to it and allows them

1  to draw in the insurance, and the insurance certification

2  which is the declaration on the insurances, which has not

3  been challenged or disputed, shows that in each policy here

4  there is substantial coverage in an amount more then what is

5  our estimated damage claim.

6          We have, really, no dispute as to whether there is

7  any -- whether we have a probability of success on the

8  merits, and then the next would be to what is the harm to my

9  plan.  That is the final remaining Rexine factor.  And that

10 goes to all of the case summaries, Your Honor, that I didn't

11 read into the record.  And I'm sure Your Honor has read here

12 brief and looked at some of our summaries.

13         These aren't easy cases to read.  They aren't easy

14 cases to follow.  They aren't easy -- Your Honor, we have had

15 a client that was arrested as of last Friday and she is still

16 in jail.  Nothing has been done by these debtors to fix this

17 problem.  They have not -- if they have done it, Your Honor,

18 it's not in any declaration; let's put it that way.

19         We are in a situation where we've got a debtor

20 with substantial insurance coverage, 131 plus victims that

21 have been thrust into the criminal justice system through no

22 fault of their own.  Again, I'm not going to read in all the

23 summaries. I can tell Your Honor doesn't need it, but they're

24 there, Judge, and they should be read because these people

25 have been harmed and they are not -- this is not a situation

1  where two people got into an accident on the street and it is

2  negligence.  This is not that situation.

3          My co-counsel who filed these actions put Mr.

4  Galainena on notice of them with a letter.  It's attached to

5  their own declarations.  They had been aware of this

6  situation for a long period of time.  It is now time for my

7  clients to get their justice and it does -- there is no

8  impact to the debtors' reorganization especially with our

9  concession on timing.

10         So with that, Your Honor, we would ask that you

11 grant us relief from the stay to pursue not only the debtor,

12 but the directors and officers, and that be effective on June

13 30th or whenever the effective date of the plan is, Your

14 Honor. We're not asking it should be earlier, but if it had

15 to be a little later we can deal with theat.  Then we can

16 pursue the coverage and the defense can be provided by the

17 coverage, and we can obtain justice for our clients.

18         Thank you.

19         THE COURT:  Alright, thank you.

20         MR. SHORE:  Your Honor, Chris Shore from White &

21 Case on behalf of Hertz.

22         Can you hear me?

23         THE COURT:  I can.

24         MR. SHORE:  Okay.  Your Honor, let me start with a

25 few facts and then kind of pivot because I've got a new

 1  request for relief that is being made today with respect to

 2  how this is going to happen.

 3        Of the 131 claimants, right, they are all alleging

 4  pre or post-petition injury as a result of an alleged Hertz

 5  policy.  They make serious allegations.  I want to make sure

 6  the court knows the debtors take them seriously.  By not

 7  addressing, we're not conceding that they're right; we just

 8  don't see that as an issue for today in the context of the

 9  lift stay motion or the PI motion.

10        All of those -- well fewer than 30 of those 131

11  had any prepetition pending litigation.  And those

12  litigations have only gone through the service of the

13  complaint.  There hasn't been an answer filed in any of them.

14  So there's been no real litigation other than some discovery

15  which took place in one action.

16        Since the filing of the original motion the

17  original claimants and now all the remaining claimants have

18  filed proofs of claim asserting prepetition unsecured claims

19  in unliquidated amounts.  All of those claimants, having

20  filed proofs of claim, will be solicited in connection with

21  the plan on file and they can vote their claims for a dollar

22  at all the states where they have asserted proper claims.

23        No claimant has yet opted into the debtors' claims

24  dispute resolution process, none have opted out, but

25  ultimately that is a claimant by claimant decision that will

1  have to be made.  I hear Mr. Ciardi saying that every single

2  one of his clients is going to opt-out, but we will see when

3  that happens.

4           Finally, the debtors intend to object to the filed

5  claims.  We will get to the issue of both the legal and

6  factual merits of what's been asserted. It is our intent,

7  given the nature of the claims, that that would be a post-

8  confirmation process.  It is not something that we're going

9  to try to do in connection with confirmation or prior to the

10 effective date of the plan.

11          (Indiscernible) Mr. Hersey, who is on Zoom today,

12 has asked Mr. Ciardi can't we just push this until after the

13 effective date of the plan.  The claimants refuse to do that.

14 One is they have the hearing today.  Now we're pivoting and

15 saying we want to have the hearing today, but we want to have

16 the relief effective as of the effective date of the plan.

17 And I don't think that is the appropriate way to do it

18 because there are a number of issues that need to get

19 resolved before we take up the lift stay if what we're

20 talking about is post effective date procedures.

21          So what we would ask you to do is either treat

22 this as a preliminary hearing, extend the stay to after the

23 effective date, and we will take it up at the July or August

24 omnibus when we have a better idea of the things I'm going to

25 lay out or deny the motions without prejudice from a filing

1  after the effective date of the plan and we can just put it

2  back on calendar.

3       It sounds like we don't need today is the third

4  motion that is up which is the preliminary injunction because

5  the preliminary injunction was only ever going to run up to

6  the effective date of the plan. The stay is only going to run

7  up to the effective date of the plan.  And so if they're

8  conceding that they're not going to move forward against the

9  individual defendants until after the effective date I think

10  our motion is moot.

11       As set forth in our briefs, you know, and I'm not

12  going to repeat it, under the totality of the circumstances

13  we don't believe there is cause to lift the stay right now.

14  And if it is still in play, a short injunction, up through

15  the effective date of the plan to prevent prosecution against

16  the D's and O's is appropriate.

17       I'd like to just make four key points that span

18  both the lift stay and the preliminary injunction issue.

19       One, there's no pressing need to go forward with

20  this right now.  The original lift stay motion was filed last

21  June it's been kicked consensually until today.  The only

22  thing that seems to have changed is that we have a plan on

23  file and I don't think it would be appropriate form to be

24  addressing plan objections.  We really should be focusing

25  just on the claims themselves.

1        I guess one thing that has changed is that there

2   is -- I hope we can convince the court that there is more

3   than a substantial possibility that the debtors were

4   reorganized that this point.

5        Point two, there's no prejudice to the claimants

6   that gets fixed by lifting the stay right now to allow them

7   to proceed in State Court.

8        First, they're not going to get back to State

9   Court absent motions that haven't been filed yet.  When I say

10  State Court or in Federal Court other than the District of

11  Delaware, they're not going to get back there unless one of

12  those two courts, Your Honor or the District Court, abstains,

13  or there's a transfer motion or some other procedure

14  mechanism.

15       They filed proofs of claim and having submitted to

16  this court's jurisdiction they're either going to be

17  liquidated in this court, again absent some abstention, or

18  they're going to be liquidated in the District Court or the

19  District Court is going to decide whether to send those

20  actions back.  As it is right now they said all of the 131

21  claimants have consented to the courts in Delaware resolving

22  the issue.

23       Second -- look, I hear what Mr. Ciardi says that

24  all the claimants are going to vote no for the plan. I mean

25  it is a little odd that they would all vote no to a plan that

1  hopefully will pay them in full, but they reserve the right

2  to do so.  I think we should see which of the claimants are

3  not willing to release the D's and O's in connection with a

4  third-party release.

5          Three, they have the ability to vote no and

6  object.  I don't dispute that.  But we're going to see, in

7  the context of this plan, the extent to which D's and O's are

8  exculpated, for example.  We're going to see the extent of

9  the reliefs which is given to D's and O's parties under

10 indemnification.  And we're going to get a better view after

11 plan confirmation as to which of those parties are in play.

12         I hold out hope that some or all of the claimants

13 might opt into the settlement procedures.  There is no reason

14 why they shouldn't want to settle their claims.  It's a

15 little frustrating to hear their counsel say that every

16 single one of them is going to choose litigation over

17 settlement, but, again, we might have a little bit more

18 visibility on that by the time we get to the effective date.

19         I was prepared to argue substantial prejudice to

20 the debtors in the period up to the effective date, but it

21 sounds like we're not -- there isn't going to be an attempt

22 by the plaintiffs to tie-up our D's and O's in the period

23 between now and the effective date.  I will note that the

24 defendants include the entire current board of the debtors

25 plus the CEO, general counsel, treasurer, and chief

1  information officer; all of whom, as Your Honor knows, are

2  working day and night, like many people are, to get this plan

3  over the finish line.

4          There is ultimately going to be cost strain.  Now

5  if what we're talking about is a proceeding just against the

6  debtors then it's just the cost of claims administration.  If

7  we're talking about a claim against the D's and O's there's

8  no dispute that they all are subject to indemnification and

9  in a 100 cent plan or 85 cent plan or whatever it is going to

10  end up being that is real dollars that go out that aren't

11  going to other claimants by proceeding against the D's and

12  O's.

13          I -- the fact that there is insurance doesn't mean

14  that there is no cost to the debtors in allowing that to

15  happen either.  As we lay out there are deductibles that the

16  debtors would have to pay, $10 million under the umbrella

17  policies, $5 million under the -- so it's not allowing a

18  proceeding against the D's and O's isn't a free exercise.

19          Again, in the context of a 100 cent plan what

20  would be the reason why Mr. Ciardi and his clients would want

21  to go after the D's and O's and add additional hurdles to

22  their claims if the debtor is going to pay the claim in full.

23  They don't need access to other third parties or the

24  insurance.

25          Finally, on the equities I do believe they favor

1  the debtors and the estates for the purpose of addressing

2  whether or not the stay should be lifted.  The -- I don't

3  think, as I said, that when we get to the effective date of

4  the plan what the -- what Mr. Ciardi is saying is we should

5  open the floodgates and have the new reorganized debtors sued

6  in jurisdictions around the country for acts of a prior

7  debtor as opposed to having these all administered either in

8  this court because they are business torts and not personal

9  injury claims that the court can liquidate or in the District

10 Court.

11          At the end of the day these are all claims against

12 the debtors.  The policies that they're talking about wanting

13 to change are the policies of the debtors that on the

14 effective date isn't going to be the old debtor.  There is

15 going to be new equity holders.  There is going to be a new

16 board.  And to the extent that new entities, the reorganized

17 debtor, commits acts against customers or, more appropriately

18 said, files reports that cause police to take action against

19 customers that is not getting -- that is not what we need to

20 be doing.

21          What we need to be doing is using the bankruptcy

22 process as a central clearing house for the liquidation of

23 claims against the debtor, not against the reorganized

24 debtors. I can't imagine what it looks like for a reorganized

25 debtor to on the first day of its existence, according to Mr.

1  Ciardi, being sued in multiple jurisdictions around the

2  country with respect to claims that arose either prior to the

3  petition date or between the petition date and the effective

4  date.

5          So my view is -- I don't think we've fixed the

6  problem by saying we're going to lift the stay now and just

7  have it effective as to the effective date. I think we need

8  to have a two-step process here.  We need to see where we are

9  when we get to the effective date.  What has happened with

10 respect to claim allowances and voting.  What has happened

11 with respect to releases and exculpations, and is the court

12 going to be confirming the plan.

13          It will also let us know the extent of a payout to

14 creditors and it will inform the needs of anybody to be

15 pursuing claims against prior board members and management.

16 Once we get to that state then we still have those issues

17 that need to be resolved before the stay gets lifted, right.

18 We need to figure out, given the exculpation in the releases,

19 who of the defendants they want to bring claims against are

20 still live targets for them.

21          Two, we need to see, again, if the claims are paid

22 in full the extent to which they even need to proceed against

23 those individuals.

24          Three, we can see who has opted in or out of the

25 claims processes.

1          Four, we're going to have to get to the issue.  I

2   don't think the issue is ripe today, as to whether these are

3   business torts or personal injury claims, but, again, that

4   only effects the venue between this court and the District

5   Court for the District of Delaware who would then have to

6   address one way or another whether those claims were going to

7   be liquidated as part of the bankruptcy proceeding or whether

8   there was going to be a form of abstention.

9          Then we can talk about, you know, depending upon

10  where the claims are going forward, we can talk about the

11  procedures and what procedures apply including the opt-in and

12  opt-out of the claims reconciliation mediation process.

13         So I just think there is too much that is unknown

14  at this point to adopt a procedure.  I guess I'm happy that

15  Mr. Ciardi is conceding that he is not trying to interfere

16  with the plan process.  I would have wished it happened

17  earlier than just now, but I think there is just too much

18  that would go into a lift stay determination to be making

19  that today.

20             THE COURT:  Thank you.

21             MR. CIARDI:  Your Honor?

22             THE COURT:  Mr. Ciardi?

23             MR. CIARDI:  Yes. A couple things. These are --

24  these issues are not business tort issues.  The Hertz

25  contract, which is attached to Document 85-9, Page 27 of 152

1    of that contains an arbitration provision.  I will -- I can

2    be very clear, Your Honor, that Hertz at no point in time

3    chose to exercise the arbitration provision for any of our

4    clients that have these claims because under the arbitration

5    provision they aren't allowed to do that if they're personal

6    injury cases.

7            So they chose the criminal justice system to

8    resolve these issues.  They chose the criminal justice system

9    in order to address what were, basically, policies that their

10   directors and officers put in place that allowed people to

11   get put in jail inappropriately and illegally.

12           One of the documents attached to my declaration is

13   a listing of the various state laws that deal with theft

14   reporting of rental cars.  None of the Hertz policies comply

15   with any state law, none.  They didn't comply back when I

16   filed the declaration.  They didn't comply before that.  They

17   don't comply now.

18           Now we're hearing that there is going to be a

19   brand new Hertz that is going to magically appear on June

20   30th or whenever and it's going to be a new Hertz with new

21   policies, new directors and this isn't going to be happening

22   anymore.  Well, Judge, we raised this in 2017, 2018, 2019,

23   2020 and over all of those years Hertz has done nothing to

24   address a systemic problem that has put 131 of our clients in

25   jail based upon some of the declarations -- some of the

1  testimony that has been attached to the declarations,

2  probably ten, twenty times more than that that aren't

3  represented by us.  We have new people being arrested every

4  day.  As last as last Friday we have a woman that was put in

5  jail.

6          These aren't going to be business torts.  My

7  clients are not opting in to an ABR procedure.  They are not

8  opting into any release because this is not a car accident,

9  this is not a business tort, this somebody whose freedom was

10 taken away because of a cavalier attitude that Hertz has

11 towards filing police reports.  Then they don't show up and

12 then they don't withdraw them.

13          So when there's a question about why are we not

14 just opting in and letting the dispute resolution process

15 take its course, there are certain things that must be

16 addressed by the courts in this country.  This is one of

17 them.

18          Now we have filed a mass tort case in Delaware in

19 the State Court in Delaware.  If it all moves and all 131

20 cases end up in a mass tort that is heard by the Federal

21 Court in Delaware we're okay with that, but we don't want to

22 wait forever.  We don't want to wait and come back on June

23 30th and hear well, Judge, we want to go through the claims

24 resolution process; well, Judge, we're in the process of

25 changing our policy, and then six, seven, eight months later

1 my clients, some of whom are in jail still, have no justice.

2        If they're comfortable that there is going to be a

3 new Hertz on June 30th let the new Hertz come to court with

4 their changed policies which, frankly, wouldn't be a lot of

5 work, let us deal with that in the Federal District Court in

6 Delaware in a mass tort with all 131 defendants, but then

7 we're not back in front of Your Honor on June 30th, and then

8 on August 30th, and, well, why arent' they are in the ABR

9 process, and now we want to do objections to claims.

10       This isn't a claims objection process.  While we

11 may have filed proofs of claim this court isn't the proper

12 venue for that. Its either going to get heard in the Federal

13 District Court or in the State Court.  It's not going to get

14 heard here.  These are personal injury.  You can't get more

15 personally then the denial of freedom, Your Honor.  You

16 can't.  That is not possible.

17       So they're going to get heard somewhere else.  Let

18 that process start.  There is clearly enough insurance

19 coverage and if we wait till June 30th there is clearly going

20 to be no distraction to the debtors' management.

21       So once again we would renew our request, Your

22 Honor, for relief from the stay.  We're okay with it being

23 effective June 30th.  We're okay bringing it all to the

24 Federal District Court in Delaware so it's heard one mass

25 tort action there.  The cases need to start.

1          Thank you, Your Honor.

2          THE COURT:  Mr. Shore, any response?

3          MR. SHORE:  Let me just clarify my point about new

4    Hertz.  First, we're here on 131 claims that have been filed.

5    They're prepetition claims.  We're not here addressing

6    policies that have existed by the debtor in a post-petition

7    period, nor policies that are going on after the effective

8    date.

9          The mechanism for addressing those issues is not a

10   lift stay motion to allow them to proceed with the

11   prosecution of a petition claim, but coming to the court and

12   asking that the court change the policies, or require the

13   debtors to comply.  These requests and the emphasis on the

14   policies going forward is just a means of making their

15   prepetition claim seem more urgent.

16         Whether the new board and the new debtor changes

17   policies or doesn't change policies that is going to be an

18   issue for the new debtor.  We're not fixing the problem by

19   allowing claims against the debtors or allowing the

20   liquidation of these claims in multiple form.  That is -- I'm

21   just -- we're trying to match-up the tool for fixing a

22   problem, match up the tool with the problem.

23         Lifting the stay here isn't going to affect any of

24   that.  There is no chance that any of the proceedings are

25   going to result in a change of policy before the effective

1  date.  That is just where we are right now.  So what's going

2  to happen post-effective date isn't going to be fixed by a

3  claim adjudication on prepetition or post-petition pre-

4  effective date claims.

5           THE COURT:  Anything further, Mr. Ciardi?

6           MR. CIARDI:  Your Honor, just on that last point.

7  I will agree with Mr. Shore that the proof of claim process

8  will never fix Hertz's policies.  What it's going to require

9  is involvement of either a State Court Judge or the District

10  Court who hears all 131 cases and says this has to stop, and

11  not only is there a damage award, but you need to fix what

12  you are doing wrong.

13          We may bring those to Your Honor's attention as

14  part of the plan confirmation process because it may be an

15  issue for good faith under the plan.  We don't want to go

16  there.  We want to go and adjudicate our issues in the

17  appropriate forum where these sort of issues are addressed.

18  But if that is -- if Mr. Shore would prefer that we bring

19  them to Your Honor and have Your Honor direct them to change

20  their policies we will do that too.

21          Somebody needs to change their behavior and we're

22  either doing it here in District Court or in State Court

23  because until this point in time nobody has listened.  And we

24  would ask Your Honor to, again, grant relief so that we can

25  get somebody to listen.

1          Thank you.

2          MR. BENTLEY:  Your Honor, may I be heard briefly?

3          THE COURT:  Yes.

4          MR. BENTLEY:  Good afternoon.  Thank you, Your

5    Honor.  Philip Bentley of Kramer Levin for the official

6    creditors committee.

7          Your Honor, we have not filed papers in connection

8    with the motions that are now before you, but the relief that

9    is being requested has just changed dramatically during the

10   course of this hearing.  It raises a concern that I wanted to

11   raise with Your Honor from the committee.

12         The plaintiffs are no longer seeking relief from

13   the court between now and confirmation or even between now

14   and the effective date, just post effective date relief.  The

15   concern that raises, Your Honor, relates to the fact that the

16   plan that was presented to Your Honor yesterday reflects an

17   agreement that was negotiated to a lot of work between the

18   committee and the debtors.  Some aspects of that deal relate

19   to the claims resolution processes.

20         There will be a representative of unsecured

21   creditors controlling the (indiscernible) or the settlement

22   of certain claims.  And we're still working out those issues,

23   Your Honor.  We're going to be filing a protocol and a plan

24   supplement quite soon reflecting that resolution and we just

25   wanted to express the concern that Your Honor not grant

1  relief today that might prejudice the parties abilities to

2  shape the post-effective date claims administration process.

3          THE COURT:  I understand.

4          MR. BENTLEY:  That's all we wanted to add, Your

5  Honor.

6          THE COURT:  Alright, thank you.

7          Well let me make my ruling then unless -- I'm

8  sorry, did anybody else want to be heard?

9      (No verbal response)

10         THE COURT:  Well the parties have appropriately

11  addressed what is before me on the relief from stay and they

12  both cite the Rexine factors.  Mr. Ciardi's statements that

13  he is not seeking anything, any relief from the stay

14  effective before the plaintiffs confirm has changed somewhat

15  the dynamic.

16         I am cognizant of both the debtor and the

17  committee's concern about making any ruling today that could

18  adversely affect either negotiation on plan documents or,

19  really, the process that was talked about yesterday as far as

20  who may ultimately be the plan sponsor.

21         So I do think that the debtor has shown that even

22  though Mr. Ciardi is saying that relief from the -- he will

23  agree that relief from the stay will not be effective before

24  the effective date of any plan.  I think that granting stay

25  relief today may have some serious implications for the

1  debtors' ability to get to the effective date of a plan.

2          And in addition I think that it would help the

3  court to know exactly what the options are for resolution of

4  these claims.  I think that depends on what the plan says,

5  whether that plan is confirmed, and what the process is that

6  was just eluded to by counsel for the committee; what that

7  process is actually for resolving those.

8          I agree with counsel for the debtor that while Mr.

9  Ciardi you state that your clients will not opt into any

10  claim resolution process, will not agree to any third-party

11  or other releases, I won't know that until those deadlines

12  have passed.  So, again, that militates towards not granting

13  relief from the stay today because the harm to the debtor and

14  other parties by pursuing today that may affect all of those

15  things.

16          And while I heard on the second prong of the

17  Rexine factors, that is the harm to the plaintiffs if relief

18  from the stay is not granted today, what I heard from Mr.

19  Ciardi was the harm that they have suffered and they continue

20  to suffer if the debtors promises continue to proceed;

21  however, the vast majority of the in excess of 130 plaintiffs

22  has suffered that harm.  The vast majority it is not ongoing

23  other than the pendency of actions against them, but I did

24  not hear that a delay of a couple months will cause

25  irreparable harm.

1          That is not to minimize the allegations of the

2  serious harm that they assert was done to them, to their

3  families by these alleged acts having been arrested when, in

4  fact, they had valid rental agreements pending.  I just think

5  that the harm in the next couple of months is not sufficient

6  to potentially up-end the plan process. So I still think that

7  the plan process is paramount for the next two months.

8          I also note that in their papers the debtor

9  remarked that many of the plaintiffs identified in the second

10  motion for relief have neither filed a lawsuit.  So there is

11  not a pending lawsuit dealing with their claims.

12          I am not prepared today to decide whether or not

13  these claims must be decided in the bankruptcy court.  There

14  is clear case law that says the filing of a proof of claims

15  subject's claimants to jurisdiction of the bankruptcy court.

16  The bankruptcy court, though, cannot decide personal injury

17  claims.  I am not prepared today to decide that these claims

18  are personal injury claims as defined in Section 157 or if

19  these are more business torts as some of the case law has

20  suggested would not mandate that the bankruptcy court does

21  have jurisdiction over them.

22          If, in fact, I determine that I do not have

23  jurisdiction of these claims the proper court with

24  jurisdiction would be the Delaware District Court because of

25  the fact that the plaintiffs have filed proofs of claim.  But

1   at this point I am not prepared to say whether I will decide

2   if it should properly be before the District Court.

3          Again, I think we -- I agree with the debtors that

4   we should wait and see how these claimants vote on the plan,

5   what plan is actually up for vote, what process that plan

6   includes for a resolution prepetition, and post-petition pre-

7   effective date claims, and what those claims will actually

8   receive after they are liquidated.

9          I don't think this is as simple as Mr. Ciardi

10  states which is the insurance company is going to take care

11  of these and the debtor will have no further input into the

12  claim resolution.  Even in the absence of a bankruptcy that

13  is not true.  Management does get involved even if the claims

14  are defended by the insurance company, but even more so in a

15  bankruptcy case, again, where the claims resolution is

16  governed by a plan process or a potential plan process.

17         So I will preliminarily deny relief from the stay

18  because I do not think that the harm to the plaintiffs is

19  outweighed by the harm to the debtors and their estate at

20  this stage, but I will schedule a final hearing on the motion

21  and I will ask the parties to consult and pick a date that is

22  in August that will be appropriate to have a continued

23  hearing on that because by that time we should know what has

24  happened with a plan and what has happened with these claims

25  vis-à-vis (indiscernible).

1       I don't know if -- I doubt that Hertz has a

2   hearing set that far out, but I will look real quickly.  I

3   don't see any.  Well why don't the parties consult off the

4   record and work out a date -- yes, Ms. Capp confirms that the

5   last hearing they have in Hertz is the June hearing.

6       So why don't the parties consult and file a form

7   of order that they can agree upon reflecting my ruling and

8   scheduling the final hearing for an agreed upon date in

9   August.  You have to check with Mr. Capp, which even I have

10  to do, to get an appropriate date.

11      MR. SHORE:  Will do, Your Honor.

12      MR. CIARDI:  Thank you, Your Honor.

13      THE COURT:  Alright, again, I think the PI is moot

14  at this point.  So I don't need to deal with that.

15      We will stand adjourned then.  Thank you.

16      (Proceedings concluded at 2:57 p.m.)

17

18

19                      CERTIFICATE

20

21  I certify that the foregoing is a correct transcript from the

22  electronic sound recording of the proceedings in the above-

23  entitled matter.

24
    /s/Mary Zajaczkowski                    April 22, 2021
25  Mary Zajaczkowski, CET**D-531